```
1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF KANSAS
2

3    UNITED STATES OF AMERICA,

4                     Plaintiff,

5    vs.                      Case No. Case No. 07-20168-20

6    LATYSHA D. TEMPLE,

7                     Defendant.

8
                 TRANSCRIPT OF SENTENCING PROCEEDINGS
9                          before
                  HONORABLE JOHN W. LUNGSTRUM
10                          on
                   SEPTEMBER 24, 2009
11

12                      APPEARANCES

13   For the Plaintiff:   Terra D. Morehead
                          United States Attorney's Office
14                        500 State Avenue
                          Kansas City, Kansas 66101
15
     For the Defendant:   James C. Heathman
16                        Attorney at Law
                          3706 S.W. Topeka Blvd., Ste. 402
17                        Topeka, Kansas 66609

18

19

20

21

22

23

24

25
```

REBECCA S. RYDER, CCR, RMR
UNITED STATES COURT REPORTER
913-551-5645

| | |
|---|---|
| 1 | <u>THURSDAY, SEPTEMBER 24, 2009</u> |
| 2 | THE COURT:  We're here in |
| 3 | Case No. 07-20168-20, United States of America versus |
| 4 | Latysha D. Temple.  Would the parties state their |
| 5 | appearances, beginning with counsel for the United |
| 6 | States. |
| 7 | MS. MOREHEAD:  May it please the court, |
| 8 | Terra Morehead, assistant United States attorney, |
| 9 | appearing on behalf of the government. |
| 10 | MR. HEATHMAN:  May it please the court, |
| 11 | your Honor, Ms. Temple appears in person and with |
| 12 | counsel James Heathman. |
| 13 | THE COURT:  Thank you, counsel.  Let me |
| 14 | begin, since we are here for sentencing today, |
| 15 | Mr. Heathman, by inquiring of you for the record |
| 16 | whether you have reviewed and reviewed with |
| 17 | Ms. Temple a copy of the presentence investigation |
| 18 | report. |
| 19 | MR. HEATHMAN:  I have, your Honor. |
| 20 | THE COURT:  And, Ms. Temple, do you confirm |
| 21 | that Mr. Heathman has, in fact, reviewed with you a |
| 22 | copy of the presentence investigation report? |
| 23 | THE DEFENDANT:  Yes, sir. |
| 24 | THE COURT:  All right.  Thank you.  I will |
| 25 | place the presentence investigation report into the |

1     official record of the case.  It will be maintained

2     confidential, but in the event that either party

3     should need access to it for some appropriate legal

4     purpose, then it will be made available, except for

5     the recommendation portion, which always does remain

6     confidential.

7          Now, in this case the government has lodged one

8     objection; the defendant has lodged six.  I think the

9     best way to deal with this is to have you,

10     Mr. Heathman, address your objections, address your

11     ultimate sentencing thoughts, in other words, what

12     sentence you are arguing for, and give Ms. Temple the

13     opportunity to be heard, and then I'll hear from Ms.

14     Morehead and we will simply put all of this together

15     and not sort of do it piecemeal.  Do you have any

16     objection to proceeding along those lines?

17               MR. HEATHMAN:  No, your Honor.

18               THE COURT:  Ms. Morehead, do you have any

19     objection to proceeding --

20               MS. MOREHEAD:  No objection, your Honor.

21               THE COURT:  Mr. Heathman, you may proceed.

22               MR. HEATHMAN:  Thank you, your Honor.  Your

23     Honor, I believe first and foremost the objection was

24     to the guideline calculation of the -- under the

25     Sentencing Guidelines for the base offense level, and

1    in the presentence report, my recollection was, or

2    is, that that was a 33, and I argued that it should

3    be something less than that.  And the way I think the

4    government calculated that, or it's calculated in the

5    presentence report, was that Ms. Temple may have been

6    along with Mr. Wesley as many as ten times when

7    Mr. Wesley had some kind of transaction with

8    Mr. Humphrey.  My recollection from the testimony was

9    that sometimes those might have been drugs, sometimes

10   they were money.  I don't think there was any

11   information about how much money, if it was partial

12   payments, full payments.  Mr. Humphrey did indicate

13   that he dealt with Mr. Wesley in weights of

14   5-kilogram, and other times there were even more, and

15   I think the government or the presentence report

16   writer had calculated using the framework of as many

17   as ten.  With 5 kilograms that equals 50 kilograms

18   that is at least possible.  My recollection of the

19   testimony, however, is that I don't believe there was

20   a time frame set out for when any of these ten

21   ride-alongs may or may not have occurred, if they

22   were before the September date when she got involved

23   with the wiretaps or even potentially prior to the

24   conspiracy charged in this case.

25        The other issue that I have is that

```
1        Mr. Humphrey's testimony is certainly in conflict
2     with itself.  Mr. Humphrey denied -- and I think this
3     is fully set out in our sample.  He denied for a year
4     and a half ever knowing Ms. Temple, and I know
5     there's been argument that, well, what he said was
6     that he didn't know any of Wesley's people back in
7     December of 2007; that just meant Mr. Foy.  But the
8     court may recall that Officer Jones was asked
9     specifically, how did that question come about you?
10    You didn't just ask him about Mr. Foy; you said
11    something along the lines of, tell me everything you
12    know, or, who all was involved? and he agreed.  That
13    was the context of the question in which Mr. Humphrey
14    said he didn't know any of Wesley's people, of which
15    I think clearly her involvement would indicate she
16    would be one.  So Mr. Humphrey for a year and a half,
17    more than a year and a half, denies even knowing
18    Ms. Temple as one of Mr. Wesley's people.  In a
19    statement given in 2009 just shortly a week before
20    trial Mr. Humphrey had stated that he knew her, and
21    he said that Mr. Wesley would use her vehicle as many
22    as ten times but Mr. Wesley was always the driver.
23    That's what his proffer statement said.  Then at
24    trial -- and the court may recall we had to show him
25    the statement numerous time to get him to admit that,
```

1    yes, in fact, he had said that Mr. Wesley was always

2    the driver, but at trial that changed to Ms. Temple

3    always being the driver.  And so I think there is

4    some significant conflict in what Mr. Humphrey said

5    and whether or not the jury believed Mr. Humphrey.

6    And to that extent we really don't know because with

7    the aiding and abetting instruction that was given,

8    the jury certainly could have found Ms. Temple guilty

9    without believing Mr. Humphrey.  There was other

10    testimony presented that Mr. Wesley usually had the

11    drugs sold prior to picking them up from

12    Mr. Humphrey; in other words, he would set up a deal

13    with Mr. Humphrey; he would get on the phone to his

14    contacts and make sure he can get rid of the drugs,

15    meet with Mr. Humphrey; he would get the drugs; he

16    would go deliver them to people that were

17    distributing for him; and then he would get the money

18    and go back and pay Mr. Humphrey.

19         Now, in that scheme there's no need to store or

20    stash drugs anywhere.  Mr. Humphrey said that there

21    were a few times when Mr. Wesley could not pay until

22    the next day, and I believe that that is fairly

23    consistent with what Mr. Anderson testified to,

24    although I certainly think there are conflicts in Mr.

25    Anderson's statement as well.  His testimony, the

```
 1            judge may recall, was that there was one episode at
 2            Ms. Temple's house where he saw something -- in one
 3            of his statements he said it was in '06; in one he
 4            said it was in '07.  In one statement he said it was
 5            a half kilogram of crack cocaine; and the other
 6            statement, he said it was cash.  So there's one event
 7            taking place.  The nature of the contraband changes,
 8            and the date changes.  So that's certainly an issue,
 9            I think, that bears upon Mr. Anderson's credibility.
10            But what it does tell us is that potentially there
11            may have been a half a kilogram stored at
12            Ms. Temple's house from time to time, and the only
13            reason to store that would have been those few times
14            when Mr. Wesley couldn't get rid of it.  So if you
15            use the half kilogram calculation two or three times,
16            we have got anywhere from half a kilo to maybe
17            2 kilograms of cocaine.  And if that's her
18            involvement, I think that certainly reduces the
19            guideline sentence, the base offense level, to 26,
20            but it also would reduce the statutory framework from
21            a 50-kilogram to a 500-kilogram scenario where her
22            sentence would be five to 40 instead of ten.  So I
23            would ask the court to give consideration, if we
24            apply these facts in trying to really ferret out what
25            her involvement was from the evidence, lacking
```

1    anything else, I think the case law is that we have

2    to go with the smaller value.

3              THE COURT:  Mr. Heathman, I don't think I

4    followed that last argument of yours.  She was found

5    guilty of being part of a conspiracy, the object of

6    which was one that has a ten-year mandatory minimum

7    sentence.  I don't think even if she is found to be

8    personally responsible for a smaller quantity of

9    drugs that that suddenly changes what she was

10   convicted of and what the statutory sentence in terms

11   of the mandatory minimum is, do you?  Is that what

12   you're arguing to me?

13             MR. HEATHMAN:  I'm arguing that this court

14   should consider that, that if her --

15             THE COURT:  Do you have any authority for

16   that proposition?

17             MR. HEATHMAN:  No, sir.

18             THE COURT:  I didn't think you did.

19             MR. HEATHMAN:  No, sir.  But it would be, I

20   think, also consistent with the sentencing purposes

21   if that framework is established that that's what

22   she's really doing and that's what she's really

23   involved in.  Otherwise, we have punishments that I

24   think grossly outweigh her actual involvement in the

25   case.  Having said that, your Honor, I think we would

1         start at a Level 26 instead of a 33.

2              And the other objection to the PSR was the

3         weapon enhancement.  I think it's clear that she

4         wasn't in possession of a weapon and it wasn't in

5         close proximity to her, and therefore it can be

6         attributable to her if it's reasonably foreseeable to

7         her, and I know the case law that we have cited has

8         specifically indicated just because it's a drug

9         conspiracy with a large amount of drugs that doesn't

10        automatically mean there are going to be weapons

11        involved.  There has to be something other than that.

12        The only indication of any conversations that she had

13        about a weapon was after the home invasion that we

14        argued is not connected to this conspiracy in any

15        way, and Mr. Wesley had told her he wanted her to buy

16        a gun.  She obviously didn't do that.  There is no

17        indication that Mr. Wesley ever possessed a weapon in

18        her presence.  There's no indication that she was

19        ever in the vehicle in which the weapon that was, I

20        think, most closely tied to Mr. Wesley at the time of

21        his arrest, that she was ever in that vehicle or knew

22        about it.  And, frankly, I'm not sure who that weapon

23        belonged to or if it was even connected to the

24        conspiracy, so I don't believe it was reasonably

25        foreseeable to Ms. Temple that there would be weapons

1    involved, especially in light of her limited role in

2    the conspiracy, and I think it's established her role

3    as limited.  I don't know that the government opposes

4    the idea that she was not ever involved directly in

5    drug transactions -- I believe they stated so at

6    sentencing -- but she played a part in the overall

7    conspiracy even without being involved in the actual

8    transactions.  So having said that, I don't believe

9    it's foreseeable to her, and the weapon enhancement

10   shouldn't attach.

11        As for the role in the offense, there was a

12   finding of a mitigating role.  In my sentencing

13   memorandum I address the fact that we certainly don't

14   object to the mitigating role.  I think it should be

15   a minimal participant as opposed to a minor

16   participant, the distinction being that a minimal

17   participant is truly among the least culpable of

18   individuals.  And if you recall the involvement of

19   other individuals in the case similarly situated to

20   Ms. Temple, those would be the girlfriends of some of

21   the other more culpable operators --

22             THE COURT:  You didn't actually file an

23   objection on that basis though, did you?

24             MR. HEATHMAN:  I didn't object to the minor

25   as a mitigating role.

```
 1                    THE COURT:  Right.  But you didn't file an
 2          objection and say it should have been a minimal.
 3                    MR. HEATHMAN:  That's correct.
 4                    THE COURT:  Did you?
 5                    MR. HEATHMAN:  That's correct.
 6                    THE COURT:  All right.
 7                    MR. HEATHMAN:  But in consideration of the
 8          role adjustment, whether it should be minor or
 9          minimal, I think under the circumstance if you apply
10          her actual role the minimal category seems to be more
11          applicable than just the minor.
12               The other objection that we had, your Honor, was
13          to the obstruction.  I don't know what she said that
14          the jury believed was a lie.  I think the government
15          would be required to put on exactly which statement
16          it was, and we would have to have a finding of which
17          statement it was that was a lie because the
18          statement, number one, has to be under oath, which
19          obviously her testimony would be it has to be on a
20          material issue, which I don't know because I don't
21          know which statement they are attributing to her as a
22          lie, and it can't be by some form of mistake but
23          actually an intent to deceive or mislead.
24                    THE COURT:  The issue is not what the jury
25          believed or didn't believe; it's what the court
```

```
 1          believed or didn't believe.

 2                    MR. HEATHMAN:  I understand.

 3                    THE COURT:  All right.

 4                    MR. HEATHMAN:  But at this point we don't

 5          know what statement is being attributed to her that

 6          was alleged to be untruthful.  I think the court

 7          would have to make a specific finding as to a

 8          specific statement, and I know of none; therefore, I

 9          don't think the enhancement for obstruction would

10          apply.  The case cited certainly takes into account

11          that there may be people who testify and a jury

12          convicts them and simply by the nature of their

13          testimony does not mean they have committed perjury,

14          and it appeared to me from the presentence report

15          that that was exactly the scenario that was being

16          alleged.  She testified.  The jury obviously didn't

17          believe her; therefore, it's perjury, and the

18          enhancement would attach, and I don't think that's

19          sufficient.

20               Having said that, I think those are the

21          objections that I raised in my sentencing -- in my

22          objections to the presentence report and in the

23          sentencing memorandum.  Those would be the objections

24          that I had.

25                    THE COURT:  Is there a specific sentence
```

```
 1          for which you are arguing?
 2                    MR. HEATHMAN:  Well, in my sentencing
 3          memorandum, your Honor, I think that the need -- the
 4          sentencing mandate to be sufficient but not greater
 5          than necessary to carry out the purposes of
 6          sentencing is obviously the key component, and one I
 7          know the court's concerned with.  In doing so, we
 8          have to look at numerous factors.  Other similarly
 9          situated individuals and disparities in sentencing is
10          obviously a concern.  I guess I would answer it this
11          way.  Under the statutory framework if this court
12          were to indicate that ten years is the appropriate
13          formulation because it couldn't go below that based
14          on what she was found guilty of, then I think the
15          ten-year mandatory minimum sentence certainly is more
16          in line with her involvement.  It is also, I believe,
17          even at ten years almost double or double that of
18          other individuals.  Ten years, being the mandatory
19          minimum, I think is certainly seen by the legislature
20          as minimally sufficient or else it would be a higher
21          minimum level.  I don't think the 188 month, which is
22          the low end of the guideline range, would be
23          appropriate because I do think that would be
24          excessive in terms of her involvement in the case.
25             Keeping in mind the other sentencing factors,
```

```
 1        her criminal history, which I hadn't addressed, I
 2        think is also important in that most of what she had
 3        done was prior to 1997.  Her scores for the two
 4        offenses in 1997 would have dropped off at ten years,
 5        and she was nine years and nine months, if my
 6        calculations are right.
 7                THE COURT:  But you would concede, would
 8        you not, though, that the sixth objection concerning
 9        the criminal history points that are derived from the
10        convictions in Paragraphs 195 and 196 should be
11        overruled based upon the probation officer's
12        response?  Wouldn't you agree with that?
13                MR. HEATHMAN:  I believe that's correct.
14                THE COURT:  All right. I will then overrule
15        those for that reason.
16                MR. HEATHMAN:  And I didn't raise those in
17        my objection for that reason.
18                THE COURT:  I noticed you did in the
19        addendum to the presentence report, but in your
20        sentencing memo you did not, so I assumed you were
21        persuaded by the --
22                MR. HEATHMAN:  Correct.  I think the
23        accurate way to calculate it for purposes of the
24        presentence report was to count those as
25        criminal history.  In terms of calculating a sentence
```

```
 1          based on the criminal history, however, I think it's
 2          important that they are property crimes, number one.
 3          We're talking about the felony crime is the most
 4          serious, and it is a $200 and $400 amount.  So we're
 5          not talking about a master, extensive criminal
 6          endeavor.  And the other offense that was scored was
 7          an attempted theft out of Johnson County.  Both of
 8          those, your Honor, were just right at just shortly
 9          prior to the ten-year sentence, and I think under the
10          comments to the Sentencing Guidelines there is
11          certainly statements made that when you have a
12          situation like that that overrepresents
13          criminal history the court may either depart to a
14          criminal history category of I or certainly take that
15          into account in looking at the issue of variance.
16          But it is not just the fact that those two scorable
17          offenses were nine years and nine months, but if you
18          look at her criminal history that was more recent,
19          there was an offense in 2005, I believe, which was
20          resisting a police officer.  That stemmed from an
21          argument where she was told to be quiet and she
22          continued to argue.  Certainly, again, not an
23          extensive criminal endeavor.  And the remainder seem
24          to be traffic offenses.  And those other offenses
25          were -- the other traffic offenses, your Honor, were
```

1    prior to -- excuse me -- were more recent, 2006,

2    2007, but, again, were speeding tickets and traffic

3    in nature.

4         So if you look at her overall criminal history

5    since 1999, I think she's turned a corner.  I think

6    her criminal involvement was minimal.  I think that

7    her record reflects that.  Her testimony, her work

8    history.  She had been regularly employed at decent

9    jobs throughout even up into her involvement in this

10   case.  I think it is sufficient -- significant that

11   she was employed and not even a known participant in

12   any of this until roughly September of 2007.  She had

13   lost her job the first week of August 2007, and she's

14   relying on Mr. Wesley to help pay bills, and at that

15   point she's heard on phone calls that are involving

16   money and transactions, money left at her house and

17   to bring some money left at her house.  She went back

18   to work to support her family on her own in late

19   October, so there was a two-month window where she is

20   out of work and relying on Mr. Wesley.  And following

21   that she's back at work, supporting herself, and I

22   think that gives us a picture of her personal

23   characteristics, of what her interest was.

24        She was -- and the court can read through the

25   memorandum, but she didn't have the easiest life.

```
1        She had a divided family.  She had sexual abuse as a

2        child.  She was pregnant as a teenager, dropped out

3        of school without graduating because she had three

4        kids, but she had raised them pretty much as a single

5        parent, although it wasn't the easiest, and my

6        understanding from speaking to Ms. Temple was some of

7        the thefts that are involved in her criminal history

8        actually involved clothing items and things like that

9        for the children.  Obviously, that doesn't excuse it,

10       but I think it gives a picture of a lady as a single

11       mother with limited education and background, that

12       she's making choices to try to better her family and

13       do what's necessary, not a mastermind criminal.

14           I don't think there was any allegation in this

15       case that she was making a lot of money from this

16       criminal enterprise other than to get some help

17       paying some bills.  She had vehicles that were liened

18       up mostly.  They weren't worth much more than what

19       the amounts were that she was paying.  And those

20       amounts, if my recollection was -- one of them was

21       7,000 and one was maybe 13,000.  Between the two

22       we're looking at about a $20,000 value in vehicles,

23       so certainly she wasn't one that's driving around in

24       a $45,000 or $55,000 vehicle.  And I think that's the

25       type of personal characteristic that the court should
```

1    consider.  I mean, that's who she is, and that's what

2    she was doing, and I think her biggest trouble arose

3    from dating Mr. Wesley, and Mr. Wesley's enterprises

4    were spilling over into her personal life, more so

5    after she lost her job, and at that point you see the

6    phone calls, you hear the phone calls, you see her

7    involvement, and not before.  I say that because I

8    want the court to consider that in determining not

9    only her role in the offense but also in terms of the

10   sentencing factors and her characteristics and trying

11   to find an appropriate sentence that is minimally

12   sufficient, giving her just consideration for what

13   she's actually done and what she's dealing with.

14            THE COURT:  Thank you, Mr. Heathman.

15       Ms. Temple, you have the right to make a

16   statement to the court if you want to.  You're not

17   required to do so, but you may if you wish.  If you

18   do, then please come up to the lectern.

19            THE DEFENDANT:  As I stand here today, I

20   still don't know what I done wrong.  I understand

21   that a jury found me guilty of being a part of a

22   conspiracy about drugs.  I don't understand it.  I

23   was a mother.  I did everything -- I worked.  I took

24   care of my kids.  I took my daughter to college, and

25   she had to come back because she had to take care of

```
 1        her siblings because this thing happened.  I don't
 2        understand how people can come and testify, a person
 3        I've never seen before in my life, never seen him
 4        before in my life, can sit here and tell me, not tell
 5        me, yeah, me, the jury, everybody that was in the
 6        courtroom that he witnessed drugs transactions with
 7        me being involved.  How could you have ever done
 8        that, sir, when even in the car you said that I was
 9        driving, I had never even purchased it?  That right
10        there shows that anybody can come up here and say
11        anything, and that's what it is.
12             But what about me?  What about the person -- I
13        still -- I don't understand.  I sit in CCA every day
14        wondering, what did I do wrong?  And Terra Morehead
15        don't get no credit for me.  This don't have nothing
16        to do with her.  The Lord was trying to bring me to
17        him, and if this is the way he did it, I might not
18        understand it now, but I can trust him because I know
19        what he has for me is for good.  While I'm out on
20        house arrest, I find out that my son have been
21        molested, the same thing that I endured.  I was not
22        there to be able to hold him or hug him and let him
23        know that I know, it happened to me, but all because
24        Ms. Morehead wanted to take something that she
25        think -- if you thought that, if she really, truly
```

```
 1        thought that I had involvement when she first picked
 2        me up, Judge Lungstrum -- she never came to talk to
 3        me.  I would be somebody pertinent.  I know that I
 4        have done wrong in the past.  I know that I can admit
 5        guilt when I have done something wrong.  I couldn't.
 6        I couldn't.
 7             When I was on house arrest, she offered a plea
 8        of two months halfway house, six months paper.  When
 9        I declined, by the time I got home, my attorney got a
10        phone call, we got two witnesses that said ten times
11        this, ten times that.  Oh, now I finally been seen.
12        Somebody -- and I respond to motions to sever, and
13        she said it.  Severance.  She said it.  Nobody --
14        even though she wasn't never seen or nothing that --
15        and I have the paperwork that I never was seen.  Now
16        all of a sudden -- I don't take that.  I'm not going
17        to put my tail between my legs and be glad and happy
18        and, oh, thank you, and I'll get this.  I could have
19        done that.  I could have done -- I did five years on
20        paper.  I could have done two months in a halfway
21        house and six months paper.  I have been at CCA for
22        four right now.  I could have done that.  I couldn't
23        do it because I didn't do nothing wrong.  I'm not --
24        I know people come here every day and say what they
25        didn't do or what -- I mean, lie and just -- my
```

1    government -- this is the government.  But she

2    twisted it.  She twisted it so much that the whole

3    case contradicts itself.  If I'm involved -- I'm not

4    involved, then you want to give me two months halfway

5    house and six months paper, but you think I'm

6    involved with 50 kilos of cocaine.  This is Terra

7    Morehead.  Everybody knows that she wouldn't let up

8    like that on me.

9          My family has been torn apart.  It wasn't my

10   fault I lost my job.  Two months.  I was off two

11   months, and my whole life changed because this man

12   gave me money to pay my bills or to help me buy

13   groceries or to pay my mortgage for two months?  I

14   was working since '01.  I have check stubs since '01.

15   Would a drug dealer girlfriend do all this that Ms.

16   Morehead claimed?  Would they do that?  She claimed

17   that I was being investigated for tax evasions when

18   we first got involved in this case, my first court

19   appearance.  That was a lie, but this is the

20   government.  That's a lie.  I have tax papers from

21   '01.  I have check stubs from '01 to '07, the day I

22   was picked up.  I have -- my cars, they said when

23   they came to my home they didn't know that those were

24   my vehicles.  I offered to let them see my bank lien

25   statements then.  I got loans for those cars.  The

1    bank wouldn't have gave me those cars if I didn't

2    have an adequate way of paying it.  You just can't

3    walk in a bank and just ask for that and they give it

4    to you without them knowing you have means of paying

5    it.

6         My income, when I first got involved in this

7    case, she said that the $800 that I was depositing

8    every month -- every week in my account was drug

9    money.  This is why I didn't get pretrial the first

10   time.  But why would she not be truthful?  Because I

11   have check stubs, and I have bank statements that

12   shows that every month I deposited an $800 check.

13   She said it was cash.  She said it was money that I

14   was getting from Monterial putting into the account.

15   That was a lie.

16        My life has been a nightmare.  Could you imagine

17   waking up and your whole life been stripped from you?

18   Everything, everything, my pride, my dignity,

19   everything that I told my kids what to stand for.

20   And then for her to offer me a plea, to think that

21   sounds good, you take it, take it, take it?  I

22   couldn't do that.

23        The day that I got found guilty, I looked at the

24   jury, and I was trying to understand.  Okay.

25   Maybe -- I don't know what they said.  Maybe he

1    wasn't supposed to help me pay the bills.  Maybe he

2    didn't supposed to use my car.  I was never there.

3    She got me at a birthday party at Chili's.  Yeah, I

4    was there.  He was in his own vehicle too.  I can't

5    say he never drove my car before, but I didn't have

6    knowledge of it.

7         When I was on the stand, they said that I

8    obstructed justice because my attorney warned me not

9    to take the stand, but I had to -- I had to explain

10   some things.  If you get snippet phone calls, bits

11   and pieces of a phone call, not the whole entire

12   phone call, it do sound funny -- I heard them -- when

13   she played just half of it, but I'm the one on the

14   other end.  I know.  I know that this phone call

15   consisted of more.  I know that it was a phone call

16   before this.  I know.  But when you got a woman in

17   power who just all about winning, don't care about

18   who life it destroy -- I am somebody's mother; I'm a

19   grandmother; I'm a sister; I'm a granddaughter; I am

20   somebody's daughter.  They care.  I keep thinking

21   something good going to come out of this.  I know the

22   Lord, he got a plan.  Something good going to come

23   out of this.  I fail to see it, but I still trust

24   him.  I took the stand, and they said that I'm not

25   telling the truth.  But you can debrief somebody over

```
 1        30 times and he's telling the truth?  I just feel
 2        like if you're going to tell the truth you best
 3        remember it the first time, but then you will
 4        remember closer when I get to trial after they
 5        debrief you 30 times?  Over 30.  That's what Mr.
 6        Anderson said.
 7             And then Mr. Humphrey, you didn't know Wesley's
 8        people, and then when we get our -- the objections
 9        from the PSR people, oh, he was just meaning the
10        people who was part of the drug transaction.
11        Exactly.  He wasn't meaning you, the girlfriend.
12        Exactly.  Because they know that's all I was, was the
13        girlfriend.  He had a wife.  She would know more
14        about him.  She would know more about him than me.  I
15        want to understand it.  I try over and over again.  I
16        don't even know what I did to Ms. Morehead.
17             While we sitting in trial she comes in here and
18        tell my attorney that I have been shoplifting over
19        the weekend.  I have a monitor on my ankle.  I didn't
20        have a pass or anything.  Why would you do that?
21        What is wrong with -- what is wrong with you?  Is it
22        all about power?  You don't care?  That's my family.
23        They know me.  They know.  But she thinks she knows
24        me from some phone calls?  She said 33.  I can count
25        seven that she played, and half of those was my
```

```
 1        cousin house being invaded.
 2              Yes, I was scared.  I lived nearby him, and I
 3        don't want nobody coming to harm me or my children,
 4        but I also knew I was a felon and I wasn't buying a
 5        gun, I couldn't be taken away from my children, but
 6        at the hands of Terra Morehead I was.
 7                    THE COURT:  All right.  Thank you,
 8        Ms. Temple.  You may be seated, counsel and
 9        Ms. Temple.  Ms. Morehead?
10                    MS. MOREHEAD:  Your Honor, my objection
11        that's mentioned in the presentence report, frankly,
12        I don't know that I intended it as an objection; it
13        was more of an observation than anything.  I saw the
14        notation in the presentence report in connection with
15        the court's considerations, and I merely wanted to
16        point out that Ms. Temple had actually already
17        received, based upon the presentence report, five
18        levels off of where she initially started, and the
19        government didn't believe that she should receive yet
20        another benefit because her mitigating and minor role
21        had already been fully assessed.  Ms. Temple without
22        that starts out at 324 to 405 months, and she's
23        already receiving an adjustment down of 136 to 170
24        months.  That's based upon the calculations in the
25        presentence report.
```

1          Judge, with regards to the first objection which

2     Mr. Heathman mentioned having to do with the quantity

3     of drugs involved, one argument he makes is, we don't

4     know when this time frame is, whether it was actually

5     once she became involved with the phone calls or if

6     it was before that, outside the conspiracy.  And

7     frankly, Judge, that doesn't matter.  Based upon

8     relevant conduct, if she was involved in this

9     conspiracy, even if it was outside of the two years

10    that we charged, then it counts as relevant conduct.

11         As far as when her phone calls began, that's

12    because that's when we started intercepting Monterial

13    Wesley.  We were monitoring Henry Grigsby's phones

14    before that, if you recall, so we wouldn't have had

15    the opportunity to hear Ms. Temple's calls before

16    that.

17         And as far as this argument that he repeatedly

18    makes about not knowing any of Mr. Wesley's people,

19    as Mr. Humphrey mentioned, he didn't personally know

20    Ms. Temple like he knew Mr. Wesley.  What he

21    testified to was he had met her or seen her on a

22    couple of occasions in addition to these occasions

23    where she was with Mr. Wesley or driving Mr. Wesley

24    on these transactions.  And when he was shown a photo

25    of her, he immediately recognized her as being

```
 1          Wesley's girlfriend.  There would have been no way
 2          for him to know that if he had never seen her before,
 3          never observed her before.  So the fact that he could
 4          identify her corroborated that information, you know.
 5              As far as the quantity of drugs, the presentence
 6          report, the government believes, has given a fair
 7          assessment of what she should be held accountable
 8          for.  Frankly, Judge, as you're aware, because Wesley
 9          and Foy's presentence reports have been assessed --
10          they are being assessed at least 150 kilos, and I
11          think at their sentencings it could actually go
12          higher based upon some relevant conduct because of
13          their objections that could come out, but she is only
14          being held accountable for what probation reasonably
15          could assess that she was involved with, and
16          Mr. Humphrey did testify that there were at least ten
17          occasions where she was present.  Even if we give the
18          benefit of yet another doubt -- and I'm not
19          suggesting that you do that, certainly, but
20          Mr. Humphrey did indicate sometimes money was
21          involved, sometimes drugs were involved.  Even if we
22          take that down to, okay, let's say five times they
23          were drugs and five times they were money, there's no
24          way to say, was the money exchanged in connection
25          with those particular drugs that had been just
```

1    transferred?  So let's say there were five occasions

2    at 5 kilos.  That still only drops her two additional

3    levels, which still puts her at 151 to 188 months.

4    That's an offense level of 34 based upon all the

5    adjustments, the other adjustments given.  So the 188

6    at least, the low end of where she is right now, is

7    still within that next guideline range below that.

8    That's even giving her an additional benefit of the

9    doubt.  And, again, I'm not suggesting that she --

10   that that's the case.  I think the probation office

11   was very generous with this assessment.

12        It's also interesting, Ms. Temple's lawyer gets

13   up and said says, well, you should believe Chauncey

14   Anderson about this half kilo, he says, and let's

15   assess her just for half a kilo, yet Ms. Temple gets

16   up right after that and says, don't believe anything

17   Chauncey Anderson specifically says because he's not

18   believable, and she mentions this 50 times he was

19   debriefed.  And, Judge, you did the in-camera

20   inspection of Chauncey Anderson's file.  All of that

21   other information had nothing at all to do with Ms.

22   Temple or this case.  There were only the few

23   occasions where he was interviewed in connection with

24   his knowledge of this case, and that's what was

25   presented, and there weren't 50 occasions he was

1    debriefed.  And so you can give, frankly, all of the

2    testimony whatever weight you think it deserves, but

3    I think Ms. Temple has attempted to mischaracterize a

4    few things in the comments that she made to the

5    court.

6         Firearm enhancement, I would like to talk about

7    next.  Mr. Heathman says, well, Judge, there's no

8    evidence that she ever possessed a gun, and beyond

9    that there's no evidence that she knew Monterial

10   Wesley ever possessed a gun.  There can be no dispute

11   that when Monterial Wesley was arrested that he had a

12   gun in his vehicle in the middle of a drug deal;

13   however, what Mr. Heathman and Ms. Temple both

14   ignored was Government's Exhibit No. 241.

15        Now, Ms. Temple said there were only seven calls

16   and they were only partial calls that were played.

17   Actually, Judge, at trial we played a total of 15

18   calls that Ms. Temple was involved with, and we

19   played the entirety of the calls that were made

20   involving Ms. Temple.

21        And the other argument they made was, any calls

22   that were made about any guns, like Ms. Temple was

23   going to go buy a gun, came after this home invasion

24   because they were concerned about her safety.  If you

25   remember, the home invasion occurred the evening of

```
1          October 17, close to midnight; however, there was a
2      call on specifically October 16 that we played, which
3      was Exhibit 241, between Ms. Temple and Mr. Wesley,
4      and this was a call where Mr. Wesley asked Ms. Temple
5      to go by Ant's house.  If you remember, Ant was
6      Antoine Nunn, who was another identified unindicted
7      coconspirator who was involved in distributing drugs.
8      And Mr. Wesley mentioned that -- and I'll quote this.
9      Wesley says, "I want you to ride by Ant's.  He is in
10      handcuffs.  I want to see if Peep's --" and then
11      there's some unintelligible comment, and Ms. Temple
12      says, "By who?"  And Mr. Wesley says, "By Ant's," and
13      Ms. Temple says, "Oh, 51st?"  And Wesley says, "Yeah.
14      You know where his house is, over around there, don't
15      you?"  And she answers, Yes," and he answered, "Yeah.
16      I want you to ride by there.  The police have him in
17      handcuffs, and I am trying to see what's going on.  I
18      got this pistol and shit in here," and she answers,
19      "All right.  Where you at?"  And we played that call.
20      Mr. Wesley told her he wanted her to go over there
21      and see what was going on at Ant's house.  He
22      couldn't go over there because -- he couldn't make
23      contact over there because he had a gun in the car.
24      And it wasn't some vague reference; it was, "I got
25      this pistol and shit in here."
```

1       And so what we have to show to get that firearm

2     enhancement, frankly, Judge, is foreseeability.  And

3     if this isn't foreseeability, I'm not sure what is,

4     when we have a specific reference where Monterial

5     Wesley tells her, I've got a gun, and he's wanting

6     her to go checkout his fellow drug trafficker's

7     residence to see what was going on.

8       So we believe that the firearm enhancement --

9     this was prior to the home invasion, Judge.  This was

10     a full day before the home invasion.  So this had

11     nothing to do with the home invasion.  It's

12     completely unrelated to the calls about her getting a

13     gun, and we believe then the firearm enhancement is

14     appropriate.

15       We have this debate now about the minor/minimal

16     participant, and, Judge, I did not object to that.

17            THE COURT:  I deem it waived.  I deem any

18     objection by the defendant further to have been

19     waived, and I would say I would not grant it in any

20     event based upon what I believe was the situation

21     here, but you need not address it further.

22            MS. MOREHEAD:  Okay.  I won't.  She got

23     five levels off at three and two, and we believe

24     that's appropriate.

25       The other one, Judge, is, frankly, the

```
 1          obstruction.  And, Judge, Mr. Heathman says, well,
 2          you've got to point to something that shows that she
 3          was lying.  Everything Ms. Temple testified to,
 4          Judge -- we talked about every -- just about every
 5          call she had.  We talked about the money.  We talked
 6          about the countersurveillance, the one call where
 7          she's calling out the police in this call.  And it's
 8          a call between Wesley and Foy, but you can hear her
 9          voice in the background, and she's calling out
10          countersurveillance.  Judge, if I remember, she
11          denied any knowledge of Mr. Wesley being involved in
12          drug trafficking; she denied any knowledge about, you
13          know, participating at all in any of these
14          transactions; and so based upon her testimony -- this
15          isn't a situation based upon confusion, mistake, or
16          faulty memory where she, you know, remembered things
17          differently or we could make that assessment.  These
18          were material issues.  You know, if she would have
19          got up here and said, well, yeah, I knew Monterial
20          Wesley was involved in drug trafficking, but I wasn't
21          involved, that's her ability or her opportunity to
22          profess her innocence, but her testimony went beyond
23          that.  Her testimony went to the point of flat out
24          denying things that there was hard and fast evidence
25          of: the countersurveillance, the money at her house.
```

1      All of that indicates that she was not being

2      truthful.

3           You know, Judge -- and I don't want to belabor

4      my comments too much, but, you know, she wants to

5      blame this on me, and that's fine, but her attitude

6      here today is markedly different than the Latysha

7      Temple you saw in court for six or seven weeks.  And

8      her interaction with Monterial Wesley here in this

9      courtroom, it wasn't something where she was

10     disassociating herself or she was shocked that he

11     would subject her to this type of, you know,

12     activity, and her comments about plea offers, or

13     whatever, you know, she had the same opportunity to

14     cooperate that anybody else in this case did.

15     Everyone -- there was no one that was foreclosed from

16     cooperating in this case, and she opted not to do

17     that.  She wants to profess her innocence.  She

18     certainly has that right to.  She wants to say that,

19     you know, she was a good, hardworking mother, and I'm

20     sure there are good attributes that can be spoken

21     about her.

22          Look at her criminal history.  You know, there

23     are -- they want to say, well, in '97 she had these

24     occasions, but there were other occasions, not just

25     one or two times she stole things, but three, four

```
1    times.  And her recollection about me telling her

2    attorney that she had shoplifted, I never once told

3    her attorney that.  Actually, pretrial had advised of

4    an incident that occurred while she was on release

5    during the course of the trial, and if you want the

6    specifics of that, Ms. Goldsmith can give those to

7    you.  But Ms. Temple returned an enormous amount of

8    goods there was no record of having been bought, that

9    there was only a certain amount that were in stores,

10   and they determined that they had -- that same amount

11   had been stolen from another similar store.  They

12   couldn't say who stole them or how they came to be in

13   that, but they didn't allow her to return them.  I

14   never used the word shoplifting, so I think that's

15   funny that that came out today, but that never

16   happened.

17       We believe, Judge, that a sentence of 188 months

18   is fair and just.  That's just shy of a little over

19   15 years.  She's given a huge benefit by mitigating

20   and minor role.  She wants to compare, frankly, her

21   participation with other girlfriends, and I just

22   don't see the comparison.  If there's any comparison,

23   it would be Lakela Houff.  The difference between

24   Latysha Temple and Lakela Houff though, Judge, is

25   Lakela Houff cooperated.  She was, you know, able to
```

1    come in and testify about her participation as far as

2    her facilitation of this.  It was similar to Latysha

3    Temple, certainly was no more than Latysha Temple's.

4    And based upon all of the facts and circumstances in

5    this case, we believe that the presentence report is

6    accurate.  We believe that all the enhancements

7    should apply and that a sentence within the

8    guideline range is appropriate in this case.

9              THE COURT:  Thank you, Ms. Morehead.  I'm

10   going to take just a moment here.  I'll be in recess

11   and then back with you shortly.

12             (A recess was taken.)

13             THE COURT:  The court has carefully

14   considered the parties' written submissions,

15   including the objections as set out in the

16   presentence investigation report and the submissions

17   that were made by way of sentencing memoranda, the

18   statements, arguments, and the recollection of

19   certain evidence that was made here in the courtroom

20   today.  The court has decided that the sentence which

21   is sufficient but not greater than necessary to carry

22   out Congress' objectives for sentencing is a sentence

23   of 151 months.  I arrive at that sentence as follows:

24        First of all, with regard to Objection No. 1, to

25   the base offense level based upon quantity, I do

1    sustain that objection.  It is my finding by a

2    preponderance of the evidence that Ms. Temple was

3    responsible as the law defines it, that is,

4    concerning the quantity of drugs which she reasonably

5    foresaw and which fell within the scope of her

6    particular agreement with the coconspirators of over

7    five but less than 50 kilograms of cocaine.

8         I rely in part upon Mr. Humphrey's testimony at

9    trial, and I do believe that Mr. Humphrey's

10   statement, to which there was an objection lodged in

11   Paragraph 273 about not knowing Wesley's people, I

12   believe Ms. Temple has made far too much of that.  I

13   agree with the assessment that all Mr. Humphrey meant

14   was that he didn't really know all the goings-on of

15   how Mr. Wesley conducted his business.  I think he

16   testified persuasively at trial about his modus

17   operandi, the way he worked with Mr. Wesley, and the

18   extent of the times that Ms. Temple was with him.

19   And he indicated that he did see Ms. Temple with

20   Mr. Wesley either driving the car or in the car,

21   perhaps her car, on what he described as several

22   occasions.

23        I think that the flaw in the computation in the

24   presentence investigation report attributing

25   50 kilograms to Ms. Temple is not really taking into

1       account the way they did do business.  Mr. Humphrey

2       in his testimony made it clear that Mr. Wesley

3       virtually never paid cash, certainly never paid for

4       the full amount when he picked up the drugs;

5       therefore, there were numerous meetings where either

6       there was -- were drugs exchanged or there was money

7       exchanged.  And there's no way for me to sort out

8       from Mr. Humphrey's testimony whether the number of

9       times they met -- even if you took the ten -- that

10      was not his testimony at trial but in some statements

11      that he made -- there's no way to sort out whether

12      those were all drugs or some money.  And I believe

13      it's more likely than not that some were drugs and

14      some were money, so therefore I believe that the

15      computation of the quantity was too high.  I do

16      believe that Ms. Temple did accompany Mr. Wesley on

17      perhaps as many as ten trips, that she knew they were

18      drug transactions, and that she knowingly assisted

19      Mr. Wesley either by driving and/or by loaning her

20      vehicle.  In addition, she may well have stored a

21      kilogram or two at her house, and I think all of that

22      adds up to a quantity level which justifies a

23      two-level lower base offense level, but that's the

24      extent of it.

25          Second, with regard to the objection in

```
1          Paragraph 258 concerning the firearm, I am overruling
2      that objection for the following reasons:  It is true
3      that there was no firearm found on Ms. Temple and
4      that the firearm on the day of the arrest of
5      Mr. Wesley.  That may be significant as to
6      Mr. Wesley, but the significance that he had one that
7      day simply is corroboration of other testimony or
8      other evidence in the case.
9          Mr. Humphrey again testified at some length that
10     he on numerous occasions saw Mr. Wesley during their
11     drug transactions with a gun in his vehicle and
12     identified them as handguns.  These would have been
13     some occasions of which may have involved Ms. Temple
14     having driven or accompanied Mr. Wesley, so I came to
15     this hearing today with at least a certain level of
16     suspicion that Ms. Temple would have had reason to
17     have known about Mr. Wesley's involvement with
18     firearms as part of his drug trafficking operation,
19     but I was not really persuaded yet until Ms. Morehead
20     called to my attention Exhibit 241, which was a
21     telephone call played during the trial of the case,
22     the details of which I had not recalled until she
23     refreshed my recollection today, and that is the
24     conversation concerning Ms. Temple going and checking
25     out Ant's house and that Mr. Wesley said he had a gun
```

1       in his car, and it's obvious in all of that that Ms.

2       Temple expresses no surprise, no consternation.  It's

3       a matter of fact -- of course, she will go check it

4       out -- and it was just matter of fact that Wesley's

5       got a gun in his car.  I think this is consistent

6       with the general notion that the nature of the drug

7       business, the specifics of Mr. Wesley's having a gun

8       on numerous occasions as reported by Mr. Humphrey and

9       as corroborated by his arrest -- the date of his

10      arrest and then this phone conversation which shows

11      that it clearly was, as the law requires, foreseeable

12      to Ms. Temple that Mr. Wesley would be using -- or

13      having a firearm in connection with the drug

14      transactions.  So I think that it was reasonably

15      foreseeable and that the two-level enhancement was

16      proper.

17         I also overrule the objection at Paragraph 266

18      concerning obstruction of justice.  I believe that

19      Ms. Temple perjured herself at trial, that she

20      intentionally testified falsely on material matters

21      in order to affect the outcome of the case.

22      Ms. Temple denied that Mr. Wesley was -- that she

23      knew that Mr. Wesley was involved in drug dealing and

24      that she didn't help him in any way with his drug

25      dealing.  I believe that was false when she said it

```
1        at trial; I believe it was false when she said it

2        today.  I don't know whether she's trying to justify

3        herself to friends and family; I don't know whether

4        she has simply tried to justify it in her own mind

5        because she's had a difficult life and a number of

6        mouth to feed, but I'm satisfied that Ms. Temple was

7        well aware of what Mr. Wesley was doing and that she

8        was participating in it herself by way of assisting

9        him by driving him to transactions, loaning a car, or

10       storing things at her house, and she is fully

11       culpable for those matters.

12            There was also an objection raised at

13       Paragraph 269, a fourth objection, concerning a phone

14       call on September 19, 2007.  I'm not going to rule on

15       that objection because it does not affect the outcome

16       and I'm not taking it into account.

17            I previously indicated that the Objection No. 6

18       at Paragraph 278 is overruled for the same reasons

19       that the probation officer gave in her response at

20       Paragraph 280, and Mr. Heathman conceded that that

21       was appropriate.

22            The objection that was discussed today, if you

23       call it an objection, that rather than a minor role

24       there should have been a minimal role, as I indicated

25       when Ms. Morehead was at the lecturn, I believe has
```

1    been waived by not having been preserved in the

2    presentence report objections or in the sentencing

3    memorandum.  Moreover, even had it not been waived, I

4    believe that the nature of Ms. Temple's role was not

5    minimal.  In some respects I think the probation

6    office was fairly generous in the way in which they

7    treated Ms. Temple in this case with regard to the

8    adjustments, and for those reasons clearly I would

9    not have considered her among the very least culpable

10   people that you could conceivably have here.  I mean,

11   she just was involved in too many occasions to get a

12   minimal adjustment, and she was only held accountable

13   for those drugs that she was directly participating

14   in, not the entire scope of the conspiracy.  So for a

15   lot of reasons I don't think she's entitled to a

16   minimal adjustment.  Mr. Heathman's arguments could,

17   of course, be construed to be requesting a downward

18   variance in light of the totality of his argument,

19   and, of course, the government noted that in

20   Paragraph 247 here there was -- in 247 that there had

21   been some recognition by the probation office of

22   bases on which a court might vary down and the

23   government's disagreement with that.  I see no basis

24   to vary downward here for all of the reasons that I

25   indicated.  I think the probation office was very

1   generous in their scoring of all of this with regard

2   to the role in the offense.  I think that her

3   participation has been adequately reflected by a

4   sentence within the guideline range.

5        I think that that sentence of 151 months takes

6   into account the seriousness of the offense, the need

7   for just punishment or deterrence, and incapacitation

8   of Ms. Temple.  I greatly regret the impact on her

9   family that this will cause, but it's a choice that

10  she knowingly made, and these are the consequences

11  that attend to it.  With regard to supervised

12  release, a period of five years is appropriate.  I'm

13  not going to impose a fine.  There is a special

14  assessment of $100 which is mandatory under the Crime

15  Victims Relief Act.

16          UNIDENTIFIED SPECTATOR:  You stupid bitch.

17  I'm going to kill you.

18          THE COURT:  There is a special assessment

19  of $100, which is mandatory under the Crime Victims

20  Relief Act.  I'm not going to deny federal benefits

21  because it would not serve a punitive purpose here.

22       I intend to impose each of the mandatory and

23  special provisions of supervision which are set forth

24  in Part D of the presentence report.

25       The supervised release term in addition to the

1    imprisonment sentence will allow the defendant the

2    opportunity to receive correctional treatment in an

3    effective manner and will assist with community

4    reintegration in accordance with 18 U.S.C.

5    Section 3553(a)(2)(D).

6         In light of Ms. Temple's inability to pay a

7    fine, the court intends to waive the fine amount.

8         A $100 special assessment is required pursuant

9    to 18 U.S.C. Section 3013.

10        The defendant is prohibited from purchasing or

11   possessing a firearm or other dangerous weapon as

12   defined by statute as a result of the instant offense

13   of conviction.

14        The mandatory condition for drug testing and DNA

15   collection is imposed pursuant to 18 U.S.C. Section

16   3583(d).

17        Due to a reported history of substance abuse,

18   substance abuse treatment and alcohol prohibition

19   conditions are deemed warranted.

20        That's the court's proposed sentence.

21        Ms. Morehead, anything further on behalf of the

22   government?

23             MS. MOREHEAD:  No, your Honor.

24             THE COURT:  Mr. Heathman, on behalf of

25   Ms. Temple?

```
1              MR. HEATHMAN:  No, your Honor.

2              THE COURT:  Very well.  Is there any legal

3         reason why sentence should not now be imposed in this

4         case?

5              MR. HEATHMAN:  The defendant knows of none,

6         sir.

7              THE COURT:  Very well.  Please rise.

8         The court determines that the presentence

9         investigation report and the previously stated

10        findings are accurate and orders those findings to be

11        incorporated in the following sentence:

12        Pursuant to the Sentencing Reform Act of 1984,

13        it is the judgment of the court that the defendant,

14        Latysha D. Temple, is hereby committed to the custody

15        of the Bureau of Prisons to be imprisoned for a term

16        of 151 months on Count 1.

17        Upon release from imprisonment, she shall be

18        placed on supervised release for a period of five

19        years on Count 1.

20        Within 72 hours of release from the custody of

21        the Bureau of Prisons, she shall report in person to

22        the probation office in the district to which she is

23        released.

24        While on supervised release, she shall not

25        commit another federal, state, or local crime, shall
```

1    comply with the standard conditions that have been

2    adopted by this court as well as the special and

3    mandatory conditions previously stated by the court.

4        It is further ordered Ms. Temple pay to the

5    United States a special assessment of $100 through

6    the Clerk of the United States District Court.

7    Payments on the assessment are to begin immediately

8    and may be satisfied while in Bureau of Prisons

9    custody.

10       The court waives a fine in this case based on

11   the defendant's inability to pay.

12       The court further orders a money judgment

13   against the defendant for a sum of money equal to

14   $10,750 in United States currency representing the

15   amount of proceeds obtained as a result of the

16   offense, the distribution of cocaine and cocaine

17   base, all controlled substances in violation of 21

18   U.S.C. Section 841(a)(1), for which the defendants

19   are jointly and severally liable.

20       Both the government and the defendant are

21   advised of their respective rights to appeal this

22   sentence and conviction.  An appeal taken from this

23   sentence is subject to 18 U.S.C. Section 3742.

24       The defendant is advised that you can lose your

25   right to appeal if you do not timely file your notice

1    of appeal.  You can lose it if you don't file it

2    within the time period proscribed by law in the

3    district court.

4         Rule 4(b) of the Federal Rules of Appellate

5    Procedure gives you ten days after the entry of

6    judgment to file a notice of appeal.  If you so

7    request, the clerk of the court will immediately

8    prepare and file a notice of appeal on your behalf.

9    If you are unable to pay the cost of an appeal, you

10   have the right to apply for leave to appeal in forma

11   pauperis.

12        That shall be the sentence of the court.

13        Is there anything further to be brought before

14   the court today, Ms. Morehead?

15             MS. MOREHEAD:  No, your Honor.

16             THE COURT:  Mr. Heathman?

17             MR. HEATHMAN:  Nothing, sir.

18             THE COURT:  Very well.  I do remand the

19   defendant to the custody of the United States

20   marshals, and that concludes this matter.  We are in

21   recess.

22             THE DEFENDANT:  I'll see you again, Ms.

23   Morehead.

24             (Court was adjourned.)

25                       * * * * *

```
1

2                        CERTIFICATE

3   STATE OF KANSAS        |

4                          |   ss

5   COUNTY OF JOHNSON      |

6

7           I, Rebecca Ryder, RMR, CRR, a Certified

8   Shorthand Reporter and official reporter for the United

9   States District Court, District of Kansas, do hereby

10  certify that as such official reporter I was present at

11  and reported in machine shorthand the above and foregoing

12  proceedings.

13          I further certify that a transcript of my

14  shorthand notes was prepared and that the foregoing

15  transcript is a true and correct transcript of my notes in

16  said case to the best of my knowledge and ability.

17

18                              S/REBECCA S. RYDER
                                REBECCA S. RYDER, RMR, CRR
19

20

21

22

23

24

25
```