```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF KANSAS
 2

 3   UNITED STATES OF AMERICA,

 4                    Plaintiff,

 5   vs.                          Case No. 07-20168

 6   MONTERIAL WESLEY,

 7                    Defendant.

 8

 9               TRANSCRIPT OF PROCEEDINGS
             Motions in Limine Conferences
                        before
10           HONORABLE JOHN W. LUNGSTRUM
                         on
11        March 31, 2009 and April 8, 2009

12                    APPEARANCES

13   For the Plaintiff:

14   Terra Morehead
     United States Attorney's Office
15   500 State Avenue
     Kansas City, KS 66101
16
     For the Defendant Wesley:
17
     Robert N. Calbi
18   Calbi & Yotz, PC
     819 Walnut St., Ste. 401
19   Kansas City, MO 64106-1810

20   For the Defendant Simpson:

21   Charles M. Rogers
     Wyrsch Hobbs Mirakian, PC
22   1000 Walnut, Ste. 1600
     Kansas City, MO 64106

23

24

25
```

REBECCA S. RYDER, CCR, RMR
UNITED STATES COURT REPORTER
913-551-5645

```
 1      For the Defendant Foy:

 2
        Lance D. Sandage
 3      The Sandage Law Firm, PC
        4700 Belleview Ave., Ste. 404
 4      Kansas City, MO 64112

 5      For the Defendant Trinkle:

 6
        Branden A. Bell
        The Bell Firm, PA
 7      PO Box 442489
        Lawrence, KS 66044
 8
        For the Defendant Temple:
 9
        James C. Heathman
10      3706 S.W. Topeka Blvd. No. 402
        Topeka, KS 66609
11
        For the Defendant McDaniel:
12
        Fred Bellemere, III
13      Seigfreid, Bingham, Levy, Selzer & Gee, PC
        2800 Commerce Tower
14      911 Main Street
        Kansas City, MO 64105
15
        For the Defendant Goodwin:
16
        Richard W. Johnson
17      Johnson & Johnson LLC
        312 Delaware St.
18      Kansas City, MO 64105

19

20

21

22

23

24

25
```

INDEX

|  | PAGE | VOL |
|---|---|---|
| TUESDAY, MARCH 31, 2009 | | |
| Motion in Limine Hearing | 4 | 1 |
| WEDNESDAY, APRIL 8, 2009 | | |
| Motion in Limine Hearing | 112 | 1 |
| PLAINTIFF'S EVIDENCE | | |
| ERIC T. JONES | | |
| Direct examination by Ms. Morehead | 152 | 1 |
| Cross examination by Mr. Johnson | 157 | 1 |
| JEREMY AARON SNYDER | | |
| Direct examination by Ms. Morehead | 161 | 1 |
| Cross examination by Mr. Johnson | 166 | 1 |
| NEIL KENT VOGEL | | |
| Direct examination by Ms. Morehead | 168 | 1 |
| Cross Examination by Mr. Johnson | 178 | 1 |

EXHIBITS

| NUMBER | PAGE | VOL |
|---|---|---|
| 1 | 162 | 1 |
| 2 | 176 | 1 |

```
 1                    TUESDAY, MARCH 31, 2009

 2              THE COURT:  The court now calls Case No.

 3       07-20168, United States of America versus Monterial

 4       Wesley and others.  Would the parties state their

 5       appearances, beginning with counsel for the United

 6       States.

 7              MS. MOREHEAD:  May it please the court,

 8       Terra Morehead, assistant United States attorney,

 9       appearing on behalf of the government.

10              THE COURT:  For Mr. Wesley?

11              MR. CALBI:  Robert Calbi on behalf of

12       Mr. Wesley, your Honor, who appears in person.

13              THE COURT:  Thank you.  For Mr. Simpson?

14              MR. ROGERS:  Charles Rogers on behalf of

15       Mr. Simpson, who appears in person.

16              THE COURT:  For Mr. Foy?

17              MR. SANDAGE:  Yes, your Honor.  Lance

18       Sandage on behalf of Mr. Foy, who appears in person.

19              THE COURT:  For Mr. Trinkle?

20              MR. BELL:  Brandon Bell for Mr. Trinkle,

21       who also appears in person.

22              THE COURT:  For Ms. Temple?

23              MR. HEATHMAN:  Ms. Temple in person, your

24       Honor, with counsel James Heathman.

25              THE COURT:  And Mr. McDaniel?
```

1          MR. BELLEMERE:  Fred Bellemere, your Honor,

2    for Mr. McDaniel, who is here in person.

3          THE COURT:  And for Mr. Goodwin?

4          MR. JOHNSON:  Rick Johnson, Judge.

5    Mr. Goodwin is here and he is also in custody.

6          THE COURT:  I would like to now address the

7    issues that I would like to address with you all by

8    way of procedural matters.

9       First, let me talk to you about the seating

10   arrangements and where we're going to be and all of

11   those kinds of things.  The seating arrangement that

12   you have today is the seating arrangement you will

13   have for the trial itself.  The defendants are lined

14   up really just in order of the indictment from the

15   front of the courtroom to the back and so forth, no

16   attempt to make any assessment of how people should

17   be grouped or anything like that.  It's just by the

18   order in which individuals were indicted.

19      At the trial itself the defendants will be

20   shackled but not have handcuffs on.  The cuffs are on

21   today simply as a further security measure because of

22   the lack of personnel from the marshals to provide

23   the ordinary and expected security that we would have

24   in a courtroom.  During the trial there will be

25   additional security, so therefore the handcuffing

1    will certainly not take place.  The tables will be

2    skirted so that the feet shackles, leg shackles will

3    not be visible to the jury.  Moreover, the defendants

4    will all be brought into the courtroom and taken out

5    of the courtroom out of the presence of the jury so

6    that there will be no indication to the jury that the

7    individuals are being shackled.  And, as I say, that

8    is merely done as a routine security caution in

9    light of the number of defendants that we will have.

10       Currently eight of you remain to go to trial.

11   Certainly each of the defendants are entitled to wear

12   civilian clothes for trial.  There are certain

13   restrictions on those that counsel should be aware of

14   and be communicating with family members for those

15   defendants who are incarcerated, certain restrictions

16   as to belts and ties and so forth.  I will expect you

17   to get with the marshals and acquaint yourself with

18   what those restrictions are so that that doesn't

19   create a problem.  I will expect counsel to have

20   coordinated arrangements with family members so that

21   we get to the starting of the trial next week and not

22   have any delay because clothes aren't there.  If, in

23   fact, we get to the beginning of trial next Tuesday

24   and civilian clothes have not been made available to

25   a defendant, we will simply proceed, and we will

1        proceed in whatever garb the individual defendant has

2        on.  We will not delay the trial.  So it's incumbent

3        upon you as the lawyers to the extent that you

4        consider it important to have the defendants dressed

5        in civilian attire to take care of those arrangements

6        before we start so that when we commence with the

7        jury selection next Tuesday we will not be waiting on

8        that.

9            Let's talk about the starting times.  I have

10       moved up the starting time for the jury selection in

11       this case for April 7 to 10:30 in the morning.

12       Frequently I do not start criminal jury trials with

13       regard to the jury selection process until 1:00

14       o'clock simply because it is my preference when able

15       to do so to complete the voir dire examination and

16       the jury selection without the necessity for a break

17       for a number of reasons that are probably obvious to

18       the lawyers but to the individual participants as

19       well.  It simply makes it more manageable and less

20       likely to have something go wrong in the course of

21       jury selection here.  Obviously, given the number of

22       participants, that's not a practical consideration

23       anyway, so in my assessment it appears a better plan

24       to start at 10:30, and my goal and intention is to

25       complete the jury selection process on Tuesday,

1    April 7, but that's all we would do on Tuesday,

2    April 7, and then we would move on to the next phase

3    beginning the next day, and I'll discuss that a

4    little bit more.

5        Let me tell you about starting times.  In

6    general on April 14 and April 21, those Tuesdays in

7    which we will be holding trial, the court will start

8    at 10:30 on each of those two days, the 14th and the

9    21st.  That's because I teach a class at the

10   University of Kansas School of Law and I don't get

11   here until such time as would enable us to start at

12   10:30.  On any other day during the trial except to

13   the extent that we indicate as the case goes on some

14   reason to do otherwise, we will start trial at

15   9:00 a.m., and I will expect counsel to be here by

16   8:30 each day in the event that there are matters to

17   take up in advance of proceeding that morning.  It is

18   my practice not to take up the jury's time with

19   matters that we need to deal with.  If there is an

20   evidentiary question, if there is any matter that

21   needs to be dealt with, we take care of it on our

22   time, not the jury's time once the jury is selected,

23   so you need to be here.  I'll be here a half hour in

24   advance, Tuesdays not quite a half hour in advance.

25   I don't want to break the speed limit, but I get here

1       in enough time that I could take something up 20

2       minutes in advance of trial at least, and I want you

3       all to be ready and available as well.  We will not

4       meet on any Monday during the time that this trial is

5       in session.  I reserve Mondays for my ordinary

6       criminal calendar and for other matters that require

7       advance scheduling for protracted evidentiary

8       hearings, such as complex sentencings or approving

9       settlements in multidistrict litigation cases or

10      approving class certification in class action cases,

11      etc.  Mondays are set aside for other purposes, so we

12      will not meet on any Monday during the course of the

13      trial.

14          We will conduct the voir dire examination and do

15      the jury selection upstairs in Room 643.  That simply

16      is because that is a larger room.  It is commonly

17      known as the Court of Appeals courtroom, and that's

18      because it was designed with a bench large enough to

19      accommodate three chairs.  It has, in fact, the seal

20      of the Tenth Circuit Court of Appeals behind the

21      bench, like our courtroom here, which has the seal of

22      the district court, and it is simply a larger space

23      and will accommodate us for the selection of the

24      jury; however, we will then, once the jury is

25      selected, we will the next day, when we recommence

1        with opening statement and so forth, we will be back

2        in this courtroom, and we will try the case in this

3        courtroom.  I will give you this heads up as well

4        about the jury selection in the courtroom upstairs.

5        The spectator seating may be limited.  There's not a

6        ton of spectator seating up there, and at least the

7        western half of what is the seating gallery out there

8        will be reserved for prospective jurors to sit in,

9        those who are not up in the jury box or in the chairs

10       in front of the jury box actively participating in

11       the selection of the jury.  So for those of you with

12       friends and family or people involved in the case who

13       want to attend the jury selection process, let them

14       know that seating is limited and it will be the

15       eastern half of the seating area upstairs.  Any

16       assistance on that you want, or clarification, Ms.

17       Scheurer can certainly help with you that.

18            We are not conducting the trial itself up in

19       that room even though it's larger for at least a

20       couple of reasons.  One reason is that that courtroom

21       is not equipped with the electronic capacity this

22       courtroom has, and I think that makes it better to

23       try the case in this courtroom than that courtroom.

24       It isn't really designed as a trial courtroom even

25       though it does have a jury box.  Of more importance,

1      however, is that, unlike our setting here in this

2      particular courtroom where we have direct access to a

3      secure holding facility, that isn't available on the

4      sixth floor.  So, therefore, individuals have to be

5      transported back and forth on elevators, and it

6      simply requires more delay or else more personnel to

7      be involved in dealing with things on breaks and the

8      like, and it simply is a less suitable place as a

9      trial goes on.  And we are using it, therefore, only

10     for the jury selection portion.  Any questions about

11     what I've stated so far?  Ms. Morehead?

12             MS. MOREHEAD:  Judge, I don't really have a

13     question.  I did bring to Ms. Scheurer's attention --

14     I think it was about two weeks ago -- I did receive a

15     notice from the Tenth Circuit that a case that I

16     tried -- it's a very lengthy factual case that lasted

17     almost two weeks -- is set for oral argument in

18     Denver on May 6.  Now, I don't know that we will

19     still be in trial come May 6, but I wanted to bring

20     that to your attention.  It's a Wednesday, and I

21     could arrange, frankly, to fly out after court on

22     Tuesday.  It would be a late afternoon flight, and

23     then I would literally just miss one day.  I'm the

24     sixth case on the docket, frankly, so I know I won't

25     get done early to where maybe we could plan on the

1    afternoon session, but I was going to ask the court

2    to accommodate that.

3              THE COURT:  Have you filed a motion to

4    continue the oral argument?

5              MS. MOREHEAD:  Judge, I have not, and,

6    frankly, I haven't because it's been my practice --

7    and I haven't ever done it, but I've known of defense

8    counsel who have done it, who have had trials

9    conflict with Tenth Circuit arguments, and, frankly,

10   they have been denied.  So I didn't.  The only other

11   option that I can even come up with would maybe be

12   see if they would allow me to do it by video

13   teleconferencing.  I have not checked on that.  My

14   cocounsel is also from here.  But they have a very

15   lengthy docket.

16             THE COURT:  You might check on that, and

17   thank you for calling this to the court's --

18   actually, all of our attention.  Ms. Scheurer had

19   passed on that that might be a concern.  It is my

20   strong desire, and will be my intention, to get this

21   case to the jury before then, in part because I will

22   have to be gone on May 1, which is a Friday, as well

23   as Monday, May 4, and I am scheduled to start another

24   trial on Tuesday, May 5, so it is my goal to have

25   this case to the jury by the close of business on

```
1        April 30, and I will do everything in my capacity to
2        get that accomplished.
3             Let's talk about the jury selection process for
4        a moment.  The way I conduct the jury selection
5        process is that we will -- there will be chairs set
6        up in front of the jury box upstairs as well as to
7        the side.  And, by the way, the courtroom upstairs
8        has already been set up in its configuration, I
9        believe.
10            Is that correct, Ms. Scheurer?
11                  THE COURTROOM DEPUTY:  That's correct.
12                  THE COURT:  So that all of you counsel are
13       invited to go up there.  Ms. Scheurer will be happy
14       to give you a tour, so to speak, so you can see what
15       I'm talking about and eyeball that today before you
16       leave.  But there will be chairs in front of the jury
17       box and to the side of the jury box.  We will call up
18       a total of 28 prospective jurors and four prospective
19       alternates.  That will be done, of course, by the
20       computer-generated selection process which randomly
21       takes from the pool of people who are being called
22       in, and that way the first 32 individuals, the first
23       28 of whom are prospective jurors and the final four
24       of whom are prospective alternates, we will qualify
25       those 32 people for cause, and then the peremptory
```

1    challenges will be exercised, and those peremptories

2    add up to 16 between the government and the

3    defendants collectively, and then there will be one

4    peremptory challenge for the government and one for

5    the defendants to exercise collectively.

6         As to the alternates, the way in which the voir

7    dire process proceeds is that I will do the initial

8    examination of the jury, I will go through the

9    routine questions, including making sure the jury

10   understands what the nature of the charges are, what

11   the nature of the criminal prosecution and the

12   particular constitutional rights are that adhere to

13   the defendants in the case, and I will ask them the

14   obvious sorts of questions that one would expect to

15   be asked in any jury examination involving a case of

16   the particular nature that this one happens to be.  I

17   will ask them questions about strongly held views

18   about trafficking or alleged trafficking in drugs,

19   alleged involvement in firearms, etc., I will deal

20   with all of those issues myself.  In the course of

21   that portion I will, however, call upon the lawyers

22   to help me in at least three instances, and I do this

23   for several reasons, but the primary reason I do it

24   is to allow counsel to have relatively early on in

25   the process some interaction with the jury yourself

1     so that you're not just kind of sitting there as

2     inert objects while the judge is talking at them for

3     a couple of hours.  I will ask you to do this in the

4     following at least two ways, and we will talk about

5     the third.

6          First of all, as soon as I have given the jury

7     some of the basic overview about the nature of this

8     case and the nature of criminal prosecutions to begin

9     with, I will then call upon counsel to introduce

10    yourselves to the jury.  At that point I do not want

11    you to introduce either a case agent or an individual

12    defendant.  I want you simply to introduce yourself,

13    and I want you to tell the jury enough about who you

14    are and where you practice or with whom you practice

15    that would enable the jurors to decide whether or not

16    they may be acquainted with you or might have any

17    other reason why we should pursue further some issue

18    that might arise from who you are or in your case

19    perhaps even where you're from.  Mr. Rosenthal?

20              MR. ROSENTHAL:  Should I tell them I'm from

21    Berkeley?

22              THE COURT:  I think you should decide what

23    you feel is important to disclose and what you feel

24    is not.

25              MR. ROSENTHAL:  Just a ZIP code.

1              THE COURT:  But that's your opportunity to

2       deal with that.  Then I will come back through and

3       ask government counsel to introduce the case agents,

4       and I'll ask defense counsel to introduce each of the

5       individual defendants at that time.  I don't want you

6       to give the jury a total biography of the defendants

7       because, of course, what you say is not evidence;

8       it's -- and the jury will be instructed to that

9       effect, but I want you to say enough about the

10      individual defendants in terms of where they are from

11      that a prospective juror might jog something about

12      them or not concerning who the individuals might

13      happen to be.  So if you want to say that somebody

14      lives in Leavenworth or is from the East Bay, or

15      whatever it might happen to be that would help the

16      jurors understand who the individuals are, that is

17      appropriate, but don't give us a biographical sketch

18      that has an end run on testimony that might have been

19      offered had you decided that that was the appropriate

20      thing to do.

21          Finally, at some point in time I will want to

22      have the jurors exposed to the potential list of

23      witnesses in the case to ascertain whether or not any

24      members of the jury are acquainted with peremptory

25      witnesses.  This can be done in two different ways,

 1          and I leave it to counsel for the defendants

 2          collectively to help guide me here.  Often in

 3          criminal cases the defendants may not produce any

 4          evidence and may simply rely on the burden of proof

 5          and the government's inability to satisfy that and

 6          not produce any witnesses.  In other cases the

 7          defendants may themselves have witnesses who they

 8          intend to call and actually do wish to present.  I

 9          could either ask the government to read a list of all

10          of the peremptory witnesses, in which case I would

11          instruct the jury that the government is doing that

12          at my direction as an accommodation to all of us to

13          save some time and the government will not

14          differentiate in their reading of the witness list,

15          whether these are prospective government witnesses or

16          prospective defense witnesses; or I can, if the

17          defense counsel wish, allow you to read from lists of

18          witnesses of your own.

19               Are there any defense counsel who wish to

20          actually read your own witness list as opposed to my

21          asking the government as an accommodation to read the

22          entire group of witnesses?

23                    MR. ROGERS:  This may not be responsive to

24          the question.  I don't wish to read my own, but I

25          have a third suggestion, which is to have the witness

1     list written out with the witnesses in alphabetical

2     order and distributed in writing to the prospective

3     jurors.

4            THE COURT:  I have no objection to

5     proceeding along those lines.  I haven't paid

6     attention to how long your witness list is, Ms.

7     Morehead.  How long is it?

8            MS. MOREHEAD:  It's long.  The problem with

9     that is oftentimes I expand a little bit and talk

10    about who is from what agency, where the potential

11    witness lives; and giving it to someone and expecting

12    them to read it in a few moments, you're not really

13    engaging and being able to address that, so I think

14    it's more effective, frankly, to read it.

15           THE COURT:  I do have the concern of, with

16    the written list, Mr. Rogers, if it says Jim Jones

17    and Tom Smith and Harry So-and-So, of course, people

18    have no idea whether that's someone who lives in

19    Overland Park or lives in Chicago or whether they

20    work with the government or whether they are

21    civilian, and I think it is more useful to explain

22    that information to the jury, and in light of Ms.

23    Morehead's comments, I think that's the way we should

24    proceed.

25     Mr. Rosenthal?

1          MR. ROSENTHAL:  Thank you, your Honor.  How

2     about the alternative of having you or the clerk read

3     the information that we just talked about?

4          THE COURT:  I see no reason to do that.  We

5     have done it numerous times with the government

6     reading the list with my instruction to the jury, and

7     I think it's quite adequate that way.

8          Ms Morehead, I will ask you to do that.

9          Mr. Rogers?

10          MR. ROGERS:  Should we provide Ms. Morehead

11     with short descriptions of who our witnesses are?

12          THE COURT:  I think that would be helpful

13     if you have not already done so in your witness list

14     so that that would facility her ability to do that.

15          MR. ROGERS:  Great.  Thank you.

16          THE COURT:  Very well.  I will also

17     instruct the jury at that time that I have -- that my

18     direction to Ms. Morehead is not only to read all of

19     the witnesses who might be called by either party, or

20     any of the parties, but also that she is to read a

21     list which is the largest possible universe of

22     witnesses, in other words, witnesses who might

23     conceivably be called at the trial, and that the

24     members of the jury should not draw any inferences,

25     if not all of those names are called because it is

```
 1            likely in most trials that most of the people who

 2            are -- not all the people, rather, who are listed are

 3            necessarily going to be called, and that's a decision

 4            that doesn't get made until the course of the trial,

 5            but I will ask that all possible witnesses be

 6            identified so we don't have a situation where

 7            somebody's next-door neighbor is a witness and we

 8            haven't read their name because we didn't think they

 9            were going to be called.

10                 Ms. Morehead?

11                      MS. MOREHEAD:  Judge, I try to do that.  As

12            you're aware, we have a number of cooperating

13            defendants as well as cooperating individuals who are

14            represented by counsel who will most likely be in

15            here at the same time, so I intend to advise the jury

16            of the names of attorneys.  That way, again, if,

17            let's say, Mr. Sandage's wife happens to be on the

18            jury and she has a different last name or -- you

19            know, I mean, I will include them.  They are not

20            obviously going to be witnesses, but they may be

21            coming in, and so I'll also mention them, and I would

22            invite counsel if there are any other individuals

23            like that that we might want to acquaint the jury

24            with that, I would be happy to include those as well.

25                      THE COURT:  Without objection that is the
```

1      way in which we will proceed.

2           Once I have finished with my portion of the voir

3      dire examination, I will give the government 30

4      minutes to follow up on my examination by

5      individually asking questions to the jury, and I will

6      give the eight defendants, if that be the number that

7      goes to trial, a total of two hours for yourselves to

8      question the prospective jurors, and that's a

9      maximum.  There will be a time clock put on the

10     government and on the defendants.  I can either tell

11     you that that's 15 minutes apiece, or I can allow you

12     to divide that time up amongst yourselves.  There may

13     be some reasons that you could think of that would

14     cause some of you to feel like you want more and some

15     of you to want less time.  I would invite defense

16     counsel to get your heads together and see if there

17     is any accommodation that you would like to make in

18     terms of that amount of time, but once we start on

19     Tuesday, unless you've called it back to my attention

20     that you have been unable to reach agreement among

21     yourselves about how things are going to work, I will

22     put two hours up on the clock for the defense, and

23     when two hours are up, two hours are up.  So if you

24     cannot work it out among yourselves, you should call

25     back to us; we will get you in here; and I will

1    resolve it for you in some way or another.  But it

2    does break down into approximately 15 minutes apiece.

3    As I say, for some of you, you may not want that much

4    time; for others, you may want more.  So I suggest

5    that you visit about that.

6         I'm not going to set aside any additional time

7    for the government to follow up on that, but under

8    the somewhat unusual circumstances of such a lengthy

9    period for the defendants, should something be

10   uncovered in the course of the defendants' two hours

11   of examination that the government feels for good

12   cause should allow the government some further

13   inquiry, you should simply call that to my attention,

14   Ms. Morehead.  I'm not suggesting I would permit it.

15   I certainly wouldn't permit it just because it was

16   something that, oh, gosh, that would have been a nice

17   thing to ask, but if there is something there that is

18   compelling enough that I might say should not have

19   necessarily have been anticipated by the government

20   but has come up in the course of the two hours set

21   aside for the defendants, I would entertain a request

22   by the government for some additional follow up and

23   we would see where that leads us.  I don't anticipate

24   that happening.  I just want to make sure that that's

25   understood, that that's a possibility.

1          Now, during my questioning of the jurors as well

2     as during counsel's questioning of the jurors, I will

3     invite the jurors to request to approach the bench to

4     address counsel and the court out of the hearing of

5     the other jurors if they have matters about which

6     they wish to keep their confidence.  I will, among

7     other things, ask about people who have been in

8     trouble with the law.  I will ask things about

9     strongly held views about alleged trafficking.

10    Sometimes that brings responses from people who may

11    have had family members who have had some problems

12    and they don't want to talk about those, or whatever

13    it might happen to be, and I will not hesitate to

14    bring people to the bench to talk, and counsel will

15    be invited to join us, of course.  I don't want you

16    to get the wrong impression.  I'm not encouraging,

17    nor intending to engage in, individual voir dire of

18    each juror at the bench, but should that be prudent

19    as to any particular juror or any particular matter,

20    I won't hesitate to do it myself.  More important

21    than that, if I don't call somebody up and you see

22    some reason why you think I ought to call them up to

23    talk at the bench, don't hesitate to simply stand up

24    ask leave to approach counsel, come on up, and

25    explain to me that you think we should individually

1    interrogate a particular person, whatever the reason

2    might happen to be, including, perhaps, you have been

3    noticing that juror and that juror's behavior is odd

4    and you're afraid that juror might say something

5    which might pollute the whole panel, or whatever it

6    might happen to be.  I might not have picked up on

7    that.  Maybe you have.  I invite you to call it to my

8    attention.

9        Of course, during your portion of the voir dire

10   examination, counsel, it is not a time to argue the

11   case.  I know all of you are experienced trial

12   lawyers.  As such, I know that you know that any time

13   you can argue and try to get the jury on your side of

14   the case, that's something that is in your client's

15   interest to do it.  When I was a lawyer, that's what

16   I did.  But I'm the judge, and I'm telling you don't

17   do it or else I'll make a point of reminding you that

18   that's not really the thing you're supposed to be

19   doing during the voir dire examination.  So please

20   keep that in mind, that the purpose of the voir dire

21   examination is to find out information to inform the

22   court on cause challenges and inform counsel for

23   peremptory challenges as well.  So please keep that

24   in mind.

25       With regard to cause challenges, if at any time

1      during the examination of the prospective jurors you

2      believe something has occurred which gives rise to a

3      cause challenge, you should simply follow this

4      procedure.  Stand up, ask leave to approach the

5      bench.  We will put on -- upstairs as well as here we

6      have this annoying noise which makes it difficult for

7      the jury to hear, and we will talk about the cause

8      challenge at the bench.  I'll let people be heard at

9      that time, and I'll make a ruling on it.  I do not

10     want you to feel that you have to, nor do I think you

11     should, make your cause challenge in open court in

12     front of the juror affected, or any of the other

13     jurors, for that matter.  I want you to do it at the

14     bench to maintain the whole atmosphere of objectivity

15     here that should be involved and not cause some juror

16     to have some hurt feelings, especially if he or she

17     doesn't get stricken for cause and you have been the

18     one who perhaps singled them out for some point.

19          Once we have finished, all of the questioning

20     that's been done and the time clock has run out, if

21     you haven't made your challenge for cause at that

22     point, you'll sort of have one last chance, because I

23     will ask at that point, beginning with the

24     government, and then going -- as I will with

25     everything throughout the trial, beginning in order

1          of the prosecution, so therefore beginning with

2          Mr. Wesley, I will ask each counsel whether you pass

3          the jury for cause.  That is your final opportunity

4          if you have a cause challenge.  If you let it go

5          there, well, forever hold your peace, as the old

6          saying goes.  You have waived your cause challenge.

7               After then the cause challenges have been dealt

8          with, if any, Ms. Scheurer will circulate between the

9          counsel tables to take care of the peremptory

10         challenges.  The defendants will exercise the

11         peremptory challenges collectively.  I see no reason

12         why that should not be the case here, for you to

13         exercise those collectively.  Again I invite you, if

14         you wish, to get together among yourselves.  If you

15         want to make some allocation among yourselves about

16         how you would like to deal with that, so be it, but

17         otherwise I will look to your collective judgment to

18         exercise the peremptory challenges on behalf of the

19         defendants.

20              I have followed that procedure in multidefendant

21         cases in the past.  I have never had difficulty with

22         that.  And even in cases where there were very much

23         differences in interests, we have been able to figure

24         out some accommodation by the lawyers talking to each

25         other and making some allocation.  And, again, I

1    would invite you, if you want to do that, so be it,

2    but I will look to you to exercise those, and that

3    will include the one peremptory challenges to each

4    side for the alternates.

5        At the conclusion of the peremptory challenges,

6    once those have all been made, I will then ask if

7    there are any objections to the peremptory

8    challenges.  That is the point at which it would be

9    appropriate to make any Batson challenge.  It's my

10   view that it's premature to make a Batson challenge

11   until all of the peremptories have been exercised,

12   but once they have been exercised, that would be the

13   point in time, if you believe you have a Batson

14   challenge, to make it.  My procedure then would be to

15   call counsel to the bench.  I would hear from the

16   objector first, indicating what the prima facie basis

17   for your challenge is.  I would then hear from the

18   other side concerning the legitimate,

19   nondiscriminatory reason for the making of the

20   strike, and finally I would hear from the objector

21   concerning why you believe that's pretextural or

22   otherwise believe that, in fact, the strike was made

23   for an impermissible reason, and then I will rule on

24   that at the bench.  Again, if you fail, of course, to

25   make any objection based upon Batson, you will have

1    waived that particular objection.  That will leave us

2    then with a total of 12 jurors and two alternates,

3    which is what we will try the case with.

4        That completes my description of the jury

5    selection process.  Any questions about that before I

6    move to the next phase?

7                MR. ROGERS:  Just a couple.  With regard to

8    the number of prospective jurors who show up

9    upstairs, are you going to make allowance for

10   potential challenges for cause and have extra jurors

11   standing by?

12               THE COURT:  I think that's a pretty good

13   idea, don't you, Mr. Rogers?

14               MR. ROGERS:  I do.  That's why I was taken

15   aback when you said there would be --

16               THE COURT:  Sixty will show up, There will

17   be 28 plus four will be called into the courtroom and

18   qualified for cause.

19               MR. ROGERS:  I understand.  Thank you.

20   With regard to the peremptory challenges, they will

21   be done alternately?

22               THE COURT:  Yes.  Mr. Rosenthal?

23               MR. ROSENTHAL:  Your Honor, obviously,

24   you've given this a great deal of thought and try

25   many cases.  I don't know whether or not you

```
1        entertained -- you couldn't have done so because we
2        didn't make any motion, but a request for additional
3        peremptory challenges.  The way it appears to me
4        right now, it appears that we will probably have --
5        I'm not good at math, but if you divide eight into
6        ten, each counsel, if we were divided, you would --
7        we would have a little bit more than one challenge
8        each, per lawyer; whereas, the one lawyer on the
9        prosecution side has six.  So I don't know --
10                THE COURT:  First I will answer you by
11       saying, Mr. Rosenthal, you should have done this
12       before.  If you wanted to bring it to the court's
13       attention in advance, you should have filed a motion.
14       I only say that because that's what you said.  I
15       would not have done that here absent a showing before
16       today that there were such a divergence of interests
17       among the defendants that you could show to me that a
18       juror you thought would be good, the other defense
19       counsel would have because of the situation of the
20       clients some reason to think was bad.  In other
21       words, merely the fact that eight of you or some
22       smaller or larger number will have to collaborate on
23       making ten strikes is not enough in my opinion to
24       justify any additional peremptory challenges.  What
25       it would take would be a showing of some inherent
```

```
 1          conflicts that the parties have in their positions.

 2          If your client was pointing the finger at somebody

 3          else and somebody else was pointing the finger at

 4          him, I wouldn't make you share those challenges.

 5          That has not been called to my attention that that's

 6          the way this case is developing, so therefore that is

 7          my reasoning for not assigning any additional

 8          challenges even without any motion having been made

 9          by counsel.

10                  MR. ROSENTHAL:  Thank you very much.  I

11          appreciate the reasoning, and I understand the mere

12          number itself is probably not a factor to grant

13          the --

14                  THE COURT:  Right.

15                  MR. ROSENTHAL:  I know -- again, I'm sure

16          you've given this a lot of thought.  I feel like

17          someone who has been invited to someone's house and

18          you're about to sit down and you say, could we

19          rearrange the seating arrangement around the table so

20          it would be more to my liking?  That's not what I'm

21          going to ask, but I'm concerned about the shackling.

22          I've never had a trial where the defendants were

23          shackled, and I don't know, candidly, how it would

24          work.  I know there is some law on it out there.

25                  THE COURT:  We have done it on numerous
```

1     occasions, and by using the skirting and by bringing

2     the jury in and out at times when the defendants are

3     already seated, those two procedures are approved by

4     the Tenth Circuit and make that such that there is no

5     unfair prejudice to the defendants.  It simply is a

6     matter of necessity for security so we don't have 20

7     marshals sitting around the courtroom during the

8     entire trial.

9                 MR. ROSENTHAL:  I do -- I could either take

10    a long time and go through the reasons why there may

11    be problems and impose on everybody this time --

12    maybe I shouldn't do that.  Maybe I should register

13    my objection to it, and if I have anything else to

14    say, I'll tell you in writing.

15                THE COURT:  Obviously, if you want your

16    objection to be considered as anything more than

17    token, you need to give some explanation for it.

18                MR. ROSENTHAL:  I mean, I would.

19                THE COURT:  Now is the time to do it.

20                MR. ROSENTHAL:  Thank you.  Here is the

21    situation.  Jurors are very smart.  They figure out

22    exactly what is going on.  If the defendant is in

23    custody, even if he's not dressed in orange, I have

24    never had jurors think the defendant -- say at the

25    end of the case, oh, my gosh, he was in custody?  He

1    was dressed just like us.  I think it's going to take

2    them about two seconds to figure out that these guys

3    are shackled.  For example, when we introduce

4    ourselves, I mean, you rise when you talk, so people

5    are constantly standing up.  Well, everybody is going

6    to be standing up here except for the defendants, who

7    are in custody at the table, so I introduce Mr.

8    Wallace, Mr. Wallace can't stand up.

9              THE COURT:  I'll direct Ms. Morehead that

10   her case agents can't stand up either.

11             MR. ROSENTHAL:  Well, it --

12             THE COURT:  I don't think there will be any

13   inference that they are shackled, but I think Ms.

14   Morehead, Mr. McCue, and Mr. Jones are here.  I

15   assume they are probably your case agents.  Don't

16   stand up except when you're getting ready to go to

17   the witness stand, if necessary.

18             MR. ROSENTHAL:  I just don't think that

19   there's the same potential for the jurors to have

20   inferences against the government agents as they are

21   against the defendants in the case.  I think there's

22   a danger that the jurors will think these defendants

23   are shackled because of some particular reason.

24             THE COURT:  Do you have anything more than

25   speculation and conjecture and your concerns about

1    that to call to my attention?  If you do not, then I

2    understand your speculation and conjecture, but

3    that's not the basis on which I'm going to grant your

4    objection and do anything different in light of the

5    real necessity to be able to provide security for

6    everyone here, which is unable to be done without

7    manpower that simply is not available.

8              MR. ROSENTHAL:  I think there has to be a

9    factual showing made that on the facts of this

10   case -- again, mere numbers don't do it.

11             THE COURT:  I think the factual record in

12   this case is adequate to justify that, Mr. Rosenthal,

13   and I don't think I need to go into any more detail

14   about the allegations, particularly concerning your

15   client, in fact, along those lines in terms of

16   weapons and so forth.  Here is the point.  Unless

17   you've got something that indicates to me based upon

18   some law that you have from our circuit that the

19   procedure that I have directed is going to take place

20   should not take place, I've heard you, I've heard

21   your concerns, they are speculative, and I overrule

22   them.

23             MR. ROSENTHAL:  Okay.

24             THE COURT:  Thank you.  You may be seated.

25             MR. CALBI:  Your Honor, I'm asking for

1    guidance.  I'm not here to make an argument.  As far

2    as the shackling, I have always told my clients when

3    the jury comes into the room and when the judge comes

4    into the room that they need to stand.

5                  THE COURT:  They do not need to.

6                  MR. CALBI:  I just want to be clear that --

7                  THE COURT:  Again, I want the case agents

8    to follow the same protocol in front of the jury.  I

9    don't want you standing for respect of the jury or

10   respect of the court or anybody else.  I want the

11   jury to believe as much as possible that the protocol

12   is the lawyers get up but the civilians don't have to

13   and should not.

14                  MR. CALBI:  Just wanted to be clear on

15   that, Judge.

16                  MR. ROGERS:  Your Honor, I need to approach

17   the podium and make a record.  I want to join in

18   Mr. Rosenthal's objection, which the court has

19   already overruled, so I won't need to argue it any

20   further.  Secondly, I am assuming when you say

21   shackled you're talking about the way they are today.

22                  THE COURT:  Not handcuffs, but leg irons.

23                  MR. ROGERS:  How does that prevent them

24   from standing?  There's a skirted table.

25                  THE COURT:  They could if you wanted them

```
1          to, but I'm prepared to follow the protocol of nobody

2          stands so that nobody gets up and fumbles around or

3          clanks around because that's less likely to disclose

4          something that you might not want to have disclosed.

5                    MR. ROGERS:  Mr. Simpson, can you stand up

6          now?

7                    (Mr. Simpson stood up.)

8                    MR. ROGERS:  I don't hear a clank.  I would

9          prefer that they do stand and that everybody stands.

10         I agree with Mr. Rosenthal.  Nobody is going to be

11         misled by the fact that the agents don't stand.

12                   THE COURT:  I don't care if you all want

13         the defendants to stand.  I don't have any problem

14         with that, but it is my concern that someone might

15         more likely reveal that they have leg irons on if

16         they stand and clank around.  Now, I don't know that

17         that's going to happen, but it's relatively close

18         quarters here.  Movements could reveal something that

19         otherwise you might prefer wasn't revealed, so in my

20         view it's better not to have them stand.  If defense

21         counsel unanimously tell me, we would rather have our

22         defendants stand, I will defer to that because that

23         will have been a trial strategy decision that you all

24         have made that is in your best interests, and I would

25         defer to that.
```

1            MR. ROGERS:  I'll consult with defense

2       counsel about that when we have a chance, your Honor.

3            Secondly -- and this -- I understand that the

4       reason for the current seating arrangement is the

5       necessity of having the defendants behind the skirted

6       tables, but it's impossible to have a privileged

7       communication with your client when you're sitting

8       4 feet away across the table and there's people on

9       each side of both of you, and I had hoped to be

10      seated next to Mr. Simpson so we could have whispered

11      conversation, passed notes, he could view my computer

12      screen, things like that.

13            THE COURT:  Feel free at any time to get up

14      and go around and talk to Mr. Simpson.  You're not

15      prohibited from doing so at any time during the

16      trial.  You may visit with him at any length; you may

17      stand behind him, if you like, during the

18      proceedings.  We will accommodate you to make sure

19      that the limitations we have on size of courtrooms

20      does not inhibit your ability to defend your client

21      to the fullest, and don't feel that any sort of court

22      protocol or normal observance should prohibit you

23      from doing all you need to do to communicate with Mr.

24      Simpson during the trial.

25            MR. ROGERS:  Thank you, your Honor.  And,

```
1        lastly, this is actually back to square one, maybe,
2        with regard to the objection to shackling per se as
3        stated by Mr. Rosenthal.  On behalf of Mr. Simpson, I
4        would urge that -- I haven't done any research
5        because I had no idea this was coming, but I have
6        been involved in cases before where there was
7        shackling of defendants and where measures were taken
8        similar to skirting the tables, in fact, skirting the
9        tables and other security measures, and in those
10       cases -- one in this circuit, one in the Eighth
11       Circuit, one in the Seventh Circuit, and one that
12       never went to trial but was in the Ninth Circuit.  In
13       all of those cases there were individualized showings
14       made with regard to a particular defendant because it
15       was that defendant's presumption that he could appear
16       before the jury in an unfettered condition that was
17       being infringed.  I have seen no such showing with
18       regard to Mr. Simpson, that he would somehow be a
19       threat to the security of the court, and so therefore
20       I would object to him being shackled during this.
21            THE COURT:  Thank you, Mr. Rogers.  Your
22       objection is overruled.  Anything further?
23            MR. ROGERS:  That's all.  Thank you.
24            MR. JOHNSON:  Judge, will join in
25       Mr. Rosenthal's objection on shackling.  I think
```

1   asking us today whether or not we can state facts

2   that would give rise sufficient for this court to

3   sustain the objection, I think would be a little bit

4   difficult.  I think my concern is that something

5   happens during the course of the trial, a jiggling

6   chain or something like that, that says, now we do

7   have a basis for the objection, and we're coming up

8   after the fact and asking for relief, and we don't

9   want to do it twice.  I don't know if a mistrial

10  would be appropriate relief, but those are things

11  that may come up.

12      If I may say, Judge, there are devices that

13  balance security in the courtroom versus the person's

14  presumption of innocence.  There is a leg iron that

15  is worn under the clothing, a locking leg brace where

16  if the person takes off with any speed it locks so

17  they can't run, forces them to a straight leg

18  position.  That is what I have seen used as security

19  devices for-in custody defendants at trial.  I don't

20  know if the marshal's office has those types of

21  devices.  That would be my preference over something

22  that's actually exposed, which has the potential for

23  creating noise, which has the potential of being

24  seen.  So I think there's an alternative that will

25  satisfy all of the interests involved if the marshals

```
1        have those available.
2                     THE COURT:  I don't know who wishes to
3        speak on behalf of the marshals.
4                     DEPUTY MARSHAL:  If they would like to
5        provide eight of them for the rest of the defendants,
6        I would be happy to do that, or some electronic stun
7        device.  If you can get all the defense attorneys and
8        defendants to agree to that, we would be happy to do
9        that too.
10                    THE COURT:  I gather what you're saying is
11       we don't have that equipment.
12                    DEPUTY MARSHAL:  That's correct, Judge.
13                    THE COURT:  For the record, your objection
14       is overruled.  In case anybody wonders about this, I
15       might make clear I would not entertain a motion for a
16       mistrial because defendants jiggled their leg irons,
17       by the way.  That seems to me to be very subject to
18       manipulation if someone determines that they think
19       the case may not be going favorably for them.
20                    MR. JOHNSON:  I understand, Judge.  If it's
21       not Mr. Goodwin, it's someone else, I may not make
22       the objection, may just take it up when it becomes
23       ripe, but I understand that.
24                    THE COURT:  Mr. Bellemere?
25                    MR. BELLEMERE:  Judge, I have the least
```

1       amount of defense experience, but what would happen

2       if the court asked the jury in voir dire whether or

3       not somehow or another it was determined that one or

4       more of the defendants happened to be restrained in

5       the courtroom, would that somehow or another

6       influence their decision, would it affect their

7       judgment, their ability to reach a fair and --

8       somehow or another kind of address the thing?  It

9       seems like we're trying to skirt it, and I have to,

10      you know, give up to the guys that have done this all

11      this time, but what would be wrong with asking them a

12      voir dire question about it?

13                  THE COURT:  Mr. Rosenthal?

14                  MR. ROSENTHAL:  That's something that

15      occurred to me also, that it might be preferable.

16      There may be people who think that highlights it too

17      much.  I think that is a good subject for us to

18      discuss amongst ourselves and to try to reach some

19      kind of consensus.  I think the more honest you are

20      with the jury -- if you were to say, listen, I have

21      these guys shackled.  I don't want you to think it's

22      because this is a dangerous group of guys or we have

23      the Taliban here or something.  It's just I have to

24      be careful because I have responsibility for many

25      people.

1             THE COURT:  And it's a numbers thing.  If

2       we didn't have eight people, it might be a different

3       calculus, but we have a number of people, and there

4       are -- this is not a case involving alleged mortgage

5       fraud; this is a case involving allegations of drugs

6       and guns.  In other words, it is a case that has to

7       it inherently allegations or violence or threats of

8       violence and inherent danger that makes it different

9       from a white collar prosecution, for example.

10            I would be totally receptive to following up on

11       that particular request and asking that sort of

12       question during my portion of the voir dire if

13       counsel want me to do that.  I have no problem doing

14       that.  Can you today as you sit here, counsel, agree

15       that you would like me to pursue that in voir dire?

16             MR. ROSENTHAL:  I don't know that I could

17       think it all the way through for myself sitting here.

18       I think it's something we could talk about and give

19       you plenty of heads up.  I know you would want to

20       work out the language carefully and not do it on the

21       fly.  I can tell you've given a lot of thought to

22       this, and I don't want you to think that -- for

23       example, some of the things that you have done are

24       clearly the work of a judge who has tried cases and

25       knows what it's like to be sitting where we're

1   sitting.  I appreciate that very much.  I don't want

2   you to think that I'm just here to complain or that

3   I'm not grateful for --

4              THE COURT:  You're here to represent the

5   interests of your client here, is what I want you to

6   do.  I will ask a voir dire question if I have a

7   request made collectively on behalf of counsel given

8   to me, let's say, by close of business on Wednesday,

9   and I would invite you -- if you want to agree upon

10  proposed language, I would invite you to submit that

11  language to me.  And unless I feel that that language

12  is sort of unfairly advocacy-oriented -- in other

13  words, I probably wouldn't go so far as to say

14  something that would be, you know, arguing your case

15  for you, but as long as it's straight forward and

16  truthful about the circumstances, I would be

17  delighted to give an instruction that follows your

18  collective request.  If I haven't heard from you by

19  that time, I will decide that you all have decided

20  you don't think that's something in the best

21  interests of your clients to do.

22        Along those lines, another area I should have

23  mentioned before -- and I apologize for having

24  forgotten this.  This case obviously involves --

25  seven out of eight individuals who are being tried

1      are African American.  It is our experience that if

2      we have a handful of African American people on the

3      jury pool that would be what one would expect, maybe

4      anywhere from zero to half a dozen, simply because of

5      the way in which the jury selection process works.

6      That's a whole nothing matter.  But my point is this.

7      Sometimes lawyers would like the court to inquire

8      about the issue of race; sometimes lawyers would like

9      to inquire about it themselves; and sometimes lawyers

10     would like to not have the subject come up at all.

11     I, frankly, do think it's something that ought to be

12     addressed by the court or by counsel, but counsel

13     have individual views about whether you think it's

14     better to be addressed by the court or by the

15     lawyers.  What do you think about that, Mr. Calbi?

16     Do you have a view about that?

17             MR. CALBI:  I believe it should be brought

18     up, Judge, and I believe it should be something that

19     the court should do so this way neither side is kind

20     of skewing that point or something.  Some people may

21     be offended by the subject, and if it's brought up by

22     the court, I think it makes it a safer environment.

23             THE COURT:  Does any counsel object to it

24     being done by the court?  All right.  Then I will do

25     that.  I truly think that's the best way to do it,

```
 1            but I have had lawyers make the argument to me that

 2            they have their own approach to it.  So that's fine.

 3            I am happy to do it.

 4                 All right.  After we have the jury selected on

 5            Tuesday, we will retire for the day.  When we start

 6            the next day, on Wednesday, we will actually start

 7            with a brief reading of preliminary instructions by

 8            the court.  Those preliminary instructions will not

 9            deal with any of the substantive issues, the elements

10            of the alleged offenses or anything like that.  The

11            preliminary instructions will simply go back and

12            remind the jury of a few things about a criminal

13            prosecution: presumption of innocence, the right to

14            remain silent, some of those things, to keep

15            reinforcing those ideas that the court feels strongly

16            about, these constitutional rights, and also talking

17            to them a little bit about their role as jurors,

18            again, somewhat reinforcing the admonition that they

19            will get before we break on Tuesday and just giving

20            them a heads up as to how the trial will unfold.  In

21            terms of the nature of those instructions, they are

22            brief, and they are relatively innocuous but

23            important in the sense that they underscore some

24            issues like that.  When that's completed, then I will

25            turn to opening statement, and I will allocate an
```

```
1      hour to the government, and I'll allocate two hours
2      to be divided by agreement among the defendants.
3      And, again, if you all are unable to reach some
4      conclusion about this, about how you're going to
5      allocate the opening, I'm going to put two hours up
6      on the clock and let you have at it, but I would hope
7      that you might be able to get your heads together and
8      let me know how you would like to do it, and I would
9      be more than happy to have you say that you have
10     agreed that -- I'm being totally hypothetical now --
11     that Mr. Wesley, who gets to go first, gets 20
12     minutes, and Mr. Simpson gets ten minutes, and
13     Mr. Wallace gets 15, whatever it might happen to be.
14     And I am not suggesting those are even relevant
15     times, but I'm giving you that purely by example.  If
16     you would put that in something that you submit to
17     the court, then we will follow that and we will put
18     that up on the clock so you have individual timing to
19     do that because I am concerned -- I don't want
20     Mr. Goodwin to be left with 30 seconds on the clock
21     because everybody else has been too windy.  And we
22     would have to address that, but my hope is that you
23     all will get your heads together and figure out some
24     appropriate allocation among yourselves, submit it to
25     us, and we will follow it and do it that way.
```

1          MR. CALBI:  Your Honor, on that point,

2     before we move on, can the defense counsel, speaking

3     hypothetically, agree to perhaps go in a different

4     order than we're in?  We don't have to always follow

5     this same --

6          THE COURT:  Thank you for raising that.

7     The order of indictment is the default way in which

8     we're going to proceed.  I have, again, no objection

9     to you all coming up with a different approach as

10    long as it's something that you tell me how you want

11    to do it.  You can do it in terms of the order of

12    either voir dire or opening statement or examining a

13    witness.  There may be a particular witness, for

14    example, in which it simply makes sense that a

15    particular lawyer is going to take the lead on that

16    witness, and there's really no reason for me to run

17    through seven names until I get to the guy who is

18    really going to be the one who has the laboring oar.

19    So what you should do -- I am looking at you,

20    Mr. Calbi, because you are the lead off batter.  I

21    don't want to impose any responsibilities on you that

22    are not sort of part of the charge you accepted by

23    being on this case, but you might take it upon

24    yourself to help me with this by virtue of letting us

25    know, on this witness they said they are going to

```
1   call, this one, somebody else, Mr. Bellemere, is

2   going to be the lead person.  So I'll call on him

3   immediately, and I will ask everybody else if you

4   have questions.  I'm perfectly amenable to doing

5   that.  That's how I've done it in the past, and I'm

6   happy to do it that way here.  Mr. Bellemere?

7           MR. BELLEMERE:  Excuse me, Judge.  In my

8   experience sometimes defendants waive their opening

9   argument and do it at the close of the government's

10  case.  If that were something that had be

11  considered -- does that occur in federal court?

12          THE COURT:  It is permissible.  You may do

13  that.  You may reserve your opening.  You might want

14  to talk to other counsel about whether that's a good

15  idea or not and as to what the timing might be.  I

16  don't presume to give you advice about a good way or

17  bad way to do it, but it is permissible to do it that

18  way, if you choose.

19          MR. BELLEMERE:  If that occurs, does the

20  court -- if the court was aware of that, does the

21  court somehow or another instruct the jury that

22  counsel for so-and-so has reserved his opening and

23  will give it at a different --

24          THE COURT:  And understand this, of course,

25  that you only have reserved your right to make your
```

```
1       opening statement until later if, in fact, you're
2       going to put on evidence in a case-in-chief yourself.
3                   MR. BELLEMERE:  Right.
4                   THE COURT:  In other words, if ultimately
5       your client were not going to testify and your client
6       were not going to put on any evidence, you would not
7       have the right to get up and make some statement
8       later simply because you reserved your right to begin
9       with; it would only be that you would reserve that
10      right and you would have that right to make a
11      statement before putting on evidence on
12      Mr. McDaniel's behalf.  Have I communicated --
13                  MR. BELLEMERE:  I understand that.  Thank
14      you.  It's a good refresher for me.  Anyway, it's
15      acceptable?
16                  THE COURT:  Surely.
17                  MR. BELL:  Judge, I believe you indicated
18      that you won't be here on May 1; is that correct?
19                  THE COURT:  That's correct.
20                  MR. BELL:  If the trial spills over that
21      long, we can plan on not having court then?
22                  THE COURT:  Yes.
23                  MR. BELL:  Okay.  I canceled travel plans,
24      and I may be able to get them back.
25                  THE COURT:  And I apologize for not telling
```

```
 1            you earlier.
 2                      MR. JOHNSON:  Judge, may I ask, Ms.
 3     Morehead, she had been estimating four to six weeks,
 4     and I don't know if she's still anticipating four to
 5     six weeks for trial.  That will help manage all of
 6     our stuff that happen outside of this case that come
 7     up over the next month.
 8                      MS. MOREHEAD:  Judge, I wish had a crystal
 9     ball.  Many of these attorneys I have not had
10     experience with, so I don't know how long cross
11     examinations will take, and the like, so I don't want
12     to limit it any more than what I've already done.
13                      THE COURT:  You certainly have an estimate
14     of how long it would take with reasonable cross
15     examination.  Whether you get reasonable cross
16     examination or not, I don't know.
17                      MS. MOREHEAD:  I would hope we are closer
18     to four weeks, but I always underestimate, and
19     then --
20                      THE COURT:  No, you don't.  You don't
21     always underestimate, and I will help you accomplish
22     the shorter -- and I should say, with regard to cross
23     examination, while obviously everyone has the right
24     and the opportunity to make the points you need to
25     make in cross examination, I certainly will not
```

1          permit merely cumulative cross examination that does

2          nothing more than give you a little face time in

3          front of the jury.  You need to have something to ask

4          for your portion of the cross examination that

5          adds -- even if it's just as to your client.  But

6          keep that in mind, that I will be very -- I will

7          encourage you to not duplicate things and not simply

8          take up the jury's time unless you've got something

9          really to do.  I'm not worried about that being a

10         problem, counsel.  I simply want to throw that out so

11         you're aware that I'm thinking along those lines

12         because I am desirous of, first of all, having the

13         case tried in a way in which both sides, both the

14         government and the defendants, have an opportunity to

15         fairly and impartially air this dispute out, but I'm

16         also concerned that it not take any more time out of

17         the lives of 14 jurors than it otherwise would take,

18         and I don't think it's anybody's wish to string it

19         out.  I think sometimes jurors hold it against people

20         when it gets strung out, and I don't want that to

21         happen either.  Any other questions about the way in

22         which the trial itself will proceed?

23              MR. JOHNSON:  In regards to voir dire with

24         the jurors we bring into the courtroom, I assume once

25         they are struck for cause they will be excused from

1    the courtroom and another juror will take that

2    individual's place?

3              THE COURT:  Yes.

4              MR. JOHNSON:  When that new person comes

5    in, does the court reread all the questions that have

6    been covered by the panel that has already been

7    there?  I'm confused as to how that works

8    efficiently.

9              THE COURT:  The answer is no.  What I will

10   generally do is ask them, now, did you see and hear

11   the process up until now?  Were there any of the

12   questions that I asked to which you would have given

13   some response?  If I sense that the juror is tuned

14   in, then I may take that answer at face value.  If I

15   sense the juror needs a little help, I will say, for

16   example, the question about knowing the lawyers or

17   knowing anything about the case or prior brushes with

18   the law, or whatever it might happen to be.  I'll go

19   back and give refreshers that would help, depending

20   where we are in the process.

21       If someone is excused -- I will deal with the

22   excuses for scheduling conflicts right up front

23   because that's probably -- in my experience that has

24   been where the most attrition occurs.  True for-cause

25   challenges are less likely in my experience than

1    people who need to be excused because of scheduling

2    conflicts, so we will address that at the very front

3    so we don't have too much replowing to do.

4                MR. JOHNSON:  The 30 or so jurors that are

5    not yet put on the venire panel, are they watching

6    via closed circuit?

7                THE COURT:  No.  They will be in the

8    courtroom.

9                MR. JOHNSON:  They will be, just not

10   questioned?

11               THE COURT:  That's correct.  They will be

12   seated in the spectator gallery on the west side of

13   that courtroom that's directly upstairs, which is

14   directly adjacent to the jury box, and where the

15   chairs will be, again, I wish -- I maybe should have

16   held this conference upstairs so you could have seen

17   that, but I wanted to have you see what the trial

18   arrangement was going to be like more so than the

19   voir dire arrangement, and Ms. Scheurer can show you

20   that later so you can see it.

21               MR. JOHNSON:  That answers my question.

22   Thank you, Judge.

23               MR. CALBI:  Your Honor, you mentioned

24   scheduling conflicts, and I'm sure the court has

25   thought of this, but the first Thursday and Friday of

```
1          the week of trial is Holy Thursday and Good Friday,

2          and, you know, that may be a potential conflict for

3          the jurors.  And I know how jury selection goes.

4          Though we don't like to admit it, if they want to try

5          to get out, they may jump on that bandwagon, and I

6          didn't know how the court was going to approach that.

7                    THE COURT:  Generally speaking, I would be

8          hard pressed, because of the variety of schedules

9          that are available to people for religious

10         observances, unless they showed to me a

11         particularized necessity for attending at a certain

12         time that would preclude them from a Friday evening,

13         or Thursday evening, of course, would be typically

14         the Easter service, I would be unlikely to excuse a

15         juror because it happens to be Good Friday, or

16         whatever it might happen to be.  I hate making

17         statements that aren't at least qualified, but I

18         would have to hear what somebody had to say.  If

19         Father O'Malley has to do a mass that morning, it may

20         be different than somebody who could go to church

21         later on in the evening.  Mr. Rosenthal?

22                    MR. ROSENTHAL:  This might help us in

23         allocating our time.  What will you be asking during

24         your questioning?  Is it the typical series of prior

25         jury service? know anybody in law enforcement? where
```

```
1          do you live? what do you do? what does husband or

2          wife do?

3                    THE COURT:  Yes.  Each of the jurors will

4          go through and be shown a questionnaire that they

5          will -- ten or 11 questions that they will answer,

6          but I suspect that there are few questions that

7          aren't just totally case specific that I won't be

8          asking.  There may be some case-specific thing

9          that -- obviously, I'm not tuned in to your case like

10         you are, and so I might not think of that.  But I

11         will certainly ask them questions about their

12         understanding of the burden of proof, about whether

13         they think that's too great a burden for the

14         government, and ask their understanding about the

15         presumption of innocence and the necessity to vote

16         not guilty at this stage, and I will take them

17         through those kinds of things as well as the matters

18         about who they know and what they know and what their

19         past experiences have been.

20                   MR. ROSENTHAL:  Thank you.  I always

21         appreciate not having to do voir dire, actually.

22                   THE COURT:  Hopefully -- again, all you

23         will need to do, hopefully, if I get it close to

24         right, is go in there and follow up.  I may not

25         follow up on everybody.  I'll try to, but I might
```

1    miss something you thought was important that ought

2    to be followed up on.  Great.  That's why you've got

3    some time to do it.

4        In addition, there may be something about your

5    particular client's situation that I wasn't thinking

6    about, so you will have that opportunity, but I don't

7    want you to go back and duplicate what I've tried to

8    do about the general stuff, and I will probably

9    communicate my frustration if people were to do that.

10            MR. ROSENTHAL:  Understood.

11            THE COURT:  Any other questions about how

12    the trial itself will unfold?  Mr. Rogers?

13            MR. ROGERS:  I may be perseverating on this

14    shackling issue, but it occurred to me during some

15    remarks made by Mr. Bellemere, what if the court's

16    response, I guess, to the remarks made by

17    Mr. Bellemere, what if an in-custody defendant elects

18    to testify, and how would that be handled with regard

19    to the shackling?

20            THE COURT:  Mr. Rogers, obviously, what

21    happens there is we, outside the presence of the

22    jury, make sure that that particular individual is

23    put in a position where he -- and it is all males

24    that are in custody here -- will be relieved of any

25    impediments to walking to the jury box.

 1                    MR. ROGERS:  Thank you.

 2                    THE COURT:  That's a totally appropriate

 3          question.  I don't mean to suggest it isn't, but of

 4          course that's how it's done.

 5                    MR. JOHNSON:  One final question.  And

 6          maybe this is self-evident.  When we have bench

 7          conference to discuss matters outside the presence of

 8          the jury, I know you have a white noise machine, but

 9          how will all of us gather around so everyone can hear

10          us whispering objections and hear the court's

11          rulings?  I think we have enough people for a

12          football team gathered in a small spot for this

13          conversation.

14                    THE COURT:  We will make it work, Mr.

15          Johnson.  If I find it isn't, I will make alternative

16          steps, but we will make it work.

17               One other thing lest I forget, and now I have

18          forgotten.  So Mr. Rosenthal -- I don't remember what

19          I was going to say.  Go ahead.

20                    MR. ROSENTHAL:  Your Honor, I was going to

21          ask if it's possible to get some relief from having

22          these materials in the U.S. Attorney's Office and us

23          being able to view them only there on the general

24          instructions they give us when we go there.  Say we

25          walk in the U.S. Attorneys' Office.  They want to

```
 1            know how long we are there, and they ask us to put

 2            our initials on each page after we have reviewed it,

 3            which I have not done and I won't do.  I don't think

 4            it's any of their business.  I think that if there

 5            was a habeas later on, the client waived the

 6            privilege, then they might be able to ask those

 7            questions, but I don't think that under any

 8            circumstances, whether we review it in their office

 9            or not, that they are entitled to know that, or know

10            the substance of that information.

11                But I think as a practical matter during trial,

12            during business hours we're here in court, and we

13            keep long hours at night, at least I do, and I'm sure

14            every trial lawyer I know does.  Generally during

15            trial you don't get a lot of sleep.  This may be the

16            one trial where there is some sleep because the

17            materials are in the United States Attorney's Office.

18            And I guess they don't run it like a diner; it's not

19            open 24 hours a day.  So I am wondering if we can get

20            some relief from that.  I think there are protective

21            orders and less restrictive alternatives.

22                        THE COURT:  I have invited you previously,

23            Mr. Rosenthal, that if there is a specific matter,

24            specific document, a specific article, a specific

25            something, that you do not have that you believe is
```

1     something you need to have in your possession and the

2     U.S. Attorney's Office is not giving you under their

3     general policy to call that to my attention.  Here is

4     my view of that.  Until you show me something

5     specific, generalities aren't going to get anyplace,

6     but I will listen to specifics.  Otherwise, you are

7     entitled, of course, to copies of things to which you

8     are entitled to copies.

9               MR. ROSENTHAL:  Right.

10              THE COURT:  But that's relatively limited

11    under Rule 16 and the Supreme Court's case law as to

12    those things you're entitled to copies of.  In

13    addition, as the trial goes forward, the Jencks Act

14    provides you some additional protections if the

15    government doesn't give you disclosures or copies of

16    things sooner.  Otherwise, the matters that the

17    government has allowed you to see are all matters

18    which you are not otherwise as a matter of right

19    entitled to see.  You are seeing it because the

20    government thinks it's in their best interests to

21    have you be acquainted with as much of the case as

22    possible, in other words, I suppose to persuade you

23    to give your client some advice about how to deal

24    with the case.  It's either out the goodness of the

25    government's heart or, realistically, for the reason

1          I just said, but they are doing it because they

2     perceive that they want to let you have access to

3     that.  Therefore, they can give you access on

4     whatever terms they dictate.  It's their information

5     that they don't have to give you.  If you can come

6     forward with a specific showing that indicates this

7     document, this article, this whatever it is, is

8     something to which I am entitled to possess and the

9     government won't agree with you about that, call it

10    to the court's attention.  I invited that previously,

11    and no such specific request has been made, so

12    therefore I assume none has been able to be

13    articulated, but that rule would go on during trial.

14    Otherwise, the government is entitled to deal with

15    the material the way they best see fit.

16          MR. ROSENTHAL:  I agree with you that

17    there's a distinction, where the government is

18    essentially availing themselves voluntarily of

19    disclosures, that they can do it on their terms or

20    not do it at all, but I think once we are in trial

21    it's different under the Jencks Act.  For example, I

22    was looking at it the other day.  You probably know

23    the answer to this better than do.  The way I read

24    the Jencks Act was that we were entitled to copies

25    after the witness has testified.

1              THE COURT:  Absolutely.

2              MR. ROSENTHAL:  So I --

3              THE COURT:  I hope the government will give

4         you copies beforehand, but you're entitled to them

5         afterwards.  There's no question about that.

6              MS. MOREHEAD:  Judge, the way we have

7         addressed this before in similar cases, while they,

8         pretrial, can come in and review the materials in our

9         office, we will be providing those same documents in

10        court every day.  They will be here in court for

11        review.  However, as previously indicated -- and I

12        thought we addressed this at the last hearing -- we

13        will collect those at the end of the day and retain

14        those.  Those are CI debriefs, cooperating defendant

15        interviews, plea agreements which have previously

16        been sealed, and the like.  And I know, Judge, you're

17        aware because it happened in this court.  We had that

18        set up before, and what ended up happening were some

19        of those materials ended up at CCA, and by

20        maintaining those here in the courtroom and

21        maintaining those --

22             THE COURT:  You are obligated to provide

23        copies as the law requires you to do it.  Beyond

24        that -- and I'm speaking to you, Ms. Morehead -- you

25        are entitled to give copies or not as you see fit,

```
 1              but as to those things which you are obligated to

 2              turn over, including statements under the Jencks Act,

 3              when a witness has testified, obviously, you're

 4              obligated to do that.  I believe it expedites the

 5              trial process, however, if you make disclosure of

 6              those documents before rather than after the witness

 7              has testified, and my experience with you has been in

 8              the past that you have, in fact, provided that

 9              information before rather than after the witness has

10              testified so that it does expedite matters, and I

11              would hope that that's what you will do here as well.

12                      MS. MOREHEAD:  That's what I've done,

13              Judge, and I'll do that throughout the trial as well.

14                      MR. ROSENTHAL:  I wanted to have a clear

15              understanding.  I heard two different things from Ms.

16              Morehead, or I understood two different things.  She

17              probably said one thing.  She said that they are

18              going to be materials that will be available to us in

19              the courtroom but we can't leave with them at the end

20              of the day.  And she's probably within her rights to

21              say that prior to the witness having testified under

22              the Jencks Act.  Once the witness has testified under

23              the Jencks Act, then our Jencks material, the way I

24              see it, we can walk out of the courtroom with that.

25                      THE COURT:  Absolutely.  And she's not said
```

1    anything differently.  And, more importantly, I don't

2    care what she says.  I'm telling you that you're

3    entitled to it.  But that's not different from what

4    she's saying.

5              MR. ROSENTHAL:  I wanted to be sure about

6    that.  I'll agree to any kind of protective order

7    that -- I don't want anybody to be in danger.  I

8    don't want this stuff floating around CCA.  I'll

9    agree to any kind of protective order that's

10   reasonable.

11             THE COURT:  Talk to Ms. Morehead.  I've

12   told you what the ground rules are.  She's not

13   obligated to give you copies.  I'm not going to make

14   her.  If you come to some arrangement and you want to

15   submit an agreed-upon protective order to me, I'm

16   happy to entertain that.

17             MS. MOREHEAD:  Judge, I thought at our last

18   hearing that was the protective order that you

19   imposed about that material.  We made concessions;

20   they made concessions; and I believe the court

21   adopted that.

22             THE COURT:  I understand.

23             MS. MOREHEAD:  That's what I'm operating

24   under in good faith that we addressed at the last

25   court hearing, so I intend to abide by that.

```
 1              THE COURT:  Very well.

 2              MR. ROSENTHAL:  Me too.

 3              THE COURT:  The last thing I want to touch

 4        on with regard to the trial itself is that, with

 5        regard to each of the defendants that go to trial, I

 6        will make specific inquiry after the government's

 7        case-in-chief is closed.  And assuming I haven't

 8        granted a Rule 29 motion in favor of that defendant,

 9        I will ascertain whether or not each individual

10        defendant, first of all, wishes to testify or not to

11        testify.  I will then make an individualized record

12        as to each defendant regardless of which the decision

13        is to make sure that the defendants all understand

14        what their constitutional right are, both the right

15        to remain silent, which, of course, I think most of

16        us recognize almost from pop culture as being there,

17        but also that they have a right to testify, if they

18        want to, and that that's their decision and not the

19        lawyer's, if they decide they are not going to

20        testify and give up their right to not testify, that

21        that's a decision they have made, not the decision

22        the lawyer has made for them.  So I will make that

23        individualized inquiry with each defendant before we

24        move through that phase of the proceeding.

25              I think you probably understand that in today's
```

1          world most judges do instruct before closing

2          argument.  When I first came on the bench, there were

3          judges -- it was much more common for judges to

4          instruct in federal court after closing argument.  I

5          instruct before closing argument, and I will invite

6          you to use the court's instructions in your closing

7          arguments.

8               I don't feel the need to tell anybody how to try

9          a case, but I will pass on this observation.  It has

10         been my experience that jurors in this courtroom at

11         least have been most persuaded by closing arguments

12         that are tied to the instructions.  Jurors by nature,

13         of course, see the court, appropriately so, I hope,

14         as a neutral who is giving them advice about what the

15         law is, or instructions on what the law is, that is

16         not slanted to either side.  Therefore, they are very

17         concerned about what the judge has said about the

18         case.  And, therefore, when the lawyers can take

19         those instructions and say, remember, the judge said

20         this is what had to happen, or, this is what the

21         rules of the road are, now, remember when a certain

22         witness testified, or, remember this, or, remember

23         that, and tie it to those instructions, that's very,

24         very effective with jurors.  So I invite you, when

25         the time comes, to use the instructions as part of

1    your closing arguments.  I think it is a helpful

2    thing to do.  That is why I instruct before closing

3    argument.  I will go into more detail about how I do

4    closing and instructions later.  There's no reason to

5    belabor that now.  That's one aspect.

6         The other aspect is that I will have copies for

7    the jurors to read along with me, so they will have

8    those to follow as we read along with them.

9         With regard to proposed instructions, you don't

10   need to feel obligated to submit the boilerplate

11   instructions that you would expect to be given, like

12   first thing you do is pick a foreperson or something

13   like that.  What I am looking for by way of proposed

14   instructions are instructions that are specific to

15   what this case is about, the elements, how you

16   think -- what you think about the elements.  Maybe

17   you agree with the government.  Maybe the elements

18   aren't much in question.  This case isn't novel in

19   terms of the legal theory, generally.  There may be

20   some point that you think is important, some

21   instruction about how jurors should view cooperators

22   or that sort of thing.  And, of course, the court has

23   instructions on those, but I invite you to look at

24   those kinds of things when you submit instructions

25   and feel free to submit proposed instructions on

```
1        those kinds of issues where you think it is

2        particularized to your case.  And I don't care if you

3        want to file a complete set of instructions.  That's

4        fine.  But you don't need to.  I'm likely to build my

5        own instructions based around the kinds of things I

6        normally say about the routine matters, like first

7        thing you do is select a foreperson and that kind of

8        thing, but I solicit your help on issues you think

9        are at issue in the case, such as the elements and

10       any defenses or particularized issues about

11       credibility of witnesses and the like.  I have a few

12       other things to go through on procedure and rules of

13       the road.  Let me touch on those now.

14            With regard to counsel, I would ask you at any

15       time that you make an objection during trial, and

16       most specifically an objection to a question asked in

17       examination, to stand to make the objection.  I do

18       that not as a matter of protocol but rather for some

19       practical reasons.

20            First of all, it's very helpful to the court

21       reporter.  Obviously, there are multiple participants

22       here, and her being able to see as well as hear

23       somebody assists her greatly in making a record, and

24       I don't know about you, but I want to keep the court

25       reporter happy, so stand to make an objection.
```

1          Second of all -- and this is really substantive.

2     If I see motion, counsel rising during a question,

3     and see that there's an objection coming, I can help

4     you by instructing the witness not to answer until I

5     rule on the objection.  If you blurt something out

6     after the question is finished, which is the right

7     time to make the objection, once the question is

8     finished, the juror [sic] may blurt out an answer

9     before I have a chance to help you.  So as you see

10    the question unspooling and you know you're going to

11    object and you stand up, I can get in the process and

12    help.  That's primarily why I ask you to do that.

13         The third reason is not applicable in criminal

14    cases, but most lawyers don't try cases as much as

15    they take depositions, and in depositions people make

16    objections just to preserve them for the record all

17    the time, and sometimes at trial that's not good

18    strategy.  If you have to stop and think about it a

19    little bit by having to stand up, maybe you'll eat

20    that objection.  There are a lot of foundation

21    objections that might be sustained and the other side

22    might have to put on a little more foundation, but

23    when it all was over, what you've done is tell the

24    jury just how knowledgeable this witness really is,

25    and you might have been better off to eat that

1       foundation objection and argue ultimately to the

2       jury, how in the world does that person really know

3       all the things they claim to know?  We didn't hear

4       anything about their background or how they arrived

5       at the conclusion, etc.  So if you have to stop and

6       think about it maybe, sometimes you'll not make an

7       objection that in retrospect would have been a good

8       one to hold.

9          Second -- this is merely a matter of personal

10      annoyance that is left over from my lawyering days --

11      don't greet the witnesses.  It's perfectly fine for

12      you to introduce yourself to a witness if you think

13      they ought to know who you represent in all of this.

14      I don't have any problem with that.  But don't engage

15      in any sort of false, or even honest, camaraderie or

16      joviality or *bonne ami* here.  It encourages others to

17      do the same thing, and I don't like it, so don't do

18      it.

19              MR. ROSENTHAL:  Don't say good morning?

20              THE COURT:  Don't say good morning; right.

21              MR. ROSENTHAL:  Just go right to your

22      question.

23              THE COURT:  Officer Jones, I'm Harold

24      Rosenthal.  I represent Harold Wallace.  I would like

25      to ask you some questions.  That's fine.  But to say,

1    officer, are you having a good day today?  No, we

2    don't do that.

3              MR. ROSENTHAL:  How do you like this

4    weather?

5              THE COURT:  Right.  We don't need that.

6    Maybe things have changed.  When I tried cases, there

7    were lawyers that liked to do that, and I didn't like

8    it, so it's one of the few things I get to do here.

9    I can say you can't do that.  So please don't.

10             Back on a more serious thing.  If you need to

11   approach a witness to show that witness a document or

12   tangible object, or whatever it might happen to be,

13   you do not need to ask my leave to approach.  If it's

14   your practice to do so, fine.  Of course, that is the

15   standard practice most lawyers engage in, but you do

16   not need to do so.  You don't need to worry about me

17   jumping you if you don't ask leave to approach.  If

18   you're going up to that -- you're examining a witness

19   or cross examining a witness and you're asking them

20   to do something and they can't figure out what it is,

21   instead of standing there and trying to talk them

22   through it, I have no problem with your walking up

23   and saying, I mean, what does it say right there?

24   You don't need to ask my leave to approach.  Just do

25   it.  I have no problem with that whatsoever.  If I

1    think counsel is going up to the witness stand

2    because you think by you standing there that will

3    alter their answer somehow because of your physical

4    presence, I will detect that, or else counsel on the

5    other side will, and you'll be invited to go back to

6    the lectern.  But otherwise, no problem.

7        With regard to the lectern, you are not tied to

8    that.  At any time during your trying this case if

9    it's your practice to move about the courtroom in

10   jury selection or opening statement or examining

11   witnesses, feel free to do it with this exception.

12   Stay an arm's length from the jurors.  That's their

13   space.  Don't invade it.  I used to try cases with

14   people -- maybe I was a little guilty of this myself

15   too -- who wouldn't mind getting in the jury box with

16   the jurors to help them out a little bit, but don't

17   do that.  Respect their space.  But remember that the

18   microphone is in the lecturn if that's an issue for

19   you, and there's the proximity to the electronic

20   devices and so forth that you use to present

21   evidence.  But otherwise you're not going to have any

22   problem from me.

23       Any questions about any of those matters or any

24   other kinds of things that you wonder, gosh, might he

25   be irritated or call me on this if it happens at

1          trial?

2                    MR. JOHNSON:  I want to make sure I have

3          sufficient opportunity to consult with Mr. Goodwin

4          during the course of the trial.  I know visiting

5          hours at CCA, I think they shut down at 4:00 o'clock

6          or so.  With the practicality of him being

7          transported to CCA each morning and evening, there

8          may not be opportunities to see him there.  I don't

9          know what the court's policy is.  I don't know what

10         the marshal's policy is in terms of having them here

11         in sufficient time in the morning or leaving him here

12         with sufficient amount of time in the evening to

13         insure that we can brief and debrief for each day.  I

14         can't try this without him.

15                    THE COURT:  I think that's very reasonable,

16         and I think that's even more reasonable in light of

17         the fact that you're not sort of sitting right next

18         to him, necessarily, at all times during the trial.

19         Al Canter, who is our local supervisor in the

20         marshal's office, is here today.  Mr. Canter, I don't

21         know what your normal approach would be, but

22         particularly because of the need to restrict mobility

23         within the courtroom, I think it's important to have

24         availability of the defendants before and after trial

25         with sufficient time to allow communication.  What is

1    your take on how a reasonable timing would work?

2             DEPUTY MARSHAL:  They're normally here by

3    8:30.  I can get them here by 7:30.  Normally they

4    will leave, you know, whenever the court's done.  I

5    can hold them an hour after that.

6             THE COURT:  Okay.  I think 7:30 is probably

7    a little early.  If we had them here by 8:15?

8             DEPUTY MARSHAL:  8:00 o'clock would be

9    fine.

10            THE COURT:  8:00 o'clock?  Let's have the

11   individuals who are in custody here by eight, and if

12   we retain them for half an hour after court, would

13   that be adequate?

14            MR. JOHNSON:  I think typically it would

15   be, and if I need more time on an individual day, I

16   will let the court know.

17            DEPUTY MARSHAL:  They can come to me too if

18   they need more time.  We will work it out.

19            THE COURT:  My experience is that Deputy

20   Canter is here to serve the public, including

21   counsel, so he will try to work with you to

22   facilitate that as much as he can.

23            MR. JOHNSON:  And, Judge, I have not been

24   in the tank here.  I don't know how much space there

25   is.  If eight of us are trying to meet with our

```
 1          clients before or after court each day, I don't know
 2          if there's consultation space, but we can deal with
 3          that when we get to it?
 4                    THE COURT:  Mr. Canter will make it
 5          available to you in one way or another, so he will
 6          work out.
 7                    MR. JOHNSON:  Thank you.
 8                    THE COURT:  That's a very good point.  I
 9          appreciate your calling it to our attention.
10             Mr. Bell?
11                    MR. BELL:  When do you want us to submit
12          the proposed jury instructions and how would you like
13          it done?
14                    THE COURT:  The "when" is sometime before
15          I'm going to finalize my instructions now.  It
16          depends upon how much detail and how much
17          instructions.  In other words, something may not come
18          up until late in the presentation of evidence, and I
19          would understand.  If something comes up and you want
20          to submit something, that's great.  If this last week
21          before trial you're sitting there looking at the
22          elements and you're thinking a certain instruction
23          ought to be a certain way because that's how you're
24          contemplating trying the case, make a proposed
25          instruction at that point in time.  That won't
```

1       preclude you from making a subsequent request later

2       if something comes up or you don't think that --

3       something you hadn't thought of before.  So I'm

4       not -- I'm sure there's an order someplace that says

5       the proposed instructions are supposed to be filed by

6       such-and-such a date.  I don't care that much about

7       that as long as I get them in sufficient time to be

8       able to give you full and fair consideration for what

9       it is you're asking me to do.  So I'm more likely to

10      be able to accommodate you.  As far as the "how," you

11      know, there's two answers to that.  To protect

12      yourself and make a record, you probably should

13      submit them electronically, like you would any

14      pleading.  I think that will suffice here.  If I

15      think -- I'm not going to go further.  I'm building

16      too many "what ifs" in there.  That's probably

17      sufficient.

18              MR. BELL:  Thank you, Judge.

19              MR. ROSENTHAL:  Here's one practical

20      problem.  I understand the marshals have to allocate

21      people's housing and they have issues about room, but

22      Mr. Wallace was moved to Leavenworth city jail.

23      Visited him lasted night.  It was all fine.  People

24      were nice; plenty of time to talk; I brought my

25      computer in.  Very, very easy.  But there's one issue

1    as to breakfast, if I have this right, and breakfast

2    isn't served until 7:00 o'clock.  He's picked up at

3    six and then doesn't get fed.  Now, just keeping in

4    mind what you said before about Mr. Wallace,

5    forgetting about everything that happened outside the

6    courtroom, I have been with him in court a lot, and

7    he has always been a perfectly well-behaved person.

8              THE COURT:  He deserves to be fed before he

9    comes to trial.  I concur.

10              MR. ROSENTHAL:  He's not having a low blood

11    sugar attack, but I think that he --

12              THE COURT:  My remarks about Mr. Wallace

13    are not to be taken as conclusions about who Mr.

14    Wallace is or how he should be treated ultimately or

15    on creature comforts.  Beyond that, there is

16    sufficient reason to believe that the marshals' view

17    of security here is one which ought to be actualized.

18         Now, with regard to food and water, housing, Mr.

19    Wallace, of course, needs to be accommodated.

20         Mr. Canter, I assume we can figure out a way to

21    get breakfast for Mr. Wallace.

22              DEPUTY MARSHAL:  Yes, Judge.

23              THE COURT:  And thank you for drawing it to

24    our attention.

25              MR. ROSENTHAL:  And thank you for your

1    remarks.  I understand that, but it's important for

2    the defendant to understand.

3              THE COURT:  It is important for me to

4    communicate to all the nonlawyers involved on both

5    sides that, frankly, I don't care how this case comes

6    out.  I do not care if a defendant is convicted or

7    found not guilty.  I only care that both sides have a

8    full and fair be opportunity and that if, in fact, a

9    submissible case is made then the jury makes a

10   decision, whatever it might happen to be; and my job

11   is to facilitate it so that there's an opportunity

12   for both sides to have that full and fair

13   opportunity.  That's all I'm doing.  Sometimes I have

14   to make conclusions based upon allegations that give

15   rise to possibilities or probabilities, but that has

16   nothing to do with whether or not in the end somebody

17   is guilty or not guilty or other aspects of this

18   should take place.

19              MR. ROSENTHAL:  Thank you.

20              THE COURT:  Just a couple of other things

21   to clean up before we return to the motions in

22   limine, and I suggest we take a lunch break before we

23   take up the motions in limine, but these last two

24   things are as follows:

25        First of all, some of you may be more familiar

```
 1          than others with the judiciary's privacy policy and

 2          how that interacts with our CM/ECF, the online

 3          maintenance of court records.  Transcripts of

 4          proceedings are, like other things that we do in

 5          federal court, ultimately made a part of the

 6          electronic record accessible by those who have access

 7          through PACER to the court's electronic record

 8          system, meaning that ultimately if a transcript of

 9          this hearing today or the trial itself, or whatever,

10          is ordered for some purpose, such as an appeal, then

11          it will be made available to the public

12          electronically, and the privacy policy that the

13          judiciary has adopted will come into effect, meaning

14          that counsel will be given notice, and there's all

15          sorts of things to it.  I won't go through all the

16          details.  Counsel will be given notice and you'll

17          have the opportunity to make requests for redactions

18          from the transcript, and certain matters are by

19          definition redactable.  Those are things like minor

20          children's names or account numbers or some things

21          like that.

22              Here is my advice to you, however, going forward

23          with regard to this whole subject.  Keep in mind when

24          you ask questions at trial that you don't necessarily

25          have to draw out certain private or confidential
```

1    information unless it's truly relevant to the case.

2    For example, a given witness is called, and, of

3    course, the jury ought to know something about where

4    that witness is from.  Maybe the witness lives at 512

5    Maple Lane in Overland Park, Kansas, but that has

6    nothing to do with the facts of the case because

7    that's just -- that witness is here for some reason

8    that has nothing to do with that address.  Well,

9    there's no reason to inquire about the matter in a

10   way that would elicit an answer that would give the

11   full street address.  What's important is that this

12   is the Mary Jones who lives in Overland Park or the

13   Tom Smith who lives in Leavenworth, or whatever, as

14   opposed to the particular street address, so I would

15   ask counsel to keep that in mind when asking

16   questions, that you needn't elicit certain

17   information and worry that it's been made a matter of

18   the public record and ought to be some day taken out

19   of the record by some request to redact.

20        Finally, does either side wish to invoke Federal

21   Rule of Evidence 615, the rule excluding witnesses?

22            MR. JOHNSON:  Yes, your Honor.

23            THE COURT:  All right.  It's been invoked

24   by counsel for Mr. Goodwin and, of course, applies

25   across the board.

1          Let me tell you my understanding of the law in

2     the Tenth Circuit concerning Federal Rule of Evidence

3     615.  Not only, of course, does that mean that

4     witnesses other than the defendants themselves and

5     the case agents are not entitled to be in the

6     courtroom during the trial itself, but they also are

7     not entitled to communicate with one another about

8     their prospective testimony.  Until a witness has

9     been discharged by the court, or has been excused by

10    the court, that witness is not entitled to discuss

11    their testimony with anyone other than counsel.  Now,

12    they may discuss it with counsel.  Lawyers have an

13    obligation, obviously, to try to figure out what the

14    evidence is going to be, and anybody you can get to

15    talk to you, you're free to ask them what they are

16    going to say, and you are, of course, subject to

17    disciplinary rules and ethical restraints, and you

18    know you can ask witnesses what their testimony is,

19    but you can't tell them what their testimony is going

20    to be.  That's where the line gets drawn.

21         Lay people, whether they be government employees

22    or ordinary citizens, are not subject to those

23    constraints with the court.  Therefore, whether it be

24    family members, whether it be the case agents,

25    whether it be the defendants themselves, they are not

1     entitled to talk to other prospective witnesses about

2     their testimony once the trial begins.  That

3     communication must be done by the lawyers alone.  And

4     the Tenth Circuit's point is, the reason behind the

5     rule is, so that we do get as much as possible the

6     real perceptions of the witnesses and not testimony

7     that's been unduly shaded because they have been

8     talking about it with people who may have an interest

9     in what that testimony ought to be.  As I say, the

10    lawyers are under no restrictions other than your

11    ordinary ethical restrictions about what you can do

12    in communication.  This applies to others.  Any other

13    questions?  Mr. Rogers?

14              MR. ROGERS:  This is not a question, your

15    Honor.  Well, it is a question, I guess, with regard

16    to the motions in limine.  I'm just as hungry as

17    everybody else, but I have a matter scheduled at 2:00

18    o'clock this afternoon.  I'm wondering if I can argue

19    my motions in limine and be excused.

20              THE COURT:  I am under no need to stop, but

21    I want to make sure -- we have been going for two

22    hours straight, and, counsel, frankly, you perhaps

23    didn't allow enough time.  You maybe ought to try to

24    figure out how to deal with that, but I would

25    accommodate you, if you wish.

1          MS. MOREHEAD:  Could we just take a short

2     recess, Judge?  I don't know what we're doing, but we

3     have been going for --

4          THE COURT:  I think the motions in limine

5     are going to take -- we have had a pretty interesting

6     discussion here this morning, but the motions in

7     limine may take some 30 to 60 minutes to resolve, and

8     I'm perfectly happy to do that.  I've got other

9     matters on my calendar this afternoon as well, but I

10    think we need to address these things.  We have eight

11    individuals here who are in custody who need to be

12    processed.  That's not something you do in five

13    minutes.

14         Mr. Canter, if we took a break, what is a

15    reasonable time to have those in custody back with

16    us, having had the opportunity to attend to personal

17    matters?

18         MS. MOREHEAD:  Judge, there's only four

19    defendants that have motions in limine.  You

20    mentioned Mr. Rosenthal's would be for Friday, so

21    there's only Mr. Wesley, Mr. Simpson, Ms. Houff, and

22    Mr. McDaniel that have pending motions in limine.

23         THE COURT:  The others, of course, are

24    entitled to be here, and I have always thought I

25    would like to be involved even if it was somebody

1     else's motion.  The others are entitled to be here.

2          There's seven people in custody, Mr. Canter.

3     How soon can we have them back?

4               DEPUTY MARSHAL:  No later than 1:15.

5               THE COURT:  What's the earliest you can

6     have them?  I'm not talking about lunch.  I'm talking

7     about going to the restroom.

8               DEPUTY MARSHAL:  Okay.  Twenty minutes.

9               THE COURT:  Mr. Bellemere?

10              MR. BELLEMERE:  Briefly, I have a matter in

11    Lawrence at 4:00 o'clock.  I didn't file any limine

12    motions.  If we get into it, I want to be able to

13    leave at 2:30 or 2:45.

14              THE COURT:  And you are free to do so.

15    Let's take 20 minutes, and then we will reassemble

16    and take up the motions in limine at that point.

17    Until that time we are in recess.

18              (A recess was taken.)

19              THE COURT:  Mr. Rosenthal notified Ms.

20    Scheurer that we would proceed without him.  He's

21    attending to something.

22         Mr. Rogers, you're now rising in support of your

23    motions, so let's deal with those.

24              MR. ROGERS:  That's correct.  I will be

25    brief.

1           THE COURT:  Let the record reflect that the

2       court has reviewed your motions as well as the

3       government's response, and, of course, Mr. Wesley has

4       also by Document 654 joined in Document 641, the

5       motion concerning certain proposed expert testimony.

6       You may proceed.

7           MR. ROGERS:  That's the one I will start

8       with, your Honor.  The government's response is that

9       this motion is premature, and I would point out that

10      I think the purpose of the requirements of disclosure

11      in Ruling 16(a)(1)(G) is to give the court at least a

12      pretty good notion of what we're talking about so

13      that the court can see whether or not Rule 702 is --

14          THE COURT:  Mr. Rogers, let me interrupt

15      you.  I don't think that's right because I, in fact,

16      have heard these witnesses testify in the past.  I

17      have no doubt in my own mind that if Ms. Morehead

18      does a competent job she can lay a foundation for

19      their expertise, so it's not for my edification.  The

20      question is whether you are on appropriate notice as

21      to whether or not this testimony is going to be

22      brought before the court and as to what needs to

23      happen to go from there.  And, frankly, I don't know

24      why Ms. Morehead isn't correct that she has to lay a

25      proper foundation for these witness.  If she fails to

1    do so, your objection would be sustained, but your

2    objection at this juncture is not ripe to be decided

3    in your favor.  She has disclosed to you a summary of

4    what their testimony is going to be.  I'm talking

5    about McCue and Jones.  They are testifying about

6    drug traffickers' proclivities.  I don't know exactly

7    what they are going to say about that, but until I

8    actually hear that or hear more particularly what the

9    basis for that opinion is that they articulate, that

10   is premature.  Now, you could, I suppose, ask to have

11   a hearing right now and have me put McCue and Jones

12   on the stand and let them do that for you right here.

13   I don't know that you want to do that, and otherwise

14   I'm overruling your motion.

15           MR. ROGERS:  Told you I would be brief,

16   your Honor.

17           THE COURT:  Very well.  Let's talk about

18   the second one because there I have a little more

19   sympathy with your motion, frankly, because there the

20   government's position is, we have disclosed to you in

21   the past a bunch of things that Mallory said, and so

22   therefore you go figure out what he's going to say at

23   trial.  I don't think that's what the rule says.

24           MR. ROGERS:  That's exactly correct, your

25   Honor.  The rule is quoted in pertinent part on the

1    first page of my motion, Document 642, and that was

2    basically all I was going to say.  Saying you've got

3    the stuff in the past doesn't give you notice that

4    this is --

5              THE COURT:  I agree with you.  I think the

6    government owes to defense counsel a written summary

7    of any testimony that the government intends to give

8    from Mallory and you cannot simply incorporate prior

9    reports.

10             MS. MOREHEAD:  Judge, it's, frankly, not a

11   report, and I don't anticipate -- I don't know

12   whether Agent Mallory will testify, but, for

13   instance, he's the interstate nexus expert.  We don't

14   have any interstate nexus, and one of the reports

15   that was submitted was his interstate nexus report

16   which summarizes his findings and why he based that.

17   And the other one is --

18             THE COURT:  Wait a minute, Ms. Morehead.

19   If Mr. Mallory is not going to testify, then I will

20   simply grant the motion.  If Mr. Mallory is going to

21   testify or you wish to have the latitude to call him

22   under certain contingencies, you must comply with the

23   rule and you must provide a written summary of his

24   expected testimony.  You may not do it by

25   incorporation by reference with some prior

1      disclosures that have been made, no matter how

2      detailed those may have been.  You must now decide

3      what information you're going to provide to

4      Mr. Rogers, and I'll give you until the close of

5      business on Wednesday to do so.

6              MS. MOREHEAD:  Very well.  Judge, with the

7      interstate nexus and the firearms expert, that in the

8      past has sufficed by way of expert --

9              THE COURT:  Perhaps that's because no one

10     has filed such a motion and elicited such a ruling,

11     and that's my ruling.

12             MS. MOREHEAD:  That is fine, Judge.  I'll

13     clarify that about Agent Mallory's testimony then.

14             THE COURT:  Thank you very much.

15             MR. ROGERS:  Your Honor, may I be excused

16     from the rest of the proceedings?

17             THE COURT:  You are excused.

18             MR. ROGERS:  Thank you.

19             THE COURT:  Let's turn our attention to

20     Document 650.  By the way, of course, I did not call

21     upon you, Mr. Calbi, although you would have been

22     entitled to speak to the motion concerning Jones and

23     McCue, although I suspect your silence is probably

24     good judgment, but your motion is noted, and you

25     certainly are entitled at any point in time to object

1     that no proper foundation has been laid for their

2     purported expert testimony.

3               MR. CALBI:  Thank you, Judge.

4               THE COURT:  Very well.  But your motion at

5     this juncture is denied.  It is simply without

6     prejudice to reasserting the grounds of lack of

7     foundation.

8               MR. CALBI:  Thank you, Judge.

9               THE COURT:  All right.  Mr. McDaniel's

10    counsel filed three motions, and those begin with

11    650, concerning the vehicle stop evidence.  I'm,

12    frankly, confused about the facts here because in

13    your motion, Mr. Bellemere, you express what I take

14    to be the belief or understanding that a cell phone

15    must have been recovered as a result of the stop.

16              MR. BELLEMERE:  Yes, your Honor.

17              THE COURT:  And that number was subject to

18    a wiretap authorization, and certain calls were

19    monitored; is that right?

20              MR. BELLEMERE:  No.  I apologize, Judge.

21    This has to do with the motion with regard to the

22    motion to suppress.  I filed that motion because on

23    November 27 my client was in an automobile, actually

24    a Tahoe, that was stopped for an alleged traffic

25    violation, and the Tahoe was searched, and in the

1    course of searching that Tahoe a cell phone was

2    found.  Then the cell phone was opened up and a

3    number was obtained for that cell phone.  Now, the

4    government intends, in my understanding now, intends

5    to offer into evidence a telephone call from,

6    purportedly, Mr. Wesley to that phone number that

7    belonged to the cell phone that was found in this car

8    as a result of the warrantless search, and that phone

9    number is now attached to my client, and I attempted

10   to get a copy of a DEA report that had been redacted

11   which showed that the phone number was first --

12   that's the first document, and then all this

13   discovery where that phone number is mentioned.  The

14   government objected to that, but fortunately I was

15   able find a different report in the government's

16   discovery, same report, that had the phone number in

17   it.  And so I say that that phone number and that

18   phone call that they are trying to use against my

19   client was as a result of a warrantless search of the

20   vehicle that was stopped, what I believe was

21   pretexturally stopped, and I think the record would

22   show that too before the court, and therefore I don't

23   think it's admissible.

24              THE COURT:  That's what I understood you to

25   be saying.  Perhaps I didn't articulate it very well,

```
 1          but that's what I understood you to be saying, was
 2          that -- I'm trying to restate it again to make sure
 3          it's clear in my own mind, but your understanding of
 4          the evidence is that that cell phone -- and I'm
 5          asking you this.  Are you saying that you believe the
 6          evidence is that that cell phone number first comes
 7          to the attention of the authorities as a result of
 8          the car stop?
 9                    MR. BELLEMERE:  Yes, your Honor.
10                    THE COURT:  Let me hear from Ms. Morehead
11          because I took her response to say that that wasn't
12          her understanding of the facts, and so I want to find
13          out what she says the facts are about that.  Ms.
14          Morehead?
15                    MS. MOREHEAD:  Judge, the car stop that
16          Mr. -- I guess I'm totally confused.  That was part
17          of my response.  The car stop that Mr. Bellemere
18          talks about occurred on November 27 of 2007.  The
19          defendant was intercepted on phone calls before that
20          date.  We have phone calls that we intend to play
21          between the defendant and Mr. Wesley before that
22          date.  Specifically, a good example of that, we
23          didn't charge everybody with all the phone counts.
24          We could have.  But a good example is Count 34 that
25          Mr. McDaniel and Mr. Wesley -- Mr. Wesley talked on
```

1    November 26, the day before.  I don't know how he can

2    say a phone we would have gotten on the 27th, that

3    the first time we knew about it was on the 27th, when

4    we had intercepted phone calls from it many times

5    before.

6              THE COURT:  Let's stop right there.  With

7    regard to the phone calls that were intercepted

8    before the date of the stop, what is your position

9    with regard to those calls?

10             MR. BELLEMERE:  Your Honor, as far as I

11   could tell with regard to this particular phone and

12   all this discovery that has been given, there are

13   three phone calls.  There is one on the 25th and

14   there's two on the 26th.  Okay?

15             THE COURT:  All right.

16             MR. BELLEMERE:  And the phone call on the

17   26th, which is the only one that seems to be

18   important here, that phone call is one that they

19   claim that my client ordered a kilo of cocaine from

20   another defendant in this matter, and that is -- and

21   that is before that time.  That phone call,

22   incidentally, that has been transcribed, and that was

23   given to me, first was made by an unknown male, okay,

24   and subsequently that has changed.  It's not an

25   unknown male now.  It's Keith McDaniel.  And that's

1    because they recovered that phone on the 27th.

2              THE COURT:  That's the next question.

3         Ms. Morehead, is that how this is attributed to

4    Mr. McDaniel?

5              MS. MOREHEAD:  No.

6              THE COURT:  How does the government's

7    evidence reflect that on the November 26 call

8    Mr. McDaniel was one of the speakers?

9              MS. MOREHEAD:  First of all, we have phone

10   calls from Mr. McDaniel dating back to August 15.  We

11   will be playing numerous calls with him, and that

12   phone call on -- we have phone calls in September and

13   the like.  The agents listened to those calls.  We

14   recognize his voice on there, that that's him, number

15   one.  Number two, we have other individuals that have

16   dealt with Mr. McDaniel that will say that that is

17   him and that is the phone number, one of the phone

18   numbers, associated with him.  So again I'm at a

19   loss --

20             THE COURT:  Let me go back to

21   Mr. Bellemere.  What do you have to say about that?

22             MR. BELLEMERE:  As far as the discovery, I

23   have seen the phone number first surfaces in a report

24   dated November 27, 2007.

25             THE COURT:  Let me ask you this.

1           MR. BELLEMERE:  I have the phone calls

2     here.

3           THE COURT:  If you've got the phone calls,

4     do they not reflect that phone number?

5           MR. BELLEMERE:  The phone calls reflect the

6     phone number, but as far as the phone call that the

7     government seeks to introduce, it's got unknown male

8     on the transcript.  On the previous transcripts they

9     have other people's names on there.

10          THE COURT:  All right.  Here is what I am

11    prepared to do with regard to this motion.  I agree

12    that if the government were to seek to offer either

13    the cell phone itself or evidence that that cell

14    phone was seized from Mr. McDaniel and that therefore

15    he was the speaker on those phone calls you would be

16    entitled to proceed on your motion to suppress.  You

17    previously withdrew that based upon the government's

18    representation that they were not going to use

19    anything from that stop, and, accordingly, I would

20    foreclose the government from -- since they made that

21    representation earlier, I would foreclose the

22    government from presenting any evidence of the cell

23    phone having been seized from Mr. McDaniel from that

24    stop.  That does not preclude the government from

25    putting on evidence that a particular phone number

1       had been previously tapped and putting on independent

2       evidence based upon witnesses who would testify based

3       upon their familiarity as to Mr. McDaniel's voice.

4       If, in fact, whether it be an agent or whether it be

5       a previously codefendant or cooperating individual

6       who testified to those phone calls from November 25

7       or 26, said, I'm familiar with Keith McDaniel's

8       voice, that's Keith McDaniel's voice on that call,

9       the jury would be entitled to consider that for what

10      it's worth, but the government's is not entitled to

11      say, by the way, on November 27 we seized that phone

12      from Mr. McDaniel, and so therefore that corroborates

13      the idea that that's his voice.  That's the court's

14      ruling here.

15              MR. BELLEMERE:  Could I ask this question,

16      Judge?  It's been a long time for me, but the point I

17      would like to make is this.  This phone call, this

18      phone was definitely recovered -- was found in this

19      search that was warrantless, and at the time the

20      phone number was recovered, and therefore the phone

21      number was given to the government, and it was put in

22      a report.  Now then, the government has had these

23      phone calls before and has not attached those -- has

24      looked at these phone calls before and looked at --

25      and was unable to tell whether it was my client or

```
 1        not.  Now, isn't there some situation -- wasn't there

 2        something called the fruits of --

 3              THE COURT:  Fruit of the poisonous tree.

 4        But there's no fruit here.  This is a vegetable.  It

 5        grew well before the stop because the agents and/or

 6        some codefendant or previously codefendant, if they

 7        can come in and sit there, raise their right hand,

 8        swear to tell the truth that they are familiar with

 9        Mr. McDaniel's voice and that is his voice, I'm not

10        going to suppress those calls.  If they step to that

11        witness stand and say, by the way, we seized that

12        phone, and that's his phone number, then I think

13        you've got a mistrial because that's forbidden.  They

14        cannot do that here because they represented to you

15        earlier they were not going to use anything out of

16        that car stop, and therefore they may not.  So your

17        motion is granted to the extent that they are

18        precluded from using anything from the car stop,

19        including the fact that the cell phone number on the

20        phone that was recovered is the same phone number as

21        the one which they had previously monitored, but your

22        motion is denied to the extent that you seek to

23        suppress the playing of the calls which occurred on

24        November 25 and 26 from that telephone, provided that

25        proper foundation can be laid to make those calls
```

```
 1        relevant by identifying speakers.  So that's the
 2        court's ruling.
 3             Let's move to your next motion, and that is
 4        concerning Mr. Humphrey's proffer.  I've read your
 5        motion and the response.  My question to Ms. Morehead
 6        is, what is the alleged relevance of the statement
 7        that Mr. McDaniel is said to have made while at CCA?
 8        This is the subject of the motion which has been
 9        documented as Document No. 651.
10             MS. MOREHEAD:  Sorry, Judge.  I lost my
11        train of thought.  I had this set back and I couldn't
12        recall.  It had been a while since I had responded.
13             THE COURT:  Sure.
14             MS. MOREHEAD:  With regards to any
15        statements that are made at CCA, with regards to
16        communications with other individuals, obviously, it
17        has to be relevant, and Mr. McDaniel specifically
18        made some statements to one of the codefendants and
19        specifically referenced -- I don't want to misstate
20        the context of it, but it was more in line with what
21        occurred in this conspiracy; it wasn't about anything
22        extraneous from this conspiracy.  And so any
23        statements -- that was the purpose of the interview,
24        was to talk about this case.  So any statements that
25        were made were in connection with comments that were
```

1          made in connection with this conspiracy.

2                    THE COURT:  Ms. Morehead, I want you to

3          look, if you would, please, at Document 651.

4                    MS. MOREHEAD:  Yes.

5                    THE COURT:  Where Mr. Bellemere has put

6          quotation marks around certain information.  He says,

7          "Comes now counsel for defendant Keith McDaniel and

8          notes in proffer meeting on April 14, 2008, defendant

9          Thomas Humphrey advised the government as follows:

10         Quote, that during his incarceration at CCA he heard

11         a codefendant by the name of Keith McDaniel make

12         several comments about kilogram-quantity cocaine

13         dealers.  Mr. Humphrey opines that McDaniel stated

14         that the government has arrested and charged mostly

15         small dealers and have not found the majority of the

16         large kilogram dealers."

17              The first question about that as to McDaniel is,

18         there's nothing in that particular statement that

19         would indicate that has anything to do, necessarily,

20         with this conspiracy.  Second, there's nothing in

21         that statement that indicates that this was based on

22         a firsthand knowledge by Mr. McDaniel as opposed to

23         what the talk was around CCA and that he's simply

24         repeating that, and based upon what was in that

25         proffer, I would share Mr. Bellemere's concern about

1    any relevance to a mere statement like that.

2                MS. MOREHEAD:  I would agree with that,

3    Judge.  As you've indicated, we have an ongoing

4    obligation to turn over any new information or

5    additional information, and we are doing that, as

6    indicated, within 24 hours, and we will continue to

7    do that if additional information becomes available.

8                THE COURT:  Based upon the proffer quoted

9    in Document 651, I'm going to grant the motion and

10   exclude that testimony.

11       Finally, Mr. McDaniel has moved in Document

12   No. 652 concerning a telephone call referencing --

13   you said referencing parole officer, but to be fair,

14   it says referencing PO, the phone call.  The phone

15   call is very short.  It's attached as an exhibit by

16   you.  And he says, "I'm talking to my PO right now."

17       Honestly, I do not believe that the unfair

18   prejudicial aspect of that statement significantly

19   outweighs the probative value of linking Mr. McDaniel

20   to Mr. Wesley for this purpose.  First of all, he

21   does not even say that it's a parole officer.  He

22   says "my PO."  Now, it's a quick call, and I bet

23   there's not much to that particular point.

24       Second, even if that's so, that's Mr. McDaniel

25   speaking, and that's the facts of the case here, and

1        I don't believe it's unfairly prejudicial to him.  If

2        the facts are that he was dealing with Mr. Wesley in

3        a drug transaction and happened to use some words

4        which might cast some light on the fact that he had

5        some other previous problems, that is not the basis

6        for him to inoculate this call and cause it to be not

7        presented to the jury.  The appropriate resolution to

8        your request here is to instruct the jury about any

9        other matters -- they are not to judge this based

10       upon other things which have happened with various

11       defendants in the case and so forth, and the court

12       will do so, and you are invited to propose a specific

13       instruction, if you like, that the court will give to

14       the jury to direct them that they are not to draw any

15       inference from this call, if you so wish.  I don't

16       suggest you do that, but I will definitely give a

17       general instruction to the jury on several different

18       levels concerning what the defendants are on trial

19       for here and that nothing that's been submitted here

20       with regard to various aspects of other things they

21       did are something that they can use against them

22       here.  So I see no unfair prejudice, and your motion

23       is denied.

24              MR. BELLEMERE:  You wouldn't allow me the

25       opportunity to discuss it a hair further?  Having

```
1    heard you deny it, it's probably not going to change
2    anything; however --
3              THE COURT:  I will be happy to hear from
4    you.
5              MR. BELLEMERE:  I notice that you say
6    that -- there's nothing about this phone call, first
7    of all, that has anything to do with drugs.  That's
8    the first thing.
9              THE COURT:  Except the context that the
10   government provided about the series of calls in
11   which Mr. Wesley is, according to the government's
12   theory of the case, attempting to arrange
13   transportation for his drugs.  In that context
14   clearly the jury could find that this is part of how
15   your client was involved with Mr. Wesley in this
16   process.  You are correct that in this phone call he
17   doesn't say, how about giving me an eightball? or the
18   like.  It's talking about transportation.  But you
19   cannot divorce it from the context, which is the
20   context that the government provided for us in their
21   response; therefore, it is probative, and the
22   probative value is high because it does tend to link
23   Mr. McDaniel to the conspiracy, if the jury believes
24   the government's evidence beyond a reasonable doubt,
25   would show that Mr. Wesley in furtherance of his drug
```

1     business was dealing with Mr. McDaniel in an attempt

2     to arrange for transportation.  Unfortunately,

3     Mr. McDaniel couldn't talk to him on that occasion

4     because he was otherwise occupied.  The reason he was

5     otherwise occupied is relatively innocuously

6     presented, and it is not sufficient to outweigh the

7     high probative value of that statement or part of

8     that conversation itself.  That's why I'm denying

9     your motion.

10             MR. BELLEMERE:  Your Honor, in furtherance

11    of my position -- and I want you to know the only

12    thing I care about is, if my clients testifies, then

13    I don't care about all this, but on the other hand,

14    it seems like to me what we were required to do, we

15    were required not to put in evidence that would

16    potentially impeach a witness before the witness

17    testified, or advise the jury, give the jury some

18    kind of information that would cause them to believe

19    that the defendant had had a prior conviction for a

20    crime.  Now, I filed this motion, and then today, I

21    believe, or maybe it was last week, the government

22    was able to come up with a separate phone call that

23    talks about my client having a rental, and my client

24    is talking to Mr. Wesley, and that phone call could

25    be used just as easily as this one to suffice for the

1    government's position that we -- that my client

2    provides rides for Mr. Wesley, if that's their

3    thought, without having to use the inflammatory PO.

4    I just don't think that's appropriate.  And of course

5    I'm not in a position to argue with the court.  My

6    point is that it's impeaching his character before he

7    has a chance to testify and it's giving the jury an

8    opportunity to conclude if he doesn't testify that

9    he's a crook or criminal with a prior record because

10   he's seeing a probation officer.

11               THE COURT:  I've made my ruling, including

12   the proper approach is to make an instruction to the

13   jury but make sure that they know what their duty is

14   in this case.  And the Tenth Circuit, I believe,

15   would say that that instruction is sufficient to

16   protect your client's interests, and your objection

17   is overruled.

18               MR. BELLEMERE:  Thank you, your Honor.

19               THE COURT:  All right.  Now, Mr. Calbi,

20   let's turn to Document 653, the motion concerning the

21   testimony of the confidential informant.  Obviously,

22   we all know that you came to this case late in the

23   game because Mr. Houdek was compelled to withdraw

24   because he had developed an actual conflict of

25   interest by representing both Mr. Wesley and, unknown

1      to him, a person who was a confidential informant in

2      this very case; therefore, he withdrew from this

3      case.  It's my understanding he also withdrew from

4      the other case.  Is that your understanding as well?

5             MR. CALBI:  I learned that from the

6      government's' response.  Prior to that I wasn't aware

7      of it.

8             THE COURT:  That is my understanding, and

9      my understanding independently from the case files of

10     the court is that he withdrew from the other case as

11     well.  So that is the posture that we find ourselves

12     in.  This is a very interesting issue because neither

13     one of you were able, I'm sure, to cite any authority

14     about other courts having handled precisely this

15     problem.

16            MR. CALBI:  I couldn't find any, your

17     Honor.

18            THE COURT:  Neither could I.  That's why I

19     say I don't think it's because you overlooked it.  I

20     think you couldn't find anything because this issue

21     has not arisen.  Let me hear from you about this, and

22     then we will hear from Ms. Morehead, but if you wish

23     to speak to the motion, you may do so.

24            MR. CALBI:  Your Honor, it puts me a little

25     bit in a box as far as the government's response says

```
 1        I'm speculating and so on and so forth, and the
 2        reason I'm speculating, I can't go to Mr. Houdek, ask
 3        him what he told his client or what advice he gave
 4        because that's a privileged communication, and I
 5        really couldn't go to the informant and find out what
 6        Mr. Houdek might have in, fact, instructed her,
 7        though the informant could have waived the privilege.
 8            And I looked at the -- in the discovery and the
 9        disclosures.  The confidential informant gave a
10        statement to the government when Mr. Cornwell was
11        representing her, and if I understand the facts
12        correctly -- and Ms. Morehead could correct me if I'm
13        wrong -- I believe Mr. Cornwell was her attorney
14        before Mr. Houdek became involved.  If the informant
15        would just testify as to what she gave in that
16        statement and stay to script, I imagine the
17        government would -- the government's position is
18        stronger that she didn't glean anything from
19        Mr. Houdek, Houdek's representation.  My concern is,
20        as we all know, we don't know what this witness is
21        going to say when they take the stand.  They could
22        very rarely stay exactly to script.  They might have
23        learned something from Mr. Houdek's representation
24        that they use to embellish their testimony, and we're
25        in a position where we can't unring the bell.  And I
```

1        find that I'm in a unique position.  I have an

2        attorney that had represented both the informant and

3        my client at the same time, and I just feel it's --

4        just as we learned in law school, it doesn't pass the

5        smell test for me, but I can't give you any direct

6        case law that says this shouldn't happen.

7                THE COURT:  Uh-huh.  Thank you, Mr. Calbi.

8        Let me hear from Ms. Morehead.

9                MS. MOREHEAD:  As indicated by Mr. Calbi,

10       any testimony that would be anticipated from this

11       individual occurred prior to Mr. Houdek's

12       representation.  I have a hard time believing -- I

13       mean, I take defense counsel at their responsibility,

14       and it would have been unethical for Mr. Houdek,

15       frankly, to provide information about one client to

16       another client.

17               THE COURT:  Let me ask you this.  Would

18       there be -- would either of you believe that there

19       would be any ethical preclusion to Mr. Houdek

20       providing, either in person or by affidavit, sworn

21       testimony that he did not say anything to the

22       confidential informant person about Mr. Wesley's

23       case?  I don't think that would violate the

24       attorney/client privilege, for him to say, I did not

25       tell the confidential informant anything based upon

1          my representation -- that I learned in my

2          representation of Mr. Wesley, or whatever it might

3          happen to be.  That, in my opinion, would not violate

4          the attorney/client relationship.  I believe that

5          such a statement, in effect, was made by Mr. Houdek

6          at the hearing we had when we excused him, although I

7          do not have a transcript of that, and nobody has

8          provided me with one.  But I think it would be -- I

9          think we need a better factual record to resolve this

10         because on the one hand I agree that in a sense

11         Mr. Wesley's counsel is speculating on what might

12         have happened, but that's really all he is left with

13         at this juncture, is raising a question.  It's a

14         question I think should be answered by the government

15         making a record from Mr. Houdek and potentially from

16         the confidential informant as well by affidavit or

17         otherwise that no such communication occurred, and I

18         assume that's actually a fairly -- that that (a) is

19         true and (b) would not be that difficult, therefore,

20         to accomplish.  If that's not true, if, in fact,

21         Mr. Houdek is unwilling to swear under oath that he

22         did not share anything about this case with the

23         confidential informant, then I do have concerns about

24         what that opens.  But like you, Ms. Morehead, I doubt

25         Mr. Houdek did.  He's certainly a person of

1    reputation for integrity, but I think we need to tie

2    down the factual record, so I would suggest that --

3    not suggest, I will tell you I'm going to retain this

4    under advisement until we make that record to show

5    that there is no basis other than the most purest of

6    conjecture in which we would have to say he must have

7    been fibbing when he told us he didn't do it.

8        If that's all we have, I don't think you have

9    anything, Mr. Calbi, but I think you're entitled to

10   some factual representation by Mr. Houdek and, if

11   possible, from the confidential informant as well

12   that no such communication took place.  If we have

13   that, I think it passes the smell test.  I think it

14   was appropriate for you to call it to the court's

15   attention; I think it was an excellent issue to

16   raise.  But as I look at the cases that have dealt

17   with even the more analogous topics and I focus in on

18   what the court was looking at there, I'm not troubled

19   if we do complete that factual record.  And you may

20   be seated.

21       I'm going to make a slightly elaborated record

22   here very briefly to lay out my thinking.  In the

23   United States v. Bowie, 892 F.2d 1494, 1501 (10th

24   Cir. 1990) the Tenth Circuit looked at a case that

25   involved a situation of defense counsel who was still

1    in the case had previously represented a government

2    witness in a related case and identified that the

3    primary conflict of interest concerned there was that

4    defense counsel may not be able to effectively cross

5    examine the witness for fear of divulging privileged

6    information.  Well, of course, that's why Mr. Houdek

7    had to get out, at least in part, to begin with, and

8    we don't have that issue here because we have

9    unconflicted counsel who is representing Mr. Wesley,

10   so we don't have the issue that Bowie case dealt

11   with.

12        In Coles versus  Folino, Third Circuit case

13   reported at 162 Fed. Appx. 100, 105 from 2005, the

14   Third Circuit found that defense counsel's dual

15   representation of both the defendant and a

16   prosecution witness prior to trial in a robbery and

17   attempted murder was not an impermissible conflict

18   because defense counsel was unaware that the witness

19   would be eventually called to testify against the

20   defendant at the time of the dual representation and

21   because defense counsel did not represent the witness

22   when he cross examined him at trial.

23        In some ways that's a little closer to our

24   situation because Mr. Houdek did testify at the

25   hearing, although, again, you weren't there, and I

1    realize you're entitled to more than my recollection

2    of what Mr. Houdek said at the hearing, but it's a

3    matter of public record also in his motion that he

4    filed that he was totally unaware of this situation

5    until it came to his attention shortly before he did

6    file the motion to withdraw.

7        So like the Third Circuit case here, we don't

8    have an ongoing dual representation in which, if you

9    take Mr. Houdek at his word, which, without anything

10   to the contrary, I have no reason not to, causes me

11   to believe that the likelihood of some conversation

12   which might have disclosed some confidence from

13   Mr. Wesley to the confidential informant is highly

14   unlikely to have occurred, and even in our case,

15   unlike that Third Circuit case, we have different

16   counsel.  In that Third Circuit case you still had

17   the person who was conflicted still representing the

18   defendant and doing this cross examination; they just

19   didn't represent the CI any more.  So our case is

20   better than that from the standpoint of feeling good

21   about there not being a problem.

22       Finally, an example case that does stand for the

23   other proposition, that there is a problem, is United

24   States versus Calvo, 226 Fed Appx. 769, a Ninth

25   Circuit case from 2007, and there the Ninth Circuit

```
 1          found that the defendant was entitled to resentencing

 2          because the attorney did have an active conflict of

 3          interest that had an adverse impact where there the

 4          defense attorney represented both the defendant and

 5          the confidential informant whom the government called

 6          to testify at sentencing to establish the quantity of

 7          methamphetamine upon which the defendant's sentence

 8          was based.  There the Nine Circuit, very

 9          appropriately, pointed out that because the

10          defendant's conviction and resulting sentence based

11          on the large amount of methamphetamine would benefit

12          the CI's ability to demonstrate substantial

13          assistance and therefore get a downward departure,

14          and because any attempt to cross examine the CI might

15          reduce that person's ability to demonstrate

16          assistance, then the dual representation constituted

17          an active conflict of interest that entitled the

18          defendant to resentencing.

19               Once again we don't have that here because we

20          don't have Mr. Houdek purporting to wear multiple

21          hats or something.  We have Mr. Calbi, who is not

22          tainted by any conflict.  So in the cases that I was

23          able to find that are even close, they do not cause

24          me concern here as long as we are satisfied that

25          Mr. Houdek did not have conversations in which he
```

1      shared information about Mr. Wesley with the

2      confidential informant, but I think we need such a

3      record made to be able to conclusively rule on it.

4      That is why I retain this under advisement.  I can

5      set a deadline for you, Ms. Morehead, or I could

6      simply say you may not call the confidential

7      informant until you make that record with us.  What

8      is your preference?

9              MS. MOREHEAD:  Judge, I would prefer that

10     you just say -- I mean, I'll try to get that record

11     made, but I'll definitely do it before that witness

12     would testify.

13             THE COURT:  Yeah.  I realize we're a week

14     to go before trial, you have a lot of things to do,

15     but before that witness is permitted to testify --

16     and I assume you know the identity of the individual

17     at this juncture.

18             MR. CALBI:  I do, your Honor.

19             THE COURT:  I do not.  I'll leave it to

20     you, since you know who we're talking about, to make

21     sure that the court is aware of the circumstances,

22     and you are entitled to object to that witness

23     testifying if you have not been provided the

24     opportunity at that point to examine this particular

25     record.  I would believe that affidavits would be

```
1    sufficient.  If you have a different view, you're

2    entitled to air that to me as well.  All right.

3    Anything further on that motion?

4         Hearing none, that's the court's rulings.  That

5    concludes these motions, and, Mr. Rosenthal, I do

6    want to take up your motion in limine, but there's

7    another matter I need to take up with you that I'm

8    not quite in a position to take up yet.

9              MR. ROSENTHAL:  Right.

10             THE COURT:  So I would like to attend to

11   Mr. Lamb and his client, but I want to you stick

12   around.

13             MR. ROSENTHAL:  I'm at your disposal for as

14   long as you want.  I changed my hotel.  I can stay

15   through tomorrow.

16             THE COURT:  I think we will be fine, but I

17   wanted to attend to Mr. Lamb and have him on his way.

18   I think otherwise we have completed our business for

19   today.

20        Is there anything else other than Mr. Wallace's

21   issues and Mr. Rosenthal's motion that need to be

22   attended to before we break?  I hear nothing.

23        I will remind the defendant who is on bond,

24   Ms. Temple, that you are subject to those conditions

25   and if you were to violate any of those your bond
```

1    could be revoked.  I assume you know that, and I

2    assume you agree to be bound by those conditions and

3    to appear when directed to do so.  Is that correct?

4            DEFENDANT TEMPLE:  Yes.

5            THE COURT:  Then you are free to go on

6    those conditions.  The other defendants are remanded

7    to the custody of the United States marshals, and we

8    will be needing Mr. Wallace again here fairly

9    shortly, I believe.  Thank you.  By that I mean it

10   should take 30 minutes or so for this next

11   proceeding.  Let's say at 2:30 we will reconvene with

12   regard to Mr. Wallace.  We are in recess.

13           (Court was adjourned.)

14              WEDNESDAY, APRIL 8, 2009

15           THE COURT:  We're here this afternoon in

16   Case No. 07-20168, United States of America versus

17   Monterial Wesley and others.  Would the parties state

18   their appearances, beginning with counsel for the

19   United States.

20           MS. MOREHEAD:  May it please the court,

21   Terra Morehead, assistant United States attorney,

22   appearing on behalf of the government.

23           THE COURT:  For Mr. Wesley?

24           MR. CALBI:  Robert Calbi on behalf of

25   Mr. Wesley, your Honor, who appears in person.

1          THE COURT:  Thank you.  For Mr. Simpson?

2          MR. ROGERS:  Charles Rogers on behalf of

3     Mr. Simpson, who appears in person.

4          THE COURT:  For Mr. Foy?

5          MR. SANDAGE:  Yes, your Honor.  Lance

6     Sandage on behalf Shevel Foy, who appears in person.

7          THE COURT:  For Mr. Trinkle?

8          MR. BELL:  Brandon Bell for Mr. Trinkle,

9     who also appears in person.

10          THE COURT:  For Ms. Temple?

11          MR. HEATHMAN:  Ms. Temple in person, your

12     Honor, with counsel James Heathman.

13          THE COURT:  And Mr. McDaniel?

14          MR. BELLEMERE:  Fred Bellemere, your Honor,

15     for Mr. McDaniel, who is here in person.

16          THE COURT:  And for Mr. Goodwin?

17          MR. JOHNSON:  Rick Johnson, Judge.

18     Mr. Goodwin is here and he is also in custody.

19          THE COURT:  Thank you.  I set this hearing

20     for today in light of a number of motions which have

21     been filed which were prompted by disclosures made by

22     the United States pursuant to an order that the court

23     made concerning the schedule on which certain

24     information obtained from cooperators and so forth

25     would be made available to counsel for the

1    defendants.

2         Since those motions have been filed, however,

3    another motion has been filed that I want to deal

4    with first.  That is Mr. Calbi's motion, Document

5    714, on behalf of Mr. Wesley to continue the trial

6    setting.  I think it's appropriate to deal with that

7    first.  I have reviewed your motion, Mr. Calbi, and I

8    would invite you to speak to it at this time.

9         MR. CALBI:  Thank you, your Honor.  Judge,

10   I'll be brief.  I won't recite the facts that I have

11   set forth in the motion.  I would just like to bring

12   to the court's attention that when we had the phone

13   conference last Wednesday afternoon on April 1 and we

14   had discussed moving the trial date from yesterday

15   until tomorrow, I had just arrived back in New York,

16   and, really, I guess I wasn't ready for the amount of

17   things that were perhaps going to overwhelm me during

18   the week that I was there for my dad's funeral.

19   Also, I guess I did not anticipate the flurry of

20   motions that had been filed from the 1st until last

21   evening and also the additional disclosures based on

22   that and a conversation that I had with Mr. Wesley

23   yesterday.  He felt that I should file this request

24   to be better prepared for the trial setting.  I just

25   don't feel, your Honor, that I could be adequately

1    prepared tomorrow due to I have not yet finished

2    reading the additional disclosures.  I understand

3    that the court was going to attempt to make it as

4    easy as possible under the circumstances by just

5    doing voir dire and opening statement Thursday and

6    Friday, but even based on that I just feel I need

7    additional time to be ready.

8         I say this with a heavy heart because I know we

9    have all tried to get ready and make this trial go.

10   Part of -- my ego got in the way, perhaps, thinking I

11   could be ready, but when the bottom line gets down to

12   it, I feel I need additional time to protect Mr.

13   Wesley's rights, and that's where my mind should be

14   first and foremost.  I told this court March 30 that

15   I would be ready April 7.  I lost that week, and I

16   guess I am just looking to get that week back so I

17   can be adequately prepared, and I would ask this

18   court to start on Tuesday, the 14th.

19             THE COURT:  Does anyone else wish to be

20   heard on the motion made by Mr. Calbi?  I'll start

21   with you, Ms. Morehead.  Does the government have any

22   input?

23             MS. MOREHEAD:  I have no objection, your

24   Honor.

25             THE COURT:  Counsel for any of the

1        defendants?

2            Mr. Calbi, it is with a great deal of reluctance

3        that I grant your motion -- but I do grant your

4        motion -- because I think obviously for each and

5        every one of us there comes a time when we need to

6        bring this matter to a head and to get it in a

7        position where a jury will be able to determine what

8        the rights of the parties might happen to be, and I

9        am anxious to get to that point so that everyone can

10       iron all this out.

11           On the other hand, your situation does present a

12       very unusual combination of circumstances.  First of

13       all, your late entry into the case where you with a

14       great deal of, I think, grace and with a great deal

15       of professionalism agreed to undertake the

16       representation of Mr. Wesley on relatively short

17       notice for a trial involving as much information as

18       this involves, compounded, obviously, by the very sad

19       circumstances surrounding the passing of your father,

20       which came, as you point out in your motion, at

21       perhaps the worst time it could have come in

22       connection with your ability to defend Mr. Wesley.

23           As you point out, he is looking at the

24       possibility of life in prison if he is found guilty

25       of the charges that have been brought against him,

```
1      and that is a serious matter, and I believe that it's

2      in the interests of justice that the beginning of the

3      trial be continued until next Tuesday, and I am

4      willing to make that order now.

5          We will start at 10:30 on Tuesday, the 14th, and

6      we will start with jury selection, and we will

7      accomplish jury selection on that day.  We will

8      proceed to opening statement the next day, but we

9      will also anticipate that witnesses will begin to be

10     presented that day as well.  In other words, the

11     ground rule we had in place for starting on the 9th

12     and having no witnesses on the 10th, as Mr. Calbi

13     points out, was in deference to his situation, but

14     that's no longer necessary, so, Ms. Morehead, simply

15     the government should be prepared to proceed

16     forthwith on Wednesday, the 15th.

17          The second motion that I would like to address

18     here is the government's motion to permit the witness

19     Keenan Ringgold to appear by live video

20     teleconference.  That was given Document No. 685.  No

21     responses have been filed to that motion, but I will

22     invite any statement, comment, argument, objection,

23     whatever, by counsel at this point.  I hear no -- I

24     see someone rise.  Mr. Rogers?

25               MR. ROGERS:  I guess a statement is what it
```

```
 1        is, merely an objection for the record.  I have no
 2        argument in furtherance of it.
 3                THE COURT:  Mr. Rogers, with all due
 4        respect, an objection for the record is meaningless.
 5        Either you think the rights of your client are being
 6        adversely affected and you should explain to me why
 7        because I might give you relief, but your objection
 8        for the record does nothing other than give you an
 9        opportunity to stand up and say something.  If you
10        wish to attempt to persuade me that that motion
11        shouldn't be granted, at least do so.
12                MR. ROGERS:  I will at least go so far as
13        to state the grounds for my objection.
14                THE COURT:  Thank you.
15                MR. ROGERS:  We would object on behalf of
16        Mr. Simpson on the basis that this tends to emphasize
17        the testimony of Mr. Ringgold; that it tends to make
18        him a more sympathetic and thus more credible witness
19        in the eyes of the jury; and that the court's going
20        along with this procedure would tend to communicate
21        to the jury the court's view that Mr. Ringgold's
22        testimony is either exceptionally important or
23        exceptionally credible.  So that's my objection.
24                THE COURT:  Thank you, Mr. Rogers.  Anyone
25        else wish to be heard on this motion?
```

1        Ms. Morehead, I think Mr. Rogers makes some good

2    points here.  I would like you to address those, if

3    you would.

4        MS. MOREHEAD:  Judge, first of all, I

5    specifically don't recall -- it's been a while since

6    we interviewed Mr. Ringgold.  I don't even

7    specifically recall whether he gave any specific

8    information about Mr. Simpson, but he does have some

9    relevant information about a number of the

10    codefendants that are specifically going to trial.

11        Mr. Rogers talks about sympathy.  We could do

12    this by closed-circuit live television where

13    literally what the jury is going to see is, you know,

14    his body sitting there, or we can wheel him in in a

15    wheelchair in front of the jury, and, you know, any

16    machinery or any contraptions that are attached to

17    him would be viewable by the jury, which to me would

18    be even more -- that would pose the situation of more

19    sympathy, if he were here in person, than by live

20    video teleconferencing.

21        You know, this would be a situation where,

22    obviously, we would have a screen, he testifies live,

23    and I don't know of any provisions that exclude this.

24    In fact, as I pointed out in my motion, there are --

25    have been occasions in this district where that has

1    specifically been done, especially in connection with

2    a witness who has some sort of infirmity or illness

3    that would make it difficult for them to travel.

4              THE COURT:  What explanation would you

5    propose to give to the jury as to why we would be

6    presenting Mr. Ringgold's testimony that way as

7    opposed to some other witness?

8              MS. MOREHEAD:  However you saw fit, Judge.

9    If a limiting instruction needed to be given, that

10   would be appropriate, you know, that the jury should

11   not consider his testimony any differently than any

12   other witness, you know.  And, obviously, we're going

13   to talk about his medical condition when he testifies

14   because if in the middle of his testimony he needs to

15   take a break, you know, we want to leave that option

16   open.  And when, frankly, I met with him, we were

17   there for a couple of hours, and by the time we were

18   winding down, he had gotten -- just sitting there

19   talking, he becomes very weak.  So, you know, with

20   cross examination it may become appropriate to have

21   breaks, but we could do some sort of instruction to

22   the jury about how they are to consider that.  I,

23   frankly, didn't look at the cases that that's been

24   done here in the district, but I suspect they gave

25   some sort of instruction about this sort of

1      testimony, but I didn't specifically look into that

2      either.

3                  THE COURT:  I have actually had that

4      experience in my courtroom, but I, frankly, don't

5      recall exactly what we said in that case.  It was for

6      slightly different reasons, but we did give some

7      instruction.  I don't recall exactly what it was, but

8      I think that would be appropriate.  Let me ask this.

9      Do you contemplate utilizing exhibits with Mr.

10     Ringgold?

11                 MS. MOREHEAD:  You know, I don't, other

12     than if we have to show photographs.  And, again, I

13     wasn't sure logistically if we hold that up in front

14     of the camera he's able to see that or if I need to

15     have those there in South Carolina for him to view.

16     I've talked to his attorney.  His attorney plans on

17     being there just to facilitate getting all of this

18     done, and he obviously needs to be available to

19     converse with Mr. Ringgold should the need come up,

20     but I really hadn't contemplated any exhibits

21     specifically.  If anything, maybe a phone call or

22     two, but I think I can get any exhibits that he would

23     testify about, you know, with other witnesses that

24     would be testifying.  Right now I don't know of

25     anything specifically, but if defense counsel had

1     that situation arise --

2              THE COURT:  That would be my next question.

3     Are there exhibits that, just thinking ahead -- I

4     need help from defense counsel here, so I'm speaking

5     to you, Ms. Morehead, but I'm really directing this

6     more to defense counsel.  Obviously, Mr. Johnson, you

7     have filed on Mr. Goodwin's behalf concerning a

8     desire to voir dire Mr. Ringgold outside the presence

9     of the jury.

10             MS. MOREHEAD:  Was it Mr. Ringgold?

11             THE COURT:  Yes.  He was one of the two

12    individuals that Mr. Johnson sought to voir dire.

13         That causes me to believe that you have some

14    questions for Mr. Ringgold or he may have some

15    testimony against Mr. Goodwin.  Let me start with

16    you.

17         And you may be seated, Ms. Morehead.

18             MS. MOREHEAD:  Judge, so you know, last

19    time we were here, I had those for the court, and I

20    meant to give them to you.  I have them today.  We

21    have accumulated the documents and photographs, that

22    sort of thing, we would be using in trial, and I have

23    given those to defense counsel.  I have copies for

24    the court.  And as far as physical exhibits, I could

25    provide Mr. White a copy of those exhibits to take

1          down there with him.

2                    THE COURT:  Honestly, I would prefer under

3          the circumstances that, especially as you have

4          described Mr. Ringgold's testimony from the

5          government's standpoint, if I were to grant your

6          motion, I would prefer to have you show him the

7          exhibits here in open court and allow him to see them

8          on camera so there is no question that he is looking

9          at the same thing.

10                    MS. MOREHEAD:  That we're looking at?

11                    THE COURT:  That there's not something

12         that's been doctored up or changed or anything that

13         he would be looking at.  Again, no reason to even

14         bring that up other than to think about hypothetical

15         concerns that could occur, so I would rather have it

16         done by your, if there's a photo you need to display,

17         doing it in open court.  If it hampers your

18         examination of Mr. Ringgold, frankly, that would

19         simply be the consequence of doing it remotely,

20         and so I think you would be making an assessment that

21         overall you would be better off presenting him

22         remotely but maybe not getting to do some things with

23         him compared to bringing him live and doing those

24         things, but I am concerned more about how we

25         accommodate defense counsel under the circumstances.

1              Now let me bring Mr. Johnson up.

2              MR. JOHNSON:  The motion in regards to Mr.

3    Ringgold is simply to conduct voir dire in advance of

4    his testimony.  In the government's disclosures Mr.

5    Ringgold identifies Mr. Goodwin.  He identifies him

6    by the monitor Bugs and says that he knows him to be

7    a drug dealer in the Leavenworth area.  I don't know

8    based upon that statement if Mr. Ringgold has

9    personal knowledge of Mr. Goodwin so that he can

10   testify that --

11             THE COURT:  Let's assume that he does.

12   Let's assume for these purposes that Mr. Ringgold has

13   evidence that would be competent for him to give

14   against Mr. Goodwin, that would be relevant to the

15   charges against him.  Then so now we move on to

16   your -- you're going to have the opportunity to cross

17   examine Mr. Ringgold.

18             MR. JOHNSON:  Yes, sir.

19             THE COURT:  Are there exhibits that you

20   would need to use with Mr. Ringgold?  And if so, how

21   would you propose to deal with that?

22             MR. JOHNSON:  The only exhibit that I may

23   need to use that I have not listed as a trial exhibit

24   because I don't intend to introduce it unless it's

25   necessary for impeachment is his proffer statement

| 1 | that he made to government witnesses.  If it is |
| 2 | necessary -- |
| 3 | THE COURT:  What about his plea agreement? |
| 4 | MR. JOHNSON:  And potentially -- |
| 5 | THE COURT:  I assume that his plea |
| 6 | agreement has a provision in it indicating that he is |
| 7 | cooperating with the government.  Now, often the |
| 8 | government brings that out in their case-in-chief, |
| 9 | and I assume the government will bring that out in |
| 10 | their case-in-chief.  Nonetheless, you and any other |
| 11 | counsel for any defendant who is cross examining Mr. |
| 12 | Ringgold is entitled to utilize that sort of exhibit |
| 13 | with Mr. Ringgold.  How would you envision utilizing |
| 14 | those exhibits with Mr. Ringgold if he were located |
| 15 | remotely?  What would you want to do? |
| 16 | MR. JOHNSON:  In order for me to be able to |
| 17 | use them, obviously, he would have to be able to |
| 18 | observe them. |
| 19 | THE COURT:  Right. |
| 20 | MR. JOHNSON:  Beyond that -- he would have |
| 21 | to be in a position to observe them, whether remotely |
| 22 | or here.  I don't know if he has access to the |
| 23 | broadcast that's on this equipment. |
| 24 | THE COURT:  Let's get a little bit of |
| 25 | information about that.  We're going to get our |

1    technical person up here to be able to answer the

2    questions about how much we can recreate for Mr.

3    Ringgold by doing it from here.  I mean, I don't

4    want -- I don't want to create a situation in which

5    defense counsel is cross examining Mr. Ringgold with

6    one hand tied behind your back, so it's important to

7    me that you be in a position -- I'm using you as the

8    spokesperson right off the bat simply because I knew

9    you had raised that motion.  I don't know who all

10   might be wanting to cross examine Mr. Ringgold, but

11   that is a concern.  Let's defer that discussion

12   further then until the technical person gets here and

13   we can explore that a little bit more.  Why don't you

14   be seated.  I'll take that back.  Let's do this.

15   Mr. Johnson, come back up.  As long as we're on a

16   roll, why don't we talk about your motion, Document

17   699, to conduct witness voir dire.  I've read your

18   motion, and I've read the government's response to

19   it.  So go ahead.

20            MR. JOHNSON:  Thank you, Judge.  There were

21   two bits of information that came out of those

22   disclosures.  I don't think that I've got a basis

23   right now to move this court to exclude those from

24   trial in limine because I think don't have enough

25   information to present.  In regards to Mr. Ringgold,

     1        you already know what his statement was, that

     2        essentially he identifies Mr. Goodwin and identifies

     3        Mr. Goodwin as a drug dealer.  There's nothing in the

     4        proffer beyond that.  It could be secondhand

     5        knowledge that he has, it could be because he

     6        personally witnessed something.

     7                THE COURT:  Let me just stop you.  Ms.

     8        Morehead's response essentially is, come on.  Give me

     9        a break.  I'm not going to throw him up there and

    10        have him talk about hearsay and so forth, and the

    11        court isn't going to permit that either.  In other

    12        words, if Ms. Morehead asks Mr. Ringgold questions

    13        about Mr. Goodwin, it will be incumbent upon her to

    14        establish his firsthand knowledge about these things

    15        and establish that some conversation he has is

    16        relevant.  Now, that's no different from any other

    17        witness.

    18                MR. JOHNSON:  Of course.  And my fear is,

    19        Judge, in having tried a few cases, that someone will

    20        ask the question, do you know Mr. Goodwin? and then

    21        immediately piping from their lips will be, yes, he

    22        is a drug dealer in Leavenworth.  And I hope that Ms.

    23        Morehead wouldn't elicit that information until a

    24        proper foundation has been laid and I have an

    25        opportunity to object if, in fact, it is

1    objectionable, but it's such prejudicial information

2    from both Mr. Anderson and Mr. Ringgold to identify

3    Mr. Goodwin in that context that it is my fear if

4    that information gets in front of the jury without an

5    evidentiary basis for it --

6              THE COURT:  Thank you.  I'm denying your

7    motion.  There are adequate procedural safeguards to

8    prevent such evidence coming before the jury.

9    Obviously, Ms. Morehead, you are cautioned with this

10   witness, and also Mr. Anderson or any other witness,

11   that you are to make sure they understand that they

12   are not to volunteer information about people being

13   drug dealers or otherwise, that they are simply to

14   answer questions and not do that.

15        And, Mr. Johnson, if a witness does do something

16   along those lines and it turns out that that

17   individual doesn't have some foundation for doing so,

18   there are numerous remedies, including striking the

19   testimony of that witness clear to declaring a

20   mistrial as to your client.  And I wouldn't hesitate

21   to do any of those things, depending upon the

22   egregiousness of the circumstances.  But I will have

23   to say that I have been doing this for 17½ years and

24   I have never seen the government in our court put

25   somebody up and have them say, yeah, I know that guy.

1    He's a drug dealer some place.  If that were to

2    happen here, I would be surprised.  Doesn't mean it

3    couldn't happen, but if it does, you have plenty of

4    remedies.

5            MR. JOHNSON:  That would satisfy us, Judge.

6    Just being extra cautious.

7            THE COURT:  No problem.  That's your job.

8        Our technical person has come up and conferred

9    with Ms. Scheurer, our courtroom deputy.  He tells us

10   that he believes that our equipment will work such

11   that Mr. Ringgold would be able to see remotely the

12   information from the, what we call the ELMO, I guess

13   the -- probably not even the brand any more, but it's

14   the device we use to project stuff in the courtroom.

15   And he will be able to see -- he would be able to see

16   that remotely, so therefore you could take a plea

17   agreement or any other document or photograph or any

18   other article that you wish to have him look at

19   closely, place it on the screen, and draw his

20   attention to it just as if he were any other witness.

21   We have the capability, I think, to allow that and

22   also shut off the monitors in the jury box.

23       Don't we, Ms. Scheurer?

24           THE COURTROOM DEPUTY:  Yes.

25           THE COURT:  So in the unlikely event we

```
 1        were dealing with an article about the admissibility
 2        of which there might be some good faith question, we
 3        could do it in a way that the jury wouldn't see it
 4        but Mr. Ringgold would.  I think that's unlikely
 5        under what my expectations of things are, but we
 6        could do it that way as well.
 7             Ms. Morehead?
 8                  MS. MOREHEAD:  Judge, one thing I was going
 9        to advise the court, I have already preliminarily
10        talked to Mr. White, Mr. Ringgold's attorney, about
11        timing and logistics and stuff, so he could kind of
12        be planning ahead, and kind of what he and I had
13        talked about was that he would travel to South
14        Carolina on Monday, April 20, and Mr. Ringgold's
15        testimony would be presented on the 21st, and perhaps
16        we could do it so that his testimony would be maybe
17        right after lunch, and that way we could be in here
18        over the lunch hour testing out the equipment, making
19        sure he could see what we needed him -- we could do
20        kind of a test run with the equipment.  If there were
21        any glitches, maybe we would have time to work those
22        out in the meantime.  So just for planning purposes,
23        I thought I would alert the court that that was kind
24        of the sequence we were hoping to accomplish.
25                  THE COURT:  I think we need to actually do
```

```
1       a test run, so to speak, earlier than that so that if

2       it turns out that it doesn't work we're in a

3       situation where you can arrange to have Mr. Ringgold

4       here personally if you want to have him as a witness.

5       I'm perfectly fine waiting until Tuesday, the 21st,

6       whatever it might happen to be, but if the logistics

7       don't work, I don't propose giving additional time in

8       the trial if there's a complication getting Mr.

9       Ringgold here personally.

10              MS. MOREHEAD:  I don't think that would be

11      a problem.  The marshals have indicated that they

12      will -- by us saving them, frankly, the effort, they

13      said if it just didn't work out they would do

14      whatever they needed to do to get him here on short

15      notice.  We will do whatever.  If we have the

16      opportunity to do a test run, we certainly can do

17      that.

18              THE COURT:  Ms. Scheurer indicates that,

19      assuming I grant your motion, that you would have the

20      opportunity then to do a test run sooner so you'll

21      know whether or not that's going to work out.

22          Anyone else wish to be heard on this subject?

23          Hearing none, I'm going to grant the motion.

24      Mr. Rogers is the only objection that was made, on

25      behalf of Mr. Simpson.  His objection was one that
```

1    certainly has some substance to it, but I believe

2    that Ms. Morehead's point concerning sympathy being

3    as much engendered, or more so, by Mr. Ringgold's

4    personal appearance in a wheelchair and so forth

5    pretty much cancels out the sympathy aspect.  To the

6    extent that that seems to make Mr. Ringgold somehow a

7    more important witness or somehow emphasizes his

8    testimony, I believe that along with the sympathy

9    issue are subject to limiting instructions which will

10   adequately protect the rights and interests of the

11   defendants in this case.  Moreover, I think, in

12   talking through with Mr. Johnson here logistics in

13   cross examination and so forth, I am persuaded that

14   he will only be permitted to testify remotely if, in

15   fact, the logistics are such that the defendants are

16   able to cross examine Mr. Ringgold just as if he were

17   here live in the courtroom.  If logistically that

18   doesn't work out, then I will not permit him to

19   testify remotely.  So in that sense the government is

20   assuming the risk that the technical side of things

21   will work out and they will be able to present Mr.

22   Ringgold accordingly.  With that in mind, I will

23   grant the government's motion with those stipulations

24   and restrictions.

25        I would now like to take up the motions that

1    were made by Mr. McDaniel, Documents 686, 695, and

2    696, concerning disclosures that were made about

3    prospective information that Messrs. Anderson and

4    Humphrey have concerning Mr. McDaniel.  I've read

5    your submission, Mr. Bellemere, as well as the

6    government's response.  Do you wish to speak to

7    those?

8            MR. BELLEMERE:  Just briefly.  With regard

9    to Document 686, I don't believe that -- I believe

10   that this at best would have to come in as

11   coconspirator hearsay, and I don't -- just on their

12   face they don't seem to be any -- we can't tell where

13   they occurred.  They may have taken place in jail,

14   but let's assume they didn't.  They certainly don't

15   have anything to do with the furtherance of the

16   conspiracy.  In fact, I don't know that Mr. Anderson

17   has any place in the conspiracy.  So for that

18   reason --

19           THE COURT:  Mr. Bellemere, I appreciate as

20   to these motions your zealous representation of

21   Mr. McDaniel, but the government's response makes it

22   obvious that these were disclosures of information

23   that have been made available to them by these

24   individuals.  They did not purport to be disclosures

25   of testimony that they literally intended to offer up

1       to the jury, rather of information that's available

2       to them.  And they disclosed that to you at the

3       court's direction so that you and other counsel would

4       be aware that there are individuals out there who

5       purport to have some knowledge.  It is incumbent upon

6       the government before the jury has any of that

7       information shared with it to present that

8       information with a proper foundation and in a form

9       that is otherwise admissible, not only relevant and

10      material but accords with the rules of hearsay or

11      otherwise.  So your objections that you've

12      hypothesized here as to all three of these situations

13      are premature, much as those which you've raised that

14      we ruled on previously, and I see no basis to grant

15      you prospective relief.  Rather, I'm going to deny

16      your motions without prejudice to your raising these

17      issues contemporaneously if it appears that the

18      government has attempted to put evidence in which

19      does not satisfy the rules of evidence.  You will be

20      fully protected.

21          We are not going to guess what evidence the

22      government is going to put on, and we're not going to

23      pretry each of these items of evidence.  I rejected

24      the request for a James hearing that was made.  We

25      will be able to do this in the ordinary course of

```
1    things, and you will have a full and fair opportunity

2    to raise those objections on behalf of Mr. McDaniel.

3    Your motions are denied.

4         That brings us to Mr. Goodwin's, really, two

5    motions that kind of go together in light of the

6    filings that were made here.  They really don't

7    implicate anybody else other than Mr. Goodwin.  There

8    are some things I want to talk about and so on and so

9    forth.  Frankly, I would be more than happy to excuse

10   the other defense counsel and the defendants who wish

11   to be excused because you may have other things you

12   could use your time at more productively than sitting

13   here and listening to us talk about Mr. Goodwin's

14   motions to suppress.  So any counsel -- we have

15   covered the things I wanted you all here for,

16   scheduling, the issue of remote presentation and so

17   forth, so for any of you who wish to be excused, you

18   may now be excused.

19        MS. MOREHEAD:  Judge, could I ask one

20   question too?  You had mentioned, I think -- and I've

21   lost track of time, but maybe if we got down to fewer

22   defendants we might do voir dire here.  Are we still

23   going to do that upstairs?

24        THE COURT:  We're still at the number where

25   we will do it upstairs.  Let me say that if something
```

1    happened that additional defendants and the

2    government worked out some arrangement short of a

3    trial it could still affect certain logistical

4    aspects for the trial.  We're not at the point that

5    that's implicated yet.  We're still a defendant or

6    two over where we could make some accommodations, but

7    if we had a couple defendants maybe -- I don't know

8    what the number is -- who resolved their disputes

9    without trial, then I would want to revisit a couple

10   of these issues.  So keep posted for that.

11        Let me say one other thing just as putting

12   everybody on notice.  Once we start at 10:30 Tuesday

13   morning, with any luck start at 10:30 Tuesday

14   morning, if someone wishes to offer a plea of guilty,

15   that will not occur until the jury has been selected.

16   Once we start that morning, I'm not going to -- put a

17   different way even, before we start that morning,

18   we're not going to delay the start that morning for

19   any pleas of guilty.  So if people want to plead

20   guilty, that's fine; if they don't want to plead

21   guilty, that's fine; but you need to arrange to have

22   that accomplished before Tuesday morning.  And as a

23   practical matter, I don't get here until around 10:00

24   o'clock on Tuesday, so, practically speaking, I'm not

25   going to be able to take a plea Tuesday morning.  If

1     another judge is available to do it, fine.

2     Otherwise, you will need to participate in the voir

3     dire because we're going to start and we're going to

4     go and we will take a plea at 5:00 o'clock, 6:00

5     o'clock, 7:00 o'clock at night, whenever it is that

6     we're done doing voir dire.  I hope it's sooner than

7     that, but whenever it might happen to be.  So keep

8     that in mind for any of you who might be thinking

9     along those lines.  There is that timing aspect

10    involved.  For anyone who wishes to be excused --

11         Mr. Rogers?

12              MR. ROGERS:  Before we excuse people, your

13    Honor, I would like to make some suggestions

14    regarding furniture arrangement and courtroom

15    security, if I might.

16              THE COURT:  Sure.

17              MR. ROGERS:  I'm extremely uncomfortable

18    having to walk around the table to consult with my

19    client.  And I think -- having seen what the drapes

20    look like that go around the bottom of the tables, it

21    seems to me, your Honor, that we could accomplish the

22    same screening interest and probably be better from

23    the security standpoint if the two smaller tables

24    were -- first of all, if the big counsel tables were

25    moved up to here and the two smaller tables were put

| | |
|---|---|
| 1 | at the end in an L shape, and then you could have |
| 2 | Mr. Calbi, Mr. Wesley, me, Mr. Simpson, etc., |
| 3 | Mr. Sandage, Mr. Foy, etc., have plenty of room for |
| 4 | everybody to be seated next to their client and still |
| 5 | with the table between the jury and the feet of the |
| 6 | clients. |
| 7 | THE COURT:  I will take that suggestion |
| 8 | under advisement and see if that will work.  We have |
| 9 | people who will help us do that, and we will take |
| 10 | that into account.  If we agree with you that that's |
| 11 | feasible, we will take that into account.  But first |
| 12 | let me ask, do any of the other defense lawyers have |
| 13 | a different point of view?  I don't want to let Mr. |
| 14 | Rogers speak for himself to the detriment of anybody |
| 15 | else. |
| 16 | Mr. Johnson? |
| 17 | MR. JOHNSON:  We have a point of view, |
| 18 | which is we prefer to sit next to each other. |
| 19 | THE COURT:  And I would prefer to have you |
| 20 | sit next to each other. |
| 21 | MR. JOHNSON:  With this table we're a |
| 22 | little better off because it's a little narrower than |
| 23 | that thing, which is a large piece of furniture, and |
| 24 | I don't think they can come close to whispering to |
| 25 | their clients there.  But I know Mr. Goodwin and I |

```
 1            would prefer to sit next to each other during trial.
 2                      THE COURT:  We will see if we can
 3            accommodate that.  That would be my preference if I
 4            were counsel, to be sitting next to my client.
 5                      MR. ROGERS:  And the other security-related
 6            issue has to do with the leg irons, and this is a
 7            suggestion being directed towards the marshals, that
 8            if the concern is that if the defendants were to rise
 9            when the court entered the courtroom and -- or left,
10            or when the jury entered or left the courtroom, that
11            the chains might make some noise, they could easily
12            be wrapped with duct tape, and that would keep that
13            silent.
14                      THE COURT:  You've obviously given thought
15            to this, Mr. Rogers.
16                      MR. ROGERS:  Actually, I have experienced
17            it, Judge.
18                      THE COURT:  And perhaps you have another
19            career as a consultant on these matters that could be
20            available to you, but we will take your useful
21            suggestions under consideration.  Thank you, Mr.
22            Rogers.
23                 Does anybody wish to be excused?
24                 Mr. Calbi, do you wish to be excused?
25                      MR. CALBI:  I'm going to stay, your Honor,
```

1          Mr. Wesley asked me to stay.

2                    THE COURT:  All right.  Mr. Rogers?

3                    MR. ROGERS:  I would like to be excused,

4     your Honor.

5                    THE COURT:  You are excused.  And

6     Mr. Sandage?

7                    MR. SANDAGE:  My client and I would both

8     like to be excused.

9                    THE COURT:  You're excused.  Mr. Bell?

10                    MR. BELL:  Judge, we will stay.

11                    THE COURT:  Mr. Heathman?

12                    MR. HEATHMAN:  I'll stay, your Honor.

13                    THE COURT:  Mr. Bellemere?

14                    MR. BELLEMERE:  My client would like to be

15     excused, as would I, your Honor.

16                    THE COURT:  You're excused, and individual

17     defendants I have indicated are excused.  I'm going

18     to step down momentarily.  I'll allow the marshals to

19     escort those individuals out of the courtroom.  Let

20     me know when we're ready to proceed and we will.

21     Court stands in recess.

22                    (A recess was taken.)

23                    THE COURT:  Let the record reflect that

24     several of the other defendants have chosen to be

25     excused and as a matter of fact only Mr. Goodwin

1    remains among the defendants.  Other counsel, Mr.

2    Bell and Mr. Heathman, are still with us, as well as

3    Mr. Rogers, but they are free to leave should they

4    desire at any time without further ado.

5         I've read your motions, Mr. Johnson.  I've read

6    Ms. Morehead's response.  I want to hear some

7    commentary from you all, and then I have some

8    questions.

9         Mr. Johnson, I'll give you first shot.

10             MR. JOHNSON:  We have two motions before

11   the court.  One is a second motion to suppress

12   Mr. Goodwin's statement.  As a result of filing that

13   motion, there was a new disclosure by the government

14   in regards to an executed search warrant and a

15   related arrest of Mr. Goodwin at another location.  I

16   want to deal with the second motion first, given the

17   government's response.  I will candidly admit that

18   the database that I used doesn't have unpublished

19   opinions and I wasn't aware of the Tenth Circuit

20   opinion that was issued in January of 2009.  And

21   perhaps in this court's mind that may well prove

22   fatal to the motion that we put before the court.

23   Given that case, my analysis is really under a strict

24   search-incident-to-an-arrest scrutiny, which is

25   whether or not the areas searched and the items

1     seized are something that is either subject to harm

2     an officer or whether or not it has evidentiary value

3     that may be destroyed by the arrestee.

4          I think in this case, your Honor, cell phone

5     cases are not prevalent.  The government cited Finley

6     out of the Fifth Circuit.  I couldn't find any other

7     cell phone cases that were on point, at least in the

8     context of search incident to arrest.  I know there

9     are pager cases out there.  Perhaps they are closely

10    analogous.  But at the moment that the officer seized

11    the cell phone and the content therein, it really was

12    at that point something that was no longer subject to

13    destruction by Mr. Goodwin, and something that could

14    have been preserved.  In fact, they probably seized

15    and sealed that evidence.  At least from the reports,

16    I believe that they did.  At that point they had all

17    the time in the world necessary to get a search

18    warrant to open the cell phone and to examine the

19    contents therein.  I don't think that this is the

20    same kind of analysis that can be drawn with a

21    container case where it's simple enough to open a

22    container and look inside.  This is a device where

23    you have to go in, go through menu after menu, and

24    each one pulls up details of each record.

25               THE COURT:  I might add that all Ms.

1          Morehead proffered in her response to your first

2     motion with regard to Mr. Goodwin's cell phone, which

3     doesn't mean that's all she might want to use it for,

4     but was how Mr. Jones allegedly -- and I'm assuming

5     this.  That's one of my questions, actually, but I'm

6     assuming that her point was that Mr. Jones when he

7     testified to the grand jury based his statement that

8     Goodwin called because he knew about the cell phone

9     having Mr. Goodwin's number in it that was on him at

10    the time of the arrest.  Now, frankly, I need to know

11    more about that from the government, but for our

12    purposes here the question is not so much what other

13    information might have been gotten out of that cell

14    phone but as it relates to your first motion to

15    suppress.

16              MR. JOHNSON:  Sure.

17              THE COURT:  It really is focused on where

18    is the number in the cell phone if there's an issue

19    at all, and I don't know that.  There are obviously

20    some factual matters that I have some question about,

21    and my first curiosity was to see where you were

22    headed as a matter of your legal argument in light of

23    the case law cited by the government.  The

24    unpublished Tenth Circuit case that the government

25    cited which relies on Finley does seem to stand for

1      the proposition that it isn't a violation of

2      somebody's constitutional rights to actually look

3      into the cell phone when that's a search incident to

4      a lawful arrest.  There, of course, that was a case

5      in which the underlying arrest was in connection with

6      this whole potential violation of someone's civil

7      rights and obstruction of justice and so forth, and

8      the cell phone was seized and looked at at that

9      particular time.

10            MR. JOHNSON:  You're referring to the

11     Silvan case?

12            THE COURT:  Correct.  So in light of that

13     case, your argument then is what?

14            MR. JOHNSON:  In light of that case, your

15     Honor, like I said, your Honor, I'm being candid with

16     the court.  I have not found any case law that

17     contravenes the holdings in Silvan or Finley.  Given

18     that it's an unpublished opinion, I suppose I can

19     still say it's a matter of first impression in the

20     Tenth Circuit, and from a straight forward analysis

21     of a search incident to an arrest, our argument is

22     that the cell phone at the moment it was seized by

23     Leavenworth police officers was no longer an item

24     that was subject to destruction by Mr. Goodwin.  In

25     fact, Mr. Goodwin, I believe, was arrested outside of

1    the car.  If I am misspeaking or incorrect, your

2    Honor -- but it's my belief that the cell phone was

3    found inside the car.

4              THE COURT:  I don't believe that's what the

5    police report said.  Now, help me with that.

6              MR. JOHNSON:  I may be incorrect on that in

7    terms of what was in the report.  And, of course, we

8    haven't heard from the officers.

9              THE COURT:  I'm talking about where we are

10   thinking the facts are going.  My recollection of the

11   police report is Mr. Goodwin had the phone on his

12   person.

13        Is that correct, Ms. Morehead?

14              MS. MOREHEAD:  That's correct, your Honor.

15              THE COURT:  All right.

16              MR. JOHNSON:  That is in relationship to

17   the motion to suppress the content of the cell phone.

18   It is our concern that at trial the government, in

19   putting on its case against Mr. Goodwin where there

20   are some phone calls from that registered phone, they

21   are going to have to identify Mr. Goodwin as one of

22   the parties to that phone call, and they are going to

23   use the records that they obtained as a result of the

24   search on October 2, 2007, in part to further its

25   case against Mr. Goodwin.  So we seek to suppress

1     that as evidence at trial.

2                   THE COURT:  What records do you mean by

3     that?

4                   MR. JOHNSON:  First off, the identity of

5     the phone itself, which is its registered phone

6     number, which I understand from the police reports

7     they obtained by getting the cell phone itself,

8     search incident to arrest, and then I don't know what

9     other records they obtained inside that phone, but to

10    the extent there are inculpatory records -- for

11    example, records of phone calls between Mr. Goodwin

12    and any of the other coconspirators -- we would seek

13    to suppress those.  I don't know exactly what the

14    list is.  I know the officers made a list.

15                   THE COURT:  I got your point.  Then how

16    does that relate back to your first motion?  Is your

17    first motion still viable?

18                   MR. JOHNSON:  It is, Judge.

19                   THE COURT:  Explain --

20                   MR. JOHNSON:  In doing my research, I think

21    that -- well, I believe that the government can use

22    otherwise suppressible material in front of the grand

23    jury, and it can use hearsay in front of the grand

24    jury, and the rules of evidence are obviously more

25    relaxed in front of that body than they are in front

```
 1          of this court, but assuming Officer Jones can testify

 2          today that he was aware of the Leavenworth Police

 3          Department search and seizure on October 2, 2007 --

 4          he testified in front of the grand jury, and his

 5          testimony was clearly conclusionary when he

 6          testified, this is a phone call between Mr. Goodwin

 7          and Mr. Grigsby.  He has to have some basis for that.

 8          It was my presumption at the time I filed the motion

 9          that the only basis, was simply getting records from

10          phone company.  There now is additional information.

11          I'm going to presume for the sake of this argument

12          right now that Officer Jones knew of the October 2

13          stop.  But that still doesn't mean that he had

14          sufficient knowledge, whether it was obtained by

15          hearsay or had personal knowledge, to identify

16          Mr. Goodwin as a caller in August of 2007 with Mr.

17          Grigsby or Mr. Wesley.  In this case it was Mr.

18          Grigsby.

19                    THE COURT:  And I understand your argument.

20                    MR. JOHNSON:  I don't think the additional

21          facts from October 7 give him --

22                    THE COURT:  I got you.  I'm not cutting you

23          off because I don't want to hear you because I want

24          to hear you, but I wanted to see more like an opening

25          statement, so to speak, so I can understand what you
```

1    are still disputing with the government about to get

2    a better idea where we need to go, and you have told

3    me that now, and now I want to talk to Ms. Morehead

4    and come back and talk some more.

5              MR. JOHNSON:   Thank you, Judge.

6              THE COURT:   Thank you, Mr. Johnson.   Ms.

7    Morehead, is it correct if he were called to testify

8    Mr. Jones would testify -- by that I'm speaking of

9    Task Force Officer Eric Jones, the record should

10   reflect -- that he was aware of this cell phone

11   seizure and the identification of that telephone

12   number as having been the phone that was on the

13   person of Mr. Goodwin when Mr. Goodwin was arrested

14   in connection with Mr. Jones' testimony to the grand

15   jury, which is in issue here?

16             MS. MOREHEAD:   Judge, he absolutely was.

17   And, in fact, upon the filing of the motion to

18   suppress that was made, I was actually -- I had met

19   with Officer Jones the same day or the day after that

20   got filed, and I was like, okay, how were you -- how

21   did you conclude that that was Goodwin?   And he said,

22   well, because we got the cell phone on him.   And as

23   these events unfolded on October 2, Officer Jones and

24   Agent McCue were actually -- the Leavenworth police

25   were doing things at their direction.   They were part

1    of our investigation; they were part of the wiretap,

2    and the search warrant and the trashing and all of

3    that was at their direction.  And so they were in

4    intimate contact with them as these events unfolded

5    not only on that date but thereafter.

6         I would just clarify a few things for the court.

7    This got filed, frankly, you know, and I wanted to

8    get the case law on file, so I didn't really expand

9    much on the facts, but to expand on these facts --

10   and I articulated, obviously, in my response, the

11   search warrant that was issued was not only for the

12   residence but anybody living at the residence, as

13   well as vehicles.  And in that affidavit Officer

14   Snyder specifically articulated why they believed

15   Mr. Goodwin was living at that address, and so

16   certainly in their mind Mr. Goodwin was part and

17   parcel of this search warrant to begin with.  When

18   they saw him driving, Officer Vogel and

19   Officer Hinkle, they were aware he was suspended, and

20   they then proceeded to arrest him incident to arrest.

21             THE COURT:  Again I don't want to interrupt

22   you any more than I did Mr. Johnson, but --

23             MS. MOREHEAD:  Could I just --

24             THE COURT:  Not really.  Here is what I

25   want to do.  I understand where you're coming from; I

1    understand where Mr. Johnson is coming from.  I would

2    like to have an evidentiary hearing in which Mr.

3    Jones is permitted to testify concerning why he

4    testified the way he did to the grand jury, and I

5    would like to have evidence from the officer or

6    officers in connection with the search warrant and

7    then the ultimate arrest and seizure of the phone

8    from Mr. Goodwin.  Rather than simply having you and

9    Mr. Johnson tell me what you think the facts are, I

10   would like to play that out with live testimony, and

11   then I will give you all the opportunity to give me

12   your arguments at the end of it, but I believe we

13   still have a live controversy here on both of these

14   points that need to be resolved.  I understand what

15   both sides have suggested the law is, especially with

16   regard to Document 710.  Neither side favored the

17   court with any law on 698, the first motion,

18   concerning what would happen here, and I will tell

19   you, I've done a lot of research on this -- me

20   personally as well as my law clerk -- over the last

21   several days on that first motion, and the law is

22   quite sketchy, to be charitable about it, in that

23   particular area.  I understand, perhaps, why you

24   didn't cite anything, because there's really nothing

25   as directly on point as what was cited by the

1    government, for example, in its response to Document

2    710, but there are legal arguments that you all need

3    to be thinking about as well in this context, and I

4    have formulated some thoughts about those, but

5    there's maybe more to the story than what were the

6    facts in connection with that testimony before the

7    grand jury.

8         Now, obviously, Mr. Jones is probably available

9    any time the rest of us are here, including right

10   now.  I don't know about the Leavenworth officers.

11             MS. MOREHEAD:  They are fine.

12             THE COURT:  What are their schedules?  Are

13   they here?

14             MS. MOREHEAD:  Yes, they are here.

15             THE COURT:  Oh, is that these gentlemen in

16   the back?  I thought they were part of the marshal

17   auxillary.

18             MS. MOREHEAD:  No, they are here.  I have

19   all my witnesses.

20             THE COURT:  Pardon me.  I thought you all

21   were here for another purpose.

22        I think we need to have these individuals

23   testify and establish a factual record, and then we

24   can go from there.

25             MS. MOREHEAD:  Absolutely, Judge.

```
 1                    THE COURT:  You may proceed.

 2                    MS. MOREHEAD:  Eric?

 3                    MR. JOHNSON:  Before we begin, I don't have

 4          a copy of the grand jury transcript.  Is there one

 5          the government could let me use in the course of this

 6          hearing?

 7                    THE COURT:  I don't think I brought my copy

 8          down.

 9                         ERIC T. JONES,

10    having been duly sworn, was examined and testified as

11    follows:

12                        DIRECT EXAMINATION

13    BY MS. MOREHEAD:

14                    THE COURT:  You are Eric T. Jones, the

15          officer about whom we have been conversing; is that

16          correct?

17                    THE WITNESS:  That is correct, sir.

18                    THE COURT:  You may proceed, Ms. Morehead.

19    Q.    (By Ms. Morehead) Please remind the court about your

20          involvement with this investigation, if you would.

21    A.    I was one of the lead co-case officers of this

22          investigation.

23    Q.    And in connection with the events in 2007 which

24          preceded the superseding indictment in this case,

25          were you intimately familiar with all the facts as
```

1      they unfolded during the course of this

2      investigation?

3   A.   Yes.

4   Q.   Specifically, when you testified on January 30, 2008,

5      did you provide information concerning Franklin

6      Goodwin?

7   A.   Yes.

8   Q.   And in connection with Mr. Goodwin, during your grand

9      jury testimony did you specifically testify

10      concerning a specific phone call that he was involved

11      with making to Henry Grigsby?

12   A.   Yes.

13   Q.   And during your testimony did you, in fact, indicate

14      that you had knowledge that the caller for the call

15      for which the jury heard testimony, that that was, in

16      fact, Franklin Goodwin?

17   A.   I believe I made the statement that this was a phone

18      call between Mr. Goodwin and Mr.Grigsby, so yes, in

19      essence, that's what I was saying.

20   Q.   And that involved Count 11, which was a phone call

21      which had been made on August 20 of 2007; correct?

22   A.   Yes.

23   Q.   And when you testified before the grand jury on

24      January 30, 2008, what did you base that statement or

25      that testimony on, that you had knowledge that that

1      was Mr. Goodwin on the phone?

2   A.  That statement was based upon subscriber information

3      that we received for that phone number which came

4      back to Mr. Goodwin at his mother's address in

5      Leavenworth.  It listed his Kansas drivers license,

6      social security number, date of birth, as well as the

7      follow-up investigation that Leavenworth PD conducted

8      in which they conducted a trash pull search warrant

9      at his residence, came into contact with him, and

10      discovered that he, in fact, did have that phone in

11      his possession.

12   Q.  And when that specific event occurred on October 7,

13      2007, did they keep you posted on the events of the

14      investigation of Mr. Goodwin that day?

15   A.  Yes.  Throughout this entire investigation we were

16      constantly in contact with each other, and, in fact,

17      the majority of them spent most of their time in our

18      office throughout this investigation.

19   Q.  They were monitoring -- they were involved in

20      monitoring phone calls, just as many of the DEA

21      agents and other personnel were; is that right?

22   A.  Yes.  All the members of the narcotics unit,

23      including the supervisor, were assigned shifts.  They

24      were intimately involved and assisted us in

25      identifying several of the key players in

1          Leavenworth.

2    Q.    When you start, for instance, with regards to

3          Mr. Goodwin, is it true that the phone calls that he

4          had with Mr. Grigsby would have occurred in about

5          August of 2007?

6    A.    Yes.

7    Q.    And do you recall the phone number that those calls

8          came from?

9    A.    Are you referring to Mr. Goodwin's phone number?

10   Q.    Yes, Mr. Goodwin's phone number.

11   A.    I'm doing this off memory, but I believe it's

12         (913)683-5074, I believe.

13   Q.    If I showed you some records, would that refresh your

14         recollection or confirm what you're going off your

15         memory by?

16   A.    That would be better, yes.

17   Q.    Let's just confirm that.  And what you're looking at,

18         is that an internal log of phone calls that came in

19         and what number they were associated with?

20   A.    Yes.  This is a spreadsheet that Special Agent McCue

21         and did I throughout this investigation, because of

22         the volume of phone calls, to keep the call numbers

23         and what they were talking about kind of in order.

24   Q.    What did you find out?

25   A.    In fact, in August of '07 there's several phone calls

1      from (913)683-5074 that we have identified as

2      Franklin Goodwin.

3  Q.  Okay.  And was there even a phone call by Mr. Goodwin

4      to Monterial Wesley during the intercepts in this

5      case as well?

6  A.  Yes, there was.

7  Q.  Was that the same phone number, the (913)683-5074?

8  A.  Yes, it was.

9  Q.  In connection with the events on October 2 of 2007,

10     were you -- did you become aware of, during the

11     contact with Mr. Goodwin, recovery of a phone?

12 A.  Yes.

13 Q.  And when did you receive the information about the

14     recovery of that particular phone?

15 A.  That day.

16 Q.  And in connection with those events that the phone

17     was recovered and the information that the officers

18     obtained, was that the basis then of your testimony

19     before the grand jury?

20 A.  Yes.

21          MS. MOREHEAD:  Judge, that's all the

22     testimony I have.

23          THE COURT:  All right.  Mr. Johnson, you

24     may cross examine.

25          MR. JOHNSON:  Thank you, Judge.

```
 1                        CROSS EXAMINATION
 2   BY MR. JOHNSON:
 3   Q.   Officer Jones, let's actually get the exact language
 4        of the -- of your testimony to the grand jury before
 5        the court.  Have you reviewed the transcript?
 6   A.   No, sir.
 7   Q.   I only have one copy, so we will have to share.
 8             MR. JOHNSON:  May I approach, Judge?
 9   A.   You may.
10   Q.   (By Mr. Johnson) I'm going to show you first page 20.
11        This is a transcript; is that correct?
12   A.   Yes.
13   Q.   Okay.  And this is the 30th day of January, 2008?
14   A.   That's correct.
15   Q.   And you are the witness who is testifying?
16   A.   That's correct.
17   Q.   On page 20, line 23, it begins with a question:
18        "QUESTION:  Okay.  Count 11.  August 20, 2007.
19        Tell us about that count."
20        Officer, will you read your answer beginning at
21        line 25 and going onto page 21.
22   A.   Yes.  "That is a call to Mr. Grigsby and another
23        supplier or customer of his.  Goodwin wants a two and
24        a kick so -- and Grigsby agrees."
25   Q.   Okay.  And then the next reference you actually make
```

| | |
|---|---|
| 1 | to Mr. Goodwin is in regards to a question and answer |
| 2 | on line 17 to 19 where Ms. Morehead asked you if Mr. |
| 3 | Goodwin is a Leavenworth resident. |
| 4 | A. That's correct. |
| 5 | Q. And you answered yes. |
| 6 | A. Yes. |
| 7 | Q. And that was the only testimony that you actually |
| 8 | gave in regards to identifying Mr Goodwin? |
| 9 | A. That's correct.  I answered the questions as they |
| 10 | were brought before me. |
| 11 | Q. At the time that you testified, you did not tell the |
| 12 | grand jury how you were able to identify Mr. Goodwin? |
| 13 | A. That's correct. |
| 14 | Q. You only gave the conclusion that, in fact, it was |
| 15 | Mr. Goodwin? |
| 16 | A. That's correct. |
| 17 | Q. What you knew at that time though was subscriber |
| 18 | information for the phone number? |
| 19 | A. Yes, sir. |
| 20 | Q. And knew that that phone itself had been taken from |
| 21 | Mr. Goodwin? |
| 22 | A. That's correct. |
| 23 | Q. But you didn't have any information at that time from |
| 24 | any of the parties of the phone calls? |
| 25 | A. Sorry.  Say that again. |

1    Q.    At the time the phone calls were intercepted in

2          August 2007?

3    A.    Okay.

4    Q.    You had no information from Mr. Grigsby himself?

5    A.    Okay.

6    Q.    Is that right?

7    A.    That's correct.

8    Q.    Mr. Grigsby did not identify for you the party on the

9          other end?

10   A.    That's correct.

11   Q.    You have that information now?

12   A.    That's correct.

13   Q.    You knew only the subscriber info, information?

14   A.    Yes, sir.

15   Q.    And that the phone was on Mr. Goodwin?

16   A.    Yes, sir.

17   Q.    But you had not done any voice analysis?

18   A.    No, sir.

19   Q.    And you had no witnesses who identified Mr. Goodwin?

20   A.    No, sir.

21   Q.    That didn't come about until, again, Mr. Grigsby

22          recently?

23   A.    That's correct.

24   Q.    And then you were able to further identify

25          Mr. Goodwin when he made his statement to you in

```
 1        February 2008?

 2   A.   That's correct.

 3                MR. JOHNSON:  No further questions, Judge.

 4                THE COURT:  Thank you very much.  Mr.

 5        Jones, you may step down.  Thank you.

 6            Ms. Morehead, you may call your next witness.

 7                MS. MOREHEAD:  Judge, I have, frankly,

 8        Officer Snyder here, who authored the search warrant.

 9        I don't know if you want any background information

10        about that.

11                THE COURT:  It doesn't seem to me to be

12        something I need, but I don't want to try your case

13        for you, so to speak.  If you think there's something

14        there I ought to know about, put him on.

15                MS. MOREHEAD:  I think I will.

16                THE COURT:  I'm more interested in the

17        arrest than I am the search warrant.

18                MS. MOREHEAD:  I think I will just for the

19        sake of laying some foundation.

20                THE COURT:  Sure.  You may.

21

22

23

24

25
```

```
 1                    JEREMY AARON SNYDER,

 2    having been duly sworn, was examined and testified as

 3    follows:

 4                    DIRECT EXAMINATION

 5    BY MS. MOREHEAD:

 6    Q.   Please tell the court where you're employed.

 7    A.   Currently with the Olathe Police Department.

 8    Q.   And how long have you been with the Olathe Police

 9         Department?

10    A.   About six months.

11    Q.   And before that where were you employed?

12    A.   The Leavenworth Police Department.

13    Q.   And how long were you employed there?

14    A.   About five years.

15    Q.   And during the course of your employment there, were

16         you involved in the wiretap investigation concerning

17         Monterial Wesley and the other codefendants in this

18         particular case?

19    A.   Yes.

20    Q.   And in connection with that investigation, were you

21         involved in securing a search warrant then back on

22         October 2 of 2007?

23    A.   Yes, I was.

24    Q.   And in connection with that, did you prepare an

25         affidavit?
```

```
 1   A.   I did.

 2   Q.   Was that signed by a Leavenworth County district

 3        judge?

 4   A.   It was.

 5   Q.   I want to hand you what's been marked as Plaintiff's

 6        Exhibit No. 1.  Can you just tell the court what that

 7        set of documents consists of.

 8   A.   Sure.  This would be the affidavit and application

 9        for the search warrant and additionally the search

10        warrant return and the copy of the Leavenworth Police

11        Department property card which identifies the items

12        that I marked down as being seized from the

13        residence.

14   Q.   And this is a certified copy of that; is that right?

15   A.   That's correct.

16             MR. JOHNSON:  No objection.

17             THE COURT:  All right.  Without objection

18        Exhibit 1 is admitted for the purpose of this

19        hearing.

20             (Exhibit 1 was admitted into evidence.)

21   Q.   (By Ms. Morehead) In connection with that affidavit,

22        Officer Snyder, there was information that you

23        provided to the district court judge, and I am

24        reading from, frankly, the first paragraph of that

25        affidavit, that "the Leavenworth Police Department
```

```
1          Special Investigations Unit has received reliable

2          information from an unnamed source that

3          Mr. Goodwin Jr. has been receiving and selling

4          cocaine."

5              Can you tell Judge Lungstrum today what you were

6          referencing in connection with the information that

7          you had when you applied for the search warrant?

8    A.   Sure.  I was referencing information that I received

9          from Officer Jones.  We had been given telephone

10         numbers that we were tasked out to identify who was

11         the actual subscriber or the holder of the phone.  So

12         we went ahead and went out and tried to make phone

13         calls in order to view this person actually using a

14         cell phone.

15   Q.   All right.  So when you were referring to there was

16         reliable information from an unnamed source, you were

17         speaking from -- you were speaking about information

18         that you had -- you and other officers had gathered

19         from the intercepted phone calls that had been made

20         from a phone number associated with Mr. Goodwin as

21         the subscriber?

22   A.   That's correct, directly from the T3.

23   Q.   Is there a reason you didn't put that in this

24         affidavit, that it was from the federal T3 wiretap

25         investigation?
```

```
 1   A.   Yes, sir.

 2   Q.   Why didn't you put that in there?

 3   A.   Basically, this would have been an open document once

 4        it goes back through the district court clerk.

 5   Q.   All right.  And so with that kind of explanation you

 6        indicated that you went through the process then of

 7        trying to make -- take opportunities to try to

 8        identify different individuals, including

 9        Mr. Goodwin, with regards to phone numbers that had

10        been intercepted on the wiretap?

11   A.   That's correct.

12   Q.   And were there any episodes prior to October 2 where

13        you or other officers along with you made efforts to

14        identify if that phone number that Officer Jones

15        mentioned, the phone number 683-5074, whether that

16        was a phone attributable to Mr. Goodwin?

17   A.   Yes, there were other attempts.

18   Q.   Tell us what happened on those other attempts.

19   A.   Myself and Officer Vogel, we had located Mr. Goodwin,

20        and we had attempted to make a phone call.  He was

21        walking in between the residence that I had written a

22        search warrant for and his mother's house.

23   Q.   What's the distance from 312 S. Ninth Street to his

24        mother's residence?

25   A.   It would probably be about half a block.  It's less
```

```
 1          than a block.

 2   Q.    Okay.  And do you remember when that was in

 3          connection with the October 2 incident?

 4   A.    It would probably have been about a few days prior.

 5   Q.    Okay.  And so as you see him walking, what do you and

 6          Officer Vogel do in connection with the phone number

 7          (913)683-5074?

 8   A.    Officer Vogel went ahead and made a blocked phone

 9          call, or, in other words, like, a Star 67, in order

10          to keep the privacy of the phone number.  Mr. Goodwin

11          was seen to go get his phone; he looks at the phone

12          and then puts it away.  It's our assumption that he

13          didn't answer the phone because it was a blocked or a

14          private number.

15   Q.    Okay.  And so that event had occurred, again, prior

16          to this search warrant on October 2?

17   A.    That's correct, prior to.

18   Q.    And then in connection with this you also did a trash

19          pull and collected a number of items of evidence out

20          of the trash at 312 S. Ninth Street; is that right?

21   A.    That's correct.

22   Q.    And was Mr. Goodwin -- was there information in the

23          trash that associated to Mr. Goodwin at that address?

24   A.    Several documents.

25   Q.    In the search warrant did you, in fact, indicate that
```

1      you were seeking authorization to search not only the

2      residence but any persons residing at the residence

3      and any vehicles associated with those individuals?

4   A.   That's correct.

5              MS. MOREHEAD:   Judge, that's all I have.

6      Thank you.

7              THE COURT:   All right.   Mr. Johnson, you

8      may cross examine.

9                     CROSS EXAMINATION

10  BY MR. JOHNSON:

11  Q.   Officer or detective?

12  A.   Officer is fine.

13  Q.   Did you draft a report regarding your surveillance of

14       Mr. Goodwin using a telephone?

15  A.   No, I did not.

16  Q.   Why not?

17  A.   We were just doing mainly just stuff off the fly.

18  Q.   Off the fly?

19  A.   Just basically off the fly or as you're going.

20  Q.   Okay.  You were cooperating with McCue and Jones,

21       with the DEA, and I guess the Kansas City Kansas

22       Police Department?

23  A.   That would be correct.

24  Q.   And you were acting under their direction?

25  A.   Yes, sir.

1   Q.   And you went to identify Mr. Goodwin?

2   A.   That's correct.

3   Q.   And you attempted to identify him as a user of a

4        particular phone?

5   A.   That's correct.

6   Q.   Working with the DEA?

7   A.   We were working with the DEA, that's correct.

8   Q.   And you didn't generate a report?

9   A.   Not a narrative report, no.

10  Q.   Any report?

11  A.   Just the report from my search warrant.

12  Q.   Okay.  And that makes no mention of this particular

13       surveillance that you conducted days before the

14       execution of the search warrant?

15  A.   I don't typically put assumptions in my search

16       warrants, just facts.

17  Q.   Were you there during the execution of the search

18       warrants?

19  A.   I was.

20  Q.   Do you know one way or another if Mr. Goodwin has a

21       son by the name of Franklin Sherman Goodwin Jr.

22  A.   I guess that would be a high probability.

23  Q.   Okay.  You found in your trash pull school documents

24       with the name Franklin S. Goodwin Jr. on them?

25  A.   I just recall Franklin Goodwin.

1    Q.   But they were school documents?

2    A.   Some of them were school documents.

3    Q.   Did they look like they came from an elementary

4         school?

5    A.   They did.

6              MR. JOHNSON:  Thank you.  No further

7         questions.

8              MS. MOREHEAD:  Nothing based on that, your

9         Honor.

10             THE COURT:  Then you may step down.

11        Ms. Morehead, you may call your next witness.

12             MS. MOREHEAD:  Thank you.  I call Officer

13        Vogel.

14                  NEIL KENT VOGEL,

15   having been duly sworn, was examined and testified as

16   follows:

17                  DIRECT EXAMINATION

18   BY MS. MOREHEAD:

19   Q.   Please tell the court where you're employed.

20   A.   City of Leavenworth Police Department.

21   Q.   And how long have you been employed with the police

22        department?

23   A.   I'm going on eight years now.

24   Q.   And are you assigned to the narcotic unit there with

25        the Leavenworth Police Department?

1    A.    Yes, I am.

2    Q.    And how long have you been assigned to them?

3    A.    I'm going on about three years now, I believe.

4    Q.    Officer Vogel, were you involved in the wiretap

5          investigation concerning Monterial Wesley and others,

6          including Mr. Goodwin?

7    A.    I was.

8    Q.    I want to direct your attention back to October 2 of

9          2007.  Did you and Officer Jason Hinkle have occasion

10         to come into contact with Mr. Goodwin on that date?

11   A.    Yes, ma'am.

12   Q.    And before you came into contact with him, were you

13         aware that Officer Snyder had, in fact, obtained a

14         search warrant for 312 S. Ninth Street, any persons

15         residing at the residence along with any vehicles

16         associated to that location?

17   A.    I was.

18   Q.    And in connection with that, can you tell us what you

19         did prior or just preceding the execution of that

20         search warrant.

21   A.    Myself and Officer Hinkle both set up surveillance at

22         312 S. Ninth Street.  During surveillance -- we set

23         up about the more early morning hours.  I did see

24         during that surveillance time a black male come out

25         of the residence wearing, I believe, a black jacket

1    and yellow pants.  It was very recognizable.  I

2    wasn't sure who that was at that given point, but

3    they did get into a vehicle, a red and blue Ford

4    Thunderbird.  Officer Hinkle and I attempted to

5    follow the vehicle to see if we could identify the

6    person occupying the vehicle, or driving it, but we

7    lost it pretty shortly thereafter that.

8  Q.  Had you seen that vehicle on prior occasions?

9  A.  Yes, I have.

10  Q.  And where had you seen that vehicle on prior

11    occasions?

12  A.  I had actually seen Mr. Goodwin driving it on a prior

13    occasion, and I had also seen it parked there at 312

14    S. 9th, and also at 922 Cherokee.

15  Q.  What is at 922 Cherokee?

16  A.  That's where Mr. Goodwin's mother lived.

17  Q.  In connection with the surveillance that you did, did

18    you have occasion to see the vehicle after you

19    initially lost sight of it?

20  A.  Yes, I did.

21  Q.  And where did you see it at?

22  A.  I was actually just in the general vicinity.

23    Officer Hinkle had told me personally that he had

24    found the vehicle again and it was currently parked

25    at 922 Cherokee Street.

1   Q.   What happened once the vehicle was relocated at 922

2        Cherokee?

3   A.   Once the vehicle was found again at 922 Cherokee, we

4        set up surveillance again on that vehicle with yet

5        again the attempt to identify the driver of the

6        vehicle.  Officer Hinkle brought to my attention that

7        he observed a person that appeared to be the same

8        person that I had given him a description of earlier

9        that morning getting into the vehicle.  I had

10       binoculars with me and was at a good vantage point

11       where I could make a positive identification that it

12       was Franklin Goodwin Jr. getting into the vehicle.

13  Q.   What did you and Officer Hinkle do?  I assume you and

14       Officer Hinkle are in separate vehicles.  Is that

15       safe to assume?

16  A.   That's correct.

17  Q.   What did you and Officer Hinkle do at that point,

18       once you had identified that Mr. Goodwin was driving

19       that vehicle?

20  A.   We knew that -- I had already checked with my

21       dispatcher to verify that Mr. Goodwin had a suspended

22       drivers license.  Our goal was, prior to serving that

23       search warrant at that location, to try to make sure

24       he was away from that location for officer safety

25       purposes.  We do that on occasion.  We followed him

1    northbound on Tenth Street from Cherokee all the way

2    up to Metropolitan.  He went west on Metropolitan to

3    a car wash in the 1200 or 1300 block.  Officer Hinkle

4    made contact with him first.  I got stuck in a little

5    bit of traffic, but whenever I pulled my car into the

6    lot, Officer Hinkle already had him in custody.

7    Q.   Was Mr. Goodwin arrested for driving while suspended?

8    A.   He was.

9    Q.   In connection with his arrest, was there an amount of

10   U.S. currency and a cell phone found on his person?

11   A.   Yes, ma'am.

12   Q.   With regards to the cell phone, tell us what

13   transpired once you and Officer Hinkle had

14   Mr. Goodwin in custody.

15   A.   What we had done before, when we would come in

16   contact with someone we believed was involved in this

17   conspiracy, other codefendants, when we would find a

18   phone we thought we were intercepting, we would place

19   test calls for the phone to verify our assumptions

20   that we had.

21   Q.   And in this particular case did you know that the

22   phone number that had been identified as being

23   subscribed to by Franklin Goodwin, that it was

24   (913)683-5074?

25   A.   I did.

1    Q.   And so with that information what did you do while

2         you were there with Officer Hinkle?

3    A.   While I was there, Officer Hinkle actually had the

4         phone.  I placed a phone call to the phone, and I

5         made sure it came up private, not to mistake it with

6         anybody else that would be calling in.  The phone

7         rang.  It came up private.

8    Q.   What phone?  Could you just --

9    A.   I'm sorry.  The phone that we identified as taken off

10        of Mr. Goodwin Jr.

11   Q.   And what number did you actually dial to do this test

12        call then with regards to the phone that

13        Officer Hinkle had?

14   A.   I can't remember the exact number.  It's the one that

15        Mr. Jones stated.  It was 683-5074.  But I put Star

16        67 in there first to disguise my number.

17   Q.   When you dialed that cell phone number, what happened

18        with regards to the phone Officer Hinkle had taken

19        off of Mr. Goodwin?

20   A.   That was seized as evidence.

21   Q.   What happened with regards to the phone?

22   A.   It showed up private on the phone.  It was indicating

23        it was ringing.

24   Q.   In connection with that, in Officer Hinkle's report,

25        he indicated that Mr. Goodwin's cell phone rang and

1       he answered it.  Did Officer Hinkle actually answer

2       the phone when you did that test call?

3  A.   Yes.

4  Q.   Was that also an indication that that was the same

5       phone number that had showed up in the wiretap

6       investigation concerning phone calls between Frank

7       Goodwin and Henry Grigsby?

8  A.   Yes, ma'am.

9  Q.   Now, today did you bring that cell phone with you?

10  A.   I did.

11  Q.   And in connection with that cell phone, prior to

12       coming into court did I ask you to turn that on?

13  A.   Yes, you did.

14  Q.   What happens -- what kind of a cell phone is that?

15  A.   It's a -- I think it's a Motorola.  It's a Razr cell

16       phone.

17  Q.   Are you familiar with those kinds of cell phones?

18  A.   I am.

19  Q.   Why?

20  A.   I used to own one.

21  Q.   When you turn that cell phone on, what happens?

22  A.   It will bring up Motorola at first.  Then the little

23       Cingular guy -- I can't explain him -- he pops up.

24       Then it says my phone number is . . . and it displays

25       the phone number on the screen.

```
 1   Q.   Were you able to look in the called numbers of that

 2        cell phone and identify the private number that you

 3        indicated?  Is that still stored in that phone?

 4   A.   It is.

 5   Q.   And what shows up on that cell phone as we sit here

 6        today?

 7   A.   There's actually two other missed calls -- or two

 8        other calls that happened after mine.  Mine is like

 9        the seventh one on the call list, so it shows private

10        in there.

11   Q.   What time did that happen on October 2, 2007?

12   A.   I can't remember if it was 12:07 or 12:17.

13   Q.   Do you have the phone with you?

14   A.   Yes, I do.

15   Q.   Can you look at it for us just so we have a clear

16        record.

17   A.   Yes.  That's what I was telling you came up the first

18        time.

19             MS. MOREHEAD:  Judge, can we put it on the

20        display?

21             THE COURT:  You may.

22   Q.   (By Ms. Morehead) Do you want to step down here,

23        officer?

24   A.   Yes.

25             MS. MOREHEAD:  Judge, I would mark this as
```

```
 1          Government's Exhibit No. 2 for purposes of this
 2     hearing and to demonstrate this for the court.
 3                 THE COURT:  Very well.  Any objection?
 4                 MR. JOHNSON:  No objection.
 5                 THE WITNESS:  The phone is off.
 6                 THE COURT:  Exhibit 2 is admitted.
 7                 (Exhibit 2 was admitted into evidence.)
 8     A.   The phone is off.  I just hit the on button.  That's
 9          the first screen that pops up.  Next will be the
10          little guy that I was explaining.  There is the phone
11          number.
12     Q.   (By Ms. Morehead) Okay.
13     A.   It's saying registering because it's probably
14          inactive by now.
15     Q.   Whose picture comes up there on the front of that?
16     A.   It's Mr. Goodwin.  To access the call logs, you hit
17          this button.  It says menu.  Arrow left.  To the
18          right part of the screen, recent calls, hit select.
19          Go to received calls, select.  You have the number.
20          It has private.  Since there's a check mark next to
21          private, that means the call was answered.  To view
22          that, 12:17 p.m, the call was -- you hit okay to
23          accept, in our case Officer Hinkle did.  It was 10/2
24          of '07, and the conversation was 11 seconds long.
25               Can I turn it back off?
```

1   Q.   Why don't you leave it on in case some questions pop

2        up.

3             Subsequent to that, Officer Vogel, did you have

4        occasion to go through that phone and write down the

5        internal information documenting phone calls made or

6        phone calls received?

7   A.   Yes.  Officer Hinkle and I did at the residence.

8   Q.   That would have been done later?

9   A.   Uh-huh.

10  Q.   Was that in connection -- was that a yes?

11  A.   Yes, ma'am.  I'm sorry.

12  Q.   Was that in connection with the narcotics

13       investigation and the search warrant that was

14       executed?

15  A.   Yes, ma'am.

16  Q.   And the search warrant, with regards to the one that

17       Officer Snider testified to, did it allow for the

18       search of cellular and digital telephones?

19  A.   It did.

20             MS. MOREHEAD:  Judge, that's all I have.

21       Thank you.

22             THE COURT:  Thank you.  Mr. Johnson?

23

24

25

1          CROSS EXAMINATION

2    BY MR. JOHNSON:

3    Q.   Officer, the search warrant was for the residence?

4    A.   Yes, and people associated to the residence.

5    Q.   It authorized you to execute that search warrant at

6         the residence on Ninth Street?

7    A.   Yes.

8    Q.   And any people located at that residence?

9    A.   Yes.

10   Q.   And any items located at that residence?

11   A.   Yes.

12   Q.   You did not locate the cell phone at that residence?

13   A.   No.

14   Q.   You took it there later?

15   A.   Yes.

16   Q.   Had you been working on the investigation with

17        Mr. Goodwin in advance of October 2?

18   A.   I don't recall.  I mean, we might have intercepted

19        what we believed to be his phone prior to that date.

20   Q.   Do you recall working in the investigation at all

21        prior to October 2?

22   A.   Yes.

23   Q.   What did you do prior to October 2?

24   A.   Prior to October 2 myself and other members of my

25        unit, some of which are no longer with my unit, were

1              responsible for speaking with Task Force Officer Eric

2              Jones, Special Agent Tim McCue in this investigation,

3              starting it up.  Once the investigation started up,

4              we also assisted in monitoring the wiretaps and

5              surveillances and things like that.

6    Q.   So you had been participating in the investigation

7         for some period of time with Officer Jones?

8    A.   Yes, sir.

9    Q.   On October 2 when you arrested -- I say you, you the

10        Leavenworth Police Department, arrested Mr. Goodwin,

11        where were you at the time of the arrest?

12   A.   I was pulling into the parking lot.

13   Q.   Did you witness -- was it Vogel?

14   A.   I'm Officer Vogel.

15   Q.   I'm sorry.  I get the two confused.  Hinkle?

16   A.   Yes.

17   Q.   Did you observe Officer Hinkle conduct the arrest?

18   A.   Yes.

19   Q.   Where was Mr. Goodwin when he was apprehended?

20   A.   He was outside of his vehicle.  I believe he was

21        walking across the parking lot area, where

22        Officer Hinkle intercepted him.

23   Q.   How far away from his car was he at the time he was

24        arrested?

25   A.   Fifteen, 20 yards, maybe.

1   Q.   And he was actually arrested at gunpoint and put on

2        the ground?

3   A.   He was to my understanding.

4   Q.   Did you witness that?

5   A.   I believe I witnessed Officer Hinkle with his pistol

6        out pointed at Mr. Goodwin, and Mr. Goodwin didn't

7        resist or anything like that.  He went right to the

8        ground.

9   Q.   What did you do -- did you witness then the actual

10       handcuffing of Mr. Goodwin?

11  A.   As I was pulling into the parking lot, Officer Hinkle

12       was placing restraints on Mr. Goodwin, so yes.

13  Q.   And did you immediately join him?

14  A.   I walked over.  He was already secured, so I didn't

15       need to assist him in placing any other restraints on

16       him.

17  Q.   Who of you two actually searched Mr. Goodwin?

18  A.   I believe Officer Hinkle was the one that searched

19       Mr. Goodwin.

20  Q.   Did you witness the search?

21  A.   Yes.

22  Q.   And what were the results of searching his person?

23  A.   I know that Officer Hinkle located a large sum of

24       U.S. currency on him, and also located a cellular

25       phone on him.  I would have to check if we found

1        anything else.  I can't remember.

2   Q.   Where on him did you find the cell phone?

3   A.   I didn't find the cell phone.  Officer Hinkle did.  I

4        don't recall which pants pocket it might have been

5        in.

6   Q.   Was it in pants pockets?

7   A.   I believe so, but I'm not 100 percent.

8   Q.   What was the weather on that day?

9   A.   It was kind of chilly.  It wasn't freezing out or

10       anything like that, but it was enough to where you

11       probably needed a jacket.

12  Q.   Was it wet out?  Was it raining or anything like

13       that?

14  A.   I don't recall it being wet, but it could have been.

15       I don't recall.

16  Q.   Why did you end up searching the car?

17  A.   Because we just arrested him for driving while

18       suspended and we can search incident to arrest the

19       area that they were immediately accessible to.

20  Q.   But he was arrested 10 or 15 yards, something like

21       that, from the car?

22  A.   Yes.

23  Q.   Can you describe what that car looks like.

24  A.   It was a red-and-blue Ford Thunderbird.  It had

25       mismatched parts to make it a full car.

1   Q.   It seemed like it was kind of a beater car with

2        mismatched body panels?

3   A.   Yeah.  They were all to go to that vehicle, but they

4        were all different colors, but it was red or blue.

5   Q.   When you say red or blue, it wasn't a fancy two-tone

6        paint job, it was different body panels?

7   A.   Yes.

8   Q.   Did you issue a citation for driving while suspended?

9   A.   I believe Officer Hinkle did that.

10  Q.   Do you know the citation number?

11  A.   No.

12  Q.   Do you know if it was ever processed in court?

13  A.   I don't know if it was or not.  I don't know the

14       report number, but there was a report taken on that.

15  Q.   Do you have a copy of the report in front of you?

16  A.   Not the driving-while-suspended report, no.

17  Q.   Did you actually witness the other officer write the

18       citation?

19  A.   No.

20  Q.   So you don't know if one was actually handed out or

21       not?

22  A.   I know that he would have written a citation.  We

23       won't arrest somebody and not give them a citation

24       for it.

25  Q.   Did you then participate in the search of the house

```
 1          on Ninth Street?

 2    A.    Somewhat.

 3    Q.    What did you do in regard to the search?  What was

 4          your role?

 5    A.    When I arrived, the majority of the searching had

 6          been done by Officer Snyder.  He had found the

 7          majority of the evidence.  I went upstairs and

 8          searched part of the upstairs bedroom area, but

 9          primarily most of the evidentiary items that were

10          located were done by Officer Snyder.

11    Q.    Did you locate any evidence that was taken by the

12          police and marked?

13    A.    Yes.  I would have assisted in evidence packaging and

14          stuff like that down the road.

15    Q.    Was there anything that you yourself recovered that

16          was collected and marked?

17    A.    Um.

18    Q.    For the record, you're referring --

19    A.    I'm referring to the narrative that I wrote for the

20          search warrant at 312 South Ninth.

21    Q.    Is that because you don't remember?

22    A.    Yeah, I don't recall.  I located a digital scale that

23          was in the far closet from the room.  This was the

24          master bedroom upstairs.

25    Q.    Will you describe that for us.
```

1    A.    I have it with me, if you want me to show it to you.

2    Q.    What was the condition at the time that you seized

3          it?

4    A.    As I put in my report, it was kind of dusty, didn't

5          appear to be functional at that time.

6    Q.    Did not appear to be in use?

7    A.    Yes, at that time.

8    Q.    Did you have any other contact with Mr. Goodwin after

9          that day?

10   A.    No.

11                  MR. JOHNSON:  No further questions.

12                  THE COURT:  Ms. Morehead?

13                  MS. MOREHEAD:  Nothing else, your Honor.

14                  THE COURT:  All right.  Thank you.  You may

15         step down.

16         Ms. Morehead, do you have any additional

17         evidence to present?

18                  MS. MOREHEAD:  No, your Honor.

19                  THE COURT:  Mr. Johnson, does Mr. Goodwin

20         have new evidence to present?

21                  MR. JOHNSON:  No evidence, Judge.

22                  THE COURT:  All right.  Now we have gotten

23         our evidentiary record.  I'm prepared to hear

24         argument.

25              Mr. Johnson?

1            MR. JOHNSON:  Yes, your Honor.  In regards

2     to the first motion that we filed, which is to

3     suppress the statement, the question is whether or

4     not at the time that the court issued a warrant based

5     upon the indictment the body issuing the indictment,

6     the grand jury, had probable cause to believe that

7     Mr. Goodwin committed a crime.

8            THE COURT:  Have you looked at the cases on

9     this?  The cases you cited, of course, are clearly

10    distinguishable from our situation.

11           MR. JOHNSON:  Yes.

12           THE COURT:  Not only that they were civil

13    cases -- that's less of an issue because they are

14    dealing with the constitutional question -- but these

15    had to do with cases involving warrants issued by a

16    magistrate based upon evidence presented or

17    affidavits presented to the magistrate.  Have you

18    looked at grand jury cases concerning what the

19    standard is there?

20           MR. JOHNSON:  Yes, your Honor.

21           THE COURT:  What about the grand jury cases

22    you have --

23           MR. JOHNSON:  I think the issue is fairly

24    complex when we think about it.  All of the grand

25    jury cases that I reviewed -- which I chose not to

1     cite in the motion because I don't believe they

2     apply -- are dealing with a defendant seeking the

3     relief of dismissal of an indictment.  It is true

4     that ordinarily a court cannot review a grand jury's

5     determination of probable cause in the context of

6     dismissal of an indictment.  The relief for absence

7     of probable cause in issuing an indictment and

8     beginning federal charges is to go in front of a

9     jury.  There can be relief if there is misconduct in

10    front of the jury, and the degree of misconduct

11    dictates the degree of relief.

12              THE COURT:  Did you find any case in which

13    a statement was obtained from an arrestee based upon

14    an indictment issued by a grand jury in which the

15    court subsequently suppressed the statement based

16    upon the lack of probable cause by going back and

17    looking into the grand jury record?

18              MR. JOHNSON:  I did not find a single case

19    that dealt with the issue.  Perhaps my research

20    wasn't complete, but I think I tried to cast the net

21    as far --

22              THE COURT:  I found none neither.

23              MR. JOHNSON:  It raises a good issue.  Like

24    I said, it's complex.  You have a Fourth Amendment

25    right to be free from an arrest based upon a warrant

 1            that's issued without probable cause.  If a

 2     magistrate looked at this information that was

 3     presented to the grand jury, just as to what Officer

 4     Jones testified to, perhaps even with the additional

 5     facts that we now know today as to the basis of his

 6     opinion, could we review that magistrate's

 7     determination?  There's no doubt that we can.  That's

 8     the law.  We know that we can't review a grand jury

 9     determination of probable cause in the context of

10     dismissing of an indictment, but the question is, can

11     we review a grand jury's determination of probable

12     cause in the context of a Fourth Amendment arrest?  I

13     think, your Honor, as a matter of law policy it would

14     be unwise for the government to insulate itself from

15     Fourth Amendment review by using the grand jury as a

16     body to get the warrant rather than a judge.  I think

17     part of the reason we don't see a lot of review on

18     this, we haven't seen any review on this, is because

19     the vast majority of criminal cases don't start with

20     an indictment, the vast majority of them start with a

21     complaint and an arrest warrant that we review.  It's

22     unusual, I think, that an original warrant is issued

23     on an indictment.  Typically the cases start with the

24     filing of a complaint.  Those are always subject to

25     review, but the question is, under the Fourth

1          Amendment, there has to be review of a probable cause

2          determination for the purpose of issuance of a

3          warrant.  All cases that I found that deal with a

4          person having been arrested pursuant to a warrant and

5          then some evidence obtained as a result have all been

6          reviewable, whether they were issued by a magistrate

7          or not.  But no, it's a novel issue.  I'll admit

8          that.  That's absolutely true.  I would encourage the

9          court to review the probable cause determination of

10         the grand jury in the context of this.  Part of the

11         reason we have not asked this court to dismiss the

12         indictment is because I don't think we have grounds

13         to do so even absent probable cause because the case

14         law is clear on that.

15              I don't think, obviously, that what Officer

16         Jones testified to was speculative; it was

17         conclusionary.  I don't think it rises to the level

18         of misconduct that would warrant any type of relief,

19         but I still think that it doesn't amount to probable

20         cause.  The threshold question that that jury had to

21         answer in issuing the indictment is whether or not in

22         August 2007 it had some fact by which it could say

23         that there was a substantial probability that

24         Franklin Goodwin Jr. was the caller, and it didn't

25         have those facts, and it didn't have probable cause

```
1        to issue the indictment, and hence there was no cause

2        for the warrant.

3               THE COURT:  Let's break that analysis down.

4        If you assume that what Task Force Officer Jones was

5        saying when he said Goodwin made the call, that what

6        he was saying was, it's my opinion that the caller

7        there was Goodwin, and that that opinion was based

8        not simply on the registration of the phone to

9        Mr. Goodwin but also the knowledge that that was, in

10       fact, a phone that Mr. Goodwin carried on his person,

11       was registered to him back a longer time ago, and it

12       was still carried on his person in October, now as a

13       matter of a lay opinion that a person could offer,

14       wouldn't that be a very sound opinion, that the

15       likelihood was more likely than not to a substantial

16       degree that the person who owned the phone and who

17       had it on his person some months later was the same

18       person who spoke on the phone in August?  Isn't that

19       an opinion that is a pretty sound one?

20              MR. JOHNSON:  I would say, your Honor --

21              THE COURT:  Do you have a cell phone?

22              MR. JOHNSON:  Yes.

23              THE COURT:  Do other people make calls on

24       your phone?

25              MR. JOHNSON:  Yes.
```

```
1              THE COURT:  How frequently?
2              MR. JOHNSON:  I don't know, Judge.  My wife
3       and I each carry cell phones.  We live in a
4       three-story house.  It depends on which phone is
5       closest.  I would say quite frequently in my case.
6              THE COURT:  Would you say that your wife
7       uses your phone more than you do?
8              MR. JOHNSON:  No.
9              THE COURT:  Would you say that she uses it
10      a quarter of the time that you do?
11             MR. JOHNSON:  No.
12             THE COURT:  Ten percent, maybe?
13             MR. JOHNSON:  Yes, some percentage.
14             THE COURT:  All right.  Some percentage,
15      but maybe 10 percent or less?
16             MR. JOHNSON:  Perhaps.
17             THE COURT:  Okay.  My postulate to you
18      would be that that's probably consistent with most
19      people, that as a matter of common knowledge with
20      cell phones, which, unlike land lines, which have
21      multiple receivers throughout a house which various
22      people might pick up and use at any one time, cell
23      phones are traditionally kept on one's person and are
24      therefore, I would say, logically used 90 percent, or
25      whatever the number is of the time by that
```

1      individual, that someone offering the opinion --

2      based upon what Task Force Officer Jones knew, he

3      offered an opinion that was pretty much in accordance

4      with what I would expect the facts to be.  And if

5      what we're talking about is probable cause and not

6      certainty or beyond a reasonable doubt, if we're

7      merely talking about a reasonable likelihood that the

8      individual in question is the one who committed the

9      crime, then isn't an opinion based upon facts which

10     would give rise to a 90 percent likelihood -- it

11     could be 75 percent likelihood, but I'm going to say

12     90 percent likelihood that that's accurate -- more

13     than enough to generate the reasonable likelihood

14     that that individual is the caller?

15              MR. JOHNSON:  I certainly appreciate the

16     court's analysis, but I don't think we will concede

17     the point.  I still think that --

18              THE COURT:  I wouldn't be surprised if you

19     didn't concede the point, but I would like to hear

20     your argument to the contrary.

21              MR. JOHNSON:  I think it still comes down

22     to -- within the broad realm of probabilities and

23     possibilities, it still comes down to an individual

24     phone call on August 20, 2007; and there must be some

25     fact -- other than the general idea that it is

1      Franklin Goodwin's phone, there must be some fact by

2      which he can be tied to that individual phone call,

3      and there is nothing.

4           At the time that Officer Jones testified, he

5      could have offered some fact, some articulable fact,

6      that Franklin Goodwin was participating in that phone

7      call on August 20 with Hank Grigsby, and I think that

8      is the threshold question to answer, what did he have

9      at the time that he testified that Mr. Goodwin took

10     that phone call other than the fact that he is the

11     owner and user of the cell phone?

12          THE COURT:  I understand your argument.

13     What is your argument concerning the cell phone being

14     taken from Mr. Goodwin's person in connection with

15     the arrest?

16          MR. JOHNSON:  Our argument on that, Judge,

17     is that at the time that the cell phone was taken

18     from Mr. Goodwin, once they apprehended it, the only

19     reason they could go inside it to search the contents

20     would be if they thought it was a threat to them --

21     which it wasn't -- digital data is not a threat to an

22     officer, so it would be to prevent the destruction of

23     evidence.  They had seized it.  At that point there

24     was no threat of Mr. Goodwin destroying evidence in

25     the cell phone.

1     THE COURT:  Isn't that true of all the cell

2  phone cases, all of which say they can seize them and

3  look at them?

4     MR. JOHNSON:  They all say that.  I agree

5  with that.

6     THE COURT:  So your argument would

7  essentially be that the cases that would hold to the

8  contrary are poorly reasoned and that, to be

9  courteous to the Tenth Circuit, since this was an

10  unreported decision, therefore, were they to think

11  about this more carefully, an opinion that they cared

12  to publish, they would arrive at a different result?

13     MR. JOHNSON:  That would be our legal

14  position, Judge.

15     THE COURT:  Okay.  Thank you.  I

16  understand.

17   Ms. Morehead?

18     MS. MOREHEAD:  Judge, I don't want to

19  belabor the point any more than the court wants me

20  to, but a couple of things came to my mind in

21  connection with some of the questions that the court

22  asked.

23   First of all, with regards to the cell phone,

24  the argument that, well, we could get a search

25  warrant then, just as was demonstrated by Officer

1    Vogel, even after that test call came in, there were

2    other calls that show up which bumped off other

3    recent calls.  It only holds so many recent calls, so

4    the longer you wait to look in that phone to gather

5    that information, the more chance there is of losing

6    that data.  I think that's the analysis that prior

7    courts have done in connection not only with cell

8    phones but pagers, that is, losing data.  It's not

9    that the phone is going to disappear or run away, but

10   there is information you can lose if you don't look

11   at it in an immediate situation.

12       In connection with this case, what we have is

13   Officer Jones testifying before the grand jury not

14   only that Mr. Goodwin was involved in this one phone

15   call that is charged in the indictment but that he's

16   a member of the conspiracy, and in connection with

17   this, what Officer Jones had not only was the

18   subscriber information about the phone, not only the

19   fact that the phone was recovered October 2, 2007,

20   from Mr. Goodwin's person, and then there was a test

21   call made to that phone to verify that it was the

22   same phone number, but we have the facts of the

23   search warrant itself.  From the phone calls that

24   were made in October, there was -- I'm sorry, from

25   the phone calls that were made in August to

1    Mr. Grigsby, there was clearly indication that Mr.

2    Goodwin, the user of a phone subscribed to by a guy

3    named Franklin Goodwin was involved in drug

4    trafficking.  That's the reason in October the

5    officers attempted to verify and validate, who is

6    Franklin Goodwin? and is this the same Franklin

7    Goodwin?  So they go to his house and do a trash

8    pull, and you can see the reference in the search

9    warrant to the dirty trash that was recovered from

10   Mr. Goodwin's trashing.

11       And I don't really want to go back and revisit

12   old issues, but if you remember, Mr. Goodwin sat

13   before you and swore under oath that he was only

14   involved in marijuana, and you can see from not only

15   the trashing but the documentation that was provided

16   in Mr. Johnson's pleading about the search warrant

17   that there was evidence of crack cocaine involvement

18   by Mr. Goodwin, and, in fact, there was items related

19   specifically to crack cocaine found at his residence

20   and in his trash.  Clearly, that corroborates the

21   premise that we went into on October 2 when they

22   secured this search warrant based upon the phone

23   calls that he was involved in drug trafficking, and

24   that did nothing but corroborate that.  The search

25   warrant did nothing but corroborate the wiretap that

1     was ongoing at that point.

2          We don't -- you know, the search of the cell

3     phone I kind of push off to the side because we

4     identify independent of what was in the cell phone by

5     the test call, them clearly dialing that number and

6     it ringing, that this is the same number that had

7     been intercepted in the wiretap.  So we can connect

8     those two dots right there without even having to

9     open up the phone.

10          I demonstrated for you today in court verifying

11     that, in fact, as Officer Vogel indicated, there had

12     been that test call.  That's verified on the phone in

13     court today.  I did that primarily because the

14     reports were a little bit lacking.  There wasn't

15     specific reference to that.  There was reference that

16     the phone rang and it was answered, but not that that

17     was in connection to a test call, so I wanted to

18     demonstrate that to the court.

19          But even beyond that, the search of the cell

20     phone was clearly necessary in order to preserve

21     whatever information we were going to be able to get

22     from it at that moment, and that's the reason it was

23     done, and so I kind of see those as two separate

24     animals, one being doing the test run.  We were able

25     to identify this being the cell phone independent of

1        looking in the phone.  So I believe, you know, the

2        case law does allow for this type of situation, and

3        that's all I have.

4                    THE COURT:  This is not specifically within

5        the scope of Mr. Johnson's motion, but he indicated

6        earlier when we were talking about this, before we

7        went into this evidentiary hearing, that he had some

8        concern about other information that might have been

9        gleaned from the phone.  Is the government intending

10       to offer additional evidence that was obtained after

11       the phone was seized?

12                   MS. MOREHEAD:  Well, Judge, the first --

13       frankly, honestly, as an officer of the court -- I

14       even knew of this was after he filed his motion.

15                   THE COURT:  So it's not nothing you were

16       intending to --

17                   MS. MOREHEAD:  I had not intended.  In

18       fact, I didn't even have that information to know.

19                   THE COURT:  Certainly we don't need to be

20       expanding the evidentiary scope of the trial.

21                   MS. MOREHEAD:  That wasn't my intent, but I

22       would at least want to introduce the phone because

23       it's clearly relevant.  We have other testimony like

24       Mr. Grigsby, who will testify to that phone call and

25       that it was Mr. Goodwin, so arguably the content of

1       the phone would be cumulative.  Then we don't have to

2       worry about any search-and-seizure issue, and I'm all

3       about not making issues on appeal and streamlining.

4               THE COURT:  There you go.

5               MS. MOREHEAD:  So the fact that I didn't

6       know about this until a day ago, it was not my intent

7       to do that.  That was why I put them in two different

8       categories.  But clearly the recovery of this cell

9       phone, the test run, the test call, and that sort of

10      thing is clearly probative and relevant.

11          Now, if there were any questions around, well,

12      you didn't look in the phone, or, you didn't do any

13      analysis of this phone, then, obviously, you know,

14      we're going to have to go there with the jury, but

15      that was, frankly, not my intention as I was

16      preparing for trial because I didn't even know about

17      it.  But I am all about streamlining, and I don't

18      want to be too cumulative.

19              THE COURT:  Thank you.

20          Mr. Johnson, you certainly have presented a

21      novel issue here, and I appreciate your having done

22      so.  It was the appropriate thing to do in the

23      interests of your client, and I am now prepared to

24      rule on the two motions and to deny them both.

25          I want to begin with your second motion, the

1    motion to suppress the recovery of the cell phone

2    from the person of Mr. Goodwin after the arrest.  I

3    am prepared based on my review of the cases cited in

4    Silvan W. versus Briggs, the case at 2009 Westlaw

5    159429 that was cited by counsel for the United

6    States -- and hats off there to counsel for locating

7    that case.  It was a January 23, 2009, unpublished

8    opinion.  Albeit that it is an unpublished opinion,

9    it is based upon authority which I found nothing to

10   the contrary in looking at other cases that were

11   published from other circuits, and it appears to be

12   that not only majority rule but the rule that's been

13   applied universally really is that a cell phone

14   seized incident to a lawful arrest may be examined in

15   the way in which this phone was examined.  And as Ms.

16   Morehead points out, here, interestingly enough,

17   where the only information that's really relevant is

18   the telephone number on the cell phone, that

19   information was obtained without more than literally

20   seizing the phone from the person of Mr. Goodwin,

21   which clearly officers were entitled to do, and

22   placing the test call.  Didn't even require opening

23   it.  Therefore, the whole question of whether or not

24   this is analogous to a detainer -- which the cases

25   which have analyzed it said yes, it is, but you can

1     look in it -- we don't even need to get to that step

2     because by virtue of the test call that was made it

3     was established that the cell phone taken from

4     Mr. Goodwin had the same number as the cell phone

5     that was on the call in August of 2007.  So based

6     then on the representation of the government that

7     there's nothing further evidentiary concerning which

8     they intend to cover this cell phone, the motion to

9     suppress the cell phone should be, and hereby is,

10    denied.

11         That takes us back to what Mr. Jones testified

12    to to the grand jury, which is the more troublesome

13    issue because I could find no case which sought to

14    suppress a statement that was made following an

15    arrest based upon a warrant that was generated by an

16    indictment.  What I did find was case law discussing

17    the subject of dismissal of the indictment based upon

18    various scenarios.

19         And you made a very interesting argument, Mr.

20    Johnson, and that is distinguishing between the two

21    situations, the dismissal and the suppression.  I'm

22    honestly not sure whether or not that distinction

23    would be made ultimately because in a sense either

24    way the point that is being argued by the defendant

25    is a lack of probable cause, and it appears to me

1       from these cases -- and I really start with the

2       Supreme Court cases and look at what they have said

3       on this.  I'll specifically for the record indicate

4       I'm talking about Costello v. United States, 350 U.S.

5       359 (1956); United States v. Calandra, 414 U.S. 338

6       (1974); and Bank of Nova Scotia v. United States,

7       which arose out of the Tenth Circuit, 487 U.S. 250

8       (1988).  It appears to me there that what the Supreme

9       Court is saying is that we are not going to

10      second-guess probable cause determinations by the

11      grand jury unless there is actually evidence of

12      subornation of perjury or actually misconduct.  I

13      think there probably are policy reasons that -- as

14      you articulate, there probably is an argument for

15      policy reasons that differentiate, but I suspect that

16      the way in which the Supreme Court looks at

17      indictments coming from grand juries there is a

18      pretty good argument to be made there of that there

19      should not be a distinction based upon the relief

20      that's being sought from challenging the probable

21      cause determination and that the probable cause

22      determination is not challengeable unless it's based

23      upon an allegation of perjury.

24          Granted, that's not what Mr. Goodwin's argument

25      is.  Initially there were allegations of

1    recklessness, but now that you know Mr. Jones had

2    some basis other than pulling it out of a hat, I

3    don't see even a plausible argument of recklessness

4    here on Mr. Jones' part in saying that this is Mr.

5    Goodwin's phone.  So I do question whether or not

6    there would be any relief otherwise.

7        But let's assume that there were.  Let's assume

8    that there were relief that would be available. Then

9    my analysis would to go back and look at what

10   transpired at the grand jury.

11       And in that connection I would analyze that in

12   two ways because, as you point out, Mr. Johnson, the

13   rules of evidence are, to put it mildly, different at

14   the grand jury.  The notion that lay opinion --

15   because that's what it is; it's not even expert

16   opinion; it's lay opinion -- is clearly something

17   that's presented to grand juries.  What Mr. Jones did

18   was tantamount to lay opinion when he said this was

19   Mr. Goodwin's phone, and that lay opinion would have

20   been sufficient for the grand jury to base its

21   ultimate conclusion on, I believe.

22       The problem, of course, is it would have been

23   better in the sense of total accuracy had Mr. Jones

24   said to the grand jury, I believe that's Mr. Goodwin

25   on this call because . . . and then stated the

1    reasons why and allowed the grand jury to arrive at

2    its own conclusions.

3         Now, if we analyze this -- if we take this to

4    the next step and say, all right, if we want to say

5    that a lay opinion by Mr. Jones, really that isn't

6    good enough here because he should have set out the

7    basis for it and we look at this almost in a Frank

8    versus Delaware way and start redacting and say,

9    instead of what Mr. Jones said, let's say what he

10   should have said, what he should have said is that a

11   phone call was made from this telephone number in

12   August of 2007; that is a phone number that is

13   registered to Franklin Goodwin in Leavenworth; that

14   is a phone that was recovered on Mr. Goodwin's person

15   on October 2; and when a test call was made, it came

16   up this same number; Mr. Goodwin was also seen

17   carrying a phone that appeared to respond to that

18   number in terms of the observation of the police

19   officer who saw him check a phone contemporaneous

20   with a call sometime shortly before that; we know

21   that the call in August of 2007 had to do with drug

22   trafficking and a search warrant based upon probable

23   cause turned up evidence of drug trafficking at Mr.

24   Goodwin's house; based on all that, members of the

25   jury, you decide whether or not you think there is

```
 1          probable cause to believe Mr. Goodwin is the person

 2          who made that call in August, I believe the answer is

 3          yes, there's probable cause based on that.  Is that

 4          enough to convict Mr. Goodwin beyond a reasonable

 5          doubt?  I don't know.  That's what juries are all

 6          about.  But that's not the standard.  The standard

 7          is, does that amount to the probable cause?  And here

 8          I think it does.  Illinois v. Gates, 462 U.S. 213,

 9          245 (1983).  Quote, the standard for probable cause

10          does not require indubitable or necessarily

11          convincing evidence but only so much, quote,

12          reasonably trustworthy information as to, quote,

13          warrant a prudent man believing the person in

14          question committed is or committing an offense.

15          United States v. Ventresca, 380 U.S. 102, 107 (1965)

16          quoting Beck v. Ohio, 379 U.S. 89, 91 (1964).

17              I think if you follow this process logically all

18          the way through, had Mr. Jones said -- laid out all

19          the evidence he had in his mind that formed the basis

20          for his conclusion that clearly would establish

21          probable cause; therefore, even if we could

22          second-guess, even if we could go back and examine

23          whether or not the indictment was based on probable

24          cause, absent an allegation of subornation of

25          perjury, I believe the motion would fail.  So for all
```

1     these reasons the motion is denied.

2          All right.  Is there anything further that we

3     should do in this matter today?

4          Ms. Morehead?

5

6               MS. MOREHEAD:  No, your Honor.

7               THE COURT:  Mr. Johnson?

8               MR. JOHNSON:  No, Judge.

9               THE COURT:  Very well.  I will remand Mr.

10    Goodwin to the custody of the United States marshals,

11    and we are in recess.

12              MS. MOREHEAD:  Can we withdraw the

13    exhibits?

14              THE COURT:  Without objection you may

15    withdraw the exhibits.

16              MR. JOHNSON:  No objection.

17              THE COURT:  You may do so.  All right.

18    We're in recess.

19                   (Court was adjourned.)

20                    *  *  *  *  *

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2


 3


 4   STATE OF KANSAS        |

 5                          |   ss

 6   COUNTY OF JOHNSON       |

 7

 8           I, Rebecca Ryder, RMR, CRR, a Certified

 9   Shorthand Reporter and official reporter for the United

10   States District Court, District of Kansas, do hereby

11   certify that as such official reporter I was present at

12   and reported in machine shorthand the above and foregoing

13   proceedings.

14           I further certify that a transcript of my

15   shorthand notes was prepared and that the foregoing

16   transcript is a true and correct transcript of my notes in

17   said case to the best of my knowledge and ability.

18

19                                  /Rebecca S. Ryder
                                    REBECCA S. RYDER, RMR, CRR
20                                  U.S. Court Reporter

21

22

23

24

25
```

REBECCA S. RYDER, CCR, RMR
UNITED STATES COURT REPORTER
913-551-5645