VOLUME 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

                    Plaintiff,

vs.                                 Case No. 07-20168

MONTERIAL WESLEY,

                    Defendant.


TRANSCRIPT OF TRIAL PROCEEDINGS
HONORABLE JOHN W. LUNGSTRUM
on
APRIL 14, 2009 to MAY 15, 2009


APPEARANCES

For the Plaintiff:

Terra Morehead
United States Attorney's Office
500 State Avenue
Kansas City, KS 66101

For the Defendant Wesley:

Robert N. Calbi
Calbi & Yotz, PC
819 Walnut St., Ste. 401
Kansas City, MO 64106-1810

For the Defendant Simpson:

Charles M. Rogers
Wyrsch Hobbs Mirakian, PC
1000 Walnut, Ste. 1600
Kansas City, MO 64106

REBECCA S. RYDER, CCR, RMR
UNITED STATES COURT REPORTER
913-551-5645

```
 1    For the Defendant Foy:

 2
      Lance D. Sandage
 3    The Sandage Law Firm, PC
      4700 Belleview Ave., Ste. 404
 4    Kansas City, MO 64112

 5    For the Defendant Trinkle:

 6
      Branden A. Bell
      The Bell Firm, PA
 7    PO Box 442489
      Lawrence, KS 66044
 8
      For the Defendant Temple:
 9
      James C. Heathman
10    3706 S.W. Topeka Blvd. No. 402
      Topeka, KS 66609
11
      For the Defendant McDaniel:
12
      Fred Bellemere, III
13    Seigfreid, Bingham, Levy, Selzer & Gee, PC
      2800 Commerce Tower
14    911 Main Street
      Kansas City, MO 64105
15
      For the Defendant Goodwin:
16
      Richard W. Johnson
17    Johnson & Johnson LLC
      312 Delaware St.
18    Kansas City, MO 64105

19

20

21

22

23

24

25
```

<pre>
 1                              INDEX

 2


 3       TUESDAY, APRIL 14, 2009
         VOIR DIRE (Omitted)                        14    1
 4       OPENING STATEMENTS (Omitted)               14    1
         WEDNESDAY, APRIL 15, 2009
 5       OPENING STATEMENTS (Omitted)               25    1


 6


 7                      PLAINTIFF'S EVIDENCE


 8       ERIC JONES
         Direct examination by Ms. Morehead         26    1
 9       THURSDAY, APRIL 16, 2009


10       ERIC JONES (CONT'D)


11       Direct examination (Cont'd) by Ms. Morehead  219  1
         Cross examination by Mr. Calbi             487   1
12       Cross examination by Mr. Rogers            524   1
         Cross examination by Mr. Bellemere         570   1
13       THURSDAY, APRIL 21, 2009
         KEENAN JARREL RINGGOLD
14       Direct examination by Ms. Morehead         625   1
         Cross examination by Mr. Bell              671   1
15       Cross examination by Mr. Calbi             679   1
         Cross examination by Mr. Johnson           697   1
16       Redirect examination by Ms. Morehead       718   1
         Recross examination by Mr. Bell            726   1
17       ERIC JONES (CONT'D)
         Cross examination (Cont'd) by Mr. Bellemere  730  1
18       Cross examination by Mr. Johnson           744   1
         Cross examination by Mr. Heathman          782   1
19       Cross examination by Mr. Sandage           804   1
         Cross examination by Mr. Bell              833   1
20       WEDNESDAY, APRIL 22, 2009
         ERIC JONES (CONT'D)
21       Cross examination (Cont'd) by Mr. Bell     850   1
         Redirect examination by Ms. Morehead       861   1
22       Recross examination by Mr. Calbi           922   1
         Cross examination by Mr. Rogers            926   1
23       Cross examination by Mr. Bellemere         934   1
         Cross examination by Mr. Johnson           947   1
24       Cross examination by Mr. Heathman          950   1
         Cross examination by Mr. Sandage           959   1
25       Redirect examination by Ms. Morehead       962   1
         Cross examination by Mr. Bellemere         964   1
</pre>

| 1 | HENRY GRIGSBY JR. | | |
|---|---|---|---|
| | Direct examination by Ms. Morehead | 966 | 1 |
| 2 | Cross examination by Mr. Calbi | 1096 | 1 |
| | Cross examination by Mr. Rogers | 1107 | 1 |
| 3 | THURSDAY, APRIL 23, 2009 | | |
| | HENRY GRIBSBY JR. (CONT'D) | | |
| 4 | Cross examination by Mr. Bell | 1131 | 2 |
| | Cross examination by Mr. Johnson | 1135 | 2 |
| 5 | Redirect examination by Ms. Morehead | 1165 | |
| | Recross examination by Mr. Calbi | 1175 | 2 |
| 6 | Recross examination by Mr. Bell | 1178 | 2 |
| | Recross examination by Mr. Johnson | 1180 | 2 |
| 7 | CARY WAYNE STONE | | |
| | Direct examination by Ms. Morehead | 1183 | 2 |
| 8 | JAMICAH JOHNSON | | |
| | Direct examination by Ms. Morehead | 1195 | 2 |
| 9 | Cross examination by Mr. Calbi | 1258 | 2 |
| | LEIGH ANN GREENE | | |
| 10 | Direct examination by Ms. Morehead | 1265 | 2 |
| | Cross examination by Mr. Calbi | 1288 | 2 |
| 11 | Cross examination by Mr. Rogers | 1290 | 2 |
| | BRADLEY SLAYBAUGH | | |
| 12 | Direct examination by Ms. Morehead | 1293 | 2 |
| | Cross examination by Mr. Sandage | 1307 | 2 |
| 13 | Redirect examination by Ms. Morehead | 1310 | 2 |
| | LORAN FREEEMAN | | |
| 14 | Direct examination by Ms. Morehead | 1311 | 2 |
| | Cross examination by Mr. Calbi | 1346 | 2 |
| 15 | Cross examination by Mr. Rogers | 1349 | 2 |
| | Cross examination by Mr. Sandage | 1357 | 2 |
| 16 | Cross examination by Mr. Heathman | 1364 | 2 |
| | Redirect examination by Ms. Morehead | 1373 | 2 |
| 17 | Redirect examination by Mr. Sandage | 1376 | 2 |
| | DONNIE RAY JOHNSON | | |
| 18 | Direct examination by Ms. Morehead | 1378 | 2 |
| | Cross examination by Mr. Rogers | 1397 | 2 |
| 19 | FRIDAY, APRIL 24, 2009 | | |
| | THOMAS HUMPHREY | | |
| 20 | Direct examination by Ms. Morehead | 1406 | 2 |
| | Cross examination by Mr. Rogers | 1507 | 2 |
| 21 | Cross examination by Mr. Heathman | 1520 | 2 |
| | Cross examination by Mr. Bellemere | 1541 | 2 |
| 22 | Cross examination by Mr. Sandage | 1558 | 2 |
| | Cross examination by Mr. Calbi | 1570 | 2 |
| 23 | Redirect examination by Ms. Morehead | 1597 | 2 |
| | Recross examination by Mr. Heathman | 1609 | 2 |
| 24 | Recross examination by Mr. Sandage | 1609 | 2 |
| | BYRON JEROME BROWN | | |
| 25 | Direct examination by Ms. Morehead | 1612 | 2 |
| | Cross examination by Mr. Rogers | 1646 | 2 |

| | | |
|---|---|---|
| 1 | TUESDAY, APRIL 28, 2009 | |
| | BYRON JEROME BROWN (CONT'D) | |
| 2 | Cross examination by Mr. Calbi | 1674 | 2 |
| | Cross examination by Mr. Bell | 1679 | 2 |
| 3 | Cross examination by Mr. Sandage | 1702 | 2 |
| | Redirect examination by Ms. Morehead | 1704 | |
| 4 | Recross examination by Mr. Rogers | 1709 | 2 |
| | Recross examination by Mr. Calbi | 1719 | 2 |
| 5 | Redirect examination by Ms. Morehead | 1721 | 2 |
| | CLINTON HOLMAN | |
| 6 | Direct examination by Ms. Morehead | 1725 | 2 |
| | Cross examination by Mr. Heathman | 1753 | 2 |
| 7 | DANNY TARRANTS | |
| | Direct examination by Ms. Morehead | 1755 | 2 |
| 8 | Cross examination by Mr. Bellemere | 1803 | 2 |
| | Cross examination by Mr. Calbi | 1814 | 2 |
| 9 | CHAUNCEY KYLE ANDERSON | |
| | Direct examination by Ms. Morehead | 1820 | 2 |
| 10 | Cross examination by Mr. Sandage | 1850 | 2 |
| | Cross examination by Mr. Heathman | 1870 | 2 |
| 11 | Redirect examination by Ms. Morehead | 1879 | 2 |
| | Recross examination by Mr. Heathman | 1884 | 2 |
| 12 | NEIL KENT VOGEL | |
| | Direct examination by Ms. Morehead | 1889 | 2 |
| 13 | Cross examination by Mr. Johnson | 1910 | 2 |
| | PAMELA BENNETT | |
| 14 | Direct examination by Ms. Morehead | 1912 | 2 |
| | Cross examination by Mr. Calbi | 1938 | 2 |
| 15 | Cross examination by Mr. Rogers | 1944 | 2 |
| | WEDNESDAY, APRIL 29, 2009 | |
| 16 | PAMELA BENNETT (CONT'D) | |
| | Cross examination (Cont'd) by Mr. Rogers | 1963 | 2 |
| 17 | LAKELA HOUFF | |
| | Direct examination by Ms. Morehead | 1970 | 2 |
| 18 | DOUG DORLEY | |
| | Direct examination by Ms. Morehead | 1987 | 2 |
| 19 | Cross examination by Mr. Calbi | 2033 | 2 |
| | Cross examination by Mr. Rogers | 2043 | 2 |
| 20 | Cross examination by Mr. Sandage | 2044 | 2 |
| | Cross examination by Mr. Bellemere | 2046 | 2 |
| 21 | MICHAEL HOLDER | |
| | Direct examination by Ms. Morehead | 2048 | 2 |
| 22 | Cross examination by Mr. Rogers | 2081 | 2 |
| | Cross examination by Mr. Sandage | 2096 | 2 |
| 23 | GORDON MALLORY | |
| | Direct examination by Ms. Morehead | 2104 | 2 |
| 24 | Cross examination by Mr. Rogers | 2110 | 2 |
| | ANTHONY EDWARD SMITH | |
| 25 | Direct examination by Ms. Morehead | 2112 | 2 |
| | Cross examination by Mr. Calbi | 2125 | 2 |

```
 1    LUCRETIA WEBER
      Direct examination by Ms. Morehead        2137    2
 2    ANDREW BENSON
      Direct examination by Ms. Morehead        2152    2
 3    Cross examination by Mr. Calbi            2161    2
      Cross examination by Mr. Rogers           2162    2
 4    ANDREA MICHIELS
      Direct examination by Ms. Morehead        2163    2
 5    TIMOTHY MCCUE
      Direct examination by Ms. Morehead        2169    2
 6    THURSDAY, APRIL 30, 2009
      TIMOTHY MCCUE (CON'TD)
 7    Direct examination (Cont'd) by Ms. Morehead  2212
      Cross examination by Mr. Rogers           2229    2
 8    Cross examination by Mr. Johnson          2264    2
      Cross examination by Mr. Heathman         2281    2
 9    Cross examination by Mr. Bellemere        2291    2
      Cross examination by Mr. Calbi            2297    2
10    LAWRENCE DRAKE
      Direct examination by Ms. Morehead        2320    2
11    Cross examination by Mr. Rogers           2340    2
      ASHLEY CLARK
12    Direct examination by Ms. Morehead        2349    2
      Cross examination by Mr. Rogers           2392    2
13    Cross examination by Mr. Johnson          2397    2
      Redirect examination by Ms. Morehead      2400    2
14    Recross examination by Mr. Rogers         2401    2
      PLAINTIFF RESTS                           2418    2
15    TUESDAY, MAY 5, 2009
      HAROLD J. FOSKETT
16    Direct examination by Mr. Bellemere       2511    2
      LATYSHA DENISE TEMPLE
17    Direct examination by Mr. Heathman        2531    2
      Cross examination by Ms. Morehead         2569    2
18    Redirect examination by Mr. Heathman      2606    2
      ERIC JONES
19    Direct examination by Mr. Johnson         2611    2
      INSTRUCTIONS READ (Omitted)               2658    2
20    WEDNESDAY, MAY 6, 2009
      Closing Arguments (Omitted)               2668    2
21    THURSDAY, MAY 7, 2009
      Jury Deliberates                          2678    2
22    FRIDAY, MAY 8, 2009
      Jury Deliberates                          2685    2
23    TUESDAY, MAY 12, 2009
      Jury Deliberates                          2693    2
24    WEDNESDAY, MAY 13, 2009
      Jury Deliberates                          2694    2
25    THURSDAY, MAY 14, 2009
      Jury Deliberates                          2703    2
```

```
 1    FRIDAY, MAY 15, 2009
      Verdict                                        2766     2
 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              EXHIBITS

2    NUMBER                                        PAGE    VOL
     2                                            114      1
3    3                                            127      1
     7                                            129      1
4    6                                            130      1
     11                                           131      1
5    10                                           133      1
     271-294                                      145      1
6    300                                          145      1
     270, 270A                                    148      1
7    155                                          204      1
     155A (demonstrative)                         204      1
8    156                                          209      1
     156A (demonstrative)                         209      1
9    157                                          210      1
     157A (demonstrative)                         210      1
10   158                                          212      1
     158A (demonstrative)                         212      1
11   160                                          213      1
     160A (demonstrative)                         213      1
12   162, 162A                                    221      1
     162A (demonstrative)                         221      1
13   168                                          222      1
     168A (demonstrative)                         222      1
14   15-17                                        227      1
     169                                          230      1
15   169A (demonstrative)                         230      1
     170                                          232      1
16   170A (demonstrative)                         232      1
     295, 296                                     234      1
17   295A, 296A (demonstrative)                   234      1
     171                                          237      1
18   171A (demonstrative)                         237      1
     172                                          240      1
19   172A (demonstrative)                         240      1
     173                                          242      1
20   173A (demonstrative)                         242      1
     18                                           244      1
21   175                                          247      1
     175A (demonstrative)                         247      1
22   180, 181                                     249      1
     180A, 181A (demonstrative)                   249      1
23   19                                           255      1
     22-26                                        255      1
24   20-21                                        257      1
     27                                           259      1
25   182                                          263      1
     182A (demonstrative)                         263      1

| | | | |
|---|---|---|---|
| 1 | 183, 184 | 264 | 1 |
| | 183A, 184A (demonstrative) | 264 | 1 |
| 2 | 185 | 265 | 1 |
| | 185A (demonstrative) | 265 | 1 |
| 3 | 189 | 266 | 1 |
| | 189A (demonstrative) | 266 | 1 |
| 4 | 190 | 266 | 1 |
| | 190A (demonstrative) | 266 | 1 |
| 5 | 191 | 268 | 1 |
| | 191A (demonstrative) | 268 | 1 |
| 6 | 321 | 278 | 1 |
| | 321 (demonstrative) | 278 | 1 |
| 7 | 194 | 280 | 1 |
| | 194A (demonstrative) | 280 | 1 |
| 8 | 195 | 281 | 1 |
| | 195A (demonstrative) | 282 | 1 |
| 9 | 196 | 282 | 1 |
| | 196A (demonstrative) | 282 | 1 |
| 10 | 197 | 285 | 1 |
| | 197A (demonstrative) | 285 | 1 |
| 11 | 198 | 285 | 1 |
| | 198A (demonstrative) | 285 | 1 |
| 12 | 199 | 286 | 1 |
| | 199A (demonstrative) | 287 | 1 |
| 13 | 200 | 287 | 1 |
| | 200A (demonstrative) | 287 | 1 |
| 14 | 201 | 288 | 1 |
| | 201A (demonstrative) | 288 | 1 |
| 15 | 28-30 | 291 | 1 |
| | 203 | 297 | 1 |
| 16 | 203(demonstrative) | 298 | 1 |
| | 204 | 299 | 1 |
| 17 | 204A (demonstrative) | 299 | 1 |
| | 205 | 300 | 1 |
| 18 | 205A (demonstrative) | 300 | 1 |
| | 206 | 301 | 1 |
| 19 | 206A (demonstrative) | 301 | 1 |
| | 207 | 302 | 1 |
| 20 | 207A (demonstrative) | 303 | 1 |
| | 208-210 | 304 | 1 |
| 21 | 31 | 309 | 1 |
| | 211 | 312 | 1 |
| 22 | 211A (demonstrative) | 312 | 1 |
| | 212 | 313 | 1 |
| 23 | 212A (demonstrative) | 313 | 1 |
| | 216 | 314 | 1 |
| 24 | 216A (demonstrative) | 314 | 1 |
| | 217 | 314 | 1 |
| 25 | 217A (demonstrative) | 315 | 1 |
| | 218 | 315 | 1 |

| | | | |
|---|---|---|---|
| 1 | 218A (demonstrative) | 315 | 1 |
| | 297 | 316 | 1 |
| 2 | 297A (demonstrative) | 316 | 1 |
| | 32-33 | 317 | 1 |
| 3 | 214 | 323 | 1 |
| | 214A (demonstrative) | 323 | 1 |
| 4 | 215 | 324 | 1 |
| | 215A (demonstrative) | 324 | 1 |
| 5 | 221 | 327 | 1 |
| | 221A (demonstrative) | 327 | 1 |
| 6 | 222 | 329 | 1 |
| | 222A (demonstrative) | 329 | 1 |
| 7 | 223 | 330 | 1 |
| | 223A (demonstrative) | 330 | 1 |
| 8 | 224 | 331 | 1 |
| | 224A (demonstrative) | 332 | 1 |
| 9 | 225 | 333 | 1 |
| | 225A (demonstrative) | 333 | 1 |
| 10 | 226 | 333 | 1 |
| | 226A (demonstrative) | 333 | 1 |
| 11 | 227 | 334 | 1 |
| | 227A (demonstrative) | 334 | 1 |
| 12 | 228-231 | 335 | 1 |
| | 228A-231A (demonstrative) | 335 | 1 |
| 13 | 46-48 | 336 | 1 |
| | 232 | 338 | 1 |
| 14 | 232A (demonstrative) | 339 | 1 |
| | 233 | 339 | 1 |
| 15 | 233A (demonstrative) | 339 | 1 |
| | 234 | 343 | 1 |
| 16 | 234A (demonstrative) | 343 | 1 |
| | 238 | 347 | 1 |
| 17 | 238A (demonstrative) | 347 | 1 |
| | 50-52 | 366 | 1 |
| 18 | 240 | 368 | 1 |
| | 240A (demonstrative) | 368 | 1 |
| 19 | 241 | 369 | 1 |
| | 241A (demonstrative) | 369 | 1 |
| 20 | 242 | 370 | 1 |
| | 242A (demonstrative) | 371 | 1 |
| 21 | 249 | 373 | 1 |
| | 249A (demonstrative) | 373 | 1 |
| 22 | 243 | 375 | 1 |
| | 243A (demonstrative) | 375 | 1 |
| 23 | 250 | 376 | 1 |
| | 250A (demonstrative) | 376 | 1 |
| 24 | 251 | 376 | 1 |
| | 251 (demonstrative) | 377 | 1 |
| 25 | 252 | 378 | 1 |
| | 252A (demonstrative) | 378 | 1 |

| | | |
|---|---|---|
| 244 | 378 | 1 |
| 244A (demonstrative) | 379 | 1 |
| 245 | 380 | 1 |
| 254A (demonstrative) | 380 | 1 |
| 246 | 381 | 1 |
| 246A (demonstrative) | 381 | 1 |
| 241 | 382 | 1 |
| 241A (demonstrative) | 382 | 1 |
| 248 | 383 | 1 |
| 248A (demonstrative) | 383 | 1 |
| 253 | 384 | 1 |
| 253A (demonstrative) | 384 | 1 |
| 254, 255 | 385 | 1 |
| 254A, 255A (demonstrative) | 386 | 1 |
| 256 | 389 | 1 |
| 256A (demonstrative) | 390 | 1 |
| 257 | 409 | 1 |
| 257A (demonstrative) | 409 | 1 |
| 259 | 415 | 1 |
| 259A (demonstrative) | 415 | 1 |
| 268 | 418 | 1 |
| 268A (demonstrative) | 418 | 1 |
| 258 | 421 | 1 |
| 258A (demonstrative) | 421 | 1 |
| 261A (demonstrative) | 422 | 1 |
| 261 | 422 | 1 |
| 262 | 424 | 1 |
| 262A (demonstrative) | 424 | 1 |
| 263 | 426 | 1 |
| 263A (demonstrative) | 427 | 1 |
| 264 | 428 | 1 |
| 264A (demonstrative) | 429 | 1 |
| 266 | 435 | 1 |
| 266A (demonstrative) | 435 | 1 |
| 267 | 436 | 1 |
| 267A (demonstrative) | 436 | 1 |
| 268 | 438 | 1 |
| 268A (demonstrative) | 438 | 1 |
| 301 | 442 | 1 |
| 53, 54 | 443 | 1 |
| 56, 57 | 443 | 1 |
| 132, 133 | 445 | 1 |
| 70, 82 | 451 | 1 |
| 83 | 457 | 1 |
| 269 | 481 | 1 |
| 707 and 708 | 558 | 1 |
| 1417 | 582 | 1 |
| 1417A (demonstrative) | 582 | 1 |
| 1420 | 583 | 1 |
| 1420A (demonstrative) | 583 | 1 |

| | | | |
|---|---|---|---|
| 1 | 1421A | 597 | 1 |
| | 815 | 825 | 1 |
| 2 | 322-325 | 865 | 1 |
| | 328 | 911 | 1 |
| 3 | 329 | 1167 | 2 |
| | 329A (demonstrative) | 1167 | 2 |
| 4 | 42-44 | 1187 | 2 |
| | 34-39 | 1212 | 2 |
| 5 | 235 | 1252 | 2 |
| | 235A (demonstrative) | 1252 | 2 |
| 6 | 41 | 1269 | 2 |
| | 40 | 1276 | 2 |
| 7 | 72 | 1282 | 2 |
| | 330 | 1285 | 2 |
| 8 | 71 | 1288 | 2 |
| | 68 | 1328 | 2 |
| 9 | 62-66 | 1335 | 2 |
| | 87 | 1341 | 2 |
| 10 | 67 | 1368 | 2 |
| | 331 | 1507 | 2 |
| 11 | 332 | 1598 | 2 |
| | 333 | 1602 | 2 |
| 12 | 334 | 1603 | 2 |
| | 302 | 1899 | 2 |
| 13 | 84-85 | 1905 | 2 |
| | 55, 55A, 55B | 1922 | 2 |
| 14 | 134 | 1922 | 2 |
| | 58, 59 | 1925 | 2 |
| 15 | 60, 61, 61A | 1928 | 2 |
| | 728 | 1964 | 2 |
| 16 | 728A | 1965 | 2 |
| | 75-79A | 1999 | 2 |
| 17 | 100, 101 | 2011 | 2 |
| | 109, 113 | 2014 | 2 |
| 18 | 99 | 2017 | 2 |
| | 114-131 | 2020 | 2 |
| 19 | 102, 103 | 2022 | 2 |
| | 104 | 2025 | 2 |
| 20 | 108 | 2027 | 2 |
| | 107, 107A | 2029 | 2 |
| 21 | 110-112 | 2030 | 2 |
| | 97, 98 | 2031 | 2 |
| 22 | 92, 93 | 2067 | 2 |
| | 89-91 | 2070 | 2 |
| 23 | 94, 95 | 2077 | 2 |
| | 80, 81 | 2109 | 2 |
| 24 | 146 | 2116 | 2 |
| | 149 | 2119 | 2 |
| 25 | 147, 148 | 2120 | 2 |
| | 96 | 2166 | 2 |

| | | |
|---|---|---|
| 1 | 86 | 2177 2 |
| | 339 | 2186 2 |
| 2 | 14 | 2191 2 |
| | 45 | 2192 2 |
| 3 | 729 | 2231 2 |
| | 730 | 2233 2 |
| 4 | 731 | 2235 2 |
| | 335-336 | 2366 2 |
| 5 | 1436 | 2513 2 |
| | 1437 | 2514 2 |
| 6 | 1303 | 2535 2 |
| | 1304 | 2536 2 |
| 7 | 1305B | 2543 2 |
| | 1036C, 1036D | 2545 2 |
| 8 | 1307 | 2548 2 |
| | 340 g | 2581 2 |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

1          <u>THURSDAY, APRIL 23, 2009</u>

2                    (The following proceedings were had outside

3        the presence of the jury:)

4                    THE COURT:  If we're ready to proceed, we

5        will bring the jury back in

6                    MR. BELL:  Judge, may I approach the

7        podium?

8                    THE COURT:  Please.

9                    (The following proceedings were had in the

10       presence of the jury:)

11                   THE COURT:  Welcome back, members of the

12       jury.  And, Mr. Bell, you may cross examine.

13                   MR. BELL:  Thank you, Judge.

14                   HENRY GRIGSBY (CONT'D),

15       having been previously duly sworn, was examined and

16       testified as follows:

17                        <u>CROSS EXAMINATION</u>

18       BY MR. BELL:

19       Q.   Mr. Grigsby, my name is Brandon Bell.  I have some

20            questions for you.

21       A.   Okay.

22       Q.   I represent Billy Trinkle.  And you said Billy

23            Trinkle only bought small amounts of cocaine from

24            you?

25       A.   Yes.

1132

```
 1   Q.   Do you ever remember referring to Billy as a crack

 2        head?

 3   A.   Yes.

 4   Q.   When you called him that, you meant that he was

 5        addicted to cocaine?

 6   A.   Yes.

 7   Q.   And you understood that his addiction was so strong

 8        that he would call you multi times during the day?

 9   A.   Yes.

10   Q.   Because if the drugs weren't delivered as soon as he

11        called you, he would keep calling you until they got

12        there?

13   A.   Yes.

14   Q.   And do you remember a time when once he was given

15        cocaine he started to consume them right in the open

16        as soon as they were given to him?

17   A.   Yes.

18   Q.   So he was going through probably about an eightball a

19        day; is that about right?

20   A.   Yeah, roughly, eightball to a quarter ounce.

21   Q.   Now, you were also buying a vehicle from someone in

22        the Trinkle family; is that right?

23   A.   Yes.

24   Q.   You were making, like, monthly payments or something

25        like that?
```

1133

```
1   A.   Yes.

2   Q.   And you and Billy would talk on the phone about that

3        sometimes?

4   A.   Yeah.

5   Q.   Now, sometimes you would see Billy in the clubs

6        around Leavenworth; is that right?

7   A.   Yes.

8   Q.   Okay.  Would your cousin, Keenan Ringgold, be at

9        those clubs at the same time?

10  A.   Occasionally.  Not all the time, no.

11  Q.   Okay.  Is it fair to say that Keenan didn't hang out

12       at the clubs that often?

13  A.   No, not that often.  Yes, it's fair to say that.

14  Q.   All right.  When he was there, he didn't stay for

15       long, did he?

16  A.   No, not that I can recall, no.

17  Q.   I believe you testified that sometimes Mr. Ringgold

18       would take your drugs and not pay you?

19  A.   Yes.

20  Q.   What kind of excuses would he give you for not paying

21       for the drugs?

22  A.   Well as far as the marijuana, I know he was using it.

23       He would say business is slow and he had things to

24       spend money on and, you know, just different excuses

25       like that.
```

1    Q.   Did you believe him?

2    A.   Yes.  To an extent, you know.  I felt he didn't know

3         how to manage his money, so . . .

4    Q.   Did you ever feel that he was being sort of not

5         exactly truthful with you about where the money was

6         going?

7    A.   Sometimes.

8    Q.   Now, you sold quite a bit of drugs in 2006 and 2007?

9    A.   I guess that could be a fair statement.

10   Q.   Okay.  About how much do you think that you sold

11        during that time period?

12   A.   I'm not sure.  It's hard to say.

13   Q.   More than 10 kilograms?

14   A.   Probably about 10, 15.

15   Q.   And about how much money do you think you made off

16        those sales through 2006 and 2007?

17   A.   I don't know.  I can't just off the top of my head

18        figure that out.

19   Q.   If Billy had stopped buying cocaine from you in 2006

20        or 2007, would that have put you out of business?

21   A.   No.  I had multiple customers.

22   Q.   Your business wouldn't have really blinked, would it?

23   A.   I wouldn't say that, no.

24   Q.   All right.  You would have been able to go on

25        continuing to distribute cocaine?

 1    A.    Yes.

 2                    MR. BELL:  I have no further questions,

 3          Judge.

 4                    THE COURT:  All right.  Ms. Morehead?

 5                    MR. JOHNSON:  Judge.

 6                    THE COURT:  Oh, excuse me.  Mr. Johnson?

 7                    MR. JOHNSON:  I do have some questions.

 8                    THE COURT:  I apologize.

 9                    CROSS EXAMINATION

10    BY MR. JOHNSON:

11    Q.    Mr. Grigsby, my name is Rick Johnson.  I'm Franklin

12          Goodwin's lawyer.  You testified on direct that you

13          started selling cocaine as a juvenile?

14    A.    Yes.

15    Q.    And then you were arrested about the age of 17?

16    A.    Yes.

17    Q.    And at that point then, at least for a period of

18          time, in your early twenties, you stopped selling

19          narcotics?

20    A.    Yes.

21    Q.    You spoke with case agents and the prosecutor along

22          with your lawyer when you made a proffer statement?

23    A.    Yes.

24    Q.    And that would have been some time -- well, that

25          would have been on March 26, 2009?

```
 1    A.    Yes.

 2    Q.    And when you spoke with them, you started telling

 3          them also about your background?

 4    A.    They pretty much already had -- knew about my

 5          background.

 6    Q.    But you told them about it?

 7    A.    Yes.

 8    Q.    And you told them what you told the jury about your

 9          background as a drug dealer?

10    A.    Yes.

11    Q.    And you told the agent that you were a drug dealer

12          from 14 for 17?

13    A.    Yes.

14    Q.    And that you stopped?

15    A.    Yes.

16    Q.    And that you resumed again about the age 25 or so

17          when you came out here to Kansas?

18    A.    Yes.

19    Q.    Mr. Grigsby, I want to show you a copy of a report

20          that was prepared on March 26, 2009.  Have you seen

21          this report at all?

22    A.    No.

23    Q.    Were you given an opportunity to review your proffer

24          statement?

25    A.    No.
```

 1    Q.    And no opportunity to review it for accuracy?

 2    A.    No.

 3    Q.    On Paragraph 2 --

 4                MS. MOREHEAD:  Judge, I'm going to object.

 5          If he hasn't seen it, there's no point in showing it

 6          to him.  He didn't write it.

 7                THE COURT:  Mr. Johnson, are you attempting

 8          to refresh his recollection?

 9                MR. JOHNSON:  I would like to have the

10          witness review it to see whether or not --

11          essentially to impeach the witness because of a prior

12          inconsistent statement.

13                MS. MOREHEAD:  He can't do it with --

14                MR. JOHNSON:  I would like to have Mr.

15          Grigsby review the report.

16                THE COURT:  Why don't you approach and you

17          can explain what you want to do.

18                (Counsel approached the bench and the

19          following proceedings were had:)

20                THE COURT:  What is it you're trying to do?

21                MR. JOHNSON:  He testified that he stopped

22          selling drugs at age 17 until age 25.  We have a

23          report that says he was a drug dealer off and on all

24          the way until age 25.  I would like him to review the

25          report and ask if he made a prior inconsistent

```
 1            statement on March 26.

 2                      MS. MOREHEAD:  First of all, he can't

 3            impeach somebody with somebody else's report that he

 4            can't even authenticate.  Second of all, that's not

 5            what he said.  He said he stopped at age 17, he

 6            stopped for several years, and he started back up at

 7            some point, but that's not an inconsistent statement

 8            that he said it was off and on.

 9                      THE COURT:  I don't know about that.  You

10            may ask him, have you ever made a statement . . .

11            whatever the statement is that is contained in there,

12            and you may call whoever he made the statement to to

13            testify to what that prior statement was, but I don't

14            believe you can have him look at this and then just

15            say, is everything in here true or false?  I think

16            that's a little bit -- not the appropriate way to do

17            it.  Ask him if he's ever made that statement, and

18            then if he denies it, you can prove that statement to

19            the contrary.

20                      MR. JOHNSON:  Thank you, Judge.

21                      (The proceedings returned to open court.)

22   Q.   (By Mr. Johnson) Mr. Grigsby, on March 26 when you

23            spoke with the case agents and the prosecutor, did

24            you tell them that you were actually, in fact,

25            dealing drugs off and on from age 17 up until age 25?
```

```
 1    A.   That's possible, yes.

 2    Q.   Well, which is true?  You told the jury that you

 3         stopped selling drug at age 17.

 4    A.   Well, I did, and I started working, so when I --

 5         between not working -- when I stopped working, I

 6         started selling drugs when I moved out here,

 7         so . . .

 8    Q.   Yesterday you testified that you stopped dealing

 9         drugs at age 17 and you started working.

10    A.   Yes.

11    Q.   On March 26 you told case agents that you were

12         selling drugs off and on until age 25?

13    A.   That's possible.  I can't remember exactly how it

14         went.  It was a long time ago.

15    Q.   It was not even a month ago.

16    A.   I'm saying it was a long time ago when that took

17         place, so I can't remember exactly how the steps went

18         on that as far as when was I selling drugs and when I

19         wasn't.  The question was, was I selling drugs and

20         did I stop?  And I said, yes, I stopped because I was

21         working.  When I worked, I didn't sell drugs.

22    Q.   So you were selling drugs on occasion between age 17

23         and age 25?

24    A.   Not that I can recall, but I might have.  I'm not

25         sure.  I can't remember.
```

1    Q.   And you might have told agents that you were, in

2         fact, selling drugs?

3    A.   I'm not sure.  I don't remember saying that.

4    Q.   You don't remember what you told the case agents?

5    A.   I remember what I told them, but I don't remember

6         saying that, no.

7    Q.   You may or may not have said that?

8              MS. MOREHEAD:  Judge, I'm going to object.

9         That's been asked and answered.

10             THE COURT:  Sustained.

11   Q.   (By Mr. Johnson) You said yesterday that it is really

12        stressful selling drugs?

13   A.   Yes.

14   Q.   And that's because there's a lot of risk involved

15        with being a drug dealer?

16   A.   Yes.

17   Q.   Some of those risks include getting shot,

18        potentially?

19   A.   Yes.

20   Q.   Getting robbed?

21   A.   Yes.

22   Q.   Getting robbed at gunpoint?

23   A.   Yes.

24   Q.   Having people not pay you back?

25   A.   Yeah.

```
 1   Q.   If you have a kilo that costs approximately $20,000,

 2        that's cash that -- you're out buying it, you've paid

 3        20,000 for the kilo?

 4   A.   Yes.

 5   Q.   You would like to recover that $20,000?

 6   A.   Yes.

 7   Q.   And then hopefully also make a profit?

 8   A.   Yes.

 9   Q.   So if somebody doesn't pay you back, that's money

10        that you're out.  So that's another risk?

11   A.   Yes.

12   Q.   You also have a risk of getting arrested?

13   A.   Yes.

14   Q.   And you get arrested, you could face a tremendous

15        amount of punishment?

16   A.   Yes.

17   Q.   In this instance you're facing and have been facing

18        life imprisonment?

19   A.   Yes.

20   Q.   You've not yet been sentenced, but that is within the

21        realm of possibility for you?

22   A.   Yes.

23   Q.   And so when you are a drug dealer and you are facing

24        these risks, you need to do things to help protect

25        you?
```

```
 1   A.   Yes.

 2   Q.   One thing that drug dealers do to protect themselves,

 3        carry guns?

 4   A.   Some, yes.

 5   Q.   And you had firearms?

 6   A.   I didn't carry them though.

 7   Q.   You had six firearms?

 8   A.   Yes.

 9   Q.   You owned six guns, but you didn't carry them?

10   A.   No.  The area I was in, it wasn't necessary to carry

11        a gun.

12   Q.   You were just a collector?

13   A.   Yes.  I always had a thing for guns.

14   Q.   Okay.  So you were a drug dealer with a thing for

15        guns but didn't carry them?

16   A.   Yes.

17   Q.   Nonetheless, your buddy Harold Wallace still had

18        contacts back in Richmond, California?

19   A.   Yes.

20   Q.   And back in Richmond, California, there was a gang

21        war?

22   A.   I guess, yes, you could say that.

23   Q.   At least you understood that from Mr. Wallace?

24   A.   Yes.

25   Q.   And that's why you gave to Mr. Wallace firearms?
```

1    A.   Yes.

2    Q.   And you gave him firearms so he could send them to

3         California?

4    A.   Yes.

5    Q.   So that they could be used in fighting a gang war

6         with gang members?

7    A.   I'm not going to say that for sure.  He just said he

8         needed some guns, and I had some, so I gave them to

9         him.  I can't say what his use for them was.

10   Q.   But he needed them in California, and that's why you

11        gave them to him?

12   A.   Yes.

13   Q.   Because of all of the stressors associated with being

14        a drug dealer, you decided that you were going to get

15        out of the cocaine business?

16   A.   Yes.

17   Q.   And that's because selling cocaine has a greater risk

18        of punishment than selling marijuana?

19   A.   That was one of the reasons, yes.

20   Q.   It was your belief that if you were caught selling

21        large quantities of marijuana your punishment would

22        be lower than if you got caught selling large

23        quantities of cocaine?

24   A.   That was one of the reasons, but not exactly the

25        total reason why did I that.  I did it because of the

```
 1            fact that selling marijuana was less stressful than

 2            selling cocaine.  It's a lot of things as far as

 3            getting bad drugs, having to return it, it's a lot

 4            that go into that, the reason why that makes the

 5            business stressful.  Marijuana pretty much you can

 6            look at and see what you got and see if it's good

 7            marijuana or not, and the customers are happy and

 8            more laid back.  You don't have to deal with them

 9            calling you all the time, and, you know, it's a lot

10            of headaches and pains that go with it.

11    Q.    Sure.  Marijuana is easier quality control?

12    A.    Yes.

13    Q.    It's also -- an additional stressor is that the

14            potential punishment for selling it is less?

15    A.    Yes.

16    Q.    And all of these things make being a drug dealer

17            stressful?

18    A.    Yes.

19    Q.    You said that you stopped selling cocaine?

20    A.    Yes.

21    Q.    At least selling cocaine for yourself; is that right?

22    A.    Yes.

23    Q.    But you continued to sell cocaine for Harold Wallace?

24    A.    Well, I really wasn't anticipating selling it.  I

25            wasn't supposed to be.  It was something he had going
```

1    on between him and James Heags.  At times he would

2    call me when he don't answer the phone or something

3    like that and then ask me to check on him or

4    something.

5    Q.    Okay.  Just so I understand from your testimony

6    yesterday, you said you stopped selling cocaine, and

7    you when you stopped, you started getting marijuana

8    from Wallace?

9    A.    Yes.

10   Q.    And Wallace was sending that through the mail to you?

11   A.    Yes.

12   Q.    And also as part of that package he would send

13   cocaine?

14   A.    Yes.

15   Q.    Also you would receive the cocaine with that package?

16   A.    Yes.

17   Q.    And then you would distribute the cocaine for

18   Wallace?

19   A.    Well, not really.  I was not doing distributing.  At

20   times I have, but I wasn't trying to.

21   Q.    You just said you weren't distributing; right?

22   A.    No.  It was between him and James Heags on selling

23   that.

24   Q.    You would get the cocaine; right?

25   A.    Yes.

```
 1   Q.   And then you would distribute it to Shaq; right?

 2   A.   I would just give it to him.

 3   Q.   Okay.  You would give it to him?

 4   A.   Yes.

 5   Q.   So you would distribute it; right?

 6   A.   Let's be clear on what you mean by distributing.

 7        Distributing, my interpret of that is selling it to

 8        him.

 9   Q.   I see.  By not making money on it, you weren't

10        distributing it?

11   A.   I wasn't selling to him, no.  I just handed it to

12        him, and he took care of that for Mr. Wallace, and I

13        just checked on him to make sure the money was right

14        sometimes.

15   Q.   Okay.  And you would also make sure the money was

16        good?

17   A.   Yes.

18   Q.   You would get the dope, and you would give it to

19        Shaq?

20                  MS. MOREHEAD:  Objection; asked and

21        answered.

22                  THE COURT:  Overruled.  You may complete

23        this.

24   Q.   (By Mr. Johnson) You would give the dope to Shaq;

25        right?
```

1   A.   Uh-huh.

2   Q.   Is that --

3   A.   Yes.

4   Q.   And then Shaq would give you the money?

5   A.   Yes.

6   Q.   And then count the money, like you said, to make sure

7        it's right?

8   A.   Yes.

9   Q.   And then you would give the money to Mr. Wallace?

10  A.   Yes.

11  Q.   And in exchange for your role in that operation, he

12       would, as I understand it, give you marijuana that

13       you could sell?

14  A.   Yes.

15  Q.   That was marijuana that you could make a profit on?

16  A.   Yes.

17  Q.   And you were doing it this way because you wanted to

18       get out of the business of selling crack cocaine?

19  A.   Yes.

20  Q.   Also at this time you were running a rap music label?

21  A.   Yes.

22  Q.   Let me ask you a few questions about that in terms

23       of, did you have a recording studio?

24  A.   I didn't own a recording studio, no.  I had a studio

25       that I actually went to, yes.

1148

```
 1    Q.    And then you would use money to fund studio time?

 2    A.    Yes.

 3    Q.    And then you would actually print records of the

 4          recordings that you would make?

 5    A.    Yes.

 6    Q.    So you were producing the albums?

 7    A.    Yes.

 8    Q.    Were you using drug money to produce those albums?

 9    A.    Yes.

10    Q.    And did you have several associates with you in that

11          hip hop business?

12    A.    Yes.

13    Q.    Were they also people that worked with you to

14          distribute drugs?

15    A.    One of them was, yes.

16    Q.    Who was that?

17    A.    Jerry Davis.

18    Q.    One more time.  Jerry Davis?

19    A.    Yes.

20    Q.    You got charged in this case when?  When were you

21          arrested?

22    A.    December 26 of '07.

23    Q.    And when you were arrested, you were arrested on two

24          separate indictments?

25    A.    Yes.  Well, I was arrested on one and then later was
```

1     superseded.

2  Q.   There were two indictments?

3  A.   Yes.

4  Q.   The Boytina Locke indictment; right?

5  A.   Yes.

6  Q.   And then the one that brings us here for trial today?

7  A.   Yes.

8  Q.   On -- I'll call it the Locke indictment.  On the

9       Locke indictment you were facing three counts; right?

10 A.   Yes.

11 Q.   One was a conspiracy?

12 A.   Yes.

13 Q.   And you've pleaded guilty to that?

14 A.   Yes.

15 Q.   Count 3 was a wire communications count?

16 A.   Yes.

17 Q.   And a wire communications count is using a telephone

18      in furtherance of this conspiracy; right?

19 A.   Yes.

20 Q.   And you were facing on that count up to four years'

21      imprisonment?

22 A.   Yes.

23 Q.   And you could also face up to $250,000 in fines?

24 A.   Yes.

25 Q.   You had an additional count there, Count 6, which is

1    also another wire communications count?

2  A.  Yes.

3  Q.  And the punishment on that is up to four years'

4      imprisonment?

5  A.  Yes.

6  Q.  You're familiar with the term running wild in terms

7      of sentencings?

8  A.  Yes.

9  Q.  What does running wild mean?

10 A.  Running separately.  The time on each one doesn't run

11     concurrent, run together; it runs separately.

12 Q.  That means, for example, that if you got four years

13     on Count 3 and Count 6 running wild that would be a

14     total of eight years of punishment?

15 A.  Yes.

16 Q.  That means that you would serve the first four years;

17     right?

18 A.  Yes.

19 Q.  And then when you're done serving that first four

20     years, you would begin serving the second four-year

21     sentence?

22 A.  Yes.

23 Q.  So that's what you call running wild?

24 A.  Yes.

25 Q.  You knew that you were facing that as a potential

```
 1          punishment?
 2                    MS. MOREHEAD:  Judge, could we approach,
 3          please?
 4                    (Counsel approached the bench and the
 5          following proceedings were had:)
 6                    MS. MOREHEAD:  Judge, I am going to object.
 7          This is the same line of questioning he was trying to
 8          get into with Mr. Ringgold.
 9                    THE COURT:  And my response is the same.
10          It's what Mr. Grigsby believes, not what the law is;
11          and that was Mr. Rogers' question on which you
12          objected, was to find out whether he thought that was
13          true or not.  Your objection is overruled.  He may
14          ask him about this.  It does not matter whether or
15          not it could happen.  If he thinks it could or if he
16          doesn't think it could, that's fine.  If he thinks
17          this could happen, it shows part of what he feels he
18          might be able to dispel by way of helping the
19          government.  You may ask the question.
20                    (The proceedings returned to open court.)
21     Q.   (By Mr. Johnson) So we were talking about the Locke
22          indictment and the two wire communications counts?
23     A.   Yes.
24     Q.   And those were dismissed?
25     A.   Yes.
```

| | | |
|---|---|---|
| 1 | Q. | By dismissing that you avoided up to four years on |
| 2 | | each count? |
| 3 | A. | Yes. |
| 4 | Q. | And you avoided the potential of those running wild? |
| 5 | A. | Yes. |
| 6 | Q. | And so it was beneficial for you to enter into a plea |
| 7 | | agreement to have those go away? |
| 8 | A. | Yes. |
| 9 | Q. | And your expectation is at sentencing the government |
| 10 | | will dismiss those two counts? |
| 11 | A. | Yes. |
| 12 | Q. | You are a cooperating defendant? |
| 13 | A. | Yes. |
| 14 | Q. | And you have been -- where have you been staying |
| 15 | | since you were arrested? |
| 16 | A. | I was in CCA but I was recently moved. |
| 17 | Q. | So you're no longer at CCA, but you have been in |
| 18 | | confinement? |
| 19 | A. | Yes. |
| 20 | Q. | At CCA what do they call a cooperating defendant? |
| 21 | A. | Rat, snitch. |
| 22 | Q. | Okay.  So you're a snitch? |
| 23 | A. | Yes. |
| 24 | Q. | On this indictment you were facing a lot more than |
| 25 | | just three charges? |

```
 1    A.   Yes.

 2    Q.   You were facing on Count 5 a charge of distribution

 3         of cocaine or crack cocaine?

 4    A.   Yes.

 5    Q.   And the range of punishment on that was a minimum of

 6         five years and a maximum of 40 years?

 7    A.   Yes.

 8    Q.   You have a prior drug conviction?

 9    A.   Yes.

10    Q.   And we have used the term 851?

11    A.   Yes.

12    Q.   And you understand that with the prior drug

13         conviction that can increase the range of punishment

14         on particular counts?

15    A.   Yes.

16    Q.   Including Count 5, which was the distribution count?

17    A.   Yes.

18    Q.   And instead of facing five to 40 years with the 851,

19         you would be facing ten to life?

20    A.   Yes.

21    Q.   But by the agreement that was dismissed, correct, or

22         will be dismissed?

23    A.   Yes.

24    Q.   So you're not facing ten to life any more on Count 5?

25    A.   Well, actually, the agreement was verbally made, was
```

1     an open agreement that I made to plead guilty to two

2     counts of conspiracy on one case and the forfeiture

3     allegations.  That was the only thing, and that was

4     before I was even a cooperating witness.  I did that

5     February 20.  I later on decided to make the decision

6     to cooperate after I was aware of all the evidence

7     that was against me and all the statements that was

8     made by multiple codefendants.

9  Q.  And part of the agreement, you called it a verbal

10     agreement --

11 A.  Yes.  It was nothing written and no promises made.

12 Q.  Sure.  We will get to that.

13 A.  I basically pled to the courts.

14          MS. MOREHEAD:  Judge, I would ask that the

15     witness be allowed to answer the question when asked.

16          THE COURT:  The answer had become

17     nonresponsive.  You may ask a new question,

18     Mr. Johnson.

19          MR. JOHNSON:  Thank you, Judge.

20 Q.  (By Mr. Johnson) Part of that verbal agreement was to

21     dismiss the distribution count?

22 A.  Yes.

23 Q.  You were facing multiple distribution counts on this

24     indictment?

25 A.  Yes.

| | | |
|---|---|---|
| 1 | Q. | Count 24 was also an allegation of distribution of |
| 2 | | crack cocaine? |
| 3 | A. | Yes. |
| 4 | Q. | And that also had a range of punishment of ten to |
| 5 | | life with your 851? |
| 6 | A. | Yes. |
| 7 | Q. | And that also by verbal agreement will be dismissed? |
| 8 | A. | Yes. |
| 9 | Q. | Count 26, also distribution of crack cocaine? |
| 10 | A. | Yes. |
| 11 | Q. | And that also had a range of punishment of a minimum |
| 12 | | of ten and a maximum of life? |
| 13 | A. | Yes. |
| 14 | Q. | And that also will be dismissed? |
| 15 | A. | Yes. |
| 16 | Q. | And that's by your verbal agreement? |
| 17 | A. | Yes. |
| 18 | Q. | You had multiple wire communication counts? |
| 19 | A. | Yes. |
| 20 | Q. | Count 9 was a wire communication count? |
| 21 | A. | Yes. |
| 22 | Q. | And we have already discussed that has a maximum |
| 23 | | possible punishment of four years? |
| 24 | A. | Yes. |
| 25 | Q. | And that's going to be dismissed? |

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Count 10 was a wire communications count? |
| 3 | A. | Yes. |
| 4 | Q. | And that will be dismissed? |
| 5 | A. | Yes. |
| 6 | Q. | Count 11 was a wire communication count? |
| 7 | A. | Yes. |
| 8 | Q. | And that will be dismissed? |
| 9 | A. | Yes. |
| 10 | Q. | Count 12 was a wire communication count? |
| 11 | A. | Yes. |
| 12 | Q. | That's going to be dismissed? |
| 13 | A. | Yes. |
| 14 | Q. | Count 13 was an attempted distribution; is that |
| 15 | | right? |
| 16 | A. | Yes. |
| 17 | Q. | And that has a range of punishment with an 851 of up |
| 18 | | to 30 years' imprisonment? |
| 19 | A. | Yes. |
| 20 | Q. | And you're no longer facing that potential 30 years' |
| 21 | | imprisonment on Count 13? |
| 22 | A. | No. |
| 23 | Q. | And that's because there's an agreement to have that |
| 24 | | dismissed? |
| 25 | A. | Yes. |

 1   Q.   Count 14 was a wire communication count?

 2   A.   Yes.

 3   Q.   That will be dismissed?

 4   A.   Yes.

 5   Q.   Count 15 is a wire communication count?

 6   A.   Yes.

 7   Q.   That will be dismissed?

 8   A.   Yes.

 9   Q.   Count 18 is a wire communication count?

10   A.   Yes.

11   Q.   Also by agreement that count will be dismissed?

12   A.   Yes.

13   Q.   Count 23 is a wire communication count?

14   A.   Yes.

15   Q.   That too will be dismissed?

16   A.   Yes.

17   Q.   And Count 25 is a wire communication count?

18   A.   Yes.

19   Q.   Also by agreement that will be dismissed?

20   A.   Yes.

21   Q.   You have no written plea agreement?

22   A.   No.

23   Q.   But you have some verbal agreements with the

24        government?

25   A.   Yes.

```
1   Q.   With no written plea agreement you did not waive your
2        right to appeal?
3   A.   Correct.
4   Q.   If you believe after you are sentenced that your
5        sentence violates the law, you can file an appeal?
6   A.   Correct.
7   Q.   And you can ask the Tenth Circuit Court of Appeals to
8        review whether or not your sentence was legally
9        appropriate?
10  A.   Yes.
11  Q.   That's a right that you've maintained in this case?
12  A.   Yes.
13  Q.   You also had -- you pled guilty to two conspiracies?
14  A.   Yes.
15  Q.   And they were on two separate cases?
16  A.   Yes.
17  Q.   But they have been put together onto one case?
18  A.   Yes.
19  Q.   And you understand what that did for you; right?
20  A.   Yes.
21  Q.   You understand that with two separate cases there is
22       a risk that they will be treated separately for
23       sentencing purposes?
24  A.   Yes.
25  Q.   But by putting them on one case at sentencing they
```

| 1 | | will be treated together? |
|---|---|---|
| 2 | A. | Yes. |
| 3 | Q. | So it will be like being sentenced on just one of |
| 4 | | them? |
| 5 | A. | Yes. |
| 6 | Q. | And that's a benefit that you got out of your plea |
| 7 | | agreement? |
| 8 | A. | Yes. |
| 9 | Q. | While you didn't have -- you did not agree to |
| 10 | | cooperate at the time of your plea? |
| 11 | A. | Correct. |
| 12 | Q. | But you left open the possibility of cooperating? |
| 13 | A. | Yes. |
| 14 | Q. | That was a decision that you could make at any time? |
| 15 | A. | Yes. |
| 16 | Q. | It was a standing offer for you to accept? |
| 17 | A. | Yes. |
| 18 | Q. | And you chose to accept that offer? |
| 19 | A. | Yes, sir, I did. |
| 20 | Q. | And by accepting that offer, you're hoping that the |
| 21 | | government will file the 5K motion? |
| 22 | A. | Yes. |
| 23 | Q. | And what did you testify to as your believe as to |
| 24 | | where your case without the 5K motion will fall on |
| 25 | | the guidelines? |

1   A.   292 months to 365 months.

2   Q.   What does that come out to?

3   A.   About 24 to 30½ years.

4   Q.   And that is your estimated sentence based upon the

5        two counts to which you pled guilty?

6   A.   Yes.

7   Q.   And so if you didn't cooperate and you came into

8        court for sentencing, that is your best estimate as

9        to the range of punishment that the court may impose?

10  A.   Yes.

11  Q.   And you don't want to do 25 to 30 years, roughly?

12  A.   No.

13  Q.   You would like to get out earlier?

14  A.   Yes.

15  Q.   You want to see your children?

16  A.   Yes.

17  Q.   You would like to have quality time with your

18       children and not just simply quality time with your

19       grandchildren or great grandchildren?

20  A.   Yes.

21  Q.   And so you hope that the government will consider

22       what you did today as substantial assistance?

23  A.   Yes.

24  Q.   And if they file that motion, the judge will be

25       permitted to even give you a sentence less than the

```
1          statutory minimum?

2    A.    Yes.

3    Q.    The statutory minimum for conspiracy is ten years?

4    A.    Yes.

5    Q.    You don't ultimately know as part of your agreement

6          what the government is going to recommend?

7    A.    Right.

8    Q.    But your expectation is that if they file this motion

9          they will recommend a sentence less than the roughly

10         24½ years?

11   A.    Yes.

12   Q.    And you're hoping that they go substantially less

13         than 24½ years?

14   A.    Yes.

15   Q.    Do you have a goal in mind as to what sentence you

16         would like to receive?

17   A.    No.  I'm not trying to put no numbers on it.  I'm

18         just hoping for the best.

19   Q.    You don't have anything in mind?

20   A.    No, not really.  I just know anything less than that

21         would be better.

22   Q.    You had, as we have already discussed, a drug-dealing

23         operation; correct?

24   A.    Yes.

25   Q.    You and Harold Wallace worked together?
```

```
 1    A.    Yes.

 2    Q.    You had agreements to work together to distribute

 3          cocaine and crack cocaine?

 4    A.    Yes.

 5    Q.    You and Shaq had agreements to help each other

 6          distribute cocaine?

 7    A.    Yes.

 8    Q.    For example, Shaq would help you store drugs and

 9          money?

10    A.    Yes.

11    Q.    He would help you distribute them?

12    A.    Yes.

13    Q.    He would help you by maintaining communication with

14          customers?

15    A.    Yes.

16    Q.    He would help you by actually meeting with the

17          customers and completing the sale?

18    A.    Yes.

19    Q.    And he would collect money for you?

20    A.    Yes.

21    Q.    And then he would give the money to you; correct?

22    A.    Yes.

23    Q.    And then Wallace was helping you out by sending you

24          drugs through the mail?

25    A.    Yes.
```

```
1    Q.    And you were helping him out by taking his drugs and

2          getting them to Shaq?

3    A.    Yes.

4    Q.    Your sister also helped you out?

5    A.    Yes.

6    Q.    She was essentially your warehouse in the area?

7    A.    Well, I wouldn't consider it my warehouse, no.

8    Q.    A stash house?

9    A.    No.  It was just -- I didn't really use her house

10         like that.  It was just occasions when I was in the

11         area and didn't want to ride with the drugs, I might

12         have put them there temporarily, but I wouldn't

13         consider her house being a stash house, no.

14   Q.    Okay.  It was more of a temporary location?

15   A.    Yes.

16   Q.    But something that she agreed to help you with?

17   A.    Yes.

18   Q.    These are all people that you had agreements with to

19         help distribute drugs?

20   A.    Yes.

21   Q.    And you mentioned Jerry Davis among some others;

22         right?

23   A.    Yes.

24   Q.    Then you had as part of your operation a whole host

25         of customers?
```

```
 1    A.   Yes.

 2    Q.   And these were people to whom you sold the drugs?

 3    A.   Yes.

 4    Q.   But you didn't care what they did with the drugs

 5         after they bought them?

 6    A.   No.

 7    Q.   They could go and smoke it for all you cared?

 8    A.   Right.

 9    Q.   They could go and flush it for all you cared?

10    A.   Correct.

11    Q.   You had no agreement with them?

12                    MS. MOREHEAD:   Judge --

13    Q.   (By Mr. Johnson) Right?  You had no agreement with

14         them?

15    A.   Yes.

16    Q.   They were just your customers?

17    A.   Yes.

18    Q.   Billy Trinkle was just one of your customers?

19    A.   Yes.

20    Q.   Franklin Goodwin was one of your customers?

21    A.   Yes.

22    Q.   And you had no agreement with Franklin Goodwin that

23         he distribute the drugs that you sold?

24    A.   No.

25                    MR. JOHNSON:   Thank you.  I've got no
```

```
 1          further questions.
 2                    THE COURT:  All right.  Ms. Morehead?
 3                    REDIRECT EXAMINATION
 4   BY MS. MOREHEAD:
 5   Q.   Mr. Grigsby, Mr. Calbi asked you yesterday about a
 6        phone call we played between you and James Heags.  Do
 7        you remember that phone call?
 8   A.   Which phone call with James Heags?
 9                    MS. MOREHEAD:  Judge, could I -- I just
10        want to refresh his memory with a portion of that.
11        Could we cue up Government's Exhibit 168.
12                    THE COURT:  You may.
13                    MS. MOREHEAD:  And start at 49 seconds or
14        thereabouts.
15                    (A portion of Exhibit No. 168 was played in
16        open court.)
17   Q.   (By Ms. Morehead) When you mentioned that to Shaq
18        that -- first you're talking about Tater Bug.  Remind
19        the jury who Tater Bug is.
20   A.   Monterial Wesley.
21   Q.   And said he was whipping everything up, so if you did
22        it from him you gotta get it already ready.  What
23        were you referring to, Mr. Grigsby?
24   A.   Referring to crack.
25   Q.   I'm sorry?
```

1    A.    Referring to crack.

2    Q.    When you had this discussion with James Heags, had

3          Monterial Wesley and you had a discussion before that

4          about this very thing?

5    A.    Yes.

6    Q.    This phone call, if I represented to you that it was

7          on August 7, 2007, would you have any dispute with

8          that?

9    A.    No.

10                 MS. MOREHEAD:  Judge, I would ask for

11         admission of Government's Exhibit 329 and 329A.

12                 THE COURT:  Did you identify those for us

13         in terms of -- that's a phone call; is that correct?

14                 MS. MOREHEAD:  Phone call along with a

15         transcript, Judge, and Mr. Grigsby is a participant

16         in this particular phone call.

17                 THE COURT:  Is there any objection?

18                 MR. BELLEMERE:  Your Honor, I'm sorry.  I

19         missed something, please.  Is this a phone call made

20         on some date?  Is there a number or something so --

21                 MS. MOREHEAD:  It's also made on August 7

22         of 2007.

23                 MR. BELLEMERE:  Thank you.

24                 MS. MOREHEAD:  This is on Target Phone No.

25         1, which is one of Mr. Grigsby's phones.

```
 1              THE COURT:  Is there a phone call number,
 2      if that helps people find it?
 3              MS. MOREHEAD:  Call No. 336.
 4              MR. BELLEMERE:  Thank you, your Honor.
 5          Thank you, ma'am.
 6              THE COURT:  Is there any objection?
 7      Hearing none, Exhibits 329 and 329A are admitted,
 8      329A is for demonstrative purposes.  You may proceed.
 9              (Exhibit 329 was admitted into evidence,
10      and Exhibit 329A was admitted for demonstrative
11      purposes only.)
12  Q.  (By Ms. Morehead) Mr. Grigsby, who was that phone
13      call with?
14  A.  Myself and Mr. Wesley.
15              (Exhibit No. 329 was played in open court.)
16  Q.  (By Ms. Morehead) And in connection with that call,
17      tell us what that call involved.
18  A.  Well, I was complaining about the drugs being bad and
19      they wouldn't sell, and he wanted -- I was trying to
20      return them to him, and he was saying that the new
21      that he had was basically just as bad and the only
22      alternative is that if he give it to me already
23      cooked up.
24  Q.  And when you say the only alternative was he was
25      going to give it to you already cooked up, just so
```

```
1              I'm clear, are you saying your understanding was he
2         was going to give you the exchange and what he was
3         going to give you was crack cocaine?
4    A.   Yes.
5    Q.   And based upon your conversations with him, was it
6         your understanding that it was already ready?
7    A.   Yes.
8    Q.   And so when Mr. Calbi asked you if it was possible
9         that the crack had not yet been prepared, what was
10        your understanding of whether it was already ready?
11   A.   It was already cooked up.
12   Q.   Mr. Bell asked you some questions about Mr. Trinkle.
13        First of, all do you know, did Billy Trinkle have a
14        job during the time you knew him?
15   A.   Not that I'm aware of, no.
16   Q.   And he asked you about if you were buying a vehicle,
17        and I think what he said was it from someone in Mr.
18        Trinkle's family?
19   A.   Yes.
20   Q.   Were you buying a vehicle?
21   A.   Yes.
22   Q.   Who were you buying a vehicle from?
23   A.   Billy Trinkle's brother.
24   Q.   And what's his name?
25   A.   I just know him by Bun.
```

1    Q.    Certainly not from Billy Trinkle; right?

2    A.    Yes.

3    Q.    And while you and Billy Trinkle may have been talking

4          about that, you weren't paying Billy Trinkle any

5          money or any drugs for a vehicle; is that correct?

6    A.    Occasionally I would give the money to him.  His

7          brother was incarcerated.  And the car notes needed

8          to be paid, and I took over the notes, and I normally

9          gave it to his mother, but occasionally I gave it to

10         him.

11   Q.    Now, you knew that Billy Trinkle used drugs; is that

12         right?

13   A.    Yes.

14              MS. MOREHEAD:  Could we play call 321,

15         please.

16   Q.    (By Ms. Morehead) When Billy Trinkle said, "I'm just

17         trying to make a couple dollars," what did you take

18         that to mean, Mr. Grigsby?

19              MR. BELL:  Objection; speculation.

20              MS. MOREHEAD:  Judge, this was the

21         conversation.

22              THE COURT:  No, I'm going to overrule the

23         objection.  You may ask that.

24         If you had -- I'm not asking you to guess today

25         as you listen to that question.  The question is, did

```
1        you at the time, when you were having this
2        conversation, have some understanding of what this
3        discussion was about?
4              If that's the question you're asking --
5                    MS. MOREHEAD:  Yes, Judge.
6                    THE COURT:  -- then I do overrule the
7        objection.
8    A.  Yes.  My understanding was he was trying to make some
9        money, make a quick profit.
10   Q.  (By Ms. Morehead) From what?
11   A.  From the drugs that he was inquiring about.
12   Q.  And just so I'm clear, how does someone make a profit
13       from drugs that they get from you?
14   A.  They sell them.
15   Q.  And so even though Billy Trinkle was a user, did you
16       also have an understanding that he sold drugs that
17       you sold to him?
18   A.  Yes.
19   Q.  Now, Mr. Goodwin asked you a question about
20       customers, and you were a customer of Monterial
21       Wesley; is that right?
22   A.  Yes.
23   Q.  And the drugs that you sold or that you bought from
24       Mr. Goodwin -- the drugs you bought from Monterial
25       Wesley, did you in turn sell them for Monterial
```

1        Wesley?

2   A.   Yes.

3   Q.   You were selling them for him?

4   A.   No, no.  I sold them, but not for him, no.

5   Q.   After you got drugs from Monterial Wesley, you then

6        sold the drugs that you got from him; right?

7   A.   Yes.

8   Q.   And with regards to Billy Trinkle, he bought drugs

9        from you; correct?

10  A.   Yes.

11  Q.   And you knew that he was selling drugs that he was --

12       that you were getting from him; correct?

13  A.   Yes.

14  Q.   Now, Franklin Goodwin, he was one of your customers;

15       correct?

16  A.   Correct.

17  Q.   Did you know what he was doing with the drugs that

18       you were buying -- that he was buying from you?

19            MR. JOHNSON:  Objection; calls for

20       speculation.

21            MS. MOREHEAD:  This is if he knows, Judge.

22            THE COURT:  Overruled.  The question was if

23       you know.  Again, we're not asking for you to guess

24       or speculate.  The question is whether or not you had

25       some knowledge.

```
 1   A.   No.  I can't say for sure what he was doing.  I can

 2        assume he was selling them.

 3   Q.   And what can you base that on, Mr. Grigsby?

 4   A.   The amount of weight.

 5   Q.   The amount of weight.  And what was that weight

 6        again?

 7   A.   Half ounce to an ounce to 2¼ ounces.

 8   Q.   Now, several of the attorneys asked you about

 9        cooperating.

10   A.   Yes.

11   Q.   And Mr. Johnson asked you about being a snitch.  Do

12        you remember that?

13   A.   Yes.

14   Q.   A rat and a snitch?

15   A.   Yes.

16   Q.   And that's what people who are cooperators are

17        referred to when they are incarcerated?

18   A.   Yes.

19   Q.   When you made the decision weeks ago, a few weeks

20        ago, to cooperate, was that an easy decision?

21   A.   No.

22   Q.   Why not?

23   A.   Because it's a label you don't want to have, but you

24        got to weigh your options, and I know that my family

25        out there is doing bad, and I'm used to always being
```

```
 1              there to help.  I just recently lost my grandma.  My

 2              mom is sick.  I need to get back home.

 3   Q.    And when you are a rat and a snitch, does that have

 4         any consequences for you when you're incarcerated?

 5   A.    Yes.

 6   Q.    Tell the jury what those consequences are.

 7   A.    You can get killed.

 8   Q.    Are there any other concerns that you had when you

 9         made the decision that you were going to become a

10         cooperator in this case?

11   A.    My family.

12   Q.    What about your family?

13   A.    You know, some people may not like what you doing and

14         want to make an example.  Since you're in jail, they

15         can't touch you, so they might take it out on your

16         family.

17   Q.    Are those all considerations that you had in this

18         case before you just became a cooperating defendant?

19   A.    Yes.

20   Q.    Now, Mr. Johnson asked you about the counts that you

21         had in the Boytina Locke conspiracy and the counts

22         that you had in this conspiracy case.  Do you

23         remember him asking you all those questions?

24   A.    Yes.

25   Q.    And part of the agreement in this case was -- correct
```

```
 1              me if I'm wrong -- was that you would be -- we would
 2              recommend that you be sentenced under the Sentencing
 3              Guidelines?
 4     A.    Yes.
 5     Q.    Do you recall us talking about that yesterday?
 6     A.    Yes.
 7     Q.    And what's your understanding under the Sentencing
 8              Guidelines if you have a bunch of counts, let's say
 9              15 counts, that are all related, they are all drug
10              counts, they all are connected to the same activity,
11              what's your understanding under the guidelines about
12              what happens to the sentences on all those counts?
13     A.    Well, my understanding is normally you sentence under
14              the Sentencing Guidelines based on the ones that
15              carry the most time, and the other ones are normally
16              run concurrent with that.
17     Q.    And so when you entered the plea agreement in this
18              case, remind the jury what two counts you pled to.
19     A.    I pled to two counts of conspiracy, which is the ones
20              that carry the most time.
21     Q.    And can you get any more than life, which is what
22              those two counts each potentially carry?
23     A.    No.
24                      MS. MOREHEAD:  That's all I have, Judge.
25                      THE COURT:  Very well.  Any recross?
```

```
 1                   MR. CALBI:  Just a little bit, your Honor,
 2        please.
 3                      RECROSS EXAMINATION
 4   BY MR. CALBI:
 5   Q.   Mr. Grigsby, I just want to be clear.  Yesterday you
 6        testified that Monterial Wesley sold to you anywhere
 7        from 2½ to 5½ kilograms of cocaine in 2006, 2007;
 8        correct?
 9   A.   Yes.
10   Q.   Okay.  And during those two years you obviously sold
11        a lot more cocaine than that?
12   A.   Correct.
13   Q.   So you had other suppliers?
14   A.   Yes.
15   Q.   As a matter of fact, when Mr. Wesley sold you the
16        cocaine, he didn't tell you who you needed to sell it
17        to?
18   A.   No.
19   Q.   And after you sold it, you didn't go back to Mr.
20        Wesley and give him any of the proceeds that you
21        earned?
22   A.   No.
23   Q.   So he wasn't your boss in any way?
24   A.   No.
25   Q.   So you guys just did your own business transaction
```

1    and went your separate ways?

2  A.    Correct.

3  Q.    Okay.  And you had your own set of customers?

4  A.    Yes.

5  Q.    Byron Brown, was he a customer of yours?

6  A.    Yes.

7  Q.    Okay.  Do you know if he ever bought any drugs from

8        Mr. Wesley?

9              MS. MOREHEAD:  Judge, I'm going to object.

10        This goes beyond the scope of redirect.

11              THE COURT:  I think it does.  Help me on

12        that, Mr. Calbi.

13              MR. CALBI:  Judge, he talked about who his

14        customers were, and Mr. Brown was one of them.  Okay.

15        We can leave it at that, Judge.  That's fine.

16              THE COURT:  All right.

17  Q.    (By Mr. Calbi) Mr. Grigsby, you had testified that

18        you had some concerns of being a snitch, that there

19        may be threats against your family; correct?

20  A.    Yes.

21  Q.    Okay.  To your knowledge have any of the participants

22        in this case made any threats against your family?

23  A.    No.

24  Q.    Okay.  So there's been no threats made against

25        yourself or any of your family members?

1   A.   Well, not from them, no.  Other people, once you get

2        that label, that just don't like that kind, there's

3        been threats made from them, but not directly from

4        them, no.

5   Q.   This last phone conversation we played, Government's

6        Exhibit 329, is there anything in there that directly

7        says that Mr. Wesley already had the crack prepared,

8        or is that just your belief, that he had the crack

9        prepared?

10  A.   From the sound of the phone call, I guess it sounds

11       like that I already knew that it was ready, but I'm

12       going off what I'm hearing.

13  Q.   And then on August 14 was when you gave Mr. Wesley

14       the bad coke back?

15  A.   Correct.

16  Q.   And he gave you $10,000?

17  A.   Well, I had already gave him the drugs back way

18       before that.  I just met with him that day just to

19       get the money.

20  Q.   Okay.  And did you have any conversation with Mr.

21       Wesley concerning this transaction?

22  A.   Only thing I can remember him saying was that it

23       worked out better to get the money back because he

24       didn't have enough crack to cover it.

25  Q.   Okay.  Okay.

```
 1                    MR. CALBI:  I have nothing further, your
 2        Honor.
 3                    THE COURT:  All right.  Mr. Rogers?
 4                    MR. ROGERS:  No.
 5                    THE COURT:  Mr. Heathman?
 6                    MR. HEATHMAN:  No.
 7                    THE COURT:  Mr. Bellemere?
 8                    MR. BELLEMERE:  No?
 9                    THE COURT:  Mr. Bell?
10                    MR. BELL:  Briefly, Judge.
11                    RECROSS EXAMINATION
12   BY MR. BELL:
13   Q.   Mr. Grigsby, Ms. Morehead played a call for you and
14        asked you what your understanding of that call was.
15        Do you remember?
16   A.   Yes.
17   Q.   All right.  And you said that it was your
18        understanding that Billy was attempting to make a
19        dollar by selling drugs; is that right?
20   A.   Yes.
21   Q.   And the exact words in that call is that he's just
22        trying to get a bid; is that right?
23   A.   He said make a buck or two.
24   Q.   But he says, "I'm calling to just get a bid."  Do you
25        remember that?
```

```
 1   A.   Yes.

 2   Q.   Did you take that that he was trying to see how much

 3        it would cost to get a certain quantities of drugs?

 4   A.   No.  I took it that he just was saying that he wanted

 5        to get some drugs.

 6   Q.   Right.  But he says, "I'm just calling to get a bid."

 7        Does that mean he's inquiring about price, like

 8        bidding on -- like at an auction you bid on

 9        something?

10   A.   It's possible.

11   Q.   When he says, "I'm just trying to make a dollar," is

12        it possible he was just trying to see how much it was

13        going to cost him versus other potential suppliers in

14        the area?

15   A.   It's possible, yes.

16   Q.   Potentially when he says he's just trying to make a

17        dollar that means he could be trying to save money to

18        see if you're the cheapest supplier that's available;

19        right?

20   A.   Yeah, it's possible.

21   Q.   Ms. Morehead also asked you if you -- it was your

22        understanding that Mr. Trinkle was selling drugs.  Do

23        you remember that?

24   A.   Yes.

25   Q.   All right.  Was that the same thing as Mr. Goodwin,
```

1        that you just sort of assumed that that's what was

2        happening?

3   A.   Yes.

4   Q.   Okay.  But as you said before, you never saw him

5        actually sell drugs or anything?

6   A.   No.

7   Q.   Okay.

8             MR. BELL:  I have no further questions.

9        Thank you, Mr. Grigsby.

10             THE COURT:  Mr. Sandage, I assume no?

11             MR. SANDAGE:  No, your Honor.

12             THE COURT:  Mr. Johnson?

13                  RECROSS EXAMINATION

14   BY MR. JOHNSON:.

15   Q.   Mr. Grigsby, you testified that had you no idea what

16        Mr. Goodwin was doing with the dope you sold him?

17   A.   Yes.

18   Q.   And you didn't care what he did with it?

19   A.   Yes.

20   Q.   You had no agreement with him to do anything with it?

21   A.   No.

22   Q.   He was just your customer, not a conspirator?

23   A.   Yes.

24             MS. MOREHEAD:  Judge, I'm going to object.

25        That goes to the ultimate issue.

1           THE COURT:  Well, sustained, because the

2     conspirator is a legal term concerning which I will

3     instruct the jury.

4  Q.   (By Mr. Johnson) He was just a customer without an

5     agreement with him?

6  A.   Yes.

7           MR. JOHNSON:  Thank you.

8           THE COURT:  Ms. Morehead?

9           MS. MOREHEAD:  Nothing.

10           THE COURT:  Mr. Grigsby, you may step down.

11     Who is your next, Ms. Morehead?

12           MS. MOREHEAD:  It's law enforcement.

13           THE COURT:  All right.  We can let you go

14     ahead and call your next witness.  Would counsel

15     approach in the meantime while that's happening,

16     please.

17           (Counsel approached the bench and the

18     following proceedings were had:)

19           THE COURT:  I wanted to go back and revisit

20     my ruling yesterday with regard to the foundation as

21     to Mr. Goodwin now that Mr. Grigsby has finished his

22     examination.  He did not retreat from his

23     identification on Exhibit No. 175.  That taken

24     together with Mr. Jones' testimony about his

25     interview of Mr. Goodwin, which counsel reminded me

1    of yesterday -- and I went back and reviewed it --

2    caused me to believe that sufficient foundation has

3    been laid for Exhibits 158, 171, 173, and 175.  They

4    are now admitted for all purposes.  In other words,

5    the 104(b) aspect has been satisfied as to those

6    exhibits and, of course, as to the corresponding

7    transcripts as well.

8         I don't remember whether I told the jury these

9    things were conditional, that I should go back and

10   let the jury know that they have been admitted

11   finally or not.

12             MS. MOREHEAD:  What I would ask, Judge,

13   frankly, so we don't confuse them, is maybe at the

14   end of the government's evidence you could do that as

15   all encompassing.  That way we're not doing it

16   piecemeal.

17             THE COURT:  I am perfectly happy to wait.

18             MS. MOREHEAD:  That way, if they haven't

19   themselves made up their mind -- I don't know.

20             THE COURT:  Very well.  Thank you all.

21

22

23

24

25

```
 1                        CARY WAYNE STONE,

 2    having been duly sworn, was examined and testified as

 3    follows:

 4                       DIRECT EXAMINATION

 5    BY MS. MOREHEAD:

 6    Q.   Tell us where you work, please.

 7    A.   I'm a detective sergeant with the Atchison Kansas

 8         Police Department.

 9    Q.   And relate to the jury, if you would, Detective

10         Stone, your work history relative to being a law

11         enforcement officer.

12    A.   I began my career with Atchison Police Department in

13         November of 1992.  Since then I have worked full time

14         as a narcotics officer for about six years.  I was

15         promoted to detective in 2000 and detective sergeant

16         in 2008.

17    Q.   And what kind of responsibilities do you currently

18         have as a detective sergeant?

19    A.   I oversee most all of the criminal cases in Atchison.

20    Q.   And in the course of your career as a law enforcement

21         officer, have a number of cases that you have been

22         involved with involved narcotic investigations?

23    A.   Yes.  Probably 40, 50, 50 percent throughout my

24         career.

25    Q.   And as an Atchison police officer your jurisdiction
```

```
 1           confines are within the city limits of Atchison,

 2           Kansas?

 3    A.     Yes, ma'am.

 4    Q.     And in connection with your appearance here today,

 5           did you become aware back in mid-2007 that the Drug

 6           Enforcement Administration was involved in a

 7           drug-trafficking investigation, a Title III wiretap

 8           investigation?

 9    A.     I was.

10    Q.     And do you recall how it was or why it was you kind

11           of first got alerted to that investigation?

12    A.     Yes.  We had inadvertently arrested another

13           individual by the name of Christopher Rivers on a

14           cocaine case, and I started doing some background

15           investigation on Mr. Rivers when I believe that I was

16           contacted by someone from DEA saying, we may have

17           some conflict going on.

18    Q.     All right.  And so as a result -- do you recall about

19           when Mr. Rivers was arrested and you would have first

20           kind of became aware of this investigation?

21    A.     I believe early to mid-2007.  I'm not sure of the

22           exact date.

23    Q.     Okay.  And then once the wiretap commenced in late

24           July, early August 2007, were you kind of kept

25           apprised of certain activity that was being monitored
```

```
 1          on the wiretap?

 2   A.    Yes.  Mainly related to the Atchison subjects.

 3   Q.    And it became known at some point that there were

 4         some folks from Atchison included in this

 5         investigation?

 6   A.    That's correct.

 7   Q.    All right.  I want to direct your attention to

 8         September 14 of 2007.  Did you become involved in an

 9         event that occurred involving an individual named

10         Donnie Johnson?

11   A.    Yes, I did.

12   Q.    Tell the jury how you first became aware of that

13         situation.

14   A.    I was contacted by Agent McCue.  He told me that -- I

15         believe the surveillance had Donnie Johnson at a

16         place, I believe, in Leavenworth.  It appeared to be

17         a drug transaction.  Agent McCue asked me -- or told

18         me that Donnie Johnson was headed back to Atchison

19         driving an older brown Chevrolet pickup.  He would

20         have been northbound on K-7 Highway, which does come

21         in the south side of Atchison.  He asked that I have

22         the vehicle stopped and searched at that time, when

23         it arrived in the city limits.

24   Q.    Were you in Atchison when you got that call?

25   A.    I was.
```

1    Q.   In connection then with the information that you

2         received from Agent McCue, what did you do in

3         connection with Mr. Johnson?

4    A.   I first notified two of our uniformed patrol officers

5         of the situation.  I placed them in the south part of

6         our city along K-7.  I asked them if they see this

7         vehicle come in town to please stop it.  I was

8         sitting actually where K-7 comes into Atchison.  It's

9         at the Wal-Mart parking lot.  I was parked in the

10        southwest corner of the parking lot.  Several minutes

11        later Mr. Johnson did -- was coming northbound on

12        K-7.  He was subsequently stopped by our officers.

13   Q.   All right.  How far of a distance is it, for those

14        folks that might not be familiar, from Leavenworth to

15        the Wal-Mart in Atchison?

16   A.   Probably 20 miles.

17   Q.   And in connection then with this stop, the uniformed

18        officers stopped Mr. Johnson; is that right?

19   A.   That's correct.

20   Q.   Did you subsequently have contact with that stop?

21   A.   Yes.  It just so happened where I was parked in the

22        southwest corner of Wal-Mart, Mr. Johnson decided to

23        pull into Wal-Mart for the traffic stop with the

24        officer behind him.  He was probably a hundred feet

25        or so from me when he stopped.  I observed him

```
 1        actually pull in the stop.  I was in an unmarked

 2        vehicle, so you could not notice me.

 3   Q.   Okay.  And did you then encounter Mr. Johnson and his

 4        vehicle at that time?

 5   A.   Yes.  What I did notice when Mr. Johnson pulled up

 6        was that he appeared to be reaching underneath the

 7        driver's side of the seat, looking in the rearview

 8        mirror at the police officer at the time.  Myself and

 9        Officer Curtis Page approached Mr. Johnson, removed

10        him from the vehicle, where he was patted down and

11        handcuffed at that time.

12                  MS. MOREHEAD:  Judge, I would ask for admit

13        of Government's Exhibits 42, 43 and 44.

14                  THE COURT:  Is there any objection?

15        Hearing none, Exhibits 42, 43, and 44 are all

16        admitted.

17                  (Exhibits 42 through 44 were admitted into

18        evidence.)

19   Q.   (By Ms. Morehead) You'll be able to see on that

20        monitor just to your right, Detective Stone.  I've

21        got on the monitor Government's Exhibit 42.  Do you

22        recognize that?

23   A.   Yes.

24   Q.   How do you recognize that?

25   A.   I believe that's the photo that I took, and I believe
```

```
 1          that's my vehicle sitting just to the left of that.
 2    Q.    All right.  This brown pickup, whose vehicle is that?
 3    A.    Donnie Johnson.
 4    Q.    And then there appears to be a vehicle here with the
 5          door open.  Is that your vehicle that you have
 6          mentioned?
 7    A.    Yes.  That was my unmarked police vehicle.
 8    Q.    All right.  And Government's Exhibit No. 44?
 9    A.    That is Donnie Johnson.
10    Q.    Okay.  Is that how he appeared back on September 14,
11          2007, at the time of this car stop?
12    A.    It is.
13    Q.    Once he was secured, you mentioned that, in fact, you
14          had seen him reach under what you believe to be the
15          driver's seat?
16    A.    Correct.
17    Q.    What did you do in connection then with this stop?
18    A.    Again, based on Agent McCue's information, I asked
19          Mr. Johnson if he had any drugs on him, where the
20          drugs were.  He said he didn't have any.  As I
21          recall, the door to the truck was still open.  We
22          were standing probably next to the bed on the
23          driver's side.  I then reached in and looked
24          underneath the driver's side seat and located a
25          Baggie containing what appeared to be crack cocaine.
```

1   Q.   Okay.  I want to show you what I've marked

2        Government's Exhibit 43.  Tell the jury what that is.

3   A.   That is the bag that I found underneath the driver's

4        side's seat along with Mr. Johnson, a cell phone, and

5        the keys to the vehicle.

6   Q.   All right.  So when you first -- the location of the

7        bag and the crack cocaine in this photograph is

8        actually on the driver's side seat; is that right?

9   A.   That's where I placed it after I located it

10       underneath the seat on the floorboard.

11  Q.   That was going to be my question, how did it get

12       there?  You placed it there?

13  A.   That's correct.

14  Q.   Can you just describe how this bag appeared when you

15       first seized it.

16  A.   Just like it's shown right there.

17  Q.   Appears to be just some sort of plastic Baggie.  Is

18       it tied then?

19  A.   Yes.  It appeared to be tied in a single knot.

20  Q.   Okay.  And then the cell phone there, do you recall

21       where you seized that from?

22  A.   I don't recall if that was in the truck or on

23       Mr. Johnson's person.  I believe it was in the truck

24       on the front seat.

25  Q.   All right.  And was Mr. Johnson the only occupant of

1    the vehicle?

2  A.  He was.

3  Q.  I want to hand you what I've marked as Government's

4      Exhibit No. 45.  Obviously, this has changed in

5      appearance, but once you secured the crack cocaine

6      that you seized from Mr. Johnson, what did you do

7      with regard to that item of evidence?

8  A.  I maintained its custody until several minutes later

9      Agent McCue arrived on scene and I transferred it to

10     him.

11 Q.  All right.  And while you were there with Donnie

12     Johnson, did anything else happen?

13 A.  Another traffic stop was initiated shortly after on

14     another suspect.

15 Q.  Was that also initiated by your agency?

16 A.  It was.

17 Q.  And were you involved at all in that particular stop

18     of that vehicle?

19 A.  Very limited.

20 Q.  And where was this in connection with Donnie

21     Johnson's vehicle stop?

22 A.  Ironically, he pulled in directly behind Donnie

23     Johnson and the market police unit with another unit

24     behind him.

25 Q.  Was that vehicle containing Jamicah Johnson and Sasha

1   Gerard?

2   A.   It was.

3               MS. MOREHEAD:   Judge, that's all I have of

4       this witness.

5               THE COURT:   All right.   Any cross

6       examination?

7               MR. CALBI:   None from me, your Honor.

8               THE COURT:   Just raise your hand if you

9       want to cross.   I see no hands.

10          Mr. Stone, you may step down, and you are

11      excused.

12          The government may call its next witness.

13              MS. MOREHEAD:   Judge, can we approach?

14              (Counsel approached the bench and the

15      following proceedings were had:)

16              MS. MOREHEAD:   Judge, my two cooperators on

17      this incident, their attorneys indicated they had

18      some other court commitments first thing, and the

19      first one thought he might get here around 10:30.

20      The other one thought he would get here around 11:00.

21      So I didn't know if maybe we could take our recess a

22      little early.

23              THE COURT:   We can do that.

24              MS. MOREHEAD:   He said he was going to be

25      coming from -- I think it was Missouri city court,

1        and he thought he could be here by 10:30.

2                    THE COURT:  Let's take our recess now.

3        Mr. Bellemere?

4                    MR. BELLEMERE:  Could I ask a fairly stupid

5        question, perhaps?

6                    THE COURT:  No, but you could ask any

7        question you think might enlighten us.

8                    MR. BELLEMERE:  It might enlighten me.  I'm

9        having trouble understanding what the relevance of a

10       stop in Atchison has to do -- with two guys, whether

11       or not there was a probable cause having to do with

12       these seven people here.  There's no tie-in so far

13       that I know of with these seven, and I just can't

14       quite figure out what we're wasting all this time on.

15       I'm sorry for using the word waste.  I just don't

16       quite understand --

17                    MS. MOREHEAD:  Sly as a fox.

18                    THE COURT:  You haven't fooled us,

19       Mr. Bellemere.  You're on top of all of this stuff,

20       and despite your well honed tactic of denigrating

21       yourself, I, frankly, believe you have a better

22       understanding of this than a lot of people I've dealt

23       with.

24                    MS. MOREHEAD:  Judge, this clearly goes to

25       the conspiracy.  These were individuals who purchased

1    cocaine.  That's the issue.  Was this marijuana, or

2    was it crack cocaine?  And we have got the dope on

3    the table.

4              THE COURT:  You have alleged a conspiracy

5    involving all these individuals which included the

6    Johnsons for the distribution of cocaine and crack

7    cocaine, and the government is entitled to prove that

8    conspiracy.

9         Your client hasn't admitted he was a

10   participant, and the government is entitled to prove

11   it.  That's where we are.  All right.  We will take

12   our recess.

13             (The proceedings returned to open court.)

14             THE COURT:  All right, members of the jury.

15   We will take our recess at this time for 15 minutes.

16   I'll remind you of all those admonitions.  Please be

17   sure not to discuss the case among yourselves or with

18   anybody else or do anything which touches on the case

19   at all.  Take a little break from the action, and we

20   will be back in 15 minutes.

21        Ms. Ludwig, please take charge of the jury.

22   Participants, remain here.

23             (The following proceedings were had outside

24   the presence of the jury:)

25             THE COURT:  Is there anything further we

```
1    should do before we break?  Hearing none, we are in

2    recess.

3                    (A recess was taken.)

4                    THE COURT:  Ms. Morehead, I understood that

5    you have an issue you want today take up before we

6    began.

7                    MS. MOREHEAD:  It was an issue Mr. Sandage

8    wanted to take up, but he's since told me it's a

9    nonissue.  We're going to forge ahead.

10                   MR. SANDAGE:  Just helping it along, Judge.

11   Just helping it along.

12                   THE COURT:  Thank you, Mr. Sandage.  You're

13   a good man.  Are we ready to proceed?

14                   MS. MOREHEAD:  Yes, Judge.

15                   THE COURT:  Then we will bring the jury in.

16                   (The following proceedings were had in the

17   presence of the jury:)

18                   THE COURT:  All right.  The government may

19   call its next witness.

20                   MS. MOREHEAD:  Thank you, your Honor.  I

21   call Jamicah Johnson to the stand.

22

23

24

25
```

```
 1                    JAMICAH JOHNSON,

 2   having been duly sworn, was examined and testified as

 3   follows:

 4                  DIRECT EXAMINATION

 5   BY MS. MOREHEAD:

 6   Q.   Mr. Johnson, can you tell the jury where you were

 7        raised, where you grew up.

 8   A.   Natchitoces, Louisiana.

 9   Q.   What was the name of town?

10   A.   Natchitoces, Louisiana.

11   Q.   How old are you today?

12   A.   Twenty-three.

13   Q.   And did you pretty much grow up and live in Louisiana

14        then?

15   A.   Yes, ma'am.

16   Q.   And at some point did you have occasion to move to

17        Kansas?

18   A.   Yes, ma'am.

19   Q.   And when did you move to Kansas?

20   A.   May 1, 2007 -- no, 2008, 2008.  No, seven, yeah,

21        seven.

22   Q.   2007?

23   A.   Yes.

24   Q.   Okay.  And in connection with coming to Kansas, tell

25        the jury how it was that you came to Kansas.
```

1    A.   Well, back at home I was in -- I was, like, on

2         probation, or whatever, and I got into lots of

3         trouble, and I left from down there and came up here.

4    Q.   Why did you come to Kansas?

5    A.   My brother stay up here.

6    Q.   Where was he staying at?

7    A.   Atchison, Kansas.

8    Q.   You indicated that you were on probation in

9         Louisiana.  And was that for a 2002 aggravated

10        battery conviction?

11   A.   Yes, ma'am.

12   Q.   While you were on probation, you got in some more

13        trouble?  Is that what you said?

14   A.   Yes, ma'am.

15   Q.   And so is it safe to say you fled Louisiana and came

16        to Kansas to get away from your trouble in Louisiana?

17   A.   Yes, ma'am.

18   Q.   In connection to moving to Atchison, Kansas, had you

19        ever been there before you came in May of 2007?

20   A.   No, ma'am.

21   Q.   How long had your brother been living in the

22        Atchison, Kansas, area?

23   A.   Like 18 years now.

24   Q.   Do you and he have the same mother and father?

25   A.   Yes, ma'am.

1    Q.   And who was he living with in Atchison, Kansas?

2    A.   With his wife and kid.

3    Q.   And for 18 years he had been living here?

4    A.   Yes, ma'am.

5    Q.   So is he an older brother?

6    A.   Yes, ma'am.

7    Q.   And what's his name?

8    A.   Jimmy Ray Johnson.

9    Q.   And once you moved to Atchison, Kansas, did you

10        become acquainted with a number of individuals there

11        in that community?

12   A.   Yes, ma'am.

13   Q.   And in connection with living in Atchison, Kansas,

14        did you become involved in selling drugs?

15   A.   Yes, ma'am.

16   Q.   Tell the jury how you first became involved in that,

17        Mr. Johnson.

18   A.   My friend, he had put me on.

19   Q.   A friend from where?

20   A.   Atchison.

21   Q.   What was your friend's name?

22   A.   Ricky Jenkins.

23   Q.   So Ricky Jenkins turned you on to selling drugs there

24        in Atchison?

25   A.   Yes, ma'am.

```
 1   Q.   And how did you -- did you become acquainted with
 2        someone named Henry Grigsby?  Or you might have known
 3        him as Hank.
 4   A.   Yes, ma'am.
 5   Q.   How did you meet Hank?
 6   A.   Through Ricky Jenkins.
 7   Q.   And tell us about the first time you would have been
 8        with Ricky Jenkins when you met Henry Grigsby.  How
 9        did that go?
10   A.   Back in Atchison, he was dealing there first, and I
11        couldn't get no job or nothing because I was on flee
12        from back at home, and it was like, I got somebody
13        you can hire, or whatever, and from then --
14   Q.   Can you just speak a little bit louder.
15             THE COURT:  And a little bit slower, maybe.
16   Q.   (By Ms. Morehead) And a little bit slower.  Have
17        people told you you have a little bit of an accent
18        too before?
19   A.   Yes.
20   Q.   A southern accent from Louisiana?
21   A.   Yes, ma'am.
22   Q.   You probably think we have accents.  I don't know.
23        But if you could just speak a little slower and a
24        little louder.  Okay.  All right.  Tell us again
25        about how you met Henry Grigsby.
```

1   A.   Through Ricky Jenkins.  And I couldn't get a job;

2        therefore, I felt like that was the only thing I

3        could do to get money.  So he, like, took me in.

4        From then me and Grigsby started like -- started

5        having our own little thing going on.

6   Q.   All right.  So Mr. Jenkins introduced you to Henry

7        Grigsby; is that right?

8   A.   Yes, ma'am.

9   Q.   And did Ricky have any sort of relationship with Mr.

10       Grigsby involving drugs?

11  A.   Yes.

12  Q.   All right.  What was -- what did you know about that?

13  A.   That's what he was telling me.  He did it before I

14       got there.  There was -- it was like a plug, and then

15       from then I, like, got in with him and we started

16       buying drugs from him.

17  Q.   All right.  Were you ever with Ricky Jenkins when he

18       bought drugs from Henry Grigsby?

19  A.   Yes, ma'am.

20  Q.   How many times do you think you were with Ricky

21       Jenkins when he was buying drugs from Henry Grigsby?

22  A.   Twice.

23  Q.   And after you saw this and were with Ricky Jenkins,

24       is that when you got your own plug with Hank and

25       started buying directly from Hank?

```
 1   A.   Yes, ma'am.

 2   Q.   You said you came in May of 2007; is that right?

 3   A.   Yes, ma'am.

 4   Q.   About when was it that you would have first bought

 5        drugs on your own from Henry Grigsby?

 6   A.   Like in July, I think.

 7   Q.   Okay.  What quantity of drugs were you buying from

 8        Henry Grigsby?  Did it vary or was it always the same

 9        amount?

10   A.   Different amount.

11   Q.   And what was the smallest amount that you would have

12        bought from Henry Grigsby?

13   A.   An ounce.

14   Q.   An ounce.  And what was the most that you would have

15        bought from him at one time?

16   A.   4½ ounces.

17   Q.   Okay.  And how many times, total, do you think you

18        bought from Henry Grigsby?

19   A.   Like somewhere within 10 or 15 times.

20   Q.   Okay.  And through Ricky you indicated you met Hank?

21   A.   Yes, ma'am.

22   Q.   Did you acquire a phone number for Hank?

23   A.   Yes, ma'am.

24   Q.   When you would need drugs, how would you get ahold of

25        Mr. Grigsby?
```

1    A.    Through my cell phone.

2    Q.    Then how would you make arrangements to get the drugs

3          from Mr. Grigsby?  You would obviously call him?

4    A.    Yes, ma'am.

5    Q.    How would that typically go?

6    A.    I would call him; he would give me somewhere to meet

7          him in Leavenworth.

8    Q.    Did you always meet him in Leavenworth?

9    A.    Yes, ma'am.

10   Q.    And what different places -- let me ask you this.

11         You said 10 to 15 times that you bought from Henry

12         Grigsby.  On all of those occasions did you

13         actually -- when you would meet in Leavenworth, was

14         it always Henry Grigsby that you met with?

15   A.    No, ma'am.

16   Q.    Who else did you meet with?

17   A.    Shaq.

18   Q.    And why would you meet with Shaq?

19   A.    Because Grigsby would be out of town somewhere.

20   Q.    All right.  And so he would tell you to meet with

21         Shaq then, I assume?

22   A.    Yes, ma'am.

23   Q.    Now, on these 10 to 15 times, how many times do you

24         think you actually met with Henry Grigsby?  And if

25         you -- if you can't give me an exact time, number of

1     times, that's fine.  Was it more times that you met

2     with Hank, or was it more times that you met with

3     Shaq?

4  A.  More times I met with Hank.

5  Q.  And when you went to Leavenworth, you said, what

6     locations would you typically meet him at?

7  A.  At a grocery store.

8  Q.  Okay.  Anywhere else, or was it always at the grocery

9     store?

10 A.  Like, some street, but I don't remember the street.

11 Q.  Okay.  Just -- was that a residential area?

12 A.  Yes, ma'am.

13 Q.  Where there houses and stuff then?

14 A.  Yes, ma'am.

15 Q.  Okay.  Anyplace else you remember?

16 A.  There was only two places.

17 Q.  All right.  Now, in connection with the 10 to 15

18    times that you came to Leavenworth to buy drugs, were

19    you -- was anybody ever with you when you would come?

20    And I'm -- I'm excluding the couple times you were

21    with Ricky when he was buying drugs, okay?  I'm just

22    talking about the 10 to 15 times you bought drugs.

23    Was anybody else with you?

24 A.  Yes, ma'am.

25 Q.  Who else was with you?

 1   A.   Sasha.

 2   Q.   Okay.  Were there ever any times that you went by

 3        yourself to meet Henry Grigsby or Shaq?

 4   A.   Yeah.  Like once or twice.

 5   Q.   And the other times Sasha went with you?

 6   A.   Yes, ma'am.

 7   Q.   Is that right?

 8   A.   Yes, ma'am.

 9   Q.   And who is Sasha?

10   A.   Sasha Gerard, my ex-girlfriend.

11   Q.   All right.  She was your girlfriend at the time?

12   A.   Yes, ma'am.

13   Q.   And why would Sasha ride with you on these eight to

14        13 times that you went?

15   A.   To make sure that everything went all right.  And

16        sometimes, like, when me and her, we put in together

17        to get something, she just hold up on that, and I

18        hold my part.

19   Q.   All right.  So you said two reasons, is what I heard.

20        One was to make sure everything went all right?

21   A.   Yes, ma'am.

22   Q.   And in connection with buying drugs, why was it

23        necessary to have someone else there to make sure

24        that everything went all right?

25   A.   Like just -- I don't know.  I guess just to feel

1    protected, I guess.

2  Q.   To feel protected?

3  A.   I don't know.

4  Q.   And then the other reason, sometimes Sasha and you

5       were sharing the drugs that you had bought; is that

6       right?

7  A.   Yes, ma'am.

8  Q.   Some of it was yours and some of it was hers; is that

9       right?

10 A.   Yes, ma'am.

11 Q.   In connection then with, you know -- you said you

12      would have someone else with you to feel protected.

13      Did you use anything?  Did he ever, aside from taking

14      Sasha with you, did you ever take anything else with

15      you to help you be protected?

16 A.   Yes, ma'am.

17 Q.   What else did you take?

18 A.   A gun.

19 Q.   And how many times do you think you took a gun with

20      you when you would go buy drugs from Henry Grigsby or

21      Shaq?

22 A.   Like three times.

23 Q.   We have been talking about you buying drugs from

24      Henry Grigsby, you said, 10 to 15 times.  What were

25      you buying on those 10 to 15 times?

1    A.   Like every time I bought from him or like --

2    Q.   No -- yeah, what kind of drugs were you buying from

3         him?

4    A.   Powder cocaine and crack cocaine.

5    Q.   All right.  Anything else that you ever bought from

6         him?

7    A.   No.

8    Q.   And you said powder cocaine.  How much -- of the 10

9         to 15 times that you bought from Henry Grigsby, how

10        often was it powder and how often it was crack?

11   A.   Within the 10 to 15 times it was like half and half.

12   Q.   Half and half?

13   A.   Yes, ma'am.

14   Q.   Okay.  And why would you buy it sometimes soft and

15        sometimes hard then?

16   A.   Sometimes soft for personal use and sometimes, like,

17        trying to make more money.

18   Q.   All right.  So sometimes it would be for personal

19        use?  Is that what you said?

20   A.   Yes, ma'am.

21   Q.   Whose personal use?

22   A.   Me and Sasha and some of friend -- some of my

23        friends.

24   Q.   And back during this time period, were you and Sasha

25        and your friends, were you all using cocaine?

1  A.   Yes, ma'am.

2  Q.   Was it -- and do you know how much you were using?

3       Was this an everyday thing, or was it more of a

4       recreational thing?

5  A.   More like every other day.

6  Q.   Okay.  You said the powder cocaine that you got was

7       for personal use; is that right?

8  A.   Yes, ma'am.

9  Q.   Was all of it for personal use, or did you sell some

10      of that?

11 A.   I sell some of it.

12 Q.   And then the crack cocaine that you bought on the

13      occasions that you bought hard, what was that for?

14 A.   For personal use and also to sell.

15 Q.   Were you also using crack cocaine?

16 A.   Yes, ma'am.

17 Q.   How often would you use crack cocaine?

18 A.   Like every weekend.

19 Q.   Was that more of a recreational thing then?

20 A.   Definitely.

21 Q.   So you've used both powder cocaine and crack cocaine;

22      is that right, Mr. Johnson?

23 A.   Yes, ma'am.

24 Q.   Can you explain to the jury of different effects that

25      powder cocaine and crack cocaine have on an

```
 1          individual.
 2    A.    Powder is, like, much stronger than crack cocaine
 3          because it's straight to you, and crack is basically
 4          like, once you're selling it, you're making it to
 5          make more for crack.
 6    Q.    And I'm sorry.  I didn't follow that, so let me reask
 7          that.  Let me break it down a little bit.  When you
 8          used powder cocaine, how were you using the powder
 9          cocaine?
10    A.    I was snorting it.
11    Q.    Okay.  When you would snort the powder cocaine, how
12          did that make you feel?
13    A.    Like a downward high.
14    Q.    A downward high?
15    A.    Yes, ma'am.
16    Q.    And the crack cocaine that you would use
17          recreationally on weekends, what effect did that have
18          on you?  I assume you were smoking that.
19    A.    Yes, ma'am.
20    Q.    Is that right?
21    A.    Yes, ma'am.
22    Q.    How would you smoke that?  Would you smoke it out of
23          a pipe, or did you do it in some other way?
24    A.    Like, a primo, wrapped up in, like, joint papers in
25          with cigarette, break it up in there.
```

```
 1   Q.   You just described -- you called it a primo, and
 2        that's a cigarette, tobacco, laced with crack
 3        cocaine, wrapped in --
 4   A.   Like, rolling papers.
 5   Q.   Like ZigZag papers?  What effect did smoking crack
 6        have on you?  How did that make you feel?
 7   A.   Upward high.
 8   Q.   Upward high?
 9   A.   Make you want to move a lot.
10   Q.   Make you want to what?
11   A.   Move a lot.
12   Q.   And in connection with the drugs you were buying from
13        Henry Grigsby, whether that be soft or hard, how much
14        of that were you actually turning around and selling
15        and how much of it were you actually using yourself,
16        either you, Sasha, or your friends that you were
17        sharing it with?
18   A.   I would say like 40 percent of mine I would use for
19        personal use.
20   Q.   So 40 percent, personal use; 60 percent, you were
21        selling it for profit?
22   A.   Yes, ma'am.
23   Q.   And of the profit you made, were you able to bankroll
24        any money?  In other words, were you getting rich
25        doing this?
```

```
 1   A.   Not really, no.

 2   Q.   Were you supporting your habit?

 3   A.   Yeah.  It was, like, buying clothes and eating.

 4   Q.   Okay.  So you would spend your money buying more

 5        drugs?  Some you used?

 6   A.   Uh-huh.

 7   Q.   You bought clothes, went out to eat.  Anything else

 8        you were spending your money on?

 9   A.   Jewelry.

10   Q.   Jewelry?

11   A.   Shoes.

12   Q.   Shoes, clothes?

13   A.   Yes, ma'am.

14   Q.   Did you tell me the most you bought at a given time?

15        I think you said 1 ounce and -- what was the most you

16        bought?

17   A.   4½ ounces.

18   Q.   4½ ounces.  And do you know how much you would have

19        paid for 4½ ounces?

20   A.   Around 2800.

21   Q.   Okay.  And how much did you actually typically profit

22        on that amount of drugs?  What would you hope to make

23        out of $2,800?

24   A.   All together?

25   Q.   Yeah.
```

```
 1   A.   Like $3,800.

 2   Q.   All right.  So you would make about $1,300 profit?

 3   A.   Yes, ma'am.

 4   Q.   Or you said $2,800, and you hoped to make $3,800?

 5   A.   Yes, ma'am.

 6   Q.   So about $1,000 profit?

 7   A.   Yes, ma'am.

 8   Q.   Right?  Now, when you would buy soft, you said some

 9        of that you would use for personal use.  Were you

10        involved in cooking the powder cocaine that you got

11        into crack cocaine?

12   A.   No, ma'am.

13   Q.   Did you have anybody on your behalf cook powder

14        cocaine into crack cocaine for you?

15   A.   Yes, ma'am.

16   Q.   And who would you have do that?

17   A.   My homey, OG friend.  He's an older dude.

18   Q.   You said one of your homey dudes, which was an older

19        guy?

20   A.   Yes.

21   Q.   What was in it for him to cook crack for you?

22   A.   He would smoke it.

23   Q.   So he was a smoker?

24   A.   Yes, ma'am.

25   Q.   Was there a reason you didn't cook it?
```

1    A.    I don't know how to cook.

2    Q.    All right.  When you would come down from Atchison to

3          buy drugs from either Hank or Shaq, how would you get

4          here?

5    A.    My brother truck and in his car.

6    Q.    And in connection with this investigation, do you

7          recall an incident that occurred on September 14 of

8          2007?

9    A.    Yes, ma'am.

10   Q.    What happened on that day, Mr. Johnson?

11   A.    When I got had pulled over?

12   Q.    Yeah.

13   A.    On my way back from Leavenworth I got pulled over.

14         They searched the car and took me and my girlfriend

15         out of the car and found drugs in there and on her.

16   Q.    All right.  So you came -- on that day you went to

17         Leavenworth to buy drugs; is that right?

18   A.    Yes, ma'am.

19   Q.    And who went with you on that day?

20   A.    Sasha.

21              MS. MOREHEAD:  Judge, I would ask for

22         admission of Government's 34 through 39.

23              THE COURT:  Is there any objection?

24         Hearing none, Exhibits 34 through 39 are admitted.

25

1212

```
1              (Exhibits 34 through 39 were admitted into
2         evidence.)
3    Q.   (By Ms. Morehead) I want to show you what I've marked
4         Government's Exhibit 34.  Do you recognize that,
5         Mr. Johnson?
6    A.   Yes, ma'am.
7    Q.   What is that?
8    A.   My brother's car and Sasha.
9    Q.   All right.  That vehicle right there, whose vehicle
10        is that?
11   A.   My brother's.
12   Q.   All right.  And who is this?
13   A.   Sasha.
14   Q.   Okay.  And once you got in front of the Price Chopper
15        there in Leavenworth?
16   A.   Yes.
17   Q.   When you got there, what did Sasha do?
18   A.   She was going in the store.
19   Q.   Okay.  And Government's Exhibit No. 35, what's that?
20   A.   That my brother car.
21   Q.   And do you see somebody right there?
22   A.   Yes, ma'am.
23   Q.   Who is that?
24   A.   Shaq.
25   Q.   Okay.  And Government's Exhibit 36, what's that show?
```

1    A.   Shaq's getting out of the car.

2    Q.   Shaq getting out of your car?

3    A.   Yes, ma'am.

4    Q.   What happened when Shaq came over, got in your car --

5         is that right?

6    A.   Yes, ma'am.

7    Q.   What happened when Shaq came and got in your car?

8    A.   That's when I bought the drugs from him.

9    Q.   When you dealt with Shaq or Henry Grigsby, they would

10        give you either powder cocaine or crack cocaine.  Did

11        you have to pay for that when you got the drugs, or

12        did they front you the drugs to pay later?

13   A.   I had to pay right then.

14   Q.   All right.  So was that always --

15   A.   Yes, ma'am.

16   Q.   No fronting?

17   A.   No, ma'am.

18   Q.   All right.  So you get the drugs from Shaq, and Sasha

19        comes back out?

20   A.   Yes, ma'am.

21   Q.   And you guys leave?

22   A.   Yes, ma'am.

23   Q.   Where do you go?

24   A.   We are heading back to Atchison.

25   Q.   Do you have any idea that you're being watched or

1          that anybody's got an eye on you?

2     A.   No, ma'am.

3     Q.   Or that anybody's following you?

4     A.   No, ma'am.

5     Q.   Okay.  Government's Exhibit 37, what's that?

6     A.   That's the Wal-Mart in Atchison, Kansas.

7     Q.   Okay.  And whose vehicle is that?

8     A.   My brother's.

9     Q.   And what happened when you pulled into Atchison?

10    A.   When I pulled into Atchison, I turned in the Wal-Mart

11         parking lot, and I pulled in right behind the

12         sheriffs, and they jumped out and pulled in front of

13         me and got us out of the car.

14    Q.   All right.  And did you have any idea at that point

15         what was going on?

16    A.   No, ma'am.

17    Q.   What did they say?

18    A.   I did have an idea at the same time, thinking that

19         they pulled me over for my warrant back at home.

20    Q.   You thought it was because of your warrant?

21    A.   Yes, ma'am.

22    Q.   What did they say to you when they pulled you over?

23    A.   Where the drugs?

24    Q.   And Government's Exhibit 38, is that how you looked

25         on that day?

```
 1    A.    Yes, ma'am.

 2    Q.    And who is that?

 3    A.    Sasha.

 4    Q.    And is that how she looked on that day?

 5    A.    Yes, ma'am.

 6    Q.    And in connection then -- tell us what happened as

 7          you're getting stopped by the police.  Tell us what

 8          happens between you and Sasha there in the car.

 9    A.    After they pulled us over?

10    Q.    Yeah.  First of all, where were the drugs that you

11          had boughten from Shaq?

12    A.    Sasha had them.

13    Q.    Sasha had them?

14    A.    Yes, ma'am.

15    Q.    And why did Sasha have them?

16    A.    Because I asked her to hold them.

17    Q.    Was that -- when did you ask her to hold those drugs?

18    A.    When we were coming from Price Chopper.

19    Q.    On your way back you gave her the drugs and said,

20          hey, hold onto these?

21    A.    Yes, ma'am.

22    Q.    So when they ask you, where are the drugs, what do

23          you say?

24    A.    I say, I don't know what you all talking about.  I

25          don't have any drugs.
```

1216

```
 1   Q.   And did they eventually find the drugs?

 2   A.   Yes, ma'am.

 3   Q.   On Sasha?

 4   A.   Yes, ma'am.

 5   Q.   And when you were stopped by the police, did you give

 6        them a name?

 7   A.   Yes, ma'am.

 8   Q.   What name did you give them?

 9   A.   Derek Johnson.

10   Q.   And who is Derek Johnson?

11   A.   My brother.

12   Q.   Is that another brother?

13   A.   Yes, ma'am.

14   Q.   And when you gave the name Derek Johnson, what

15        happened?

16   A.   They asked me what my social security number was, and

17        I told them, I don't remember; it's in my wallet in

18        my brother's house.  And that was it.

19   Q.   You gave them the name Derek Johnson though?

20   A.   Uh-huh.

21   Q.   Was there a problem about giving your brother's name,

22        Derek, the reason why?

23   A.   Because I know he didn't have any warrants, thought

24        that I was getting pulled over for warrants.

25   Q.   You gave your brother's name Derek because you knew
```

1      you had a warrant out of Louisiana; right?

2   A.   Yes, ma'am.

3   Q.   You were driving the car.  Was there a problem with

4        your brother Derek's driving privileges?

5   A.   Not as far as I'm concerned, no, ma'am.

6   Q.   Were you arrested at that time?

7   A.   Yeah.  I found out that he had a warrant, and they

8        took me to the county jail.

9   Q.   You found out that your brother had a warrant too?

10  A.   Yes, ma'am.

11  Q.   And was that for some driving things?

12  A.   Driving on a suspension.

13  Q.   Okay.  And so you give your brother's name, but he

14       had a warrant, and you end up getting arrested

15       anyway?

16  A.   Yeah.

17  Q.   Did you ever clear up -- did you eventually get out

18       of jail?

19  A.   Yes, ma'am.

20  Q.   How did you get out of jail?

21  A.   When I got to the county jail, they search to

22       prove -- to see if you have any other warrants, and

23       he didn't have no other warrants, so they gave me a

24       bond for driving on a suspension and let me out.

25  Q.   You got a bond and got out?

```
 1    A.    Yes, ma'am.

 2    Q.    Did you ever clear up with them before you got out

 3          that really you weren't Derek Johnson but you were

 4          Jamicah Johnson?

 5    A.    No.

 6    Q.    All right.  Why didn't you do that?

 7    A.    Because I didn't want to go to jail.

 8    Q.    Is it safe to say you lied to the police about who

 9          you were?

10    A.    That's not safe to say, but that's what I did.

11    Q.    That's what it is?

12    A.    Definitely.

13    Q.    And you eventually got charged in connection with

14          this particular case; right?

15    A.    Yes, ma'am.

16    Q.    How did you get arrested, Mr. Johnson?

17    A.    The day after they indicted me and found me?

18    Q.    Yeah.  You were indicted in February of 2008?

19    A.    Yes, ma'am.

20    Q.    And how were you arrested?  Were you arrested in

21          Kansas or --

22    A.    I was arrested in Atchison, Kansas, by the

23          detectives.

24    Q.    All right.  And in connection then with your arrest,

25          you became part of this particular case as a
```

1219

| | | |
|---|---|---|
| 1 | | defendant; is that right? |
| 2 | A. | Yes, ma'am. |
| 3 | Q. | And in connection with this prosecution, did you, in |
| 4 | | fact, agree to cooperate in connection with your |
| 5 | | involvement in this case? |
| 6 | A. | Yes, ma'am. |
| 7 | Q. | Did you, in fact, plead guilty, Mr. Johnson? |
| 8 | A. | Yes, ma'am. |
| 9 | Q. | Do you recall when that was? |
| 10 | A. | December 10.  I'm not quite sure. |
| 11 | Q. | If I said it was -- I'm sorry.  I was looking at the |
| 12 | | wrong one.  If I said December 12 of 2008, would you |
| 13 | | disagree with that? |
| 14 | A. | No, ma'am. |
| 15 | Q. | On the same day that you pled guilty, on December 12, |
| 16 | | 2008, did you agree to be interviewed in connection |
| 17 | | with your knowledge and familiarity with this |
| 18 | | particular case? |
| 19 | A. | Yes, ma'am. |
| 20 | Q. | And in connection with that, tell the jury what you |
| 21 | | pled guilty to, Mr. Johnson. |
| 22 | A. | To conspiracy. |
| 23 | Q. | And also to the forfeiture allegation of over $10 |
| 24 | | million? |
| 25 | A. | Yes, ma'am. |

1    Q.    And the conspiracy charge, that was for a conspiracy

2          to manufacture, possession with intent to distribute,

3          and to distribute 50 grams or more of crack cocaine;

4          correct?

5    A.    Yes, ma'am.

6    Q.    And a conspiracy to possess with intent to distribute

7          and to distribute 5 kilograms or more of powder

8          cocaine; is that correct?

9    A.    Yes, ma'am.

10   Q.    And in connection with that particular charge that

11         you pled guilty to, what's your understanding of the

12         potential sentence that you're facing for that

13         charge?

14   A.    Ten to life.

15   Q.    That means not less than ten years and not more than

16         life?

17   A.    Yes, ma'am.

18   Q.    And in connection with your plea agreement, were

19         there certain agreements that the government made in

20         connection with you pleading guilty?

21   A.    Say it again.

22   Q.    Were there certain things that the government agreed

23         to in connection with your plea agreement?

24   A.    Yes, ma'am.

25   Q.    For instance, in exchange for your plea agreement was

1    there an agreement that any other charges against you

2    would be dismissed at the time of sentencing?

3  A.  No, ma'am.

4  Q.  That wasn't part of what you understood the agreement

5    to be?

6  A.  Say it one more time.

7  Q.  Was part of the plea agreement -- there were other

8    charges that you had besides the conspiracy; correct?

9  A.  Yes, ma'am.

10  Q.  What other charges do you remember being charged

11    with?

12  A.  Just conspiracy to manufacture drugs.

13  Q.  Just the conspiracy?

14  A.  And was it the gun or --

15  Q.  Were you also charged with --

16  A.  Oh, no, no.

17  Q.  Possessing the drugs on September 14 of 2007?

18  A.  Oh, yes.

19  Q.  The cocaine that you had, the crack that you had on

20    you that day?

21  A.  Yes, ma'am.

22  Q.  That was another charge against you?

23  A.  Oh, I thought it was the same charge, like it's just

24    in the conspiracy.  I don't know.

25  Q.  So you thought all you had was one charge?

```
 1    A.    I thought that was just, like, part of the whole
 2          conspiracy, like, just one charge in the conspiracy.
 3    Q.    So you thought that everything that you were involved
 4          in in this case was just one count and you pled
 5          guilty to that one count?  Is that what you thought?
 6    A.    That's what I thought, but --
 7    Q.    All right.  In connection with this particular
 8          agreement, in connection with that, did the
 9          government also agree to recommend a sentence under
10          the guidelines?  Do you know what I'm talking about
11          when I'm talking the guidelines?
12    A.    Yes, ma'am.
13    Q.    What is your understanding of the guidelines?
14    A.    Guidelines is a minimum ten to life.  The guidelines
15          is, like, when you plead guilty, you get, like, three
16          points off.
17    Q.    Three points off for pleading guilty?
18    A.    And --
19    Q.    Let me ask you, what's your understanding of how your
20          sentence is figured on the guidelines?
21    A.    Like from levels to your points.
22    Q.    Okay.  So it's the level of the crime that you've
23          committed?
24    A.    Uh-huh.
25    Q.    That along with your criminal history points?
```

```
 1    A.    Yes, ma'am.

 2    Q.    That gives you a sentencing range?  Is that what you

 3          believe?

 4    A.    Uh-huh.

 5    Q.    All right.  Do you know what the Sentencing

 6          Guidelines -- what your potential sentence might be,

 7          Mr. Johnson?

 8    A.    No, ma'am.

 9    Q.    Do you have any -- obviously, we have got a minimum

10          of ten years, but do you know where you're going to

11          be on the guidelines?

12    A.    No, ma'am.

13    Q.    Okay.  And when you agree to plead guilty, part of

14          your agreement was that you would agree to cooperate

15          truthfully and fully in this particular prosecution;

16          is that right?

17    A.    Yes, ma'am.

18    Q.    And as part of this agreement, if did you that, if

19          you cooperated, told what you knew, testified if

20          necessary, told the truth, what's your understanding

21          of what this plea agreement allowed for?

22    A.    A 5K1.

23    Q.    5K1?

24    A.    Yes, ma'am.

25    Q.    And what's your understanding of what a 5K1 is?
```

1    A.    The statute for information to give the government

2          and be truthful, be -- everything you speak about,

3          and that's basically all I know.

4    Q.    So you tell the truth, and then the government, is it

5          your understanding, will make a determination whether

6          that information has been substantial?

7    A.    Yes, ma'am.

8    Q.    And if so, then they will file -- the government will

9          file a motion asking the judge to do what?

10   A.    A downward departure.

11   Q.    To sentence you less than what the guidelines call

12         for?  Is that your understanding?

13   A.    Yes, ma'am.

14   Q.    And that would give you the option of getting

15         somewhere less than ten years, possibly?

16   A.    Yes, ma'am.

17   Q.    Now, when you entered this plea agreement, did

18         anybody make any promises to you about what your

19         sentence was going to be?

20   A.    No, ma'am.

21   Q.    Did anyone make any promises that the government

22         would even file a 5K1.1?

23   A.    No, ma'am.

24   Q.    What's your understanding in connection with this

25         plea agreement if there's an indication that you've

1      lied or you haven't told the truth?  What will happen

2      with this plea agreement?

3   A.   They would take it away; you won't have it.

4   Q.   And in connection with your sentence that you get in

5      this case, what's your understanding of who makes the

6      decision about what sentence you get?

7   A.   The judge.

8   Q.   In connection with where you're sitting right now,

9      you don't know what you're looking at other than

10     somewhere between ten and life?

11  A.   Yes.

12  Q.   What's your hope though about what's going to

13     happen -- about what kind of a sentence you're going

14     to get?

15  A.   The minimum of ten.

16  Q.   A minimum of ten?  You're hoping for ten?

17  A.   Well, I'm hoping for less than ten, but ten if that's

18     what it is.

19  Q.   Are you hoping for the best?

20  A.   Yes, ma'am.

21  Q.   What would the best be in your mind?

22  A.   Well, the best would be time served, but I don't --

23  Q.   That would be a pretty good deal?

24  A.   Yes, ma'am.

25  Q.   Anybody told you that's going to happen?

1    A.    No, ma'am.

2    Q.    Do you really think that's going to happen?

3    A.    No, ma'am.

4    Q.    When were you arrested, Mr. Johnson?

5    A.    February 8 of 2007.

6    Q.    Have you been in custody since then?

7    A.    Yes, ma'am.

8    Q.    Where have you been housed since you have been

9          arrested?

10   A.    Leavenworth, CCA.

11   Q.    And CCA is the federal holding facility where people

12         pending sentencing or pending trial or pretrial

13         detainment, that's where they are kept; is that

14         right?

15   A.    Yes, ma'am.

16   Q.    And from February 8, 2007, until you pled guilty on

17         December 12 of 2008 -- I'm sorry, February 2008 is

18         when you were arrested; correct?

19   A.    Yes, ma'am.

20   Q.    Okay.  So from February 8, 2008, to December 12,

21         2008, when you pled guilty for those approximately

22         eight months or so, eight, nine, ten months that you

23         were incarcerated, were you considering cooperating

24         with the government?

25   A.    Yes, ma'am.

```
1    Q.   And you had an attorney representing you, still do;

2         right?

3    A.   Yes, ma'am.

4    Q.   He's present in the courtroom today?

5    A.   [Nodded head.]

6    Q.   Right?

7    A.   Yes, ma'am.

8    Q.   Based upon your consideration of this particular

9         case, did you make the decision to cooperate?

10   A.   Yes, ma'am.

11   Q.   Was that an easy decision?

12   A.   Kinda sorta it was.

13   Q.   Why was it easy?

14   A.   Why was it easy?

15   Q.   Yeah.

16   A.   Because I just made my mind up just to go ahead and

17        get it over with.

18   Q.   Were there any reservations that you had about

19        becoming a cooperating defendant and coming in and

20        testifying?

21   A.   Was there any other cooperations?

22   Q.   Were any -- did you have any concerns about becoming

23        a cooperating defendant?

24   A.   Yes, ma'am.

25   Q.   What concerns would you have in becoming a
```

| 1 | | cooperator? |
|---|---|---|
| 2 | A. | Like, basically, just make my mind up to do it so I |
| 3 | | can hope for the best. |
| 4 | Q. | Okay.  When people cooperate against other people in |
| 5 | | cases like these, is there a label that people get |
| 6 | | called? |
| 7 | A. | Yes, ma'am. |
| 8 | Q. | What are they called? |
| 9 | A. | Cowards, snitches, and rat, you know, all that. |
| 10 | Q. | Have you been called that since you pled guilty? |
| 11 | A. | Yes, ma'am. |
| 12 | Q. | By people in this case? |
| 13 | A. | Yes, ma'am. |
| 14 | Q. | Has that influenced you to go ahead and testify and |
| 15 | | go forward with being a cooperator?  Did that make |
| 16 | | you change your mind? |
| 17 | A. | No, ma'am. |
| 18 | Q. | You have been in custody since February 8, 2008.  The |
| 19 | | indictment against you, were there a lot of people |
| 20 | | named in that indictment, about 20 -- including you, |
| 21 | | 24 people? |
| 22 | A. | Yes, ma'am. |
| 23 | Q. | Did you know all of those people? |
| 24 | A. | No, ma'am. |
| 25 | Q. | Were there a lot of them you didn't know? |

1    A.    Yes, ma'am.

2    Q.    Since you've been at CCA, have you come to know a

3          number of those individuals?

4                MR. CALBI:  Your Honor, may I approach,

5          please?

6                THE COURT:  You may.

7                (Counsel approached the bench and the

8          following proceedings were had:)

9                MR. CALBI:  Judge, I think we may be going

10         down a slippery slope, maybe not this question, but

11         he may blurt it out, or the next question may lead to

12         who is in CCA, and I don't think that's knowledge

13         that the jury should possess.  I'm just trying to

14         anticipate what the witness may say or where we're

15         going with this line of questioning.

16               MS. MOREHEAD:  Judge, this was the line of

17         inquiry that I was going to bring up initially, but

18         then Mr. Sandage thought it was a nonissue, so I

19         didn't bring it up, but the truth of the matter is,

20         Judge, I intend to play -- this individual has taken

21         on kind of the role of being the barber up there at

22         CCA, and so he's had lots of conversations with lots

23         of the defendants in this case, and I intend to play

24         several phone calls for him to identify their voice.

25         Identity has been challenged on those phone calls,

1    and I need to lay a foundation even though he didn't

2    know these people, wasn't familiar with them, in the

3    last ten months -- well, almost over a year now,

4    because here we are in April -- he's had numerous

5    conversations with them, and he is able to identify

6    their voice.

7              THE COURT:  Who specifically is he going to

8    identify?

9              MS. MOREHEAD:  He can identify Mr. Wesley.

10   He can identify Mr. Foy.  He can identify Mr.

11   McDaniel.

12             MR. CALBI:  Judge, we're not challenging

13   identity on anything, so anything -- how this

14   pertains to Mr. Wesley --

15             THE COURT:  Wouldn't appear to apply to Mr.

16   Wesley.

17             MS. MOREHEAD:  Except the phone calls we're

18   going to play with him are with Mr. Foy.

19             THE COURT:  Just don't ask him about -- is

20   there a way you can do this without getting too far

21   into the detail of the setting?

22             MS. MOREHEAD:  I would love to, Judge, but

23   my concern is this:  They are going to be attacking

24   his credibility about the identity.  You know, I'm

25   not -- that's why I tried to be clear before, what

1    path I needed to go down.

2              THE COURT:  I understand.

3              MS. MOREHEAD:  And, you know, I need to be

4    able to lay a foundation.  It's not just like --

5    because if I don't put out there that he's had the

6    opportunity to hear their voice, then they are going

7    to be able to come in and say, you didn't even know

8    him, and the closing argument is going to be, they

9    bring in this guy who didn't even know them to

10   identify their voice.

11             THE COURT:  I understand.  Let me hear from

12   Mr. Sandage.

13             MR. SANDAGE:  Your Honor, on behalf of Mr.

14   Foy, the issue of CCA is a moot point because I

15   believe I'm going to cross examine him about issues

16   that happened at CCA prior to him doing that, so I

17   confirmed with my client, and he understands the

18   risks involved with that.

19        As far as the foundation and how that's going to

20   come in procedurally, I believe a couple things -- I

21   would ask that the court advise Ms. Morehead that she

22   can't preface it by who is on the phone call.  I'm

23   going to play you a phone call, and can you identify

24   the voices?

25             THE COURT:  By the way, I think that is the

1    procedure she used with Mr. Grigsby in connection

2    with his identification of Mr. Goodwin.  She did not

3    preface -- she played a call, and the transcript was

4    not displayed to the jury.  In fact, we took down the

5    monitor here just in case a person sitting in the

6    witness stand could have seen that.

7              MR. SANDAGE:  It's a concern of mine.

8              THE COURT:  Rightfully so.  And we would

9    follow that procedure.  Did you say Mr. McDaniel is

10   the other person?

11             MS. MOREHEAD:  Yes.

12             THE COURT:  Mr. Bellemere?

13             MR. BELLEMERE:  I believe there's

14   foundation for him to recognize my client's voice

15   because my client has said he's played basketball

16   with him.  If that's the only reason to inquire with

17   regard to foundation of voices on the tape, I would

18   like to have a brief moment with my client, but I'm

19   willing to concede that point, and I can cover that

20   in just a second.

21             THE COURT:  All right.  Why don't you check

22   with him and see.

23             MR. JOHNSON:  Just so I'm clear, we are not

24   talking about admitting any defendants' statements

25   through this witness, or are we?  If we are --

1           THE COURT:  That's another issue which has

2      not been broached.  Ms. Morehead simply indicated

3      we're headed towards identification, not alleged

4      statements.

5           MR. JOHNSON:  That doesn't sound like an

6      issue with Mr. Goodwin because you've admitted those

7      recordings, so that's moot.

8           MS. MOREHEAD:  I'm not getting into the

9      substance of any conversations that they may have had

10     at this point.  I just want to lay the foundation

11     that he's talked to these folks, had contact with

12     them regularly, would be able to identify their

13     voice, and then play a couple of phone calls for him

14     and see who, if anyone, he can identify on those

15     phone calls based upon his contact, and I just don't

16     want to shortcut myself in closing arguments.

17          THE COURT:  I hear you.  Let's see where we

18     are.  Mr. Bellemere?

19          MR. BELLEMERE:  I think we will have to

20     play those phone calls, Judge.  I'm sorry.

21          THE COURT:  With regard to Mr. Wesley,

22     where Mr. Calbi is concerned, there's no need to

23     identify Mr. Wesley's voice as the other speaker, is

24     there?

25          MS. MOREHEAD:  Well, except if I'm going to

1    do it open-ended, I'm going to say, do you recognize

2    any of the voices on that call?  And if he says,

3    yeah, I recognize Monterial Wesley and Shevel Foy,

4    you know --

5              THE COURT:  Second point then is, is there

6    any -- how recently has he had these conversations

7    with people?

8              MS. MOREHEAD:  He was in the same cell with

9    Mr. Foy for a long period of time, I think.

10             THE COURT:  My question is, for example,

11   the extent to which there may be evidence before the

12   jury that someone was at some point in CCA, if, in

13   fact, it is otherwise irrelevant in the case, then

14   clearly the probative value would have to be

15   significantly outweighed by the unfair prejudice.  I,

16   frankly, would find that it wasn't significantly

17   outweighed if the probative value were high enough.

18   I think the probative value is high enough, and I

19   don't think the prejudice to Mr. Wesley, even though

20   he is -- the probative value doesn't apply to him.

21   The prejudicial effect to Mr. Wesley would not be

22   particularly high if -- particularly if there's no

23   need to suggest that Mr. Wesley is still there.  In

24   other words, somebody may have been there

25   temporarily.  They got arrested; we had to do

1    something with them; yada, yada, yada.  But if we're

2    saying, yeah, I rode down on the bus --

3            MR. SANDAGE:  Yada, yada, yada.  That's

4    good, Judge.  I like that.

5            THE COURT:  We have had some of that in

6    this case, the best I can interpret.  But, in other

7    words, if you don't need to get him to say, I rode

8    down with Wesley this morning, you know, if there's a

9    way that this can unfold so that, yes, it is

10   potentially there that somebody's been in custody at

11   some point but it doesn't carry with it the notion

12   that he's still there, that would be helpful.  That

13   would ameliorate any claim of unfair prejudice that

14   Mr. Wesley might have, especially in the balancing

15   end of things, because there's no probative value as

16   to Wesley.  That does raise some concerns, so

17   ameliorating the unfair prejudice is important.

18           MS. MOREHEAD:  I don't have a problem not

19   highlighting all of those details, you know, how

20   often did you see him, how much contact, whatever.  I

21   guess my only concern is getting --

22           THE COURT:  I know where you may be going.

23   I think it depends on what the cross examination is.

24   In other words, I think you can go about it

25   relatively succinctly on direct.  If you feel that

```
1     based upon cross examination it now is important to

2     say, okay, all right.  We really have to go into this

3     and all the detail to bolster the credibility because

4     he talked to him 24 times, including on the ride down

5     this morning -- which wouldn't have been the case --

6     then we will revisit it then.  But as a starting

7     point it would seem that you would not need to do

8     that.  Then on redirect if you do you can ask leave

9     to approach and we will sort it through at that

10    juncture.

11          In addition, Mr. Calbi, I think in connection

12    with the final instructions, not now, I think that

13    would just highlight it now, but I would -- I would

14    defer to you if you felt differently, but I believe

15    there should be a limiting instruction that there's

16    no adverse inference to be drawn by virtue of the

17    fact that somebody at some point in time may have

18    been in detention in the course of the case.  I think

19    if you would like to craft something and submit it I

20    would be happy to give you a limiting instruction

21    along those times to protect Mr. Wesley's interests.

22              MS. MOREHEAD:  Judge, I appreciate what

23    you're saying.  My only concern, you're suggesting,

24    you don't really need to until they get into that on

25    cross.  Sly as a fox over here might not ask
```

1    anything, and then in closing he comes up and says,

2    well, well, they bring in Jamicah Johnson.  He says,

3    yeah, that's Harv.  We don't know how he knows that

4    voice or how often he's heard that voice or in what

5    context.

6            THE COURT:  That's different.  He's taking

7    that chance.  I don't care what you do with McDaniel

8    in that regard.  It's Wesley that I'm trying to

9    protect because there's no probative value as to

10   Wesley from anything I've heard, and yet there is

11   some potential unfair prejudice as to Mr. Foy.  He

12   accepts that.  He's running the risk of all of this

13   because he has his own ax to grind with this guy with

14   regard to what happened at CCA.  With regard to

15   McDaniel, he's taking his chances.  Life isn't always

16   like you would like it to be, but you play where you

17   are, and Mr. McDaniel is taking that risk.  It's

18   Wesley I'm trying to protect.

19           MS. MOREHEAD:  Very well, Judge.  I get it

20   now.  Thank you.

21           THE COURT:  Wait a minute.  Mr. Rogers has

22   a concern.

23           MR. ROGERS:  There is no basis whatsoever

24   for talking about Mr. Simpson at CCA because he's not

25   on any phone calls; is that right?

```
 1              THE COURT:  Right.  There's going to be no
 2       discussion of any conversation with Simpson; right?
 3              MS. MOREHEAD:  That's right.
 4              THE COURT:  We have established this, but
 5       there were comments made at CCA about which
 6       Mr. Bellemere had earlier raised some issues
 7       concerning stray comments that McDaniel may have made
 8       at CCA.  There may be other stray comments that other
 9       people may have made at CCA.  If you do at some point
10       in time in the case believe those comments should be
11       admitted in the case, I want to take those up at the
12       bench first for a number of different reasons.
13              MS. MOREHEAD:  That will happen with
14       Mr. Humphrey, who probably is going to testify this
15       afternoon because I had some problems getting some
16       other witnesses.  With that preface, I would be happy
17       to do that.
18              THE COURT:  Is everybody satisfied where we
19       are?  All right.  Let's proceed.
20              (The proceedings returned to open court.)
21  Q.  (By Ms. Morehead) Mr. Johnson, since being at CCA,
22       have you become acquainted with some individuals that
23       you previously did not know?
24  A.  Yes, ma'am.
25  Q.  All right.  I want to show you a couple of
```

1    photographs here.  First of all, Government's

2    Exhibit 275, do you recognize that individual?

3  A.  Yes, ma'am.

4  Q.  Who is that individual?

5  A.  Shevel Foy.

6  Q.  Did you know him before being at CCA?

7  A.  No, ma'am.

8  Q.  And while being at CCA, can you just describe for us

9    how much contact you would have had with him.

10  A.  Like, about five months.

11  Q.  Five months.  What happened in those five months?

12  A.  We was in the same pod.

13  Q.  And how often would you have contact with him in

14    those five months?

15  A.  We was in the same cell.  We talked every day.

16  Q.  So every day.  And then aside from those five months

17    you were in the same pod and would have talked every

18    day, have you had other contact with Mr. Foy?

19  A.  Yes, ma'am.

20  Q.  Where has that happened at?

21  A.  Outside rec and inside rec, and that's it.

22  Q.  Okay.  So recreation times?

23  A.  Yes, ma'am.

24  Q.  Now, have you had a job while you've been up there at

25    CCA?

1240

```
1    A.   Yes, ma'am.

2    Q.   What's your job up there?

3    A.   Barber.

4    Q.   Barber?

5    A.   Yes, ma'am.

6    Q.   Cutting people's hair?

7    A.   Yes, ma'am.

8    Q.   Have there been any times that you've had occasion to

9         cut Mr. Foy's hair while being at CCA?

10   A.   Yes, ma'am.

11   Q.   So as a result of some contact with Mr. Foy at CCA,

12        do you believe that if you heard his voice you would

13        be able to recognize it?

14   A.   Yes, ma'am.

15   Q.   Okay.  Government's Exhibit 291, do you recognize

16        that individual?

17   A.   Yes, ma'am.

18   Q.   Who is that individual?

19   A.   I don't -- I forgot his name.

20   Q.   All right.  How do you know that -- have you had

21        contact with that individual there at CCA?

22   A.   Yes, ma'am.

23   Q.   In what context?

24   A.   Outside rec.

25   Q.   Okay.  And did you know that individual before?
```

```
 1   A.   No, ma'am.

 2   Q.   All right.  And if you heard that individual's voice,

 3        do you think you would recognize it?

 4   A.   Yes, ma'am.

 5              MR. SANDAGE:  Your Honor, may I approach?

 6              THE COURT:  You may.

 7              (Counsel approached the bench and the

 8        following proceedings were had:)

 9              MR. SANDAGE:  That question is precisely

10        the concern I have, would you recognize his voice on

11        the phone.  That's giving him the answer before he's

12        ever heard the call, in my opinion.

13              THE COURT:  Well, I don't agree with that

14        because I think the concern would be if calls were

15        played and she said, do you hear Mr. Foy's voice on

16        this call?  Obviously, it's irrelevant to start

17        playing calls if she hasn't established that she

18        thinks -- that he thinks he has the ability to

19        understand -- to recognize people's voice.  I agree

20        that it's getting close to the concern, but I really

21        think she has to lay the foundation that he believes

22        he has the knowledge, so I think that's where he is

23        now.

24           So are you planning to play the calls, or have

25        you played the calls for him out of court?
```

```
 1            MS. MOREHEAD:  I've never played calls for

 2       him before, Judge.

 3            THE COURT:  So this will be blind in court,

 4       not blind, but the first time in court?

 5            MS. MOREHEAD:  Yes.

 6            MR. BELLEMERE:  Judge, are we going to play

 7       just, like, Call A and Call B, or what would happen

 8       if we played, like, a little bit like we do with

 9       photographs?  They have spreads.  What would happen

10       if she plays three or four calls and asks if he can

11       identify anyone -- just tell him, I'm going to play

12       four phone calls for you, see if you can identify any

13       of these people on those phone calls.  What would be

14       wrong with that?

15            THE COURT:  What would be wrong with that,

16       including one that had somebody's voice on it that's

17       not --

18            MR. BELLEMERE:  That doesn't have anything

19       to do with this matter.

20            THE COURT:  One other call that doesn't --

21            MS. MOREHEAD:  I'll play a call with

22       Grigsby and Heags to see if he can identify that.

23            MR. BELLEMERE:  That won't make any

24       difference.  Well, he can.  I'm trying to say,

25       there's a little bit of chance to this --
```

```
 1                    THE COURT:  Who are you suggesting that she
 2          should play a call of other than Grigsby and Heags?
 3                    MR. BELLEMERE:  I don't know who all the
 4          calls are from.
 5                    THE COURT:  Grigsby and Goodwin?
 6                    MR. BELLEMERE:  But, Judge, he dealt with
 7          those -- wait a minute.  He dealt with those two
 8          people; right?
 9                    THE COURT:  Uh-huh.  Right.
10                    MR. BELLEMERE:  So he should know -- but
11          he's never dealt with my client and didn't know him
12          before, and the same would be true with his client,
13          didn't know him before.  All I'm trying to say is,
14          maybe we ought to -- I can't come up with who the
15          calls should be, but the logical thing would be if
16          this guy is going to testify that he actually can
17          truly identify the voice, there ought to be other --
18          like we do in photographs, there ought to be a
19          spread.  I haven't had a chance to think about this
20          because I didn't know he was going to try to ID my
21          client's voice, so I don't have a good suggestion for
22          you, but I don't think it makes any sense to play a
23          phone call of people he's dealt with.
24                    MS. MOREHEAD:  Judge, you told them -- they
25          were the ones that objected to the foundation to
```

```
 1        their phone calls, and you said that I would be able

 2        to lay that foundation.

 3                THE COURT:  I understand.  I'm just

 4        evaluating Mr. Bellemere's objection.  He's entitled

 5        to have his say, and I am going to listen to it.

 6                MR. BELLEMERE:  He didn't know my client's

 7        name, so how can he --

 8                THE COURT:  Maybe he won't be able to

 9        recognize his voice.

10                MR. BELLEMERE:  That's possible.  But I'm

11        trying to look at the fairness aspect of it.  You're

12        the judge, obviously.  I've made my point.

13                THE COURT:  I understand your point, but

14        I'm going to overrule your objection, and I will

15        permit Ms. Morehead to proceed, but I will -- it is

16        true that he certainly should know Grigsby and Heags,

17        but I think you should approach it that way, and I

18        think that you understand where we're going from

19        here.  So you may proceed.

20                MS. MOREHEAD:  Absolutely.

21                MR. ROGERS:  Your Honor, might I suggest

22        that Mr. Wesley's voice is not in dispute and

23        Mr. Humphrey is not a defendant in this part of the

24        case, so maybe phone calls between Wesley and

25        Humphrey would be an appropriate blind to throw in
```

```
 1        there, whatever you call that.

 2               MS. MOREHEAD:  Can I present my case how I

 3        see fit, Judge?

 4               THE COURT:  I understand the concern raised

 5        by counsel, but I believe your approach is

 6        permissible, and I will allow you to do it.

 7               MS. MOREHEAD:  Thank you.

 8               (The proceedings returned to open court.)

 9   Q.   (By Ms. Morehead) Mr. Johnson, I'm going to play a

10        few phone calls for you.  For the record, I've turned

11        your monitor off there by you; is that right?

12   A.   Yes, ma'am.

13   Q.   And have you listened to any of these phone calls

14        before?

15   A.   No, ma'am.

16   Q.   Okay.  And in connection then with the calls I play,

17        I just want to see if you can recognize any voices

18        that are on these calls.  All right?

19   A.   Yes, ma'am.

20               MS. MOREHEAD:  Could we pull up

21        Exhibit 168, please.

22               (A portion of Exhibit No. 168 was played in

23        open court.)

24               THE COURT:  Would you stop that for a

25        second, and counsel approach, please.
```

1    MS. MOREHEAD:  Yes, Judge.

2              (Counsel approached the bench and the

3        following proceedings were had:)

4              THE COURT:  I am concerned about how long

5        of the duration of the call you need to play.

6              MS. MOREHEAD:  Okay.

7              THE COURT:  I wonder if we could agree on a

8        format in which you ask the witness to raise his hand

9        or something if and when -- if and when he believes

10       he recognizes any of the voices.

11             MS. MOREHEAD:  Okay.  Absolutely.

12             THE COURT:  That way we aren't subjected to

13       the duration of the call unless on cross examination

14       counsel wishes to go back in to test that

15       identification.  I think that keeps us from

16       cumulative presentation of these tapes.

17             MS. MOREHEAD:  Great idea.  Thank you,

18       Judge.

19             (The proceedings returned to open court.)

20   Q.  (By Ms. Morehead) Mr. Johnson, were you -- were you

21       able to listen to that call?

22   A.  Yes, ma'am.

23   Q.  And in listening to that call, did you listen to the

24       voices on that call?

25   A.  Yes, ma'am.

1    Q.   And was it long enough that you are able to determine

2         whose voices are on that call?

3    A.   It was long enough for me to determine one of them.

4    Q.   Okay.  And which -- whose voice did you determine you

5         recognized on that call?

6    A.   Shevel Foy.

7    Q.   Shevel Foy?

8    A.   Uh-huh.

9    Q.   Okay.  And in connection with this call, whose voice

10        did you think that Shevel Foy's was?

11   A.   The one that was cussing.

12   Q.   The one that was cussing?

13   A.   Uh-huh.

14   Q.   Okay.  In connection with -- okay.  Let's play

15        Exhibit 208.

16             MR. BELLEMERE:  Could we approach the

17        bench?  I'm sorry.  I know it's laborious.

18             THE COURT:  No, no.  It's all right.

19             (Counsel approached the bench and the

20        following proceedings were had:)

21             MR. BELLEMERE:  I would respectfully

22        request, your Honor, that the next phone call, what's

23        going to be played would have been the phone call

24        that would have been purportedly between Shevel Foy

25        and whoever the other -- Mr. Wesley.  I am wondering

```
 1        whether or not this gentleman hasn't been advised

 2        that the phone calls -- I say -- strike that.  I'm

 3        wondering, I would like to see if there's some --

 4                 THE COURT:  You're concerned that in his

 5        own mind he thinks if he identifies Foy and McDaniel

 6        that it might be to his benefit?  You're not

 7        suggesting he's been told that by the government.

 8        You think he's just smart enough to have figured it

 9        out?

10                 MR. BELLEMERE:  Yes, your Honor.

11                 THE COURT:  Your concern is that he has

12        failed his first test, for the record, since that

13        conversation was between Grigsby and Heags?

14                 MR. BELLEMERE:  Yes, your Honor.

15                 THE COURT:  Do you have another call not

16        involving Foy or McDaniel that you could play?

17        Honestly, I want to -- it's my job as the judge to

18        determine whether or not this is reliable.

19                 MS. MOREHEAD:  I can play a Billy Trinkle

20        call.

21                 THE COURT:  And so far I have had some

22        concern about Mr. Johnson's reliability in this

23        regard.  Mr. Trinkle might not be as good a test.

24        Although Billy tries to approximate a down-witted

25        accent, he doesn't always get it.  Is there a call
```

1     with Mr. Humphrey that you could use or something

2     like that that we can see what he can do?

3               MS. MOREHEAD:  I was trying to -- not

4     without --

5               THE COURT:  Somebody who has -- are there

6     any calls between two people who have already pled

7     guilty?

8               MS. MOREHEAD:  No.

9               THE COURT:  All of the calls are between

10    someone who --

11              MS. MOREHEAD:  All the calls I've played so

12    far -- I was trying to think.

13              MR. BELL:  I know there are some calls

14    between Vinol Wilson, who is not here and not a

15    defendant.  I believe they are between Humphrey -- I

16    believe they are Humphrey.

17              MS. MOREHEAD:  The problem is, those aren't

18    introduced.

19              THE COURT:  They certainly could be if you

20    have them available to play.  I'm more concerned

21    about false positives than false negatives under

22    these circumstances.  If we play a Humphrey/Wilson

23    call and he identifies that as McDaniel or Foy, I get

24    nervous.  If he says, I don't know who those guys

25    are, I think we go to the next step.

1        MR. BELL:  I'm just thinking out loud.

2        THE COURT:  That's a decent suggestion.  We

3    could admit those into evidence if there is no

4    objection, not for any substantive purpose, but

5    purely for the purpose of testing his ability to

6    accurately forecast these -- not forecast but

7    identify these voices.  Are you able to come up with

8    a call like that?

9        MS. MOREHEAD:  I don't know.  I'll have to

10   look at my list and see.

11       THE COURT:  Take a look and see.

12       MR. SANDAGE:  At this point I would object

13   to any more phone calls being introduced regarding my

14   client.  In his belief he just heard Mr. Foy's voice,

15   and whether or not that's correct or incorrect, I

16   think the inquiry is over.  We can't in my opinion --

17   I would object to any more calls being introduced

18   regarding Mr. Foy.  I think the inquiry is over.

19       THE COURT:  Your objection is noted, and

20   I'll take it under advisement until I see where we're

21   going from here.

22       MR. JOHNSON:  So the record is clear, I'm

23   certain we have all been talking circumstantially.

24   The last call was between James Heags and Henry

25   Grigsby.

```
 1                      THE COURT:  That's correct.  I mentioned
 2          that had already.
 3                      (The proceedings returned to open court.)
 4                      MS. MOREHEAD:  Judge, could we approach for
 5          a minute?
 6                      THE COURT:  Sure.
 7                      (Counsel approached the bench and the
 8          following proceedings were had:)
 9                      MS. MOREHEAD:  Judge, the call -- there is
10          a call between Mr. Humphrey and Mr. Grigsby.  It's
11          not introduced.  I'm not sure -- you know, we have
12          got it cued up for the transcript, so I'm just
13          procedurally not sure.
14                      THE COURT:  Offer it into evidence for the
15          purpose of using it as a test call to evaluate the
16          reliability of Mr. Johnson's testimony.
17                      MS. MOREHEAD:  I mean, the jury is just
18          going to see the transcript come up.  I just wanted
19          to get in my own mind, do I just offer it and play
20          it?
21                      THE COURT:  Yes.  I will -- you don't need
22          to explain to the jury at this point in front of the
23          witness what the limited purpose was.  If someone
24          will kindly remind me when we're concluded with the
25          witness -- Mr. Rogers, thank you, I appreciate it, if
```

```
 1          you would, Mr. Sandage having nominated you.  I would
 2          be happy to explain the limited purpose to the jury.
 3                    (The proceedings returned to open court.)
 4                    MS. MOREHEAD:  Judge, I would ask for
 5          admission of Government's Exhibit 235 and 235A.
 6                    THE COURT:  All right.  Is there any
 7          objection for the limited purpose previously
 8          discussed?  Hearing none, Exhibits 235 and 235A are
 9          admitted for a limited purpose.
10                    (Exhibit 235 was admitted into evidence,
11          and Exhibit 235A was admitted for demonstrative
12          purposes only.)
13   Q.    (By Ms. Morehead) Mr. Johnson, I'm going to play a
14          telephone call for you and ask you --
15                    MS. MOREHEAD:  Judge, it's pretty short.
16          Is it okay if I play the whole thing?  It's only 51
17          seconds long.
18                    THE COURT:  That would be fine.
19   Q.    (By Ms. Morehead) I'm going to play this call and
20          would ask you if there's anyone on this call whose
21          voice you might recognize.  All right?
22                    (Exhibit No. 235 was played in open court.)
23   Q.    (By Ms. Morehead) Did you have an opportunity to
24          listen to that call, Mr. Johnson?
25   A.    Yes, ma'am.
```

1   Q.   Were there any voices on that call that you

2        recognized?

3   A.   Yes, ma'am.

4   Q.   Whose voice do you recognize there?

5   A.   Humphrey's.

6   Q.   Humphrey?

7   A.   Yes, ma'am.

8   Q.   Okay.  And who is Humphrey?

9   A.   It's Humphrey.

10  Q.   Is he someone else in this case?

11  A.   Yes, ma'am.

12  Q.   Okay.  Did you know Humphrey before you were involved

13       in this case, Mr. Johnson?

14  A.   No, ma'am.

15  Q.   Government's Exhibit 271, turning your monitor on, do

16       you recognize that person?

17  A.   Yes, ma'am.

18  Q.   Who is that?

19  A.   Humphrey.

20  Q.   Okay.  And how are you able to recognize Humphrey's

21       voice, Mr. Johnson?

22  A.   We was in E pod together back in CCA.

23            MS. MOREHEAD:  Can we pull up Call No. 208.

24            MR. SANDAGE:  May I approach?

25            THE COURT:  Yes, you may.

```
 1                    (Counsel approached the bench and the
 2          following proceedings were had:)
 3                    MR. SANDAGE:  I apologize.
 4                    THE COURT:  It's okay.  You're doing your
 5          job.
 6                    MR. SANDAGE:  Your Honor, I don't know
 7          where the court -- you said you didn't know what line
 8          we were going on.  We have one where he actually ID'd
 9          someone that was true, so at this point I would
10          reassert my fact that I think he believes the first
11          phone call was Foy.  The inquiry is over.  I think
12          that washes away the concern that he was always going
13          to say Foy or McDaniel because that's what he thought
14          he had to do to help himself today.
15                    THE COURT:  Are you saying you're
16          withdrawing your objection, or you're re --
17                    MR. SANDAGE:  I guess I'm renewing it.
18                    THE COURT:  I'm going to deny it though.  I
19          am satisfied, having listened to this call, that he
20          isn't just reflexively sitting here saying the names
21          of the people who have been presented to him before,
22          which was my great concern.  He identified Humphrey's
23          voice.  He identified it as having been at CCA.  He
24          may have been wrong, obviously, about Foy's voice,
25          and he may be wrong about other identifications he
```

```
 1        makes, but I don't think he has established -- or I

 2        am persuaded that he is making a good faith effort,

 3        that he has a factual basis to make identifications

 4        of these individuals, of their voices.  He could be

 5        wrong, and of course that's going to be something I

 6        suspect you would point out at various times in

 7        undercutting his credibility and the weight to be

 8        attached to the evidence he gives, but I'm not going

 9        to preclude him from going further at this time.

10                   MR. SANDAGE:  I won't come up again then.

11        Thank you.  On this issue.

12                   (The proceedings returned to open court.)

13                   THE COURT:  Sorry.  You mentioned an

14        exhibit number, and I --

15                   MS. MOREHEAD:  Judge, actually, I might

16        rethink that.

17            If you could cue Phone Call 257, I want to start

18        at 16 minutes and 30 seconds and continue at that

19        location.

20   Q.   (By Ms. Morehead) Mr. Johnson, what I would like to

21        tell you to do is, if while listening to this phone

22        call at any point in time you think you can identify

23        anyone's voice, raise your hand, or if you've

24        listened and you don't recognize the voice, raise

25        your hand, and we will stop it at that point.  Okay?
```

```
 1          So you let me let me know when you think you've heard
 2      enough and you feel comfortable saying, yes, I do
 3      recognize someone's voice or, no, I don't recognize
 4      someone's voice.  Do you understand what I'm saying?
 5  A.  Yes, ma'am.
 6               MS. MOREHEAD:  Is that all right, Judge?
 7               THE COURT:  Yes.  Without objection that's
 8      the appropriate procedure.
 9               (Exhibit 257 was played in open court.)
10  Q.  (By Ms. Morehead) Did you raise your hand?
11  A.  [Nodded.]
12  Q.  All right.  Did you recognize anyone's voice on that,
13      Mr. Johnson?
14  A.  Yes, ma'am.
15  Q.  All right.  Whose voice did you recognize?
16  A.  Shevel Foy and Monterial Wesley.
17  Q.  (By Ms. Morehead) Government's Exhibit 272?
18               MR. CALBI:  Judge, may I approach, please?
19               THE COURT:  You may.
20               (Counsel approached the bench and the
21      following proceedings were had:)
22               MR. CALBI:  Judge, we don't have any
23      identification issues with Mr. Wesley.  I don't care
24      if he identifies him on the phone.  I don't
25      understand why we need to put his picture up.  We
```

```
 1          have no issues with Mr. Wesley.

 2                    MS. MOREHEAD:  I want to make sure that's

 3          who he says Wesley is.  I'm not going any further

 4          than that.  He named two names.  We have identified

 5          he knows Shevel Foy, but we hadn't done it with Mr.

 6          Wesley.  I want to verify that that's who he thinks

 7          Wesley is.

 8                    MR. CALBI:  If it stops there --

 9                    THE COURT:  Is he going to say he met him

10          at CCA?

11                    MS. MOREHEAD:  No.  I'm not going there.

12          I'm just going to ask him if he knows who that is.

13                    THE COURT:  Very well.

14                    (The proceedings returned to open court.)

15   Q.     (By Ms. Morehead) Government's Exhibit 272 -- I'm

16          sorry.  Do you recognize that photograph?

17   A.     Yes, ma'am.

18   Q.     Who is that?

19   A.     Terio.

20   Q.     Who is it?

21   A.     Monterial Wesley.

22   Q.     Okay.  Now, if we could pull off Call No. 262, and

23          what I'm going to ask you to do is again listen to

24          the voices and see if there's any voices that you can

25          identify, and if at some point after you've listened
```

1    to whatever portion you need to listen to, if you'll

2    just raise your hand, we will stop it at that point.

3    All right?

4            MR. BELLEMERE:  Monitor?

5            MS. MOREHEAD:  It's off.

6            MR. BELLEMERE:  Thank you.

7    Q.  (By Ms. Morehead) Your monitor is off, isn't it?

8    A.  Yes.

9            (A portion of Exhibit No. 262 was played in

10   open court.)

11   Q.  (By Ms. Morehead) You raised your hand; is that

12   right, Mr. Johnson?

13   A.  Yes, ma'am.

14   Q.  Were there any of the voices that you recognized on

15   that phone call?

16   A.  No, ma'am.

17   Q.  No.  All right.

18           MS. MOREHEAD:  Judge, that's all I have.

19   Thank you.

20           THE COURT:  All right.  Mr. Calbi?

21               CROSS EXAMINATION

22   BY MR. CALBI:

23   Q.  Mr. Johnson, I believe you stated you moved to Kansas

24   in May of 2007; correct?

25   A.  Yes, sir.

```
 1   Q.   And then you started buying cocaine from Mr. Grigsby
 2        in July of 2007?
 3   A.   Yes, sir.
 4   Q.   Do you know if that was in the beginning of July,
 5        toward the end of July?  Do you have any recollection
 6        of what part of July it might have been?
 7   A.   No, sir.
 8   Q.   Okay.  And I believe that you testified that you
 9        bought from Mr. Grigsby 10 to 15 times; correct?
10   A.   Yes, sir.
11   Q.   Okay.  And I believe Ms. Morehead went over with you
12        that you entered into a plea of guilty on December 12
13        of 2008; correct?
14   A.   Yes, sir.
15   Q.   And you also gave a statement or a proffer to the
16        government on December 12 of 2008?
17   A.   Yes, sir.
18   Q.   Okay.  And at that proffer your attorney was there
19        with you; correct?
20   A.   Yes, sir.
21   Q.   Okay.  Do you remember being asked at that proffer
22        about how many times you've purchased cocaine from
23        Mr. Grigsby?
24   A.   Yes, sir.
25   Q.   Okay.  And do you remember what that number was, what
```

1    you told the people on that day?

2  A.   Like 10 to 15 times.

3  Q.   And that's what you believe you said at your proffer

4    interview?

5  A.   Yes, sir.

6           MR. CALBI:  Your Honor, may I approach the

7    witness, please?

8           THE COURT:  You may.

9  Q.   (By Mr. Calbi) Mr. Johnson, I'm going to show you

10   notes from the proffer interview.  And can you just

11   read to yourself Paragraph 2, please.

12          MS. MOREHEAD:  Judge, there needs to be

13   some foundation laid about whether he's familiar

14   with --

15          THE COURT:  It depends on what he's going

16   to do.  If he's going to show him this and ask him if

17   that refreshes his recollection, he may do so.

18   Beyond that there would need to be some different

19   foundation.

20       But I presume that's what you're doing; is that

21   right, Mr. Calbi?

22          MR. CALBI:  Exactly, your Honor.

23          THE COURT:  Very well.

24  Q.  (By Mr. Calbi) Have you had an opportunity to read

25   that, Mr. Johnson?

```
 1    A.    Yes, sir.

 2    Q.    Does that refresh your recollection as to what you

 3          told the government during your proffer interview?

 4    A.    Yes, sir.

 5    Q.    And did you tell the government during your proffer

 6          interview that you purchased from Mr. Grigsby 10 to

 7          15 times?

 8    A.    I'm quite sure I think I did.

 9    Q.    So then you don't believe what's in these --

10                THE COURT:  Now, you can't do that.

11                MR. CALBI:  Thank you, Judge.

12    Q.    (By Mr. Calbi) Now, I believe you also testified,

13          Mr. Johnson, that on three occasions you took a gun

14          with you for protection when you were purchasing

15          drugs; correct?

16    A.    Yes, sir.

17    Q.    But you made purchases 10 to 15 times?

18    A.    Yes, sir.

19    Q.    Okay.  What was it about those other 7 to 12

20          purchases that you felt secure that you didn't need

21          to take a weapon with you?

22    A.    'Cause everything was -- everything was cool.  The

23          first couple times, I ain't did no business with

24          them, so I didn't know what -- was the purpose of

25          having it.
```

1    Q.    Okay.  Help me out a little bit, Mr. Johnson.  I

2          really didn't follow that.  My question was, the

3          other 7 to 12 times that you purchased drugs, you

4          didn't carry a gun with you, so you felt secure.

5          Would that be a fair statement?

6    A.    Yes, sir.

7    Q.    Okay.  What was it about those 7 to 12 times that you

8          felt secure that you didn't need to carry a weapon?

9    A.    Because after the first couple times I see everything

10         was okay between me and doing business with them.

11         That was it.  I just felt like I didn't have to bring

12         it with me any more.  I wanted to see how he was the

13         first couple times, see was he wanted to rob me or

14         anything like that.  It wasn't nothing like that, so

15         I just stopped carrying it.

16              MR. CALBI:  I believe that's all I have of

17         this witness, your Honor.

18              THE COURT:  Mr. Rogers, do you have

19         anything?

20              MR. ROGERS:  No, your Honor.  Thank you,

21         sir.

22              THE COURT:  Very well.  Mr. Sandage, do you

23         have anything?

24              MR. SANDAGE:  No questions, your Honor.

25              THE COURT:  Mr. Bell, do you have anything?

```
1              MR. BELL:  No, Judge.

2              THE COURT:  Mr. Heathman?

3              MR. HEATHMAN:  No, Judge.

4              THE COURT:  Mr. Bellemere?

5              MR. BELLEMERE:  No, your Honor.

6              THE COURT:  And Mr. Johnson?

7              MR. JOHNSON:  No, thank you.

8              THE COURT:  Ms. Morehead, any redirect?

9              MS. MOREHEAD:  No, your Honor.

10             THE COURT:  That concludes the testimony

11       from Mr. Johnson, and we will take our noon recess

12       until 1:30.  I'll remind you, the jurors, of the

13       admissions not to discuss the case among yourselves

14       or with anybody else.

15           I should also tell you -- excuse me.  I forgot

16       to do it.  I'm sure I was about to be reminded to do

17       this.  When I admitted Exhibit No. 235, it was for a

18       limited purpose.  The limited purpose was simply to

19       demonstrate whether or not Mr. Johnson was able to

20       recognize those voices on that call.  It was not

21       admitted for any substantive purpose as to what the

22       individuals on the call were talking about, so

23       disregard anything along those lines.  It was merely

24       for the purpose of ascertaining Mr. Johnson's ability

25       to recognize the voices or not on that particular
```

```
 1          call, Exhibit 235.  So we will see you back at 1:30.

 2          Ms. Scheurer, please take charge of the jury.

 3          Counsel, remain here.  Deputy, you may take

 4          Mr. Johnson whenever is convenient for you to do so.

 5                   (The following proceedings were had outside

 6          the presence of the jury:)

 7                   THE COURT:  All right.  Is there anything

 8          further we need to do at this juncture?  All right.

 9          Mr. Humphrey next, Ms. Morehead?

10                   MS. MOREHEAD:  No.  I have some other --

11          he's a filler, actually.

12                   THE COURT:  Okay.

13                   MS. MOREHEAD:  I was worried I was -- I was

14          worried we were going to run out of witnesses.

15                   THE COURT:  All right.  See you all at

16          1:30.  Until that time we're in recess.

17                   (The luncheon recess was taken.)

18                   THE COURT:  Are we ready to proceed?

19                   MS. MOREHEAD:  Yes, Judge.

20                   THE COURT:  Well, then, we will bring in

21          the jury.

22                   (The following proceedings were had in the

23          presence of the jury:)

24                   THE COURT:  The government may call its

25          next witness.
```

1          MS. MOREHEAD:  Thank you.  I would call

2     Leigh Ann Greene to the stand.

3               LEIGH ANN GREENE,

4     having been duly sworn, was examined and testified as

5     follows:

6               DIRECT EXAMINATION

7     BY MS. MOREHEAD:

8          MR. JOHNSON:  Your Honor, may we approach

9     real quick?

10          (Counsel approached the bench and the

11     following proceedings were had:)

12          MR. JOHNSON:  Judge, there's an Atchison

13     County sheriff in the courtroom.  I don't know if

14     that's a witness.  That's all.

15          MS. MOREHEAD:  He's here because he

16     transported some of the inmates that are testifying.

17     He's not a witness.

18          THE COURT:  Thank you very much.

19          (The proceedings returned to open court.)

20          THE COURT:  Ms. Morehead, you may proceed.

21  Q.   (By Ms. Morehead) Please tell the jury where your

22     employed.

23  A.   With the City of Overland Park.

24  Q.   What is your occupation?

25  A.   Detective.

```
 1    Q.   Relate to the jury, if you would, Detective Greene,

 2         your work history relative to being a law enforcement

 3         officer.

 4    A.   Originally started out as a dispatcher with the city

 5         of Overland Park and then eventually became a

 6         detective working narcotics, and now I'm currently

 7         assigned to the task force with the DEA.

 8    Q.   You indicated you started out as a dispatcher?

 9    A.   Correct.

10    Q.   And was that a civilian position with that

11         department?

12    A.   Yes, it was.

13    Q.   And then you became actually a certified law

14         enforcement officer with that department?

15    A.   Correct.

16    Q.   And about when was that?

17    A.   That was 2003.

18    Q.   And once you became a law enforcement officer, you

19         attained the rank of detective and were working

20         narcotic-related cases?

21    A.   Correct.

22    Q.   You indicated you have been -- you're currently a

23         task force officer with DEA?

24    A.   Correct.

25    Q.   How long have you been in that capacity?
```

1    A.    About two and a half years.

2    Q.    And we have had Task Force Officer Eric Jones

3          testify.  The capacity that you have in your police

4          agency, would that be similar to the capacity he

5          fills with DEA from the Kansas City Kansas Police

6          Department?

7    A.    Correct.

8    Q.    All right.  Detective Greene, were you involved in

9          different aspects of the Title III wiretap

10         investigation that occurred back in 2006 into 2007?

11   A.    Yes.

12   Q.    And in connection with this particular investigation

13         that you're here to testify for today, can you just

14         kind of give us a general overview of some of your

15         duties and responsibilities throughout the course of

16         this investigation.

17   A.    Mainly I worked the actual wire monitoring and

18         transcribing some of the calls, and then also

19         assisting with surveillance.

20   Q.    All right.  And so we have heard some approximately

21         hundred calls that came from that wiretap.  Those are

22         the types of calls then that you monitored in the

23         wire room that you've described?

24   A.    Correct.

25   Q.    You said you also assisted with surveillance.  And

```
 1        can you describe for us what that might consist of.
 2   A.   If we get a phone call where we believe that
 3        individuals are going to meet, we would go out and
 4        try to cover those individuals meeting.
 5   Q.   Do you recall participating in some surveillance back
 6        on September 14 of 2007?
 7   A.   Yes.
 8   Q.   And tell us why it was that you happened to be
 9        involved in surveillance on that day.
10   A.   Some calls were intercepted on the night before, and
11        additionally some more calls were intercepted on the
12        day, the 14th, so we went out and tried to cover
13        those calls.
14   Q.   When you say "cover those calls," what are you
15        trying -- what's your goal as a surveillance officer?
16   A.   It's to go out, try to locate the vehicles, and then
17        follow in them and try to observe their meeting and
18        if they are exchanging anything.
19   Q.   And where did you and the other law enforcement
20        personnel go then to cover, as you said, these calls?
21   A.   Leavenworth, Kansas.
22   Q.   And during the course of monitoring calls was there a
23        specific reference made about where it was believed
24        individuals were going to be meeting so that that's
25        how you knew where to go?
```

```
1    A.   I don't know those specific calls.  We just responded
2         to the area, and the case agent on the call told us
3         kind of what area to go to, and then we just waited
4         for additional --
5    Q.   All right.  And eventually what location did you go
6         to in order to cover the calls that were coming in?
7    A.   The area of the Price Chopper.
8    Q.   And that's in Leavenworth, Kansas?
9    A.   Right, correct.
10   Q.   And how many law enforcement personnel were out there
11        covering this area?
12   A.   I know there was several in our group, and
13        Leavenworth PD as well as Atchison was also
14        assisting.
15   Q.   Okay.  And in connection with the covering of this
16        area, did you have a vantage point then that you were
17        able to observe individuals coming and going from the
18        area of the Price Chopper?
19   A.   Yes.
20              MS. MOREHEAD:  Judge, I would ask for
21        admission of Government's Exhibit 41.
22              THE COURT:  Any objection?  Hearing none,
23        Exhibit 41 is admitted.
24              (Exhibit 41 was admitted into evidence.)
25   Q.   (By Mr. Calbi) In connection with the surveillance
```

```
 1          that was done on September 14, I want to show you
 2          what I have marked as Government's Exhibit 41.  Do
 3          you recognize that photograph?
 4   A.     Yes, I do.
 5   Q.     All right.  And how do you recognize that photograph?
 6   A.     That was one of the vehicles that was given out by
 7          Special Agent McCue during the surveillance.
 8   Q.     And was that vehicle observed coming to and meeting
 9          with someone at the Price Chopper and then leaving?
10   A.     Correct.
11   Q.     Okay.  And did you have occasion to later see this
12          vehicle again?
13   A.     Yes, I did.
14   Q.     All right.  After this vehicle came to the area of
15          the Price Chopper, tell us, what was the next thing
16          you observed in that area of the Price Chopper?
17   A.     This vehicle left, and then we continued to follow
18          our target subject that we were following, and then
19          we after a few minutes ended up returning back to the
20          Price Chopper.
21   Q.     Okay.  And who was the target that you were actually
22          following during this surveillance?
23   A.     James Heags.
24   Q.     Okay.  And so James Heags had came to the Price
25          Chopper.  Did James Heags meet with the individual in
```

```
 1        this vehicle?

 2   A.   According to the other agents.  I did not actually

 3        see them meet.

 4   Q.   Did you see this vehicle leave the area?

 5   A.   Yes, I did.

 6   Q.   Okay.  Again, you're following James Heags.  Did you

 7        actually see him leave the area of the Price Chopper?

 8   A.   Yes.

 9   Q.   And at some point come back to the Price Chopper?

10   A.   Yes.

11   Q.   I want to show you what's been marked as Government's

12        Exhibit 34.  Do you recognize that?

13   A.   Yes, I do.

14   Q.   Tell us what this is, Detective Greene?

15   A.   This was a Lincoln Town car that arrived in the

16        parking lot.  This was given out by Special Agent

17        McCue over the radios that we listen to.  And then he

18        pulled up next to James Heags' vehicle and this

19        female got out of the vehicle.

20   Q.   All right.  And Government's Exhibit 35.  Do you

21        recognize that?

22   A.   No, I don't.

23   Q.   Government's Exhibit 36?

24   A.   No, I don't.

25   Q.   Okay.  In connection then with the monitoring that
```

1272

1    you did, you indicated the female left or got out of

2    the vehicle that we see in Government's Exhibit 34.

3    Did you ever see that individual come back to that

4    vehicle?

5  A.  Yes.  She originally had got out and went into the

6    store, and then a few minutes later she came back out

7    and walked towards the vehicle.

8  Q.  All right.  And were you at a vantage point where you

9    could see that activity?

10  A.  Yes.

11  Q.  All right.  And so once that individual, the female,

12    got back in the vehicle, what did you do by way of

13    surveillance?

14  A.  Myself and my group continued to follow that vehicle.

15  Q.  By "that vehicle" are you talking about the vehicle

16    that we see in the photograph?

17  A.  Yes, ma'am.

18  Q.  And where did you follow that vehicle?

19  A.  To the area of Atchison, Kansas.

20  Q.  And what kind of vehicles were you and the other

21    surveillance officers in?

22  A.  Our government vehicles that were provided.

23  Q.  And are those unmarked, just

24    as-normal-looking-as-possible cars?

25  A.  Yes.

```
 1   Q.   And what kind of a distance were you following this

 2        particular vehicle?

 3   A.   The stretch of road that we were actually on was a

 4        two-lane, so most of us were pretty far back.  There

 5        was only one of us, usually, that was close to the

 6        vehicle.

 7   Q.   And what ended up happening with regards to this

 8        particular vehicle that we see in Government's

 9        Exhibit 34?

10   A.   That vehicle eventually was stopped.

11   Q.   And where at?

12   A.   The Wal-Mart outside of Atchison.

13   Q.   And did you arrive at that location and see that

14        activity happening?

15   A.   Yes, I did.

16   Q.   And when you got to that location -- we talked about

17        the pickup truck, Government's Exhibit 41.  Did you

18        come to see that pickup truck again in that area?

19   A.   Yes.

20   Q.   Government's Exhibit 42, tell us what that is.

21   A.   That's the same truck.  It was parked now at the

22        Wal-Mart.

23   Q.   And Government's Exhibit 37, tell us what that is.

24   A.   That is the Lincoln that we were following and

25        eventually stopped.
```

1    Q.    And did it pull up near or stop near the pickup truck

2          that you had earlier seen in Leavenworth?

3    A.    Yes.

4    Q.    Were there already police encountering the

5          pickup truck when this vehicle was stopped, the

6          Lincoln was stopped there in the Wal-Mart parking

7          lot?

8    A.    Yes.

9    Q.    And once this Lincoln was stopped in the Wal-Mart

10         parking lot, what did you and the other officers do?

11   A.    The other three agents that were with me contacted

12         the driver of this vehicle, and I contacted the

13         female, the passenger.

14   Q.    Government's Exhibit 38, who is that?

15   A.    That's the driver of the Lincoln.

16   Q.    Did that individual identify himself to law

17         enforcement?

18   A.    I believe so.

19   Q.    Do you recall what name that individual gave?

20   A.    Derek Johnson.

21   Q.    And then Government's Exhibit 39, who is that?

22   A.    Sasha Gerard.  She's was the passenger in the

23         vehicle.

24   Q.    Okay.  When you made contact with those occupants,

25         what transpired then with this particular stop?

1    A.   I had her get out of the vehicle; she was placed in

2         cuffs; and then Special Agent McCue asked her a few

3         questions.

4    Q.   Okay.  And during your contact with Ms. Gerard, did

5         you, in fact, recover any evidence in connection with

6         this stop?

7    A.   Yes.

8    Q.   What did you recover?

9    A.   A plastic Baggie of white crack substance that was in

10        her bra area.

11   Q.   Okay.  And how were you able to recover that?

12   A.   I was starting to pat her down, and she told me that

13        she had it in there.

14   Q.   All right.  So once you were directed to that area,

15        was it actually hid from now your view before you

16        actually located it?

17   A.   Yes.

18   Q.   I want to hand you what I've marked as Government's

19        Exhibit No. 40.  Do you recognize that?

20   A.   Yes, I do.

21   Q.   What is that?

22   A.   That's the plastic bag that I recovered that day.

23   Q.   Okay.  Would you agree with me that it does not

24        appear to be in the same condition as when you first

25        recovered it?

1    A.    Correct.

2    Q.    It's been -- tell us what's different about it.

3    A.    It's been put into another bag, which is handled by

4          the lab.

5    Q.    Okay.  So aside from testing that would have been

6          done at the laboratory, including removing it from

7          the original packaging, is that the same object that

8          he removed from Sasha Gerard?

9    A.    Yes.

10                  MS. MOREHEAD:  Judge, I would ask for

11         admission of Government's Exhibit 40.

12                  THE COURT:  Any objection?  Hearing none,

13         Exhibit 40 is admitted.

14                  (Exhibit 40 was admitted into evidence.)

15   Q.    (By Mr. Calbi) Now I kind of want to jump ahead with

16         you, Detective Greene, in connection with this

17         investigation.  Were you also involved in the

18         sequence of events following the arrest on

19         November 27, 2007, of Monterial Wesley, Thomas

20         Humphrey, and Rtayvian Simpson?

21   A.    Yes.

22   Q.    And were you actually involved in any way in the

23         activity that we have had some testimony about at the

24         car wash?

25   A.    Yes.

```
 1    Q.   What was your involvement there?

 2    A.   I was also assisting with surveillance that day.

 3    Q.   All right.  And following the arrest of those

 4         individuals at the car wash in Missouri, did you have

 5         some subsequent responsibilities in connection with a

 6         search of 3708 Stonewall Court?

 7    A.   Yes.

 8    Q.   And did that occur that same day, November 27 of

 9         2007?

10    A.   Yes.

11              MS. MOREHEAD:  Judge, has Exhibit 70 -- I

12         think it's already been introduced.  I just want to

13         make sure.

14              THE COURT:  Exhibit 70 was introduced

15         through Mr. Jones.

16              MS. MOREHEAD:  Thank you, Judge.

17    Q.   (By Ms. Morehead) I want to show you what I have

18         marked as Government's Exhibit No. 70.  Do you

19         recognize that, Detective Greene?

20    A.   Yes.

21    Q.   And tell us what this is.

22    A.   This is a signed consent to search the address of

23         3708 Stonewall.

24    Q.   Okay.  And in connection with this original consent

25         to search, what was your contact with this particular
```

```
 1        document?

 2   A.   This was provided to me originally by Special Agent

 3        McCue.  It was already signed by one of the occupants

 4        of that address, a Monterial Wesley, and I was

 5        supposed to go to the address and contact Lakisha

 6        Wesley, who had already been contacted, to have her

 7        sign this as well.

 8   Q.   And this consent is for two addresses, 3708 Stonewall

 9        Court and then 932 Leavenworth; is that right?

10   A.   Correct.

11   Q.   Where did you go to make contact with Lakisha Wesley?

12   A.   I went to 3708 Stonewall Court.

13   Q.   With regard to Government's Exhibit 70, I see over

14        here -- we have had some testimony from Officer Jones

15        that this included the consent to search signed by

16        Monterial Wesley at 5:51 on 11:27.  When you received

17        this document, was that information already contained

18        on it?

19   A.   Yes.

20   Q.   Okay.  Over here on the right side of the paper I see

21        some additional writing.  Tell us what that is.

22   A.   That is the signature of Lakisha Wesley as well as

23        TFO Pamela Bennett, who I work with, and she was the

24        witness.  The time of 18:56 is when she signed it.

25   Q.   And is that military time?
```

| | | |
|---|---|---|
| 1 | A. | Yes.  Regular time, it's 6:56 p.m. |
| 2 | Q. | All right.  And so that was about an hour after the |
| 3 | | time that Mr. Wesley would have signed the consent? |
| 4 | A. | Correct. |
| 5 | Q. | In connection with that consent to search, once it |
| 6 | | was signed, did you and other law enforcement |
| 7 | | officers proceed to search 3708 Stonewall Court? |
| 8 | A. | Yes. |
| 9 | Q. | In connection with that did you seize a number of |
| 10 | | items of evidence? |
| 11 | A. | Yes, I did. |
| 12 | Q. | And were there some other law enforcement personnel |
| 13 | | that seized other items of evidence? |
| 14 | A. | Yes. |
| 15 | Q. | One of the things that you seized, did it include |
| 16 | | documents? |
| 17 | A. | Yes. |
| 18 | Q. | And in connection with seizing documents, what are |
| 19 | | some of the things that you look for when you're |
| 20 | | doing a search of a residence? |
| 21 | A. | Any of the, like, bills that show people are living |
| 22 | | there, who the bills are coming to, any other names |
| 23 | | that might be involved in the case that we're |
| 24 | | familiar with, phone numbers, showing whether bills |
| 25 | | are either paid in cash or paid in check, if they |

1       have been paid.

2   Q.   Okay.  And financial documents, just any

3        miscellaneous documents that might be important?

4   A.   Yes.

5   Q.   Okay.  Now, were there a number of documents that you

6        seized?

7   A.   Yes.

8   Q.   I want to hand you two envelopes and just ask you if

9        you can identify the two envelopes first.

10  A.   Yes.

11  Q.   And how do you identify these envelopes?

12  A.   Because I mark that I acquired them, and that's my

13       writing with the address and the date that I acquired

14       it.

15  Q.   Okay.  And that's on both envelopes then?

16  A.   Correct.

17  Q.   And does this envelope tell us where you acquired

18       these particular documents?

19  A.   Yes, it does.

20  Q.   Where is that at?

21  A.   It's in the upper left-hand corner.

22  Q.   All right.  I'm going to open up the first group of

23       documents, and just for the record just tell us what

24       documents are contained in the first envelope.

25              THE COURT:  Which exhibit number is this?

```
1          MS. MOREHEAD:  Judge, I'm not going to

2     introduce all these documents.  I was going to have

3     her say what generally the documents are, and then

4     I'm going to specifically mention a few of those by

5     exhibit numbers.

6          THE COURT:  All right.  As long as it's not

7     too specific.

8          MS. MOREHEAD:  No.

9   Q.  (By Ms. Morehead) I don't want to be too specific.

10    Tell us generally what's in there.

11  A.  Repair order for a motorcycle, a Sprint phone bill.

12    I believe this is just mail from a mortgage company

13    for their house payment, insurance information on

14    vehicles.

15  Q.  Okay.  And so just miscellaneous documents?

16  A.  Yes.

17  Q.  All right.  Looking on this document, where is it

18    that you recovered these items from?

19  A.  Those were from the briefcase located in the master

20    bedroom.

21  Q.  Okay.  And were you able to determine how many

22    occupants were living at this house?

23  A.  Yes.

24  Q.  Who did you acquire that information from?

25  A.  Lakisha.
```

1    Q.   And how many different rooms were in this house?

2    A.   I know there was three upstairs, and I don't know --

3         I can't remember on the basement.

4    Q.   Three bedrooms upstairs?

5    A.   Yes.

6    Q.   And did there appear to be people living in any of

7         those -- how many of those bedrooms -- let me ask you

8         this -- did it appear someone was living there?

9    A.   It appeared someone was living in all of them.

10   Q.   Government's Exhibit 72, did you identify this as a

11        repair order for a motorcycle?

12   A.   Yes.

13              MS. MOREHEAD:  Judge, I would ask for

14        admission of Government Exhibit No. 72.

15              THE COURT:  Any objection?  Hearing none,

16        Exhibit 72 is admitted.

17              (Exhibit 72 was admitted into evidence.)

18   Q.   (By Ms. Morehead) Tell us what this is, if you would,

19        again now that it's displayed, Detective Greene.

20   A.   It's an invoice for a repair order for Worth Harley

21        Davidson.

22   Q.   And does this have some dates on it of when this

23        activity occurred?

24   A.   Yes.

25   Q.   What's the invoice date?

1283

1   A.   8/23 of '07.

2   Q.   Okay.  And who does it associate to?

3   A.   Monterial Wesley.

4   Q.   And is there a phone number associated with Monterial

5        Wesley on that work order?

6   A.   Yes.

7   Q.   Tell the jury, if you would, what that is.

8   A.   That is our target telephone that we were monitoring.

9   Q.   What target phone number was that?

10  A.   (913)290-0955.

11  Q.   Looking on the chart behind you, was that, in fact,

12       Target Phone No. 3?

13  A.   Yes, ma'am.

14  Q.   Okay.  And this invoice, was there an amount of work

15       that was done with regards to this particular

16       motorcycle per this invoice?

17  A.   Yes.

18  Q.   And what was that total amount?

19  A.   $2,897.36.

20  Q.   Okay.  And was there an indication -- it appears

21       there had been a deposit posted before?

22  A.   Correct.

23  Q.   And was there an indication of how that was paid for?

24  A.   Yes.

25  Q.   And how?

1    A.    Cash.

2    Q.    And what was that amount?

3    A.    $2640.

4    Q.    And then this second envelope, just tell us generally

5          what document you seized in connection with that

6          envelope.

7    A.    Western Union receipts, looks like a water bill from

8          the water department, real estate tax stuff, some

9          phone numbers and addresses, AT&T phone bill, some

10         more Western Union receipts, a deposit at a bank,

11         deposit slip, some old check registers, and a title

12         for a vehicle.

13   Q.    Okay.  Were there a lot of other documents besides

14         these ones we're talking about today that were

15         actually seized that day, Detective Greene?

16   A.    Yes, yes.

17   Q.    And per the envelope where were these documents

18         seized from?

19   A.    The master bedroom in the dresser.

20               MS. MOREHEAD:  Judge, I'm going to mark the

21         whole envelope as Government's Exhibit 330.  I would

22         ask for admission of those items.

23               THE COURT:  Any objection?  Exhibit 330 is

24         admitted.

25

```
 1              (Exhibit 330 was admitted into evidence.)

 2   Q.   (By Ms. Morehead) I want to talk about a few of these

 3        items specifically, Detective Greene.  First of all,

 4        Government's Exhibit 74, was this one of the

 5        documents you seized?

 6   A.   Yes.

 7   Q.   What is this?

 8   A.   It's a Western Union receipt.

 9   Q.   What's the date on it?

10   A.   11/10 of '07.

11   Q.   And what does this appear to be a Western Union

12        receipt for?

13   A.   It appears the sender, Kisha Wesley, is sending it to

14        City Residential Lending.

15   Q.   And what was the total amount of the transaction that

16        was done on this date?

17              MR. CALBI:  Judge, I'm going to object.

18        The document speaks for itself.  The witness is just

19        reading what's on the piece of paper, and I believe

20        it's superfluous.

21              THE COURT:  Overruled.

22   Q.   (By Ms. Morehead) Go ahead.

23   A.   1,622.95.

24   Q.   And Government's Exhibit 73, what does this show?

25   A.   This is a Water Works Department, looks like a
```

1286

1    receipt for a bill.

2    Q.   And what address is that for?

3    A.   932 Cherokee.

4    Q.   What were the dates of service for that water bill?

5    A.   10/4 of '07 to 1/18 of '07.

6    Q.   Who was the recipient of this particular document?

7    A.   Monterial Wesley.

8    Q.   Okay.  Another document in the ones that you just

9         mentioned in Government's Exhibit No. 330, what's

10        this?

11   A.   It's some type of bill from KCI.

12   Q.   Who is that addressed to?

13   A.   Antwon Simpson.

14   Q.   And what address?

15   A.   932 Cherokee.

16   Q.   Then this particular document that you mentioned.

17        And tell us what this is.

18   A.   That is a phone number, addresses, and it looks like

19        an email address.

20   Q.   And is there any name on that that appears to be

21        significant for the purposes of this investigation to

22        you?

23   A.   Yes.

24   Q.   Who is that?

25   A.   Shevel Foy.

1    Q.   And with an address in Independence, Missouri?

2    A.   Yes.

3    Q.   And what sort of information -- I don't want you to

4         tell us specifically what that information is, but

5         what sort of information is on this document?

6    A.   Oh, there's a password, information on a password.

7    Q.   Does that appear to be connected to some sort of

8         computer?

9    A.   Correct.

10   Q.   Like email or something, I don't know, some password

11        though that you would need to access something?

12   A.   Correct.

13   Q.   And looking -- turning that around, what's this that

14        we see right here?

15   A.   It looks like his email address.

16   Q.   Which is what?

17   A.   Mr.Foys@yahoo.com.

18   Q.   Is there another location below that?

19   A.   Yes.

20   Q.   What is that?

21   A.   Honestly, I can't understand that.

22   Q.   In addition to seizing various documents from that

23        location, were there several vehicles that were also

24        seized from that location?

25   A.   I just know of a motorcycle that was seized.

1288

1    MS. MOREHEAD:  Judge, I would ask for

2    admission of Government's Exhibit 71.

3    THE COURT:  Is there any objection?

4    Hearing none, Exhibit 71 is admitted.

5    (Exhibit 71 was admitted into evidence.)

6  Q.  (By Ms. Morehead) Looking at Government's Exhibit 71,

7    Detective Greene, what's that?

8  A.  That's the 1999 Harley Davidson that was in the

9    garage of the residence.

10  Q.  Okay.  And what color is that?

11  A.  Bluish purple.

12    MS. MOREHEAD:  That's all I have, Judge.

13    THE COURT:  All right.  Is there any cross

14    examination?  Mr. Calbi?

15    MR. CALBI:  Thank you, your Honor.

16    CROSS EXAMINATION

17  BY MR. CALBI:

18  Q.  Detective, I want to turn your attention to

19    November 27 of 2007.  I believe you said you took

20    part in a surveillance at the car wash?

21  A.  Yes.

22  Q.  What role did you play there?

23  A.  I assisted with surveillance.

24  Q.  Where were you located, I guess -- were you located

25    at the car wash?

```
 1    A.    Yes.

 2    Q.    Where were you located at?

 3    A.    I don't recall which area of the car wash, sir.

 4    Q.    Okay.  When -- do you recall Mr. Humphrey's vehicle

 5          being in a car wash bay?

 6    A.    Yes.

 7    Q.    And then Mr. Wesley's vehicle pulled up in front of

 8          Mr. Humphrey's vehicle?

 9    A.    Correct.

10    Q.    So where were you in relation to those two vehicles?

11    A.    Somewhere behind them.

12    Q.    Well, were you behind Mr. Humphrey's, or were you

13          behind Mr. Wesley's?

14    A.    I don't know, sir.

15    Q.    So you don't recall?

16    A.    No, sir.

17    Q.    Okay.  Do you recall Mr. Wesley getting out of his

18          vehicle and approaching Mr. Humphrey?

19    A.    No, sir.

20    Q.    Is there anything that you recall from the car wash

21          other than just being there?

22    A.    No, sir.

23    Q.    And Government's Exhibit 72 just shows that cash was

24          tendered to pay for repairs on the motorcycle;

25          correct?
```

1    A.   Correct.

2    Q.   It doesn't say who tendered the cash; correct?

3    A.   Correct.

4    Q.   So we don't know who tendered the cash on that day;

5         we just know the motorcycle repairs were paid for in

6         cash.

7    A.   Correct.

8                   MR. CALBI:   I have nothing further.

9                   THE COURT:   Any further cross examination?

10        Mr. Rogers?

11                  MR. ROGERS:   Thank you, your Honor.

12                   CROSS EXAMINATION

13   BY MR. ROGERS:

14   Q.   Detective Greene, your purpose in going to the area

15        of the car wash on November 27 was to assist in the

16        surveillance; right?

17   A.   Correct.

18   Q.   And surveillance means watching to see what happens;

19        right?

20   A.   Correct.

21   Q.   And were you equipped with a camera or --

22   A.   No, sir.

23   Q.   Were you riding with somebody else in the same

24        vehicle?

25   A.   I don't recall, sir.

1    Q.    Okay.  And your purpose in being there was to watch,

2          though, and see what happened?

3    A.    Correct.

4    Q.    And that, you will agree, was kind of the crowning

5          moment of this months-long investigation?

6    A.    Correct.

7    Q.    A very significant event certainly in the course of

8          this investigation?

9    A.    Correct.

10   Q.    And you had been involved in this investigation for

11         several months yourself?

12   A.    [Nodded head.]  Correct.

13   Q.    Okay.  She can't take down a nod, so I have to ask on

14         that.  Okay?  And yet you don't now remember what you

15         saw?

16   A.    No, sir.  If I don't have a report, I'm not going to

17         remember.

18   Q.    Okay.  So you would agree that it's very important to

19         write a report about these things contemporaneously?

20   A.    Sure.

21   Q.    And you weren't asked to write a report about that;

22         you were sent off to Leavenworth to seize documents?

23   A.    Correct.

24   Q.    At the scene of the arrest, at the car wash, after

25         the arrest took place -- did you take part in the

1       arrest itself?

2   A.  No.  I was there at the very end of it.

3   Q.  Okay.  Did you get out of your car?

4   A.  Yes, sir.

5   Q.  Did you approach any of the individuals who had been

6       arrested?

7   A.  No, sir.

8   Q.  Did you conduct any inspection of either the vehicle

9       driven there by Mr. Humphrey or the vehicle driven

10      there by Mr. Simpson?

11  A.  No, sir.

12  Q.  And did you recover any items of physical evidence?

13  A.  No, sir.

14  Q.  And at the time that the arrest took place, was your

15      vehicle in close proximity to either of the suspect

16      vehicles?

17  A.  I don't believe so.

18  Q.  Okay.  So you're not the person who pulled up right

19      behind Mr. Wesley's vehicle?

20  A.  No, sir.

21              MR. ROGERS:  That's all the questions I

22      have.

23              THE COURT:  Any further cross examination

24      by anyone?  Hearing none, any redirect?

25              MS. MOREHEAD:  Nothing based on that.

1           THE COURT:  Hearing none, Ms. Greene, you

2      may step down, and without objection you are excused.

3           The government may call its next witness.

4           MS. MOREHEAD:  Thank you, your Honor.  I

5      call Detective Brad Slaybaugh.

6                BRADLEY SLAYBAUGH,

7   having been duly sworn, was examined and testified as

8   follows:

9                DIRECT EXAMINATION

10  BY MS. MOREHEAD:

11  Q.   Please state your name for the record.

12  A.   Bradley Slaybaugh.

13  Q.   Where are you employed?

14  A.   City of Independence Missouri Police Department.

15  Q.   And how long have you been so employed?

16  A.   A little over 24 years.

17  Q.   And what's your current rank with the department?

18  A.   I'm a detective.

19  Q.   And tell us, Detective Slaybaugh, just kind of give

20       us a brief overview of your 24-year career with the

21       Independence Police Department.

22  A.   I spent time in the patrol division, was a field

23       training officer; I made it to detective in the

24       special operations unit.  We was responsible for drug

25       investigations and tactical situations.  I was a

```
 1              detective in the drug enforcement unit within the

 2              department assigned to Drug Enforcement

 3              Administration as a task force officer for a little

 4              over six years, and back to the Independence drug

 5              unit, and now I'm in general crimes within the

 6              investigations unit assigned to investigating

 7              assaults.

 8      Q.    And in connection with your duties and

 9              responsibilities with the Independence Police

10              Department, did you have occasion to be involved in

11              an incident that occurred on -- investigating an

12              incident that occurred on October 17 of 2007?

13      A.    Yes, I did.

14      Q.    And involving an individual named Shevel Foy?

15      A.    Yes, that's correct.

16      Q.    Tell the jury, if you would, Detective Slaybaugh, how

17              you became -- you and the Independence police became

18              involved in that situation.

19      A.    I believe we -- our patrol officers responded out on

20              an alarm call to an address on Elizabeth in eastern

21              Independence, and upon our patrol officers arriving

22              there, they contacted Mr. Foy and, I believe, his

23              wife, and they was reporting that someone had kicked

24              in their front door and had fired shots inside their

25              residence at them.
```

```
1   Q.   All right.  Do you recall what time law enforcement

2        were first dispatched to that location?

3   A.   I believe it is somewhere after 11:30 p.m. at night.

4        I could review my report and get an exact time.

5   Q.   Sure.  Would that help refresh your recollection?

6   A.   It would.

7   Q.   Okay.

8   A.   It would have been 11:03 p.m.

9   Q.   All right.  Now, you indicated this came out as a

10       alarm call.  Can you tell the jury what that kind of

11       a call is.

12  A.   There's a lot of different alarm calls.  A lot of

13       residences have panic alarm -- intrusion alarms where

14       they will go in to an alarm company, who monitors

15       those alarms, and they will notify our dispatchers,

16       who will in turn send police out to the residence to

17       check it.

18  Q.   All right.  And at any point in time during this

19       episode did this come in as a 911 call?

20  A.   Not that I'm aware of, no.

21  Q.   Okay.  And once the initial officers got there and

22       seized the situation, how did you become involved?

23  A.   We were notified by patrol officers of the shooting

24       there, who notified us to respond out to conduct a

25       follow-up investigation on the shooting.
```

```
1    Q.   Do you remember about when you got there, Detective

2         Slaybaugh?

3    A.   Again, I believe it was about a quarter 'til 12.

4    Q.   Okay.

5    A.   Roughly.

6    Q.   I'm sorry.  And you said this was a Elizabeth.  What

7         was the exact address that you responded to?

8    A.   It was 1104 North Elizabeth, Independence, Missouri.

9    Q.   Okay.  And when you arrived, Detective Slaybaugh,

10        what do you recall about that particular scene?

11   A.   When I got there, I recall there had been pieces of

12        the front door laying on the front steps.  The front

13        door had obviously been kicked inward.  There was a

14        bullet hole through the front door, right above it.

15        There was an empty shell casing inside the threshold,

16        the front steps.  It was kind of a split-level house.

17        When you came up to the front porch, you would go up

18        one landing, and then it turned 90 degrees to go up

19        into the living room of the residence, and if you

20        went down the steps, it would also go down into a

21        basement, and on one of the landings there was an

22        empty shell casing there.  There was an apparent

23        bullet hole in the hallway of the house, and there

24        was another one going through the back of the living

25        room.  It went through a window and out across the
```

```
 1        porch.

 2   Q.   And when you arrived at that scene, did you make any

 3        observations about any occupants at that location?

 4   A.   Upon my arrival there was two subjects setting in, I

 5        believe it was a Chevy Tahoe, in the driveway, and

 6        one of the occupants of that Tahoe was pointed out to

 7        me to be the victim, Shevel Foy, and at that point is

 8        when I contacted Mr. Foy, and I conducted an

 9        interview of him inside my car in the driveway.

10   Q.   Now, you indicated that Shevel Foy when you first got

11        there was in a Chevy Tahoe?

12   A.   It was a larger Blazer style --

13   Q.   Okay.  And was he the only occupant of that vehicle?

14   A.   No.

15   Q.   What observations did you make?

16   A.   There was another black male that was with him in

17        that vehicle.

18   Q.   Okay.  And can you describe your observations of Mr.

19        Foy when you first encountered him, Detective

20        Slaybaugh.

21   A.   He was very calm, appeared to be composed for

22        something of that happening.  I thought he was very

23        composed.

24   Q.   Did you find that in any way to be normal or unusual?

25        What did you -- what did you think at that point?
```

1   A.   I thought it was unusual due to the circumstances

2        that somebody just kicked in his front door, fired

3        shots at him down a hallway with his wife and kids in

4        the residence.  I thought he was very calm and

5        composed for that occurring.

6   Q.   Okay.  And Shevel Foy, the individual that you came

7        into contact with -- Government's Exhibit 275 -- and

8        you'll see that on your monitor there to your right.

9        Do you recognize that individual?

10  A.   Yes, I do.

11  Q.   And who is that?

12  A.   That's Mr. Foy, who I spoke with that night.

13  Q.   All right.  And you mentioned that in connection with

14       this incident Mr. Foy's wife was also present during

15       this incident?

16  A.   Yes, that's correct.

17  Q.   Did you ascertain her name?

18  A.   I didn't -- I didn't conduct the interview with her.

19       I believe it was Kecia or something similar to that.

20  Q.   Lakecia?

21  A.   Lakecia, yes.

22  Q.   And you mentioned -- I think you said children, but

23       what other individuals were present during this

24       particular episode there on October 17, 2007, at 1104

25       North Elizabeth?

```
1    A.   It was reported that their children were in their

2         bedrooms at the time.  I believe by the time I

3         arrived they had been taken from the residence by

4         friends or relatives.

5    Q.   Could you refer to your report and just see if there

6         are any notations about the identity of children on

7         that?

8    A.   Looks like they are -- small child, Aniyah.

9    Q.   Could you pronounce that -- or spell it for me, I

10        mean?

11   A.   A-N-I-Y-A-H, as in Henry.

12   Q.   Might that be pronounced Aniyah or Aniyah?

13   A.   Yes, that would probably be correct.

14   Q.   Okay.  And that's Aniyah Foy then?

15   A.   Yes.

16   Q.   Okay.  And was that -- was that a young child then?

17   A.   Yes.

18   Q.   And in talking to Mr. Foy, did he describe to you

19        what had transpired during this apparent home

20        invasion?

21   A.   He stated he had been asleep in the master bedroom

22        with his wife.  He woke to the alarm going off and

23        his wife shaking him.  He got up, went down the

24        hallway, observed the intruder coming up the steps,

25        and he observed the intruder shoot at him as he was
```

1    coming down the hallway, and he said the intruded

2    then turned around and left the residence.  He

3    watched him through an upper window, where the

4    intruder ran outside to a car that was parked in the

5    street out in front of the house.  The intruder

6    turned around, fired an additional shot towards the

7    house, and then got in the car, which was being

8    driven by another male, and the car left eastbound on

9    Elizabeth Street.

10   Q.   Did Mr. Foy describe when the intruder came into the

11        house any statements that would have been made by the

12        intruder?

13   A.   He said the intruder was yelling, get down, get down,

14        police, get down.

15   Q.   All right.  And in connection then with this episode,

16        did Mr. Foy give you any sort of description of

17        either the suspect or the vehicle?

18   A.   He did both, I believe.  I believe he said it was a

19        black male.  I believe he said he was approximately

20        5'11", 170 pounds, and that he believed it was a

21        black Monte Carlo that he got into.

22   Q.   Okay.  And when you are out at a scene like this

23        investigating a crime, once you talk to the purported

24        victims of the crime, do you do anything by way of --

25        you know, what do you do as far as -- do you give

```
 1            them your name and your phone number and that sort of

 2            thing?

 3   A.   Yes, we do.  We will give them a report number,

 4            usually our names, phone numbers, and we will check

 5            with any of the neighbors, trying to locate

 6            additional witnesses to the crime.

 7   Q.   Okay.  And with regards to Mr. Foy, I assume you did

 8            that, you gave him your name and your phone number?

 9   A.   That's correct, yes.

10   Q.   And is part of -- why do you do that?  Why do you

11            give somebody that's a victim of a crime your name

12            and your phone number?

13   A.   Usually they will recall or -- they will run into

14            friends or family or they will recall things later

15            on, or just to give them an outlet to check back to

16            see the status of the case.

17   Q.   Okay.  And so if, in fact, someone were to have

18            additional information they wanted to provide to the

19            police about a certain event, you've given them your

20            phone number and your name, and they would be able to

21            do that?

22   A.   Yes.

23   Q.   And with regards to this particular incident, did Mr.

24            Foy, or anyone else for that matter, ever contact you

25            after this incident and tell you, hey, I think we
```

```
 1        know who did this, and provide you with additional
 2        information?
 3   A.   No.
 4   Q.   After this incident did you have any further contact
 5        with Shevel Foy?
 6   A.   No, I did not.
 7               MS. MOREHEAD:  Judge, I would like to play
 8        Government's Exhibit 249, and I would like to start
 9        at the one-minute-and-two-second mark.
10               THE COURT:  Is there any objection?
11               MR. SANDAGE:  I would like to approach,
12        your Honor.
13               THE COURT:  All right.
14               (Counsel approached the bench and the
15        following proceedings were had:)
16               THE COURT:  What is the purpose of the
17        request?
18               MS. MOREHEAD:  Judge, the purpose is
19        two-fold.  Number one, the approximately -- and it's
20        about a minute, I think, that I want to play.  It's
21        the phone call where Mr. Foy calls Mr. Wesley and
22        specifically articulates what has transpired, which,
23        again, specifically coincides with Detective
24        Slaybaugh's testimony that Mr. Foy provided, and it's
25        also to have him identify whether, in fact, the
```

1    participant of that phone call, Mr. Foy, if that's

2    the same voice that he recalls talking to, whether he

3    talked to Mr. Foy.

4              THE COURT:  Mr. Sandage?

5              MR. SANDAGE:  Your Honor, I would ask that

6    we use the same procedures we used with Mr. Johnson

7    in that regard.  I believe this is another one of

8    these blind recordings where we don't know how he's

9    going to do it, and I would ask that, now that

10   everybody knows what he's testifying about, that he

11   be given the same audio again to identify.

12             THE COURT:  I would say this, that as to

13   playing it for the first purpose that you

14   articulated, I would not permit that as being

15   basically argument to show that his testimony was

16   consistent with the phone call.  That's something you

17   can do in argument.

18        As to voice identification, I believe that that

19   call would be too suggestive to be reliable voice

20   identification.  If you do want to see if this

21   witness can through some random process like we went

22   through this morning, identify Mr. Foy's voice on a

23   less suggestive call, I would consider what concerns

24   Mr. Foy's counsel might have about that, but that

25   would seem more reasonable.

1          MS. MOREHEAD:  Judge, I would ask you to

2     refer to 249 yourself, if you wouldn't mind.

3          THE COURT:  Okay.

4          MS. MOREHEAD:  And just look at those

5     details at about a minute on and see if that

6     satisfies the court.

7          THE COURT:  That is a whole nother basis on

8     which the authentication of Mr. Foy's voice might be

9     available.  In other words, I understand a

10    circumstantial argument for that process, but without

11    you having submitted to me any legal authority about

12    how I might evaluate that in this context with a

13    voice situation, I'm not prepared -- as I sit here

14    right now, I remember the details of the call, but in

15    my own mind I think there's a strong circumstantial

16    argument to be made that -- also with Mr. Jones'

17    testimony about what was seen on the pole camera,

18    that one could draw a pretty darn good likelihood

19    that this was Mr. Foy.  But I'm not prepared to make

20    a definitive ruling at this juncture because nobody's

21    presented me any authority about the extent to which

22    901(4), I think it is, might be applicable in this

23    context in that particular way.  So, frankly, you

24    need to take your chances or do what I suggested.

25         Mr. Sandage, I assume Mr. Foy continues to take

1    the position --

2              MR. SANDAGE:  Absolutely, your Honor.  Why

3    would we give up now?

4              MS. MOREHEAD:  Judge, I'm mindful of the

5    fact that it's clearly the jury's job to decide

6    whether --

7              THE COURT:  Good question.

8              MS. MOREHEAD:  -- we have proven beyond a

9    reasonable doubt, and I don't think for the purposes

10   of admissibility that the court requires that level

11   of proof.

12             THE COURT:  I don't, I don't.  But, look,

13   if you look at Rule 901 on authentication, it isn't

14   clear to me that in this particular context this is

15   an appropriate way to do it.  It may well be, but,

16   frankly, in other cases I've had with phone calls,

17   that's not how it's been authenticated.  So be it.

18   But I'm prepared to have people send me authority if

19   they want to, and I'm prepared to get it as we speak

20   from the offices of my learned law clerk.

21             MS. MOREHEAD:  That's fine.  My next

22   witness will be fine on that issue.

23             MR. BELLEMERE:  To my way of thinking, this

24   is solely for the purpose of one thing, and that is

25   to show violence.

```
 1              THE COURT:  I've already said we can't do
 2    this call.  I've already said that we can't do this
 3    call.
 4              MR. BELLEMERE:  I actually go beyond that
 5    and say it seems to me that all the defendants are
 6    cloaked with something now that's happened to Mr.
 7    Foy, and we don't know exactly what the cause of that
 8    is, whether it's allegedly because of his
 9    surreptitious activity --
10              THE COURT:  What relief are you seeking?
11              MR. BELLEMERE:  I think the prejudicial
12    effect of this entire line of testimony outweighs the
13    probative value.
14              THE COURT:  I totally disagree.  Because of
15    the entirety of the issue of the identification of
16    Mr. Foy and the establishment of the conspiracy,
17    which affects all of the defendants, I think the
18    probative value is extremely high because of the way
19    in which this particular event unfolds, and it also
20    spins off as to why Ms. Temple did what she did, why
21    Mr. Wesley did what he did, why there were
22    conversations that went on.  I think this is an
23    integral event to proving the entire case as this has
24    developed.  To the extent that anybody thinks that
25    there should be a limiting instruction about not
```

1       holding it against anybody else that Mr. Foy got shot

2       at, I don't know, but I totally disagree about the

3       probative value of this particular sequence.

4                    (The proceedings returned to open court.)

5                    MS. MOREHEAD:  Judge, I don't have any

6       further questions of Detective Slaybaugh.

7                    THE COURT:  All right.  Any cross

8       examination?  Mr. Calbi?

9                    MR. CALBI:  I have none, your Honor.

10                   THE COURT:  Mr. Rogers?

11                   MR. ROGERS:  No, your Honor.  Thank you.

12                   THE COURT:  Mr. Sandage?

13                   MR. SANDAGE:  Briefly.

14                        CROSS EXAMINATION

15      BY MR. SANDAGE:

16      Q.   Good afternoon, Detective Slaybaugh.  I represent

17           Shevel Foy.  How long was it after the break that you

18           arrived at the scene?

19      A.   It would have been approximately 45 minutes.

20      Q.   And it was your testimony on direct examination that

21           when you arrived at the scene Mr. Foy was calm?

22      A.   Yes.

23      Q.   So he had 45 minutes to calm down; correct?

24      A.   Yes.

25      Q.   And sometimes when you arrive at the scene it's more

| | | |
|---|---|---|
| 1 | | in close proximity to the actual event; is that |
| 2 | | correct? |
| 3 | A. | That's correct, yes. |
| 4 | Q. | And at that time sometimes people involved in a break |
| 5 | | in might be more upset at the beginning and calm down |
| 6 | | over a period of time; is that correct? |
| 7 | A. | Yes. |
| 8 | Q. | And, in fact, in this case law enforcement, a patrol |
| 9 | | officer, had already arrived; is that correct? |
| 10 | A. | Yes. |
| 11 | Q. | And had talked to -- I presume talked to Mr. Foy and |
| 12 | | Ms. Foy about the incident; correct? |
| 13 | A. | Yes. |
| 14 | Q. | And finally it's not unusual -- I think you said it |
| 15 | | was unusual that people are calm in that incident, is |
| 16 | | that correct, in those instances; correct? |
| 17 | A. | Well, they usually have a level of excitement to |
| 18 | | them. |
| 19 | Q. | But you've seen it the other way.  You've seen it |
| 20 | | consistent with the way Mr. Foy was that evening; is |
| 21 | | that correct? |
| 22 | A. | I suppose, yes, it could be. |
| 23 | Q. | Was the other gentleman in the car, was he in an |
| 24 | | agitated state? |
| 25 | A. | I never spoke to him, and I -- he was never |

```
1          identified to my knowledge.

2     Q.   What about Mrs. Foy?  Was she in an agitated state?

3     A.   No.  I would say that she was cooperative with us.

4          She assisted us in, you know, going through, looking

5          for evidence in the residence.

6     Q.   And on that front Mr. Foy was equally cooperative; is

7          that correct?

8     A.   Yes.

9     Q.   And they allowed you into the residence; is that

10         correct?

11    A.   Yes, they did.

12    Q.   And you were able to conduct your investigation; is

13         that correct?

14    A.   Yes.

15    Q.   And they could have told you they didn't want you to

16         come in; is that correct?

17    A.   Yes, it is.

18    Q.   And then if you wanted to search that residence after

19         that you would have had to have obtained a search

20         warrant to do that; is that correct?

21    A.   That's correct.

22    Q.   But they didn't require any of that; they allowed you

23         into the residence; is that correct?

24    A.   Yes.

25    Q.   All right.
```

1            MR. SANDAGE:  I have nothing further, your

2       Honor.

3            THE COURT:  Very well.  Anything further

4       from any other counsel?  All right.  Ms. Morehead,

5       redirect?

6            MS. MOREHEAD:  Yes, Judge.

7                     REDIRECT EXAMINATION

8   BY MS. MOREHEAD:

9   Q.  Detective Slaybaugh, did you do a full, extensive

10      search of the Foy residence?

11  A.  No, we did not.

12  Q.  Would that have included looking in any closets?

13  A.  We did not look in any closets.

14  Q.  Did you look for any money or drugs in that

15      residence?

16  A.  No.

17            MS. MOREHEAD:  Judge, that's all I have.

18            THE COURT:  Mr. Sandage?

19            MR. SANDAGE:  Nothing, your Honor.

20            THE COURT:  Mr. Slaybaugh, you may step

21      down, and without objection you are excused, and the

22      government may call its next witness.

23            MS. MOREHEAD:  Thank you, your Honor.  I

24      call Loran Freeman to the stand.

25

```
 1                         LORAN FREEMAN,

 2     having been duly sworn, was examined and testified as

 3     follows:

 4                       DIRECT EXAMINATION

 5     BY MS. MOREHEAD:

 6     Q.    Please tell the jury where you're employed.

 7     A.    I'm a police officer with the Independence Police

 8           Department Career Criminal Unit.

 9     Q.    How long have you been employed with the Independence

10           Police Department?

11     A.    Since May of 2001.

12     Q.    Relate to the jury, if you would, your work history

13           with the Independence Police Department.

14     A.    I have been assigned to the patrol division, served

15           in patrol for about three years.  I took an

16           assignment with a directed patrol division, kind of a

17           proactive patrol division, for a few years, and then

18           transferred to the DEA Task Force under the drug

19           enforcement unit.

20     Q.    And how long were you a task force officer with DEA?

21     A.    Approximately 2½ years.

22     Q.    And in connection with your duties and

23           responsibilities while you were at DEA, did that

24           parallel duties and functions that Task Force Officer

25           Jones and Task Force Officer Leigh Ann Greene, same
```

```
 1            kind of thing they would be doing along with agents

 2            from the DEA?

 3    A.      Yes.

 4    Q.      Detective Freeman, in connection with the

 5            investigation that you're here to testify about in

 6            this case, tell the jury just generally what your

 7            involvement or participation in the investigation

 8            consisted of.

 9    A.      My responsibilities varied from monitoring phone

10            calls in the Title III phone intercept room to

11            surveillance in the field to other

12            enforcement-related activities pertinent to the case.

13    Q.      And you indicated one of the things you did was

14            monitor phone calls?

15    A.      That's correct.

16    Q.      And we have had some testimony about calls coming in

17            and then agents listening to them and then having

18            occasion to transcribe them?

19    A.      Yes.

20    Q.      Did you -- or officers.  Did you do those functions?

21    A.      Yes, I did.

22    Q.      How much time do you think you spent in the wire

23            room?

24    A.      Ballpark figure, 200 hours.  It was a fairly lengthy

25            investigation.  I know I put a lot of overtime in as
```

1    well.

2  Q.    And in connection with that did you have an

3        opportunity to listen to numerous individuals who

4        were ultimately indicted in this case in connection

5        with those phone calls?

6  A.    Yes.

7  Q.    And with regards to some of them, some of those

8        individuals that you monitored phone calls with, or

9        on, during the wiretap monitoring the phone calls,

10       did you have occasion to have subsequent contact with

11       a number of those individuals as well?

12 A.    Yes, I did.

13 Q.    All right.  Also, in addition to monitoring phone

14       calls, did you also occasionally participate in

15       surveillance?

16 A.    Yes, on several occasions.

17 Q.    Did one of those incidents of surveillance occur on

18       August 20 of 2007?

19 A.    Yes, ma'am.

20 Q.    And in connection with that surveillance, what was

21       your involvement on that day concerning surveillance?

22 A.    Myself and several other agents and officers with

23       varying agencies who were participating in the

24       investigation were requested to respond to the city

25       limits of Leavenworth, Kansas, to establish

```
 1              surveillance in a couple different locations in

 2              anticipation of a potential narcotics-related

 3              transaction between different members -- I'm sorry,

 4              between different persons of interest in the

 5              investigation.

 6     Q.       Did part of that surveillance include surveillance of

 7              an individual named James Heags?

 8     A.       Yes, ma'am.

 9     Q.       In Leavenworth?

10     A.       Yes.

11     Q.       Tell us what observations you made on August 20 of

12              2007 concerning Mr. Heags.

13     A.       In referring to my surveillance report from that

14              date, at approximately 2:15 in the afternoon we --

15              I'm sorry, approximately 2:00 in the afternoon we had

16              established surveillance in the area of a residence

17              at 610 Oak Street, Leavenworth, Kansas.

18     Q.       In connection -- you're referring to a report.  Is

19              that a report you made shortly after the surveillance

20              that you did in this particular case?

21     A.       Yes.

22     Q.       And does that particular report help refresh your

23              recollection about specific times or specific

24              locations that you would have done -- participated in

25              surveillance on that day?
```

```
 1    A.   Yes.

 2    Q.   After seeing the initial observations then during the

 3         course of surveillance, what happened with regards to

 4         Mr. Heags?

 5    A.   At approximately 2:15 a light-colored -- gold- or

 6         silver-colored four-door Cadillac was observed parked

 7         in front of the residence, which was positively

 8         identified by another agent who was working with me

 9         as a vehicle that he recognized as belonging to or

10         being commonly operated by Mr. Heags.

11    Q.   All right.  And so with that information did that

12         cause you to kind of pay attention to that particular

13         vehicle?

14    A.   Yes.

15    Q.   And what did you do -- what observations did you make

16         with regards to that vehicle?

17    A.   We maintained surveillance of that vehicle until

18         approximately 2:55 in the afternoon, when we observed

19         a black male, later identified as Mr. Heags, exiting

20         the residence, walking to the vehicle, carrying

21         multiple black plastic trash bags, like household

22         trash bags, that seemed to be relatively full to the

23         vehicle and then placing in them in the back seat.

24    Q.   What did you observe with regards to Mr. Heags and

25         the trash bags that you just mentioned?
```

```
 1   A.   We observed him, you know, again, hand-carry the bags
 2        to the vehicle, secure them in the back passenger
 3        compartment area of the vehicle, and then drive from
 4        the residence to an alleyway located behind Car
 5        Quest, which is an auto parts store in Leavenworth,
 6        located at 708 Delaware.  He pulled to the rear of
 7        the business, an alleyway, parked near a trash
 8        Dumpster, which appeared to be owned or at least
 9        privately shared between that business and other
10        businesses, removed the trash bags from the vehicle,
11        and then place them in the Dumpster.
12   Q.   All right.  And then did Mr. Heags depart the area?
13   A.   He did.
14   Q.   Once he had departed the area, what did you do with
15        regards to the observations that you had made with
16        regards to the trash bags?
17   A.   When we were confident Mr. Heags was well away from
18        the area by maintaining -- and also maintaining
19        visual contact with the Dumpster to verify that
20        nobody else approached the Dumpster, placed anything
21        in it or took anything out, we approached the
22        Dumpster, recovered the bags, and then delivered them
23        to a secure area in the Leavenworth -- in the city of
24        Leavenworth.
25   Q.   Okay.
```

1    A.    And examined the contents.

2    Q.    Okay.  And do you recall anything about the contents

3          of the items that you observed in the trash -- two

4          trash bags then?

5    A.    Yes, yes, I do.

6    Q.    And what -- what was -- what, if anything,

7          significant do you recall from your observations of

8          the trash?

9    A.    There were three U.S. Priority Mail postal boxes,

10         cardboard boxes commonly used to ship smaller items,

11         U.S. postal property.

12   Q.    At that point had there been any sort of

13         interceptions on the wire about why these were

14         initially -- or why these ended up being significant

15         in this investigation?

16   A.    I recall hearing some shared intelligence or

17         information from Special Agent McCue or Task Force

18         Officer Jones that some information had surfaced

19         relative to use of cereal boxes or other items being

20         shipped from other locations outside of the state of

21         Kansas.

22   Q.    But was --

23   A.    And Missouri.

24   Q.    Was that after though your discovery of these parcel

25         packages that you found in the trash on this date?

1318

| | | |
|---|---|---|
| 1 | A. | To the best of my memory, yes. |
| 2 | Q. | All right.  And so when you first see these items, |
| 3 | | did you, in fact, make notations about the |
| 4 | | information that was contained on those parcel |
| 5 | | packages? |
| 6 | A. | Yes, I did. |
| 7 | Q. | And did that include documenting things like address |
| 8 | | information, the "to" and "from," where the packages |
| 9 | | had gone to and from? |
| 10 | A. | Yes. |
| 11 | Q. | And as well as the date these items would have been |
| 12 | | shipped? |
| 13 | A. | That's correct. |
| 14 | Q. | Did you document those in your report? |
| 15 | A. | Yes, I did. |
| 16 | Q. | And how many packages total had been discarded in |
| 17 | | this trash? |
| 18 | A. | It appeared to be three packages, and I had a total |
| 19 | | of three shipping labels from three different |
| 20 | | packages. |
| 21 | Q. | All right.  And by shipping labels, was that an |
| 22 | | indication that packages had been successfully sent |
| 23 | | and then received at some point? |
| 24 | A. | They appeared to have been, yes. |
| 25 | Q. | All right.  I'm not that interested in the "to" and |

```
 1              "from" information, detective, but could you just

 2              tell us the dates that were indicated on these

 3              packaging labels, about when these packages had been

 4              received.

 5    A.        Certainly.

 6    Q.        Okay.

 7    A.        The first shipping label I'll make reference to I

 8              refer to as Label 1 in my report.  This particular

 9              shipping label shows the receiving date or a date of

10              receipt by the person who picked up the package, or

11              at least signed for it, would have been August 13,

12              2007.

13    Q.        Okay.

14    A.        At approximately 9:46 in the morning.

15    Q.        All right.

16    A.        Shipping Label No. 2 would have been received on

17              June 21, 2007, at approximately 10:24 a.m.

18    Q.        Okay.

19    A.        Label No. 3 would have been received on June 13,

20              2007, at approximately 12:13 p.m.

21    Q.        Okay.  And was there anything else that you noted

22              about the trash, contents of the trash, Detective

23              Freeman?

24    A.        As I recall, we discovered one, maybe two boxes of

25              cereal that were half full.
```

```
 1   Q.   All right.  I want to hold up for you what has been
 2        marked as Government's Exhibit 19.  The items that
 3        you saw in the discarded trash bags that had been
 4        placed in the Dumpster by Mr. Heags.  Were they
 5        similar in any fashion to what we see here before the
 6        jury?
 7   A.   Yes.
 8   Q.   And what was similar with regard to what you observed
 9        in the trash?
10   A.   The particular box that you're holding there is, to
11        the best of my memory, nearly identical to what I
12        seen in the trash.
13   Q.   All right.
14   A.   Label, the markings, the outer markings, everything.
15   Q.   Now, also in connection with this investigation did
16        you also -- were you also involved in an incident
17        that occurred on November 27 of 2007 in which
18        Monterial Wesley, Rtayvian Simpson, and Thomas
19        Humphrey were arrested at a car wash?
20   A.   Yes, I was.
21   Q.   And what was your involvement in the activity at the
22        car wash?
23   A.   On that particular date for that operation, I was
24        assigned as a spotter/observer in a DEA aircraft that
25        was being utilized to monitor movements of Mr.
```

1321

```
 1        Wesley, Mr. Humphrey in anticipation of a meeting.
 2   Q.   All right.  And use of air surveillance is something
 3        that can be utilized in connection with a particular
 4        investigation; is that right?
 5   A.   Yes, ma'am.
 6   Q.   Is it something that's easy to, I guess, you know,
 7        stage or get into place?  Is that something that can
 8        be done on a minute's notice, or does that take some
 9        planning?
10   A.   It depends on the nature of the operation.  I've seen
11        it both ways.  It can be fairly simple to arrange
12        for, but there are times when it can be complicated
13        as far as logistics are concerned, timing,
14        availability of the aircraft, flight crews, things of
15        that nature.
16   Q.   Now, we have had some testimony by Officer Jones --
17        and also played a series of phone calls -- that there
18        appeared the day before, on November 26, 2007, to be
19        at least some indication that there was going to be a
20        meeting that took place on November 27.
21   A.   That was my understanding, yes, ma'am.
22   Q.   Would you agree with that?
23   A.   Yes.
24   Q.   As a result of that then were various personnel,
25        including the aircraft surveillance arrangements,
```

```
 1              were those all made ahead of the actual doing of

 2              that?

 3    A.   Actually, I believe Special Agent McCue asked that I

 4              contact the flight crew in St. Louis and arrange for

 5              that.  I believe I took care of that, yes.

 6    Q.   Is that where the aircraft comes from, is from St.

 7              Louis?

 8    A.   Yes, ma'am.

 9    Q.   And then on November 27 you actually went up with

10              that crew in the airplane to monitor the surveillance

11              of the various participants; is that right?

12    A.   That's correct.

13    Q.   And what kind of an aircraft is this?

14    A.   It's an Cessna 206 stationary.  It's a single-engine

15              high-performance high-wing utility aircraft.

16    Q.   And when you are involved in that aspect of

17              surveillance, what do you actually do with regards to

18              the aircraft?

19    A.   My primary mission and responsibility is to

20              coordinate all communication with agents and officers

21              on the ground, between them and possibly the case

22              agent, due to the sometimes unreliable ground

23              communications over great distances.  A lot of times

24              I find myself relaying information from one agent to

25              another to make sure that everybody stays on top of
```

1        what's happening.  That wasn't an issue that day, but

2        primarily my job is to monitor the movement of

3        targets of interest in cases, announce directions of

4        travel, roadway use, and anything that I observe them

5        doing from the air.

6    Q.  All right.  And so during the course of the

7        surveillance that you did from the air, were you able

8        to monitor movement of certain individuals?

9    A.  Yes.

10   Q.  And whose movements did you monitor?

11   A.  As I recall, to the best of my memory, it was

12       Monterial Wesley's vehicle that we followed that day,

13       but I cannot say with 100 percent certainty.  I

14       clearly remember the meeting at the car wash and when

15       the arrest took place.

16   Q.  Do you remember over what time period you were

17       actually monitoring the activity from the air?

18   A.  I want to say approximately 2½ to 3½ hours.

19   Q.  Okay.  And while this surveillance is going on from

20       the air, what are you and what's the airplane

21       physically doing in the --

22   A.  Depending on whether or not the target is stationary

23       or parked or in motion, anything from what we would

24       call a turnabout a point, to lazy eights or other

25       maneuvers that would keep the aircraft in a position

1    where I could maintain visual contact with the

2    target.

3  Q.  And is that something that is easy to do from the air

4    once you've got a target, a particular vehicle, to

5    follow it as it moves about to various locations?

6  A.  Depending on weather, flying conditions,

7    visibility -- sometimes it's easier than others, but

8    it is challenging.

9  Q.  And once the incident at the car wash occurred, was

10   there any aspect of that that you were able to

11   visualize or see or monitor, or what happened with

12   regards to the air surveillance at that point?

13  A.  I observed the two vehicles of interest meet at the

14   car wash near a single bay.  I was given a verbal cue

15   by either Special Agent McCue or Task Force Officer

16   Jones -- I don't recall which -- that the decision

17   had been made to approach, contact, and detain both

18   subjects at that time, which I in turn relayed over

19   the radio to verify that all participating personnel

20   heard that, and we maintained visual contact at the

21   scene until both subjects were released.  Everybody

22   who was encountered was in custody and seemed secure.

23  Q.  Did aircraft surveillance terminate at that point?

24  A.  We remained in the area a short while longer to

25   verify that we weren't needed.  Then we returned back

1325

```
 1            to the downtown airport.
 2      Q.    All right.  Following the arrest of Monterial Wesley,
 3            Rtayvian Simpson, and Thomas Humphrey, did you have
 4            further duties that particular day?
 5      A.    Yes, I did.
 6      Q.    What were your further duties on that day, Detective
 7            Freeman?
 8      A.    I was asked to establish surveillance in the area of
 9            the residence of Latysha Temple at 3416 South
10            Arrowhead Court in Independence in anticipation of a
11            potential search warrant service at that residence.
12      Q.    And in connection with your going to that location,
13            did you, in fact, make contact with Latysha Temple?
14      A.    Yes, ma'am.
15      Q.    And in connection with that then, tell us what
16            happened with regards to your contact with Latysha
17            Temple.
18      A.    At approximately 3:45 that afternoon myself and
19            assistant agents and investigators from the
20            Independence Police Department approached Temple's
21            residence, knocked at the door, and made contact with
22            a young man by the name of Ronald Mitchell, who
23            stated he was Latysha's son, advised me that she was
24            not home.
25      Q.    And how old was that individual, if you know?
```

1   A.   In referring to my report, he's not in the index.   I

2        would say early teens, approximately, 13, 14 years,

3        maybe.

4   Q.   Okay.  And you were advised Latysha Temple was not

5        home?

6   A.   Yes, I was advised she was at work.

7   Q.   Did, in fact, Latysha Temple respond to that

8        location?

9   A.   Yes, she did.

10  Q.   And did you make contact with her once she was at

11       that location?

12  A.   I did.

13  Q.   And when you made contact with Latysha Temple at that

14       location, tell us what that contact consisted of.

15  A.   I summarized that somebody that she was familiar with

16       was being detained by law enforcement officials as a

17       result of an ongoing criminal investigation.   I

18       advised her that I had been asked by the primary case

19       agents involved in the case to seek her cooperation

20       and her consent to permit a complete and entire

21       search of her residence for any evidence of criminal

22       activity or contraband.

23  Q.   Okay.  What did Ms. Temple indicate?

24  A.   Initially she declined to sign or at least

25       participate in any formal consent of the waiver,

1    written document.  I had then contacted either

2    Special Agent McCue or Task Force Officer Jones,

3    advised them of the results of our conversation, at

4    which point they advised me they were speaking with

5    Mr. Wesley, who was offering to speak with Latysha

6    Temple over the phone regarding this matter.  I asked

7    Ms. Temple if she was going to participate in this

8    conversation.  She said she would.  I provided her my

9    phone, and she had a conversation, at which point --

10   which lasted for roughly a minute, two minutes.  She

11   returned the phone to me and said, okay, I'm fine.

12   I'll sign the form.

13   Q.   Okay.  And when you had asked to search, did

14        Ms. Temple make any comments to you?

15   A.   Yes, she did.

16   Q.   What did she say?

17   A.   Something to the effect of, you can go ahead and look

18        around.  There's nothing here.

19   Q.   Okay.  And in connection with initially her refusing

20        to search, once she talked to Monterial Wesley, she

21        consented to the search?  Is that what you're saying?

22   A.   That's correct.

23   Q.   I want to hand you what I've marked as Government's

24        Exhibit 68 and ask you if you recognize that.

25   A.   Yes, I do.

1   Q.   What is that?

2   A.   That is the original consent-to-search form which I

3        provided to Ms. Temple and reviewed with her.  These

4        are her initials near each line acknowledging that

5        she had read them and understood them, and her

6        signature by the signature line next to the date and

7        time.

8               MS. MOREHEAD:  Judge, I would ask for

9        admission of Government's Exhibit No. 68.

10              THE COURT:  Any objection?  Hearing none,

11       Exhibit 68 is admitted.

12              (Exhibit 68 was admitted into evidence.)

13  Q.   Detective Freeman, looking now at Government's

14       Exhibit 68, you mentioned that Ms. Temple's initials

15       appear on certain lines; is that right?

16  A.   That's correct.

17  Q.   So not to confuse, obviously, anyone, this form

18       appears to be in both English and then Spanish with

19       regards to each line; is that right?

20  A.   That's correct.

21  Q.   All right.  And what are these notations right there

22       to the left of each of those three lines?

23  A.   Those would be the handwritten initials of LT as

24       provided by Ms. Temple at the time she was presented

25       with the form.

1    Q.    Okay.  And down here at the bottom there appear to be

2          some signatures?

3    A.    Yes.

4    Q.    First of all, what's this right here?

5    A.    That is the date and time that she reviewed and then

6          ultimately signed the document.

7    Q.    And tell us what date and time that is.

8    A.    November 27, 2007, at 18:45 hours.  That's military

9          time for 6:43.

10   Q.    Okay.  And whose signature is this right here?

11   A.    That would be the signature of Latysha Temple.

12   Q.    And whose signature is that?

13   A.    That is my signature.

14   Q.    And what about this one?

15   A.    That is Detective Aaron Gietzen, Independence PD Drug

16         Enforcement Unit.

17   Q.    Okay.  So both of you witnessed the signature of

18         Latysha Temple?

19   A.    Yes.

20   Q.    Now, you mentioned, Detective Freeman, that you had

21         been monitoring phone calls during the course of the

22         this investigation?

23   A.    Yes.

24   Q.    And on November 27, 2007, in connection with your

25         conversation with Ms. Temple, did you recognize her

1    voice as you were speaking to her in relationship to

2    any of the calls that you had been monitoring over

3    the course of the approximately 200 hours that you

4    were in the wire room?  Do you recall hearing her

5    voice on any of those calls?

6              MR. HEATHMAN:  Your Honor, may we approach?

7              THE COURT:  You may.

8              (Counsel approached the bench and the

9    following proceedings were had:)

10             MR. HEATHMAN:  My objection is I think

11   we're having him trying to identify her.  I don't

12   know if there's going to be a phone call played or

13   not, but this is unusual for me, as well, I think,

14   for him, to say -- this is not any particular call,

15   and I think it's highly suggestive because originally

16   Ms. Temple was listed as an unknown female.  At some

17   point during the investigation she became Latysha

18   Temple, and then from that moment on he's known her

19   and referred to her as Latysha Temple for months,

20   whether or not he knew that was her or not.

21             THE COURT:  I think this question may help

22   answer that.  I don't know.  The question was, when

23   you talked to her, did you recognize her voice in

24   connection with somebody on the call.  Now, I don't

25   think there's anything wrong with that.

1          MR. HEATHMAN:  He has referred to her for

2     months prior to his actual meeting of her as Latysha

3     Temple, and my worry is that he's going to identify

4     anybody who he's already believed is Latysha Temple

5     as Latysha Temple when he's --

6          THE COURT:  That's subject to cross

7     examination.  I think this is far different from a

8     fellow who is at a house very briefly in connection

9     with a dramatic incident who comes into court and is

10    presented a telephone call that describes that very

11    dramatic incident, which clearly would suggest that,

12    yeah, that's the guy I was talking to, compared to

13    someone who said they monitored numerous phone calls

14    involving a particular individual and then has a

15    face-to-face meeting with her.  I think that's

16    clearly something that can be pursued.

17          (The proceedings returned to open court.)

18          THE COURT:  Why don't you restate your

19    question, please.

20          MS. MOREHEAD:  Thank you.

21    Q.   (By Ms. Morehead) Let me if I can remember how I

22    asked that.  During the course of monitoring of phone

23    calls over the approximately 200 hours, in connection

24    with your meeting with Ms. Temple at her residence,

25    did you recognize her voice in connection with any of

1          the phone calls that you had been monitoring

2          throughout the course of the wiretap investigation?

3    A.    I can say that I was confident as I was speaking with

4          her that she was the same person that I had listened

5          to in numerous monitored phone calls identified as

6          Latysha Temple.

7    Q.    All right.  And in connection then with those phone

8          calls --

9                     MS. MOREHEAD:  Could I just have a moment,

10         Judge?

11                    THE COURT:  You may.

12                    MS. MOREHEAD:  Judge, could I pull up

13         Government's Exhibit 251, please, and play that?

14                    THE COURT:  Without objection you may

15         proceed.

16                    (Exhibit No. 251 was played in open court.)

17                    THE COURT:  Pardon me.  Would you stop that

18         for a minute, please, and could you approach.

19                    MS. MOREHEAD:  Sure.

20                    (Counsel approached the bench and the

21         following proceedings were had:)

22                    THE COURT:  I don't know if you were

23         intending to do this for identification purposes, but

24         the monitors were on for the witness and up here, so

25         if you were, then you need to do a different call.

1      MS. MOREHEAD:  All right.  I will, Judge.

2   I apologize.

3      MR. HEATHMAN:  If it's for identification,

4   I think he's already identified that that's her voice

5   on those phone calls.

6      THE COURT:  He hasn't said that any of the

7   calls in evidence are hers.  I personally would

8   accept for foundation -- for authenticity purposes

9   his testimony that he has reviewed the calls that

10   have been admitted into evidence involving her voice

11   and that those are ones that involve her voice.  I

12   would accept that if he can say that.  I don't

13   suggest it, but if he can say that, I would accept

14   that.  You don't have to go through --

15      MR. HEATHMAN:  And that's all right with

16   me.

17      MS. MOREHEAD:  All right.  Very good.

18      (The proceedings returned to open court.)

19   Q.   (By Ms. Morehead) Detective Freeman, I think we can

20   shortcut this then.  I think you mentioned when you

21   talked to Ms. Temple on November 27 you were

22   confident that her voice was the same voice on the

23   calls where she had been identified as Latysha

24   Temple; is that correct?

25   A.   That's correct.

1   Q.   And that are the subject of this particular jury

2        trial; is that correct?

3   A.   Yes.

4   Q.   All right.

5                   MS. MOREHEAD:  Is that sufficient, Judge?

6                   THE COURT:  Yes, it is.

7                   MS. MOREHEAD:  Okay.  Very good.

8   Q.   (By Ms. Morehead) In connection with the search at

9        Ms. Temple's residence, once the intercept was

10       signed --

11                  THE COURT:  I'll take that -- I think it

12       should be tied to the exhibits that have been

13       admitted in evidence.  I don't know -- Mr. Heathman,

14       I leave it to you.  I said it was sufficient, but I

15       don't know whether you think that's sufficient with

16       regard to your objection.

17                  MR. HEATHMAN:  Your Honor, I certainly do.

18       As to the exhibits that have been admitted so far, I

19       certainly would, and I may not object to any other

20       exhibits on that basis.

21                  THE COURT:  All right.  That's good.  If

22       it's good enough for you, it's good enough for me.

23                  MS. MOREHEAD:  All right.  Judge.

24   Q.   (By Ms. Morehead) With regards then to the search of

25       Ms. Temple's residence, did you then proceed to

1335

1    conduct a search of that residence?

2    A.    Yes, we did.

3    Q.    And in connection with that, with regards to a search

4          of that residence, did you, in fact, take some

5          photographs in connection with items that you

6          observed?

7    A.    Yes, I did.

8    Q.    Okay.

9                    MS. MOREHEAD:  Judge, I would ask for

10         admission of Government's Exhibits 62 through 66.

11                   THE COURT:  Is there any objection?

12         Hearing none, Exhibits 62 through 66 are admitted.

13                   (Exhibits 62 through 66 were admitted into

14         evidence.).

15   Q.    (By Ms. Morehead) First of all, Detective Freeman,

16         were there a number of vehicles that you located at

17         the residence?

18   A.    Yes, there were.

19   Q.    I want to show you Government's Exhibit No. 62.  Tell

20         the jury what that is.

21   A.    That is a 1973 Chevrolet Caprice two-door

22         convertible.

23   Q.    It appears to be purple in color with some sort of

24         spinners on the wheels; is that accurate?

25   A.    Yes.  Purple in color with chrome and purple custom

1       rims.

2    Q.    And did you -- were you able to determine the owner

3          of this particular vehicle?

4    A.    I don't believe I was able to that evening.  I

5          believe that the vehicle identification number which

6          I requested be ran through local computer indices

7          came back not on file.  I don't believe I was able to

8          determine a lien holder or a registered owner at that

9          moment.

10   Q.    Did Ms. Temple indicate whose vehicle this was?

11   A.    I don't recall with certainty if she did or not.  I

12         believe she did.  I believe she identified it as

13         Monterial's.

14   Q.    Was this vehicle seized in connection with the search

15         of her residence at the direction of Special Agent

16         McCue?

17   A.    I did have those vehicles transported from the

18         residence, yes.

19   Q.    Okay.  And Government's Exhibit No. 64, tell us what

20         this shows.

21   A.    That is a gold-colored Mercedes Benz four-door

22         passenger car.

23   Q.    There appears to be another vehicle behind it; is

24         that right?

25   A.    That's correct.  That's a white Mercedes Benz sport

```
 1              utility vehicle with the black pushcart-type bumper,

 2              which you can clearly see on the photo.

 3     Q.       Is that shown in Government's Exhibit 65 and 66?

 4     A.       Yes.

 5     Q.       Who were the registered owners of those vehicles?

 6     A.       Both of those vehicles, I believe there -- I believe

 7              those were registered to -- well, I don't know.  I

 8              don't know.  As a matter of procedure, I would

 9              request a records verification on the vehicle

10              information.  It's not notated in my report, so --

11     Q.       (By Ms. Morehead) Okay.

12     A.       So I can't recall from memory.

13     Q.       Did you seize those vehicles initially as well at the

14              direction of Special Agent McCue?

15     A.       Yes.

16     Q.       Okay.  And then in connection with the search of the

17              residence, did you, in fact, do a formal search of

18              the residence?

19     A.       Yes, I did.

20     Q.       Okay.  Government's Exhibit 63, tell the jury what

21              that is.

22     A.       That is a roll of transparent shrink wrap.

23     Q.       And handing you Government's Exhibit 67, do you

24              recognize that?

25     A.       Yes, I do.
```

1    Q.   What is that?

2    A.   That is the item that is detailed in the photograph

3         under Exhibit 63.  That is the roll of shrink wrap

4         that I seized.

5    Q.   And does Government's Exhibit 67 appear to be in the

6         same condition as when you received it or when you

7         collected it?

8    A.   Yes, it does.

9    Q.   Where did you recover this item of evidence?

10   A.   That was discovered in the garage of the residence to

11        the right of the Chevy Caprice that was photographed

12        earlier, or in the photograph earlier.

13   Q.   And this particular residence, can you kind of

14        describe the lay out of it, Detective Freeman?

15   A.   As I recall, it was a split-entry single family

16        dwelling, two-car garage, residential structure,

17        split entry being you go through the front door,

18        steps leading upward, steps leading downward to a

19        lower level and a garage area.

20   Q.   And this garage area where you found this shrink

21        wrap, first of all, was the shrink wrap in plain

22        view?

23   A.   Yes, it was.

24   Q.   Out in the open?

25   A.   Yes.

1    Q.   And that area of the premises that you searched, the

2         garage was accessible to -- by coming from the house

3         into the garage?

4    A.   Yes.  There was a doorway there.

5    Q.   And tell the jury why you seized this particular item

6         of evidence, the roll of shrink wrap?

7    A.   In my training and experience at the task force and

8         from prior assignments as a law enforcement officer

9         since 1993, I have seen that shrink wrap used

10        commonly to secure not only cash but bulk quantities

11        of narcotics and other controlled substances for ease

12        of packaging and shipping.

13   Q.   Okay.  Now, in connection with also this

14        investigation, did you, in fact, also have occasion

15        to be involved in the search of Shevel Foy's

16        residence?

17   A.   The apartment residence in Independence?

18   Q.   Yes, the apartment he subsequently relocated to.

19   A.   Yes, I was a part of a portion of a search, yes.

20             THE COURT:  Before we go there, why don't

21        we take our afternoon recess.  All right.  Members of

22        the jury, I'll remind you all of the admissions.  Ms.

23        Scheurer is coming around to take charge of you.

24             You may step down, Mr. Freeman.

25             Counsel and the parties remain here, please.

1340

```
 1              (The following proceedings were had outside
 2        the presence of the jury:)
 3              THE COURT:  Is there anything we need to do
 4        before we break?  All right.  I'll see you all in 15
 5        minutes.  We are in recess.
 6              (A recess was taken.)
 7              THE COURT:  If we're ready to proceed, we
 8        will bring in the jury.
 9              (The following proceedings were had in the
10        presence of the jury:)
11              THE COURT:  All right.  Ms. Morehead, you
12        may resume your examination.
13              MS. MOREHEAD:  Thank you.
14   Q.   (By Ms. Morehead) Detective Freeman, I think when we
15        stopped for the afternoon break I was asking you
16        questions about whether you were involved in
17        connection with a consent to search that was obtained
18        in connection with an apartment belonging to Shevel
19        Foy.  Do you recall us talking about that?
20   A.   Yes, I do.
21   Q.   Were you, in fact, involved in an incident that
22        occurred on January 8, 2008, involving Mr. Foy?
23   A.   I was.
24   Q.   I want to first hand you what I've marked as
25        Government's Exhibit 87, ask you if you can identify
```

```
 1            that.
 2    A.    This is an original consent-to-search form presented
 3            to Lakecia Foy by Task Force Officer Bob Wesley on
 4            that date.
 5    Q.    And were you a witness to that particular consent to
 6            search?
 7    A.    Yes, I was.
 8    Q.    Does your signature appear on there as well?
 9    A.    Yes, it does.
10              MS. MOREHEAD:  Judge, I would ask for
11            admission of Government's Exhibit No. 87.
12              THE COURT:  Is there any objection?
13            Hearing none, Exhibit 87 is admitted.
14              (Exhibit 87 was admitted into evidence.)
15    Q.    (By Ms. Morehead) In connection with the incident
16            that occurred on January 8, 2008, concerning Mr. Foy,
17            can you tell us just kind of what transpired on that
18            day.
19    A.    Yes.  As a result of surveillance that we had
20            initiated approximately one to two days prior to that
21            date, we had determined that Mr. Foy -- or at least
22            we expected Mr. Foy was residing at that particular
23            apartment building, in that apartment, with Lakecia.
24            Surveillance was initiated early that morning, and he
25            was observed leaving the apartment in the company of
```

```
 1              two small children.  We maintained surveillance of
 2              Mr. Foy until -- and followed him until he dropped
 3              them off at a -- was preparing to drop them off,
 4              rather, at a day care provider in north central
 5              Independence off of Hidden Valley Road and Missouri
 6              291 Highway, where a car stop was initiated and Mr.
 7              Foy was apprehended.
 8    Q.   Now, we had some testimony by Detective Slaybaugh
 9         earlier.  Are you familiar with him?
10    A.   Yes.
11    Q.   With the Independence Police Department?
12    A.   Yes.
13    Q.   Concerning an incident that occurred in Independence
14         on Elizabeth, were you familiar with that incident
15         and the circumstances surrounding that?
16    A.   Yes.
17    Q.   And following that incident on Elizabeth, through
18         surveillance did you determine that the Foys had
19         relocated to this apartment in Kansas City, Missouri?
20    A.   Numerous attempts to visually verify whether or not
21         Mr. Foy was still frequenting that residence on
22         Elizabeth had been made.  I don't believe that we
23         determined that he was residing or likely to reside
24         at that apartment until one or two days prior to his
25         arrest, sometime in there.
```

1   Q.   When you were attempting to locate him, was there a

2        warrant for his arrest at that point in connection

3        with this investigation?

4   A.   Yes, ma'am.

5   Q.   And so when surveillance observed him leaving the

6        residence and then going to a different location, was

7        he, in fact, arrested in connection with the arrest

8        warrant in this case?

9   A.   Yes, he was.

10  Q.   And did you have contact with Mr. Foy on that date?

11  A.   Yes, I did.

12  Q.   What did that consist of?

13  A.   A brief request for information from him.  As I was

14       already aware of his identity, it wasn't anything

15       pertinent to who he was.  I knew who he was.

16       Conversation that may have lasted approximately five

17       to seven minutes.

18  Q.   All right.  Now, you indicated again that you had

19       spent some 200 or so hours monitoring phone calls in

20       this particular case?

21  A.   Yes.

22  Q.   And during the course of the monitoring of those

23       calls, kind of the same kinds of questions I asked

24       with regards to Ms. Temple, were there any calls that

25       you monitored in connection with this case that were

1    identified as the speaker being Shevel Foy?

2    A.   Yes.

3    Q.   And then on January 8, 2008, when you had contact

4         with Mr. Foy, did you make any sort of determination

5         whether the voice that you had been hearing in

6         connection with all the phone calls attributed to

7         him, whether that was the same as the voice that you

8         were hearing face to face with Shevel Foy on

9         January 8, 2008?

10   A.   It was my opinion at that time that the voice I heard

11        in those numerous phone calls that I had monitored

12        and Mr. Foy's voice there that I was speaking with

13        was the same person.

14   Q.   Okay.  And those are the same phone calls -- many of

15        the same phone calls that have been introduced in

16        this particular trial; is that correct?

17   A.   That's my understanding, yes.

18   Q.   Going back to the consent to search then, does

19        this -- this, in fact, is the document that was

20        signed by Lakecia Foy; is that right?

21   A.   That's correct.

22              MS. MOREHEAD:  Judge, I would ask for

23        admission of Government's Exhibit 87.

24              THE COURT:  It's already been admitted.

25              MS. MOREHEAD:  I'm sorry.  It's been a long

1345

```
 1          day.

 2   Q.   (By Ms. Morehead)  Okay.  Going to this then, we have

 3          already seen, obviously, a prior consent to search

 4          with Ms. Temple.  Is this a similar form?

 5   A.   It's a similar form, yes.

 6   Q.   What's that?

 7   A.   That would be the date that the form was presented to

 8          Ms. Foy.

 9   Q.   Whose signature is that?

10   A.   That would be Lakecia Foy's signature.

11   Q.   And that signature?

12   A.   That is the signature of Task Force Officer Bob West,

13          that signature, and my signature as witnessed below.

14   Q.   And was a search of the Foy residence then conducted?

15   A.   Yes.

16   Q.   And were other agents involved in that particular

17          search?

18   A.   Yes.

19   Q.   Were you familiar during the course of this

20          investigation with a red truck that was associated

21          with Shevel Foy?

22   A.   Yes.

23   Q.   And you had participated on numerous surveillance

24          operations; is that right?

25   A.   Yes, ma'am.
```

1   Q.   Had you seen Shevel Foy's red truck on any of those

2        occasions?

3   A.   Yes.  I do recall seeing his truck at least once.

4   Q.   And on January 8, 2008, in connection with Mr. Foy's

5        arrest, was that red truck located?

6   A.   The red truck was located.

7   Q.   Do you remember where it was located?

8   A.   I can't say with 100 percent certainty.

9   Q.   But it was located?

10  A.   Yes.

11              MS. MOREHEAD:  Judge, that's all I have.

12       Thank you.

13              THE COURT:  Cross examination, anyone?  Mr.

14       Calbi?

15              MR. CALBI:  Thank you, Judge.

16                   CROSS EXAMINATION

17  BY MR. CALBI:

18  Q.   Detective, I want to talk to you about the aerial

19       surveillance that you were doing on November 27 of

20       2007.

21  A.   Yes.

22  Q.   And if I understand correctly, you followed -- at

23       least your belief it was the Wesley vehicle for a

24       couple of hours at least that day.

25  A.   I am certain within a reasonable degree of certainty

```
 1          that that was the vehicle we were following, yes.
 2    Q.    And do you remember on that particular day where the
 3          vehicle went that you were following?
 4    A.    No.  I don't recall where that vehicle originated,
 5          and I haven't seen the report, the surveillance
 6          report, that would indicate where that surveillance
 7          began to refresh my memory.
 8    Q.    Okay.  And so you don't know if you started in
 9          Leavenworth or in Kansas City?
10    A.    I suspect it was Leavenworth, but, again, I can't
11          with 100 percent certainty say.
12    Q.    Then you arrived at the car wash?
13    A.    Yes, we did.
14    Q.    And were Mr. Humphrey and Mr. Wesley's vehicle
15          already at the car wash by the time you had gotten
16          there?
17    A.    There was one vehicle.  As I recall, there was one
18          vehicle already there.
19    Q.    Okay.  And where was that vehicle?  Was it in one of
20          the bays, or was it outside one of the bays?
21    A.    I don't recall if this was the vehicle that was in
22          the bay.  I believe it was the vehicle that was in
23          the bay.
24    Q.    And then another vehicle approached the vehicle that
25          was in the bay?
```

1    A.   Yes.

2    Q.   And when that vehicle approached the vehicle that was

3         in the bay, did an occupant of that vehicle get out?

4    A.   I believe there was a pause in time from the time

5         that that vehicle arrived and that I seem to recall

6         somebody exiting the vehicle, yes.

7    Q.   And do you know who that individual was?

8    A.   No, sir, I do not.

9    Q.   At some point in time then, for lack of a better

10        term, the agents that were there converged on the

11        scene; correct?

12   A.   That's correct.

13   Q.   And when those agents converged on the scene, the

14        occupant that had gotten out of that vehicle and

15        approached the vehicle that was in the bay was how

16        far away from that vehicle?

17   A.   I can't definitively say.  That's an enclosed bay,

18        and I was circling the scene from the air.

19        Approximately 3,000 feet.  I don't know.

20   Q.   Were you still able to see that individual, or he had

21        already walked into the bay where the other vehicle

22        was?

23   A.   To the best of my memory, I lost view of that subject

24        as they entered the bay.

25   Q.   Okay.  And when the DEA officers converged on the

1    scene, do you know how many different vehicles they

2    came in?

3  A.   I could only approximate.  Roughly six to nine

4    different vehicles.

5  Q.   Okay.  And do you know if any of those vehicles hit

6    the vehicle that was in front of the bay?

7  A.   I couldn't say definitively one way or the other from

8    that altitude, sir.

9  Q.   So you don't know?

10  A.   No.

11            MR. CALBI:  I have nothing further, Judge.

12            THE COURT:  Mr. Rogers?

13            MR. ROGERS:  Thank you, your Honor.

14                    CROSS EXAMINATION

15  BY MR. ROGERS:

16  Q.   Good afternoon, sir.  I would also like to talk about

17    an aerial surveillance.  On November 27 you said you

18    hadn't seen a surveillance report to refresh your

19    recollection.  Did you write a report?

20  A.   Regarding that surveillance?

21  Q.   Regarding that that --

22  A.   I don't believe I did, sir, no.

23  Q.   But you know that there has been a report written by

24    somebody else?

25  A.   I'm assuming a report was written.  That would be

```
 1          procedure.

 2     Q.   Let me show you what I will represent to you is a

 3          report written by Officer Jones.  You know Officer

 4          Jones?

 5     A.   Yes.

 6     Q.   And I'm calling your attention to page 4 of 10,

 7          starting with the last paragraph on that page

 8          numbered 16.  I'll show that to you to see if that

 9          refreshes your recollection as to where the

10          surveillance began.

11     A.   Yes, sir, it does.

12     Q.   Okay.  And that began there in Leavenworth?

13     A.   Yes, sir.

14     Q.   And having seen that, do you remember whether or not

15          you were part of the surveillance when it began there

16          in Leavenworth?

17     A.   Yes, sir, I was.

18     Q.   Okay.  Now, let's talk a little bit about the way

19          this surveillance happened.  Keep that up there and

20          look at it again if you need to.  You are in an

21          aircraft?

22     A.   Uh-huh.

23     Q.   It's a small, single-engine propeller aircraft?

24     A.   Yes.

25     Q.   And do you know what altitude you were flying at?
```

1    A.    During this particular surveillance I don't recall

2          with certainty the exact altitude.  I can tell you

3          that we would operate in a normal specific range of

4          altitudes for this type of activity.

5    Q.    What would that be?

6    A.    For this type of activity we try to maintain an

7          altitude anywhere from 2,000 to 3,000 foot.

8          Altitudes in aviation terms are typically given a

9          mean sea level, which would assume that you're flying

10         at an altitude that's 3,000 feet MSL above the sea.

11         When you're operating over land, the specific land

12         elevation in that area may vary anywhere from, say,

13         in the Rocky Mountains to 10,000 feet MSL or here in

14         the midwest typically ranges from a 1,000 to

15         1,500 feet, which makes actually the line of sight

16         distance a lot less than 3,000 feet, in that general

17         area.  I don't know the field elevation, but I would

18         assume it would be somewhere around a thousand.

19   Q.    All right.  Field elevation is what me, a

20         nonflyer-type person, would consider altitude in

21         terms of how high you are above the ground, how high

22         you are as you're standing on the ground in relation

23         to sea level field?

24   A.    Elevation at Lee's Summit airport, for instance, is

25         1,004 feet above sea level.

1352

```
 1   Q.   Your altitude is measured in distance between mean
 2        sea level and where the plane is?
 3   A.   Yes.
 4   Q.   And so to get the distance between the plane and the
 5        ground you have to know the field elevation and
 6        subtract that from the altitude?
 7   A.   Yes.
 8   Q.   If you do that type of arithmetic with the numbers at
 9        3,000 and 1,000, you are about 2,000 feet above the
10        ground?  That's a good estimate?
11   A.   Fair enough.
12   Q.   Did you have with you binoculars or some other sight
13        aid?
14   A.   Yes.
15   Q.   What kind?
16   A.   I don't know the specific make and model.  It's a
17        pair of optics that are provided by the flight crew.
18   Q.   Okay.
19   A.   It's a gyroscopic stabilized pair of optics.  As far
20        as the view power, I can't recite that from memory.
21   Q.   Pretty good equipment?
22   A.   Yes.
23   Q.   Because you're there for the purpose of watching what
24        goes on on the ground?
25   A.   Yes, sir.
```

1   Q.   Okay.  Did you have any type of video recording

2        device that you used?

3   A.   No.

4   Q.   So we didn't see the aerial videotape because there

5        is none?

6   A.   That's correct.

7   Q.   Now, when you are at Leavenworth, as the surveillance

8        commenced before the target vehicle, we will call it,

9        left the Leavenworth area, did you see the people get

10       into that vehicle?

11  A.   I just -- that surveillance was supplemented by

12       agents on the ground, who had a close visual eye on

13       the target residence and the vehicle prior to it

14       leaving.

15  Q.   I'm asking about what you saw.

16  A.   I did not.

17  Q.   So you didn't see whether or not Mr. Simpson carried

18       a Rug Doctor out and put it in the back seat of the

19       car?

20  A.   If I saw somebody leave the house, I would see a

21       person.  I wouldn't be able to identify who it was.

22  Q.   Would you be able to see whether or not they were

23       carrying something?

24  A.   I might be able to; I might not.

25  Q.   Something as large such as a carpet cleaning machine?

```
 1    A.    That might be visible.  Again, that depends on

 2          visibility, weather conditions, altitude, a lot of

 3          factors.

 4    Q.    And you've mentioned a couple of maneuvers that

 5          would -- the aircraft would execute.  You're not

 6          flying it?

 7    A.    Typically I'm --

 8    Q.    -- riding shotgun?

 9    A.    I'm sitting in the back seat next to a very large

10          window and the pilot has the aircraft.

11    Q.    Okay.  And the aircraft would execute some maneuvers

12          you described as --

13    A.    Turnabout a point.

14    Q.    Turnabout a point.  And that means sort of flying in

15          a short circle?  Is that --

16    A.    Typically a wide radius circle, yes.

17    Q.    A wide radius circle?

18    A.    Uh-huh.  It could be -- the necessity of the

19          dimension of the radius that we would fly would be

20          dictated by the pilot or the spotter who is spotting,

21          whichever one is best suited to maintain the visual

22          contact with the target.

23    Q.    Okay.  And that's because this is a fixed wing

24          aircraft, not a helicopter?

25    A.    That's correct.
```

1   Q.   And so you can't just hover above?  You have to fly

2        around?

3   A.   That's correct.

4   Q.   But you also want to stay where you're in visual

5        contact with whatever you're looking at?

6   A.   That's correct.

7   Q.   And I assume a lazy eight is like a figure eight

8        that's flown slowly?

9   A.   That's correct.

10  Q.   And that's for the same purpose, so you can maintain

11       visual contact while keeping the vehicle moving so it

12       stays aloft?

13  A.   That's correct.

14  Q.   All right.  Now, I believe Mr. Calbi's already asked

15       but -- whether you were able to see the -- let me ask

16       you this way.  Was the target vehicle that you

17       followed from Leavenworth the vehicle that was in the

18       bay of the car wash or the vehicle that pulled up

19       behind the vehicle in the bay of the car wash?

20  A.   With a reasonable degree of certainty, I would say

21       that would be the vehicle that approached the vehicle

22       that was already in the bay.

23  Q.   Okay.  And is it fair to say from where you were

24       observing you could see when the verbal cue was given

25       by Mr. McCue and the agents converged on the car

1    wash?  You were able to see the six to nine vehicles

2    driven by DEA agents and task force officers who

3    converged?

4  A.   Yes.

5  Q.   And at least one of those you were able to see came

6    right up very close behind the vehicle you followed?

7  A.   There were multiple vehicles in the area there, and I

8    can say that there were numerous vehicles that were

9    very close to the target vehicle at the time that the

10    arrest was made.  I can't say how close.  I can't

11    specifically identify any one particular vehicle as

12    being closer than any others.

13  Q.   You can't say whether or not one of those was so

14    close it actually struck or hit or bumped the target

15    vehicle?

16  A.   No, sir, no.

17  Q.   You don't know one way or the other?

18  A.   No, sir, I don't.

19  Q.   Okay.  And you remained in the area conducting your

20    visual surveillance of -- until the suspects were

21    secured and until the scene was secured and the

22    agents had gotten back in their vehicles and left the

23    scene; is that a fair statement?

24  A.   Yes, sir.

25  Q.   Okay.  And were you able to observe whether or not an

1    agent or officer was taking a videotape of the scene?

2    A.   I don't know if that scene was being videotaped or

3         recorded in any fashion or not.

4    Q.   Okay.  Do you know whether the law enforcement

5         vehicles had been moved at some point between the

6         time that they converged and the time that the

7         officers got in them and left?

8    A.   I don't have any recollection of that either, sir.

9    Q.   Okay.  One way or the other?

10   A.   One way or the other.

11             MR. ROGERS:  That's all the questions I

12        have.  Thank you.

13             THE COURT:  Mr. Sandage?

14             MR. SANDAGE:  Yes, your Honor.

15                    CROSS EXAMINATION

16   BY MR. SANDAGE:

17   Q.   Officer, what day did you say Mr. Foy was arrested on

18        this federal indictment?

19   A.   That was the 8th of December?  I kind of recall.  I

20        don't recall the exact --

21   Q.   Do you have any reports --

22   A.   I don't have that report in front of me, no.

23             MR. SANDAGE:  May I approach the witness,

24        your Honor?

25             THE COURT:  Yes, you may.

```
 1              MR. SANDAGE:  Your Honor, we're going to
 2        come back to that.  Ms. Morehead is looking for
 3        something.
 4              THE COURT:  Very well.
 5   Q.   (By Mr. Sandage) We will establish what day it was in
 6        a second, but before we get into that, what was your
 7        responsibility on the day?
 8   A.   My responsibilities were to coordinate surveillance
 9        efforts of Mr. Foy's apartment in Independence and
10        attempt to verify whether or not he was, in fact,
11        staying there, and if seen, to attempt to apprehend
12        him, take him into custody regarding the warrant.
13   Q.   What time did you begin that surveillance?
14   A.   That surveillance ran very late the night before,
15        until approximately midnight, maybe later, and I
16        believe we began again the following morning
17        somewhere approximately 6:00 a.m., maybe a little
18        before.
19   Q.   And you say we, so there's more than one officer
20        assigned to that responsibility?
21   A.   Yes.
22   Q.   How many other officers were doing the surveillance?
23   A.   I recall definitively at least one, possibly a
24        second.  It would have been myself and at least
25        two -- well, definitely two, possibly a third agent
```

```
 1           that were with us.

 2    Q.   And who were the other agents, please?

 3    A.   Task force -- Special Agent with immigration Tim

 4         Ditter, I believe Task Force Officer Tom Delato was

 5         with me that morning, and I believe Special Agent

 6         Doug Dorley was with me.

 7    Q.   Were you in charge of this surveillance?

 8    A.   I was coordinating it.  I wouldn't call it from a

 9         supervisory level, but I believe I was coordinating

10         the effort, yes.

11    Q.   So it was your responsibility over that scene that

12         morning then?

13    A.   Yes.

14    Q.   At some point I believe you testified that Mr. Foy

15         left the residence.

16    A.   Yes, he did.

17    Q.   What time did that happen?

18    A.   Without looking at the report to refresh my

19         recollection, I would say sometime between 7:00 a.m.

20         and 7:30.

21    Q.   And he left with people with him?

22    A.   Two small children were with him, yes.

23    Q.   And what car did they get in?

24    A.   Without looking at the report to refresh my memory, I

25         believe it was a sports utility vehicle of some make
```

1    and model.  I don't recall.

2  Q.  Did you follow Mr. Foy as he left the residence?

3  A.  Yes, we did.

4  Q.  You did?

5  A.  Me specifically, I did not.  From my position of

6    where I was able to observe the apartment, there was

7    some delay between me leaving that position and

8    getting to my vehicle.  I called that information

9    ahead to agents who were in the area, the perimeter,

10    who then maintained an eye on Mr. Foy as he drove

11    from the area, and I ultimately caught up to them on

12    Missouri 291 Highway.

13  Q.  And how long after that did you catch up to him on

14    Missouri 291 Highway?

15  A.  Me personally, it was 45 seconds to a minute and a

16    quarter, maybe.

17  Q.  I believe on direct examination that you testified

18    that you had some role in this search of the

19    apartment; is that correct?

20  A.  Yes, the latter portion of the search.

21  Q.  So at some point you came back to the residence; is

22    that correct?

23  A.  Yes.

24  Q.  Did the search of the residence and the subsequent

25    arrest of Mr. Foy occur at the same time?

```
 1    A.    No.

 2    Q.    What was the time difference on that, please?

 3    A.    Merely estimating a time -- because, again, I don't

 4          have the report to refresh my memory -- I'm

 5          estimating 2½ to four hours.  I know that's pretty

 6          broad, but that's the best I can do.

 7    Q.    Where did -- you followed surveillance on Mr. Foy; is

 8          that correct?

 9    A.    Yes.

10    Q.    And at some point Mr. Foy's car stops; is that

11          correct?

12    A.    That's correct.

13    Q.    And at some point -- strike that.  Did you make the

14          initial contact with Mr. Foy when you decide to

15          arrest him?

16    A.    No, I do not.

17    Q.    Who is the first officer who comes in contact with

18          Mr. Foy?

19    A.    To the best of my memory, that was Traffic Officer

20          Larry Petrie, Independence Police Department Traffic

21          Unit.

22    Q.    How long after that was it before you made contact

23          with Mr. Foy?

24    A.    Approximately a minute, maybe less.

25    Q.    And at the arrest how many officers are at the scene
```

1      when Mr. Foy is taken into custody?

2  A.  Approximately six to ten.

3  Q.  Were you the lead investigative officer for the

4      arrest of Mr. Foy as well?

5  A.  I was coordinating that effort, so I guess you could

6      state that, yes.

7  Q.  And you then testified on direct examination at some

8      point you made a physical contact with Mr. Foy; is

9      that correct?

10 A.  Physical contact, no, but verbal contact, yes.

11 Q.  I apologize.  What I meant was a face-to-face contact

12     with Mr. Foy.

13 A.  I understand.  Yes, sir.

14 Q.  Is that true?

15 A.  Yes.  It was brief.

16 Q.  It was brief?

17 A.  Yes.

18 Q.  I believe you testified on direct examination, you

19     said brief was five to seven minutes?

20 A.  Approximately five to seven minutes.

21 Q.  And you said you asked him questions?

22 A.  General questions to the effect of, are you okay?

23     Are you feeling any bumps or bruises?  I don't

24     really -- there was some discussion as to which

25     detention facility he was going to be transported to

```
1        and detained in until otherwise directed by either

2        Special Agent McCue or TFO Jones.

3   Q.   So it was a pretty short conversation then?

4   A.   Yes.

5   Q.   Short answers?  Are you hurt?  And his response to

6        that question was?

7   A.   To the best of my recollection, he was fine.

8   Q.   Any bumps or bruises?  His answer to that question

9        was?

10  A.   To the best of my recollection, he had none.

11  Q.   And did he inquire of you as to where he would be

12       going or did you tell him where he would be going?

13  A.   I don't recall one way or the other regarding that

14       question, sir.

15  Q.   Is that the sum total of the conversation between and

16       you Mr. Foy on that morning?

17  A.   I think in general that sums it up, yes, sir.

18            MR. SANDAGE:  Thank you.  Nothing further,

19       your Honor.

20            THE COURT:  Mr. Bell?

21            MR. BELL:  Nothing, Judge.

22            THE COURT:  Mr. Heathman?

23            MR. HEATHMAN:  Thank you, your Honor.

24

25
```

<pre>
 1                      CROSS EXAMINATION

 2   BY MR. HEATHMAN:

 3   Q.    Did you say it was Detective Freeman?

 4   A.    Yes, sir.

 5   Q.    Detective Freeman, I want to ask you some questions

 6         about, first off, your surveillance over the wiretap.

 7         Do you remember having questions about sitting on the

 8         wire or listening to phone calls?

 9   A.    Yes, sir.

10   Q.    And you said as many as 200, I think?

11   A.    Approximately 200 hours of service in the wire room,

12         yes.

13   Q.    All right.  Do you know how many of those calls

14         involved Ms. Latysha Temple?

15   A.    I wouldn't even venture to guess a number, sir.

16   Q.    Did you also type up the conversations as they were

17         being heard?

18   A.    As a matter of procedure, as those calls were

19         received, they would be summarized unless it was

20         determined it was a call that required transcription.

21   Q.    Is there a way to identify which of those you

22         actually heard?

23   A.    Yes.  If the conversation seemed to involve or

24         revolve around any criminal activity relative to

25         narcotics or other criminal activity, that would be
</pre>

```
 1        one that would require transcription.

 2   Q.   Am I correct then that your first involvement, at

 3        least face-to-face contact, with Ms. Temple was on

 4        November 27?

 5   A.   Yes.

 6   Q.   Okay.  And prior to that you had heard conversations

 7        over the wiretap?

 8   A.   Numerous, yes.

 9   Q.   And initially this individual was referred to as an

10        unknown female, wasn't she?

11   A.   That's entirely possible, yes.

12   Q.   Okay.  And then at some point later she was

13        identified in the phone conversations as Latysha

14        Temple?

15   A.   At some point in the investigation, yes.

16   Q.   And that was done prior to ever having any

17        face-to-face actual meeting or confrontation with

18        her, was it not?

19   A.   That would be correct.

20   Q.   And then you went through or carried your belief that

21        this was Ms. Temple from the time that that

22        determination was made prior to having any

23        face-to-face contact with her up to the time you

24        actually did meet her?

25   A.   Based on intelligence and other information offered
```

```
 1            to me by TFO Jones and Special Agent McCue, it was

 2            apparently determined that that was Ms. Temple on the

 3            phone, and that would be correct.

 4   Q.   Did you inquire how they had determined that that was

 5            Ms. Temple on the phone?

 6   A.   I don't recall doing so, no, sir.

 7   Q.   All right.  And then you went to her house on

 8            November 27?

 9   A.   That's correct.

10   Q.   And did she give you consent to search ultimately?

11   A.   Yes, sir.

12   Q.   Okay.  Well, initially she said you can go ahead and

13            look, you won't find anything; right?

14   A.   That's correct.

15   Q.   All right.  Then when you read her rights and consent

16            forms, she decided that maybe she didn't want you to

17            look in the house; is that correct?

18   A.   That's correct.

19   Q.   And ultimately she relented and said, sure, go on in?

20   A.   That's correct.

21   Q.   All right.  When you went into her house, you found,

22            I think, a roll of cellophane or wrap?

23   A.   That's correct.

24   Q.   And what color was that?

25   A.   Semi transparent in color.  I wouldn't call it a
```

1   particular color.  I suppose it had kind of a blue

2   shade to it, maybe green, greenish tint.

3 Q.  Okay.  So transparent but blue?

4 A.  Semi transparent, yes.

5 Q.  All right.  Or green?  Did you find any duct tape at

6   her house?

7 A.  I don't recall if I found duct tape or not.

8 Q.  Did you find any black electrical tape at her house?

9 A.  I don't recall, sir.

10 Q.  In fact, the narcotics involving in this case, do you

11   know how they were packaged?

12 A.  No, sir, I do not.

13 Q.  Do you know that none of them were wrapped inside of

14   blue or green cellophane?

15 A.  I was not aware of that, sir.

16 Q.  Did you ever look to check that?

17 A.  Those would have been parts of the case that I was

18   not directly involved with, sir.

19 Q.  Okay.  Now, you said in your experience that --

20   training and experience that drug traffickers will

21   utilize such material as the roll of cellophane to

22   package and wrap narcotics in bulk?

23 A.  Yes.

24 Q.  Did you find any bulk narcotics at Ms. Temple's

25   house?

```
 1   A.   No, sir, I did not.  I only found a user amount of

 2        marijuana.

 3   Q.   Thank you for that.  Did you find any money at her

 4        house?

 5   A.   No, sir.

 6   Q.   In your training and experience, sir, do you know

 7        where you can buy --

 8                 MR. HEATHMAN:  Did you admit 67?

 9                 MS. MOREHEAD:  Yes.

10                 THE COURT:  Actually, no.

11                 MS. MOREHEAD:  I didn't, Judge?  I

12        apologize.  I would offer that.  I intended to if I

13        didn't.  I knew there was one exhibit I didn't

14        introduce.

15                 THE COURT:  Is there any objection to 67?

16                 MR. HEATHMAN:  No, sir.  I was going to do

17        it if she didn't.

18                 THE COURT:  Hearing no objection, Exhibit

19        67 is now admitted.

20                 (Exhibit 67 was admitted into evidence.)

21   Q.   (By Mr. Heathman) Do you know where you can purchase

22        items such as Exhibit 67?

23   A.   I have never shopped for such an item, but I

24        understand they can be purchased at a variety of

25        retailers: hardware stores, Wal-Mart, Home Depot.
```

```
 1    Q.   Now, in your training and experience, sir, places

 2         that might package narcotics in bulk also have other

 3         evidence of narcotics; is that correct?

 4    A.   In some cases, yes.

 5    Q.   In most cases, don't they?

 6    A.   In some cases.  I couldn't go as far as a percentage

 7         or anything like that if that's what you're looking

 8         for, but it's certainly possible.  It depends on the

 9         person and how tidy they are.

10    Q.   Usually these guys that are packaging in bulk, they

11         don't just kind of eyeball it, do they?

12    A.   No.

13    Q.   I mean, they don't say, it looks kind of like an

14         ounce?  They don't do that?

15    A.   Not typically, no, sir.

16    Q.   They weigh it?

17    A.   Yes, sir.

18    Q.   And they use digital scales usually, don't they?

19    A.   Digital scales or other materials that they can use

20         to weigh these items accurately, yes.

21    Q.   And did you locate any digital scales at Ms. Temple's

22         house?

23    A.   No, sir.

24    Q.   And they may also package smaller ones in Baggies,

25         smaller Baggies?
```

1    A.    Yes.

2    Q.    Did you find any smaller Baggies at Ms. Temple's

3          house?

4    A.    Not that I recall, sir, no.

5    Q.    And I believe you told us that -- you told us at

6          least as far as it relates to drugs what people may

7          use this for, Exhibit 67.  Do you know what else --

8          excuse me -- Exhibit 63 is the photograph.  The

9          actual roll is 67.  Do you know what else people

10         might use that for?

11   A.    Cellophane shrink wrapping of that size, I suppose it

12         would have maybe a variety of different uses, but

13         I -- again, I've never purchased or used anything

14         like that for anything myself.

15   Q.    Might be used to cover items so you didn't get paint

16         on them?

17   A.    Certainly possible, sir.

18   Q.    Do you see paint in the photograph?

19   A.    I see, yeah, a couple of cans of paint and a paint

20         roller.

21   Q.    Did you find -- let me ask you this.  Strike that.

22         Do you know what chafing or shafing dishes are?

23   A.    I'm sorry.

24   Q.    Chafing or shafing dishes?

25   A.    No, sir.

1    Q.   Have you ever been to a buffet where they have had

2         the dishes up in the air and then there's a flame

3         underneath them?

4    A.   Yes.

5    Q.   Did you find any of those at Ms. Temple's house close

6         to this location?

7    A.   I don't recall if I did or not, sir.

8    Q.   Do you know that people sometimes use materials such

9         as cellophane to cover leftovers?

10   A.   Yes.

11   Q.   Did you locate in the garage area containers of men's

12        clothing?

13   A.   I recall encountering possibly a duffel bag or some

14        other item of luggage, potentially, but I don't

15        recall a container of men's clothing.

16   Q.   Okay.  I'm going to put back up Exhibit 62.  Did you

17        look at this area right back here that I've just

18        circled for you?

19   A.   I don't recall if I personally examined that area,

20        but I'm sure it was examined.

21   Q.   Do you recall whether or not that area had boxes and

22        other containers of men's clothing?

23   A.   I seem to recall boxes being about in the residence,

24        potentially in the garage, maybe inside.  Containing

25        what, I don't recall.

1    Q.   All right.  So is it fair to say then, detective,

2         that as far as the notion that drug users or dealers

3         may use this packing to wrap narcotics, there are

4         multiple uses for this stuff?

5    A.   Yes, sir.

6    Q.   And you did not find any bulk evidence any other bulk

7         evidence of narcotics at her house?

8    A.   No, sir.

9    Q.   Nothing that would corroborate the notion that she

10        was packaging bulk amounts of narcotics or money?

11   A.   There was nothing present at the residence at that

12        time to suggest that she was in possession of bulk

13        narcotics at that time, that's correct.

14   Q.   Well, or at any other time, was there?

15   A.   As far as that particular time goes, to my knowledge,

16        no.

17             MR. HEATHMAN:  Nothing further, your Honor.

18             THE COURT:  Mr. Bellemere?

19             MR. BELLEMERE:  I have no questions.

20             THE COURT:  Mr. Johnson?

21             MR. JOHNSON:  No, thank you.

22             THE COURT:  Any redirect?

23

24

25

<u>REDIRECT EXAMINATION</u>

BY MS. MOREHEAD:

Q.   The home invasion at the Foy residence, do you recall
     the date of that incident?

A.   It was in the fall months of 2007.  Specific date, I
     don't recall.

Q.   Was it before November 27, 2007, when you were at
     Latysha Temple's house?

A.   Yes, it was prior to that.

Q.   To do the consent to search?

A.   Yes, it was prior to that date.

Q.   When you were monitoring, working the wire room, you
     and other law enforcement personnel would work
     shifts; is that right?

A.   Yes.

Q.   And in connection with that, if you were working a
     particular shift -- let's say you worked today.  What
     kind of a shift would you typically work?

A.   It varied on the need for manpower and resources to
     manage the room based on a schedule.

Q.   Typically though.

A.   Typically, you know, you could work anywhere from
     eight to four, four to midnight, sometimes later or
     earlier.

Q.   Maybe about an eight-hour shift then?

1   A.   Typically an eight-hour shift, yes.

2   Q.   And when you're not there, obviously, there's other

3        calls coming in?

4   A.   Yes.

5   Q.   And when you come on duty then, whenever your next

6        shift is, what practice did you have in connection

7        with calls that would have came in during the course

8        of this wiretap investigation?

9   A.   As a matter of practice, for me, when I would report

10       to begin my tour of duty in the room, I would

11       research back calls that had been received, pertinent

12       calls that had been received and transcribed since my

13       prior tour of duty just to stay current with

14       activities and information that was being developed

15       in the case.

16  Q.   So even calls that necessarily didn't come in while

17       you were monitoring, you kept up to speed on other

18       pertinent calls that had came in when you weren't on

19       duty?  Is that what you're saying?

20  A.   Yes, ma'am.

21  Q.   Why did you do that?

22  A.   In an effort to stay caught up with the ever-changing

23       environment, new information that was being developed

24       on a daily, sometimes hourly basis in the case.

25  Q.   Explain to the jury, if you would, why that would be

1       important in an investigation like this.

2    A.    It would be important in this investigation, or at

3          least an investigation like that, so that you could

4          have a clear understanding of events that are taking

5          place in the case as they unfold versus having to try

6          and reason or understand a bit of information that

7          you now have and maybe it doesn't make sense without

8          having prior knowledge of other things that have

9          taken place before it.

10   Q.    Were you very vigilant about that?

11   A.    I try to be, yes, ma'am.

12   Q.    So even though pertinent calls may not have came in

13         with Latysha Temple during your watch, you took it

14         upon yourself -- or Shevel Foy or any of the other

15         participants that you listened to, you took it upon

16         yourself to go back to listen to all those calls that

17         had came in when you weren't on duty?

18   A.    At least a portion of the important calls, or the

19         pertinent calls, yes, ma'am.

20              MS. MOREHEAD:   Judge, that's all I have.

21              THE COURT:   All right.   Anything further

22         based on that?

23              MR. CALBI:   I have nothing.

24              THE COURT:   Mr. Sandage?

25

| | |
|---|---|
| 1 | <u>REDIRECT EXAMINATION</u> |
| 2 | BY MR. SANDAGE: |
| 3 | Q.   In relation to what Ms. Morehead was talking about, |
| 4 |      when you would go in and review what occurred on your |
| 5 |      off time, would you read the synopsis of the calls, |
| 6 |      or would you actually put on headphones and listen to |
| 7 |      the actual phone call? |
| 8 | A.   I would -- sometimes I would do both.  Some calls I |
| 9 |      would simply read the transcription or synopsis. |
| 10 |     Some of the calls I would put the headphones on and |
| 11 |     listen to the call recorded. |
| 12 | Q.  In connection with that, did you ever hear who you |
| 13 |     purported to be Mr. Foy on any of those phone calls? |
| 14 | A.  Yes. |
| 15 |           MR. SANDAGE:  Thank you.  Nothing further. |
| 16 |           THE COURT:  Anything based on that, Ms. |
| 17 |     Morehead? |
| 18 |           MS. MOREHEAD:  No, your Honor.  Thank you. |
| 19 |           THE COURT:  All right.  You may step down. |
| 20 |     Without objection you are excused.  The government |
| 21 |     may call its next witness. |
| 22 |           MS. MOREHEAD:  Judge, my next witness is |
| 23 |     Donnie Johnson. |
| 24 |           THE COURT:  Very well.  If counsel would |
| 25 |     approach while you're doing that. |

```
 1              (Counsel approached the bench and the
 2       following proceedings were had:)
 3              THE COURT:  Based upon the additional
 4       testimony of Mr. Freeman, I'm prepared to make my
 5       findings under Rule 104(b) with regard to Ms. Temple
 6       and Mr. Foy, and in the case of Mr. Foy, the
 7       considerable circumstantial evidence I am now
 8       satisfied and comfortable in relying on supports the
 9       identification of his voice in connection with the
10       home observation calls and the ability to tie that
11       voice to the other calls in which he is identified.
12       In addition, Mr. Freeman has provided identification
13       based upon his discussion with Mr. Foy and which he
14       testifies he is quite certain that's who he was
15       dealing with.
16          With regard to Ms. Temple, I think we talked
17       about that earlier, but, again, he rather
18       unequivocally indicated that he believed that was Ms.
19       Temple's voice on those calls.  I now believe that
20       the appropriate authentication has occurred for those
21       calls.  That leaves only the McDaniel calls, which
22       are still in issue.
23              MR. SANDAGE:  For purposes of the record, I
24       continue my objection.  I feel that foundation hasn't
25       been laid.
```

1       THE COURT:  You certainly don't have to

2   agree with me.  That's my ruling.

3       MR. SANDAGE:  I want to.  Certain times you

4   just can't do it.

5       THE COURT:  I understand.

6           DONNIE RAY JOHNSON,

7   having been duly sworn, was examined and testified as

8   follows:

9           DIRECT EXAMINATION

10  BY MS. MOREHEAD:

11  Q.   Please tell us how old you are.

12  A.   Thirty-three.

13  Q.   And, Mr. Johnson, where did you grow up?

14  A.   Leavenworth, Kansas.

15  Q.   And is that where you were born and raised?

16  A.   I was born in Atchison, Kansas.

17  Q.   All right.  And did you spend pretty much all your

18       life in that area or in the vicinity of Leavenworth

19       and Atchison?

20  A.   Yes.

21  Q.   In connection with your presence here in this case

22       today, you are a codefendant; is that correct?

23  A.   Yes.

24  Q.   And in connection with this particular case, you were

25       charged along with 23 other individuals in connection

1    with activity between 2006 and 2007; is that right?

2  A.   Yes.

3  Q.   In connection with your appearance here today, did

4       you, in fact, enter into a plea agreement with the

5       government in connection with the indictment against

6       you?

7  A.   Yes.

8  Q.   And, Mr. Johnson Rogers, in connection with that

9       indictment that you were originally charged with,

10      there were several counts for which you were charged

11      with; is that correct?

12  A.   Yes.

13  Q.   Which included the conspiracy charge?

14  A.   Yes.

15  Q.   And a count for possessing crack cocaine in August of

16      2007?

17  A.   Yes.

18  Q.   For possessing a firearm in connection with the

19      possession of that crack cocaine?

20  A.   Yes.

21  Q.   And being a felon in possession of a firearm?

22  A.   Yeah.

23  Q.   And you were also charged with several phone counts,

24      is that right, for using the telephone in connection

25      with this drug offense is?

```
 1   A.   Yes.

 2   Q.   And then also for an incident that occurred on

 3        September 13, 2007, where you were found to be in

 4        possession of a quantity of crack cocaine?

 5   A.   Correct.

 6   Q.   Is that right?

 7   A.   Yes.

 8   Q.   And in connection with the plea agreement that you

 9        entered into, did you, in fact, plead guilty to two

10        of those counts?

11   A.   Yes.

12   Q.   And what two counts did you plead guilty to,

13        Mr. Johnson?

14   A.   The conspiracy and the weapons charge.

15   Q.   All right.  And with regards to the conspiracy count,

16        that was a conspiracy to possess with intent to

17        distribute and to distribute 5 kilograms or more of

18        cocaine and a conspiracy to manufacturer, possess

19        with intent to distribute, and distribute 50 grams or

20        more of crack cocaine; is that correct?

21   A.   Yes.

22   Q.   And what is your understanding with regards to that

23        particular charge?  What kind of potential sentence

24        you were facing?

25   A.   Ten years.
```

1381

1    Q.    A minimum of ten years?

2    A.    Yes.

3    Q.    And do you know what the maximum possible sentence

4          you could be facing might be?

5    A.    Life.

6    Q.    And you also indicated you pled to a firearm charge

7          for actually possessing a firearm in connection with

8          drug trafficking; correct?

9    A.    Correct.

10   Q.    And in connection with that offense, what's your

11         understanding of what possible sentence you can get

12         for that offense?

13   A.    Mandatory five years.

14   Q.    And that five-year sentence on the firearm charge,

15         what's your understanding of what happens with that

16         sentence in connection with the conspiracy sentence?

17   A.    They are run consecutive.

18   Q.    And what's your understanding of what that means?

19   A.    That I have to serve one sentence and then start

20         serving the other one.

21   Q.    So as you sit here today, based upon those two

22         charges, you're looking at a mandatory minimum of 15

23         years and a maximum of life; is that correct?

24   A.    Yes.

25   Q.    Now, you also agreed to the forfeiture allegation in

```
 1          excess of $10 million; is that right?
 2     A.   Yes.
 3     Q.   Now, Mr. Johnson, in connection with this plea
 4          agreement, did the government agree to a number of
 5          things in connection with you entering this plea
 6          agreement?
 7     A.   Yes.
 8     Q.   No. 1, did we agree to dismiss all the other charges
 9          against you?
10     A.   Yes.
11     Q.   Was there also an agreement that the parties would
12          recommend a sentence under the guidelines, the United
13          States Sentencing Guidelines?
14     A.   Yes.
15     Q.   Do you recall that?
16     A.   Yes.
17     Q.   What's your understanding of what the guidelines are,
18          Mr. Johnson?
19     A.   That they will be based on my criminal history.
20     Q.   And what else?
21     A.   I'm not for sure.
22     Q.   Okay.  Your criminal history, do you recall if it
23          also involves the offense level that you're facing?
24     A.   Yes.
25     Q.   So based upon the offense level and your
```

1    criminal history, the Sentencing Guidelines will give

2    kind of a range of what possible sentence you're

3    looking at?  Is that your understanding?

4  A.   Yes.

5  Q.   And what is your understanding -- you had

6    initially -- and I want to kind of keep the firearm

7    charge separate because it's a consecutive sentence,

8    but all those other charges, what was your

9    understanding?  If you had a bunch of those charges

10    all together under the guidelines, what happens to

11    those sentences?

12  A.   I'm not understanding that.  Say it again.

13  Q.   I probably didn't say that very good.  When you

14    entered this plea agreement, before you entered into

15    the plea agreement, you had a number of charges?

16  A.   Uh-huh.

17  Q.   Is that right?

18  A.   Yeah.

19  Q.   And did you have an understanding -- before you

20    entered your plea agreement, did you have an idea

21    about the sentencing Sentencing Guidelines?  Did you

22    have an understanding about them?

23  A.   Yeah.

24  Q.   And you had a number of charges against you before

25    you pled guilty?

 1   A.   Correct.

 2   Q.   Correct?  Did you have an understanding before you

 3        pled guilty about how the Sentencing Guidelines look

 4        at you having numerous, numerous charges?

 5   A.   Yes.

 6   Q.   And what was your understanding?

 7   A.   That I would be doing, I think, somewhere between 25

 8        and 30 years.

 9   Q.   Under the guidelines?

10   A.   Under the guidelines.

11   Q.   Does that not include the firearm charge, or are you

12        including that, the firearm charge?

13   A.   That's not including the firearm.

14   Q.   All right.  So before you entered this plea

15        agreement, you were thinking that based upon the

16        guideline calculation you would be facing, what was

17        that figure, 25 to 30 years?

18   A.   Yes.

19   Q.   Okay.  And then another five years on top of that

20        with the firearm charge?

21   A.   Yes.

22   Q.   And you mention that one of the things that affect

23        your Sentencing Guidelines is your criminal history;

24        is that right?

25   A.   Correct.

```
1   Q.   And you do, Mr. Johnson, have a prior conviction in

2        Leavenworth County in 2002 for sale of cocaine; is

3        that right?

4   A.   For possession of cocaine.

5   Q.   For possession of cocaine.  Was it originally a sale

6        of cocaine?

7   A.   Yes.

8   Q.   That was reduced to possession of cocaine?

9   A.   Yes.

10  Q.   So you, in fact, had that prior drug conviction.  And

11       was part of the plea agreement that the government

12       would agree not to file what we refer to as an 851

13       enhancement?

14  A.   Correct.

15  Q.   Do you remember that?

16  A.   Yeah.

17  Q.   What's your understanding of an 851 enhancement?

18  A.   It would double my mandatory minimum.

19  Q.   Okay.  That would be under the statute that you would

20       have been looking at, 20 to life under the statute;

21       correct?

22  A.   Yes.

23  Q.   But under the guideline calculation you were above

24       that anyway?

25  A.   Yes.
```

1   Q.   Twenty-five to 30 is what you thought?

2   A.   Yes.

3   Q.   And did the government agree to recommend a sentence

4        at the low end of the guideline range?

5   A.   Yes.

6   Q.   And did you also understand as part of the plea that

7        you would get automatically three levels off for

8        accepting responsibility in a timely fashion?

9   A.   Yes.

10  Q.   Do you remember what day you pled guilty,

11       Mr. Johnson?

12  A.   No.

13  Q.   If I told you it was January 6 of 2009, would you

14       have any dispute with that?

15  A.   No.

16  Q.   Now, as you sit here today, do you have any clearer

17       idea about what your guideline sentence is going to

18       be?

19  A.   A little.

20  Q.   And what do you know now that that's a little more

21       clearer?

22  A.   Well, now I'm into a plea, so it's a 15-year deal.  I

23       don't know what my offense level will be, but it

24       might change.  I'm not for sure.

25  Q.   All right.  So your starting-out point is 15 to life;

1387

1    is that right?

2    A.   Yes.

3    Q.   Has a presentence report -- have you seen any sort of

4         calculations that have indicated to you what that

5         estimate is?

6    A.   No.

7    Q.   All right.  As you sit here today, based upon your

8         offense conduct then and the criminal history that

9         you possess, all you know is it's a minimum of 15 and

10        it's upward from there?

11   A.   Correct.

12   Q.   Okay.  Now, Mr. Johnson, in connection with this plea

13        agreement that you signed, did you, in fact, agree

14        that you would cooperate with the government

15        truthfully in connection with this investigation and

16        any matter in connection with this case, including

17        testifying if necessary?

18   A.   Correct.

19   Q.   And when you entered this plea agreement, did anybody

20        make promises to you about what kind of sentence you

21        would get?

22   A.   No.

23   Q.   Did anybody threaten you at all in order to get you

24        to cooperate in this case?

25   A.   No.

1   Q.   Now, Mr. Johnson, in connection with your agreement

2        with the government, if you, in fact, cooperate and

3        provide truthful information, what's your

4        understanding about what the government would do if,

5        in fact, it was determined that you had provided

6        substantial assistance?

7   A.   It would make it some of my time knocked off.

8   Q.   Do you know what we call that under the guidelines?

9   A.   No.

10  Q.   Okay.  Do you understand that would require the

11       government filing a motion?

12  A.   Yes.

13  Q.   For the judge?

14  A.   5K1 motion.

15  Q.   5K1 motion.  And in connection with that did anyone

16       promise you that the government would do that by you

17       coming in and testifying, just by doing that?

18  A.   No.

19  Q.   Okay.  Did anybody -- the government did indicate,

20       though, that if you provided substantial assistance

21       that that motion would be filed?

22  A.   Yes.

23  Q.   Did anybody make any promises, though, about what

24       kind of a reduction the government would recommend

25       for you if you testified truthfully in this case?

1    A.   No.

2    Q.   And what's your understanding about who will make the

3         ultimate decision about what sentence you get in this

4         case?

5    A.   The judge makes the ultimate decision.

6    Q.   And as you sit right now, Mr. Johnson, do you have

7         any expectation about what sentence you're going to

8         receive from Judge Lungstrum?

9    A.   I'm expecting 15.

10   Q.   All right.  And if you cooperate, do you have any

11        hopes by your cooperating what might happen with

12        regards to that, wherever you start out, whether it's

13        15 or higher, what would happen with that sentence?

14   A.   Hopefully, it gets reduced.

15   Q.   And do you have any expectation about what that

16        sentence might be?

17   A.   I have no idea what it might be.

18   Q.   Mr. Johnson, as a defendant in this case can you kind

19        of explain to the jury how you first -- or how it is

20        you're a codefendant in this case.

21   A.   I am a codefendant through Hank Grigsby.

22   Q.   Okay.  And you knew Hank then; is that right?

23   A.   Yes.

24   Q.   How did you come to know Hank Grigsby?

25   A.   Through music.

1    Q.    Through music?

2    A.    Yes.

3    Q.    Do you recall the incident that occurred on

4          September 14, 2007?

5    A.    Yes.

6    Q.    Remind the jury what happened on September 14, 2007.

7    A.    I do believe that was the day I was pulled over and

8          had a large amount of crack cocaine on me.

9    Q.    All right.  Government's Exhibit 42, do you recognize

10         that photograph, Mr. Johnson?

11   A.    Yeah.  That's my truck.

12   Q.    All right.  And who is that, Government's Exhibit 44?

13   A.    Me.

14   Q.    And Government's Exhibit 43, what's that?

15   A.    What was found in my truck.

16   Q.    All right.  And on September 14, 2007, how long

17         before that had you actually known Hank?

18   A.    Probably 2½, maybe three months.

19   Q.    And prior to this occasion on September 14, 2007, how

20         many prior -- how many times before that had you

21         bought drugs from him?

22   A.    I would say probably two or three.

23   Q.    And in connection with the times that you purchased

24         drugs from Mr. Grigsby, what drugs did you purchase

25         from him?

```
 1    A.   Crack cocaine.

 2    Q.   And are you familiar with the terms hard and soft?

 3    A.   Yes.

 4    Q.   When I say soft, what am I talking about?

 5    A.   Powder cocaine.

 6    Q.   When I say hard, what am I talking about?

 7    A.   Crack cocaine.

 8    Q.   And on the two or three prior occasions when you

 9         bought from Hank prior to September 14, 2007, you

10         said you bought crack cocaine.  Was it -- each and

11         every time you bought was it hard then?

12    A.   Yes.

13    Q.   What quantities did you buy from him on those prior

14         occasions?

15    A.   It was like an ounce to two ounces.

16    Q.   Was there a reason you bought it hard as opposed to

17         soft?

18    A.   No particular reason.  That's just the way I got it.

19    Q.   And did you know how to cook crack?

20    A.   No.

21    Q.   In connection with the times that you had met with

22         Henry Grigsby, the two to three prior times, where

23         had those incidents taken place at?

24    A.   Gas stations.

25    Q.   And on this occasion, on September 14, do you
```

1          remember where this incident happened at?

2     A.   Price Chopper.

3     Q.   On this occasion when you went to the Price Chopper

4          in Leavenworth, who did you meet with on that day?

5     A.   A guy named Shaq.

6     Q.   Shaq?

7     A.   Yes.

8     Q.   Had you met Shaq before September 14, 2007?

9     A.   No.  That was the first meeting we had.

10    Q.   And so the prior occasions Hank had made those

11         deliveries to you?

12    A.   Yes.

13    Q.   The prior occasions when Hank made those deliveries,

14         was he by himself?

15    A.   Yes.

16    Q.   And were you by yourself?

17    A.   Yes.

18    Q.   And in connection with -- was that the case on this

19         occasion?  On September 14 was Shaq by himself?

20    A.   Yes.

21    Q.   Do you know why on this occasion Mr. Grigsby sent

22         Shaq as opposed to meeting you himself?

23    A.   I do not know why.

24    Q.   Now in connection with -- back during this time

25         period, Mr. Johnson, did you use any kind of illegal

1        drugs?

2    A.   Marijuana.

3    Q.   Who did you purchase your marijuana from?

4    A.   Both Hank and Shaq.

5    Q.   Had you purchased marijuana previously from Hank and

6         Shaq?

7    A.   Yes.

8    Q.   You indicated this was the first time Shaq had

9         delivered crack to you?

10   A.   Yes.

11   Q.   Had you dealt before September 14, 2007, then buying

12        marijuana from Shaq?

13   A.   Yes.

14   Q.   And what kind of marijuana did you buy from Shaq on

15        those occasions?

16   A.   It was a high grade marijuana.

17   Q.   Do we have a name that we call that?

18   A.   Kush.

19   Q.   And have you met -- how had you met Shaq in

20        connection with this activity?

21   A.   I used to go to school with Shaq.

22   Q.   And how many times do you think you had purchased the

23        high grade marijuana from Shaq?

24   A.   Numerous times.

25   Q.   And what quantities would you buy as far as the

1394

```
 1        marijuana?

 2   A.   An eighth to a quarter.

 3   Q.   An eighth to a quarter?

 4   A.   Yeah.

 5   Q.   Is that ounces, pounds, what?

 6   A.   Ounces.

 7   Q.   Okay.  The marijuana that you would buy, the high

 8        grade marijuana from Shaq, was that from your

 9        personal use, or did you sell any of that?

10   A.   Personal use.

11   Q.   And aside from using marijuana then, did you use any

12        other illegal drugs?

13   A.   No.

14   Q.   The crack cocaine that you bought from Hank, what did

15        you do with it?

16   A.   I sold it.

17   Q.   How much did it cost for you to buy crack cocaine

18        from Hank?  You said you were buying 1 to 2 ounces?

19   A.   Yeah.

20   Q.   What was the price?

21   A.   Anywhere between $700 to $800 an ounce.

22   Q.   And if you bought 2 ounces?

23   A.   It would be $1,600.

24   Q.   All right.  And do you know what I mean when I say

25        fronting?
```

1    A.   Yes.

2    Q.   What's fronting?

3    A.   When you give somebody something with no money

4         involved.

5    Q.   In connection with your dealings with Hank and Shaq,

6         whether it was when you bought weed on prior

7         occasions or the crack cocaine, what arrangement did

8         you have with regards to paying for what you were

9         buying?

10   A.   I paid cash up front.

11   Q.   So your agreement with Mr. Grigsby with regards to

12        the crack cocaine was he would give a certain

13        quantity of crack cocaine and you would pay him for

14        that amount of crack cocaine right then and there?

15   A.   Yes.

16   Q.   The incident in which you were found with a gun and

17        crack cocaine, Mr. Johnson, where did that happen at?

18   A.   Lawrence, Kansas.

19   Q.   And, again, that happened in August of 2007; is that

20        right?

21   A.   Yes.

22   Q.   And what quantity of cocaine did you have on that

23        occasion?

24   A.   How much did I have?

25   Q.   Yes.

```
 1   A.   Like under 5 grams.

 2   Q.   Okay.  And so but you did have possession of a

 3        firearm on that date as well; is that right?

 4   A.   Yes.

 5   Q.   And we talked -- you actually have a prior

 6        conviction.  You were convicted of possession, but

 7        the original charge was sale; is that correct?

 8   A.   Yes.

 9   Q.   And in August in connection with that particular

10        situation you actually had a firearm in connection

11        with the drugs that you were in possession of; is

12        that right?

13   A.   Uh-huh.

14   Q.   Yes?

15   A.   Yes.

16   Q.   And is that something that you would typically do,

17        have a firearm in connection with being involved in

18        drug trafficking?

19   A.   Not typically, no.

20   Q.   But you did on --

21   A.   I just did that night, yes.

22   Q.   You did on that night in Lawrence?

23   A.   Yes.

24   Q.   And why did you take a gun with you on this

25        particular occasion when you went to Lawrence in
```

1      August?

2  A.   I went to a concert and I just wanted to have it with

3       me to be safe.

4  Q.   For protection?

5  A.   Yes.

6  Q.   And you had both cocaine and marijuana with you on

7       that date?

8  A.   Yes.

9  Q.   Did you have any large amount of cash on you?

10 A.   No.

11              MS. MOREHEAD:  Nothing further, Judge.

12              THE COURT:  All right.  Cross examination?

13              MR. CALBI:  No questions, your Honor.

14              MR. ROGERS:  Just a couple, your Honor.

15                   CROSS EXAMINATION

16 BY MR. ROGERS:

17 Q.   I'm not real clear on the last thing you told Ms.

18      Morehead.  You had this gun with you in August of

19      2007 in Lawrence because you went to a concert; is

20      that correct?

21 A.   Yes.

22 Q.   And so had you the gun for your protection at the

23      concert?

24 A.   Correct.

25 Q.   It wasn't there to protect your small amount of crack

1      or your small amount of weed?

2   A.   No.

3   Q.   So even though you had it and the crack and the weed

4        at the same time, the gun was not to protect the

5        drugs or the drug money?

6   A.   No, it was not.

7              MR. ROGERS:  Thank you.

8              THE COURT:  All right.  Mr. Sandage?

9              MR. SANDAGE:  No, thank you, your Honor.

10             THE COURT:  Mr. Bell?

11             MR. BELL:  No, Judge.

12             THE COURT:  Mr. Heathman?

13             MR. HEATHMAN:  No, Judge.

14             MR. BELLEMERE:  No, sir.

15             MR. JOHNSON:  No.

16             THE COURT:  Any redirect?

17             MS. MOREHEAD:  No, your Honor.

18             THE COURT:  Very well.  Mr. Johnson, that

19      does conclude your testimony.

20          Do you want to call your next witness and get

21      some preliminaries out of the way?

22             MS. MOREHEAD:  I already sent him away,

23      Judge.  He's going to be a pretty lengthy witness.  I

24      apologize.

25             THE COURT:  That's no problem.  I have the

```
 1            feeling the jury doesn't mind eight minutes.  Would
 2            counsel approach for just a minute, though, to talk
 3            about scheduling.  The marshal may take charge of
 4            Mr. Johnson at this time.
 5                      (Counsel approached the bench and the
 6            following proceedings were had:)
 7                      MS. MOREHEAD:  Eight minutes, Judge.
 8            You're killing me.
 9                      THE COURT:  Ms. HARE, one of our
10            alternates, has a sick relative in Mississippi.  She
11            has been trying to make some arrangements to get down
12            there.  Apparently, it's a cousin who is dying.
13                      MS. MOREHEAD:  Has died?
14                      THE COURT:  Dying, a dying cousin.
15                      MS. MOREHEAD:  Sorry.
16                      THE COURT:  And she's planning on driving
17            down there and has talked to Sharon about -- she and
18            Sharon have been in communication about this.  She's
19            been fine.  It's just trying to figure out whether
20            there's any possibility she can get away from here
21            earlier tomorrow than 5:00 o'clock.  Obviously, I've
22            told Sharon to be noncommittal about it because we
23            can't really afford to lose significant quantities of
24            time if the case isn't otherwise on track.  We have
25            tomorrow.  We have three trial days next week because
```

```
1    Monday and Friday are both out.  I have obligated
2    myself to select a jury on the morning of the 6th in
3    another case.  So that's the -- which is a Wednesday,
4    which I will recess this case, if necessary, to do
5    that so that I can move that other case along.
6         Ms. Morehead, where do you think we stand
7    time-wise, and what can we do, if anything, to give
8    her relief?  If we can't, we can't.  I think she will
9    understand.
10             MS. MOREHEAD:  Judge, I will be as -- I can
11   fill up all day tomorrow.  That's not a problem.  I
12   felt comfortable that -- again on Tuesday we won't be
13   starting until 10:30, I assume?
14             THE COURT:  No.  We will start at 9:00 next
15   Tuesday.
16             MS. MOREHEAD:  Great.  Awesome.
17             THE COURT:  I am finished teaching.
18             MS. MOREHEAD:  That will give me an extra
19   hour and a half.  I would say my case, I could be
20   done, I am hoping, Tuesday, but no later than
21   Wednesday.  A number of my witnesses are shorter,
22   like, some of the law enforcement people will be
23   shorter, and the way things have been coming in, it's
24   been better.  I do have a number of other
25   cooperators.  I, frankly, was going to put
```

```
1        Mr. Humphrey on tomorrow.  He doesn't have

2        information on all the defendants, so I wouldn't

3        expect cross on everyone, but he has some on some,

4        and then other law enforcement tomorrow.  I'm

5        thinking -- did I say Tuesday or Wednesday?  I am

6        sorry.  I forgot about Monday.  I want to correct

7        myself.  Wednesday or Thursday.  I would be done

8        Wednesday or Thursday next week is what I'm thinking.

9               THE COURT:  As we sit here right now,

10        without committing anyone or putting you all in a

11        box, because I'm not intending this, what are people

12        thinking about presenting your own cases, putting on

13        evidence in your own cases, based on what you've

14        heard so far and what you have a pretty good reason

15        to believe might be coming down the pike?

16               MR. CALBI:  Judge, I don't really

17        anticipate putting on anyone.  Perhaps if there's a

18        witness Ms. Morehead doesn't call that I would find

19        compelling to put on.  It would be relatively short

20        though.  It would be just for a limited purpose and

21        not anything long.  I guess that's the best way I can

22        answer the court's question.

23               MR. ROGERS:  Obviously --

24               THE COURT:  For the record he renews his

25        motion to sever, or words to that effect.
```

1        Does anybody feel like as you sit here right now

2    your answer is likely to be different from Mr.

3    Calbi's, that is, that if there's evidence it will be

4    relatively brief?  Is anybody sitting there thinking

5    you've got a lot of evidence you want to put on?

6                MR. HEATHMAN:  I don't have a lot.  I may

7    put on some.

8                MR. ROGERS:  I might have half a day's

9    worth at the maximum.

10               THE COURT:  Half a day?

11               MR. HEATHMAN:  Would be more than enough,

12   probably.

13               THE COURT:  Okay.

14               MS. MOREHEAD:  What time were you thinking

15   about cutting off short tomorrow, Judge?

16               THE COURT:  What have been your last

17   communications with her?

18               THE COURTROOM DEPUTY:  She hasn't asked me

19   again this week.  She was happy to know that she

20   wasn't due back on Monday and that would be enough.

21               THE COURT:  All right.  I'm reluctant --

22   given what I'm heard and given everything else, I'm

23   reluctant to quit early tomorrow.

24               MS. MOREHEAD:  If I happen to get done with

25   whatever witnesses I have slotted tomorrow, Judge --

```
 1        I have a number of witnesses that are not available

 2    until next week, so I'm going to push to get as many

 3    on tomorrow as I can.

 4              THE COURT:  All right.

 5              MR. JOHNSON:  Ms. Morehead, are we going to

 6    get to the witnesses with Mr. Goodwin and the Gant

 7    issue?

 8              MS. MOREHEAD:  I'm going to have them here.

 9    I'm going to --

10              THE COURT:  And the what issue?

11              MR. JOHNSON:  Gant issue.

12              THE COURT:  Excuse me.  I thought you said

13    can.

14              MS. MOREHEAD:  Gant.  Frankly, I'm only

15    intending to call Officer Vogel on the cell phone

16    itself for that limited --

17              THE COURT:  Morning, afternoon?

18              MS. MOREHEAD:  Afternoon.

19              THE COURT:  So we can talk about that over

20    the noon hour?

21              MS. MOREHEAD:  Sure, sure.

22              THE COURT:  Very good.  All right.  Thanks.

23              (The proceedings returned to open court.)

24              THE COURT:  I promise I didn't do that

25    to -- you're earning a full day's pay, you know, but
```

1    I was checking to see what our scheduling might be so

2    I could give you a report, and it appears to me we're

3    pretty much on track of where I anticipated.  You'll

4    remember that next week we only have three days.

5    This could as a result go over into the next week

6    after that, to the next Tuesday after that, or

7    Wednesday.  But, you know, I feel pretty good about

8    how we stand on the timing.  We are not going to

9    intend to stop short tomorrow even though if it did

10   happen accidentally I know some of us would think

11   that was not so bad, but in order that we make sure

12   we get as much progress done as possible, we will go

13   as far as we have witnesses available to go.  If it

14   turns out we don't go until five, we will quit then.

15   I won't waste your time chatting with the lawyers,

16   but that was the subject of our discussion, trying to

17   figure out a better idea to give you all about where

18   things stand, because I suspect that's a question

19   that's on your mind.

20        I'll remind you of the admonitions not to

21   discuss the case among yourselves or to do anything

22   which touches on the case.  Have no contact with the

23   participants, no research, no anything.  Have a nice

24   evening.  I'll see you at 9:00 tomorrow morning.

25        Ms. Scheurer, please take charge of the jury.

```
 1      Everybody remain here, if you would, and we will

 2      catch up on a couple of these things.

 3                  (The following proceedings were had outside

 4      the presence of the jury:)

 5                  THE COURT:  All right.  Now, we discussed

 6      before the break an issue we will need to raise at

 7      some point.  And be sure and not let me forget about

 8      the timing on that, Ms. Morehead.  Before you go into

 9      the cell phone, we can take that up and review that

10      outside the hearing of the jury.

11          Is there anything else we need to be thinking of

12      for tomorrow?  All right.  See you in the morning.

13      Until then we are in recess.

14                  (Court was adjourned.)

15                          * * * * *

16                  FRIDAY, APRIL 24, 2009

17                  THE COURT:  We're ready to proceed?

18                  MS. MOREHEAD:  I think Mr. Heathman had a

19      brief something.

20                  THE COURT:  I have been briefed by Ms.

21      Scheurer on your situation, Mr. Heathman, and

22      certainly regret that you've got that on your plate

23      here, and understand that you may get a vibration

24      come through to you at some point, and we will work

25      with you.
```

1          MR. HEATHMAN:  Thank you, your Honor.

2          THE COURT:  Sure.  Anything further we need

3     to do?

4          MS. MOREHEAD:  Nope.

5          THE COURT:  Then, hopefully, Ms. Scheurer

6     will bring in the jury shortly.

7          Welcome back, members of the jury.  And, Ms.

8     Morehead, you may call your next witness.

9          MS. MOREHEAD:  Thank you, your Honor.  I

10    call Thomas Humphrey.

11               THOMAS HUMPHREY,

12 having been duly sworn, was examined and testified as

13 follows:

14               DIRECT EXAMINATION

15 BY MS. MOREHEAD:

16          THE COURT:  Ms. Morehead, you may proceed.

17          MS. MOREHEAD:  Thank you, your Honor.

18 Q.   (By Ms. Morehead) How old are you, Mr. Humphrey?

19 A.   Thirty-eight.

20 Q.   And can you tell the jury a little bit about

21      yourself, where you grew up and that sort of thing.

22 A.   South Kansas City.  I went to Grandview High School.

23 Q.   And did you spend -- have you spent most of your life

24      then in the Kansas City metropolitan area?

25 A.   Yes.

1    Q.   And in connection with your presence here today, you

2         are a codefendant?

3    A.   Yes.

4    Q.   In connection with your presence here today, did you,

5         in fact, enter into a plea agreement with the

6         government in connection with the charges against

7         you?

8    A.   Yes.

9    Q.   Now, in connection with your case you were charged --

10        or you are charged with a number of counts; is that

11        right?

12   A.   Yes.

13   Q.   And tell the jury originally what you were -- what

14        you're charged with.

15   A.   Conspiracy to distribute cocaine and money

16        laundering.

17   Q.   Okay.  Originally, when you were originally indicted

18        though, you were charged with a number of other

19        counts as well; is that right?

20   A.   Yes.

21   Q.   Let's talk about that first.  In connection with this

22        particular case, you mentioned that you were charged

23        with conspiracy?

24   A.   Yes.

25   Q.   And is that a conspiracy to possess with intent to

1  distribute and to distribute 5 kilograms or more of

2  cocaine?

3  A.  Yes.

4  Q.  And manufacture, possession with intent to

5  distribute, and to distribute 50 grams or more crack

6  cocaine?

7  A.  Yes.

8  Q.  Okay.  And in addition to that particular count, you

9  were originally charged with some other substantive

10  counts as well; correct?

11  A.  Yes.

12  Q.  And that included four counts of attempted possession

13  of 5 kilograms or more -- attempt to possess

14  5 kilograms or more of cocaine; is that right?

15  A.  Yes.

16  Q.  And you were also charged with several phone counts

17  as well; is that right?

18  A.  Yes.

19  Q.  And in connection with your plea agreement, you pled

20  guilty to a superseding information; is that right?

21  A.  Yes.

22  Q.  And you pled to two counts.  Tell us now what those

23  two counts again were.

24  A.  Conspiracy to distribute and money laundering.

25  Q.  Okay.  And you've also agreed to a forfeiture of in

1     excess of $10 million, a money judgment; is that

2     right?

3  A.  Yes.

4  Q.  And when you were -- you were arrested on November 27

5     of 2007; is that correct, Mr. Humphrey?

6  A.  Yes.

7  Q.  And following your arrest, you were appointed an

8     attorney?

9  A.  Yes.

10 Q.  And in connection with the representation that you

11    had with that attorney, what did you do -- well,

12    actually, upon your arrest, what did you do in

13    connection with this particular case?

14 A.  As far as my property and stuff that was forfeited,

15    or --

16 Q.  Yeah.  What did you -- the minute you were arrested

17    on November 27, what did you start doing?

18 A.  I don't know what you're saying.

19 Q.  Did you start cooperating with the agents and the

20    government right away in this investigation?

21 A.  Not right away, no.

22 Q.  When did you start?

23 A.  With my finances, it was like December, so right

24    after I was arrested is my finances.  I forfeited my

25    properties, my vehicles, and all my cash and bank

```
 1        accounts, yes.

 2   Q.   All right.  And you began discussions then with the

 3        government about cooperating in connection with this

 4        case?

 5   A.   Yes.

 6   Q.   And has that cooperation been an ongoing process and

 7        has it continued?

 8   A.   Yes.  It started with the Missouri side, like I said,

 9        my property and my case over there, yes.

10   Q.   Okay.  And in connection then with the indictment

11        that was handed down in February of 2008, you were

12        indicted along with 23 other individuals; is that

13        right?

14   A.   Yes.

15   Q.   Is it safe to say back in 2006 and 2007 there were

16        some of those individuals that you knew and some of

17        those individuals that you didn't know?

18   A.   Yes.

19   Q.   In connection with your plea agreement, let's talk

20        about the original charges.  When you were kind of

21        assessing what you were going to do in this

22        particular case, I assume you had some idea based

23        upon the charges that you were originally facing what

24        kind of a sentence you thought you might be facing?

25   A.   Yes.
```

1    Q.   And before you pled guilty and pled to the two counts

2         you mentioned, what did you think you were going to

3         be facing as far as a possible sentence?

4    A.   Approximately 15 years.

5    Q.   Okay.  And the charge of conspiracy, do you know what

6         the statutory mandatory minimum of that particular

7         sentence, what it calls for?

8    A.   5 kilograms or more, ten years.

9    Q.   And what's the maximum?

10   A.   Life.

11   Q.   And under the Sentencing Guidelines, what's your

12        understanding of how the Sentencing Guidelines

13        determine what your sentence is going to be?

14   A.   They go off your criminal history and add that to the

15        current offense.  That's all I know.

16   Q.   And that gives the possible range that you're looking

17        at under the Sentencing Guidelines?

18   A.   Yes.

19   Q.   And the estimate that you had before you pled guilty

20        to 15 years, is that based upon the Sentencing

21        Guidelines calculation that you thought you would

22        fall under then?

23   A.   No.  I hadn't looked at the guidelines yet.  It was

24        just a guess on my part.

25   Q.   That was just your guess.  All right.  Since then

1    have you kind of looked over the guidelines?  Do you

2    have some idea now what you're looking at under the

3    guidelines?

4  A.   Yes.

5  Q.   As you sit here today, what's your understanding of

6    what you would be facing under the Sentencing

7    Guidelines?

8  A.   Closer to life.

9  Q.   And so even though initially when you thought all you

10    might be looking at is 15 years, as time progressed

11    and it became apparent that you were looking at life,

12    did that at all -- when you began cooperating, you

13    believed that you were looking at 15 years; is that

14    what you're saying?

15  A.   No.  When I got arrested, I believed I was looking at

16    15 years.

17  Q.   All right.  And when you began cooperating, what did

18    you believe?

19  A.   I had already found out that I was looking at closer

20    to life.

21  Q.   All right.  And so once you came to that realization,

22    that you were looking closer to spending the rest of

23    your life in prison, what did you decide to do then?

24  A.   I decided to cooperate.

25  Q.   This is not your -- I hate to use cliches, but this

```
 1        is not your first rodeo, is it, Mr. Humphrey?
 2   A.   No, ma'am.
 3   Q.   In fact, in 1992 you were convicted in the Western
 4        District of Missouri for conspiracy to distribute
 5        crack cocaine?
 6   A.   Yes.
 7   Q.   And in connection with that conviction, the
 8        government certainly could have filed an 851 against
 9        you.  Do you know what an 851 is?
10   A.   Yes.
11   Q.   What's your understanding of what an 851 is?
12   A.   Double the penalty.
13   Q.   And that would have had you facing on the minimum
14        side 20 years, but you still would have been facing
15        up to life?
16   A.   Yes.
17   Q.   All right.  And so in connection with your decision
18        to cooperate, have you, in fact, been interviewed a
19        number of times?
20   A.   Yes.
21   Q.   By a number of different law enforcement personnel
22        and different agencies?
23   A.   IRS, a lot, yeah.
24   Q.   Okay.  In connection with the plea agreement that you
25        entered into with the government, the two counts that
```

1       you pled guilty to, what's the minimum sentence that

2       you could face, again, on those two charges under the

3       plea agreement?

4   A.   I believe 30 years.

5   Q.   Thirty years?

6   A.   I believe so.

7   Q.   And what's the maximum?

8   A.   Life.

9   Q.   Okay.  And in connection with your plea agreement,

10       your understanding, part of the plea agreement is

11       that we would recommend that the judge sentence you

12       under the guidelines; correct?

13  A.   Yes.

14  Q.   And that the government would recommend a sentence at

15       the low end of wherever you end up on the guidelines?

16       Is that also your understanding?

17  A.   Yes.

18  Q.   In the plea agreement did you, in fact, agree to

19       cooperate fully and truthfully in any matter,

20       including in the prosecution of other individuals in

21       this particular case?

22  A.   Yes.

23  Q.   Which would include testifying?

24  A.   Yes.

25  Q.   And in connection with that, if, in fact, there was a

1    decision made by the government that you had provided

2    substantial assistance in this case or any other case

3    or any other matters, what was your understanding of

4    what the government agreed to do in connection with

5    your plea agreement?

6  A.  They would recommend a downward departure.

7  Q.  And do you know what that's called?

8  A.  A 5K1.

9  Q.  And in connection with that provision of the plea

10   agreement, do you understand that it's the

11   government's decision whether that motion gets filed?

12 A.  Yes.

13 Q.  In connection with that motion, has anybody made any

14   promises that anybody will make such a motion on your

15   behalf?

16 A.  No.

17 Q.  Has anybody made any sort of promise to you about

18   what sentence you're going to get in this case?

19 A.  No.

20 Q.  In connection with the sentence in this case, what's

21   your understanding about who makes the final decision

22   about what sentence you're going to get?

23 A.  The judge.

24 Q.  If, in fact, there's a decision by the government, or

25   for that matter by the judge, that you've not

1    testified truthfully or that you've, you know, lied

2    under oath, what do you think that would do, first of

3    all, with regards to the plea agreement, and second

4    of all, what do you think that would do with regards

5    to your sentence?

6  A.  Enhancement.

7  Q.  If that happened, do you think you would still get

8    the benefit of the plea agreement?

9  A.  No.

10 Q.  Do you think you would get a 5K motion filed?

11 A.  No.

12 Q.  Mr. Humphrey, we know back in 1992 you were involved

13   with drug trafficking; is that right?

14 A.  Yes.

15 Q.  And can you tell the jury how long you have been

16   involved in trafficking illegal narcotics.

17 A.  From '92 -- well, I was incarcerated for seven of

18   those years, so I wasn't then.

19 Q.  So you got a seven-year sentence in your 1992 case?

20 A.  Yes.  Well, I got eight years and a month, but I had

21   to do seven of it.

22 Q.  All right.

23 A.  And then I started back in 2000 something, 2004,

24   maybe.

25 Q.  After your release from imprisonment were you on

1       supervision, like, parole or probation?

2    A.   Yes.

3    Q.   And did you complete that term of supervision?

4    A.   Yes.  Five years of supervision.

5    Q.   And once you got off supervision, did you, in fact,

6         start selling drugs again?

7    A.   Yes.

8    Q.   And when you got out of prison after serving seven

9         years, what did you do during the five years that you

10        were not involved in drug trafficking?

11   A.   I worked.  You mean what did I do, what type of work?

12   Q.   Uh-huh.

13   A.   I was a sheet metal worker.

14   Q.   Okay.  And did you, in fact, become a businessman at

15        some point?

16   A.   Yes.

17   Q.   Tell the jury about that.

18   A.   I bought an audio stereo rim and tire shop, bought a

19        bunch of real estate, and had acquired a few

20        restaurants and a store.  So . . .

21   Q.   And the audio shop that you mentioned, what was the

22        name of it?

23   A.   A16 Audio & Wheels.

24   Q.   And where was that located?

25   A.   8716 East 67th Street.

1    Q.   And when did you start that business?  Approximately

2         if you can't be exact.

3    A.   2003.

4    Q.   Okay.  And you said you bought some properties?

5    A.   Yes.

6    Q.   What kind of properties did you buy?

7    A.   Apartment building and just rental, single-family

8         rental houses.

9    Q.   And when did you buy those properties, or was it over

10        a period of time?

11   A.   Yes, since my release.

12   Q.   You mentioned that you owned a couple of restaurants?

13   A.   Yes.

14   Q.   What kind of restaurants did you own?

15   A.   Fish restaurants.

16   Q.   And what was the name of those?

17   A.   Lutfis Fried Fish; two in Omaha, Nebraska, and two in

18        the inner city of Kansas City.

19   Q.   When did you have those restaurants?

20   A.   2007?  2006, 2007.  2007.

21   Q.   And once you started selling drugs again after you

22        were off supervision, did you start -- some of the

23        money that you were making from your businesses, your

24        rental properties and stuff, was that being used in

25        connection with -- or let me ask you this:  Was your

```
 1        the money that you were generating from your drug

 2        trafficking, was that being commingled and joined

 3        with your legitimate money that you were making from

 4        your businesses?

 5   A.   Yes.

 6   Q.   And 2006, 2007, were you a pretty successful

 7        individual?

 8   A.   Yes.

 9   Q.   And in connection with drugs, were you a user of

10        drugs, Mr. Humphrey?

11   A.   Not cocaine or anything like that, no.

12   Q.   What would you use?

13   A.   When I used to work out, steroids and occasional

14        marijuana use.

15   Q.   Okay.  Was that -- the marijuana use, was that

16        recreational or --

17   A.   Yes.

18   Q.   Okay.  And In connection with the drug trafficking

19        that you did, what drugs have you been involved in?

20        And let's -- dating back to 1992, it was obviously

21        crack; right?

22   A.   Yes.

23   Q.   What about when you started selling drugs again in --

24        did you say that was about 2004?

25   A.   Yes, somewhere around there.
```

1    Q.   Okay.  What were you selling once you started selling

2         drugs again?

3    A.   Marijuana.

4    Q.   How long did you sell marijuana?

5    A.   For -- up until the time that I got arrested, but

6         cocaine came in later.

7    Q.   All right.  About when did cocaine come in later?

8    A.   At least 2005.

9    Q.   And the marijuana that you were involved in

10        distributing, what quantities of marijuana would you

11        be involved in?

12   A.   Hundreds of pounds.

13   Q.   And once cocaine got -- kind of 2005, I think you

14        said, what happened with regards to your marijuana

15        business?

16   A.   It continued but yet it was secondhand.  It wasn't my

17        priority.

18   Q.   It was not your priority?

19   A.   No.

20   Q.   And in connection with this particular case, did you

21        come to be acquainted with an individual named

22        Monterial Wesley?

23   A.   Yes.

24   Q.   And tell the jury how you became acquainted with

25        Monterial Wesley.

```
 1   A.   Through his relative.  I think it was a cousin or
 2        something.
 3   Q.   And what was that cousin's name?
 4   A.   Monster.
 5   Q.   Monster?
 6   A.   Yes.
 7   Q.   Okay.  Do you know his real name?
 8   A.   Clinton Holman.
 9   Q.   How were you acquainted with Clinton Holman?
10   A.   We met in prison.
11   Q.   And was that when you were in prison --
12   A.   From '92 to '99, yes.
13   Q.   Okay.  Did you know Clinton Holman before that then?
14   A.   No.
15   Q.   Once you got out of prison, did you and Clinton
16        Holman have contact with each other after that?
17   A.   Yes.
18   Q.   And do you remember about when you met Monterial
19        Wesley?
20   A.   I believe that it was 2006.
21   Q.   And in -- do you recall the circumstances of how you
22        met Monterial Wesley?
23   A.   Yes.  His cousin brought him along with us somewhere.
24   Q.   Okay.  And what kind of relationship did you and
25        Clinton Holman have before you met Monterial Wesley?
```

```
 1    A.    We were slash business partners.

 2    Q.    Okay.  What do you mean by that?

 3    A.    We went in together on quantities of cocaine.

 4    Q.    Okay.  And once you met Monterial Wesley in 2006,

 5          tell me how your -- what happened with regards to

 6          your contact with Monterial Wesley.

 7    A.    We just met, or whatever, whenever Clinton was

 8          around, and after that we seen each other a few times

 9          when me and Clinton went to go get cocaine, and then

10          it escalated from there.

11    Q.    You said it escalated from there.  You and Clinton

12          Holman were in a business arrangement together.  And

13          describe for me how that would work.

14    A.    He just knew somebody we could get cocaine from, but

15          we had to buy so much to get it at a cheaper price,

16          so that's where us three came in at.

17    Q.    Us three, who are you talking about?

18    A.    Me, Clinton, and Monterial.

19    Q.    All right.  So 2006 you start pooling your money

20          together to get quantities of cocaine from Clinton

21          Holman's supplier?

22    A.    Yes.

23    Q.    Did that situation change at some point?

24    A.    Yes.

25    Q.    How did it change, or why did it change?
```

```
 1   A.   Clinton -- something happened to Clinton, and he had

 2        to go away for a little while, and then I had a

 3        connect.

 4   Q.   All right.  What happened with regards to Clinton

 5        Holman?

 6   A.   I think he went on the run.

 7   Q.   Okay.  And was he eventually arrested?

 8   A.   Yes.

 9   Q.   Did you help him out on that?

10   A.   Yes.

11   Q.   What did you do?

12   A.   I bonded him out.

13   Q.   Okay.  And so once Clinton Holman -- and do you know

14        why Clinton Holman went on the run?  Did you know

15        anything about that situation personally?

16   A.   The particular case --

17             MR. ROGERS:  I object to that as

18        irrelevant, your Honor.

19             MS. MOREHEAD:  Judge, it's part of the

20        conspiracy.  It's back in 2006.

21             THE COURT:  Unless it's really closely

22        involved, I think it's just going to take us off on

23        some other -- why don't you move on.

24             MS. MOREHEAD:  I will.

25   Q.   (By Ms. Morehead) Once Clinton Holman went on the
```

```
 1          run, you indicated that you got another connect.  Is

 2          that what you said?

 3     A.   Yes.

 4     Q.   What do you mean by that?

 5     A.   Another source for cocaine.

 6     Q.   And how did you come up with that other source of

 7          cocaine?

 8     A.   I met him in Kansas City.

 9     Q.   How did that happen?

10     A.   I was buying marijuana and the mention of cocaine

11          came up.

12     Q.   And who was that individual, Mr. Humphrey?

13     A.   His name was Alberto or something like that.  He got

14          killed in '06.

15     Q.   Okay.  Alberto -- what race was Alberto?

16     A.   Mexican.

17     Q.   So were you buying marijuana from Alberto initially?

18     A.   Yes.

19     Q.   And somehow the subject of cocaine came up?

20     A.   Uh-huh.

21     Q.   Yes?

22     A.   Yes.  I'm sorry.

23     Q.   And in '06 -- and, again, this is in '06 -- how long

24          were you buying cocaine from Alberto?

25     A.   I don't know exactly which month.  Like I said, I was
```

1      already buying marijuana from him.  I don't know

2      exactly when it transferred over to cocaine, but the

3      majority of '06.

4   Q.   How much weed were you buying from Alberto?

5   A.   Two, three hundred pounds at a time.

6   Q.   And then once that switched over to cocaine -- did

7      you switch over to getting cocaine from Alberto

8      shortly after Holman went on the run and you lost

9      that source of cocaine?

10  A.   Yes.

11  Q.   Okay.  And so Alberto then became your source of

12     cocaine?

13  A.   Yes.

14  Q.   And how much cocaine would you buy from Alberto?

15  A.   In between 10 and 20 kilos at a time.

16  Q.   And how often would you buy quantities of cocaine

17     from Alberto?

18  A.   Every week.

19  Q.   And how would the cocaine from Alberto get to you?

20  A.   From Mexico here just in transportation, different

21     vehicles, whatever.

22  Q.   Would Alberto bring that to you himself?

23  A.   No.

24  Q.   Or did he have couriers?

25  A.   Couriers.

1    Q.    And where would that -- did he bring marijuana you --

2          did you receive marijuana the same time you would

3          receive your shipment of cocaine?

4    A.    No.

5    Q.    Those were two separate --

6    A.    -- vehicles, yes.

7    Q.    Okay.  And in connection with the cocaine that you

8          would get on a weekly basis -- and, again, we're in

9          2006 -- how much were you buying that cocaine for,

10         from Alberto?

11   A.    How much of the cocaine was I getting from him?

12   Q.    No.  I'm sorry.  How much were you paying for the

13         cocaine that you were buying from Alberto?

14   A.    In 2006 about 14,000, 14,500.

15   Q.    Okay.  And the cocaine that you would get in 2006 on

16         a weekly basis, what did you do with regards to that?

17   A.    I distributed it in Kansas City.

18   Q.    And can you tell us who your customer base was with

19         the cocaine that you got in 2006.

20   A.    Clinton Holman, Monterial Wesley, and that was pretty

21         much it then.

22   Q.    Was this a situation where you were still pooling

23         your money together?

24   A.    No.

25   Q.    Or was this a situation where you were buying it

1    yourself and then selling it to the other people?

2  A.   I sold it to the other people.

3  Q.   And when you would do that, when you would sell it to

4       them in that fashion, Clinton Holman and Terio, as

5       you said, how much would you profit on the kilograms

6       of cocaine?

7  A.   I was selling it for roughly seventeen five, 17,500.

8       So roughly $3,000 off each one.

9  Q.   Okay.  And, again, remind -- I didn't make myself a

10      note.  I try to do that so then I don't have to come

11      back and ask again because my memory is bad.  What

12      was the quantity you were getting on a weekly basis

13      of cocaine?

14 A.   It started in between 10 and 20.

15 Q.   Did it ever increase with Alberto?

16 A.   Well, the vehicle only hold 20, depending on the

17      size, so if he sent another vehicle, yes.

18 Q.   Okay.  Were there sometimes that you would get more

19      than one shipment in a week?

20 A.   Yes.

21 Q.   What would be the most that you would get in a week?

22 A.   Tops would have been 40, but I think, depending on

23      the size of them, I think the most I received was 38

24      or 37.

25 Q.   Thirty-seven or 38 kilos?

```
 1    A.    Yes.

 2    Q.    And in connection then with your relationship with

 3          Monterial Wesley in 2006, once you began selling then

 4          the cocaine to him, did you -- were you in the

 5          business of selling marijuana to Monterial Wesley?

 6    A.    Not really.

 7    Q.    What do you mean, not really?

 8    A.    It was small quantities.  It was -- not really.

 9    Q.    What quantities of marijuana -- again let's keep it

10          in 2006, when Alberto was your supplier.  How much

11          marijuana might you sell to Monterial Wesley?

12    A.    Maybe 20 pounds.

13    Q.    Twenty pounds?

14    A.    Of marijuana.

15    Q.    Total or --

16    A.    Yes.  I mean, if he wanted that, that would be the

17          most.

18    Q.    Okay.  Was this just brick marijuana?

19    A.    Yes.

20    Q.    How much -- what was the price of brick marijuana

21          that you were getting from Alberto?

22    A.    I paid probably $170 a pound, and then I paid the

23          driver $100 each pound to bring it, so 270, maybe.

24    Q.    Okay.  And how much would you turn around and sell

25          that weed for?
```

```
 1   A.   Roughly 400.

 2   Q.   And then you said, I think, something happened to

 3        Alberto in 2006?

 4   A.   Yes.

 5   Q.   What happened to him?

 6   A.   Somebody killed him.

 7   Q.   And do you remember when that was?

 8   A.   No, ma'am.

 9   Q.   Sometime in 2006 though?

10   A.   I'm pretty sure it was 2006.

11   Q.   And what happened -- you no longer then had a source,

12        or Alberto was no longer your source.  What

13        happened -- and let me ask you this:  In 2006 before

14        Alberto got killed, was he your only source of

15        cocaine?

16   A.   Yes.

17   Q.   Okay.  And after he was killed, what happened?

18   A.   Right before he was killed, I would say he sold my

19        number to a guy in Mexico, so that's one of the guys

20        in the picture over there.

21   Q.   All right.  And Alberto, you said, sold your number

22        to someone else?

23   A.   Yes.

24   Q.   What do you mean by that?  What number are you

25        talking about?
```

```
 1    A.   My telephone number.

 2    Q.   All right.  And you said his picture, and you pointed

 3         over here.  Whose picture are you referring to?

 4    A.   Jerry.

 5    Q.   Okay.  And the jury sees here a picture on top of

 6         this chart, Gerardo Trevino?

 7    A.   Yes.

 8    Q.   Okay.  And you came to know him as Jerry then?

 9    A.   Yes.

10    Q.   So just before Alberto gets killed, he sells your

11         number to Jerry?

12    A.   And his associates, yes.

13    Q.   And Jerry's associate?

14    A.   Uh-huh.

15    Q.   Then what happened once Jerry gets your number?

16    A.   It was more regular, you know.  The shipments was

17         more regular, and that was it.

18    Q.   All right.  So Jerry gets your number.  Does Jerry

19         then become your supplier?

20    A.   Yes.

21    Q.   And when your number gets sold, did Alberto tell you

22         that he had done that?

23    A.   I went to Mexico and I met him.

24    Q.   You met who?

25    A.   I met Jerry and the other associate guys.
```

1    Q.   All right.  So Alberto -- or was that something

2         Alberto arranged before he was killed then?

3    A.   Yes.

4    Q.   Okay.  So you go to Mexico and meet now Jerry and his

5         associates?

6    A.   Yes.

7    Q.   How many folks do you think you met while you were in

8         Mexico?

9    A.   Just them three.

10   Q.   Just which three?

11   A.   Jerry and the other two guys.  They didn't speak any

12        English.

13   Q.   Jerry spoke English?

14   A.   Yes.

15   Q.   What was the purpose of going down to Mexico and

16        meeting with Jerry and his associates?

17   A.   To continue business.

18   Q.   Do you remember about when you would have went down

19        to Mexico for the purpose of that meeting?

20   A.   No.  I might -- my passport would show it.  That

21        would be about it.  I don't recall.

22   Q.   And in connection then with that trip down there, how

23        long did you stay in Mexico?

24   A.   Just a few days.

25   Q.   What all did you and Jerry do down there?

1   A.   Just talked business and --

2   Q.   Did he show you any of his operation down there or

3        any details about what he was doing in Mexico?

4   A.   Just how it would get across the border, the

5        different vehicles and stuff, and guaranteed it.

6        That's all.

7   Q.   Okay.  And so are we still in 2006 when Jerry comes

8        into the picture?

9   A.   Yes.

10  Q.   So 2006 and forward to November 27 of 2007 was Jerry

11       your source?

12  A.   Yes.

13  Q.   You made a comment that the shipments were more

14       regular.  What do you mean by that?

15  A.   Like, every week, you know.  I mean, no skipping a

16       week.

17  Q.   Were there sometimes with Alberto that a week might

18       be skipped?

19  A.   Yes.

20  Q.   And did that create any problem for you?

21  A.   Yes.

22  Q.   Why?

23  A.   Supply and demand.

24  Q.   If you didn't have the supply, what did your

25       customers say about that?

```
 1    A.    They would go elsewhere.

 2    Q.    Okay.  Now, you mentioned that when you were dealing

 3          with Alberto Clinton and Terio were your customers?

 4    A.    Yes.

 5    Q.    Were there other people that you would sell

 6          quantities of cocaine to on occasion during that time

 7          period when you were dealing with Alberto?

 8    A.    Yes.

 9    Q.    Once you began dealing with Jerry, did your customer

10          base expand at all?

11    A.    No.

12    Q.    No?  You kept still dealing with the same

13          individuals?

14    A.    Yes.

15    Q.    And what other individuals besides Clinton Holman and

16          Monterial Wesley would you sell cocaine to that you

17          got from either Alberto or Jerry?

18    A.    Well, when Alberto was alive, it was a guy named

19          Sheldon.  He was a barber in South Kansas City.  He

20          got killed in '06 also.

21    Q.    Okay.

22    A.    Another individual named Black.  He's already in the

23          federal system.  And Black's cousin.  He's in the

24          federal system too.

25    Q.    Okay.  What about once you started dealing with Jerry
```

| | |
|---|---|
| 1 | in '06 into '07 now?  Who else were you selling |
| 2 | cocaine to besides Clinton Holman and Monterial |
| 3 | Wesley?  And at some point did Clinton Holman fall |
| 4 | out of your customer base? |
| 5 | A.   He fell out, yes. |
| 6 | Q.   Okay. |
| 7 | A.   So it was Kevin Harris and Vinol Wilson. |
| 8 | Q.   At that point you had Monterial Wesley, Kevin Harris, |
| 9 | and Vinol Wilson? |
| 10 | A.   Yes. |
| 11 | Q.   All right.  And in connection then with dealing with |
| 12 | Jerry, you said the shipments became more regular. |
| 13 | What kind of vehicles would bring these shipments of |
| 14 | cocaine to you? |
| 15 | A.   Little four-door cars and pickup trucks. |
| 16 | Q.   Was it always the same courier that brought that, |
| 17 | brought the cocaine? |
| 18 | A.   No. |
| 19 | Q.   Or was it different folks? |
| 20 | A.   It was different. |
| 21 | Q.   Once you started dealing with Jerry, did you buy |
| 22 | marijuana from Jerry as well? |
| 23 | A.   No.  Cut that off. |
| 24 | Q.   So when you started dealing with Jerry, you weren't |
| 25 | buying marijuana? |

1    A.   Not from Jerry.   I was getting Brazilian marijuana,

2         but it was from some guys that got busted in Kansas

3         City, some Spanish guys.

4    Q.   All right.   And that source then of marijuana, when

5         did it dry up?   When did they get busted?

6    A.   '07.

7    Q.   And how much marijuana were you buying from those

8         folks?

9    A.   Three or four hundred pounds a week.

10   Q.   With regards to once you started dealing with Jerry,

11        were you also selling -- you said you would sell

12        cocaine to Kevin Harris?

13   A.   Yes.

14   Q.   Did you also sell marijuana to Kevin Harris?

15   A.   No.

16   Q.   Vinol Wilson.   You mentioned him with the cocaine

17        that Jerry was supplying.   Did you also sell

18        marijuana to Vinol Wilson?

19   A.   No.

20   Q.   When you started dealing with Jerry in '06 and '07,

21        you indicated you were selling some of that cocaine

22        to Monterial Wesley.   Were you also still selling

23        marijuana to Monterial Wesley?

24   A.   In '07, no.

25   Q.   Did you have -- because you mentioned Monterial

```
 1          Wesley.  When you were selling him marijuana, it
 2          would only be maybe 20 pounds whenever he wanted it.
 3          Did you have other customers that you were
 4          distributing your marijuana to?
 5   A.     Yes.
 6   Q.     And Kevin Harris, was he, in fact, prosecuted in the
 7          Western District of Missouri?
 8   A.     Yes.
 9   Q.     Did you cooperate in connection with his prosecution?
10   A.     Yes.
11   Q.     And Vinol Wilson, he's part and parcel of this case;
12          is that right?
13   A.     Yes.
14   Q.     Now, Mr. Humphrey, when these shipments of cocaine
15          would come in -- I want to focus on Jerry now.  I
16          think we have talked about Alberto.  But Jerry, where
17          would those shipments be delivered to?
18   A.     You mean the actual residence or --
19   Q.     Yeah.  When they would bring the shipment in, how did
20          you actually get -- how did you get it?
21   A.     I rented a garage, like, a storage facility, and I
22          offloaded it there.
23   Q.     And where was that storage facility?
24   A.     Off of Hickman Mills Drive and Longview Road.
25   Q.     Is that where you would store your marijuana as well?
```

```
 1    A.    No.  As soon as I got it, it was gone.

 2    Q.    The marijuana?

 3    A.    Everything.  So I never had to store anything.

 4    Q.    Okay.  So the storage shed that you rented?

 5    A.    It was just to pull the vehicle in, unload it, get

 6          the vehicle back out, and carry on.

 7    Q.    All right.  And when you said as soon as you got your

 8          shipment, whether it be weed or cocaine, it would be

 9          gone, what do you mean by that?

10    A.    I already had people lined up to take it.

11    Q.    Why did you do that?

12    A.    Don't want to store it, didn't want to get caught

13          with it.

14    Q.    And did you have -- did Jerry ever make those

15          deliveries himself?

16    A.    Yes.  All the time after Alberto was gone.

17    Q.    Jerry would make those deliveries?

18    A.    Yes.

19    Q.    Anybody else besides Jerry make those deliveries

20          then?

21    A.    He would be there, but I don't know who the other

22          people would be.

23    Q.    There would be other people with Jerry then?

24    A.    He would drop them off sometimes, so I would never

25          see him.
```

1   Q.   And when -- when Jerry would meet with you then, you

2        would offload the drugs, what arrangements did you

3        and Jerry have about settling up?

4   A.   I would pay him and load the truck back up and he

5        takes off.

6   Q.   Okay.  And you said that you had people lined up.

7        Did you have a way that you liked to do business with

8        your customers?

9   A.   Yes.

10  Q.   What arrangements did you have, or did you have

11       different arrangements with the different folks?

12  A.   Different arrangements with different folks.

13  Q.   Like, with Vinol Wilson, what arrangements did you

14       have with him?

15  A.   I would drop it off and come back and pick up the

16       money.

17  Q.   You would drop off the cocaine to him?

18  A.   Yes.

19  Q.   And where would you and Vinol Wilson typically make

20       that swap?

21  A.   His house.

22  Q.   And where did he live at?

23  A.   Off of Blue Ridge, 70 --

24  Q.   In Missouri?

25  A.   Seventy and Blue Ridge, something like that, yes.

1   Q.   Did you know where he was distributing his cocaine

2        at?

3   A.   Topeka.

4   Q.   Topeka, Kansas?

5   A.   Yes.

6   Q.   And you would drop the cocaine off at his house, and

7        then he would pay you when?

8   A.   Minutes later or hours -- or an hour later.

9   Q.   Okay.  And we call -- is there a term that we use

10       when you don't get paid right away?

11  A.   Fronting.

12  Q.   Fronting?

13  A.   Yes.

14  Q.   Okay.  Were there times -- were there ever any times

15       with Jerry that you didn't have the money to pay him,

16       to send him back on his way, and he had to wait

17       around or anything?

18  A.   Yes.

19  Q.   That happened?

20  A.   Yes.

21  Q.   How often would that happen?

22  A.   After I bought a lot of those businesses, I fell a

23       little short on cash.

24  Q.   Okay.  And sometimes he would have to wait then until

25       you got your money to pay him?

1   A.   Yes.

2   Q.   And then what about with Kevin Harris?  And, again,

3        with Jerry you would offload at the storage facility.

4        And what arrangements would you make with Kevin

5        Harris?

6   A.   We would swap right there?

7   Q.   At the storage facility?

8   A.   No.  Wherever we meet at, we would just swap right

9        there.

10  Q.   You would deliver the cocaine to Kevin Harris, and he

11       would pay you right there?

12  A.   Yes.

13  Q.   What about with Monterial Wesley?

14  A.   I would give it to him, and it would take him a few

15       hours to come back.

16  Q.   With --

17  A.   With the money.

18  Q.   With the money?

19  A.   Yes.

20  Q.   Okay.  In connection with Vinol Wilson, did the

21       quantity of cocaine that you were getting from Jerry,

22       was that similar to what you had been getting from

23       Alberto?

24  A.   Yes.  It was just steadier, you know.

25  Q.   Okay.  Would it be -- how much would -- what would

```
 1          the quantity be that you would get on a weekly basis

 2          from Jerry?

 3     A.   The most per vehicle would be 20.

 4     Q.   Okay.  And, again, was that pretty much a weekly

 5          basis?

 6     A.   Pretty much.

 7     Q.   Were there any times -- you mentioned with Alberto

 8          there were some weeks that skipped or you didn't get

 9          the delivery.  Did that happen with jerry?

10     A.   Yes.

11     Q.   And how often did that happen?

12     A.   It was mostly by my choice because of the price

13          increase and I didn't want to pay the difference.

14     Q.   Okay.

15     A.   So I just say forget it.

16     Q.   I think you said you started out with Alberto paying

17          14,500?

18     A.   Yes.

19     Q.   When you started dealing with Jerry in 2006, how much

20          were you paying a kilo then?

21     A.   The least I paid was 12,500, and the most I paid was

22          16,500.

23     Q.   All right.  Which some of that was less than what you

24          had been paying with Alberto, but it ended up going

25          above what you had been paying Alberto?
```

1    A.    Yes.

2    Q.    And you never paid more than 16,000 then a kilo from

3          Jerry?

4    A.    Sixteen five.

5    Q.    Sixteen five.  Sorry.  My mistake.  And with regards

6          to Kevin Harris, the quantity of cocaine that you

7          would get -- or let me just ask you this:  With

8          regards to Kevin Harris, Vinol Wilson, and Monterial

9          Wesley, when you would get a shipment of cocaine in,

10         how did you go about the business of dividing it up

11         or determining, you know, who got what?

12   A.    Demand.

13   Q.    Whatever they wanted then or whatever you could get?

14   A.    Whatever they could pay for today.

15   Q.    Okay.  And with regards to Vinol Wilson, what was

16         kind of the -- was there a typical amount that you

17         would sell to Vinol Wilson, or did it vary from time

18         to time?

19   A.    It varied from time to time.

20   Q.    What would the least amount be that Vinol Wilson

21         might buy from you at a time?

22   A.    Two.

23   Q.    And what would the most be?

24   A.    Ten.

25   Q.    And what was the average?

1    A.    Five.

2    Q.    And what about with regards to Kevin Harris?

3    A.    About five.

4    Q.    About five?

5    A.    Yeah, the average.

6    Q.    And what about with regards to Monterial Wesley?

7    A.    Average or just overall?

8    Q.    Average.  Let's start there.

9    A.    The later part of the year, just five.

10   Q.    Okay.  Later part of what year?

11   A.    '07.

12   Q.    What was the least amount -- when you were dealing

13         with Jerry, '06, '07, what was the least amount of

14         cocaine that you were selling to Monterial Wesley?

15   A.    Five at a time.

16   Q.    Five at a time?

17   A.    Yes.

18   Q.    And what was the most that you would have ever sold

19         him at one time?

20   A.    Ever?  Well, in the same day, or what are you saying?

21   Q.    Yeah, however you need to do that.

22   A.    Okay.  The most ever was 20.

23   Q.    Okay.  And you indicated that with regards to Vinol

24         Wilson and Monterial Wesley you would drop it off and

25         get the money later; is that right?

1444

1   A.   Yes.

2   Q.   Did you ever get shorted any of your money from

3        anyone?

4   A.   Yes.

5   Q.   Who did you ever get shorted with?

6   A.   Mostly Monterial.

7   Q.   Okay.  Now, you talked about supply and demand and

8        that the price of cocaine went up.  You were paying

9        all the way up to 16,500 with Jerry.  Why didn't you

10       like paying that higher price?

11  A.   Because I didn't like to raise the prices on the guys

12       that I was dealing with.

13  Q.   Why?

14  A.   Complaints.

15  Q.   Okay.  And when the price went up to sixteen five,

16       what were you having to turn around and sell the

17       cocaine that -- the kilos that you were selling?

18  A.   Nineteen and twenty.

19  Q.   So you had to raise your prices between 19,000 and

20       20,000?

21  A.   Yes.

22  Q.   Per kilo?  And in connection then with -- do you know

23       why the price went up between 2006 and progressing

24       into 2007?

25  A.   The new Mexican president.

1445

1    Q.   Okay.  And what happened with regards to the supply

2         of cocaine?

3    A.   It went down.

4    Q.   And in connection then with the supply going down,

5         prices went up?

6    A.   Yes.

7    Q.   Now, did you ever have any episodes or occurrences

8         where you would get bad shipments of drugs?

9    A.   One.

10   Q.   One time?

11   A.   Yes.

12   Q.   Tell the jury about that.

13   A.   I got like 20 bad kilos, and I got stuck with them

14        here in Kansas City, so I distributed them.

15   Q.   Did you know when you first got them that they were

16        bad?

17   A.   No.

18   Q.   Would you have had any way of knowing that?

19   A.   No.  I would have had a way, but I'm talking about

20        it's been good all that time, so there was no way to

21        tell.

22   Q.   All right.  When you would get a shipment of cocaine

23        in, would you do anything to test it or see what the

24        quality was or anything like that?

25   A.   No.

1    Q.   All right.  You just got it and shipped it out?

2    A.   Yes.

3    Q.   How did you end up finding out that you had gotten

4         this bad shipment of cocaine?

5    A.   Kevin Harris and Monterial called me back.

6    Q.   In connection with finding out that you had some bad

7         cocaine, what did you do?

8    A.   I told them to try to get rid of it and I would make

9         up the difference.

10   Q.   Okay.  Did you -- did you, in fact, end up getting

11        some of that cocaine back?

12   A.   Yes.

13   Q.   How much of it?

14   A.   About -- out of all of it, I think I only received a

15        kilo of it back.

16   Q.   A kilo of it back?

17   A.   Yes.

18   Q.   So even though it was bad -- did you give Vinol

19        Wilson any of that bad cocaine?

20   A.   No.  He wasn't around.

21   Q.   Just Kevin Harris and Monterial Wesley then got the

22        bad dope?

23   A.   Yes.

24   Q.   And of this 20 kilos that you found out after the

25        fact was bad, you only ended up getting back about a

1     kilo of it?

2   A.   Yes.

3   Q.   Who did you get that back from?

4   A.   Monterial.

5   Q.   So the difference you had to make up, did that end up

6        being only a kilo then?

7   A.   No.

8   Q.   What did you end up having to make up?

9   A.   A fourth of it overall.  Roughly each one lost

10       9 ounces.

11  Q.   Okay.

12  A.   So a quarter key.

13  Q.   So when you said that you told them you would make up

14       the difference, that was including, whatever they

15       were able to get rid of, you made up the difference

16       of what they would have lost?

17  A.   Yes.

18  Q.   How much out of your pocket did you end up losing?

19  A.   At the going price of whatever cocaine was at the

20       time, five kilos.

21  Q.   Did Jerry ever make that good, or did you ever get

22       any redress from Jerry?  Did you ever recoup your

23       loss?

24  A.   I just shorted him 50,000.

25  Q.   Did he know that?

```
 1   A.   Yes.

 2   Q.   Okay.  So in a subsequent transaction you didn't pay

 3        him 50,000 on one of the shipments?

 4   A.   Yes.

 5   Q.   All right.  Now, in connection with your activities

 6        in 2006 and into 2007, I know you mentioned you went

 7        to Mexico to meet Jerry at some point.  Did you do

 8        any other traveling?

 9   A.   Yes.

10   Q.   What other kind of traveling did you do?

11   A.   Just pleasure, mostly.

12   Q.   Vacations?

13   A.   I went alone most of the time, so I don't know if it

14        was vacation, but yes, pleasure.

15   Q.   Where would you go?

16   A.   Miami Hawaii, San Diego, go all over the United

17        States and Mexico.

18   Q.   Okay.  Are you married, Mr. Humphrey?

19   A.   Yes.

20   Q.   And do you have any children?

21   A.   Yes.

22   Q.   How many children do you have?

23   A.   Six.

24   Q.   And what are their age ranges?

25   A.   Eighteen being the oldest and two being the youngest.
```

1   Q.   And when you were involved in your drug trafficking,

2        I assume you were supporting your wife and your

3        children?

4   A.   Yes.

5   Q.   Now, you mentioned that you had several fish

6        restaurants in Omaha?

7   A.   Yes.

8   Q.   Did that require you to travel up to Nebraska on

9        occasion?

10  A.   Every week.

11  Q.   And In connection with the arrangements then you had

12       to make with selling the cocaine here in Kansas City,

13       that kind of had to revolve around --

14  A.   My everyday activities, yes.

15  Q.   All your other activities?

16  A.   Yes.

17  Q.   Now, once you -- 2006, 2007, we talked about your

18       trips; we know about your businesses.  What other

19       things did you spend your money on?

20  A.   Vehicles and trips and shopping.

21  Q.   Okay.  Now, I think I heard you say when you were --

22       when you began cooperating part of that was you

23       surrendered or gave up quite a bit of property that

24       you had?

25  A.   Yes.

```
1    Q.   What did that consist of, Mr. Humphrey?

2    A.   An apartment building, five rental houses, a

3         residential house, two residential houses, and all my

4         businesses and ten bank accounts.

5    Q.   Okay.  And how much cash -- was there any cash that

6         agents seized when they went -- did you, in fact, end

7         up signing a consent to have your residences searched

8         after your arrest on November 27?

9    A.   Yes.

10   Q.   Was there some cash at your house as well that was

11        seized?

12   A.   Yes.

13   Q.   And do you know how much total cash there was seized?

14   A.   No.

15   Q.   And what about vehicles?  Were any of your vehicles

16        seized?

17   A.   Six.

18   Q.   And do you recall what vehicles were seized?

19   A.   Yes.

20   Q.   Tell the jury what those vehicles were.

21   A.   My Escalade, my F-150, my Camaro, my motorcycle, my

22        girlfriend's Benz, and her SUV.

23   Q.   All right.  When you say your girlfriend --

24   A.   Wife at the time.

25   Q.   Okay.  You and -- are the two of you lawfully
```

```
 1        married?

 2   A.   Yes.

 3   Q.   Okay.  In connection with other property that was

 4        taken, did you also have some jewelry that they

 5        seized?

 6   A.   I believe they seized my bracelet.

 7   Q.   What kind of bracelet was that?

 8   A.   A diamond bracelet.

 9   Q.   And all of those nice things that you have just

10        talked about -- properties, businesses, money, all of

11        your property -- were those acquired either directly

12        through drug trafficking or indirectly by the

13        commingling of drug money in with the purchase of

14        those items?

15   A.   Yes.  And good credit.

16   Q.   And good credit.  You paid cash for what you got?

17   A.   No.  Three of the houses, yes, but I took out loans

18        on all of them afterwards.

19   Q.   When you were arrested on November 27, 2007, you

20        quickly found out that law enforcement had been

21        monitoring phone calls and conducting surveillance

22        for several months of not only you but other

23        individuals in this case; is that right?

24   A.   Yes.

25   Q.   The months preceding your arrest on November 27,
```

1    2007, obviously, you got hindsight now, but did you

2    see any red flags going up in the months preceding

3    your arrest?

4  A.  Yes.

5  Q.  What kinds of red flags did you see?

6  A.  The surveillance every time I left seeing Monterial.

7  Q.  Okay.  So you actually saw surveillance, what you

8    believed to be surveillance then?

9  A.  Yes.

10 Q.  Did that change what you were doing?

11 A.  Yes.  I didn't know if it was a robbery or if it was

12   DEA.

13 Q.  Okay.

14 A.  You know, so . . .

15 Q.  Did it change the way you did things but not what you

16   were doing?

17 A.  Yes.

18 Q.  In other words, were you more careful but just

19   obviously not careful enough?

20 A.  Exactly.

21 Q.  You didn't stop doing what you were doing?

22 A.  No.

23 Q.  And on that board behind you there's a couple phone

24   numbers at the bottom (913)387-6038 and

25   (816)977-0446.  Were those both your telephone

```
 1        numbers?
 2    A.  I believe so.
 3    Q.  Did you have a bunch of different phone numbers over
 4        the course of time?
 5    A.  Yes.
 6    Q.  Sometimes would you have a phone number and get rid
 7        of it and get another phone number?
 8    A.  Yes.
 9    Q.  Did you do that for some particular reason?
10    A.  To try to avoid wiretaps.
11    Q.  And individuals who are involved in drug trafficking,
12        are they kind of savvy about that or kind of aware of
13        that possibly happening?
14    A.  Some of us are.
15    Q.  Okay.  And so in connection then with the activity
16        that was monitored during August and November of
17        2007, there were a number of phone calls that were
18        intercepted specifically involving both and you
19        Monterial Wesley; is that right?
20    A.  Yes.
21    Q.  And you and other people as well?
22    A.  Yes.
23    Q.  I want to talk about a few incidents, Mr. Humphrey,
24        and a few of those phone calls.  I want to direct you
25        to an incident that occurred on September 5 of 2007,
```

```
 1          and I want to start by playing first Phone Call
 2          No. 199, which, again, was on September 5, somewhere
 3          around 2:00 o'clock that afternoon.  Okay?
 4    A.    Okay.
 5                    THE COURT:  Is that the exhibit number
 6          you're referring to?
 7                    MS. MOREHEAD:  199.
 8                    THE COURT:  The reason I ask is we have
 9          phone call numbers and exhibit numbers.  I assumed
10          that was Exhibit --
11                    MS. MOREHEAD:  I'm going to try to stick
12          with exhibit numbers, Judge.
13                    THE COURT:  All right.  Thank you very
14          much.
15                    (Exhibit No. 199 was played in open court.)
16    Q.    (By Ms. Morehead) Do you recall that phone call?
17    A.    Yes.
18    Q.    First of all, who was that conversation between?
19    A.    Me and Monterial.
20    Q.    There was a comment about, "Where you at?
21             "The barbershop."
22             What was that particular location?
23    A.    There was two of them, but that particular one was
24          Watson's barbershop.
25    Q.    What do you mean, there were two of them?
```

REBECCA S. RYDER, CCR, RMR
UNITED STATES COURT REPORTER
913-551-5645

1    A.    There was two different barbershops we would go to.

2    Q.    Where was the other one?

3    A.    Straight down the street on, like, 58th and Prospect.

4    Q.    Okay.  Tell us what you recall happening on this

5          particular incident.

6    A.    I remember going to the barbershop, and I gave him my

7          bag, and a light blue Explorer started following me.

8    Q.    Okay.

9                MS. MOREHEAD:  Can you play Government's

10         Exhibit 200.

11   Q.    (By Ms. Morehead) Is your monitor on, Mr. Humphrey?

12   A.    Yes.

13   Q.    Government's Exhibit No. 30, do you recognize that

14         photo?

15   A.    Yes.

16   Q.    What do you recognize about this photograph?

17   A.    My truck and Monterial's truck.

18   Q.    Can you show me where that is on the screen.

19   A.    The F-150 behind that Charger is mine.

20   Q.    Right there then?

21   A.    Yes.  And that one is Monterial's truck.

22   Q.    All right.  What happened when you arrived at the

23         barbershop on this day?

24   A.    I guess I was picking up money.  That was what I

25         believe.

1   Q.   Okay.  And in connection with the activity we see in

2        Government's Exhibit 30, Government's Exhibit 322,

3        323, 324, 325, what does that show?

4   A.   All those combined?

5   Q.   Yeah.

6   A.   It appears as if both our doors open up and they both

7        close, so we was either swapping bags or getting a

8        bag.

9   Q.   The phone call I just played, 200, that was on

10       September 5, this one about 2:30 in the afternoon,

11       the statement by Mr. Wesley, "That one got an extra

12       one, extra one in there," what's that mean?

13  A.   An extra thousand.

14  Q.   And, "I'll trade you down to 13," what's that mean?

15  A.   He owed me 14,000 on another debt.

16  Q.   Okay.  Were there times that Monterial Wesley owed

17       you from prior transactions?

18  A.   Yes.

19  Q.   And 202, which also has been indicated that it

20       occurred on September 5, this one about 4:45 in the

21       afternoon --

22            MS. MOREHEAD:  Can you play 202.

23            THE COURT:  Pardon me.  You want to stop

24       that.

25            MS. MOREHEAD:  Sorry.

```
 1                    THE COURT:  Are you intending to have the
 2       transcript or not?  Because the transcript is not
 3       coming up.
 4                    THE LAW CLERK:  Only the audio is coming
 5       through.  The video is not.
 6                    THE COURT:  No transcript.  And that's been
 7       the case on 199 as well, frankly.  I didn't know --
 8                    MS. MOREHEAD:  I didn't know.  Is it coming
 9       through on yours?
10                    THE JURY:  (Negative responses.)
11                    MS. MOREHEAD:  Sorry.  I think --
12                    (A discussion was had off the record.)
13                    MS. MOREHEAD:  The other two calls were
14       short enough, Judge.  I'm just going to --
15                    (Exhibit No. 202 was played in open court.)
16                    MR. ROGERS:  Your Honor, did you caution
17       the jury that this is for demonstrative purposes
18       only?
19                    THE COURT:  The transcript?  It's the same
20       call we have seen before, but I will reemphasize to
21       you, members of the jury -- I suspect you do recall,
22       since we have had numerous of these transcripts --
23       that it is for demonstrative purposes only.
24    Q.  (By Ms. Morehead) The prior call, when Mr. Wesley
25       mentioned there was an extra one in there and he
```

```
 1            would trade you down to 13, there was still, I think

 2            you said, 13,000 that he would have owed; is that

 3            right?

 4   A.       Yes.

 5   Q.       And then he calls back and mentions that there was an

 6            extra six in there.  And what was that in reference

 7            to, Mr. Humphrey?

 8   A.       6,000 more.

 9   Q.       And how do you know it's 6,000?

10   A.       Because when I asked him if it was little ones he

11            said huh-uh.

12   Q.       And what would little ones be?

13   A.       Hundred.

14   Q.       All right.  And so he already owed you 13, so with

15            this extra six, where does that put him?

16   A.       Takes him down to seven.

17   Q.       All right.  On September 7 of 2007 I want to play

18            another call that came in -- this one came in about

19            11:00 o'clock in the morning -- and ask you about it.

20                       (Exhibit No. 203 was played in open court.)

21                       THE COURT:  Would you identify the

22            exhibit number for us, please.

23                       MS. MOREHEAD:  203, Judge.

24                       THE COURT:  Thanks.

25                       MS. MOREHEAD:  I'm sorry.  Did I not do
```

```
 1          that?
 2                    THE COURT:  I don't think so, but . . .
 3                    MS. MOREHEAD:  I apologize.  203 on
 4          September 7.
 5     Q.   (By Ms. Morehead) Mr. Humphrey, what's the content of
 6          this conversation?
 7     A.   That out of however many I gave him he only got rid
 8          of two so far, 2 kilos, and he had -- somebody
 9          already opened one, and they took an ounce out,
10          so . . .
11     Q.   Okay.  Mr. Humphrey, in connection with that call,
12          you made a comment that you hadn't accepted their
13          calls because they were trying to be back today or
14          tomorrow.  What were you talking about?
15     A.   Jerry, Jerry returning with some more.
16     Q.   And when you said you hadn't accepted their calls,
17          why hadn't you done that?
18     A.   Because I didn't know whether or not I was going to
19          be able to get rid of it the date that they showed up
20          or not.
21     Q.   All right.  And so in connection with this
22          conversation about somebody getting snatched up, do
23          you know what that was in connection with?
24     A.   I don't know who got snatched up, no.
25     Q.   Okay.  But there was some discussion about that?
```

1    A.    Yes.

2    Q.    In addition to you selling Monterial Wesley cocaine

3          and having that relationship, did you and Monterial

4          Wesley ever socialize together?

5    A.    Very rarely, but we would go to the strip club.

6    Q.    And how often would that happen?

7    A.    I would be there two, three times a week, so I'm

8          like --

9    Q.    Okay.

10   A.    If he were to meet me somewhere, I would tell him I

11         would be there, yes.

12   Q.    Did you ever go out and eat, or anything like that,

13         together?

14   A.    Yes.

15   Q.    And would that be in connection with doing a deal, or

16         were there some times that you would get together

17         with him independent of doing either a transaction

18         where you were selling him cocaine or he was giving

19         you money?

20   A.    That's it.

21   Q.    It was in connection with one of those two events?

22   A.    Yes.

23   Q.    I want to show you a photograph that we have had

24         testimony was taken on September 11 of 2007, and this

25         is Government's Exhibit 31.  Do you recognize where

```
 1        that photograph was taken from?

 2   A.   Yes.  Hooter's off of I-70.

 3   Q.   Okay.  Is that in Missouri?

 4   A.   Yes.

 5   Q.   And do you remember any meeting on September 11 of

 6        2007 with Monterial Wesley?

 7   A.   I don't recall the date, but yes, I remember this

 8        happening.

 9   Q.   What do you -- did you see anything in this paragraph

10        that looks familiar?

11   A.   He's leaning in my car.  He's in my passenger's side.

12   Q.   Who is in your passenger's side?

13   A.   Monterial.

14   Q.   And there's a vehicle here, I see, but behind it?

15   A.   It's an F-150.  That's mine.

16   Q.   That's yours?

17   A.   Yes.

18   Q.   And this door that's open here, whose door is that?

19   A.   That's my passenger door.

20   Q.   What about this vehicle right here?

21   A.   That's the one Monterial is in.

22   Q.   Had you seen him in that Mercedes before?

23   A.   Yes.

24   Q.   And when you would meet with Monterial Wesley on

25        these various occasions -- we have had a couple now
```

1    here where you're in your F-150 -- is that typically

2    what you were in, or would you be in other vehicles

3    as well?

4  A.   I would be in other vehicles as well.

5  Q.   What other vehicles might you meet Monterial Wesley

6    in other than your F-150?

7  A.   My Camaro, a white Benz, and a -- I don't know if

8    it's called champagne-colored, or whatever, Yukon.

9  Q.   Okay.

10  A.   Pewter.

11  Q.   Pewter?

12  A.   I think that's what it is.

13  Q.   Okay.  Pewter Yukon?

14  A.   Yes.

15  Q.   What about Monterial Wesley?  What vehicles do you

16    recall him ever coming to these various locations

17    with?  And the earlier photograph that we had here --

18  A.   That's a Range Rover.

19  Q.   That's the vehicle there that you're talking about?

20  A.   Yes.

21  Q.   And so we had the Range Rover on that occasion.  On

22    this occasion we have the Mercedes SUV?

23  A.   Yes.

24  Q.   What other vehicles do you recall him ever showing up

25    to meet with you in?

```
 1   A.   Several rental cars, a tan Mercedes four-door, a red

 2        SS truck, a gray SS truck, and a purple convertible,

 3        old school car, and that's about it.

 4   Q.   Okay.  We will come back and talk about those in a

 5        minute.  On this occasion he shows up in this white

 6        SUV Mercedes, and you said he's leaning into your

 7        vehicle.  What part your vehicle is he leaning into?

 8   A.   The passenger's side.

 9   Q.   Do you recall what transpired on this date between

10        you and Wesley?

11   A.   Well, I don't know if he is putting something in the

12        vehicle or receiving a package out of the vehicle,

13        but it's either/or, and I don't know if I'm in there

14        already to pick up my food or not.

15   Q.   Okay.  Did you eat -- when you would -- oftentimes

16        you would meet at restaurants; is that right?

17   A.   Yes.

18   Q.   And would you oftentimes eat in connection with those

19        meetings?

20   A.   In places like that I would have a call-in order so

21        it doesn't look too strange of me just sitting in the

22        parking lot.  So that's how I did it.

23   Q.   Okay.  Government's Exhibit 271, who is that a

24        photograph of?

25   A.   That is me.
```

1  Q.   Okay.  And is that how you looked back in November of

2       2007?

3  A.   Yes.

4  Q.   And is your appearance a little bit different now?

5  A.   Yes.

6  Q.   How is it different?

7  A.   I have a haircut, and I think I lost a few pounds.

8  Q.   Okay.  And so when we see these photographs like

9       this, you're not sure whether you're giving him

10      cocaine or he's dropping off money but --

11 A.   But it's either/or.

12 Q.   Either/or?

13 A.   Yes.

14 Q.   I would like to now play you a call, Government's

15      Exhibit 211, which we have had testimony occurred on

16      September 13, 2007, about 10:30 in the morning.

17      Okay?

18 A.   Yes.

19              (A portion of Exhibit No. 211 was played in

20      open court.)

21              THE COURT:  Pardon me.  Which exhibit

22      number?

23              MS. MOREHEAD:  211, Judge.

24              THE COURT:  211.  Thank you.

25              MS. MOREHEAD:  Yes.

1    Q.   (By Ms. Morehead) What are you and Monterial Wesley

2         talking about here?

3    A.   Actually, I don't know.  I'm like --

4    Q.   Had you tried to -- had you apparently tried to get

5         hold of him?

6    A.   Yeah.  I was trying to get in touch with him, but I

7         don't know exactly what transpired after that, but

8         yes.

9              MS. MOREHEAD:  All right.  Go ahead.

10             (The playing of Exhibit No. 211 was

11        concluded.)

12   Q.   (By Ms. Morehead) Do you recall that particular day

13        you were having some event with the radio station?

14   A.   Yes.

15   Q.   What was that?

16   A.   Promotion to grow my business.

17   Q.   Okay.  And there appeared to be some conversation

18        that the two of you would meet after you got done

19        with that event?

20   A.   Yes.

21             MS. MOREHEAD:  Could you play Government's

22        Exhibit 216.

23   Q.   (By Ms. Morehead) And Government's Exhibit 216 was

24        the same day at about 2:00 o'clock that afternoon.

25        Okay?

```
 1              (A portion of Exhibit No. 216 was played in

 2         open court.)

 3    Q.   (By Ms. Morehead) When you asked, "You made it to the

 4         world yet?" what are you talking about?

 5    A.   Into the city.

 6                   (The playing of Exhibit No. 216 was

 7         concluded.)

 8    Q.   (By Ms. Morehead) Now I want to show you what's been

 9         marked as Government's Exhibit 32.  Do you recognize

10         that?

11    A.   Yes.

12    Q.   What do you recognize?

13    A.   Myself and Monterial leaving the restaurant.

14    Q.   Okay.  And who is this?

15    A.   That is me.

16    Q.   And who is this?

17    A.   Monterial.

18    Q.   Okay.  And what do you recall about this particular

19         date?

20    A.   We went to Chili's to eat, and I had -- my F-150 is

21         parked over in the direction that we're headed.

22    Q.   Okay.  Government's Exhibit 33, do you recognize

23         that?

24    A.   Yes.

25    Q.   What's that?
```

```
 1   A.    My F-150.

 2   Q.    Okay.  It appears both doors are open, and I notice

 3         here you have on a red shirt?

 4   A.    Yes.  I'm in the driver's side.

 5   Q.    And I can see a red shirt, that looks like, on who's

 6         there in the driver's seat.  It looks like somebody's

 7         over here on that side of your vehicle, the

 8         passenger's side.

 9   A.    Yes.

10   Q.    Who is that?

11   A.    Monterial.

12   Q.    What's going on on this occasion?

13   A.    He's grabbing a bag out of my front seat.

14   Q.    And if he's grabbing a bag out of your front seat,

15         what does that mean?

16   A.    Cocaine.

17   Q.    Did you see how he came to the restaurant on this

18         occasion?

19   A.    No.  I don't recall.

20   Q.    Okay.

21               MS. MOREHEAD:  Judge, this might be a good

22         segue to stop.  I'm getting ready to go into another

23         incident.

24               THE COURT:  All right.  Thank you.  We will

25         do that.  Members of the jury, I'll remind you of the
```

1  admonitions, and, Ms. Ludwig, please take charge of

2  the jury.  Mr. Humphrey, please remain here, and,

3  counsel, we will visit about scheduling.  With that,

4  Ms. Ludwig will take charge of the jury, and we will

5  see you all in 15 minutes.

6            (The following proceedings were had outside

7  the presence of the jury:)

8            THE COURT:  Is there anything we should do

9  before we break?

10           MR. ROGERS:  Your Honor, the government has

11  disclosed to us in our red notebooks and now in other

12  copies various documents of interviews with

13  Mr. Humphrey.  With regard to the proffer interview

14  that took place on --

15           THE COURT:  Pardon me just a moment.  Is

16  there any reason we can't have Mr. Humphrey gone at

17  this juncture?

18           MR. ROGERS:  No.

19           THE COURT:  Deputy, do you want to take

20  Mr. Humphrey.  All right.  I thought it might be best

21  to discuss this with Mr. Humphrey off the stand.

22           MR. ROGERS:  I don't know that it matters

23  from his point of view, but with regard to the

24  proffer interview on December 12, 2007, the last

25  three pages are redacted, and my suspicion is that it

1      may have to do with some of the things that he talked

2      about on direct examination, in which case I think

3      we're entitled to see it.

4                  MS. MOREHEAD:  December 12?  I'm not seeing

5      that.

6                  THE COURT:  Mr. Rogers, why don't you come

7      and show her what you're talking about.

8                  MR. ROGERS:  The last three pages of

9      December 14, prepared December 17.

10                 MS. MOREHEAD:  That's all indexing.  That's

11     all indexing, which has social security numbers and

12     stuff like that of different individuals that are

13     talked about during --

14                 THE COURT:  Do you have an unredacted copy

15     you can show Mr. Rogers in camera or -- just to make

16     sure there's no --

17                 MS. MOREHEAD:  Sure.  It's just identifiers

18     of various people, which are social security numbers,

19     FBI numbers, and the like.

20                 MR. ROGERS:  It's been that on all of

21     these, but usually it's only like half a page.

22                 THE COURT:  Just show him, satisfy him.  If

23     you have an issue, Mr. Rogers, we can take it up.

24     Otherwise, if I don't hear from you, I will assume

25     that it was as Ms. Morehead represented.

1    MS. MOREHEAD:  Judge, could we take up one

2    more matter?

3                   THE COURT:  Sure.

4                   MS. MOREHEAD:  You asked me -- before there

5    was any point in time where I was going to ask any of

6    the witnesses about any conversations at CCA, we

7    needed to talk about that.

8                   THE COURT:  Yes.

9                   MS. MOREHEAD:  And I will be asking

10   Mr. Humphrey, frankly, about that specifically with

11   regards to Mr. McDaniel.  The substance of what I

12   intend to get into, frankly, Judge, are statements

13   against interests.  After Mr. Humphrey did not have

14   any recollection of having been previously acquainted

15   with Mr. McDaniel, once they got to CCA, Mr. McDaniel

16   approached Mr. Humphrey and started conversating and

17   mentioned that they had met in a strip club at some

18   point along with Mr. Wesley, and he also mentioned

19   that on one of these transactions, hey, do you

20   remember my vehicle was there?  And he described his

21   vehicle, and it's one of the vehicles that Mr.

22   Humphrey, in fact, has mentioned here today that he

23   recalled Mr. Wesley being in.  So that was a

24   statement against Mr. McDaniel's interests that, in

25   fact, he was present during that drug deal.

1    He also admitted to Mr. Humphrey that he had

2    gotten some of his bad dope that he had ended up

3    selling to Mr. Wesley.  Again, that's an affirmation

4    on Mr. McDaniel's part to Mr. Humphrey that he had,

5    you know, acquired some of the bad cocaine, and there

6    would have been no way for Mr. McDaniel, frankly, to

7    know that unless it had happened, and that, you know,

8    parallels with what his testimony is.

9        So I'm just proffering that, Judge.  I don't

10   intend to get into any statements that Mr. McDaniel

11   said about anyone else or extraneous to Mr.

12   McDaniel's own statements against his own

13   self-interests.  I wanted to proffer that to the

14   court.

15             THE COURT:  Mr. Bellemere, those appear to

16   be admissible against Mr. McDaniel under Rule 801(d).

17   Do you have any thoughts to the contrary?

18             MR. BELLEMERE:  I don't know, Judge.  If I

19   thought about it, maybe I'll see if I can come up

20   with one.  Right now I'm dumbfounded.

21             THE COURT:  Good luck, Mr. Bellemere,

22   because I think you might have a lot of trouble

23   coming up with something.  It is outside the scope of

24   the time of the conspiracy, so I would give a

25   limiting instruction that that would be admissible

```
 1        only against Mr. McDaniel and not against anybody
 2        else.  So that is in order.
 3                  MR. BELLEMERE:  Judge, the other things
 4        that are there, which I don't know if she's going to
 5        do or not, has to do with, allegedly, a statement
 6        from Wesley to Humphrey that McDaniel was the guy
 7        from Columbia.  I don't know whether that's going
 8        to come --
 9                  THE COURT:  She's said she's not going to
10        offer that.  She's told us the universe of what she's
11        going to offer.  Why don't you talk to her about it
12        between the two of you.  If there's any confusion, we
13        can talk about it when we --
14                  MR. BELLEMERE:  I think I'm good.
15                  THE COURT:  We will start up again at 11:00
16        o'clock.
17                  (A recess was taken.)
18                  THE COURT:  Are we ready to bring in the
19        jury?  Got the witness up?
20                  (The following proceedings were had in the
21        presence of the jury:)
22                  THE COURT:  Ms. Morehead, you may resume
23        your examination.
24                  MS. MOREHEAD:  Thank you, your Honor.
25   Q.   (By Ms. Morehead) Mr. Humphrey, I want to direct your
```

```
 1        attention to events that occurred on September 28 of

 2        2007.  And first of all I want to play some phone

 3        calls that started occurring around 3:00 o'clock that

 4        afternoon.

 5                    MS. MOREHEAD:  If we could pull up Phone

 6        Call No. 228.

 7                    (Exhibit No. 228 was played in open

 8        court.).

 9   Q.   (By Ms. Morehead) When you reference that you were at

10        the shop, where were you referring to?

11   A.   A16 Audio & Wheels.

12                    MS. MOREHEAD:  Can we now play Call 229,

13        which occurred that same day just a few minutes

14        later.

15                    (Exhibit No. 229 was played in open

16        court.).

17   Q.   (By Ms. Morehead) There was a reference by Mr.

18        Wesley, "We just going to go up there and eat where

19        we always go and eat?"

20   A.   Yes.

21   Q.   Did you know where he was talking about?

22   A.   Yes.

23   Q.   What was your understanding of what he was talking

24        about?

25   A.   Chili's.
```

```
 1    Q.    And then you said, "'Cause I don't know how long it's
 2          going to take him to get back."  Do you recall who
 3          you were talking about?
 4    A.    That's one of my employees.  I was watching the shop.
 5    Q.    All right.  Now Government's Exhibit No. 230, which
 6          came in about 4:33.
 7                    (Exhibit No. 230 was played in open court.)
 8    Q.    (By Ms. Morehead) Do you recall that?
 9    A.    Yes.
10    Q.    Okay.  And Government's Exhibit 231, which just came
11          in a couple minutes after that.
12                    (Exhibit No. 231 was played in open court.)
13    Q.    (By Ms. Morehead) You mentioned you were in the white
14          car that day.  What car were you in?
15    A.    A Benz.
16    Q.    Mercedes Benz?
17    A.    Yes.
18    Q.    Government's Exhibit 46, do you recognize that?
19    A.    Yes.
20    Q.    Okay.  Who is in the driver's seat there?
21    A.    Me.
22    Q.    And Government's Exhibit 48, do you recognize that?
23    A.    Yes.
24    Q.    And in one of those calls there was a reference by
25          Mr. Wesley that he was in the H3.  Do you see an H3
```

1    here?

2    A.    Yes.

3    Q.    What do you recall happening in connection with you

4          arriving at the Chili's on September 28?

5    A.    I didn't even pull over.  I think I pulled up right

6          beside the H3 and he leaned in and I drove off.

7    Q.    All right.  When you say he leaned in, who are you

8          referring to?

9    A.    Monterial.

10   Q.    What did he get out of your vehicle?

11   A.    A bag of cocaine.

12   Q.    Okay.  Now, on these incidents that we have been

13         talking about where we have the photos of the meet

14         and that sort of thing, the last incident, on

15         September 13, you indicated he got a bag out of your

16         vehicle.  You indicated cocaine.  On this incident he

17         got a bag out of your vehicle, as you indicated.  Do

18         you recall on those occasions how much cocaine you

19         would have sold to him?

20   A.    Minimum of five.

21   Q.    All right.  When you would talk about 5 kilos, was

22         there any kind of code language that you and Mr.

23         Wesley would use about how many or what number you

24         were dealing with?

25   A.    I would just say a handful.

1    Q.   And a handful --

2    A.   Being five.

3    Q.   Okay.  Five?

4    A.   Uh-huh.

5    Q.   Now I would like to jump ahead to November 26 of

6         2007, and I want to play a couple of calls.  Do you

7         recall the day before on November 25 having a

8         conversation with Mr. Wesley where you described some

9         sort of high speed chase that you be involved in in

10        connection with law enforcement?

11   A.   Yes.

12   Q.   Had that incident actually happened?

13   A.   Yes.

14   Q.   And then on November 26 -- I want to play Call No.

15        260, which came in right around 11:57 that day, right

16        around noontime.

17                  MS. MOREHEAD:  Would you play 260.

18                  (Exhibit No. 260 was played in open court.)

19   Q.   (By Ms. Morehead) In that call you said, "I'm trying

20        to do something today.  I was just seeing if you

21        could make a few calls and see if anybody can be on

22        deck."  What did you mean by that, Mr. Humphrey?

23   A.   Have some bags of cash ready.

24   Q.   And you indicated, "The rims in the front are 19-inch

25        rims."  Are you talking about tires there,

1477

1           Mr. Humphrey?

2    A.    No.

3    Q.    What are you talking about?

4    A.    19,000 for each kilo.

5    Q.    Okay.  And when you said you were calling him to see

6          if he could have bags of money ready, when you would

7          obtain money from Mr. Wesley after you had provided

8          the cocaine to him, how would the money come to you

9          from him?

10   A.    In different bags.

11   Q.    And what do you mean by "in different bags"?

12   A.    There would be multiple bags inside of one bag.

13   Q.    Okay.  And what kind of bags are we talking about?

14   A.    Just plastic shopping bags, or whatever.

15   Q.    And they would be inside another bigger bag?

16   A.    Duffel-bag type.

17   Q.    Duffel bag?

18   A.    Uh-huh.

19   Q.    Yes?

20   A.    Yes.

21   Q.    Did you guys pass the duffel bags back and forth

22         between each other?

23   A.    Yes.

24   Q.    And when you would get then a duffel bag with these

25         separate bags of money in them, how many different

1    bags of money might there be on any given time?

2  A.   About three.

3  Q.   Were there sometimes that all the money would be

4       together?

5  A.   Not that I recall.

6  Q.   Always there were separate bags of money?  And in

7       connection with that then, were there always the same

8       amounts of money in each bag that he would give you?

9  A.   No.

10 Q.   Now I want to play Government's Exhibit 264, which

11      actually came in, again, on November 26 about 7:00

12      o'clock that evening.

13           MS. MOREHEAD:  Could we pull up 264.

14           (A portion of Exhibit No. 264 was played in

15      open court.)

16 Q.   (By Ms. Morehead) What did that mean, "You're ready

17      for me now, ain't you?"

18 A.   I already got the cocaine.

19           (A portion of Exhibit No. 264 was played in

20      open court.)

21 Q.   (By Ms. Morehead) What did you mean by that, you were

22      just shaking the tail, make sure nobody ain't with

23      you?

24 A.   That was after the high speed chase, or whatever, so

25      I was just riding around the city, making sure I

1    wasn't being followed.

2    Q.    Okay.

3                    (A portion of Exhibit No. 264 was played in

4          open court.)

5    Q.    (By Ms. Morehead) What did that mean, "When it gets

6          dark, we both go by the same rules"?

7    A.    Don't work after dark.

8    Q.    Why not?

9    A.    Just the rule.

10   Q.    Okay.

11                   (A portion of Exhibit No. 264 was played in

12         open court.)

13   Q.    (By Ms. Morehead) The comment about he thought you

14         were still up north, do you know what that was in

15         reference to?

16   A.    I was in Omaha.

17   Q.    Okay.  Had you been in Omaha that day earlier?

18   A.    I believe so.

19                   (Exhibit No. 264 was played in open court.)

20   Q.    (By Ms. Morehead) What did you mean by that

21         statement, Mr. Humphrey, "I'm tapped, I'm tapped.

22         That's why I'm telling to you get something lined

23         up"?

24   A.    I was saying that I was short on cash.

25   Q.    And the part about you were wanting him to get

1    something lined up, in that earlier call you had said

2    something about getting people on deck.

3  A.  Yes.

4  Q.  Is that what you were referring to?

5  A.  Yes.

6  Q.  Getting people lined up?

7            (Exhibit No. 264 was played in open court.)

8  Q.  (By Ms. Morehead) Mr. Wesley commented that he had "a

9    few things lined up but ain't nobody really

10    entertaining, what I am saying, until --" do you know

11    what that was in reference to?

12  A.  Until it's in hand.

13  Q.  Until it's in hand?

14  A.  Yes.

15  Q.  Until what's in hand?

16  A.  The drugs.

17  Q.  Okay.  And then you said, "All right.  I'm about to

18    see I can get, I can get a handful."  What are you

19    talking about there?

20  A.  Five.

21  Q.  Five what?

22  A.  Kilos.

23  Q.  Of what?

24  A.  Cocaine.

25            (A portion of Exhibit No. 264 was played in

REBECCA S. RYDER, CCR, RMR
UNITED STATES COURT REPORTER
913-551-5645

1    open court.)

2  Q.   (By Ms. Morehead) All right.  There was a comment by

3       Mr. Wesley a couple times, "Something's better than

4       nothing."  What did you take that to mean,

5       Mr. Humphrey?

6  A.   Five is better than none at all.

7  Q.   And then you made a comment, "I can't even cover it.

8       I can't even cover it."  What did you mean by that,

9       Mr. Humphrey?

10  A.   Prepay the load.

11  Q.   And in connection with prepay the load, I just want

12       to make sure I know what you're talking about.

13       Tell me what you mean.

14  A.   As in pay for it as soon as it gets here so the

15       driver can turn right back around.

16  Q.   All right.  Go ahead.

17               (A portion of Exhibit No. 264 was played in

18       open court.)

19  Q.   (By Ms. Morehead) Mr. Wesley then indicates that you

20       would get together early in the morning, ten or 11,

21       and he said, "We will just get together and just

22       rap."  What was your understanding of that part of

23       the conversation?

24  A.   As in we would take care of it tomorrow.

25  Q.   When you had that conversation, when you said, "I

1   can't even cover it," had that happened before, where

2   you couldn't cover a load --

3   A.   Yes.

4   Q.   -- right away where you paid them and they turned

5   around and left?

6   A.   Yes.

7   Q.   And what would you do in those situations?

8   A.   Just short them.  Whatever I had, I would give it to

9   them and tell them I would get them the next week.

10  Q.   All right.  But you could go ahead and do the

11  transaction even though you couldn't cover it?

12  A.   Yes.

13  Q.   And how many times had that happened before where you

14  couldn't cover the load that you had coming in to

15  you?

16  A.   Not too often.

17  Q.   And from that call then you and Mr. Wesley agreed to

18  get together the next day, ten or 11 or something?

19  A.   Yes.

20  Q.   Okay.

21              (The playing of Exhibit No. 264 was

22  concluded.)

23  Q.   (By Ms. Morehead) Now I would like to go to

24  November 27, 2007, and I would like to play Call 265,

25  which came in around 11:10 in the morning.

```
 1                    (Exhibit No. 265 was played in open court.)

 2   Q.   (By Ms. Morehead) In that call you tell Mr. Wesley,

 3        "Let me hit you as soon as I go pick up the kids."

 4        What were you talking about, Mr. Humphrey?

 5   A.   The kilos.

 6   Q.   And why did you refer to it in that fashion, that you

 7        were going to go pick up the kids?

 8   A.   It's just -- he would know what I was talking about.

 9   Q.   All right.  And so you're going to pick up the kids

10        and hit him right back then?

11   A.   Yes.

12   Q.   All right.  Now I would like to play Government's

13        Exhibit 268, same day, 11:27:07, about five minutes

14        after 12, or four minutes after 12.

15                    (A portion of Exhibit 268 was played in

16        open court.)

17   Q.   (By Ms. Morehead) Mr. Wesley asked, "Are you out by

18        the house?"  Do you know what he was referring to

19        there?

20   A.   My old house.

21   Q.   Okay.  Where was that at?

22   A.   Lee's Summit.

23   Q.   Okay.

24                    (The playing of Exhibit No. 268 was

25        concluded.)
```

1    Q.    (By Ms. Morehead) In that call there was mention

2          about a car wash right off 47th.  Were you familiar

3          with that location?

4    A.    Yes.

5    Q.    Had you been to that location before with regards to

6          Mr. Wesley?

7    A.    No.

8    Q.    How did you know what he was talking about?

9    A.    The food place was a buffet at -- I forget the name

10         of it, right there on Eastwood Trafficway.

11   Q.    And he said, "So that I can jump on, right on the

12         thing."  Did you know what --

13   A.    The highway.

14   Q.    The highway?  And so it appeared the two of you were

15         making arrangements to meet at this car wash?

16   A.    Yes.

17   Q.    The conversation before that where you said you were

18         going to go pick the kids up, where did you have to

19         pick the kids up that day?

20   A.    They were already with me.

21   Q.    Okay.  Why did you tell Mr. Wesley then that you need

22         to go pick them up?

23   A.    So I can continue to drive around to make sure I

24         wasn't being followed.

25   Q.    And in connection then with meeting with Mr. Wesley

1        on November 27 of 2007, what was the purpose of

2        meeting with him?

3    A.   To give him the 5 kilos.

4    Q.   And if the rims were 19, that would have been a total

5        of $95,000 he would have owed you?

6    A.   Yes.

7    Q.   And when you would give him the kilos of cocaine,

8        whatever quantity that was on prior occasions, how

9        soon after would you get the turn around on getting

10       the money -- him getting the money back to you?

11   A.   Sometimes minutes, sometimes a couple hours.

12   Q.   During the course of any of your conversations with

13       Mr. Wesley, did he ever indicate to you where he kept

14       his money?

15   A.   A few conversations he said he got it out by the

16       house, out by my house.

17   Q.   Do you know where that was?

18   A.   Not specifically.  I haven't been there, but yet, I

19       mean, the general area, yes.

20   Q.   Okay.  And can you give us just a general area of

21       where that is, what other, like, streets or locations

22       might be around there?

23   A.   I-70 and I think Adams Dairy Parkway.  There's a

24       Wal-Mart right there.

25   Q.   I-70 and?

```
 1   A.    Adams Dairy Parkway.

 2   Q.    Adams Berry?

 3   A.    Dairy.

 4   Q.    Sorry.  I'm not that familiar with Missouri.

 5         So after this phone call you say you're going to

 6         meet at the car wash.  Tell me what happens.

 7   A.    I arrived at the car wash, and as I pulled in the

 8         stall, I noticed a couple cars with Johnson County

 9         tags and some white men in it, and before I could

10         leave, Monterial pulled up behind me, and then they

11         swoop on us.

12   Q.    Where had you parked your vehicle at when you got

13         there?

14   A.    In the stall.

15   Q.    Had you proceeded to wash your car?

16   A.    Yes.

17   Q.    Okay.  I want to show you what I've marked

18         Government's Exhibit 53.  What's that?

19   A.    My Camaro.

20   Q.    And so you were outside your Camaro washing it?

21   A.    Yes.

22   Q.    As you were doing that, is that when you noticed

23         these vehicles?

24   A.    Yes.

25   Q.    What do you think at that point?
```

1487

```
1    A.   That it's time to go.

2    Q.   Directly behind your vehicle there's a vehicle back

3         here.  Whose vehicle was that?

4    A.   Monterial's.

5    Q.   So he pulls up.  And tell me what transpired then.

6    A.   I continued to spray the car, and I was about to tell

7         him about the situation, and he opens up my passenger

8         door, and then we're here.  That's all that happened.

9    Q.   All right.  So Monterial Wesley had gotten out of his

10        vehicle?

11   A.   Yes.

12   Q.   When he arrived, did you make any observations about

13        if he was alone or with someone else?

14   A.   He got out the passenger's side.

15   Q.   So someone else was driving?

16   A.   Yes.

17   Q.   And he then approached your vehicle, and I thought I

18        heard you say he opened the passenger door?

19   A.   Yes.

20   Q.   Why did he do that?

21   A.   To retrieve the cocaine that I was in the process of

22        telling him that we gotta split, but it happened so

23        quick it was no words was able to exchange.

24   Q.   And him going to the passenger's side of the vehicle,

25        was that standard protocol for him to get the cocaine
```

                                                                        1488

 1        out?

 2   A.   Yes.

 3   Q.   I want to show you what I've marked Government's

 4        Exhibit 54.  Do you recognize that?

 5   A.   Yes.

 6   Q.   What's that?

 7   A.   The five kilos.

 8   Q.   And this is a photograph of the --

 9   A.   Inside of my Camaro.

10   Q.   Passenger's side of your vehicle?

11   A.   Yes.

12   Q.   Is that where you had placed the kids that day?

13   A.   Yes.

14   Q.   And before he got the cocaine out, what happened?

15   A.   They came from everywhere.

16   Q.   Police?

17   A.   Yes.

18   Q.   Agents, federal agents?

19   A.   DEA.

20   Q.   You were arrested?

21   A.   Yes.

22   Q.   Monterial Wesley was arrested?

23   A.   Yes.

24   Q.   And the driver of his vehicle was arrested?

25   A.   Yes.

```
 1    Q.   In connection with this particular incident on

 2         November 27, obviously, someone drove Mr. Wesley to

 3         your location?

 4    A.   Yes.

 5    Q.   I want to reflect back on the prior incidents that

 6         you had done business with Mr. Wesley.  First of all,

 7         were there other occasions where -- let me ask you

 8         this:  Were there some occasions that Mr. Wesley

 9         would meet with you by himself?

10    A.   Yes.

11    Q.   And you knew he was by himself?

12    A.   Yes.

13    Q.   We talked about the incident at Chili's when there

14         were folks inside the restaurant for his brother's

15         birthday.

16    A.   Yes.

17    Q.   So were there some occasions where at least you had

18         some occasions that there were other people with him

19         but you didn't see them?

20    A.   Yes.

21    Q.   Were there other occasions that you dealt with Mr.

22         Wesley where there were individuals with him when you

23         would do -- when you would either give him cocaine or

24         he would bring the money back to you?

25    A.   Yes.
```

1    Q.   And in connection with those episodes, tell the jury

2         about that.

3    A.   We would just meet at other places, and I don't

4         believe he had a drivers license, or something, so he

5         would have to have other people drive him.

6    Q.   Okay.  And when other people would drive him, tell me

7         what you remember about those other people.  Were

8         there any -- first of all, let's talk, were there any

9         other male individuals that would occasionally drive

10        him?

11   A.   Well, I couldn't say drive, but at the same location

12        with him, yes.

13   Q.   What do you mean by that?

14   A.   Where we used to meet up at, it would be a couple

15        individuals out there.

16   Q.   Where you used to meet, what do you mean by that?

17   A.   Where we used to meet up, over some friend of his

18        house or something.

19   Q.   So you used to meet over at some friend of his house.

20        Where was that at?

21   A.   Off of 68th and Paseo, something like that.

22   Q.   And other folks -- other individuals would be there?

23   A.   Yes.

24   Q.   Did you know any of those other individuals at the

25        time?

1    A.   No.

2    Q.   Are any of those individuals codefendants in this

3         case now?

4    A.   Yes.

5    Q.   Who is a codefendant now that you now know who they

6         are?

7    A.   Foy.

8    Q.   Okay.  Just so we're clear, Government's Exhibit 272,

9         you recognize that person?

10   A.   Monterial.

11   Q.   All right.  And Government's Exhibit 275?

12   A.   Foy.

13   Q.   All right.  Tell us about what you remember on

14        incidents where you observed this individual present

15        at those locations.

16   A.   Well, first I noticed his vehicle, and then, you

17        know, I would see him occasionally, but yet I've

18        never had no dealings with him directly, no.

19   Q.   So you would see him.  And where would he be when you

20        and Monterial Wesley were conducting the

21        transactions?

22   A.   Either in his vehicle or sitting on the porch.

23   Q.   Okay.  And when you say you would see him in his

24        vehicle, I assume Shevel Foy's vehicle?

25   A.   Yes.

1    Q.   What vehicle do you recall being associated with him?

2    A.   The red SS truck.

3    Q.   Were there ever any times that you would meet with

4         Monterial Wesley and he would be in a vehicle and

5         there would be other occupants in the vehicle?

6    A.   Yes.

7    Q.   And were there occasions that you did not see who the

8         person was or -- let me start there, that you didn't

9         see who the people were?

10   A.   Yes.

11   Q.   Were there occasions where you saw the people but you

12        didn't know who they were?

13   A.   Yes.

14   Q.   Were there any occasions that you saw the people in

15        the vehicles along with Mr. Wesley that you knew who

16        they were?

17   A.   Yes.

18   Q.   Okay.  And tell the jury about that.

19   A.   His girlfriend.  I recognize her.

20   Q.   Okay.  Now, did you know -- this, again, is only if

21        you knew -- if Mr. Wesley was married?

22   A.   Yes.

23   Q.   Had you ever met his wife, Lakisha Wesley?

24   A.   No, not that I recall.

25   Q.   Were there ever any times that his family and your

```
 1          family socialized together, like family's barbecues,

 2          anything like that?

 3   A.     No.

 4   Q.     Now, you mentioned his girlfriend.  Had there ever

 5          been any occasions where you had met Monterial

 6          Wesley's girlfriend?

 7   A.     Yes.

 8   Q.     Tell the jury about that, if you would.

 9   A.     Once at a restaurant they was getting ready to go

10          inside, and another time I recall we was at a strip

11          club.

12   Q.     Okay.  In connection with those encounters with

13          Monterial Wesley's girlfriend -- let's talk first

14          about, they were getting ready to go into a

15          restaurant?  Is that what you said?

16   A.     Yes.

17   Q.     What occurred -- do you remember what occurred on

18          that occasion?

19   A.     I was I pulling up as they were going into the

20          restaurant, and he would backtrack and grab the bag

21          out of my car or I would grab a bag out of his.

22   Q.     So you saw his girlfriend on that occasion?

23   A.     Yes.

24   Q.     Were you introduced to her on that encounter?

25   A.     Not that particular one, no.
```

1    Q.   Okay.   Then you said there was an incident at a strip

2         club?

3    A.   Yes.

4    Q.   Tell the jury about that.

5    A.   It was a strip club that I frequented, or whatever,

6         and we were always just inside having drinks and

7         entertainment.

8    Q.   Okay.   And how many times would Monterial Wesley's

9         girlfriend be with him at the strip club?

10   A.   Inside I only recall that one time, but I met him

11        outside a couple times.

12   Q.   Okay.   So one time she was actually inside the club?

13   A.   Yes.

14   Q.   Were you formally introduced to her on that occasion?

15   A.   Yes.

16   Q.   Government's Exhibit 289, do you recognize that

17        photo?

18   A.   Yes.

19   Q.   Who is that?

20   A.   That's his girlfriend.

21   Q.   Okay.   And when you met her that time inside the

22        strip club, did you have any sort of conversation

23        with her?

24   A.   Just general conversation.

25   Q.   Were there other individuals with you on that

```
 1        occasion?
 2   A.   It was, but not at our table.
 3   Q.   Okay.  "Not at our table."  Whose table are you
 4        talking about?
 5   A.   Mine and their two's.
 6   Q.   All right.  So you were actually sitting with them in
 7        the strip club?
 8   A.   Yes.
 9   Q.   And was there anybody else with Monterial Wesley and
10        his girlfriend on this occasion at the strip club?
11   A.   I believe so, but I can't recall exactly whether or
12        not it was.
13   Q.   Then you said there was a couple of occasions you
14        would be at the strip club and you would go out and
15        you would see her on those couple of occasions?
16   A.   Yes.
17   Q.   And what would the circumstances be when you would go
18        out and she would be outside?
19   A.   Me and him would swap bags.
20   Q.   Where would she be at?
21   A.   She would be in the other vehicle.  We would do all
22        the swapping in mine.
23   Q.   So you would go to your vehicle, do the swapping; he
24        would get cocaine, or he would give you money?
25   A.   Yes.
```

1    Q.   Did I ask you, were there ever any times that Wesley

2         paid at the same time, where he would give you the

3         cocaine and you would get the money right then and

4         there?  Did that ever happen?

5    A.   Few and far between if it has.

6    Q.   Okay.  So when we're talking about these, it was --

7         if there were ever any of those, they were few and

8         far between, so generally it was either getting

9         cocaine or getting money back?

10   A.   Yes.  They were never for the full amounts, no.

11   Q.   What do you mean, it was never for the full amount?

12   A.   For however many it would be.

13   Q.   If he gave you any money?

14   A.   It would just be a partial payment.

15   Q.   Right there on the spot it wouldn't be the whole

16        amount?

17   A.   Correct.

18   Q.   So she would be in the other vehicle.  Are you

19        referring to whatever vehicle Mr. Wesley came in?

20   A.   Yes.

21   Q.   And where would she be at on those occasions?

22   A.   Probably driving on most of them.

23   Q.   Okay.  A couple times at the strip club you saw her

24        with Wesley?

25   A.   Yes.

1    Q.   Any other times when you and he were doing

2         transactions that she was also with him at other

3         locations other than the strip club?

4    A.   Yes.

5    Q.   What other locations do you remember her being with

6         Mr. Wesley when these transactions would take place?

7    A.   Probably in one of my rental properties and just

8         different stores.

9    Q.   You indicated that the transactions would happen with

10        him coming to your vehicle.  Were there ever any

11        times where you actually just pulled up beside each

12        other and did the swap right there without anyone

13        having to get out of their vehicle?

14   A.   Yes.

15   Q.   How did those transactions take place?

16   A.   We would say where we were going, and we would just

17        come down the street at the same time, and we would

18        stop fast enough to throw a bag out, he would throw a

19        bag in, and we would keep going.

20   Q.   All right.  And was she ever with him on those

21        occasions?

22   A.   Yes.

23   Q.   Total, can you give us some idea how many occasions

24        you would have seen her with Monterial Wesley when

25        you would be doing the bag swaps?

```
 1   A.   Total, I couldn't give you an accurate count, no,

 2        but, I mean, I can just say several.

 3   Q.   Okay.  Now, Mr. Humphrey, on any of these occasions

 4        that you were involved with Monterial Wesley doing

 5        these drug transactions, had you ever seen him with a

 6        firearm?

 7   A.   Yes.

 8   Q.   And tell the jury about that.

 9   A.   I mean, about the firearm itself or --

10   Q.   Yeah.  What were the circumstances that you would see

11        him with a firearm?

12   A.   Oh.  To help keep us from getting robbed from

13        outsiders.

14   Q.   Where would you be though when you would see him with

15        the gun?

16   A.   He would be in my vehicle, most likely.

17   Q.   And he would have the gun on him then?

18   A.   Yes.

19   Q.   And were there ever any times you got in his vehicle

20        where you would have seen a gun inside his vehicle?

21   A.   Yes.

22   Q.   Not necessarily on the person but in his vehicle?

23   A.   But in the vehicle, yes.

24   Q.   And do you recall anything about the firearms that he

25        ever had on him?  Were they handguns, I guess?
```

1499

1    A.    They were handguns, yes.

2    Q.    Do you know much about guns?

3    A.    Not very much.

4    Q.    Did you ever carry guns on you during any of these

5          transactions?

6    A.    No.

7    Q.    Did you have guns available to you if you wanted to

8          use a gun or have a gun?

9    A.    I mean, I have friends with guns, but as far as in my

10         possession, no.

11   Q.    In fact, when the police -- the police searched your

12         houses, your businesses, and all of those locations,

13         your vehicles.  Do you know if the police recovered

14         any firearms at any of those locations?

15   A.    None.

16   Q.    No, you don't know, or --

17   A.    No.  I said to my knowledge there was none present,

18         so they couldn't have found any.

19   Q.    All right.  Do you recall on November 25 in that

20         conversation you had with Monterial Wesley you were

21         talking about the high speed chase?

22   A.    Yes.

23   Q.    Did you, in fact, discuss with him having had a gun

24         on that occasion as you were being chased by the

25         police?

```
 1   A.   Yes.

 2   Q.   Did you have a gun that -- on that occasion?

 3   A.   No.

 4   Q.   Why did you tell him that you did?

 5   A.   To keep down robbery, you know, you talk that you

 6        have guns, and it lessens your chance of the people

 7        you're dealing with robbing you.

 8   Q.   When Mr. Wesley would be with his girlfriend in

 9        connection with these transactions that you did, did

10        you make any notation about any particular vehicles

11        that they would be in when she was involved?

12   A.   When she would be involved, it would just be two

13        different vehicles.

14   Q.   What vehicles were they?

15   A.   A white one and a tan one.

16   Q.   Do you know what kind of vehicles they were?

17   A.   They were Mercedes.

18   Q.   After you were arrested on November 27 of 2007, were

19        you initially housed at CCA?

20   A.   Yes.

21   Q.   And on February 5 of 2007 were a number of other

22        individuals, the other vast majority of the

23        individuals in this case, arrested in connection with

24        the big indictment where all 24 individuals were

25        indicted?
```

```
 1    A.    Yes.

 2    Q.    Were a number of those individuals at some point --

 3          did you have contact with them either at CCA or in

 4          connection with court proceedings that you had?

 5    A.    Yes.

 6    Q.    And with regards to the other individuals in this

 7          indictment, were there any other individuals that

 8          after the fact you recognized?

 9    A.    In CCA?

10    Q.    Yes.

11    A.    Yes.

12    Q.    And who was it that you, in fact, determined that you

13          recognized or were aware of?

14    A.    Immediately it was monster.

15    Q.    Okay.  And, again, that was Clinton Holman?

16    A.    Yes.

17    Q.    Okay.  He was involved in a case on the Missouri

18          side?  Is that your understanding?

19    A.    Yes.

20    Q.    Anyone else that you initially recognized in

21          connection with this case?

22    A.    Oh, in connection with this case, no.

23    Q.    Okay.  I want to show you just a couple more photos.

24          First of all, Government's Exhibit 273 and 274.  Do

25          you recall either of them ever being with Mr.
```

1502

```
 1            Wesley -- or seeing them and recognizing them as you
 2            sit here today, being with Mr. Wesley on any of the
 3            incidents aside from the November 27 incident?
 4   A.    No.
 5   Q.    All right.  Government's Exhibit 291, do you
 6            recognize that individual?
 7   A.    Yes.
 8   Q.    And what do you know -- what do you know that
 9            individual's name to be?
10   A.    Harv or Keith.
11   Q.    Okay.  And before you were indicted on this case
12            along with the other 23 people, was he someone that
13            you recognized in connection with this case?
14   A.    No.
15   Q.    After, in fact, he was arrested then at CCA, did you
16            and he have several conversations?
17   A.    Yes.  He introduced hisself to me.
18   Q.    And in connection with introducing himself to you,
19            did he make any references to you about knowing who
20            you were?
21   A.    Yes.
22   Q.    What did he indicate?
23   A.    He said he seen me at a strip club or something like
24            that and something about his gray SS truck.
25   Q.    Okay.  And so he indicated first that he had seen you
```

```
 1        at a strip club?

 2   A.   Yes.

 3   Q.   Do you have any recollection of having seen him at a

 4        point in time at the strip club?

 5   A.   No.

 6   Q.   All right.  But he obviously said he recognized you?

 7   A.   Yes.

 8   Q.   And then he said something about a gray SS truck?

 9   A.   Yes.

10   Q.   And what did he say about the gray SS truck?

11   A.   That that was his.

12   Q.   What was that in reference to?

13   A.   He just asked me if I remembered a gray SS truck, and

14        I said yes.  He said it was his.

15   Q.   Okay.  And in connection with your contact with

16        Monterial Wesley, do you recall there ever being a

17        gray SS truck present?

18   A.   Yes.

19   Q.   And under what circumstances would you see the gray

20        SS truck?

21   A.   Whenever I met up with Monterial and he got in my

22        vehicle and was in his SS truck, I just assumed it

23        was the red one painted gray.

24   Q.   The red truck that you now know -- or that you knew

25        belonged to -- who you didn't know at the time but
```

1      now know is Shevel Foy?

2   A.   Yes.

3   Q.   And the gray SS truck and the red SS truck, did they

4      appear the same, just different colors?

5   A.   Yes.

6   Q.   So when Mr. McDaniel mentioned that that was his gray

7      SS truck, how many times on these transactions would

8      you have seen the gray SS truck there?

9   A.   Just a few.

10  Q.   What about the red SS truck?  How many times do you

11     think you saw the red SS truck at drug transactions

12     or money transactions that you were doing?

13  A.   That was a while ago, but it was a lot.

14  Q.   On those occasions when you would see the red SS

15     truck, how many times did you see Shevel Foy?

16     Although at the time you didn't know that's who he

17     was, how many times did you see him there?

18  A.   Probably 70 percent of the time.

19  Q.   When you would see the red SS truck?

20  A.   Yes.

21  Q.   And with regards to the gray SS truck, did you

22     actually see anyone in connection with the gray SS

23     truck?

24  A.   Just Monterial.

25  Q.   All right.  And then did Mr. McDaniel make any other

1      statements to you specifically about the bad cocaine?

2   A.  Yes.

3   Q.  Tell the jury about that, Mr. Humphrey.

4   A.  When I got the bad 20 kilos, whatever, he said he

5       ended up with one of them, or something like that.

6   Q.  And what did he say about what he had to do with

7       regards to the bad kilo?

8   A.  I think he had to give it back.  He couldn't get rid

9       of it, or something.

10  Q.  Did he indicate to you where he was getting rid of

11      his cocaine?

12  A.  It was either him or Monterial.

13  Q.  I don't want to know what Monterial said.

14  A.  I don't recall if it was either him or Monterial, but

15      one of them said Columbia.

16  Q.  Okay.  All right.  I just want to know if you recall

17      him telling you where he was from.  And you don't

18      recall that?

19  A.  Not offhand, no.

20  Q.  All right.  And with regards to the bad -- the

21      reference to the bad dope, did that coincide with the

22      20 kilos that you previously indicated that you had,

23      in fact, came to be in possession of?

24  A.  Yes.

25                  THE COURT:  Members of the jury, these

1   statements that Mr. Humphrey has just testified about

2   to be attributed to Mr. McDaniel may be considered by

3   you only against Mr. McDaniel and not against any of

4   the other defendants.  There's an exception to the

5   hearsay rule, the rule that keeps from allowing into

6   evidence statements that are made outside the

7   courtroom, where it's a statement that's made by a

8   particular individual who happens to be a party to

9   the case, and in that situation this is admissible

10  against Mr. McDaniel.  I'll give you some further

11  instructions later about statements you may have

12  heard by other people at other times which are

13  alleged to have been made during the course of the

14  alleged conspiracy and how you may treat those

15  statements.  I'm giving you this limiting instruction

16  as to these statements attributed to Mr. McDaniel at

17  this time.

18          MS. MOREHEAD:  Thank you, your Honor.

19  Judge, I would ask for admission of Government's

20  Exhibit 331.  It's not on your list.  I apologize,

21  Judge.

22          THE COURT:  What is that?  A photo?

23          MS. MOREHEAD:  Yeah.

24          THE COURT:  Is there any objection?  Have

25  folks seen that?

1                         MS. MOREHEAD:  Yeah.  I've shown it to

2          them.

3                         THE COURT:  Hearing no objection,

4          Exhibit 331 is admitted.

5                         (Exhibit 331 was admitted into evidence.)

6     Q.   (By Ms. Morehead) Up on the monitor, Exhibit 331, do

7          you recognize that?

8     A.   The gray SS truck.

9     Q.   And does that appear to be the gray SS truck that you

10         have mentioned here before the jury today?

11    A.   I believe so.

12                        MS. MOREHEAD:  Judge, that's all I have of

13         this witness.

14                        THE COURT:  Very well.  Mr. Rogers?

15                        MR. ROGERS:  Thank you, your Honor.

16                        CROSS EXAMINATION

17    BY MR. ROGERS:

18    Q.   Mr. Humphrey, my name is Charlie Rogers.  I represent

19         Rtayvian Simpson.  Is it fair to say, sir, that

20         November 27, 2007, is the first time you ever saw

21         Rtayvian Simpson?

22    A.   Yes.

23    Q.   And you didn't even see him until after the agents

24         swooped down and you were arrested; is that correct?

25    A.   Correct.

1508

```
 1   Q.   You saw Mr. Monterial Wesley get out of the
 2        passenger's side of a vehicle; right?
 3   A.   Yes.
 4   Q.   That was the Black Ranger Rover?
 5   A.   Yes.
 6   Q.   And you had seen that Ranger Rover before?
 7   A.   Yes.
 8   Q.   And then after the arrest you saw Mr. Simpson?
 9   A.   Correct.
10   Q.   You've never seen him there before?
11   A.   Correct.
12   Q.   You've never seen him together with Mr. Wesley
13        before?
14   A.   Correct.
15   Q.   Okay.  Now, I believe you also were shown photograph
16        Government's Exhibit 274; is that right?  Is that
17        correct?
18   A.   Yes.  I --
19   Q.   That's what Ms. Morehead just showed you?
20   A.   Yes.
21   Q.   Do you know who that is?
22   A.   No.
23   Q.   And you never saw that person before?
24   A.   No.
25   Q.   If I were to tell you that that was another of Mr.
```

1        Wesley's brother's named Antwon Simpson, would you

2        have any reason to dispute it?

3   A.   No reason.

4   Q.   But you've never seen him before either?

5   A.   No.

6   Q.   Now, during the conversations that you had on the

7        telephone that led up to your being at the car wash

8        on November 27, those were just conversations with

9        Mr. Wesley; correct?

10  A.   Correct.

11  Q.   You've never had a telephone conversation with

12       anybody you think might possibly have been

13       Mr. Simpson, have you?

14  A.   No.

15  Q.   By Mr. Simpson I mean Mr. Rtayvian Simpson.

16  A.   No.

17  Q.   Even though I just showed you Antwon's picture?

18       We're clear on that?

19  A.   Clear.

20  Q.   And you had no reason to believe that Monterial

21       Wesley would be accompanied by anybody that day, did

22       you?

23  A.   No.

24  Q.   Now, you have seen Monterial Wesley with a firearm

25       before; is that correct?

1510

```
 1   A.   Yes.

 2   Q.   And you indicated that that would be sometimes when

 3        he was in your car or sometimes when you were in his

 4        car?

 5   A.   Correct.

 6   Q.   And you said the purpose of that firearm would be to

 7        protect the two of you from being robbed?

 8   A.   Correct.

 9   Q.   When was the last time that you saw Monterial Wesley

10        in your car with a firearm?

11   A.   I can't tell you the day.

12   Q.   Was it before November 27 of 2007?

13   A.   Yes.

14   Q.   Was it before August of 2007?

15   A.   Well, I couldn't put a date on it.

16   Q.   Okay.  When was the last time you were in Monterial

17        Wesley's car and saw him with a firearm there?

18   A.   Probably summer.

19   Q.   Of 2007?

20   A.   Yes.

21   Q.   So during the times when these phone calls that we

22        have heard were being recorded and the times when the

23        photographs that we have seen were being taken of

24        various meetings at various places, those would all

25        be well after the last time you saw Monterial Wesley
```

```
 1        with a firearm?

 2   A.   Yes.

 3   Q.   Okay.  And you and Monterial Wesley started out doing

 4        business as partners more or less?

 5   A.   Yes.

 6   Q.   With Mr. Holman?

 7   A.   Yes.

 8   Q.   And then at some time you started being not a partner

 9        but a supplier?

10   A.   Yes.

11   Q.   And you in your businesses -- for example, you own

12        restaurants that sell fish; right?

13   A.   Yes.

14   Q.   Or did own until the government got them?

15   A.   Did own.

16   Q.   And in those restaurants you would buy fish and other

17        food items and other merchandise from suppliers;

18        correct?

19   A.   Correct.

20   Q.   And then you would do something with them, prepare

21        them, have them cooked and served and sell them to

22        your customers?

23   A.   Correct.

24   Q.   And that was the relationship that you had with Mr.

25        Wesley during 2007 and the latter part of 2006?
```

1512

1    A.   What relationship?

2    Q.   Relationship of a supplier to a customer, who would

3         then sell the product to some other customer?

4    A.   Yes.

5    Q.   After your arrest -- let me ask you this:  You were

6         found guilty in 1992 of distribution of cocaine?

7    A.   Yes.

8    Q.   That was in the United States District Court for the

9         Western District of Missouri?

10   A.   Yes.

11   Q.   And did you have a trial, or did you plead guilty?

12   A.   I pled guilty.

13   Q.   Was that a cooperation agreement such as the one

14        you've reached in this case?

15   A.   No.

16   Q.   You did not have that -- give information in that

17        case?

18   A.   Correct.

19   Q.   You received in that case -- that involved a whole

20        lot less cocaine than we're talking about here;

21        right?

22   A.   Correct.

23   Q.   And you received an eight-year-and-one-month

24        sentence, I believe you said?

25   A.   Ninety-seven months.

1   Q.   Ninety-seven months.  And that was under the Federal

2        Sentencing Guidelines?

3   A.   Yes.

4   Q.   And that was your first offense of conviction?

5        You've never been convicted of anything else?

6   A.   As a juvenile.

7   Q.   Okay.  Okay.  What have you been convicted of as a

8        juvenile?

9   A.   Theft and --

10              MS. MOREHEAD:  Judge, could we approach,

11       please.

12              (Counsel approached the bench and the

13       following proceedings were had:)

14              MR. ROGERS:  I can withdraw it.

15              THE COURT:  I think you should.  First of

16       all, I don't know why you're impeaching the

17       credibility of a witness who just exonerated your

18       client.  That's not a very good tactic.

19              MR. ROGERS:  That's what I was thinking,

20       Judge.

21              THE COURT:  Okay.  Let's move on.

22              (The proceedings returned to open court.)

23              THE COURT:  That question is withdrawn?

24              MR. ROGERS:  Thank you.

25              THE COURT:  Very well.

1   Q.   (By Mr. Rogers) And you -- at the time that you were

2        arrested on November 27, 2007, you had served seven

3        years in a federal -- in the federal prison system;

4        correct?

5   A.   Yes.

6   Q.   And plus five more years of supervised release?

7   A.   Yes.

8   Q.   And so you knew that you were looking at some pretty

9        serious problems in this case?

10  A.   Well, I was under the impression that since it was

11       cocaine and no firearms that were involved that I

12       would fall in, like I said, 15 years.

13  Q.   But after you realized the extent of the

14       investigation, you realized that that was not the

15       situation?

16  A.   Correct.

17  Q.   And that's when you reached your plea agreement or

18       started to reach your plea agreement with the

19       government?

20  A.   Yes.  My initial one was all my finances.

21  Q.   Right.  And you did that through your lawyer?

22  A.   Yes.

23  Q.   And the way that works is, you did what is called a

24       proffer.  Actually, there was a series of proffer

25       interviews; correct?

```
 1   A.   Correct.

 2   Q.   And what that is is a meeting between you and law

 3        enforcement investigators where you were basically

 4        saying, hey, if we can reach an agreement on price,

 5        here's what I have to sell; right?

 6   A.   Well --

 7   Q.   I'm being a little bit flippant about it, but

 8        basically -- you basically have an interview where

 9        you say, here is what I'm willing to say if I were to

10        reach a cooperation agreement; right?

11   A.   In order to sell something, you need a price and a

12        product.

13   Q.   Right.  So you'll --

14   A.   There was no price.

15   Q.   You hadn't agreed on the price, but you're showing

16        them the product in hopes of getting a price?

17   A.   Yes.

18   Q.   Okay.  Fair enough.  And you had that first interview

19        on December 14, 2007, less than a month after your

20        arrest?

21   A.   Yes.

22   Q.   And then they came back on January 8, 2008, and they

23        came back the next week, January 15, 2008; is that

24        correct?

25   A.   And if I'm correct, it was the IRS.
```

```
 1    Q.   Government agents, in other words?

 2    A.   Yes.

 3    Q.   And could that also -- there were a bunch of agents

 4         from different agencies at all of these interviews;

 5         right?

 6    A.   In the Western District of Missouri, yes.

 7    Q.   Okay.  And also DEA agents and task force officers

 8         and people like that?

 9    A.   No.

10    Q.   Let me show you just to refresh your recollection a

11         report of that interview, those interviews, on

12         January 8, 2008, and January 15, 2008, to see if that

13         refreshes your recollection about who was at that

14         interview.

15    A.   That says two guys, yeah, one DEA from the Western

16         District of Missouri and one IRS agent.

17    Q.   And the DEA would be the Task Force Officer Anthony

18         Smith?

19    A.   [Nodded head.]

20    Q.   Okay.  Anyway, you talked to them then; right?

21    A.   Yes.

22    Q.   And then you reached a plea agreement with the

23         government that you executed back in December of

24         2008; correct?

25    A.   Correct.
```

1    Q.    Now, that was done through negotiations between your

2          lawyer and the government's lawyers; right?

3    A.    Yes.

4    Q.    And you went over that plea agreement with your

5          lawyer before you signed it?

6    A.    Yes.

7    Q.    And you signed it under oath?

8    A.    Yes.

9    Q.    Well, excuse me.  You signed a petition to enter a

10         plea of guilty under oath?

11   A.    Yes.

12   Q.    And the petition to enter a plea of guilty talked

13         about the plea agreement; right?

14   A.    Correct.

15   Q.    And the plea agreement had in it a very lengthy

16         recital of the factual basis for your plea; correct?

17   A.    Correct.

18   Q.    But that was not your words, was it?

19   A.    No.

20   Q.    Those were put in it, and you were basically in the

21         position of signing it or not?

22   A.    Those were the facts that the government had against

23         me, yes.

24   Q.    Okay.  But they are also facts that have to do with

25         other people; correct?

```
 1    A.    Yes.

 2    Q.    Did you have any back and forth with the government

 3          about what would be in the factual basis?

 4    A.    No.

 5    Q.    You just signed what they said?

 6    A.    I just pled guilty.

 7    Q.    Okay.  Let me ask you about part of that.

 8                   MS. MOREHEAD:  Judge, can we approach,

 9          please?

10                   THE COURT:  You may.

11                   (Counsel approached the bench and the

12          following proceedings were had:)

13                   THE COURT:  What are you proposing to do?

14                   MR. SANDAGE:  I'm going to ask him about

15          the second full paragraph on page 7 of the --

16                   THE COURT:  Are you talking about the one

17          during the course of the wire?  No, okay.  I see.  So

18          why would you want to ask him about this when this

19          hasn't been in evidence and there's absolutely

20          nothing in evidence implicating Rtayvian Simpson and

21          this will not come in evidence, cannot come into

22          evidence unless you put it there, and thereby create

23          some evidence implicating Mr. Simpson, who right now

24          has a good chance of a Rule 29 motion in his favor?

25          Counsel, I don't think you should go there.  What are
```

1      you doing?

2               MR. ROGERS:  I don't think it has anything

3      to do with Rule 29 evidence.  I'm not offering it for

4      the truth of the matters asserted.  I'm offering it

5      to show --

6               THE COURT:  What if he says, yeah, that's a

7      good point.  I do remember I saw Rtayvian one time?

8      Where are you going with that?  He has said nothing

9      to harm your client.  What are trying to do?

10             MR. ROGERS:  I'm trying to show that he and

11     other witnesses from this case, which I will talk to

12     later, have signed documents --

13             THE COURT:  I'm not going to permit you to

14     do it.  Come on back.  One reason is, you weren't at

15     the plea hearing, you don't know what he said about

16     that at the plea hearing.  In addition, I wouldn't

17     let you do it even if it wasn't potentially walking

18     your client into a conviction that he is otherwise

19     about to escape.

20             (The proceedings returned to open court.)

21             MR. ROGERS:  I don't have any other

22     questions for you, Mr. Brown.  Thank you.

23            THE COURT:  Mr. Heathman?

24           MR. HEATHMAN:  Thank you, your Honor.

25

1            CROSS EXAMINATION

2    BY MR. HEATHMAN

3    Q.   Mr. Humphrey, my name is James Heathman.  I'm

4         representing Ms. Temple in this matter.  Am I

5         correct, sir, that you entered into a plea agreement

6         in this case?

7    A.   Yes.

8    Q.   And that was December of 2008; is that correct?

9    A.   Correct.

10   Q.   And you understand in that plea agreement that there

11        is at least some indication you may get credit for

12        substantial assistance?

13   A.   Correct.

14   Q.   You understand that's called a 5K or a 5K1.1 motion?

15   A.   Yes.

16   Q.   And the entity that determines whether or not you get

17        that assistance is the government; isn't that true?

18   A.   That's true.

19   Q.   If you provide testimony that is truthful and honest

20        and substantially helps the government, you may get

21        that credit?

22   A.   Correct.

23   Q.   And the determination of whether it's true or helpful

24        is made by the folks sitting behind me?

25   A.   Yes.

1    Q.   You did not have that plea agreement when you

2         originally spoke or made a proffer in this case in

3         December of 2007, did you?

4    A.   Yes.

5    Q.   Did you have?

6    A.   I didn't.

7    Q.   All right.  In December of 2007 do you recall Officer

8         Jones asking you to tell him in the context of this

9         alleged conspiracy who all was involved?

10   A.   I don't recall, no.

11   Q.   Do you recall whether or not you indicated to him

12        names of people who were involved?

13   A.   This is 2007, December?

14   Q.   Yes, sir.

15   A.   No.

16                  MR. HEATHMAN:  May I approach, your Honor?

17                  THE COURT:  You may.

18   Q.   (By Mr. Heathman) I'm going to hand you what's been

19        discussed anyway as your proffer from December of

20        2007 and ask you to read Paragraph 14.

21   A.   "Humphrey stated that --"

22   Q.   No, just read it to yourself.

23   A.   Oh.

24   Q.   Have you done so?

25   A.   Yes.

1    Q.   Does that refresh your recollection on whether or not

2         you made an indication to Officer Jones in December

3         of 2007 who you believed was involved?

4    A.   Yes.

5    Q.   And as it relates to Mr. Wesley or any of his people,

6         what did you tell Mr. Jones as to who was involved?

7    A.   I told him me and Wesley.

8    Q.   And as far as Wesley's people and your knowledge of

9         those people, what did you tell him?

10   A.   I told him I had no dealings, direct dealings, with

11        them.

12   Q.   And at that time you weren't worried about whether

13        the government agreed, believed you, or was going to

14        give you any credit?

15   A.   Correct.

16   Q.   You didn't have a plea agreement at that point?

17   A.   I was -- just said what happened.

18   Q.   And then you discussed your involvement with agents

19        from the government on, I believe, on January 8 of

20        2008?

21   A.   I don't know.

22   Q.   Did you discuss with them proffers for -- in January?

23        Do you know?

24   A.   I'm talking about, I don't recall the dates.  I mean,

25        yeah, I know what happened, but I can't recall the

```
 1            dates.
 2    Q.    All right.  Do you know whether or not it was
 3            January, February or --
 4    A.    No.
 5    Q.    Would you agree with me that you discussed with them
 6            at least three times in 2008?
 7    A.    I agree with whatever you have in front of you.  I
 8            can't say.
 9    Q.    All right.
10    A.    Yes.
11    Q.    Let me show it to you.
12                 MR. HEATHMAN:  For the record, your Honor,
13            I'm showing the witness the proffer from January of
14            2008.
15    Q.    (By Mr. Heathman) And there are two contained in one,
16            I believe.  Would you read just the synopsis for me,
17            just to yourself.
18    A.    That's the same one the other guy just showed me.
19    Q.    All right.  And is that concerning your conversations
20            with agents in January of 2008?
21    A.    Yes.
22    Q.    Do you know in January of 2008 how many times, if at
23            all, you referenced Ms. Temple?
24    A.    None.
25    Q.    Do you recall discussing anything with the agents in
```

```
 1        April of 2008?
 2   A.   The exact words, no.
 3   Q.   All right.  I'm going to --
 4   A.   You don't have to show me.  I'm going to believe
 5        whatever you show me, yes.
 6   Q.   I understand.  I just want to you read it so we have
 7        a clear record.  Just go ahead and read that to
 8        yourself.
 9   A.   Which paragraph?
10   Q.   I'm pointing out a synopsis for a proffer statement
11        of April of 2008.
12   A.   Correct.
13   Q.   And in April of 2008 does that refresh your
14        recollection as to whether or not you had
15        conversations with the agents for the government?
16   A.   And as I told the other lawyer, all that is in the
17        Western District of Missouri.
18   Q.   Excuse me?
19   A.   I said, all that is about me and Western District of
20        Missouri.
21   Q.   All right.  And did you mention Ms. Temple in that
22        statement?
23   A.   No.
24   Q.   And you believe that involved the Western District of
25        Missouri and didn't involve this case at all?
```

1    A.    That proffer.

2    Q.    I want you to read to yourself Paragraph 4 in that

3          same proffer statement from April of 2008.

4                    MS. MOREHEAD:  Judge, could we approach,

5          please?

6                    (Counsel approached the bench and the

7          following proceedings were had:)

8                    MR. HEATHMAN:  Your Honor, he said it

9          involved just the Western District, and he's

10         discussing people who were involved directly in this

11         case.

12                   MR. BELLEMERE:  I have an objection.  That

13         is going to be -- go forward.

14                   MR. HEATHMAN:  I wasn't asking him to

15         name -- I'm just saying, isn't it true you discussed

16         other individuals in this case?  And I was going to

17         leave it at that.

18                   MS. MOREHEAD:  That's the stuff I'm not

19         allowed to bring out.

20                   THE COURT:  But he is -- Mr. Heathman has a

21         valid point to make if, in fact, the April 18 proffer

22         touched on this case and he did not mention Ms.

23         Temple.  Mr. Humphrey has said it didn't touch on

24         this case.  Now, Mr. Heathman, you are entitled to

25         ask him, in looking at this, does this refresh your

```
1          recollection that you did discuss individuals

2          involved in this case?  If his answer is yes, you can

3          ask him, is Ms. Temple's name here?

4                    MR. HEATHMAN:  That's all I was doing.

5                    THE COURT:  You're entitled to do that.

6                    MS. MOREHEAD:  Judge, on redirect I don't

7          want to get into the content of it.

8                    THE COURT:  You can't ask him who else he

9          mentioned because all he's doing is impeaching

10         Humphrey's testimony now about Temple.  You can't

11         take that and use it too implicate McDaniel because

12         that's not within the scope of Mr. Heathman's

13         questioning.

14                   MS. MOREHEAD:  That's not what I would want

15         to do.  The thing is, this was just some information

16         he volunteered; it wasn't that they asked him any

17         questions about this.

18                   THE COURT:  He can say that.  That's not

19         problem.

20                   MS. MOREHEAD:  Okay.  Great.

21                   (The proceedings returned to open court.)

22                   MR. HEATHMAN:  Thank you, your Honor.

23    Q.   (By Mr. Heathman) Mr. Humphrey, I want you to go

24         ahead and read to yourself Paragraph 4 in that

25         proffer of April of 2008.
```

```
 1    A.    Yes.

 2    Q.    Am I correct -- well, let me ask you this:  Does this

 3          refresh your memory as to whether or not you made

 4          mention or discussed other individuals in connection

 5          with this case?

 6    A.    Correct.

 7    Q.    But you did not mention Ms. Temple in April of 2008,

 8          did you?

 9    A.    No.  Well, I don't know because you told me to read

10          the synopsis, and it didn't mention him either.  So

11          you going to flip the page, and is she going to be on

12          the next one?

13                    MR. HEATHMAN:  No.  Actually, that is a

14          good point.

15               If we can take the time, your Honor?

16               I will hand it to you and you can read the

17          entire document --

18                    THE COURT:  But not out loud.  Let me

19          advise you what you're doing.  You're being given

20          that to refresh your recollection as to what happened

21          on that day.  You're not to accept that as correct or

22          incorrect.  You're not to just read from that to the

23          jury or say that's in that piece of paper.  That

24          piece of paper is handed to you to see if now you go,

25          good point.  I remember something about that
```

1528

```
 1        particular conversation.  That's all he's doing at

 2        this point.

 3                THE WITNESS:  He told me to read the

 4        synopsis.

 5                THE COURT:  I gotcha.  You can look at the

 6        rest of it too, but you understand what you're

 7        looking at it for?

 8                THE WITNESS:  Yes.

 9                THE COURT:  All right.  Have you completed

10        looking at it, Mr. Humphrey?

11                THE WITNESS:  Yes.

12                THE COURT:  I think he's finished looking

13        at it.

14                MR. HEATHMAN:  He reads faster than I do.

15   Q.   (By Mr. Heathman) Thank you, sir.  Does that refresh

16        your memory as to whether or not you mentioned Ms.

17        Temple in April of 2008?

18   A.   Yes, but it had several parts that was blacked out,

19        so I don't know who is there, but I don't recall

20        mentioning Ms. Temple, no.

21   Q.   Do you know that those blacked out parts were done by

22        the government?

23   A.   Yes.

24   Q.   So at least in the parts that you can read --

25                MR. HEATHMAN:  Do you have one that's not
```

1529

1    redacted so that he can -- maybe we can do that over

2    the break.

3  Q.  (By Mr. Heathman) At least as far as the ones that

4    you can read, you didn't mention Ms. Temple?

5  A.  Correct.

6  Q.  All right.  And then in December of -- strike that.

7    For the remainder of 2008 did you have any other

8    discussions with the government?

9  A.  I don't know.

10  Q.  All right.  And in December of 2008 you enter a plea

11    agreement?

12  A.  Yes.

13  Q.  And the plea agreement we have already talked about?

14  A.  Yes.

15  Q.  And you're hoping to get some credit for.  Did the

16    government then come and discuss with you Ms.

17    Temple's involvement in this case at some point?

18  A.  They just showed me pictures and asked me who was

19    this, who was that, where was I, and they played

20    recordings, yes.

21  Q.  Okay.  And was one of the pictures they showed you an

22    event at the Chili's Restaurant?

23  A.  Yes.

24  Q.  Do you recall the date of that?

25  A.  No.  It was several at the Chili's Restaurant.

1    Q.   All right.  Let me ask you this.  In December of 2007

2         did they show you some pictures as well?

3    A.   Of me and transactions that I done, yes, and audio

4         recordings.

5    Q.   In December of 2007 -- excuse me.  In December of

6         2007 did they show you photographs involving the

7         September 28 incident at Chili's?

8    A.   I don't know exactly which photos they showed me.

9         They showed me a group of photos, and I said that was

10        me; and the audio, I said that was me.

11   Q.   And do you recall that you didn't identify Ms.

12        Temple's vehicle in any of the photographs that were

13        showed to you in 2007?

14   A.   No, I don't recall that.

15   Q.   Go ahead and read for me Paragraph 12 -- or, excuse

16        me, 11 of the proffer from December of 2007.  Just

17        let me know when you're done.

18   A.   It said, I did recognize the vehicle --

19   Q.   Let me know when you're done reading it.

20   A.   I'm done.

21   Q.   All right.  So does that refresh your recollection as

22        to whether or not you identified Ms. Temple's

23        vehicle?

24   A.   That said I did recognize it.

25   Q.   This says you recognized what?

1    A.   The white Mercedes.

2    Q.   All right.  What was your girlfriend driving?

3    A.   It says that I was driving my girlfriend's white

4         Mercedes.  That's what I'm saying.

5    Q.   So your girlfriend's white Mercedes?

6    A.   Yes.

7    Q.   Not Ms. Temple's white Mercedes?

8    A.   But you pointed at the white Mercedes there, so --

9    Q.   I understand.

10   A.   Okay.  Yes.

11   Q.   The white Mercedes that you're talking about in

12        December of 2007 is your girlfriend's white Mercedes;

13        is that correct?

14   A.   And the other white Mercedes is parked out front

15        also.

16   Q.   Okay.  Well, I guess we're going to have to do this.

17        Can you read that and tell me if there's another

18        white Mercedes.

19             THE COURT:  Again, wait a minute.  What

20        we're doing is asking whether Mr. Humphrey now

21        remembers.

22             MR. HEATHMAN:  All right.

23             THE COURT:  Okay?  This isn't the way we do

24        it in real life; right?

25             THE WITNESS:  Right.

1           THE COURT:  That's what we're doing here.

2       He's asking, when you look at this, do you remember

3       what you said in December of '08?  That's all he can

4       do right now.  That doesn't mean to say he might not

5       be able to do something else later, but that's what

6       he can do right now.

7           THE WITNESS:  Yes.

8   Q.   (By Mr. Heathman) Have you read that Paragraph 11?

9   A.   Yes.

10  Q.   Does that refresh your memory as to whether or not

11      you indicated that Ms. Temple's white Mercedes was

12      present?

13  A.   Correct.

14  Q.   And what's your -- what is your memory as to what you

15      indicated to Officer Jones in 2007 about Ms. Temple's

16      Mercedes being at the Chili's?

17  A.   No, it was just out front, but yet he came from the

18      Hummer, or he went to the Hummer.

19  Q.   All right.  Now, you were then debriefed the final

20      time in April of 2009; am I correct?

21  A.   Yes.

22  Q.   April 2?

23  A.   Yes.

24  Q.   And where did that take place, sir?

25  A.   Here.

| | | |
|---|---|---|
| 1 | Q. | Here at the courthouse? |
| 2 | A. | Yes. |
| 3 | Q. | At that time you had indicated you had met Ms. Temple |
| 4 | | at a strip club; correct? |
| 5 | A. | Yes. |
| 6 | Q. | You had not told any law enforcement officers prior |
| 7 | | to April 2, 2009, that you had met Ms. Temple; isn't |
| 8 | | that correct? |
| 9 | A. | They never asked me. |
| 10 | Q. | When they asked you to tell us who all is involved in |
| 11 | | December of 2007, you didn't mention Ms. Temple; is |
| 12 | | that correct? |
| 13 | A. | Correct. |
| 14 | Q. | And then you indicated that -- I think today earlier |
| 15 | | that most of the times anybody was driving you |
| 16 | | thought Ms. Temple was driving.  Did I understand |
| 17 | | that correctly? |
| 18 | A. | Certain vehicles, yes. |
| 19 | Q. | Do you recall telling the officers on April 2 that |
| 20 | | Wesley was always the driver of the vehicles?  Do you |
| 21 | | recall that? |
| 22 | A. | Probably.  I don't recall. |
| 23 | Q. | Well, sir, I'm trying to figure out if your memory is |
| 24 | | sufficient to be able to tell us what actually |
| 25 | | happened.  You understand that? |

| | | |
|---|---|---|
| 1 | A. | But earlier I said that I believe he didn't have a |
| 2 | | license, so if somebody else was with him, they were |
| 3 | | driving.  That's exactly what I said. |
| 4 | Q. | And I understand today you told us that the times |
| 5 | | that she was there she was driving. |
| 6 | A. | Correct. |
| 7 | Q. | And on April 2 do you recall telling officers in this |
| 8 | | case, April 2 of 2009, just the opposite, that it was |
| 9 | | Mr. Wesley driving? |
| 10 | A. | I don't recall what I said, no. |
| 11 | Q. | All right.  Let me hand you the proffer from April 2 |
| 12 | | of 2009, and I am going to point out to the paragraph |
| 13 | | that I think is relevant.  You can read the entire |
| 14 | | document, if you wish.  Does that refresh your |
| 15 | | recollection, sir, to the fact that you had |
| 16 | | indicated -- |
| 17 | | MR. MORE:  I'm going to object.  He can ask |
| 18 | | if it refreshes his recollection.  He can't -- |
| 19 | | MR. HEATHMAN:  I'll rephrase, your Honor. |
| 20 | | THE COURT:  You may rephrase it. |
| 21 | Q. | (By Mr. Heathman) Does that refresh your recollection |
| 22 | | as to what you told Officer Jones in relation to who |
| 23 | | was driving the vehicle whenever you would see Mr. |
| 24 | | Wesley and Ms. Temple? |
| 25 | A. | In the pictures that were shown I said that he was |

```
 1              driving --
 2                        THE COURT:  Pardon me.  Pardon me.  The
 3              answer to that question is either yes or no.  Does it
 4              refresh your recollection?
 5                        THE WITNESS:  Yes.
 6    Q.    (By Mr. Heathman) And what did you tell Officer Jones
 7              on April 2, 2009?
 8    A.    Well, it was in reference to a particular picture and
 9              the position we was in, so I said that Wesley would
10              be driving.
11                        MR. HEATHMAN:  May I approach, your Honor?
12                        THE COURT:  Surely.
13    Q.    (By Mr. Heathman) Would you read that paragraph again
14              to yourself.
15    A.    These are two different things.  You just asked me a
16              different question.
17    Q.    All right.  Did you read it?
18    A.    Yes.
19    Q.    Let's make sure before I walk back.  I don't want to
20              ask you two different questions.  My question is, did
21              that refresh your recollection as to who was driving
22              during the times when you advised Wesley was -- when
23              the two would be together?
24                        MS. MOREHEAD:  Objection; asked and
25              answered.
```

```
 1                    THE COURT:  Overruled.

 2   Q.   (By Mr. Heathman) Do you recall at that question?

 3   A.   That's not the same question you just asked me.  You

 4        asked me --

 5                    THE COURT:  That's why I overruled it.

 6                    MR. HEATHMAN:  Maybe we should just start

 7        over.

 8                    THE COURT:  Why don't we take our lunch

 9        recess and fall back and draw a new plan in the sand.

10            Members of the jury, I'll remind you of the

11        admonitions.  Don't discuss the case among yourselves

12        or with anybody else.  Don't have any contact with

13        the participants in the case.  Don't do anything that

14        touches on the case.  Have a nice lunch.  And, Ms.

15        Scheurer, take charge of the jury.  At 1:30 we will

16        start back up again.  Mr. Humphrey, you can remain

17        here.  Participants, remain here so we can talk.

18        Deputy, whenever it works for you, feel free to take

19        Mr. Humphrey.

20                    (The following proceedings were had outside

21        the presence of the jury:)

22                    THE COURT:  We are in limbo, Mr. Bellemere.

23                    MR. BELLEMERE:  Could I ask for dismissal?

24                    THE COURT:  Well, you could.

25                    MR. BELLEMERE:  What was that, Rule 29?
```

```
 1              THE COURT:  Your argument is not as good.
 2     Anything else we need to talk about before we break?
 3     I know, Mr. Johnson, we have some business to
 4     transact at some point if we're going to get to that
 5     today.  Are we?
 6              MS. MOREHEAD:  No.
 7              MR. JOHNSON:  I'm prepared whenever.
 8              MR. ROGERS:  For the record, I would like
 9     to read into the record the question -- the material
10     I was going to ask Mr. Humphrey about because I
11     showed the court the document, but that's not in the
12     record.
13              THE COURT:  Very well.
14              MR. ROGERS:  And I'm not disputing the
15     court's ruling.  I have to be clear.  I was going to
16     read him the -- have him read the part, when Wesley
17     would meet Humphrey, he would often bring along a
18     second -- he would often bring a second individual
19     along, including his two brothers, Antwon Simpson and
20     Rtayvian Simpson.
21              THE COURT:  Under Rule 403 I do not permit
22     you to do that.
23              MS. MOREHEAD:  That's evidence, Judge, yet
24     to be introduced.
25              THE COURT:  If there's evidence to be
```

1    introduced, great, but there isn't the basis with

2    Mr. Humphrey to go into that.  All right.  See you

3    all at 1:30.

4              (The luncheon recess was taken.)

5              THE COURT:  If we're ready to proceed, we

6    will bring in the jury as soon as Ms. Scheurer has

7    them lined up.  Mr. Heathman, you can come on up to

8    the lectern whenever you're ready to go.

9              MR. HEATHMAN:  Thank you, your Honor.

10             (The following proceedings were had in the

11   presence of the jury:)

12             THE COURT:  All right.  Mr. Heathman, you

13   may resume your cross examination.

14             MR. HEATHMAN:  Thank you, your Honor.

15   Q.   (By Mr. Heathman) Mr. Humphrey, before the break do

16        you recall we were discussing times when Mr. Wesley

17        and Ms. Temple would be in one of two of her

18        vehicles, the Mercedes?

19   A.   Yes.

20   Q.   Either the four-door or the SUV?

21   A.   Yes.

22   Q.   And during the times that they were in one of Ms.

23        Temple's vehicles, was Mr. Wesley always the driver?

24   A.   Not always, no.

25             MR. HEATHMAN:  Your Honor, may I approach?

```
 1              THE COURT:  You may.

 2   Q.   (By Mr. Heathman) I hand you, sir, the proffer that

 3        was made by you on April 2 of this year, 2009, and

 4        point out the paragraph where I believe that's

 5        relevant, ask you to read that to see if that

 6        refreshes your recollection.

 7              MS. MOREHEAD:  Judge, I don't think there's

 8        been a question about whether he needs that to

 9        refresh his recollection about anything.

10              THE COURT:  Mr. Heathman?

11   Q.   (By Mr. Heathman) Mr. Humphrey, do you recall telling

12        Agent Jones anything different?

13   A.   Yes.

14   Q.   All right.  Do you remember what you told Agent

15        Jones?

16   A.   Yes.

17   Q.   And, sir, is it true that you told Agent Jones that

18        Mr. Wesley was always the driver?

19   A.   In a certain instance that he asked about.  When we

20        met up like this, I told him he was always the

21        driver.

22   Q.   All right.  Thank you, sir.  Now, you also indicated

23        that on the September 28 incident at Chili's -- do

24        you recall that incident as far as the pictures?

25   A.   Yes.
```

1    Q.    September 28 of 2007?

2    A.    Yes.

3    Q.    Mr. Wesley was at a birthday party?

4    A.    Yes.

5    Q.    For a brother?

6    A.    Yes.

7    Q.    And Mr. Wesley, do you recall he didn't want you to

8          come in?

9    A.    Correct.

10   Q.    Didn't want other people to see you?

11   A.    Correct.

12   Q.    And I believe you also testified that there were

13         times that you lied to Mr. Wesley during the time you

14         would be dealing with him?

15   A.    Yes.

16   Q.    The particular the time I wrote down anyway was in

17         your conversation about picking up the kids?

18   A.    Yes.

19   Q.    And you already had the kids, or the kilos, with you

20         at that time?

21   A.    Correct.

22   Q.    Do you, sir, believe that it's possible there were

23         times Mr. Wesley also lied to you?

24   A.    Possibly.

25   Q.    When he says he has to get ready or he has to go pick

1    up money, he may actually have money on him; isn't

2    that true?

3  A.   We don't exchange at those times, no.

4  Q.   So you would disagree with that?

5  A.   Correct.

6  Q.   Am I correct, sir, that the first time that you

7    indicated that Ms. Temple's white -- strike that --

8    that Ms. Temple was involved in any of these

9    activities was April 2 of 2009?

10  A.   That's the first time they asked me about her

11    involvement, yes.

12  Q.   And that's the first time you volunteered anything

13    about her involvement?

14  A.   Correct.

15  Q.   Thank you, sir.

16         MR. HEATHMAN:  I don't have anything

17    further, your Honor.

18         THE COURT:  All right.  Mr. Bellemere?

19              CROSS EXAMINATION

20  BY MR. BELLEMERE:

21  Q.   Mr. Humphrey, my name is Fred Bellemere, and I

22    represent Keith McDaniel.  I think I understood you

23    to say that early on you thought your exposure in

24    this particular case here could be up to from 30

25    years to life.  Did I understand that to be your

1           accurate reflection?

2    A.     Yes.

3    Q.     And did I also understand that in the course of your

4           plea agreement a number of counts were dismissed

5           against you?

6    A.     Yes.

7    Q.     When all that occurred, before we started talking

8           about anything else, was your total exposure at that

9           juncture 30 years to life?

10   A.     Yes.  And once you dropped the other counts it

11          doesn't matter because the number one count in the

12          conspiracy covers it all anyway, so it's still at 30.

13   Q.     Okay.  So really the bottom line of all this is that

14          you're trying to help yourself in the best way you

15          can by testifying against these defendants here and

16          others in different cases in the hopes that the

17          United States Government will file something called a

18          5K1 and give you some credit for substantial

19          assistance; is that a fair statement?

20   A.     Yes.

21   Q.     Do you have any thoughts or expectations as to what

22          you might receive or what you would hope to receive

23          from all this that you're doing here in court today

24          and maybe what you've done in Mr. Harris's court and

25          what you may or may not do in Mr. Wilson's court?

```
1    A.   Well, I haven't actually thought about no specific
2         time because then that way I can't be disappointed.
3    Q.   Okay.  But it is true you certainly hope to get less
4         than this 30 years?
5    A.   Correct.
6    Q.   And would I be safe in assuming that you would like
7         to at least get close to half of that number?
8    A.   Yes, you would be safe to assume that.
9    Q.   All right.  Now, with regard to -- I want to ask you
10        a couple of general things, okay, and then I want to
11        get to the -- Mr. McDaniel's issue.  I notice that
12        there is a $10½-million-dollar forfeiture provision
13        in this plea agreement.
14   A.   Yes.
15   Q.   Where did that number come from?
16   A.   I have no idea.
17   Q.   So that number didn't come from you?
18   A.   No.
19   Q.   Did you ever keep records truthfully about all these
20        drugs that we have been talking about, these kilos of
21        cocaine that have come from Mexico?  Did you ever
22        actually have any kind of record anywhere that would
23        show you how much you were getting, say, weekly or
24        monthly, or are you just going on your best
25        recollection?
```

1    A.    Best recollection.  Didn't write down nothing.

2    Q.    Pardon me?

3    A.    I didn't write down anything.

4    Q.    Okay.  Now, we have been through this a number of

5          times, so I prefer not to go through it again, but as

6          I best understand your testimony, you had an

7          opportunity to speak with the government in December

8          of 2007, December 17.  I'll tell you that's the date

9          of the report, but it says that you talked to them on

10         December 14.

11   A.    Okay.

12   Q.    Then I see the next time you talked to them there's a

13         report dated January 30, but it talks about two

14         dates, January 8 and 15 of 2008, and I think you

15         testified you thought those conversations basically

16         related to your financial situation.

17   A.    Yes.  That was the bulk of it.

18   Q.    Okay.  And then I see a subsequent report.  Well, I

19         see a subsequent report dated January 30, 2008, that

20         again refers back to the statements -- your

21         conversations with the government agents on January 8

22         and January 15, and I don't know why you would have

23         any knowledge of that because it just goes back to

24         the time you saw them before; right?

25   A.    Correct.

 1   Q.   And then I see a report dated April 18, 2008, which

 2        is a report referencing an April 14, 2008, proffer

 3        meeting that you had with government agents Mr.

 4        Smith, Mr. Thomas, the assistant U.S. Attorney, Ms.

 5        Morehead.  That would have been on April 14, 2008.

 6        Does that ring a bell with you, that meeting?

 7   A.   Yes.

 8   Q.   Okay.  And then the last time I think you had an

 9        opportunity to talk to the government before your

10        testimony here today was -- or make an offer or

11        something having the government ask you questions was

12        on April 2, 2009.  So just a little while ago?

13   A.   Correct.

14   Q.   Okay.  Before coming to court today, did you have an

15        opportunity to meet with the U.S. Attorney Ms.

16        Morehead and/or Mr. McCue and/or Mr. Jones and/or Mr.

17        Smith to go over what your testimony might be?

18   A.   No.

19   Q.   So the last time you talked to any government agent

20        was on April 2, 2009?

21   A.   Correct.

22   Q.   During any of those conversations were any of those

23        conversations recorded to your knowledge?

24   A.   I assume they all were.  I don't know for sure

25        though.

1   Q.   Did they ever -- you didn't see any kind of a video

2        camera that might have been on you?

3   A.   I just assumed that one was present.  I didn't -- no

4        knowledge.

5   Q.   Okay.  And no one ever asked to you write out in

6        longhand any of the transactions that you're

7        testifying to here today in court?  There's no one

8        that asked you to --

9   A.   No.

10  Q.   -- sit down with pen and pencil and draw out your

11       dealings with these defendants here and other

12       defendants in other cases?

13  A.   No.

14  Q.   Okay. I recall that on your direct testimony you

15       mentioned something about a gray truck being

16       driven -- a gray SS truck being driven by Mr. Wesley.

17       Did I remember that accurately as far as you recall?

18  A.   Yes.

19  Q.   There was a picture of a gray SS truck.  Did that

20       look like the truck that you think that you might

21       have seen -- do you remember Ms. Morehead just showed

22       it a little bit before --

23  A.   It was just gray.  That's what I said it was, a gray

24       SS truck.

25  Q.   Did that look like the truck that you might have seen

1    Mr. Wesley in?

2  A.   Yes.

3  Q.   Okay.  I suppose the next question would be, in that

4       regard, when you saw Mr. Wesley in that gray SS

5       truck, do you recall seeing anybody else with him at

6       that particular juncture as you look back on it now?

7  A.   No.

8  Q.   Okay.  And it is a fair statement, is it not, to say,

9       Mr. Humphrey, that you never dealt with my client in

10      any kind of business matter, with Mr. McDaniel?  Is

11      that a fair statement?

12 A.   Correct.

13 Q.   Now, then, I remember that Ms. Morehead showed you a

14      picture, Government's Exhibit 291, which was a

15      photograph I believe, of Mr. McDaniel.  Well, I need

16      to show it to you again.  You remember that

17      photograph?

18 A.   Yes.

19 Q.   And you said that you first came in contact with him

20      at CCA?

21 A.   Yes.

22 Q.   And CCA is Corrections Center of America?

23 A.   Something like that.

24 Q.   Kind of a weigh station in between --

25 A.   Yes.

1   Q.   -- arrest and trial perhaps in some regards, okay?

2   A.   Yes.

3   Q.   And then you said that you had conversations with him

4        while at CCA; true?

5   A.   Yes.

6   Q.   Would you do me a courtesy and tell me whether or not

7        those conversations occurred on just one occasion or

8        multiple occasions.

9   A.   Multiple occasions.

10  Q.   Do you recall when those conversations started,

11       roughly, and when they might have ended, roughly?

12  A.   Dates, I don't recall, but we lived in the same pod,

13       and then he was moved to another pod, so that's when

14       it ended.

15  Q.   When you and he lived in the same pod, did you have

16       conversations on more than one day about this matter?

17  A.   Yes.

18  Q.   Is that a fair statement?

19  A.   Yes.

20  Q.   At some point in time did you leave Corrections

21       Center of America?

22  A.   Yes.

23  Q.   Do you recall roughly when that might have been?

24  A.   The exact date, I don't know.  It was in '08.  That's

25       all I know for sure.

1  Q.  As I understand what your statement is -- let me ask

2      you this:  Do you recall what it is that you told the

3      officers in this case -- it was on April 2 you met

4      with Agent Tim McCue, Officer Eric Jones, and

5      Assistant United States Attorney Ms. Morehead.  Do

6      you recall clearly what you told them about my

7      client, or would you need to look at this report to

8      kind of see if that helps refresh your recollection?

9  A.  I recall.

10  Q.  You do?

11  A.  Yes.

12  Q.  Okay.  In that regard what did you say about my

13      client coming up to you and discussing his having

14      seen you before?

15  A.  He said that he know that I didn't know who he was

16      but yet he met me before at a strip club or something

17      with Monterial and that he knew who I was, and that

18      was it.

19  Q.  Okay.  So, in essence, he's advising you that you and

20      he had met before, but that --

21  A.  And we're on the same case, yes.

22  Q.  And then the next thing that you -- what was it that

23      you think he said -- what was it he said to you about

24      this Chevy truck, this gray truck?

25  A.  He was telling me, do you remember the gray SS truck?

1       And I was like yeah.  He was like, that was mine.  So

2       he was letting me know that he knew who I was.

3   Q.  Did he say that -- Mr. Humphrey, do you recall

4       whether or not he said that he had, you know, how

5       many times that he had been -- do you recall whether

6       or not he said how many times he had been in the area

7       when you and Mr. Wesley might have been transacting

8       business in this red truck?

9   A.  No, I don't recall how many times.

10  Q.  I wish you would do me a courtesy here -- if I get

11      the right one.  I'll tell you that I've actually

12      circled those, but see if, in looking at that report,

13      which is that report we're talking about of April 2

14      of 2009, does that refresh your recollection,

15      Mr. Humphrey, about how many times he said he might

16      have been in that gray truck?

17  A.  Yes.  One.

18  Q.  Okay.  Is that what he -- that's what you told the

19      officer, did you not?

20  A.  Yeah.  I said that I recall one time.

21  Q.  Well, you recalled or that he said he was there one

22      time?

23  A.  No.  I said that I recalled one time.

24  Q.  Okay.  All right.  So is it fair to assume that you

25      didn't see that gray truck multiple times then?

1   A.   I seen the truck multiple times, but that one time in

2        particular that me and him was talking about.

3   Q.   Okay.  And on that one time in particular that you

4        and him was talking about, did you actually recall

5        then seeing him in the truck?

6   A.   No, I didn't see him.

7   Q.   Okay.  But, in essence, he's saying he was only there

8        once in his gray truck, isn't he?

9   A.   Yes.

10  Q.   In essence, that's the bottom line of it, isn't it?

11  A.   I guess.

12  Q.   Listen, I'm not trying to trick you.  That's the

13       truth.  I am trying to find out what it is you recall

14       and what it is he said.  That's all.

15  A.   Oh, that's what I said.  I said one time then.

16  Q.   That's what Mr. McDaniel told you, he had been at a

17       restaurant one time in his gray truck and saw you do

18       business?

19  A.   Yes.

20  Q.   And also you indicated that he said something else to

21       you about some bad drugs.  Do you recall that?

22  A.   Yes.

23  Q.   Would you tell me what it was you recall him saying

24       about the bad drugs?

25  A.   That he ended up with one of the bad ones that I had.

1    Q.    Okay.  Now, I recall, Mr. Humphrey, that you had a

2          meeting with the government, as I referred to, back

3          on April 18, 2008.  Okay?

4    A.    Okay.

5    Q.    This report here that we have been talking about --

6                   MS. MOREHEAD:  Judge, the meeting actually

7          occurred on April 14 of 2008.

8                   MR. BELLEMERE:  Thank you for clarifying

9          me.  I keep looking at the doggone date prepared.

10         You had a meeting with the government back on

11         April 14, 2008.  Do you recall that?

12   A.    Yes.

13   Q.    And this meeting here took place on April 2, 2009, so

14         I'm assuming, since this information that you

15         provided to the government regarding my client on

16         April 2, 2009, was somehow or another imparted to you

17         after April 18, 2008 -- does that sound right to you?

18   A.    Well, the questions that they asked me April 14

19         weren't the same as they asked me April 2, a year

20         later, and if I'm correct, we had the meet in E pod

21         either -- it had to be after February of '08, so it

22         was probably about April at that time, so I left E

23         pod after April '08.

24   Q.    Okay.  So my client shared with you this information

25         sometime between -- he was always in E pod up until

```
 1        he left.  Did he leave E pod before you did?

 2  A.    Yes.

 3  Q.    And you left E pod in April of '08?

 4  A.    No.  I said it had to be after April 08 then.

 5  Q.    Because he left E pod after April of '08?

 6  A.    No.  I left E pod after April 08.  I said he left

 7        before I did.

 8  Q.    All right.  I'll try this one more time because I'm

 9        confused in my own mind, not because of anything

10        you've done.  You had conversations with my client

11        multiple times in E pod over more than one day or

12        two?

13  A.    Yes.

14  Q.    Okay.  And my client then left E pod after those

15        conversations with you and before you left E pod?

16  A.    Right.

17  Q.    Okay.  And you're saying that those conversations

18        that you had with my client before he left E pod must

19        have occurred some time in April of 2008?  Is that

20        what I'm understanding?

21  A.    No.  I told you that the interview with the agents

22        happened in April of 2008, and they didn't ask me

23        about him at that particular time.

24  Q.    Okay.  I want to show you, Mr. Humphrey, what is the

25        report that purports to cover the meeting on
```

```
 1          April 14, 2008.

 2   A.     Uh-huh.

 3   Q.     Okay?  And I want you to look at the second page

 4          under Paragraph 4.  I don't want you to tell me

 5          anything about that.  I just want to know whether or

 6          not if you look at that that would refresh your

 7          recollection as to whether or not any of those

 8          government agents asked you anything about Mr.

 9          McDaniel.

10   A.     But this doesn't state what you just asked me about

11          Mr. McDaniel.

12   Q.     I understand that.

13   A.     Okay.

14   Q.     You were talking about Mr. McDaniel on April -- in

15          April of 2008, is that correct, in that report?

16   A.     Not in reference to what you just asked me, no, but,

17          yes, I did mention Keith McDaniel, that he moved into

18          E pod.

19   Q.     Just to make clear so the jury will understand, you

20          did mention Mr. McDaniel in April of 2008; is that

21          not correct?

22   A.     Okay --

23   Q.     Yes or no?

24   A.     Yes.

25   Q.     Now, then --
```

1           THE COURT:  Pardon me.  The question was,
2     you did not mention McDaniel?
3           MR. BELLEMERE:  No.  I asked if he
4     mentioned Mr. McDaniel in the April 18 report.  I
5     asked him if he asked him that, yes or no.
6           THE COURT:  I misunderstood your question.
7     Would you repeat it.  I confused things here.
8           MR. BELLEMERE:  Yeah.
9  Q.  (By Mr. Bellemere) Mr. Humphrey, it is true that on
10     the report that I showed you dated April 18, 2008,
11     you mentioned my client, Mr. McDaniel.  That is a
12     true statement, isn't it?
13  A.  True.
14  Q.  It is also true that the representations that we have
15     discussed that were in this April 2, 2009, report are
16     not mentioned in the April 18, 2008, report; is that
17     true?
18  A.  Not all of them, no.
19  Q.  Well, the ones we have talked about here in court are
20     not mentioned on the April 14, 2008, report; true or
21     false?
22  A.  But you said that between April 14 of '08 and April 2
23     of '09, you said I was imparted with something --
24  Q.  No.  I just -- only thing I'm asking you -- I'm not
25     trying to confuse you.

```
 1   A.    That's what I'm saying.  You confused me.  Yes, it is
 2         stating something in '08 report that's not in '09
 3         report.
 4   Q.    And also are things in the '09 report that are not
 5         mentioned in the '08 report; true?
 6   A.    Correct.
 7   Q.    I'm sorry.  You know, when you get to a certain
 8         point, you get confused.  I'm not trying to mess
 9         things up.  I'm just trying to understand.
10               One last thing I would like to cover with you,
11         Mr. Humphrey.  I didn't quite understand this.  I
12         remember that the government played a telephone call,
13         the number of which I'm not exactly sure, but it had
14         to do with your attempting to elude some people that
15         you referred to as alphabets.  Do you remember that
16         telephone call?
17   A.    Yes.
18   Q.    Do you remember that Ms. Morehead asked you -- first
19         of all, you remember that?  You remember that phone
20         call?
21   A.    Yes.
22   Q.    And do you remember in that phone call you made
23         reference to having a weapon with you?
24   A.    I said that if I would have had a mini chopper.  If.
25   Q.    Do you recall -- I thought somehow or another you
```

```
 1        indicated that you actually had a weapon with you.
 2   A.   Later on in the conversation I said something about I
 3        only had eight in the clip.
 4   Q.   If I understood your testimony, you indicated to me
 5        that -- not just to me, but to the jury, that you
 6        recall that Mr. Wesley would carry a gun with him to
 7        help protect you all from getting robbed and things
 8        like that.  Did I understand that correctly?
 9   A.   Correct.
10   Q.   And you said, in turn, that you never carried a
11        weapon; is that true?
12   A.   True.
13   Q.   But this phone call is just between you and Mr.
14        Wesley, isn't it?  Your purpose, as I understood it,
15        in saying that on the telephone phone call, as you
16        represented it to the jury, was to let folks out
17        there know that you weren't going to be an easy
18        target.  Did I understand that --
19   A.   Correct.
20   Q.   You're only sharing that with your partner, Mr.
21        Wesley.  You're not sharing that to all these other
22        malcontents?
23   A.   He was the only one that needed to know at that time.
24   Q.   Okay.  Does that mean that you actually were worried
25        about whether or not Mr. Wesley might be robbing you
```

1       on some occasion?

2    A.   Yes.

3    Q.   So you didn't trust Mr. Wesley?

4    A.   Trust no one.

5    Q.   But nonetheless you didn't have a gun?

6    A.   No.

7              MR. BELLEMERE:  All right.  Sir, I have no

8         further questions, your Honor.

9              THE COURT:  All right.  Mr. Sandage?

10             MR. SANDAGE:  Yes, your Honor.  Thank you.

11                     CROSS EXAMINATION

12   BY MR. SANDAGE:

13   Q.   Mr. Humphrey my name is Lance Sandage.  I represent

14        Shevel Foy.  I would like to talk to you briefly

15        about your '92 conviction.  Is that when it was, '92,

16        correct, sir?

17   A.   Correct.

18   Q.   Were you on bond in that case?

19   A.   Yes.

20   Q.   Prior to going into custody, did you stash away

21        $80,000 cash?

22   A.   Well, I accumulated it throughout my incarceration.

23        Once I was released, I had $80,000.

24   Q.   So you had accumulated cash while you were

25        incarcerated plus --

| | | |
|---|---|---|
| 1 | A. | What I had, yes. |
| 2 | Q. | Okay.  What did you have before you were |
| 3 | | incarcerated? |
| 4 | A. | The exact dollar amount, I don't know, because I |
| 5 | | spent money the seven years I was incarcerated, and I |
| 6 | | had $400 sent to me every month for 84 months, so -- |
| 7 | Q. | And the money that we're talking about is, I suspect, |
| 8 | | drug proceeds from your activities back in '92 or |
| 9 | | thereabouts; is that correct? |
| 10 | A. | Yes. |
| 11 | Q. | And you were stashing or hiding that money for when |
| 12 | | you got out from your '92 prison sentence; correct? |
| 13 | A. | No.  I got caught on the street, and they didn't |
| 14 | | search my person or my possession.  They didn't |
| 15 | | search my vehicle or my house. |
| 16 | Q. | Okay.  So it was just money that you had? |
| 17 | A. | Yes. |
| 18 | Q. | And you pled guilty in that case; is that correct? |
| 19 | A. | Yes. |
| 20 | Q. | And after you pled guilty, you met with a probation |
| 21 | | officer; correct? |
| 22 | A. | Yes. |
| 23 | Q. | And that probation officer attempted to gather |
| 24 | | information regarding you; is that correct? |
| 25 | A. | Yes. |

1560

```
 1    Q.    Asked you questions about your education; right?

 2    A.    Yes.

 3    Q.    Asked you questions about your past criminal

 4          behavior?

 5    A.    Yes.

 6    Q.    Asked you questions about -- maybe even asked you

 7          questions about your current offense that you were in

 8          custody for?

 9    A.    Yes.

10    Q.    Asked you questions about your finances?

11    A.    Uh-huh.

12    Q.    Your life abilities?

13    A.    Yes.

14    Q.    Your assets?

15    A.    Yes.

16    Q.    Your income?

17    A.    Yes.

18    Q.    Dependents that you might have?

19    A.    Yes.

20    Q.    Bills that you might have to pay?

21    A.    Yes.

22    Q.    And in the course of those discussions, did you

23          disclose to probation that you had had cash back at

24          your house?

25    A.    No.
```

1   Q.   Okay.  So you lied to them?

2   A.   No.  He didn't ask.

3   Q.   Well, he asked you about your assets.

4   A.   He said that, well, you didn't have a job, you got a

5        court-appointed attorney, he said, so I guess you

6        don't have anything; right?  I said yes, and he said

7        end of questions.

8   Q.   Okay.  Well, when he asked you that question, did you

9        have anything, after he prefaced it and he asked if

10       you had anything and you said no, correct?

11  A.   He stated it.  He didn't ask it.  He said, I take it

12       you don't have anything and moved on.

13  Q.   Okay.  After all that process was done, a report was

14       completed regarding in anticipation for something

15       called a presentence report; correct?

16  A.   Yes.

17  Q.   And that report kind of rehashes everything about

18       your past; correct?

19  A.   Yes.

20  Q.   About the criminal conduct in which you had pled

21       guilty; is that correct?

22  A.   Yes.

23  Q.   And, again, it goes into some financial information

24       regarding you; is that correct?

25  A.   Yes.

```
 1   Q.   And you had a chance to review that?  You reviewed
 2        that?
 3   A.   Yes.
 4   Q.   Anywhere in there did that $80,000, give or take a
 5        few thousand dollars, did that show up anywhere in
 6        that report?
 7   A.   Well, you keep missing it.  It wasn't 80,000 until I
 8        came home.
 9   Q.   How much was it, sir?
10   A.   Total, I don't know.
11   Q.   Okay.  Ballpark it.
12   A.   But when I got home, seven years later, it was a
13        total of $80,000, yes.
14   Q.   Was it more than 80,000?
15   A.   No.  I said that I got $400 sent to my bank account,
16        or my godfather sent to me $400 a month for the 84
17        months that I was gone that I didn't spend no money.
18        That added to what I already had.  Plus I had other
19        friends and family sending me money.  But yes, I had
20        a nest egg of $80,000 when I came home.
21   Q.   All right.  When you were back in '92 you were
22        exposed to a prison sentence; is that correct?
23   A.   Yes.
24   Q.   And I think you testified that you received 97
25        months?
```

```
 1    A.    Yes.

 2    Q.    You were also exposed to possible fines, I

 3          anticipate?

 4    A.    Just special assessment.

 5    Q.    Do you know if -- to the best of your recollection,

 6          could you have received a fine in that case?

 7    A.    Well, if you want to get technical.  It was never a

 8          federal case; it was city; but the feds picked it up

 9          because I wouldn't cooperate against my codefendant,

10          and they made it federal.  So all the fines and stuff

11          would have just been city fines anyway.

12    Q.    And that's your recollection?

13    A.    Yes.

14    Q.    And so then you come out of incarceration about seven

15          years later, after you were sentenced?

16    A.    Yes.

17    Q.    And then you go on supervised release.  Tell the

18          ladies and gentlemen of the jury what supervised

19          release is.

20    A.    Probation.

21    Q.    And you have to see someone on a regular basis?

22    A.    Yes.

23    Q.    We call them a probation officer; correct?

24    A.    Correct.

25    Q.    How often were you required to see that probation
```

| | | |
|---|---|---|
| 1 | | officer? |
| 2 | A. | Maybe once a month. |
| 3 | Q. | Okay.  And what's that probation officer's |
| 4 | | responsibilities to the court?  Do you know? |
| 5 | A. | Make sure you have a job and make sure you remain |
| 6 | | crime free. |
| 7 | Q. | All right.  And monitor your activities; correct? |
| 8 | A. | Yes. |
| 9 | Q. | Make sure you're not admitting additional criminal |
| 10 | | acts; is that correct? |
| 11 | A. | Yes. |
| 12 | Q. | At any point in those discussions -- I assume you got |
| 13 | | a job after you got out; is that correct? |
| 14 | A. | Yes. |
| 15 | Q. | At any point in those conversations with the |
| 16 | | probation officer did you ever tell them that you had |
| 17 | | accumulated this wealth during drug activities and |
| 18 | | while you were incarcerated and that you had some |
| 19 | | money when you got out? |
| 20 | A. | No. |
| 21 | Q. | Okay.  Regarding Mr. Foy, I think you testified on |
| 22 | | direct examination with Ms. Morehead that you saw him |
| 23 | | at 68th and Paseo; is that correct? |
| 24 | A. | Yes. |
| 25 | Q. | And then later on in the direct examination with Ms. |

```
1          Morehead you said that happened a while -- you saw

2          him a while ago?

3   A.     I said 68th and Paseo was a while ago, yes.

4   Q.     Is that where you saw him?

5   A.     Yes.

6   Q.     And you saw him at that house, and I think you

7          testified that 70 percent of the time he was actually

8          present; is that correct?

9   A.     Yes.

10  Q.     And then the other 30 percent of the time the red SS

11         150 that you've discussed was present; is that

12         correct?

13  A.     Yes.

14  Q.     And that you never actually had physical contact with

15         him?

16  A.     Correct.

17  Q.     You never did a hand-to-hand buy with him?

18  A.     No.

19  Q.     Uh-huh.  Never saw him do anything with anything; is

20         that correct?

21  A.     Correct.

22  Q.     And you said that a lot of times he was either in his

23         car; correct?

24  A.     Yes.

25  Q.     Or he was on the porch?
```

```
 1    A.    Yes.

 2    Q.    And the porch I assume you're describing is a

 3          residence near 68th and Paseo.  Did you know whose

 4          residence that was?

 5    A.    [Shook head.]

 6    Q.    Were there other people on the porch with him?

 7    A.    A few times, yes.

 8    Q.    And do you know those individuals?

 9    A.    No.

10    Q.    And when you say a while ago, would this have been

11          back when you were selling marijuana as well as

12          cocaine?

13    A.    No, because Clinton Holman was already introducing me

14          to him, so no.

15    Q.    When you say him, I don't know --

16    A.    Monterial.

17    Q.    You said you sold marijuana to Mr. Wesley before?

18    A.    Yes.

19    Q.    So it could have been about that time; is that right?

20    A.    Yes, but I said that we cut it off.

21    Q.    You cut off what?

22    A.    The marijuana.

23    Q.    You and Mr. Wesley cut off the marijuana?

24    A.    Yes.

25    Q.    And when, again, did you say that was cut off?
```

1    A.   I don't recall.  I said it earlier, so, I mean --

2    Q.   Okay.  I think you said it was some time when Jerry

3         started supplying you cocaine?

4    A.   So it had to be '06 or '07, yeah.

5    Q.   Do you remember hearing a couple of audio recordings

6         that Ms. Morehead played on direct examination

7         involving conversations between and you Mr. Wesley?

8    A.   Yes.

9    Q.   And I'm going to draw your attention to a

10        conversation on November 26 of 2007.  You remember

11        that date, don't you?

12   A.   The night before we were arrested?

13   Q.   Kind of sticks out; right?

14   A.   Yeah.

15   Q.   All right.  And I think Ms. Morehead discussed with

16        you that you guys were talking about a deal for the

17        following day; is that right?

18   A.   Correct.

19             MR. SANDAGE:  All right.  I would ask that

20        the government, if you would, please, play Exhibit --

21        what's previously been admitted as Government's

22        Exhibit 260.

23   Q.   (By Mr. Sandage) And before she plays that, I ask you

24        to pay particular attention, please, Mr. Humphrey, to

25        like about at the 35-second mark.

```
 1                 (A portion of Exhibit 260 was played in

 2         open court.)

 3                 MR. SANDAGE:  If you would stop it right

 4         there, I'm going to stop it there, and then I'll get

 5         into what I want to talk about at that point.

 6    Q.   (By Mr. Sandage) It was your direct examination that

 7         you're telling Mr. Wesley that you're going to sell

 8         cocaine for 19,000 a kilogram?

 9    A.   Correct.

10                 MR. SANDAGE:  Would you play the rest,

11         please.

12                 (A portion of Exhibit No. 260 was played in

13         open court.)

14    Q.   (By Mr. Sandage) Am I correct in saying he just says,

15         "I'm going to get on top of it right now.  I didn't

16         know which way we was going yesterday"?

17    A.   Yes.

18    Q.   Is he referring to a conversation that occurred, I

19         guess, on November 25 of 2007, the day before?

20    A.   Yes.

21    Q.   Do you know what he means when he says, "I didn't

22         know which way we were going to go yesterday"?

23    A.   Whether or not I was going to be ready today or not.

24    Q.   Not whether or not you had pot or marijuana?  I mean

25         marijuana or cocaine?
```

```
 1    A.    No, whether or not I was going to be ready today.

 2    Q.    And, again, you actually didn't meet Mr. Foy until

 3          you were actually riding back with him from a court

 4          appearance back to CCA; is that correct?

 5    A.    Correct.

 6    Q.    And you had never spoken to him --

 7    A.    No.

 8    Q.    To this day you haven't spoken to him, have you?

 9    A.    Only back and forth to court.  That was it.

10    Q.    So it's your testimony that you saw his vehicle back

11          at 68th and Paseo?

12    A.    Yes.

13    Q.    Back sometime in 2007?

14    A.    Or six.

15    Q.    Six, seven.  And that maybe 70 percent of the time

16          Mr. Foy was there?

17    A.    Correct.

18               MR. SANDAGE:  Your Honor, before you -- can

19          I confer with my client one second?

20               THE COURT:  Yes, you may.

21               MR. SANDAGE:  Nothing further.

22               THE COURT:  All right.  Mr. Calbi?

23               MR. CALBI:  Thank you, your Honor.

24

25
```

<u>CROSS EXAMINATION</u>

BY MR. CALBI:

Q.   Mr. Humphrey, my name is Robert Calbi.  I represent
     Mr. Wesley.  Mr. Humphrey, I want to go back to when
     you first started -- when you first met Mr. Wesley.
     Am I correct that your testimony was you met him
     through Mr. Holman?

A.   Yes.

Q.   And when approximately was -- period of time was
     that?

A.   I would guess 2005.

Q.   Okay.  And when did you first start doing
     transactions with Mr. Wesley as far as drugs are
     concerned?

A.   Had to be then.

Q.   Okay.  Sometime in 2005?  And at that time I believe
     your testimony was that yourself and Mr. Holman and
     Mr. Wesley kind of pooled your money together;
     correct?

A.   Yes.

Q.   Okay.  How much -- we're doing marijuana and cocaine
     at that time or just marijuana or just cocaine?

A.   Just cocaine.

Q.   Okay.  And what sort of amounts are we doing in 2005?

A.   We had to get five or more to get a discount.

1    Q.   And were you always getting a discount, or was there

2         sometime you were getting less than five?

3    A.   No.  That's why we would get together, to get more

4         than five.

5    Q.   Then at some point in time you're not pooling money

6         together?

7    A.   Correct.

8    Q.   When does that happen?

9    A.   Exactly, I don't know.  I couldn't give you a date on

10        that, no.

11   Q.   Well, let's start with a year.

12   A.   It was either 2005 or the beginning of 2006.

13   Q.   Okay.  So we have either a late 2005 or an early

14        2006; correct?

15   A.   Yes.

16   Q.   And am I safe to assume when you say late 2005 we're

17        kind of perhaps around Thanksgiving or Christmastime;

18        or early 2006 would be January or February; correct?

19   A.   Perhaps, yes.

20   Q.   And so now you're not pooling money anymore?

21   A.   No.

22   Q.   So you're getting your stuff from Alberto?

23   A.   Yes.  Well, yes.

24   Q.   Okay.  And then you're getting and selling it to

25        either Mr. Wesley, Mr. Holman, or is there anyone

1          else out there?

2     A.   2005?

3     Q.   Late 2005, early 2006, when you no longer are pooling

4          money, what's your customer base?

5     A.   I was going out of town.

6     Q.   Okay.  So you -- when you say you were going out of

7          town, you weren't selling to Mr. Wesley then?

8     A.   Not when we were pooling together, no.

9     Q.   No, no, when you're not pooling your money together.

10    A.   When we're not -- oh, I was going out of town, so it

11         was just Mr. Wesley and Mr. Holman.

12    Q.   And what sort of amounts are you doing at this point

13         in time?

14    A.   In between ten and 20.

15    Q.   And Alberto is bringing up this ten or 20?

16    A.   Yes.  From between there -- well, it started off in

17         between five and ten.  Then it went up to ten and 20.

18    Q.   Well, then, let's focus in on the five and ten.  And

19         that would have been, either late 2005, early 2006;

20         correct?

21    A.   Somewhere along there.

22    Q.   Okay.  Describe for the jury how exactly Alberto is

23         getting the cocaine to you.

24    A.   In a car.  It was in a hidden compartment.

25    Q.   So he's driving it up from Mexico?

```
 1    A.   No.  He paid somebody to send it up.

 2    Q.   Okay.  So Alberto is not involved, but some mule, for

 3         lack of a better term.

 4    A.   For lack of a better term, yes.

 5    Q.   So this mule is in a vehicle driving from somewhere

 6         in Mexico; is that correct?

 7    A.   On the American side they come through at El Paso.

 8    Q.   Okay.  And then straight up into Kansas City?

 9    A.   Yes.

10    Q.   And let's just say, for example -- how often is the

11         delivery coming?

12    A.   At least once a week.

13    Q.   At least once a week?

14    A.   Yes.  It was more than one vehicle.

15    Q.   Okay.  So same driver or different driver?

16    A.   Different drivers.

17    Q.   Okay.  So these different drivers are taking you five

18         to 10 kilograms every delivery, perhaps more than

19         once a week?

20    A.   Yes.

21    Q.   Did it ever skip a week?

22    A.   Yes.

23    Q.   Okay.  Did it ever skip two weeks?

24    A.   Maybe.  But that would be tops.

25    Q.   Okay.  So it could have been there was a delivery
```

1        twice a month?

2   A.   No.  I'm saying if they ever missed two weeks it only

3        happened once and it was, like, tops.

4   Q.   Okay.  So it only would have happened one time?

5   A.   It would be a minimum of three deliveries a month,

6        minimum.

7   Q.   And you still had a two-person customer base?  Is

8        that your testimony?  Mr. Wesley and Mr. Holman?

9   A.   Pretty much, yes.

10  Q.   Well, pretty much means there may be more than two.

11       So was it just Mr. Wesley and Mr. Holman, or do we

12       now have other people involved?

13  A.   Well, depends if we're talking about '05 or '06.

14  Q.   I'm in late, 2005, early 2006.  We're in that time

15       period, okay?  We have the mule coming up from

16       El Paso up to Kansas City; and is your customer base

17       Mr. Wesley and Mr. Holman, or is it "pretty much,"

18       meaning there's maybe someone else?

19  A.   It's more.  I stated earlier on the record that it

20       was Black -- he's already in the federal system --

21       and whoever his cousin was.

22  Q.   So we have got -- I believe you threw Shelton out

23       there too?

24  A.   Yes.

25  Q.   So we have got Mr. Holman; we have got Mr. Wesley; we

```
 1        have got Shelton; we have got Black; we have Black's

 2        cousin?

 3   A.   Right.  And Shelton got killed, and Black went to

 4        prison, and Black's cousin, I don't know what

 5        happened to him.

 6   Q.   We're still in early 2006.  That's your customer

 7        base?

 8   A.   Possibly, 2006, yes.

 9   Q.   How many kilos is Mr. Wesley getting now in early

10        2006 from you every week?

11   A.   Well, it depend on -- when Black got arrested and

12        Shelton got killed, he would have got practically the

13        whole load.

14   Q.   Okay.  Let's assume everybody's in line.  We have

15        Holman; we have Wesley; we have Shelton; we have

16        Black; we have Black's cousin.  So now we have got

17        five people in your customer base.  How many kilos is

18        Wesley getting every week?

19   A.   In between three and five.

20   Q.   So he was getting three to five kilos a week?

21   A.   Yes.

22   Q.   And how many kilos are you getting delivered every

23        week then?

24   A.   Back then, like I said, each car held in between five

25        and ten.  So a minimum of five in one car and a
```

1       maximum of 20 if two cars came.

2   Q.  How many kilos total on an average are you getting

3       delivered a week to the best of your recollection in

4       early 2006?

5   A.  Minimum of ten.

6   Q.  So we have got five people.  You get 10 kilos

7       delivered.  How many is Holman getting?

8   A.  One or two.

9   Q.  How many is Shelton getting?

10  A.  One.

11  Q.  And Black?

12  A.  One to two.

13  Q.  And Black's cousin?

14  A.  He gets it from Black.

15  Q.  So you're not selling to Black's cousin?

16  A.  No.  That's why I said I didn't know who exactly he

17      was.  Once Black left, I didn't have no contact with

18      the cousin.

19  Q.  And I believe at that time kilos are now costing you

20      $14,500.

21  A.  Yes.

22  Q.  Is Holman paying you cash right on the spot?

23  A.  Yes.

24  Q.  And Shelton?

25  A.  I got the cash later on that day.

```
 1    Q.    Okay.  And Black?

 2    A.    That day.

 3    Q.    And Wesley?

 4    A.    That day.

 5    Q.    Okay.  And when you say that day, I'm assuming it

 6          wasn't a contemporaneous exchange?

 7    A.    Right.

 8    Q.    And you were doing that why?

 9    A.    Why was I getting rid of it?

10    Q.    No.  Why were you not getting your payment right on

11          the spot, you know, a kilo and here's my bag of

12          money?

13    A.    Because they had to give it to whoever they was

14          getting rid of it to.  Nobody likes to put their own

15          money at the front of it.

16    Q.    And you were just -- I mean, we're talking big types

17          of money here.  You know what I mean?  We have got

18          10 kilos coming up at $14,500.  So help me out.

19          That's over $140,000; correct?

20    A.    Yes.

21    Q.    And Holman is the only one paying cash on the spot,

22          and he is getting one to two.  Let's assume he gets

23          two.  That knocks out $29,000, so you've got $111,000

24          worth of cocaine floating around on a wing and a

25          prayer that these people are going to pay you back;
```

1     correct?

2  A.  Yes.

3  Q.  And yet you just testified five minutes ago to trust

4     no one.  Isn't that what you said?

5  A.  Yes.

6  Q.  And you're trusting these people that they are going

7     to come running up and pay you back 111,000?

8  A.  They all don't owe me that much.  It's divided

9     between them, but that's the total that was out

10     there.

11  Q.  And you said trust no one?

12  A.  Trust no one.

13  Q.  Yet you're trusting that these individuals are going

14     to come and actually pay you?

15  A.  Correct.

16  Q.  When does Shelton get murdered?

17  A.  The DEA knows.  I don't know the exact date.

18  Q.  Let's go with the time of year.  Sometime 2006?

19  A.  Or late 2005, one of the two.  I'm assuming it's

20     2006.

21  Q.  Okay.  Well, let's take a step back because I want to

22     make sure I'm clear, okay?  I thought we had Alberto

23     making deliveries in late 2005, early 2006, so I'm

24     going to assume he was still alive at that period of

25     time.

1    A.   Yes.  I said that he was making them originally.  I
2         said he got killed in roughly 2005, 2006.  That's
3         where we're at right now, that we don't know exactly
4         when it was.
5    Q.   Okay.  So then Jerry becomes involved?
6    A.   Jerry was always involved, but yet he wasn't involved
7         at that level.  Jerry used to just be one of the
8         drivers.
9    Q.   Okay.  So that then Jerry gets promoted from driver
10        to the number one guy?
11   A.   As in he knew the new connect.
12   Q.   Okay.  And he spoke English and Spanish, and he could
13        drive on the American side?
14   A.   Yes.
15   Q.   He went from driving to being up here; correct?
16   A.   Working up under there up -- yeah, the man.
17   Q.   So Jerry's the man, and Jerry is involved in sometime
18        late 2005, early 2006 -- or some time at least in
19        2006 we have Jerry?
20   A.   Yes.
21   Q.   Now, when Jerry is involved, is your customer base
22        still Holman, Wesley, Black, Black's cousin -- well,
23        Black's cousin just dealt with Black -- and Shelton?
24   A.   Well, I just stated that he has always been involved,
25        so I would say yes.

1580

| | | |
|---|---|---|
| 1 | Q. | When Jerry went from driver to being the connect? |
| 2 | A. | But he still drove all of 2007.  The only person that |
| 3 | | came to see me was Jerry. |
| 4 | Q. | Okay.  So in late 2005, early 2006 we had multiple |
| 5 | | drivers? |
| 6 | A. | Yes. |
| 7 | Q. | But now in 2007 Jerry's the only driver? |
| 8 | A. | The vehicles held more. |
| 9 | Q. | Held more what? |
| 10 | A. | Kilos, cocaine. |
| 11 | Q. | Okay.  And what does that have to do with whether we |
| 12 | | had multiple drivers or one driver? |
| 13 | A. | Because one driver could make the trip of possibly |
| 14 | | three other drivers. |
| 15 | Q. | Okay.  So now we have Jerry being the one driver? |
| 16 | A. | Yes. |
| 17 | Q. | So let's jump to 2007 where we have Jerry being the |
| 18 | | only driver. |
| 19 | A. | Yes. |
| 20 | Q. | Okay.  How often does Jerry make this trip? |
| 21 | A. | Minimum of once a week. |
| 22 | Q. | Okay.  Are we still taking the same route out of |
| 23 | | Mexico through El Paso up to Kansas City? |
| 24 | A. | Yes. |
| 25 | Q. | Jerry is making that trip? |

1    A.    Yes.

2    Q.    And he comes up to Kansas City and gives the dope to

3          you out at the storage facility; correct?

4    A.    Yes.

5    Q.    Is that a yes, sir?

6    A.    Yes.

7    Q.    Okay.  And then Jerry either turns around right away

8          to go back to Mexico, I'm assuming; correct?

9    A.    At least Texas.

10   Q.    Okay.  Or he has to wait a couple days to get the

11         money?  I believe you testified to that earlier.

12         Sometimes he had to hang around?

13   A.    Yeah.  No more than overnight.

14   Q.    So he would wait overnight and then drive back to

15         Texas?

16   A.    Yes.

17   Q.    And then get another delivery and just quickly turn

18         around and come back?

19   A.    There was more than one vehicle.  On occasion another

20         vehicle had met him in Dallas, so eight hours back to

21         Dallas, getting rest, and come right back to Kansas

22         City.  That's how I got more than one delivery in the

23         same week, but they are identical vehicles, yet one

24         driver as far as coming to Kansas City; they swap in

25         Dallas.

1    Q.   Okay.  So we have now changed from Mexico to El Paso,

2         from Jerry driving up to Kansas City to perhaps now

3         Jerry meeting a vehicle in Dallas and then making a

4         swap there and going from Dallas to Kansas City?

5    A.   We never changed.  The vehicle still comes from

6         Mexico to El Paso, from El Paso to Dallas, from

7         Dallas to Kansas City, and that's when Jerry is going

8         to see me.  Now, to get the vehicles back, I don't

9         know who take them all the way back, but I know if I

10        got another vehicle waiting for me they will meet

11        Jerry in Dallas and Jerry can come right back so I

12        can see him within the next day or two.  That's only

13        if the vehicle's waiting.  So no, I didn't say that.

14   Q.   When does your customer base change from Holman,

15        Shelton, Black, Wesley -- okay, Black goes to

16        prison -- or somebody goes to prison and someone gets

17        shot.  What sort of time frame are we talking about?

18   A.   Mid '06, I guess.  I don't know exactly when Black

19        went to jail, and I don't know when -- I think

20        Shelton got killed in January of '06.

21   Q.   Okay.  So Shelton has been out of the picture for a

22        while then if we're in the middle of '06 at this

23        point in time?

24   A.   Yes.

25   Q.   Okay.  And in the middle of 2006 how much are kilos

| | | |
|---|---|---|
| 1 | | now? |
| 2 | A. | Like I said, it fluctuated in between 12½ and 16½, so |
| 3 | | I couldn't tell you what particular time -- the most |
| 4 | | I ever paid was 16½; the least I ever paid was 12½. |
| 5 | | So it's in between there. |
| 6 | Q. | Okay.  And how many kilos is Jerry taking up? |
| 7 | A. | Roughly, roughly 20. |
| 8 | Q. | Okay.  And who is buying these 20 in the middle of |
| 9 | | 2006? |
| 10 | A. | In the middle of 2006?  I would say that Monterial |
| 11 | | got the bulk of them and Kevin Harris got the rest. |
| 12 | Q. | Okay.  When you say Monterial is getting the bulk of |
| 13 | | them, bulk is kind of a relative term out of 20. |
| 14 | | What do you consider bulk? |
| 15 | A. | More than half. |
| 16 | Q. | Okay.  Well, 11, 12, 13, 14, 15, 16, 17, 18, and 19 |
| 17 | | are more than half. |
| 18 | A. | It depends on how many Kevin had the money for right |
| 19 | | then.  If he wanted eight, I gave him eight, and I |
| 20 | | gave the other two, or whatever I had left, to |
| 21 | | Monterial, but if he only wanted five and I had 20, I |
| 22 | | would give the rest of them to Monterial. |
| 23 | Q. | And so really then Kevin Harris was dictating how |
| 24 | | many kilos Monterial got.  Kevin Harris got first |
| 25 | | shot.  If he wanted eight, he got eight; if he wanted |

1       five, he got five?

2   A.  Because he had cash.

3   Q.  Because he had cash?

4   A.  Yes.

5   Q.  But yet Mr. Wesley, who you don't trust because you

6       don't trust anyone, was able to pay on credit?

7   A.  Yes.

8   Q.  Okay.  Just want to make sure I understand that.  Was

9       there ever a time in 2006 or 2007 that the amount of

10      cocaine that was being delivered to you lessened?

11  A.  Yeah.  Because each trip is different, depending on

12      the shape of the squares, because the spot is going

13      to remain the same that you hide them in, but the

14      shape of cocaine changes depending on where it came

15      from.  So yes, it's going to change every trip unless

16      they all are the same, and it's very rare that they

17      are all the same size and same shape.

18  Q.  I guess my question might have been a poor question.

19      I was talking about the amounts of kilos that you

20      got.

21  A.  And I'm talking about the amount of kilos because of

22      the space.

23  Q.  Okay.  So, I mean, was there -- for instance, was

24      there a drought where there was a short a supply of

25      cocaine sometime in 2005, 2006, 2007?

1    A.   Oh, yes.  And I stated early earlier, it was prices.

2         I didn't feel like paying the price difference

3         because I knew you couldn't keep up with it on

4         the people here to where I just refused the cocaine.

5         There was always a supply, but nobody wanted to pay

6         the price, so I didn't bother with it.

7    Q.   Okay.  So you could have gotten as much cocaine as

8         you wanted in 2006 or 2007, okay, but you just didn't

9         want to pay the higher prices?

10   A.   Correct.

11   Q.   So it wasn't a shortage; there was just -- it was

12        costing more to get cocaine?

13   A.   Yes.

14   Q.   Mr. Humphrey, I just want to be clear.  I believe

15        when we were talking about the sale -- excuse me.

16        I'm sorry -- the events on September 5 of 2007

17        outside of the barbershop, you remember Ms. Morehead

18        showed you the exhibit -- I think it was

19        Exhibit 199 -- and you pointed out your car, and you

20        pointed out Mr. Wesley's vehicle?

21   A.   Yes.

22   Q.   And I believe you testified that he was picking up

23        money on that day?

24   A.   No.

25   Q.   He was delivering money?

```
1    A.   He was either delivering money or picking up cocaine.

2         That's what I said.

3    Q.   So you don't remember which one it was?

4    A.   No.  There would be no other reason for us to meet

5         up.

6    Q.   Okay.  So he might have just been dropping off money?

7         That's a possibility?

8    A.   Yes.

9    Q.   And it's also a possibility that he was picking up

10        cocaine?

11   A.   Yes.

12   Q.   Okay.  So let's assume he was picking up cocaine?

13        Okay.  And I believe your testimony earlier was that

14        it was very rare that he would just pay for it right

15        on the spot.  We have established that he has a line

16        of credit with Mr. Humphrey?

17   A.   Yes.

18   Q.   Okay.  So sometime after that then on September 5 he

19        would have had to pay you; correct?

20   A.   Yes.

21   Q.   Okay.  Do you know when you got paid?

22   A.   It would have been the next day.

23   Q.   It would have been the next day?

24   A.   Unless that's where you have them tapes that I called

25        and I said I have been looking for you and he said he
```

1587

1    had to go to court or something like that.  But

2    generally the next day.

3  Q.  Okay.  And so just mechanically how would that work?

4    Mr. Wesley picks up the cocaine and then the next day

5    he pays you; correct?

6  A.  He paid me that day or the next day, being the

7    latest.

8  Q.  Okay.  But he didn't pay you on the spot, so it was

9    sometime in the future you got paid?

10  A.  Yes.

11  Q.  So how would you know he was ready to pay you?

12  A.  He would call me.

13  Q.  He would call you?

14  A.  Yes.

15  Q.  You guys were using your cell phones; right?

16  A.  Yes.

17  Q.  So if Mr. Wesley called you to say, I've got the

18    money, where are we going to meet, we should have a

19    phone call to that effect if you were each using the

20    target phones?

21  A.  Well, I wasn't using the target phones all the time.

22  Q.  Okay.

23  A.  Yes.

24  Q.  But Mr. Wesley?

25  A.  That I know of.  I don't know what phones -- we all

1    had multiple phones.

2  Q.  Okay.  But we know some of the phone conversations of

3      the phones that you guys used we have record

4      recordings of; correct?

5  A.  Yes.

6  Q.  Okay.  Now let's go to September 11 -- September 13.

7      We're at Chili's.  Okay?  Remember, we saw

8      photographs of Chili's, and there was -- the bags

9      were -- again, there was some sort of transaction

10     that happened there; correct?

11 A.  Yes.

12 Q.  Money and/or cocaine transferred?

13 A.  Yes.

14 Q.  Okay.  When Mr. Wesley got these drugs from you on

15     September 13, he would have paid you sometime after

16     September 13?  Granted, it might have been later in

17     the day on the 13th or sometime the 15th because it

18     always happened the next day?  By the end of the next

19     day you were always paid?

20 A.  Unless, like I said earlier, he was MIA, missing in

21     action.

22 Q.  A slight delay, but at some point you got your

23     money --

24 A.  Yes.

25 Q.  -- from the man that you didn't trust but extended

```
 1          credit to him.  You eventually got your money; is

 2          that your testimony?

 3   A.     Yes.

 4   Q.     Okay.  Do you know when you got paid on the 13th --

 5          for that transaction on the 13th?  Do you have any

 6          recollection as to when you got paid?

 7   A.     No, I don't recall that at all.

 8   Q.     Okay.  But, again, he would have called you and said,

 9          I got the money?

10   A.     Yes.

11   Q.     Or you would have called Humphrey and said, where's

12          my money?

13   A.     [Nodded head.]

14   Q.     I mean, there would have been some communication that

15          some sort of transaction had happened?

16   A.     Correct.

17   Q.     And, you know, if he had gotten 5 kilos from you at

18          $18,000, just to use an average figure, he would have

19          had $90,000 for you.  That's a pretty significant

20          event; correct?

21   A.     Yes.

22   Q.     So you would have perhaps remembered when you got

23          paid or where you got paid or how you got paid?

24   A.     All I remember is that I got paid, not when, how, or

25          where.
```

1    Q.   So it's not that significant of an event then that

2         you would remember?

3    A.   None of them were.  I mean, these are every day

4         events, so, like, it's just my life.

5    Q.   Okay.  And then we have got the event on

6         September 28.  Supposedly there was another

7         transaction made on that day, drugs and money;

8         correct?

9    A.   You're telling me.  I'm just listening.  Yes, I don't

10        know the dates.

11    Q.   Okay.  Well, I believe that was at Chili's again.

12    A.   Okay.

13    Q.   Okay.  And I believe he had the H3 Hummer.  Remember

14        that?

15    A.   Oh, yes.  They showed us a picture.

16    Q.   Okay.

17    A.   Yes.

18    Q.   So again you would have gotten paid either sometime

19        later in the day on the 28th or the 29th or perhaps

20        shortly thereafter?

21    A.   Yes.

22    Q.   Okay.  And again there would have been some sort of

23        communication by phone?

24    A.   Yes.

25    Q.   Okay.  Where's my money? or, I've got your money;

1    correct?

2  A.   Yes.

3  Q.   Okay.  And then some sort of delivery would have been

4       made of the money?

5  A.   Yes.

6  Q.   Okay.  And you can't recall when or where or how that

7       might have happened?

8  A.   No.

9  Q.   Okay.  Let's talk about the phone conversation on

10      November 26, which I believe was Exhibit 264, where

11      you made the comment, I can't even cover it.  Do you

12      remember making that comment to Mr. Wesley on the

13      phone?

14 A.   Yes.

15 Q.   And I believe your testimony was that that meant

16      that, you know, you needed your money pretty quick

17      because you didn't want Jerry, or whoever was

18      driving, waiting around?

19 A.   Yes.

20 Q.   And it didn't mean that you wanted your payment right

21      away?  Didn't mean that; correct?

22 A.   Correct.

23 Q.   Okay.  And Mr. Wesley's comments to you that we will

24      just meet tomorrow and rap about it, what did that

25      mean?

```
 1    A.    We would take care of it tomorrow.

 2    Q.    Take care of what tomorrow, the sale?

 3    A.    Yes.

 4    Q.    Okay.  So you weren't expecting any money at all from

 5          Mr. Wesley the next day?  He was just going to come

 6          up and take the 5 kilos, and everything was going to

 7          be fine?

 8    A.    No.  I mean, he was going to pay for them, but when

 9          he was going to pay for them is just the same as all

10          the other ones.  I didn't know exactly when.

11    Q.    Okay.  But you were expecting to get paid sometime

12          later on the 27th or the next day?

13    A.    Yes.

14    Q.    Okay.  And you were just alerting Mr. Wesley that you

15          wanted your payment quickly?

16    A.    Yes.

17    Q.    Okay.  What's your definition of quick, Mr. Humphrey?

18    A.    Today.

19    Q.    Okay.  And so, I mean, isn't that usually the way you

20          guys operated, either that day or the day after?

21    A.    Yes.

22    Q.    Okay.  So why were you telling him the day before

23          that, you know, you can't cover it and you needed

24          your payment quickly if that was your usual mode of

25          operation?
```

1    A.   Because he started owing me more and falling behind,

2         and yet that's where the trust went.

3    Q.   Oh.  So all along from 2005 up until the day you were

4         arrested, or at least the day before you were

5         arrested, you trusted Mr. Wesley?

6    A.   No.  I said that the trust went earlier because we

7         started disagreeing on money amounts to where I was

8         under the impression that he was thinking I was

9         saying the bags was short to where I told him what

10        the bags were every time, and there was a discrepancy

11        one time on a large dollar amount.

12   Q.   Okay.  As a matter of fact, when you were arrested,

13        you owed your suppliers about $300,000, didn't you,

14        Mr. Humphrey?

15   A.   Somewhere along there.

16   Q.   That's a lot of money, isn't it?

17   A.   To them, no.

18   Q.   Okay.  To you is that a lot of money?

19   A.   Yes.  I guess it is.

20   Q.   Okay.  So I mean, you didn't want to fall any further

21        behind, did you?

22   A.   No.

23   Q.   So, I mean, were you really going to give away

24        $95,000 of cocaine without payment after you were

25        already $300,000 in the hole?

```
 1    A.   Well, where you got this 300,000 at, I don't know

 2         where you got it from, but I said that at one

 3         particular time I had got in debt to $300,000, but

 4         yet at this point in time, no, I didn't owe them

 5         $300,000 for this particular load.

 6    Q.   Well, I understand you perhaps didn't owe $300,000

 7         for that particular load, but did you owe these

 8         people at the time, in November of 2007, $300,000,

 9         your suppliers back in Mexico?

10    A.   I don't know if it was in November.  Like I said,

11         there was one particular time that I know I had a

12         $300,000 debt out there, but yet I've taken care of

13         bulk of it, and yet it would have been paid that day.

14    Q.   What would have been paid that day?

15    A.   My debt, the $300,000, whatever the balance was.

16         Like, I'm telling you it wasn't $300,000 at that

17         particular time.  I said that was the biggest debt

18         that I ever had.  I stated earlier that we had a

19         discrepancy of $50,000, so that automatically would

20         take it down to 250.  I told him I wasn't giving him

21         that because I swallowed them 5 kilos that was bad a

22         long time ago.  That's how the debt had got so high

23         in the beginning.

24    Q.   Okay.  Mr. Humphrey, I am going to show to you, sir,

25         your proffer statement of December 14 of 2007.
```

```
 1              You're more than happy to read the whole thing if you
 2              want, but the particular paragraph I'm talking about
 3              is Paragraph 6.  I would like you to read that to see
 4              if it perhaps would refresh your recollection.
 5    A.   I just refreshed it.  I told you I know what my debt
 6              was total, but yet I just told you if you take the
 7              fifty off of that plus what I'm paying them today the
 8              debt would have been squashed.
 9    Q.   Do you remember telling agents that at the time you
10              were arrested you were in debt to H for $300,000?
11    A.   For $300,000, that's what I said, yes.
12    Q.   That's what you told the agents?
13    A.   Yes.  And I just told you where fifty of it was.
14    Q.   Okay.  So my question to you, sir, is, very simply,
15              on the day you were arrested, were you still in debt
16              to H for $300,000?
17    A.   And I told you that I was going to pay that debt that
18              day.  If you look in the evidence, the money that was
19              at my house, and if you add the ninety in there,
20              there's more than enough to cover the debt.
21    Q.   How much money was at your house, sir?
22    A.   I have no clue, but I know it was more than enough.
23    Q.   Okay.  You have no clue, but you know it was more
24              than enough?
25    A.   I hadn't finished counting it.
```

1    Q.   Did you have $200,000 in cash at your home?

2    A.   Probably.

3    Q.   Okay.  And you were going to give all of that to

4         Jerry and take care of your debt?  That's your

5         testimony?

6    A.   Yes.  That's how I do it every week.

7    Q.   It's how you do it every week?

8    A.   The only way to make money.

9    Q.   Okay.  And I just want to be clear that there was no

10        shortage of cocaine in 2006 and 2007.  You could have

11        got as much cocaine as you wanted, but you weren't

12        happy with the price increase; is that correct?

13   A.   That's what causes droughts, so I said it was a

14        drought, yes.

15   Q.   So there was a drought now in 2006 or 2007?

16   A.   I said that's what's causes droughts, the price

17        increase.  People don't want to pay the price, so

18        that automatically makes the price of cocaine go up,

19        so I said that I can't get anything because I don't

20        want to pay the difference.

21   Q.   But the cocaine was there, but you didn't want to pay

22        the difference?

23   A.   In Mexico, yes, it was there.

24   Q.   Okay.

25   A.   Okay.

1           MR. CALBI:  Judge, can I have just one

2       second to confer with my client, please?

3           THE COURT:  Yes, you may.

4           MR. CALBI:  Thank you.  Judge, I'm done for

5       now.  Thank you.

6           THE COURT:  Mr. Bell and Mr. Johnson,

7       anything?

8           MR. BELL:  Nothing, Judge.

9           MR. JOHNSON:  No, thank you.

10          THE COURT:  Very well.  Ms. Morehead?

11          MS. MOREHEAD:  Thank you, Judge.

12                  REDIRECT EXAMINATION

13  BY MS. MOREHEAD:

14  Q.   First of all, Mr. Humphrey, there were some questions

15       about when Alberto was killed, and you weren't

16       exactly sure.  You thought it was sometime in

17       September -- I'm sorry in 2006; is that right?

18  A.   Yes.

19  Q.   If I indicated to you that that was August 14 of

20       2006, would you have any dispute or disagreement with

21       that at all?

22  A.   No.

23          MS. MOREHEAD:  Judge, I would ask for

24       admission of Government's Exhibit 322.  That's in

25       counsel's discovery at page 899.

```
 1                    THE COURT:  322 has already been used for a

 2          photograph.

 3                    MS. MOREHEAD:  I'm sorry, Judge.  332.

 4                    THE COURT:  And what is that?  Could you

 5          tell me what 332 is, generically speaking.

 6                    MS. MOREHEAD:  It's a certificate of death,

 7          your Honor.

 8                    THE COURT:  Thank you.  Is there any

 9          objection?  Hearing none, Exhibit 332 is admitted.

10                    (Exhibit 332 was admitted into evidence.)

11    Q.    (By Ms. Morehead) Looking at Government's

12          Exhibit 332, there is the exhibit sticker at the

13          bottom, the name Alberto Garcia appears at the top.

14          Do you see that?

15    A.    Yes.

16    Q.    With the date listed as August 14, 2006.  Does that

17          coincide with whatever recollection you would have

18          about when he did die, and does it, in fact, coincide

19          with when you indicated you started dealing with

20          Jerry, which was somewhere around the middle of 2006?

21    A.    Jerry directly, yes.

22    Q.    Okay.  Since Mr. Calbi finished, I think I'll start

23          back up with that, since that's fresh in our mind.

24          He mentioned September 5, 2006 [sic].  That was the

25          incident at the barbershop.  We saw pictures.  For
```

1      instance, Government's Exhibit 325.  Do you remember

2      that?

3   A.   Yes.

4   Q.   When you were testifying with Mr. Calbi, you

5      indicated you couldn't remember whether that was

6      money or drugs.  I just want to see if this refreshes

7      your recollection and ask to play one of the phone

8      calls that happened on September 5, 2007, between you

9      and Mr. Wesley.  And that would be Government's

10     Exhibit 202.

11                    (Exhibit No. 202 was played in open court.)

12  Q.   (By Ms. Morehead) Does that refresh your

13     recollection?

14  A.   Yes.

15  Q.   Okay.  And so the calls that occurred with regards to

16     September 5 of 2007, would you agree -- what would

17     your -- after hearing that particular call, what

18     would your conclusion be about the photographs that

19     we saw?  What was going on there in the parking lot

20     of the barbershop?

21  A.   I was there to pick up money.

22  Q.   All right.  And like Mr. Calbi said, if there had

23     been a prior drug transaction, there would be a phone

24     call on that?  Remember him asking you that?

25  A.   Yes.

1          MS. MOREHEAD:  Judge, I don't have these

2     disks prepared, but I will have them prepared and

3     introduced, but I'm going to introduce Exhibit 333,

4     call from Target Phone No. 4, Phone Call No. 166.

5          THE COURT:  Is there any objection?

6          MR. SANDAGE:  Your Honor, may we approach?

7          THE COURT:  You may.

8          (Counsel approached the bench and the

9     following proceedings were had:)

10          MR. SANDAGE:  There's 6,000 phone calls.

11     Before we play it, I want to make sure -- I don't

12     have command of all of them.  If she can proffer to

13     us whether or not there's something in there we

14     should be aware that might be objectionable before it

15     says Foy murdered half of Kansas City that we might

16     keep out of evidence --

17          THE COURT:  I understand.

18          MR. SANDAGE:  Bad example, but drives the

19     point.

20          MS. MOREHEAD:  I can pull up the transcript

21     numbers so they can look at it.

22          THE COURT:  Why don't you let them look at

23     that real quick.

24          MS. MOREHEAD:  We're going to have three or

25     four of these, Judge.  Would there be a way we can

1     take our afternoon recess?  Maybe we could do that

2     over the recess?  With regards to Mr. Calbi's

3     questions, there are about three calls that either

4     predate or postdate what he was asking about which

5     completely coincides --

6               THE COURT:  Okay.  Let's do that.  That

7     would be the easiest thing to do.

8               MR. SANDAGE:  Thank you, Judge.  I

9     appreciate it.

10               THE COURT:  No problem.

11               (The proceedings returned to open court.),

12               THE COURT:  Members of the jury, we are

13     going to take our recess a little bit early so

14     counsel can make sure everybody is on the same page

15     about some things.  I'll remind you of the

16     admonitions.  Recess will be approximately 15

17     minutes.  Could stretch to closer to ten after three,

18     but in any event I'll remind you of the admonitions.

19     Ms. Ludwig is coming around to take charge of you,

20     and there she is, so you are in recess.

21               (The following proceedings were had outside

22     the presence of the jury:)

23               THE COURT:  Anything we ought to do before

24     I step down?  Hearing none, I am stepping down.  We

25     are in recess.

```
 1                    (A recess was taken.)

 2                    THE COURT:  Anything we need to do before

 3         we bring in the jury?  Hearing none, we will bring in

 4         the jury.

 5                    (The following proceedings were had in the

 6         presence of the jury:)

 7                    THE COURT:  All right.  Ms. Morehead has

 8         offered Exhibit 333.  Is there any objection?

 9         Hearing none, Exhibit 333 is admitted.

10                    (Exhibit 333 was admitted into evidence.)

11                    MS. MOREHEAD:  Judge, this is a call,

12         September 4, 2007, from Target Phone 4, which is

13         Call No. 166, for reference purposes.  And there will

14         not be a transcript that coincides with this, your

15         Honor.

16                    (Exhibit No. 333 was played in open court.)

17    Q.   (By Ms. Morehead) And in connection with that

18         particular call, there appeared to be a reference

19         that Mr. Wesley at least had some portion or two bags

20         possibly, is that right, or one bag and he was

21         waiting on another bag?

22    A.   Yes.

23    Q.   And on the 5th then -- and that was something he was

24         going to have for you at the time.  Would there have

25         been more money then that he would have owed you on
```

1       the 5th?

2   A.  Yes.

3   Q.  Now, you mentioned these bags that you were

4       exchanging back and forth, and I think you mentioned

5       to Mr. Calbi that sometimes there would be a bag that

6       would be short, or something along those lines?

7   A.  Yes.

8   Q.  Is that right?  He asked if every bag had the same

9       amount in it?

10              MS. MOREHEAD:  I would like to play

11      Government's Exhibit 334, which is the day before

12      September 3, 2007, from Target Phone No. 3, which is

13      Call No. 1968, your Honor.

14              THE COURT:  Is there any objection?

15      Hearing none, Exhibit 334 is admitted.

16              (Exhibit 334 was admitted into evidence.)

17  Q.  (By Mr. Calbi) Mr. Humphrey, what was that call in

18      connection with?

19  A.  He gave me a bag.  It had 99,700 in it, and he said

20      it should be more, and we was -- he told me am I sure

21      because the bundles, some of them was 5,000, and I

22      said, yeah, some of them was 3,000 instead of 5,000.

23  Q.  When you would get these large amounts of money from

24      Monterial Wesley, for instance, were they in -- in

25      each bag then there were different bundles of money?

1       Is that what you're saying?

2    A.   Yes.

3    Q.   Different denominations within each bundle?

4    A.   Yes.

5    Q.   How did you go about the business of actually

6         counting that money then?

7    A.   I separated by denominations, and I had two money

8         counters, electronic money counters.

9    Q.   And you mentioned to Mr. Calbi that you and Mr.

10        Wesley started having issues because he started

11        falling more behind, I think you said, and you

12        started disagreeing on the amount of money that there

13        were discrepancies on; is that right?

14   A.   Yes.

15   Q.   And at least these calls in September of 2007, do

16        they confirm what you've just told Mr. Calbi?

17   A.   Yes.

18   Q.   Now, we talked about --

19             MS. MOREHEAD:  Could you pull back up the

20        photos.

21   Q.   (By Ms. Morehead) We showed you photographs several

22        times where your vehicle was there, and we talked

23        about the circumstance around that.  Do you remember

24        us talking about that?

25   A.   Yes.

1    Q.   For instance, on this particular event Mr. Calbi

2         asked you about September 5 of 2007.  Do you have any

3         way of knowing, Mr. Humphrey, who was there -- who

4         may have came and went from that location before you

5         got there?

6    A.   No.

7    Q.   Do you have any way of knowing who may have came and

8         went from that location after you left?

9    A.   No.

10   Q.   Government's Exhibit 48, Mr. Heathman asked you some

11        questions about Ms. Temple.  Do you remember that?

12   A.   Yes.

13   Q.   And in connection with -- he asked you some questions

14        about seeing Ms. Temple's vehicle?

15   A.   Yes.

16   Q.   And when you went to the Chili's restaurant on

17        September 28 and you pulled up, Mr. Wesley had

18        indicated he was in an H3.  Did you see any other

19        vehicles that you recognized when you were pulling

20        up?

21   A.   Over here, it was to the left, there was a -- I don't

22        know if that was that same day or not, so I can't

23        say.

24   Q.   Okay.  Tell me what you're thinking, and we will see.

25

1   A.   When I first pulled up and I am looking on the

2        left --

3                  MR. SANDAGE:  Objection; calls for --

4                  THE COURT:  Sustained.  That's not a valid

5        question.

6                  MS. MOREHEAD:  Let me pull up another

7        photograph then, Judge.  I didn't want to do it in a

8        leading manner.

9   Q.   (By Ms. Morehead) Government's Exhibit 47, do you

10       recognize that?

11  A.   Yes.

12  Q.   Tell us what that is.

13  A.   The SS truck, the red one.

14  Q.   And on that date did you make any other -- does this

15       photograph refresh your recollection at all?

16  A.   That's what I was just about to say.  It was on the

17       left-hand side of when he was pulling up.

18  Q.   And you said you weren't sure.  After seeing this

19       photograph, did that refresh your recollection?

20  A.   Yes.

21  Q.   And was that red SS truck there that day as well?

22  A.   Yes.

23  Q.   Now, parked right in front of the Chili's we see the

24       H3; is that right?

25  A.   Yes.

1   Q.   What about this vehicle right here?  Did you

2        recognize that vehicle?

3   A.   Yes.

4   Q.   How did you recognize that vehicle?

5   A.   You've seen it before several times.

6   Q.   And in what situations?

7   A.   When I was meeting Monterial.

8   Q.   And what kind of vehicle is that, just for the

9        record?

10  A.   A Mercedes SUV.

11  Q.   Mr. Bellemere asked you questions about some

12       conversations you had with Mr. McDaniel.  Do you

13       remember him asking you questions about that?

14  A.   Yes.

15  Q.   And he asked you about some information you provided

16       that Mr. McDaniel admitted that he had been at a

17       restaurant, present at least on one occasion, and he

18       was trying to recall your -- or try to refer you to

19       that incident.  Do you remember him talking to you --

20       Mr. Bellemere asking about that?

21  A.   Yes.

22  Q.   When you provided the information about Mr. McDaniel

23       saying that he had been present on one occasion, why

24       didn't you say that he had indicated he had been

25       present many other times in that?

1    A.   Why didn't I say that?

2    Q.   Yeah.

3    A.   I don't know.

4    Q.   Did he tell you that?

5    A.   No.  That I recall of for sure, he told me just one.

6    Q.   And is that what you told the agents about then, is

7         what he told you?

8    A.   Yes, yes.

9              MS. MOREHEAD:  Let me just check, Judge.

10             THE COURT:  All right.

11   Q.   (By Ms. Morehead) On the call that we played, which

12        was Exhibit 333, we were -- on September 4 you talked

13        about you were going up -- you were going to pick up

14        your baby, and then there was a comment that you

15        made, don't worry, I'm not going to -- and you made a

16        comment.  Do you remember --

17   A.   Short you.

18   Q.   Okay.  What was that in reference to?

19   A.   To how many I was going to give him.

20   Q.   And how many you were going to give him of what?

21   A.   Kilos.

22             MS. MOREHEAD:  Nothing further.

23             THE COURT:  All right.  Any recross based

24        on this?  Mr. Heathman?

25             MR. HEATHMAN:  Just briefly.

1609

```
 1                    RECROSS EXAMINATION
 2   BY MR. HEATHMAN:
 3   Q.   Mr. Humphrey, Exhibit 48, is that the photograph the
 4        officers showed you at your proffer in December 2007?
 5   A.   I don't know when they showed it to me, but yes, it
 6        was showed to me.  I can't tell you when.
 7   Q.   Okay.  All right.  And what's this vehicle here?
 8   A.   You put a dot somewhere?
 9   Q.   So let me circle it.
10   A.   H3 Hummer.
11   Q.   Right.  Who was driving the H3 Hummer?
12   A.   I'm assuming Monterial.  That's the one I pulled up
13        to.
14   Q.   Did you see anybody get out of this vehicle here?
15   A.   I didn't see anybody get out of none of the vehicles.
16        Everybody was inside.
17   Q.   Did you see anybody get in this vehicle here?
18   A.   No.  I left.
19              MR. HEATHMAN:  Nothing further, your Honor.
20              THE COURT:  Mr. Sandage?
21              MR. SANDAGE:  Yes, your Honor.
22                    RECROSS EXAMINATION
23   BY MR. SANDAGE:
24   Q.   Mr. Humphrey, along those same lines, the government
25        showed you on redirect examination Government's
```

```
 1        Exhibit No. 47.  Do you remember looking at that just
 2        a couple minutes ago?
 3   A.   Yes.
 4   Q.   I believe it was your testimony on redirect that you
 5        believe that was the Simpson car that you had seen on
 6        prior occasions, the red SS 150; is that correct?
 7   A.   Correct.
 8   Q.   Was your testimony that that was on the September 20,
 9        2007, the transaction at Chili's?  Is that what you
10        just told Ms. Morehead?
11   A.   Yes.
12   Q.   Do you see anybody inside that vehicle?
13   A.   No.
14   Q.   Did you see Mr. Foy that day?
15   A.   No.
16   Q.   I believe you testified on direct examination, not
17        recently, but earlier this morning, that that was a
18        day that Mr. Wesley's family member was having a
19        birthday party at Chili's; right?
20   A.   Correct.
21   Q.   And, in fact, you weren't supposed to go inside; is
22        that correct?
23   A.   Correct.
24            MR. SANDAGE:  Your Honor, nothing further.
25            THE COURT:  Mr. Bellemere?  Mr. Calbi?
```

```
 1                    MR. CALBI:  No, your Honor.

 2                    THE COURT:  Mr. Rogers?

 3                    MR. ROGERS:  No, your Honor.

 4                    THE COURT:  Ms. Morehead, anything based on

 5          any of this?

 6                    MS. MOREHEAD:  No, your Honor.

 7                    THE COURT:  All right.  Mr. Humphrey's

 8          testimony is then concluded, and I will remand him to

 9          the custody of the United States marshals, and the

10          government may call its next witness.

11                    MS. MOREHEAD:  I will call Byron Brown,

12          your Honor.

13                    THE COURT:  I understand it will take a

14          little while to trade off Mr. Humphrey for Mr. Brown,

15          members of the jury.  If you want to stand up, move

16          around, or not, that's fine.

17                    MR. BELLEMERE:  Does that relieve us all,

18          Judge, to get up and stand and walk around for a

19          minute?

20                    THE COURT:  Well --

21

22

23

24

25
```

```
 1                    BYRON JEROME BROWN,

 2   having been duly sworn, was examined and testified as

 3   follows:

 4                    DIRECT EXAMINATION

 5   BY MS. MOREHEAD:

 6   Q.   How old are you, Mr. Brown?

 7   A.   Thirty.

 8   Q.   And can you tell the jury where you grew up and where

 9        you were -- where you spent most of your life.

10   A.   Leavenworth, Kansas.

11   Q.   And did you actually go to school in Leavenworth?

12   A.   Yes, ma'am.

13   Q.   And in connection with the time that you've spent in

14        Leavenworth, does your family live in Leavenworth?

15   A.   Yes, they do.

16   Q.   And you are here in this particular case as a

17        codefendant; is that right?

18   A.   Yes, I am.

19   Q.   And in connection with being here today, you, in

20        fact, have entered into a plea agreement with the

21        government in connection with your cooperation

22        against the codefendants; is that right?

23   A.   Yes, ma'am.

24   Q.   And in your plea agreement did you, in fact, plead

25        guilty to the conspiracy count and also the
```

1613

```
1          forfeiture allegation in excess of $10 million?

2    A.    Yes.

3    Q.    And the conspiracy count involved -- involves a

4          conspiracy to possess with intent to distribute and

5          to distribute 5 kilograms or more of cocaine or to

6          possess with intent to distribute, to manufacture and

7          to distribute 50 grams or more of crack cocaine; is

8          that correct?

9    A.    Yes, ma'am.

10   Q.    And originally were you also charged in connection

11         with some other counts?

12   A.    I had a telephone call.

13   Q.    Telephone count?

14   A.    Uh-huh.

15   Q.    Okay.  When you pled guilty, you, in fact, pled to

16         the conspiracy count; correct?

17   A.    Yes, I did.

18   Q.    With regards to the plea that you entered, Mr. Brown,

19         when you -- and for the record, you've pled guilty on

20         December 1 of 2008; is that right?

21   A.    Yes, ma'am.

22   Q.    Now, were you cooperating, providing information to

23         the government, long before that?

24   A.    Yes, ma'am.

25   Q.    And do you recall when you started cooperating with
```

1        the government?

2   A.   The day of my arrest.

3   Q.   And you talked to the agents when you were arrested;

4        correct?

5   A.   Yes, I did.

6   Q.   And once you appeared in court, were you given an

7        attorney?

8   A.   Yes, ma'am.

9   Q.   And that attorney is in court today; is that right?

10  A.   Yes, he is.

11  Q.   And you understand if you need to you can confer with

12       Mr. DeHardt at any time?

13  A.   Okay.

14  Q.   Is that right?

15  A.   Yes, ma'am.

16  Q.   Okay.  And once Mr. DeHardt became your attorney, did

17       you continue to cooperate?

18  A.   Yes, ma'am.

19  Q.   And were there several times since your arrest -- and

20       when were you arrested, Mr. Brown?

21  A.   February 5, I think it was.

22  Q.   Of 2008?

23  A.   Yes, ma'am.

24  Q.   So for the last 14 months or so have you had an

25       opportunity on multiple occasions to talk to the

```
 1          agents concerning information you know in connection
 2          with this case?
 3   A.     Yes, I have.
 4   Q.     And with regards to your plea agreement, was there,
 5          in fact, an agreement that you would be sentenced
 6          under the United States Sentencing Guidelines?
 7   A.     Yes.
 8   Q.     And when you decided to cooperate, is it safe to say,
 9          because it was obviously before you pled guilty, you
10          didn't know what plea agreement might be available to
11          you?
12   A.     Right.
13   Q.     Okay.  And when you made that decision to cooperate
14          initially, did you have any sort of idea about what
15          kind of time you might be looking at with regards to
16          your charges?
17   A.     When they give you the indictment papers, it says ten
18          to life, the charge on it.
19   Q.     So you knew right away that you were facing not less
20          than ten years and not more than live?
21   A.     Yes, ma'am.
22   Q.     And under the plea agreement there was an agreement
23          that you would be sentenced under the guidelines.
24          Under the guidelines do you have any idea what kind
25          of sentence you might be facing on the conspiracy
```

1       charge?

2   A.  No, ma'am.

3   Q.  And so the most that you know is not less than ten

4       years and not more than life?

5   A.  Yes, ma'am.

6   Q.  Is that safe to say?

7   A.  Yes, ma'am.

8   Q.  And what -- can you tell the jury why, if you didn't

9       have any sort of agreement with the government at

10      first and you didn't really know for sure how much

11      time you were looking at, why you decided to begin

12      cooperating from the day you were arrested?

13  A.  Because -- mainly because the evidence they say they

14      had against me, wasn't no sense in trying to fight

15      it.

16  Q.  Okay.  And when you entered into this plea

17      agreement -- when you met with the agents before you

18      entered your plea agreement, when they sat down and

19      talked to you, did you provide as much information as

20      you could and be as truthful as you could?

21  A.  Yes, I did.

22  Q.  When you entered this plea agreement, was part of

23      that plea agreement that you would continue

24      cooperating in connection with the prosecution of

25      anyone else?

1   A.   Yes, ma'am.

2   Q.   And did that provide that you had to cooperate fully

3        and truthfully?

4   A.   Yes, ma'am.

5   Q.   And in connection with this plea agreement, there's a

6        provision in there, is there not, that if the

7        government determines that you have provided

8        substantial assistance that they would -- that the

9        government would file a motion under 5K1.1?

10  A.   Yes, ma'am.

11  Q.   Do you know what a motion under 5K1.1 is?

12  A.   I've heard about it.

13  Q.   What's your understanding of what that is?

14  A.   A downward departure, I guess.

15  Q.   Okay.  And so that if you provide

16       truthful substantial assistance, you would have the

17       opportunity to have your sentence lowered?

18  A.   Yes, ma'am.

19  Q.   And has anyone made a promise to you as you sit here

20       today that such a motion will be filed?

21  A.   No promises have been made.

22  Q.   Has anyone made any promises or representations to

23       you about what sentence you're going to get in this

24       case?

25  A.   No, ma'am.

```
 1   Q.   What's your understanding of who makes the decision

 2        about what sentence you're going to get?

 3   A.   The judge.

 4   Q.   And what do you think would happen, Mr. Brown, if it

 5        was determined that you -- with regards to your plea

 6        agreement, what do you think would happen if it was

 7        determined that you lied or provided untruthful

 8        information?

 9   A.   Be charged.  It's another charge.

10   Q.   Another charge?

11   A.   Uh-huh.

12   Q.   What would happen with the plea agreement?

13   A.   It goes out the window.

14   Q.   Okay.  And if you testify truthfully, provide

15        substantial assistance, do you have any sort of

16        expectation about what your sentence is going to end

17        up being in this case?

18   A.   No.  I got some hopes about what I would like it to

19        be.

20   Q.   What would your hope be if you provided substantial

21        assistance in this case?

22   A.   Less than ten years.

23   Q.   Less than ten years?

24   A.   Yes, ma'am.

25   Q.   Okay.  And as part of the plea the government did
```

 1         agree to recommend the low end of the

 2         guideline range, wherever you end up; right?

 3    A.   Yes, ma'am.

 4    Q.   And in connection with the information that you have

 5         provided to law enforcement, did you, in fact,

 6         provide them information about some of the

 7         individuals that are codefendants in this case?

 8    A.   Yes, ma'am.

 9    Q.   Now, are there some of the people in this case that

10         you don't know and you don't have any information

11         about?

12    A.   Yes, ma'am.

13    Q.   And did you have an opportunity at some point to kind

14         of go through a stack of photos to see who you knew

15         in this case and who you didn't know?

16    A.   Yes, ma'am.

17    Q.   Can you tell the jury how you became acquainted --

18         let's start, first of all, with Monterial Wesley.

19    A.   I knew him -- I met him around the late nineties.

20    Q.   And how was it that you met him?

21    A.   Through some friend, friend that he was close with.

22    Q.   He lives in Leavenworth as well; right?

23    A.   As far as I know of, yeah.

24    Q.   Okay.  And would you consider Leavenworth a pretty

25         small town?

```
 1    A.   Yes, ma'am.

 2    Q.   Okay.  And Government's Exhibit 272, who is that?

 3    A.   Monterial Wesley.

 4    Q.   Okay.  And did you also become acquainted with Henry

 5         Grigsby?

 6    A.   Yes, ma'am.

 7    Q.   And how did you know Henry Grigsby?

 8    A.   Met him through his cousin.

 9    Q.   And Government's Exhibit 276, do you recognize that

10         photo?

11    A.   Yes, ma'am.

12    Q.   Who is that?

13    A.   Hank Grigsby.

14    Q.   And in connection with this particular case, did you

15         ever buy drugs from either Henry Grigsby or Monterial

16         Wesley?

17    A.   Both.

18    Q.   First of all, Mr. Brown, can you tell the jury, do

19         you use any sort of illegal drugs?

20    A.   I smoke marijuana.

21    Q.   Is that something you do every day?  Is it a habit,

22         or is it more of a recreational thing?

23    A.   Recreational.

24    Q.   I assume because you would occasionally smoke

25         marijuana you would maybe buy marijuana at some point
```

1      for your personal use?

2   A.   Yes, ma'am.

3   Q.   Who would you buy marijuana that you would use for

4        your person use, who would you buy it from?

5   A.   One of Hank Grigsby's people.

6   Q.   Who was that?

7   A.   Shaq.

8   Q.   In connection with Henry Grigsby and Monterial

9        Wesley, who was it that you started buying drugs from

10       first?

11  A.   Monterial Wesley.

12  Q.   And about when was it that you would have started

13       dealing with Monterial Wesley?

14  A.   I started in -- I think it was '01 up until maybe

15       '06, into '06, middle of '06.

16  Q.   Okay.  The conspiracy in this case is from 2006 to

17       2007.  2007, which was through November 27 of 2007,

18       are you familiar with that being the time of

19       conspiracy?

20  A.   Yes, ma'am.

21  Q.   In connection with that time period in 2006 and 2007,

22       what time period were you dealing with Monterial

23       Wesley?

24  A.   I would say again '06.

25  Q.   Okay.  And in connection -- and that was when you

| | | |
|---|---|---|
| 1 | | started dealing with him, during that time period |
| 2 | | then, in '06? |
| 3 | A. | Yeah. |
| 4 | Q. | And what drugs did you buy from Monterial Wesley when |
| 5 | | you were buying drugs from him? |
| 6 | A. | Powder cocaine. |
| 7 | Q. | When we talk about soft and hard, you know what we're |
| 8 | | talking about, right, Mr. Brown? |
| 9 | A. | Yes, ma'am. |
| 10 | Q. | When you said you would buy cocaine from Mr. Wesley, |
| 11 | | what kind of cocaine was that? |
| 12 | A. | Powder cocaine. |
| 13 | Q. | All right.  Did you ever buy crack cocaine from |
| 14 | | Monterial Wesley? |
| 15 | A. | No, ma'am. |
| 16 | Q. | When you would buy powder cocaine from Monterial |
| 17 | | Wesley, what quantities of powder cocaine were you |
| 18 | | buying from him? |
| 19 | A. | Nine ounces to 18 ounces. |
| 20 | Q. | And if you would buy 9 ounces of powder cocaine from |
| 21 | | him, how much were you paying for that? |
| 22 | A. | Six grand. |
| 23 | Q. | $6,000? |
| 24 | A. | Yes, ma'am. |
| 25 | Q. | And if you were buying 18 ounces, how much would you |

```
 1        buy?

 2   A.   How much was it?

 3   Q.   I'm sorry.  You said -- what did I just ask?  You

 4        said 9 ounces, you paid 6,000?

 5   A.   Uh-huh.

 6   Q.   If you doubled that and bought 18 ounces, how much

 7        would you pay?

 8   A.   Double the price, twelve.

 9   Q.   Okay.  And in connection with the cocaine that you

10        bought from Monterial Wesley, what did you do with it

11        after you would buy that?

12   A.   Turn it into crack cocaine.

13   Q.   And so how would you do that?  Did you actually cook

14        it?

15   A.   Yes, ma'am.

16   Q.   And how did you go about the business of cooking

17        cocaine into crack cocaine?

18   A.   Pyrex and some baking soda.

19   Q.   And what method did you use to cook crack?

20   A.   Stove top.

21   Q.   And where would you go to cook your powder cocaine

22        and crack cocaine?

23   A.   In my own house.

24   Q.   Did you ever go anywhere else to cook crack?

25   A.   No, ma'am.
```

1    Q.   In connection then with the time period that you

2         dealt with Monterial Wesley during this conspiracy,

3         how long did that relationship continue?

4    A.   It wasn't a frequent thing.  It was like the last

5         person I got to go to.

6    Q.   So it was an infrequent thing?

7    A.   Uh-huh.

8    Q.   Between 2006 and 2007 how many times do you think you

9         bought drugs from Monterial Wesley?

10   A.   Maybe three at the most.

11   Q.   Three times?

12   A.   Uh-huh.

13   Q.   And when you would actually deal with Monterial

14        Wesley, where did those incidents take place?

15   A.   Thirty-First Street in Kansas City, Missouri.

16   Q.   And why did they take place there?

17   A.   He didn't like doing business in Leavenworth.

18   Q.   And where else did they -- was there any other -- any

19        place else that they took place at.

20   A.   Like, down the street from where I had seen him on

21        31st at a McDonald's one time.

22   Q.   One time at a McDonald's?  How many times do you

23        think it happened at the location off of 31st Street?

24   A.   It was in that area all three times.

25   Q.   Okay.  So one time at McDonald's, the other couple

1    times were --

2  A.   Up the street.

3  Q.   Up the street?  When you recall dealing with

4       Monterial Wesley, did you know whether or not he had

5       a girlfriend?

6  A.   He's married.  I know he's married.

7  Q.   Okay.  Did you ever know if he had a girlfriend?

8  A.   Sort of, yeah.

9  Q.   And how did you know that?

10 A.   Because I had been to her house one time.

11 Q.   All right.  And where was that at?

12 A.   435 and Holmes Road.

13 Q.   And do you recall what her name was or anything about

14      her?

15 A.   No, I don't remember her name.

16 Q.   Okay.  And in connection with his girlfriend that

17      lived at this location, you said you were at her

18      house one time?

19 A.   Uh-huh.

20 Q.   What was the purpose of going to that location?

21 A.   I was meeting him there to get some powder.

22 Q.   So there was actually a transaction that occurred at

23      that location?

24 A.   Yes, ma'am.

25 Q.   Do you recall if anyone was present when you met --

```
 1        and I assume you met Monterial Wesley on that
 2        occasion?
 3   A.   Yes, ma'am.
 4   Q.   Was there anybody else present when you met him on
 5        that occasion?
 6   A.   One of his brothers.
 7   Q.   Do you remember who that was?
 8   A.   Antwon.
 9   Q.   Okay.  And that actually happened in her house then?
10   A.   Yes, ma'am.
11   Q.   Okay.  What about the times that occurred at
12        McDonald's or the times that happened at 31st, on
13        31st Street?  Was Monterial by himself, or was he
14        with anyone else?
15   A.   He was always with somebody.
16   Q.   Who else do you recall him being with on any of those
17        other occasions?
18   A.   His wife or one of his brothers.
19   Q.   You said one of his brothers.  Who are you referring
20        to?
21   A.   Antwon and Raytayvian [sic].
22   Q.   And when you were doing transactions with Mr. Wesley
23        on 31st Street or at the McDonald's, I assume you
24        would drive there?
25   A.   Yes, ma'am.
```

```
 1    Q.   And where would those transactions take place?

 2    A.   He would get in my car, and we would do the

 3         switcheroo and then go on about our business.

 4    Q.   And did you make any -- do you have any recollection

 5         of what vehicles Mr. Wesley would have been driving

 6         on any of those occasions?

 7    A.   Back then he had a Escalade.

 8    Q.   Do you remember what color?

 9    A.   Like pearl white.

10    Q.   Pearl white, okay.  Any other vehicles?

11    A.   He was always in something different.  Sometimes they

12         wasn't his, so --

13    Q.   Okay.  Sometimes it wasn't his vehicle?

14    A.   Yeah.

15    Q.   And on these occasions when you were in a vehicle and

16         you had driven him -- I'm excluding the one with the

17         girlfriend in the house, but the other incidents, who

18         was driving in connection with Mr. Wesley's vehicle?

19    A.   His wife or one of his brothers would be driving.

20    Q.   You mentioned a couple names, I think.  Can you

21         remind me of those names of the brothers.

22    A.   Antwon and Raytayvian.

23    Q.   I want to show you Government's Exhibit 274.  Do you

24         recognize that?

25    A.   Yes, ma'am.
```

| | | |
|---|---|---|
| 1 | Q. | Who -- |
| 2 | A. | Antwon Simpson. |
| 3 | Q. | And Government's Exhibit 273? |
| 4 | A. | Raytayvian. |
| 5 | Q. | Did you know either of them, Antwon or Rtayvian -- |
| 6 | | did you know any of them from your living in |
| 7 | | Leavenworth? |
| 8 | A. | Yes, ma'am. |
| 9 | Q. | Had you seen them on other occasions unrelated to |
| 10 | | drug transactions? |
| 11 | A. | Yes, ma'am. |
| 12 | Q. | In connection with the drugs that you bought from Mr. |
| 13 | | Wesley, do you know what the term fronting means? |
| 14 | A. | Say that again. |
| 15 | Q. | Fronting? |
| 16 | A. | Yes, ma'am. |
| 17 | Q. | What's your understanding of what that means? |
| 18 | A. | Have one person basically let you hold some drugs and |
| 19 | | then you pay them back later. |
| 20 | Q. | And what was your relationship or business |
| 21 | | arrangement with Mr. Wesley? |
| 22 | A. | There was one time where he did that for me, but it |
| 23 | | wasn't no good, so I had to return it. |
| 24 | Q. | What was no good? |
| 25 | A. | The powder that he gave me. |

1    Q.   What was wrong with the powder that he had given you?

2    A.   It wasn't doing what it supposed to do.

3    Q.   What was it doing?

4    A.   Losing real bad.

5    Q.   Anything else about it?

6    A.   Just trash.

7    Q.   Okay.  And so normally then would you have to pay Mr.

8         Wesley up front?

9    A.   Uh-huh, yes, ma'am.

10   Q.   Or pay it when you got it?

11   A.   Yes, ma'am.

12   Q.   And you mentioned that you would get -- were there

13        ever any times that you bought a whole one?  Do you

14        know what I'm talking about when I say a whole one?

15   A.   Yes, ma'am.

16   Q.   What am I talking about?

17   A.   A whole bird.

18   Q.   A whole kilo?

19   A.   Yes, ma'am.

20   Q.   Did you ever buy a whole kilo from him?

21   A.   No, ma'am.

22   Q.   When you would get the cocaine, the powder cocaine,

23        from him, can you describe what it looked like for

24        us.

25   A.   All white, chunks.

```
 1   Q.   What do you mean by all white trunks?

 2   A.   Chunks.

 3   Q.   Chunks.  Sorry, chunks.

 4   A.   Just a shred off the slab of a kilo.

 5   Q.   And what do you mean when you're saying it was

 6        straight off the kilo?

 7   A.   Just broken off.

 8   Q.   Did you ever make any observations about the chunks

 9        of cocaine?

10   A.   You always got to look at it, yeah.

11   Q.   How was it packaged when you would get it from Mr.

12        Wesley?

13   A.   What they normally come is, they would be repackaged,

14        just ZipLocs.

15   Q.   So it would be just in ZipLocs?

16   A.   Uh-huh.

17   Q.   Is that right?

18   A.   Yes, ma'am.

19   Q.   Did you ever go to any family gatherings with

20        Monterial Wesley?  Was your relationship just

21        business?  Where you were buying drugs from him, or

22        was it a different type of a relationship?

23   A.   It was kind of both.  I was kind of friends with his

24        wife's family.

25   Q.   And did you ever go to any family gatherings or
```

```
 1        anything like that?
 2   A.   Yes, ma'am.
 3   Q.   You mentioned that Monterial Wesley would be your
 4        last resort.  Is that what you said?
 5   A.   Yes, ma'am.
 6   Q.   Were there other people that you were buying drugs
 7        from?
 8   A.   Yes, ma'am.
 9   Q.   Tell us who Government's Exhibit 277 is.
10   A.   That's Shaq.
11   Q.   And that was who you would buy weed from?
12   A.   Yes, ma'am.
13   Q.   What about Government's Exhibit 287?
14   A.   Perez.
15   Q.   And do you know what Perez's relationship would be to
16        Monterial Wesley?
17   A.   Brother-in-law.
18   Q.   And had you ever bought any drugs from Shannon Perez?
19   A.   Yes, ma'am.
20   Q.   And, again, going back to 2006 all the way through
21        2007 to November 27 of 2007, what time period would
22        you have dealt with Shannon Perez?
23   A.   Probably the end of -- around the end of '06.
24   Q.   Okay.  And in connection with that activity with
25        Shannon Perez what were you buying from him?
```

1632

```
 1   A.   Powder cocaine.

 2   Q.   What quantities would you buy from him?

 3   A.   Two, two ways; a couple fours if need be.

 4   Q.   What were you buying from him, hard or soft?

 5   A.   It was soft.

 6   Q.   And did you ever see Shannon Perez cook crack

 7        cocaine?

 8   A.   Yes, ma'am.

 9   Q.   And where did you see that happen at?

10   A.   At his house on Chestnut.

11   Q.   And did you make any observations about anybody who

12        was participating in that?

13   A.   His stepfather.

14   Q.   Who is that?

15   A.   I just know him by Mays.

16   Q.   So his stepfather would be also Lakisha Wesley's

17        stepfather?

18   A.   Yes, ma'am.

19   Q.   Were there times that you saw Shannon Perez in

20        possession of large quantities of drugs?

21   A.   A couple occasions.

22   Q.   What would the amounts of cocaine be that you saw

23        Shannon Perez in possession of?

24   A.   Maybe a kilo.

25   Q.   With regards to -- did you call him Hank?  Is that
```

1    what you called him?  Or Henry Grigsby?

2  A.   I called him Hank.

3  Q.   Hank?  You said you bought cocaine from him as well?

4  A.   Uh-huh.

5  Q.   Yes?

6  A.   Yes, ma'am.

7  Q.   When were you buying cocaine from Henry Grigsby?

8  A.   From -- that was my main source.  When I couldn't get

9       it, I got to search around.

10  Q.   Typically you would be dealing with Hank?

11  A.   Yes, ma'am.

12  Q.   You're aware now as you sit here that we have a

13       number of phone calls where you were dealing with

14       Henry Grigsby?

15  A.   Yes, ma'am.

16  Q.   Between 2006 and 2007 tell us about how much you were

17       getting from Henry Grigsby.

18  A.   Maybe anywhere from a kilo to 2 kilos a month.

19  Q.   And would that be soft or hard?

20  A.   Soft.

21  Q.   And do you recall how much you were paying for the

22       quantity of cocaine that you were getting from Henry

23       Grigsby?

24  A.   I believe it was around 22.

25  Q.   Per what?

1634

```
 1    A.    Per kilo.

 2    Q.    Okay.  Would you buy a whole one at a time or how --

 3    A.    I start off buying whole ones, and then -- after I

 4          got a couple extra dollars, then I would buy a whole

 5          one, try to make a couple more dollars, and then go

 6          back and buy another one.

 7    Q.    All right.  And how long would it take you -- the

 8          kilo that you were buying -- let's say for a kilo you

 9          were buying from Hank, how much of that would you

10          then cook into crack?

11    A.    All of it.

12    Q.    You weren't turning around selling any powder to

13          anybody else?

14    A.    Sometimes I did, yes, ma'am.

15    Q.    Okay.  And what's the reason you would turn around --

16          would you cook it all at once, or would it be a

17          certain amount that you would cook at a time?

18    A.    No.  I would do nine at a time.

19    Q.    Nine ounces at a time?

20    A.    Uh-huh.

21    Q.    So what's the reason then you would cook that whole

22          kilo, or most of the kilo for that matter, into

23          crack?  What were you trying to do?

24    A.    Make my own pockets fat by selling crack.

25    Q.    And of the crack that you were making then, how would
```

1    you distribute it?

2    A.   I sold small pieces.

3    Q.   What would the quantities -- pieces.  How much are we

4         talking about for pieces?

5    A.   Twenties on up.

6    Q.   Twenties on up?

7    A.   Uh-huh.

8    Q.   What would -- do you know what I'm talking about when

9         I say a ball?

10   A.   Yes, ma'am.

11   Q.   How much is a ball?

12   A.   Anywhere from a hundred to 150.

13   Q.   What's the quantity?

14   A.   3.5.

15   Q.   And are there any other terms that we call that, call

16        a ball?

17   A.   No.  That's the main one, basketball.

18   Q.   What's a biscuit?

19   A.   Oh, another term for 3.5.

20   Q.   Okay.  What's a 7-Up?

21   A.   Seven grams.

22   Q.   And would you ever sell 7-Ups?

23   A.   Occasionally.  That wasn't my thing, but if somebody

24        needed it, yeah.

25   Q.   Did you sell a lot of biscuits or balls?

1    A.    I sold a few.

2    Q.    And what about an ounce, getting up into an ounce at

3          a time?  Did you ever sell ounces?

4    A.    Only -- I tried not to.  But there was some people

5          that couldn't get it, so, yeah, I would.

6    Q.    And why did you -- why do you say I tried not to sell

7          the ounce quantities?

8    A.    Because it's taking away from me.

9    Q.    How does it take away from you, Mr. Brown?

10   A.    By selling it like that, I don't make no profit.

11   Q.    When you sell a larger quantity -- let's kind of

12         break it down.  How much would you sell an ounce of

13         crack for if somebody called you up, said, hey, I

14         need an ounce of crack?

15   A.    A thousand.

16   Q.    Okay.  How many pieces could you get out of an ounce?

17   A.    You can cut about maybe sixteen, seventeen hundred

18         out of it.

19   Q.    You could get sixteen or seventeen hundred pieces?

20   A.    No.  Worth of dollars.

21   Q.    Dollars.  So out of that same ounce, if you sold it

22         in pieces, you could make sixteen or seventeen

23         hundred dollars?

24   A.    Yes, ma'am.

25   Q.    Okay.  Did you have a regular customer base of people

1      that you sold to?

2   A.   Yes, ma'am.

3   Q.   And people who couldn't get it anywhere else and you

4        had to -- you ended up selling them an ounce, did you

5        have any idea what they might do with that ounce that

6        you had just sold to them?

7   A.   Sell it.

8   Q.   All right.  How would you know that though?  How

9        would you know that they weren't just going to smoke

10       that ounce?

11  A.   That's what everybody did.  I mean, they had people

12       waiting.  They would call, I got some people waiting.

13       I really need it so --

14  Q.   So that was an indication to you that they were

15       planning on selling it?

16  A.   Yes, ma'am.

17  Q.   When you were selling pieces, the people that you

18       would sell pieces to, do you know what they were

19       doing with the crack that you were selling to them?

20  A.   They were smoking it.

21  Q.   They were smokers then?

22  A.   Yes, ma'am.

23  Q.   Users?

24  A.   Yes, ma'am.

25  Q.   Did you have a regular base of clientele of smokers?

1638

| | | |
|---|---|---|
| 1 | A. | Yes, ma'am. |
| 2 | Q. | How many clients do you think -- did you have some |
| 3 | | regulars and some irregulars, I guess, some that came |
| 4 | | a lot and some that didn't come? |
| 5 | A. | Yes, ma'am. |
| 6 | Q. | But occasionally? |
| 7 | A. | Yes, ma'am. |
| 8 | Q. | Were there some people that might get more than -- |
| 9 | | crack more than once a day from you? |
| 10 | A. | Yes, ma'am. |
| 11 | Q. | How many customers do you think you distributed this |
| 12 | | cocaine, crack cocaine, to? |
| 13 | A. | A lot. |
| 14 | Q. | Did you also know an individual named Boytina Locke? |
| 15 | A. | Yes, ma'am. |
| 16 | Q. | How did you meet Boytina Locke? |
| 17 | A. | Through some mutual friends. |
| 18 | Q. | Okay.  And do you know if that was one of Henry |
| 19 | | Grigsby's suppliers? |
| 20 | A. | Yes, ma'am. |
| 21 | Q. | And were there any occasions that you would buy |
| 22 | | cocaine from Boytina Locke? |
| 23 | A. | Through an associate of his, yes, ma'am. |
| 24 | Q. | Okay.  With regards to Henry Grigsby, we talked about |
| 25 | | there was one time you got some bad powder from |

```
 1        Monterial Wesley.  Were there any times that you got

 2        any bad dope from Hank?

 3   A.   No, ma'am.  It was from Boytina Locke that I got the

 4        bad.

 5   Q.   So you got some other bad dope from Boytina Locke?

 6   A.   Yes, ma'am.

 7   Q.   Okay.  Was that something that was occasionally a

 8        problem?

 9   A.   Not a regular problem, no.

10   Q.   Okay.  What about Government's Exhibit 275?  Do you

11        know who that is?

12   A.   Know him, know him, no.  But I know his name is Rat.

13   Q.   Had you seen him before in connection with Monterial

14        Wesley?

15   A.   Yeah.  A few of the gatherings or outings.

16   Q.   Okay.  Government's Exhibit 286, do you know who that

17        is?

18   A.   Yes, ma'am.

19   Q.   Who is that?

20   A.   KK.

21   Q.   And did you ever sell anything to KK, or did you ever

22        buy anything from KK?

23   A.   I helped him out.  I sold some large quantities,

24        four-ways and some nines, for him.

25   Q.   So had you sold him some four-ways and some nines?
```

```
 1    A.   Yes, ma'am.

 2    Q.   Do we call nines something else?

 3    A.   Ninas.

 4    Q.   And that would be -- you said helping him out.  What

 5         do you mean by that?

 6    A.   Because maybe I couldn't get it from Hank or maybe he

 7         couldn't get it from one of his main sources, so I

 8         was just trying to help him out.

 9    Q.   Okay.  Government's 284, do you know who that is?

10    A.   Yes, ma'am.

11    Q.   Who is that?

12    A.   Billy Trinkle.

13    Q.   Did you ever have any dealings with Billy Trinkle?

14    A.   Yes, ma'am.

15    Q.   What kind of dealings did you have with him?

16              MR. BELL:  Judge, may I approach?

17              THE COURT:  You may.

18              (Counsel approached the bench and the

19         following proceedings were had:),

20              MR. BELL:  Judge, I'm concerned because as

21         part of his factual basis in his plea agreement he

22         identified that he knows Billy Trinkle, who was

23         buying narcotics from Henry Grigsby back starting in

24         the fall of 2004.  Given the foundation elements and

25         the time elements, I'm concerned that he might say
```

```
 1            that he knows something about that, but his

 2            experience would only be in a time outside the

 3            conspiracy, if I am making any sense here.

 4                      THE COURT:  I understand.

 5                      MS. MOREHEAD:  I'm only asking him about

 6            his personal dealings with Billy Trinkle, not what he

 7            might have known somebody else's dealings would be.

 8            I think that would be hearsay or secondhand

 9            information, so I'm just going on what he knows.  He

10            gave us lots of other information, but I'm trying to

11            point him only to what he knows.

12                      THE COURT:  Mr. Bell?

13                      MR. BELL:  I don't know what is going to

14            come out of his mouth, obviously.  I understand

15            that's the direction she was leading him.

16                      THE COURT:  Reask the question that makes

17            it clear that you're asking for his own personal

18            knowledge, and we will be fine.

19                      MS. MOREHEAD:  Sure.

20                      (The proceedings returned to open court.)

21   Q.   (By Ms. Morehead) Government's Exhibit 284, you

22            indicated, was who, Mr. Brown?

23   A.   Billy Trinkle.

24   Q.   And did you ever personally have any dealings where

25            you sold any drugs to Billy Trinkle between 2006 and
```

```
 1        2007?

 2   A.   Yes, ma'am.

 3   Q.   And what would you have sold Billy Trinkle?

 4   A.   Some balls and some sevens.

 5   Q.   And balls being, again, 3.5 grams and sevens being --

 6   A.   Seven grams.

 7   Q.   Seven grams?

 8   A.   Yes, ma'am.

 9   Q.   What would that be?  Would that be soft or hard?

10   A.   Sometimes both.

11   Q.   And with regards to the amount that you bought or

12        that you sold to him, sorry, you said it would be

13        both, sometimes soft, sometimes hard?

14   A.   Yes, ma'am.

15   Q.   Can you break that down?  Let me ask you overall

16        first; then I'll come back and ask that.  How many

17        times do you think you sold to Billy Trinkle between

18        2006 and 2007?

19   A.   Couple times a week.

20   Q.   And within that time period on the occasions you

21        would sell soft and hard to him, was there -- can you

22        put some indication to us whether a certain

23        percentage was soft and a certain percentage was

24        hard, or can you do that?

25   A.   Kind of.  Sometimes he would come and get a ball soft
```

```
 1        and a ball hard, and sometimes he would come and just

 2        get it all soft.

 3   Q.   And did you have any idea -- and by that I just mean

 4        your own personal knowledge -- what he was going to

 5        do with that amount of soft or hard that you were

 6        selling to him?

 7   A.   Some of it was for resell; some was for personal use.

 8   Q.   Okay.  Did he make that clear to you?

 9             MR. BELL:  Objection; lack of foundation.

10   A.   Just know.

11             THE COURT:  Pardon me.

12             MS. MOREHEAD:  I'll rephrase, Judge.

13             THE COURT:  You may.

14   Q.   (By Ms. Morehead) And you said sometimes it would be

15        soft and sometimes it would be hard.  Did you know

16        whether or not Billy Trinkle was a drug user?

17   A.   Yes, I do.

18   Q.   And how do you know that?

19   A.   Just by the signs.

20   Q.   The signs?

21   A.   Yeah.

22             MR. BELL:  Objection; speculation.  Move to

23        strike, Judge.

24             THE COURT:  Well, no.  This is a lay

25        opinion, which, if you want to establish some
```

```
 1        foundation as to what the foundation for that lay

 2        opinion is, you may.

 3                 MS. MOREHEAD:  I will, Judge.

 4   Q.   (By Ms. Morehead) What signs are you talking about,

 5        Mr. Brown?

 6   A.   Always congested, maybe an occasional bloody nose;

 7        and if you look at his nose, I think one of his

 8        things had collapsed on him from snorting so much.

 9   Q.   So based upon that, you believed that he did use

10        drugs?

11   A.   Right.

12   Q.   All right.  When you say snorting, what kind of

13        ingestion -- what kind of cocaine requires you to

14        snort that?

15   A.   Powder cocaine.

16   Q.   Did you and Mr. Trinkle ever have a falling out?

17   A.   Yes, ma'am.

18   Q.   What was that over?

19   A.   I was missing some drugs, and I'm pretty sure he took

20        it.

21   Q.   All right.  And do you remember between 2006 through

22        November of 2007 about when that would have happened?

23   A.   The exact date, no, but I know it was in the

24        summertime.

25   Q.   All right.  And did you do any more business with him
```

```
 1        after you had that episode with him?

 2   A.   No, ma'am.

 3   Q.   Did you ever know the individual in Government's

 4        Exhibit 278?

 5   A.   Yes, ma'am.

 6   Q.   How did you know him?

 7   A.   He's from Leavenworth.

 8   Q.   Okay.  And did you ever have any personal dealings

 9        with him?

10   A.   No, ma'am.

11   Q.   Okay.  Government's Exhibit 279, did you ever know

12        him?

13   A.   No, ma'am.  I met him while I was incarcerated.

14   Q.   All right.  And do you know who Government's

15        Exhibit 281 is?

16   A.   Yes, ma'am.

17   Q.   Who is that?

18   A.   That's Hank's cousin.

19   Q.   And do you know what he goes by?

20   A.   Cano.

21   Q.   Did you ever have any dealings with Cano?

22   A.   Yes, ma'am.

23   Q.   And what kind of dealings did you have with him?

24   A.   Sold him marijuana.

25   Q.   Okay.  And what about Government's Exhibit 282?  Do
```

1    you recognize that individual?

2  A.   I met him when I was locked up.

3  Q.   All right.  And what about Government's Exhibit 283?

4  A.   That's Hank's sister.

5  Q.   Okay.

6           MS. MOREHEAD:  Judge, I don't have any

7    other questions of Mr. Brown.

8           THE COURT:  All right.  Mr. Rogers?

9           MR. ROGERS:  Thank you, your Honor.

10              CROSS EXAMINATION

11 BY MR. ROGERS:

12 Q.   Can you see that picture, Mr. Brown?

13 A.   Yes, sir.

14 Q.   What is that man's name?

15 A.   Raytayvian Simpson.

16 Q.   Pronounce that again for me.  Pronounce the name

17   again for me again, please.

18 A.   Raytayvian.

19 Q.   Raytayvian?

20 A.   Yeah.

21 Q.   And that's the name that you were introduced to this

22   person by at family gatherings with Montel Wesley and

23   his wife and their family?

24           MS. MOREHEAD:  Judge, I think it's

25   Monterial Wesley.

1       MR. ROGERS:  I'm sorry.  Monterial Wesley.

2       Thank you.

3    A.   Family gatherings, no.  I know him from a couple

4         other places I ran into him at.

5    Q.   (By Mr. Rogers) You ran into him a couple other

6         places?

7    A.   Uh-huh.

8    Q.   And that would have been back before the time that

9         you had dealings with Monterial Wesley, which ended

10        in early 2006; is that correct?

11   A.   Yeah.

12   Q.   And what other places did you run into him?

13   A.   At one of his wife's cousin's house.

14   Q.   One of --

15   A.   Monterial's wife's cousins.

16   Q.   And that's where you heard that his name was

17        Raytayvian?

18   A.   They called him Ray.

19   Q.   Ray.  They called him Ray for Raytayvian, short?

20   A.   Uh-huh.

21   Q.   Okay.  Now, as I understand it, there was a total of

22        three times that you say that you went to the

23        vicinity of 31st Street in Kansas City, Missouri, to

24        buy powder cocaine from Monterial Wesley?

25   A.   Yes, sir.

1648

1   Q.   And one of those times you did it at the McDonald's?

2   A.   Uh-huh.

3   Q.   And there's a McDonald's there at the basically 31st

4        and Van Brunt?

5   A.   Yes, at the bottom of the hill.

6   Q.   At the bottom of the hill?

7   A.   Uh-huh.

8   Q.   And are you familiar with that area from other

9        activities?

10  A.   No, sir.

11  Q.   The only times you've been there are those three

12       times?

13  A.   Yes, sir.

14  Q.   All right.  Then there were two other times that you

15       say you went to some place on 31st Street?

16  A.   Uh-huh.

17  Q.   You have to answer yes or no.

18  A.   Yes, sir.

19  Q.   She can't take down uh-huh and huh-uh.

20            Did you go to the same place on 31st Street on

21       both of those times?

22  A.   Yes.

23  Q.   Did you ever leave your car?

24  A.   Get out of my car, no.

25  Q.   Okay.  So you would pull up some place in your car,

```
 1          and Mr. Wesley would be there in another car, and he
 2          would get out and get into your car; is that correct?
 3   A.     Yes, sir.
 4   Q.     And if he was with anybody else in his car, they
 5          would stay in his car?
 6   A.     Yes, sir.
 7   Q.     Okay.  So you would have no conversation with whoever
 8          might be in his car?
 9   A.     Yes, sir; correct.
10   Q.     All right.  And was that in front of any particular
11          house there on 31st Street, or any particular
12          business?
13   A.     A little white house on 31st.
14   Q.     Both times?
15   A.     Uh-huh.
16   Q.     And when did those meetings take place?
17   A.     Exact dates, I don't know, but I know it was like
18          around the beginning or the middle of '06.
19   Q.     You told us earlier that the last time you had any
20          interaction with Mr. Wesley in terms of buying drugs
21          from him was --
22   A.     '06.
23   Q.     Early '06; isn't that right?
24   A.     Around the middle of '06, yeah.
25   Q.     Okay.  But this was before that?
```

1    A.   What was before that?

2    Q.   The meetings that happened in front of the white

3         house on 31st Street.

4    A.   No.  That was where we met.

5    Q.   Okay.  Was it in the daytime or the nighttime when

6         you would go there?

7    A.   It was daytime.

8    Q.   And so you remember what the neighborhood was like?

9    A.   Yeah.  That's why I only went down there in the

10        daytime.

11   Q.   Do you remember any landmarks in the neighborhood?

12   A.   No, besides the McDonald's down the street and a

13        grocery store as soon as you get off the highway and

14        come to the stop sign.

15   Q.   And by the house on 31st Street, could you see any

16        public buildings?

17   A.   Not that I recall, no.

18   Q.   Do you recall seeing a school about a block away from

19        that house on 31st Street?

20   A.   No, sir.

21   Q.   Did you recall seeing a church about half a block

22        from that house on 31st Street?

23   A.   No.  What I recall is some duplexes or apartments

24        across the street.

25   Q.   Across the street?

```
 1   A.   Yeah.

 2   Q.   No church?

 3   A.   No.

 4   Q.   All right.  Now, how long was it -- by the way, which

 5        of those times do you say Raytayvian or Ray Simpson

 6        was driving Monterial's car?

 7   A.   The exact time I don't remember.  It was three

 8        different times I went down there, so --

 9   Q.   All right.  And you already said it wasn't the time

10        at McDonald's; correct?

11   A.   Correct.

12   Q.   So it was one of two times?

13   A.   Right.

14   Q.   Was it the first time you went to the house on 31st

15        Street or the second time?

16   A.   The third time I went down there.

17   Q.   You're now saying there's a third time you went

18        there?

19   A.   I went to the house twice; I went to the McDonald's

20        once.

21   Q.   Okay.

22   A.   So --

23   Q.   My question is, was it the first time that you went

24        to the house or the second time that you went to the

25        house?
```

1   A.   The second time I went to the house.

2   Q.   You're sure of that?

3   A.   Yeah.

4   Q.   So it couldn't have been the first time?

5   A.   Right.

6   Q.   And so who was in the car with Monterial the first

7        time you went to the house?

8   A.   I believe it was his wife that brought him up there.

9   Q.   Who was in the car with Monterial the time you went

10       to McDonald's?

11  A.   That's when he drove hisself.

12  Q.   Okay.  So that's all three times on 31st Street?

13  A.   Uh-huh.

14  Q.   And so you know Antwon Simpson?

15  A.   Uh-huh.

16  Q.   You never saw Antwon Simpson on 31st Street?

17  A.   On the porch?

18  Q.   You never saw him with Monterial Wesley on 31st

19       Street?

20  A.   He was on the porch when I pulled up.

21  Q.   He was on the porch of the little white house?

22  A.   Uh-huh.

23  Q.   Did you know who lived in that little white house?

24  A.   No, I didn't.

25  Q.   Still don't?

```
 1    A.    Still don't.

 2    Q.    Do you recall talking with the DEA agents, Mr. McCue

 3          and Mr. Jones, who are in court today, and another

 4          agent named Sean Goeke back on March 17 of 2008?

 5    A.    I don't know the exact names, but yeah, I remember

 6          talking to them.

 7                    MS. MOREHEAD:  It wasn't March 17.  That's

 8          the date of the report.  The interview was on

 9          March 11, 2007 -- or 2008.

10                    MR. ROGERS:  Thank you.  You're right.

11          Like Mr. Bellemere, I get confused easily.

12    Q.    (By Mr. Rogers) Anyway, do you remember that

13          conversation?

14    A.    Yes.

15    Q.    Your lawyer was there?

16    A.    Yes, sir.

17    Q.    Ms. Morehead was there?

18    A.    Yes, sir.

19    Q.    Do you recall telling them that many of the

20          transactions were conducted in front of Wesley's

21          mother's house on 31st Street in Kansas City,

22          Missouri?

23    A.    Yes.

24    Q.    That's what you told them then even though now you

25          say you don't know and never knew whose house that
```

1   was?

2   A.   To be exact, I didn't know.  I said that because of

3        one of Ray's cars being in the driveway, and it was

4        broke down.

5   Q.   One of Ray's cars?

6   A.   Uh-huh.

7   Q.   A car that you knew him to own?

8   A.   Yes, sir.

9   Q.   How long did he own that car?

10  A.   A few months.

11  Q.   What kind of car was that?

12  A.   A Chevy Caprice?

13  Q.   And you know that it was Ray who owns that?

14  A.   Uh-huh.

15  Q.   Now, you also told them at that time -- do you recall

16       telling them at that time that Simpson -- and that

17       means Antwon Simpson and Raytayvian Simpson were

18       present on several occasions when you acquired drugs

19       from Mr. Wesley?

20  A.   Yeah, they were there.

21  Q.   On several occasions?

22  A.   The times I went down there, yeah.

23  Q.   Okay.  But you've told us about three times.

24  A.   Uh-huh.

25  Q.   Right?

1   A.   Right.

2   Q.   One time when you say Raytayvian was there?

3   A.   Right.

4   Q.   And one time when you say Antwon was on the porch?

5   A.   Right.

6   Q.   And Monterial drove himself?

7   A.   Right.

8   Q.   But what you told the police was several of the

9        occasions; correct?

10  A.   During the course of '06 and '07.

11  Q.   A few times before then?

12  A.   Yes, many times.

13  Q.   All right.  So before '06 there were many times?

14  A.   Right.

15  Q.   Where you would go to this house on 31st Street?

16  A.   Or the one on Holmes Road.

17  Q.   Or the one on Holmes Road?

18  A.   Uh-huh.

19  Q.   We're talking about the house on 31st Street.  You're

20       never claiming that you ever saw Raytayvian on Holmes

21       Road; right?

22  A.   Right.  I never saw him down there.

23  Q.   So you're saying that before 2006 there were many

24       times that you went to the house?

25  A.   Right.

1    Q.   On 31st Street?

2    A.   Right.

3    Q.   And was Raytayvian's Chevy Caprice there in the

4         driveway on all of those times?

5    A.   It was broke down at the times I went down there,

6         yeah.

7    Q.   Every single time you went, whether it was before,

8         during, or after 2006?

9    A.   Before, no.

10   Q.   Let me ask you this.  The last time you saw

11        Raytayvian on 31st Street was during the first half

12        of 2006; correct?

13   A.   Correct.

14   Q.   Was his hair the same way it appears in Exhibit 373?

15   A.   Yeah.  I believe that's when they started to grow

16        their hair like that.

17   Q.   I'm talking about Raytayvian.  When you saw him, was

18        his hair like --

19   A.   The beginning of that.  It wasn't probably -- it

20        wasn't that long.

21   Q.   It was not that long?

22   A.   Right.

23   Q.   In 2006?

24   A.   Right.

25   Q.   Okay.  But it had already started to grow into --

```
 1    A.    Dreadlocks.

 2    Q.    Dreadlocks or whatever you call those?

 3    A.    Yes.

 4    Q.    Okay.  And was it colored?  Was it red?

 5    A.    To be specific, I don't remember.  I don't think so

 6          though.

 7    Q.    Okay.  Let me show you what's marked as Defendant's

 8          Exhibit 703.  Who is that a picture of?

 9    A.    That's their other brother, I believe.

10    Q.    What's his name?

11    A.    I don't know his name.

12    Q.    When you arrived at the house on 31st Street the last

13          time you went there in 2006, which is the time you

14          say Raytayvian Simpson was in the car with Monterial

15          Wesley, was Wesley's car already there parked?

16    A.    No.

17    Q.    So you parked first, and then he pulled up behind

18          you?

19    A.    Yes, sir.

20    Q.    And did you leave first and they remained there?

21    A.    Yes, sir.

22    Q.    Okay.  Now, if, as you told the police, this was

23          Mr. Simpson's mother's house, it would make sense for

24          him to go with his brother for a ride to the house;

25          right?
```

1    MS. MOREHEAD:  Judge, I'm going to object.

2    Calls for speculation.

3    THE COURT:  Overruled.

4    Q.   (By Mr. Rogers) Wouldn't that make sense?

5    A.   State that again.

6    Q.   If that, as you told the police, was Mr. Simpson's

7    mother's house, Mr. Wesley's mother's house, it would

8    make sense for him, for Mr. Simpson, to ride with his

9    brother to his mother's house?

10   A.   Yeah.

11   Q.   Do you know where DeAnthony Simpson lived?

12   A.   No.

13   Q.   At the time that they pulled up behind you, you were

14   looking in your rearview mirror; is that correct?

15   A.   Yes.

16   Q.   You didn't turn around and study the people in the

17   car, did you?

18   A.   No.

19   Q.   You just sat there waiting for Mr. Wesley to come up

20   and get in the passenger's side of your car?

21   A.   Yes.

22   Q.   So all you have is a view through your rearview

23   mirror, through your rear window?  What kind of car

24   are you driving, by the way?

25   A.   I have a Lexus then.

```
 1   Q.   Was it a sedan or an SUV?

 2   A.   Sedan, four-door.

 3   Q.   And what kind of car was Monterial in that time?

 4   A.   A truck, Cadillac Escalade.

 5   Q.   Cadillac Escalade?

 6   A.   Uh-huh.

 7   Q.   Tinted windows?

 8   A.   Yeah.

 9   Q.   And so you had a very limited view of whoever else

10        might have been with him, didn't you?

11   A.   If it was at night, I would say yes, but during the

12        day you can see in the cars.

13   Q.   You can see into cars through the tinted windshield?

14   A.   During the day you can, yeah.

15   Q.   During the day.  And were you paying attention to who

16        was there?

17   A.   Yeah.  I pay attention because the neighborhood was

18        bad.

19   Q.   Were you paying attention to who was in the driver's

20        seat when Mr. Wesley's coming up and getting into the

21        passenger's seat?

22   A.   No.

23   Q.   Okay.  Did you ever meet a man named Thomas Humphrey?

24   A.   Not on the street, no.

25   Q.   Before you were locked up on this case?
```

1    A.    No, never met him.

2    Q.    And you have no idea from your own personal knowledge

3          whether there ever were any meetings between him and

4          Monterial Wesley?

5    A.    No.

6    Q.    And you have no idea whatever happened at any

7          meetings between Thomas Humphrey and Monterial

8          Wesley?

9    A.    No.

10   Q.    Or whoever accompanied either of them to any

11         meetings; correct?

12   A.    Correct.

13   Q.    You were arrested on this case February 5, 2008,

14         decided that you would cooperate with the government

15         in an effort to lighten your own consequences;

16         correct?

17   A.    Yeah.

18   Q.    And you started that at the time of your arrest, and

19         then you had a lawyer appointed for you, Mr. DeHardt,

20         and then you met with him and got some notion of what

21         you were facing under the Federal Sentencing

22         Guidelines and redoubled your efforts to cooperate,

23         didn't you?

24   A.    Yeah.

25   Q.    And what you did was have your lawyer arrange for

```
 1        what's called a proffer interview?

 2   A.   Right.

 3   Q.   And what that is is a session at which you are able

 4        to show the government what information you could

 5        provide to them if they give you what you want,

 6        correct, or what you're willing to accept?

 7   A.   Correct.

 8   Q.   And so that is the interview we're talking about on

 9        March 11 of 2008; correct?

10   A.   Correct.

11   Q.   And at that time you knew that Mr. Wesley had been

12        charged?

13   A.   Yeah.

14   Q.   And you had some idea from talking to your lawyer

15        about what other people had been charged; correct?

16   A.   I had my indictment papers, so . . .

17   Q.   Right.  So you knew who all was charged?

18   A.   Right.

19   Q.   And you knew some of these people, and some of these

20        people you didn't?

21   A.   Right.

22   Q.   It's fair to say that to this day you have never

23        claim to have purchased any illegal drugs from

24        Rtayvian Simpson; right?

25   A.   Purchased from him, correct, I haven't purchased
```

1        anything from him.

2   Q.   And he has never been directly involved in any

3        illegal drug transaction in which you were involved

4        or which you personally witnessed, has he?

5            MS. MOREHEAD:   Judge, I'm going to object.

6        That goes to the ultimate issue.

7            THE COURT:   Overruled.

8   A.   Will you say at that again.

9   Q.   (By Mr. Rogers) Raytayvian Simpson has never been

10        personally involved in any drug transaction in which

11        you were involved or which you personally witnessed,

12        has he?

13   A.   No, besides being the driver.

14   Q.   All right.   And we already agreed that that could

15        just be getting a ride to his mama's house; right?

16   A.   Correct.

17   Q.   But at the time that you gave your proffer interview

18        you knew that the more valuable the prosecution

19        thought your information was the more likely you

20        would be to get the 5K1 motion; right?

21   A.   I just told them what I knew.

22   Q.   Did you hear the question?

23   A.   Repeat it again.

24   Q.   At the time you gave your proffer interview, you knew

25        that the more valuable the prosecution thought the

```
 1            information you gave them was the more likely you

 2            would be to get your 5K1 motion?

 3   A.   No.

 4   Q.   You didn't know that?

 5   A.   No, I didn't.

 6   Q.   You and your lawyer never discussed that?

 7   A.   We discussed --

 8                MS. MOREHEAD:  Judge, I'm going to object

 9            to anything he and his lawyer talked about.  That

10            would be attorney/client privilege, and Mr. Rogers

11            can't delve into that.

12                MR. ROGERS:  I'll rephrase it, Judge.

13                THE COURT:  Thank you.

14   Q.   (By Mr. Rogers) Ms. Morehead asked you quite a bit

15            about substantial assistance; correct?

16   A.   Substantial assistance?  She asked me -- asked me to

17            tell truthfully, what I knew, my part.

18   Q.   She told you just this afternoon that whether or not

19            a 5K1 motion is filed would depend upon the

20            government's determination of whether they believed

21            you had provided substantial assistance; correct?

22   A.   Correct.

23   Q.   And that's the phrase that appears also in your plea

24            agreement that you signed; right?

25   A.   I believe so.
```

1   Q.   Substantial assistance?  And that is -- substantial,

2        you know what that word means; right?

3   A.   Yeah.

4   Q.   And so the more helpful the government finds your

5        information, the more substantial is the assistance

6        they think you've provided; right?

7   A.   Right.

8   Q.   And so the more people you can give information on --

9   A.   Right.

10  Q.   -- the more likely they are to think you've provided

11       substantial assistance; correct?

12  A.   I just tell what I know, yeah.

13  Q.   Is that correct?

14  A.   Correct.

15  Q.   Okay.  And you knew that in your own mind based upon

16       whatever conversations you had with whoever when you

17       had your proffer interview?

18  A.   Correct.

19  Q.   Now, when you were arrested, nobody told you who else

20       was charged in this case, correct, on February 5?

21  A.   Correct.

22  Q.   And so when you talked to the agents on February 5,

23       you didn't mention Mr. Simpson, did you?

24  A.   No.  They wasn't asking me about Mr. Simpson.

25  Q.   All right.  Now, and yet by the time you gave your

1    proffer interview on March 11, you knew Mr. Simpson

2    was charged in this case because you had the

3    indictment?

4  A.  Right.

5  Q.  And they showed you Mr. Simpson's photograph when

6    they were showing you other peoples' photographs that

7    they were asking you about; correct?

8  A.  Yeah.

9  Q.  So you knew they wanted to hear information about

10    Mr. Simpson?

11  A.  Like I said, I told them what I knew.

12  Q.  But you knew they wanted information about

13    Mr. Simpson; correct?

14  A.  Correct.

15  Q.  And you knew information about Mr. Simpson would help

16    you get what you hoped to get, a 5K motion, and a

17    motion that will allow sentencing underneath the

18    statutory minimum for the crime to which you've pled

19    guilty; correct?

20  A.  I knew that he's not one of the main people they

21    wanted, so I told what I knew.

22  Q.  Would you agree something is better than nothing?

23  A.  Right.

24  Q.  And so even though you didn't say he was one of the

25    main people, you were able to give some information

1        about him that you repeated for us today?

2   A.   Right.

3   Q.   Now, you're not a friend of Mr. Wesley and

4        Mr. Simpson these days, are you?

5   A.   Correct.

6   Q.   And before you were arrested in this case, you were

7        not their friend, were you?

8   A.   Correct.

9   Q.   In fact, you got into an altercation with Monterial

10       Wesley and Antwon Simpson back in April or May of

11       2007, didn't you?

12  A.   Yes, sir.

13  Q.   And that was at least a year after you quit doing any

14       business, as you say, with Monterial Wesley?

15  A.   Right.

16  Q.   And so that's another little incentive.  You can get

17       a little bit of revenge on the people who got into a

18       fight with you outside a bar in Lawrence, Kansas,

19       can't you?

20  A.   That's not how I was looking at it, so --

21  Q.   Didn't ever cross your mind?

22  A.   No.

23  Q.   But you mentioned it to the agents during that very

24       same interview, didn't you?

25  A.   That they jumped on me, yeah.

```
 1   Q.   And Rtayvian Simpson was not even there, was he?

 2   A.   No.  It was his other brother.

 3   Q.   It was his brother Antwon?

 4   A.   Antwon.

 5   Q.   Yet you were happy to give information about the

 6        people who you say jumped on you at the bar in

 7        Lawrence?

 8   A.   Again, I told them what I knew.

 9   Q.   They didn't ask you, did these guys jump on you, did

10        they?

11   A.   No.  But I think they already knew.

12   Q.   Let's go back to this 31st Street.  Let me show you

13        what's been marked as Exhibit 722.  Have you seen

14        that building before?

15   A.   No.

16   Q.   Let me show you what has been marked as Defendant's

17        Exhibit 719.  Have you seen that building before?

18   A.   No.

19             MR. ROGERS:  Those are all the questions I

20        have, your Honor.

21             THE COURT:  All right.  We will break five

22        minutes early, get you on your way.  All right.

23        Members of the jury, we will be in recess until 9:00

24        o'clock Tuesday morning, 9:00 o'clock Tuesday

25        morning.  Get the time right because last week it was
```

1       10:30, but now it's 9:00 next Tuesday morning.

2            Let me remind you of all the admonitions not to

3       discuss the case among yourselves or with anybody

4       else.  Don't have any contact with the participants

5       in the case.  Please don't do any research or

6       investigation or do anything about this case.  I'm

7       sure you realize the importance of that, of why

8       you're the only people who really will know the whole

9       story.  Please limit yourself to what you receive

10      here in the courtroom.

11           Ms. Scheurer, please take charge of the jury.

12      Counsel and the participants, please remain here.

13      And whenever need be the marshals may take Mr. Brown.

14                (The following proceedings were had outside

15      the presence of the jury:)

16                THE COURT:  Is there anything we should do

17      before we break?

18                MS. MOREHEAD:  I have one thing.

19                THE COURT:  Mr. Calbi?

20                MR. CALBI:  It may be the same thing that

21      Ms. Morehead is going to bring up.

22                MS. MOREHEAD:  I think it is.

23                MR. CALBI:  I believe Mr. DeHardt's

24      schedule on Tuesday is pretty jammed up, and if Ms.

25      Morehead wants to take a witness out of order --

```
 1                    MS. MOREHEAD:  I hadn't talked to him about
 2        that, I guess.
 3                    MR. CALBI:  I, at least on Mr. Wesley's
 4        behalf, wouldn't have any objection, like we had to
 5        do last week to accommodate -- I know Mr. DeHardt's
 6        may have some problems being here on Tuesday, but
 7        I'll leave that up to the district attorney.  I just
 8        thought I would state that.
 9                    MR. DeHEARDT:  Judge, I will try to get
10        myself covered.  I have to go to Louisburg, Kansas,
11        for the KCMBA to participate in a mock trial.  I got
12        jammed up last week, and they canceled it, and we
13        scheduled it for next Tuesday morning so I could
14        participate.  If I can find somebody to do that for
15        me, I will be back here.  And, frankly, I am going to
16        lean all over my bride.
17                    THE COURT:  We have a bunch of volunteers.
18                    MR. DEHEARDT:  Mr. Rogers, I'm sure, would
19        be glad to do that.  I'm going to, frankly, call my
20        bride and see if I can convince her to conduct this
21        mock trial.
22                    THE COURT:  We will work with you, if you
23        need to.  I assume no one else has any objection.
24                    MS. MOREHEAD:  He will let me know on
25        Monday.
```

```
 1              Judge, that wasn't what I was going to bring up.
 2      Obviously, Mr. Brown was testifying, and I had honed
 3      him into 2006, 2007, and then Mr. Rogers promptly
 4      opened the door, trying to impeach him, that he said
 5      there were all these other occasions before that.
 6      And, in fact, there were other occasions when
 7      Rtayvian Simpson was involved, and I had tried to be
 8      succinct in that, and I intend in redirect to get
 9      back up and fully delve into that now.  So I wanted
10      to mention that I felt like Mr. Rogers had fully
11      opened the door for me to do that, which was
12      obviously outside of the charged conspiracy, and I am
13      going to come back and ask Mr. Brown about that now.
14              THE COURT:  Mr. Rogers?
15              MR. ROGERS:  I don't know that I opened the
16      door.  I thought he kind of tried to open the door
17      himself, and it was ludicrous on its face because
18      before that Mr. Simpson would not have been old
19      enough to be driving.
20              THE COURT:  All we have in that regard is
21      that Mr. Brown said that many times before 2006 he
22      went to the house on 31st Street and Mr. Simpson was
23      there.  Now, whether he drove there or somebody drove
24      him there, I really don't know that.
25              MR. ROGERS:  Or whether he lived there.
```

1           THE COURT:  Or whether he lived there.  We

2       don't know any of that.  And, by the way, in light of

3       the allegations in this case, I suppose Mr. Simpson

4       could conceivably have driven at an earlier age than

5       one might expect under the appropriate licensing

6       laws.  That would be theoretically possible.

7           MR. ROGERS:  He was driving because Mr.

8       Wesley's license was suspended.

9           THE COURT:  I understand.  I don't know

10      about any of that aspect, but it depends upon what

11      you mean by thinking the door is open.  What

12      additional evidence would Mr. Brown be able to

13      testify to?  I certainly don't know myself.

14          MS. MOREHEAD:  He would provide information

15      that there were other occasions that Mr. Rtayvian

16      Simpson drove Mr. Wesley to drug transactions, other

17      than the one that I honed him in on between 2006 and

18      2007.  So that was --

19          THE COURT:  Tell me more about it.  I need

20      more detail than that.

21          MS. MOREHEAD:  There were multiple

22      occasions --

23          THE COURT:  Do you have some kind of

24      something I could look at so you wouldn't have to sit

25      and --

1          MS. MOREHEAD:  I have his proffer

2     interview, Judge.  I would be happy to show you that.

3          THE COURT:  Let's have a look at that.

4          MS. MOREHEAD:  You guys have these in your

5     notebooks.

6          THE COURT:  The reason I asked to see it is

7     because I think the door is only open for a very

8     limited purpose.  That is this:  Pre-charged

9     conspiracy actions are sometimes admissible to show

10    the lead-up to the conspiracy, but that's not what

11    you're arguing.  Second, it could be 404(b) evidence

12    upon notice, but no notice of utilizing this as

13    404(b) was given.  The only thing I see the door open

14    for is the extent to which the certainty of Mr.

15    Brown's opinion that he saw Mr. Simpson on the day in

16    question is bolstered by the fact of how well he

17    knows Mr. Simpson and how many times or how

18    frequently he has seen Mr. Simpson.

19         MS. MOREHEAD:  Right.

20         THE COURT:  To that extent you can go

21    back -- but I would not permit you to tie it to,

22    quote-unquote, drug transactions.

23         MS. MOREHEAD:  Very well.  Judge.

24         THE COURT:  I think that would not be

25    appropriate.

1          MS. MOREHEAD:  Very well.

2          THE COURT:  All right.  Anything else in

3     here?  Are you seeking --

4          MR. BELLEMERE:  No.  I'm just walking

5     around, Judge.  At my age I'm worried about blood

6     clots.

7          THE COURT:  That's a pretty good note to

8     end on, don't you think?  See you all next Tuesday.

9     Until then we are in recess.

10          (Court was adjourned.)

11                    * * * * *

12          TUESDAY, APRIL 28, 2009

13          THE COURT:  We had a juror who ran just a

14     little bit late.  We're all set to go now if you are

15     ready to go.  If there's nothing further then, we

16     will bring in the jury.

17          (The following proceedings were had in the

18     presence of the jury:)

19          THE COURT:  Welcome back.  Counsel, you may

20     proceed with cross examination.

21          MR. CALBI:  Judge, I believe Mr. Rogers was

22     done, so I believe I was next on the list.

23

24

25

1    BYRON JEROME BROWN (CONT'D),

2  having been previously duly sworn, was examined and

3  testified as follows:

4              CROSS EXAMINATION

5  BY MR. CALBI:

6  Q.   Mr. Brown, my name is Robert Calbi, and I represent

7       Mr. Monterial Wesley.  I want to review a couple

8       things from Friday to make sure I got my facts

9       straight.  I believe you testified that in 2006 you

10       bought cocaine from Mr. Wesley approximately three

11       times; is that correct, sir?

12  A.   Yes.

13  Q.   And you didn't make any purchases as the best of your

14       recollection goes in 2007; is that correct?

15  A.   Correct.

16              MR. CALBI:  Judge, could I have permission

17       to turn Mr. Brown's microphone?  I think it's facing

18       out.

19              THE COURT:  Thank you.  Thank you for

20       noticing that.

21              MR. CALBI:  Thank you.

22  Q.   (By Mr. Calbi) Those three purchases that you made

23       from Monterial Wesley in 2006, do you know

24       approximately what part of the year it was in 2006?

25       Was it in the beginning of the year, middle of the

```
 1          year, end of the year?  Do you have any recollection?

 2   A.     I would say towards the beginning of the year.

 3   Q.     And your testimony was, I believe, a couple of sales

 4          were made somewhere on 31st Street in Kansas City,

 5          Missouri; is that correct?

 6   A.     Yes, sir.

 7   Q.     And another one was made somewhere out off I-35 and

 8          Holmes Road?

 9   A.     No.  That was before '06.  The other one was to

10          McDonald's, down the street.

11   Q.     So all three sales in 2006 then took place somewhere

12          on 31st Street in the Kansas City area?

13   A.     Yes, sir.

14   Q.     The amounts that you purchased from Mr. Wesley, do

15          you recall what those were, sir?

16   A.     9 ounces and 18 ounces.

17   Q.     Out of the three purchases were two of them 9s and

18          one 18 or all three 9s?  Do you have a recollection

19          as to what those amounts were?

20   A.     Two 9s and an 18.

21   Q.     In 2006 and 2007 were you purchasing cocaine from

22          anyone else during that time period?

23   A.     Yes, sir.

24   Q.     Was that Mr. Grigsby?

25   A.     Yes, sir.
```

1    Q.   And what amounts were you purchasing from Mr.

2         Grigsby?

3    A.   I was getting kilos from him.

4    Q.   Okay.  And were you buying those kilos in bulk, like,

5         each time you were just purchasing 1 kilo from Mr.

6         Grigsby?

7    A.   Depends, yeah, but yeah, one or two.

8    Q.   Now, you've spoken to law enforcement, I believe, two

9         times, Mr. Brown, the first being on the day you were

10        arrested.  I believe that was February 5 of 2008; is

11        that correct?

12   A.   Yes, sir.

13   Q.   Okay.  And I want to focus in on that interview that

14        you had with law enforcement on that day.  Do you

15        recall if you were questioned about Mr. Wesley during

16        that first interview on February 5 of 2008?

17   A.   No, I don't think so.  I don't think I was.

18   Q.   To the best of your recollection you don't believe

19        you were questioned about Mr. Wesley?

20   A.   Maybe asked did I know him.

21   Q.   I'm sorry?

22   A.   Maybe asked did I know him.

23             JUROR BRUNS:  Could we scoot the microphone

24        closer to him, please.

25             THE COURT:  All right.  They are still

```
 1          having trouble hearing you, Mr. Brown.  If you would

 2          speak up and speak directly into the microphone, or

 3          we will scoot the microphone directly towards you.

 4                    JUROR BRUNS:  Thank you.

 5    Q.   (By Mr. Calbi) Do you recall, Mr. Brown, also during

 6          that February 5 interview with law enforcement if you

 7          had any discussions about Mr. Grigsby?

 8    A.   I believe so, yes, sir.

 9    Q.   Okay.  And do you recall what you told law

10          enforcement about your involvement with Mr. Grigsby

11          on February 5 of 2008?

12    A.   No, I don't.

13    Q.   Okay.

14                    MR. CALBI:  Your Honor, may I approach the

15          witness, please?

16                    THE COURT:  Yes, you may.

17    Q.   (By Mr. Calbi) Mr. Brown, I'm going to show you a

18          document and ask you to read Paragraph 3 and see if

19          that refreshes your recollection.  Please don't read

20          it out loud, but just read that paragraph to yourself

21          and let me know when you're done, please.

22              Reading that paragraph, sir, did that help

23          refresh your recollection as to what you told law

24          enforcement on February 5, 2008, concerning Mr.

25          Grigsby?
```

```
 1    A.   Yes.

 2    Q.   Okay.  And does reading that report refresh your

 3         recollection as to the amount of cocaine that you

 4         were purchasing from Mr. Grigsby at that time?

 5    A.   Yes.

 6    Q.   Isn't it true that you were purchasing from Mr.

 7         Grigsby anywhere from 1 ounce to 9 ounces at that

 8         time?

 9    A.   At the beginning, yeah, when I started dealing with

10         him, yeah.

11    Q.   Okay.  And then that increased up to a kilogram at a

12         time?  Is that what your testimony is, sir?

13    A.   Yes, sir.

14    Q.   Reading that paragraph I showed you from the

15         February 5, 2008, interview, did that refresh your

16         recollection as to whether law enforcement asked you

17         about Mr. Wesley?

18    A.   Yes, sir.

19    Q.   And do you recall when you were questioned by law

20         enforcement about Mr. Wesley what you may have told

21         law enforcement about Mr. Wesley on February 5, 2008?

22    A.   Just what I read right there, yeah.

23    Q.   Okay.  So you have no independent recollection of

24         what you might have told law enforcement on

25         February 5 of 2008?
```

1   A.   No.  It's been over a year.

2   Q.   Okay.  Just so I'm clear, I believe you testified on

3        Friday, sir, that you don't consider yourself a

4        friend of Monterial Wesley.  As a matter of fact, the

5        two of you, for lack of a better term, really don't

6        get along at all; correct?

7   A.   Yeah.

8   Q.   And there was an altercation or a fight that you had

9        with a brother of Monterial Wesley's sometime in

10       2007; is that correct, sir?

11  A.   Correct.

12            MR. CALBI:  I have nothing further at this

13       time, your Honor.

14            THE COURT:  Mr. Bell?

15                 CROSS EXAMINATION

16  BY MR. BELL:

17  Q.   Your name is Byron Jerome Brown?

18  A.   Correct.

19  Q.   Also known as Bob G?

20  A.   Correct.

21  Q.   Your date of birth is --

22            MS. MOREHEAD:  Judge, I'm going to object.

23       Could we approach or --

24            THE COURT:  You may.

25            (Counsel approached the bench and the

```
 1          following proceedings were had:)

 2                    THE COURT:  Why are you objecting?

 3                    MS. MOREHEAD:  I'm not sure why we're

 4          putting his date of birth on the record.

 5                    MR. BELL:  Just to confirm identity, Judge.

 6                    THE COURT:  Is there any reason we need to

 7          have -- the date of birth doesn't bother me so much.

 8          Are there other identifiers you're looking for?

 9                    MR. BELL:  This witness has a prior felony

10          on his record, information that was obtained by the

11          government's disclosure, but my independent

12          research -- I want to make sure my information is

13          correct as to who this person is.

14                    THE COURT:  Is it different from what the

15          government --

16                    MR. BELL:  They didn't disclose what his

17          birthday was to me.

18                    THE COURT:  I'm sorry.  Did the government

19          disclose to you his prior felony?

20                    MR. BELL:  They did disclose it.  However,

21          the other information I obtained was based on my

22          search of the Department of Corrections website.

23                    THE COURT:  You think you have found

24          another felony conviction for this individual?  Is

25          that what you're saying?
```

1           MR. BELL:  I do not, Judge.  The

2      information that the government showed me matched up

3      with what I found.  What the sentence was, the length

4      was more than a year that he actually served, and

5      what the actual convictions were for is, again,

6      supplanted by my own research.

7           THE COURT:  Do you know anything about

8      this?

9           MS. MOREHEAD:  No.  I've disclosed that.  I

10      don't know what he thinks he's doing with this, and I

11      have a problem with putting someone's date of birth

12      on the record when there's no reason to do that

13      because of privacy restrictions.  I'm not sure where

14      he is going.

15           THE COURT:  I don't either because I'm

16      trying to understand what you are trying to do with

17      regard to this information.  I'm just not clear what

18      you're saying.

19           MR. BELL:  I will say that the government

20      disclosed a handwritten thing saying he had a

21      conviction for theft and burglary, and they had the

22      case number.  I took that information and put Mr.

23      Brown's name into the KDOC website and came up with

24      the date of conviction, how long he was sentenced,

25      and inmate information.  Again, I want to be able, as

1    part of cross examination, to be able to extrapolate

2    those facts out, not the actual length of sentence,

3    but that it was more than a year.

4              THE COURT:  Does the government contest

5    that he was convicted of a prior felony?

6              MS. MOREHEAD:  No, Judge.  And I don't

7    think the length of the sentence has anything to

8    do --

9              THE COURT:  As long as it's a felony, he

10   can be cross examined by virtue of the fact -- and

11   there's not an age issue here?

12             MS. MOREHEAD:  Could I get that, Judge?

13             MR. BELL:  It's a '96 conviction.

14             MS. MOREHEAD:  It's been longer than ten

15   years.

16             THE COURT:  Then it would have to involve

17   dishonesty or that sort of thing.

18             MR. BELL:  It's a theft conviction.

19             THE COURT:  Which probably doesn't fit

20   that --

21             MS. MOREHEAD:  Could I just get that

22   information, Judge?

23             THE COURT:  Yeah.

24             MR. BELL:  Judge, if my information is

25   correct --

1     THE COURT:  Why don't you wait for Ms.

2     Morehead to come back.

3           MS. MOREHEAD:  Judge, I'm not actually

4     showing that.  I did not disclose that because I did

5     not have that as part of my record, so I don't know

6     where he obtained that.  He said he got it from the

7     Kansas Department of Corrections website, which I --

8           MR. BELL:  I can show you the notebook

9     where they have it written down as a disclosure to

10    us.

11          MS. MOREHEAD:  It is?

12          MR. BELL:  It's handwritten.

13          MS. MOREHEAD:  Oh, I do remember that now.

14          THE COURT:  I'm looking at Rule 609(b),

15    which provides that evidence of a conviction more

16    than ten years old is not admissible unless the

17    proponent gives the adverse party sufficient advance

18    written notice of attempt to use such evidence and

19    provides the adverse party with the fair opportunity

20    to contest the use of such evidence.

21        Obviously, Mr. Bell, you didn't give notice to

22    the government, as I would guess, beyond what they

23    disclosed to you.

24          MR. BELL:  I did not, Judge, and in that

25    instance I would say that the government knew about

1     it because I didn't know about it until they told me

2     about it.

3            THE COURT:  But you're now trying to

4     develop more information about it than what the

5     government knew, and I'm still trying to figure out

6     what you want to do.  Are you wanting to say were you

7     convicted of a felony in '97?

8            MS. MOREHEAD:  1996.

9            THE COURT:  1996, whatever the year was,

10    that was more than ten years ago.  Is there some

11    detail you're trying to get into?

12           MR. BELL:  My understanding is that the

13    operation is from whenever he was released from

14    custody.  It's my understanding he was released from

15    custody in August of '99, so that would make it back

16    within the ten years.

17           THE COURT:  Okay.  That would be correct,

18    that it's not admissible if a period of more than ten

19    years has elapsed since the date of the conviction or

20    the release of the witness for the confinement

21    imposed, whichever is the later date.

22           MR. BELL:  I don't know if my information

23    is correct unless I can corroborate that with him.  I

24    got my information from the KDOC website.

25           THE COURT:  But the only thing you're

```
 1        interested in is the fact of the conviction?

 2                   MR. BELL:  That is correct.

 3                   MS. MOREHEAD:  I don't dispute that, Judge.

 4                   THE COURT:  In that case ask him about the

 5        fact of the conviction.  I will find that, in fact,

 6        the probative value does outweigh any unfair

 7        prejudicial effect if it's limited to the fact of the

 8        conviction, so even if it is more than ten years, you

 9        can use it.  Will that solve the problem?

10                   MR. BELL:  Yeah, it will.

11                   (The proceedings returned to open court.)

12   Q.   (By Mr. Bell) Mr. Brown, you're a convicted felon?

13   A.   Yes, sir.

14   Q.   You were convicted of burglary of a dwelling?

15   A.   Yes, sir.

16   Q.   You were also convicted of theft?

17   A.   Yes, sir.

18   Q.   I believe that we talked a little bit -- not we, but

19        you were asked a little bit about if you -- what your

20        guideline sentence would be if you were convicted in

21        this case.  Do you remember that?  Last week?

22   A.   Yes.

23   Q.   You said at the time you agreed to enter your guilty

24        plea you didn't know what your guideline range was

25        going to be?
```

1    A.    Correct.

2    Q.    However, between then and now you've had a chance to

3          figure that out; right?

4    A.    No, not yet.

5    Q.    Surely you have some idea.  You've gone over the

6          guidelines and what they mean for you; right?

7    A.    I've seen the list.  I don't know where I'm at on the

8          list.

9    Q.    So if I understand your testimony correctly, up to

10         this point, even before you entered your guilty plea,

11         you had no idea what your potential sentence would

12         be?

13   A.    Ten to life.

14   Q.    Ten to life, but you never even went over the

15         guidelines with your attorney to see what your

16         potential sentence could be under the guidelines?

17   A.    No.

18   Q.    And you understand that the guidelines are going to

19         control what sentence you get because of your plea

20         agreement; correct?

21   A.    Correct.

22   Q.    But you never thought it was important to actually

23         see what that sentence would be?

24   A.    Don't you have to do a PSI first?

25   Q.    Well, a PSI can be done, but you can go over it

1    yourself.  Wasn't it explained to you that you can go

2    over the guideline range yourself and get an idea

3    where you're going to end up?

4  A.  Yeah, but it's not going to be accurate.  Yeah.

5  Q.  Did you go through that process?

6  A.  I kind of did, but still it's not accurate, so --

7  Q.  Okay.  So you kind of went through it and got an idea

8    of, hey, it looks like I'm going to be somewhere

9    around this area; right?

10  A.  I hope I'm somewhere around this area.

11  Q.  But you knew it wasn't going to be exactly correct

12    because at the end of the day you know the judge is

13    going to sentence you?

14  A.  Right.

15  Q.  But you still got an approximate idea of where you

16    thought you might end up?

17  A.  Hope I might end up, yeah.

18  Q.  Okay.  Did you get an idea -- when you were going

19    through there, you got an idea of what your severity

20    level was going to be; is that right?

21  A.  Yeah.

22  Q.  Okay.  And your severity looked somewhere between 32

23    and 36; is that right?

24  A.  I believe so.

25  Q.  Okay.  And because of that prior felony conviction

```
 1        you're going to end up in a Criminal History Category

 2        II or III; is that right?

 3   A.   No.  I was probably thinking a little higher.

 4   Q.   So you understand that under the guidelines if you

 5        were at Severity Level 36, three or four

 6        criminal history points, you were look at anywhere

 7        between 19 and 24 years; right?

 8   A.   I guess.  I'm not sure.

 9   Q.   And then you were also aware that just by deciding to

10        enter your plea agreement with the government that

11        you would get a few points knocked off your severity

12        level for acceptance of responsibility?

13   A.   Yes.

14   Q.   And by virtue of that the government agreed to knock

15        a further point off for acceptance of responsibility

16        as part of your plea agreement?

17   A.   Three points, yeah.

18   Q.   Three points.  And you're aware that by doing that

19        your severity level went down to anywhere between 14

20        and 17 years; right?

21   A.   Okay.

22   Q.   And the government also agreed to recommend the low

23        end of the guidelines, that you be sentenced to the

24        low end?

25   A.   Right.
```

```
1    Q.   So that brought you down to actually 14 years?

2    A.   Correct.

3    Q.   Okay.  And so before, when you were looking at

4         anywhere between 24 years, now, just by virtue of

5         your agreement with the government, you're looking at

6         closer to 14 years; is that accurate?

7    A.   Yeah.

8    Q.   All right.  Now, you were also aware that the

9         government, if they find that you provided

10        substantial assistance to them, can file something

11        called a 5K; right?

12   A.   Right.

13   Q.   And that would reduce your sentence even further?

14   A.   Correct.

15   Q.   And they can also file a motion under 3553(e); right?

16   A.   Correct.

17   Q.   And that's important because that can get you out

18        from underneath the ten-year mandatory minimum;

19        right?

20   A.   Right.

21   Q.   So you could actually be doing less than ten years

22        when this is all said and done?

23   A.   Correct.

24   Q.   But you're also aware that the only party, the only

25        one who can decide to file those motions to get you
```

```
 1        out from underneath the ten years is the government;
 2        right?
 3   A.   Correct.
 4   Q.   Your lawyer can't file it?
 5   A.   Correct.
 6   Q.   The judge can't make them do it?
 7   A.   Correct.
 8   Q.   They have to be satisfied with your testimony?
 9   A.   Correct.
10   Q.   And that's the only way that you get out from
11        underneath ten years?
12   A.   Correct.
13   Q.   All right.  Did the government also agree not to
14        charge you -- strike that.  I believe on direct
15        examination you testified that you sold to
16        Mr. Trinkle both powder cocaine and crack cocaine; is
17        that right?
18   A.   Correct.
19   Q.   Do you remember talking to the officers in this case
20        on March 11, 2008?
21   A.   Correct.
22   Q.   And when you were doing those debrief sessions, they
23        basically show you pictures and say, do you know this
24        person?  Right?
25   A.   Correct.
```

1    Q.   All right.  And they showed you Mr. Trinkle's

2        picture?

3    A.   I believe so, correct.

4    Q.   And you said, yes, I know this person?

5    A.   Correct.

6    Q.   And they said, tell us what you know about this

7        person.  Right?

8    A.   Yeah, correct.

9    Q.   Now, at that time you didn't tell the officers that

10      you ever sold Billy Trinkle crack, did you?

11    A.   I don't recall.

12             MR. BELL:  May I approach the witness,

13      Judge?

14             THE COURT:  You may.

15    Q.   (By Mr. Bell) I have a paragraph circled here, Mr.

16      Brown.  If you could read that paragraph, and it

17      continues onto the next page.  You don't need to read

18      it out loud, but let me know when you're finished

19      reading it.  Are you finished reading that?

20    A.   Uh-huh.

21             MR. BELL:  May I approach?

22             THE COURT:  Yes, you may.

23    Q.   (By Mr. Bell) Is your recollection refreshed as to

24      whether you ever told the government if you sold

25      Billy Trinkle crack?

```
 1   A.   Yeah, by reading that, yeah.

 2   Q.   You never told them that, did you?

 3   A.   I don't think on that one.  I think the first time I

 4        did.

 5   Q.   You think the first time you talked to them you told

 6        them?  And that would have been when you were

 7        arrested on February 5?

 8   A.   Uh-huh.

 9             MR. BELL:  May I approach?

10             THE COURT:  Yes.

11   Q.   (By Mr. Bell) Go ahead and read through this

12        document.  Don't read it out loud.  Just let me know

13        when you're finished.  Have you had a chance to

14        review that?

15   A.   Yeah.

16             MR. BELL:  May I approach?

17             THE COURT:  You may.

18   Q.   (By Mr. Bell) Isn't it true, Mr. Brown, that you

19        didn't tell police then, on February 5, that you ever

20        sold Billy Trinkle crack cocaine, did you?

21   A.   No, I didn't.

22   Q.   You never even mentioned Billy Trinkle's name at all

23        on February 5, did you?

24   A.   No, I didn't.

25   Q.   And it was only after February 5 that you got the
```

1       list of people who were indicted with you; is that

2       right?

3  A.   No.  We got it that day.

4  Q.   All right.  So on that day or after that day, that's

5       when you realized he was on the case with you?

6  A.   Correct.

7  Q.   It was only after that day that you mentioned Billy

8       Trinkle's name to the police?

9  A.   Yes.

10 Q.   I believe you also testified on direct examination

11      that you sold Mr. Trinkle sevens or quarter ounces of

12      cocaine; is that right?

13 A.   Correct.

14 Q.   We already know in February when you were arrested

15      you didn't say anything about Billy Trinkle at all to

16      the police; correct?

17 A.   Correct.

18 Q.   Are you also aware that when you sat down with the

19      police and they asked you to tell us everything you

20      know about Billy Trinkle on March 11 you never said

21      anything about selling sevens or quarter ounces to

22      Billy Trinkle, did you?

23 A.   Correct, no.

24 Q.   All right.  So the first time we're hearing anything

25      about you selling sevens or quarter ounces to

1     Mr. Trinkle is in court today; right?

2  A.  Correct.

3  Q.  Because you didn't tell the police that in February,

4     did you?

5  A.  Correct.

6  Q.  You didn't tell them in March when they said, tell us

7     everything you know; right?

8  A.  Correct.

9  Q.  So the first time we're hearing it, today in court?

10  A.  Correct.

11  Q.  Now, you entered a plea agreement in this case; is

12     that right?

13  A.  Correct.

14  Q.  And as a part of that plea agreement you had to sign

15     off on a factual basis for your plea?

16  A.  You mean --

17  Q.  Meaning, your plea agreement, there was a whole list

18     of facts, of things that happened during the

19     conspiracy, and you had to sign and agree that that

20     had all happened?

21         MS. MOREHEAD:  Judge, I'm going to object.

22     Could we approach?

23         THE COURT:  Yes.

24         (Counsel approached the bench and the

25     following proceedings were had:)

1        THE COURT:  Mr. Bell, where do you intend

2    to go with this?

3        MR. BELL:  It's a prior inconsistent

4    statement, Judge.

5        THE COURT:  The problem is this:  At the

6    plea colloquy I ask these individuals -- where they

7    have this statement that is put in a plea agreement

8    that says this is evidence we think could be

9    presented at trial, I ask the lawyer whether the

10    lawyer's reviewed the discovery and is this

11    consistent with what the lawyer thinks evidence could

12    be produced.  Yeah.  And I ask the individual, now,

13    as to the specific allegations concerning you in

14    here, do you admit that these are true?  So this is

15    not a statement by Brown.  This is part of what they

16    collectively are indicating they think evidence could

17    be presented at trial.

18        MR. BELL:  Okay.

19        THE COURT:  I don't intend to allow anybody

20    to cross examine from that -- from the plea agreement

21    under Rule 403 because if we go into that as an

22    attempted prior inconsistent statement it would be

23    appropriate to have the actual colloquy that took

24    place at the plea to clarify exactly what occurred

25    and to explore the understanding of what this

1     statement having to do with the factual basis was in

2     the plea agreement because I do not consider that as

3     a statement having been made by the individual other

4     than the extent to which he's just saying, I don't

5     contest that this stuff could come in at trial.  Is

6     there something specific from that that you are

7     focusing in on?

8                MR. BELL:  There is, Judge.  First off,

9     there's no admission that he sold quarters.  It just

10    says eightballs of drug quantity.  Second off, in the

11    factual basis it actually says crack cocaine; it

12    doesn't say anything about soft cocaine or powder

13    cocaine; whereas, in the other statements he's made

14    it just says soft cocaine.  So there are two

15    inconsistencies, one drug quantity and drug type.

16               THE COURT:  Now, what you want to do with

17    him is not go into the entirety of the statement but

18    to ask him about those two specific points?

19               MR. BELL:  That's correct.

20               THE COURT:  Ms. Morehead?

21               MS. MOREHEAD:  Judge, the problem is, the

22    plea colloquy is just what you described.  You ask,

23    is this the evidence that you think the government

24    could prove if, in fact, you went to trial?  And

25    that's exactly what the government would be able to

```
 1          prove.  Now, we don't have the benefit of his
 2          testimony if we go to trial, so that's all that we're
 3          allowed to put forth at that point.  Whether there's
 4          additional information or, you know, different
 5          information that he would bring out if he went to
 6          trial, we're not in a position to be able to explain
 7          that.  By him piecemealing a few sentences out of
 8          a -- I think the factual basis is eight or ten pages
 9          long, so I think being able to do that would take it
10          out of the entire context that it was offered for.
11                    MR. BELL:  Judge, it's just one sentence.
12                    THE COURT:  Why don't you show me exactly
13          what you've got there so I can see it.
14                    MR. BELL:  Sure.  This is the underlying
15          sentence.
16                    THE COURT:  The way -- here is what I
17          think.  I think that because the Paragraph 3 on
18          page 2 says that the parties agree the facts
19          constituting the offense to which the defendant is
20          pleading guilty are as follows, and doesn't say that
21          the parties agree that the following evidence would
22          be produced at trial, which is the way the plea
23          colloquy is done, I would let you go to that
24          statement, but the government would be entitled to
25          come back on redirect to clarify that.
```

```
 1              Now, I'm concerned that that opens the door to a

 2       whole extraneous discussion about the plea colloquy,

 3       but the statement here about eightball quantities is

 4       what he says in connection with the statement that is

 5       characterized by the government as constituting the

 6       facts of the offense, so I would permit you to do

 7       that.

 8              MR. BELL:  Thank you, Judge.

 9              (The proceedings returned to open court.)

10   Q.  (By Mr. Bell) Mr. Brown, you entered a plea agreement

11       in this case; right?

12   A.  Correct.

13   Q.  As part of that agreement there was a factual basis

14       that was laid out that described everything that had

15       happened during the course of the conspiracy?

16   A.  Correct.

17   Q.  All right.  And you remember reviewing that document

18       with your attorney?

19   A.  Correct.

20   Q.  And then you had to sign it?

21   A.  Correct.

22   Q.  Is that right?  Do you remember in that document that

23       you only stated that you sold eightball quantities of

24       cocaine to Mr. Trinkle?

25   A.  Correct.
```

1     Q.   And do you also remember that in the thing you signed

2          off on you said that you sold eightball quantities of

3          crack cocaine to Mr. Trinkle?

4     A.   No, I don't recall that.

5               MR. BELL:  May I approach?

6               THE COURT:  Yes, you may.

7     Q.   (By Mr. Bell) Have you had a chance to review that?

8     A.   Yes.

9     Q.   So you would agree with me, wouldn't you, Mr. Brown,

10         that in this document that you signed off on that you

11         told them -- that you stated that you were selling

12         eightballs of crack cocaine to Mr. Trinkle; correct?

13    A.   Yes.

14    Q.   Didn't say anything about quarter ounces or sevens?

15    A.   Correct.

16    Q.   However, it doesn't say anything about you selling

17         powder anyway here to Mr. Trinkle, does it?

18    A.   Correct.

19    Q.   Just says crack cocaine?

20    A.   Correct.

21    Q.   Let me see if I have this correct.  On February 8 of

22         2008 you don't mention Mr. Trinkle's name at all;

23         correct?

24    A.   Correct.

25    Q.   When you go to talk to the police in March and they

1    ask you to tell us everything you know about

2    Mr. Trinkle, you tell them that I sold him eightballs

3    of soft cocaine; right?

4  A.  Correct.

5  Q.  Don't mention anything about crack; right?

6  A.  Right.

7  Q.  Don't mention anything about quarter ounces; right?

8  A.  Right.

9  Q.  Okay.  Then when it's time for you to sign off on

10   your factual basis, you say that you sold Mr. Trinkle

11   eightballs of crack cocaine; right?

12 A.  That's what I signed to, yeah.

13 Q.  Doesn't say anything about quarter-ounce quantities?

14 A.  Not quarter ounce.

15 Q.  Doesn't say anything about soft cocaine?

16 A.  Correct.

17 Q.  Then when you come to trial today, you say that you

18   sold Mr. Trinkle quarter ounces; right?

19 A.  Uh-huh.

20 Q.  You sold -- and then you say you sold him both hard

21   and soft cocaine?

22 A.  Correct.

23 Q.  All right.  Mr. Brown, you believe that Mr. Trinkle

24   stole drugs from you at some point; correct?

25 A.  Correct.

1   Q.   And after that that's when you stopped dealing with

2        him?

3   A.   Correct.

4   Q.   All right.  Let me ask you this:  How much would you

5        sell -- say that you would sell a quarter ounce of

6        cocaine to Mr. Billy Trinkle?

7   A.   Two hundred bucks.

8   Q.   And how much would you sell an eightball of crack

9        cocaine to Mr. Trinkle for?

10  A.   A hundred bucks.

11            MS. MOREHEAD:  I'm sorry.  I did not hear

12       that.

13            THE COURT:  I'm sorry.  Could you repeat

14       your answer, please, Mr. Brown.

15  A.   200 and 100.

16  Q.   And for the soft how much would you sell a quarter

17       ounce for?

18  A.   Same price.

19  Q.   And how much were you buying kilogram quantities of

20       cocaine for?

21  A.   Twenty-two, maybe a little bit more sometime.

22  Q.   What does it mean to jump on someone else's case?

23  A.   When you find out some information about a person

24       that you do not know and jump on their case.

25  Q.   All right.  And the term jump on someone's case, does

1       that mean that that information that you get

2       necessarily has to be accurate?

3   A.  I don't really know because I ain't jumped on

4       nobody's case.

5   Q.  Have you ever encouraged others to jump on somebody

6       else's case?

7   A.  No.

8   Q.  You're sure?

9   A.  Uh-huh.

10              MR. BELL:  I have no further questions,

11      Judge.

12              THE COURT:  Does anyone else wish to cross

13      examine?  Mr. Sandage?

14                  CROSS EXAMINATION

15  BY MR. SANDAGE:

16  Q.  Mr. Brown, I represent Mr. Foy.  Couple things to

17      clear up from last week's testimony.  It was your

18      testimony on direct examination with Ms. Morehead

19      that you never purchased cocaine from Mr. Wesley; is

20      that correct?

21  A.  That I what?

22  Q.  That you never purchased crack cocaine from

23      Mr. Wesley.

24  A.  Crack cocaine?

25  Q.  Yes.

```
 1    A.    Correct.

 2    Q.    And as far as Mr. Foy is concerned, I believe you

 3          testified on direct examination with Ms. Morehead

 4          that you only saw him at gatherings.

 5    A.    Correct.

 6    Q.    And when you mean gatherings, you mean family

 7          functions at the Wesley house?

 8    A.    Correct.

 9    Q.    Like birthday parties for the kids?

10    A.    Yes.

11    Q.    That's the only gathering you ever saw Mr. Foy at; is

12          that correct?

13    A.    Correct.

14    Q.    At those gatherings you never really had

15          conversations with him, did you?

16    A.    Correct.

17    Q.    And you didn't really know his name, did you?

18    A.    Correct.

19    Q.    So when you were first shown a picture of him by law

20          enforcement, you recognized him from those gatherings

21          then; is that correct?

22    A.    Correct.

23                MR. SANDAGE:  Thank you.  Nothing further,

24          your Honor.

25                THE COURT:  Anyone else?  Hearing none, Ms.
```

```
 1          Morehead, you may redirect.

 2                    MS. MOREHEAD:  Thank you, Judge.

 3                    REDIRECT EXAMINATION

 4   BY MS. MOREHEAD:

 5   Q.   Mr. Brown, when you were first arrested on

 6        February 5, 2008, where were you taken?

 7   A.   The national armory, I believe.

 8   Q.   The armory on 18th Street here in Kansas City,

 9        Kansas?

10   A.   Yes, ma'am.

11   Q.   And were there a number of other individuals who were

12        arrested at that time?

13   A.   Yes, ma'am.

14   Q.   And was one of the individuals you saw there, was

15        that Billy Trinkle?

16   A.   Yes, ma'am.

17   Q.   And at the armory -- first of all, you weren't

18        represented by an attorney at that time, were you?

19   A.   No, ma'am.

20   Q.   And in connection with being there, did you, in fact,

21        agree to talk to the agents there at the armory?

22   A.   Yes, I did.

23   Q.   And do you remember how long you talked to them at

24        the armory when you were there?

25   A.   Between five and ten minutes.
```

```
 1    Q.   Was there a reason that you only spoke to them for

 2         five or ten minutes?

 3    A.   Yes, ma'am.

 4    Q.   Why?

 5    A.   Because I didn't want the other people to get

 6         suspicious.

 7    Q.   And in connection then with that, did you tell the

 8         agents that you would be happy to talk to them at a

 9         later time but under the circumstances, being at the

10         armory with these other people there, you didn't feel

11         comfortable doing it there?

12    A.   Correct.

13    Q.   That five- to ten-minute period of time, did you have

14         time to tell them everything that you knew about the

15         individuals that you have testified about in this

16         case?

17    A.   No, ma'am.

18    Q.   Now, Mr. Bell asked you about jumping on cases.  Do

19         you remember him asking about that?

20    A.   Yes, ma'am.

21    Q.   Now, Mr. Sandage just asked you about Mr. Foy, and

22         you told the ladies and gentlemen of the jury on

23         Friday that you recognized him from family

24         gatherings.

25    A.   Yes, ma'am.
```

1    Q.    Why haven't you came in and jumped on Mr. Foy's case

2          and came in and testified that he sold you drugs?

3    A.    'Cause I never did any dealings with him.

4    Q.    And do you have any idea what Mr. Foy's -- just from

5          what you know about this case where he is in the

6          pecking order of this case?

7                   MR. SANDAGE:  Objection; beyond cross

8          examination, your Honor.

9                   THE COURT:  I'm going to sustain the

10         objection.  That's not firsthand information.

11         That --

12                  MS. MOREHEAD:  That's fine, Judge.  That's

13         fine.

14   Q.    (By Ms. Morehead) In connection with questions by Mr.

15         Rogers, he asked you some questions about Rtayvian

16         Simpson.  Do you remember those questions?

17   A.    Somewhat, yes, ma'am.

18   Q.    All right.  In connection with your knowledge and

19         familiarity with Monterial Wesley and his brothers,

20         can you again describe family gatherings and the

21         amount of time that you would spend -- I don't want

22         to talk about buying drugs from them, but just aside

23         from that, before you had this falling out.

24   A.    They used to have big birthdays at the lake. I would

25         go out there, be out there for a couple hours, few

```
 1          hours.

 2    Q.    Before you had the falling out with Monterial Wesley

 3          and his brother -- and the fight that you had, that

 4          was one of the other brothers; is that right?

 5    A.    Yes, ma'am.

 6    Q.    Okay.  And prior to that how often would you have had

 7          contact with Monterial Wesley when you guys were on

 8          good terms?

 9    A.    On the detail shop in Leavenworth for a while, so I

10          seen him a lot back then.

11    Q.    In connection then specifically with Rtayvian Simpson

12          and Antwon Simpson, were you familiar with them?

13    A.    Antwon, yes; Raytavian, not so much.  I seen him a

14          couple times.

15    Q.    Okay.  When you would see him though, would you know

16          who he was?

17    A.    Yes, ma'am.

18    Q.    And in connection then with Mr. Rogers' questions,

19          you indicated in 2006 there were only three times

20          after -- during the course of the conspiracy we have

21          charged, '06 to '07, that you would have bought drugs

22          from Monterial Wesley; correct?

23    A.    Yes, ma'am.

24    Q.    Before that though you had had contact with him on

25          numerous occasions as well?
```

```
 1    A.    Correct.

 2    Q.    On those numerous occasions were there times that you

 3          observed Rtayvian Simpson with Monterial Wesley?

 4    A.    Before that I would see him maybe by himself, and if

 5          he would be -- like I said, I seen him at his wife's

 6          cousin's house.

 7    Q.    His wife's cousin's house?

 8    A.    Uh-huh.

 9    Q.    Where was that?

10    A.    Third and Pawnee.

11    Q.    In Leavenworth?

12    A.    Yes, ma'am.

13    Q.    All right.  In 2006 you indicated there was at least

14          one occasion you recalled that Rtayvian Simpson drove

15          Monterial Wesley to one of the incidents you

16          testified about; is that right?

17    A.    Yes, ma'am.

18    Q.    Was there any doubt in your mind that that was

19          Rtayvian?

20    A.    No, ma'am.

21              MS. MOREHEAD:  Judge, that's all I have.

22              THE COURT:  All right.  Is there any

23          recross based on that, Mr. Rogers?

24              MR. ROGERS:  Thank you, your Honor.

25
```

1        RECROSS EXAMINATION

2   BY MR. ROGERS:

3   Q.   Ms. Morehead asked you, sir, about occasions when you

4        were on good terms with Monterial Wesley and his

5        brothers; correct?

6   A.   Correct.

7   Q.   And that was when you went to the family gatherings

8        at the lake, you said?

9   A.   Lake house, yes, sir.

10  Q.   What lake are we talking about?

11  A.   Smithville.

12  Q.   And the house being Mr. Wesley's house?

13  A.   Yes, sir.

14  Q.   And would that be his house on Stonewall Court or

15       where he used to live on Cherokee?

16  A.   The house before Stonewall, which is not Cherokee.

17  Q.   Where was that?

18  A.   Kiowa.

19  Q.   Kiowa?

20  A.   Uh-huh.

21  Q.   And that's in Leavenworth also?

22  A.   Uh-huh.

23  Q.   Okay.  At that time is when you would see Rtayvian

24       Simpson; is that correct?

25  A.   Correct.

1    Q.    And Ms. Morehead asked you about times before 2006

2          when you met with Monterial Wesley to purchase drugs;

3          correct?  Remember when she asked you that?

4    A.    I don't think so.

5    Q.    Okay.  Let me ask you this:  Is it correct that when

6          you would meet with Monterial Wesley not at one of

7          these family gatherings he would not be with Rtayvian

8          Simpson; correct?

9    A.    Have I seen him without Rtayvian?

10   Q.    When you saw him and it wasn't a family gathering,

11         Rtayvian wasn't there; correct?

12   A.    Correct.

13   Q.    I notice you just called him Rtayvian; right?

14   A.    Yeah.

15   Q.    And that's his name, isn't it?

16   A.    Raytavian.

17   Q.    You think his name is Raytavian?

18   A.    Uh-huh.

19   Q.    Is that --

20   A.    Correct.

21   Q.    Okay.  And you're still sticking by what you told us

22         last week, that at family gatherings he was always

23         called Ray?

24   A.    That's what I was introduced to him as, yeah.

25   Q.    And that's what everybody else called him there too?

1    A.   No.  That's just what I was introduced to him as.

2    Q.   When you were first introduced to him many years ago?

3    A.   Uh-huh.

4    Q.   This is my little brother, Ray?

5    A.   He didn't introduce me to him, but yeah.

6    Q.   So you don't mean to tell us that if you were at a

7         family gathering and Mr. Simpson was there the other

8         family members would be calling him Ray?  That's not

9         what you're telling us?

10   A.   I don't really recall what they was calling him.  I

11        wasn't there to see him, or I wasn't there to, you

12        know, be around him like that, so . . .

13   Q.   And he was only a small child in those days, or a

14        young kid; right?

15   A.   Yes, sir.

16   Q.   So you weren't paying him a whole lot of attention?

17   A.   No.

18   Q.   Now, Ms. Morehead asked you about the falling out

19        that you had with Monterial Wesley and his brother

20        Antwon Simpson; correct?

21   A.   Correct.

22   Q.   And we talked about that last week too, didn't we?

23   A.   Correct.

24   Q.   After you left the courthouse last week, you were

25        transported on a van back to the place where you were

1      being held; is that correct?

2   A.    Uh-huh.

3   Q.    And you sat on the van next to a guy named Damon

4         Buford, didn't you?

5   A.    I don't know what his name was.

6   Q.    Okay.  You sat next to somebody and you talked to

7         somebody?

8   A.    Uh-huh.

9   Q.    And you talked to somebody about being here in court?

10  A.    Coming to court, yeah.

11  Q.    And being here to testify?

12  A.    No, not to testify.

13  Q.    So you deny that you told --

14             MS. MOREHEAD:  Judge, I'm going to object.

15        Can we approach?

16             THE COURT:  You may.

17             (Counsel approached the bench and the

18        following proceedings were had:)

19             MS. MOREHEAD:  Judge, I'm going to object.

20        I think this is, first of all, beyond the scope, and

21        No. 2, I've gotten no notice about somebody named

22        Damon Buford.  I think anything Mr. Rogers would

23        refer to that he thinks he has would be hearsay, and

24        so I ask for a proffer of what he thinks he has.

25             MR. ROGERS:  I'm happy with the proffer.  I

1     certainly have given no notice.  I don't think it's

2     (a) required, and (b) I'm attempting to lay the

3     foundation for proving up impeachment through

4     extrinsic testimony by confronting the witness with a

5     statement, giving him a chance to explain or deny it.

6     What I anticipate -- what I have been told and am

7     basing these questions on is that he made the

8     statement to Mr. Buford on the van back to CCA Friday

9     afternoon that he had lied on Mr. Simpson to get even

10    with his brothers for jumping him.

11            MS. MOREHEAD:  I would ask Mr. Rogers if

12    he's spoken with Mr. Buford and gotten that

13    information, and if he has, who his lawyer is and who

14    he talked to about that.  I suspect this is second-

15    or third-hand information that Mr. Rogers is relying

16    on, and he's not asking this on a good faith basis.

17            MR. ROGERS:  I think I have a good faith

18    basis.  I haven't had an opportunity to speak to the

19    lawyer since I got this information.  I just got it

20    three minutes before we started court.

21            THE COURT:  Is the source of your

22    information your client?

23            MR. ROGERS:  Yes.

24            THE COURT:  Without -- I don't want to go

25    into this too far, but the information you have is

1    that Mr. Brown made a statement to this other

2    individual about his having --

3              MR. ROGERS:  -- lied on Mr. Simpson to get

4    even -- actually, maybe lied on them to get even with

5    Monterial and Antwon for jumping on him.

6              MS. MOREHEAD:  Now we don't even know the

7    context of what it was.  Mr. Rogers hasn't spoken to

8    that individual.  He's relying on third-hand

9    information.  I don't think he has a good faith basis

10   to inquire of this individual at this time about this

11   information.

12             MR. ROGERS:  What I have done to try to

13   verify it when I could --

14             THE COURT:  What is the next question you

15   would like to ask Mr. Brown?

16             MR. ROGERS:  Isn't it true you told Damon

17   Buford on the van Friday afternoon that you lied on

18   Mr. Simpson to get back at his brother for jumping on

19   you?

20             MS. MOREHEAD:  Now we're assuming a fact

21   not in evidence.

22             THE COURT:  Which is?

23             MS. MOREHEAD:  That it even happened.

24             THE COURT:  Well, okay.  And what if his

25   answer is no?

1    MR. ROGERS:  If his answer is no, I will

2    take further efforts to -- I will talk to

3    Mr. Buford's lawyer, get his permission to talk to

4    his client, go up there my next opportunity, find out

5    if --

6    THE COURT:  But you will not ask another

7    question after that question if his answer is no?

8    MR. ROGERS:  I don't think -- I think the

9    foundation has been laid by then for impeachment.

10    THE COURT:  All right.  And that's all

11    you're going to do?

12    MR. ROGERS:  The other thing, I will tell

13    you I have checked on PACER, verified that Mr. Buford

14    did appear in the Western District of Missouri Friday

15    afternoon and entered a plea of guilty in his own

16    case, and I got his lawyer's name and phone number.

17    MS. MOREHEAD:  Who is that?

18    MR. ROGERS:  Bob Martin.

19    THE COURT:  Did Mr. Buford -- this is a

20    very potentially slippery slope.

21    MR. ROGERS:  I understand.

22    THE COURT:  I know you're aware of that

23    because if, in fact, your client is making this up

24    and it's something -- he is at some point found

25    guilty of something, or if he is not and is making

1      this up, there will be severe repercussions for him,

2      in other words, if the source is not accurate along

3      those lines.  So you realize that this is risky

4      business that you're engaging in here, but you think

5      it's in your client's best interests?  You want to

6      lay this foundation?

7                MR. ROGERS:  That's exactly correct, your

8      Honor.

9                THE COURT:  You've discussed this with

10     Mr. Simpson and apprised him?

11               MR. ROGERS:  I haven't discussed in detail.

12     I didn't have time to discuss the nature, so if you

13     would rather I go back and do that, or if you want

14     to --

15               THE COURT:  I honestly think you should

16     because it's apparent to me Ms. Morehead is not

17     convinced of the accuracy of what's been reported to

18     you, and I suspect Ms. Morehead will consequently

19     investigate.

20               MS. MOREHEAD:  And I will bring him in, and

21     I will have him testify that no such statement was

22     made.  I have a hard time believing that that was

23     said.

24               THE COURT:  If it winds up that that --

25     that the facts are not as you have represented them

```
 1          to be, the consequences for Mr. Simpson would be bad,
 2          so I think you maybe want to verify this more than
 3          the conversation you've had.  We will take our
 4          morning recess early, and that's what -- I'll give
 5          you the opportunity to visit with Mr. Simpson.  If
 6          you conclude that this is something you believe
 7          should be done for your client, I will allow you to
 8          ask the question that you just told me that you would
 9          ask to lay the foundation.  If he answers no, I will
10          not allow you to ask anything further.  You're stuck
11          with the answer, so to speak, and therefore it would
12          be left in your case-in-chief.  If you wish to prove
13          the bias of Mr. Brown -- which is really what you
14          would be doing; you would be proving his bias by
15          these extrinsic statements.
16                    MR. ROGERS:  Exactly.
17                    THE COURT:  -- you would be left to your
18          own devices.  That's what I understand you're
19          proposing; is that correct?
20                    MR. ROGERS:  That's correct, your Honor,
21          although -- yeah, that is correct.
22                    THE COURT:  Okay.
23                    MR. ROGERS:  I'm clear.
24                    (The proceedings returned to open court.)
25                    THE COURT:  Members of the jury, we're
```

```
 1        going to take our morning recess now.  I'll remind
 2        you of the admonitions.  We will resume in 15
 3        minutes.  Ms. Ludwig, I think, is going around to
 4        find you.
 5             Participants remain here.  Mr. Brown, remain
 6        here.  As to the jury, we're now in recess.
 7                   (The following proceedings were had outside
 8        the presence of the jury:)
 9                   THE COURT:  You may proceed as you
10        indicated with Mr. Brown.  Anything further we should
11        do before we break?  All right.  We will be in recess
12        until 25 after.
13                   (A recess was taken.)
14                   THE COURT:  Mr. Rogers, what is your
15        pleasure?
16                   MR. ROGERS:  Here is my pleasure.  I don't
17        know if it's my plan or not.  What I would -- I've
18        spoken with Mr. Martin, and he's going to try and
19        talk to his client either today by telephone or
20        tomorrow morning in person.  What I would like to do
21        is end my cross examination of Mr. Brown right here
22        subject to recall for asking that question if it
23        becomes advisable.
24                   THE COURT:  All right.  You may to do so.
25                   (The following proceedings were had in the
```

1        presence of the jury:)

2                    THE COURT:  Mr. Rogers?

3                    MR. ROGERS:  No further questions at this

4        time, your Honor.

5                    THE COURT:  Any other recross, Mr. Calbi?

6                    MR. CALBI:  Thank you, your Honor.

7                    RECROSS EXAMINATION

8    BY MR. CALBI:

9    Q.   Mr. Brown, when you met with law enforcement on

10        February 5 of 2008, I imagine you originally sat down

11        with them and they read you your rights; correct?

12   A.   Correct.

13   Q.   Okay.  And then they took what I would call

14        biographical information like your name, your

15        address, your date of birth, information such as

16        that; correct?

17   A.   Correct.

18   Q.   Okay.  And then after you went through those

19        preliminaries, they also at some point during that

20        interview gave you a consent-to-search form that you

21        reviewed, and you signed that; correct?

22   A.   Yes, sir.

23   Q.   Okay.  And then not only did you do all of those

24        three things, then you also had discussions with law

25        enforcement about Henry Grigsby, Mr. Locke, they

```
 1        asked you about Mr. Wesley, there was discussions
 2        about Shannon Perez, and there were discussions about
 3        a Caucasian male, as you indicated, not knowing that
 4        person's name; correct?
 5   A.   Yes, sir.
 6   Q.   You did all of those things that I just outlined for
 7        you, and your recollection is that it took just five
 8        to ten minutes?
 9   A.   Yes, sir.
10             MR. CALBI:  I have nothing further, Judge.
11             THE COURT:  All right.  Anything further by
12        way of recross?  Hearing none, Ms. Morehead?
13             MS. MOREHEAD:  Judge, could we approach,
14        please?
15             (Counsel approached the bench and the
16        following proceedings were had:)
17             MS. MOREHEAD:  Judge, frankly, I need to go
18        back and clarify.  Mr. Calbi has misstated what Mr.
19        Brown's testimony was.  My questions had to do with
20        the information at the armory, which is what Mr. Bell
21        had asked him about.  There was some prior contact
22        that they had when he was arrested.  That's when the
23        consent to search was signed and all of that.
24             THE COURT:  Well, you can do it.
25             MS. MOREHEAD:  I just wanted you to know
```

1    what I was doing.

2              THE COURT:  You can do it.

3              (The proceedings returned to open court.)

4                    REDIRECT EXAMINATION

5    BY MS. MOREHEAD:

6    Q.   Mr. Brown, Mr. Calbi asked you a few questions about

7         the statements that you made on the day you were

8         arrested.  When you and I talked, I think I asked you

9         about when you were at the armory.  Do you remember

10        that?

11   A.   A little.

12   Q.   Okay.  And when you were at the armory, how long did

13        you talk to the agents there before you asked them --

14        before you told them you didn't really want to talk

15        there, that you would talk to them later?

16   A.   It was five or ten minutes.

17   Q.   All right.  Now, Mr. Calbi asked you about some other

18        things that were discussed, like the consent to

19        search, and mentioned a few other people, Boytina

20        Locke and other individuals.  When did that take

21        place?

22   A.   The consent to search took place, like, after, I

23        guess, they booked us in.

24   Q.   Okay.  That was right after you were arrested then;

25        correct?

1   A.   Correct.

2   Q.   Was that at the Leavenworth Justice Center in

3        Leavenworth?

4   A.   No, ma'am.  They booked us in at the armory.

5   Q.   Were you arrested at the Leavenworth Center though?

6   A.   Yes, ma'am.

7   Q.   In Leavenworth?

8   A.   Yes, ma'am.

9   Q.   And do you recall talking to Agent Ditter and signing

10       the consent to search for your residence at that

11       location?

12  A.   My residence, yes, ma'am.

13  Q.   All right.  And I think that's what Mr. Calbi was

14       talking about, was the consent to search your

15       residence.  Do you recall doing that?

16  A.   Yes, ma'am.

17  Q.   And that was immediately upon your arrest?

18  A.   Yes, ma'am.

19  Q.   And then you were taken to the armory?

20  A.   Yes, ma'am.

21            MS. MOREHEAD:  That's all I have, Judge.

22            THE COURT:  All right.  Anything further

23       based on that?  Hearing none, then that appears to

24       conclude the testimony of Mr. Brown.  I will remand

25       him to the custody of the United States marshals.

```
1          All right.  The government may call its next witness.
2                    MS. MOREHEAD:  Thank you, Judge.  I would
3      call Clinton Holman.
4                    MR. SANDAGE:  While we're waiting for
5      Mr. Holman to be placed, can we discuss an issue that
6      might come up?
7                    THE COURT:  Come forward, please.
8                    (Counsel approached the bench and the
9      following proceedings were had:)
10                   MR. SANDAGE:  Your Honor, there's an area
11     of testimony involving Mr. Foy that Mr. Clinton -- I
12     don't know if you're going to get into it or not, but
13     he said that prior to Wesley getting drugs from
14     Humphrey he got them from Foy, so he got cocaine from
15     Foy before Mr. Humphrey.  I would consider that to
16     predate the indictment, to be 404(b) and something
17     that the government hasn't given notice on and
18     shouldn't be able to delve into on direct.  Instead
19     of interrupting the jury, I thought we could get
20     clarity from the government before we get started.
21                   MS. MOREHEAD:  Judge, this is to lay the
22     foundation about how he knew the individuals.
23     Obviously, there was drug dealing by many of these
24     individuals prior to 2006.  I intend to focus in on
25     2006 to 2007, but clearly to show the relationship of
```

1    the parties he's able to give some background

2    information about how he knew these individuals and,

3    you know, the extent that he knew them.  I don't

4    intend to delve into detail about that, but it will

5    be mentioned.

6              THE COURT:  It would be admissible for that

7    purpose, but you're entitled to a limiting

8    instruction, Mr. Sandage, that it would not be

9    admissible in any respect to show the guilt of Mr.

10   Foy but rather --

11             MR. SANDAGE:  That's the first we knew

12   about the limited purpose.  If that's the limited

13   purpose, I would ask the court to give that limiting

14   instruction.

15             THE COURT:  All right.

16             MR. SANDAGE:  I appreciate it, your Honor.

17             THE COURT:  Obviously, I'll be attempting

18   to do that at the right time.  If you think my timing

19   isn't right, give me a holler and I'll follow up.

20             MR. SANDAGE:  You're on top of it, Judge.

21   I don't have to do that.

22             THE COURT:  Thanks.

23

24

25

```
 1                        CLINTON HOLMAN,

 2     having been duly sworn, was examined and testified as

 3     follows:

 4                      DIRECT EXAMINATION

 5     BY MS. MOREHEAD:

 6               THE COURT:  Mr. Holman, if you would just

 7          adjust that microphone so that you're speaking right

 8          directly into it so we can hear you clearly, I would

 9          appreciate that.

10            Ms. Morehead, you may proceed.

11               MS. MOREHEAD:  Thank you, your Honor.

12     Q.   (By Ms. Morehead) How old are you, Mr. Holman?

13     A.   Thirty-four.

14     Q.   And you're currently in custody; is that right, Mr.

15          Holman?

16     A.   Yes.

17     Q.   And in connection with you being here to testify in

18          this case, you were prosecuted in the Western

19          District of Missouri in connection with a drug case;

20          is that right?

21     A.   Yes.

22     Q.   And in connection with that particular case, did you,

23          in fact, agree to cooperate in any matters that you

24          might have information on?

25     A.   Yes.
```

1    Q.   Okay.  First of all, Mr. Holman, let's go over your

2         criminal history.  You have had a number of prior

3         felony convictions; is that right?

4    A.   Yes.

5    Q.   Dating back to 1992?

6    A.   Yes.

7    Q.   And does that include four prior drug charges from

8         Missouri, all from Missouri?

9    A.   Yes.

10   Q.   1992, possession of crack cocaine in Johnson County?

11   A.   Yes.

12   Q.   1994, distribution of crack in the Western District

13        of Missouri, in federal court?

14   A.   Yes.

15   Q.   1995, distribution of cocaine in Jackson County?

16   A.   Yes.

17   Q.   And in 1995, distribution of drugs near a school in

18        Jackson County, Missouri?

19   A.   Yes.

20   Q.   In connection with those offenses, did you, in fact,

21        do some time, incarceration?

22   A.   Yes.

23   Q.   And how long were you incarcerated?

24   A.   Sixty months.

25   Q.   And was that federal time?

```
 1    A.    Yes.

 2    Q.    And when did you get out of custody?

 3    A.    February 1998.

 4    Q.    February 1998?

 5    A.    Yes.

 6    Q.    And in connection then -- after you got out of

 7          custody, were on you supervision?

 8    A.    Yes.

 9    Q.    How long were you on supervision?

10    A.    For 60 months.

11    Q.    So another five years?

12    A.    Yes.

13    Q.    Puts us to 2003?

14    A.    Yes.

15    Q.    Did you successfully complete your supervision?

16    A.    Yes.

17    Q.    Now, back when you were in custody in 1998, did you

18          have occasion to meet an individual named Thomas

19          Humphrey?

20    A.    Yes.

21    Q.    Were there any other individuals -- did you also meet

22          some other individuals that we're going to talk about

23          in connection with this case?

24    A.    Yes.

25    Q.    All right.  After you got off supervision in 2003, in
```

1    2006 did you pick up a couple of forgery convictions

2    in Cape Girardeau County, Missouri, and Scott County,

3    Missouri?

4  A.   Yes.

5  Q.   Did you get probation on those?

6  A.   I had to do a year.

7  Q.   A year on those, state time?

8  A.   Yes.

9  Q.   And in 2007 you were charged and then convicted with

10   conspiracy to distribute 50 grams or more of crack in

11   the Western District of Missouri; is that right?

12 A.   Yes.

13 Q.   What was your sentence that you received in that

14   case?

15 A.   131 months.

16 Q.   All right.  Let's talk about what happened to you in

17   2003 after you got off paper, you were no longer on

18   supervision.  Did you have occasion to have contact

19   with Thomas Humphrey after that time period?

20 A.   Yes.

21 Q.   Now, you had met him while you were incarcerated

22   before; is that right?

23 A.   Yes.

24 Q.   And then after you got off paper is when you first

25   ran into him; is that right?

1    A.   Yes.

2    Q.   Now, once you were -- once you met Thomas Humphrey

3         again did you and he become involved in narcotic

4         trafficking together?

5    A.   Yes.

6    Q.   Tell the jury how that kind of occurred with you and

7         Mr. Humphrey.

8    A.   We had went in a few times and pooled our money

9         together to buy a kilo, and then once we was able to

10        buy a kilo by ourselves, we went our separate ways,

11        but we still stayed in contact with the person we was

12        messing with.

13   Q.   All right.  Let me make sure I understand.  You said

14        at first the two of you would pool your money

15        together to buy a kilo of cocaine together?

16   A.   Yes.

17   Q.   And was there a reason that you were pooling your

18        money together?

19   A.   Yes.  Because the people we messed with, you had to

20        be able to buy a key.  You couldn't buy anything

21        under a key.

22   Q.   Who were the individuals you were dealing with then?

23   A.   A Mexican named Jesse.

24   Q.   And at some point did you stop messing with Jesse and

25        start dealing with someone else?

```
 1    A.   No.  Only messed with Jesse.

 2    Q.   You messed with Jesse.  When you and Mr. Humphrey had

 3         enough to kind of go your separate ways, as you said,

 4         do you know if Mr. Humphrey started buying from

 5         someone else?

 6    A.   I have no idea of that.

 7    Q.   But the two of you remained in contact with one

 8         another?

 9    A.   Yes.

10    Q.   Now, at some point, Mr. Holman, did you go on -- I'm

11         going to use this kind of term loosely, but did you

12         go on the run?

13    A.   Yes.

14    Q.   And in connection with your 2007 case in the Western

15         District of Missouri, did it actually involve some

16         activity that occurred in 2004?

17    A.   Yes.

18    Q.   Okay.  And did you have any codefendants in that

19         case?

20    A.   Yes.

21    Q.   How many?

22    A.   One.

23    Q.   One other codefendant?

24    A.   Yes.

25    Q.   And was that a male or a female?
```

1    A.    A female.

2    Q.    And were you aware after 2004 that the authorities

3          were, for lack of a better word, onto you though?

4    A.    Yes.

5    Q.    In 2006 were you aware that you, in fact, had been

6          charged with forgeries in Missouri as well?

7    A.    Yes.

8    Q.    And so after these events in 2004 did you, in fact --

9          when we use that word, that you went on the run, what

10         exactly did you do?

11   A.    Well, elude the police, law enforcement.

12   Q.    Okay.  Now, you weren't actually charged until 2007;

13         is that right?

14   A.    Yes, for the federal charge.

15   Q.    Now, in connection with this particular case, are you

16         familiar with an individual named Monterial Wesley?

17   A.    Yes.

18   Q.    How are you familiar with Monterial Wesley?

19   A.    He's my cousin.

20   Q.    And tell the jury how the two of you are related.

21   A.    My mother and his mother's cousins.

22   Q.    And so you and Mr. Wesley would be second cousins

23         then?

24   A.    Yes.

25   Q.    And is it safe to say you've known him your whole

1      wife?

2   A.   Yes.

3   Q.   Grew up with him?

4   A.   Yes.

5   Q.   Knew him and that sort of thing?

6   A.   Yes.

7   Q.   Back when you were on the run, did you, in fact, have

8        contact with Monterial Wesley?

9   A.   Yes.

10  Q.   Once you went on the run, did your circumstances

11       about buying drugs, did that change?

12  A.   Can you repeat that again.

13  Q.   Yes.  I'm sorry.  When you were on the run, did the

14       circumstances of how you were buying drugs, did that

15       change?

16  A.   No.

17  Q.   Did you continue dealing with Jess, Jesse?  Is that

18       his name?

19  A.   No.

20  Q.   Who did you start dealing with after you went on the

21       run?

22  A.   Humphrey, Tommy Humphrey.

23  Q.   And do you recall about when that would have been?

24  A.   Probably about July of '04.

25  Q.   Okay.  So from July of '04 forward you would have

```
 1        been dealing directly with Thomas Humphrey?

 2   A.   Yes.

 3   Q.   And when you were dealing with Thomas Humphrey, what

 4        did that include?  What did that involve, I should

 5        say?

 6   A.   Buying narcotics from him.

 7   Q.   And what circumstances?  How would that occur?  How

 8        would you and Mr. Humphrey have occasion to buy --

 9        how would you have occasion to buy narcotics from

10        Mr. Humphrey?

11   A.   Well, I would meet him in town.  I would come in from

12        out of town and meet him on the highway by the

13        Independence Mall, that exit.

14   Q.   What drugs were you buying from Mr. Humphrey?

15   A.   Kilos or marijuana.

16   Q.   When you say kilos, what are you referring to?

17   A.   One to 2 kilos.

18   Q.   Of what?

19   A.   Of cocaine.

20   Q.   Okay.  And you would also buy marijuana?

21   A.   Yes.

22   Q.   And how much marijuana were you buying from

23        Mr. Humphrey?

24   A.   Anywhere between 25 to 50 pound.

25   Q.   Okay.  And then where were you directing that
```

1      quantity of drugs while you were on the run from 2004

2      forward?  Where were you distributing those drugs?

3  A.  St. Louis, Missouri.

4  Q.  And how often would you pick up from Mr. Humphrey?

5  A.  Probably about twice a month.

6  Q.  Do you know in connection with your cousin Monterial

7      how he became acquainted with Thomas Humphrey?

8  A.  I introduced them to each other.

9  Q.  And do you recall about when that would have been?

10  A.  Probably about '03.

11  Q.  So shortly after you connected or ran into

12      Mr. Humphrey after you were off paper is when you

13      first introduced your cousin to Thomas Humphrey?

14  A.  Yes.

15  Q.  And did your connection with Thomas Humphrey, buying

16      drugs from him, continue until you went into custody?

17  A.  Yes.

18  Q.  Do you remember when you went into custody?

19  A.  Yes.  February of '06.

20  Q.  And was that in connection with the forgery charges

21      in Missouri?

22  A.  Yes.

23  Q.  And did you remain in custody after?

24  A.  Yes.

25  Q.  When was it that you first appeared in federal court?

1    A.    January 2007.

2    Q.    And that was on the indictment where you're serving

3          131 months?

4    A.    Yes.

5    Q.    Up until then February of 2006 did you, in fact,

6          continue buying kilo quantities of cocaine from

7          Mr. Humphrey along with the marijuana that you

8          mentioned?

9    A.    Yes.

10   Q.    Would the last time then that you would have dealt

11         with Mr. Humphrey, would that have been in February

12         of 2006?

13   A.    Yes.

14   Q.    And in connection then with your cousin, Monterial

15         Wesley, did you have any information about whether --

16         this is only if you knew, whether he was having --

17         whether he was conducting drug business with

18         Mr. Humphrey prior to you going into custody?

19              MR. CALBI:  Your Honor, may I approach,

20         please?

21              THE COURT:  You may.

22              (Counsel approached the bench and the

23         following proceedings were had:)

24              MR. CALBI:  Judge, I would like Ms.

25         Morehead's question to perhaps be buttoned up a

```
 1        little bit and talk about January or February of '06.

 2        Anything prior to January or February of '06 I

 3        believe is outside the scope of the conspiracy, and I

 4        believe she doesn't need to set that up for

 5        identification purposes.  The witness has testified

 6        that he has known Mr. Wesley his whole life.

 7                 MS. MOREHEAD:  Except Mr. Humphrey has

 8        already testified that he was dealing specifically

 9        with Mr. Foy and Mr. Wesley before that time period.

10                 THE COURT:  You mean Mr. Holman and Mr.

11        Wesley?

12                 MS. MOREHEAD:  What did I say?

13                 THE COURT:  You said Foy and Wesley.

14        Humphrey testified he was dealing with Holman and

15        Wesley.

16                 MS. MOREHEAD:  I'm sorry, yes.  So this is

17        obviously germane to the relationship of these

18        parties and how then it would have continued even

19        after Mr. Holman was in custody.

20                 THE COURT:  Well, from the perspective of

21        Mr. Wesley, who has already pled guilty to the

22        conspiracy, from his perspective there doesn't need

23        to be a lot of detail about tying this.  I think you

24        ought to go to the conspiracy period here with Holman

25        and not spend time in the preperiod.  I'm going to
```

1          sustain the objection.

2                    MS. MOREHEAD:  Okay.  Very good.

3                    (The proceedings returned to open court.)

4     Q.   (By Ms. Morehead) Mr. Holman, with regards to the few

5          months before you were arrested in February of 2006,

6          do you know whether or not Monterial Wesley was

7          engaged in drug trafficking with Thomas Humphrey?

8     A.   Humphrey had said something about it, but I never

9          seen them doing business theirself.

10    Q.   Did you ever during that time period buy anything

11         directly from your cousin, Monterial Wesley?

12    A.   Yes.  Marijuana.

13    Q.   And in connection then with your familiarity with

14         your cousin Monterial Wesley, did you become familiar

15         with another individual named Shevel Foy?

16    A.   I don't know no one named Shevel Foy.

17    Q.   Okay.  Did you know somebody named Rat?

18    A.   Yes.

19    Q.   Okay.  And in connection with activity on the street,

20         are there occasions where you don't know people's

21         real names, in fact, you know them by nicknames?

22    A.   Yes.

23    Q.   And how did you become acquainted with an individual

24         named Rat?

25    A.   Through my cousin.

1   Q.   Through Monterial Wesley?

2   A.   Yes.

3   Q.   Do you remember about when that was?

4   A.   Before '03.

5   Q.   Did your -- and did your -- did you actually have

6        contact with Rat from '03 up until the time that you

7        would have been arrested?

8   A.   No.

9   Q.   Never?

10  A.   Not from '03 until I was arrested.

11  Q.   Okay.  And I'm -- I don't know if I might not have

12       asked that question right.  You became acquainted

13       with Rat; is that right?

14  A.   I been knowing Rat before 2003.

15  Q.   So you knew him before?

16  A.   Yes.

17  Q.   All right.  You knew though that -- just correct me

18       if I'm wrong -- that Rat and Monterial Wesley were

19       acquainted as well; is that right?

20  A.   Yes, ma'am.

21  Q.   And how did you know that?

22  A.   Through my cousin.

23  Q.   Through Monterial Wesley?

24  A.   Yes.

25  Q.   And would you have had contact with Rat in connection

1       with Monterial Wesley?

2   A.  Yes.

3   Q.  Under what circumstances would that have been?

4   A.  Well, one time where --

5               THE COURT:  Would you clarify the time

6       frame.

7               MS. MOREHEAD:  Yeah, I was going to, Judge.

8   Q.  (By Ms. Morehead) You're getting ready to talk about

9       an incident.  When did that occur?

10  A.  Probably like in 2002.

11  Q.  All right.  Then could we move forward? I guess is

12      what I'm asking.  From the time you hooked back up

13      with Thomas Humphrey when you and Monterial Wesley

14      were involved in drug -- I'm sorry, you and Thomas

15      Humphrey were involved in drug activity together, you

16      were also having contact with your cousin during that

17      time?

18  A.  Yes.

19  Q.  Did you have contact with Rat during that time as

20      well?

21  A.  No.

22  Q.  Never?

23  A.  Not during that time when I was on the run.

24  Q.  In connection with the contact that you had with

25      Thomas Humphrey after you were arrested, was there --

```
 1          were there occasions where you still talked to him?

 2   A.     Yes.

 3   Q.     And how would that occur?

 4   A.     I would get his cell phone number and call him.

 5   Q.     Were there also times that you were having contact

 6          with your cousin?

 7   A.     Yes.

 8   Q.     And in connection with your contact with those two

 9          individuals, once you came to be in federal custody,

10          did you provide authorities information not only

11          about Thomas Humphrey but also about your cousin,

12          Monterial Wesley?

13   A.     Yes, but it was mainly about Tommy Humphrey.

14   Q.     But you also provided information about your cousin;

15          is that right?

16   A.     Yes.

17   Q.     And in connection with the information you provided,

18          did that include providing phone numbers that you had

19          acquired both of Thomas Humphrey and Monterial

20          Wesley?

21   A.     Yes.

22   Q.     And in connection with having those phone numbers,

23          were there ever any times that you, in fact, made

24          calls to Thomas Humphrey between August of 2007 and

25          November of 2007?
```

1   A.   I can't remember -- really remember what time the

2        calls was, but I know they was in 2007.

3   Q.   And were those recorded calls?

4   A.   Yes.

5   Q.   In connection with that did you also make recorded

6        calls to your cousin Monterial Wesley?

7   A.   Yes.

8   Q.   And were there -- during those calls were there

9        discussions about drug trafficking that you had with

10       them?

11  A.   No, not direct.

12  Q.   Huh?

13  A.   It wasn't direct.

14  Q.   Okay.  When you say not direct, tell the jury what

15       you mean by that.

16  A.   Street codes.

17  Q.   And how would those conversations occur?

18  A.   Well, just talk about anything, just ask how the

19       weather is going, is the weather, okay?  That mean if

20       it's good.

21  Q.   Is what good?

22  A.   The game, the dope game.

23  Q.   And when you would ask those questions then and got

24       information on the phones, the agents were listening;

25       is that right?

```
 1   A.   Yes.

 2   Q.   And did you pass that information on to them?

 3   A.   Yes.

 4   Q.   Now, in connection with Monterial Wesley, did you --

 5        were you acquainted with any girlfriends that he had?

 6   A.   I don't know if they was his girlfriend, but I was

 7        acquainted with a few of his lady friends.

 8   Q.   All right.  Were there any in particular that you

 9        became acquainted?

10   A.   Yes.

11   Q.   Who was that?

12   A.   A lady named Tasha.

13   Q.   And prior to being arrested in February of '06, would

14        you have ever had contact with Monterial Wesley when

15        Tasha was with Monterial Wesley?

16   A.   Yes.

17   Q.   And in connection with that do you recall any

18        vehicles that were associated with Tasha?

19   A.   Well, the few times it was in a Benz truck and a

20        rental.

21   Q.   A Benz truck and then a rental?

22   A.   Yes, a rental, an SUV.

23   Q.   And in connection with the contact that you had prior

24        to being arrested in February of '06, you indicated

25        that you were buying -- that you would buy drugs from
```

1    Monterial Wesley?

2  A.   Yes.

3  Q.   And was that just marijuana --

4  A.   Yes.  One time I buyed a key from him.

5  Q.   One time you bought a key from Monterial Wesley?

6  A.   Yes.

7  Q.   Just so I'm sure, when you say a key, are you talking

8       about a kilogram?

9  A.   Of powder, cocaine powder.

10 Q.   While you were on the run, would you ever have to

11      pick up drugs from your cousin Monterial Wesley?

12 A.   Yes.

13 Q.   Would you ever have to drop off money to Monterial

14      Wesley?

15 A.   Yes.

16 Q.   Do you know what the term fronting means?

17 A.   No, ma'am.

18 Q.   When you get drugs from Monterial Wesley, did you

19      have to pay for them at the same time, or did you get

20      the drugs and pay for them with money later, at a

21      later time?

22           MR. CALBI:  Judge, may I approach, please?

23           THE COURT:  You may.

24           (Counsel approached the bench and the

25      following proceedings were had:)

```
 1              MR. CALBI:  Judge, I'm confused in my time

 2       frame.  I don't know if we are talking January and

 3       February of 2006 or if he's talking prior to the

 4       conspiracy what he was doing with Monterial Wesley.

 5       And, again, I would object on those grounds.

 6              THE COURT:  It isn't clear to me either

 7       when he talked about the kilo of cocaine that he got

 8       whether that purported to be --

 9              MS. MOREHEAD:  I'm sorry.  I thought I had

10       asked him to focus on those few months before.

11              THE COURT:  What I believe you asked him

12       was, before you were arrested in February of '06.  Of

13       course, that could have been December of '05, or it

14       could have been some earlier time.

15              MS. MOREHEAD:  The conspiracy is on or

16       about, so that's why I said a few months.

17              THE COURT:  It could have been in '03.  I

18       think it wasn't clear.  I agree with Mr. Calbi that

19       it wasn't clear whether that was within the scope of

20       the inquiry or not.  If it's not clear to me and Mr.

21       Calbi, it may not be clear to the jury, so it may not

22       be very helpful, so I would ask -- I would sustain

23       the objection and ask you to clarify.

24              MS. MOREHEAD:  Okay.  I will.

25              (The proceedings returned to open court.)
```

1    Q.    (By Ms. Morehead) In connection with -- you said you

2          obtained a kilo from your cousin.  Was that just a

3          one-time event?

4    A.    Yes, because I really deal with Tommy Humphrey.

5    Q.    Okay.  And in connection with that one-time event

6          where you got a kilo from Terio, do you remember

7          about when that was relative to you being arrested in

8          February of '07 -- I'm sorry, February of '06?

9    A.    Sometime in '05.

10   Q.    So that was quite a few years ago?

11   A.    Yes.

12              THE COURT:  Members of the jury, I'm going

13         to give you a limiting instruction that that

14         testimony from Mr. Holman about purchasing that

15         particular kilo is not something for which you can

16         hold Mr. Wesley responsible with regard to the

17         charges in this case.  It's admissible for other

18         purposes, showing the nature of the relationship

19         between the two of them and so on and so forth, for

20         identification purposes, but not to hold Mr. Wesley

21         responsible for that particular transaction.

22              MS. MOREHEAD:  Thank you, Judge.

23   Q.    (By Ms. Morehead) The few months before you were

24         arrested in February of '06, going back, you know, a

25         few months -- do you know what I mean when I say a

1    few months?

2    A.   Yes.

3    Q.   What do you think I mean by that?

4    A.   Prior to in the last six months to being

5         incarcerated.

6    Q.   Okay.  Let's confine it a little bit more.  Let's say

7         the two to three months before you were arrested.

8         Okay?

9    A.   Yes.

10   Q.   So you were arrested in February of '07, so we're

11        going to go back --

12              THE COURT:  '06.

13              THE WITNESS:  '06, yes.

14              MS. MOREHEAD:  I'm sorry.

15   Q.   (By Ms. Morehead) February of '06.  Few months,

16        December, January of -- December '05, January of '06,

17        that time frame, all right, up until the time you

18        were arrested.

19   A.   The last three months?

20   Q.   The last three months or so.  Do you have that time

21        frame kind of in your mind?

22   A.   Yes.

23   Q.   Were you having contact with Monterial Wesley during

24        that time?

25   A.   I really can't recall.

1    Q.   Do you recall where he was living before you got

2         arrested, your cousin Monterial Wesley?

3    A.   All I know is he stayed in Leavenworth, Kansas.

4    Q.   Did you ever go to his house?

5    A.   Not his new crib.

6    Q.   When you would be -- when you would actually see him

7         prior to your arrest, where would that have been?

8         Where would you see him at?

9    A.   Different areas, different spots, sometime off the

10        highway, sometime inside Kansas City, Kansas.

11   Q.   Okay.  Any other locations that you can tell us

12        about?

13   A.   No.  Just, like, different stops, like, at a gas

14        station or somewhere.

15   Q.   Okay.  Do you know where Monterial Wesley's -- let me

16        ask you this.  Did you know an individual named

17        Tellie Maggit?

18   A.   No.

19   Q.   Okay.  Were you familiar at all with a residence off

20        31st -- do you know where 31st and Holmes is?

21   A.   Yes, I know where 31st and Holmes is.

22   Q.   Thirty-first and Van Brunt?

23   A.   Thirty-first and Van Brunt?  Yes.

24   Q.   Okay.  In connection with your cooperation with the

25        government, you spoke to authorities on a number of

1    occasions; is that right?

2  A.    Yes.

3  Q.    And today you've indicated that you only bought a

4        single kilo of cocaine from Monterial Wesley.

5  A.    I bought some in the past, but that was before I

6        caught my federal case.

7  Q.    Okay.  Which was in '07?

8  A.    I caught my federal case in '05, but I didn't get

9        picked up until '06.

10 Q.    You weren't charged until '07 though; isn't that

11       correct?

12 A.    Yes, yes.

13 Q.    And in connection with --

14             MS. MOREHEAD:  Sorry, Judge, I was just

15       looking for a reference here.

16 Q.    (By Ms. Morehead) Did you, in fact, provide

17       authorities information about who Monterial Wesley's

18       source of cocaine was?

19 A.    Yes.

20 Q.    And how did you know that information, Mr. Holman?

21 A.    Because I was inside the circle of the fellas.

22 Q.    And the information that you provided occurred in

23       July of 2007; is that right?

24 A.    Somewhere around that time.  I just don't remember

25       what month, but I know it was in '07.

1749

```
 1   Q.   And did you tell authorities quantities of cocaine
 2        that you were aware of that your cousin Monterial
 3        Wesley was getting from Thomas Humphrey?
 4   A.   Some estimate, yes.
 5   Q.   And, again, was that because you were part of the
 6        circle?
 7   A.   Yes.
 8   Q.   Now, after you were arrested in '06 and first
 9        prosecuted in state court, did you, in fact -- when
10        you came into state court custody -- or in federal
11        custody did you come to have information about your
12        own case, your federal case?
13   A.   Yes.
14   Q.   And how did you get that information?
15   A.   From my lawyer.
16   Q.   I want to show you what's part of 135.
17             MS. MOREHEAD:  Judge, Government's
18        Exhibit 135.
19   Q.   (By Ms. Morehead) Look through that, Mr. Holman, and
20        I'll ask you if you can identify that.
21   A.   This is about my case, what I received from my
22        lawyer.
23   Q.   Okay.  And it consists of four pages, is that right,
24        four typed pages?
25   A.   Yes.
```

1   Q.   There appear to be in handwritten notes and some

2        underlining and stuff.  Whose writing is that, Mr.

3        Holman?

4   A.   Mine.

5   Q.   Okay.  And is it safe to say then you got this

6        paperwork from your lawyer?

7   A.   Yes.

8   Q.   And that would have been after you were brought

9        before -- brought to federal court in January of

10       2007?

11  A.   Yes.

12  Q.   And with regards to this paperwork that you got from

13       your lawyer, what did you do with that?

14  A.   I made copies of it and sent them out.

15  Q.   Who all did you send that out to?

16  A.   To my cousin, to my son's mother, and to another

17       friend of mine's.  I sent out three copies.

18  Q.   And why did you do that?

19  A.   Just to show them what happened to me.

20  Q.   And when you say you sent it to your cousin, who are

21       you referring to?

22  A.   Terial Wesley.

23  Q.   Did he and you discuss your case after you were taken

24       into federal custody in January of '07?

25  A.   Yes, but I can't remember what it was about, but we

```
 1          discussed it, yes.
 2                    MS. MOREHEAD:  One second, Judge.  We're
 3          trying to find --
 4                    THE COURT:  Counsel, we're consuming a lot
 5          of time.  That's not an unlimited resource with 14
 6          people sitting here.
 7                    MS. MOREHEAD:  I appreciate that, Judge.
 8          I'm trying to pare down the time there.  Mr. Holman
 9          has testified to -- I think I can get there.
10     Q.   (By Ms. Morehead) You indicated when you were still
11          having contact with your cousin that he would
12          occasionally be with Tysha; is that right?
13     A.   Yes.
14     Q.   And what vehicles during that time -- I know you
15          mentioned Tysha's Benz, and you also mentioned rental
16          vehicles.  Were there any vehicles that were
17          associated otherwise with Monterial Wesley during
18          that same time period?
19     A.   No, I don't -- no.
20     Q.   And Tysha's Benz that you're talking about, what
21          vehicle -- tell me what you were talking about with
22          that.
23     A.   An SUV.
24     Q.   Do you recall anything about the color or anything
25          like that?
```

```
 1   A.   White.

 2   Q.   I want to show you what's been marked as Government's

 3        Exhibit 65 and 66.  Do you recognize that?

 4   A.   Yes.

 5   Q.   How do you recognize that?

 6   A.   A few times I seen both of them when I pulled in

 7        town, a couple of times.

 8   Q.   And what would the reason be that you would have met

 9        with them in connection with seeing them in that

10        vehicle?

11   A.   To drop off money.

12   Q.   For what?

13   A.   For purchases of drugs.

14   Q.   And was Tysha with Monterial Wesley on those

15        occasions?

16   A.   A few times.

17             MS. MOREHEAD:  Judge, that's all I have.

18        Thank you.

19             THE COURT:  All right.  Any cross

20        examination?  I hear none.  I hear one.

21             MR. HEATHMAN:  I was just looking around to

22        see who all might go.

23

24

25
```

<u>CROSS EXAMINATION</u>

BY MR. HEATHMAN:

Q.   Mr. Holman, you have testified that you had seen
     Ms. Temple, Tysha Temple, in her white SUV a couple
     of times with Mr. Wesley?

A.   Yes, both rentals and the white vehicle.  It was a
     few times -- I don't know if it was the same time,
     but both rentals and a white truck.

Q.   Do you recall if she was the driver or the passenger?

A.   The passenger.

Q.   And she was a passenger in her white SUV?

A.   I can't recall if she was a passenger in the white
     SUV.

Q.   All right.  And, sir, am I correct that you were
     arrested in February of 2006?

A.   Yes.

Q.   Were you ever out of custody after your arrest in
     2006?

A.   No.

Q.   You're sure you saw Ms. Temple in her white SUV?  I
     think the exhibit that you saw -- that white SUV?

A.   Yes, yes.

Q.   Same as that white SUV?

A.   Yes.

Q.   Sir, would it surprise you that she didn't purchase

1        that vehicle until May of 2006?

2    A.   No.

3    Q.   Can you explain to the jury how you would have seen

4        her driving a vehicle in February of 2006 or prior if

5        she didn't even own it until May?

6    A.   Because most of the times when I seen Monterial he

7        was in the rental.

8    Q.   You testified, sir, that you saw her in that white

9        SUV.  Do you recall that?

10   A.   Yes.

11   Q.   Can you explain how she could have been driving that

12       white SUV when she didn't even purchase it until

13       three months after your arrest?

14   A.   No.

15           MR. HEATHMAN:  No further questions, your

16       Honor.

17           THE COURT:  Anyone else?  Hearing none, any

18       redirect?  Hearing none, Mr. Holman, you're remanded

19       to the custody of the United States marshals, and the

20       government may call its next witness.

21           MS. MOREHEAD:  We will get our next

22       witness, Judge.

23           THE COURT:  Who is that?

24           MS. MOREHEAD:  Danny Tarrants, Judge.

25

1                           DANNY TARRANTS,

2     having been duly sworn, was examined and testified as

3     follows:

4                         DIRECT EXAMINATION

5     BY MS. MOREHEAD:

6     Q.    How old are you, Mr. Tarrants?

7     A.    Forty-three.

8     Q.    What city and state do you live in?

9     A.    I live in Sturgeon, Missouri.

10    Q.    Where is that from Columbia, Missouri?

11    A.    Approximately 20 miles north.

12    Q.    Can you tell the jury where you grew up and where you

13          were raised.

14    A.    I grew up in Wellsville, Missouri, population 1600 or

15          so, in the same area, Midwest Missouri.

16    Q.    And is all that kind of near and around Columbia,

17          Missouri?

18    A.    Yes.

19    Q.    Were there times that you actually have lived in

20          Columbia, Missouri?

21    A.    Yeah.  I lived in Columbia approximately six years.

22    Q.    Do you remember what that time frame was?

23    A.    1999 to 2005.

24    Q.    Okay.  And do you have children?

25    A.    Yes.  I have two daughters, my daughter Gabriel and

```
 1            then --
 2                        THE COURT:  She just asked if you had any
 3            children.  Don't go any further.
 4   Q.   (By Ms. Morehead) I don't need to know their names.
 5   A.   Okay.
 6   Q.   How old are your children?
 7   A.   Thirteen and 12.
 8   Q.   Mr. Tarrants, in connection with being here in this
 9            particular case, were you, in fact, stopped by
10            police?  I'm going to use that term kind of loosely.
11   A.   Yes.
12   Q.   In June of 2007?
13   A.   Yeah.
14   Q.   And, Mr. Tarrants, what were you doing before the
15            police stopped you?
16   A.   I was dropping my fiancee and daughters and stuff off
17            before I went to my friend's house to pick up some.
18   Q.   Okay.  And you said you were getting ready to go pick
19            something up?
20   A.   Yeah.  I was getting --
21   Q.   Is that right?
22   A.   Yes, ma'am.
23   Q.   What were you getting ready to pick up?
24   A.   A four-way, 4½ ounces of cocaine.
25   Q.   What were you getting ready to do with that?
```

```
 1    A.    Take it to Marcus McDaniel.

 2    Q.    Okay.  And who is Marcus McDaniel?

 3    A.    He's Keith's brother, Harv's brother.

 4    Q.    And, for the record, you've just gestured to somebody

 5          here in the courtroom.  Who are you pointing to?

 6    A.    Keith.

 7    Q.    And what color shirt does that individual have?

 8    A.    Burnt orange, red.

 9                MS. MOREHEAD:  Judge, for the record, this

10          witness has identified the clothing worn by the

11          defendant, Keith McDaniel.

12                THE COURT:  The record shall so reflect.

13    Q.    (By Ms. Morehead) Now, you said you were getting

14          ready to deliver a four-way to Marcus McDaniel?

15    A.    Yes.

16    Q.    And the police ended up stopping you?

17    A.    Right.

18    Q.    Did you actually have drugs on you at that time?

19    A.    No.

20    Q.    What did you think was going on at that time, Mr.

21          Tarrants?

22    A.    I knew exactly what was going on.  I was being set

23          up.  It was the only guy I talked to all day.

24    Q.    Who is he?

25    A.    Marcus.
```

1    Q.   Okay.

2    A.   The night before we had tried calling and tried

3         calling, couldn't get ahold of him, and he was really

4         adamant about me coming.

5    Q.   Who was really adamant about you coming?

6    A.   Marcus.

7    Q.   On the 22nd of June?

8    A.   Right.  So, I mean, the minute I got stopped, I knew,

9         you know, what was going on.

10   Q.   Okay.  And you had not yet picked up the drugs that

11        you were to deliver to him?

12   A.   No.

13   Q.   When had you last delivered drugs to Marcus McDaniel?

14   A.   The night before.

15   Q.   And you said you had been trying to get ahold of him

16        and get ahold of him.  Was that after the incident

17        that you had sold drugs to him the night before?

18   A.   Yes, yes.

19   Q.   In connection then with being stopped by the police,

20        you didn't have any drugs on you?

21   A.   No.

22   Q.   Did the police ask you if you were in possession of

23        any drugs?

24   A.   Oh, yeah.

25   Q.   And what did you tell them?

1    A.   Told them no.

2    Q.   And did you give them authority to search your

3         residence?

4    A.   Yeah.

5    Q.   And back during that time period -- and we're going

6         to backtrack before that, Mr. Tarrants, but where

7         were you keeping your drugs that you were selling

8         back in June of 2007?

9    A.   I had a safe house off of Brown Station Road that I

10        was keeping them at because I kept them away from my

11        wife and daughter for --

12   Q.   And did you, in fact, provide that information to law

13        enforcement?

14   A.   Yeah.

15   Q.   And were you -- did you, in fact, assist them and go

16        to that location?

17   A.   Yeah.

18   Q.   And what had happened to the drugs by the time you

19        got to that --

20   A.   They were gone by the time I got there.

21   Q.   Let me finish my questions.  What had happened to the

22        drugs by the time you got to that location?

23   A.   They were gone.

24   Q.   And do you know how that would have happened?

25   A.   Nobody claims to have done it, but, I mean, when you

1       sit on the highway for 45 minutes and everybody you

2       know drives by -- you know, there was five or six

3       people knew where I was at.  I'm sure somebody just

4       went and got rid of it, whatever.

5   Q.  All right.  In connection with your contact with

6       police on June 2007, did they, in fact, find you to

7       be in possession of any drugs at all?

8   A.  No.

9   Q.  In connection with this episode in June of 2007, did

10      you begin -- did you, in fact, on that date talk to

11      some DEA agents?

12  A.  Yes.

13  Q.  And in connection with that did they ask you if you

14      would cooperate and provide information about your

15      source and who you were getting drugs from?

16  A.  Yes.

17  Q.  And what did you -- what was your response in

18      connection with that, Mr. Tarrants?

19  A.  I was just so hurt, I said yeah.

20  Q.  What were you hurt about?

21  A.  His own brother brought the wolves to my door, and I

22      had never had any trouble before with anybody.

23  Q.  Okay.  And when you said "his own brother," who,

24      again, are you referring to?

25  A.  Harv.

1    Q.   So Harv's brother brought the wolves.  And are you

2         referring to the police?

3    A.   Yeah, the police officers, yeah.

4    Q.   And so you were hurt by that fact?

5    A.   Yeah.

6    Q.   In connection with cooperating with the police, did

7         you want some sort of assurance that you weren't

8         going to get charged with anything?

9    A.   Yes.

10   Q.   Was that a concern of yours, that you were going to

11        get charged, even though --

12   A.   Absolutely, yeah.

13   Q.   -- you didn't actually get caught with any dope?

14   A.   Well, you know, I have been in trouble before, and

15        I'm aware that if DEA is there, there's some kind of

16        problem, because I'm sure they had me for something

17        somewhere along the lines.

18   Q.   In connection with wanting assurance that you weren't

19        going to get charged, what did the agents do in

20        connection with talking to you?

21   A.   They called the prosecutor in their district and

22        asked her what they should do and everything, and

23        they told them that it was fine, I wouldn't get

24        prosecuted on anything that pertains to this case.

25   Q.   All right.  And so the prosecutor, is that out of

```
1            Jefferson City as far as you know?
2     A.     Yes, I think so.
3     Q.     The prosecutor in connection with -- the federal
4            prosecutor there made an assurance that you would not
5            get prosecuted in connection with anything that you
6            were going to cooperate about in connection with your
7            case; is that right?
8     A.     Yes, uh-huh.
9     Q.     And in connection then with cooperating, did you, in
10           fact, sit down with law enforcement and provide them
11           information about your history of selling drugs?
12    A.     Yes.
13    Q.     Now, Mr. Tarrants, in connection with -- you've been
14           in trouble before.  You were convicted in 1997 for
15           assault in the second degree in Montgomery City,
16           Missouri, is that right, a felony?
17    A.     Yes.
18    Q.     Did you get probation in that case?
19    A.     Yeah.
20    Q.     Did you successfully complete probation?
21    A.     Yes.
22    Q.     And did you also have a 2004 misdemeanor, like,
23           stealing in Columbia, Missouri?
24    A.     Yeah, yeah.
25    Q.     And in connection with your history, have you ever
```

```
 1          been involved in using illegal drugs?
 2   A.     Yeah.  I was pretty wild when I was a kid, yeah.
 3   Q.     What would -- what would using drugs be?  What did
 4          that involve back then?
 5   A.     Mostly marijuana, you know, and drinking, but I'd do
 6          a bump of cocaine, you know, in the eighties mostly.
 7   Q.     And in 1998 did those circumstances change about you
 8          kind of being wild and --
 9   A.     Yeah.
10   Q.     -- all of that?
11   A.     My daughter was born.  I kind of grew up, kind of
12          snapped me out of it quite a bit.
13   Q.     And did that include working steadily and earning a
14          living and that sort of thing?
15   A.     Yeah.  I worked steady until I got an autoimmune
16          disease.
17   Q.     About when was that, Mr. Tarrants?
18   A.     2003.
19   Q.     When you got this autoimmune disease, what did that
20          do with regards to your ability to work?
21   A.     It shut down my liver, made me very lethargic.  They
22          put me on a whole bunch of medicine and stuff, and I
23          couldn't work.
24   Q.     In connection with not being able to work, what did
25          that force you and your family to do?
```

```
 1    A.   We moved from Oak Drive back to the projects, back

 2         to, you know, cheap housing, and I just felt like we

 3         took a big step backwards.  It was frustrating.

 4    Q.   Is it safe to say '03, kind of moving forward, '04,

 5         you were struggling?

 6    A.   Yeah.

 7    Q.   What did you do then in connection with trying to

 8         make money?

 9    A.   Started hustling.

10    Q.   You what?

11    A.   I started hustling, started, you know, trying to

12         figure out ways to make money, you know, whatever I

13         could get my hands on.

14    Q.   Did you, in fact, have a friend, some guy named Art?

15    A.   Yeah.

16    Q.   Who was Art?

17    A.   He was a close friend of mine from since we were

18         kids.

19    Q.   And in connection with Art what happened after you

20         got this autoimmune disease in order to make money in

21         connection with Art?

22    A.   You know, he started getting a little money around,

23         you know, started living a little better.

24    Q.   Art did?

25    A.   Yeah.
```

1    Q.    What do you mean by that?

2    A.    Started having his own car instead of borrowing mine

3          all the time and taking care of himself and was

4          actually making some good money, so I asked him what

5          was up, and he said, hey, I could do this for you,

6          so --

7    Q.    What did Art do for you?

8    A.    At first he just, you know, kind of hooked me up with

9          maybe an ounce of cocaine here and there, you know;

10         and then he introduced me to Harv after a while.

11   Q.    When Art would initially give you an ounce of cocaine

12         here and there, what was that -- what was he giving

13         you an ounce of cocaine for doing?

14   A.    At the time, at first I would just buy it really

15         cheap, and then I would hold -- then I would just

16         hold it for him.  He would say, here you hold this,

17         and I'll kick you something.

18   Q.    What were you holding for him?

19   A.    Cocaine.

20   Q.    And what quantities of cocaine -- when you say

21         holding cocaine, is it safe to say you were actually

22         storing cocaine for Art?

23   A.    Right.  I was the safe house pretty much.

24   Q.    All right.  And then Art would kick you a little

25         something for you storing his drugs?

1   A.   Right.

2   Q.   Is that right?

3   A.   Yes.

4   Q.   Would he ever pay you money?

5   A.   Sometimes, if I needed it, yeah.

6   Q.   And over the course of time then did you start making

7        money as a result of storing drugs for Art?

8   A.   Yeah.  Art got smart, just got out of it, said, I'm

9        done, you know, and he was having hard times with it,

10       so he went ahead and got done, and so I kind of

11       approached Harv myself.

12  Q.   Okay.  Did you -- and you've mentioned Harv, Keith

13       McDaniel, here in the courtroom; is that right?

14  A.   Yeah.

15  Q.   Is that what you knew him as, is Harv?

16  A.   Yeah.

17  Q.   When did you first meet Keith McDaniel?

18  A.   2004, probably.

19  Q.   And moving forward then to June of 2007, from '04 to

20       June of 2007, did you maintain and have contact with

21       Harv during that time period?

22  A.   Absolutely.  Came very close too.  I felt like I did

23       anyway.

24  Q.   And in connection then with the contact that you had

25       with Harv between '04 and up through June of 2007,

```
 1        were there occasions where you would have social
 2        contact with one another?  And do you know what I
 3        mean by that?
 4   A.   Yeah.  I would invite him to, you know, the lake.  I
 5        would always beg him to come ride on my boat and
 6        stuff or come out to the house and hang out a little
 7        bit or something, you know.
 8   Q.   Okay.  And did your contact -- did your situation as
 9        far as storing drugs and then occasionally selling
10        drugs, did that continue on a kind of a low keel pace
11        up until 2006?
12   A.   Yeah.  I was pretty skittish.  I was trying to be
13        careful.  I wasn't after the fast dollar per se.  It
14        was more like the slow quarter.  It didn't take a lot
15        for me to live.  I wasn't trying to be greedy.  And
16        then, yeah, I guess probably the summer of '06 things
17        escalated quite a bit.
18   Q.   Okay.  Let's kind of focus in on 2006 up until the
19        time that you got arrested in June of 2007, okay?  I
20        say arrested.  You didn't get arrested; you were just
21        talked to by the police?
22   A.   Right.
23   Q.   Did you have regular contact with Harv during that
24        time period?
25   A.   Yeah, for the most part.  There would be a couple
```

1    times I didn't talk to him for a couple weeks at a

2    time, but hardly ever.  I kept pretty good contact

3    with him.

4  Q.  Okay.  And at some point after Art got out of the

5      picture did you and Mr. McDaniel, Harv, did you start

6      a relationship together in connection with drug

7      trafficking?

8  A.  Yes.

9  Q.  Did that continue through 2006 and into 2007?

10 A.  Yes.

11 Q.  And when things were really moving in 2006, tell us

12     about that situation.

13 A.  When things were going really good, before people

14     started getting greedy and cutting each other off and

15     all that, we was moving -- there was times I would

16     get two whole birds and 3 pounds of -- 30 pounds of

17     weed.

18 Q.  So two birds and?

19 A.  Thirty pounds of weed.

20 Q.  Thirty pounds of weed?  In connection with your

21     relationship with Harv, 2006 through 2007, what was

22     the arrangement that the two of you had set up?

23 A.  I just moved out to Sturgeon, Missouri, so I was in a

24     very low key spot.  I would pretty much get the whole

25     thing.  It was on me.  I would get the whole thing,

1        break it up into whatever it was, meet, you know,

2        guys I knew, distribute it out, get the money, make

3        sure they paid me what they was supposed to pay me

4        and that type of deal, and make sure he got his

5        money.

6    Q.  All right.  So you would get -- when you said two

7        birds, what are you talking about?

8    A.  Two keys.

9    Q.  Of what?

10   A.  Cocaine.

11   Q.  And so you would get 2 kilos of cocaine and then an

12       amount of marijuana?

13   A.  Right.  And that was at the highlight.  Generally it

14       was one, but that summer it got pretty crazy.

15   Q.  All right.  In the summer of 2006 it got pretty

16       crazy.  What do you mean, it increased in quantity?

17   A.  Yeah.  It increased quite a bit.

18   Q.  When you would get the quantity of cocaine and

19       marijuana, how would you acquire that from Harv?

20   A.  Either his girlfriend at the time would bring it, or

21       somebody would bring it to me, or I would send

22       somebody up there.  You know, whichever.

23   Q.  Is it safe to say you didn't have a standard or set

24       way of doing it?

25   A.  Right.  No, no.

1    Q.   It would just kind of occur in different ways?

2    A.   It would --

3                    THE COURT REPORTER:  Wait.

4                    THE COURT:  You probably understand this,

5         but only one of you can talk at a time because the

6         court reporter --

7                    THE WITNESS:  Okay.  Sorry.

8                    THE COURT:  That includes me because the

9         court reporter has to take this down to make a

10        record.  So please just let whoever is asking you the

11        question finish, then you'll answer, and the rest of

12        us won't interrupt your answer.  All right?

13                    THE WITNESS:  Okay.

14   Q.   (By Ms. Morehead) Are you nervous, Mr. Tarrants?

15   A.   Yeah.

16   Q.   Okay.  You mentioned several ways that this would

17        occur.  One, you said his girlfriend would -- did you

18        say bring it?

19   A.   Yes.

20   Q.   Is that what you said?  Tell me who this individual

21        was and what you knew about that individual.

22   A.   This girlfriend, he called her Chanel.  I don't know

23        anything else about her.

24   Q.   Okay.  What kind of vehicle would Chanel drive, or

25        would she drive different vehicles?

1771

```
1    A.   Different vehicles.  She had a Monte Carlo SS, but it

2         would vary.

3    Q.   So Chanel would brings drugs to your location?

4    A.   Uh-huh.

5    Q.   Where did you actually -- where were you storing the

6         drugs that you would get from Harv?

7    A.   I generally had a place to stash them.  I tried not

8         to keep it at my house.

9    Q.   Okay.  And what places would you -- did you utilize

10        to stash the drugs that you got from Harv?

11   A.   I had a friend that was maybe a user.  I could give

12        him a little something to hold it, or we had a house,

13        you know, down by Rock Bridge that was vacant, you

14        know, we just had a key to, or whatever.

15   Q.   Okay.  And so when Chanel would bring you the drugs,

16        what would that typically consist of?

17   A.   A key.

18   Q.   A kilo?

19   A.   Yes.

20   Q.   Any marijuana that she would bring at the same time?

21   A.   No.  That was kind of on me to do that.

22   Q.   That was what?

23   A.   That was on me to do that.

24   Q.   All right.  And how often would you get -- how many

25        times do you think Chanel delivered cocaine to you
```

| 1 | | between 2006 and into 2007? |
|---|---|---|
| 2 | A. | More than I can count.  I couldn't guess.  More than |
| 3 | | ten, more than 15 times, 20 times probably. |
| 4 | Q. | Okay. |
| 5 | A. | Once a week at least. |
| 6 | Q. | Were there ever any other individuals besides Chanel |
| 7 | | that Harv would send to deliver drugs to you? |
| 8 | A. | Yeah, yeah. |
| 9 | Q. | And who else?  Anybody else that you knew their name |
| 10 | | or -- |
| 11 | A. | Didn't really know them, you know.  I -- not really. |
| 12 | Q. | How many other people do you recall would have |
| 13 | | occasion to deliver drugs to you aside from Chanel? |
| 14 | A. | I keep thinking this girl's name is Tisha that had a |
| 15 | | big, like, Impala SS or something.  There at the end |
| 16 | | after, you know, things started getting dicey and |
| 17 | | Devin got caught, you know, he switched up and it |
| 18 | | was -- Chanel had left, or whatever. |
| 19 | Q. | We will talk about Devin in a minute.  You remember |
| 20 | | somebody named -- what was her name, Tisha? |
| 21 | A. | Tisha is what I said. |
| 22 | Q. | All right.  And 2006, 2007, you mentioned Harv would |
| 23 | | have somebody bring that to you.  Were there ever any |
| 24 | | times Harv would bring drugs directly to you himself? |
| 25 | A. | Once or twice.  Not very often. |

```
 1    Q.   On the couple of times that Harv delivered himself,

 2         what do you remember about any of those incidents?

 3         Was that just cocaine or --

 4    A.   Yes.  And I let him come to my house.  He come

 5         directly to my house.

 6    Q.   And when you were -- you would get these -- before I

 7         go there, let me finish off where we were.  You said

 8         sometimes you might send someone to get them?

 9    A.   I had a couple people go get them a couple times,

10         yeah.

11    Q.   And where would you send those people on those couple

12         of times to go get whatever you were going to get?

13    A.   Wherever Harv and them was staying at the time.

14    Q.   Were there ever any times that you went somewhere?

15    A.   Yes, ma'am.

16    Q.   To pick up drugs?

17    A.   Yeah.  Went down by Van Brunt one time, or whatever.

18    Q.   One time by Van Brunt?

19    A.   Yeah.  And a couple times in Independence.

20    Q.   Do you remember where at on Van Brunt?

21    A.   Down by the old McDonald's, probably 30th, 31st

22         Street, somewhere in there.

23    Q.   What kind of a location was it this one time?

24    A.   Small house.

25    Q.   Small house?
```

1   A.   Yeah.

2   Q.   Did you know who was staying at that house?

3   A.   They were all there, but I thought Tellie was staying

4        there.

5   Q.   You said they were all there.  Who were you talking

6        about?

7   A.   Harv and Killer.  I mean, they would all just hang

8        out there.  I don't know who was doing what.

9   Q.   Harv, Killer, and did you say Tellie?

10  A.   Tellie was there, yeah.

11  Q.   What do you remember picking up that time when you

12       went to the house off of 31st Street and Van Brunt?

13  A.   I think I got a key and a truck.

14  Q.   A kilo and a truck?

15  A.   Yeah.  I bought an Explorer from him.

16  Q.   Were there several occasions that you bought vehicles

17       from Keith McDaniel?

18  A.   Yeah.  Bike and a truck.

19  Q.   A bike?

20  A.   A motorcycle, yeah.

21  Q.   Okay.

22  A.   A truck and -- I mean, he always took care of me.

23  Q.   And you indicated you would get quantities of

24       cocaine, and then there was marijuana also that you

25       got.  Let's talk about the cocaine, 2006 into 2007.

1    You said 1 to 2 kilos at a time; is that right?

2  A.  Yes.

3  Q.  How often would those shipments come to you, or how

4      often would you get those shipments, I should say?

5  A.  In the summer of -- in the summer of 2006 probably

6      every four days or so, every four or five days.

7  Q.  And in connection then with the cocaine that you

8      would get, what would you turn around and do with

9      that?

10 A.  I would break the key down, weigh it up, and

11     distribute it out to people that we knew.

12 Q.  And when you said you would break it down, when you

13     would get the kilo of cocaine, what did it look like?

14 A.  A key, wrapped up.

15 Q.  What was --

16 A.  Tight.

17 Q.  What was it wrapped in?

18 A.  Black tape, plastic.

19 Q.  Okay.  So it would still be wrapped when you would

20     get it?

21 A.  Yes.

22 Q.  When you say you would break it down, what would you

23     do with it?

24 A.  Break it down into 4½'s, nines, whatever it called

25     for that we was getting rid of.

1   Q.   When you say 4½ and nines, what are you referring to?

2   A.   Ounces.

3   Q.   When you would then turn around and distribute it,

4        who were you distributing the cocaine to?

5   A.   He had a guy Fulton, Tio, Anthony.  There was a lot

6        of Anthonys and Tonys.  There was a guy there from

7        Columbia, just random guys that he knew.

8   Q.   When you say guys that he knew, who are you referring

9        to?

10  A.   I'm sorry.  Harv.

11  Q.   How did you know who to give the 4½'s or the nines to

12       that you were distributing?

13  A.   At first he would call and tell me this, and then he

14       trusted me enough that the guy that I would actually

15       give it to would call me himself.

16  Q.   Okay.  And you indicated that you would get the

17       quantity of cocaine that you would get and you would

18       then divide it up and sell it in whatever quantities

19       people wanted?

20  A.   Right.

21  Q.   What would happen -- would they -- do you know what I

22       mean when I say fronting?

23  A.   Would they what?

24  Q.   Do you know what I'm talking about when I say the

25       word fronting?

1777

```
 1    A.   Yeah.

 2    Q.   What's your understanding of fronting?

 3    A.   That they would give the money later or whatever.

 4    Q.   Okay.  The individuals that you were giving the drugs

 5         to, or the cocaine to, were they required to pay at

 6         the time they got the drugs, or did you front them

 7         and get the money later?

 8    A.   That was a play-by-play call.  Most of the time the

 9         general rule was get the money up front.  That was

10         the general rule.

11    Q.   Okay.  And then what did you do with regards to the

12         money that you got from the cocaine that you were

13         selling?

14    A.   Made sure it was all there, wrap it up, and wait for

15         Harv to come get it.

16    Q.   And who would you give the money directly to then?

17    A.   Oh, Harv.

18    Q.   Did you ever give the money to anybody else besides

19         Harv?

20    A.   A couple times.  I didn't trust anybody too much.  I

21         felt better handing it to him.

22    Q.   And what quantity of money would you have to give

23         Harv for the kilos that you were selling?

24    A.   Well, five for nine.

25    Q.   $5,000?
```

1  A.  Right, for 9 ounces.  And you can do the math.

2  Q.  5,000 -- you were selling 9 ounces, $5,000?

3  A.  Right.

4  Q.  How about for 4½?  How much were you --

5  A.  2500.

6  Q.  Were there ever any times that you sold to any of the

7      customers that you and Harv had more than a 4½ or

8      9 ounces at a time?

9  A.  Generally not.  There was a couple times that, you

10     know, some guy would get 18, but not very often, and

11     then there was this guy I knew from the south that

12     got 18 at one time, but that was not hardly ever the

13     case.

14 Q.  In connection with the cocaine that you would get in

15     the summertime, every four to five days you would get

16     1 to 2 kilos at a time; is that right?

17 A.  Yeah.

18 Q.  Would you already have whatever amount of cocaine you

19     were getting?  Would that already in essence be sold,

20     or did you have to go about the business of selling

21     it after you got it?

22 A.  Well, I -- I didn't really have to sell it.  It would

23     be gone pretty quick if I didn't get my hands on it

24     to make -- sell it myself.  It would be gone real

25     fast, but, I mean, they had to find out that it was

1      there, and then everybody would call.

2  Q.  And why did they want to find -- why did they want it

3      to be there before they would commit to taking the

4      cocaine?

5  A.  I'm sorry?

6  Q.  You said they -- it had to be there first.  You made

7      a comment about --

8  A.  Oh, because, I mean, it's the drug game.  It ain't

9      like regular business.  You don't know if it's going

10     to make it down the highway.  You don't know -- you

11     know, so you wait and take one step at a time.

12 Q.  Okay.  And whatever amount of money then you made off

13     of the kilo or two kilos at a time that you made, you

14     would give that money to Harv?

15 A.  Uh-huh.

16 Q.  Yes?

17 A.  Yes.

18 Q.  And what did you get in exchange then for storing,

19     selling, distributing these drugs for Harv?

20 A.  He would either, you know, give me an ounce off the

21     top, you know, or, you know, give me a four-way cheap

22     enough that I could sell it to make good money.  He

23     pretty much gave me whatever I asked him for.

24 Q.  And in connection then with this amount of money, if

25     he gave you an ounce, or whatever, how much were you

1       profiting for each kilo that you were selling?

2   A.  A thousand dollars.

3   Q.  And if you were selling a couple kilos every four or

4       five days, you were making several thousand dollars

5       every week?

6   A.  Yes.

7   Q.  And what were you doing with the money that you were

8       making in 2006 into 2007?

9   A.  I put all my money into a house for my fiancee and my

10      daughters.

11  Q.  And in connection then with the relationship that you

12      had with Keith McDaniel, you mentioned you were also

13      involved in selling marijuana; is that right?

14  A.  Yeah.

15  Q.  Was that connected with your cocaine stuff with Keith

16      McDaniel, or was that separate?

17  A.  That's kind of a gray area, you know.  They are the

18      same guys, so, you know.

19  Q.  Okay.  So you were -- you were also getting marijuana

20      from Keith McDaniel; is that right?

21  A.  Yeah.  But I knew who he was getting it from.  I knew

22      where it was coming from, whatever.

23  Q.  Okay.  And were you also then selling the marijuana

24      for Keith McDaniel?

25  A.  No.  That was pretty much so I could make money.

1    Q.    That was for you to make money?

2    A.    Yeah.

3    Q.    Did you then just have to pay him the amount of money

4          for --

5    A.    Whatever he got it for.

6    Q.    Okay.  And how much were you paying for, let's say, a

7          pound of marijuana?

8    A.    500, 550.

9    Q.    And how much were you then -- that was for a pound?

10   A.    Yeah.

11   Q.    And then how much were you making on a pound of

12         marijuana?

13   A.    Couple hundred bucks.  Sell it for 2000, a thousand

14         dollars.

15   Q.    Depending on how much you --

16   A.    -- I got.  If I got 5 pounds or -- right.

17   Q.    All right.  And in connection with your contact with

18         Keith McDaniel in 2006 and, 2007, did you have

19         occasion to find out who he was getting his cocaine

20         from?

21   A.    Yeah.

22   Q.    And did you ever meet an individual -- did you ever

23         meet his supplier?

24   A.    That's what I was told he was, yeah.

25   Q.    All right.  And who is it that you met?

1    A.   I thought his name was Ontario, but, you know --

2    Q.   Okay.  So what were the circumstances that you would

3         have met Mr. McDaniel's source?

4    A.   Met him on a social level at a club in Lake of the

5         Ozarks.

6    Q.   And how was it that you were all at a club in Lake of

7         the Ozarks?

8    A.   I invited him to come down.

9    Q.   And so did Keith McDaniel come down to the Ozarks?

10   A.   Yeah, he came down and hung out for a while.

11   Q.   And did Ontario come to?

12   A.   Yeah.

13   Q.   In connection with -- did you and Mr. McDaniel go on

14        any other social trips together aside from going to

15        the Lake of the Ozarks?

16   A.   He would come to my house and hang out and barbecue

17        and whatnot.

18   Q.   And in connection with Mr. McDaniel, did you become

19        acquainted with different vehicles that he might

20        drive?

21   A.   Oh, yeah.

22   Q.   And what vehicles did you know that he was associated

23        with?

24   A.   He had an SS truck, had an old-school Cutlass

25        Oldsmobile.  There are so many.  STS Cadillac.  I

1       think, like, a gold Cadillac back when I first met

2       him.  There was a lot -- had a real nice Mercedes

3       once.  I know that he had a lot of cars.

4   Q.  And what kind of Mercedes did you know that he had?

5   A.  It was black, had nice rims on it.

6   Q.  Okay.  And in connection then with your activity with

7       Keith McDaniel, you mentioned about something that

8       happened with Devin.  Do you remember talking about

9       that?

10  A.  Yes.

11  Q.  Who is Devin?

12  A.  He was a young white kid that hung around his brother

13      Marcus.

14  Q.  Hung around Marcus?

15  A.  Uh-huh.

16  Q.  Yes?

17  A.  Yes.

18  Q.  What was the situation with Devin and Harv?

19  A.  In my opinion that summer of 2006 things were

20      getting, you know, real crazy.  We was moving a lot

21      and everything.  I was trying to back up a little

22      bit.

23  Q.  Slow down?

24  A.  Yes, slow down, and I felt like he went to Devin to

25      do more kind of what he wanted to do.  Our

1          philosophies wasn't really getting together any more

2          about what we need to do.

3    Q.   And Columbia, Missouri, is it a pretty small area?

4    A.   Yeah.  I mean, it's a college town.

5    Q.   Okay.  And did you become aware of some circumstances

6          in March of 2007 involving Devin getting arrested?

7    A.   Yeah.  He got arrested, yes.

8    Q.   And after Devin got arrested, did you continue to

9          have contact with Harv after that?

10   A.   For a couple months I didn't hear from him at all,

11         and then, you know, he got back ahold of me after,

12         you know, three or four months.

13   Q.   The drugs that you were distributing in that summer

14         of 2007 when the police stopped you after you

15         indicated you had sold a four-way to Marcus McDaniel

16         the day before and you were supposed to deliver --

17         was it another four-way?

18   A.   Yes.

19   Q.   -- that same day, I mean that day you were stopped by

20         police --

21   A.   Yes.

22   Q.   -- whose drugs were those that you were distributing?

23   A.   They were Harv's.

24   Q.   Were there ever any times when you would have contact

25         with Keith McDaniel in connection with getting drugs

```
 1        from him or giving him money that you would see him

 2        with a firearm?

 3   A.   No.

 4   Q.   I would like Mr. Tarrants to play several phone calls

 5        for you, and I'm just going to --

 6                 MR. BELLEMERE:  Do you mind if we approach

 7        at this juncture?

 8                 THE COURT:  You may.

 9                 (Counsel approached the bench and the

10        following proceedings were had:)

11                 MR. BELLEMERE:  Your Honor, it's entirely

12        possible that this man knows my client, which is

13        something that seems to be sort of established, but

14        if we're going to play phone calls for him, I would

15        like to ask again that we do a -- there's phone calls

16        in this setup that have to do with Grigsby and

17        Ringgold, Grigsby and Shaq.  I would like to see some

18        of those phone calls played along with whatever calls

19        subsequently that the government wants to play to see

20        whether or not this fella can, in fact, identify my

21        client's voice.  I know this is a double-edged sword,

22        but I think I want to try that.

23                 MS. MOREHEAD:  Frankly, Judge, I intended

24        to do that.  I'm just going to play snippets from

25        calls.
```

```
1                    THE COURT:  We will do it with monitors

2         off, all that sort of thing.  Very good.

3                    (The proceedings returned to open court.)

4    Q.   (By Ms. Morehead) Mr. Tarrants, I'm just going to

5         play some snippets from some different phone calls,

6         and I'm just going to play them, and I'll probably

7         only play them for a few minutes and then move on to

8         the next one.  Okay?

9    A.   Uh-huh.

10                   MS. MOREHEAD:  Could you play Government's

11        Exhibit 156.

12                   (Exhibit No. 156 was played in open court.)

13                   MS. MOREHEAD:  I would like to play

14        Government's Exhibit 173.

15                   (Exhibit No. 173 was played in open court.)

16                   MS. MOREHEAD:  And Government's

17        Exhibit 170.

18                   (Exhibit No. 170 was played in open court.)

19   Q.   (By Ms. Morehead) On those three snippets that we

20        played, did you recognize any of those voices?

21   A.   Just the last one.

22   Q.   And of the last one that we played, which was

23        Government's Exhibit 170, whose voice did you

24        recognize?

25   A.   Harv's.
```

```
 1                    MS. MOREHEAD:  Judge, I think we have
 2          already made a record about who was in those
 3          particular calls on prior occasions.
 4                    THE COURT:  Yes, you have.
 5                    MS. MOREHEAD:  Okay.
 6     Q.   (By Ms. Morehead) In connection with your contacts
 7          with law enforcement, did you, in fact, agree to make
 8          calls to Keith McDaniel as well?
 9     A.   Yes.
10     Q.   Was that phone numbers that you had acquired for him
11          in connection with your contact with him?
12     A.   Yes.
13                    MS. MOREHEAD:  Judge, that's all I have of
14          this witness.
15                    THE COURT:  All right.  Let's take our noon
16          recess at this point then.  Members of the jury, I'll
17          remind you of the admonitions not to discuss the case
18          among yourselves or with anybody else.  Don't talk
19          about anything associated with the case, even
20          something that doesn't appear to be significant or
21          substantive about the case.  Just forget about the
22          case while you're on recess.  Don't have any contact
23          with the participants.  Don't do any research or
24          investigation.  Just have a nice lunch, and we will
25          start at a quarter after one.  Ms. Scheurer, please
```

1    take charge of the jury.  Counsel and the parties,

2    remain here.  Mr.  Tarrants, you may step down.

3              (The following proceedings were had outside

4    the presence of the jury:)

5              THE COURT:  Is there anyone other than

6    Mr. Bellemere who is going to cross examine this

7    witness?

8              MR. CALBI:  Depending on what areas

9    Mr. Bellemere may get into, I may have a couple

10   questions for him because of what he said on direct.

11             THE COURT:  I'll call on Mr. Bellemere

12   first.  I assume you might have a question or two.

13             MR. BELLEMERE:  Your Honor, I'm not sure

14   how many.  Maybe just two.

15             THE COURT:  Sometimes brevity is the soul

16   of wit, as they say.  I'll call on you first; you can

17   do what you feel is appropriate; and, Mr. Calbi, you

18   alert me if you want to be called upon.

19        Where do we go after this witness, Ms. Morehead?

20             MS. MOREHEAD:  Judge, I've got another

21   cooperator and then a couple law enforcement.  I'm

22   going to have to, frankly, get some more witnesses

23   in.  We have gone through these witnesses a little

24   faster than I anticipated.  I'll have to see what I

25   can drum up.

1    THE COURT:  How are we doing as far as

2  reaching our ultimate objective?

3    MS. MOREHEAD:  I still think that I'll be

4  finished by Thursday sometime.  I would say earlier

5  rather than later.

6    THE COURT:  Okay.  Obviously, we will have

7  some things to do once you finish.  There are a

8  number of issues that need to be tied up, so that's

9  not going to be the end of the world if you finish

10  before the end of the day on Thursday.

11    MS. MOREHEAD:  I think I should.

12    THE COURT:  That's good to know.  Anything

13  for the good of the order?  Mr. Johnson?

14    MR. JOHNSON:  Are you going to ask the law

15  enforcement about the Franklin stop?  Are they

16  different?

17    MS. MOREHEAD:  I don't know.  We may get to

18  Mr. Franklin's stop this afternoon if that witness is

19  available, your Honor.

20    THE COURT:  Would that be after the break,

21  you think?

22    MS. MOREHEAD:  After the afternoon break?

23  It could be.

24    THE COURT:  We can take up Mr. Johnson's

25  issue now, if you want to, or come back early before

1    we start with the jury, or we can do it on the

2    afternoon recess.  When do you all want to take up

3    that issue?

4              MR. JOHNSON:  At your convenience, Judge.

5              MS. MOREHEAD:  It doesn't matter, Judge.  I

6    just need time to get some other witnesses lined out,

7    I think, because I, again, not knowing how fast we

8    were moving, so I don't want to --

9              THE COURT:  Why don't we break now so you

10   can get to work on that.

11             MS. MOREHEAD:  Okay.

12             THE COURT:  And it's not going to take us

13   that long to deal with the other issue.  Let's be

14   back here at five after one to take up that issue.

15             MR. JOHNSON:  Sounds good.

16             THE COURT:  If the rest of the people don't

17   want to -- logistically maybe it's easier for you all

18   to be here, but understand this is an issue between

19   Mr. Goodwin and the government that we're going to

20   take up at that time.  All right.  We're in recess.

21             (The luncheon recess was taken.)

22             THE COURT:  We're back in session outside

23   the hearing of the jury to take up a matter that

24   pertains to Mr. Goodwin.  Ms. Morehead, I understand

25   that perhaps this afternoon but in any event

1    sometime --

2              MS. MOREHEAD:  Soon.

3              THE COURT:  -- in the government's case you

4    do intend to offer evidence of the seizure of a cell

5    phone from Mr. Goodwin; is that correct?

6              MS. MOREHEAD:  Yes, Judge.

7              THE COURT:  And essentially that's evidence

8    that was presented at a hearing we had before the

9    trial started in connection with certain issues that

10   Mr. Goodwin had raised, and in that context we were

11   evaluating it in connection with what the basis for

12   Mr. Jones' testimony had been before the grand jury.

13   That was the context in which it arose.

14       Now you wish to offer the cell phone in evidence

15   if permitted to do so, and just make us a record here

16   about the purpose of your offer, and I will hear what

17   objection there is, and we will take it from there.

18             MS. MOREHEAD:  As the court is aware in

19   connection with Mr. Goodwin, officers saw him

20   driving, encountered him, then arrested him for

21   driving while suspended, and searching incident to

22   his arrest his person, they recovered the cell phone

23   on his person.

24             THE COURT:  He was outside of the vehicle?

25             MS. MOREHEAD:  He was.

1           THE COURT:  Not in some other, like, squad
2       car or jail someplace; he was standing outside the
3       vehicle; is that correct?
4           MS. MOREHEAD:  Yes.  He was at the car wash
5       outside the vehicle.
6           THE COURT:  Immediately after the arrest.
7       And they patted him down and recovered the cell
8       phone; is that correct?
9           MS. MOREHEAD:  Yes, Judge.  And I think if
10      I remember right there was some currency on his
11      person as well that they would have taken into
12      custody, as they do any time someone is arrested,
13      removing any property that they have from them, and
14      once they had possession of the cell phone, as
15      indicated by Officer Vogel, they did a test call to
16      that phone based upon the number that they had
17      intercepted during the course of the wire, and that
18      cell phone rang.  It came up private, if you
19      remember, and we went through the process of pulling
20      up the -- here in court for demonstration purposes
21      that that test call did come in on that date and that
22      time to verify what Officer Vogel was testifying to.
23          THE COURT:  As I also recall there was
24      evidence that the way the cell phone works, which I
25      suspect is like cell phones work -- most cell phones

```
 1          work, that with regard to some of the log information
 2          on the cell phone, as each additional new incoming
 3          call is made, certain information then disappears
 4          from the cell phone?
 5                   MS. MOREHEAD:  Yes, Judge, as far as the
 6          received calls or that information.
 7                   THE COURT:  All right.  And also initially
 8          the officers' involvement had some aspects to it
 9          about serving a search warrant on Mr. Goodwin's
10          residence, and Mr. Goodwin left the residence, and
11          then he was apprehended at the car wash; is that
12          correct?
13                   MS. MOREHEAD:  Yes, your Honor.
14                   THE COURT:  Does the government contend
15          that although the arrest was made for Mr. Goodwin's
16          lack of a driver's license, or whatever it was, that
17          that arrest could have been made -- or in other words
18          there was probable cause to make that arrest for the
19          drug-related offenses but it simply wasn't
20          articulated as an arrest on that basis?
21                   MS. MOREHEAD:  It could have been, Judge.
22                   THE COURT:  Okay.
23                   MS. MOREHEAD:  Judge, I think I made it
24          clear at the last hearing that I did not intend to
25          get into -- there was actually a subsequent search of
```

1   the phone, and there was contact -- there was

2   internal information from the phone that was written

3   down by the law enforcement, and I did not intend to

4   get into that.  All I intend to get into is the fact

5   that they got this cell phone off of him, did the

6   test call, it rang, and it, in fact, was the officers

7   calling that phone, so that's the extent of what I

8   intended to get in.

9            THE COURT:  Thank you, Ms. Morehead.  Now

10   counsel?

11            MR. JOHNSON:  Thank you, Judge.  It doesn't

12   sound as though the government intends to put on this

13   evidence, but I think it's fairly obvious with the

14   ruling in Gant that the marijuana stem, the rolling

15   papers, the storage shed --

16            THE COURT:  Items that were in the vehicle.

17            MR. JOHNSON:  -- that were in the vehicle

18   are no longer -- under the old analysis of search

19   incident to arrest, those are not going to be

20   admissible.

21            THE COURT:  Correct.  We had actually ruled

22   at that hearing that because of certain

23   discovery-related matters I was going to preclude the

24   government from offering that testimony anyway, but

25   even had I not, then Arizona versus Gant would say

| | |
|---|---|
| 1 | that the government would be precluded on that basis. |
| 2 | MR. JOHNSON:  That's right.  So I want to |
| 3 | discuss Gant in the context of searching the contents |
| 4 | of the cell phone.  I think we can safely say that |
| 5 | they can do this lawfully, which is to seize the |
| 6 | phone for the purpose of an inventory, that it can be |
| 7 | stored with his property and returned to him upon his |
| 8 | release.  I think that's something that is going to |
| 9 | be standard police procedure that they would do in |
| 10 | arresting somebody on a traffic stop.  I don't think |
| 11 | that it matters that they would have suspicion to |
| 12 | believe that he was involved in narcotics |
| 13 | trafficking, and I will say at least as of October 2, |
| 14 | 2007, they did not have probable cause to believe |
| 15 | that he was engaged in narcotics trafficking.  As |
| 16 | this court should recall from the testimony itself, |
| 17 | they had the phone number from the August phone |
| 18 | calls, but it wasn't really until October 2 that they |
| 19 | were able to start tying Mr. Goodwin to that |
| 20 | particular cell phone.  So I think that was the |
| 21 | missing piece of the puzzle at least in terms of |
| 22 | being able to come up with enough evidence for |
| 23 | probable cause that they got on October 2, 2007. |
| 24 | I think, similarly, in Gant -- it's been now |
| 25 | five days since I've read it.  If I recall, Gant |

1     himself was suspected of having some involvement with

2     narcotic-related crimes, and because of that they

3     used basically their authority to arrest him on the

4     driving-while-suspended charge essentially to further

5     their investigation of the narcotics.

6               THE COURT:  That aspect of the two cases is

7     very similar, obviously.

8               MR. JOHNSON:  We can change the title to

9     Arizona v. Goodwin probably fairly safely because

10    these are so closely related factually.  I think from

11    that standpoint you don't say, maybe we could have

12    arrested him for a different crime, but we didn't,

13    but because we could have, now we are dealing with an

14    investigation on a narcotics crime.  I don't think

15    that Gant allows that.  The question is, can they get

16    into the cell phone and examine the contents of it on

17    a search incident to an arrest for driving while

18    suspended?  And I think Gant says no.  I don't even

19    think Gant would allow them to seize or search the

20    phone to protect it from destruction of evidence

21    because there's no evidence contained inside that

22    phone that is going to relate to an investigation for

23    driving while suspended.  I think if they want to

24    look at the contents of that phone either to get

25    information or to protect themselves -- protect

1    destruction of evidence, they are going to need a

2    warrant because there's nothing inside that phone

3    that relates to a crime of driving while suspended.

4    And once they have seized it from Mr. Goodwin's

5    possession, no longer is there a risk that he will

6    destroy anything with it, no longer is there a risk

7    that he will use it as a weapon.  I think at that

8    point Gant makes it clear they need a warrant.

9         THE COURT:  Thank you.  Let me go back to

10   Ms. Morehead for one last thought.  You get the last

11   word, if you want it.  Mr. Johnson's argument in that

12   regard would be that it's irrelevant that there could

13   be information lost by virtue of calls coming in

14   because that's not evidence of the crime for which he

15   was convicted.  That is the --

16         MS. MOREHEAD:  Or arrested.

17         THE COURT:  Arrested, the traffic

18   infraction.  And what is your response to that?

19         MS. MOREHEAD:  Again, Judge, I'm not

20   offering the content of the phone as evidence.  I

21   thought I made that clear.

22         THE COURT:  You did.

23         MS. MOREHEAD:  Okay.  And the situation is,

24   Mr. Johnson is completely misstating -- he said they

25   had no probable cause that he was involved in drug

1    dealing.  That's nothing but a -- that's a

2    misstatement.  That's how they got the search warrant

3    they had.  It was based on probable cause that he was

4    trafficking in drugs, not only because of the wiretap

5    information, but also based upon the dirty trash, as

6    you recall, and that was with regards to his house,

7    but it was specifically related to him.

8        And the other thing that he misstated, they say

9    they didn't have any evidence that the phone was tied

10   to him.  As officer -- I don't remember who all

11   testified at the hearing.  Someone testified that, in

12   fact, they had the subscriber information that the

13   phone that was being utilized -- was subscribed to by

14   Franklin Goodwin, so that was information that they

15   had.  I think Officer Jones testified to that.  In

16   connection with knowing who that phone was connected

17   to, if I remember, they did the surveillance, did a

18   call, see him look at a phone as the phone call comes

19   in some weeks before that, but Arizona versus Gant

20   does not in any way preclude what happened here with

21   the test call to the phone and verifying that the

22   phone he had on his person at that point was

23   associated to the same number that the calls had been

24   coming into during the course of this wiretap.

25             THE COURT:  Thank you, Ms. Morehead.

```
 1          Mr. Johnson, you get the last word.
 2              MR. JOHNSON:  Irrespective of our
 3      disagreement as to the quality of the evidence on
 4      October 2, 2007, I don't think it matters.  Gant
 5      specifically deals -- limits the scope of that search
 6      to evidence of the crime for which the individual was
 7      arrested.
 8          Secondly, your Honor, the content of the
 9      phones -- while there may have been a test call, so
10      long as they don't search the contents of the phone
11      to make that call and they hear it ring, I would
12      concede they can testify to that, but when they open
13      up the phone to verify the identity within that phone
14      of the inbound call, that was what you saw, was it
15      said private, and that is searching the content of
16      that phone, and those contents are inadmissible.
17              THE COURT:  All right.  Thank you.  I think
18      on balance that the objection, although it's an
19      interesting issue, I think the objection should be
20      overruled for the following reasons:
21          First of all, obviously, this case is different
22      from Gant in that the search was not of the car but
23      of Mr. Goodwin's person, and what Gant basically did,
24      I think, was attempt to take the jurisprudence back
25      to Chimel and say, what we're looking at is, what is
```

1    the proper scope of the ability to search subject to

2    the arrest?  And Chimel does itself look at the

3    extent to which the officers are entitled to search

4    in connection with officer safety and with regard to

5    preserving evidence.

6         Now, in this particular case I think finding the

7    cell phone on Mr. Goodwin's person as part of that

8    search is clearly something that the officers were

9    entitled to do as a search incident to arrest.

10   Furthermore, opening the phone, examining the phone

11   to verify that it's a telephone and not a potential

12   weapon certainly would have been within the scope of

13   that as well.  This is where I do believe that the

14   existence of probable cause to arrest Mr. Goodwin on

15   the drug-related charges does become potentially

16   important because the question is whether under these

17   circumstances where you have the individual with the

18   item on his or her person you can do anything with

19   that in connection with preserving evidence of some

20   crime other than the crime for which he was being

21   arrested.  Gant makes it very clear that they

22   couldn't search the car on that basis.  The car is

23   immobilized at that point, but because of the

24   potential to lose evidence here by virtue of the way

25   in which incoming calls are kept on a log on a cell

1    phone such that they could go away, if that were the

2    case, I think the officers did have the right to

3    determine whether there was any evidentiary value to

4    that cell phone by doing what they did here, and as a

5    result, because I think they did have probable cause

6    to arrest Mr. Goodwin based upon the facts underlying

7    the search warrant and the facts you heard at that

8    particular hearing, I think they did have the right

9    to do the cursory inspection that they did at the

10   time to be sure they would not lose something of

11   evidentiary value from that phone.

12       So for those reasons I overrule the objection

13   and would permit for the relatively limited scope

14   that the government has indicated that it wants to

15   utilize it, admit the telephone for purposes of

16   showing the information Ms. Morehead indicated.

17       If we're ready to proceed, then we will bring in

18   the jury.

19           MR. CALBI:  We need the defendants first,

20   Judge.

21           THE COURT:  Excuse me.  I forgot about

22   that.  I'm sorry.  I got so focused on talking to you

23   and Mr. Johnson that I forgot that we didn't have

24   anybody else with us.  I'll step down so you can get

25   that accomplished.

```
 1                    (A recess was taken.)

 2                    THE COURT:  Are we all accounted for?

 3          Okay.  We will bring in the jury.  Have we decided

 4          who is inquiring?  Just Mr. Bellemere?

 5                    MR. CALBI:  I may, Judge, after

 6          Mr. Bellemere is done.

 7                    THE COURT:  And, Mr. Bellemere, you've

 8          decided you are going to inquire?

 9                    MR. BELLEMERE:  Yes, your Honor.

10                    THE COURT:  All right.

11                    MR. BELLEMERE:  Judge, do you want me to

12          take my place?

13                    THE COURT:  Sure.  You don't have far to

14          go, so --

15                    MR. BELLEMERE:  That's good.  Don't have

16          much time either.

17                    (The following proceedings were had in the

18          presence of the jury:)

19                    THE COURT:  Members of the jury, I

20          apologize for holding you over a little bit past when

21          I said we were going to start.  That was my fault.

22          We had a matter we needed to deal with.  I didn't

23          allocate enough time.  We took it up over our lunch

24          hour, but not soon enough.  That's my fault, not

25          theirs, so hold it against me, not the lawyers, if
```

1          you would, please.

2                  Mr. Bellemere, you may proceed.

3                  CROSS EXAMINATION

4    BY MR. BELLEMERE:

5    Q.   Mr. Tarrants, my name is -- did I pronounce that

6         right, Tarrants?

7    A.   Yes, sir.

8    Q.   My name is Fred Bellemere.  I represent Mr. McDaniel,

9         Keith McDaniel.  Okay?

10   A.   Yeah.

11   Q.   As I understood it, you lived in Columbia, Missouri,

12        on June 22, 2007?

13   A.   No.  Sturgeon, Missouri.

14   Q.   Sturgeon, okay.  Before June 22, 2007, when was the

15        last time that you lived in Columbia, Missouri?

16   A.   2004, 2005, maybe.

17   Q.   Where is the house that you were buying with the drug

18        proceeds for your fiancee and your daughters?

19   A.   It's in Sturgeon, Missouri.

20   Q.   It's in Sturgeon.  You sill own that house?

21   A.   No, I don't.

22   Q.   Did you sell the house?

23   A.   No.  It's not in my name.

24   Q.   What happened?  Pardon me?

25   A.   It's in my fiancee's name.

```
 1   Q.   Are you still hooked up with her?

 2   A.   Yes.

 3   Q.   Okay.  So that house that you've got in Sturgeon,

 4        Missouri, is in your fiancee's name, and you're still

 5        associated with her or living with her, I assume?

 6   A.   Yes, sir.

 7   Q.   And your two daughters live there as well?

 8   A.   One.

 9   Q.   One does.  And am I accurate that the proceeds or a

10        portion of the proceeds that you received from

11        selling drugs that you have alleged here in court

12        today have gone into the purchase of that house?

13   A.   Yes.

14   Q.   How much money would you say that you've made selling

15        drugs that have gone into the purchase of that house?

16   A.   I couldn't tell you.

17   Q.   Well, let's look at it like this.  One time I read a

18        report that said that you were getting --

19                  MS. MOREHEAD:  I object to --

20                  THE COURT:  Do you want to rephrase your

21        question?

22                  MR. BELLEMERE:  Yes, I do.  I do.

23   Q.   (By Mr. Bellemere) Did you ever say that Mr. McDaniel

24        gave you $500 a week for an ounce of cocaine for

25        storing his drugs?
```

REBECCA S. RYDER, CCR, RMR
UNITED STATES COURT REPORTER
913-551-5645

1    A.    Yeah.

2    Q.    So if, in fact, you got $500 a week and this was a

3          fairly frequent occasion that you were storing drugs

4          for Mr. McDaniel, as you allege, if you did that for

5          52 weeks a year, you would make $26,000, is that

6          accurate, at $500 a week?

7    A.    That's accurate.

8    Q.    If you made $26,000, would you have put that into

9          that house?

10   A.    At least half, probably.

11   Q.    At least half of it?  If you got an ounce of cocaine,

12         as you allege, from Mr. McDaniel, you would have been

13         able to sell that for a thousand dollars?  Did I

14         understand that accurately?

15   A.    I had one person I could sell it for a thousand

16         dollars to.

17   Q.    Did you sell the other ounce to other people other

18         than just one person?

19   A.    Yes.

20   Q.    What would you get for an ounce of cocaine aside from

21         a thousand bucks?

22   A.    It varied.  $650, $850.  Depends on who it was.

23   Q.    Do you have an estimate of how much you made from

24         that transaction?  I've already multiplied 52 times

25         500.  If you were getting 500 versus 650 or a

1      thousand, you know, how often -- how would you break

2      that down?  Twenty-six weeks a year you got 500 bucks

3      a week and 26 weeks a year you got 650 to a thousand

4      a week?

5  A.  I couldn't say it was that much, no.  There was hit

6      and miss weeks, months you wouldn't see him, you

7      know.  When I got the money, that's where I put it.

8  Q.  Okay.  If I understand it accurately, on June 22,

9      2007, you were in the process of making some drug

10     transaction?

11 A.  Yep.

12 Q.  When you were stopped by the police?

13 A.  Yes, sir.

14 Q.  As a result of that stop by the police you felt

15     betrayed in some respects?

16 A.  Yes.

17 Q.  Did you feel betrayed by my client, Mr. McDaniel?

18 A.  Yeah.

19 Q.  Why did you feel betrayed by Mr. McDaniel?

20 A.  They said -- they wouldn't listen to what I was

21     trying to tell them after the whole thing with Devin.

22 Q.  I see.  Am I not accurate that you continued to do

23     business with Mr. McDaniel, as you allege, from and

24     after June 22 of 2007?

25 A.  I have done business with him?

```
 1    Q.   Yes.

 2    A.   Not that I recall.

 3    Q.   Are you telling this court and this jury that you did

 4         no business with Mr. McDaniel after June 22, 2007,

 5         you stored no drugs for him, you sold no drugs for

 6         him, you received no marijuana from him to sell on

 7         your own to help you make out?  Is that what your

 8         testimony is?

 9    A.   After I got stopped by the police?

10    Q.   Yes.

11    A.   No.  I told him about one of my buddies and hooked

12         them up once.  That's it.

13    Q.   So what you did after you talked to the police on

14         June 22, 2007, you hooked up one of your buddies with

15         Mr. McDaniel?

16    A.   Yep.

17    Q.   Okay.  Did I understand accurately that you said you

18         would sell a quarter ounce of coke for, was it --

19         that's not right.  You would sell -- how much would

20         you sell 4½ ounces of cocaine for?

21    A.   Right at 2500.

22    Q.   Okay.  And then you would sell the 9 ounces for

23         5,000?

24    A.   Yes.

25    Q.   You said you thought you sold half a kilo at one time
```

```
 1        in bulk?

 2   A.   Yes.

 3   Q.   And you said -- would that then have been 18,000 --

 4        wait, no.  That's not right.  How much would you have

 5        sold that for?

 6   A.   It would probably have been ten, maybe nine five.

 7   Q.   And you were in charge down there in Columbia, as you

 8        allege, of receiving all of the material that you

 9        have testified to that you claim Mr. McDaniel brought

10        down into Columbia?  You were in charge of storing

11        it; true?

12   A.   Yes.

13   Q.   You were in charge of breaking it down?

14   A.   Yes.

15   Q.   And you were in charge of distributing it?

16   A.   Yes.

17   Q.   For that you received some money, as you've testified

18        to?

19   A.   Yes.

20   Q.   Then on June 22, 2007, you told on my client; is that

21        true?

22   A.   Yeah.

23   Q.   If I understood it correctly, the deal you got with

24        the prosecutor, or whoever was involved in that

25        transaction, was that you were not going to be held
```

```
 1            accountable for anything that you told them that you

 2            had done that was in conjunction with Mr. McDaniel;

 3            is that a fair statement?

 4   A.   Yes.

 5   Q.   So in other words, all this stuff we're talking about

 6            now you're at no risk for?

 7   A.   No, sir.

 8   Q.   Is that right?

 9   A.   That's right.

10   Q.   But as I understand it, if you don't come here and

11            talk to me or talk to the jury and the court, you can

12            be indicted still on things that the government had

13            on you before they stopped you on June 22, 2007; is

14            that accurate?

15   A.   That's my assumption.

16   Q.   That's what you understand?

17   A.   Yeah.

18   Q.   And you also understand that in the course of that

19            they could indict you; true?

20   A.   Yes.

21   Q.   And that they could hold you accountable for some

22            sort of drug transactions that you may have been

23            involved in down in Columbia; true?

24   A.   I don't really understand it, but I think so, yeah.

25   Q.   What are you scared of that the government could
```

```
 1          indict you for that has to do with something other

 2          than occurred on or about June 22 -- before June 22,

 3          2007?

 4   A.     Everything I just told you.

 5   Q.     Well, I thought you received immunity for that.

 6   A.     Yes, sir, but that's all I've done, so that's the

 7          poison tree, as they call it, or whatever.

 8   Q.     I see.  The fruit of the poisonous tree?

 9   A.     Yeah.

10   Q.     So, in other words, whatever you discuss with them,

11          it means they can't ever get to you?

12   A.     I don't think it went that far.

13   Q.     I see.  Well, could you still lose your house?

14   A.     I am sure, yeah.

15   Q.     And you could be indicted for something, we don't

16          know what; true?

17   A.     I'm sure somewhere.

18   Q.     Well, you were threatened with that.  Wasn't that

19          true?

20   A.     Yes.

21   Q.     And that's why you're here in court today; true?

22   A.     Yes.

23   Q.     I believe it was that the government asked you about

24          some vehicles that Mr. McDaniel owned and you said he

25          owned a black truck, is that right, a black SS truck?
```

```
 1    A.   Yes, sir.

 2    Q.   That doesn't -- if I hand you what has heretofore

 3         been marked -- wait a minute.  I'll do it this way so

 4         everybody can see.

 5              I'm going to show you what has been marked as

 6         Government's Exhibit 331.  That's not a black truck,

 7         is it?  Oh, your machine isn't on?  All right.  I got

 8         it.  That isn't the truck, is it, Mr. Tarrants, that

 9         you saw Mr. McDaniel driving?

10    A.   That's an SS truck, but that's not it.  I don't

11         think so.

12    Q.   That's not the one you saw him in?

13    A.   Unless they painted it, that ain't what I saw.

14    Q.   Okay.  I just want to be clear.  That wasn't the

15         black truck that you saw?

16    A.   No.

17    Q.   And I want to show you what has heretofore been

18         marked as Government's Exhibit 62 and ask you if that

19         looks like the car that you say you saw Mr. McDaniel

20         in down in Columbia.

21    A.   Nope, that's not it.

22    Q.   Okay.  I'm sorry for your -- I understand that you

23         have an autoimmune disease.  You testified to that;

24         is that correct?

25    A.   Yes, sir.
```

1812

```
 1    Q.   Are you still dealing with that disability?

 2    A.   Yes.

 3    Q.   At this juncture what are you doing?  Are you taking

 4         dialysis or --

 5    A.   Taking six or seven pills a day.  Couldn't really

 6         tell you what they are.  I know one is a steroid and

 7         some others, some kind of immune suppressant.

 8    Q.   Are you unable to work?  I think I asked you that,

 9         and I don't know, did you answer that?

10    A.   For the most part, yeah.

11    Q.   What do you mean by that?

12    A.   I mean, you know, I'm sure if I was, you know,

13         eligible to have a cushy job at a desk or something I

14         could probably do that for a length of time, but then

15         I would get sick and lose it anyway, so it's a

16         complicated situation.

17    Q.   Are you on social security disability?

18    A.   No.

19    Q.   Did you ever apply for it?

20    A.   Yes.

21    Q.   Did you get rejected?

22    A.   I got rejected and it's under appeal.

23    Q.   You have -- what's your educational background?

24    A.   I have an associate's degree.

25    Q.   In what?
```

1    A.    I'm a certified parallel.

2    Q.    What does a paralegal do?

3    A.    Law clerk stuff.

4    Q.    Did you ever have a job as a paralegal?

5    A.    No.

6    Q.    Did you ever apply for one?

7    A.    No.

8    Q.    If everything is as you say it was, Mr. McDaniel must

9          have trusted you quite a bit; is that a fair

10         statement?

11   A.    Yes.

12   Q.    Let me ask you something, Mr. Tarrants.  Would you

13         lie under oath to protect yourself from being

14         indicted, protect yourself from losing a house that

15         you purchased with drug proceeds?  Would you lie to

16         keep a house and a roof over the head of your fiancee

17         and your children?

18   A.    No.

19   Q.    You wouldn't lie to do that?

20   A.    No.

21               MR. BELLEMERE:  I have no further

22         questions.

23               THE COURT:  Any additional cross

24         examination by anybody else?

25               MR. CALBI:  Just a couple questions, your

```
 1        Honor.

 2                      CROSS EXAMINATION

 3   BY MR. CALBI:

 4   Q.   Mr. Tarrants, when was the first time that you met

 5        Monterial Wesley?

 6   A.   I met him once at a bar at the Lake of the Ozarks.

 7   Q.   Okay.  So one time you met him?

 8   A.   I saw him in passing a couple times, never spoke.

 9   Q.   Do you know approximately when it was that you met

10        Mr. Wesley in the bar at the Lake of the Ozarks?

11   A.   I would say it was December of 2006.

12   Q.   And I believe you testified that you believe that Mr.

13        Wesley was Mr. McDaniel's supplier; is that correct?

14   A.   That was the going assumption, yes.

15   Q.   Okay.  And when you say that was the going

16        assumption, what does that exactly mean, sir?

17   A.   You overhear people talking about, you know, that's

18        the man, that type of deal.

19   Q.   But you never had any business dealings with Mr.

20        Wesley?

21   A.   None.

22   Q.   Never talked with him?

23   A.   No.

24   Q.   Okay.  As far as any transactions go?

25   A.   Not on a drug level.
```

1   Q.   You never saw him come down to Columbia with Mr.

2        McDaniel?

3   A.   No.

4   Q.   Okay.  So outside of this assumption you don't have

5        any personal facts yourself that Mr. Wesley supplied

6        Mr. McDaniel with anything, did you, sir?

7   A.   No, sir.

8                MR. CALBI:  I have nothing further, your

9        Honor.

10               THE COURT:  Anyone else?  Hearing none, Ms.

11       Morehead?

12               MS. MOREHEAD:  Nothing based on that cross

13       examination, your Honor.

14               THE COURT:  Very well.  Then, Mr. Tarrants,

15       you may step down.  Without objection you are

16       excused.  The government may call its next witness.

17               MS. MOREHEAD:  Your Honor, I'm going to

18       call Chauncey Anderson.

19               MR. BELL:  Judge, may we approach?

20               THE COURT:  Yeah.

21               (Counsel approached the bench and the

22       following proceedings were had:)

23               MR. BELL:  As part of the government's

24       disclosures about Mr. Anderson, they revealed a 1996

25       conviction for a felon in possession of a firearm

1     under Kansas statute; however, that's the first sort

2     of chronological disclosure we have.  There's no

3     listing of what that prior felony conviction was that

4     would have been the basis for the '96 conviction.

5     Maybe it's not admissible; maybe we're not entitled

6     to it; maybe we are; but I don't know that if I don't

7     know what it is.

8          MS. MOREHEAD:  I don't know what it is

9     either, Judge.  I assume it's a juvenile conviction

10     based upon his age.  There wasn't anything that came

11     up in the records check I had, so that makes -- under

12     Kansas law you can actually charge someone with being

13     a felon in possession if the underlying offense is a

14     juvenile conviction.  So that's my assumption, but I

15     don't have any firsthand information about that.

16          MR. BELL:  Even if it is a juvenile

17     conviction, that was not an absolute bar to its

18     admissibility for impeachment purposes anyway.

19     Again, I don't know what it is, so I can't tell you

20     whether it is or not.

21          THE COURT:  All this is interesting.  What

22     are you asking?

23          MR. BELL:  Judge, I guess I was under the

24     assumption that the government knew what the

25     conviction was and felt that it wasn't discoverable.

```
 1              THE COURT:  Ms. Morehead says she does not

 2      know what it was.  I take it you haven't done your

 3      independent research on this one?

 4              MR. BELL:  I haven't been able to find it

 5      either.  My independent research revealed -- the

 6      government had it down as --

 7              THE COURT:  Here is what I think.  Under

 8      all the circumstances I would permit you to ask this

 9      individual if he were convicted in nineteen ninety

10      whatever, '96, of having been a felon in possession

11      of a firearm.

12              MR. BELL:  Okay.

13              THE COURT:  And you can leave it like that.

14      I think that gets before the jury that there probably

15      was something else that happened before that that

16      would qualify for the felony without any more

17      information to know what that was.  I won't let you

18      take it any further, and if the government doesn't

19      know, they don't know.  I'll let you ask that

20      question.

21              MS. MOREHEAD:  Judge, I disclosed that, but

22      it's more than ten years ago, and I don't think felon

23      in possession is a crime that involves truth or

24      veracity.

25              THE COURT:  It doesn't, but I misspoke when
```

```
1        I said that was an important part of the analysis.

2        Rather, it's simply a balancing test to determine

3        whether or not the probative value is outweighed by

4        the prejudicial effect or some other adverse aspect,

5        and I don't think it is.  I'm going to let him

6        inquire about that.

7                  MR. BELL:  To save us some time, while

8        we're here, this witness made some nontime-specific

9        statements about my client.  So we don't have to come

10       up here again, I'm wondering if we could ask Ms.

11       Morehead to direct whatever questions she might have

12       for this witness during the time frame within the

13       conspiracy.

14                  MS. MOREHEAD:  Judge, I intend to do that.

15       I'll tell you, he has information about a lot of

16       these individuals that predate that, so if the door

17       is opened about oh-you-say-it-was-only-one-time kind

18       of thing, then I may ask to come back up and revisit

19       that.  But going back to the criminal --

20                  THE COURT:  It would not open the door if,

21       for example, cross examination was, oh, only one time

22       within the period charged in the conspiracy.

23                  MS. MOREHEAD:  With regards to identity is

24       what I was speaking more to, if they tried to --

25                  THE COURT:  You hardly know the guy?
```

```
 1              MS. MOREHEAD:  Exactly.  But I would broach
 2      that with the court.  I wanted to go back to
 3      criminal history.  Over the lunch break I found out
 4      from Mr. Anderson, he actually disclosed to me a more
 5      recent felony conviction.  I think it was in '06.  I
 6      have it written down.  But it was a felony fleeing
 7      and eluding, so I also intend to ask him about that.
 8      I didn't -- that doesn't come up in any records check
 9      I had.  He indicated he didn't actually do time on
10      that, so that may be why.  It was from Douglas
11      County, and, frankly, I have some real problems
12      sometimes with knowing about criminal convictions
13      from Douglas County.  I don't know if that's
14      something about their reporting problems or what, or
15      if they don't want people to know there's crime that
16      goes on in Douglas County.
17              THE COURT:  There's no crime in Douglas
18      County.
19              MR. BELL:  Zero crime.
20              THE COURT:  I didn't want counsel to think
21      I had not disclosed about it.  Mr. Anderson is the
22      one that mentioned that to me.
23              MR. BELLEMERE:  In an effort to try to keep
24      from getting up here, Mr. Anderson has several
25      hearsay statements that he got information from Mr.
```

```
 1          Wesley about, and I don't think any of those
 2          statements we need to get into.  It's hearsay.  And I
 3          wanted to cover that now.
 4                    MS. MOREHEAD:  I thought we had already
 5          covered that, Judge.  I'm perfectly aware of -- it's
 6          obviously statements that are made during the course
 7          of the conspiracy.
 8                    THE COURT:  If you think there's a problem
 9          contemporaneous with it occurring, object.
10                    MR. BELLEMERE:  I wanted to save everybody
11          time.  Thank you.
12                    THE COURT:  All right.
13                    (The proceedings returned to open court.)
14                    CHAUNCEY KYLE ANDERSON,
15    having been duly sworn, was examined and testified as
16    follows:
17                       DIRECT EXAMINATION
18    BY MS. MOREHEAD:
19    Q.   How old are you, Mr. Anderson?
20    A.   Thirty.
21    Q.   And where did you grow up?
22    A.   Leavenworth, Kansas.
23    Q.   In connection with your criminal history, you have
24         several felony convictions; is that right?
25    A.   Yes.
```

1    Q.   And dating back to 1996, were you convicted in

2         Leavenworth County of being a felon in possession of

3         a firearm?

4    A.   Yes.

5    Q.   And in 1998 did you have a possession of cocaine in

6         Leavenworth County as well?

7    A.   Yes.

8    Q.   And in 2002 -- did you do any time at all in

9         connection with the '96 or '98 cases out of

10        Leavenworth County?

11   A.   They were all -- they all went together.  All of my

12        cases went together.  I caught the firearm charge,

13        and I was sentenced to prison, and everything was ran

14        concurrent.

15   Q.   Okay.  In connection though with the '96 and '98

16        case, did you actually go to prison, state prison, on

17        that, or did you get probation on that?

18   A.   I went in.  The '96 case I got probation.

19   Q.   Okay.

20   A.   And I violated my probation with the charge of the

21        firearm charge, and I went to state prison.

22   Q.   On the cocaine charge?

23   A.   Yes.

24   Q.   All right.  And then in 2002 were you charged in

25        connection with distribution of drugs and being a

```
 1        felon in possession of a firearm here in

 2        federal court?

 3   A.   Yes.

 4   Q.   In fact, was Judge Lungstrum the judge that you

 5        appeared in front of?

 6   A.   Yes.

 7   Q.   Back in 2002 what was the sentence that you received

 8        in connection with that?

 9   A.   Twenty-seven months.

10   Q.   And were you already off of state paper?  In other

11        words, your '96 and '98 cases, were they over and

12        done with when you caught your federal gun charge?

13   A.   Yes.

14   Q.   And in connection then with your 2002 drug and gun

15        case, was that in Leavenworth County?

16   A.   Yes.

17   Q.   And it ended up going federal then?

18   A.   Yes.

19   Q.   When you went and did your 27 months in federal

20        custody, when did you actually get out in connection

21        with that charge?

22   A.   The end of 2003.

23   Q.   And were you on supervision?

24   A.   Yes.

25   Q.   And did you violate supervision at some point?
```

1   A.   Yes.

2   Q.   And what happened in connection with that?

3   A.   I received a year-and-a-day sentence.

4   Q.   And when did you get out on that?

5   A.   '06; around March, April '06.

6   Q.   So you were out for some period of time before you

7        actually violated; is that safe to say?

8   A.   Yes.

9   Q.   And then you got out eventually in 2006?

10  A.   Yes.

11  Q.   Were you released with no paper to follow in 2006, or

12       were you still on supervision?

13  A.   No paper.

14  Q.   So the year and the day that you got for violating

15       your supervision for the federal case was over and

16       done with then when you got out in '06?

17  A.   Yes.

18  Q.   Do you remember about when that was in '06, Mr.

19       Anderson?

20  A.   I believe the end of March.

21  Q.   Since being released from custody have you acquired

22       another felony conviction in 2007?

23  A.   Yes.

24  Q.   Douglas County?

25  A.   Yes.

1   Q.   What was that for?

2   A.   Attempting to flee or elude.

3   Q.   What happened in connection with that?

4   A.   Probation.

5   Q.   How long were you on probation for?

6   A.   One year.

7   Q.   Are you done with that?  Are you off paper on that?

8   A.   Yes.

9   Q.   When you got out of federal prison in 2006, no

10       supervision to follow, where did you live, once you

11       got out in '06?

12  A.   Leavenworth for a short period.

13  Q.   Leavenworth for a short period?

14  A.   Yes.

15  Q.   How long are you saying, a short period?

16  A.   Probably stayed there for maybe a month and a half,

17       two months, maybe.

18  Q.   Then where did you end up moving or living?

19  A.   I was living in Lawrence.

20  Q.   Did you still spend time even after you stayed in

21       Lawrence in Leavenworth County?

22  A.   Yes.

23  Q.   And since you grew up in Leavenworth County, I assume

24       you were more than acquainted with a number of

25       individuals that lived in the Leavenworth area?

```
 1   A.   Yes.

 2   Q.   Was one of those individuals Monterial Wesley?

 3   A.   Yes.

 4   Q.   And how long have you been knowing Monterial Wesley?

 5   A.   Since I was about 14 or 15.

 6   Q.   And during the time that you were, you know, in and

 7        out of trouble from '96 forward, aside from the time

 8        that you were in federal prison, did you have regular

 9        contact with Monterial Wesley?

10   A.   Yes.

11   Q.   When you got out in 2006, when you were living in

12        Leavenworth, did you have contact with Monterial

13        Wesley?

14   A.   Yes.

15   Q.   What about when you moved over to Lawrence?  Did you

16        continue to have contact with Monterial Wesley?

17   A.   Yes.

18   Q.   And did you stay in Lawrence then after -- you said

19        you moved to Lawrence.  Did you stay there after

20        that, or did you move somewhere else?

21   A.   I stayed there.  But how long are you meaning?

22   Q.   Yeah, how long did you stay in Lawrence?

23   A.   I was in Lawrence probably until about the time that

24        I got in trouble for fleeing and eluding, which would

25        have been October, November '07.
```

1    Q.   Okay.  In connection with living in Lawrence you were

2         there for much of '06 into most of '07; is that

3         right?

4    A.   Actually, it was '06.  I'm sorry.  The end of '06 is

5         when I got in trouble for fleeing and eluding, so

6         probably about October of '06 is when I stopped

7         living in Lawrence, into '07.

8    Q.   Where did you go after you left Lawrence?

9    A.   Kansas City.

10   Q.   Kansas City, Missouri, or Kansas?

11   A.   Missouri.

12   Q.   Missouri?

13   A.   Yes.

14   Q.   Same question.  Did you continue having regular

15        contact with Monterial Wesley clear up until November

16        of 2007?

17   A.   Yes.

18   Q.   Can you kind of describe from March of 2006 forward

19        the contact that you would have had with Monterial

20        Wesley, what that consisted of.

21   A.   Friends, talked on the phone, hung out sometimes

22        periodically.  That's about it.

23   Q.   Okay.  And when you would -- you said you would hang

24        out periodically.  Would some of those occasions be

25        social activities?

```
 1   A.   Yes.

 2   Q.   Which would include what?

 3   A.   Going to the club or hanging out, smoking, riding.

 4        That's about it.

 5   Q.   All right.  And as a result of spending time with him

 6        after you got out of -- off of supervision or -- off

 7        of supervision in 2006, March of 2006, and were

 8        released from prison, did you ever have any knowledge

 9        of Monterial Wesley being involved -- up through

10        November of 2007, Monterial Wesley being involved in

11        drug activity?

12   A.   Yes.

13   Q.   How do you know that?

14   A.   One or two occasions I seen with my own eyes, and

15        other than that, just conversations that, you know,

16        him talking to me and me talking to him.

17   Q.   Okay.  So it was -- some of it was what you

18        personally saw; some of it is what he shared with you

19        or told you about?

20   A.   Yes.

21   Q.   In connection with having contact with Monterial

22        Wesley, I assume you would have had occasion to

23        become familiar with friends or associates of his?

24   A.   Yes.

25   Q.   Did you ever have occasion to know an individual
```

1       named Shevel Foy or Rat?

2   A.  Yes.

3   Q.  And what did you know him as?

4   A.  Meaning?

5   Q.  Did you know him as Shevel Foy, or did you know him

6       as Rat?

7   A.  I knew him as Rat.

8   Q.  And after March of 2006 were there any occasions that

9       you observed Rat in the company of Monterial Wesley?

10  A.  Yes.

11  Q.  And can you tell us about any of those incidents in

12      particular that you recall?

13  A.  You want me to elaborate on incidents where certain

14      things were going on or just period because, I mean,

15      there was a lot of times that I was, you know --

16  Q.  Let's talk generally first.  Generally what would

17      those circumstances consist of?

18  A.  Just me being in Kansas City maybe and seeing him

19      over at the shop hanging out, or that's about it.

20  Q.  What shop are you referring to?

21  A.  Detail shop or some kind of auto mechanic shop on

22      Prospect.

23  Q.  You would go to that location, to this detail shop?

24  A.  Periodically.

25  Q.  And what was your -- whose shop was that?  Did you

1       know?

2   A.   It was my understanding that it was Tysha's daddy's.

3   Q.   And when you say it was Tysha's daddy's, who were you

4        talking about?

5   A.   I don't know his name.

6   Q.   You don't know Tysha's daddy's name?

7   A.   No.

8   Q.   When you were talking about Tysha though, who were

9        you talking about?

10  A.   TT.

11  Q.   And how did you know her?

12  A.   Monterial's girl.

13  Q.   And after you got out in March 2006, did you, in

14       fact, know that she was Monterial Wesley's girlfriend

15       then?

16  A.   Yes.

17  Q.   And were there occasions that you would be in the

18       company of Monterial Wesley and she would be there as

19       well?

20  A.   Yes.

21  Q.   Let's go back to Rat now.  You indicated generally

22       situations that you would be in the company with him.

23       Were there any specific instances that you recall

24       where he was -- there was any indication of any sort

25       of drug activity going on where Rat was present?

 1   A.   Two times.

 2   Q.   Tell the jury about that.

 3   A.   First time I remember is when -- close to around the

 4        time when I first got out in 2006.  I was with

 5        Monterial.  We were around on 31st Street, and I rode

 6        with him over to a house that was around from where

 7        his mom used to stay at.

 8   Q.   Let's stop there, if we could.  You said you were

 9        somewhere off 31st Street around from where his mom

10        used to stay?

11   A.   Uh-huh.

12   Q.   Is that what you said?

13   A.   Yes.

14   Q.   And whose mom are you referring to?

15   A.   Monterial's.

16   Q.   Okay.  And are you familiar with that location?

17   A.   Yes.

18   Q.   The house where Monterial Wesley's mom stayed?

19   A.   Yes.

20   Q.   And do you know what street that was on?

21   A.   Not -- 31st or Linwood, but I'm pretty sure it's

22        31st.

23   Q.   Okay.  So the location you're talking about is a

24        residence separate from that?

25   A.   Yes.

1    Q.   And do you know whose residence that was?

2    A.   I believe it was Telly's.

3    Q.   And who is Telly?

4    A.   One of Monterial's friends.

5    Q.   Okay.  Tell us what occurred then on this case when

6         you were at that residence with Monterial Wesley.

7    A.   I was with him.  We pulled up.  Rat and Telly were

8         over there.  I went in the house to go use the

9         bathroom.  When I was on my way in the house to go

10        use the bathroom, there was a suitcase in there on

11        the floor.  He was zipping it up, and there was --

12   Q.   Who is he?

13   A.   Rat.

14   Q.   Okay.

15   A.   And I was leaving.  When I left out of the bathroom,

16        I went back out.  By the time I went back out, got

17        back in the car, just came back out, got back in the

18        car with Monterial.

19   Q.   So you said there was a suitcase that he was zipping

20        up?

21   A.   With money in it.

22   Q.   And that was going to be my question.  Were you able

23        to see what the contents of that suitcase were?

24   A.   Uh-huh.  It was money.

25   Q.   And can you describe the suitcase that you saw?

| | | |
|---|---|---|
| 1 | A. | A black rolling suitcase with an extendable handle. |
| 2 | Q. | And the money that you saw in this suitcase, do you |
| 3 | | have any idea how much money was in it? |
| 4 | A. | No, I don't. |
| 5 | Q. | Can you give the jury an idea by demonstrating with |
| 6 | | your hand the relative size of this suitcase as far |
| 7 | | as you remember? |
| 8 | A. | These dimensions, probably this wide.  If it |
| 9 | | was standing up, it probably would have been about |
| 10 | | this tall. |
| 11 | Q. | If it would have been standing on the end then? |
| 12 | A. | If it was standing out like when he came out of the |
| 13 | | house and was rolling it and it was standing up, |
| 14 | | without the handle it was probably about this high, |
| 15 | | about this wide, and about that. |
| 16 | Q. | All right.  So that was one time that you saw him |
| 17 | | that involved -- I'm going to call that the money |
| 18 | | incident, okay?  What was the other incident that you |
| 19 | | were present?  You said there were two times. |
| 20 | A. | The other incident was Monterial be giving him some |
| 21 | | cocaine. |
| 22 | Q. | All right.  And do you remember about when that would |
| 23 | | have been time period wise? |
| 24 | A. | Summer of '07. |
| 25 | Q. | Okay.  So summer of '07 you were with Monterial |

```
 1          Wesley; is that right?
 2    A.    Yes.
 3    Q.    And where were you when this contact with Rat
 4          occurred?
 5    A.    At some townhouses.  I don't know the exact location.
 6    Q.    What do you recall happening on this occasion?
 7    A.    I was pulling in the back, me and Monterial, pulling
 8          in the back of the garage area of these townhouses.
 9          Rat coming out, him giving Rat a brown paper sack,
10          Rat sitting in the back seat, opening it up, take out
11          the coke, look at it, put it back in, shut it.
12    Q.    And do you know where that cocaine came from?
13    A.    Yeah.  It was from Antoine Wheelchair.  He was giving
14          it to Antoine, but Antoine obviously didn't want it
15          for some reason.  Then he went back and picked it up.
16    Q.    Just so I understand it, Antoine in the wheelchair --
17          do you know Antoine's last name?
18    A.    No.
19    Q.    Okay.  Antoine in the wheelchair had had this
20          quantity of cocaine; is that right?
21    A.    Yeah.  Monterial was giving it to him, and we left,
22          and Antoine had a problem with it.  We went back over
23          there, and Monterial picked it up, and then we left.
24    Q.    All right.  And so this amount of cocaine from
25          Antoine, Antoine had a problem with it; is that
```

```
 1          right?

 2    A.    I don't know for a fact that it was given to Antoine

 3          because I wasn't present in the residence.  I was in

 4          the car.  He went in the house, came back out.  I

 5          just know when we were leaving that he was on the

 6          phone with him talking to him, and he went back over

 7          there because I guess he had a problem with it, and

 8          he picked it back up.

 9    Q.    All right.  So you were with him when he went to

10          Antoine's house, dropped the package off, left, and

11          then went back and got it later; is that what you're

12          saying?

13    A.    Yes.

14    Q.    Okay.  And this amount of cocaine, did Monterial

15          Wesley indicate anything about what the problem with

16          the drugs was?

17    A.    No.

18    Q.    And you were with him then when he drove that amount

19          of cocaine to Rat and gave that to Rat?

20    A.    Yes.

21    Q.    Do you know what the relative amount of that was?

22    A.    About half a key.

23    Q.    How was it packaged?

24    A.    It was a big Ziploc bag inside of a brown paper sack.

25    Q.    And you talked about an occasion where you saw Rat in
```

1   possession of a large amount of money.  Were there

2   ever any times that you saw Monterial Wesley in

3   possession of any large amounts of money?

4   A.   Nothing more than about 4 or 5 grams.

5   Q.   Okay.  And were you ever present with him when he

6   ever went and picked up cocaine from anyone?

7   A.   Yes.

8   Q.   Tell the jury about that.

9   A.   Two times I was with him.  First time was when I

10   first got out, '06.  I was riding with him.  We went

11   and met Tommy at a pet store or some kind of place

12   where he was buying fish, something.  He got out of

13   the car, hopped in the car with him.  I stayed in his

14   car.  They sat in the car for a moment.  They got out

15   of the car.  He came back in the car with the bag;

16   Tommy went in the fish store; and we left.

17   Q.   All right.  And that was shortly after you got out;

18   is that right?

19   A.   Yes.

20   Q.   And when was the other time?

21   A.   I really don't know exactly when it was, honestly.

22   Q.   Between '06 and -- after you got out?

23   A.   Yes, it was after I got out, but I just don't

24   remember whether it was directly after I got out or

25   whether it was the following summer.  I just don't

1836

```
 1            know.

 2   Q.   All right.  Tell us about that incident.

 3   A.   I was riding with him, and we went and met -- we

 4        pulled up at a fast food place.  I don't remember

 5        which place it was either.  And he got out of the car

 6        with me again and then got in the car with him; came

 7        back with a bag; we left.

 8   Q.   Okay.  In connection with being with Monterial

 9        Wesley, were there ever any times -- you mentioned a

10        time that he delivered something to Antoine in the

11        wheelchair.  Were there any other times that you were

12        with him where he would have delivered drugs to

13        anyone else that you were present at and observed?

14   A.   One time Hank came to Kansas City to pick up

15        something from him.

16   Q.   Okay.  So one time you were present when Hank picked

17        something up from Monterial Wesley?

18   A.   Uh-huh.

19   Q.   Yes?

20   A.   Yes.

21   Q.   When you talk about Hank, do you know his real name?

22   A.   Henry Grigsby.

23   Q.   Did you know him from your days in Leavenworth?

24   A.   Yes.

25   Q.   And so you would know who he was, obviously?
```

```
 1   A.   Yes.

 2   Q.   And then anyone else besides Henry Grigsby that you

 3        saw Monterial Wesley ever deliver drugs to?

 4   A.   No.

 5   Q.   Did you happen to know what quantity that was on that

 6        occasion that he gave drugs to Henry Grigsby?

 7   A.   No.

 8   Q.   Now, Mr. Anderson, in connection with your activity

 9        with Monterial Wesley, after you got out in 2006, you

10        mentioned that you were familiar with his girlfriend,

11        Tysha?

12   A.   Yes.

13   Q.   And were you aware of any vehicles after you got out

14        in March of 2006, any vehicles through November of

15        2007 that would have been associated with Latysha

16        Temple?

17   A.   The Mercedes car, the Mercedes SUV.

18   Q.   What about Monterial Wesley?  What vehicles, if any,

19        were you familiar that he had or that he drove?

20   A.   Escalade, Range Rover, Chevy, motorcycle, and

21        rentals.

22   Q.   And what?

23   A.   Rentals.

24   Q.   And rentals?

25   A.   Yes.
```

1838

1    Q.   With regards to rental vehicles do you know -- it

2         sounds like Monterial Wesley had several vehicles

3         that he could drive.

4    A.   Yes.

5    Q.   Is that right?  And do you know why he would be

6         driving rental vehicles on occasion?

7    A.   I don't know what his reasoning may have been for it.

8    Q.   Okay.  Do you have any information about anyone who

9         was renting vehicles for Monterial Wesley?

10   A.   I was with him -- I was present with him and Tysha

11        once when she rented one.

12   Q.   And what kind of vehicle do you recall her renting

13        for him?

14   A.   A Dodge Magnum.

15   Q.   And do you remember -- again, was that after you got

16        out in 2006?

17   A.   Yes.

18   Q.   Now, in connection with his girlfriend Latysha

19        Temple, do you know any locations where she was

20        living?

21   A.   Blue Springs.  Independence or Blue Springs.  I don't

22        know exactly what city it is.  I didn't go out there

23        a lot.  Like, Independence, Blue Springs, or

24        something like that.

25   Q.   Somewhere in Missouri?

```
 1   A.   Uh-huh.  And I'm not familiar with those different
 2        areas at all.
 3   Q.   Do you remember any street locations that may have
 4        been associated with that?
 5   A.   No.  I'm going to go with Blue Springs.
 6   Q.   Okay.  So you think it was actually in Blue Springs?
 7   A.   Yes.
 8   Q.   What kind of a residence was it that you went to that
 9        you knew was associated with Latysha Temple?
10   A.   Big house in a cul-de-sac.
11   Q.   A house in a cul-de-sac?
12   A.   [Nodded head.]
13   Q.   And in connection with that who did you go there
14        with?
15   A.   With Monterial.
16   Q.   And what was the reason that you had gone -- how many
17        times did you actually visit that particular
18        location?
19   A.   Maybe three.
20   Q.   And what would the occasions be that you would have
21        gone over there with Monterial Wesley?
22   A.   If I had been with him and we were getting ready to
23        go out somewhere and he was going to get dressed or
24        change clothes.
25   Q.   Were there ever any special events that you went to
```

1        at Latysha Temple's residence?

2   A.   His birthday.

3   Q.   Whose birthday?

4   A.   Monterial's.

5   Q.   Do you know when his birthday is?

6   A.   It's October, the beginning.

7   Q.   So do you know -- do you recall if that would have

8        been October of 2006 or October of 2007?

9   A.   It was 2007.

10  Q.   In connection with Latysha Temple's residence, were

11       there ever any occasions that you observed any

12       activity in connection with drug trafficking at her

13       house?

14  A.   I saw him with drugs there once.

15  Q.   Tell the jury about that.

16  A.   He was in the room.  We got to the house, and he was

17       going to change clothes, and he was in the room doing

18       something, and I was in the living room, and he told

19       me I could come in there.  As I was walking in, he

20       was placing a bag with cocaine inside of a shoebox

21       and setting it inside a closet.

22  Q.   Was this inside a bedroom in that residence?

23  A.   Yes.

24  Q.   Did you ever see any amounts of money at that

25       residence?

1841

```
 1   A.   No.

 2   Q.   Did Monterial Wesley ever tell you whether he had

 3        amounts of money at that residence?

 4   A.   No.

 5   Q.   You said you thought this was about a half a kilo of

 6        cocaine?

 7   A.   Yes.

 8   Q.   In a shoebox?

 9   A.   Could have been.  I don't know exactly.

10   Q.   How was it packaged?  Let me ask you that.

11   A.   In a Ziploc bag.

12   Q.   Okay.  And the quantity that you saw, would that have

13        been consistent with a half a kilogram?

14   A.   Could have been.  I didn't -- again, I didn't see

15        exactly, so I don't really know.  I don't want to say

16        that it was because I don't know that.

17   Q.   Okay.  Did you become aware, Mr. Anderson, that

18        Monterial Wesley was arrested November 27 of 2007?

19   A.   Yes.

20   Q.   How did you become aware of that?

21   A.   Friend named April.

22   Q.   So someone told you about that?

23   A.   Yes.

24   Q.   And once Monterial Wesley was in custody, did you and

25        he ever speak after that?
```

```
 1    A.    No.

 2    Q.    And did you have any idea about what his case

 3          involved?

 4    A.    Yes.

 5    Q.    And what was your understanding of what that case

 6          involved?

 7    A.    That he was apprehended in the process of going to

 8          get drugs from Tommy.

 9    Q.    Okay.  And did you ever hear any discussion that the

10          investigation involved a wiretap?

11    A.    Yes.

12    Q.    And do you remember when that would have been that

13          you would have known that?

14    A.    Yes.

15    Q.    When was that?

16    A.    Shortly after he was picked up.

17    Q.    Okay.  And in connection with that did that have --

18          give you any concerns?

19    A.    Yes.

20    Q.    Why?

21    A.    Because I knew of a lot that was going on and because

22          there had also been things that could have been, you

23          know, that could have caused me to be incriminated.

24    Q.    All right.  You had -- would you agree that you had

25          talked on the phone with him in connection --
```

```
1              THE COURT:  Counsel, could you all approach

2         for a minute.

3              (Counsel approached the bench and the

4         following proceedings were had:)

5              THE COURT:  I'm concerned about Mr.

6         Anderson's statement about his understanding about

7         Mr. Wesley being arrested for going to meet up -- to

8         get drugs from Mr. Humphrey.  It wasn't clear that he

9         was saying that he just heard those were allegations.

10        He presented it as if he had heard after the fact.

11        That should not be admissible against Mr. Wesley on

12        the count associated with the day of his arrest.

13        Unless Mr. Anderson had some otherwise admissible

14        basis to do that, such as Mr. Wesley admitting to him

15        or something, which I doubt is the case, I'm going to

16        simply instruct the jury that they are not to

17        consider what he said about some knowledge of the

18        arrest as being proof that Mr. Wesley is guilty on

19        that particular count.

20             MS. MOREHEAD:  That's fine.  That was not

21        the purpose of that, Judge.

22             THE COURT:  I didn't think it was.  Just

23        the way it came out, Mr. Calbi didn't object, and

24        probably, again, because I think in context that's

25        probably -- it wasn't intended to go that way.
```

1    Rather than have the jury mislead by that, I thought

2    I should give them an instruction.

3           MS. MOREHEAD:  Is it okay in that situation

4    if I lead him more in the direction?  I could have

5    done it in a leading fashion.

6           THE COURT:  It may draw an objection, but I

7    would overrule it if you are attempting to lead to

8    keep someone out of some area that would be unfairly

9    prejudicial to one of the defendants.  If somebody

10   wants to get the full matter out on the table either

11   by objection or some other means, we can get there.

12   I have no problem with you doing that.

13           (The proceedings returned to open court.)

14           THE COURT:  Members of the jury, I want to

15   give you a limiting instruction here.  Mr. Anderson

16   has mentioned having some information about Mr.

17   Wesley's arrest on the day in question in connection

18   with Mr. Humphrey, and I wanted to caution you that

19   that information is not admissible for the purpose of

20   proving Mr. Wesley's or anyone else's guilt on the

21   particular offense that is associated with that

22   particular day and that particular arrest.

23   Specifically, that would be Count No. 38, and

24   associated with it is Count No. 39, and you are not

25   to consider Mr. Anderson's testimony as supporting

1    the government's burden of proof on those two counts

2    in that respect.

3         Ms. Morehead, you may proceed.

4              MS. MOREHEAD:  Thank you, Judge.

5    Q.  (By Ms. Morehead) Mr. Anderson, you certainly had

6    some information then about Mr. Wesley's situation,

7    being arrested and facing charges; is that right?

8    A.  Yes.

9    Q.  And you indicated -- I think where we were going was

10   you had some concerns because of information that

11   might implicate you or -- I can't remember your exact

12   words, or something to that effect?

13   A.  I said incriminate me.

14   Q.  Incriminate.  Thank you for correcting me.  You, in

15   fact, had talked on the phone with Monterial Wesley

16   on occasion; is that right?

17   A.  Yes.

18   Q.  And after you got out in March of 2006, were there

19   ever any times that you personally got drugs from

20   Monterial Wesley?

21   A.  Not cocaine.

22   Q.  Okay.  What would it have been?

23   A.  Ecstasy.

24   Q.  Okay.  And in connection then with the activity of

25   being with him and being associated with him, did

1      that cause you some concern?

2   A.   Yes.

3   Q.   Obviously, you were not indicted; is that right?

4   A.   Yes.

5   Q.   And, in fact, in connection with your testimony here

6        regarding your knowledge of the several people that

7        you talked about, has the District of Kansas, the

8        U.S. Attorney's Office, agreed not to file any

9        charges against you based upon information that

10       you're providing in connection with this case?

11  A.   Yes.

12  Q.   And to not charge you in connection with the

13       information you provide?

14  A.   Yes.

15  Q.   And now, with regards to the information that you

16       provided in this particular case regarding Monterial

17       Wesley, did you, in fact, at some point begin

18       cooperating with law enforcement about criminal

19       investigations, to include the information that you

20       provided about Monterial Wesley and these other

21       individuals?

22  A.   Yes.

23  Q.   And that occurred following an incident that you were

24       involved in in Missouri; is that right?

25  A.   Yes.

```
 1    Q.   And what did that involve, Mr. Anderson?

 2    A.   It was a DUI sobriety checkpoint, and it was a

 3         firearm in the vehicle.

 4    Q.   Okay.  And when was that?

 5    A.   April of '08.

 6    Q.   And so you were aware Monterial Wesley had been

 7         charged and arrested November 27 of '07?

 8    A.   Yes.

 9    Q.   Did you become aware there had been other individuals

10         charged in connection with that case in February of

11         2008?

12    A.   Yes.

13    Q.   Then April 2008 you get arrested.  And who is that

14         by?

15    A.   Missouri Highway Patrol.

16    Q.   And in connection with that have you ever been

17         charged in connection with that particular incident?

18    A.   No.

19    Q.   When you were arrested in connection with that, did

20         you, in fact, contact an attorney?

21    A.   Yes.

22    Q.   And in contacting that attorney, what did that

23         attorney do in connection with you cooperating with

24         law enforcement?

25    A.   Contacted the individual at the office that he needed
```

1        to speak with, Mr. Becker,.

2   Q.   Was that the U.S. Attorney's Office in Missouri

3        concerning --

4   A.   Yes.

5   Q.   -- the firearm charge, the felon in possession of a

6        firearm?

7   A.   Yes.

8   Q.   And did anybody ever make any promises to you in

9        connection with that particular charge?

10  A.   No.

11  Q.   And following then -- do you remember when you would

12       have had contact with the U.S. Attorney's Office over

13       there following your April of '08 incident?

14  A.   Approximately a couple of weeks after the incident.

15  Q.   So maybe middle of 2008 then?

16  A.   Yes.

17  Q.   In connection with that firearm charge has anybody

18       told you that you're not going to be charged?

19  A.   No.

20  Q.   You, in fact, did start providing information with

21       law enforcement though, and did you, in fact, provide

22       information in this case in January of 2009 and March

23       of 2009?

24  A.   Yes.

25  Q.   What was -- what were you told, I guess, in

1          connection with the information that you're providing

2          with regards to your cooperation and how that will

3          affect the potential gun charge that you're facing in

4          Missouri?

5     A.   It would be taken into consideration.

6     Q.   And was there an indication that law enforcement

7          would basically tell the prosecutor over there about

8          any cooperation that you provided?

9     A.   Yes.

10    Q.   Would that include testifying in this particular

11         case?

12    A.   Yes.

13    Q.   And the firearm charge that you could be charged

14         with, felon in a possession of a firearm, do you have

15         any idea how much potential time you could do in

16         connection with that charge?

17    A.   Maybe five years.

18    Q.   If, in fact, you're charged, was there an indication

19         that they would pass that information to the

20         prosecutor for him to take into consideration in

21         connection with the outcome of that case?

22    A.   Yes.

23    Q.   Do you have any idea or expectation about what's

24         going to happen with that case?

25    A.   No.

1    Q.  Has anybody in any way made any promises or

2        guarantees to you aside from the fact that you won't

3        be charged in this case, any promises or assurances

4        about the gun matter?

5    A.  No.

6             MS. MOREHEAD:  Judge, that's all I have of

7        this witness.

8             THE COURT:  All right.  Cross examination,

9        Mr. Calbi?

10            MR. CALBI:  Judge, I believe I was going to

11       ride caboose with Mr. Anderson.  If there's anyone

12       else that needs to go --

13           THE COURT:  Do we have an engine?

14           MR. CALBI:  If not, I'm ready.

15           THE COURT:  All right.  Mr. Sandage?

16           MR. SANDAGE:  May it please the court?

17             CROSS EXAMINATION

18   BY MR. SANDAGE:

19    Q.  Good afternoon, sir.  My name is Lance Sandage, and I

20        represent Shevel Foy.

21    A.  Good afternoon.

22    Q.  Your prior drug conviction in this court, you

23        received a 27-month sentence; is that correct?

24    A.  Yes, sir.

25    Q.  Did you cooperate in that case?

1    A.   No.

2    Q.   You did not receive a 5K?

3    A.   No.

4    Q.   You were arrested in April of 2008 for DUI.  Is that

5         what you just testified to?

6    A.   DUI sobriety checkpoint.

7    Q.   And in the process of that they found -- law

8         enforcement found a weapon; is that correct?

9    A.   Yes, sir.

10   Q.   Were you taken into custody for the possession of

11        that weapon?

12   A.   I was taken into custody, yes.

13   Q.   How long did you spend in custody?

14   A.   Overnight.

15   Q.   You were released the next day?

16   A.   Yes, sir.

17   Q.   Were you charged with any crimes?

18   A.   I was charged with DUI and possession of marijuana.

19   Q.   Were you charged with any crimes on that day related

20        to the firearm?

21   A.   No.

22   Q.   Did you meet with any law enforcement regarding the

23        firearm?  Did a detective come and talk to you about

24        the firearm?

25   A.   No.

```
 1    Q.   Did you talk to anybody that day regarding

 2         information you had regarding other criminal

 3         activities in the city?

 4    A.   No.

 5    Q.   When was the first time you had discussions regarding

 6         other criminal activities in the city with law

 7         enforcement?

 8    A.   With my attorney and the DEA and the other

 9         individuals and Mr. Becker.

10    Q.   How long after your stop in April of 2008 did -- was

11         it before those conversations started taking place

12         with the DEA?

13    A.   Approximately a couple weeks.

14    Q.   Two weeks?

15    A.   Approximately.

16    Q.   I think it was your testimony with Ms. Morehead that

17         you've never been charged with that crime?

18    A.   No.

19    Q.   And if you were charged with that crime, do you feel

20         like you would be on bond, or do you feel that you

21         would be detained?  In your prior case in this court

22         in 2003, were you on bond or were you detained?

23    A.   I was on bond for a month and a half.

24    Q.   How many prior gun charges do you have?

25    A.   Two.
```

1    Q.   So in April of 2008 that firearm would be your third

2         arrest for possession of a firearm?

3    A.   Yes.

4    Q.   After you had been convicted of a felony?

5    A.   Yes, sir.

6    Q.   And it's your belief -- has anybody told you that for

7         the current firearm charge that's been uncharged or

8         unindicted that you face a potential of 15 years in

9         the --

10                  MS. MOREHEAD:  Judge, could we approach,

11        please?

12                  THE COURT:  You may.

13                  (Counsel approached the bench and the

14        following proceedings were had:)

15                  MS. MOREHEAD:  Judge, I'm going to object.

16        He's not an armed career criminal.

17                  MR. SANDAGE:  He has two priors.

18                  MS. MOREHEAD:  You have to have two prior

19        crimes of violence -- actually, three prior crimes of

20        violence or drug-trafficking offenses.  He's got one

21        prior drug trafficking.

22                  MR. SANDAGE:  So he's looking at ten?

23                  MS. MOREHEAD:  He's looking at not more

24        than ten years.

25                  MR. SANDAGE:  I'll rephrase the question.

1        Sorry.

2                    THE COURT:  Very well.

3                    (The proceedings returned to open court.)

4    Q.   (By Mr. Sandage) I apologize.  Let me rephrase the

5         question.  Has anybody told you you are looking at

6         possibly ten years of incarceration for the current

7         gun charge that's pending?

8    A.   No.  Actually, upon initially meeting with my

9         attorney, he had indicated, just off of briefly

10        knowing, he didn't really know what my --

11                   MS. MOREHEAD:  Judge, I'm going to --

12                   THE COURT:  Yeah.

13                   MS. MOREHEAD:  -- object to attorney/client

14        privilege.

15                   THE COURT:  Yeah.  We shouldn't get into --

16                   MR. SANDAGE:  It was unsolicited.

17                   THE COURT:  I realize that.

18             Mr. Anderson, you've got a privilege here with

19        what you and your lawyer talked about.  You probably

20        shouldn't be disclosing what you and your lawyer

21        talked about.  I think the question in and of itself

22        was just whether or not you had some knowledge of

23        some possible exposure, and you indicated you hadn't.

24        We will see what counsel goes to from there.

25   Q.   (By Mr. Sandage) You said -- we will go in a

1      different line.  You said approximately two weeks

2      after your arrest in August of 2008 was your first

3      meeting with the DEA?

4  A.  Approximately two to three weeks.

5  Q.  Okay.  And from two to three weeks -- let's stay in

6      April of 2008.  So sometime in April of 2008 you met

7      with the DEA?

8  A.  I would say May.

9  Q.  May.  I'm sorry.  I apologize.  How many times have

10     you met with the DEA since May of 2008?

11  A.  I couldn't tell you.  A lot.

12  Q.  Okay.  More than ten?

13  A.  Yes.

14  Q.  More than 20?

15  A.  Probably.

16  Q.  More than 30?

17  A.  Maybe around there, around 30, maybe.

18  Q.  Around 30 times?

19  A.  Uh-huh.

20  Q.  So since May of 2008 -- we are currently almost -- on

21      the verge of May of 2009 -- you met with DEA

22      approximately 30 times; is that your testimony?

23  A.  Yes.

24  Q.  Have you ever met with the FBI?

25  A.  They may have been present during the first -- during

1856

1       the initial meeting.

2   Q.   Have you met with ATF?

3   A.   I believe he was present during the initial meeting.

4   Q.   Have you met with Immigration Customs Enforcement?

5   A.   No.

6   Q.   Have you met with Kansas City police detectives?

7   A.   No.

8   Q.   Have you met with any other law enforcement agencies

9       outside the four or five you just went over in the

10      last couple seconds?

11  A.   No.

12  Q.   Is it fair to say that you're talking about a variety

13      of topics with law enforcement?

14  A.   Yes.

15  Q.   And it was your testimony on direct examination by

16      Ms. Morehead that you've only had -- out of the 30

17      conversations you've had with law enforcement, two of

18      those conversations involved people allegedly charged

19      with crimes in this court; is that correct?

20  A.   I wouldn't say two.  I would say probably a little

21      bit more than two, maybe two -- maybe three or four.

22  Q.   So it's your testimony now that you've actually met

23      with law enforcement three or four times regarding

24      individuals associated in this case that you're in

25      here testifying about today?

1    A.    I have met with law enforcement regarding other

2          issues, upon which time I was asked questions about

3          individuals on this.

4                    MR. SANDAGE:  Your Honor, may we approach?

5                    THE COURT:  You may.

6                    (Counsel approached the bench and the

7          following proceedings were had:)

8                    MR. SANDAGE:  Your Honor, I have two

9          reports of interviews regarding people involved in

10         this case, and he's just now testified that he's had

11         three or four interviews regarding people involved in

12         this case.

13                   MS. MOREHEAD:  Well, some of them have been

14         trial prep and meeting with me and stuff.  There have

15         only been two occasions where there's been disclosure

16         of information that he's given, and we have provided

17         those reports.  Anything else that came out of any

18         other interviews has only been the same information;

19         it hasn't been additional or different information.

20                   THE COURT:  There aren't proffer reports or

21         statements or anything other than what has been

22         disclosed to counsel?  Is that what you're saying?

23                   MS. MOREHEAD:  That's right.  We might talk

24         to somebody three or four times.  If they don't

25         disclose any additional or different information,

1    there's never a report done, if there's nothing new

2    disclosed.  That's what that's about.  Which includes

3    trial prep.

4                THE COURT:  You are representing that all

5    statements that he gave prior to final trial

6    preparation and/or any and all proffer interviews

7    which have been reduced to writing have been

8    disclosed to counsel for the defendants; is that

9    correct?

10                MS. MOREHEAD:  If there's any disclosures

11    about what he's testified to.  Some of what he told

12    is stuff that I can't get into, and so I haven't.

13    But yes, everything that he said in connection with

14    this case that he's told during any interviews, we

15    disclosed.

16                MR. SANDAGE:  What about the issue that

17    he's now also testified to 30 some odd interviews

18    with law enforcement?  Isn't there an obligation from

19    the government under Giglio or Jencks that there

20    might be impeachment material in there that the

21    defense should have had an opportunity to review and

22    prepare to cross examine this witness with?

23                THE COURT:  Ms. Morehead?

24                MS. MOREHEAD:  Judge, those are other

25    extraneous cases.  If there was any impeachment

```
 1        information or anything related to -- that I would be
 2        obligated to give, I would have done that.  Those
 3        involve completely unrelated matters that have
 4        nothing at all to do with this case, many of which
 5        are ongoing investigations, and I'm not obligated to
 6        disclose anything other than the information that
 7        I've disclosed against -- or against these
 8        individuals in this case, and specifically about Mr.
 9        Anderson by way of impeachment material.
10             THE COURT:  You are representing that you
11        have discharged the government's duties under Brady
12        and Giglio and have turned over to the defendants all
13        those materials that you are required to turn over;
14        is that correct?
15             MS. MOREHEAD:  Yes.
16             MR. SANDAGE:  That's her representation.
17        Until we have the conversation, we don't have any way
18        of knowing, so I appreciate the courtesy.
19             THE COURT:  Very well.
20             (The proceedings returned to open court.)
21   Q.   (By Mr. Sandage) Have you received financial
22        compensation in this case from the Drug Enforcement
23        Agency for your assistance?
24   A.   No.
25   Q.   I believe it was your testimony on direct
```

```
 1          examination, sir, that you knew Rat, whose real name

 2          is Shevel Foy; correct?

 3   A.     Yes.

 4   Q.     And that you saw him over at this shop; is that

 5          correct?

 6   A.     I have seen him at the shop before, yes.

 7   Q.     And then Ms. Morehead went into some specific detail

 8          regarding two specific events in which one was, she

 9          characterizes, the money transaction, the second one

10          was the drug transaction.  Do you remember that

11          testimony?

12   A.     Yeah.  There was no money transaction though.  He

13          wasn't making a transaction.  It was just present.

14   Q.     The issue involving the money happened, I think you

15          said, sometime in 2006; is that correct?

16   A.     Shortly after I was released, yes.

17   Q.     And you were released in what month?

18   A.     March, the end of March.

19   Q.     March of 2006?

20   A.     Yes.

21   Q.     And so would that have been how soon after March of

22          2006, sir?

23   A.     Within a month, month and a half.  I was in the

24          halfway house for a month.

25   Q.     And so it was after you got out of the halfway house?
```

```
 1    A.    Yes.

 2    Q.    And was that out of the halfway house for which

 3          offense?

 4    A.    That was for my violation.

 5    Q.    Of supervised release?

 6    A.    Yes.

 7    Q.    And what were you violated for?  What did you do?

 8                   MS. MOREHEAD:  Judge -- go ahead.

 9                   THE COURT:  You may answer.

10    A.    Positive UA.

11    Q.    (By Mr. Sandage) For controlled substances violation?

12    A.    Yes.

13    Q.    What was the drug?

14    A.    Marijuana.

15    Q.    So the jury understands what supervised release is,

16          that's a -- what do you know supervised release to

17          be?

18    A.    It's like parole supervision for when you're released

19          from incarceration.

20    Q.    So after you got out of the Federal Bureau of

21          Prisons, you were placed on a term of supervised

22          release?

23    A.    Yes.

24    Q.    And you had a probation officer?

25    A.    Yes.
```

1    Q.   And you checked in with that probation officer?

2    A.   Yes.

3    Q.   And you were supposed to be compliant with things

4         that the court -- special conditions that the court

5         set in the time that you were sentenced; correct?

6    A.   Yes.

7    Q.   And one of those was, I assume, to be subjected to

8         random drug urinalysis; is that correct?

9    A.   Yes.

10   Q.   Through that process is when you tested positive for

11        marijuana?

12   A.   Yes.

13   Q.   Was that your first violation?

14   A.   Yes.

15   Q.   And so in roughly May of 2006 is when you say that

16        you saw Mr. Foy with a suitcase?

17   A.   I wouldn't say May.  I would say I got out at the end

18        of March.  I would say probably closer towards the

19        end of April.

20   Q.   Okay.  And the location of that was where again?

21   A.   It was around the corner from Monterial's mom's

22        house.

23   Q.   And you went upstairs -- the purpose of going in the

24        house was to use the restroom; is that correct?

25   A.   That's why I went in, yes.

1863

1  Q.  That's why you were there?

2  A.  Yes.

3  Q.  And then you went to the restroom?  Do you remember

4      the layout of the house?

5  A.  Not particularly.  I remember that once you walk into

6      the house there's the living room and then there's

7      another room after, and the bathroom was over in this

8      side, and it was a real junky bathroom.

9  Q.  And had you ever been in that house before?

10  A.  Yes, one time.

11  Q.  Have you been in the house since then?

12  A.  No.

13  Q.  Do you know who owns that house?

14  A.  No, I don't.

15  Q.  When you came out of the restroom, you said that you

16      saw Mr. Foy with a black suitcase; is that correct?

17  A.  Yes.

18  Q.  Was the suitcase open or closed?

19  A.  He was closing it.

20  Q.  Did you stop to talk to Mr. Foy, or did you walk past

21      him towards the exit?

22  A.  I didn't stop to talk to him.  I walked past him

23      toward the door.

24  Q.  So your encounter with Mr. Foy would have been a

25      matter of seconds?

1    A.    Matter of seconds.

2    Q.    And it's your testimony that you looked into that bag

3          and saw cash?

4    A.    It's my testimony that I looked -- I was walking out,

5          and as I was walking out, I saw him closing it, and I

6          saw currency over the top of it in vacuum-sealed

7          packs.

8    Q.    And I guess you weren't there long enough to know

9          whether or not the entire suitcase was filled with

10         money then?

11   A.    I saw it over the top, but no, I don't know that.

12   Q.    And that observation period, I was wrong on a few

13         seconds, I guess.  How long would you say that you

14         got to look into that black bag?

15   A.    I would say a few seconds.

16   Q.    Few seconds.  No conversations with Mr. Foy regarding

17         that bag?

18   A.    No.

19   Q.    He didn't claim ownership of that bag?

20   A.    No.

21   Q.    He didn't tell you it was Mr. Wesley's bag?

22   A.    No.

23   Q.    He didn't tell you if it was Telly Maggit's bag?

24   A.    No.

25   Q.    He didn't tell you if it was your bag?

1   A.   I didn't talk to him.

2   Q.   Did you go out in the car and talk to Mr. Wesley

3        about that event?

4   A.   We didn't talk about that event specifically, but

5        after --

6   Q.   That's fine.  The second incident that you talked

7        about regarding Mr. Foy was a time where you saw half

8        a kilogram of cocaine transferred; correct?

9   A.   Yes.

10  Q.   And it was your testimony on direct examination that

11       Mr. Wesley gave the cocaine to Mr. Foy; is that

12       correct?

13  A.   Yes.

14  Q.   And that was after you had gone with Mr. Wesley to

15       Antoine's house to pick it up; correct?

16  A.   We were on our way over there because he was taking

17       it to him.  We left.  As we were leaving --

18  Q.   I don't mean to -- taking it to who?  I'm sorry.

19  A.   To Toine.

20  Q.   Okay.  Go ahead.

21  A.   And as we were leaving, Antoine called him.

22       Obviously -- I'm guessing he had a problem with it.

23       We turned around, went back, and he picked it back

24       up.

25  Q.   Mr. Wesley picked it up?

1    A.   Yes.

2    Q.   Was it still in this brown paper bag that you

3         described on direct examination?

4    A.   Yes.

5    Q.   Did you look in the contents of it when you left

6         Toine's residence and went to wherever Mr. Foy was?

7    A.   No.

8    Q.   And then where is Antoine's residence?

9    A.   I don't know the exact location of it.  I just

10        remember -- I just remember briefly that there was a

11        steep driveway to it and a couple dogs out in front.

12        I'm not familiar with the area.  It's in Kansas City,

13        Missouri, though.

14   Q.   Kansas City, Missouri?

15   A.   Yes.

16   Q.   And then I believe it was your testimony on direct

17        examination that you went to an apartment complex; is

18        that correct?

19   A.   Townhouses.

20   Q.   Where were those townhouses located?

21   A.   I don't know the location.

22   Q.   Okay.  In Kansas City also?

23   A.   Kansas City, yes.

24   Q.   And it was at that point that Mr. Foy came out of the

25        residence?

1    A.    Yes.

2    Q.    Was he carrying anything when he came out?

3    A.    No.

4    Q.    And then he got into the back of your vehicle?

5    A.    Yes.

6    Q.    Tell the jury what you said happened at that point.

7    A.    He got into the car with us, and Monterial gave him

8          the bag.  He opened up the bag, pulled it out, looked

9          at it, put it back in the bag, and closed it.

10   Q.    Was there any money exchanged?

11   A.    No.

12   Q.    I believe also on direct examination, sir, that you

13         told Ms. Morehead that you had met with law

14         enforcement, or she went over two prior times you met

15         with law enforcement, I believe first in February of

16         2009 and then the following month, the latter part of

17         March 2009?

18   A.    Yes.

19   Q.    Do you remember that?  I'm going to ask you to think

20         about the March of '09, the last one, okay, for a

21         minute.  Do you remember if Task Force Officer Eric

22         Jones was in the room?

23   A.    I don't know his last name, but Eric yes.

24   Q.    He's in the courtroom today, yes?

25   A.    Yes.

```
 1    Q.   In fact, he's sitting right there in the brown suit?

 2    A.   Yes.

 3    Q.   And you had discussions with him regarding people

 4         involved in this case; correct?

 5    A.   Yes.

 6    Q.   And he showed you pictures?

 7    A.   Yes.

 8    Q.   Do you remember him talking to you about the drug

 9         transaction that you and I have just been discussing

10         and that you discussed with Ms. Morehead on direct

11         examination?  Do you remember talking to him about

12         that?

13    A.   Yes.

14    Q.   Do you remember telling him that Mr. Wesley was

15         actually the one that picked up the cocaine from Mr.

16         Foy that day?

17    A.   No.

18              MR. SANDAGE:  May I approach the witness,

19         your Honor?

20              THE COURT:  Yes, you may.

21              MR. SANDAGE:  For the record, this is a

22         report from March 27 of 2009 prepared by Eric Jones.

23    Q.   (By Mr. Sandage) I would ask you to read to yourself

24         Paragraph 9, I'm pointing to.  Read it to yourself

25         and see if that refreshes your recollection and let
```

1    us know when you're done reading.

2  A.   I'm done.

3  Q.   Wow.  Does that refresh your recollection?

4  A.   Yes, it does.

5  Q.   Do you recall telling him that?

6  A.   I recall us discussing it.  If that's what it says, I

7       told him that, yeah.

8  Q.   Do you also recall telling him that Foy came out of

9       the building with a bunch of garages -- coming out of

10      a residence with a bunch of garages underneath the

11      residence?

12 A.   Townhouses with garages on all of them.  They all

13      looked the same.

14 Q.   Do you remember telling him that Mr. Foy had a brown

15      paper bag?

16 A.   No.

17 Q.   Do you remember telling him that you saw that that

18      brown paper bag had cocaine in it?

19 A.   Yes.

20 Q.   The brown paper bag that Mr. Foy had?  Do you

21      remember telling him that?

22 A.   The one he had after Mr. Wesley gave it to him, yes.

23 Q.   Do you remember then telling Officer Jones that then

24      after that you and Mr. Wesley went to Mr. Nunn's

25      house to deliver the cocaine?

1    A.    No.

2    Q.    You don't remember saying that?

3    A.    No.

4    Q.    Is it fair to say that that rendition we just went

5          over is different than what you just testified to on

6          direct?

7    A.    Yes.

8    Q.    And on cross examination?

9    A.    Yes.

10   Q.    In fact, it's completely opposite?

11   A.    Yes, it is.

12               MR. SANDAGE:   Nothing further, your Honor.

13               THE COURT:   Anyone else before Mr. Calbi?

14         Pardon me.   Mr. Heathman?

15                     CROSS EXAMINATION

16   BY MR. HEATHMAN:

17   Q.    Mr. Anderson, you testified you talked with the DEA,

18         FBI -- ATF might have also been present -- as many as

19         30 times?

20   A.    Yes, sir.

21   Q.    Since April or May of 2008?

22   A.    Yes.

23   Q.    Do you recall when it was that you spoke to any of

24         those agencies or individuals about anything about

25         this case?

```
 1    A.    Since the beginning, when is the first time we ever

 2          discussed it at all?

 3    Q.    Yeah, somebody might have even mentioned anything to

 4          you about this case.

 5    A.    I already knew about the case.  They didn't mention

 6          it to me.  Yeah, the first time that anything was

 7          mentioned about the case was at my initial meeting

 8          with them, and in the initial meeting it was stated

 9          that I may be asked questions or I may, you know, be

10          asked questions regarding this case.

11    Q.    When, again, was your initial meeting with them?

12    A.    It was in '08.

13    Q.    Okay.

14                MR. HEATHMAN:  Your Honor, may I approach?

15                THE COURT:  Yes.

16                (Counsel approached the bench and the

17          following proceedings were had:)

18                MR. HEATHMAN:  Again, your Honor, I have

19          the same problem.  I think that with Mr. Sandage this

20          individual has indicated it's not two times he's been

21          talked to about this case, there was as many as three

22          or four.  One was as early as April of 2008.  We have

23          no information about what he indicated or what was

24          asked of him or what he responded.

25                THE COURT:  I think -- the question is, has
```

1      there been something written generated from that?

2                    MS. MOREHEAD:  No.  All that was said was

3      at some point they may ask questions of him about

4      this case.  The first time any questions were asked

5      about this case was in January of '09, which is what

6      they have.

7                    THE COURT:  Have you gone back -- or let's

8      put it differently.  Over the break this afternoon I

9      want you and the agents to go back and make sure that

10     there's not some other document that was generated by

11     one of these agents that somehow has been overlooked

12     by accident or otherwise, but supposedly by accident,

13     in the discovery process here in light of Mr.

14     Anderson's testimony.  Obviously, nothing he has said

15     has precluded the possibility that he talked to

16     people and nothing was written up as a result of it,

17     in which case it would be difficult for the

18     government to have given you anything, if nothing was

19     written up.  Ms. Morehead, I believe, is standing on

20     her representation that she has given you everything

21     that exists in writing, but I'm going to direct her

22     to verify that because this witness does maintain

23     that he has been interviewed more times than what it

24     appears the writings reflect.  I think it would

25     behoove us to take one more look just to be careful

```
 1        about it.
 2                  MS. MOREHEAD:  Judge, I would just ask to
 3        correct the record because he's not indicating in
 4        that first meeting that he was interviewed about
 5        this; it was just discussed that at some point he may
 6        be asked questions about it.
 7                  THE COURT:  You will have a chance,
 8        obviously, to conduct redirect, in which you can
 9        certainly do that.
10                  MS. MOREHEAD:  That's fine.
11                  THE COURT:  All right.
12                  (The proceedings returned to open court.)
13   Q.   (By Mr. Heathman) Mr. Anderson, the reports I have
14        been given about your statements to the government
15        appear to have been regarding a proffer of January 12
16        of 2009; is that correct?
17   A.   Yes.
18   Q.   And in January 12 of 2009 do you recall indicating
19        that you may have seen something at Ms. Temple's
20        house in the summer of 2006?
21   A.   It was 2007.
22   Q.   I understand, but did you tell the agents it was
23        2006?
24   A.   Yes, I may have.
25   Q.   And so if you told them it was 2006, at some point
```

1        later then did you remember that it wasn't 2006 and

2        that it was 2007?

3  A.    Yes.

4  Q.    And you also recalled that in January of 2009 you

5        indicated to the agents that you saw a shoebox that

6        might have as much as a half of a kilogram of

7        cocaine?

8  A.    Yes.

9  Q.    You were then interviewed again in March of 2009; is

10       that correct?

11 A.    Yes.

12 Q.    And in March of 2009, sir, did you tell them that it

13       was money in the shoebox?

14 A.    I may have.

15 Q.    You would agree with me that money is materially

16       different than half a kilogram of cocaine?

17 A.    Yes.

18 Q.    Why, sir, would you indicate in January that there

19       was cocaine in a shoebox --

20                MS. MOREHEAD:  Judge, could we approach,

21       please?

22                (Counsel approached the bench and the

23       following proceedings were had:)

24                MS. MOREHEAD:  Mr. Heathman is wholly

25       misstating what he said.  In fact, he's maintained

1    all along what he saw was cocaine at Ms. Temple's

2    house.  Never once does he indicate he saw money at

3    Ms. Temple's house.

4              THE COURT:  Show me the money reference,

5    Mr. Heathman.

6              MS. MOREHEAD:  It was that he was told by

7    Monterial Wesley that $5,000 had been stolen by Ms.

8    Temple's son.

9              THE COURT:  I'm looking at Paragraph 19 on

10   the report of investigation, page 4 of 5.  It says,

11   "Wesley had also told the CS that Temple's son had

12   stolen $5,000 in cash from Wesley's stashed money,

13   but Temple had replaced the money before Wesley came

14   back over.  The CS has also seen a shoebox full of

15   money over at Temple's house as well."

16             MS. MOREHEAD:  I, frankly, Judge, was

17   looking up here, where he indicated he saw cocaine at

18   her house.

19             THE COURT:  Well, Mr. Heathman has a good

20   faith basis to ask whether this is a different

21   shoebox full of money.  You're clear, but maybe

22   there's a different shoebox full of money.

23             MS. MOREHEAD:  Okay.  Thank you.

24             (The proceedings returned to open court.)

25             THE COURT:  All right.  Mr. Heathman, would

1      you restate the question so we can get it back in our

2      minds, please.

3                  MR. HEATHMAN:  Certainly.

4   Q.  (By Mr. Heathman) Sir, do you recall in January -- in

5      March of 2009 when you were discussing this case with

6      the government you indicated that there was a shoebox

7      full of money in Ms. Temple's house?

8   A.  You said in March?

9   Q.  March 29 of 2009 did you indicate that?

10  A.  I may have.

11  Q.  Is that the same shoebox that earlier you had

12     testified -- strike that, that you had indicated to

13     the government in January contained a half a kilo of

14     cocaine?

15  A.  Yes.

16  Q.  Now, you would agree with me that money and cocaine

17     are two separate things?

18  A.  Yes.

19  Q.  Why would you tell the agents in January of 2009 that

20     the shoebox had cocaine and then in March turn around

21     and tell them that the shoebox had money?

22                  MS. MOREHEAD:  Judge, I'm going to object.

23     He's already indicated it was separate occasions.

24  A.  I didn't hear that.

25                  THE COURT:  Overruled.  You may answer, Mr.

1           Anderson.

2     A.    There was one occasion when I was asked a question

3           about it.  The first time I answered the question and

4           I hadn't really had time to reflect on it.  I just

5           was hit with the question, and to my best

6           recollection at that time, I answered it.

7     Q.    (By Mr. Heathman) All right.  So your best

8           recollection when you were first hit with it, it was

9           cocaine in the shoebox; and on the second occasion,

10          after rethinking it, you realized it was money in the

11          shoebox?

12    A.    Initially I told them it was cocaine.  On the last

13          meeting I may have told them that it was money.  I'm

14          under oath now and I'm answering it was cocaine.

15    Q.    Okay.  So you're under oath now.  Does it take an

16          oath, sir, to get you to tell the truth?

17    A.    No, sir.

18    Q.    Now, also you had indicated on direct examination

19          that you were with Mr. Wesley on this particular

20          occasion when you went to Ms. Temple's house;

21          correct?

22    A.    Yes.

23    Q.    I'm talking about the incident where you saw the

24          cocaine now in the box.

25    A.    Yes.

1   Q.   All right.  In the shoebox.  Do you know what kind of

2        shoebox it was?

3   A.   An orange and tan Nike shoebox.

4   Q.   Is that men's shoes, women's shoes?

5   A.   I don't know if it was men's or women's.

6   Q.   Were there purses in the shoebox?

7   A.   No.

8   Q.   Was there feminine items in the shoebox?

9   A.   No.

10  Q.   Do you know where Ms. Temple was working in the

11       summer of 2007?

12  A.   No.

13  Q.   She wasn't home when you and Mr. Wesley went over

14       there for him to change clothes, was she?

15  A.   No.

16  Q.   And Mr. Wesley went inside to change?

17  A.   Yes.

18  Q.   Put something you believe was cocaine in a shoebox?

19  A.   Yes.

20  Q.   And then did he change clothes?

21  A.   Yes.

22  Q.   And you departed?

23  A.   Yes.

24  Q.   Were you with Mr. Wesley when he went back to pick up

25       the cocaine?

```
 1   A.    No.

 2   Q.    Do you know if he went back and picked it up prior to

 3         Ms. Temple arriving home?

 4   A.    No.

 5               MR. HEATHMAN:  Let me check my notes just a

 6         second, your Honor.  I don't have anything further.

 7         Thank you.

 8               THE COURT:  Mr. Calbi, I think maybe it's

 9         time for you.

10               MR. CALBI:  Your Honor, I think the train

11         has left without the caboose.  I don't have any

12         questions.

13               THE COURT:  Okay.  Redirect?

14               MS. MOREHEAD:  Thank you, Judge.

15                     REDIRECT EXAMINATION

16   BY MS. MOREHEAD:

17   Q.    Mr. Anderson, you think there were some questions

18         about the two interviews that you gave in connection

19         with this particular case.  Do you recall questions

20         about that?

21   A.    Yes.

22   Q.    Specifically January 12 of 2009?

23   A.    Yes.

24   Q.    And then again on March 27 of 2009.  Do you remember

25         everything that you talked to the agents about on
```

1880

```
1          January 12 of 2009?

2    A.    No, not everything.

3    Q.    Okay.

4                MS. MOREHEAD:  Judge, could I approach the

5          witness?

6                THE COURT:  Yes, you may.

7    Q.    (By Ms. Morehead) Specifically I wanted to direct

8          your attention to Paragraph 7 and see if that

9          refreshes your recollection about what you indicated

10         the first time you talked about this case.

11   A.    Yes.

12   Q.    And specifically I'm talking about the information

13         about Latysha Temple.

14   A.    Yes.

15   Q.    Does that refresh your recollection?

16   A.    Yes.

17   Q.    When you talked to them again in March of 2009, do

18         you recall all the details of information that you

19         gave about Latysha Temple?

20   A.    Yes.

21   Q.    What information did you change in connection with

22         what you indicated to the agents initially?

23   A.    I don't think I follow what you're asking me.  You're

24         saying what did I change from now to this?  Because

25         this is basically what I just said.
```

1    Q.   Yeah.  And correct me if I'm wrong.  You indicated

2         initially, did you not, that the incident with the

3         cocaine and the shoebox occurred in -- when did

4         you --

5    A.   Initially I said, '06 but it was '07.

6    Q.   Let me show you Government's Exhibit -- not

7         Government's Exhibit but the interview that you did

8         in March and Paragraph 18 and 19, if you could just

9         look at that.

10   A.   Yes.

11   Q.   Okay.  And did you, in fact, provide the date that

12        you had seen that?

13   A.   I provided the correct date.

14   Q.   When was that?

15   A.   2007.

16   Q.   And with regards to the 2007 incident when you said

17        you saw -- was that the summer of 2007?

18   A.   Yes.

19   Q.   And what did you indicate when you had the second

20        interview what you saw at Latysha Temple's house the

21        summer of 2007?

22   A.   The second interview I really don't recall.

23   Q.   Okay.  Could you look at that again, Paragraph 18 and

24        19.

25   A.   This is the second interview you're asking me about

```
 1        right here?

 2   Q.   Yes.  Start down here at Paragraph 18.

 3   A.   Yes.  If this is the second interview, I'll read it.

 4   Q.   Paragraph 18 and Paragraph 19 just to refresh your

 5        recollection.

 6   A.   Read it out loud or --

 7   Q.   No.  Read it to yourself.

 8   A.   Yes.

 9   Q.   What did you tell them in the March interview that

10        you had seen at Latysha Temple's house the summer of

11        2007?

12   A.   I believe that I told them money, but if this is --

13        if this is -- what I just read right here is from the

14        second interview.  It said that I saw cocaine.

15        That's what I said.

16   Q.   All right.  So as far as the first interview and the

17        second interview, the only thing that changed with

18        regards to the seeing cocaine was you went from the

19        summer of '06 until summer of '07?

20   A.   Yes.

21   Q.   Between January and March this year when you had the

22        first and second interview, what made you reflect

23        back and figure out that instead of '06 it was

24        actually '07?

25   A.   Because she didn't live in that house in '06.
```

```
 1    Q.    Okay.  So then that made you believe that --

 2    A.    If she did live in that house, I didn't know because

 3          I hadn't been to her house yet.

 4    Q.    That would have been in '07 then?

 5    A.    Right.

 6    Q.    And with regards to the money and the shoebox that

 7          you provided information about during your second

 8          interview, was that a separate incident that you were

 9          referring to to the agents?

10    A.    Yeah.  To be honest with you, I don't even -- I don't

11          recall the money/shoebox -- the money/shoebox

12          scenario.  I may have mixed my answers up with

13          cocaine and money.  There's a big difference, but I

14          don't recall the money situation.  I've never seen

15          him with enough money to fill a shoebox.

16    Q.    Did you have some information though about money at

17          Latysha Temple's house in connection with Monterial

18          Wesley?

19    A.    The only thing I knew of money at her house was

20          Monterial told me her son took a certain amount of

21          money from him and she replaced it.

22    Q.    And so in that second interview did you, in fact,

23          mention money in connection with Latysha Temple's

24          residence?

25    A.    Yes.
```

```
 1   Q.    You though don't recall saying the money had anything
 2         to do with the shoebox?
 3   A.    No.
 4                   MS. MOREHEAD:  Judge, that's all I have.
 5                   THE COURT:  Any recross, Mr. Heathman?
 6                   MR. HEATHMAN:  Just briefly, your Honor.
 7                      RECROSS EXAMINATION
 8   BY MR. HEATHMAN:
 9   Q.    So I'm clear, did you just testify in March of 2009
10         there was some money but it didn't have anything to
11         do with a shoebox?
12   A.    I didn't see it specifically, no.  When they asked me
13         questions about money regarding Tasha's house in the
14         March interview, I told them the same information I
15         just told her.
16                   MR. HEATHMAN:  May I approach, your Honor?
17                   THE COURT:  Yes.
18   Q.    (By Mr. Heathman) I'm going to show you both of your
19         statements, December statement -- that's
20         Paragraph 7 -- and Paragraph 19 of the March
21         statement.  Let me know when you're done reading.
22   A.    Yes, I see it.
23   Q.    Does that, sir, refresh your recollection as to your
24         indication of money being in a shoebox in March of
25         2009?
```

1  A.   Yes.

2  Q.   All right.  And do you remember telling the agents

3       there was money and it did involve a shoebox and you

4       told them that in March?

5  A.   I don't recall it, but I just read it right there, so

6       I'm assuming I did.

7  Q.   All right.  We're talking about, what, three weeks

8       ago?

9             MS. MOREHEAD:  Judge, I'm going to object.

10 A.   No.  You said December.

11            MR. HEATHMAN:  I'm sorry.

12            THE COURT:  Excuse me.  We have an

13      objection.  What's your objection?

14            MS. MOREHEAD:  The objection is, the only

15      purpose of showing that was to refresh his

16      recollection, and he's saying it doesn't refresh his

17      recollection, he doesn't remember saying that.

18            THE COURT:  That is correct.  And, members

19      of the jury, you are to disregard Mr. Anderson's

20      answer about, well, if it's there, that must be it,

21      because that wasn't the question.  The question was,

22      does it refresh your recollection?  The answer is no.

23 Q.   (By Mr. Heathman) To make sure I'm understanding,

24      this statement that you read doesn't remind you or

25      refresh your memory as to what you told these agents

1      three weeks ago?

2   A.   No.

3   Q.   But yet you have memory --

4              THE COURT:  Mr. Heathman, I know you're not

5        meaning to do this, but March 9 is more than three

6        weeks ago.

7              MR. HEATHMAN:  Approximately three weeks

8        ago.

9              THE COURT:  You mean six weeks ago, or

10       whatever it was.

11             MR. HEATHMAN:  March 29.  What are we now?

12             THE COURT:  I thought you said March 9.

13       Maybe I misheard you.

14             MR. HEATHMAN:  I may have.

15  Q.   (By Mr. Heathman) March 29 is the date of the

16       statement.  Do you recall that?  So that was

17       approximately a month.

18             THE COURT:  Thank you.  I misheard you.

19             MR. HEATHMAN:  That's all right.  And I may

20       have misspoke.

21  Q.   (By Mr. Heathman) That was approximately a month ago.

22  A.   I understand.

23  Q.   And you made misstatements about your memory between

24       January of '09 and March of '09; correct?

25  A.   Correct.

```
 1   Q.   But you expect the court to believe your testimony
 2        about 2007 is something that you know without a
 3        doubt?
 4   A.   Yes.
 5             MR. HEATHMAN:  I don't have anything
 6        further.
 7             THE COURT:  Mr. Sandage, I assume nothing
 8        from you?
 9             MR. SANDAGE:  No, your Honor.
10             THE COURT:  Ms. Morehead?
11             MS. MOREHEAD:  Nothing, Judge.
12             THE COURT:  Mr. Anderson, you may step
13        down.  I'm not going to excuse you for the reasons we
14        previously discussed.  In case something should
15        develop along those lines simply be on call from the
16        prosecutor if we need to call you back.
17             Members of the jury, we will use this
18        opportunity for our afternoon recess.  We will resume
19        at 25 after three.  Ms. Ludwig, please take charge of
20        the jury.
21             I'll remind you of the admonitions, of which you
22        are well aware.  If counsel and the parties will
23        remain here, I would like to visit with you for a
24        moment.
25                  (The following proceedings were had outside
```

```
 1              the presence of the jury:)
 2                        THE COURT:  All right.  I didn't excuse
 3         Mr. Anderson in the event that you should over the
 4         break come up with something that inadvertently
 5         wasn't disclosed and want to have him be available
 6         and not have to bring him back on a separate day if
 7         that were cause to reopen his examination.
 8                        MS. MOREHEAD:  That's fine, Judge.
 9                        THE COURT:  Anything else we should do
10         before we break?  Hearing none, we're in recess.
11                        (A recess was taken.)
12                        THE COURT:  All right.  If we're ready to
13         proceed, we will bring in the jury, but first, Ms.
14         Morehead, can you give us a report?
15                        MS. MOREHEAD:  Judge, there were no other
16         occasions where there were any details provided about
17         this particular case.  There were discussions, as
18         indicated by Mr. Anderson, that possibly questions
19         might be asked at a later time, and I did provide all
20         of the information that was disclosed in connection
21         with this case on any subsequent occasions.
22                        THE COURT:  It's not clear to me, did you
23         disclose any new information?
24                        MS. MOREHEAD:  No.
25                        THE COURT:  As a result of your search?
```

```
 1              MS. MOREHEAD:  No, I did not.  There was no
 2        new information to disclose.
 3              THE COURT:  Thank you.  Unless and until
 4        counsel independently can suggest some other course
 5        of action, we will simply proceed.
 6              (The following proceedings were had in the
 7        presence of the jury:)
 8              THE COURT:  Thank you.  Ms. Morehead, the
 9        government may call its next witness.
10              MS. MOREHEAD:  Judge, I would call Neil
11        Vogel.
12                   NEIL KENT VOGEL,
13   having been duly sworn, was examined and testified as
14   follows:
15                   DIRECT EXAMINATION
16   BY MS. MOREHEAD:
17   Q.   Please tell the jury where your employed.
18   A.   The City of Leavenworth.
19   Q.   And what is your occupation?
20   A.   I work as a police officer there.
21   Q.   And relate to the jury your work history relative to
22        being a law enforcement officer with the Leavenworth
23        Police Department.
24   A.   I currently work in the special investigations unit
25        which is our narcotics unit, for narcotics
```

1890

1    enforcement.  Prior to that I was a patrol officer

2    for approximately five years.

3  Q.  And how long have you been a law enforcement officer

4    total?

5  A.  It will be eight years in the end of May.

6  Q.  So the last three years have been as a narcotics

7    officer?

8  A.  Yes, ma'am.

9  Q.  And in connection with being a narcotics officer in

10    the city of Leavenworth over the last three years,

11    specifically as it relates to this investigation, we

12    have had testimony that in the summer of 2006 that

13    your agency contacted DEA about assisting in an

14    investigation.  Were you in that unit dating back

15    that far?

16  A.  At the beginning of it I was, not but right whenever

17    I came up to the unit.  That's when I was introduced

18    to it.

19  Q.  Okay.  And in connection then with this

20    investigation, Officer Vogel, that primarily occurred

21    in 2007, were you an integral part of that

22    investigation?

23  A.  Yes, I was.

24  Q.  And we have had testimony about wiretaps that

25    occurred on a number of phones.  Were you -- did you

1    participate in connection with that aspect of the

2    investigation?

3  A.  I did.

4  Q.  What was your participation in that part of the

5    investigation?

6  A.  I was charged with listening and monitoring phone

7    calls from target phones that we had identified as

8    individuals believed to be in this conspiracy.  After

9    we did monitor these phones, I was also required to

10   do surveillance on these individuals during this

11   investigation and also responsible for taking some

12   individuals into custody at the conclusion of the

13   investigation.

14 Q.  All right.  And in monitoring the calls that occurred

15   in this particular case, what amount of time did you

16   spend monitoring phone calls?

17 A.  Pretty much from the beginning of the investigation

18   until the end.  I was in the wire room quite

19   regularly.

20 Q.  And we have had testimony those would typically be in

21   eight- to ten-hour shifts; is that right?

22 A.  That's right.

23 Q.  And in connection with this monitoring calls during

24   your allotted time period, would you also listen to

25   calls that had came in on other shifts where you may

```
 1              not have physically been there at the time but that

 2              you had an opportunity later to listen to calls?

 3    A.   I would.

 4    Q.   And in connection with monitoring those calls, were

 5              there a number of individuals as calls were being

 6              intercepted that you, because of your own knowledge

 7              and familiarity with individuals, that you were

 8              familiar with those individuals and recognized their

 9              voice?

10    A.   A few of them, yes.

11    Q.   Now, in connection with this investigation, do you

12              recall phone calls being monitored in connection with

13              an individual that was identified potentially as

14              Franklin Goodwin?

15    A.   I do.

16    Q.   And do you remember how many calls you would have had

17              occasion to monitor in connection with intercepting

18              calls from that particular individual?

19    A.   Probably a few of them.

20    Q.   And in connection with the wire room we have had

21              testimony that when the calls come in there's

22              actually an indication of what number that particular

23              call is being generated from.

24    A.   That's correct.

25    Q.   Is that right?
```

1   A.   That's correct.

2   Q.   And in connection with the calls that were being

3        monitored in connection with Franklin Goodwin, do you

4        recall the telephone number that was associated with

5        calls made purportedly from that individual?

6   A.   Yes, I do.

7   Q.   Can you tell the jury what that phone number was.

8                MR. JOHNSON:  For the record, the witness

9        is looking at a report.

10               THE COURT:  Is that correct?  Are you using

11       that report to refresh your recollection as to what

12       the call was?

13               THE WITNESS:  Yes, your Honor.

14               MS. MOREHEAD:   Thank you, Judge.

15  A.   You want me to tell you what the number was?

16  Q.   (By Ms. Morehead) Could you, please.

17  A.   It's (913)683-5074.

18  Q.   Okay.  And in connection with your investigation of

19       identifying individuals what were -- let me strike

20       that and I'll move on.

21            In connection with investigating the source of

22       that particular phone number, did you have occasion

23       on October 2 of 2007 to have contact with Franklin

24       Goodwin, defendant in this particular case?

25  A.   I did.

1   Q.  Tell the jury, if you would, how you came to have

2       contact with Mr. Goodwin on that particular day.

3   A.  Myself and other members of my unit were trying to

4       identify who was responsible for holding this

5       particular phone.  We believed that it was

6       Mr. Goodwin because whenever we would monitor the

7       phones his name would come up on the monitoring as a

8       caller ID.  We set up surveillance on several

9       occasions to monitor the locations that we knew him

10      to be at, primarily at, I believe, 312 South -- North

11      Ninth -- 312 North Ninth Street and I believe at his

12      mother's residence at 922 Cherokee, which was within

13      a block of each other.  We had set up one day,

14      watched him leave his mother's residence.  I placed a

15      phone call to this number that I just gave you as he

16      was walking down the street.  I looked at him pick up

17      a phone.  He looked at it, but didn't answer the

18      phone.  Eventually it went to voice mail, and he

19      never went back to his phone after that.

20  Q.  Could we stop there.  In connection with your making

21      a phone call, what kind of a phone would you have

22      used to make that initial call to the phone

23      associated with Franklin Goodwin?

24  A.  At the time it would have been my department-issued

25      cell phone.

1    Q.   And if you make a call to some other telephone, what

2         comes up by way of caller ID associated with your

3         phone?

4    A.   Well, typically our phones that we have, we don't

5         have it to where they are blocked.  I actually have

6         to enter a code in order for the number to come up

7         blocked, and that's what I would have done.

8    Q.   All right.  And when you do that, when you enter the

9         code, what's that code?

10   A.   Star 67.

11   Q.   When you enter Star 67, then when you call someone,

12        how does that come up?

13   A.   It comes up blocked or unidentified or something of

14        that nature, I think.

15   Q.   Okay.  And prior to October 2, 2007, had you made

16        this attempt to try to identify the owner of that

17        phone?

18   A.   We had.

19   Q.   And tell us what then occurred on October 2, 2007.

20   A.   October 2, 2007, we received a search warrant for an

21        address at 312 S. Ninth Street.  Prior to serving

22        that search warrant that morning myself and

23        Officer Hinkle were doing surveillance on the

24        residence.  There was a vehicle that I knew that came

25        and went from there, a red and blue Ford Thunderbird.

1    You couldn't miss it because the whole car was kind

2    of pieced together by different parts, but it was for

3    a Thunderbird.

4         While we were watching the residence that

5    morning, I observed a black male I could see at that

6    time -- I couldn't tell who it was -- wearing, I

7    believe, some black pants and a yellow shirt -- or

8    vice versa, one of the two; I can't remember -- exit

9    the house and then got in the passenger's seat of the

10   car, and then the vehicle left.

11   Q.  And the reason you couldn't identify who that was?

12       Why?

13   A.  I wasn't able to get to my binoculars fast enough to

14       readily identify him, and they got in the car pretty

15       quick, so I couldn't for sure say who that was.

16   Q.  Okay.  Then what happened?

17   A.  Officer Hinkle and I followed the car for a short

18       duration of time and then lost the car.  We just --

19       we sat back up on the residence in that area with

20       hopes of finding the car again.  Between 11:00 and

21       12:00 -- it was about 11:00, 11:30-ish Officer Hinkle

22       called me again and told me he had seen the car, it

23       was parked in front of 922 Cherokee.  That's where I

24       went, and I sat up, and I watched the residence as

25       well as the car.  While I was watching the car, I saw

1        the same individual -- I believed to be the same

2        individual because they were wearing the exact same

3        clothing as I had described earlier -- come out of

4        the residence.  At that time I was able to get my

5        binoculars on the individual and identify them as

6        Franklin Goodwin Jr.

7   Q.   What did you observe Mr. Goodwin do then in

8        connection with the vehicle?

9   A.   Mr. Goodwin entered the passenger's side again and

10       slid to the driver's seat and then drove away, just

11       made me believe that possibly the driver's side

12       wouldn't open, that's why he had to enter in that

13       side.

14  Q.   In connection with Mr. Goodwin driving that vehicle,

15       did that cause any concern to you?

16  A.   Yes, ma'am.

17  Q.   Why was that?

18  A.   Officer Hinkle and I had checked his driving status

19       prior to making contact with Mr. Goodwin, and it was

20       suspended, so he was not a lawful operator of a

21       vehicle.

22  Q.   Okay.  And what did you and Officer Hinkle do then in

23       connection with Mr. Goodwin?

24  A.   Prior to serving the search warrant at that house, he

25       and I followed Mr. Goodwin.  He went to Tenth Street,

| 1 | | which was less than a block away from where his |
|---|---|---|
| 2 | | mother resided, went northbound on Tenth Street all |
| 3 | | the way up to Metropolitan, which is the road that |
| 4 | | runs right in front of Fort Leavenworth, went west on |
| 5 | | Metropolitan to a car wash that's approximately three |
| 6 | | blocks to the west, and parked his car in a stall |
| 7 | | area where you, like, vacuum your cars out and stuff. |
| 8 | Q. | And was Mr. Goodwin subsequently arrested for driving |
| 9 | | while suspended? |
| 10 | A. | He was. |
| 11 | Q. | In connection with his arrest did you do a search of |
| 12 | | his person? |
| 13 | A. | Officer Hinkle did a search of his person. |
| 14 | Q. | Were you present when that happened? |
| 15 | A. | Yeah.  When I showed up, he was searching him. |
| 16 | Q. | I want to show you what's been marked as Government's |
| 17 | | Exhibit No. 302.  Do you recognize that? |
| 18 | A. | Yes, ma'am, I do. |
| 19 | Q. | What is that? |
| 20 | A. | That's the phone that was retrieved from Mr. Goodwin. |
| 21 | Q. | And in addition to seizing that particular cell |
| 22 | | phone, was there also an amount of U.S. currency that |
| 23 | | Mr. Goodwin had on his person? |
| 24 | A. | Yes, there was. |
| 25 | Q. | And how much was that? |

```
 1    A.   It was approximately $1,263, I think; 1200 some

 2         dollars.

 3    Q.   Okay.  And Government's Exhibit 302, does it appear

 4         to be in the same condition as when it was seized

 5         from Mr. Goodwin?

 6    A.   Yes, ma'am.

 7              MS. MOREHEAD:  Judge, I ask for admission

 8         of 302.

 9              THE COURT:  Any new objection?

10              MR. JOHNSON:  Same objection from us,

11         Judge.  Nothing new.

12              THE COURT:  Hearing no other objections,

13         and the previously objection having been overruled,

14         Exhibit 302 is admitted.

15              (Exhibit 302 was admitted into evidence.)

16    Q.   (By Ms. Morehead) With regards to this particular

17         cell phone, what did you and Officer Hinkle do with

18         regards to it?

19    A.   I did what I had done earlier.  I placed a test call

20         to this phone.

21    Q.   And what does that involve you doing?

22    A.   Officer Hinkle had the phone in his possession.  I

23         called the number just like I had done previously,

24         dialed Star 67, 913, and then the number.  I can't

25         remember the number off the top of my head.  And then
```

Case 2:07-cr-20168-JWL   Document 1112   Filed 11/05/09   Page 783 of 1656
1900

1       it rang.

2    Q.   Would that have been (913)683-5074?

3    A.   Yes, ma'am.

4    Q.   And when the phone rang, what happened?

5    A.   I do remember now whenever you -- whenever the call

6         came in, it said private.

7    Q.   Okay.  And that would indicate what?

8    A.   That would indicate that that was the phone that

9         Mr. Goodwin was in possession of, indicating that I

10        was contacting the appropriate phone.

11             MS. MOREHEAD:  Judge, I would ask Officer

12        Vogel to step down.  I'm not that familiar --

13   Q.   (By Ms. Morehead) Are you familiar, first of all,

14        Officer Vogel, with this particular phone?

15   A.   I am.

16   Q.   How are you familiar with it?

17   A.   I used to own one.

18   Q.   Okay.

19             MS. MOREHEAD:  Judge, could we have him

20        come down to the ELMO and show for the jury

21        verification or validation that, in fact, he did that

22        test call as made on that phone?

23             THE COURT:  Yes, he may do so.

24             MR. JOHNSON:  Judge, I would object just as

25        cumulative.

```
 1                  THE COURT:  Overruled.

 2    Q.   (By Ms. Morehead) Is the cell phone off now, Officer

 3         Vogel?

 4    A.   It is.

 5    Q.   Okay.

 6    A.   To turn the phone on, you have to hit this red button

 7         right here, hold your finger down on it, and it will

 8         power up.  You have to pay attention to the phone

 9         because whenever it powers up it will have this

10         little character that comes on the screen.  After the

11         character comes on the screen, the number that's

12         associated with this phone will come up, 683-5074.

13         It will say searching for network, and the reason

14         it's saying searching for network is because this

15         phone has been out of the loop for quite a while, so

16         the number associated with this phone is probably

17         being used by someone else now.

18    Q.   Okay.

19                  THE COURT:  So nothing more is going to

20         happen?

21                  MS. MOREHEAD:  I'm asking him to show us on

22         the received calls where he called.

23    A.   The front picture here is Mr. Goodwin's face on the

24         phone.

25    Q.   (By Ms. Morehead) Okay.
```

1  A.  When you hit the top button right here, that accesses

2      the menu.  You arrow up here where it says recent

3      calls, hit select.  When you go to received calls,

4      you hit select, and you arrow down.  That's showing

5      with the little check mark that indicates that the

6      call was received.

7  Q.  Okay.

8  A.  So you arrow down here, hit view.

9  Q.  And you just clicked on private; is that right?

10 A.  That's correct.

11 Q.  Okay.

12 A.  It shows that the phone call was placed at 12:17 --

13     sorry.  It shows that the call that I placed was

14     placed at 12:17 p.m. on 1/02 of '07.

15 Q.  Okay.  That would have been shortly after noon then?

16 A.  Yes.

17 Q.  And this notation underneath here, what does that

18     indicate?

19 A.  That's the duration of the call.

20 Q.  Eleven seconds?

21 A.  Yes.

22 Q.  All right.

23          MS. MOREHEAD:  Judge, could Officer Vogel

24     return to his seat then?

25          THE COURT:  Yes.

1    Q.   (By Ms. Morehead) In connection then also with this
2         investigation, you indicated you were involved on the
3         tail end with arresting a number of individuals; is
4         that right?
5    A.   Yes, ma'am.
6    Q.   And were you aware on November 27, 2007, that, in
7         fact, Thomas Humphrey, Monterial Wesley, and Rtayvian
8         Simpson were arrested?
9    A.   I was.
10   Q.   And in connection with that activity were you
11        involved in the search of a safety deposit box?
12   A.   I was.
13   Q.   And we have had testimony from Officer Jones about a
14        particular safety deposit box at Community Bank of
15        America, which is, again, Judge, Government's
16        Exhibit 82.  Were you involved at all on November 27,
17        2007, with the consent to search that occurred at
18        that safety deposit box?
19   A.   No.  I just heard about it.
20   Q.   Okay.  Were you though involved the following day
21        with the safety deposit box, that date being
22        November 28, 2007?
23   A.   I was.
24   Q.   And was that after a search of -- were you involved
25        in a search of Monterial Wesley's residence?

```
 1   A.   Yes, I was.

 2   Q.   And that was on November 27?

 3   A.   Yes.

 4   Q.   In connection with that particular search were there

 5        a number of documents that were seized, information

 6        obtained, including information about another safety

 7        deposit box?

 8   A.   Yes, ma'am.

 9   Q.   Okay. I want to hand you what I've marked as

10        Government's Exhibit 84.  Tell the jury what that is.

11   A.   This is a consent-to-search form that we keep with us

12        just in case we need to ask someone for permission to

13        search a location, a phone, an address, or something

14        of that sort.

15   Q.   And did you, in fact, execute this consent to search

16        on November 28 of 2007?

17   A.   Yes, ma'am.

18   Q.   And what location did this search -- what did it

19        consist of?

20   A.   We went to a Mid-America safety deposit box and one

21        at First National, safety deposit box.  The one at

22        Mid-American, I believe, was fairly empty.  I don't

23        believe there was much in that safety deposit box.

24        The one that we went to next was First National Bank,

25        and we located documentation in there for, like, home
```

```
 1              loans and home documentation, and that's what these

 2              items are.

 3     Q.    Which is marked as Government's Exhibit 85?

 4     A.    That's correct.

 5     Q.    Okay.

 6     A.    Also in there we located approximately between 9,500

 7              and 10,000 in cash.

 8     Q.    All right.  And this consent to search, was that, in

 9              fact, signed by Lakisha Wesley?

10     A.    It was.

11                    MS. MOREHEAD:  Judge, I would ask for

12              admission of Government's Exhibit 84 and 85.

13                    THE COURT:  Any objection?  Hearing none,

14              Exhibits 84 and 85 are admitted.

15                    (Exhibits 84 and 85 were admitted into

16              evidence.)

17     Q.    (By Ms. Morehead) With regards to Government's

18              Exhibit 84, Officer Vogel, can you explain for us

19              what this is.

20     A.    If you could read the top, the date just indicates

21              the date that we made contact with Ms. Wesley,

22              roughly around the time that we made contact with

23              her, case number, indicates an information report we

24              would have taken, since we were going to be searching

25              some safety deposit boxes, and then I wrote Ms.
```

1    Wesley's name in.  It says, "I, Lakisha Wesley,

2    having been informed of my constitutional rights not

3    to have a search made of the premise hereafter

4    mentioned without a search warrant and of my rights

5    to refuse to consent to such a search, hereby

6    authorize," and that's where we place our names at.

7    Myself, Officer Snyder, and Sergeant Goeke were the

8    ones that were present for the searches of these

9    safety deposit boxes.

10   Q.  You then got consents to search those safety deposit

11       boxes?

12   A.  I did.

13   Q.  And had you ascertained by way of documentation from

14       the residence that Lakisha Wesley had access,

15       authority, and control over those safety deposit

16       boxes?

17   A.  Yes.  Anything we recovered from the Wesleys was

18       turned over to the DEA.

19   Q.  And then whose signature is that?

20   A.  That's Ms. Lakisha Wesley's signature.

21   Q.  And whose signature is that?

22   A.  That's my signature.

23   Q.  All right.  And then on November 28, did you, in

24       fact, search those two locations, one being the First

25       National Bank of Leavenworth, safety deposit box

1    there?

2  A.   Yes.

3  Q.   And I believe you indicated that in that safety

4       deposit box you recovered and retrieved documents

5       that are contained in Defendant's Exhibit No. 85; is

6       that right?

7  A.   Yes, ma'am.

8  Q.   And let's just kind of talk about, there first

9       appears to be some sort of envelope.  Tell us what

10      this is.

11 A.   This is an envelope addressed to Monterial -- and I

12      know they meant to put A in there because that's his

13      middle initial -- Wesley.

14 Q.   Does it show an address for him?

15 A.   Yes.  1429 Kiowa in Leavenworth.

16 Q.   Are you familiar with -- is there such an address in

17      Leavenworth?

18 A.   There is.

19 Q.   Then it looks like there's Manila folder with some

20      documents in it?

21 A.   Okay.

22 Q.   Is that right?

23 A.   Yes, it is.

24 Q.   What do these appear to be?

25 A.   These appear to be, like, home loan applications,

```
 1        information on payment histories or what your

 2        payments might possibly be.

 3   Q.   All right.  And then there appears to be a brown

 4        Manila folder with another envelope inside.  Would

 5        you agree with that?

 6   A.   Yes, ma'am.

 7   Q.   Inside this what does that show?

 8   A.   It's a check to Monterial Wesley from McCaffrey

 9        Agents.  It's, like, a title company, I believe.

10   Q.   More documents then concerning different --

11   A.   Like, loan documentation.

12   Q.   Loan documentation?

13   A.   Yes.

14   Q.   Okay.  And then a third folder with -- Manila kind of

15        folder.  Does it have a label on it?

16   A.   Yes, it does.

17   Q.   What's that label?

18   A.   The label says Monterial and Lakisha Wesley, contract

19        for deed.

20   Q.   Okay.  Again, are there a number of documents in here

21        that appear to be relevant to the purchase or -- the

22        purchase of a residence?  I'll just say that.

23   A.   Yes, ma'am.

24   Q.   And then in addition to the documents that we have

25        talked about in Government's Exhibit 85 you also
```

1     indicated that there was U.S. currency in that safety

2     deposit box?

3  A.  Yes, ma'am.

4  Q.  And somewhere in the neighborhood of 9,500 to 10,000,

5     I think you said?

6  A.  Yes.

7  Q.  What did you do with regards to that amount of money

8     that you seized out of that safety deposit box?

9  A.  The money was actually taken to the bank, and they

10     provided us with, like, a cashier's check.  They

11     counted it out for us to make sure the count was

12     correct.  Once they did that -- they didn't really

13     cut us a check.  It wasn't dated to the police

14     department or anything like that.  I believe it was

15     the DEA who actually received the check; we have just

16     had possession of it and then provided it to the DEA.

17  Q.  All right.  So the amount of money that you got out

18     of that safety deposit box was turned over to the

19     bank, which then a check went to DEA?

20  A.  That's correct.

21  Q.  Do you remember that exact amount?

22  A.  I do not remember the exact amount.

23  Q.  That's fine.

24         MS. MOREHEAD:  Nothing further, Judge.

25         THE COURT:  All right.  Any cross

1      examination?

2                    MR. CALBI:  None from me, your Honor.

3                    THE COURT:  Mr. Johnson?

4                    MR. JOHNSON:  Thank you.

5                    CROSS EXAMINATION

6    BY MR. JOHNSON:

7    Q.   Officer Vogel, when you arrested Mr. Goodwin on

8         October 2, 2007, he was cooperative with you?

9    A.   Yes, as far as I know.  I mean, I wasn't the one who

10        initially took him into custody.

11   Q.   When you got there, with what you observed, he was

12        cooperative and compliant?

13   A.   Yes.

14   Q.   You're familiar with the address of 922 Cherokee?

15   A.   I am.

16   Q.   That's a relatively small house?

17   A.   Yes.

18   Q.   It's pretty beat up?

19   A.   It's not in great shape.

20   Q.   Almost looks like it might be ready to fall down?

21   A.   I wouldn't go that far, but it's not in the best

22        shape I've ever seen.

23   Q.   And the car that Mr. Goodwin was driving was an

24        old -- well, older Thunderbird, mid-nineties?

25   A.   Yes, I believe so.

```
 1   Q.   And it had mismatched body panels?

 2   A.   Yes.

 3   Q.   Some of the body panels were blue?

 4   A.   Yes.

 5   Q.   Some of the body panels were red?

 6   A.   Yes.

 7   Q.   The driver's door didn't work?

 8   A.   As far as I know.  I don't remember.  I would just

 9        assume that, since he slid from one side to the next.

10   Q.   Who was your partner at the time of the arrest?

11   A.   Officer Hinkle.

12   Q.   Do you recall Officer Hinkle attempting to get in the

13        car through the driver's' door?

14   A.   I don't remember if he did or not.

15   Q.   You don't recall if either one of you tried the door

16        and it didn't work?

17   A.   I really don't remember.

18   Q.   But nonetheless you saw Mr. Goodwin enter the car

19        twice?

20   A.   Yes.

21   Q.   And each time he went through the passenger door?

22   A.   Yes.

23              MR. JOHNSON:  Nothing further.  Thank you.

24              THE COURT:  Any further cross?  Hearing

25        nothing, Ms. Morehead, any redirect?
```

```
 1              MS. MOREHEAD:  I don't have any redirect,
 2        Judge.
 3                    THE COURT:  Mr. Vogel, you may step down.
 4        Without objection you are excused.
 5                    THE WITNESS:  Thank you, your Honor.
 6                    THE COURT:  The government may call its
 7        next witness.
 8                    MS. MOREHEAD:  Pam Bennett, your Honor.
 9                       PAMELA BENNETT,
10   having been duly sworn, was examined and testified as
11   follows:
12                    DIRECT EXAMINATION
13   BY MS. MOREHEAD:
14   Q.   Please tell the jury where you're employed.
15   A.   I'm employed by the Kansas City Kansas Police
16        Department, and I am currently assigned to the Drug
17        Enforcement Administration Drug Task Force.
18   Q.   Can you tell the jury about your work history
19        relative to being a police officer.
20   A.   I have been a police officer since July of 1997, and
21        I have been assigned to narcotics since September of
22        2003 and assigned to DEA since September of 2003.
23   Q.   And being assigned to DEA in connection with your
24        employment with the Kansas City Kansas Police
25        Department, do you function as a task force officer
```

1913

```
 1          in the same capacity that we have had testimony from

 2          with regards to Officer Jones?

 3   A.     Yes.

 4   Q.     And also Detective Greene?

 5   A.     Yes.

 6   Q.     Leigh Ann Greene?

 7   A.     Yes.

 8   Q.     All of you are task force officers working in

 9          conjunction with DEA?

10   A.     Yes, we are.

11   Q.     Now, in connection with this particular

12          investigation, Officer Bennett, were you involved in

13          the ongoing investigation that we were -- that you're

14          here to testify about today?

15   A.     Yes, I was.

16   Q.     Can you tell the jury primarily what your involvement

17          in the overall scope of this investigation, what it

18          consisted of.

19   A.     My primary involvement was to investigate an

20          alternate source of supply of the cocaine

21          organization that Eric Jones was investigating.

22   Q.     Okay.  And we have had some testimony about, I'm

23          going to call it a spinoff of this case involving

24          Boytina Locke.

25   A.     Yes.  That was my primary responsibility.
```

1    Q.   And in connection then with the monitoring of calls

2         and coordinating activities and that sort of thing,

3         you would have done the same thing in connection with

4         that part of the investigation that Officer Jones and

5         Agent McCue did on this side of the investigation?

6    A.   Yes.

7    Q.   Is that right?

8    A.   Yes, that is correct.

9    Q.   Now, in connection with this particular case though,

10        did you, in fact, have occasion to be involved in

11        some activity on November 27 of 2007?

12   A.   Yes, I did.

13   Q.   And specifically involving a car wash in Kansas City,

14        Missouri, on the Missouri side?

15   A.   Yes.

16   Q.   Tell the jury what your involvement in that

17        situation, what it consisted of.

18   A.   Basically, prior to the transaction I conducted -- I

19        assisted in conducting surveillance of the car wash

20        and people coming and going from the car wash, and

21        then after the take down I assisted in collecting

22        evidence.

23   Q.   With regards to the surveillance that you did prior

24        to what you have characterized as the take down, tell

25        us what that consisted of.

1   A.   We monitored the traffic coming to and from the car

2        wash and then the cars leaving the car wash, and

3        there was another gas station very close.  Went to

4        the gas station, then came back to the car wash to

5        conduct the transaction.

6   Q.   Initially you were at the car wash then?

7   A.   Yes.

8   Q.   And it sounds like you at some point left the car

9        wash to go to a gas station that was nearby?

10   A.   Yes.  It was just right on the back side of the car

11        wash.

12   Q.   Why did you go from the car wash then to that gas

13        station?

14   A.   One of the cars that had arrived at the car wash left

15        the car wash and went to the gas station, so I pulled

16        into the gas station to see what they were doing.

17        They were obviously waiting on someone.

18   Q.   Did you have eyes on at the car wash when that

19        vehicle arrived?

20   A.   Yes.

21   Q.   And would that -- which vehicle would that have been

22        that you saw arrive and then go to the gas station?

23   A.   It was the black Land Rover.

24   Q.   And when the Land Rover left the car wash and went to

25        the gas station, what did you do in connection with

```
 1        the gas station then?
 2   A.   I went over and got gas at the gas station just so --
 3        I needed gas and so I could see what they were trying
 4        to do.
 5   Q.   And did you observe the individuals from the Land
 6        Rover at the gas station?
 7   A.   Yes.
 8   Q.   What were they doing?
 9   A.   I believe it was the passenger went inside the gas
10        station, came back out.  They weren't -- it didn't
11        appear -- it appeared to me that they were just
12        waiting on someone to arrive.
13   Q.   Okay.  And did you -- were you actually right there
14        with the individuals that were in that vehicle?  I
15        mean, did you have contact with them at the gas
16        station?
17   A.   I didn't have any contact with them, but I was
18        getting gas at the gas pumps, and they were parked
19        right in front of the gas station.
20   Q.   All right.  And once they finished their activity at
21        the gas station, what happened with regards to them?
22   A.   They went back to the car wash.
23   Q.   And could you -- from the vantage point you were at
24        at the gas station, can you see the car wash?
25   A.   I could see the car wash.  I did leave the gas
```

1      station though and reposition on the other side of

2      the car wash.

3  Q.  As you were doing that do you know what happened with

4      regards to the car wash?

5  A.  I know that the other car arrived and then the meet

6      took place, and the take down.  I was actually not

7      directly involved in the take down.  I had come

8      around the car wash and was arrived as it was

9      happening.

10 Q.  All right.  So you didn't see what happened with

11     regards to who was at the car wash or what occurred

12     in connection with that then?

13 A.  I did not see the actual take down, no.

14 Q.  Okay.  When you got there -- first of all, where were

15     you when you got there?

16 A.  I'm not very good with direction.  I was on the --

17     the car wash and then the gas station [indicating].

18     I left the gas station and pulled around to the

19     opposite side.  I think it's going to be the west

20     side of the car wash.

21 Q.  Okay.

22 A.  And the meet had actually taken place -- they had

23     come in from the east side of the car wash into that

24     bay, so I was on the west side, so the cars were

25     facing out towards me.

1918

1   Q.   Did you come in then from the front end where the

2        cars would have been facing?

3   A.   Yes.  I came --

4   Q.   From that direction?

5   A.   From the front point of the car wash, and I wasn't

6        the first car into the bay.  We were trying to make

7        sure that nobody could go mobile out of the bay so we

8        didn't have any type of mobile police chase or any --

9        we were trying to avoid a dangerous situation, so

10       there was another car that -- in front of me, and I'm

11       not sure who it was that came into the front of the

12       car wash, and then I know Agent McCue came into the

13       rear of the car wash to contain the people inside the

14       car wash.

15  Q.   In connection with this car wash, did it have

16       multiple bays?

17  A.   Yes.

18  Q.   So that if one was being used by someone washing

19       their car there would be other bays available for

20       someone to pull up and wash their car?

21  A.   Yes.

22  Q.   In connection then with -- once you got there, were

23       the individuals that were in the two vehicles that we

24       are going to talk about, were they already in

25       custody?

```
 1    A.    Yes.

 2    Q.    When you got there then, we have had testimony --

 3          Government's Exhibit 53?

 4    A.    Yes.

 5    Q.    What is that?

 6    A.    That is the initial vehicle that pulled into the bay

 7          of the car wash that arrived to conduct the

 8          transaction.

 9    Q.    Just so I'm clear, when you got there, you would have

10          came in from -- let me ask you this.  The bay of the

11          car cash, were there two openings to it?

12    A.    Yes.

13    Q.    So if this car got done washing, it could go ahead

14          and pull straight on out of the car wash?

15    A.    Yes.

16    Q.    And that's the way you would have came in?

17    A.    The way it pulled out is where I came in, yes.

18    Q.    In connection with these two vehicles what were your

19          responsibilities with regards to processing that

20          area?

21    A.    Once the scene was secured, Officer Jones conducted a

22          video of all the evidence and of the area, and then I

23          assisted in collecting the evidence out of the two

24          vehicles.

25    Q.    Okay.  Government's Exhibit 53, you've testified
```

1    about.  Government's Exhibit 54, what is this?

2  A.  That's a picture of the passenger's side of the

3    vehicle from the previous picture.  That's a brown

4    paper sack containing approximately 5 grams of

5    cocaine.

6  Q.  First of all, tell us what Government's Exhibit 134

7    is.

8  A.  It is the brown paper sack that you can see in the

9    photograph that was holding the 5 kilograms of

10    cocaine.

11  Q.  And when you took possession of this, obviously, you

12    would have taken possession of the brown paper bag

13    and then separated the contents of that bag; is that

14    right?

15  A.  Yes.

16  Q.  And Government's Exhibit 55, 55A, and 55B, what are

17    those?

18  A.  This is the cocaine that was contained in the brown

19    paper sack that I removed from the vehicle.  They

20    have been taken apart for testing by the lab.

21  Q.  Okay.  In Government's Exhibit 54 --

22         THE COURT:  Pardon me.  May I ask you to

23    clarify that?  Are there three separate exhibits

24    which contain alleged cocaine?

25         MS. MOREHEAD:  Yes, Judge.  55, 55A, and

```
 1        55B.
 2                    THE COURT:  All right.  Thank you.
 3   Q.   (By Ms. Morehead) With regards to the photograph
 4        in -- the photograph Government's Exhibit 54, how
 5        were these -- there were how many kilos of cocaine
 6        that you took possession of?
 7   A.   Five.
 8   Q.   And in connection with them, how were they originally
 9        packaged?
10   A.   They were packaged in, like, black electrical tape,
11        wrapped very tight.  It appears it's black electrical
12        tape.  Some type of tape.
13   Q.   All right.  And at least in -- you said these three
14        packages, 55, 55A and 55B.  Obviously, they don't
15        appear in the same way now.  Would you agree with
16        that?
17   A.   Yes.
18   Q.   And in the packages, specifically all three packages,
19        did you see the black electrical tape?
20   A.   Yes.  The wrappers are also contained with the
21        cocaine, but they have just been separated, and they
22        are all here.
23   Q.   It looks like with regards to Government's Exhibit 55
24        one of the black packages is contained there?
25   A.   Yes.
```

```
 1   Q.   In 55A there appear to be two?

 2   A.   Yes.

 3   Q.   And then in 55B there appear to be one, two in that

 4        one as well as far as the black electrical tape?

 5   A.   Yes, the wrappers.

 6   Q.   And in connection with laboratory processing, they

 7        would have obviously been removed from that

 8        packaging, the black electrical tape packaging;

 9        correct?

10   A.   Yes.

11   Q.   And then weighed and tested?

12   A.   Yes.

13   Q.   Aside from those differences then, how it would have

14        been altered for purposes of testing, do 55, 55A, and

15        55B appear to be in the same condition?

16   A.   Yes.

17             MS. MOREHEAD:  Judge, I would ask for

18        admission of 55, 55A, 55B, and also 134.

19             THE COURT:  Is there any objection?

20        Hearing none, Exhibits 55, 55A, 55B, and 134 are all

21        admitted into evidence.

22             (Exhibits 55, 55A, 55B, and 134 were

23        admitted into evidence.)

24             MS. MOREHEAD:  Thank you, your Honor.

25   Q.   (By Ms. Morehead) Do you know whose vehicle this
```

```
 1        belonged to, Officer Bennett?

 2   A.   I believe, it was Thomas Humphrey's.

 3   Q.   Okay.  With regards to Mr. Humphrey's vehicle, I

 4        assume you did a thorough search of it?

 5   A.   Yes.

 6   Q.   And in connection with it was there -- aside from

 7        maybe some documentation, was there anything of any

 8        other evidentiary value that you seized from his

 9        vehicle?

10   A.   I believe just documents.

11   Q.   Okay.  And then did you, in fact, search the second

12        vehicle, the one that you saw drive over to the gas

13        station?

14   A.   Yes.

15   Q.   And what was your contact with that vehicle?

16   A.   I processed evidence.  After Officer Jones had

17        videotaped it, we located documents, a handgun, a

18        magazine; I think -- I think that's all.

19   Q.   All right.  So in connection then with the search of

20        the Land Rover, Government's Exhibit 56, tell the

21        jury what that is.

22   A.   That's a graph of the driver's side compartment of

23        the Land Rover.  On the floor is the handgun and a

24        magazine to the handgun which is kind of up

25        underneath the pedals.
```

```
 1    Q.   All right.  Does this show the magazine?

 2    A.   Yes, ma'am.

 3    Q.   And then the handgun here?

 4    A.   Yes, ma'am.

 5    Q.   All right.  Now, who took this particular photograph?

 6    A.   I did.

 7    Q.   And we have had Officer Jones testify about a video?

 8    A.   Yes, ma'am.

 9    Q.   And you were aware he was doing a video; is that

10         right?

11    A.   Yes.

12    Q.   Now, Government's Exhibit 328, do you recognize that?

13    A.   Yes.

14    Q.   Does that appear to be a clip from that video?

15    A.   Yes, it is.

16    Q.   Now, in this particular clip it looks like there's a

17         white I-Pod-associated cord there along with the

18         firearm.  Do you know what would have happened with

19         regards to that cord in connection with the

20         photograph that you took in Government's Exhibit 56?

21    A.   I would have moved the cord because it was irrelevant

22         to the evidence.

23    Q.   Okay.  You were attempting to photograph the firearm;

24         is that right?

25    A.   That is correct.
```

1   Q.   Government's Exhibit 57, did you also photograph --

2        or did you also take that particular photograph?

3   A.   Yes, I did.

4             MS. MOREHEAD:   Judge, I would also ask for

5        admission of Government's Exhibits 58 and 59.

6             THE COURT:   Is there any objection?

7        Hearing none, Exhibits 58 and 59 are admitted.

8             (Exhibits 58 and 59 were admitted into

9        evidence.)

10  Q.   (By Ms. Morehead) We see here, Officer Bennett, in

11       connection with the firearm a magazine; is that

12       right?

13  A.   Yes, ma'am.

14  Q.   And as a law enforcement officer are you familiar

15       with firearms such as this, a semi-automatic pistol?

16  A.   Yes, vaguely.

17  Q.   And what's this portion of the firearm that I've just

18       circled?

19  A.   That would be where the magazine would be seated.

20  Q.   All right.  And would you agree with me that when you

21       took this photograph the magazine was not in the

22       firearm?

23  A.   Yes.

24  Q.   Government's Exhibit 58, tell us what this is.

25  A.   That's the magazine that would be seated in that

1       handgun.

2   Q.   And in connection with that were you able to tell

3       that the magazine, in fact, was loaded?

4   A.   Yes.

5   Q.   And I assume that you are the one that took

6       possession of the firearm the magazine and anything

7       associated with those two objects?

8   A.   Yes.  I also cleared the handgun.  It had a round in

9       the chamber.

10   Q.   Government's Exhibit 59, tell us what this is.

11   A.   That's a photograph of me holding the weapon and

12       showing immediately after I cleared it the round that

13       was in the chamber falling to the step board of the

14       vehicle.

15   Q.   What's that right there?

16   A.   That's the round that came out of the chamber when I

17       cleared it.

18   Q.   Okay.

19           MS. MOREHEAD:  One second, Judge.  I

20       apologize.  Sorry, Judge.  I didn't have one of them

21       marked.

22           THE COURT:  All right.

23   Q.   (By Ms. Morehead) I want to show you what I've marked

24       Government's Exhibit No. 60, 61, and then 61A.  And

25       do you recognize those?

1    A.    Yes.  These are the items that I removed from the

2          Land Rover that day.

3    Q.    Okay.  And first of all, Government's Exhibit No. 60,

4          tell us what this is.

5    A.    It is a Ruger semi-automatic handgun.

6    Q.    Okay.  And Government's Exhibit 61?

7    A.    It is the magazine that I recovered on the floor with

8          the handgun.

9    Q.    And 61A?

10   A.    These are the rounds that I took out of the weapon

11         and out of the magazine.

12   Q.    All right.  And how many rounds total did you seize

13         in connection with this particular firearm?

14   A.    I believe it was nine.

15   Q.    In connection with the photograph that we showed, one

16         of them was actually in the chamber?

17   A.    Yes.

18   Q.    And would that mean another eight would have been in

19         the magazine?

20   A.    Yes, ma'am.

21              MS. MOREHEAD:  Judge, I would ask for

22         admission of Government's Exhibit 60, 61, and 61A.

23              THE COURT:  Any objection?  Hearing none,

24         Exhibits 60, 61, and 61A are all admitted.

25

1928

```
 1            (Exhibits 60, 61, 61A were admitted into
 2       evidence.)
 3   Q.  (By Ms. Morehead) I want to now hand you what I've
 4       marked as Government's Exhibit 135, 136, and then 137
 5       and ask you if you recognize those items.
 6   A.  Yes.
 7   Q.  And, first of all, with regards to Government's
 8       Exhibit No. 135, tell us what that envelope is.
 9   A.  It is a Missouri state registration packet that I
10       recovered from the glove box of the Land Rover.
11   Q.  Okay.  And Government's Exhibit 136?
12   A.  It is paperwork that I recovered from the visor of
13       the Land Rover.
14   Q.  And where at in the visor of the Land Rover?
15   A.  Above the passenger's seat.
16   Q.  Of the Land Rover?
17   A.  Yes, ma'am.
18   Q.  Okay.  And what about Government's Exhibit No. 137?
19   A.  Driver's side visor, above the driver's side visor of
20       the Land Rover.
21   Q.  Just so we're clear, when we're talking about
22       passenger's side visor and driver's side visor, are
23       those -- tell us what those are.
24   A.  The sun visors.
25   Q.  All right.  That you flip down?
```

```
 1    A.    That flip down.  Sorry.

 2    Q.    And do those items, 135, 196, and 137, appear to be

 3          in the same condition as when you would have recorded

 4          them?

 5    A.    Yes, ma'am.

 6    Q.    Okay.

 7                    MS. MOREHEAD:  Judge, I would ask for

 8          admission of 135, 136 and 137.

 9                    MR. CALBI:  Judge, may we approach, please?

10                    THE COURT:  Yes, you may.

11                    (Counsel approached the bench and the

12          following proceedings were had:)

13                    MR. CALBI:  Judge, I may be mistaken, but I

14          think part of Exhibit 135 -- I haven't had a chance

15          to see what Ms. Morehead has there, but at least in

16          my book it talks about Mr. Holman's evidence notes

17          that he had testified to earlier today.

18                    THE COURT:  Uh-huh.

19                    MR. CALBI:  In there it talks about things

20          that may have taken place in 2004, and I believe

21          that's outside the date of the conspiracy, and I find

22          it highly prejudicial to allow it to come in.

23                    THE COURT:  In other words, specifically

24          the item that Mr. Holman testified to previously

25          about information concerning his case?
```

1    MR. CALBI:  Correct.  And he never got

2    specific about it, so I didn't object at the time.

3    Now we're getting at the dates, and I find it highly

4    prejudicial.

5    MS. MOREHEAD:  Judge, first of all, there's

6    nothing in this case documentation specifically that

7    references any of the parties in this case.  It does

8    talk -- we have already had testimony that that

9    involved his activity in '04 because '04/'05 is when

10   he went on the run.

11   THE COURT:  Right.

12   MS. MOREHEAD:  But what it serves to do,

13   frankly, Judge, is to corroborate his testimony that

14   he was close friends or close associates with

15   Monterial Wesley, and the fact that this is paperwork

16   that's connected to his case after -- he wouldn't

17   have gotten this until, I think he said January of

18   '07, which we then find it in the defendant's car in

19   November of '07.

20   THE COURT:  Have you looked at the document

21   yourself, Mr. Calbi, as to whether or not you think

22   there is anything in there that somehow makes

23   reference that could be misleading?  My quick read

24   through here is consistent with what Ms. Morehead

25   said, that there's nothing that sort of overlaps with

1    the people on our case.  I can certainly give an

2    instruction that the admission of this document is

3    not for the truth of anything contained in it or to

4    be considered by the jury for any purpose other than

5    the extent to which it is the document that Mr.

6    Holman referenced, to the extent that that

7    corroborates his testimony that there was such a

8    document, this is it.

9         MR. ROGERS:  I have no problem with a

10   limiting instruction along those lines, Judge.  That

11   would be fine.  When we start talking about drug

12   activity, 2004, we get a bit nervous as far as how

13   the jury may be misconstruing that.

14        MR. CALBI:  I would object to it.  I think

15   that whatever limited relevance it might have is

16   vastly outweighed by the risk of confusion.  I

17   understand the reality of limiting instructions.  I

18   probably have more faith in them than I should, but

19   having said that, if it's so minimally relevant to

20   bolster a very minimally relevant testimony of a very

21   minor witness, I think the risk of confusion between

22   the two is extremely great.  I think under Rule 403

23   the balance ought to be against its admission.

24        THE COURT:  I'm going to overrule the

25   objection.  I agree with you that it's minimally

```
 1        relevant, but I think it's zero unfairly prejudicial,

 2        and I think it is even less than minimally likely to

 3        be confusing if I give a limiting instruction;

 4        therefore, that limits the possibility of confusion,

 5        does not significantly outweigh the minimal probative

 6        value, but I sure have enjoyed the opportunity to

 7        visit with you all about it.  I'll admit the

 8        evidence, and I'll give a limiting instruction.

 9                  (The proceedings returned to open court.)

10                  THE COURT:  Members of the jury, I'm going

11        to admit Exhibits 135, 136, and 137.  As to

12        Exhibit 135, one of those documents is some paperwork

13        which Mr. Holman testified about previously that has

14        to do with the case against him, all of which has

15        nothing to do with this case and took place before

16        the events in this case were alleged to have

17        occurred; therefore, I'm admitting this paperwork for

18        the very limited purpose of corroborating Mr.

19        Holman's testimony concerning him having shared some

20        information with Mr. Wesley et al., and you are not

21        to consider it for the contents of it proving the

22        truth of anything here or for any other purpose other

23        than the extent to which there is such paperwork that

24        was found in Mr. Wesley's car, and that's the extent

25        of it.
```

```
 1              MS. MOREHEAD:  Thank you, your Honor.

 2   Q.   (By Ms. Morehead) All right.  Officer Bennett,

 3        looking then at the documents, first of all,

 4        Government's Exhibit 135, again, I think Judge

 5        Lungstrum just alluded to this, but does this appear

 6        to be information related to specifically Clinton

 7        Holman?

 8   A.   Yes.

 9   Q.   All right.  And, again, this was in the glove box of

10        the Land Rover?

11   A.   Yes.

12   Q.   And then this additional documentation, tell us what

13        this is.

14   A.   That is the Missouri registration for the year

15        2007 -- I'm sorry, Kansas registration for the year

16        2007 registering the Land Rover to Lakisha Wesley and

17        Monterial Wesley.

18   Q.   And that was in Leavenworth County; is that right?

19   A.   Yes.

20   Q.   Did it give an address of where they lived?

21   A.   Yes, it does.  3807 Stonewall Court, Leavenworth,

22        Kansas.

23   Q.   Okay.  And did this include also an insurance card?

24   A.   Yes.  It's an insurance card on the 2003 Range Rover.

25   Q.   Government's Exhibit 136, I believe you said, was
```

1      over the passenger visor; is that right?

2   A.   Yes.

3   Q.   And what does this include?

4   A.   It is a receipt for repairs to a 2002 Cadillac

5        Escalade in the name of -- the receipt is in the name

6        of Kisha Wesley.

7   Q.   What address was that at?

8   A.   Kisha's address is listed as a Leavenworth, Kansas,

9        address.

10  Q.   What was the date of this particular invoice?

11  A.   November 2, 2007.

12  Q.   And then what is this document?

13  A.   This is a receipt from Home Depot in the name of

14       Rtayvian Simpson with a Leavenworth address.

15  Q.   Okay.

16  A.   And it's for -- I'm sorry.  It's an application for

17       employment.

18  Q.   Okay.  And does it look like it's been partially

19       filled out?

20  A.   Yes, it does.  It's not completed.

21  Q.   And then the documentation that you said you got over

22       the driver's side visor, tell us what this is.

23  A.   It looks like it's a receipt for the purchase of a

24       Cricket Kyocera cell phone.  It's a receipt for

25       $172.35, and it was purchased in Kansas City,

```
 1         Missouri.

 2    Q.   Okay.  What about this document?

 3    A.   It's a receipt in the name of Tate Wesley from

 4         Speedway Chrysler Dodge Jeep, and it is for a Pulley

 5         Powe test on a vehicle, and it's dated October 26,

 6         2007.

 7    Q.   And is there a phone number listed on that particular

 8         document?

 9    A.   Yes.  (913)290-0995.

10    Q.   To make sure the record is clear, that was our Target

11         Phone No. 3; is that right?

12    A.   Yes, that's correct.

13              MR. CALBI:  Your Honor, I hate to interrupt

14         Ms. Morehead, but could we approach a moment, please?

15              THE COURT:  You may.

16              MR. CALBI:  Thank you.

17              (Counsel approached the bench and the

18         following proceedings were had:)

19              MR. CALBI:  Judge, the only document I was

20         provided in Government's Exhibit 137 was Shevel

21         Foy's.  This registration to it and these other

22         documents at least weren't part of my packet.

23              MS. MOREHEAD:  They were in discovery.  If

24         they didn't get copied into the exhibit notebook, I

25         apologize, but all of these documents were
```

 1    photocopied and put into discovery.  I may not --

 2    they may have inadvertently -- whoever did the

 3    copying may not have put all of the documents in

 4    there.  The others are just really -- they literally

 5    took these -- there's nothing really --

 6                 THE COURT:  Why don't you show --

 7                 MR. CALBI:  I didn't object because I

 8    thought it was going to be that document.  I probably

 9    won't have an objection.

10                 MS. MOREHEAD:  A lot of it is stuff I'm not

11    going to reference.

12                 THE COURT:  Having admitted it in evidence,

13    I think it is now appropriate, since counsel didn't

14    have the opportunity to object prior to them being

15    admitted into evidence, to look at it and see if

16    there's anything that he would have objected to and

17    therefore would make a motion to strike.

18                 MR. CALBI:  Your Honor, I don't want to get

19    the envelopes confused.  I don't want to mess up

20    their exhibit.  These came out of here.

21        Judge, I don't have any objection now that I've

22    had the opportunity to look at the whole document.  I

23    apologize --

24                 MS. MOREHEAD:  I apologize, Judge.  I

25    didn't realize they weren't all copied.

1      THE COURT:  Anybody else have any concerns

2      to raise, having looked at these?

3           MR. ROGERS:  I am still looking, Judge.

4           THE COURT:  If there's a little note that

5      says Rtayvian knows it all, you would probably like

6      to find that, or the converse.

7           MR. ROGERS:  He's got an alibi.  He was on

8      jury duty at the time.

9           MS. MOREHEAD:  I bet he showed up too.

10          THE COURT:  And working at Home Depot.

11          MR. ROGERS:  That's Rtayvian working at

12     Home Depot.

13          THE COURT:  Very good.  Nothing from you

14     then, Mr. Rogers?

15          MR. ROGERS:  No, your Honor.

16          THE COURT:  All right.

17          (The proceedings returned to open court.)

18  Q.  (By Ms. Morehead) With regards to several of these

19      documents, are they primarily miscellaneous documents

20      that you seized?

21  A.  Yes, ma'am.

22  Q.  Specifically, though, I would like to look at this

23      particular document.  Tell us what this is.

24  A.  It looks like it's a Missouri license and title

25      application in the name of Shevel Markee Foy.  It's

1      got a vehicle VIN number for, I think it says an '03

2      Chevy.

3   Q.  And is there a date associated with this particular

4      document?

5   A.  The date of -- the date at the top is October 15,

6      2007.

7   Q.  Okay.  Does that --

8   A.  And that's also -- yeah, the date at the bottom is

9      also October 15, 2007.

10  Q.  Okay.

11          MS. MOREHEAD:  Judge, I don't have anything

12      further of Officer Bennett.

13          THE COURT:  Very well.  Any cross

14      examination?  Mr. Calbi?

15          MR. CALBI:  Thank you, your Honor.

16              CROSS EXAMINATION

17  BY MR. CALBI:

18  Q.  Officer Bennett, I want to talk with you about the

19      activities on November 27 of 2007.  I believe you

20      eventually wound up at the car wash because there

21      was -- the phones of Mr. Humphrey and Mr. Wesley were

22      being monitored and that's where they indicated that

23      they were meeting, and I -- am I correct to assume

24      that someone in DEA then notified you that this

25      meeting was going to be taking place?

1    A.    My office is actually at DEA, so I would have been

2          there when we decided to go out on the surveillance,

3          yes.

4    Q.    And so when did you -- where were you at when you

5          realized this meeting was going to take place at the

6          car wash?  I mean, were you already out on the road

7          roaming the streets, or were you at DEA headquarters

8          in Overland Park?  Where were you at?

9    A.    I was probably at the office.  I don't recall where I

10         was at.

11   Q.    Do you know then how long it took you to get from DEA

12         headquarters to where the car wash was on 47th and

13         approximately Bristol in Kansas City?

14   A.    The distance is -- it takes about 30 minutes.  I'm

15         not exactly sure how long it took me that day.

16   Q.    Okay.  Well, were you to the best of your

17         recollection driving over the speed limit to hurry up

18         and get there, or if it usually takes about 30

19         minutes, it probably would have taken you

20         approximately 30 minutes on that day?

21   A.    I think it took me approximately 30 minutes.  I had

22         time to get there and get set up.  We weren't

23         rushing.

24   Q.    Now, when you got to the car wash, I believe the Land

25         Rover wasn't there yet; correct?

1    A.   Yes, I believe it was not there.

2    Q.   Okay.  And then before you went to the gas station,

3         did the Land Rover appear at the car wash?

4    A.   The Land Rover arrived at the car wash, drove through

5         the parking lot, and then went to the gas station.

6    Q.   Where were you at?  Were you still at the car wash,

7         or had you gone to the gas station?

8    A.   I was actually across the street from the car wash in

9         a business parking lot watching the car wash.

10   Q.   So then the Land Rover went to the gas station, and

11        then you went to the gas station?

12   A.   That is correct.

13   Q.   And then I believe you mentioned that the passenger

14        from the Land Rover went inside the gas station?

15   A.   Yes.

16   Q.   Okay.  The driver stayed in the vehicle?

17   A.   I believe so.

18   Q.   Okay.  And then you started to pump gas immediately,

19        or what's your recollection of the events that

20        transpired?

21   A.   When I pulled up to the pumps at the gas station, I

22        started getting gas.

23   Q.   To the best of your recollection did you -- I believe

24        you said you needed gas, so I take it you were pretty

25        close to empty?

1  A.   Yes.

2  Q.   Okay.  And so then you were filling up your vehicle

3       with gasoline?

4  A.   Yes.

5  Q.   Okay.  Passenger left the gas station and went back

6       to the Land Rover.  Were you still pumping your gas?

7  A.   The passenger came out of the convenience store, got

8       in the car, and they left.

9  Q.   Okay.  And were you still pumping your gas?

10 A.   I believe I was.

11 Q.   And then they went to the car wash?

12 A.   As soon as they started acting like they were going

13      to leave, I stopped pumping gas.

14 Q.   Okay.  So when they -- when the passenger got in the

15      vehicle to leave, you quit pumping your gas?

16 A.   Yes.

17 Q.   Okay.  Did you notice if the black Camaro had already

18      arrived at the car wash before you quit pumping your

19      gas?

20 A.   I did not notice.

21 Q.   You don't know if the Camaro was in the bay yet or

22      not?

23 A.   I don't know.

24 Q.   So then the Land Rover leaves the gas station, you

25      quit pumping your gas, and you follow the Land Rover

```
 1              into the car wash?  Or do you just sit in your car
 2              and observe?
 3    A.   I leave the gas station.  The Land Rover goes on what
 4              I believe is going to be the east side of the gas
 5              station.  I go around to the west side of the gas
 6              station -- I'm sorry, to the west side of the car
 7              wash.  So I observed it leave and go back to the car
 8              wash.  I'm not sure what you're asking me.
 9    Q.   Okay.  Well, I'll try it again then.  I apologize.
10              The Land Rover leaves the gas station; correct?
11    A.   Yes.
12    Q.   Okay.  Are you in your vehicle as that vehicle is
13              pulling out of the gas station, if you recall?
14    A.   Yes.
15    Q.   Okay.  The Land Rover, I believe, goes to the east
16              side of the car wash and you go to the west side of
17              the car wash?
18    A.   That's correct.
19    Q.   Okay.  Do you observe -- do you then observe any
20              events that happened at the car wash before the take
21              down?  In other words, do you observe the Land Rover
22              pull up in front of the black Camaro?
23    A.   I observed the Land Rover pull --
24                   MS. MOREHEAD:  Judge, I'm going to object.
25              The Land Rover was not in front of the Camaro; it was
```

1    behind the Camaro.  So I think he's misstating the

2    evidence.

3              MR. CALBI:  I apologize, Judge.

4  Q.  (By Mr. Calbi) Do you observe the Land Rover pulling

5    up behind the Camaro?

6  A.  Yes.  I observed the Land Rover pull up behind the

7    bay.  I can't see from my vantage point what is

8    inside the bay.  I hear from radio traffic what's

9    going on, but I don't observe it.

10  Q.  Okay.  So you just see the Land Rover pull up in

11    front of the bay?

12  A.  Yes.

13  Q.  Okay.  And are you still driving around now again to

14    the west side of the car wash, or have you stopped

15    driving and you're in position?

16  A.  I believe I had stopped driving.

17  Q.  Do you observe a passenger get out of the Land Rover?

18  A.  No.

19  Q.  Okay.  So the next thing that you observe then, if

20    I'm correct, is the DEA swarms in and does their take

21    down?

22  A.  I hear the go signal, and we all swoop in and do the

23    take down.

24  Q.  I want to be clear.  From the time the Land Rover

25    pulled up behind the Camaro, you didn't see anyone

1       get out of the Land Rover or anything of that nature?

2   A.  I could not see the Land Rover, so no, I did not see

3       anybody get out of it.

4   Q.  Did you observe by any chance -- when DEA swarmed in,

5       there were other vehicles involved besides yours, I

6       imagine; correct?

7   A.  Yes.

8   Q.  Did you observe any of the DEA vehicles collide or

9       hit or strike the Land Rover in any form as they were

10      pulling into the car wash?

11  A.  I didn't observe the actual pinch happen, but I did

12      see the vehicle -- Agent McCue's car pinning in the

13      Land Rover after it was all secured.

14  Q.  Okay.

15              MR. CALBI:  I have nothing further, your

16      Honor.

17              THE COURT:  Anyone else with cross

18      examination?  Mr. Rogers?

19                  CROSS EXAMINATION

20  BY MR. ROGERS:.

21  Q.  So you actually saw Agent McCue's vehicle in physical

22      contact with the Land Rover after the area had been

23      secured?  Is that what you told us?

24  A.  Yes.

25  Q.  And could you tell whether any impact damage had

1    happened to either vehicle?

2    A.   A minimal amount of damage to Agent McCue's vehicle.

3    Q.   Okay.  So it hit it hard enough to at least wrinkle

4         his hood or something?

5    A.   It put a little dent in the hood, yes.

6    Q.   You testified that you took the still photographs at

7         the scene; is that correct?

8    A.   That's correct.

9    Q.   Did you take all of them, or did you just took some

10        of them and somebody else took some?

11   A.   I believe I took all of them.

12   Q.   And was that before or after Mr. Jones did the video,

13        if you remember?

14   A.   It was after the video.

15   Q.   So you were not there at the -- where the Land Rover

16        was when the driver of the Land Rover was removed

17        from the driver's side of the --

18   A.   I was running up through the opposite side of the car

19        wash bay as they were removing the people from the

20        vehicles.

21   Q.   Now, could you -- when you got to the car wash area

22        the second time, okay, the last time --

23   A.   Right.

24   Q.   -- from where you were, could you see the Camaro?

25   A.   When I got there on foot, when I ran up during the

```
 1        take down?
 2   Q.   No, no, no.  Immediately before the take down, at the
 3        time that you heard the go signal.
 4   A.   When I drove back around in the front of the car
 5        wash, I could then see through the bay and see that
 6        there was a Camaro in the bay.
 7   Q.   Okay.  And did you see anyone open the passenger's
 8        side door of the Camaro?
 9   A.   I could not see that, no.
10   Q.   Do you know whether or not that happened?
11             MS. MOREHEAD:  Judge, if she didn't see it,
12        she wouldn't know whether it happened.
13             THE COURT:  Well --
14   Q.   (By Mr. Rogers) Could you see whether or not that
15        happened?  How is that for a question?
16             THE COURT:  I think she said she didn't.
17             MS. MOREHEAD:  She said she didn't see it.
18   Q.   (By Mr. Rogers) My question is, were you in a
19        position so you could have seen it if it did happen?
20             THE COURT:  You may answer.
21   A.   Okay.  Thank you.  The only time I could see into the
22        bay is when I was driving past the car wash to get
23        set up to where I could see during the go signal and
24        take down.  I couldn't see the activities inside the
25        bay.
```

1    Q.   (By Mr. Rogers) Now it's clear in my mind at least.

2         I don't know if it's clear in yours, but it's

3         certainly clear in mine.  So you don't know whether

4         or not that happened because you couldn't see?

5    A.   That's correct.

6    Q.   Now, going back to the photographs that you took and

7         the video --

8              MR. ROGERS:  Somebody put cocaine on top of

9         my pictures.

10             MS. MOREHEAD:  All the pictures I just

11        introduced are right over there.

12   Q.   (By Mr. Rogers) Calling your attention to the

13        Exhibit 328, which I believe is a still from the

14        video; is that correct?

15   A.   I believe it is the still from the video.

16   Q.   Or a frame from the video?  Is that what we call it?

17        That is what shows the I-Pod cord; is that correct?

18   A.   Yes.

19   Q.   And at that point that cord is on top of a pistol;

20        right?

21   A.   Yes.

22   Q.   And the pistol is the Ruger that's Exhibit 60?

23   A.   That's correct.

24   Q.   Can you see on that -- you're the one who actually

25        moved that cord so you could take a better picture of

1948

1     the Ruger?

2  A.   That's correct.

3  Q.   And you can see that that's actually two cords, one a

4       power cord that plugs into a -- what I used to call a

5       cigarette lighter, but now days it's a vehicular

6       power outlet or something?

7  A.   Yes.

8  Q.   And there's also a small black cord that plugs into

9       the earphone jack of an I-Pod and connects that to

10      the sounds system of the vehicle; correct?

11 A.   I don't know what that black cord is.

12 Q.   There is the black cord that --

13 A.   I see the black cord.

14 Q.   You recovered the white cord, or somebody did; right?

15 A.   I recovered --

16 Q.   It's in the bag.

17 A.   Okay.

18 Q.   Okay?

19 A.   I don't recall recovering it.

20 Q.   Okay.  You don't recall untangling it from the other

21      cord when you moved it?

22 A.   No, I don't.

23 Q.   Okay.  Now let me call your attention to Exhibit 56,

24      a photograph that you took of the driver's seat of

25      the Land Rover; correct?

1    A.   Yes.

2    Q.   And what's this item right here?

3    A.   An I-Pod.

4    Q.   Okay.  And do you own an I-Pod?

5    A.   Do I own one?  Yes.

6    Q.   Okay.  And that's one of the smaller I-Pods, for lack

7         of a better term, a Nano, or something like that?

8    A.   I believe so.

9    Q.   That's the kind you own?

10   A.   Actually, I own the newer Nano that's smaller than

11        that.  It's about half that size.

12   Q.   Okay.  And will a cord like this with a thing like

13        that fit into an I-Pod like --

14   A.   Yes, I believe that is the power cord for the I-Pod.

15   Q.   Okay.  Now, before you took the still photographs,

16        Officer Jones had already done the video; correct?

17   A.   Yes.

18   Q.   By the way, do you know what you did with the power

19        cord when you took it off of the pistol to take the

20        photographs?

21   A.   I do not know what I did with it.

22   Q.   Okay.  I'm looking again at Exhibit 56.  It's pretty

23        clear that the pistol is there and the cord is gone;

24        right?

25   A.   Yes.

1    Q.    And can you make out anything about the black cord

2          there?  I can show you the actual paper photograph,

3          if that would be easier, yes.

4    A.    I don't see the black cord in the picture.

5    Q.    Okay.

6                    MR. ROGERS:  May I approach, your Honor?

7                    THE COURT:  You may.

8    Q.    (By Mr. Rogers) Can you see it in the real picture

9          either?

10   A.    No.  There might be something here, but I can't --

11         with the glare I don't see the cord.

12   Q.    Okay.  So you don't know what happened to it either?

13   A.    I don't know.

14   Q.    Okay.  You don't know where the pistol was when

15         Mr. Simpson left the driver's side of that vehicle,

16         do you?  I'm placing again for the record Exhibit 328

17         on the monitor.  You don't know where the pistol was

18         at that time, do you?

19   A.    It was on the floor.

20   Q.    Okay.  Do you know how it got from the floor to the

21         bottom -- what I would call the door sill if it were

22         in a house?

23   A.    I don't know how it got there.  I could speculate

24         that he drug it with his feet when he was exited from

25         the car.

1    Q.   Or that somebody moved it?

2    A.   I don't know.

3    Q.   Okay.  There's no question that it's underneath the

4         power cord, the white cord?

5    A.   In this picture?

6    Q.   Yes.

7    A.   No, there's no question.

8    Q.   And the pistol itself is in the same position in that

9         picture as it was when you photographed it in

10        Exhibit 57?

11   A.   Yes, sir.

12   Q.   Okay.  Now, Exhibit 57, by the way, also shows the

13        magazine up here?

14   A.   Yes, sir.

15   Q.   So it was not in immediate proximity to the pistol,

16        especially if the pistol had been dragged out of the

17        car, right, or towards the outer part of the car?

18   A.   What do you mean by immediate proximity?

19   Q.   It's not where it would have fallen out of the

20        picture -- of the pistol and ended up.

21   A.   Oh, it doesn't appear so.

22   Q.   Okay.

23   A.   There is a round in the chamber though.

24   Q.   There is a round in the chamber, and we will get to

25        that in a minute.  Have you, I assume, as a police

1    officer -- at least when you were a patrol officer,

2    you carried a side arm; is that correct?

3  A.    Yes.  I still carry a side arm.

4  Q.    Okay.  Different one now than you had then, or the

5    same?

6  A.    Same gun.

7  Q.    Is this a Glock?

8  A.    Yes.

9  Q.    It is a 9-millimeter semi-automatic handgun?

10 A.    A .40.

11 Q.    Okay.  A .40-caliber semi-automatic handgun.  I was

12    about to say millimeter, and I knew that wasn't

13    right.  But it is a semi-automatic, and has a

14    magazine that fits into the handle?

15 A.    Yes.

16 Q.    And it requires a certain amount of movement to

17    extract the magazine from the gun; correct?

18 A.    Are you speaking about my handgun?

19 Q.    Let's talk about yours first, yeah.

20 A.    Okay.  It just is one motion of the thumb to extract

21    the magazine.

22 Q.    One motion to release?  Then do you pull it out or it

23    falls out, or it can fall out or you can pull it out

24    either way?  It doesn't always fall out?

25 A.    You know, I don't know that I've ever tried to get it

1       to fall out without --

2  Q.   Without pulling it?

3  A.   Right.

4  Q.   So it's a two-handed deal the way you do it?

5  A.   It could be a two-handed deal, yes.

6  Q.   And have you operated a Ruger like this?

7  A.   I have not.

8  Q.   Okay.  So you don't know what would cause it to fall

9       out?

10 A.   No, I have no idea.

11 Q.   Okay.  Let me ask you this.  Have you ever

12      accidentally dropped your handgun?

13 A.   No, I have not.

14 Q.   Have you ever seen anybody do that?

15 A.   I have.

16 Q.   Did the magazine come out?

17 A.   No.

18 Q.   Okay.  That would be a very unusual kind of

19      circumstance, wouldn't it?

20 A.   Yes.

21 Q.   Okay.  Now, I told you we would talk about the one

22      round in the chamber of the gun.  Since you've never

23      operated a Ruger like this, is it fair to assume that

24      in your training you've learned that most of these

25      semi-automatic handguns operate similarly?

1    A.   Yes, that's correct.

2    Q.   And what happens is that when the gun is empty and

3         somebody places a loaded magazine into it there's not

4         a round in the chamber, is there?

5    A.   If the gun is empty and you place a loaded magazine

6         into the chamber, you would have to rack a round into

7         the chamber to get the round there, so yes, you're

8         correct.

9    Q.   Okay.  And that also would cock the gun, wouldn't it?

10   A.   I'm not -- yes.

11   Q.   But you can also uncock it without firing it?

12   A.   Yes.

13   Q.   If you were -- you had racked a round into the

14        chamber, as you say, and then removed the magazine,

15        would the round still be in the chamber, or would it

16        come out with the magazine?

17   A.   It would remain in the chamber.

18   Q.   Okay.  Was the gun in Exhibit 59, which is

19        Exhibit 60, was it cocked when you recovered it?

20   A.   There was a round in the chamber.  I'm not exactly

21        sure what you mean by cocked.

22   Q.   Was the hammer cocked so it could fire with a single

23        pull of the trigger?

24   A.   I don't know.  I don't know -- I'm not familiar with

25        the Ruger, and it's not -- that's not the same as a

```
 1            Glock, so I'm not familiar with that.

 2   Q.   All right.  So --

 3   A.   I believe it would fire.

 4   Q.   "I don't know" is a good answer.  Well, certainly --

 5        let me put it this way.  Is it true that the whole

 6        idea of a semi-automatic handgun is, squeeze the

 7        trigger, it fires the round, and then it

 8        automatically chambers another round and cocks the

 9        hammer?

10   A.   Yes, that's correct.

11   Q.   And then you squeeze the trigger again, but if you

12        just squeeze the trigger without it being cocked,

13        without the hammer being cocked, then it's a much

14        more difficult trigger pull to both cock and fire?

15        Is that the way your Glock works?

16   A.   No.

17   Q.   You can't fire your Glock unless it's been --

18   A.   As long as there's a round in the chamber and you

19        have a magazine, you can fire multiple rounds with

20        the trigger pull on a Glock.

21   Q.   Okay.  So on your Glock if you chamber a round --

22   A.   Yes.

23   Q.   And then I think you said earlier there's some way to

24        uncock the hammer?

25   A.   Well, you can unload the chamber without firing a
```

1          round on a Glock.  There is no cocking in a Glock.

2    Q.    Okay.  That's what had me confused, apparently.

3                Let me then turn to Exhibit 136, and especially

4          the employment application for Home Depot --

5    A.    Yes.

6    Q.    -- that you recovered.  And that's the one that

7          pertains to Mr. Simpson; is that correct?

8    A.    That is correct.

9    Q.    And it has his first name here; is that right?

10   A.    That's correct.

11   Q.    And that's spelled R apostrophe T-Y-A-V-I-A-N.

12   A.    That's correct.

13   Q.    There's no such name as Raytavian, is there, on that

14         application?

15   A.    No.

16   Q.    And on the fourth page it shows a professional

17         reference; is that correct?

18   A.    Yes.

19   Q.    And whose name is listed there?  Let me ask a leading

20         question.  Does it say, "Brad Turner"?

21   A.    It could say, "Brad Turner."

22   Q.    And it says, "Complete Carpet Care"?

23   A.    Yes, that's correct.

24   Q.    Okay.  Did you also recover other documentation from

25         the Land Rover?

1    A.    I believe the only documentation I recovered is what

2          we spoke about earlier.

3    Q.    Did you see a little memo-sized notebook on the

4          dashboard of the passenger's side?

5    A.    I don't recall that.

6    Q.    Okay.  I guess we could play the video, but it seems

7          like it would take a long time.  You're not saying

8          there wasn't one, you didn't recover such a thing?

9    A.    I would have to look in our reports.  I don't

10         remember.

11              THE COURT:  Mr. Rogers, I was going to see

12         if you were about done, but it's after five now, so

13         let's bring this to a close, and you can resume your

14         cross examination in the morning, if you so choose.

15         Members of the jury, I'll remind you of the

16         admonitions not to discuss the case among yourselves

17         or with anyone else or to have anything to do with

18         the case while you're off duty, so to speak.  Come

19         back tomorrow at 9:00 o'clock prepared to proceed.

20         Ms. Scheurer, please take charge of the jury.

21         Ms. Bennett, you may step down.  Counsel and the

22         participants, please remain here.

23              (The following proceedings were had outside

24         the presence of the jury:)

25              THE COURT:  One thing I wanted to address

REBECCA S. RYDER, CCR, RMR
UNITED STATES COURT REPORTER
913-551-5645

1     was my solicitation to you for proposed instructions.

2     We're in the process of preparing the instructions

3     now, and so to the extent that you're interested in

4     maximizing the impact of your proposals, I would

5     suggest getting something to us tomorrow.  It would

6     be very helpful.

7                    MS. MOREHEAD:  Could you give us until

8     Thursday, Judge?

9                    THE COURT:  I'll give you until whenever

10    you want; it's just that I'm going to get them done,

11    and it may not be as much like you want them if I

12    don't have them sooner rather than later.

13                   MS. MOREHEAD:  I understand.  I have to

14    teach a class tonight.  I didn't know we weren't

15    going to get a lot of notice.

16                   THE COURT:  You had notice before the trial

17    started, Ms. Morehead.

18                   MS. MOREHEAD:  But you told us that you

19    wouldn't need them until closer to the time, so I

20    didn't know it was going to come this quickly as far

21    as notice.  I'll work on that, Judge.

22                   THE COURT:  I am perfectly satisfied that

23    without your input I can formulate some instructions

24    that may pass muster.

25                   MS. MOREHEAD:  Very good.

1    THE COURT:  If you want to submit

2    something, I'm telling you that the proverbial train

3    may have left the station when it comes to

4    discretionary-type aspects of the instructions if I

5    don't get something sooner rather than later.

6         Anything else we ought to talk about tonight

7    before we break?  Hearing none, see you all in the

8    morning.  Until then we are in recess.

9              MR. BELLEMERE:  Judge, when can we have

10   access to these books, you know, take them home with

11   us and at our own leisure in preparation for closing?

12   Do we get that option, or is this something that is

13   going to stay here forever.

14             MS. MOREHEAD:  Judge, I have been giving

15   them copies of witnesses' statements, as you directed

16   me to, as they have been testifying, so they have

17   been getting those as we progress.  I have some more

18   to give them today.  But, frankly, the books have

19   other information aside from the folks who have

20   testified here today.

21             THE COURT:  Mr. Bellemere, as you know,

22   we're not going to meet on Friday, so perhaps that

23   would give you an opportunity -- the way I see it

24   now, it appears likely from what Ms. Morehead said

25   she will complete the presentation of her evidence by

```
 1          Thursday.  We will take up legal issues at that

 2          juncture.  Won't meet on Friday or next Monday.  By

 3          next Tuesday we will have the opportunity for any

 4          defendants who wish to to present evidence, and if

 5          none, then we have got other things we will do.  But

 6          that gives you a couple of working days to step down

 7          with Ms. Morehead and see what it is you want to take

 8          home with you, because it appears to me she has no

 9          objection to you taking home things that are actually

10          pertinent to the case by way of information that's

11          been discussed and so on and so forth.  She may have

12          some concerns about other matters that -- frankly, I

13          don't even know what's in your notebook -- but which

14          may be more sensitive for other reasons.  If you

15          can't come to an accommodation, call it to my

16          attention, and we will try to resolve it.

17                   MR. BELLEMERE:  Okay.  The other thing,

18          Judge, if I were going to present any evidence, I

19          ought to have it here ready to fire Tuesday morning

20          at 9:00?

21                   THE COURT:  That's what it would seem like.

22                   MS. MOREHEAD:  Judge, I am not planning on

23          taking all of Thursday.  I just want the court to --

24          that's my best estimate.

25                   THE COURT:  Let's talk about that a little
```

1    bit.  Given your estimate, how early on Thursday do

2    you think you would finish?

3            MS. MOREHEAD:  I think, Judge, frankly, I

4    will be done by Thursday morning.

5            THE COURT:  When?

6            MS. MOREHEAD:  Oh, before noon.  I'll say

7    that.

8            THE COURT:  Before noon?

9            MS. MOREHEAD:  Yes.  That's probably the --

10   yeah.

11           THE COURT:  I'm sorry, that's what?

12           MS. MOREHEAD:  That's the best guess I can

13   give.

14           THE COURT:  Now, I would say that, of

15   course, you're down the batting order a little bit,

16   Mr. Bellemere, so I would start with Mr. Calbi.

17   Having no desire to commit anybody to anything, my

18   expectation right now would be if you're going to put

19   on evidence, I suspect I would be inclined to ask you

20   to do so on Thursday.  If, in fact, Ms. Morehead did

21   get done Thursday morning, I think we can attend to

22   our business in relatively short order and still have

23   some time to put some evidence on from the

24   defendants.  I'm interested in getting an idea from

25   people for planning purposes along those lines about,

```
 1      again, without committing people to anything, what
 2      they might have in mind.  So since you're first up,
 3      I'm going to put the onus on you a little bit to be
 4      thinking about that, maybe even polling your
 5      colleagues.  I would have some flexibility, but it
 6      depends on how much there is.  If there's going to be
 7      any significant amount of evidence put on by the
 8      defendants -- by that I mean more than net a day's
 9      worth -- then that would affect my thinking about how
10      we would handle all this.  If it's going to be a
11      day's worth or less, that would have an impact on my
12      thinking in a different direction.  So it would
13      really help me in knowing how much I'm going to push
14      what the expectation is from the defendants.  Maybe
15      you can run some traps and let me know what you find.
16              MR. CALBI:  I'll let you know tomorrow,
17      Judge.  I'll poll my colleagues and try to give the
18      court a feel.
19              THE COURT:  Sounds good.  Anything else we
20      need to do?  Hearing none, we're in recess.
21              (Court was adjourned.)
22                      * * * * *
23              WEDNESDAY, APRIL 29, 2009
24              THE COURT:  Is there anything we need to do
25      before we bring in the jury?  Hearing no requests, we
```

```
 1        will bring the jury in when Ms. Scheurer gets them

 2        lined up.

 3                 (The following proceedings were had in the

 4        presence of the jury:)

 5                 THE COURT:  Welcome back, members of the

 6        jury.

 7             Ms. Bennett, I will remind you that you remain

 8        under oath.

 9                      PAMELA BENNETT,

10   having been previously duly sworn, was examined and

11   testified as follows:

12                 CROSS EXAMINATION (CONT'D)
     BY MR. ROGERS:
13   Q.   Ms. Bennett, you may recall at the close of the day

14        yesterday I was asking about a notebook in the -- on

15        the dash of the passenger side of the Land Rover?

16   A.   Yes.

17   Q.   You appear to have a document in front of you, and

18        I'm going to ask you, does that include the same

19        document that I have marked as Defendant's

20        Exhibit 728?

21   A.   It's not included in here, but I recognize this

22        document.

23   Q.   Okay.  What is Defendant's Exhibit 728?

24   A.   It's a DEA Form 12 which is a receipt for seized

25        items.
```

1  Q.  Did you complete it?

2  A.  I did.

3  Q.  And that lists items that you seized from the Land

4      Rover?

5  A.  Yes, it does.

6          MR. ROGERS:  Your Honor, at this time I

7      offer the admission of Defendant's Exhibit 728.

8          MS. MOREHEAD:  Judge, I object to the

9      relevance of it.  I don't know --

10         THE COURT:  Does it purport to show the

11     article that you were inquiring about earlier?

12         MS. MOREHEAD:  He could use it to refresh

13     her recollection, but I don't know why it needs to be

14     introduced.

15         MR. ROGERS:  I think it's admissible as

16     substantive evidence.

17         THE COURT:  I don't know why it wouldn't be

18     either.  The objection is overruled.  Exhibit 728 is

19     admitted.

20         (Exhibit 728 was admitted into evidence.)

21 Q.  (By Mr. Rogers) Calling your attention, Officer

22     Bennett to N34, what is that?

23 A.  It says "notes from red book."

24 Q.  And now let me show you what has been marked as

25     Defendant's Exhibit 728A and ask you what that is.

1    A.    I believe it's notes from the red book.

2    Q.    Okay.  And was that, in fact, a red notebook that was

3          in the Land Rover?

4    A.    Yes, it was.

5    Q.    And do you now remember where it was?

6    A.    I believe it was on the dash.

7    Q.    By the passenger's side?

8    A.    Uh-huh, yes, sir.

9    Q.    Okay.  Fair enough.

10                   MR. ROGERS:  Your Honor, at this time I

11         would offer Exhibit 728A.

12   Q.    (By Mr. Rogers) Have you looked at all three pages of

13         that, and are these all photocopies that you made

14         from that red notebook?

15   A.    Yes.

16                   THE COURT:  Is there any objection?

17                   MS. MOREHEAD:  I don't know.  I haven't

18         seen it yet.

19                   THE COURT:  Very well.

20                   MS. MOREHEAD:  No objection, your Honor.

21                   THE COURT:  Exhibit 728A is admitted.

22                   (Exhibit 728A was admitted into evidence.)

23   Q.    (By Mr. Rogers) I'm showing you, Officer, the --

24         before do I this, let me ask you a couple questions.

25         You indicated yesterday that you had been at the wire

```
1           room at DEA headquarters, for lack of a better term,

2           before going to the area of the car wash; is that

3           correct?

4    A.     Actually, I was at the office, and then we went out

5           on surveillance, and, actually, I started at a

6           different location other than the car wash, after

7           reading my reports.

8    Q.     That's what I was going to ask you about.  Did you

9           initially assume a position near 55th and Prospect in

10          Kansas City, Missouri?

11   A.     Yes.

12   Q.     And that's by a barbershop and a car repair shop and

13          Family Dollar Store, stuff like that?

14   A.     Yes, that's correct.

15   Q.     Okay.  And during that surveillance were you in radio

16          contact with other members of the surveillance team?

17   A.     Yes, I was.

18   Q.     Does that include Officer Jones, who was conducting

19          what's called the rolling surveillance?

20   A.     Yes.

21   Q.     And does that also include the airborne surveillance?

22   A.     Yes.

23   Q.     Did you also monitor radio traffic from people who

24          were listening to phone calls in the wire room

25          pertinent to the surveillance?
```

1    A.    We wouldn't have had radio contact with people in the

2          wire room.  They would have been calling Officer

3          Jones or Agent McCue, who would have been relaying

4          the information to us.

5    Q.    Okay.  Now, but you did hear the back and forth of

6          what was going on with the surveillance while you

7          were waiting there near the barbershop?

8    A.    Yes.

9    Q.    And also that radio traffic is what caused you to

10         relocate from the barbershop area to the car wash

11         area?

12   A.    Yes.  We conducted a moving surveillance and followed

13         the Land Rover away from the barbershop.

14   Q.    Okay.  Now, let me show you what's been admitted as

15         Exhibit 728A, the first page of that.  First of all,

16         do you see this address here?

17   A.    Yes, I do.

18   Q.    2724 Wabash?

19   A.    Yes.

20   Q.    Is that correct?  And are you familiar with that

21         address?

22   A.    I am not.

23   Q.    After seeing it on this piece of paper?

24   A.    It's an address in Kansas City, Missouri.  I'm not

25         further familiar with it.

1    Q.   All right.  And do you see at the bottom the words

2         Wallstreet?

3    A.   Yes, I do.

4    Q.   All one word, Wallstreet; correct?

5    A.   Yes.

6    Q.   Do you recall from your radio traffic during the

7         surveillance before you left the barbershop the

8         notion that the Land Rover was looking at lofts in

9         downtown Kansas City?

10   A.   No.

11   Q.   Okay.  Do you know that the Wallstreet Towers is, in

12        fact, a building at 1101 Walnut Street in Kansas

13        City, Missouri, which is a building of lofts?

14   A.   No.

15   Q.   Okay.  Used to be an office building.

16   A.   I'm not familiar with it.

17   Q.   Okay.  And you didn't check that out?

18   A.   I didn't, no.

19   Q.   Now, during the surveillance did you become aware of

20        a telephonic discussion about some law enforcement

21        activity taking place in a park where Mr. Wesley says

22        on the telephone to whoever he's talking to, we're

23        going by there right now, see all those cop cars

24        here, or words to that effect?

25   A.   I don't recall that information.

1   Q.   Let me ask you this.  Do you know whether the

2        vicinity of 27th and Wabash where this house is

3        located is near Spring Valley Park in Kansas City,

4        Missouri.

5   A.   I'm not very familiar with Kansas City, Missouri, at

6        all.  I have no idea where that park is.

7                    MR. ROGERS:  Those are all the questions I

8        have, your Honor.

9                    THE COURT:  All right.  Does anyone else

10       wish to cross examine?  I see no hands.

11            Ms. Morehead, any redirect?

12                    MS. MOREHEAD:  No, your Honor, not based on

13       that.

14                    THE COURT:  Very well.  Ms. Bennett, you

15       may step down.  Without objection you are excused.

16                    THE WITNESS:  Thank you.

17                    THE COURT:  The government may call its

18       next witness.

19                    MS. MOREHEAD:  Judge, I'm going to call

20       Lakela Houff.

21

22

23

24

25

1          LAKELA HOUFF,

2     having been duly sworn, was examined and testified as

3     follows:

4                    DIRECT EXAMINATION

5     BY MS. MOREHEAD:

6     Q.    Please tell the jury how old you are.

7     A.    Thirty-four.

8     Q.    And, Ms. Houff, you're a codefendant in this case; is

9           that right?

10    A.    Yes, ma'am.

11    Q.    And you're the sister of Henry Grigsby?

12    A.    Yes, ma'am.

13    Q.    Do you have any children?

14    A.    Yes, ma'am.

15    Q.    How many children do you have?

16    A.    Three.

17    Q.    And what are their age ranges, youngest to oldest?

18    A.    Eleven months, five, and 13.

19    Q.    Okay.  And in connection with you being here today,

20          you, in fact, have previously pled guilty in this

21          particular case; is that right?

22    A.    Yes, ma'am.

23    Q.    You pled guilty on March 30 of 2009?

24    A.    Yes, ma'am.

25    Q.    And you entered a guilty plea as charged to all the

```
 1        charges in the indictment against you; is that right?
 2   A.   Yes, ma'am.
 3   Q.   And that included a count of conspiracy?
 4   A.   Yes, ma'am.
 5   Q.   And that conspiracy count was a conspiracy to possess
 6        with intent to distribute and to distribute
 7        5 kilograms or more of cocaine, and it also included
 8        a conspiracy to manufacture, possess with intent to
 9        distribute, and to distribute 50 grams or more of
10        crack cocaine; is that right?
11   A.   Yes, ma'am.
12   Q.   Additionally, you pled to two additional counts, a
13        count of attempting to possess with intent to
14        distribute cocaine -- that occurred on August 24,
15        2007, and that involved the package coming through
16        the mail that never got here.  You pled guilty to
17        that charge; correct?
18   A.   Yes, ma'am.
19   Q.   And then you also pled guilty to a phone count which
20        was between you and your brother that alleged that
21        you used a phone on September 7, 2007, in connection
22        with the conspiracy charge?
23   A.   Yes, ma'am.
24   Q.   In addition, you agreed to a monetary forfeiture
25        judgment in the amount of $10 million?
```

1    A.    Yes, ma'am.

2    Q.    And when you pled guilty back at the end of March,

3          Ms. Houff, you did that without the benefit of any

4          plea agreement; is that also right?

5    A.    Yes, ma'am.

6    Q.    And as part of that plea of guilty you got no benefit

7          from the government; is that right?

8    A.    Yes, ma'am.

9    Q.    Now, in connection with your being a defendant in

10         this case in connection with testifying here, have

11         you, your attorney, and the government discussed the

12         opportunity for you to possibly reduce whatever

13         sentence you're looking at?

14   A.    I'm sorry.  Can you repeat the question.

15   Q.    Have there been -- were there discussions between

16         you, your attorney, and the government about you

17         availing yourself of the opportunity to possibly

18         reduce your sentence by cooperating, in essence, by

19         testifying in this case?

20   A.    Yes, ma'am.

21   Q.    All right.  And you have an attorney in this case; is

22         that right, Ms. Houff?

23   A.    Yes, ma'am.

24   Q.    And he's present here today?

25   A.    Yes, ma'am.

1    Q.   As you sit here today, based upon the charges that

2         you pled guilty to, all of the charges that you pled

3         guilty to in the indictment, what's your

4         understanding of what potential sentence you could

5         face upon your conviction?

6    A.   What kind of --

7    Q.   What sentence would you be looking at upon your plea

8         of guilty to those charges?  What's your

9         understanding?

10   A.   Possibly ten years.

11   Q.   Okay.  And you understand that the charge, the

12        conspiracy charge, carries a mandatory minimum

13        sentence of ten years?

14   A.   Yes, ma'am.

15   Q.   Is that right?

16   A.   Yes, ma'am.

17   Q.   Do you know what the maximum possible sentence is for

18        that charge?

19   A.   I don't remember.

20   Q.   Okay.  In connection with your understanding then of

21        what you're facing, without any sort of cooperation,

22        without any sort of testimony, what sentence do you

23        believe you would be looking at?

24   A.   Ten years or more.

25   Q.   All right.  And in connection with agreeing to come

```
 1              in and cooperate and testify about what you know, you

 2              indicated that you have the possibility of having

 3              that sentence reduced.  And are you familiar with how

 4              that would happen if you cooperated?

 5    A.   Yes, ma'am.

 6    Q.   How would that happen?  What's your understanding of

 7              what would happen?

 8    A.   You mean if I cooperate?

 9    Q.   Uh-huh.

10    A.   That I would have the opportunity of getting less

11              time.

12    Q.   And is it your understanding that how that happens is

13              the government would have to file a motion asking the

14              judge to reduce your sentence?

15    A.   Yes, ma'am.

16    Q.   And have you heard the term 5K1.1?

17    A.   Yes, ma'am.

18    Q.   All right.  What's your understanding of what that

19              is?

20    A.   If that's filed, then the judge have basically leeway

21              to do whatever, to go completely under.

22    Q.   Okay.  Under the ten years?

23    A.   Yes, ma'am.

24    Q.   You understand that 5K1.1 motion, that it's solely

25              within the government's discretion whether that would
```

```
 1        be filed.  Do you understand that?
 2   A.   Yes, ma'am.
 3   Q.   That would only occur if, in fact, you provided
 4        substantial assistance.  Do you understand that?
 5   A.   Yes, ma'am.
 6   Q.   And by coming in here and testifying, has anyone made
 7        any promises to you that that motion is going to be
 8        filed in connection with your testimony?
 9   A.   No, ma'am.
10   Q.   Has anybody made any promises or assurances about
11        what sentence you're going to get in this case?
12   A.   No, ma'am.
13   Q.   What's your understanding of who will make the
14        ultimate decision about what sentence you get in this
15        case?
16   A.   Judge Lungstrum.
17   Q.   In connection with your testimony did anybody tell
18        you what to come in here and say when you testified?
19   A.   No, ma'am.
20   Q.   And you understand that you are under oath to tell
21        the truth?
22   A.   Yes, ma'am.
23   Q.   If you came in here and lied under oath, what do you
24        think that would do with regards to any possible
25        sentence that you would get?
```

```
 1    A.    Make it worse.

 2    Q.    Ms. Houff, you were arrested in this particular case;

 3          is that right?

 4    A.    Yes, ma'am.

 5    Q.    When were you arrested?

 6    A.    Sometime in February.

 7    Q.    Of 2008?

 8    A.    Yes, ma'am.  Sorry.  I had to think about it.

 9    Q.    And in connection with that, did you remain in

10          custody for a number of months?

11    A.    Yes, ma'am.

12    Q.    How long were you actually in custody?

13    A.    Three months.

14    Q.    And at the time you were incarcerated, were you

15          pregnant at the time?

16    A.    Yes, ma'am.

17    Q.    And who was the father of that particular child?

18    A.    Harold Wallace.

19    Q.    And you ended up getting out on bond; is that right?

20    A.    Yes, ma'am.

21    Q.    And did the government oppose that release by you?

22          In other words, did I object to you getting released?

23    A.    Yes, ma'am.

24    Q.    And after you got released, did you actually have

25          your baby then?
```

1    A.    Yes, ma'am, the very next day.

2    Q.    And in connection with your release, if you were

3          arrested in February, you would have been released in

4          May then?

5    A.    Yes, ma'am, May 2.

6    Q.    And over the almost last one year you've been on

7          supervision, on bond?

8    A.    Yes, ma'am.

9    Q.    Have you any violations at all while you've been on

10         bond?

11   A.    No, ma'am.

12   Q.    And is it safe to say, Ms. Houff, that you're well

13         familiar or well aware of the facts surrounding the

14         investigation in this case?

15   A.    Yes, ma'am.

16   Q.    That it involved a wiretap between August of 2007

17         through November of 2007?

18   A.    Yes, ma'am.

19   Q.    And during the course of that wiretap were there

20         occasions, where there were phone calls between you

21         and your brother that were intercepted in this case?

22   A.    Yes, ma'am.

23   Q.    And even during that -- even at that time were you

24         employed?

25   A.    Yes, ma'am.

1    Q.   What kind of work were you doing back in 2007?

2    A.   I worked for City Card.

3    Q.   What was your job?

4    A.   Customer service.

5    Q.   What did that include?

6    A.   Assisting customers with their account and then

7         trying to sell more products to them as far as

8         opening up more accounts.

9    Q.   And at that time you had two children?

10   A.   Yes.

11   Q.   And were you earning your own keep, paying your own

12        bills, and that sort of thing?

13   A.   Yes, ma'am.

14   Q.   You and your two children lived alone?

15   A.   Yes, ma'am.

16   Q.   And during the course of -- let's kind of go back.

17        We have had testimony from your brother that you were

18        living in Kansas City, Missouri; is that right?

19   A.   Yes, ma'am.

20   Q.   During that time?  When did you actually come to

21        Kansas City from California?

22   A.   It was '06, I believe.

23   Q.   What was the reason that you moved to Kansas City?

24   A.   To get my kids a better life.

25   Q.   And once you moved to Kansas City, you were employed?

1    A.    Yes, ma'am.

2    Q.    Did you have a better life?

3    A.    I thought I did.

4    Q.    And at some point did you become involved in activity

5          with your brother, involved in this particular case?

6    A.    Yes, ma'am.

7    Q.    And tell the jury what that involved, what you did to

8          assist your brother in his drug-trafficking activity.

9    A.    I allowed my brother to store drugs in my house.

10   Q.    And were there ever any times that you would store

11         money of his or keep money of his as well?

12   A.    Yes, ma'am.

13   Q.    And in connection with doing that for your brother,

14         did you ever get anything in exchange for that?

15   A.    No, ma'am.

16   Q.    Did he ever pay you any money to do that?

17   A.    No, ma'am.

18   Q.    Why -- tell the jury why you were doing that, why you

19         were allowing your brother to store drugs and money

20         at your house.  This is a house where you and your

21         children lived; correct?

22   A.    Yes, ma'am.

23   Q.    Why did you do that?

24   A.    Because I loved him.

25   Q.    And in connection with the money that he stored at

```
 1              your house, were there times that you had to count

 2              money out and give him money that he requested you to

 3              take to him?

 4    A.   Yes, ma'am.

 5    Q.   Do you know how much money you would have stored at

 6              your house at a given time?

 7    A.   I don't remember exact dollar amounts at this point.

 8    Q.   Okay.  And during the course of this activity did

 9              Harold Wallace have occasion to come to Kansas City?

10    A.   Yes, ma'am.

11    Q.   Now, before you came to Kansas City, did you know

12              Harold Wallace from the days you were living in

13              California?

14    A.   Yes, ma'am.

15    Q.   And prior to him coming here to Kansas City, had you

16              and he had any sort of relationship in California?

17    A.   Before he came out here?

18    Q.   Yes.

19    A.   No, ma'am.  Just friends.  Just knew him, but not to

20              the degree that it was when he came out here.

21    Q.   All right.  In August, early August, of 2007 did

22              Harold Wallace, in fact, come here from California?

23    A.   Yes, ma'am.

24    Q.   And in connection with Harold Wallace, did you know

25              any of the circumstances that caused him to come to
```

```
 1        Kansas City?
 2   A.   Yes, ma'am.
 3   Q.   And were you aware when you allowed -- when he came
 4        here, did you have any idea at that point what kind
 5        of activity he had been involved in before?
 6   A.   Yes, ma'am.
 7   Q.   And when he came here to Kansas City, did you allow
 8        him to stay at your house?
 9   A.   Yes, ma'am.
10   Q.   And in connection with Harold Wallace and your
11        brother, did you become aware of any connection that
12        they had with regards to drug activity?
13   A.   Yes, ma'am.
14   Q.   What was your understanding of what that activity
15        consisted of?
16   A.   They were -- they had drugs that were at my house.
17   Q.   Okay.  Did you become aware of drugs being sent
18        through the mail at some point?
19   A.   Yes, ma'am.
20   Q.   What was your knowledge about that?
21   A.   I knew that it had come over, and I knew the specific
22        time when they were waiting for it, actually, and it
23        never came.
24   Q.   And in connection with Harold Wallace and your
25        brother, were there times that you would be a
```

1    messenger, where Harold Wallace might call you and

2    tell you something and then you would call your

3    brother and give him whatever information Harold

4    Wallace had asked you to pass on to your brother?

5  A.   Yes.

6  Q.   And likewise were there times that your brother would

7    call you with information and ask you to pass that

8    back to Harold Wallace?

9  A.   Yes, ma'am.

10 Q.   And were there some of those communications that

11   involved drug activity?

12 A.   Yes, ma'am.

13 Q.   And were there any times -- what was your

14   understanding about the drugs that were coming in

15   from California from Harold Wallace to your brother?

16   What was your understanding at that point what that

17   situation consisted of?

18 A.   I just knew that he was having drugs sent from

19   California for my brother.

20 Q.   And were there ever any times that you would send

21   money to Harold Wallace at either his request or your

22   brother's request?

23 A.   Yes, ma'am.

24 Q.   And how would you do that?

25 A.   Western Union.

```
 1    Q.   And how would you do that?

 2    A.   I would go to Western Union and send it to --

 3    Q.   And how -- I'm sorry.

 4    A.   I'm sorry.

 5    Q.   And you would send it to Harold Wallace where?

 6    A.   To Richmond, California, but it wouldn't be directly.

 7         It would never be in his name.

 8    Q.   It would be in someone else's name?

 9    A.   In whatever names I was told.

10    Q.   And how many times do you think you sent Western

11         Union money to Richmond, California, to whoever you

12         were directed to send that to?

13    A.   I don't really recall the exact amount of times.  It

14         was a couple of times.

15    Q.   Would it have been more than five times?

16    A.   Possibly, yes, ma'am.

17    Q.   Would it have been more than ten times?

18    A.   No, ma'am.

19    Q.   So somewhere between five and ten times?

20    A.   Possibly, yes, ma'am.

21    Q.   And what amounts of money are we talking about?

22    A.   A couple hundred here and there.  It was never -- I

23         don't recall exactly how much it was.

24    Q.   Was there a reason as to how much money you would

25         send by Western Union?
```

```
1    A.    Yes, ma'am.

2    Q.    What was the reason?

3    A.    Because you weren't supposed to send too much.

4    Q.    And so you would make sure it was just smaller

5          amounts?

6    A.    Yes, ma'am.

7    Q.    In connection then with Harold Wallace, once he came

8          here, did you and he have a romantic relationship

9          together?

10   A.    Yes, ma'am.

11   Q.    And you became pregnant as a result of that?

12   A.    Yes, ma'am.

13   Q.    You mentioned why you were helping your brother out.

14         Why were you doing this activity for Harold Wallace?

15   A.    The same reason.

16   Q.    Why?

17   A.    Because I thought I loved him.

18   Q.    And in connection with Harold Wallace were there

19         times that he would come and go from Kansas City to

20         Richmond, California, between August and October of

21         2007?

22   A.    Yes, ma'am.

23   Q.    Did you become aware that he was arrested in October

24         of 2007?

25   A.    Yes, ma'am.
```

1   Q.   And in connection with an occasion where he flew back

2        to California, he was arrested at the airplane?

3   A.   Yes, ma'am.

4   Q.   And with regards to him flying to California on that

5        occasion, who obtained the airline tickets for him to

6        go from Kansas City to California?

7   A.   I did.

8   Q.   And did you put those in his name?

9   A.   No, ma'am.

10  Q.   Whose name did you put the ticket that allowed him to

11       go from Kansas City back to Richmond, whose name was

12       that?

13  A.   I don't remember.

14  Q.   Was it just some person's name?

15  A.   It was a name that I was given.

16  Q.   And in connection with the activity with Harold

17       Wallace and your brother bringing in drugs from

18       California, at some point did you become aware that a

19       female was coming in from out of town with some

20       quantity of drugs?

21  A.   Yes, ma'am.

22            MS. MOREHEAD:  I just wanted to verify what

23       phone number, Judge.  I would like to play just the

24       first few seconds, first 30 seconds or so, of phone

25       Call No. 204.

```
 1              THE COURT:  All right.  Without objection
 2       you may do so.  That was exhibit number?
 3              MS. MOREHEAD:  Exhibit No. 204.
 4              THE COURT:  204?
 5              MS. MOREHEAD:  Yes.  Just for the record,
 6       that's a phone call that occurred on September 7 of
 7       2007, Target Phone No. 2.
 8              (Exhibit No. 204 was played in open court.)
 9   Q.  (By Ms. Morehead) Do you recall that particular phone
10       call, Ms. Houff?
11   A.  I do now, yes, ma'am.
12   Q.  And who was on that phone call?
13   A.  Me and my brother.
14   Q.  And the discussions that you were having during that
15       phone call, what did that involve?
16   A.  Me asking him to pick the girl up.
17   Q.  And who had you gotten the information from that
18       there was a girl coming in with 17?
19   A.  Harold.
20   Q.  And so was that an occasion where you were passing on
21       information to your brother?
22   A.  Yes, ma'am.
23              MS. MOREHEAD:  Judge, that's all I have of
24       this witness.
25              THE COURT:  Is there any cross examination?
```

```
 1        I see none.  All right.

 2             Ms. Houff, you may step down.

 3                  THE WITNESS:  Thank you.

 4                  THE COURT:  The government may call its

 5        next witness.

 6                  MS. MOREHEAD:  Judge, I'm going to call

 7        Doug Dorley.

 8                       DOUG DORLEY,

 9   having been duly sworn, was examined and testified as

10   follows:

11                     DIRECT EXAMINATION

12   BY MS. MOREHEAD:

13   Q.   Please tell the jury where you're employed.

14   A.   I'm employed as a special agent with the United

15        States Drug Enforcement Administration.

16   Q.   And how long have you -- I'll have you relate to us

17        your work history leading up to and then when you

18        became a DEA agent.

19   A.   Sure.  I was originally employed as a City of Moline,

20        Illinois, police officer, and I started with them in

21        January of 2001.  After a couple of years with Moline

22        I was farmed out to the Illinois State Police, where

23        I was assigned to a narcotics task force, and that

24        was in March of 2004.  September of 2005 I was hired

25        by the Drug Enforcement Administration, and I have
```

1      been assigned to Kansas City District Office ever

2      since.

3  Q.  All right.  And as a DEA agent do you perform the

4      same duties and functions that many of the other DEA

5      agents have came in here and testified already that

6      they perform investigating drug cases?

7  A.  Yes, ma'am.

8  Q.  In this particular investigation that you're here to

9      testify about, Agent Dorley, what various roles did

10     you participate in?

11 A.  For this investigation my main role was to assist on

12     surveillance operations, on any type of enforcement

13     activities, whether it's arrests of certain

14     individuals or multiple surveillance, aerial

15     surveillance, things of that nature; and also

16     assisted working in the wire room, listening to

17     actual intercepted phone calls come across and then

18     the transcribing of those phone calls.

19 Q.  Okay.  And in connection with those activities did

20     you become involved in some activity that occurred on

21     November 27 of 2007?

22 A.  Yes, ma'am.

23 Q.  And specifically some surveillance and then some

24     arrests that occurred on that day at a car wash in

25     Kansas City, Missouri?

1    A.    Yes, ma'am.

2    Q.    Tell the jury what activity you were involved in on

3          that particular day.

4    A.    On that day we had received information based off of

5          the intercepted phone calls that Monterial Wesley was

6          going to meet with Thomas Humphrey for a narcotics

7          transaction.  The determination was made by the case

8          agents that at that point we were going to arrest the

9          individuals that showed up at that actual drug

10         transaction.  I was assigned as one of the block

11         vehicles.  I was assigned as the actual driver of

12         that block vehicle and had three other law

13         enforcement officers assigned with me as my team.  My

14         primary responsibility in that operation was to be

15         the front blocking vehicle, to make sure that the

16         targets that we were trying to arrest were not able

17         to either ram us, evade, or escape our apprehension.

18   Q.    Agent Dorley, prior to being at this particular

19         location, were you familiar with the area in Kansas

20         City, Missouri?

21   A.    Not very familiar.  I knew the main crossroads, but

22         as far as businesses in that area, I couldn't tell

23         you too much about them.

24   Q.    We have had testimony that the arrests occurred at a

25         car wash.

1    A.    Yes, ma'am.

2    Q.    Can you describe the car wash for us.

3    A.    The car wash to the best of my memory was situated

4          kind of north to south as to the buildings and the

5          bays.  You can access the bays from either the west

6          side of the car wash -- and the car wash was behind a

7          McDonald's, and I believe the McDonald's was parked

8          facing the road, which I believe is Eastwood

9          Trafficway.  So to actually access the car wash, you

10         would have to drive on a side street past the

11         McDonald's to go to the car wash.

12   Q.    All right.  Do you recognize Government's Exhibit 53?

13   A.    I do.

14   Q.    How do you recognize that?

15   A.    That is the vehicle that Thomas Humphrey showed up at

16         the narcotics drug transaction driving.

17   Q.    And what portion of the -- what did you actually

18         observe before you converged on the area?  Tell me --

19         describe for us what you had observed previously.

20   A.    Prior to converging on the actual car wash where I

21         was stationed at, we were not -- we didn't see the

22         vehicles coming into the car wash or anything like

23         that.  We were trying to stay as concealed as

24         possible, but based off of the radio traffic that was

25         being put out, we were informed that Thomas Humphrey

```
 1              had showed up in a black Camaro and that Monterial

 2              Wesley and another individual had showed up in a

 3              black Land Rover.

 4     Q.   All right.  And so from your vantage point you

 5              couldn't see either of those vehicles arriving?

 6     A.   No, ma'am.

 7     Q.   Okay.  And so all of the information you obtained was

 8              by way of radio?

 9     A.   That's correct.

10     Q.   And once then those two vehicles -- let me ask you

11              this.  First of all, would you agree with me that

12              Thomas Humphrey's vehicle is situated in a car wash

13              bay?

14     A.   Yes, ma'am.

15     Q.   And were there other bays at that same car wash?

16     A.   There were.

17     Q.   Just to kind of acclimate where you came onto the

18              location, this being obviously the front of his

19              vehicle, what direction would his vehicle be facing?

20     A.   His vehicle was facing west.

21     Q.   Okay.  So this is west?

22     A.   Yes.

23     Q.   And then this end of the building here would be what?

24     A.   The north side.

25     Q.   Okay.  And that would make this the east?
```

```
 1    A.   Yes.

 2    Q.   And this would make this the south?

 3    A.   Correct.

 4    Q.   And what direction did you come from then when you

 5         got the -- I assume there was some sort of signal

 6         saying that agents were going to converge on the

 7         area?

 8    A.   Yes.

 9    Q.   Once you got that signal, where did you come from and

10         where did you go?

11    A.   I actually had my vehicle situated in the McDonald's

12         parking lot, which was south of the car wash, so I

13         had to proceed out of the parking lot, get onto the

14         access road, which is on the west side of the car

15         wash, and proceed up there kind of from the southwest

16         area until we actually pulled into the parking lot

17         for the car wash.

18    Q.   All right.  Is there a parking lot area that kind of

19         surrounds the car wash area?

20    A.   To the best of my memory it's not really a parking

21         lot area; it's just open area so people can get their

22         cars out of the wash bays, dry them off, continue to

23         detail them, whatever they are doing.

24    Q.   And so on the west and on the east there's areas

25         where people can pull up and park and do the activity
```

```
 1        that you've described?

 2   A.   Yes, ma'am.

 3   Q.   And when you came then from the south, where did you

 4        go?

 5   A.   I came in from the southwest area, and based off of

 6        the radio traffic, we had a number of stalls we had

 7        to drive past until we got to the actual target stall

 8        that Mr. Humphrey's vehicle was in.  I drove

 9        immediately to the area and put my vehicle -- blocked

10        my vehicle in front of his vehicle in the actual car

11        wash.

12   Q.   Do you remember how many bays you had to pass to get

13        to that bay?

14   A.   I want to say it was the fifth bay, fifth or sixth

15        bay.

16   Q.   Okay.  And so when you came, is it safe to say if

17        this photograph were extended out you would have been

18        coming in from this direction?

19   A.   Yes, from the Wesley side.

20   Q.   Were there other agents that came from the east?

21   A.   Yes, there were.

22   Q.   And when you arrived at that location, I thought I

23        heard you say you were the first blocking vehicle; is

24        that right?

25   A.   Yes, ma'am.
```

1994

```
 1   Q.   And what does that mean?

 2   A.   The blocking vehicle -- normally there are two

 3        vehicles.  Without trying to get into the actual

 4        tactics we use, the main reason for having the

 5        blocking vehicles is to prevent the harm of other

 6        people if the person we're trying to arrest tries to

 7        either run, evade, or do something with their

 8        vehicle.  So the blocked vehicle's main point is just

 9        to keep that vehicle still.

10   Q.   All right.  And in order to effect that maneuver when

11        you got to that location, where did you position your

12        vehicle?

13   A.   I put my vehicle as close as I could in the actual

14        bay to Mr. Humphrey's vehicle which would still allow

15        me to open up the front doors of my vehicle.  The

16        actual bay is -- the doors for the bay are smaller

17        than the bay itself, so I got my vehicle maybe 3 or 4

18        feet inside the bay so that everybody could still

19        exit my vehicle.

20   Q.   And so you pull some distance into the bay with the

21        front end of your vehicle?

22   A.   Yes, ma'am.

23   Q.   Are you driving?

24   A.   Yes, I am.

25   Q.   And when you pull up, as you're doing this blocking
```

1      maneuver, what do you observe in the bay in

2      connection with this Camaro?

3   A.   When I pull up, I observe the passenger's side door

4      of Mr. Humphrey's vehicle open and a subject that I

5      believe to be Monterial Wesley standing there at the

6      side of the vehicle.

7           As we enter the garage area, he looks at us, and

8      everybody is getting out of my vehicle.  I see that.

9      He immediately turns and starts to run towards the

10      rear of the vehicle.  At that point I started getting

11      out of my car and I lost sight of him.  When I got

12      back into the bay, I could no longer see him, but

13      based off of the police commands that everyone else

14      was yelling, I assumed that he had been arrested or

15      encountered by the other agents coming from the east

16      side.

17   Q.   All right.  Would that have been outside of the bay

18      area?

19   A.   Yes.

20   Q.   That Mr. Wesley ran out of?

21   A.   Yes, ma'am.

22   Q.   And in connection then with -- you see him at the

23      passenger door.  Where is he in connection with that

24      door?

25   A.   He would be toward the passenger compartment of the

1    door, so as if he were opening the door to get in or

2    look in or something of that nature.

3  Q.  Okay.  And you see him go then in a westerly -- or

4    now I'm confused -- easterly direction; correct?

5  A.  Yes.

6  Q.  And I assume you know that there's other agents that

7    are coming from that direction?

8  A.  Yes.

9  Q.  What's your focus on at that point?

10  A.  At that point my focus is, as he's running to the

11    east, we have agents to the east that can take care

12    of him.  We know that we have Mr. Humphrey that's

13    still inside the actual bay.  We had two other law

14    enforcement officers in my vehicle that were on the

15    right side they were assigned to take the driver's

16    side portion of Mr. Humphrey's vehicle, so those

17    individuals took that side of the vehicle, and even

18    though Mr. Wesley fled from where he was at in the

19    vehicle, my job was still to clear that side of the

20    vehicle for anybody else that was there.

21  Q.  All right.  And did you make observations about where

22    Mr. Humphrey was located then?

23  A.  I remember when we pulled in he was -- I believe he

24    was actually out of the vehicle with a door open and

25    was talking or something.  I know that he wasn't

1    sitting in there seated in the vehicle with the door

2    closed.  He was out doing something.  I just can't

3    remember exactly what he was doing.

4  Q.  This particular photograph shows both the driver and

5    the passenger door?

6  A.  Yes, ma'am.

7  Q.  When you arrived, is that how you observed the

8    vehicle?  I know you said you saw the passenger door

9    open.

10  A.  The passenger door, 100 percent; the driver's door, I

11    do not believe -- it was closed, I believe, when we

12    originally pulled in.  He was out of his vehicle, and

13    then the next --

14  Q.  By "he" you're talking about Mr. Humphrey?

15  A.  Mr. Humphrey, yes, ma'am.

16  Q.  Okay.

17  A.  And then the next time I saw him, he was arrested and

18    the doors were open.

19  Q.  All right.  And based upon then your clearing of the

20    bay area, was there anybody else inside the bay area

21    except Mr. Humphrey and Mr. Wesley?

22  A.  No, ma'am.

23  Q.  Now, following this particular episode at the car

24    wash, did you have some other duties and

25    responsibilities on November 27, 2007, involving the

```
 1          collection of some evidence in connection with a

 2          consent to search that was signed for 3708 Stonewall

 3          Court in Leavenworth, Kansas?

 4   A.     Yes, ma'am.

 5   Q.     And what were your responsibilities in connection

 6          with that particular search?

 7   A.     My responsibilities were as one of the searching

 8          agents to assist in the search for evidence at the

 9          residence.

10   Q.     And did that include collecting a number of items of

11          evidence?

12   A.     Yes.

13   Q.     And we have heard testimony from Detective Leigh Ann

14          Greene.  Was she also there?

15   A.     She was.

16   Q.     And when you went to that location, did you encounter

17          anyone else, or was your job strictly to search for

18          evidence?

19   A.     We encountered two other individuals that were there.

20          I believe one of them was Mr. Wesley's wife, and I

21          believe it was her sister that was also there at the

22          residence.  They knew that we were coming.  We were

23          informed that Mr. Wesley had already spoken to his

24          wife and told her that we were coming out there to do

25          the consent search on the residence, and then once we
```

```
1            got there, we, of course, made contact with them, and
2            I assisted with the search of the residence from
3            there.
4    Q.      I've placed a number of items of evidence in front of
5            you, Agent Dorley: Government's Exhibits 75, 76, 77,
6            78, 79, and 79A.  Do you recognize all of those items
7            of evidence?
8    A.      Yes, ma'am.
9    Q.      And were those all items of evidence that you would
10           have seized and collected in connection with the
11           search of 3708 Stonewall Court?
12   A.      Yes, ma'am.
13                  MS. MOREHEAD:  Judge, I would ask for
14           admission of Government's Exhibits 75 through 79A.
15                  THE COURT:  Is there any objection?
16           Hearing none, Exhibits 75, 76, 77, 78, 79, and 79A
17           are all admitted.
18                  (Exhibits 75-79A were admitted into
19           evidence.)
20   Q.      (By Ms. Morehead) Can you tell us, Agent Dorley,
21           first of all, with regards to Government's Exhibit
22           No. 75 what that is and where you would have
23           collected that item of evidence.
24   A.      This is a -- I'm sorry.  Government's Exhibit 75 is a
25           box of Remington .45 automatic ammunition.
```

1    Q.   And --

2    A.   I'm sorry.

3    Q.   Go ahead.

4    A.   This ammunition was recovered in the master bedroom

5         of Mr. Wesley's residence.

6    Q.   Is there a notation on there about how many rounds

7         are in that box, Agent Dorley?

8    A.   The property label says 23 rounds.

9    Q.   And how many rounds are typically kept in that

10        particular box of ammunition?

11   A.   The box has 50 stamped on it, so it should contain 50

12        rounds.

13   Q.   And I want to --

14             MS. MOREHEAD:  Judge, for the record, I'm

15        going to open up Government's Exhibit 75.

16             THE COURT:  Very well.

17   Q.   (By Ms. Morehead) And just for the record, Agent

18        Dorley, do all of those rounds of ammunition appear

19        to be the same?

20   A.   Twenty-two of them appear to show the same.  This

21        23rd one has a different stamping on the back of the

22        actual round.  They are the same caliber.

23   Q.   All right.  Good.  That's fine.

24   A.   Actually, I'm sorry, it looks like two of them, but

25        the rest of them all appear to be the same type.

1    Q.    I'm just going to let the jury see what we're talking

2          about here, and what I've just zoomed in on, what do

3          we call that marking on a round of ammunition?

4    A.    It's usually the caliber of the ammunition and then

5          also some other type of manufacturing mark.

6    Q.    And then it is a stamp on the round of ammunition; is

7          that right?

8    A.    Yes, ma'am, comes from the factory.

9    Q.    And it looks like some of them, as you indicated, are

10         marked -- the majority of them are marked R with a

11         .45 auto stamp; correct?

12   A.    Yes.

13   Q.    And then there's several that are PMC .45 auto; is

14         that correct?

15   A.    That is correct.

16   Q.    The two that you mentioned that were different;

17         correct?

18   A.    That's correct.

19   Q.    Now I want to look at what's been previously marked

20         as 61A, which were identified by Agent Bennett as

21         rounds of ammunition that were recovered from a

22         handgun at the car wash.

23   A.    Okay.

24   Q.    Okay?  And those two rounds that I just showed, can

25         you see those?

1    A.    Yes.

2    Q.    Do those appear to be PMC with the .45 auto?

3    A.    It does.  One of them does, yes, ma'am.

4    Q.    All right.  Let me let you look at them and just

5          tell me how many of those are similar.

6    A.    Okay.

7                    THE WITNESS:  Your Honor, I'm going to cut

8          open this bag.

9                    THE COURT:  You may.

10   Q.    (By Ms. Morehead) And are you familiar with boxes of

11         ammunition, Agent Dorley?

12   A.    Somewhat familiar.

13   Q.    I assume since you're a law enforcement officer

14         you've had occasion to buy boxes of ammunition?

15   A.    Yes, ma'am.

16   Q.    The two different head stamps, one of them being R,

17         would that be consistent with that being a Remington,

18         consistent with what we have here in this box, based

19         off that?

20   A.    That would be my assumption.  Remington usually puts

21         an R or some type of Remington-specific logo onto

22         their cartridges.

23   Q.    And if we were to buy a box of Remington ammunition,

24         I assume all 50 rounds of ammunition originally would

25         have been the same.  Is that a reasonable assumption?

1   A.   Yes.

2   Q.   And so these two rounds that are different, they

3        would have had to have came from another --

4   A.   Manufacturer.

5   Q.   Another manufacturer, from another box of ammunition.

6        Would you agree with that?

7   A.   Yes, based on my training and experience and somewhat

8        familiar knowledge of firearms, this PMC stamp on the

9        back of the shell casings -- there is a firearm

10       manufacturer or ammunition manufacturer that is known

11       for precision-made cartridges, and a lot of times PMC

12       will get stamped on the back of those.

13  Q.   All right.  And what can you tell me about these nine

14       rounds of ammunition that Agent Bennett testified she

15       recovered from the firearm?

16  A.   Four of them are stamped with PMC .45 auto, and then

17       five of them are stamped with the R&P .45 auto, which

18       is similar to the Remington box.

19  Q.   Great.  What about Government's Exhibit -- and you

20       indicated you found this box of ammunition in the

21       master bedroom of 3708 Stonewall Court?

22  A.   Yes, ma'am.

23  Q.   Where was that in the master bedroom?

24  A.   To the best of my memory, and in reviewing the

25       reports and the photographs taken, the ammunition

```
 1           that I found that we later placed into evidence was

 2           all found in different drawers in the dressers within

 3           the bedroom.

 4    Q.    All right.

 5    A.    There was about four or five different dressers in

 6           there, and they weren't all in one drawer.  It was

 7           kind of sporadically placed in different areas.

 8    Q.    All right.  What about Government's Exhibit No. 76?

 9           Tell us what that is.

10    A.    This is a Kel-Tec -- it looks like a Kel-Tec --

11    Q.    Can you -- is that something you collected?

12    A.    Yes, ma'am.

13    Q.    And -- go ahead.

14    A.    I was going to say, this would be the pistol that was

15           collected from the master bedroom of the residence

16           there, and it's a Kel-Tec 9-millimeter pistol.

17    Q.    And where did you recover that in that bedroom?

18    A.    This one was actually recovered in a box, and it was

19           underneath the bed, the master bed.

20    Q.    Okay.  Could you open Government Exhibit No. 76 and

21           show us.  What is this item that you just removed?

22    A.    That is just the pistol box from the manufacturer.

23    Q.    Okay.  And when you recovered it, the pistol that you

24           now have in your hand, was it actually in this box?

25    A.    Yes.
```

2005

1    Q.   And there appear to be some plastic straps on that

2         firearm now; is that right?

3    A.   That's correct.

4    Q.   What are those?

5    A.   These are safety straps so that the evidence

6         custodians know that the firearm has been cleared

7         safe, so they know they are not dealing with a loaded

8         firearm that they are putting into the evidence

9         vault.

10   Q.   So when you recovered this pistol from this box, it

11        did not have the straps on it; it's been secured not

12        only for your purposes but also for court purposes;

13        is that right?

14   A.   That is correct.

15   Q.   Inside this box was there, in fact, some paperwork in

16        here?

17   A.   Yes, I believe there was.

18   Q.   Including the manual?

19   A.   Yes, ma'am.

20   Q.   And I just want to display that.  There just appear

21        to be two copies, but this particular document tells

22        us what?

23   A.   That document -- looks like that's the actual

24        purchasing receipt from Capitol City Pawn for the

25        purchase of the firearm.

2006

1   Q.   And do we see a date on this document?

2   A.   October 24, 2007.

3   Q.   Okay.  And it looks like that was the contract date.

4        I see down here that if you did layaway then that's

5        how much was due?

6   A.   Yes.

7   Q.   And it looks like this being the amount that was paid

8        in total?

9   A.   Yes, that's what it looks like.

10  Q.   But the gun was actually purchased during that time;

11       is that right?

12  A.   That's what it looks like on the receipt, yes, ma'am.

13  Q.   And who was this -- who does it indicate this gun was

14       purchased by?

15  A.   Lakisha Wesley.

16  Q.   Okay.  And, again, if this was purchased October 24

17       of 2007, during the course of monitoring this wire,

18       did you become aware of a home invasion that had

19       occurred at the residence of Shevel Foy in

20       mid-October of 2007?

21  A.   Yes.

22  Q.   What about Government Exhibit No. 77?  And for the

23       record that pistol that we just talked about, the

24       Kel-Tec -- well, tell us what Government's Exhibit 77

25       is.

```
1    A.   Okay.  Government's Exhibit 77 is a package of seven

2         rounds of 9-millimeter ammunition with Wolf

3         Manufacturing as the manufacturer.

4    Q.   And where did those seven rounds come from?

5    A.   These rounds also came from the residence.  These

6         would have been located in the master bedroom as

7         well.

8    Q.   Okay.  And were these actually in the Kel-Tec pistol

9         when you recovered it?

10   A.   Off of my recollection I cannot remember if those

11        were loaded within the magazine in the firearm itself

12        or if those were found miscellaneously within the

13        bedroom dresser.  I personally don't remember making

14        that Kel-Tec firearm safe, but I just I can't

15        remember.  I know that we found the ammunition for

16        the Kel-Tec and everything was in the master bedroom.

17   Q.   Okay.  Those rounds of ammunition would have been

18        consistent with that particular firearm?  They were 9

19        millimeter?

20   A.   Yes.  That firearm would have shot that ammunition.

21   Q.   Okay.  What about Government's Exhibit 78?

22   A.   Government's Exhibit 78 is four boxes of

23        miscellaneous ammunition.

24   Q.   And, again, those being found in the master bedroom?

25   A.   Yes, ma'am.
```

1    Q.   And tell us about those rounds of ammunition or those

2         boxes and miscellaneous rounds that you recovered.

3         What did they consist of?

4    A.   From the property receipt it looks like it's 158

5         different miscellaneous rounds.  There's a box of

6         9-millimeter Wolf ammunition which is the same

7         ammunition that you just showed me in Government's

8         Exhibit -- I believe it was 77.  There's a box of

9         .380 automatic ammunition, another box of

10        9-millimeter Luger made from Winchester, and then a

11        box of .38 Special Winchester ammunition.

12   Q.   Okay.  And what about Government's Exhibit No. 79?

13   A.   Government's Exhibit 79 is the shotgun that was

14        located in the master bedroom.

15   Q.   Where was that located?

16   A.   That shotgun was located in between the box spring

17        and the mattress of the master bedroom.

18   Q.   And can you describe that shotgun for us.  And,

19        again, it has a safety mechanism through the --

20   A.   Through the bolt action, yes.

21   Q.   Through the bolt action.  And why is that on there?

22   A.   That's on there to make sure that all evidence

23        technicians know that the firearm is safe and there's

24        no ammunition in it.

25   Q.   All right.

```
 1   A.    This is a Mossberg shotgun.  It's a 12-gauge shotgun,

 2         and it just has a pistol grip added onto the back of

 3         it instead of the normal full length stock, but it is

 4         a shotgun.

 5   Q.    And are you generally familiar with -- and that is a

 6         12-gauge shotgun; correct?

 7   A.    Yes, ma'am.

 8   Q.    Are you generally familiar with shotguns?

 9   A.    Somewhat.

10   Q.    Now, Government's Exhibit No. 79A, what's that?

11   A.    This is five rounds of 12-gauge Winchester shotgun

12         ammunition.

13   Q.    Where did you get that from?

14   A.    These were also recovered from the master bedroom.

15   Q.    And were they in the shotgun, the same with this

16         firearm as with the Kel-Tec?

17   A.    I can't remember if the rounds of ammunition were

18         actually located inside the firearm or if I located

19         those within the bedroom dressers.  I personally

20         don't remember making this shotgun safe, but I can't

21         remember where -- I can't remember if these were

22         actually in the firearm or not.

23   Q.    And if those -- is that shotgun capable of holding

24         five shotgun shells?

25   A.    Yes.  Normally -- well, I believe normally the
```

1        shotguns, they can hold between three and five

2        rounds, and then you can get some extra ammunition

3        into the actual shotgun if you modified the magazine

4        so you can take out the shotgun plug, you can put

5        more rounds in them.

6    Q.   Okay.  I want to jump ahead now, Agent Dorley.  Aside

7        from assisting on November 27, 2007, were you also

8        involved in searches that occurred on December 27 of

9        2007?

10   A.   I was.

11   Q.   And I want to hand you what I've marked as

12       Government's Exhibit 100 and Government Exhibit

13       No. 101 and ask you if you recognize those two

14       documents.

15   A.   I do.

16   Q.   How do you recognize those two documents?

17   A.   Government Exhibit No. 100 is the consent-to-search

18       form signed by Catherine Heags, which is James Heags'

19       mother.  She was the resident of 575 South Street in

20       Leavenworth, Kansas, and that's a residence that on

21       December 27 we went and contacted her.  Government's

22       Exhibit 101 is a consent-to-search form signed by

23       James Heags for his residence in Leavenworth of 610

24       Oak Street, and that was a residence that we searched

25       right after we finished Catherine Heags' residence.

1    Q.   Okay.  And in connection with your activity on

2         December 27, 2007, this being nearly a month after

3         the affidavit that occurred on November 27, 2007,

4         what was the reason that you and other agents went to

5         those two locations on that date?

6    A.   On -- we went out there on that date because on

7         December 26 Hank Grigsby, another individual that was

8         involved in this investigation, was arrested on

9         December 27.  In speaking with the case agents, they

10        wanted us to attempt to contact individuals at

11        residences that had been identified in drug

12        trafficking throughout their investigation, and these

13        were two of those residences.

14   Q.   All right.

15             MS. MOREHEAD:  Judge, I would ask for

16        admission of 100 and 101.

17             THE COURT:  Any objection?  Hearing none,

18        those two exhibits are admitted.

19             (Exhibits 100 and 101 were admitted into

20        evidence.)

21   Q.   (By Ms. Morehead) You indicated 100 then was the

22        consent to search for 575 South Street?

23   A.   Yes, ma'am.

24   Q.   Is that right?  And whose signature is this here?

25   A.   That is Catherine Heags'.

1    Q.   What about there?

2    A.   That's my signature.

3    Q.   And down there?

4    A.   That's Detective Leigh Ann Greene's.

5    Q.   And in connection then with the search that was

6         conducted at 575 South Street, did you, in fact, find

7         a number of items of evidence?

8    A.   We did.

9    Q.   Government's Exhibit No. 96.  Do you recognize that?

10   A.   I do.

11   Q.   What is that?

12   A.   This is going to be the plate with residue that we

13        recovered from the residence of 575 South Street.

14   Q.   Okay.  And what was the relevance of collecting this

15        item of evidence?

16   A.   The residue on the plate appeared to be either

17        dried-up cocaine residue or dried-up crack cocaine

18        residue that was on the plate.

19   Q.   And based upon your interceptions of wire

20        communications in this case, was it your

21        understanding that 575 South Street was used as a

22        place where crack was sometimes manufactured?

23   A.   Yes, ma'am.

24   Q.   Were there any other general items of evidence that

25        you collected from 575 South Street?

1    A.    There were.

2    Q.    What all did that include?

3    A.    Without referring to my reports, I believe there were

4          other items of drug paraphernalia, I believe there

5          was a knife with a white residue on it, I believe

6          that there was a pipe used, or commonly used, to

7          smoke crack cocaine, and I think that there was some

8          other drug paraphernalia related to marijuana

9          smoking.  I think there was actually a burned

10         cigarette that was in the form of a blunt or a

11         marijuana cigarette.  We also recovered from James

12         Heags, who was at the residence at the time, we

13         recovered small amounts of marijuana from his person,

14         and we also recovered two empty firearm boxes at the

15         residence.

16   Q.    In connection with that particular residence, both

17         James Heags and his mother were there then?

18   A.    That's correct.

19   Q.    Government's Exhibit 109 and 113, do you recognize

20         those two items?

21   A.    I do.

22   Q.    And what are those items?

23   A.    Government Exhibit No. 113 is a box of .40 caliber

24         ammunition that was also recovered at the residence

25         of 575 South Street.  Government Exhibit No. 109 are

1          the two firearms cases that were recovered from the

2          residence at 575 South Street.

3    Q.    Okay.  And do those appear to be in the same

4          condition as when you recovered them?

5    A.    They do.

6    Q.    The two ammunition -- the pistol boxes, they have

7          been taped together for, I guess, convenience sake.

8          Would you agree with that?

9    A.    Yes.  We taped them together to keep them as one

10         exhibit, as they were found together.

11   Q.    Okay.

12              MS. MOREHEAD:  Judge, I ask for admission

13         of 109 and 113.

14              THE COURT:  Any objection?  Exhibits 109

15         and 113 are admitted.

16              (Exhibits 109 and 113 were admitted into

17         evidence.)

18              MS. MOREHEAD:  Thank you, your Honor.

19   Q.    (By Ms. Morehead) With regards to Government's

20         Exhibit 109, what kind of pistol boxes are those?

21   A.    Would it be all right if I refer to my report -- I

22         have it clearly stated in my report -- rather than --

23   Q.    Would that refresh your recollection?

24   A.    It would.

25              THE COURT:  Very well.

REBECCA S. RYDER, CCR, RMR
UNITED STATES COURT REPORTER
913-551-5645

```
 1   A.   Okay.  The firearms cases are, one of them is a

 2        Cobray 9-millimeter pistol.  The firearms case had

 3        the serial number of 94-0027630.  The other firearms

 4        case is for a Sig Sauer Model P226 9-millimeter

 5        pistol.

 6   Q.   (By Ms. Morehead) And just so we're clear, those gun

 7        boxes were empty when you recovered them at 575 South

 8        Street; is that right?

 9   A.   Yes.  I believe one of them had an owner's manual in

10        it but no firearms, and I think the Sig Sauer case

11        had an empty Sig Sauer magazine in the case.

12   Q.   Government's Exhibit 113, did you tell us where you

13        recovered those gun boxes in the residence?

14   A.   These gun boxes were located in the upstairs bedroom

15        the southeast bedroom, which was -- in speaking with

16        Ms. Heags, that was the bedroom that James Heags,

17        even though he didn't live there, that was the

18        bedroom that he would stay at when he was over.

19   Q.   And what about Government's Exhibit 113?

20   A.   Government's Exhibit 113 is a box of .40 caliber

21        ammunition that was also found in the upstairs

22        southeast bedroom.

23   Q.   Okay.  Now, you indicated you also got a consent to

24        search Government's Exhibit 101 for 610 Oak Street?

25   A.   That's correct.
```

```
 1   Q.   And whose is that?

 2   A.   That's James Heags'.

 3   Q.   What about there?

 4   A.   That's my signature.

 5   Q.   And there?

 6   A.   That's Detective Shawn Buck's.

 7   Q.   Okay.  And following the search at 575 South Street

 8        on that same date, December 27, 2007, did you and

 9        other agents go to 610 Oak Street?

10   A.   We did.

11   Q.   Now, during the course of this investigation were

12        there ever any occasions where you were involved in

13        surveillance at either 575 South Street or Oklahoma

14        in Leavenworth, Kansas?

15   A.   Yes.  I was personally involved in surveillances that

16        occurred at 610 Oak Street.

17   Q.   I want to hand you what's been marked as Government's

18        Exhibit 99.  Do you recognize that?

19   A.   Yes, ma'am.

20   Q.   What is that?

21   A.   This is miscellaneous documents that were seized with

22        the name of Hank Grigsby printed on the documents.

23   Q.   And those were recovered from where, Agent Dorley?

24   A.   May I refer to my notes to see the exact location?

25   Q.   Yes.
```

```
 1   A.   Those receipts -- or the evidence bag says that they

 2        were recovered here at the Kansas City District

 3        Office.  I'm trying to remember -- if memory serves

 4        me correctly, these were documents that were seized

 5        out of the green Ford Mustang, I believe, that Mr.

 6        Grigsby normally drove when he was driving around in

 7        Leavenworth.

 8   Q.   All right.  Okay.  And is that what he was in when he

 9        was arrested?

10   A.   I believe it was.  I'm not sure of the vehicle he was

11        in when he was actually arrested.  I know that

12        Leavenworth Police Department arrested Mr. Grigsby.

13             MS. MOREHEAD:  Judge, I would like to admit

14        Government's Exhibit 99.

15             THE COURT:  Is there any objection?

16        Hearing none, Exhibit 99 is admitted.

17             (Exhibit 99 was admitted into evidence.)

18   Q.   (By Ms. Morehead) Now, with regards to --

19             THE COURT:  Ms. Morehead, I'm sorry.  I'm

20        going to take our break a little bit early because I

21        have to stop for lunch a little bit early because of

22        a meeting.  Is this a good place?

23             MS. MOREHEAD:  Sure.  We're getting ready

24        to go into the evidence from 610 Oak Street, so that

25        would be fine.
```

1            THE COURT:  Members of the jury, I will

2    remind you of the admonitions.  We will resume in 15

3    minutes.  Mr. Dorley, you may step down.  Ms.

4    Scheurer, come take charge of the jury.  Counsel and

5    participants remain here, please.  We will check

6    signals.

7            (The following proceedings were had outside

8    the presence of the jury:)

9            THE COURT:  All right.  Is there anything

10   that we should do before we break?

11            MR. JOHNSON:  Your Honor, I had a quick

12   question.  I'm going to put together instructions for

13   the court over the lunch hour.  I have in mind what I

14   would like to submit.  Most of them are form

15   instructions out of the Tenth Circuit.  Is it

16   sufficient if I cite the instruction number and

17   request that it be read?

18            THE COURT:  Yes.

19            MR. JOHNSON:  I assumed as much.

20            THE COURT:  That would be just fine.  Mr.

21   Sandage, I've received some proposed instructions

22   from you.

23            MR. SANDAGE:  Yes, your Honor.

24            THE COURT:  Let the record reflect you were

25   first.

1              MS. MOREHEAD:  Actually, I think --

2              THE LAW CLERK:  Mr. Bellemere was first.

3              THE COURT:  That is true.

4              MR. BELLEMERE:  I appreciate being duly

5    noted.

6              THE COURT:  You were so early that I forgot

7    about you.  All right.  We will be in recess until a

8    quarter of 11:00.

9              (A recess was taken.)

10             THE COURT:  If we're ready to proceed then,

11   Mr. Dorley, come back up on the witness stand.

12             MS. MOREHEAD:  When you said we were going

13   to quit early, what did you --

14             THE COURT:  12:10.

15             MS. MOREHEAD:  Okay.  If you said that --

16             THE COURT:  I did not.

17             MS. MOREHEAD:  I have one other witness

18   scheduled before lunch, so you know, and the rest of

19   them are scheduled this afternoon.

20             THE COURT:  We will resume about 1:20.  I

21   have to stretch the lunch just a little bit.

22             (The following proceedings were had in the

23   presence of the jury:)

24             THE COURT:  Ms. Morehead, you may resume

25   your examination.

```
 1                       MS. MOREHEAD:   Thank you.

 2    Q.   (By Ms. Morehead) Agent Dorley, in connection then

 3         with your search of 610 Oak Street, were there a

 4         number of photographs that were taken in connection

 5         with the evidence that was seized?

 6    A.   There was.

 7                       MS. MOREHEAD:   Judge, I would ask for

 8         admission of Government's Exhibits 114 through 131.

 9                       THE COURT:   Exhibits 114 through 131?   Is

10         there any objection?   Hearing none, those exhibits,

11         114 through 131, are admitted.

12                       (Exhibits 114 through 131 were admitted

13         into evidence.)

14    Q.   (By Ms. Morehead) I would like to first show you what

15         I've marked Government's Exhibit 114.   Can you

16         tell me what that is?

17    A.   Yes, ma'am.   As we were doing the continuing search

18         of 610 Oak, we located numerous firearms.   This is a

19         photograph, obviously, of a white towel.   Concealed

20         inside that towel was a firearm and a magazine, and

21         this was located above the refrigerator in the

22         residence.

23    Q.   And this is, for the record, some sort of cabinet; is

24         that right?

25    A.   Yes.
```

1   Q.   Government's Exhibit 115, what is that?

2   A.   That is the firearm and magazine that was found.

3        It's the white towel in the previous picture.

4   Q.   And Government's Exhibit 116?

5   A.   That is just a closeup shot of the firearm once we

6        had made it safe.  That firearm was the same firearm

7        that was in the holster on the previous picture.

8   Q.   Okay.  Government's Exhibit 102, can you tell me what

9        that is.

10  A.   Government Exhibit No. 102 is the actual pistol shown

11       in the photograph there.  It's a Sig Sauer Model 226

12       9-millimeter.  It had one loaded magazine within the

13       pistol; the holster itself carried another loaded

14       magazine; and then the third long, extended magazine

15       is a magazine for a -- or it's a magazine that fits a

16       Leinad Cobray 9-millimeter pistol.  All the magazines

17       were loaded to their capacity.

18  Q.   Okay.  And Government's Exhibit 103.  What's that?

19  A.   This is the ammunition that was subsequently

20       downloaded out of the firearm once we had made them

21       safe.  These are all 9-millimeter rounds.

22  Q.   This would be the rounds of ammunition that came from

23       the magazines that you previously mentioned?

24  A.   Yes, ma'am.

25                 MS. MOREHEAD:  Judge, I would ask for

2022

```
 1          admission of 102 and 103.
 2                    THE COURT:  Is there any objection?
 3          Hearing none, Exhibits 102 and 103 are admitted.
 4                    (Exhibits 102 and 103 were admitted into
 5          evidence.)
 6   Q.     (By Ms. Morehead) Let me show you what I've marked
 7          Government's Exhibit 117.  Tell me what that is.
 8   A.     That's a photograph of a white plastic bag, and you
 9          can also see a blue plastic bag in the photograph as
10          well.  Both of those bags had a separate firearm
11          concealed inside each of the bags, and the bags were
12          located in the closet of the bedroom at 610 Oak
13          Street.
14   Q.     And Government's Exhibit 118?
15   A.     I believe that is -- that is the firearm that was
16          found inside the white bag, and that's the .45
17          caliber pistol that was found there.
18   Q.     I'm going to show you what I've marked as
19          Government's Exhibit 105, ask you if you can identify
20          that.
21   A.     Government's Exhibit 105 is the same -- appears to be
22          the same firearm seen in the picture there that we
23          seized from the residence and placed into evidence.
24   Q.     What kind of firearm was that, agent?
25   A.     It's an Essex Arms .45 caliber semi-automatic pistol.
```

1    Q.   And, again, that came from the white plastic bag that

2         we saw in the photograph?

3    A.   That is correct.

4              MS. MOREHEAD:  Judge, I would ask for

5         admission of Government's Exhibit 105.

6              THE COURT:  Any objection?

7              MR. BELLEMERE:  Excuse me, your Honor.  I

8         don't have an objection.  I've lost track of whose

9         residence this is.  This 610 Oak Street?

10             THE COURT:  Mr. Heags' residence.

11             MR. BELLEMERE:  Mr. Heags.  Thank you very

12        much.

13             THE COURT:  Is that right, Ms. Morehead?

14             MS. MOREHEAD:  Judge, I'm not attesting to

15        whose residence that is.  I think the evidence speaks

16        for itself about the connection to 610 Oak in this

17        conspiracy.

18             THE COURT:  Point well taken.

19        You can inquire further from the witness on

20        cross examination if you would like to establish

21        that.

22             MR. BELLEMERE:  All right.  Thank you.

23   Q.   (By Ms. Morehead) Government's Exhibit 119, can you

24        tell me what that is.

25   A.   Yes, ma'am.  That's a photograph of the blue plastic

1    bag that we recovered from the master bedroom closet,

2    or actually the bedroom closet there at the

3    residence.

4  Q.   And Government's Exhibit 120?

5  A.   That is the firearm that was inside the blue plastic

6    bag that has a Leinad Cobray 9-millimeter pistol.

7    It's commonly referred to as a Tech 9 pistol.  Those

8    were three magazines that were found there with the

9    pistol.  The fourth magazine that fits the pistol was

10    the one that was found with the Sig Sauer 226 that

11    was shown in the photograph of it being above the

12    refrigerator.

13  Q.   (By Ms. Morehead) Okay.  And Government's

14    Exhibit 104, tell the jury what that is.

15  A.   This appears to be the same pistol shown in the

16    photograph that we recovered from the blue plastic

17    bag in the closet of the bedroom of the residence.

18  Q.   And what condition was it in when it was recovered?

19  A.   The firearm had -- the pistol was empty.  There was

20    no magazines inside.  I'm sorry.  There was no

21    ammunition inside the magazines or in the pistol.  It

22    was just in the bag on the floor of the closet.

23  Q.   All right.

24        MS. MOREHEAD:  Judge, I would ask for

25    admission of Government's Exhibit 104.

```
 1                    THE COURT:  Any objection?  Hearing none,
 2          Exhibit 104 is admitted.
 3                    (Exhibit 104 was admitted into evidence.)
 4   Q.   (By Ms. Morehead) Agent Dorley, I want to refer back.
 5          If I recall, we just introduced Government's
 6          Exhibit 102, which you indicated was a pistol that
 7          was recovered from above the refrigerator; is that
 8          right?
 9   A.   That is correct.
10   Q.   And remind the jury what that gun was.
11   A.   Government Exhibit No. 1202 is a Sig Sauer Model 226
12          9-millimeter pistol.  It was found loaded with two
13          other -- I'm sorry.  It was found loaded with one
14          magazine full of ammunition.  A second magazine had
15          ammunition in it that was concealed in the holster
16          with the pistol, and there was also a loaded magazine
17          for a Cobray 9-millimeter pistol as well.
18   Q.   Okay.  So a 9-millimeter Sig Sauer; right?
19   A.   Yes.
20   Q.   And this again was -- 104, what's this?
21   A.   104 is called a Leinad Cobray pistol or referred to
22          as a Tech 9.
23   Q.   Government's Exhibit 109, these were two firearm
24          boxes that you recovered -- that you indicated you
25          recovered earlier that same day from 575 South
```

1        Street?

2    A.   That's correct.

3    Q.   Do these two gun boxes that you seized at that

4         address, at 575 South Street, do they correspond with

5         the two pistols, Government's Exhibit 102 and 104?

6    A.   They do.  The Sig Sauer case actually has the serial

7         number of the Sig Sauer stamped on the case which

8         matches the serial number for the Sig Sauer seized at

9         610 Oak Street.  The Leinad Cobray case that was

10        seized at 575 South Street, we could not find a

11        serial number for that case, but that case does fit

12        the Leinad Cobray that was seized at 610 Oak Street.

13   Q.   Okay.  I would like to show you Government's

14        Exhibit 121.  What is that?

15   A.   That's a green ammunition box that was found in the

16        closet of the bedroom of 610 Oak Street.

17   Q.   And Government Exhibit No. 122?

18   A.   That's a plastic bag, but concealed in that plastic

19        bag and all throughout the ammunition box were

20        multiple rounds of ammunition.

21   Q.   Government's Exhibit 108, tell the jury what that is.

22   A.   Government Exhibit No. 108 appears to be the exact

23        same ammunition box shown in the photograph.

24   Q.   And does that appear to be in the same condition as

25        when you would have recovered it?

```
 1    A.    It does.
 2                    MS. MOREHEAD:  Judge, I would ask for
 3          admission of Exhibit 108.
 4                    THE COURT:  Any objection?  Hearing none,
 5          Exhibit 108 is admitted.
 6                    (Exhibit 108 was admitted into evidence.)
 7    Q.    (By Ms. Morehead) And Government's Exhibit 108, tell
 8          the jury what it contains.
 9    A.    It contains multiple boxes of 762.39 ammunition,
10          which is the ammunition that fits an assault rifle
11          that was also seized at the residence.
12    Q.    Government's Exhibit 123?
13    A.    Government's Exhibit 123 is a photograph of a green
14          suitcase that was found inside the bedroom closet at
15          610 Oak Street.
16    Q.    And Government's Exhibit 124?
17    A.    Concealed inside the green suitcase from the previous
18          exhibit was this Rome Arm, commonly referred to as a
19          AKA-47-type assault rifle.  That weapon along with
20          magazines for that weapon were found inside the green
21          suitcase.
22    Q.    And Government's Exhibit 125?
23    A.    All those items were found inside the green suitcase
24          for the AKA-47-assault-type rifle with the magazines
25          for it along with a different butt stock to change
```

1          out.

2     Q.   I'm going to hand you what's been marked as -- and

3          for the record so that nobody's alarmed if I point it

4          at them, this firearm is rendered safe; is that

5          right?

6     A.   That's correct.

7     Q.   Again, we have a safety mechanism device on it?

8     A.   We do.

9     Q.   It's not loaded?

10    A.   That's correct.

11    Q.   Would it be safe if it was -- I don't like to point

12         guns at anybody, but if it's pointed at somebody,

13         it's safe; correct?

14    A.   Correct.  It's been made safe.

15    Q.   Government's Exhibit 107, tell me what that is.

16    A.   That appears to be the same firearm that was

17         recovered inside the green luggage suitcase in the

18         closet of the bedroom at 610 Oak Street along with

19         the four magazines that were with the weapon along

20         with the ammunition that was also there.

21    Q.   And that's 107A; is that right?

22    A.   That is correct.

23    Q.   And 107A, was that ammunition that was specifically

24         associated with 107?

25    A.   Yes.

```
1              MS. MOREHEAD:  Judge, I would ask for

2      admission of Government's Exhibit 107 and 107A.

3              THE COURT:  Is there any objection?

4      Hearing none, Exhibits 107 and 107A are admitted.

5              (Exhibits 107 & 107A were admitted into

6      evidence.)

7   Q.  (By Ms. Morehead) Government's Exhibit 110, 111, and

8      112, do you recognize that?

9   A.  I do.

10  Q.  Tell us what those items are.

11  A.  Government's Exhibit 110 is a black bag.  It's just a

12      black canvas bag.  You can actually see it on the

13      photograph here, on Government's Exhibit 125.  It was

14      a bag that was also concealed within the green

15      luggage suitcase, and to the best my recollection it

16      was a bag that we just used to help get the firearms

17      out of the residence upon seizure so we didn't carry

18      them out piece by piece.

19  Q.  Go ahead.  111?

20  A.  111 are numerous rounds of 762.39-millimeter

21      ammunition, which would be fired by the assault rifle

22      shown in Exhibit 125.  And Government's Exhibit 112

23      are once again numerous rounds of 762.39-millimeter

24      ammunition that can be fired from that firearm as

25      well.
```

1    Q.   And these items, 110, 111 and 112, were also found

2         inside that green luggage suitcase or luggage bag

3         that you've referred to?

4    A.   Yes.

5                   MS. MOREHEAD:  Judge, I would ask for

6         admission of 110, 111 and 112.

7                   THE COURT:  Any objection?  Hearing none,

8         Exhibits 110, 111, and 112 are admitted.

9                   (Exhibits 110 through 112 were admitted

10        into evidence.)

11   Q.   (By Ms. Morehead) Government's Exhibit 126, tell

12        us -- Government's Exhibits 97 and 98, do you

13        recognize those two items?

14   A.   I do.

15   Q.   What are those two items?

16   A.   Exhibit No. 97 was cocaine that was seized from the

17        residence at 610 Oak Street.  Exhibit No. 98 is a

18        digital scale that was also seized from the residence

19        at 610 Oak Street.

20   Q.   And where were those items seized?

21   A.   Exhibit 22 was seized -- and there was a blue bag

22        that was in the bathroom of the residence.

23        Exhibit 22 was inside the blue bag.  Exhibit 107,

24        being this digital scale, was seized in the bedroom

25        dresser inside the bedroom of the residence.  It was

REBECCA S. RYDER, CCR, RMR
UNITED STATES COURT REPORTER
913-551-5645

```
 1          in the top drawer.

 2     Q.   And where was that located?

 3     A.   The bedroom.

 4     Q.   Just in the drawer?

 5     A.   Yes, it was in the drawer.

 6     Q.   Okay.  Now, Government's 126 through 131, can you

 7          just take a look at those.

 8     A.   Yes, ma'am.

 9               MS. MOREHEAD:  Judge, I would ask for

10          admission of 97 and 98.

11               THE COURT:  Any objection?  Exhibits 97 and

12          98 are admitted, hearing no objection.

13               (Exhibits 97 and 98 were admitted into

14          evidence.)

15     Q.   (By Ms. Morehead) First of all, Government's

16          Exhibit 126, what's that?

17     A.   That's a photograph of the bedroom dresser, top

18          drawer, in the master bedroom.

19     Q.   And what does this photograph show?

20     A.   It shows a gold and metal tin and a knife and some

21          packaging material, or sandwich Baggies, I should

22          say.

23     Q.   What's significant about sandwich Baggies in a

24          location like this in a bedroom drawer?

25     A.   Sandwich Baggies are commonly used to package
```

```
 1              narcotics and to have them in a bedroom dresser
 2              drawer, kind of also further indicates that they are
 3              not being used for making lunch, that they are being
 4              used for some other purpose.
 5      Q.   If they were being made for lunch, where would the
 6              most practical place be for them?
 7      A.   In my opinion it would be in the kitchen where the
 8              food is.
 9      Q.   Okay.  What about Government's Exhibit 127?
10      A.   127 is a photograph of the metal tin that was -- once
11              again, that's in the drawer in the bedroom dresser.
12              And you have a photograph of the digital scale and
13              some marijuana that was seized there.
14      Q.   Okay.  128?
15      A.   128 is the blue bag that I referenced earlier.  This
16              was in the bathroom of the residence, which is off
17              the master bedroom.
18      Q.   And 129.
19      A.   That's a photograph of packaging that had concealed
20              marijuana in it inside the blue back bag.
21      Q.   And 130?
22      A.   That would be a photograph of cocaine that was seized
23              from the blue bag which was concealed in a plastic
24              Baggie.
25      Q.   And 131?
```

1    A.    It's just another shot of the same picture.

2    Q.    And in connection, again, with the search that you

3          did on December 27 of 2007, that was a month after

4          the arrest at the car wash on November 27, 2007, of

5          the individuals at that location?

6    A.    That's correct.

7    Q.    And the day after the arrest of Henry Grigsby?

8    A.    That's correct.

9              MS. MOREHEAD:  Judge, that's all I have of

10         this witness.

11             THE COURT:  Is there any cross examination?

12         Mr. Calbi?

13             MR. CALBI:  Thank you, your Honor.

14                      CROSS EXAMINATION

15   BY MR. CALBI:

16   Q.    Officer, we're going to first talk about the

17         incidents on November 27 of 2007 at the car wash when

18         your vehicle pulled in -- and let's use Government's

19         Exhibit 53, if we can, please.  And I believe your

20         testimony was you blocked the bay that the Camaro was

21         facing out of; correct?  You pulled your vehicle in

22         and --

23   A.    Yes.  My front bumper was pointed towards the front

24         that --

25   Q.    So you didn't come in --

1   A.   Not sideways, just head on.

2   Q.   Head on, okay.  When you were coming in head on, what

3        was the -- the passenger door was already open?

4   A.   Yes.

5   Q.   So you don't know who opened the door; you just know

6        that the door was open; is that correct?

7   A.   That's correct.

8   Q.   Okay.  And where exactly -- you said that Mr. Wesley

9        was by the passenger door.  Now "by" is kind of a

10       relative term, so can you narrow it down a little bit

11       more as to exactly what --

12  A.   He was in an area -- looking at the picture here, he

13       would be behind the passenger door, but he was in the

14       area that, if you were going to enter the vehicle

15       right there, as the door opens, kind of 4 or 5 feet

16       from that front passenger's seat, he was standing in

17       that area.

18  Q.   Okay.  So he was about 4 or 5 feet --

19  A.   In that area where the door opens.  I mean, he wasn't

20       at the back tire; he wasn't at the trunk; he was up

21       there near the passenger compartment with the door

22       open.

23  Q.   Okay.  And was he just standing there?  He wasn't

24       attempting to -- what's your recollection of what he

25       was doing?

1    A.    From what I can remember, I remember he had his head

2          turned towards the vehicle, but I can't remember -- I

3          mean, I -- yes, he was standing there, and I remember

4          that his head was turned towards the vehicle.

5    Q.    Okay.  Now, where would Mr. Humphrey have been in

6          relation to Government's Exhibit 53 when you first

7          pulled into the bay and came in head on?

8    A.    He was over by the driver's side in the area of the

9          open door.

10   Q.    Okay.  And when you say he was in the area of the

11         open door, was he on this side of the open door, or

12         was he on that -- was he on that side of the open

13         door?

14   A.    He would be on the side that.  If he was going to try

15         to enter the vehicle, he was on that side of the

16         door.

17   Q.    Okay.  And did he have a hose in his hand or any of

18         the other items that would be in a car wash?

19   A.    I can't remember if he had anything in his hands.  My

20         responsibility was the passenger's side, so as we

21         came in, I did a quick glance and saw the person that

22         I was assigned to, and I knew that the other guys

23         were going -- or I assumed that they were going to be

24         assigned on their side.

25   Q.    And do you have any recollection if the car was wet,

```
 1          had soap on it, if it appeared that Mr. Humphrey had
 2          already begun washing his vehicle?  Do you have any
 3          recollection?
 4     A.   Yeah.  The car was wet, and I believe that he had
 5          begun washing his vehicle.
 6     Q.   Okay.  Now, you testified that Mr. Wesley, when he
 7          saw your vehicle pulled in, turned away from the
 8          vehicle, and we will get into a little bit more
 9          detail about that, but in the vehicle that you were
10          in, did it have any sort of emergency lights or, you
11          know, sirens going off or red lights or anything like
12          that?
13     A.   Did not.
14     Q.   Okay.  So it was an unmarked car?
15     A.   Yes.
16     Q.   So you're in a vehicle with three other gentlemen or
17          three other agents?  I believe you said there were
18          four people in your vehicle?
19     A.   Yes, sir.
20     Q.   Okay.  So your vehicle with four people in it just
21          pulls into a bay, blocks in another vehicle, no
22          emergency lights, no sirens.  You haven't jumped out
23          of your vehicle yet, so I'm sure you haven't yelled
24          out DEA or anything as you're first pulling in?
25     A.   As we're pulling into the bay, no -- let me rephrase
```

```
 1              that.  As we're approaching the bay, the doors hadn't
 2              been opened.  As soon as my vehicle started pulling
 3              into the bay, I distinctly remember the back doors
 4              opening, and "police" was being yelled as the agents
 5              were getting out of the vehicle.
 6   Q.   My question to you was, when Mr. Wesley started
 7              moving away from the Camaro in Government's
 8              Exhibit 53, were the back doors already opened,
 9              people yelling "police," or did he start moving
10              beforehand as best you can recall?
11   A.   He moved at approximately the same time as our
12              vehicle was pulling into the bay and the back doors
13              were getting opened and the gentlemen were getting
14              out, yelling "police," is when he turned and ran.
15   Q.   Okay.  Well, I believe you might have said a couple
16              of different things there, so let me see if we can
17              break that down.  My question is, when your vehicle
18              first pulled into the bay, before the back doors
19              opened, did you notice any movement of Mr. Wesley
20              moving away from the vehicle?
21   A.   No, sir.
22   Q.   Okay.  So it's your testimony he didn't start moving
23              away from the vehicle until your vehicle stopped and
24              the doors were beginning to open?
25   A.   The doors had begun opening.  When we approached Mr.
```

1        Wesley, our vehicle doors were closed.  As we're

2        driving up, I distinctly remember him looking up at

3        our vehicle as we entered into the area of the bay to

4        block the vehicle; and the back doors opened, and the

5        two agents get out yelling "police," is when he

6        turned and proceeded toward the rear of the vehicle.

7    Q.  Okay.  You said that Mr. Humphrey was washing his car

8        or the vehicle appeared to have been washed?

9    A.  Yes.

10   Q.  You have no recollection though if he was still

11       washing his car as you pulled up?

12   A.  I know that he was washing his car immediately prior

13       to us doing this.  I can't remember if he still had

14       the hose in his hand or what was going on with his

15       hands.

16   Q.  Okay.  So you don't even know if the hose was on and

17       perhaps making noise?

18   A.  I remember the hose was on.  I can't remember where

19       the hose was.  The hose that I heard that was on was

20       actually in the harness, the spray hose, because I

21       remember as we were walking around that hose was

22       still leaking water.

23   Q.  And let's talk about Mr. Wesley's actions as you

24       pulled into the bay.  The doors open; he's moving

25       away from the vehicle.  I believe the term you used

1        was he ran?

2   A.   Yes, sir.

3   Q.   Again, "ran" is one of those relative terms.  I mean,

4        people can run at high rates of speed.  People can

5        just turn around and jog.  People can just turn

6        around and make a quick motion or a dart.  Can you be

7        a little bit more specific as to what your

8        recollections were of Mr. Wesley's actions?

9   A.   Certainly.  When I observed Mr. Wesley leave the area

10       of the vehicle, he immediately turned around at a

11       high rate of speed and -- we will use your term --

12       darted toward the rear of the vehicle.  At that

13       point, once I saw him dart, is when I put my vehicle

14       up into park was grabbing my door to get out, and

15       when I came back around, the other agents had already

16       encountered Mr. Wesley.

17   Q.   Okay.  I want to be clear now.  Mr. Wesley was your

18       target; correct?

19   A.   Yes.

20   Q.   You pulled in.  Mr. Wesley is your target?

21   A.   Yes.

22   Q.   So you pull in, and the doors pop open.  Mr. Wesley

23       takes off at a high rate of speed to the back of the

24       vehicle.  I'm going to imagine with a Camaro that's

25       probably 5 or 6 feet, perhaps, give or take?

```
 1    A.    Perhaps.

 2    Q.    We don't have a tape measure out.  Where is he

 3          apprehended by the other agents?  Right at the back

 4          of the vehicle?

 5    A.    He's apprehended at the, if I remember correctly, at

 6          the rear passenger's side door area of the Land Rover

 7          vehicle.

 8    Q.    Did you ever lose sight of Mr. Wesley from the time

 9          he turned to go towards the Land Rover?  He was your

10          target.  Did you ever lose sight of him?

11    A.    Yes.  As I explained, when I put the vehicle into

12          park and was opening the door, I glanced down to exit

13          the vehicle, and when I had glanced back up, the

14          other agents had already encountered Mr. Wesley.

15    Q.    So that probably, what, took a few seconds, I would

16          assume?

17    A.    Yeah.  No more than a few seconds.

18    Q.    Now, the weapons were found at Mr. Wesley's residence

19          on the following day, November 28 of 2007, is that

20          correct, or was it the same day you went out there?

21    A.    I believe it was later that night, sir.

22    Q.    Later that night you went out there.  Obviously, Mr.

23          Wesley was in custody from the time he was arrested

24          at the car wash, and so he didn't have an opportunity

25          to go back to his house before you searched it.
```

1          Would that be a true statement as far as you know?

2     A.   Yes.  To the best of my knowledge, he did not go out

3          to the residence before we went out there.

4     Q.   Okay.  And so then he wouldn't have had any of these

5          weapons -- and I'm talking about the ones that were

6          taken from his home -- at the car wash with him that

7          day as best as you know?

8     A.   No.  To my knowledge, there's know way that the

9          weapons seized at his house could have gone from the

10         car wash back out to his house.

11    Q.   The weapons that were found at Mr. Wesley's home

12         later that evening, do you know if they were

13         registered to anyone?

14    A.   I don't.

15    Q.   Okay.  Do you know if anyone in your agency would

16         have that knowledge?

17    A.   No.  The weapons -- normally what we will do with DEA

18         is, we will contact ATF and have ATF -- or our agents

19         at ATF and have them continue the traces and tracks

20         for the firearms at that point.

21    Q.   So you have no knowledge one way or the other?

22    A.   No, sir.

23    Q.   And I believe that your testimony was that the last

24         two weapons that you talked about, Exhibits 78 and

25         79, as best as you could recall, you weren't sure if

1      they were loaded or not, so there's a possibility

2      that these weapons were unloaded?

3   A. Talking about the shotgun and the pistol?

4   Q. Correct, sir.

5   A. Yes, sir.  I do not remember personally myself

6      unloading those weapons.  I remember the weapons

7      being found, and I remember us locating ammunition

8      that fit that weapon.  I cannot personally remember

9      unloading the weapons.

10  Q. And all these other weapons that were located on 610

11     Oak and 575 South Street, to your knowledge do you

12     know if Mr. Wesley ever resided there or had ever

13     been there at any time to your knowledge?

14  A. To my knowledge, I don't know if Mr. Wesley had ever

15     been at those residences.

16  Q. So you wouldn't know one way or the other if those

17     were Mr. Wesley's firearms or Mr. Smith's firearms or

18     John Doe's firearms; these are just firearms that you

19     recovered at these two different locations.  Would

20     that be correct?

21  A. Well, the two pistol cases that were found at 575

22     South Street, we had spoken to Mr. Heags under

23     Miranda, and he advised that he did have those

24     firearms over at his residence, so he did claim

25     ownership of the two --

1    Q.   So Mr. Heags at least took those out of the equation,

2         as he admitted those were his?

3    A.   Yes, sir.

4    Q.   Okay.

5              MR. CALBI:  I have nothing further, your

6         Honor.

7              THE COURT:  Any further questions by way of

8         cross examination?  Mr. Rogers?

9                      CROSS EXAMINATION

10   BY MR. ROGERS:

11   Q.   Sir, going back to the car wash, you have gone over

12        with Mr. Calbi what you observed Mr. Wesley do.  Did

13        you observe anything about the driver of the Land

14        Rover there at the scene?

15   A.   I observed that when we pulled into the car wash that

16        the vehicle still had a black male that was sitting

17        in the driver's seat, and then once we executed our

18        arrest, I observed that the male was laying on the

19        ground in custody outside of the driver's seat.

20   Q.   Okay.  When you first saw the Land Rover, was the

21        driver's side door closed?

22   A.   Yes.

23   Q.   Now, you indicated that you took part in the

24        surveillance activities that day, the 20th of

25        November.  When did you pick up the vehicle from your

```
 1        personal part of the surveillance?
 2   A.   In Kansas City, Missouri, probably a couple miles
 3        from the actual arrest.
 4   Q.   So around the vicinity of 55th and Prospect by the
 5        barbershop?
 6   A.   Yeah, that would probably be accurate.
 7   Q.   So you don't know if the vehicle stopped before it
 8        got to the barbershop except what you heard on the
 9        radio?
10   A.   That's correct.  From my observations, no.
11   Q.   But according to the radio traffic, you knew that the
12        vehicle had been in downtown Kansas City looking at
13        lofts and had driven past a park in the vicinity of
14        27th and Brooklyn?
15   A.   Yes, from the radio traffic.
16             MR. ROGERS:  Those are all the questions I
17        have.
18             THE COURT:  Very well.  Any other cross
19        examination?  Mr. Sandage?
20                  CROSS EXAMINATION
21   BY MR. SANDAGE:
22   Q.   Agent Dorley, on direct examination Ms. Morehead
23        asked you if you were aware of a home invasion at the
24        Foy residence.  Do you remember that?
25   A.   Yes, sir.
```

1    Q.   She was asking you in the context of discussing

2         weapons that were recovered from a search of Mr.

3         Wesley's home; is that correct?  Is that about the

4         time she was talking to you specifically about

5         Exhibits 77 and 78?

6    A.   Yes, sir.

7    Q.   Just so I'm clear, there's no connection between

8         those weapons found in the home invasion --

9              MS. MOREHEAD:  Judge, sorry.  Just for the

10        record, that was Exhibits 76 and 77.  I think Mr.

11        Calbi also misstated those two exhibit numbers.

12             THE COURT:  Mr. Sandage?

13             MR. SANDAGE:  That's fine, your Honor.  I'm

14        just trying to clear up a point.

15             THE COURT:  Very well.

16   Q.   (By Mr. Sandage) Exhibits 76 and 77, as Ms. Morehead

17        just alluded to, those were pieces of evidence that

18        were recovered from the Wesley residence; is that

19        correct?

20   A.   That's correct.

21   Q.   And those weapons were in no way connected to the

22        alleged home invasion of the Foy residence to the

23        best of your knowledge?

24   A.   I have no idea if they were connected or not

25        connected.

1    Q.    Thank you.

2              MR. SANDAGE:  Nothing further.

3              THE COURT:  Any other cross examination?

4         Mr. Bellemere?

5              MR. BELLEMERE:  Thank you, your Honor.

6                   CROSS EXAMINATION

7    BY MR. BELLEMERE:

8    Q.    Agent Dorley, I was a little bit confused, but I

9         think I found the answer.  The 575 South Street was a

10        house that Mrs. Catherine Heags consented to a search

11        on?  Is that what you recall?  Government's

12        Exhibit 100, I think, was a consent to search that

13        address.  So Mrs. Heags was the one who lived in that

14        house?

15   A.    Yes, sir, at 575 South Street.

16   Q.    In that house were there -- well, strike that.

17             The next house was Exhibit -- a house located at

18        610 Oak Street, and I think Exhibit 101, James Heags

19        consented to the search of that house.  Is that your

20        understanding of it?

21   A.    Yes, sir.

22   Q.    And the weapons we have seen, the assault rifles and

23        the majority of the pistols, were they found at 610

24        Oak Street?

25   A.    Yes.  There were the two weapons that were found at

1        the Wesley's residence and the four weapons found at

2        the 610 Oak Street.

3    Q.  So really we're only talking about weapons found

4        either at Mr. Wesley's -- allegedly at Mr. Wesley's

5        house or at Mr. Heags' house; true?

6    A.  Right.  The pistol cases and ammunition were the only

7        type of firearms or things related to firearms that

8        were found at 575 South Street.

9                MR. BELLEMERE:  Thank you.

10               THE COURT:  Anything further by way of

11       cross?  Seeing no requests, I go back to you, Ms.

12       Morehead, for any redirect.

13               MS. MOREHEAD:  Nothing based on that, your

14       Honor.

15               THE COURT:  All right.  Very well.

16       Mr. Dorley, you may step down.

17               THE WITNESS:  Thank you, sir.

18               THE COURT:  Ms. Morehead, the government

19       may call its next witness.

20               MS. MOREHEAD:  Judge, I called Mike Holder.

21

22

23

24

25

```
 1                        MICHAEL HOLDER,

 2     having been duly sworn, was examined and testified as

 3     follows:

 4                     DIRECT EXAMINATION

 5     BY MS. MOREHEAD:

 6     Q.   Please tell the jury where you're employed.

 7     A.   Drug Enforcement Administration.

 8     Q.   What do you do for the Drug Enforcement

 9          Administration?

10     A.   I'm a special agent investigating narcotic cases.

11     Q.   Can you relate to the jury your work history relative

12          to being a law enforcement officer.

13     A.   I was a policeman for the City of Houston, Texas, for

14          seven years, and I have been with DEA approximately

15          12 years.

16     Q.   How long have you been assigned to the Kansas City

17          office?

18     A.   Just three years.

19     Q.   And in connection with your duties and

20          responsibilities, did you assist in the investigation

21          for which you're here to testify to today?

22     A.   Yes.

23     Q.   And throughout the course of this investigation what

24          duties and functions did you have occasion to

25          perform?
```

```
 1    A.    I was just here minimally.  I was out of the country
 2          most of the time, so I just came in at the end and
 3          assisted in some of the arrests.
 4    Q.    Okay.  Did that include activity that occurred on
 5          November 27 of 2007 in connection with the arrest of
 6          three individuals at that location in Kansas City,
 7          Missouri?
 8    A.    Yes.
 9    Q.    And what were your responsibilities on that date,
10          Agent Holder?
11    A.    I participated in the surveillance prior to the
12          arrests, and I participated in the arrests.
13    Q.    Do you recall what portion of any surveillance that
14          you would have done on that date?
15    A.    Yes.
16    Q.    What do you recall?
17    A.    I was a little late.  They had already started, and I
18          was --
19    Q.    They had already started surveillance that day?
20    A.    Surveillance.  Other agents and other officers had
21          already started surveillance, and I believe I joined
22          shortly after a couple of the defendants left a bank,
23          I believe.
24    Q.    All right.  What vehicle were you involved in then
25          with regards to the individuals being at the bank?
```

1   A.   What car was I in?

2   Q.   No.  What car were they in?

3   A.   Land Rover or Ranger Rover.

4   Q.   Okay.  And were you actually involved -- had they

5        already left the bank then when you became involved,

6        or were they at the bank leaving when you became

7        involved?

8   A.   I think by the time I got there they had already left

9        and I joined when they were coming back towards

10       downtown.

11  Q.   And tell us what activity you observed then in

12       connection with surveillance with their vehicle once

13       you joined in.

14  A.   We followed them to downtown Kansas City, Missouri.

15       I believe they made a stop there at some apartments

16       or a high rise building for a little bit.

17  Q.   Okay.

18  A.   And then we ended up at a business or a shop on

19       Prospect, which is in Kansas City, Missouri, and then

20       we followed them around the neighborhood, I believe,

21       for a little bit, eventually ending up at a car wash

22       in Missouri.

23  Q.   Are you that familiar with the locations that you

24       were conducting surveillance at over in Kansas City,

25       Missouri?

```
 1    A.   No.  Actually, I had only been back in maybe two or
 2         three weeks, back in country, so I didn't have any
 3         background as far as where they frequented.
 4    Q.   Okay.  Eventually were you involved in surveillance
 5         where the Land Rover or Range Rover that you have
 6         described ended up in a car wash?
 7    A.   Yes.
 8    Q.   What did you observe with regards to that vehicle
 9         getting to the car wash?
10    A.   I remember, I believe, at one time I was behind it in
11         route to the car wash, but when it actually arrived
12         at the car wash, I was at a location where I couldn't
13         observe the actual car wash or the vehicles in there.
14    Q.   Were you involved in surveillance?  We have had some
15         testimony from Agent Bennett that at one point after
16         first arriving at the car wash it went to a gas
17         station nearby before returning back to the car wash.
18         Were you involved in that surveillance as well?
19    A.   Yes.  We were all in the area, and I remember that
20         being put out on the radio, but like I said, I was
21         kind of like -- I'm sorry.  I don't know my
22         directions over there.  I was behind a building where
23         they couldn't see me but within a few hundred yards
24         of this car wash and the gas station.
25    Q.   When that vehicle went -- returned to the car wash
```

1          then, is it my understanding from your testimony that

2          from your vantage point you could not see the

3          location of where the Land Rover ended up or when it

4          arrived at the car wash; is that right?

5    A.    Correct.

6    Q.    How did you become aware then that it had came back

7          to that location?

8    A.    Well, there was radio traffic.  The agents and

9          officers who could see what was going on was putting

10         out what happened.

11   Q.    Now, we have had some testimony that there was a

12         black Camaro that had arrived initially before the

13         Land Rover returned, and in connection with your

14         vantage point and the Camaro, did you see when it

15         arrived?

16   A.    Once again, no.  I mean, I knew it arrived because

17         whoever saw it put it out on the radio.

18   Q.    Okay.  And what was then your responsibility in

19         connection with once the individuals were all at the

20         same location in connection with this potential drug

21         transaction?

22   A.    I was going to participate in the arrest once the

23         arrest signal was broadcasted over the radio.

24   Q.    Okay.  And I assume at some point that occurred,

25         there was some signal given?

```
 1    A.    Correct.

 2    Q.    And what did you do then in connection with that

 3          signal being given?

 4    A.    I left where I had parked and went around the corner

 5          of the building -- I believe it was the Commenco

 6          building where we actually have our radios put in our

 7          cars -- and drove into the car wash, the parking lot.

 8    Q.    And just by way of reference, we have kind of used

 9          this photograph, Government's Exhibit 53.  Does that

10          look familiar, Agent Holder?

11    A.    Yes.

12    Q.    And what is this?

13    A.    It's a picture of a black Camaro and a Range Rover

14          behind it.

15    Q.    We have had testimony that this end of the vehicle

16          would have been facing to the west, east back here,

17          north, and then south.

18    A.    Okay.

19    Q.    Do you disagree with that representation?

20    A.    If those are the directions, then those are the

21          directions.

22    Q.    Okay.  With those references then where would you

23          have came from and where would you have ended up?

24    A.    I would have been behind the building north of this

25          location.
```

1    Q.   Okay.

2    A.   And I came through that parking lot, and then the

3         street that separated that building and the car wash,

4         I came in from a drive that would have been on the

5         east coming in behind the Ranger Rover.

6    Q.   All right.  And we, in fact -- do you see that

7         vehicle back there?

8    A.   Uh-huh.

9    Q.   What is that?

10   A.   It's a black Ranger Rover.

11   Q.   Is that the vehicle -- you referred to it as a Land

12        Rover or Ranger Rover.  Is that the vehicle you're

13        referring to you were involved in surveillance of?

14   A.   Yes.

15   Q.   Okay.  Now, in connection then with arriving at that

16        location, when you came in from the east, what did

17        you do?

18   A.   I was following Agent McCue in.  He was in a vehicle

19        and I was in a vehicle.  He pulled directly behind

20        the Ranger Rover, and I positioned my vehicle a

21        little bit to his left.

22   Q.   Okay.  And what were both you and Agent McCue, what

23        was your responsibility going to be with regards to

24        the arrest situation?

25   A.   We were going to take the driver into custody, of

1           Ranger Rover.

2     Q.    And in connection then with that, you being behind

3           Agent McCue, tell me what you did once you got to the

4           location where you stopped your vehicle.

5     A.    I exited my vehicle and came along the side of the

6           Ranger Rover on the driver's side close to the

7           vehicle.  Agent McCue was a little bit further out so

8           he could engage the driver.

9     Q.    All right.  And in connection with this operation

10          were there other agents that had other

11          responsibilities involving the other individuals and

12          other locations of the car wash?

13    A.    Yes.

14    Q.    And when you have a particular responsibility -- in

15          this case it was the driver -- do you focus much on

16          what's going on with regards to the other individuals

17          that other agents have responsibilities with?

18    A.    You try not to.  I mean, you have to concentrate on

19          what you're supposed to be doing, and hopefully

20          everybody else is concentrating on what they are

21          supposed to be doing, but you have to be aware of

22          everything in case something bad happens.

23    Q.    Did you make any observations -- as you're

24          approaching, getting out, going to the driver of the

25          Ranger Rover, are you making -- do you recall any

```
 1          observation that you made about other activity going

 2          on with any of the other individuals or agents?

 3    A.    No.

 4    Q.    All right.  From what you've described, even though

 5          you pull up -- I'm going to use the word kind of on

 6          the outside of Agent McCue's car; correct?

 7    A.    Correct.

 8    Q.    You went directly to the driver's door; Agent McCue

 9          came up towards the outside of the door; is that

10          accurate?

11    A.    Correct.  He was more out -- his job was to contact

12          the driver.  He was to stay up close to the vehicle

13          and protect him.

14    Q.    Okay.  And so by being up close to the vehicle --

15          what portion of the Ranger Rover did you come up

16          from?

17    A.    The rear to -- from the rear of it to the front.

18    Q.    And what side of the vehicle are we talking about?

19    A.    The driver's side.

20    Q.    All right.  And so as you come up from that

21          direction, tell me what occurs.

22    A.    Agent McCue is identifying himself as police, put

23          your hands up.  He reaches to open the door.  The

24          driver's not compliant.  He holsters up, reaches in.

25          I holster up.  We both take ahold of the driver, take
```

```
 1            him out of the car, and put him on the ground.

 2   Q.   When you say the driver was noncompliance, what do

 3        you mean by that?

 4   A.   Agent McCue opened the door, told him to get out.  He

 5        didn't.

 6   Q.   And you had heard Agent McCue make commands to put

 7        your hands up.  Was the driver compliant with regards

 8        to that?

 9   A.   From my position I couldn't see.  I could not see the

10        driver from where I was.

11   Q.   Okay.  And what was blocking your -- what would have

12        blocked your view then from where the driver was

13        positioned in the driver's seat?

14   A.   The pillar, you know, where the back of the driver's

15        door and the front of the passenger door is, that was

16        blocking the view.

17   Q.   Would you agree that Agent McCue would have had a

18        better vantage point than you as far as what action

19        the driver was taking?

20   A.   Correct.

21   Q.   All right.  So Agent McCue was making -- giving

22        commands, put your hands up and then get out of the

23        car?

24   A.   Correct.

25   Q.   And were you making any commands at that point?
```

```
 1   A.   I'm sure I was, same thing, police, get your hands

 2        up, get out.

 3   Q.   Okay.  And when the driver did not comply with

 4        getting out, what did you and Agent McCue do?

 5   A.   We extricated him from the vehicle.

 6   Q.   How did you do that?

 7   A.   We grabbed him and put him on the ground.

 8   Q.   And was the driver's door open?

 9   A.   Correct.

10   Q.   Where is the driver then put on the ground?

11   A.   Just right on the ground right outside the driver's

12        door.

13   Q.   And what happened once he was placed outside the

14        vehicle?

15   A.   He was handcuffed and searched.

16   Q.   Who did that?

17   A.   Agent McCue and myself.

18   Q.   I want show you Government's Exhibit 56.  Do you

19        recognize that, Agent Holder?

20   A.   Yes.

21   Q.   What is that?

22   A.   It's the driver's seat and driver compartment of the

23        black Range Rover.

24   Q.   Okay.  Now, we have had testimony from Officer Jones

25        that following this incident he actually did a
```

```
 1            videotape of the scene prior to the collection of any
 2            evidence.  Were you aware that there was a videotape
 3            done following the arrest of the individuals?
 4    A.   Yes.
 5    Q.   And have you had an opportunity to review that
 6            videotape before testifying today?
 7    A.   Yes.
 8    Q.   Now, in connection, first of all, with Government
 9            Exhibit No. 56, making a couple of observations,
10            first of all, there appears to be an object on the
11            driver's seat.  Do you recognize that object?
12    A.   Yes.
13    Q.   What is that?
14    A.   It's an I-Pod.
15    Q.   And do you recall that I-Pod being at that location
16            at the car wash?
17    A.   Yes.
18    Q.   And what do you recall about this I-Pod?
19    A.   After Agent McCue and I had handcuffed and searched
20            Mr. Simpson, we stood him up because there was water
21            coming out of the car wash and sat him on the wall,
22            and he asked if his I-Pod could be picked up so it
23            wouldn't get wet, so I picked it up and put it on the
24            seat.
25    Q.   Where was the I-Pod initially?
```

1    A.    The first time I saw it, it was laying in the parking

2          lot.

3    Q.    On the ground?

4    A.    On the ground.

5    Q.    And do you know how it got on the ground?

6    A.    I assume when we took Mr. Simpson out of the vehicle

7          and arrested him it came out then, or came out of a

8          pocket.

9    Q.    All right.  And somehow it ended up on the ground of

10         the car wash?

11   A.    Correct.

12   Q.    And how then did it get on the seat of the SUV?

13   A.    I placed it there.

14   Q.    Okay.  Again I want to come back to Government

15         Exhibit No. 56, but Government Exhibit No. 328, I

16         would represent, is a clip from the video footage.

17         Do you recall seeing this clip in the video footage?

18   A.    Yes.

19   Q.    And specifically there appears to be a handgun and

20         also some -- a white cord there in that location.  Do

21         you see that?

22   A.    Yes.

23   Q.    And in connection with the arrest of Mr. Simpson, did

24         you make any observations about these items in the

25         vehicle?

1    A.   I saw the gun and stated gun when we were pulling

2         Mr. Simpson out of the car.

3    Q.   When did you actually see the firearm in connection

4         with the arrest of Mr. Simpson?

5    A.   When both Agent McCue and I reached in and took hold

6         of Mr. Simpson and pulled him out of the vehicle, I

7         noticed it, and I said, gun, there's a gun.  I just

8         made everybody aware that there was a pistol there, a

9         gun.

10   Q.   And that's as you're removing Mr. Simpson, is when

11        you first observed the gun?

12   A.   Yes.

13   Q.   Why did you do that?  Why do you make it known that

14        there's a gun?

15   A.   Just to let everybody else know as far as officers

16        and agents around that we have a weapon in the

17        vicinity.

18   Q.   And it appears in connection with this photograph

19        that the gun is actually -- at least a portion of the

20        butt, or the grip, I should say, the grip is actually

21        on the doorjamb of that vehicle.

22   A.   It appears so, yes.

23   Q.   And how -- do you know how the gun got from where you

24        originally saw it to this location?

25   A.   No, I don't.

```
 1   Q.   All right.  You did though -- you and Agent McCue did

 2        remove Mr. Simpson from the vehicle?

 3   A.   Could have easily been, you know, drug over there by

 4        his foot when we was taking him out or --

 5   Q.   And when we see this -- when we see the video

 6        footage, we know that the I-Pod, from your testimony,

 7        got placed on the seat because you put it there;

 8        correct?

 9   A.   Correct, yes.

10   Q.   Aside from the I-Pod being put there, was there

11        anything else as far as specifically the firearm and

12        how it appeared in Government's Exhibit 328, that it

13        would have been moved or altered in any way from when

14        you and Agent McCue removed Mr. Simpson from the

15        vehicle?  Did I lose you?

16   A.   I'm easily lost.  Sorry.

17   Q.   Let me --

18   A.   I think your question is --

19             THE COURT:  Let her repeat it because it

20        lost me.

21             THE WITNESS:  At least we're on the same

22        page, your Honor.

23   Q.   (By Ms. Morehead) You mentioned the I-Pod.  We know

24        it got on the seat because you put it there.

25   A.   Correct.
```

```
 1    Q.   Correct?

 2    A.   Correct.

 3    Q.   And so when we look at Government's Exhibit 56, if I

 4         ask you, is this how it looked when you removed

 5         Mr. Simpson, we know the I-Pod wasn't there when he

 6         was removed from the vehicle; correct?

 7    A.   Correct.

 8    Q.   All right.  So going back to the firearm, you and

 9         Agent McCue removed Mr. Simpson from the vehicle.

10         When you first observed the firearm, when you

11         hollered out gun and finished removing Mr. Simpson

12         from the vehicle, putting him on the ground, was

13         there any -- was the firearm moved or manipulated or

14         changed in any way from the time you first saw it

15         until we see this video that Officer Jones took?

16    A.   Not that I'm aware of.

17    Q.   All right.  So would you agree with me that -- do you

18         have any recollection of this cord, the white cord

19         that we see in this photograph?

20    A.   I don't remember that at all, no.

21    Q.   Okay.  And in connection with Government's Exhibit 57

22         then, would you agree with me that, going back to 56,

23         that being the firearm, that being the magazine, that

24         57 is a close-up of those two items?

25    A.   Yes.
```

1    Q.    Okay.  And you mentioned that you observed the

2          firearm when you yelled out gun.  Did you initially

3          make any observations that, in fact, the magazine was

4          in that location?

5    A.    I don't remember seeing the magazine.  I mean, I

6          focused in on the gun.

7    Q.    Okay.

8    A.    And I don't recall if I saw the magazine at the same

9          time.  I mean, it was, like, you know, pretty quick.

10   Q.    I want to make sure this wasn't a situation where the

11         gun was up under the seat and you removed it and put

12         it in a location that we have it photographed in.

13   A.    No, I did not.

14   Q.    All right.  So when you saw the gun, it was in

15         connection with removing Mr. Simpson from the

16         vehicle?

17   A.    Correct.

18   Q.    All right.  Were you also involved, Agent Holder, in

19         the arrest of Shevel Foy?

20   A.    Yes.

21   Q.    And when did that occur?

22   A.    January of '08.

23   Q.    Do you recall what date that was?

24   A.    The 5th.

25   Q.    The 5th of January?

```
 1   A.   I believe.

 2   Q.   All right.  In connection with that activity, what

 3        was your involvement with the arrest of Mr. Foy?

 4   A.   I was part of the surveillance that led -- that

 5        followed him away from an apartment until he

 6        ultimately could be stopped by a marked police unit.

 7   Q.   And what -- if I indicated to you, Agent Holder, that

 8        that would have been January 8, do you have any

 9        dispute with that?

10   A.   No.  I apologize.

11   Q.   All right.  In connection with his arrest, what did

12        you do with regards to Mr. Foy's vehicle?

13             MS. MOREHEAD:  Judge, so I'm not

14        representing things, can I show him his report to see

15        if that refreshes his recollection?

16             THE COURT:  Surely.  Mr. Holder, we're not

17        asking you to read that and regurgitate what's in the

18        report.  We're allowing you to look at that, see if

19        it refreshes your recollection so as to be able to

20        testify what you do recall today.  If it doesn't,

21        just tell us it doesn't.  If it does, then you can

22        answer whatever question Ms. Morehead asks you.

23             THE WITNESS:  Thank you, your Honor.

24   Q.   (By Ms. Morehead) Does that refresh your

25        recollection?
```

```
1    A.    Yes.

2    Q.    What date was that then?

3    A.    January 8, 2008.

4    Q.    We have had testimony -- and before I -- in

5          connection with Mr. Foy then, what vehicle was he

6          driving?

7    A.    Black Tahoe.

8    Q.    Okay.  I want to show you what I've marked as

9          Government's Exhibit 92 and 93 and ask you if you can

10         identify those two items.

11   A.    Yes.  They were located and seized by a task force

12         officer and myself from Mr. Foy's Tahoe.

13              MS. MOREHEAD:  Judge, I would ask for --

14   Q.    (By Ms. Morehead) First of all, what is Government's

15         Exhibit 92?  Tell us what that is.

16   A.    A black plastic gun box that when you buy a pistol

17         that's what they come in.

18   Q.    Okay.  And Government's Exhibit 93?

19   A.    A box of 9-millimeter ammunition.

20   Q.    And do those appear to be in the same condition as

21         when you would have recovered them?

22   A.    Yes.

23              MS. MOREHEAD:  Judge, I would ask for

24         admission of Government's Exhibit 92 and 93.

25              THE COURT:  Any objection?  Hearing none,
```

```
 1          Exhibits 92 and 93 are admitted.

 2                    (Exhibits 92 and 93 were admitted into

 3          evidence.)

 4   Q.   (By Ms. Morehead) With regards to Government's

 5          Exhibit No. 92, what kind of a pistol box is this in?

 6          And I think -- I don't know if this will let me do

 7          this or not.  I'm going to -- what are these markings

 8          on the black gun case, Agent Holder?

 9   A.   They are tracking numbers, serial numbers, and then

10          the model number and caliber.  It's a P-2 111,

11          three-and-a-quarter-inch barrel, 9-millimeter,

12          12-shot.

13   Q.   All right.  Do you know what type of firearm this

14          pistol box --

15   A.   Taurus.

16   Q.   Okay.  And then Government's Exhibit 93, the box of

17          9-millimeter ammunition, it appears on this box that

18          this box of ammunition would hold 50 rounds; is that

19          right?

20   A.   Yes.

21   Q.   And just opening this box, how many rounds of

22          ammunition does this box contain?

23   A.   Thirty rounds.

24   Q.   Would you agree with me that there's 20 rounds

25          missing from the original box?
```

```
 1    A.    Yes.

 2    Q.    Okay.  Now, we have had some testimony from Task

 3          Force Officer Lauren Freeman.  Are you familiar with

 4          him?

 5    A.    Yes.

 6    Q.    And he indicated that, in fact, there was a consent

 7          to search obtained for the Foy apartment at 19400

 8          East 37th Terrace Court, Apartment 1503.

 9    A.    Yes.

10    Q.    Are you familiar with that address?

11    A.    Yes.

12    Q.    And were you involved in going to that location and

13          conducting a search of that residence following the

14          arrest of Shevel Foy?

15    A.    Yes.

16    Q.    And were there a number of items of evidence that you

17          collected at that location?

18    A.    Yes.

19    Q.    I want to first show you what I've marked as

20          Government's Exhibit 89 and 88.

21    A.    Okay.

22    Q.    Do you recognize those two items?

23    A.    Yes.

24    Q.    What are those?  Just tell me what they generally

25          are.
```

```
 1   A.   Receipts.

 2   Q.   Okay.  And did you collect a number of documents in

 3        connection with your search of the Foy residence?

 4   A.   Yes.

 5   Q.   And are those two of the documents that you seized at

 6        that location?

 7   A.   Yes.

 8   Q.   And where did you seize these two receipts?

 9   A.   May I refer to my report?

10   Q.   Yes.  Will that refresh your recollection?

11   A.   Yes.  They were taken out of a leather purse that was

12        found in the master bedroom.

13   Q.   Okay.  And Government's Exhibit No. 90, do you

14        recognize that?

15   A.   Yes.

16   Q.   Where did you -- did you recover that as well?

17   A.   Yes.

18   Q.   Where did you recover that?

19   A.   Also in a tan purse in the master bedroom.

20   Q.   Okay.  And Government's Exhibit No. 91, do you

21        recognize that?

22   A.   Yes.

23   Q.   And what is that?

24   A.   It is a receipt for a Taurus pistol and then a

25        Missouri purchase permit for a pistol.
```

```
 1    Q.   Okay.  Where did you recover those documents at,

 2         Government's Exhibit 91?

 3    A.   They were provided to us by Mrs. Foy when she came

 4         and took custody of the Tahoe.

 5    Q.   Okay.

 6              MS. MOREHEAD:  Judge, I would ask for

 7         admission of Government's Exhibits 88, 89, 90, and

 8         91.

 9              THE COURT:  Is there any objection?

10         Hearing none, Exhibits 88, 89, 90, and 91 are all are

11         admitted.

12              (Exhibits 89 through 91 were admitted into

13         evidence.)

14    Q.   (By Ms. Morehead) I would like to first look at

15         Government's Exhibit No. 88, and you indicated that

16         actually 88 and 89 were receipts; is that right?

17    A.   Yes.

18    Q.   And on the top of both of these receipts do they

19         appear to have the same heading on them?

20    A.   Yes.

21    Q.   What's that?

22    A.   It's in Spanish.

23    Q.   Excellence Punta Cana?

24    A.   Cana.

25    Q.   Okay.  That looks like spa receipts; correct?
```

```
 1   A.   Correct.

 2   Q.   And then if we zoom in a little bit -- I know

 3        Government's Exhibit 89 is a little faded.  Would you

 4        agree with that?

 5   A.   Yes.

 6   Q.   Right here --

 7   A.   Yes.

 8   Q.   -- do you see those markings on there?

 9   A.   Yes.

10   Q.   Does there appear to be a date?

11   A.   Yes.  That's what fecha means in Spanish.

12   Q.   What date do we see here on these two receipts?

13   A.   11/27/2007.

14   Q.   And correct me if I'm wrong, but 11/27/2007, was that

15        the same day that you were involved in the operation

16        of the car wash, arresting the three individuals?

17   A.   Yes.

18   Q.   All right.  Then on the Government's Exhibit 88, what

19        was that for?

20   A.   An excellent massage.

21   Q.   It looks like two massages?

22   A.   Two, two, yes.

23   Q.   With a price associated with it?

24   A.   Yes.

25   Q.   And then 89 was for a --
```

```
 1    A.   Haircut.

 2    Q.   Gentleman's haircut?

 3    A.   Yes.

 4    Q.   Okay.

 5              MS. MOREHEAD:  Judge, if you'll let me go

 6         through these documents, I'll -- can I finish up

 7         before we --

 8              THE COURT:  Yes, that would be --

 9    Q.   (By Ms. Morehead) All right.  Government's

10         Exhibit 90, I'm just looking at the documents you

11         indicated you recovered as well.  What were these

12         documents, Agent Holder?  Bank documents?  Would you

13         agree with that?

14    A.   Yes.  One is, like, an ATF debit receipt, and the

15         other are, like, deposit tickets.

16    Q.   Okay.

17    A.   Payment ticket.

18    Q.   The deposit receipt appears to have a date on it?

19    A.   Yes.

20    Q.   January 3, 2007?

21    A.   Yes.

22    Q.   Showing a balance of over $4,000?

23    A.   Yes.

24    Q.   And then the two deposit receipts, one appears to be

25         from 12/19/2006, and one --
```

1   A.   I think that's, like, an automated payment, $700.

2   Q.   Okay.  And this shows the date of January 7, 2007.

3        What does this show?

4   A.   It's a deposit for 1500.

5   Q.   Okay.  And then Government's Exhibit 91, I believe

6        you indicated, were two documents that Mrs. Foy

7        provided in connection with a firearm; is that

8        correct?

9   A.   Correct.

10  Q.   And what does this document show?

11  A.   That's a receipt for the purchase of the handgun and

12       a box of ammunition.

13  Q.   And what date does that appear to be?

14  A.   Looks like December 21 or 11 of '05.

15  Q.   All right.  And this appears to be from Avenue Pawn &

16       Fine Jewelry?

17  A.   Yes.

18  Q.   Where a 9-millimeter Taurus pistol was purchased with

19       the ammunition for $392?

20  A.   Correct.

21  Q.   And also part of Government's Exhibit 91, you

22       indicated, was a permit to transfer firearm?

23  A.   Correct.

24  Q.   What's the date on that?

25  A.   12/21/2005.

1  Q.   And that's for the same Taurus pistol with regards to

2       Lakecia Foy at an address in Kansas City, Missouri;

3       is that correct?

4  A.   Correct.

5                THE COURT:  All right.  Members of the

6       jury, we will use this opportunity for our lunch

7       recess.  I have to take a little bit longer time than

8       usual.  We will resume about 1:20.  I'll remind you

9       of the admonitions not to discuss the case among

10      yourselves or with anyone else or to do anything

11      which has anything to do with the case.  Don't have

12      any contact with the participants, etc.

13           Ms. Scheurer, please take charge of the jury.

14      Mr. Holder, you may step down.  Participants, if you

15      would remain here, we will visit for a moment.

16                (The following proceedings were had outside

17      the presence of the jury:)

18                THE COURT:  Any preview of coming

19      attractions in terms of what we have?

20                MS. MOREHEAD:  Judge, I have three other

21      law enforcement officers to testify, some additional

22      evidence to introduce in connection with them, and

23      then this afternoon I have the three chemists that

24      did the drug analysis, and tomorrow I anticipated

25      putting on the firearm expert and the DEA expert.  I

1    hope I go until five today, but is that okay if I

2    just have those witnesses available?

3              THE COURT:  Yes.  It is not your present

4    intent to have Mr. McCue testify?

5              MS. MOREHEAD:  He would be one of the

6    three.

7              THE COURT:  He would be one of the three

8    today?

9              MS. MOREHEAD:  I need to put him on before

10   I put the chemists on because he has to introduce

11   some of the drug evidence that hasn't been introduced

12   yet, so Agent McCue would be included in that.

13             THE COURT:  That was my -- if you had

14   somebody available, even if you had to have them

15   wait --

16             MS. MOREHEAD:  Yeah.  That included Agent

17   McCue.

18             THE COURT:  We will not hear from any

19   further cooperators; is that correct?  You've given

20   us the full range of what's left?

21             MS. MOREHEAD:  Yes, Judge, I have.

22             THE COURT:  Sounds good.  All right.  We're

23   in recess.  Pardon me.  Anything else from the

24   defense side of the room?  Hearing nothing, in that

25   case we're in recess until 1:20.

```
 1                    (The luncheon recess was taken.)

 2                    THE COURT:  Anything we need to do before

 3         we start?  All right then.  Let's bring in the jury.

 4                    (The following proceedings were had in the

 5         presence of the jury:)

 6                    THE COURT:  Ms. Morehead, you may resume

 7         your examination.

 8                    MS. MOREHEAD:  Thank you, your Honor.

 9    Q.   (By Ms. Morehead) Agent Holder, I would like to hand

10         you now Government's Exhibits 94 and 95 and ask you

11         if you recognize those.

12    A.   Can I open it?

13    Q.   Yes.  Do you recognize Government's Exhibit 94 and

14         95?

15    A.   Yes.

16    Q.   Tell us what Government's Exhibit 94 is.

17    A.   A Taurus 9-millimeter handgun, and 95 is Brown's

18         9-millimeter ammunition.

19    Q.   In connection with Government's Exhibit 94 and 95,

20         where were they recovered?

21    A.   At the apartment that Mr. Foy left prior to his

22         arrest.

23    Q.   Where were they located?

24    A.   In a purse in the closet of the master bedroom.

25    Q.   Do those items appear to be the same items that you
```

```
 1        would have recovered on January 8 of 2008?
 2    A.   Yes.
 3                 MS. MOREHEAD:  Judge, I would ask for
 4         admission of Government's Exhibit 94 and 95.
 5                 THE COURT:  Any objection?  Hearing none,
 6         Exhibits 94 and 95 are admitted.
 7                 (Exhibits 94 and 95 were admitted into
 8         evidence.)
 9    Q.   (By Ms. Morehead) Government's Exhibit 95, did you
10         indicate that those were rounds of ammunition?
11    A.   Yes.
12    Q.   And what kind of ammunition was that?
13    A.   9-millimeter.
14    Q.   And how many rounds were there?
15    A.   Ten.
16    Q.   And that ammunition, was it actually in the firearm
17         when the firearm was recovered?
18    A.   Yes.
19    Q.   And in connection with Government's Exhibit 94, you
20         indicated that that was a 9-millimeter Taurus pistol;
21         is that right?
22    A.   Yes.
23    Q.   And in connection that Taurus pistol, is there a
24         serial number associated with that pistol?
25    A.   Yes.
```

```
 1   Q.   What is that?

 2   A.   I'm trying to locate it.  Oh, it's here on the back.

 3   Q.   Okay.  Let me -- I'll -- let me help you out.

 4   A.   That's what it looked like to me.

 5   Q.   I'll quit jiggling here in a minute.  Go ahead.  Can

 6        you just say that for the record.

 7   A.   Tom Young David 79015.

 8   Q.   And the Tom Young David, those are --

 9   A.   Alpha code for TYD.

10   Q.   Okay.  Then I want to go back to Government's

11        Exhibit 92, which you previously identified was the

12        gun box that was in the vehicle driven by Mr. Foy.

13        Do you remember that testimony?

14   A.   Yes.

15   Q.   And we talked before about a label that was on the

16        gun box.  What number is on this gun box?

17   A.   TYD79015.

18   Q.   Okay.  And, again, does that appear to match the

19        firearm that you recovered back at the Foy residence?

20   A.   Yes.

21   Q.   Okay.  With regards to the ten rounds of ammunition

22        that were inside Government's Exhibit 94,

23        Government's Exhibit 95, tell us about those rounds

24        of ammunition.

25   A.   Live 9-millimeter ammunition.
```

1    Q.   And are you able to see the head stamp on those?

2    A.   Yes, I am.

3    Q.   Okay.  Are they all the same, first of all?

4    A.   They all appear to be, yes.

5    Q.   Can you tell us what head stamp you see on those

6         rounds of ammunition.

7    A.   Well, it's 9-millimeter Luger, which is the caliber,

8         and then there's, like, a star with an I or a one and

9         then a star on all of them.

10   Q.   All right.  And, again, those rounds of ammunition

11        were the rounds of ammunition that were on the

12        firearm at the Foy residence; correct?

13   A.   Yes.

14   Q.   Now, on the monitor I just put up the box of

15        ammunition, Government's Exhibit 93, which you

16        previously identified as being in a vehicle in which

17        Shevel Foy was in.  Do you remember that?

18   A.   Yes.

19   Q.   Us introducing that box?

20   A.   Yes.

21   Q.   That partial box of ammunition?

22   A.   Yes.

23   Q.   And in connection with this partial box of

24        ammunition, I now have displayed to the jury the head

25        stamp of the rounds of ammunition that are remaining

1        in that box.  Do those appear to be the same type of

2        caliber and make as the ammunition that you found in

3        the gun at the Foy residence?

4    A.  Yes.

5    Q.  In connection also with this investigation, were you

6        involved in arresting individuals on February 5 of

7        2008?

8    A.  Yes, I was.

9    Q.  And did that include the arrest of Billy Trinkle?

10   A.  Yes.

11   Q.  And in connection with Billy Trinkle, where did you

12       arrest Billy Trinkle at?

13   A.  At his residence in Leavenworth, Kansas.

14   Q.  And was there a search of his residence as well?

15   A.  Yes.

16   Q.  And in connection with Billy Trinkle, following his

17       arrest, did you have occasion to Mirandize him?

18   A.  Yes.

19   Q.  What did that consist of?

20   A.  I read him his Miranda warnings that are printed out

21       on a little yellow card that we're issued.

22   Q.  And after you advised Billy Trinkle of his Miranda

23       rights, after he was arrested, was he, in fact,

24       transported to the National Guard Armory at 18th

25       and --

1    A.    Ridge.

2    Q.    -- Ridge in Kansas City, Kansas?

3    A.    Yes.

4    Q.    And at that location did he, in fact, speak to you

5          and Officer Jones in connection with questions that

6          were asked of him?

7    A.    Yes.

8                    MS. MOREHEAD:  Nothing else, your Honor.

9                    THE COURT:  Any cross examination?  Mr.

10         Rogers?

11                        CROSS EXAMINATION

12   BY MR. ROGERS:

13   Q.    I believe you told us this morning, Mr. Holder, that

14         you became involved in this investigation at the very

15         end shortly before the incidents of November 27; is

16         that correct?

17   A.    Correct.

18   Q.    And on November 27 you were involved in the rolling

19         surveillance -- is that the term?

20   A.    Yes.

21   Q.    -- of the Land Rover, correct, or Ranger Rover?

22   A.    Yes.

23   Q.    And that was a black vehicle that you ultimately

24         learned was being driven by Rtayvian Simpson with

25         Monterial Wesley in the passenger's seat?

2082

1   A.   Yes.

2   Q.   Okay.  And I believe you first came into contact with

3        that vehicle at the Bank Community America.  Is that

4        the bank?

5   A.   I believe I picked up on the surveillance after they

6        had already left the bank.

7   Q.   Okay.  And that was someplace north of the Missouri

8        river but in Kansas City, Missouri?

9   A.   Yes.  It was off Oak Trafficway, I believe.

10  Q.   North Oak Trafficway?

11  A.   Yes.

12  Q.   And you're not that familiar with the streets in

13       Missouri, but that's, in fact, a major thoroughfare

14       in Kansas City North, isn't it?

15  A.   Yes.

16  Q.   Let me show you what's in evidence as Exhibit 707 and

17       ask you if that fairly and accurately details the

18       relative locations of the incidents that you observed

19       during your surveillance activities on November 27.

20  A.   Yes.

21  Q.   Okay.  And so North Oak Trafficway would be this

22       surface street right there that goes parallel to

23       Highway 169; correct?

24  A.   Yes, sir.

25  Q.   And you followed them down North Oak Trafficway to

1         downtown Kansas City?

2    A.   I don't know which route they took, but I remember

3         going to the downtown area, yes.

4    Q.   And they were looking at apartments or condominiums

5         in a high rise building at one point; is that

6         correct?

7    A.   That's what I remember, yeah.

8    Q.   And you saw that building?

9    A.   I'm pretty sure I did, yeah.

10   Q.   And it's an unusual-looking building because one

11        corner of it is sort of absent at the bottom; there's

12        a big pillar that supports it; right?

13   A.   I don't remember that.  I'm sorry.

14   Q.   Would you recognize the approximate address of that,

15        approximately, if I told you it was at 11th and

16        Walnut in downtown Kansas City?

17   A.   I thought it was a little further north than that,

18        but if that's the address, that's the address.

19   Q.   Is there, in fact, a building at 11th and Walnut

20        named Wallstreet Tower?

21   A.   I don't know.

22   Q.   All right.  After the arrest at the car wash, arrests

23        at the car wash, did you have occasion to look at

24        some material which was seized from the Land Rover?

25   A.   I don't think I looked at anything that was taken

```
 1            from the Land Rover, no.

 2    Q.   Okay.  Other than the gun and the I-Pod that you've

 3         talked about -- I guess the I-Pod was picked up off

 4         the ground; right?

 5    A.   Correct.

 6    Q.   So you never looked at a notebook that -- pages of

 7         which have been introduced as Exhibit 728A?

 8    A.   No.  I can't say that I recognize that at all.

 9    Q.   Okay.  But do you see the word Wallstreet down here?

10              MS. MOREHEAD:  Judge, at this point in time

11         I'm going to object.  It's cumulative, and this

12         witness has no knowledge about this.

13              THE COURT:  Sustained.

14              MR. ROGERS:  Okay.

15    Q.   (By Mr. Rogers) Let me ask you this.  As that vehicle

16         left the downtown area and ended up in the barbershop

17         area down here in the vicinity of 55th and Prospect,

18         you were part of the surveillance that followed them

19         there; correct?

20    A.   Correct.

21    Q.   And were you following them when they went through a

22         park in the vicinity of 27th and Brooklyn where there

23         was some law enforcement activity going on?

24    A.   I don't recall them going to a park.

25    Q.   Going through a park, driving through?
```

```
1    A.   No, I don't recall that.

2    Q.   Do you recall some radio traffic about a telephone

3         call describing the law enforcement activity going on

4         at the park?

5    A.   I'm going to -- no, I don't remember that.  I

6         apologize.

7    Q.   All right.  Do you know where the address of 2724

8         Wabash is in Kansas City, Missouri?

9    A.   It's near east Kansas City, Missouri.

10   Q.   Okay.

11   A.   I think just right off 71.

12   Q.   All right.  And near Highway 71?

13   A.   Yeah.

14   Q.   And, in fact, Wabash is about a block or two from

15        Prospect Avenue; is that correct?

16   A.   Yeah, because Prospect is one east of 71, so that's

17        probably just about right.

18   Q.   Okay.  And Brooklyn is a little bit west of Wabash,

19        five or six blocks?

20   A.   I was going to say east, but if it's west, it's west.

21             MS. MOREHEAD:  Judge, I'm going to object

22        to the form of the questions by Mr. Rogers.  He can

23        ask the witness, but Mr. Rogers can't be offering

24        testimony.

25             THE COURT:  He can ask leading questions.
```

1          The form of his question is all right.  The witness

2     is free to say yes or no or I don't know.

3               MS. MOREHEAD:  That's fine, Judge.

4               THE COURT:  I've instructed the members of

5     the jury previously, and I will again, that lawyers'

6     questions are not evidence, they are questions.  The

7     evidence is what the witness says, whether that comes

8     from the prosecutor or from the defendants.

9  Q.  (By Mr. Rogers) And you've only been in Kansas City

10     three years or so; right?

11  A.  I have been assigned here three years.  I have been

12     gone a lot.

13  Q.  So you certainly weren't in Kansas City when the

14     baseball stadium used to be at 23rd and Brooklyn?

15  A.  No.  Was I alive?

16  Q.  I hope so because I was --

17               THE COURT:  Mr. Holder, wait a minute.

18     Wait a minute.  Now this does turn things around.

19     Mr. Rogers asks the questions; you answer.  Okay.

20               MR. ROGERS:  May I strike my nonresponsive

21     answer, Judge?

22               THE COURT:  Yep.  Move on.

23  Q.  (By Mr. Rogers) Have you ever eaten at Bryant's

24     Barbecue?

25  A.  No.

```
 1    Q.    Okay.  Fair enough.  Let's go then to the car wash.

 2          You and Mr. McCue were in different vehicles;

 3          correct?

 4    A.    Yes.

 5    Q.    And were you by yourself in the vehicle you were

 6          driving?

 7    A.    Yes.

 8    Q.    And was McCue by himself in the one he was driving?

 9    A.    Yes.

10    Q.    And you both pulled up behind the Ranger Rover?

11    A.    Initially, yes.

12    Q.    And Mr. McCue was ahead of you?

13    A.    Yes.

14    Q.    Did you notice his vehicle strike the rear of the

15          Ranger Rover?

16    A.    No.

17    Q.    Did you hear him later make a comment about that?

18                MS. MOREHEAD:  Judge, I'm going to object.

19          That would be hearsay.

20                THE COURT:  Not as so far phrased.

21          Overruled.

22    A.    Yes.  We discussed it after the incident, yes.

23    Q.    (By Mr. Rogers) Okay.  And at the time that you and

24          Mr. McCue pulled up, you both got out of your

25          vehicles?
```

2088

```
 1    A.   Yes.

 2    Q.   And your mission, or your part of your mission, your

 3         task, was to effectuate the arrest of the driver of

 4         the Ranger Rover?

 5    A.   Yes.

 6    Q.   Turned out to be Mr. Simpson; right?

 7    A.   Yes.

 8    Q.   Now, you were behind and to the right of Mr. McCue as

 9         he approached the driver's side door of the Ranger

10         Rover; correct?

11    A.   Yes.

12    Q.   And your function was to protect him?

13    A.   Yes.

14    Q.   And so you were watching the driver?

15    A.   The driver's door and window, yes, the driver

16         compartment.

17    Q.   And the driver's window was up, wasn't it?

18    A.   I don't remember.

19    Q.   Okay.  Do you remember hearing music from the

20         vehicle?

21    A.   No.  I can't recall whether there was music or not.

22    Q.   Okay.  And the driver's door was closed?

23    A.   Yes.

24    Q.   And you heard Mr. McCue shout at the driver, get your

25         hands up, get your hands up where I can see them, or
```

1           words to that effect, didn't you?

2    A.    First identifying us as police officers, yes.

3    Q.    Police officers, get your hands up?

4    A.    Right.

5    Q.    All kind of as quickly as it could be said in a

6          forceful command voice; right?

7    A.    Yes.

8    Q.    And you were saying much the same thing?

9    A.    Yes.

10   Q.    And, in fact, the driver put his hands up at the top

11         of the steering wheel where they were visible, didn't

12         he?

13   A.    Not to me.  I think I testified I couldn't see the

14         driver.

15   Q.    Okay.  So all you can see is the side of the door?

16   A.    Right.

17   Q.    But you could not see the driver?

18   A.    Huh-uh.

19   Q.    Then the next command shouted was, get out, get out

20         of the car; correct?

21   A.    Yes.

22   Q.    How can the driver get out of the car without moving

23         his hand down to open the door?

24   A.    That command was given as the door was being opened

25         for him.  I think that's what I testified.  Agent

```
1          McCue opened the door.

2    Q.    McCue is opening the door and shouting, get out of

3          the car?

4    A.    Yes.

5    Q.    And the driver is there with his hands on the top of

6          the -- well, you can't see where his hands are?

7    A.    Right.

8    Q.    And that's the time in which McCue then grabs the

9          driver and you assist McCue in grabbing the driver

10         and pulling him out of the car and throwing him on

11         the ground?

12   A.    I don't think I used the words throw on the ground,

13         and the command was given to him, get out of the car,

14         more than once.  That's why we reached in and took

15         hold of Mr. Simpson, because he wasn't getting out.

16   Q.    But he was making no effort to do anything with his

17         hands when you saw him, was he?

18   A.    I didn't see his hands.

19   Q.    Okay.  And you didn't know then how old he was?

20   A.    Oh, no.

21   Q.    But you later learned he was 18 years old?

22   A.    I thought he was older, but if that's the age he was,

23         that's the age he was.

24   Q.    Okay.  Well, you talked to him later that day?

25   A.    Yes.
```

1    Q.   And he told you how old he was?

2    A.   I assume so.  I had to fill out an arrest sheet,

3         so -- it's just a long time ago.  I just -- I didn't

4         think he was that young.

5    Q.   Now, you did not see Mr. Simpson do anything with

6         regard to the pistol that ended up on the doorsill of

7         the Ranger Rover; correct?

8    A.   No.

9    Q.   And this pistol did not fall down there while he was

10        being removed, did it?

11   A.   The first time I noticed the gun is when it was on

12        the floor and we were taking him out of the car.

13   Q.   It's on the floor when you're taking him out of the

14        car?

15   A.   Uh-huh.

16   Q.   When you first saw Mr. Simpson's arms, hands,

17        shoulders, he wasn't doing anything below the window

18        line of the car, was he?

19   A.   When I first contacted him?

20   Q.   When you first --

21   A.   When I first -- no, huh-huh.

22   Q.   He had his hands still up by the steering wheel and

23        was being grabbed by McCue and you --

24             MS. MOREHEAD:  Judge, I'm going to object.

25        This witness has twice indicated he did not see his

1    hands.  He is putting facts not in evidence by saying

2    his hands were on the steering wheel.  That's not

3    been testified to.

4              MR. ROGERS:  I thought I prefaced this

5    with, when you first saw his hands.

6              THE COURT:  Why don't you restate your

7    question so it's clear to the witness what you're

8    asking.

9              MR. ROGERS:  Okay.

10             THE COURT:  Mr. Rogers isn't stating facts;

11   he's asking you a question.

12             MR. ROGERS:  A leading question, I hope.

13             THE COURT:  He can lead you.  If you agree,

14   fine; if you don't, tell him.

15   Q.  (By Mr. Rogers) When you first saw Mr. Simpson's

16   hands, they were still on the top of the steering

17   wheel, weren't they?

18   A.  I don't know if they were on the steering wheel.

19   They were up.  I'll say that.  I don't know if he had

20   ahold of the steering wheel or --

21   Q.  I'll take it.  Calling your attention to Government's

22   Exhibit 328, I believe you said that you did not

23   notice the white power cord?

24   A.  Correct.

25   Q.  And I am also assuming that, if you didn't notice

1          that, you didn't notice this smaller black electrical

2          cord.

3     A.   If that's a cord, I didn't notice those two things.

4          I don't know what that other one is.

5     Q.   And so they were not in this position when you first

6          saw the gun?

7     A.   No, I didn't say that.

8     Q.   You did not say -- they could have been in that

9          position?

10    A.   They could have been.  I don't recall seeing them on

11         top of the gun.  They are not going to hurt me; the

12         gun is; so I noticed the gun.

13    Q.   Okay.  So they may have been on top of the gun while

14         Mr. Simpson is sitting there with his hands up

15         wherever they are?

16    A.   Correct.

17    Q.   Okay.  And you didn't notice the magazine -- I don't

18         know where that picture went, but I don't need to

19         show it again.  You know the magazine I'm talking

20         about that was up kind of under the brake pedal?

21    A.   Yes.

22    Q.   You didn't notice it until later?

23    A.   Correct.

24    Q.   And after Mr. Simpson was out of the car and put down

25         on the ground, he asked you to pick up his I-Pod,

```
 1        which had ended up on the wet pavement of the parking
 2        lot of the car wash; right?
 3   A.   Correct.
 4   Q.   And you did that and put it up on the seat where it
 5        shows up in the picture?
 6   A.   Right.
 7   Q.   Now, you told us you later spoke with Mr. Simpson.
 8        I'm not asking you what he told you or what you asked
 9        him, but after speaking with Mr. Simpson, did you
10        verify that there was, in fact, a carpet cleaning
11        machine in the Land Rover?
12   A.   No.  I knew the carpet cleaner was in there prior to
13        speaking to Mr. Simpson.
14   Q.   So you didn't have to verify it?
15   A.   Correct.
16   Q.   Okay.  And after speaking to Mr. Simpson, did you
17        verify that a --
18              MS. MOREHEAD:  Judge, could we approach,
19        please?
20              THE COURT:  Yes, you may.
21              (Counsel approached the bench and the
22        following proceedings were had:)
23              MS. MOREHEAD:  I'm going to object to the
24        form of these questions.  He's asking if after
25        talking with Mr. Simpson if information was verified,
```

```
 1        so indirectly, without asking what Mr. Simpson said,

 2        he is, in fact, violating 801(d)(2), which we are

 3        not -- we did not offer any statements by

 4        Mr. Simpson, and they would constitute hearsay, so I

 5        would object.

 6                  THE COURT:  I think the form of the

 7        question may be problematic in that respect.  This

 8        last time, of course, it didn't matter because he

 9        said he saw it without even talking to Mr. Simpson,

10        but --

11                  MR. ROGERS:  I don't think it's -- let me

12        put it this way, Judge.  When they do it to me, it's

13        never hearsay.

14                  THE COURT:  Usually it's offered against

15        your client and it's an admission.

16                  MR. ROGERS:  No, statements of other --

17                  THE COURT:  But you would be entitled to

18        ask him, I think, did you talk to Mr. Simpson?  Yes.

19        After you talked to Mr. Simpson, did you look in the

20        back of the truck?  Yes.  But when you say, did you

21        look in the back of the truck and verify what

22        Mr. Simpson told you --

23                  MR. ROGERS:  I'll rephrase it.

24                  THE COURT:  That's what I said.  It's the

25        form of the question that is problematic.
```

1            MR. ROGERS:  I have never been a

2        prosecutor.  I don't know how to ask prosecutor

3        questions.

4            THE COURT:  Okay.

5            (The proceedings returned to open court.)

6   Q.  (By Mr. Rogers) Did you go to the car repair shop at

7        5400 or fifty-four something Prospect to look for a

8        vehicle which was being repaired there after you

9        talked with Mr. Simpson?

10  A.  Did I?  No.

11  Q.  Did anyone else do so at your request or acting on

12       information provided by you?

13  A.  I don't know if they did or not.

14            MR. ROGERS:  Those are all the questions I

15       have, your Honor.

16            THE COURT:  All right.  Mr. Sandage?

17            MR. SANDAGE:  Thank you, your Honor.

18                      CROSS EXAMINATION

19  BY MR. SANDAGE:

20  Q.  Good afternoon, agent.  You did the arrest of Mr. Foy

21       on January 8 of 2008; is that correct?

22  A.  I was present during his arrest, yes.

23  Q.  And was Officer Freeman with you at the time, or Task

24       Force Officer Freeman?

25  A.  He was also there.

1   Q.   Who took custody of Mr. Foy at the arrest?

2   A.   Some uniformed officers.

3   Q.   And then how long after that was it before you and --

4       strike that.  Were you and Task Force Officer Freeman

5       in the same vehicle?

6   A.   No.

7   Q.   Did you arrive at approximately the same time?

8   A.   Yes.

9   Q.   All right.  And he was -- Mr. Foy was already in

10      custody when you arrived then?

11   A.   No.

12   Q.   He was not?

13   A.   We followed him there and maintained surveillance

14      until a marked unit was able to get up there to

15      initiate a traffic stop, so we was all there, but the

16      people who actually put the cuffs on him and arrested

17      him was the Independence Police Department, but we

18      were all there.

19   Q.   At some point did you have any contact with Mr. Foy?

20   A.   Me and another agent drove him to the courthouse

21      after his arrest.

22   Q.   But at the scene -- did Officer Freeman handle the

23      processing at the scene of Mr. Foy?

24   A.   I don't know if he was processed at the scene.

25   Q.   Or asked questions about who he was, identification,

1            things of that nature?

2    A.   I don't know.

3    Q.   All right.  There was no weapon found in the vehicle

4         that Mr. Foy was driving; is that correct?

5    A.   That is correct.

6    Q.   I think you testified on direct examination that

7         there was the gun case; correct?

8    A.   Correct.

9    Q.   And some ammunition; correct?

10   A.   Correct.

11   Q.   And he was driving a Tahoe that morning?

12   A.   That is correct.

13   Q.   Do you know who owned that Tahoe?

14   A.   No, I do not.

15   Q.   Do you know a car that Mr. Foy generally drove?

16   A.   A red pickup.

17   Q.   So on that day he was driving a different vehicle?

18   A.   Yes.

19   Q.   I believe you testified on direct examination at some

20        point his wife, Lakecia Foy, came to pick up that

21        vehicle?

22   A.   Yes.

23   Q.   And at that time she gave you some documentation

24        regarding a weapon that was recovered back at the

25        apartment; is that correct?

```
 1   A.   Correct.

 2   Q.   And so you had already recovered that weapon at the

 3        time that she gave you those documents?

 4   A.   No.  She gave them to us prior to us going to the

 5        apartment and doing our search.

 6   Q.   And do you know -- let me show you what's previously

 7        been marked as Government's Exhibit 91.  That's one

 8        of the documents you testified about on direct

 9        examination; correct?

10   A.   Yes.

11   Q.   And that's one of the documents that Ms. Foy produced

12        to you when she came to pick up the Tahoe; is that

13        correct?

14   A.   She gave them to another TFO while I was there.

15   Q.   But you're familiar with the document so much so

16        you're able to testify about it on direct

17        examination; right?

18   A.   Yes.

19   Q.   And the name of the permit to transfer -- it's a

20        permit to transfer, transfer a firearm; is that

21        correct?

22   A.   Correct.

23   Q.   And what is that document?  For the jury's

24        clarification, what's that document used for?

25   A.   To purchase a handgun in the state of Missouri.
```

1   Q.   All right.  So someone has to go to the law

2        enforcement agency to obtain that document?

3   A.   You have to get this document from the sheriff of the

4        county that you reside -- you used to.  You don't

5        have to any more.

6   Q.   Okay.  Are you familiar then in 2005 what the

7        policies and procedures were?

8   A.   I wasn't here then, but I assume, since she got this,

9        that the policy in '05 was you had to have one of

10       these.

11  Q.   And she would have had to have gone personally to get

12       that document; correct?

13  A.   Correct.

14  Q.   And she would have had to have provided some sort of

15       identification?

16  A.   Yes.

17            THE COURT:  It sounds like your microphone

18       is not working there.  You got it.  There we go.

19            THE WITNESS:  My bad.  Sorry.  I apologize.

20  Q.   (By Mr. Rogers) So she would have had to provide some

21       sort of information to obtain that registration;

22       correct?

23  A.   Correct.

24  Q.   And if you look under the line that says make, what

25       does it say as far as what type of make?

1    A.    It is a Taurus.

2    Q.    And as far as the serial number, is that serial

3          number the same serial number that Ms. Morehead went

4          over with you on direct examination?

5    A.    Yes.

6    Q.    All right.  So it's the same weapon that was

7          recovered from the Foy residence?

8    A.    Yes.

9    Q.    All right.  And just for clarification, that document

10         has a date of issuance of December 21 of 2005; is

11         that correct?

12   A.    Yes.

13   Q.    In regards to the recovery of that weapon, you

14         testified that that weapon was recovered in a purse

15         in a bedroom closet; is that correct?

16   A.    Correct.

17   Q.    Were there any other identifying information in that

18         purse as to who the purse belonged to?

19   A.    Not that I can recall.

20   Q.    These two exhibits, Government's Exhibits 88 and 89,

21         have previously been admitted, and you looked at

22         those on direct examination.  You remember?

23   A.    Yes.

24   Q.    Ms. Morehead asked you questions regarding that it

25         was a massage and a haircut; is that correct?

```
 1    A.    Yes.

 2    Q.    And the date that those receipts were produced,

 3          according to the document, was November 27 of 2007;

 4          is that correct?

 5    A.    Correct.

 6    Q.    And were you familiar with this investigation before

 7          November 27 of 2007?  I mean, were you working with

 8          Agent McCue and Task Force Officer Jones on this

 9          investigation?

10    A.    Yeah.  I had been helping a little bit.

11    Q.    Did you know that on November 27 of 2007 that Mr. Foy

12          was out of the country?

13    A.    I wasn't aware of that.  If they had told me, I

14          forgot.

15    Q.    And these receipts are in -- seems to purport -- I'm

16          not bilingual, but it looks to be Spanish; is that

17          correct?

18    A.    Look like they are in Spanish to me, yes, sir.

19    Q.    There are some numbers that were printed out on the

20          receipt, and one of the numbers is near the middle of

21          what you're looking at on your monitor.  Is it fair

22          to say the number says 6510.14?

23    A.    Yes.

24    Q.    And then next to it there's some handwritten notes.

25          Do you see those?
```

1  A.  Yes.

2  Q.  What are the letters above it, please?

3  A.  I believe it's USD.

4  Q.  Okay.  I would ask you to look at it again and ask

5      you, does that look like it might say USA?

6  A.  It might, but I assumed it was USD for U.S. dollars.

7  Q.  And then below it is a corresponding number, and

8      what's that number, please?

9  A.  195.50.

10 Q.  And so is it fair to say that that $6,000 -- or the

11     6,000 number might be for a currency other than the

12     United States currency?

13 A.  I would assume it's pesos.  That's an awful expensive

14     massage.

15 Q.  And at all times on the day of the arrest on

16     November 8 of 2008 was Mr. Foy compliant with you?

17 A.  Oh, yes.

18 Q.  And was there any other evidence recovered from the

19     purse that was found in the bedroom?

20 A.  The one that contained the pistol?

21 Q.  Yes.  I'm sorry.

22 A.  I don't believe so.  I would have to look up my

23     report to say for certain, but I don't believe there

24     was.

25              MR. SANDAGE:  Nothing further, your Honor.

```
 1            Thank you.
 2                     THE COURT:  Any other cross examination?
 3        Hearing none, Ms. Morehead, any redirect?
 4                     MS. MOREHEAD:  Nothing based on that, your
 5        Honor.
 6                     THE COURT:  All right then.  Mr. Holder,
 7        you may step down.
 8                     THE WITNESS:  Thank you.
 9                     THE COURT:  The government may call its
10        next witness.
11                     MS. MOREHEAD:  Thank you, your Honor.  I
12        call Gordon Mallory.
13                          GORDON MALLORY,
14    having been duly sworn, was examined and testified as
15    follows:
16                       DIRECT EXAMINATION
17    BY MS. MOREHEAD:
18    Q.   Please tell the jury where you're employed.
19    A.   I'm employed with the Department of Justice, the
20         Bureau of Alcohol, Tobacco, Firearms & Explosives.
21    Q.   What's your job with them?
22    A.   I am a special agent.
23    Q.   And as a special agent with ATF, what are your duties
24         and functions?
25    A.   To investigate firearms crimes, fires, and explosives
```

1              crimes.

2     Q.   And in connection with this particular investigation,

3          Agent Mallory, did you participate, kind of

4          throughout the course of this investigation, dating

5          back to 2007, with various aspects of this

6          investigation?

7     A.   Yes, ma'am.

8     Q.   And specifically with regards to this investigation,

9          were you present on November 27 of 2007 when Thomas

10         Humphrey, Monterial Wesley, and Rtayvian Simpson were

11         arrested at a car wash in Kansas City, Missouri?

12    A.   Yes, ma'am, I was.

13    Q.   And in connection with that incident did you have

14         occasion to, after the scene was processed, take

15         possession of specifically a firearm?

16    A.   Yes, ma'am, I did.

17    Q.   And in connection with that firearm, we have had

18         testimony of the firearm and magazine being located

19         in the vehicle driven by Rtayvian Simpson in which

20         Mr. Wesley was a passenger, Government's Exhibit 57.

21         Do you recall the firearm being found in this

22         particular location?

23    A.   I believe it was, yes, when I recovered it or shortly

24         thereafter.

25    Q.   Okay.  And in connection with that, when this

1    particular firearm was seized on November 27, 2007,

2    was there -- was proper technique utilized in order

3    to take custody of that firearm?

4  A.  If I would have taken custody of it, yeah.  I use

5    rubber clothes.  I put it probably in a DEA bag, and

6    once I got to the office, I transferred it to a box

7    from ATF.

8  Q.  All right.  And one reason that you want to handle a

9    firearm such as this found at a crime scene, handle

10    it in that fashion, with gloves and that, why are you

11    doing that?

12  A.  To maintain any DNA evidence that's remaining on the

13    firearm.

14  Q.  Okay.  And Government's Exhibit No. 60 -- and I know

15    inside there's the magazine and the ammunition, 61A,

16    but with regards to Government Exhibit No. 60, once

17    you took possession of it, did you maintain

18    preservation of it in order to maintain any DNA

19    evidence?

20  A.  Yes, ma'am.  I would have put it in the box the way

21    that they have instructed us -- the plastic bag

22    degrades the DNA -- and to not keep it in there, to

23    keep it in a box.

24  Q.  All right.  Did it stay in your custody then until it

25    was transferred to a laboratory?

1    A.   Yes, ma'am.

2    Q.   And are you the one that actually transferred it to

3         the laboratory?

4    A.   Yes, ma'am.

5    Q.   And what laboratory did you transfer it to?

6    A.   I believe I took it to the Johnson County Crime Lab.

7    Q.   Okay.  Now, I also want to show you two other

8         objects, Government's Exhibit No. 80 and Government's

9         Exhibit No. 81.  Do you recognize those two items?

10   A.   Yes, ma'am.

11   Q.   Tell us, first of all, what Government's Exhibit

12        No. 80 is.

13   A.   Government's Exhibit 80 is biological DNA, known

14        samples, two oral swabs taken from Rtayvian Simpson

15        per federal search warrant.

16   Q.   What about Government's Exhibit No. 81?

17   A.   Known samples, two oral swabs taken from Monterial

18        Wesley per the federal search warrant.

19   Q.   Okay.  And in connection with Government's Exhibit 80

20        and 81, you indicated that you obtained a search

21        warrant in order to obtain these samples; is that

22        right?

23   A.   Yes, ma'am, I did.

24   Q.   And tell the jury, if you would, upon obtaining a

25        search warrant for the purpose of getting DNA from an

```
 1            individual what you would do in order to obtain the

 2            DNA.

 3   A.   You would take -- for an individual you would take

 4            cotton-tipped swabs and swab the individual's mouth

 5            or take blood.  In this instance I took cotton swabs

 6            of the individual's mouth and packaged them.

 7   Q.   And swabbing the mouth, what are you attempting to

 8            obtain?

 9   A.   DNA cells or skin cells inside the mouth.

10   Q.   Okay.  And so by swabbing the inside of the mouth

11            you're obtaining a DNA sample from that individual?

12   A.   Yeah, that's correct.

13   Q.   And in the course of your duties and responsibilities

14            with ATF is that one of the things you do in order to

15            have laboratory testing done in connection with

16            specifically firearms that might be seized?

17   A.   The laboratories request a known sample of who you

18            believe to have held the firearm.

19   Q.   With regards to Government's Exhibits 80 and 81, 80

20            being Rtayvian Simpson and 81 being Monterial Wesley,

21            once you obtained then from each of those individuals

22            the swabs from their mouth, what did you do with

23            regards to those respective swabs?

24   A.   I would have let them air dry for a moment, and then

25            I would have placed them in the envelope once they
```

1          were at least relatively dry and then sealed it.

2     Q.   And for the record Government's Exhibit 80 is an

3          envelope, kind of a small Manila envelope, same with

4          81?

5     A.   That's correct.

6     Q.   Is that right?  And so you packaged those separately?

7     A.   Yes.

8     Q.   Did you collect these DNA samples, obviously, at

9          different times, one from Mr. Simpson, one from Mr.

10         Wesley?

11    A.   That's correct, uh-huh.

12    Q.   Yes?

13    A.   Yes, ma'am.

14    Q.   And then once you collected those, did you, in fact,

15         seal the samples in the respective envelopes?

16    A.   That's correct.

17              MS. MOREHEAD:  Judge, I would ask for

18         admission of Government's Exhibits 80 and 81.

19              THE COURT:  Is there any objection?

20         Hearing none, Exhibits 80 and 81 are admitted.

21              (Exhibits 80 and 81 were admitted into

22         evidence.)

23    Q.   (By Ms. Morehead) Once you collected those DNA

24         samples, what did you do with regards to them in

25         connection with this case, Agent Mallory?

1    A.    I submitted those samples as known samples with the

2          firearm to Johnson County lab at the same time.

3    Q.    With the firearm are you talking about with regards

4          to the firearm that was seized in connection with the

5          car wash?

6    A.    Yes, ma'am.

7    Q.    And, again, that would be Government Exhibit No. 60?

8    A.    Yes, ma'am.

9    Q.    Okay.

10                  MS. MOREHEAD:  Judge, that's all I have of

11         this witness.

12                  THE COURT:  All right.  Cross examination?

13         Mr. Rogers?

14                  MR. ROGERS:  Thank you.

15                       CROSS EXAMINATION

16   BY MR. ROGERS:

17   Q.    Sir, did you conduct any examination or testing of

18         the firearm, Exhibit 60?

19   A.    No, I don't believe so.

20   Q.    So you don't know what it takes to extract the

21         magazine from the gun?

22   A.    Extract the magazine?

23   Q.    Yes.

24   A.    Yes, I know how to extract a magazine from a firearm.

25   Q.    From that particular firearm?

1    A.   That I don't recall, no.  I don't believe I extracted

2         the magazine.

3    Q.   Do you know what it takes to do it?

4    A.   Yes.

5    Q.   What does it take?

6    A.   It takes to press the magazine release button on the

7         firearm, and it has to be extracted.

8    Q.   Does it just fall out, or do you have to pull it out,

9         or --

10   A.   Depends on the firearm.

11   Q.   And you don't know with regard to that?

12   A.   No, sir, I do not.

13   Q.   Was the magazine submitted to the laboratory for DNA

14        analysis?

15   A.   That I can't recall.  I would have to see my

16        paperwork.  The exact instructions is probably what

17        they followed, and if it was in the box, they may

18        have.  Maybe not.

19   Q.   How about the ammunition that was in the magazine?

20   A.   It was not submitted, I don't believe.

21   Q.   Okay.  And before you recovered the gun, it had been

22        cleared?  There was no round in the chamber when you

23        recovered it?

24   A.   When I recovered it, I believe not, no.

25             MR. ROGERS:  Thank you.  That's all.

1           THE COURT:  Any other cross examination?

2      Hearing none, Ms. Morehead, any redirect?

3           MS. MOREHEAD:  No, your Honor.  That's all.

4           THE COURT:  All right.  Mr. Mallory, you

5      may step down.

6           THE WITNESS:  Thank you, your Honor.

7           THE COURT:  The government may call its

8      next witness.

9           MS. MOREHEAD:  I would call Tony Smith,

10     your Honor.

11           ANTHONY EDWARD SMITH,

12     having been duly sworn, was examined and testified as

13     follows:

14                   DIRECT EXAMINATION

15     BY MS. MOREHEAD:

16     Q.   Please tell the jury where you're employed.

17     A.   I am a Belton, Missouri, police officer.  I'm also a

18          task force officer with the Drug Enforcement

19          Administration.

20     Q.   And please relate to the jury your work history

21          relative to being a law enforcement officer.

22     A.   I have been employed by Belton Police Department for

23          approximately eight years.  I was a street officer

24          for a few years and then a narcotics detective for

25          approximately two years before I became a task force

```
 1              officer with the DEA for approximately the last four

 2              years.

 3   Q.   And before being a Belton police officer, did you

 4              have prior law enforcement experience?

 5   A.   No, ma'am.

 6   Q.   Okay.  And over the last four years you have been

 7              assigned as a task force officer then with DEA?

 8   A.   Yes.

 9   Q.   You then would perform many of the same duties and

10              functions that, for instance, Task Force Officer Eric

11              Jones would perform?

12   A.   Yes, that's correct.

13   Q.   Okay.  Now, in connection with this particular

14              investigation, Officer Smith, did you, in fact,

15              become involved in an investigation that Agent McCue

16              and Officer Jones were involved with?

17   A.   Yes.

18   Q.   At what stage did you kind of become involved in this

19              investigation?

20   A.   I had been investigating Thomas Humphrey for

21              narcotics violations, and we ended up finding out

22              that Thomas Humphrey was dealing with individuals

23              that Officer Jones and Agent McCue were

24              investigating.

25   Q.   Okay.  And in connection with this investigation we
```

1        have had testimony that there were several

2        authorizations to conduct wiretaps on cell phones

3        dating back to late July of 2007.  Were you aware

4        that that was going on when that activity commenced?

5   A.   Yes.

6   Q.   At what stage were you -- did you become aware that

7        there might be some involvement by Mr. Humphrey in

8        this investigation by Officer Jones and Agent McCue?

9   A.   I had some phone numbers that were Thomas Humphrey's

10       phone numbers that were being intercepted on pen

11       registers and then on some wiretaps that Officer

12       Jones and Agent McCue were conducting.

13  Q.   And we have had in testimony that pen registers are

14       obtained preliminarily in order to see who is calling

15       who or who might be talking to each other.

16  A.   Correct.

17  Q.   So you had kind of that indication initially that

18       there might be some involvement by Mr. Humphrey?

19  A.   Correct.

20  Q.   And once there were intercepts then on phones that

21       Officer Jones and Agent McCue were involved with, did

22       you become more actively involved in the

23       investigation concerning this case?

24  A.   Specifically as it related to Thomas Humphrey, yes.

25  Q.   And did that include participating in applying for

```
 1         and receiving authorization to intercept what came to

 2         be two different cell phones belonging to Thomas

 3         Humphrey?

 4    A.   Yes.

 5    Q.   And on the board behind you is a list of those

 6         different target phones specifically as it relates to

 7         Mr. Humphrey, Target Phone No. 7 and Target Phone No.

 8         11?

 9    A.   Correct.

10    Q.   Were you the affiant or the person who applied for

11         authorization to intercept those cell phones?

12    A.   Yes.

13    Q.   Then on November 27 of 2007 were you involved in the

14         arrest of Thomas Humphrey and Monterial Wesley and

15         also Rtayvian Simpson at a car wash in Kansas City,

16         Missouri?

17    A.   Yes.

18    Q.   All right.  And once Mr. Humphrey was arrested on

19         November 27 of 2007, were you involved in talking to

20         Mr. Humphrey and, in fact, obtaining consent to

21         search from him?

22    A.   Yes.

23    Q.   I want to hand you what I've marked as Government's

24         Exhibit 146 and ask you if you can identify that.

25    A.   This is consent-to-search form for his residence and
```

```
 1          his business of 816 Audio.
 2    Q.    816 what?
 3    A.    816 Audio was the name of his business, one of the
 4          businesses that he ran.
 5    Q.    All right.  And this is the consent to search that
 6          you did with him on that date; is that right?
 7    A.    Yes.
 8                    MS. MOREHEAD:  Judge, I ask for admission
 9          of Government's Exhibit 146.
10                    THE COURT:  Is there any objection?
11          Hearing none, Exhibit 146 is admitted.
12                    (Exhibit 146 was admitted into evidence.)
13    Q.    (By Ms. Morehead) Looking at Government's
14          Exhibit 146, it's entitled consent to search, and
15          then you indicated that this was for two different
16          businesses or two different locations; is that right?
17    A.    Correct.
18    Q.    One being -- what's this address here in Lee's
19          Summit, Missouri?
20    A.    That was his home address, Humphrey's home address.
21    Q.    And then there is another address added on in
22          handwriting.  What address is that?
23    A.    That was the address of one of the businesses that he
24          owned.
25    Q.    And that's 816 Audio in Kansas City, Missouri?
```

```
 1   A.   Yes, ma'am.

 2   Q.   And then down here we see a date, November 27, 2007.

 3        Whose signature is that?

 4   A.   That's Thomas Humphrey's signature.

 5   Q.   And whose signature is that?

 6   A.   That is my signature.

 7   Q.   Okay.  And once you had obtained consent to search

 8        from Mr. Humphrey, did you, in fact, respond to both

 9        of those locations to conduct a search?

10   A.   Yes, we did.

11   Q.   With regards to 816 Audio was there anything of any

12        sort of evidentiary value that you obtained at that

13        location?

14   A.   At that location there was a lot of paperwork.

15   Q.   Documentation?

16   A.   Documentation taken and things like that, and that

17        was all turned over to the IRS.

18   Q.   Okay.  And once -- in connection with your

19        investigation of Mr. Humphrey, did you learn that he

20        had a lot of assets like properties and businesses

21        and the like?

22   A.   Yes.

23   Q.   And in connection with that then, did you get IRS,

24        the Internal Revenue Service, involved in that aspect

25        of the investigation?
```

1    A.   Yes.

2    Q.   And who specifically was involved with this

3         investigation from the IRS?

4    A.   Agent Jeff Thomas.

5    Q.   In connection with Agent Thomas -- I'll come back to

6         that.  Let's talk about the search then.  Did you, in

7         fact, then search Mr. Humphrey's residence in Lee's

8         Summit, Missouri?

9    A.   Yes.

10   Q.   I want to first show you what's been marked as

11        Government's Exhibit 149.  Do you recognize that?

12   A.   Yes.

13   Q.   What is that?

14   A.   It is a heat sealer for a plastic bags.

15   Q.   And where did you locate this item of evidence?

16   A.   This was located in the basement area of his

17        residence.

18   Q.   And what was in the basement area where you found

19        this?

20   A.   I believe this was in a back room where just some

21        boxes and stuff like that were.  The basement area

22        was comprised of, like, a game room.  He had a pool

23        table down there and stuff like that.

24   Q.   All right.  And with regards to Exhibit 149, does it

25        appear to be the same as when you would have

2119

1    recovered it?

2    A.   Yes.

3              MS. MOREHEAD:  Judge, I would ask for

4         admission of 149.

5              THE COURT:  Is there any objection?  I hear

6         none.  Exhibit 149 is admitted.

7              (Exhibit 149 was admitted into evidence.)

8    Q.   (By Ms. Morehead) What was the reason that you seized

9         Government's Exhibit 149, Officer Smith?

10   A.   I believed that Thomas Humphrey was using this

11        exhibit to seal money that he was paying for cocaine

12        that he received.

13   Q.   All right.  And in connection with your training,

14        knowledge, and experience, are items like these often

15        used in that fashion in connection with drug

16        trafficking?

17   A.   Yes.

18   Q.   Now, I've placed in front of you two exhibits,

19        Exhibit 147 and 148.  Tell the jury what those two

20        items are.

21   A.   These two items are currency counters.  They are

22        money counters.

23   Q.   And where did you recover those two items?

24   A.   Both money counters were sitting side by side on

25        Thomas Humphrey's pool table in the basement area of

1       his residence.

2   Q.  Okay.  And why did you seize Government's Exhibit 147

3       and 148?

4   A.  I believed Thomas Humphrey was using these, both

5       machines, to count his money that he was using to

6       purchase narcotics.

7   Q.  All right.  And 147 and 148, do they appear to be in

8       the same condition as when you recovered them?

9   A.  Yes.

10  Q.  Now, they appear today to be wrapped in plastic and

11      tape and that sort of thing.  When you seized them,

12      were they, in fact, in that condition?

13  A.  They were not wrapped.  They were just in the

14      condition that they are in inside of this wrap now.

15  Q.  All right.

16              MS. MOREHEAD:  Judge, I would ask for

17      admission of 147 and 148.

18              THE COURT:  Is there any objection?

19      Hearing none, the Exhibits 147 and 148 are admitted.

20              (Exhibits 147 and 148 were admitted into

21      evidence.)

22              MS. MOREHEAD:  Judge, we're going to open

23      up one of these so the jury can view one of these.

24              THE COURT:  You may do so.

25  Q.  (By Ms. Morehead) Are they both similar?

```
 1   A.   They both probably are exactly similar except for the
 2        serial numbers.
 3   Q.   Okay.  So we're going to open up 148.  Go ahead.
 4             MS. MOREHEAD:  Can everybody see that?
 5             (Affirmative responses from the jury.)
 6   Q.   (By Ms. Morehead) And some folks may have seen
 7        similar types of money counters at a bank or
 8        something like that where if you had a large amount
 9        of cash this actually counts the bills; is that
10        accurate?
11   A.   Correct.
12   Q.   And it's electronic.  You plug it in, and it function
13        as it functions?
14   A.   Yes.
15   Q.   Okay.  In connection with the search of Thomas
16        Humphrey's residence, did you seize a number of other
17        items?
18   A.   Yes, we did.
19   Q.   And specifically, Officer Smith, did you seize a
20        number of vehicles associated with Thomas Humphrey?
21   A.   Yes.
22   Q.   And what vehicles did you seize in connection with
23        Thomas Humphrey?
24   A.   Do you mind if I refer to a list?
25   Q.   Do you have a list of the items that you seized?
```

```
 1   A.   Yes, I do.

 2   Q.   Is that to refresh your recollection and also to be

 3        accurate about the items that you seized on

 4        November 27 of 2007?

 5   A.   Yes, ma'am.

 6   Q.   Then you can refer to that.

 7   A.   On that date we didn't seize all the vehicles.  You

 8        want me to list all that we seized?

 9   Q.   Yes.  Tell us all that you seized and tell us when

10        you seized those in connection with -- just explain

11        that to the jury, if you would.

12   A.   Okay.  On November 27 from his business we seized a

13        2003 Cadillac Escalade.

14   Q.   What was the relative value of that vehicle?

15   A.   $28,950.

16   Q.   Okay.

17   A.   On the 27th from his residence we seized a 2006

18        Kawasaki Ninja motorcycle valued at $9,120.  From his

19        residence that same day we seized a 2005 Ford F-150

20        valued at $23,450.

21   Q.   Now, we had some testimony about Mr. Humphrey during

22        surveillance being observed in a Ford F-150

23        pickup truck.  Is that, in fact, the same pickup?

24   A.   Yes, ma'am, it is.

25   Q.   And were you involved in surveillance where that
```

| | | |
|---|---|---|
| 1 | | vehicle was observed with regards to Mr. Humphrey |
| 2 | | driving that vehicle? |
| 3 | A. | Yes, I was. |
| 4 | Q. | Okay.  Go ahead. |
| 5 | A. | During the time of his arrest earlier that same day |
| 6 | | we seized the 1996 Chevy Camaro, Super Sport Camaro, |
| 7 | | that he was driving during his arrest.  It was valued |
| 8 | | at $15,200. |
| 9 | Q. | Okay. |
| 10 | A. | Later we seized a 2001 GMC Yukon, and I want to say |
| 11 | | this is a week or two later.  It wasn't at the |
| 12 | | residence.  His girlfriend was driving it at the |
| 13 | | time.  It was valued at $12,750.  And also later we |
| 14 | | seized a 1997 Mercedes Benz valued at $10,375. |
| 15 | Q. | All right. |
| 16 | A. | That's it for the vehicles. |
| 17 | Q. | All right.  And with regards to Mr. Humphrey you said |
| 18 | | a couple of those vehicles were seized later.  And |
| 19 | | was that in connection with his cooperation once he |
| 20 | | got an attorney and began cooperating and turning |
| 21 | | over additional assets from what you seized on |
| 22 | | November 27 of 2007? |
| 23 | A. | Yes, ma'am. |
| 24 | Q. | And in connection with Mr. Humphrey, after he got an |
| 25 | | attorney and began cooperating, did he meet on |

```
 1          numerous occasions with both you and the IRS

 2          specifically about different assets and turning over

 3          and surrendering certain assets?

 4    A.    Yes, ma'am.

 5    Q.    All right.  Going back to November 27, 2007, at

 6          Mr. Humphrey's residence what else did you seize?

 7    A.    We seized two high value jewelry items out of a

 8          dresser drawer, one diamond and gold Watchman's watch

 9          valued at $3,300, and then we took a diamond and gold

10          bracelet -- it was a man's bracelet -- valued at

11          $19,700.

12    Q.    Okay.

13    A.    At the time of Mr. Humphrey's arrest, he had $3,999

14          in his pocket.  We seized that.  And from his

15          residence we seized $144,880 from a Gap shopping bag

16          that was placed on a shelf in his basement.

17              He had told us where the money was when we

18          interviewed him, and he gave his consent at the time.

19          We also took $4,766 cash from his bedroom that had

20          been strewn in different locations, on top of the

21          nightstand, in the top of a dresser drawer.  That

22          money total from his bedroom was $4,766.  The total

23          cash that we took from him was $153,645.  The total

24          jewelry value was $23,000.  The total vehicle value

25          was $99,845.  For a total cash and assets from
```

1           Humphrey of $276,490.

2    Q.    And, again, that doesn't include any other property

3          that IRS would have been involved in seizing?

4    A.    Correct.

5                    MS. MOREHEAD:  Judge, that's all I have of

6          this witness.  Thank you.

7                    THE COURT:  Any cross examination?  Mr.

8          Calbi?

9                    MR. CALBI:  Thank you, your Honor.

10                   CROSS EXAMINATION

11   BY MR. CALBI:

12   Q.    Agent Thomas, we talked about the money --

13                   THE COURT:  Pardon me.

14                   MR. CALBI:  Agent Smith.  I'm sorry.  Thank

15         you.  Learning to read would help.

16   Q.    (By Mr. Calbi) Agent Smith, sorry about that, sir.  I

17         apologize.  The money sealer that you found in

18         Mr. Humphrey's residence, did you do any searches of

19         any other participants' residences in this particular

20         case?

21   A.    No, I did not.

22   Q.    Okay.  But you were familiar with this whole

23         investigation that included some of the other

24         participants in this case, or did you only focus on

25         Mr. Humphrey?

1    A.    I normally focused on Mr. Humphrey.

2    Q.    Do you have any knowledge of whether any money

3          sealers of any kind were located from any other

4          participants in this matter?

5    A.    No, I do not.

6    Q.    If I asked you the same about money counters, are you

7          aware of any other money counters found from any of

8          the other participants in this particular case?

9    A.    I am not.  I know that at one point Humphrey and

10         Monterial Wesley had spoke on the telephone about

11         Wesley obtaining an item that might have been a money

12         counter, but I didn't have any proof of that, no.

13   Q.    Okay.  So you don't know if one was ever recovered or

14         not?

15   A.    No.

16   Q.    Okay.  And I just want to talk to you about the

17         vehicles.  You gave a laundry list of values to these

18         particular vehicles.  Were there any liens against

19         these vehicles?

20   A.    There were liens against two vehicles that did go

21         back to the bank.  I testified to what we seized.

22   Q.    Do you know which vehicles those were that had the

23         liens on them?

24   A.    Yes.  A Cadillac Escalade went back to the bank

25         because the lien was very large, and so was the

1            Kawasaki Ninja.

2    Q.    Let's stay with the Escalade for a moment.  When you

3          say the lien was very large, do you know

4          approximately how large that lien was?

5    A.    I don't have the exact number with me today, no.

6    Q.    Okay.  Would it be -- when you say large, again,

7          that's one of these relative terms to everyone.  Do

8          you believe it was more than $15,000?

9    A.    It was probably around $15,000.

10   Q.    So there might have been a net value -- let me ask

11         you this.  When you come up with 28,950 as the value

12         of the Escalade, does that take into account the

13         approximately $15,000 lien?

14   A.    No.  That's the value of the vehicle.

15   Q.    Okay.  So then there might have been a net on the

16         vehicle, for lack of a better term, of approximately

17         thirteen or fourteen thousand?

18   A.    Yes.

19   Q.    Okay.  And turning your attention to the Kawasaki

20         Ninja, do you have any idea approximately what the

21         lien was on that?

22   A.    I believe he had obtained it a short time before we

23         took it and the lien was almost the entire balance of

24         the bike.

25   Q.    Okay.  So, again, the equity in the Ninja would have

```
 1         been relatively de minimis or close to nothing?
 2    A.   Yes.
 3    Q.   Okay.  And these values that you've listed out, the
 4         28,950 on the Escalade and so on and so forth, where
 5         did these values come from, sir?
 6    A.   The values came from -- what was it called on the
 7         internet? -- the Blue Book, Kelly Blue Book.
 8    Q.   And did you put in -- were you aware of any
 9         particulars that might have been with each of the
10         vehicles?  For instance, perhaps, did you inquire
11         when new tires were perhaps put on the vehicle or
12         maybe a new engine was put in or anything like that
13         that may attribute to the increase or decrease of the
14         value of a vehicle other than just putting in generic
15         information on the internet and coming up with a
16         value?
17    A.   It didn't ask anything specific like tires or
18         anything.  It did ask if they were in good condition,
19         which all of his vehicles were in good condition.
20    Q.   Okay.
21    A.   If, you know, they had a CD player and it would have
22         asked that, and I would put in the appropriate
23         remark.
24    Q.   Right.  But specifically as far as if any work was
25         done to any of the vehicles or anything of that
```

```
 1        nature, you didn't have knowledge of that information

 2        that could have perhaps had some bearing on the value

 3        of the vehicle; correct?

 4   A.   I guess that would be correct, sure.

 5   Q.   And then you testified to the value of Mr. Humphrey's

 6        jewelry.  And how did you arrive at those values,

 7        sir?

 8   A.   We took the jewelry to -- I believe it was Tivol

 9        Jewels was the only jeweler in town that would give

10        us an estimate on these two items, and they did.

11              MR. CALBI:  I don't have anything further,

12        your Honor.

13              THE COURT:  Any other cross examination?

14        Any redirect?

15              MS. MOREHEAD:  No, your Honor.

16              THE COURT:  All right.  Then you may step

17        down.  The government may call its next witness.

18              MS. MOREHEAD:  Judge, can we approach,

19        please?

20              THE COURT:  You may.

21              (Counsel approached the bench and the

22        following proceedings were had:)

23              MS. MOREHEAD:  Judge, my next witness is

24        Agent McCue, and I had a legal issue to take up with

25        regards to his testimony, specifically as it relates
```

```
1         to Billy Trinkle, and so I didn't know if you wanted
2         to take our afternoon break so we could take it up
3         then.  Frankly, I need to take a short recess myself.
4              THE COURT:  Okay.
5              MS. MOREHEAD:  But I did want to bring that
6         up before I offered that testimony.
7              THE COURT:  Okay.  We can do that.
8              MS. MOREHEAD:  And I still have my three
9         chemists here.  As much as we -- I wouldn't expect a
10        lot of cross, but we didn't get a stipulation, so
11        we're going to have them, but we're still fine today.
12             THE COURT:  All right.
13             (The proceedings returned to open court.)
14             THE COURT:  Members of the jury, we're
15        going to take our afternoon recess at this point.
16        I'll remind you of the admonitions.  Ms. Ludwig, I
17        think, is coming around the bend to take charge of
18        you.  We will resume at about five after three with
19        those admonitions in mind.  Members of the jury, you
20        are now in recess.  Participants will remain here,
21        please.
22             (The following proceedings were had outside
23        the presence of the jury:)
24             THE COURT:  Ms. Morehead, you indicated
25        that you had a need for a break, so I don't want to
```

1        keep you too long.

2                    MS. MOREHEAD:  I don't care if we do it on

3        the front end or back end.

4                    THE COURT:  If you would forecast the

5        issue, it would help.

6                    MS. MOREHEAD:  Judge, I want to broach the

7        subject with Agent McCue, questioning him -- we have

8        had testimony about an initial interview that was

9        done with Billy Trinkle with regards to Officer

10       Jones, and Agent Holder was the one that advised him

11       of his rights.  Subsequent to Mr. Trinkle being

12       afforded counsel, he did, in fact, indicate that he

13       wanted to cooperate and be interviewed, and we did

14       interview him pursuant to a proffer agreement, and

15       that particular proffer agreement has various aspects

16       to it.  It's our typical standard proffer agreement,

17       but in that agreement there's a provision in there

18       that talks about how the statements that he makes

19       during the proffer agreement can be used and at

20       what -- in what way it can be used.  And in

21       connection with this case Mr. Bell on numerous

22       occasions has cross examined individuals, offering

23       evidence on behalf of Billy Trinkle in connection

24       with testimony by government witnesses specifically

25       to impeach them about activity that they had directly

1       connected to Mr. Trinkle.

2            For instance, with regards to Franklin Goodwin,

3       Mr. Bell offered or cross examined in connection with

4       a state factual basis in a plea agreement which

5       specifically talked about Mr. Trinkle buying crack

6       cocaine from Mr. Franklin -- Mr. Trinkle buying crack

7       cocaine from Mr. Franklin.  I don't know -- that

8       didn't sound right.

9                THE COURT:  There isn't a Mr. Franklin.

10               MS. MOREHEAD:  I'm sorry.  Mr. Brown.  I'm

11      off.  Let me start over.  I'm all askew.  We should

12      have taken my break first.  No, I'm sorry.

13           In connection with cross examination of Mr.

14      Brown, Mr. Bell asked questions of Mr. Brown about a

15      factual basis in his plea agreement involving Billy

16      Trinkle buying crack cocaine and did so in order to

17      impeach Mr. Brown.  In my opinion that inferred to

18      the jury that Mr. Trinkle did not buy crack cocaine.

19      He also, in cross examining various witnesses,

20      attempted to paint a picture that --

21               THE COURT:  That he did not buy powder

22      cocaine.  Wasn't the statement from the plea

23      agreement that he bought just crack and he had

24      testified it was both crack and powder?

25               MS. MOREHEAD:  Yes, yes.

1            THE COURT:  So the inference would be that

2       he hadn't actually sold powder but just crack.  But

3       the point is he tried to impeach Brown's testimony.

4            MS. MOREHEAD:  Yes.  And as he did with a

5       number of the witnesses.  And in the proffer

6       agreement it specifically indicates that we can use

7       statements that Mr. Trinkle made in connection with a

8       proffer agreement if -- and that can be any

9       information derived either directly or indirectly

10      from his statement to rebut any evidence offered by

11      or on behalf of Billy Trinkle in any proceeding

12      against him.  And in connection with that I believe

13      Mr. Bell has in essence opened the door for the

14      content of the proffer agreement inasmuch as it

15      refutes the picture that he has attempted to paint

16      for the jury by cross examining these various

17      witnesses, that it would serve to impeach that

18      evidence that --

19            THE COURT:  Do you have a copy of the

20      proffer agreement?

21            MS. MOREHEAD:  I have a copy.  This is not

22      the signed one.  I have a signed one, but this is the

23      content of the proffer, and that's really what I

24      wanted to discuss.

25            THE COURT:  Sure.

 1              MS. MOREHEAD:  So if you want to --

 2              THE COURT:  I'll take a look at this.

 3         Mr. Bell, do you oppose the government's

 4    request?

 5              MR. BELL:  I do, Judge.  I'll just say, you

 6    know, obviously, the Tenth Circuit has said that the

 7    government has enormous power in these proffer

 8    interviews.  That's why they are protected and only

 9    used for direct impeachment evidence.  If Mr. Trinkle

10    was going to take the stand, certainly they could use

11    the proffer against him if he made contradictory

12    statements, but just because I happened to cross

13    examine some witnesses about their prior inconsistent

14    statement doesn't open the door for them to try to

15    back door some sort of impeachment evidence in.

16              THE COURT:  Ms. Morehead, do you have any

17    legal authority that would support your position?

18              MS. MOREHEAD:  No, Judge.  I'm looking at

19    the four corners of the proffer agreement, and

20    specifically, as you can see on page 2, I highlighted

21    that portion that I believe specifically discusses

22    how I think we can -- I agree there is the provision

23    in there that if the defendant testifies we can cross

24    examine him about that, but there's another provision

25    in that proffer agreement too which I believe

```
 1          specifically --
 2                    THE COURT:  The only evidence that Mr. Bell
 3          could arguably have offered with regard to Brown, as
 4          you highlighted, is Brown's making a prior
 5          inconsistent statement.  I doubt -- I don't know if
 6          Mr. Trinkle talked about comments made by Mr. Brown,
 7          but I suspect there's nothing in his statement to
 8          that.  It might go to the ultimate issue of whether
 9          he sold both crack and powder, but all Mr. Bell did
10          was attempt to impeach Mr. Brown by pointing out what
11          would be prior inconsistent statements which would
12          undermine his credibility.  So even if Mr. Trinkle
13          sold both or neither or one or the other, the point
14          wasn't going to that; the point was whether Mr. Brown
15          had made a prior inconsistent statement.  So I don't
16          think under this agreement what you have discussed is
17          something that would open the door for you to do
18          that.
19                    MS. MOREHEAD:  Very well, Judge.
20                    THE COURT:  All right.  Five after three.
21          Thank you for raising this before the occasion.
22                    (A recess was taken.)
23                    MS. MOREHEAD:  Judge, I'm going to call the
24          two chemists.  That's two of the chemists that are
25          here now.  One is in from out of town, and the other
```

1    one is on leave, so I don't want to, frankly, take up

2    their time.

3              THE COURT:  All right.  Sure.

4              MS. MOREHEAD:  But two of the exhibits I

5    intend to introduce with the first chemist haven't

6    formally been introduced yet.  They are going to come

7    by way of Agent McCue.  One of those, Exhibit 45, has

8    been mentioned by Detective Stone, if you remember,

9    from Atchison in connection with the Donnie Johnson

10   vehicle stop.

11             THE COURT:  Correct.

12             MS. MOREHEAD:  But I wasn't going to

13   introduce that until Agent McCue.  And then 14 we

14   have not yet introduced, but we will do so, again,

15   with Agent McCue.  That was a buy with Henry Grigsby.

16   So at least a couple of the counsel were in here when

17   we decided to go in this direction, and they seemed

18   to be okay with that.  I will obviously shore up the

19   introduction of 14 and 45 with Agent McCue.  All the

20   others have been introduced.

21             THE COURT:  Any objections?  Hearing none,

22   you may proceed as you've indicated you would like to

23   do.

24             MS. MOREHEAD:  Thank you, Judge.

25             (The following proceedings were had in the

```
 1              presence of the jury:)

 2                      THE COURT:  Ms. Morehead, the government

 3          may call its next witness.

 4                      MS. MOREHEAD:  Thank you, your Honor.  I

 5          call Lucretia Weber.

 6                      LUCRETIA WEBER,

 7      having been duly sworn, was examined and testified as

 8      follows:

 9                      DIRECT EXAMINATION

10      BY MS. MOREHEAD:

11      Q.  Please tell the jury where you're employed.

12      A.  I am employed with the Drug Enforcement

13          Administration as a forensic chemist.

14      Q.  Can you tell the jury what your education and

15          experience is relative to being a forensic chemist.

16      A.  I have a bachelor of science in chemistry from the

17          University of Iowa.

18      Q.  And how long have you been a forensic chemist?

19      A.  Over 11 years.

20      Q.  And has that entire time been employed with DEA?

21      A.  Yes.

22      Q.  Can you relate to the ladies and gentlemen of the

23          jury what a forensic chemist does for the DEA.

24      A.  A forensic chemist analyzes exhibits for the presence

25          of controlled substances.
```

1    Q.   And relate to the jury, if you would, what training,

2         education, and experience you've had relative to

3         being a forensic chemist.

4    A.   Like I said, I have a bachelor of science in

5         chemistry.  Once employed with the Drug Enforcement

6         Administration, I went through a six-month, in-house

7         training program consisting of analyzing various

8         drugs of known quantity and quality.  I have also

9         taken various courses in different scientific

10        instrumentation.

11   Q.   And in connection with your duties and functions with

12        DEA, have you been trained in testing various

13        controlled substances?

14   A.   Yes.

15   Q.   And what substances have you been trained to test?

16   A.   A variety of controlled substances and noncontrolled

17        substances.

18   Q.   Would that include cocaine and powder cocaine?

19   A.   Yes.

20   Q.   Could you please tell the ladies and gentlemen of the

21        jury what in connection with cocaine and crack

22        cocaine -- first of all what the difference between

23        cocaine and crack cocaine is.  Let's start there.

24   A.   The difference between crack cocaine and powder

25        cocaine, crack cocaine is cocaine base.  Powder

```
 1          cocaine is cocaine hydrochloride.  The two are
 2          different as far as physical properties go.  Crack
 3          cocaine is a smokeable form of cocaine.  Powder
 4          cocaine is the kind of cocaine that can be absorbed
 5          through the mucous membranes of the body.
 6   Q.    Okay.  And in connection with the testing that you
 7          do, do you have the ability to do testing in order to
 8          determine whether a substance is cocaine or whether a
 9          substance is crack cocaine?
10   A.    Yes.
11   Q.    In connection with the testing that you do with
12          regards to powder cocaine, please explain, if you
13          would, the process that you go through in connection
14          with a submitted item of evidence in order to
15          determine what substance it is, crack cocaine versus
16          powder cocaine.
17   A.    The one test that we use to determine between cocaine
18          hydrochloride and cocaine base is infrared
19          spectroscopy, and that basically determines the salt
20          form, which I said is either the base form or the
21          hydrochloride form.
22   Q.    Okay.  When an item of evidence is submitted to you,
23          can you walk the jury through the process that you go
24          through to test that item.
25   A.    Once we receive the evidence in our custody, we will
```

1    weigh the bag, which is the heat-sealed bag, in its

2    sealed form with the contents inside.  That is the

3    gross weight.  We make sure that all the seals are

4    intact.  Then after that we cut open the

5    manufacturer's seal, which is the seal on the bottom

6    of the bag, and leave the agent's seal intact.  From

7    there we will remove the items, document which items

8    are in the bag.  We will weigh the evidence inside

9    and obtain a net weight, which is just the weight of

10   the powder or the drugs itself.  From there we make a

11   composite, which is formed by grinding it and passing

12   it through a 20-mesh sieve to make sure we have a

13   homogenous substance.  From there we will analyze

14   using various techniques.

15   Q.   All right.  With regards to a substance such as

16        powder cocaine -- or let's talk about powder cocaine.

17        When it is presented to you, typically when we think

18        of powder, it's powdery and loose.  When powder

19        cocaine is submitted to you, is it sometimes in that

20        form?

21   A.   Powder cocaine is generally in a loose, powdery form.

22        Sometimes it gets clumped up and we grind it to a

23        20-mesh-sieve size.

24   Q.   And so you grind it up, and that's to get -- what did

25        you call that? -- a homogenous sample?

```
 1    A.   That's correct, to make sure that it's consistent
 2         throughout.
 3    Q.   And with regards to crack cocaine, when it would
 4         arrive in your laboratory, what typically does it
 5         appear like?
 6    A.   Generally the crack cocaine appears in a rock-like
 7         form.
 8    Q.   And so again what do you do in order to get your
 9         representative sample that you mentioned?
10    A.   That also is ground to a 20-mesh sieve.
11    Q.   Okay.  Now, in connection with this particular case,
12         did you, in fact, test a number of items of evidence?
13    A.   Yes.
14    Q.   I am going to put before you what's been marked as
15         Government's Exhibit 6, 10, 14, 27, 45, and then 40
16         and ask you if you can identify those items of
17         evidence.
18    A.   Yes.
19    Q.   And how are you able to identify those items of
20         evidence?
21    A.   The items of evidence have my signature seal on the
22         bottom as well as I filled out the seal on the bag.
23    Q.   Okay.  And in connection with this particular case
24         then, are you the one that actually received these
25         items of evidence and then had occasion to test each
```

1          of those items of evidence?

2   A.    Yes.

3   Q.    Okay.  In connection, first of all, with Government's

4          Exhibit No. 6, can you tell the jury what you did

5          with regards to this particular item of evidence.

6   A.    This particular item came to me in this sealed bag

7          with the agent's seal on top.  I opened the bag at

8          the bottom, which was originally the manufacturer's

9          seal.  You can see the manufacturer's seal enclosed

10         in the bag right now.  This particular exhibit was in

11         one clear plastic Baggie.  It was a single bag, so I

12         emptied the contents.

13  Q.    Do we see that any packaging that the drugs that you

14         tested would have came in -- once you remove them, do

15         you put the packaging back inside the original

16         package and maintain it in that fashion?

17  A.    Yes.  This is the original clear plastic Baggie that

18         the evidence came to me in.

19  Q.    Okay.

20  A.    The weight of the Baggie with the contents inside are

21         weighed.  The contents are removed, and the bag is

22         weighed empty again and subtracted from the original

23         weight, and that derives the net weight of the

24         powder.

25              From there I grind -- I ground this powder to a

```
 1           20-mesh sieve, and performed my analysis from there.
 2     Q.    Okay.  And what were the results of your -- the
 3           weight, the net weight, that you were able to obtain
 4           with regards to Government's Exhibit No. 6?
 5     A.    The net weight was 55.4 grams.
 6     Q.    And after weighing that item of evidence, did you, in
 7           fact, conduct a variety of tests on that item of
 8           evidence?
 9     A.    Yes.
10     Q.    And tell the jury what you did with regards to it.
11     A.    A variety of tests was performed: gas chromatograph
12           mass spectrometry, which identified the different
13           components of this powder; infrared spectroscopy,
14           which identified between the cocaine hydrochloride
15           and the cocaine base; also performed a color test,
16           which also confirmed the presence; and then a purity
17           test by gas chromatography.
18     Q.    All right.  And what were the results that you
19           derived from those particular tests and analysis that
20           you did about what this substance was?
21     A.    That it contains cocaine hydrochloride.
22     Q.    So this evidence was what we would refer to as powder
23           cocaine; is that right?
24     A.    Yes.
25     Q.    Government's Exhibit No. 10, tell us about that item
```

```
 1        of evidence.
 2   A.   As well this particular evidence came to me in this
 3        original evidence envelope.  The contents inside were
 4        in this one clear plastic Baggie, and I performed the
 5        analysis very similarly to the first exhibit.
 6   Q.   Okay.  And how did this item of evidence appear when
 7        it was submitted to you, the substance itself?
 8   A.   This particular exhibit was a rock-like substance,
 9        which you can see its original form in the corner of
10        this bag.
11   Q.   All right.  When you process a particular item of
12        evidence, you mentioned that you grind up the
13        substance, and how do you actually grind it up?
14   A.   I ground it up with a mortar and pestle.
15   Q.   Okay.  And once it's ground up with a mortar and
16        pestle, then you pass it through the sieve to get
17        your homogenous sample?
18   A.   That's correct.
19   Q.   Do you retain a portion of that so that you can see
20        what it looked like before you changed its
21        appearance?
22   A.   Yes.
23   Q.   Is that what we see then in Government's Exhibit
24        No. 10?
25   A.   Yes.
```

1              MS. MOREHEAD:  Judge, I would like just to

2         show the jury this, if I could.

3    Q.   (By Ms. Morehead) And the bag kind of -- it's kind of

4         a glare, but the powdery substance that we see here,

5         what is this portion of this exhibit?

6    A.   That is the composite.  That is what I perform my

7         testing on.

8    Q.   And then it appears that you have heat-sealed kind of

9         a corner of this larger Ziploc bag; is that right?

10   A.   Yes.

11   Q.   And then in here, there's a rock substance here in

12        the corner?

13   A.   Yes.

14   Q.   Is that what you're referring to then, is what it

15        appeared in its original form?

16   A.   That's correct.

17   Q.   And so when the jury might see two different portions

18        of something separated out as we go through these

19        different exhibits, you're the one that would have

20        changed the appearance and packaged it in that

21        fashion?

22   A.   That's correct.

23   Q.   All right.  With regards to Government's Exhibit

24        No. 10, did you go through that same process of

25        weighing, getting a net weight on this substance?

```
 1   A.   Yes.

 2   Q.   What was the net weight of this substance?

 3   A.   27.6 grams.

 4   Q.   And you indicated that you did the same tests that

 5        you had performed with regards to Government's

 6        Exhibit No. 6?

 7   A.   Yes.

 8   Q.   And upon doing those tests with regards to Government

 9        Exhibit No. 10, what did you determine the substance

10        was with regards to the item of evidence Exhibit 10?

11   A.   Exhibit 10 contains cocaine base and sodium

12        bicarbonate.

13   Q.   And what is cocaine base and sodium bicarbonate?

14   A.   Sodium bicarbonate is often used to convert the

15        cocaine hydrochloride to cocaine base.

16   Q.   We have had some individuals talk about manufacturing

17        crack cocaine or cooking crack.  Do you know what

18        substance is typically used to mix in with cocaine

19        hydrochloride in order to manufacture crack cocaine?

20   A.   Yes.

21   Q.   What is that?

22   A.   Sodium bicarbonate.

23   Q.   Is that what we might typically call baking soda?

24   A.   Yes.

25   Q.   All right.  Government's Exhibit No. 14, do you
```

```
 1        recognize that item of evidence?

 2   A.   Yes.

 3   Q.   Tell us what that is.

 4   A.   Government's Exhibit 14 is also an exhibit that I

 5        analyzed.

 6   Q.   And did you go through the same procedure with this

 7        item of evidence?

 8   A.   Yes.

 9   Q.   And with regards to Government Exhibit No. 14, what

10        did you determine by way of the net weight?

11   A.   The net weight was 27.8 grams.

12   Q.   And did you do the same test that you had previously

13        performed on the other two exhibits?

14   A.   Yes.

15   Q.   In order to determine what substance it was?

16   A.   Yes.

17   Q.   And what did you determine with regards to what

18        Government's Exhibit No. 14 was or is?

19   A.   Government Exhibit No. 14 is cocaine base and sodium

20        bicarbonate.

21   Q.   Government's Exhibit No. 27 -- and I don't know if I

22        asked you with regards to Government's Exhibit 14.

23        Let's go back.  When that was presented to you, how

24        was it originally packaged?

25   A.   It was originally packaged in this clear plastic
```

1           Baggie inside this heat-sealed evidence envelope, and

2           a white -- off white rock-like substance was the

3           original form.

4    Q.    Thank you.  Going on to Government's Exhibit 27, tell

5           us what that item is.

6    A.    Exhibit 27 is also an exhibit I analyzed.

7    Q.    And how did it appear when it came to you?

8    A.    Government's Exhibit 27 came to me in this

9           heat-sealed evidence envelope contained inside these

10          packages, which is kind of hard to see because the

11          label is in front of it in the substitute plastic

12          bag, kind of hiding it in front.

13   Q.    All right.  So the substance that you found inside --

14          or it was in a package inside this heat-sealed

15          envelope; is that right?

16   A.    Yes.

17   Q.    And in connection with Government's Exhibit 27, did

18          you determine the net weight of this item of

19          evidence?

20   A.    Yes.

21   Q.    And what was the net weight of Government Exhibit

22          No. 27?

23   A.    375.3 grams.

24               MS. MOREHEAD:  Judge, just for reference

25          purposes, I might have should have done that on the

1    other three, but this is the package of cocaine that

2    came in the UPS -- or the United States Postal

3    Service mail package in the cereal boxes, just for

4    reference, for the jury's purpose.

5              THE COURT:  All right.

6  Q.   (By Mr. Calbi) In connection then with Government

7    Exhibit No. 27, did you do the same tests that you

8    had previously mentioned you did on the other

9    exhibits?

10 A.   Yes.

11 Q.   And what were the results of Government's Exhibit

12    No. 27?

13 A.   It contains cocaine hydrochloride.

14 Q.   Government's Exhibit No. 45, can you tell me what

15    that item of evidence is.

16 A.   Government's Exhibit 45 is also an exhibit I

17    analyzed.

18              MS. MOREHEAD:  And, Judge, for reference

19    purposes, Government's Exhibit 45 is the item of

20    evidence that was seized by Detective Stone from

21    Donnie Johnson's vehicle.

22 Q.   (By Ms. Morehead) Did you do a net weight on that

23    item of evidence?

24 A.   Yes.

25 Q.   What was the net weight on Government's Exhibit 45?

```
 1   A.    80.2 grams.

 2   Q.    Did you perform the same tests that you previously

 3         testified to with regards to the other exhibits?

 4   A.    Yes.

 5   Q.    And when this item of evidence came to you, how was

 6         it packaged?

 7   A.    Also inside this heat-sealed evidence envelope

 8         further contained in this clear plastic Baggie.

 9   Q.    How did it appear when you received it?

10   A.    Its original form was in this rock-like substance.

11   Q.    Are there two separate packages that you've done in

12         this particular envelope?

13   A.    Yes.

14   Q.    One with the portion that you ground and put through

15         the sieve, and then another portion, that is how it

16         appeared in its original form?

17   A.    Yes.

18   Q.    With regards then to Government's Exhibit 45, what

19         were the results of your tests with regards to what

20         this substance is?

21   A.    It contains cocaine base and sodium bicarbonate.

22   Q.    And Government Exhibit No. 40, did you have occasion

23         to test that item of evidence?

24   A.    Yes.

25               MS. MOREHEAD:  And, Judge, just for
```

```
 1            reference, Government's Exhibit 40 was the item that

 2            was seized by Detective Leigh Ann Greene from Sasha

 3            Gerard in connection with the vehicle stop with Sasha

 4            Gerard and Jamicah Johnson in Atchison.

 5   Q.   (By Ms. Morehead) In connection with Government's

 6            Exhibit 40, how did it appear when it was submitted

 7            to you?

 8   A.   It was also contained inside this heat-sealed

 9            evidence envelope, further contained inside this

10            clear plastic bag.

11   Q.   And what did the substance appear like when it was

12            presented to you?

13   A.   Its original form was in this off white rock-like

14            substance.

15   Q.   Did you do a net weight on that substance?

16   A.   Yes.

17   Q.   What was that net weight?

18   A.   110.3 grams.

19   Q.   And did you perform the same tests that you had

20            indicated you performed on the other substances?

21   A.   Yes.

22   Q.   What were the results that you had with regards to

23            determining what the substance in Government Exhibit

24            No. 40 -- what it is that it contains?

25   A.   Cocaine base and sodium bicarbonate.
```

```
 1                     MS. MOREHEAD:  Judge, that's all I have of
 2          this witness.
 3                          THE COURT:  All right.  Cross examination?
 4          I hear none.
 5              Ms. Weber, you may step down.  Without objection
 6          you are excused.
 7                 The government may call its next witness.
 8                     MS. MOREHEAD:  Thank you, Judge.
 9                          ANDREW BENSON,
10   having been duly sworn, was examined and testified as
11   follows:
12                          DIRECT EXAMINATION
13   BY MS. MOREHEAD.
14   Q.    Please tell us where you're employed.
15   A.    I'm employed at the Chicago DEA's North Central
16          Laboratory.
17   Q.    And what's your occupation with them?
18   A.    I'm a forensic chemist.
19   Q.    And tell the jury, if you would, your work and
20          educational history relative to being a forensic
21          chemist with DEA.
22   A.    I received a bachelor's degree in biotechnology in
23          1999, and I also received a master's in forensic
24          science in 2002.  I had an internship at the Miami
25          Dade Police Department in Miami, Florida, as well as
```

1     a research chemist position at 3M Corporation in St.

2     Paul, and have been employed by the DEA lab for the

3     last six years.

4   Q.   Mr. Benson, in connection with your responsibilities

5     with DEA, are they much the same as Ms. Weber, who

6     was just here testifying similarly that she is a

7     forensic chemist?

8   A.   Yes, they are.

9   Q.   The laboratory she is involved with is here in Kansas

10     City; is that right?

11   A.   Yes, that's correct.

12   Q.   And have you actually worked at the laboratory here

13     in Kansas City on occasion?

14   A.   Yes, I have, for rotation purposes.

15   Q.   Okay.  And then there is the laboratory in Chicago.

16     And how do some items of evidence get submitted to

17     the Chicago laboratory from Kansas City when we have

18     kind of our own laboratory here that DEA has?

19   A.   Well, basically, the lab down here is confined.

20     There's a limited amount of space.  If they receive

21     larger exhibits, they will ship them up to Chicago,

22     and we have more room, and we can better take care of

23     the larger exhibits there.

24   Q.   Do we call that bulk quantity of -- specifically of

25     drug?

```
 1    A.   Yeah.

 2    Q.   All right.  And in connection with this case were you

 3         involved in testing some bulk quantities of drugs

 4         that were submitted to your laboratory?

 5    A.   Yes, I was.

 6    Q.   With regards to Government's Exhibits 55, 55A, and

 7         55B, tell us what those items are.

 8    A.   These are the three DEA heat seals that came into our

 9         laboratory, and they were originally analyzed by a

10         chemist in our laboratory, and I had to subsequently

11         reanalyze these, as she's on maternity leave.

12    Q.   All right.  And who was the chemist who first

13         analyzed these items of evidence?

14    A.   Heather Miller.

15    Q.   Okay.  Is she a forensic chemist much like and you

16         Ms. Weber?

17    A.   Yes.

18    Q.   And in connection then with your contact with these

19         particular items of evidence, what would your contact

20         have been with them?

21    A.   I analyzed them to determine the presence or absence

22         of controlled substances.

23    Q.   Okay.  And in connection with analyzing those items

24         of evidence, is one of the things you do to weigh

25         them?
```

```
 1   A.   Yes.

 2   Q.   And is another thing that you do then to test them to

 3        see what substance they, in fact, are?

 4   A.   That's correct.

 5   Q.   Now, with regards to Government Exhibit No. -- with

 6        regards to 55, 55A, and 55B, tell me which of those

 7        items you, in fact, did test.

 8   A.   Well, per DEA policy I was only responsible for IDing

 9        the composite material, which basically this exhibit

10        was split into two different parts, and there were

11        two different composites, and they were in these two

12        bags.

13   Q.   All right.

14   A.   And I basically identified the composite material.

15   Q.   Okay.  And 55A, would that have been handled then by

16        Ms. Miller?

17   A.   Yes.

18   Q.   All right.

19   A.   They, in fact, all were originally.

20   Q.   Okay.  And with regards to net weight, what net

21        weight was attributed with regards to these items of

22        evidence?

23   A.   As far as the net weight goes, I deferred to what her

24        original report said, and which is right here, so I

25        would have to refer to the original report.
```

1    Q.   Okay.  Go ahead.

2    A.   Again, as I said before, this exhibit consisted of 5

3         kilos, and she correspondingly separated those kilos.

4         The first exhibit, 8.01 --

5    Q.   And this 8.01 that you're getting ready -- those are

6         DEA numbers that are associated with the kilos?

7    A.   That's correct.  That's our laboratory exhibit

8         number.  It's Exhibit 8, but it was consequently

9         divided into Exhibit 8.01.  A net weight of

10        3,012 grams.

11   Q.   Okay.

12   A.   And Exhibit 2 was the split, consisting of 2 kilos

13        with a net weight of 1,945 grams.

14   Q.   Okay.  8.01 consisted of how many kilos?

15   A.   Three.

16   Q.   Three kilos.  And the second one was the remaining

17        2 kilos?

18   A.   That's correct.

19   Q.   That would be net weight then?

20   A.   Yes.

21   Q.   And in connection with this quantity of -- or these

22        particular items of evidence then, did you

23        subsequently test them to determine what the

24        substance was?

25   A.   Yes, I did.

1    Q.   And what did you determine the substance to be?

2    A.   For Exhibit 8.01 it was cocaine hydrochloride.

3              MR. JOHNSON:  Beg your pardon, Judge.  For

4         the record can we identify the actual exhibit?

5              MS. MOREHEAD:  I was just getting ready to.

6    Q.   (By Ms. Morehead) Which government's exhibit would

7         8.01 be?

8    A.   That consisted of -- I believe it was in the first

9         heat-sealed bag, in this one.

10   Q.   It would be Government's Exhibit 55?

11   A.   Yes.  And that basically was a composite material of

12        the kilos 1, 4, and 5.

13   Q.   All right.  So 1, 4 and 5, the substances in them is

14        what you were responsible for testing?

15   A.   Yes.  The composite material that was already

16        determined by the original analyst.

17   Q.   What did you determine that to be?

18   A.   It was cocaine hydrochloride.  And I should mention

19        too that the original analyst determined the purity

20        of this cocaine to be 91.1 percent.

21             MR. JOHNSON:  Object to the hearsay.

22             THE COURT:  Sustained.  It was also just a

23        volunteered statement, so I'll strike it for the

24        record, ask the jury to disregard it.

25             MS. MOREHEAD:  That's fine, Judge.

```
1    Q.   (By Ms. Morehead) With regards to Government's

2         Exhibit 55, you just tested a portion then of that,

3         and it was, in fact, cocaine?

4    A.   Yes.

5    Q.   Okay.  And then Government's Exhibit 55B -- and I'm

6         looking here, okay?

7    A.   Okay.

8    Q.   Government's Exhibit 55B, is this the second item of

9         evidence that you talked about?

10   A.   Yes, it is.

11   Q.   I think you called it --

12   A.   It's Exhibit 8.02.

13   Q.   8.02, your exhibit number?

14   A.   Uh-huh.

15   Q.   All right.  Which you indicated was two additional

16        kilos of cocaine?

17   A.   That's correct.

18   Q.   And what substance -- and did you, in fact, test

19        that?

20   A.   Yes, I did.

21   Q.   And what did you determine that substance to be?

22        This substance also contained cocaine hydrochloride,

23        but there was also an adulterant present in it called

24        phenyltetrahydroimidazothiazole.

25             MS. MOREHEAD:  I'll have the spelling for
```

1         you.

2    A.   And because that adulterant was found in these

3         2 kilos and it wasn't in these 3 kilos, per policy we

4         had to treat them as separate exhibits.

5    Q.   (By Ms. Morehead) All right.  And that adulterant,

6         tell us about that.

7    A.   That adulterant is just a big, fancy, long word for a

8         medicine used for an intestinal parasite, or worms.

9    Q.   Okay.  And have you seen that type of adulterant in

10        connection with testing that you've done of cocaine

11        before?

12   A.   Yeah.  Yes, yes, I have.

13   Q.   And do you know how it comes to be part of an exhibit

14        like you test here in the laboratory like

15        Government's Exhibit 55B, which are 2 kilos of

16        cocaine?

17   A.   It's hard to say, since I wasn't there, but it could

18        be intentionally added as a cutting agent to dilute

19        the purity to spread the profits for the dealers, or

20        it could be residual stuff found in solvents, but I

21        would think that it was intentionally added as a

22        cutting agent.

23             MR. CALBI:  Objection, your Honor;

24        speculation.

25             MS. MOREHEAD:  I can expand on that why he

```
 1           thinks that, Judge.
 2                     THE COURT:  I'll sustain the objection for
 3           now, permit to you lay additional foundation.
 4   Q.   (By Ms. Morehead) In connection with narcotics that
 5           you test, are there often substances that are added
 6           to the original substance in order to make it so that
 7           there's more there than -- I guess to add to the
 8           total quantity of the substance?
 9   A.   Yes.  And, I mean, to explain --
10                     THE COURT:  Pardon me.  The question,
11           you've answered the question.
12   Q.   (By Ms. Morehead) Yeah.  It's just a yes or no.  In
13           connection with that, can you give us an example of
14           that situation happening?
15   A.   As far as adding the adulterant to --
16   Q.   Yes.
17   A.   Yes, I could.  If you have pure cocaine and you want
18           to sell so many batches of a given -- you know, a
19           given weight, you can add sugar, or whatever, to it
20           to give it more bulk, to add to the total weight, but
21           it will be less pure, and you can go around and sell
22           more batches for X amount of dollars.  That's what a
23           cutting agent is, or an adulterant is.
24   Q.   Okay.  And with regards to the adulterant that you
25           determined had been added to Government's
```

1      Exhibit 55B, did you determine how much of that had

2      been added to the original form?

3  A.   No.

4  Q.   Okay.  And this particular adulterant, have you seen

5      it added on prior occasions?

6  A.   Yes, I have.

7            MS. MOREHEAD:  Judge, that's all I have of

8      this witness.

9            THE COURT:  All right.  Any cross

10     examination?  Mr. Calbi?

11           MR. CALBI:  Thank you, your Honor.

12                 CROSS EXAMINATION

13  BY MR. CALBI.

14  Q.   Mr. Benson, just so I'm clear, 5 kilograms equals

15      5,000 grams; correct?

16  A.   That's correct.

17  Q.   The cocaine that was weighed in Government's

18      Exhibits 55, 55A, and 55B was 4,957 grams; is that

19      correct?

20  A.   That's correct.

21  Q.   This is less than 5,000 grams?

22  A.   Yes, that's correct.

23  Q.   And the adulterant that you found in the exhibit, you

24      don't know how or when that adulterant was added;

25      correct?

1    A.   That's correct.

2    Q.   You just know it's there?

3    A.   I just know it's there.

4              MR. CALBI:  Nothing further, Judge.

5              THE COURT:  Any other cross examination?

6              MR. ROGERS:  Just one question.  Can I do

7         it from here, your Honor?

8              THE COURT:  You may.

9                   CROSS EXAMINATION

10   BY MR. ROGERS:

11   Q.   Was the adulterant, which I will won't attempt to

12        pronounce, included in the net weight that you got

13        from Ms. Miller?

14   A.   It was included in the net weight because it was part

15        of the substance.

16   Q.   Okay.  Thank you.

17             THE COURT:  Any further cross examination?

18             MS. MOREHEAD:  No, your Honor.

19             THE COURT:  Any redirect?

20             MS. MOREHEAD:  Oh, sorry.  No, there's no

21        redirect.

22             THE COURT:  All right.  You may step down,

23        and without objection you are excused.

24         The government may call its next witness.

25             MS. MOREHEAD:  Thank you, Judge.

```
 1                      ANDREA MICHIELS,
 2   having been duly sworn, was examined and testified as
 3   follows:
 4                   DIRECT EXAMINATION
 5   BY MS. MOREHEAD:
 6   Q.   Please tell us where you're employed.
 7   A.   At the DEA Kansas City Subregional Laboratory in
 8        Kansas City, Missouri.
 9   Q.   And what is your occupation there?
10   A.   I am a senior forensic chemist.
11   Q.   And relate to the jury your work and educational
12        history relative to being a forensic chemist with
13        DEA.
14   A.   Well, I have been with DEA since 1984, and I have a
15        bachelor's degree in chemistry from Illinois State
16        University.  I have also had several short courses in
17        methods of analysis throughout the years.
18   Q.   Okay.  And in connection with your work at DEA as a
19        forensic chemist, do you perform the same duties and
20        functions that Ms. Webb and Mr. Benson, who have
21        already testified, as forensic chemists perform with
22        regards to DEA?
23   A.   Yes.
24   Q.   And in connection with your testimony here today,
25        were there a number of items of evidence in this case
```

1           that you examined and tested?

2      A.   Yes.

3      Q.   I want to hand you Government's Exhibits 3, 96, and

4           97, and ask you if you can identify those items.

5      A.   Yes, I can.

6      Q.   And how are you able to identify those items?

7      A.   Well, each of the pieces have my -- except for this

8           one.  You can't tell because it's not clear.  But on

9           the inside there's my seal with my signature and my

10          writing, my initials on the inner pieces with the

11          date and the lab number, and sealed across the top

12          with the agent's seal, and then across the bottom

13          with my seal, again with my signature and the date

14          and the case number in my writing.  This piece --

15     Q.   And that's Exhibit 96?

16     A.   Yes, it is.  Oh, no, no, no.  That's Government's

17          Exhibit 3.  Oh, yes, this is 96.  I'm sorry.

18     Q.   Okay.

19     A.   And this also has my seal across the tape, and it has

20          my writing on the evidence label.

21     Q.   Okay.  With regards to Government's Exhibit No. 3 --

22               MS. MOREHEAD:  And, Judge, for reference

23          purposes, this is from the first controlled purchase

24          of February 9, 2007, from Shannon Perez, which has

25          been introduced.

REBECCA S. RYDER, CCR, RMR
UNITED STATES COURT REPORTER
913-551-5645

1          THE COURT:  Very well.

2     Q.   (By Ms. Morehead) Government's Exhibit No. 3, have

3          you, in fact, seen that item?

4     A.   Yes, I have.

5     Q.   And how is it -- how did it appear when it was first

6          presented to you?

7     A.   Well, this powder was in a chunky form like the

8          little piece there, and it was in these Baggies,

9          plastic Baggies.

10    Q.   In connection with Government Exhibit No. 3, did you,

11         in fact, determine the net weight of the substance

12         inside the plastic bag?

13    A.   Yes, I did.

14    Q.   What was the net weight of the substance?

15    A.   23.3 grams.

16    Q.   And did you, in fact, perform tests in connection

17         with that substance in order to determine what it

18         was?

19    A.   Yes, I did.

20    Q.   And what tests did you perform?

21    A.   I used chemical color tests, infrared

22         spectrophotometry, mass spectrometry, and gas

23         chromatography.

24    Q.   And based upon the tests that you performed with

25         regards to Government's Exhibit No. 3, what substance

1      did you determine it to be?

2  A.  Cocaine base.

3  Q.  And Government's Exhibit No. 96?

4           MS. MOREHEAD:  Judge, for the record, this

5      was a plate that Agent Dorley testified about that

6      was recovered at 575 South Street from Leavenworth,

7      Kansas, on December 27 of 2007.

8           THE COURT:  Ms. Morehead, I might note that

9      that was not offered into evidence.

10          MS. MOREHEAD:  I apologize, Judge.  Might I

11     introduce that at this time based upon Agent Dorley's

12     testimony?

13          THE COURT:  Is there any objection?

14     Hearing none, Exhibit 96 is admitted.

15          (Exhibit 96 was admitted into evidence.)

16          MS. MOREHEAD:  Thank you.

17 Q.  (By Ms. Morehead) Can you tell us what you did with

18     regards to Government's Exhibit No. 96.

19 A.  Well, inside this paper bag is a plate and, I

20     believe, a spoon, and I scraped some of the residue

21     off of the plate and analyzed it.

22 Q.  And on a substance like that do you do any sort of

23     net weight?

24 A.  No.

25 Q.  Okay.  You would have just done a test to try to

1         determine what substance was on the plate?

2   A.    Yes.

3   Q.    And did you do the same test that you had done in

4         connection with Government's Exhibit 3 when you

5         tested the substance that you scraped from the plate

6         in Government's Exhibit 96?

7   A.    Mostly, except that I don't determine the purity

8         because there's not enough of it.

9   Q.    Okay.  What substance did you determine was on the

10        plate then, Government's Exhibit 96?

11  A.    Cocaine.

12  Q.    Is there enough -- was there enough substance there

13        in order to do a determination about whether there

14        was cocaine base present?

15  A.    No.

16  Q.    So your ability on a substance like this is just to

17        determine whether cocaine is present; is that right?

18  A.    Yes.  It depends.  If there's more residue, then it's

19        easier to determine the salt.

20  Q.    Okay.  And there wasn't enough to determine the salt

21        on this exhibit?

22  A.    No.

23  Q.    With regards to Government's Exhibit 97 --

24              MS. MOREHEAD:  Judge, this is again an item

25        of evidence that Agent Dorley testified about.  This

```
 1          item he recovered from 610 Oak Street in a -- I think

 2          he described it as a blue bag under a sink or in a

 3          cabinet, I think is what he said.

 4   Q.    (By Ms. Morehead) Have you seen this item of evidence

 5          before?

 6   A.    Yes, I have.

 7   Q.    What did you do with regard to this item of evidence?

 8   A.    The same tests as the other.

 9   Q.    Did you do a net weight of this item?

10   A.    Yes, I did.

11   Q.    And what was the net weight of this substance?

12   A.    0.24 grams.

13   Q.    And did you, in fact, do the same tests that you had

14          performed with regards to Government's Exhibit No. 3?

15   A.    Yes, except once again there wasn't enough to perform

16          a purity on this one either.

17   Q.    Okay.  And what did you determine this particular

18          substance to be?

19   A.    This was also cocaine base.

20   Q.    Okay.  Which would be crack cocaine?

21   A.    Yes.

22                MS. MOREHEAD:  Judge, that's all the

23          questions I have of this witness.

24                THE COURT:  All right.  Is there any cross

25          examination?  I see no hands.  All right.  Then you
```

```
 1        may step down, and the government may call its next

 2        witness.

 3                    MS. MOREHEAD:  Thank you, your Honor.  I

 4        call Tim McCue.

 5                        TIMOTHY MCCUE,

 6   having been duly sworn, was examined and testified as

 7   follows:

 8                     DIRECT EXAMINATION

 9   BY MS. MOREHEAD:

10   Q.   Please tell the jury where you're employed.

11   A.   I'm employed as a special agent with the United

12        States Drug Enforcement Administration.  I'm

13        currently assigned to the Kansas City District

14        Office, Group 41.

15   Q.   And relate to the jury, if you would, your work

16        history relative to being a law enforcement officer.

17   A.   I have been with DEA since February of 1998.  Prior

18        to that I was a police officer for the City of

19        Elmhurst, which is a suburb of Chicago, located about

20        ten minutes west of the city.  I spent seven years in

21        uniformed patrol and three years in a plain clothes

22        unit.

23   Q.   And in connection with your employment with DEA, tell

24        us what that has consisted of.

25   A.   I spent approximately two years in the interdiction
```

1      office.  By interdiction, we have another office, a

2      group near the airport which was responsible for

3      working bulk cash seizures or drug smuggling on

4      airplanes.  I was also responsible for coordinating

5      our working of any controlled deliveries of narcotics

6      that were taken off either by the highway patrol in

7      this state or another state if the narcotics were

8      coming here to Kansas City, and our group would

9      facilitate the actual delivery here in Kansas City,

10     or if it went to other places, we would facilitate

11     the delivery to the other end.

12  Q.  In connection with being a law enforcement officer,

13     can you tell us about your training as it relates to

14     being a law enforcement officer.

15  A.  When I was hired by the police department, I spent

16     ten weeks at the Illinois Police Academy in

17     Springfield, Illinois, after that received numerous

18     hours of training in various aspects of law

19     enforcement.  When I was hired by DEA, I spent four

20     months at the academy, which is located at the FBI

21     academy in Quantico, Virginia; and subsequent to that

22     had other training courses while at DEA, including

23     complex conspiracy courses, interdiction, internet

24     training related to case events.

25  Q.  When you were with the Elmhurst Police Department,

```
 1        Agent McCue, were you involved in investigating

 2        narcotic cases?

 3   A.   Yes.

 4   Q.   You mentioned that you were initially a street cop;

 5        is that right?

 6   A.   A unit officer, yes.

 7   Q.   Unit officer.  And were there occasions where you

 8        would encounter situations that involved narcotic

 9        offenses?

10   A.   Yes.

11   Q.   While you were at the Elmhurst Police Department did

12        you have any specialized involvement in narcotic

13        investigation?

14   A.   Went to numerous courses relating to drug

15        enforcement, drug enforcement techniques,

16        identification of drugs.

17   Q.   Okay.  And can you give us some idea while you were

18        with the Elmhurst Police Department what involvement

19        you had in investigating narcotic cases.

20   A.   In the police department it was strictly related to

21        street level arrests, some possession cases.

22        Anything that amounted to larger seizures were

23        generally handed off to a drug task force.

24   Q.   Okay.  Now, when you came to be employed with DEA --

25        is it safe to say when you were with the police
```

```
 1            department you would encounter a drug case or drug

 2            investigation as it came your way, whether that was

 3            by vehicle stop or whatever?  Would you agree with

 4            that?

 5   A.       Yes.

 6   Q.       Once you became employed with DEA, is 100 percent of

 7            your time devoted to narcotic investigations?

 8   A.       Yes, it is.

 9   Q.       And since being employed with DEA, have you been

10            involved in a number of -- you mentioned complex

11            conspiracy cases.  Have you been involved in a number

12            of those kinds of investigations?

13   A.       Yes, I have.

14   Q.       And does that include cases that have involved

15            application for and receipt of Title III wiretap

16            authorizations?

17   A.       Yes.

18   Q.       And when you mentioned your training that you had

19            with DEA, does that include a wide variety of aspects

20            of narcotic investigations?

21   A.       Yes, it does.

22   Q.       In addition to that though you had experience with

23            DEA investigating drug cases?

24   A.       Yes.

25   Q.       Can you just give us kind of a range of -- an idea as
```

1          far as range of experience that you have with the

2          investigation of narcotics cases since being with

3          DEA.

4     A.   As I said, I was originally assigned to the

5          interdiction group.  I spent approximately two years

6          there.  During that time I was involved in numerous

7          controlled deliveries of narcotics, again, where a

8          load may have been taken off and was going to be

9          delivered to Kansas City.  I was involved in what

10         they call interdiction cases at the airport with

11         cash, bulk smuggling, or people transporting

12         narcotics on the airplane.

13              After that I have been in Group 41, where the

14         cases range from what I would deem a simple buy/bust

15         where either an undercover officer or a confidential

16         informant is utilized to purchase narcotics; it could

17         be a one-time purchase, you know, for a particular

18         amount; and that would be from a simple arrest like

19         that to, again, complex conspiracy cases where the

20         investigation starts with a single person and leads

21         to what we have here in this investigation in cases

22         leading to multiple jurisdictions and agencies.

23    Q.   In connection with this particular investigation,

24         were you involved in the front end part of the

25         investigation, which Officer Jones mentioned, once

```
 1        the Leavenworth Police Department contacted DEA?
 2   A.   Yes, I was.
 3   Q.   And in connection with the initial contact that DEA
 4        had from Leavenworth Police Department, was there, in
 5        fact, an individual that they provided the name of,
 6        that being Monterial Wesley?
 7   A.   Yes, they did.
 8   Q.   And did you, in fact, do some of the things that
 9        Officer Jones indicated are done on the front end,
10        which include doing financial backgrounds of certain
11        individuals?  Did you do that with regards to Mr.
12        Wesley?
13   A.   Yes, I did.
14   Q.   And with regards to Mr. Wesley, were you able to
15        determine any legitimate source of income that he had
16        between 2006 forward in connection with this
17        investigation?
18   A.   Yes, I attempted to identify that.
19   Q.   And were you able to identify any legitimate source
20        of income that Mr. Wesley had?
21   A.   No.
22   Q.   We had testimony earlier from Officer Vogel about a
23        search that he conducted with regards to a safety
24        deposit box in Leavenworth, Kansas.  Do you remember
25        that?
```

1    A.    Yes.

2    Q.    Specifically, Government's Exhibit No. 85 and the

3          seizure of some documents in that safety deposit box?

4    A.    Yes.

5    Q.    Now, the documents in this particular safety deposit

6          box, on the front end of this investigation had you

7          already seen many of these documents?

8    A.    Yes.

9    Q.    And how had you seen these same documents on the

10         front end of this investigation?

11   A.    Through use of subpoenas to get information relating

12         to mortgage documents.

13   Q.    And finding then these documents in the safety

14         deposit box, were those many of the same documents

15         that you already had in your possession?

16   A.    Yes.

17   Q.    Now I want to look at Government's Exhibit 85, and

18         specifically one of the documents in the Manila

19         folder that Officer Vogel testified to, and it's

20         entitled Uniform Residential Loan Application.  Do

21         you see that?

22   A.    Yes.

23   Q.    And does this appear to be the loan documents in

24         connection with 3708 Stonewall Court in Leavenworth,

25         Kansas?

```
 1    A.   Yes.

 2    Q.   And on the third page of this document it appears

 3         it's dated 7/16/05 with the name -- or signature of

 4         Monterial Wesley.  Do you see that?

 5    A.   Yes.

 6    Q.   Okay.  And in connection with this document, what's

 7         the borrower information on it?

 8    A.   The borrower's name is Monterial Wesley, A. Wesley.

 9    Q.   And what address did it show for Mr. Wesley?

10    A.   932 Cherokee.

11    Q.   And did it list an employer of Mr. Wesley?

12    A.   Yes.

13    Q.   And what was that -- what was the name of that

14         employer?

15    A.   Chelsea Market, Kansas City, Missouri.

16    Q.   And what did it indicate Mr. Wesley's job was?

17    A.   Manager.

18    Q.   Did it indicate how long he had been employed there?

19    A.   Three years.

20    Q.   In these same documents did it list how much Mr.

21         Wesley claimed to be earning working at Chelsea

22         Market?

23    A.   Yes.

24    Q.   And what was indicated in the loan application for

25         3708 Stonewall?
```

```
1    A.    $75,000.

2    Q.    And Chelsea Market, did you do some investigation on

3          the front end of this with regards to Chelsea Market?

4    A.    Yes.

5                    MS. MOREHEAD:  And, Judge, I would ask for

6          admission of Government's Exhibit No. 86.

7                    THE COURT:  Is there any objection?

8          Hearing none, Exhibit 86 is admitted.

9                    (Exhibit 86 was admitted into evidence.)

10   Q.    (By Ms. Morehead) Were you able to find a Chelsea

11         Market, Agent McCue?

12   A.    Yes, I did.

13   Q.    Where was it located?

14   A.    Thirty-first Street.  I believe it's 31st and Chelsea

15         in Kansas City, Missouri.

16   Q.    Government's Exhibit 86, is that a photograph of

17         Chelsea Market?

18   A.    Yes, it is.

19   Q.    And we have heard some testimony about 31st Street

20         and about a McDonald's and that sort of thing.  How

21         far is this location from the areas that we have been

22         talking about throughout this trial?

23   A.    I believe that's going to be to the west of 31st and

24         Van Brunt a little ways away.

25   Q.    What kind of an establishment is Chelsea Market?
```

```
 1   A.   It appears to be a liquor store, maybe a local

 2        grocery store.

 3   Q.   Okay.  And can you characterize this establishment

 4        for us.

 5   A.   Again, it's a local grocery store/liquor store.

 6   Q.   All right.  I guess my question would be, did it

 7        appear to be a large operation or kind of a --

 8   A.   Mom-and-pop-type operation.

 9   Q.   Now, in connection with the investigation we had some

10        testimony about an incident that occurred on

11        October 18 with regards to Shevel Foy.  Do you recall

12        a home invasion at his residence?

13   A.   Yes, I recall that.

14   Q.   Do you recall that?

15   A.   Yes.

16   Q.   And following that incident on October 18, did you

17        have occasion to conduct surveillance concerning

18        Monterial Wesley?

19   A.   Yes, I did.

20   Q.   And what date was that?

21   A.   The 18th in the morning and afternoon.

22   Q.   Can you tell us what you observed with regards to Mr.

23        Wesley's activities on October 18 later that day in

24        connection with the home invasion.

25   A.   Later on in the day we had established surveillance
```

| | | |
|---|---|---|
| 1 | | on Mr. Wesley, Latysha Temple, and Shevel Foy.  The |
| 2 | | surveillance at one point ended or led us to Ms. |
| 3 | | Temple's residence in Independence.  During the |
| 4 | | course of that surveillance Mr. Foy started driving |
| 5 | | Mr. Wesley's white Escalade.  During that |
| 6 | | surveillance Mr. Foy had left the residence. |
| 7 | Q. | Whose residence? |
| 8 | A. | Latysha Temple's. |
| 9 | Q. | Okay. |
| 10 | A. | And was followed out by Mr. Wesley and Latysha Temple |
| 11 | | in the brown four-door Mercedes Benz. |
| 12 | Q. | Who was driving the Mercedes Benz? |
| 13 | A. | Latysha Temple. |
| 14 | Q. | Okay.  And Mr. Wesley would have been a passenger |
| 15 | | then? |
| 16 | A. | Yes. |
| 17 | Q. | And what did you observe with regards to Mr. Wesley |
| 18 | | and Ms. Temple in this vehicle? |
| 19 | A. | They left the subdivision, went westbound towards 291 |
| 20 | | Highway.  I'm drawing a blank on the street that they |
| 21 | | were westbound on, but it ultimately stopped at 291 |
| 22 | | Highway.  At that point I was notified by the wire |
| 23 | | room that surveillance was being compromised in that |
| 24 | | Mr. Wesley was talking to Mr. Foy, and I believe it |
| 25 | | was Target Phone No. 3816, advising, hey, basically |

2180

```
 1         that there's cops behind you.  There was talk that
 2         they could see our radio.  One of the officers in the
 3         surveillance was talking on his handheld radio, and
 4         they could see him actually talking on it.
 5    Q.   After the fact --
 6                   THE COURT:  By the way, members of the
 7         jury, that is not offered for the truth of that.
 8         Those are all hearsay statements made out of court.
 9         That's offered for the purpose of understanding what
10         Mr. McCue did next.
11    Q.   (By Ms. Morehead) And with regards to this phone call
12         that the wire room radioed you about, did you have
13         occasion to after the fact go back to the wire room
14         and listen to this same phone call?
15    A.   Yes.
16    Q.   And did the phone call that you were advised about,
17         when you listened to it, was it consistent with the
18         information that had been indicated to you from the
19         folks in the wire room?
20    A.   Yes, it was.
21    Q.   And in connection with being advised by the wire room
22         that there was communication between Mr. Wesley and
23         Mr. Foy about the surveillance, what was -- what
24         observations did you have?
25    A.   That they were accurate, because I was in the
```

```
 1              surveillance.
 2    Q.    What did you see the individuals doing?
 3    A.    The police officers or relating to Mr. Wesley and Ms.
 4          Temple?
 5    Q.    Yes, what did you observe with regard to your
 6          observations of Mr. Wesley in the vehicle?
 7    A.    That they were looking directly at the police
 8          vehicles and actually just physically looking and
 9          making comments back and forth to one another, and
10          that was heard on the phone in regards to that the
11          police were there.
12    Q.    Okay.
13    A.    And I know that because I was behind them essentially
14          as I'm talking to the wire room, listening or being
15          told that they are calling out the vehicles.
16    Q.    And was this a phone call between Mr. Foy and Mr.
17          Wesley?
18    A.    Yes.
19    Q.    And when you reviewed that phone call, what was the
20          substance of that phone call?
21    A.    The substance of the phone call, again, was that they
22          were being followed.  They pointed out a turquoise
23          truck, individuals talking on a handheld radio, and a
24          red pickup truck.  The phone conversation ends with
25          Mr. Wesley advising that he has to find a place to
```

1            put his bag up at.

2   Q.   Okay.  And do you recall what phone number, what

3        telephone number -- not telephone number -- what call

4        number that was on Target Phone No. 3?

5   A.   I believe it was 5047.

6   Q.   Do you have a report on that?

7   A.   Yes.

8            MS. MOREHEAD:  Sorry, Judge.  I was just

9        going to pull that back up.

10           THE COURT:  All right.

11  Q.   (By Ms. Morehead) So 5407 was a call between Mr. Foy

12       and Mr. Wesley where Mr. Foy indicated he needed to

13       put the bag up?

14  A.   Yes.

15  Q.   What was the, in fact, words that you recall?

16           THE COURT:  Can you refer to an exhibit

17       number?

18           MS. MOREHEAD:  It's actually not marked as

19       an exhibit yet.

20           THE COURT:  All right.  Then don't go into

21       the substance of it, if you would, please.

22           MS. MOREHEAD:  Judge, I'm going to mark

23       this as Government's Exhibit No. 339.

24           THE COURT:  That's Phone Call 5047 or 5407?

25           MS. MOREHEAD:  5407.

1          THE WITNESS:  5407, Target Phone 3.

2          MR. SANDAGE:  Your Honor, may we approach?

3          THE COURT:  You may.

4          (Counsel approached the bench and the

5      following proceedings were had:)

6          MR. SANDAGE:  Your Honor, I think I have

7      raised concerns like this previously.  We were never

8      given this exhibit.  I don't know what the contents

9      of it are.  As I understand what Officer McCue has

10     testified, there are 8,000 phone calls.  I don't know

11     if the government can tender to us if there's

12     anything within the context of that phone call that

13     might be not allowed.

14         MS. MOREHEAD:  I have a transcript of it.

15         MR. SANDAGE:  Okay.

16         MS. MOREHEAD:  I mean, you have it, but I

17     can get it.  Here's the transcript.

18         MR. HEATHMAN:  Is this a transcript, or is

19     this a synopsis?  In other words, is this a word for

20     word?

21         MS. MOREHEAD:  This is what you would have

22     been provided in discovery.

23         MR. SANDAGE:  Is this authenticated?

24         MS. MOREHEAD:  No.  We're not going to play

25     it along with it.  It's not authenticated.  This is

1          what you were provided with in discovery.

2                    MR. SANDAGE:  I hate to waste time with

3          this but --

4                    THE COURT:  Well, I don't know any

5          alternative, honestly.

6                    MR. SANDAGE:  I didn't know if the

7          government wanted to go in a different direction so

8          we can look at this and then come back up.

9                    MS. MOREHEAD:  It's not a very long phone

10         call, Judge.  I think it's a couple minutes.

11                   MR. HEATHMAN:  It's a phone call between

12         Monterial Wesley and Shevel Foy?

13                   MS. MOREHEAD:  Yes.

14                   MR. HEATHMAN:  And there are times in the

15         call that evidently Monterial is saying that Tysha

16         has told him or said something.  Did I read that?

17                   MS. MOREHEAD:  She's in the vehicle with

18         him when this call was made.

19                   MR. HEATHMAN:  Right.

20                   MS. MOREHEAD:  She can be heard in the

21         background.

22                   MR. HEATHMAN:  He's saying, "And Tysha said

23         she seen them."  I would object to that as hearsay.

24                   THE COURT:  Well, of course, that's subject

25         to the 801(d)(2)(E) ruling.

1           MR. HEATHMAN:  Right.  And I don't know

2     that -- I don't know that there's anything about this

3     phone call that's drug related but --

4           MS. MOREHEAD:  The relevance of this,

5     Judge, is Ms. Temple was with Mr. Wesley.  This is

6     following the home invasion when Mr. Wesley indicated

7     he needed to go put his bag up.  There was cross

8     examination by Mr. Heathman of Officer Jones with

9     regards to the subsequent call where Ms. Temple says,

10    "I found a place where we can put the bag up," and so

11    this is in reference to tying that together now based

12    upon cross examination by Mr. Heathman.

13          THE COURT:  I understand the relevance.

14    Any objections other than the extent to which I need

15    to make an 801(d)(2)(E) ruling at some point?

16          MR. SANDAGE:  It purports that Mr. Foy

17    mentions something about going by the Cryp's house.

18    I assume -- I don't know -- C-R-Y-P-S.  Cryp's is the

19    way it reads in the transcript, Cryp's house.  I

20    don't know what that's referring to.  I see some

21    prejudicial value in that.  It's nothing that's been

22    introduced into evidence.  It's nothing involving

23    this conspiracy.

24          THE COURT:  He did have a red truck. It

25    wouldn't be the Crips.

1              MS. MOREHEAD:  Crips are blue and Bloods

2       are red.

3              THE COURT:  You wouldn't want to be going

4       by the Crips' house, so obviously that wouldn't be

5       it, so I'm assuming that there's nothing there

6       attempting to inject some sort of gang inference

7       here.  I'm assuming that in context there's nothing

8       except that word.

9              MR. SANDAGE:  No.  I don't know if there's

10      other calls we're getting ready to listen to.

11             THE COURT:  And you're not opening the door

12      to some sort of --

13             MS. MOREHEAD:  No gang thing.

14             THE COURT:  Very well.

15             MS. MOREHEAD:  All right.

16             (The proceedings returned to open court.)

17             THE COURT:  All right.  Then

18      Exhibit No. 339 is admitted.

19             (Exhibit 339 was admitted into evidence.)

20             MS. MOREHEAD:  Judge, for the record, there

21      will not be a transcript that's played along with

22      this particular call.

23             THE COURT:  All right.

24             (Exhibit No. 339 was played in open court.)

25  Q.   (By Ms. Morehead) And in that call it appeared there

1   was a comment by Mr. Wesley, something about a bag.

2   Did you hear that comment?

3   A.   Yes.  "I got a bag.  I gotta do something with it.  I

4   gotta put it up."

5   Q.   And, again, did you hear a voice in the background --

6   A.   Yes.

7   Q.   -- of the phone call, a female voice?

8   A.   Yes, yes, yes.

9   Q.   And did you recognize that female voice?

10  A.   It was Latysha Temple.

11  Q.   Was that consistent with the surveillance that you

12  observed where Monterial Wesley and Latysha Temple

13  were together at that moment?

14  A.   Yes.

15  Q.   And in connection then with Latysha Temple and

16  Monterial Wesley, was there a subsequent call that

17  was significant in connection with this Phone Call

18  No. 5407 that you mentioned?

19  A.   Yes.

20  Q.   And what call was that?

21  A.   I believe it was Government's Exhibit 251 and 251A.

22  Q.   And what was the -- what was that particular call

23  about?

24  A.   Ms. Temple had called Mr. Wesley, advising that she

25  had found a place for the bag of clothes.

1    Q.   Was this call then after the call that we just played

2         involving Mr. Wesley and Mr. Foy?

3    A.   Yes, it was.

4              MS. MOREHEAD:   Judge, for the record, as

5         Agent McCue indicated, that was Call No. 251.

6              THE COURT:   All right.

7              MR. HEATHMAN:   Can we have a date for the

8         251 call?

9              MS. MOREHEAD:   251 was identified as a call

10        on October 18 of 2007, and it was identified as being

11        a call at about 2:40 p.m.

12             MR. HEATHMAN:   Thank you.

13   Q.   (By Ms. Morehead) What time were you doing your

14        surveillance when this Call 5407 that we just

15        played -- what time did that happen?

16   A.   12:54.

17   Q.   So about not quite 1:00 o'clock that day?

18   A.   Yes.

19   Q.   Is that right?

20   A.   Yes.

21   Q.   And that was on Target Phone 3 --

22   A.   Three.

23   Q.   -- that we just heard.  And with regards to

24        Government's Exhibit 251, that call was on Target

25        Phone No. 4, not quite two hours later; is that

1       accurate?

2   A.  Yes.

3   Q.  Agent McCue, in connection with this particular case

4       we have had testimony about an incident that occurred

5       on November 27 of 2007 at a car wash in Kansas City,

6       Missouri.  Were you involved in that particular

7       set of circumstances?

8   A.  Yes, I was.

9   Q.  Actually, before we go there, I need to introduce

10      these exhibits so I don't go back and forget.  I'm

11      going to backtrack for a minute so I don't forget

12      this.

13          We had some testimony from Officer Jones about

14      some initial controlled purchases that occurred with

15      regards to Shannon Perez and also Henry Grigsby.  Do

16      you recall that?

17  A.  Yes.

18  Q.  And I believe Officer Jones indicated that on one of

19      those controlled purchases you were the one who

20      collected the drugs, actually, from the CI following

21      the controlled purchase of Mr. Grigsby?

22  A.  That's correct.

23  Q.  Was that the incident on June 18 of 2007?

24  A.  Yes, it was.

25  Q.  I want to hand you what I've marked as Government's

```
 1          Exhibit 14.  Do you recognize that?

 2    A.    Yes, I do.

 3    Q.    Where did this controlled purchase take place, Agent

 4          McCue?

 5    A.    In Leavenworth, Kansas.  Originally started at the BP

 6          Amoco at Fourth and Miami.  Prior to that, to set up

 7          the whole deal, a phone call was made utilizing a

 8          confidential source.  He called Henry Grigsby on the

 9          cell phone, the (913)206 number, and arranged a

10          purchase of 1 ounce of crack cocaine.  The CS met

11          myself and Officer Neil Vogel from the Leavenworth

12          Police Department.  He was fitted with a recording

13          device, video device; he was provided $900 in the

14          United States currency; he was searched for any large

15          amounts of money or illegal contraband on his person

16          and his vehicle and then was followed to Fourth and

17          Miami to conduct a deal with Hank Grigsby.

18    Q.    And following that controlled purchase, did you, in

19          fact, receive Government's Exhibit 14 from the CI?

20    A.    Yes.

21              MS. MOREHEAD:  Judge, I would ask for

22          admission of Government's Exhibit 14.

23              THE COURT:  Any objection?  Hearing none,

24          Exhibit 14 is admitted.

25
```

```
 1                    (Exhibit 14 was admitted into evidence.)

 2    Q.   (By Ms. Morehead) And Government's Exhibit 45, were

 3         you present in connection with the arrest of -- kind

 4         of after the fact of Donnie Johnson?

 5    A.   Yes.

 6    Q.   And you've heard the testimony of Detective Stone; is

 7         that right?

 8    A.   Yes, I did.

 9    Q.   In connection with Government's Exhibit 45, how did

10         you come to be in possession of that item of

11         evidence?

12    A.   I arrived in Atchison, Kansas, shortly after Mr.

13         Johnson was arrested, and I obtained custody of the

14         cocaine or crack cocaine that was seized from him.

15         Detective Stone transferred custody of it to me.

16    Q.   And we showed a photograph which was Government's

17         Exhibit 43 which showed a photograph of a cell phone

18         and cocaine that was on a seat of Mr. Johnson's

19         vehicle.  Do you remember that?

20    A.   Yes.

21    Q.   And is that how Government's Exhibit 45 would have

22         appeared when it was presented to you in its original

23         state?

24    A.   No.  This was sent to the lab -- it was originally in

25         this bag -- and then processed.
```

1    Q.   My question was, do you recall seeing the photograph

2         of what the item looked like when Detective Stone

3         seized it?

4    A.   Yes.

5    Q.   And is that how it looked then when you received it

6         from Detective Stone?

7    A.   Yes.

8    Q.   And you then packaged it, and then it's sent off to

9         the laboratory for testing?

10   A.   Yes.

11              MS. MOREHEAD:   Judge, I would ask for

12        admission of Government's Exhibit 45.

13              THE COURT:   Is there any objection?

14        Hearing none, Exhibit 45 is admitted.

15              (Exhibit 45 was admitted into evidence.)

16   Q.   (By Ms. Morehead) All right.   Now, Agent McCue, let's

17        go to the incident -- the events of November 27,

18        2007.   Can you tell the jury your involvement on that

19        date concerning the arrests of individuals, what you

20        did in connection with the surveillance leading up to

21        the arrest.

22   A.   Pursuant to the phone calls I ultimately arrived in

23        the area of 54th and Prospect.   That's where I joined

24        the surveillance.

25   Q.   You heard testimony from several other individuals,

1    one being from air, several being from ground, and

2    were you involved in any of the aspects of that

3    surveillance at the bank leading all the way down to

4    looking at lofts and the like?

5  A.  No, I was not.

6  Q.  All right.  You then did not join until what stage in

7    the surveillance?

8  A.  As they were proceeding towards the car wash.

9  Q.  Would that have been then based upon your review of

10    the surveillance and being aware of that after the

11    Range Rover would have left the vicinity of the

12    barbershop and the detail shop?

13  A.  Yes.

14  Q.  And tell us what you observed then by way of

15    surveillance in connection with the activity in the

16    area -- the vicinity of the car wash.

17  A.  I arrived at the car wash.  There is a Commenco radio

18    service just to the north of the car wash.  I parked

19    my vehicle in the lot facing southbound overlooking

20    the car wash.  At some point the Range Rover arrived

21    at the scene and pulled up near one of the bays,

22    stayed a short time, and then went to the gas

23    station.  I maintained surveillance at the car wash

24    from the parking lot to the north.

25  Q.  And tell us what you observed then.

1    A.   At some time a black Camaro driven by Thomas Humphrey

2         arrived and pulled into one of the bays in the car

3         wash.

4    Q.   Were you able to observe that from your vantage

5         point?

6    A.   Yes.

7    Q.   What were you able to observe concerning activity and

8         Mr. Humphrey and the activity of the car wash?

9    A.   I could see that he arrived and pulled into a bay.

10        His vehicle was facing westbound.  Shortly thereafter

11        the black Range Rover/Land Rover that was being

12        driven by Mr. Simpson had arrived back at the car

13        wash.

14   Q.   All right.  I would like to look here at Government's

15        Exhibit 53.  Can you tell us from what direction then

16        based upon this photograph what -- where you were in

17        connection with it.

18   A.   Where I just drew that line, that's northbound.  The

19        front right here would be facing westbound.  The back

20        is eastbound, and that is south.  I was to the north

21        across the street in a parking lot.

22   Q.   All right.  And once Mr. Humphrey pulled into the bay

23        of the car wash, were you able to visibly see any

24        portion of his vehicle?

25   A.   No.

1    Q.   Were you able to visibly see any of the activities of

2         Mr. Humphrey inside the bay of the car wash?

3    A.   No.

4    Q.   Were there other agents that would have been at a

5         different vantage point that were able to kind of

6         call out what was going on and what activity they

7         were observing?

8    A.   Yes.

9    Q.   Okay.  And from your vantage point then what else did

10        you observe?

11   A.   Ultimately that the Land Rover arrived at the scene.

12   Q.   And, again, Government's Exhibit 53, how did you

13        observe the Land Rover or the Ranger Rover arriving

14        at the scene?  What did it do?

15   A.   It pulled in right where you see it stopping in front

16        of the bay at the car wash there.

17   Q.   Okay.  And in connection with this car wash, we have

18        had testimony there were other bays; is that right?

19   A.   Yes.

20   Q.   Were there other bays available that if somebody

21        wanted to pull up and vacuum out their car or wash

22        their car that there would have been somewhere else

23        for them to go behind Mr. Humphrey's vehicle as it

24        appears here in Government's Exhibit 53?

25   A.   Yes.  I don't recall any other vehicles that there

```
 1              was.  There might have been one.

 2    Q.   Okay.  And, again, from your vantage point, were you

 3         able to clearly see the Range Rover where it was

 4         there outside the bay of this car wash?

 5    A.   Yes.

 6    Q.   And from your vantage point were you able to observe

 7         how many occupants there were in that vehicle?

 8    A.   I could see one individual that was Mr. Wesley exit

 9         the vehicle.  The windows were tinted, but the best I

10         could see was the driver passenger.

11    Q.   (By Ms. Morehead) All right.  And that was going to

12         be my question.  Obviously, you indicated you

13         observed Mr. Wesley exit from the passenger's side of

14         the vehicle.

15    A.   Yes.

16    Q.   Would it be safe to assume there was also a driver in

17         the vehicle?

18    A.   Yes.

19    Q.   And observations not only that you were making but

20         that other agents were making as they were

21         progressing, were folks calling that out or alerting

22         other officers what was transpiring?

23    A.   Yes.

24    Q.   Tell us what occurred then, what you did in

25         connection with this situation.
```

1    A.   When Mr. Wesley entered the bay, I advised everyone

2         that he had exited the vehicle, he was walking up to

3         Humphrey, and at that point I advised other agents

4         and officers to move in for the arrest.

5    Q.   And in connection with that, are you the one then

6         that gave the --

7    A.   Yes.

8    Q.   -- go ahead for agents to converge on the area?

9    A.   Yes.

10   Q.   And once you gave that go ahead, what did you do?

11   A.   I exited the Commenco parking lot, got on the street

12        that was separating us, and pulled into the parking

13        lot of the car wash.

14   Q.   And how far of a distance was that from the -- is it

15        Commenco that you're --

16   A.   Commenco.

17   Q.   Commenco?  How far is that to the car wash?

18   A.   Fifty yards.  It's a ball park.

19   Q.   Okay.  In connection then with your vehicle, were you

20        the only occupant in that vehicle?

21   A.   Yes.

22   Q.   And as you were converging on the area, were there

23        other agents likewise converging on the area?

24   A.   There was a lot.

25   Q.   Did you have a specific responsibility that day,

1        Agent McCue, with regards to converging on the area?

2   A.   Yes.  I was to block the Range Rover.

3   Q.   And prior to doing this, is it safe to say you had,

4        maybe not with absolute certainty an idea of what was

5        going to happen, but you had at least some idea there

6        were going to be two vehicles, at least two vehicles,

7        that were going to meet up?

8   A.   Yes.

9   Q.   One being Mr. Humphrey's, one being Mr. Wesley's?

10  A.   Yes.

11  Q.   And in connection then with Mr. Wesley's vehicle,

12       tell us what you did.

13  A.   Made bumper-to-bumper contact with my vehicle to the

14       Ranger Rover.  I exited the vehicle and approached

15       the driver with my gun drawn and in a very loud voice

16       identified myself as a police officer.

17  Q.   All right.  Let's stop there, and we will come back

18       and go through it step by step.  You indicated when

19       you pulled up behind the Ranger Rover you made

20       bumper-to-bumper contact with it?

21  A.   Yes.

22  Q.   Can you tell the jury what kind of vehicle you were

23       in that day, Agent McCue.

24  A.   A 2006 Pontiac G6 GT.

25  Q.   And is that a four-door?

1   A.   It is.

2   Q.   2006 Pontiac?

3   A.   G6 GT.

4   Q.   G6 GT.  And that's a standard four-door vehicle?

5   A.   Yes.

6   Q.   Anything remarkable about it?

7   A.   Mid-sized vehicle.  It's not a large vehicle.

8   Q.   What color is it?

9   A.   Green.

10  Q.   And in connection with that then, you pulled up

11       behind the Ranger Rover?

12  A.   Yes.

13  Q.   And we have had some photographs of the Ranger Rover.

14       How would you describe the size of the Ranger Rover?

15  A.   A large, heavy SUV.

16  Q.   And when you made what you described to be

17       bumper-to-bumper contact with the vehicle, were you

18       actually able to have bumper-to-bumper contact with

19       it?

20  A.   No.  My vehicle, the nose and bumper, slid underneath

21       the bumper of the Ranger Rover, and the front end of

22       my car slid underneath and put a dent in the hood of

23       my car, and it looks like it hit the trailer hitch.

24  Q.   All right.  So the front end of your vehicle would

25       have been low enough to go underneath the bumper of

1          the Ranger Rover?

2     A.   Yes.

3     Q.   Is that right?

4     A.   Yes.

5     Q.   And what actually hit was the trailer hitch of the

6          Ranger Rover into the -- onto the hood area of your

7          vehicle?

8     A.   I believe it was a trailer hitch.  It's centered

9          right inside -- right in the center of my hood.

10    Q.   All right.  And that contact that you had with the

11         Ranger Rover, did it at all move or jar the Ranger

12         Rover?

13              MR. ROGERS:  Objection; calls for

14         speculation and conjecture, your Honor.

15              MS. MOREHEAD:  Judge, he can testify as to

16         what he sustained.

17              THE COURT:  He can testify as to what he

18         saw or perceived.  Overruled.

19    Q.   (By Ms. Morehead) What did you observe with regards

20         to that contact, Agent McCue?

21    A.   That the front of my car literally just slid

22         underneath the bumper of the Ranger Rover.

23    Q.   My question was, was there any movement at all of the

24         Ranger Rover when your vehicle, the hood of your

25         vehicle, hit the trailer hitch of the Ranger Rover?

2201

```
 1    A.    No.

 2    Q.    And how would you characterize the damage to your

 3          vehicle?

 4    A.    Minor with -- and I guess that would be subjective.

 5          It's minor in that there's a dent approximately this

 6          big on the hood of my car, a little longer.

 7    Q.    And is that consistent with the width of the trailer

 8          hitch that would have impacted the front of your

 9          hood.

10    A.    I believe it is.

11    Q.    Okay.  And in connection with that has your vehicle

12          even been fixed?

13    A.    No.

14    Q.    And why not?

15    A.    It's a waste of money.  I mean, the vehicle

16          ultimately gets surplussed.  There's no point.

17    Q.    So minimal damage?  It certainly didn't affect your

18          ability -- you still drive that vehicle?

19    A.    Yes.

20    Q.    It's in the parking lot today; is that right?

21    A.    Yes.

22    Q.    And in connection with once your vehicle -- let me

23          ask you this.  Why did you maneuver your vehicle in

24          the fashion that you did to have this

25          bumper-to-bumper contact with the SUV?
```

1    A.   For vehicle containment in the event that the driver

2         attempted to flee the area, back up, or start hitting

3         the vehicles.  It's a maneuver that we are trained to

4         do.

5    Q.   Okay.  And by making bumper-to-bumper contact, is

6         there any way for the vehicle to back up other than

7         to literally back up onto your vehicle?

8    A.   No.

9    Q.   And once then you had came to a stop with your

10        vehicle against the trailer hitch of the SUV, what

11        did you do next, Agent McCue?

12   A.   Exited my vehicle, announcing my office, police

13        officer, yelling police.  I had my gun drawn.  I was

14        wearing a bullet-proof vest that said police on the

15        front and approaching the driver of the vehicle.

16   Q.   And with regards to the Ranger Rover, what area did

17        you approach the vehicle from?

18   A.   The driver's side from the rear going forward.

19   Q.   And we have had testimony by Agent Holder; is that

20        right?

21   A.   Yes.

22   Q.   Did he assist you in this situation?

23   A.   Yes, he did.

24   Q.   And you heard him testify about the position of him,

25        that he was coming along the rear of the vehicle

1    closer to the vehicle than you were.  Is that

2    accurate?

3  A.    I believe he was to the left.  He would have been to

4    the left of me.

5  Q.    His vehicle was to the left of you?

6  A.    Yes.

7  Q.    And then when he approached the vehicle, what did you

8    do in connection with that?

9  A.    I was approaching the driver's door.  I come out away

10    from the vehicle so I could see the driver.  I was

11    yelling, get your hands up, get your hands up, and at

12    that point I opened the car door.

13  Q.    Okay.  And what kind of voice are you using when

14    you're yelling the command to get your hands up?

15  A.    Loud, I guess, commanding voice.  I'm not -- a very

16    loud voice.

17  Q.    And in connection then with your observations, once

18    you opened the door, tell us what you observed.

19  A.    As I opened the door, I'm yelling, let me see your

20    hands, or, lift your hands, raise your hands, let's

21    see your hands.  As I open the door, Mr. Simpson

22    comes from --

23         MS. MOREHEAD:  Judge, could we maybe ask

24    Agent McCue to step down?  The podium is going to

25    block his view to be able to describe what he did.

1    If we could maybe affix him in a chair in front of

2    the jury and let him just demonstrate what he

3    observed?

4              THE COURT:  You may.

5              MS. MOREHEAD:  Okay.  But now let's make

6    sure that -- where should we be?

7              THE COURT:  What would be the easiest

8    place?  Counsel can move around however you like to

9    see it.  I would also like to be able to see it, and

10   it's obscured right there.  If you would put it a

11   little bit further -- that would be great.

12             MS. MOREHEAD:  Right here, Judge?  Can all

13   the jurors see from that location?  I don't know --

14   can they stand, Judge, and stretch?

15             THE COURT:  Sure.

16   Q.   (By Ms. Morehead) Keep your voice up when you're

17   explaining.

18             THE COURT:  The court reporter hates it

19   when I allow something like this to happen.  Could we

20   move Mr. McDaniel around a little bit so he's at

21   least talking back towards the court reporter?  There

22   you go.  This will probably take two seconds after we

23   get it set up.

24             MS. MOREHEAD:  Don't get too close to the

25   podium because then the jurors can't see.

```
 1              THE WITNESS:  Sorry.

 2              THE COURT:  I think you're fine right

 3        there.

 4          Ms. Morehead, you may proceed.

 5    Q.  (By Ms. Morehead) Please explain to us, Agent McCue,

 6        what you observed, and if you can for the record

 7        articulate what you observed and then also

 8        demonstrate what you observed.

 9    A.  Okay.  When I initially opened the door, I said, let

10        me see your hands.  That was what I did.  And the

11        sequence of events as I opened the door, Mr. Simpson

12        is coming from here.  He's coming up.  His hands are

13        down here.  He just leaned over just a little bit.

14        His hands come from here.  At that point, after I say

15        let me see your hands several times, we order them

16        out of the car.

17    Q.  All right.  Could you -- I want to just do the

18        demonstration.  We will move on from there, but with

19        regards to his hands, when you opened the door,

20        describe for us -- because I think you said his hands

21        were like this, but we're not articulating that for

22        the record, okay?

23    A.  Okay.  His hands are down towards his lap, towards,

24        say, his knee area.  His hands were coming from this

25        position up.
```

1    Q.   All right.  And from this position up, again --

2    A.   As I'm demonstrating.  So if I articulate it for the

3         record, I'm leaning forward slightly.  My hands are

4         down approximately by my knees right here in this

5         particular position.  My head's down.

6    Q.   Okay.

7    A.   As I open the door, Mr. Simpson comes back.  As I say

8         let me see your hands, his hands are coming up.  His

9         hands were not coming off the steering wheel.  He was

10        not turned towards the center of the vehicle.  When I

11        opened that door, Mr. Simpson's hands were coming

12        from here up.

13   Q.   All right.

14             MS. MOREHEAD:  Could we have Agent McCue go

15        back to his resting spot?

16             THE COURT:  Yes.  Why don't we let counsel

17        go by first so we don't have a traffic jam.

18             MR. ROGERS:  To our resting spots.

19             THE COURT:  To your resting spots.

20        Obviously we're going to stop in a couple minutes, so

21        take us to wherever you're ready to stop.

22             MS. MOREHEAD:  I will, Judge.

23   Q.   (By Ms. Morehead) With regards to the other activity

24        that was going on, you and Agent Holder were involved

25        with the passenger, and is it safe to say you were --

1          I'm sorry.  The driver you were coming up from the

2          rear to the side of the Ranger Rover?

3   A.     Yes.  I'm starting at the back of the bumper moving

4          forward towards the driver's door.

5   Q.     All right.  And in connection with other activity,

6          what else was going on at that exact time from other

7          angles in connection with this activity?

8   A.     Other officers and agents were moving in from various

9          directions making arrests of Thomas Humphrey and

10         Monterial Wesley.

11  Q.     Okay.  We have had testimony of agents coming through

12         the Wesley side of the bay, coming in through the

13         bay.

14  A.     Yes.

15  Q.     Is that right?

16  A.     Yes.

17  Q.     Were there other agents that were coming up from the

18         passenger's side and from the north area of where the

19         Ranger Rover was?

20  A.     Yes.  Pretty much officers and agents were coming

21         from every direction.

22  Q.     Okay.  And was that -- I don't want you to speculate,

23         but if someone was sitting in the driver's seat of

24         the vehicle, would they have had a better vantage

25         point of what was going on in front of and around the

1    front end of the vehicle than where you were coming

2    from from the rear of the vehicle?

3  A.   I would think you would see the people coming.

4         MS. MOREHEAD:  Judge, this is probably a

5    fine stopping point.

6         THE COURT:  Then let's do that.

7    Members of the jury, we will resume at 9:00

8    o'clock tomorrow morning.  I'll remind you of the

9    admonitions, which include don't go look for Mr.

10   McCue's car in the parking lot.  Don't do anything

11   which touches on the case.  Don't do any

12   investigation of any sort.  Don't talk to anybody

13   about the case, have any contact with the

14   participants.  Just go about your business, come on

15   back at 9:00 o'clock tomorrow morning.

16   Ms. Scheurer, please take charge of the jury.

17   Mr. McCue, you may step down.  Participants, please

18   remain here and we will talk about where you are.

19        THE WITNESS:  Thank you, Judge.

20        (The following proceedings were had outside

21   the presence of the jury:)

22        THE COURT:  Where do we stand in terms of

23   how much more of Mr. McCue's testimony you think --

24        MS. MOREHEAD:  I am going to hit some areas

25   that I have not covered.  I'm not being cumulative,

```
1        Judge, trying not to be anyway.  I would say I
2        probably have maybe another half hour or so with
3        Agent McCue, and then I have my firearms expert and
4        my DNA expert in the morning.
5                THE COURT:  Both of which, I assume, are
6        relatively brief.
7                MS. MOREHEAD:  Actually, the DNA expert may
8        be a little longer.  She did the DNA analysis on the
9        gun.  She has a short PowerPoint presentation on DNA
10       analysis.  I wouldn't think it would take longer than
11       the morning to get through that evidence.
12               THE COURT:  The entirety of the evidence
13       that you described?
14               MS. MOREHEAD:  I would hope.  Not knowing
15       how long cross examination -- frankly, the DNA
16       evidence and maybe the firearm evidence, really, is
17       only germane to Mr. Simpson and Mr. Wesley, so I
18       wouldn't expect cross-examination from some counsel,
19       although they are welcome to join in the fun.
20               THE COURT:  You never know.
21               MS. MOREHEAD:  Judge, the other thing I
22       wanted to mention -- this is kind of food for thought
23       for the night.  One reason I mentioned Agent McCue's
24       vehicle is, I would expect there's going to be some
25       cross examination concerning this situation, and I
```

 1         would certainly offer the opportunity for some sort

 2         of on-scene viewing of that vehicle by the jury

 3         should the court entertain that.  And we can do that

 4         however the court might see fit, which would include

 5         maybe -- I know it's supposed to rain tomorrow, but

 6         we could put it in the secure parking lot and allow

 7         them a brief opportunity to view that.  So I wanted

 8         to mention that.

 9                   THE COURT:  I leave that to counsel for the

10         defendants.  I think his description was adequate at

11         this juncture.  If counsel for the defendants request

12         something more, I would entertain that.

13                   MS. MOREHEAD:  I just wanted to make that

14         offer.

15                   THE COURT:  That's gracious of you, but at

16         this juncture I think I would be inclined to decline.

17              Anything else we ought to do before we break?

18                   MR. CALBI:  You asked me to report to you

19         how long the defense might want to put on evidence.

20         My poll has indicated it will take anywhere from two

21         to six hours, depending on who may get Rule 29ed out.

22                   THE COURT:  I thought you were going to say

23         from two hours to six days.  That gives me a good

24         idea.  That's good enough.  Mr. Johnson?

25                   MR. JOHNSON:  Judge, I submitted our

 1     proposed jury instructions to the court over the

 2     lunch hour.  I did not bring copies.  I may have

 3     neglected to request the court submit an instruction

 4     regarding the credibility of witnesses who use

 5     intoxicants.  Based on Mr. Ringgold's testimony of

 6     how he improved his appetite, I thought maybe it

 7     would be an appropriate instruction.  It may be in

 8     the court's packet, but I'll request it orally.

 9               THE COURT:  The court felt that was an

10     appropriate instruction even without counsel's

11     suggestion, so I agree that's appropriate.

12          Anything else we should do now?  All right.  We

13     are in recess.

14               (Court was adjourned.)

15                      * * * * *

16          THURSDAY, APRIL 30, 2009

17               THE COURT:  Is there anything we need to do

18     before proceeding?  Do we have our witness?

19               MS. MOREHEAD:  Here he comes.

20               THE COURT:  It's easier when they are in

21     custody.

22               (The following proceedings were had in the

23     presence of the jury:)

24               THE COURT:  Welcome back, members of the

25     jury.  Mr. McCue, I'll remind you that you remain

```
 1          under oath.  And, counsel, you may resume your
 2          questioning.
 3                    MS. MOREHEAD:  Thank you, your Honor.
 4                    TIMOTHY MCCUE (CONT'D),
 5   having been previously duly sworn, was examined and
 6   testified as follows:
 7                 DIRECT EXAMINATION (CONT'D)
 8   BY MS. MOREHEAD:
 9   Q.    (By Ms. Morehead) Agent McCue, when we were talking
10          yesterday, we discussed the activity of November 27
11          of 2007.  Following that incident, were you involved
12          in a series of searches of various locations?
13   A.    Yes.
14   Q.    And you heard testimony, for instance, about a search
15          that occurred at Thomas Humphrey's residence and
16          Monterial Wesley's residence and eventually a
17          residence belonging to Shevel Foy, 610 Oak, and James
18          Heags' mother's house.  You heard about those
19          consent-to-search incidents; is that right?
20   A.    Yeah, but not all occurring on the 27th.
21   Q.    After the 27th though, on or after the 27th?  Would
22          you agree with that?
23   A.    I would agree.
24   Q.    And you also heard testimony from Officer Jones that
25          there was a safety deposit box at Community America
```

1      Credit Union that was searched?

2   A.   Yes.

3   Q.   And was there, in fact, U.S. currency recovered out

4        of that safety deposit box?

5   A.   Yes, there was.  And inside a safety deposit box was

6        a bag containing $54,060 in cash, and a second bag

7        there was an additional $5,000.

8   Q.   So that would have made a total of $59,060 in that

9        safety deposit box?

10  A.   Yes.

11  Q.   And then you heard Officer Vogel indicate that

12       Leavenworth officers searched a safety deposit box at

13       the First National Bank and that he turned over a

14       check to DEA in connection with the search of that

15       safety deposit box?

16  A.   Yes, he did.

17  Q.   And what was the amount of U.S. currency that was

18       derived from that safety deposit box belonging to

19       Monterial Wesley and Lakisha Wesley?

20  A.   9,960.

21  Q.   And you heard testimony about a search of Latysha

22       Temple's residence, specifically a vehicle belonging

23       to Monterial Wesley that was located there, purple in

24       color.  Do you recall that?

25  A.   Yes.

```
 1    Q.   Was that vehicle seized?

 2    A.   Yes, it was.

 3    Q.   Were there a number of other vehicles seized?  We

 4         heard Officer Smith talk about vehicles that were

 5         seized in connection with Thomas Humphrey.  Were

 6         there some additional vehicles that were seized in

 7         connection with you and Officer Jones' aspect of this

 8         investigation?

 9    A.   Yes.  We seized a 2002 Escalade from Monterial

10         Wesley, the 1999 Harley Davidson, the '73 Caprice,

11         the purple vehicle, and a Chevy SS pickup truck from

12         Mr. Foy.

13    Q.   Okay.  And subsequent to that were there also

14         seizures from some of the other codefendants in this

15         case?

16    A.   Mr. Grigsby, we seized a Mustang and I believe his

17         Affinity.

18    Q.   Any other codefendants that you seized vehicles from?

19    A.   No, ma'am.

20    Q.   In connection with -- we had testimony about the heat

21         sealer that Officer Smith testified about.

22    A.   Yes.

23    Q.   And you mentioning that one part of your duty

24         assignment with DEA was working with bulk smuggling

25         and large scale drug trafficking cases; is that
```

1        right?

2   A.   Yes.

3   Q.   And that that particular item, which for the record

4        is Government's Exhibit 149, that particular item was

5        found at Mr. Humphrey's residence?

6   A.   Yes.

7   Q.   And based upon how drug trafficking occurs, is there

8        an explanation about why Mr. Humphrey would

9        specifically have an object like that?

10  A.   In the sealer itself, the vacuum sealer, money is

11       packaged generally in plastic bags, or it's wrapped

12       up, and then it would be put in a vacuum seal bag and

13       concealed in a vehicle, and the reason you would

14       vacuum seal the money is, one, you can compress it so

15       you can put more money together and carry more, but

16       also when you vacuum seal it, you conceal it in a

17       vehicle, you attempt to mask any narcotics smell that

18       may be on the money in the event that you're stopped

19       and a canine is utilized to search a vehicle or sniff

20       a vehicle.

21  Q.   And the drugs come from the south to Kansas City;

22       correct?

23  A.   Right.

24  Q.   Where's the money go then?

25  A.   It goes south, back to Mexico.

1    Q.   All right.  And so in order to package the money to

2         give to the supplier, it would not be uncommon to

3         heat seal that and package it as you've described?

4    A.   Yes.

5    Q.   All right.  Now, in connection with February 5 of

6         2008 were you involved in the arrest of many of the

7         individuals that were charged in connection with this

8         revocation?

9    A.   Yes, I was.

10   Q.   And specifically was one of those individuals

11        arrested on that date Byron Brown?

12   A.   Yes.

13   Q.   Now, there was testimony that Mr. Brown was taken to

14        the National Guard Armory.  Were many of the other

15        individuals arrested that day also taken to that

16        location?

17   A.   Anyone that was involved in that arrest was taken

18        there for processing.

19   Q.   And why was that set up?  And kind of explain that

20        whole process of what transpired that day, on

21        February 5.

22   A.   At the conclusion of a large investigation where a

23        large number of individuals are going to be arrested,

24        the marshal's facility here is too small to process a

25        large group of people, so the armory avails itself to

```
 1            us to use their facilities in an area probably about

 2            twice the size of this room, best described as a

 3            cafeteria-sized rooms.  Individuals that are arrested

 4            are brought in.  We have a booking station which

 5            would be comprised of a computer for scanning

 6            fingerprints, photographs.  There would be some

 7            tables in which we're able to obtain biographical

 8            information from each defendant.  Then each defendant

 9            after they are processed is seated, say, in the

10            corner of the room.  It's not set up where there's

11            individual rooms or cells; it's just a big, open

12            room.

13     Q.    What time of the day or night did this happen?

14     A.    It started at 6:00 a.m.

15     Q.    In connection with Mr. Brown, was he, after he was

16            arrested, taken to the National Guard Armory?

17     A.    Yes.

18     Q.    Do you recall who actually was involved in arresting

19            him?

20     A.    I believe it was Tim Ditter, Agent Tim Ditter.  He's

21            with Immigrations Custom Enforcement.  He was

22            assigned to the task force at the time.

23     Q.    And this operation of going out and arresting a large

24            group of people, are there a lot of law enforcement

25            personnel involved from various agencies?
```

```
 1   A.   We attempt to put five or more law enforcement on

 2        each individual, so there are a lot.

 3   Q.   And when Agent Ditter brought Byron Brown to the

 4        National Guard Armory, were you involved in that he

 5        was interested in talking to you, to agents?

 6   A.   Yes.

 7   Q.   What did you do then in connection with Mr. Brown?

 8   A.   Myself and Eric Jones escorted him out of the area

 9        into a hallway or another room and started asking him

10        questions.

11   Q.   How long did that contact with Mr. Brown last that

12        day?

13   A.   No more than ten minutes.

14   Q.   And why was that encounter so brief?

15   A.   Because the only time an individual is moved out of

16        the area while we're waiting for a transport is

17        generally to use the restroom, but if a person's

18        engaged too long, the other defendants will see that

19        the individual is gone.  The person, if he wants to

20        cooperate, is nervous because he knows everyone is

21        watching him.  That's why it was a short interview,

22        and Mr. Brown himself said, hey, look this isn't

23        looking good.  I'm gone too long.  He wanted to go

24        back.

25             MR. JOHNSON:  Objection; hearsay.
```

1          MS. MOREHEAD:  Well, Judge, his credibility

2     was impeached.  I think this is a prior consistent

3     statement.

4          THE COURT:  Yes, I agree with that.  I

5     overrule the objection.  I won't go further.  I'll

6     just overrule the objection.

7          MS. MOREHEAD:  Thank you, your Honor.

8  Q.  (By Ms. Morehead) Agent McCue, subsequent to that did

9     you have subsequent opportunities to interview Mr.

10     Brown?

11  A.  Yes, with his attorney.

12  Q.  Now, was also one of the individuals that was

13     arrested in connection with this investigation

14     Franklin Goodwin?

15  A.  Yes.

16  Q.  And in connection with Mr. Goodwin, did you

17     subsequently have contact with him after he was

18     arrested by the marshals?

19  A.  Yes, but he turned himself in here at the building to

20     the marshals.

21  Q.  Right.  And once that happened, did the marshals

22     contact you and advise you that he was in custody?

23  A.  Yes, they did.

24  Q.  And did you have an opportunity to come down and

25     attempt to interview Mr. Goodwin?

1   A.   Yes, we did.  And I say "we."  It was me and Officer

2        Jones.  We were here in the building probably related

3        to matters of this case when we were contacted, so we

4        went downstairs.

5   Q.   All right.  Do you remember what day that was?

6   A.   I believe it was February 12.

7   Q.   And in connection with that activity with

8        Mr. Goodwin, was he advised of his Miranda rights?

9   A.   Yes.  And that was through me.

10  Q.   And tell the jury how you did that.

11            MR. JOHNSON:  Judge, for the record I'm

12       going to renew my objection.

13            THE COURT:  Nothing new?  Very well.  The

14       objection, of course, is overruled.

15  Q.   (By Ms. Morehead) Go ahead.

16  A.   I have a Miranda card in my wallet that I read aloud

17       to Mr. Goodwin.

18  Q.   Okay.  And in connection with you advising

19       Mr. Goodwin of his Miranda rights, he was in custody

20       at the time; is that right?

21  A.   Yes, he was.

22  Q.   Can you give us some idea about the tone of this

23       meeting with Mr. Goodwin.

24  A.   The tone with Mr. Goodwin is myself and Eric Jones

25       spoke to him in the same tone and manner as I am

1      today.

2  Q.  Were there any threats made to Mr. Goodwin for him to

3      waive Miranda and talk to you and Officer Jones?

4  A.  Absolutely not.

5  Q.  Were there any promises made in connection with the

6      information that he provided to you?

7  A.  No.

8  Q.  Now, if, in fact -- and did Mr. Goodwin, in fact,

9      waive his Miranda rights?

10 A.  Yes, he did.

11 Q.  At any point in time if someone asks for an attorney

12     what do you do, Agent McCue?

13 A.  We have -- well, the option is when an individual

14     says, I want to speak to an attorney, we can follow

15     up with a question, do you know who your attorney is?

16     can we call him? or the interview stops.

17 Q.  All right.  And, for instance, with Monterial Wesley,

18     did he, in fact, request to have an attorney?

19 A.  Yes, he did.

20 Q.  And did you make arrangements to have the attorney

21     arrive and continue on with your activity with Mr.

22     Wesley?

23 A.  Yes.  His attorney met us in our office.

24 Q.  And if, in fact, an individual tells you that they

25     don't want to talk to you or don't have anything to

1       say to you, what do you do?

2   A.   Cease.

3   Q.   And with regards to Mr. Goodwin, did you hear the

4        testimony of Officer Jones?

5   A.   Yes.

6   Q.   And the information provided by Mr. Goodwin, was it,

7        in fact, as Officer Jones related to the court?

8               MR. JOHNSON:  Objection; asking him to

9        comment on the credibility of another witness.

10              MS. MOREHEAD:  I am asking if Mr. Goodwin,

11       in fact, told him what Officer Jones indicated to the

12       court and to the jury.

13              MR. JOHNSON:  Objection; still bolstering

14       the testimony of another witness.

15              THE COURT:  I'm going to sustain the

16       objection, and you can do it the long way.

17              MS. MOREHEAD:  I will.

18  Q.   (By Ms. Morehead) Agent McCue, please tell the jury

19       exactly the information Mr. Goodwin provided to you

20       and Officer Jones.

21  A.   That he was making purchases of powder cocaine from

22       Mr. Grigsby; he made approximately six to eight

23       purchases; he was paying $1,200 for a two-way, 2

24       ounces, 2¼; that he had another individual convert

25       the powder into cocaine because he wasn't good at it;

REBECCA S. RYDER, CCR, RMR
UNITED STATES COURT REPORTER
913-551-5645

```
 1          the individual who was converting it for him was
 2          allowed to keep any overs.
 3     Q.   Okay.  And after the product was converted into
 4          cocaine, did Mr. Goodwin indicate what he did with
 5          that?
 6     A.   He sold it.
 7     Q.   In connection with Mr. Goodwin's statements to you,
 8          did he also make reference to James Heags?
 9     A.   Yes.
10     Q.   And what did he provide to you by way of information
11          about James Heags?
12     A.   That he occasionally would pick up from him as well.
13     Q.   And did he indicate where the purchases would occur
14          with regard?
15     A.   Yes.  He said most of the purchases took place in
16          front of his mother's residence.  I believe the
17          address was 922 Cherokee.
18     Q.   And in connection with the information that
19          Mr. Goodwin gave to you, did, in fact, that
20          information coincide with the intercepted phone calls
21          that you had between Henry Grigsby and Franklin
22          Goodwin?
23     A.   Yes.
24               MR. ROGERS:  Objection; calls for
25          conclusions.
```

```
 1                   THE COURT:  I'm going to overrule that.  I
 2          think that's a fair question.
 3                   MS. MOREHEAD:  Thank you, your Honor.
 4   Q.   (By Ms. Morehead) Agent McCue, at some point was an
 5          individual named Keith McDaniel arrested?
 6   A.   Yes, he was.
 7   Q.   And do you recall when Keith McDaniel was arrested?
 8   A.   On the 4th of February.
 9   Q.   February 4?
10   A.   Yes.
11   Q.   And I think Agent McCue mentioned that the majority
12          of the individuals were arrested on the 5th but there
13          had been one individual arrested on the 4th.  Was
14          that, in fact, Mr. McDaniel?
15   A.   Yes.
16   Q.   And in connection with Keith McDaniel's arrest, were
17          you involved at all in -- or let me ask you this.
18          Did you actually have contact with him?
19   A.   On the 4th, yes.
20   Q.   And in connection with that did you have conversation
21          with him?
22   A.   Yes.
23   Q.   And during the course of this wiretap investigation
24          we have had testimony about -- particularly from
25          Officer Jones about all of the phone calls that came
```

```
 1            in on -- from the various target phones.

 2    A.    Yes.

 3    Q.    As this investigation was progressing, had you had

 4          opportunity to listen to the majority, if not all, of

 5          those phone calls?

 6    A.    Yes, I did.

 7    Q.    Even when you weren't there were there -- when you

 8          weren't there, how was it that you would get up to

 9          speed on phone calls that had came in when you maybe

10          weren't there at the beginning of each shift?

11    A.    I would come in and review the call line sheets; I

12          would listen to the calls; and in addition to that

13          part of my job was to actually sit in the wire room

14          and monitor calls.

15    Q.    Now, a lot of the folks who came in and testified

16          indicated that they had various aspects like

17          listening to the phone calls for a shift or

18          surveillance and the like, maybe an eight- or a

19          ten-hour shift.  As a case agent, you and Officer

20          Jones -- while this wiretap is going on, what were

21          the hours of operation, approximately, as far as the

22          wire?

23    A.    Generally, eight to four, four to midnight.

24    Q.    Okay.  So from eight to midnight, approximately, the

25          wire room was going on, and that was seven days a
```

```
 1        week?

 2   A.   Yes.

 3   Q.   And during that time period how many hours a day were

 4        you and Officer Jones typically working?

 5   A.   Generally a minimum of ten hours.  I mean, we were in

 6        there quite a bit.

 7   Q.   And that was seven days a week?

 8   A.   Pretty much.  There was some days where we would take

 9        off or we just pop in the office for a brief moment,

10        an hour or two.

11   Q.   During any of those intercepted calls -- and we

12        played a few of those -- were there calls that were

13        intercepted that you came to believe were associated

14        with an individual named Keith McDaniel?

15   A.   Yes.

16   Q.   And on February 4, 2008, when you had contact with

17        Keith McDaniel, you indicated you had a conversation

18        with him?

19   A.   Yes.

20   Q.   Did you make any determination or assessment about

21        whether the individual you were speaking with, that

22        being Keith McDaniel, was the same voice that you had

23        heard on the phone calls that you believed were

24        associated with Keith McDaniel?

25   A.   Yes.  That was him.
```

```
 1                   MS. MOREHEAD:  Judge, could we approach?

 2                   THE COURT:  Yes.

 3                   (Counsel approached the bench and the

 4          following proceedings were had:)

 5                   MS. MOREHEAD:  Judge, I think my last

 6          recollection is you had made pretty definitive

 7          rulings with regards to everyone except Mr. McDaniel,

 8          and I did not ask after Mr. Tarrants, frankly,

 9          because I knew I was going to follow up even further

10          with Agent McCue.  We had some testimony by

11          Officer Jones; we have had some testimony now from

12          Danny Tarrants; and we have had some testimony by

13          Agent McCue; so I think that was the end of --

14                   THE COURT:  I'm going to make a more formal

15          ruling on all of that, but I'm satisfied.  I don't

16          know where Mr. Bellemere really where this stands at

17          one point.  I'm not sure he didn't concede the point

18          at one stage.  Whether he did or not, I'm fairly --

19          I'm overwhelmingly satisfied that the government's

20          made a showing, and I'll make a formal --

21                   MR. BELLEMERE:  So really no reason to take

22          up your time telling you why I think that's

23          incorrect.

24                   THE COURT:  I think that's a good point.

25                   MR. BELLEMERE:  Okay.  I would like the
```

1  record to reflect that on behalf of my client I

2  disagree with your assessment and the U.S. Attorney's

3  assessment and I object to the appropriate -- I say

4  that the appropriate foundation has not been made.

5  THE COURT:  Let the record reflect that to

6  the extent that I may have thought Mr. Bellemere

7  withdrew his objection that was only in the context

8  of, I recall a particular, perhaps, series of calls

9  that he didn't want to hear any more, and so

10  tactically he may have acted as if he was withdrawing

11  his objection at this juncture, but, indeed, he's

12  wanted to stand on it, so he will get it ruled on in

13  due course.

14  MS. MOREHEAD:  Judge, you indicated at some

15  point you would advise -- make a finding to the jury.

16  THE COURT:  I will.

17  MS. MOREHEAD:  Thank you.

18  THE COURT:  I have my checklist right here.

19  MR. BELLEMERE:  I want to go on the record

20  as saying if there's something I have done the court

21  has taken into consideration that I said that waived

22  any objection that I had to the foundation, if I did

23  so, which I don't recall, if I did, in fact, do that,

24  then I stand by that waiver because I would not -- I

25  would not mislead the court or the prosecutor in any

```
 1          standing that I had.  So I don't recall.
 2                    THE COURT:  Rather than having this issue
 3          decided on whether you waived or not, I believe the
 4          evidence is so overwhelming that the government has
 5          made its case with regard to tying up these phone
 6          calls that I hereby make the record clear that I
 7          consider you to have made no waiver.  To the extent
 8          you may have said something that I construed to be
 9          potentially a waiver, I was incorrect.  There was no
10          waiver.  You have protected Mr. McDaniel's rights
11          right up to the threshold of the plank here, and I
12          will make the appropriate ruling in a bit.
13                    MS. MOREHEAD:  Judge, that's all the
14          questions I have of Agent McCue.
15                    THE COURT:  All right.  Any cross
16          examination?  Mr. Rogers?
17                         CROSS EXAMINATION
18   BY MR. ROGERS:
19   Q.    Mr. McCue, let's start with the geography part, okay?
20         You're not from Kansas City?
21   A.    No, sir.
22   Q.    You're from Elmhurst, Illinois --
23   A.    Chicago.
24   Q.    By Chicago?
25   A.    Yes.
```

```
 1    Q.    How long have you been in the Kansas City area?

 2    A.    Ten years.

 3    Q.    Okay.  And during that ten years you haven't just

 4          been in the state of Kansas; you've had occasion to

 5          come to downtown Kansas City, Missouri; correct?

 6    A.    That's correct.

 7    Q.    As a matter of fact, you've been at my law firm's

 8          office in downtown Kansas City, Missouri, on another

 9          matter?

10    A.    Yes, sir.

11    Q.    And that's located at 1000 Walnut Street in Kansas

12          City, Missouri?

13    A.    Yes, sir.

14    Q.    When you were there, did you notice a building called

15          the Wall Street Tower at 1101 Walnut Street?

16    A.    No, sir.

17               MR. ROGERS:  Your Honor, at this time I

18          would offer Defendant's Exhibit 729, ask the court to

19          take judicial notice.  What this is is the photocopy

20          cover of the 2007 AT&T Yellow Pages and a photocopy

21          of page 343 of that book, which lists condominiums

22          and lists the Wall Street Tower.

23               THE COURT:  Is there any objection?

24               MS. MOREHEAD:  I don't have an objection.

25               THE COURT:  All right.  Exhibit 729 is
```

2231

```
 1        admitted.

 2                    (Exhibit 729 was admitted into evidence.)

 3   Q.   (By Mr. Rogers) Let me show this to you on the

 4        monitor, Mr. McCue.  Does this appear to be a

 5        photocopy of the cover of the AT&T Yellow Pages?

 6   A.   Yes, sir.

 7   Q.   For January 2007?

 8   A.   Yes.

 9   Q.   And turning to the second page of the document, that

10        appears to be page 343?

11   A.   Yes, sir.

12   Q.   And you can see the 2007 copyright date there?

13   A.   Yes, sir.

14   Q.   Okay.  And showing you the highlighted section here,

15        it says condominiums?

16   A.   Yes, sir.

17   Q.   And over here it says Wall Street Tower; correct?

18        Would it be easier to look at the real document?

19   A.   Yes, sir.

20   Q.   Okay.

21   A.   Yes, sir, I see it.  Wall Street Tower, 1101 Walnut.

22   Q.   Okay.  And a phone number?

23   A.   Yes, sir.  (846)471-1010.

24   Q.   816?

25   A.   Yes.  I said 816.
```

```
 1    Q.   I heard 846, but I don't vouch for my hearing.  Okay.
 2         Is that the same name, Wall Street, that appears on
 3         Exhibit 728A at the bottom?
 4    A.   Yes.  On Exhibit 728A on the bottom it says Wall
 5         Street.
 6    Q.   Okay.  Now, you were not physically involved with the
 7         portion of the surveillance on November 27 which led
 8         through downtown Kansas City, were you?
 9    A.   No, sir.
10    Q.   But you were monitoring the radio traffic?
11    A.   Yes, sir.
12    Q.   And you've also, as Ms. Morehead has pointed out,
13         you've been here throughout the entire trial and
14         heard a bunch of testimony about those things too?
15    A.   That's correct.
16    Q.   Okay.  And you heard testimony about the surveillance
17         leading through downtown Kansas City, Missouri, where
18         the people in the Land Rover appeared to look at
19         condos and lofts?
20    A.   Yes, sir.
21    Q.   And that would be consistent with the location that
22         we have established now for the Wall Street Tower,
23         which is listed on a document found in the vehicle?
24    A.   Yes, sir.
25    Q.   Okay.  Fair enough.  And then you actually were
```

1      present in the vicinity of 54th and Prospect, where

2      the Tiner's Total Car Care Shop is located and the

3      Watson's Barber Shop is located?

4   A.   Yes.

5   Q.   Let me show you what's been marked as Defendant's

6      Exhibit 730.  Is that a map of the -- part of the

7      Kansas City area?

8   A.   I would agree.

9   Q.   Does it appear to fairly and accurately represent

10      those parts that it shows?

11  A.   Yes, sir.

12  Q.   Okay.

13            MR. ROGERS:  Your Honor, at this time I

14      would offer Exhibit 730.

15            THE COURT:  Is there any objection?

16            MS. MOREHEAD:  I have not seen it, your

17      Honor.

18            MR. ROGERS:  I'm sorry.

19            THE COURT:  Is there any objection?

20            MS. MOREHEAD:  No, no.

21            THE COURT:  All right.  Exhibit 730 is

22      admitted.

23            (Exhibit 730 was admitted into evidence.)

24  Q.   (By Mr. Rogers) Now, Officer McCue -- Agent McCue,

25      excuse me -- this map depicts the Wall Street Tower;

2234

1      right?

2  A.   Yes.

3  Q.   It depicts the 5400 block of Prospect; correct?

4  A.   Correct.

5  Q.   You have already talked about both of those places;

6      right?

7  A.   Yes, sir.

8  Q.   It also has another address of 2724 Wabash Avenue?

9  A.   Yes, sir.

10 Q.   And calling your attention once again to

11      Exhibit 728A, the address of 2724 Wabash Avenue

12      appears on that, doesn't it?

13 A.   Yes, sir.

14 Q.   And it's pretty obvious from the map that that

15      address on Wabash is roughly in between downtown and

16      the Wall Street Tower and 54th and Prospect, where

17      the car shop is?

18 A.   Yes, sir.

19 Q.   You heard the radio traffic during the surveillance

20      referring to law enforcement activity at a park; is

21      that correct?

22 A.   Yes, sir.

23 Q.   And, in fact, you heard Officer Jones testify that

24      that park was in the vicinity of 27th and Brooklyn in

25      Kansas City, Missouri; correct?

1    A.    Yes.

2    Q.    And that's what you also recalled from the radio

3          traffic?

4    A.    Yes.

5    Q.    Let me show you then -- well, let me first establish,

6          even if I zoom in on Exhibit 730, it doesn't have the

7          detail that shows Brooklyn Avenue, I guess it is?

8    A.    I don't see it, sir.

9    Q.    Okay.  So now let me show you what has been marked as

10         Exhibit 731 and ask you if that's another kind of --

11         closeup of a portion of the same map or a map of a

12         portion of the same area, perhaps.

13   A.    It's a zoomed-in section.

14   Q.    Okay.  That's exactly what it is.  Thank you.  Is

15         that fair and accurate to the best of your knowledge?

16   A.    I believe so.

17                 MR. ROGERS:  I would offer Exhibit 731,

18         your Honor.

19                 MS. MOREHEAD:  No objection.

20                 THE COURT:  Any objection on the other side

21         of the room?  I hear none.  Exhibit 731 is admitted.

22                 (Exhibit 731 was admitted into evidence.)

23   Q.    (By Mr. Rogers) Now I'm showing you on the monitor a

24         portion of Exhibit 731 that does, in fact, still show

25         the address at 2724 Wabash; correct?

```
 1   A.   Yes, sir.

 2   Q.   It also shows Brooklyn Avenue; correct?

 3   A.   Yes, sir.

 4   Q.   And it also shows, almost obscured by the push pin,

 5        27th Street?

 6   A.   Yes, sir.

 7   Q.   Right there, East 27th Street.  And so the

 8        intersection of 27th and Brooklyn would be right

 9        there?

10   A.   Yes.

11   Q.   And next to that intersection is, in fact, a park;

12        correct?

13   A.   Yes, sir.

14   Q.   And is that the park that -- well, you've seen it on

15        the map -- that you believe Mr. Wesley was referring

16        to driving past and observing the law enforcement

17        activity?

18   A.   Quite possibly.

19   Q.   And so if you were coming from the downtown area --

20        which would be up in this direction on the map;

21        right?

22   A.   [Nodded head.]

23   Q.   -- and going down to the barber shop, which would be

24        down there on the map, it would be very likely that

25        you would go through the park; correct?
```

```
 1    A.    Sure.

 2    Q.    And also if you were going to 27th and Wabash, it

 3          would be very likely you would go to the park?

 4    A.    Okay.

 5    Q.    Wouldn't it?

 6    A.    Yes, sir.

 7    Q.    Okay.  Now, you mentioned your interrogation of

 8          Mr. Goodwin; correct?

 9    A.    Yes, sir.

10    Q.    And you also mentioned in passing your interrogation

11          of Mr. Wesley?

12    A.    Yes, sir.

13    Q.    Also on November 27 of 2007 you were present at the

14          interrogation of Rtayvian Simpson?

15    A.    Yes.

16    Q.    And you've heard Officer Jones testify about his

17          procedures in doing interrogations.  Are those

18          similar to your procedures?

19    A.    In terms of?

20    Q.    In terms of not using a video recording?

21    A.    Yes.

22    Q.    In terms of not using an audio recording?

23    A.    Yes.

24    Q.    In terms of having two officers or agents present, at

25          least?
```

1    A.   Yes, you want two.

2    Q.   And in terms of only one of those agents writes the

3         report?

4    A.   Yes.

5    Q.   And in terms the agent writing the report takes

6         handwritten notes at the interview?

7    A.   Yes, someone takes notes.

8    Q.   And after the report is written the handwritten notes

9         are destroyed?

10   A.   That's what Officer Jones testified to.

11   Q.   Is that different than you do?  You keep your notes?

12   A.   Yes, sir.

13   Q.   Did you take handwritten notes at the interview of

14        Mr. Simpson?

15   A.   No.  I believe Agent Holder wrote that report.

16   Q.   You don't know if he destroyed his notes or not?  Or

17        do you?

18   A.   I believe he has his notes.

19   Q.   You were present during the interview though?

20   A.   Yes, sir.

21   Q.   And you are the one, I believe, who advised

22        Mr. Simpson of his Miranda rights?

23   A.   That's correct.

24   Q.   Used the same little card in your wallet?

25   A.   Yes, sir.

```
 1   Q.   Now, when you were a police officer in Illinois, a

 2        street officer, you had a form of a Miranda waiver

 3        that you carried with you in your car; right?

 4   A.   There may have been.  It's been a while since I have

 5        been there, but I generally use my Miranda card.

 6   Q.   But there is such a form?  You've seen it?

 7   A.   There's one with DEA, and some police departments

 8        have them.  At the time with the police department

 9        there may have been.

10   Q.   Okay.  Now my question is, you just said there's one

11        at DEA as well?

12   A.   Yes, sir.

13   Q.   And the difference between the card and the form, the

14        advice of rights is the same; right?

15   A.   Yes, sir.

16   Q.   But there's a place on the form for the individual to

17        say, yeah, you've advised me of these rights and I'm

18        willing to talk to you?

19   A.   Yes, sir.

20   Q.   But no such thing on your card; right?  You keep the

21        card and nobody signs it?

22   A.   Correct, yes, sir.

23   Q.   So, once again, it's basically -- rather than having

24        something in writing where a defendant, like a

25        consent to search, has signed, it's just you saying
```

1           they consented to talk; right?

2    A.    Yes, sir.  And in regards to that I'm pretty sure at

3           the top of the notes Agent Holder has, it would put

4           the time that I Mirandized him.

5    Q.    But, once again, that's not signed by the suspect?

6    A.    Correct, sir.

7    Q.    Now, however, notwithstanding all that, Mr. Simpson

8           did, in fact, agree to talk to you and to Agent

9           Holder?

10   A.    Yes, sir.

11   Q.    And he did talk to you?

12   A.    Yes, sir.

13   Q.    Now, at the time that you talked with him, had you

14          become aware that the Rug Doctor was in the back of

15          the -- in the back seat area of the Land Rover or

16          Ranger Rover?

17   A.    Not me, sir, no.

18   Q.    After talking to Mr. Simpson?

19               MS. MOREHEAD:  Judge, I'm going to object.

20          Can we approach?

21               THE COURT:  Well, I don't know what his

22          next question going to be.

23               MR. ROGERS:  I can approach you and tell

24          you, if you want.  I was trying to do it like she

25          taught me.

1          (Counsel approached the bench and the

2     following proceedings were had:)

3               MR. ROGERS:  After talking with

4     Mr. Simpson, did you ascertain that a Rug Doctor had,

5     in fact, been in the back seat area of the Ranger

6     Rover?

7               THE COURT:  Are you asking him did he go

8     look, or are you just asking him what did Simpson

9     tell him?

10              MR. ROGERS:  After talking with

11     Mr. Simpson.

12              THE COURT:  Are you asking him though did

13     he go look after he talked?

14              MR. ROGERS:  I will ask him did he go look.

15              THE COURT:  The distinction between what we

16     talked about yesterday, if you said this is why

17     somebody did something next, it would be okay.  If --

18              MR. ROGERS:  If he says he didn't go look,

19     I'll ask him did he check the reports to find out.

20              MS. MOREHEAD:  He can't rely -- then we're

21     talking about hearsay.  Sorry, Judge.  I don't mean

22     to interrupt you.

23              THE COURT:  Thank you.  Of course, you

24     didn't finish the question, so I don't know what you

25     were going to ask him.  You can say, did you talk to

REBECCA S. RYDER, CCR, RMR
UNITED STATES COURT REPORTER
913-551-5645

```
 1              Mr. Simpson about the Rug Doctor?  Did you go check

 2              the car?  But you can't leave ultimately with the

 3              jury, based on talking to Mr. Simpson, did you know

 4              that he said that there was a Rug Doctor in the car?

 5              That's what you can't do either directly or

 6              indirectly.

 7                        MR. ROGERS:  Okay.

 8                        THE COURT:  You've got the picture?

 9                        MR. ROGERS:  I'll get there.

10                        THE COURT:  Yeah.

11                        (The proceedings returned to open court.)

12    Q.   (By Mr. Rogers) Okay.  You talked with Mr. Simpson?

13    A.   Yes, sir.

14    Q.   You talked about the Rug Doctor?

15                        MS. MOREHEAD:  Objection, Judge.

16                        THE COURT:  He can ask him if he talked

17              about the Rug Doctor.  That's not hearsay, simply the

18              subject of a conversation, not what somebody said,

19              therefore clearly not offered for the truth of the

20              matter.  You can ask if they talked about the Rug

21              Doctor.

22    Q.   (By Mr. Rogers) Let me ask it this way.  Was the Rug

23              Doctor mentioned during that conversation?

24    A.   I don't recall any conversation in regards to a Rug

25              Doctor.
```

1   Q.   So after the conversation you didn't go look and see

2        what was in the back of the Ranger Rover?

3   A.   No.

4   Q.   All right.  Now, you talked to Mr. Simpson about what

5        he had done before driving at the car wash?

6   A.   Yes, sir.

7   Q.   You talked to Mr. Simpson about where he had gone on

8        the 5400 block of Prospect?

9   A.   Yes, sir.

10  Q.   And after talking with Mr. Simpson, did you go to

11       Tiner's Total Car Care to see whether or not there

12       was a vehicle there belonging to Mr. Wesley?

13  A.   I did not, sir.

14  Q.   Did you send anybody else to do it?

15  A.   I don't recall specifically telling anyone to go to

16       the car shop.  I know that question has been asked.

17       I did not.

18  Q.   Now, you told us a little bit yesterday about the

19       encounter at the car wash and the encounter between

20       the vehicle you were driving and the Ranger Rover;

21       correct?

22  A.   Yes, sir.

23  Q.   And to set the scene, you had been working on this

24       case for months?

25  A.   Yes, sir.

```
 1    Q.   And you and Mr. Jones were in charge of the case?

 2    A.   Yes, sir.

 3    Q.   And this was the culmination of these months of

 4         ten-hour days, seven-day weeks; right?

 5    A.   Yes, sir.

 6    Q.   And you were there for the purpose of catching

 7         Monterial Wesley and Thomas Humphrey red handed in

 8         the act of transferring a large quantity of cocaine?

 9    A.   Yes.

10    Q.   This was going to be the culminating moment of all

11         those months of work?

12    A.   That's correct.

13    Q.   And you were the person directly assigned to securing

14         Thomas Wesley's vehicle?

15    A.   Not Thomas Wesley.

16    Q.   I'm sorry.  Monterial Wesley.  I had the two names

17         conflated.

18    A.   I think -- as the surveillance played out, I think it

19         just lended itself that I was going to secure the

20         occupant of the Ranger Rover.  It wasn't throughout

21         the whole day that was -- I think it just landed in

22         that type of position.

23    Q.   Because of where you were and where everybody else

24         was and --

25    A.   Yes.
```

| | | |
|---|---|---|
| 1 | Q. | So you're there talking on the radio with everybody |
| 2 | | else.  I'm going to do this, you do this, you do |
| 3 | | this; right? |
| 4 | A. | Once it was set up, yes. |
| 5 | Q. | So you're sitting there by the radio place, right in |
| 6 | | the parking lot of the radio place? |
| 7 | A. | Yes, sir. |
| 8 | Q. | And what's the name of that again? |
| 9 | A. | Commenco. |
| 10 | Q. | Can you spell that for me. |
| 11 | A. | C-O-M-M-E-N-C-O Radio, Commenco. |
| 12 | Q. | And that's where the DEA has their radio work done |
| 13 | | too? |
| 14 | A. | Yeah.  It's a big facility and they do all types of |
| 15 | | commercial work. |
| 16 | Q. | Okay.  But you're there, and so you're across the |
| 17 | | street from the car wash, and you're excited, aren't |
| 18 | | you? |
| 19 | A. | Yes, sir. |
| 20 | Q. | You're raring to go, so to speak? |
| 21 | A. | Yes, sir. |
| 22 | Q. | And you're the one who actually gave the go signal? |
| 23 | A. | Yes. |
| 24 | Q. | And you're driving your car, which is a Pontiac G6? |
| 25 | A. | Yes, sir. |

1    Q.   And that is a mid-sized car?

2    A.   Yeah, mid-sized.

3    Q.   If you were going to rent it at Hertz, they would say

4         mid-sized; right?

5    A.   Yes.

6    Q.   And it's got kind of a pointy front?

7    A.   It has a sloped front.

8    Q.   Right.  As opposed to the Range Rover, which is a

9         tall SUV?

10   A.   That's correct.

11   Q.   And it's not only high up off the ground, like SUVs

12        tend to be, but it's also got kind of a square back?

13   A.   Yes, sir.

14   Q.   And you did not intend to run the nose of your

15        Pontiac under the SUV, did you?

16   A.   I intended to make contact with the vehicle.

17   Q.   But you could tell by looking that you couldn't make

18        bumper-to-bumper contact, couldn't you?

19   A.   Well, after the fact.  I didn't realize it, but when

20        I braked, the front of the car, most vehicles will

21        dip down, as this car did, my car, and it went

22        underneath the bumper.  It went underneath the

23        bumper, and then there was a flat trailer hitch, the

24        plate, that the hood of my car made contact with.

25   Q.   There wasn't actually a trailer hitch on the back of

```
 1           it; there was a place where you could put a trailer

 2           hitch if you wanted to?

 3    A.     Yes, sir.

 4    Q.     And your car dipped down, and you went all the way in

 5           until you made some sort of contact with something

 6           underneath the car; right?

 7    A.     Yes.  I would say the plate of the trailer hitch.

 8    Q.     Well, did you completely stop before you made

 9           contact?

10    A.     Yes.  Probably about the portion -- I'm estimating

11           here -- that went underneath the bumper, the damage

12           on my vehicle, if this is the hood of the car, is

13           probably an area about this big.

14    Q.     You're indicating approximately 8 to 10 inches wide?

15    A.     Yes, give or take.

16    Q.     And it's not on the very edge of the hood?

17    A.     It's pretty much dead center.

18    Q.     Okay.  But it's also not on the front edge of the

19           hood?

20    A.     The damage is mostly on the front of the hood of the

21           car with the bumper being -- if this is the hood, it

22           slopes down, the best way to describe the bumper

23           area, and the damage was sustained on the hood of the

24           car.

25    Q.     On the hood, not the -- if you open the hood,
```

1           there's --

2    A.    Right on the lip, right on the lip.

3    Q.    And how far back did the damage extend?

4    A.    Estimating here, what, 2 inches, maybe.  It kind of

5          goes like that.

6    Q.    You're indicating around 2 inches?

7    A.    Approximately.

8    Q.    Approximately, okay.  And your testimony is that as

9          you applied the brakes your -- first of all, you

10          intended to make physical contact with the SUV?

11    A.    Yes, sir.

12    Q.    Even though you could have been a foot back and it

13          would have made no difference in the SUV's ability to

14          escape?

15    A.    I disagree with you, in that part of the training I

16          received is in vehicle containment.  A lot of the

17          arrests we make revolve around vehicles when an

18          individual is driving it or the individual is inside

19          the vehicle, say, during what we would call a

20          buy/bust, and as a result of that throughout DEA

21          there were a number of ramming incidents, a lot of

22          shooting incidences in regards to these arrests.

23          They implemented a training procedure called vehicle

24          containment in which you are to make contact, light

25          contact, with the vehicle.  It especially helps if

```
 1           there's another vehicle in front where you can
 2           essentially pinch the individual in and prevent them
 3           from maneuvering in an arrest situation.  If a person
 4           decides to flee, literally, with a couple inches of
 5           space in a vehicle, if a person started getting
 6           momentum, especially in a bigger vehicle, the little
 7           vehicle is going to elude.  And as the pushing would
 8           start, the difference would increase, and that would
 9           escalate the situation.  By making contact with the
10           vehicle, you attempt to take a person's ability to
11           escape from them, or at least the thought of doing
12           it.
13     Q.    But in this case the vehicle in front of the Ranger
14           Rover -- I'm sorry.  Was it a Ranger Rover or a Land
15           Rover?  I tend to use them interchangeably.
16     A.    We are using them interchangeably.  It's the bigger
17           one.  I believe it's the Range Rover.
18     Q.    Okay.  And the vehicle in front of it was
19           Mr. Wesley's vehicle, correct, the black Tahoe?
20     A.    Thomas Humphrey.
21     Q.    Humphrey.  See, I'm doing it again.  Thank you.
22           Mr. Humphrey's vehicle?
23     A.    Yes.
24     Q.    The black Camaro?
25     A.    Yes.
```

2250

1    Q.   And it was several feet in front of it?

2    A.   Yes, sir.

3    Q.   So there was plenty of room to go forward and come

4         back to ram it if you need to or want to, are so

5         inclined; correct?

6    A.   Yes.

7    Q.   Even though this may have been your training, there's

8         no real benefit to it in this circumstance, is there?

9    A.   Yes, because you truly don't know how the individual

10        is going to react.

11   Q.   So it was your intention to make contact?

12   A.   Yes, sir.

13   Q.   And so you approached at a rapid enough rate that

14        when you applied your brakes the hood, the nose of

15        the Pontiac, lowered?

16   A.   Yes, sir.

17   Q.   And that's common?

18   A.   Yes, sir.

19   Q.   Because of the springs and the shock absorbers and

20        the way they work; correct?

21   A.   I would agree.

22   Q.   And then when you came to a stop, it raised back up?

23   A.   Yes, sir.

24   Q.   And at that time it impacted the bottom of the place

25        where a trailer hitch would be if it had a trailer

1       hitch?

2   A.  Yes.

3   Q.  On the Ranger Rover?

4   A.  Yes, sir.

5   Q.  And, of course, the Ranger Rover has springs and

6       shock absorbers and stuff too?

7   A.  Yes.

8   Q.  So when it came up at the bottom of the Ranger Rover,

9       it lifted the bottom of the Ranger Rover, didn't it,

10      the back of the Ranger Rover?

11  A.  Minutely.

12  Q.  But it did so, didn't it?

13  A.  To the extent that it slid underneath there, the SUV,

14      with a stiffer suspension -- when we say lift, we're

15      not talking lifting the back end off the ground.  It

16      may have moved up ever so slightly.

17  Q.  Ever so slightly?

18  A.  Yes.

19  Q.  Four inches, 6 inches?

20  A.  No.

21  Q.  You told us yesterday that it didn't move at all;

22      right?

23  A.  If I said that -- again, your line of question now

24      was, did it move? and I'm saying ever so slightly.

25  Q.  Okay.  Obviously, with the back of the Ranger Rover

1    lifted up, it would be elevated in relation to the

2    front of the Ranger Rover, correct, compared to what

3    it was before?

4  A.  And I disagree because the vehicle, my vehicle, when

5    the vehicles made contact, the SUV moved.  It moved

6    ever so slightly.  Did it affect the front end?  I

7    don't believe so.

8  Q.  I didn't ask did it affect the front end; it affected

9    the back of it relative to the front.  In other

10   words, if something is level and you lift up one end,

11   it's higher than the other end that stays the same?

12 A.  Yes, sir.

13 Q.  Okay.  Now, you testified yesterday, I believe, that

14   you did not have this fixed, have the hood of your

15   vehicle fixed, because it was going to be surplussed

16   out anyway?

17 A.  Yes.  I have no vested interest in the vehicle.  I

18   don't sell it after it's done.  I just --

19 Q.  It belongs to the agency?

20 A.  It belongs to the agency.  I have no vested interest

21   in it and --

22 Q.  And did you make a report that included the contact

23   between the two vehicles and the damage sustained by

24   yours?

25 A.  Yes, sir.

1           MR. ROGERS:  May we approach, your Honor?

2           THE COURT:  You may.

3           (Counsel approached the bench and the

4      following proceedings were had:)

5           MR. ROGERS:  I just asked Ms. Morehead if

6      we had a copy of that, and she said no.  I think this

7      is certainly discoverable under Giglio.  It's a

8      statement of this witness concerning a matter about

9      which he testified on direct examination.

10          THE COURT:  That's Jencks, but the question

11     is whether he really used it, not the subject he

12     talked about, but did he refer to that at all?

13          MS. MOREHEAD:  No.

14          THE COURT:  The other aspect under Giglio

15     would be if, in fact, it does reflect something

16     that -- or Brady maybe -- that would be exculpatory

17     to the extent that it supports your argument that

18     there was this bumping action.  Is this report

19     available?

20          MS. MOREHEAD:  I've never seen it.  It's

21     some sort of internal department report any time a

22     vehicle sustains damage, but I don't know what it

23     involved by way of --

24          MR. ROGERS:  The reason I'm saying Giglio

25     instead of Jencks, your Honor, was just what you

1    said.  There might be something which would be

2    different.  It would certainly reflect the amount of

3    the damage, which I could assess.  I certainly could

4    have used it in preparing my cross examination.

5              THE COURT:  What I would ask is, since you

6    have clearly pursued this line of questioning more

7    than one time throughout three weeks of trial, you

8    might have asked about it sooner, since it's obvious

9    to you that you might have found it interesting, so I

10   think that is a question about the timeliness of your

11   request in light of the fact that this is not,

12   obviously, something that should have been turned

13   over under Giglio and Brady.  It only becomes

14   potentially useful if, in fact, it turns up something

15   which perhaps on the face of it it doesn't even

16   reflect.  So the fact that you've waited so long to

17   ask for it certainly mitigates any concern we would

18   have.  Now, you're going to maybe say, I didn't know

19   he had it until I just asked him, but you've had the

20   opportunity -- this is not as if you couldn't ask

21   somebody about that.

22             MR. ROGERS:  I was assuming, your Honor --

23   first of all, I was assuming that he had not made

24   such a report, and --

25             THE COURT:  Did you ask?  Did you ask Ms.

1          Morehead?

2                  MR. ROGERS:  No, I did not, because his

3          version of it hitting the top of the hood and going

4          underneath I hadn't heard until yesterday.  I had

5          heard that there was a contact, but I've seen no

6          report about any contact.  I looked and tried to find

7          such a report and didn't, and so that's why I have

8          been asking more open-ended questions than I like to

9          ask on cross examination about it, and I was just

10          assuming that Agent McCue had chosen not to write a

11          report.

12                  MS. MOREHEAD:  Well, Agent McCue didn't

13          write the report.  It's a report written by another

14          agent, just like if a police officer is involved in a

15          collision, another officer does the report to make a

16          report that such and such has happened.  It's not a

17          report by Agent McCue; it would be an internal DEA

18          report by whoever investigated it.  And, frankly, I

19          believe it was Agent Holder because he was the only

20          other agent on scene, but I don't have the report.

21                  THE COURT:  This is really no problem

22          because we will certainly let you recall McCue or

23          Holder in your case in chief, and we will direct Ms.

24          Morehead to get you a copy of this report, and you'll

25          have that opportunity should you so choose, and

1    you'll be able to -- if you called them in your case

2    in chief, you would be able to utilize leading

3    questions and treat them, of course, as if you were

4    on cross examination, given their adversarial

5    relationship to your client.

6            MS. MOREHEAD:  We can have the report faxed

7    over, Judge.  I was just kind of looking at the time,

8    and I may ask Officer Jones to step out and make a

9    quick call and have them fax it.  Maybe we will have

10   it faxed over by the break.

11           THE COURT:  Good.  Then you can recall him

12   yet this morning.

13           MR. ROGERS:  Sounds good.  Thank you.

14           (The proceedings returned to open court.)

15   Q.   (By Mr. Rogers) Let's then proceed to the events

16        right after your car -- the nose of your car is

17        underneath the rear of the Ranger Rover.  You got out

18        of your car, and Mr. Holder was to your left?

19   A.   Yes.

20   Q.   And the Ranger Rover, I believe, has darkly tinted

21        windows?

22   A.   I believe the windows are tinted, yes.

23   Q.   And at the time you get out of your car, you're

24        closer to the Ranger Rover than Mr. Holder is?

25   A.   Yes, sir.

1    Q.   And the driver's side door is closed?

2    A.   Yes, sir.

3    Q.   Is the passenger's side door also closed?

4    A.   Yes.

5    Q.   Could you hear --

6    A.   Oh, the passenger's side?

7    Q.   Yes.

8    A.   I'm sorry.  I came up -- I approached on the driver's

9         side.  I couldn't tell you if the right passenger

10        doors were open.  I know the left rear passenger door

11        was closed and the driver's door was closed.

12   Q.   Okay.  Could you hear music coming from the vehicle?

13   A.   I don't recall, sir.

14   Q.   Okay.  And you approached on the driver's side;

15        you're wearing a bulletproof vest that has "police"

16        stenciled across it?

17   A.   Yes, sir.

18   Q.   It's black and the stencil is yellow?

19   A.   Yes, sir.

20   Q.   And Mr. Simpson is in the driver's seat?

21   A.   Yes, sir.

22   Q.   And he is sitting down looking at his -- looking sort

23        of down, I believe you demonstrated yesterday?

24   A.   I can't tell you what he was doing when I approached.

25   Q.   Okay.  As you're -- and this whole thing takes just a

1        few seconds; right?

2    A.   Yes, sir.

3    Q.   You're doing things as fast as you can?

4    A.   Absolutely.

5    Q.   And you have your weapon out and drawn?

6    A.   Yes, sir.

7    Q.   And you're right handed?

8    A.   Yes.

9    Q.   You have your weapon in your right hand?

10   A.   Yes, sir.

11   Q.   And by the time you get to the driver's door -- which

12        is the front door to the driver's; right?

13   A.   Yes, sir.

14   Q.   By the time you get to the driver's door, Mr. Holder

15        is behind you and a little to your right?

16   A.   Yes, sir.

17   Q.   And the window is still rolled up, the door still

18        closed?

19   A.   Yes, sir.

20   Q.   Is that the first time you actually see Mr. Simpson?

21   A.   Yes, sir.

22   Q.   Because the driver's window is still tinted but less

23        darkly so than the rear windows or because there's

24        less of an angle?

25   A.   The first time I see him is when I approach the

2259

```
 1          driver's door and kind of step out to the side, is
 2          when I see an individual obviously who was later
 3          identified as Mr. Simpson sitting there.
 4    Q.    Okay.  And you -- you're still looking through a
 5          darkly tinted window?
 6    A.    Yes, sir.
 7    Q.    And so you can't really make out who the individual
 8          is or what they are doing?  You just see their shape?
 9    A.    Yes, sir.
10    Q.    And then you start to open the door?
11    A.    Yes, sir.
12    Q.    With your left hand?
13    A.    Yes.
14    Q.    Still got your gun in your right?
15    A.    Yes.
16    Q.    Then you're yelling, get your hands up, let me see
17          your hands, or words to that effect?
18    A.    Yes.  I'm saying that as I'm approaching the --
19          obviously, I got out of the vehicle yelling police,
20          police, and I'm walking up to the car quickly.  As I
21          get close and am about to grab the door, let me see
22          your hands, let me see your hands, as I open the
23          door.
24    Q.    And as you open the door, Mr. Simpson raises his
25          hands?
```

1    A.    Mr. Simpson, as I demonstrated yesterday, raises his

2          hands.

3    Q.    Okay.  And this is just a matter of -- from the time

4          you first get out of your car until the time you're

5          opening the door is just a matter of a few seconds;

6          right?

7    A.    Yes.  We are not talking minutes; we're talking

8          seconds.

9    Q.    And the distance between the driver's door of your

10         car and the driver's door of the Ranger Rover is less

11         than the distance between me and you right now?

12   A.    I would agree.

13   Q.    And you're getting there as fast as you can?  I'm not

14         saying you're sprinting like Rafer Jackson, but

15         you're --

16   A.    Right, like that, right.

17               THE WITNESS:  May I demonstrate, Judge?

18          You're faster than me.

19               MR. ROGERS:  May Mr. McCue demonstrate the

20         rapidity with which he moved?

21               THE COURT:  All right.

22   Q.    (By Mr. Rogers) Come on down and do it.

23   A.    If I'm getting out of the car, you're getting out

24         going, police, police, police, let me see your hands,

25         let me see your hands, let me see your hands, about

1           that fast.

2    Q.    Five seconds max?

3    A.    A little slower than what you were doing.

4    Q.    I don't have any trouble believing it too.  I'm

5          pretty decrepit in my dotage here.  And then you open

6          the door?

7    A.    Yes, sir.

8    Q.    And he puts up the hands?

9    A.    Yes, sir.

10   Q.    And you're looking then (a) at his hands, but you're

11         also looking at him?

12   A.    Yes, sir.

13   Q.    And you don't see a gun then, do you?

14   A.    No, sir.

15   Q.    There's not a gun on his lap, is there?

16   A.    No.

17   Q.    If there had been one on his lap, you would have seen

18         it?

19   A.    Yes, sir.

20   Q.    And, in fact, you don't see the gun at all?

21   A.    That's correct.

22   Q.    Until he's out of the car?

23   A.    Yes, sir.

24   Q.    When he's out of the car, you see the gun on the

25         floor?

```
 1   A.   Yes, sir.

 2   Q.   And Mr. Holder has already called it to your

 3        attention?

 4   A.   Yes, sir.

 5   Q.   And you also see the I-Pod there on the ground

 6        outside?

 7   A.   I personally knew nothing about the I-Pod.

 8   Q.   You didn't even see it at the time?

 9   A.   No.

10   Q.   Okay.  You have no reason to dispute Mr. Holder's

11        account?

12   A.   Oh, no but I'm saying any involvement with that

13        I-Pod, I didn't see it.  He requested Mr. Holder --

14        he advised Mr. Holder that it was about to get wet.

15        It was Agent Holder who placed it in the car.  I had

16        nothing to do with any I-Pod.

17   Q.   And you didn't see it on his lap either?

18   A.   No, sir.

19   Q.   It's a lot smaller than the gun though?

20   A.   Yes, sir.

21   Q.   When you saw the gun, was it in the position that

22        it's in in Government's Exhibit 308?

23   A.   Yes, sir.

24   Q.   And was the I-Pod power cord there when you saw it,

25        first saw the gun?
```

```
 1    A.   Yes, sir.

 2    Q.   And was this black speaker code or headphone

 3         cord-type thing there?

 4    A.   There was a black cord there, yes.

 5    Q.   Okay.  And did you trace that black cord anyplace?

 6    A.   No, sir.

 7    Q.   So you don't know whether or not that is hard-wired

 8         into the sound system of the vehicle so that an I-Pod

 9         can be plugged into it?

10    A.   I have no idea what that cord is for, sir.

11    Q.   Okay.  But you will agree that it's on top of the

12         gun?

13    A.   Yes, sir.

14    Q.   And you also saw the magazine, Government's

15         Exhibit 58, the magazine?

16    A.   Yes, sir.

17    Q.   And that's at the front of the floor of the driver's

18         side area; correct?

19    A.   Yes, sir.

20    Q.   And on this part this is just like a foot rest;

21         right?

22    A.   Yes, sir.

23    Q.   And here is the brake pedal?

24    A.   I would agree.

25    Q.   And here is the accelerator?
```

1   A.   Yes.

2   Q.   And so the gun would be back down in that general

3        direction?

4   A.   Yeah, within -- yes.

5             MR. ROGERS:  Those are all questions I have

6        at this time, your Honor.

7             THE COURT:  Very well.  Mr. Johnson?

8             MR. JOHNSON:  Thank you.

9                  CROSS EXAMINATION

10  BY MR. JOHNSON:

11  Q.   Agent McCue, on March 26, 2009, you participated in

12       the proffer interview with Henry Grigsby?

13  A.   Okay.

14  Q.   Is that correct?

15  A.   I would have to see the date or reports to verify

16       that.

17  Q.   I'll show you a copy of Eric Jones' report if that

18       will refresh your memory as to the date.

19  A.   Okay.

20  Q.   And that was March 26 of this year?

21  A.   Yes, sir.

22  Q.   And you and Officer Jones --

23             MS. MOREHEAD:  Judge, I'm going to object.

24       This goes beyond the scope of direct.

25             THE COURT:  What do you have to say about

1      this, Mr. Johnson?

2                  MR. JOHNSON:  Well, we could do one of two

3      things.  I could get into Henry Grigsby's prior

4      inconsistent statement through this witness right

5      now, or we can do it during my case in chief.

6                  THE COURT:  Well, I think --

7                  MR. JOHNSON:  I think out of judicial

8      economy it makes sense to do it now.

9                  THE COURT:  If Ms. Morehead objects and

10     it's beyond the scope, the objection is sustained.

11     If she doesn't object, I have no problem with you

12     doing it, but if she objects, sustained.

13  Q.  (By Mr. Johnson) You testified again about

14     participating in Franklin Goodwin's interrogation?

15  A.  Yes, sir.

16  Q.  He had actually surrendered himself?

17  A.  Yes, sir.

18  Q.  You didn't have to go out with five officers to

19     conduct the arrest?

20  A.  I think originally we did, but ultimately he turned

21     himself in.

22  Q.  You attempted to, but you just didn't know where he

23     was?

24  A.  Yes.

25  Q.  And somehow that information in some way got back to

```
 1        him to where he knew that there was a warrant?
 2   A.   Yes.
 3   Q.   And so he came to the office and surrendered to U.S.
 4        marshals?
 5   A.   That's correct.
 6   Q.   And you and Officer Jones went and met with him?
 7   A.   That's correct.
 8   Q.   And you and went by yourselves?
 9   A.   Yes.
10   Q.   There were no other people in that room other than
11        the three of you?
12   A.   There may have been a U.S. marshal, but it was
13        definitely me and Officer Jones from DEA.
14   Q.   And during that interrogation Mr. Goodwin was crying?
15   A.   I don't recall if he was crying or not, sir.
16   Q.   He was certainly distraught and upset?
17   A.   As would be anyone.
18   Q.   Now, you had a choice whether or not to bring in a
19        recorder?
20   A.   Do I have a choice?  Yes.  Can we bring one in?  Yes.
21   Q.   And you chose not to?
22   A.   I never do.
23   Q.   You have been through a substantial amount of law
24        enforcement training?
25   A.   Yes, sir.
```

1    Q.    And you've had training, as you've testified, about

2          officer safety?

3    A.    Yes, sir.

4    Q.    You've had training about manners of investigating a

5          case?

6    A.    Yes, sir.

7    Q.    You also have to have some training on the criminal

8          justice system?

9    A.    Yes, sir.

10   Q.    You know, that when you conduct an investigation, if

11         you hope that investigation will be fruitful, that

12         is, to result in a conviction, you may end up in

13         court?

14   A.    Yes, sir.

15   Q.    You may end up testifying in front of a judge?

16   A.    Yes, sir.

17   Q.    Both before and during trial?

18   A.    Yes, sir.

19   Q.    You may end up testifying, as here, in front of a

20         jury?

21   A.    That's correct.

22   Q.    And for that reason you have to be mindful of the

23         criminal justice process when you are investigating a

24         case?

25   A.    Sure.

2268

```
 1   Q.   So you learn during that training about different
 2        types of evidence?
 3   A.   Yes, sir.
 4   Q.   And you learn how that evidence may be used in court?
 5   A.   Yes, sir.
 6   Q.   So you've -- you know how, for example, audio and
 7        video recordings might be employed in court?
 8   A.   Yes, sir.
 9   Q.   Documentary evidence?
10   A.   Okay.
11   Q.   Things like the maps that Mr. Rogers was using, those
12        are types of evidence?
13   A.   Okay.
14   Q.   And you learn about these different types of
15        evidence?
16   A.   Yes, sir.
17   Q.   And one of the types of evidence is testimony?
18   A.   Yes, sir.
19   Q.   In fact, the vast majority of this trial has been
20        through witnesses testifying about what they may or
21        may not know?
22   A.   Yes.
23   Q.   It is about people testifying to what they personally
24        observed?
25   A.   Yes, sir.
```

```
 1    Q.   When you go in and interrogate somebody, there are
 2         going to be two officers?
 3    A.   Yes, sir.
 4    Q.   And the evidence of that interrogation will be the
 5         testimony of those two officers?
 6    A.   Yes.
 7    Q.   It will be the officers coming in and taking the
 8         stand and recounting what may or may not have
 9         happened?
10    A.   That's correct.
11    Q.   You know when you go in to an interrogation though
12         that you can bring a recorder?
13    A.   Yes, sir.
14    Q.   And so you can have that additional evidence?
15    A.   Sure.
16    Q.   And we could -- if you recorded Mr. Goodwin's
17         interrogation, we could play it today?
18    A.   Yes, sir.
19    Q.   And we could hear exactly what was said?
20    A.   Yes.
21    Q.   And we could see exactly what you asked?
22    A.   Correct.
23    Q.   We could see exactly how you behaved?
24    A.   Yes, sir.
25    Q.   We could see how the Miranda warning went?
```

```
 1   A.   Yes, sir.

 2   Q.   In this case we don't even get a written waiver from

 3        Mr. Goodwin?

 4   A.   Correct.

 5   Q.   We don't actually have his signature directly on a

 6        form saying, I agree to talk to you?

 7   A.   Absolutely.

 8   Q.   It's just your testimony.

 9   A.   Yes, sir.

10   Q.   No recording of that.

11   A.   Yes, sir.

12   Q.   The only manner that we have to review what you did

13        is you testifying about it?

14   A.   Yes, sir.

15   Q.   Just the witnesses in the room?

16   A.   Witnesses in the room backed up by the phone calls

17        that you heard.

18   Q.   The phone calls weren't in the room when you did the

19        interrogation.

20   A.   That's correct, sir.

21   Q.   So we have no recording of that.

22   A.   Yes, sir.

23   Q.   Did he give you an address during that interrogation

24        of 922 Cherokee?

25   A.   Yes, sir.
```

1    Q.    And did he list that as his residence?

2    A.    I don't know if that was the address listed on our

3          202 form, which is our biographical form that we

4          would take the information.  I would have to see what

5          address he provided as his address, but he's the one

6          who said 922 Cherokee.

7                    MR. HEATHMAN:  Your Honor, may we approach

8          just a moment?

9                    THE COURT:  You may.

10                   (Counsel approached the bench and the

11         following proceedings were had:)

12                   MR. HEATHMAN:  It's not substantive, your

13         Honor.

14                   THE COURT:  Okay.

15                   MR. HEATHMAN:  It's just that he kind of

16         changed gears at this point.  Ms. Temple had asked me

17         five minutes ago about a restroom break.  She's in

18         dire need.

19                   THE COURT:  Okay.  Do you mind stopping

20         now, Mr. Rogers?

21                   MS. MOREHEAD:  Are we going until 12:30

22         today, Judge.

23                   THE COURT:  Yes, assuming that's what --

24                   MS. MOREHEAD:  I just --

25                   THE COURT:  Yeah.  All right.

```
 1                    (The proceedings returned to open court.)
 2                    THE COURT:  Members of the jury, we're
 3          going to take our morning recess, 15 minutes.  I'll
 4          remind you of the admonitions not to discuss the case
 5          among yourselves, with anybody else, or to do
 6          anything which has anything to do with the case.  Ms.
 7          Scheurer will come around and take you into her
 8          charge.  When she does, you'll be on recess, and
 9          Mr. McDaniel may step down.  The participants remain
10          here, please.
11                    (The following proceedings were had outside
12          the presence of the jury:)
13                    THE COURT:  Is there anything else we
14          should do before we take our break?
15                    MR. BELLEMERE:  I wanted the court to be
16          aware that I would like an opportunity to ask Mr.
17          McCue a couple questions.
18                    THE COURT:  Okay.  I will put you on the
19          list.  You want to go -- you would be entitled to go
20          somewhere on the list.  Do you care where you go?
21                    MR. BELLEMERE:  No.
22                    THE COURT:  Mr. Calbi, are you caboosing?
23                    MR. CALBI:  I would caboose again.
24                    THE COURT:  Mr. Bellemere, I'll put you in
25          before Mr. Calbi.  Mr. Sandage and Mr. Heathman, you
```

1    still are on the list.

2              MR. SANDAGE:  I have no questions.

3              THE COURT:  I'll take you off the list

4    then.  There you go.  If there's nothing further, we

5    are in recess.

6              (A recess was taken.)

7              THE COURT:  And if we are ready, we will

8    bring in the jury.

9              MS. MOREHEAD:  Judge, let the record

10   reflect I provided counsel a report.  Agent Holder

11   had advised me that had he done a report, so I knew

12   there was that report.  Agent McCue did a report too.

13   They both basically say the same thing, but I have

14   provided those.  I don't have a problem if, for

15   instance, Mr. Rogers, since he didn't have that as a

16   benefit when Agent McCue testified, if he goes back

17   and is able to ask additional questions, but I did

18   provide that.

19             THE COURT:  We will put you before Mr.

20   Calbi, since he is going to be the last one.  If you

21   want to fine; if you don't, fine.

22             MR. ROGERS:  The only thing I would point

23   out is what I have is actually two reports of

24   investigation on DEA Form 6, and I don't have any

25   internal vehicle damage reporting form, if there is

1    such a thing.

2              THE COURT:  Do you want to establish

3    outside the hearing of the jury whether this is all

4    there is?  That might make things pretty --

5         Ms. Morehead, any objection to establishing that

6    that's all there is?

7              MS. MOREHEAD:  We called and asked for the

8    reports related to the damage related to Agent

9    McCue's vehicle.  This is what was sent.  As far as I

10   know, that's all there is.

11             THE COURT:  Do you have any objection to

12   Mr. Rogers asking Mr. McCue that here, whether this

13   is all he knows of?

14             MR. ROGERS:  Let's wait until we find out.

15   She will find out and she will tell us.

16             THE COURT:  Maybe there is something else.

17             MR. ROGERS:  That's what I'm thinking.

18             THE WITNESS:  Your Honor, may I?

19             MS. MOREHEAD:  Agent McCue wasn't privy to

20   our conversation at the bench.  I had asked

21   Officer Jones to get that, and Agent McCue indicates

22   that there is probably going to be, like, an accident

23   report, so I think there's going to be some more.

24             THE COURT:  In any event, Mr. Rogers, as

25   soon as we get you the report before the government

2275

1    rests or in your case-in-chief, should we get to

2    that, you'll have an opportunity to inquire further.

3              MR. ROGERS:  The other point I want to make

4    for the record is what I now have, which I can have

5    marked and added to the record at some point, seem to

6    be clearly discoverable under Jencks and whatever

7    else.  But having said that, that's not an issue --

8              THE COURT:  Are you claiming prejudice from

9    not getting this until now?

10             MR. ROGERS:  No.

11             THE COURT:  Very well.  All right.

12             (The following proceedings were had in the

13   presence of the jury:)

14             THE COURT:  Mr. Johnson, you may resume

15   your examination.

16             MR. JOHNSON:  Thank you, Judge.

17   Q.  (By Mr. Johnson) Officer McCue, I think when we left

18       off we were talking about types of evidence, and one

19       of the types is testimony?

20   A.  Yes.

21   Q.  When you have a suspect or witness interview, if you

22       don't record it, the evidence of that interview is

23       your testimony in court?

24   A.  That's correct, sir.

25   Q.  Through the course of this trial we have heard from a

```
 1        lot of cooperating defendants and witnesses and such.

 2   A.   Yes, sir.

 3   Q.   And throughout the course of this trial, some of

 4        them, there's been questions about whether they made

 5        prior inconsistent statements?

 6   A.   Yes, sir.

 7   Q.   And when we ask them then about their prior

 8        inconsistent statements, there's not actually a

 9        written record of it, verbatim record, a transcript?

10   A.   No, sir.

11   Q.   We don't have their actual words down on paper?

12   A.   Other than what may be contained in notes.

13   Q.   And we don't have, obviously, an audio or a video

14        recording?

15   A.   Yes, sir.

16   Q.   And some of those witnesses have said that they don't

17        remember some previous statements?

18   A.   Yes, sir.

19   Q.   Or some of those witnesses may have denied having

20        said something previously?

21   A.   Possibly.

22   Q.   If we want to show the jury what they said

23        previously, it's through the other witnesses during

24        that interview?

25   A.   Yes, sir.
```

1    Q.   And that would be you or Officer Jones, typically?

2    A.   Or their attorney, who might be present during a

3         proffer.

4    Q.   But you and Officer Jones are two witnesses typically

5         that have been at those interviews?

6    A.   Yes.

7    Q.   You are the evidence of the prior statement?

8    A.   Yes.

9    Q.   You said that your practice, your independent

10        personal practice, during witness interviews is to

11        take -- at least sometimes take notes?

12   A.   Yes, sir.

13   Q.   You don't always take notes?

14   A.   I would say typically I take notes.

15   Q.   So it's not a situation where -- let me just ask this

16        question.  Most of these interviews have been with

17        both you and Jones?

18   A.   Typically.

19   Q.   Do you before you go into an interview discuss who is

20        going to be responsible for summarizing the interview

21        in a report?

22   A.   Generally?

23   Q.   [Nodded head.]

24   A.   It could -- sometimes it depends on who has a pen and

25        paper.

1    Q.   So when you do that, do you then assign who is to

2         take notes during the interview?

3    A.   Yes.

4    Q.   And if Officer Jones is assigned to write the report

5         and take the notes, do you then also take notes, or

6         do you leave that to your partner?  One person will

7         take notes, so if he's taking notes, you do not?

8    A.   Yes.

9    Q.   If you take notes, your personal policy is to

10        preserve them?

11   A.   Yes.

12   Q.   We have heard from Officer Jones that his personal

13        policy is to destroy them.

14   A.   He destroys them, I believe.  It's not a personal

15        policy for me.  I have to keep them.  I believe it's

16        a policy.

17   Q.   So you're under DEA policy to preserve your notes?

18   A.   Yes, sir.

19   Q.   You did not take notes during Franklin Goodwin's

20        interview?

21   A.   No, I did not.

22   Q.   That was up to Officer Jones?

23   A.   Yes, sir.

24   Q.   And we have already learned that those have been

25        destroyed?

```
 1   A.   Yes, sir.

 2   Q.   Do you know and are you able to list those interviews

 3        where you took notes?

 4   A.   Yes.  I can -- thinking back, I can probably name the

 5        proffers where I had taken notes.

 6   Q.   We have heard from a lot of cooperating witnesses and

 7        defendants during the course of this trial, ten or --

 8        plus or minus.

 9   A.   Okay.

10   Q.   Can you tell us of those witnesses which ones you

11        have notes for?

12   A.   Donnie Johnson, Jamicah Johnson, Byron Brown --

13                  MR. BELL:  Judge, can we approach?

14                  THE COURT:  You may.

15                  (Counsel approached the bench and the

16        following proceedings were had:)

17                  THE COURT:  I think I know where you're

18        going, but . . .

19                  MR. BELL:  My concern is that Agent McCue

20        was there when Billy Trinkle made a proffer.

21        Obviously, any statement that he has notes concerning

22        that interview would be prejudicial.

23                  THE COURT:  I think you can stop there and

24        indicate that, "and I suppose there were others," and

25        that would not devalue the information you've
```

1       obtained for your purposes, would it?

2                       MR. JOHNSON:  It will not.

3                       THE COURT:  Very well.

4                       MR. BELL:  Thank you, Judge.

5                       (The proceedings returned to open court.)

6    Q.  (By Mr. Johnson) Nonetheless, Agent McCue, there were

7        some of the witnesses who testified you have notes

8        for?

9    A.  Yes.

10   Q.  But not all of them?

11   A.  For the ones I was involved in I believe I could go

12       back and match up the reports, yes.

13   Q.  Some of the witnesses who testified you have notes

14       for; some of them, you do not?

15   A.  Yes, sir.

16   Q.  Including Franklin Goodwin?

17   A.  Yes.

18   Q.  No notes?

19   A.  But those are notes that I did not take.

20   Q.  Thank you.

21   A.  Yes, sir.

22                       MR. JOHNSON:  One moment, Judge.

23                       THE COURT:  Certainly.

24                       MR. JOHNSON:  No further questions, Judge.

25       Thank you.

1          THE COURT:  All right.  Mr. Heathman?

2          MR. HEATHMAN:  May it please the court?

3          THE COURT:  You may proceed.

4          MR. HEATHMAN:  Thank you.

5                    CROSS EXAMINATION

6    BY MR. HEATHMAN:

7    Q.   Officer McCue, is it officer or agent or special

8         agent?

9    A.   Agent is fine.

10   Q.   Agent McCue, you testified yesterday about some

11        involvement that you believe Ms. Temple had in this

12        case.  Do you recall that?

13   A.   Yes, sir.

14   Q.   Specifically in and around the home invasion that

15        occurred at Mr. Foy's house; is that true?

16   A.   Yes, sir.

17   Q.   And do you know if there's any family relationship

18        between Ms. Temple and Mr. Foy's wife?

19   A.   There is a relationship there, I believe, but I don't

20        know what it is.

21   Q.   Do you know if they are cousins?

22   A.   Quite possibly.

23   Q.   Okay.  And Mr. Foy's home was invaded, you told us, I

24        think, on October 17?

25   A.   Yes, sir.

1    Q.    And there were shots fired inside the home?

2    A.    Yes, sir.

3    Q.    People were there, including children?

4    A.    Yes, sir.

5    Q.    Did you find it reasonable that family members might

6          be concerned about the fact that other members in the

7          family were just involved in such an episode?

8    A.    Sure.

9    Q.    Do you think that following such an episode that

10         individuals may seek protection?

11   A.    In relationship to who?

12   Q.    Well, in relationship to Ms. Temple.  Do you think it

13         would be reasonable for her to say, wow, I might need

14         to have protection?

15   A.    No.  It wouldn't make sense that she would request --

16         or be in need of protection if her cousin -- unless

17         there was some connection there.

18   Q.    Do you know how close her home is to the Foy

19         residence?

20   A.    I believe they are both in Independence.

21   Q.    Same neighborhood kind of thing?

22   A.    I'm not familiar with the distances, but they are in

23         Independence.

24   Q.    And in your investigation you became aware that there

25         was some discussion about an alarm system for her

1          home, were you not?

2    A.   Yes, sir.

3    Q.   Okay.  And you said, I think it was, on the 18th, and

4         I am assuming that the home invasion was during the

5         evening hours of the 17th?

6    A.   About 11:00 o'clock.

7    Q.   And then on the 18th would be the following day;

8         correct?

9    A.   Yes, sir.

10   Q.   And on the following day then you had some

11        surveillance at Mr. Foy's house?

12   A.   Yes, sir.

13   Q.   And you observed Mr. Foy and Mr. Wesley leave Mr.

14        Foy's house?

15   A.   At some point everyone left the residence.

16   Q.   Ms. Temple, did she leave the house with Mr. Wesley

17        and Mr. Foy, or was she even there, over at Mr. Foy's

18        house?

19   A.   At that point I don't believe she was there.

20   Q.   Okay.  And when Mr. Wesley and Mr. Foy left, they

21        were in Mr. Wesley's vehicle; correct?

22   A.   The white Escalade.

23   Q.   They left together?

24   A.   Yes, sir.

25   Q.   And then they went over to Ms. Temple's house.  Do

2284

1      you recall that?

2  A.   Yes.

3  Q.   And you didn't see either of these individuals get

4       out of the Escalade with a bag of anything you

5       believed to be money or marijuana or cocaine?

6  A.   No, sir.

7  Q.   You didn't see them put anything in her house on that

8       occasion?

9  A.   I don't think surveillance -- because she lived in a

10      cul-de-sac -- was established on the house, so no.

11 Q.   So the answer is no?

12 A.   Yes, sir.

13 Q.   And you didn't see Mr. Wesley or Mr. Foy or Ms.

14      Temple bring any kind of bag from her house, did you?

15 A.   No.

16 Q.   All right.  So you do see at some point then Mr. Foy

17      leaves the Temple residence?

18 A.   Yes.

19 Q.   And he's driving now the Escalade?

20 A.   Yes.

21 Q.   So Mr. Wesley is giving his vehicle, at least control

22      of the vehicle at that moment, to Mr. Foy?

23 A.   Yes, sir.

24 Q.   And Mr. Wesley then is vehicle-less; correct?

25 A.   Yes, sir.

```
1    Q.   All right.  And so then Mr. Wesley and Ms. Temple

2         decide to leave and go somewhere?

3    A.   Yes, sir.

4    Q.   And they are riding together?

5    A.   Yes.

6    Q.   Now, do you think if there was either yourself or a

7         family member whose home had just been invaded and

8         shots were fired, do you think you might be concerned

9         about people who were out to get you?

10   A.   If a family member of mine had a home invasion, I

11        would not have any reason to be concerned that

12        somehow I would be the next person unless there was

13        some type of relationship or I had some connection to

14        that family member's house.  That would not be my

15        thought process.  My cousin's house gets kicked in by

16        someone trying to rob them, I don't automatically

17        assume then that I'm the next person.

18   Q.   Would it be fair then to assume that maybe someone

19        was out to get them?

20   A.   Meaning the Foys?

21   Q.   Sure.

22   A.   Sure.

23   Q.   Okay.  And I believe you said that then there was

24        surveillance on these two vehicles, the white

25        Escalade and Ms. Temple's vehicle, as they were
```

1    driving; correct?

2  A.  Yes, sir.

3  Q.  And they spotted this surveillance?  Is that what you

4      testified to?

5  A.  Yes, sir.

6  Q.  And this surveillance wasn't officers in uniform, was

7      it?

8  A.  No.

9  Q.  They weren't in marked police cars, were they?

10  A.  No.

11  Q.  They were individuals that evidently there was some

12      awareness we're being followed; correct?

13  A.  By the police?

14  Q.  Well, the police came after, but you also heard, I

15      think, in the conversation there was discussion

16      about, well, are they black or white?  And I think

17      they used the N word at that time.  Do you know what

18      I refer to when I say that?

19  A.  Oh, yes, sir.

20  Q.  Right?

21  A.  Yes, sir.

22  Q.  That was in the tape you heard.  There was discussion

23      about who these people are; correct?

24  A.  Yes.

25  Q.  All right.  Now you also told us then that there was

1        a discussion about a bag; correct?

2    A.   Yes, sir.

3    Q.   And that was the audio that we heard yesterday?

4    A.   Yes, sir.

5    Q.   And a bag, I think you've told us, means money?

6    A.   Yes, sir.

7    Q.   And when Mr. Wesley or the voice that's attributed to

8         Mr. Wesley talks about his bag in that phone call,

9         you didn't see him put any kind of bag in her

10        vehicle, did you?

11   A.   No.  The --

12   Q.   Okay.  Yeah, you've answered my question.

13   A.   Yes, sir.

14   Q.   So he's talking about a bag, and he didn't say, for

15        example, he didn't say, my bag from the casino;

16        right?

17   A.   Yes, sir.

18   Q.   He didn't call it his employment bag; right?

19   A.   Yes, sir.

20   Q.   And he didn't call it his drug bag?

21   A.   Correct.

22   Q.   So bag is a slang term for money; correct?

23   A.   Yes, in the context of this investigation.

24   Q.   All right.  And did you see Mr. Wesley pick up a bag

25        on October 17 from anybody?

```
 1    A.    No, sir.

 2    Q.    On October 16 from anybody?

 3    A.    No, sir.

 4    Q.    On October 18 from anybody?

 5    A.    No, sir.

 6    Q.    Nobody connected with this case in connection with

 7          drugs?

 8    A.    Correct.

 9    Q.    Okay.  And I believe towards the end of that phone

10          conversation he said something about -- and we can

11          play it, but I want to ask you first if your

12          recollection is the same, that I've gotta figure

13          something out, I've gotta figure something out, I've

14          gotta find somewhere to put this bag; correct?

15    A.    Yes, sir.

16    Q.    Now, you're familiar with what a stash house is;

17          right?

18    A.    Sure.

19    Q.    You've heard witnesses talk about what stash houses

20          are?

21    A.    Yes, sir.

22    Q.    I think you heard the evidence about money or trucks

23          from a bag being put into a Hummer and driven over to

24          Taneiah Johnson's apartment; right?

25    A.    Yes.
```

1    Q.    And I think Lakela Houff, you heard her testify about

2          keeping money or drugs in her end of this mess;

3          right?

4    A.    Yes, sir.

5    Q.    And you were able to confirm those sightings and that

6          information; correct?

7    A.    Correct.

8    Q.    You said you had identified some safe deposit boxes

9          that Mr. Wesley owned?

10   A.    Yes, sir.

11   Q.    And who else was on the box with him?  Who had the

12         authority to go into those boxes?

13   A.    Lakisha Wesley.

14   Q.    Okay.  And that's his wife?

15   A.    Yes, sir.

16   Q.    And at least one of those boxes had an amount of cash

17         greater than $40,000, didn't it?

18   A.    Yes.

19   Q.    And Ms. Temple didn't have access to his safe deposit

20         boxes, did she?

21   A.    No, sir.

22   Q.    Okay.  And in this phone call now, coming back to --

23         I believe you testified it was the 18th, the one you

24         heard yesterday, it was Exhibit 339, and Mr. Wesley

25         is talking about finding somewhere to put up his bag;

1      correct?

2   A.   Yes.

3   Q.   He didn't say, I have to go back to Latysha's house

4        for a minute, did he?  He didn't say that in the

5        conversation, did he?

6   A.   No, sir.

7   Q.   And if he wanted to store money at her house, he

8        could have easily said, hey, we gotta break off and

9        go to Tysha's house for a minute, couldn't he?

10  A.   He could have.

11  Q.   Did you break off surveillance then at the end of

12       this phone call?

13  A.   Yes.

14  Q.   Did you follow either of these vehicles back to Ms.

15       Temple's house?

16  A.   No.  The surveillance was compromised.  Obviously,

17       they are aware that we are following them, so

18       surveillance was terminated.

19  Q.   So whether or not Mr. Wesley returned to Ms. Temple's

20       house and put up money, you don't have any idea?

21  A.   Correct, sir.

22  Q.   Or whether he went to his safe deposit box and put up

23       any money, you don't have any idea, on that occasion?

24  A.   Yes.

25  Q.   And the money that he had in his bag, you don't know

```
 1        of any drug transactions the 17th, 16th, or the 15th

 2        that would be consistent with his having a bag of

 3        drug money; correct?

 4   A.   Relating to any buys, no, sir.

 5             MR. HEATHMAN:  Nothing further, your Honor.

 6             THE COURT:  All right.  Mr. Bellemere?

 7                     CROSS EXAMINATION

 8   BY MR. BELLEMERE:

 9   Q.   Agent McCue, I want to cover a couple things and see

10        if I understand it.  You feel that you were capable

11        of identifying my client's voice on these phone

12        calls; is that true?

13   A.   Yes, sir.

14   Q.   When did you -- when did the light go on and say,

15        hey, I know that's Keith McDaniel?  Do you recall

16        approximately when that might have occurred?

17   A.   In getting his biographical information and in

18        speaking with him and transporting him from where he

19        was arrested to Wyandotte County Jail.

20   Q.   So it would be safe to say that all during your

21        investigation of this matter you had no idea who the

22        person was who was making the phone calls that you

23        all were recovering until the time that you -- he was

24        arrested on February 4, I think you testified about,

25        on 2008.  Am I understanding you correct?
```

```
 1                    THE COURT:  I think you can tell him yes or
 2        no.
 3   A.   The question is, did I recognize his voice before
 4        that?  Is that what you're asking?
 5   Q.   (By Mr. Bellemere) I don't know.
 6                    MR. BELLEMERE:  Ma'am, are you capable of
 7        reading my question back to the witness, please?
 8                    (The pending question was read back by the
 9        reporter.)
10   A.   There was a prior incident prior to the arrest that
11        also, I guess, laid foundation or proved who that
12        individual was.
13                    MR. BELLEMERE:  Your Honor, do you suppose
14        we could approach on that remark?
15                    THE COURT:  Yeah.
16                    (Counsel approached the bench and the
17        following proceedings were had:)
18                    MR. BELLEMERE:  The thing that I think he's
19        making reference to is the stop on November 27, 2007,
20        that which I filed a motion to suppress any evidence
21        that was obtained as a result of that stop.
22                    THE COURT:  Ms. Morehead is shaking her
23        head no.
24                    MS. MOREHEAD:  No, it's not, Judge.
25        Actually, after the November 27 incident law
```

1    enforcement set up a controlled purchase of crack

2    cocaine or cocaine from Keith McDaniel through Danny

3    Tarrants.  That occurred in January of 2008.  There

4    were a series of recorded phone calls that occurred

5    setting up that deal.  Mr. McDaniel showed up to

6    deliver drugs to Mr. Tarrants, and law enforcement

7    paid, and I think the amount was about $5,000 to

8    Keith McDaniel for the drugs that he delivered to

9    Danny Tarrants.  This was all done under

10   surveillance.  Keith McDaniel was observed delivering

11   the purported drugs.  It ended up that what he

12   delivered was Sheetrock packaged.  It was all taped

13   up, and it was Sheetrock, and subsequent to that they

14   arrested Mr. McDaniel, and he had some of the buy

15   money from that incident on him, and his girlfriend,

16   now wife, Allicia Frazier, had the other portion of

17   the buy money on her.

18             THE COURT:  So somebody talked to him then?

19             MS. MOREHEAD:  That's when he was arrested.

20   There were events leading up to that that they were

21   able to identify him.  Frankly, I asked Agent McCue

22   to stay away from that, but now it seems like we're

23   kind of going back over it.

24             MR. BELLEMERE:  I'm not trying -- I just

25   asked him for a foundation basis, so I feel

1          comfortable in walking away from it.

2                    THE COURT:  Here is --

3                    MR. BELLEMERE:  I didn't mean to get into

4          stuff that we hadn't gone into before.  I don't even

5          know what's going on half the time.

6                    THE COURT:  Now, that's not true.

7                    MS. MOREHEAD:  It was obviously activity

8          that was outside of the conspiracy, so --

9                    THE COURT:  But here is why the question

10         was problematic, because you asked him -- you

11         basically said, and so until you arrested him, you

12         had no idea that that person on there was Keith

13         McDaniel?  Well, obviously, you know the answer to

14         that actually is, no, you're not right.  We didn't

15         just go arrest somebody and hope it turned out to be

16         the person on the phone calls.  They had some reason

17         to think it was McDaniel.  What your question really

18         was was about recognizing the guy's voice.  That

19         question is a different question than, you had no

20         idea that that person on those calls was Keith

21         McDaniel? because they obviously did at some point

22         have an idea that's who it was because they went and

23         arrested him.  When you ask the question the way you

24         did, that invites him to say, here is all the reasons

25         I thought it was McDaniel, but when I talked to him,

 1          that's why I know I'm exactly right.  So you might

 2          want to rephrase the question.  If you want to

 3          persist with the question, you may, but it permits

 4          Ms. Morehead to come back and show all the reasons

 5          why Mr. McCue circumstantially had in mind that this

 6          was McDaniel, which he then confirmed on the day he

 7          talked to him, because you have inserted that issue,

 8          and appropriately, if you so choose, in terms of the

 9          identification of the voice.  This was exactly why I

10          thought earlier in the case you had, in fact -- not

11          really this incident -- had decided it was tactically

12          better not to probe this further, but I misunderstood

13          you then, and you have made this an issue, and she's

14          entitled to pursue it.

15                    MR. BELLEMERE:  I understand what you're

16          saying.

17                    THE COURT:  You may ask your question to

18          clarify what you want from this witness.

19                    MR. BELLEMERE:  You know, what I think I'm

20          going to do is, I think I'm going to withdraw the

21          question, ask that it be stricken from the record,

22          ask you to instruct the jury not to consider the

23          question and whatever else you think is appropriate,

24          and just forget about this.  I'm not sure that it's

25          that big a deal, but I don't want to go any further

```
 1        with this guy because I don't know exactly where that

 2        is going to lead.  I felt that it had to do with the

 3        search of the car.

 4               MS. MOREHEAD:  I don't even think Agent

 5        McCue had contact with Keith McDaniel on November 27

 6        because he was at the car wash.

 7           But, Judge, there's no basis to strike the

 8        question and strike the answer.

 9               THE COURT:  Just his question, just his

10        most recent question, but as a result, I'm not going

11        to let you go any further on this.

12               MS. MOREHEAD:  I wasn't planning on it,

13        Judge.

14               THE COURT:  Very good.

15               (The proceedings returned to open court.)

16               THE COURT:  All right.  Mr. Bellemere?

17               MR. BELLEMERE:  Your Honor, I think I

18        understood what I accomplished.  I'm going to

19        withdraw my last question on the record to

20        Mr. McDaniel.

21               THE COURT:  Very well.  You may do so.

22               MR. BELLEMERE:  You know, your Honor, I

23        apologize for taking time, but I don't think, from

24        looking at my notes, I have any further questions of

25        the officer.
```

1      THE COURT:  Very well.  Mr. Calbi?

2      MR. CALBI:  Thank you, your Honor.

3      CROSS EXAMINATION

4   BY MR. CALBI:

5   Q.   Agent McCue, I want to start off talking about your

6        discussions with Mr. Byron Brown on February 5 of

7        2008.  Okay, sir?

8   A.   Okay.  Yes, sir.

9   Q.   Okay.  And I believe you've testified that the

10       arrests or at least -- not the arrests but the

11       bookings took place at the armory; correct, sir?

12  A.   Yes.

13  Q.   And that's because of the volume of arrests that were

14       being made on that day?

15  A.   Yes, sir.

16  Q.   And I kind of got lost a little bit, so if you can

17       help me out, did you say your conversation with Mr.

18       Brown took place in the hallway?

19  A.   Yes, sir.  Or maybe in a room leading to the

20       bathroom, the restroom.  There's another open area.

21  Q.   Okay.  So yourself and Officer Jones and Special

22       Agent Thomas and Spring Williams, were they all

23       present?

24  A.   I believe so, sir.  That's, yes, whose names are on

25       the reports.

1   Q.   So there's the four of you and Mr. Brown?

2   A.   Yes, sir.

3   Q.   Okay.  In an open area or a small room, or were you

4        all just -- I'm trying to get a picture --

5   A.   Right.  I think in the initial area when we first

6        encountered him would have been in the open area

7        where the processing area was, and then we moved out

8        of that area.

9   Q.   Okay.  To get some sort of privacy?

10  A.   Yes, sir.

11  Q.   And during that discussion was there any discussion

12       of Mr. Wesley?

13  A.   Yes, to the extent that we advised him of the

14       circumstances of the investigation, advised him, and

15       I'm sure he saw a number of individuals from the

16       Leavenworth area already there, and I'm sure we told

17       them we were doing wiretap investigations on Grigsby

18       and Wesley's phones.

19  Q.   And did you question Mr. Brown in regards to his

20       dealing with Henry Grigsby, Monterial Wesley, and

21       Boytina Locke?

22  A.   With in regards to Grigsby and Boytina Locke, yes.

23  Q.   Not Monterial Wesley?

24  A.   Not anything specifically directed other than he had

25       mentioned he had dealings with Mr. Wesley, and that

1          was the extent of that information.

2     Q.   And he wasn't any more specific than that?

3     A.   No.  And, again, that's because of the time

4          constraints and Mr. Brown saying, hey, look, you

5          know, you need to get me out of here or put me back.

6          People are going to notice.

7     Q.   So then this investigation all along has been known

8          as the Operation Stonewall; correct?

9     A.   Yes, sir.

10    Q.   Monterial Wesley is in law enforcement's mind up

11         there on the food chain; correct?

12    A.   Yes, sir.

13    Q.   Okay.  And you asked Mr. Brown what he knows about

14         Grigsby, Locke, and Wesley, and he gives some general

15         answer, and there's no follow up?

16    A.   There was follow up because obviously in the initial

17         conversation he had more dealings at that time with

18         Mr. Grigsby, so the questions kind of started at that

19         point.  Then he related information regarding to

20         Mr. Locke, and pretty much that was the extent of it

21         because of the situation we were in.

22    Q.   And two years of your work regarding Mr. Wesley, and

23         you didn't follow up at that point in time?

24    A.   Yes, sir.

25    Q.   And you didn't attempt to follow up for at least

1       another six weeks?

2   A.  Sometimes that's beyond our control.

3   Q.  Yes or no, you didn't attempt to follow up for six

4       weeks?

5   A.  Yes, sir.  Yes, sir.  Yes, sir.

6   Q.  Agent McCue, I believe you testified yesterday that

7       between 2006 and 2008 there was no -- you found no

8       legitimate sources of income for Monterial Wesley; is

9       that accurate?

10  A.  Yes, sir.

11  Q.  Okay.  Was Mrs. Wesley, his wife, working during that

12      period?  She did work part of 2006?

13  A.  Yes.  But during the course of the wire, no.

14  Q.  Okay.  The wire started in August of '87; correct?

15  A.  '07, yes.

16  Q.  I'm sorry.  I meant to say 8 of '07, August of 2007;

17      correct?

18  A.  Yes, sir.

19  Q.  Okay.  So from August of 2007 to November 27 of 2007,

20      Mrs. Wesley didn't work, or at least you couldn't

21      confirm that; correct?

22  A.  Yes.  She was not working.

23  Q.  Okay.  But she might have been working in 2006?

24  A.  Yes, sir.

25  Q.  I'm going to go over a couple of these documents from

1           Government's Exhibit 85, Agent McCue.  And bear with

2      me because I may have to fish out what I'm looking

3      for.  And yesterday we talked about the loan

4      application and the Chelsea Market; correct?

5  A.  Yes, sir.

6  Q.  Okay.  And you showed us the photograph of Chelsea's

7      Market.  Did you ever go inside Chelsea's Market,

8      Agent McCue?

9  A.  No, sir.

10  Q.  Did you ever talk to anybody in Chelsea's Market?

11  A.  No, sir.

12  Q.  And did you have an opportunity to perhaps do that

13      and you elected not to?  Would that be an accurate

14      statement?

15  A.  Yes, sir.

16           MR. CALBI:  Excuse me, Judge.  It's just

17      taking me a while to fish out what I need.  I

18      apologize to the court.

19           THE COURT:  That's all right.

20  Q.  (By Mr. Calbi) Agent McCue, I'm going to show you

21      what's coming out of Government's Exhibit 85, some

22      documents, and this is -- have you had a chance,

23      going through these exhibits, to look at this part of

24      Exhibit 85 which would be the residential appraisal

25      report?

```
 1   A.   Possibly.  For which residence, sir?

 2   Q.   The 3708 Stonewall Court as the case on the top, sir.

 3   A.   My eyesight is not as bad as Agent Holder, but if you

 4        could zoom that in a little better so I can read it?

 5   Q.   I was hoping not to show my inadequacies in operating

 6        the equipment, but is that a little better for you,

 7        Agent McCue?  Do you see the top there?  It says 3708

 8        Stonewall Court?

 9   A.   Yes, sir.

10   Q.   Okay.  And did you have an opportunity to look at

11        these documents that were part of Exhibit 85?

12   A.   Yes, sir.

13   Q.   Okay.  And on the second page of the appraisal report

14        down here I'm interested in what the appraisal of the

15        property was on the report.  Do you see that, sir?

16   A.   Yes, sir.  214,000.

17   Q.   Okay.  This is another document out of Exhibit 85

18        which is a truth in lending disclosure statement.

19        Would you agree with me, sir?

20   A.   Yes, sir.

21   Q.   And it's talking about the property at 3708 Stonewall

22        Court?

23   A.   Yes, sir.

24   Q.   Okay.  And there's an amount financed right there.

25        Do you see that?
```

```
 1   A.   Yes, sir.

 2   Q.   And that's 196,095.87; is that correct?

 3   A.   Yes.

 4   Q.   Okay.  So at least the documents in Government's

 5        Exhibit 85 would reflect that Mr. Wesley was getting

 6        a mortgage of approximately $196,000 for a property

 7        that was appraised at $214,000; is that true, sir?

 8   A.   Yes, sir.

 9   Q.   Okay.  The vehicles that were seized from Mr. Wesley,

10        sir, I believe you talked about the Escalade; is that

11        correct?

12   A.   Yes, sir.

13   Q.   And that was a 2002 Escalade?

14   A.   Yes, sir.

15   Q.   And the Harley Davidson motorcycle?

16   A.   Yes, sir.

17   Q.   The 1999?  Let's stay with the Escalade for a second,

18        Agent McCue.  Did you ever get an appraisal on that

19        vehicle done?

20   A.   Yes, sir.

21   Q.   Can you share with us what that appraisal is, if you

22        recall?

23   A.   If I can review my file?

24   Q.   If referring to your notes would refresh your

25        recollection, by all means, please do so.
```

```
 1    A.   Yes, sir.  I have reviewed it, sir.

 2    Q.   Did that help refresh your recollection as to what

 3         the value of the Escalade was, sir?

 4    A.   Yes, sir.

 5    Q.   What was that?

 6    A.   $16,775.

 7    Q.   Okay.  And was there anything in your report that

 8         indicated if there was any lien against that vehicle?

 9    A.   To the best of my recollection, I believe the

10         Escalade may have been paid off.

11    Q.   But you're not sure?

12    A.   Yes.

13    Q.   Okay.  And how about the 1999 Harley Davidson?

14    A.   That was valued at $6,640.

15    Q.   Do you know if there was any liens on that vehicle,

16         sir?

17    A.   There was not.

18    Q.   And on the 1973 purple Capri?

19    A.   It was valued at $7,013.

20    Q.   Do you know if there was any liens on that vehicle?

21    A.   No, sir, there was not.

22    Q.   Let's get to the car wash on November 27, 2007, and

23         you were -- would it be safe to say you were the

24         agent in charge?

25    A.   Me and Eric Jones were.
```

1    Q.   No disrespect to Officer Jones.  Yourself and Officer

2         Jones were in charge?

3    A.   Yes, sir.

4    Q.   This was your operation?

5    A.   Yes, sir.

6    Q.   You're the one that gave the go signal?

7    A.   Yes, sir.

8    Q.   And you gave the go signal because you saw Mr. Wesley

9         get out of the passenger door of the Ranger Rover?

10   A.   He exited the Ranger Rover and approached the Camaro.

11   Q.   So he got out of the Range Rover -- how far did he

12        get from the Ranger Rover before you said -- before

13        you gave the go signal?

14   A.   As he entered the bay.

15   Q.   The bay?

16   A.   The bay.

17   Q.   Okay.  Did you have a vantage point then of being

18        able to see clearly into the bay?

19   A.   To the extent that I could see him walking in, yes,

20        and then at some point I lose sight of him.

21   Q.   Were you across the street at the radio place -- I'm

22        not even going to try the name -- before the Range

23        Rover appeared at the car wash?

24   A.   Yes, sir.

25   Q.   Were you there before Mr. Humphrey got there in his

1      black Camaro?

2  A.   Yes, sir.

3  Q.   So you were there when Humphrey comes in his black

4      Camaro, pulls into the bay?

5  A.   Yes, sir.

6  Q.   I assume Mr. Humphrey gets out of his vehicle.  Do

7      you see that?  Do you see Mr. Humphrey get out of his

8      vehicle?

9  A.   I don't recall seeing him get out, but other officers

10      had seen him out.

11  Q.   Okay.  So you have no recollection of it, but it's

12      possible he got out of his vehicle?

13  A.   Yes, sir.

14  Q.   Okay.  Do you have any recollection of Mr. Humphrey

15      washing his vehicle?

16  A.   I do not, sir.

17  Q.   So what's your next recollection of this event?  The

18      Camaro pulls into the bay.  What do you next recall?

19  A.   The Range Rover appearing back at the car wash.  It

20      was at a gas station right down the street from it.

21      That's where Officer Bennett was, and the Range Rover

22      pulled back into the car wash, parking behind

23      Mr. Humphrey.

24  Q.   And approximately how long was it from the time

25      Mr. Humphrey's just in the bay until the Range Rover

```
 1          now pulls into the car wash?

 2   A.    Best I recall, a couple minutes.  I don't think there

 3          was a large gap of time in there.

 4   Q.    So this couple of minutes you're making no

 5          observations of what Mr. Humphrey may be doing?

 6   A.    No, because I didn't have, say, the best sight of

 7          him, and he was in the bay itself, so no.

 8   Q.    But, I mean, Humphrey was a pretty important

 9          character.

10   A.    Yes.  But there were other surveillance officers were

11          still out there maintaining positions and, you know,

12          getting into position to surveil him.  I personally

13          stayed in the parking lot.

14   Q.    Was there any indication to you from either radio

15          traffic or anything else as to what Mr. Humphrey was

16          doing?

17   A.    Not that I recall.

18   Q.    So there might have been radio traffic indicating

19          what Mr. Humphrey was doing, but you can't recall it

20          at this moment; is that accurate?

21   A.    Yes, sir.

22   Q.    The Range Rover pulls in, Mr. Wesley gets out of the

23          passenger side, and approaches the bay.  Is he in

24          your line of vision?

25   A.    Yes.
```

```
 1   Q.   So you're seeing him the whole time he's walking out
 2        the door and going into the bay?
 3   A.   Yes.
 4   Q.   As he entered the bay, was he still in your line of
 5        vision?
 6   A.   No, sir.
 7   Q.   Oh, as soon as he enters the bay, you lose contact
 8        with Wesley?
 9   A.   Yes, sir.
10   Q.   Is there radio traffic indicating what Wesley is
11        doing at this point in time?
12   A.   I don't recall any, sir.
13   Q.   Okay.  So we have the two most important players of
14        your investigation, Humphrey and Wesley, in a bay
15        from a car wash, and you can't recall what either one
16        of these two individuals were doing at this point in
17        time?
18   A.   No, sir.
19   Q.   Wesley starts walking towards Humphrey; you lose
20        sight of him; then I imagine you start taking off
21        towards the Range Rover; correct?
22   A.   Yes, sir.
23   Q.   As you're approaching the Range Rover, does your line
24        of vision improve, giving you an avenue to see what
25        either Humphrey or Wesley are doing?
```

2309

```
 1    A.   To a certain degree, but my main focus at that point
 2         was on the Range Rover.
 3    Q.   So you're focusing on the Range Rover,
 4         understandably.  That's your assignment.  However,
 5         are you able to see or did you see -- or let me
 6         strike at that because I'm having a very compounded
 7         question.
 8              The Range Rover was your focus.  That's your
 9         assignment; correct?
10    A.   Yes, sir.
11    Q.   As you're driving up there though, your range of
12         vision or your ability to see what Humphrey and
13         Wesley are doing improves; correct?
14    A.   Momentarily because then I pulled up directly behind
15         the Range Rover and my vision was completely
16         obstructed.
17    Q.   Okay.  But in that moment were you able to observe
18         anything that Wesley and Humphrey were doing?
19    A.   No, sir.
20    Q.   I won't rehash what happened then.  Understandably,
21         you go up, you pull Mr. Simpson out of the vehicle,
22         okay, at any point before you pull Mr. Simpson out of
23         the vehicle are you able to observe anything that
24         Wesley and Humphrey are doing?
25    A.   No.
```

1    Q.   Okay.  Is there any radio traffic indicating to you

2         what's going on with Wesley and Humphrey?

3    A.   At the time I'm out of my car, no, sir.  I don't

4         carry a portable radio.

5    Q.   Okay.  So that's understandable.  You finally at some

6         point in time restrain Mr. Simpson; correct?

7    A.   Yes, sir.

8    Q.   At the time that Mr. Simpson is restrained, is Mr.

9         Wesley in the custody of law enforcement?

10   A.   Yes, sir.

11   Q.   So he's already in custody before Simpson is out of

12        the car?

13   A.   That I can't answer.

14   Q.   Okay.

15   A.   Everyone was taken into custody.  I can't say which

16        person was actually physically handcuffed first.  I

17        can only tell you that Mr. Simpson was handcuffed and

18        other officers and agents took those other

19        individuals into custody, and I can't tell you which

20        was one first, second, or third.

21   Q.   But would it be fair to say that it happened so

22        quickly that it was a matter of seconds before

23        everyone was in custody?

24   A.   Sure.

25   Q.   Okay.  So it may not have been Simpson, Wesley,

```
 1          Humphrey or Humphrey, Wesley, Simpson or Wesley,

 2          Simpson, Humphrey -- there's probably four or five

 3          other combinations -- but it was so quick that they

 4          were all in a matter of seconds put into custody?

 5     A.   Yes, sir.

 6     Q.   Okay.  So this happened so fast and everyone was in

 7          custody so fast, did you have any personal

 8          observations of anyone attempting to flee the scene?

 9     A.   No, sir.

10                    MR. CALBI:  I have nothing further at this

11          time, your Honor.

12                    THE COURT:  Any other questions, requests

13          for cross examination?  Mr. Rogers?

14                    MR. ROGERS:  I didn't know whether I was

15          yielding to somebody else.

16                    MS. MOREHEAD:  Judge, could we approach,

17          please?

18                    THE COURT:  Yes, you may.

19                    (Counsel approached the bench and the

20          following proceedings were had:)

21                    MS. MOREHEAD:  Judge, I just wanted the

22          record to reflect I did secure whatever other

23          documents there were besides Agent McCue and Agent

24          Holder's reports, and it consists of several e-mails

25          and also a personal property report, which is a DEA
```

```
 1        internal document identifying damage, and also

 2        identifies a motor vehicle accident report.  It's,

 3        again, a federal report.  There was $50 worth of

 4        damage to the vehicle driven by Rtayvian Simpson.  It

 5        also includes a indemnity agreement signed by Lakesha

 6        Wesley and also was indicated by Mr. Wesley that he

 7        would not hold DEA responsible at all for the damage.

 8        It also includes --

 9                THE COURT:  Fifty bucks against his $10

10        million forfeiture judgment?  You didn't get --

11                MR. CALBI:  It was before I was hired,

12        Judge.

13                MS. MOREHEAD:  It also has a specific

14        statement in there that post-Miranda Mr. Simpson

15        indicated that he was unaware of the bump from the

16        official government vehicle, as he was focused on the

17        arrest team in front of the Range Rover, so he didn't

18        even know the vehicle had been impacted, so I have

19        turned all of that over to defense counsel.  And so

20        ask and you shall receive.

21                THE COURT:  Do you have any more questions,

22        Mr. Rogers?

23                MR. ROGERS:  Yes.  Actually, a comment.

24        First of all, I think the statement attributed to

25        Mr. Simpson is highly prejudicial.  It's a statement
```

1    of the defendant that's clearly discoverable under

2    Rule 16, and I don't think that by putting that in

3    the report I should be limited from cross examining

4    about other stuff in the report.

5            THE COURT:  What is there in the report you

6    want to cross examine about?

7            MR. ROGERS:  First of all, the damage

8    estimate to Mr. McCue's vehicle is five hundred some

9    dollars.  I had it here a minute ago.  $532.25.  I

10   think that's relevant to show the extent of the

11   damage.  I think that there are some -- I want to ask

12   him about the damage that was done to the Range Rover

13   because it sounds to me that it is inconsistent with

14   his account of the impact.  And in the other report,

15   the DEA Form 6 compiled by Mr. McCue, there is an

16   account of the event that is -- I can't tell whether

17   or not it's different than what he told us in court

18   until I ask him about it.

19           THE COURT:  Well, I think you are entitled

20   to use it, if you want to, but if you do, you take it

21   as you find it, including the ability to inquire

22   about Mr. Simpson's statement.  Had the government

23   chosen to want to use that statement, they could have

24   disclosed that to you so that they could have used

25   it.  They didn't, and I wouldn't have let them use it

```
 1            on their own.  Nor did they disclose this internal
 2       report to you because, again, on the face of it
 3       there's nothing that cries out that this is
 4       exculpatory to the defendant, particularly in
 5       light of the fact that if one tried to make the
 6       argument that it's exculpatory to show that the bump
 7       is what caused the gun to come out, Mr. Simpson
 8       himself says, I didn't even notice it, so I can't
 9       fault the government for not having disclosed this
10       report previously.  It has now been disclosed to you.
11       You have certainly established there was a bump.  You
12       have certainly put that in the mind of the jury, but
13       if you want to persist further with the information
14       in this report, you do so at the risk of the
15       government on redirect inquiring.  If you do not,
16       then I will not allow the government to redirect
17       concerning any statement Mr. Simpson may have made or
18       put on a witness as to what Mr. Simpson allegedly
19       said.
20            MR. ROGERS:  Your Honor, this is part and
21       parcel of the statement I have been obliquely
22       inquiring about in an attempt to not run afoul of the
23       rules against hearsay, and have successfully, I
24       think, modified my questions to meet the government's
25       objections.
```

2315

```
 1              THE COURT:  Statements by Mr. Simpson would
 2      be admissible against him.
 3              MR. ROGERS:  It's part of the same
 4      interview, is what I'm trying to say, and so I think
 5      that it is ambush to object to inquiry about parts of
 6      that statement and now come up with a different
 7      document with a different part of that statement,
 8      which --
 9              THE COURT:  The difference is, you may not
10      offer Mr. Simpson's hearsay, but the government can
11      offer Mr. Simpson's hearsay under Rule 801(d).
12              MR. ROGERS:  I don't think they -- I
13      understand that.  I don't think they should be
14      allowed to hide it and then offer it.
15              THE COURT:  They are not.  And I agree if
16      they had hid it and then came in and said, look what
17      we found, and regardless of what Mr. Rogers wants to
18      do, we want to offer it, I would say you're
19      absolutely correct, they can't do it.  But by the
20      same token you're not entitled to get this document
21      at this juncture and utilize it to your benefit and
22      leave that statement out.  I'm not going to let you
23      do it.  Take your choice and go whichever way you
24      want to go.
25              MR. ROGERS:  Let me put it differently.
```

1          With regard to the DEA Form 6s -- Forms 6, I guess is

2          the proper plural -- that statement is attributed to

3          Mr. Simpson in both of those documents; however, with

4          regard to the other documents, these are only one

5          document because they are stapled together, and if I

6          utilize the part that is titled Motor Vehicle

7          Accident Report --

8                    THE COURT:  I think --

9                    MR. ROGERS:  I don't think the statement --

10                   THE COURT:  I find the probative value of

11         the $500 worth of damage to be exceedingly small.

12         You can get $500 worth of damage by bumping into it

13         walking by.  I do not think you're helping your

14         client by getting into the $500 worth of damage to

15         the car, but it's your case.  If you want to do that,

16         then if it's associated with that same report, that's

17         one thing.  If it's some point totally different, I

18         don't know.

19                   MR. ROGERS:  The only reason I think they

20         are together is they were stapled together because

21         they got faxed from the same file.

22                   THE COURT:  May I see it?  By the way, what

23         use is it you propose to make of this, to offer it

24         into evidence or refresh someone's recollection?

25                   MR. ROGERS:  I was going to ask a leading

```
1        question, isn't it true that the damage to the hood

2        of your vehicle was estimated at some $523.51, or

3        whatever it says, and then refresh his recollection

4        if necessary.

5                THE COURT:  Of course, this report was made

6        by somebody else.  He may not have any idea about

7        that.

8                MR. ROGERS:  I think he does because I

9        think they gave him a copy of the memo saying it's no

10       problem for you.

11               MS. MOREHEAD:  There was no discipline

12       taken, but he didn't prepare the damage report.

13               THE COURT:  Again, talk about hearsay.

14       Really, what you've got is somebody else saying they

15       have this $500 worth of damage.  But my view is if

16       you want to persist further with this -- I don't see

17       the statement about Mr. Simpson.  Where is that?

18               MS. MOREHEAD:  It's on the back page,

19       Judge.

20               MR. ROGERS:  It's a continuation of the

21       first page.

22               THE COURT:  Oh, I see.  That's the same

23       page that's got the information about --

24               MS. MOREHEAD:  Damage.

25               THE COURT:  -- damage.  If you are going to
```

1    get into using page 1 and the last page of this

2    document that was faxed to you for whatever purpose,

3    I will allow her to inquire of Mr. McCue about other

4    purposes.

5         MR. ROGERS:  I was proposing not to use the

6    first or last page, which I think are part of the

7    same document because of the sequentially numbered

8    paragraphs.

9         THE COURT:  Right.  I would agree with

10   that, that they are.

11        MR. ROGERS:  But what in my packet is the

12   fourth page, which is titled Motor Vehicle Accident

13   Report -- actually, that's page 4 of 7 up in the fax.

14   I was going to use that one little line there.

15        THE COURT:  My ruling remains the same.  If

16   you're going to inquire further about this

17   information that has just been turned over to you,

18   which I do not believe should have been turned over

19   to you any sooner than it was, then you take the

20   chance that there's things in it that are helpful to

21   the government as well that they were not going to

22   use.  I find the probative value to you establishing

23   the estimate of dollar value, which this witness has

24   no firsthand knowledge about, and which anything he

25   says wouldn't even have any probative value other

```
 1        than regurgitating what somebody else said the value

 2        was, which would not be admissible for any purpose

 3        other than to flash a number before the jury, and

 4        which I might instruct them has no probative value

 5        because he has no firsthand knowledge and it's only a

 6        matter of hearsay on his part, has such little

 7        probative value that if you want to go there you take

 8        the chance that the government gets something out of

 9        it.

10              MR. ROGERS:  In that case, your Honor, I

11        think the record is clear what I wanted to do with

12        it, and I will --

13              THE COURT:  You can mark it.

14              MR. ROGERS:  -- abide by the court's --

15              THE COURT:  That's good.

16              MR. ROGERS:  -- ruling and I will elect not

17        to ask any further questions.

18              THE COURT:  You may mark it as an exhibit

19        so you can make a record of what your proffer was so

20        that the record reflects that.

21              MR. ROGERS:  I can do that --

22              THE COURT:  You can do that outside of the

23        hearing of the jury.

24              (The proceedings returned to open court.)

25              THE COURT:  Any further cross examination?
```

1      Hearing none, any redirect?

2                  MS. MOREHEAD:  I don't have any questions

3        based on the cross examination, your Honor.

4                  THE COURT:  You may step down, Mr. McCue,

5        and the government may call its next witness.

6                       LAWRENCE DRAKE,

7   having been duly sworn, was examined and testified as

8   follows:

9                    DIRECT EXAMINATION

10  BY MS. MOREHEAD:

11  Q.   Please tell the jury where you're employed.

12  A.   The Johnson County Kansas Sheriff's Department in the

13       crime lab.

14  Q.   And how long have you been -- please relate to us

15       first your work history relative to your work as a

16       law enforcement officer.

17  A.   I started in law enforcement in 1982 in Ottawa

18       County, Kansas, for the sheriff's department.  I

19       worked there approximately a year, and I worked about

20       ten months for the Minneapolis Kansas Police

21       Department, seven years with the Overland Park Kansas

22       Police Department, I have been with the Johnson

23       County Sheriff's Department for 11 years.

24  Q.   And what jobs have you done over the course of your

25       years of experience as a law enforcement officer?

| 1 | A. | I have been a patrol officer, a full time instructor |
| 2 | | for the sheriff's department, a firearms instructor |
| 3 | | for Overland Park and the sheriff's department, full |
| 4 | | time instructor for the Johnson County Regional |
| 5 | | Police Academy, and then at the crime lab for Johnson |
| 6 | | County. |
| 7 | Q. | Can you relate to the ladies and gentlemen of the |
| 8 | | jury, please, your experience relative to firearms. |
| 9 | | Let's just talk generally about firearms. |
| 10 | A. | Personal and work related? |
| 11 | Q. | Yes. |
| 12 | A. | I basically started handling and shooting firearms |
| 13 | | when I was about six years old, began competing when |
| 14 | | I was in my teens, and then got involved with law |
| 15 | | enforcement and firearms and into the instructional |
| 16 | | arena in 1992 and have been doing that ever since. |
| 17 | Q. | And with regards to the instructional aspect of your |
| 18 | | contact with firearms, kind of explain that for the |
| 19 | | jury, if you would. |
| 20 | A. | I became an instructor.  Generally that's related to |
| 21 | | the departmental firearms that we have.  At one point |
| 22 | | I was also an instructor for the Metro Tactical |
| 23 | | Officers Association when they had their yearly |
| 24 | | conferences, and we would teach involving firearms |
| 25 | | for other agencies also. |

1   Q.   And have you acted as a range master and an armor in

2        connection with your law enforcement responsibilities

3        for our department?

4   A.   I'm a range officer -- the range master is a separate

5        division or position -- and then an armor for our

6        departmental firearms.

7   Q.   And what's a range officer?

8   A.   We are the instructors that deal with each individual

9        officer throughout, whether they be new recruits or

10       in-service training.  We're also responsible for

11       range safety weapon maintenance while we're on the

12       range.  The range master position is more for

13       scheduling and ammunition purchasing and things like

14       that.

15  Q.   And what are the requirements as far as training that

16       officers undergo when they are trained in connection

17       with the range?

18  A.   Currently the officers would go through about a

19       32-hour period with the sheriff's department when

20       they hire on, and then they go through a 40-hour

21       course with the police academy.  It changes from time

22       to time, but occasionally we will also give

23       additional training once they are out of the police

24       academy, upwards of maybe two or three days,

25       depending on the current year.

2323

```
 1   Q.   And in connection with being an armor, what does that
 2        involve?
 3   A.   Generally just overall maintenance of the firearms
 4        for our department.  The way it works, when we have a
 5        departmentally-sponsored range session, we generally
 6        inspect the firearms as they come through to make
 7        sure that they are still in proper functional order.
 8   Q.   In connection with your duties and responsibilities
 9        as they specifically related to firearms, have you
10        attended a number of specialized trainings related to
11        different aspects of firearms?
12   A.   I have been through a number of commercial or
13        factory-sponsored armor schools where representatives
14        from the factory teach you how to maintain their
15        firearms.
16   Q.   Okay.  And have you attended a number of conferences
17        as well as it relates to firearms -- different
18        aspects of firearms?
19   A.   Yes.  I have attended the three conferences for the
20        Association of Firearms and Tool Marks Examiners,
21        which we also term as AFTME.
22   Q.   Okay.  And in connection with your responsibilities
23        or duties as it pertains to firearms, have you
24        visited a number of laboratories that deal with
25        firearms and tool marks examination?
```

1    A.    Yes.  That is part of our training when we're going

2          through our training as an examiner, and as just part

3          of our normal duties we will visit other labs and

4          have contact with other examiners.

5    Q.    And have you toured a variety of manufacturers who

6          actually are engaged in the manufacturing of

7          firearms?

8    A.    Yes.  While we were in our training, a lot of the

9          manufacturers will open their facilities up to the

10         examiners and allow to us to tour through their

11         facilities and see how they manufacture the firearms

12         equipment and the ammunition.

13   Q.    And in connection with your current position, are

14         you, in fact, a firearms and tool mark examiner?

15   A.    Yes.

16   Q.    And in connection with that can you tell the jury

17         some of the different things that you are qualified

18         to do as it relates specifically to a firearm.

19   A.    For firearms examination it is concerned with

20         firearms ammunition and the related components of the

21         ammunition and generally being able to determine if a

22         cartridge case or a bullet was fired in or from a

23         specific firearm.

24   Q.    Okay.  And that's an aspect of what you're doing,

25         comparing a -- either a bullet or a shell casing to

1    see if it was fired from a particular firearm then?

2  A.   That's correct.

3  Q.   All right.  And also as part of your responsibilities

4    does that kind of come part and parcel with a

5    determination of whether the firearm is a functional

6    firearm, whether it functions as was intended by the

7    manufacturer?

8  A.   Yes.

9  Q.   Can you tell the jury what a firearm is, Deputy

10    Drake.

11  A.   A firearm is -- as far as statutorily, a firearm is

12    something that is designed or manufactured as a

13    firearm or is able to propel a projectile by means of

14    an explosion, gas, or force.

15  Q.   Are there a variety of different firearms that you've

16    had occasion to become familiar with?

17  A.   Yes.

18  Q.   Can you tell the jury what those are.  Just generally

19    kind of give us an overview of that.

20  A.   Generally just whatever we encounter in our

21    laboratory as far as long guns or handguns.  That's

22    basically the two specifics that we run into.  There

23    are muzzle-loading firearms, but we generally don't

24    have a lot to do with those.

25  Q.   Long guns would include shotguns, rifles, those sorts

```
1            of firearms; is that right?

2    A.     Yeah, shoulder-fired weapons.

3    Q.     Shoulder-fired weapons?  And handguns would be

4           pistols and revolvers; is that right?

5    A.     Yes.  And there are also single-shot pistols too.

6    Q.     All right.  And in connection with your view of

7           handguns specifically have you become familiar with

8           semi-automatic pistols?

9    A.     Yes.

10   Q.     Tell the jury what a semi-automatic pistol is.

11   A.     Generally considered a handgun that will fire with a

12          pull of the trigger, and the action is such that it

13          will extract and eject the fired cartridge case and

14          load another cartridge into the chamber without

15          having any manual force to do it.  The gun does it as

16          part of its design.

17   Q.     Okay.  And in connection with this particular case

18          were you asked to look at a particular firearm and

19          determine the functionality of that firearm?

20   A.     Under this case number -- our lab number was

21          07CL2990 -- I did -- I was submitted a Ruger P-90

22          semi-automatic handgun.

23   Q.     All right.  I want to hand you what I've marked as

24          Government's Exhibit No. 60, and inside there's also

25          Government's Exhibit 61, which we have had testimony
```

1      about, but I would ask if you can identify that

2      particular firearm.

3   A.   On the outer portion of the box there is a Johnson

4      County Crime Lab bar code on here that is specific to

5      our laboratory that has the Case No. 07CL2990 and is

6      Item 1, and I have my initials and PSN number on the

7      outside of the box that I have opened the box.

8   Q.   All right.  Go ahead and take a look at that firearm

9      then.

10  A.   Can I take it out?

11  Q.   Yes.  What are you doing right now, Deputy Drake?

12  A.   I am -- as part of the safety indoctrination we have

13     had for firearms, I'm opening the action so that I

14     can visually and physically see that there is not a

15     cartridge in the firearm.

16  Q.   All right.  And because we're going to have you

17     demonstrate, do a demonstration for the jury, we have

18     taken the safety mechanism that was originally on

19     this firearm off; right?

20  A.   Yeah.  The safety is engaged at this point.

21  Q.   But I'm talking, we had a safety device through the

22     firearm earlier.

23  A.   Oh, right.

24  Q.   So that's not on there any longer?

25  A.   No.

1    Q.   Okay.  And what can you tell us about whether that

2         gun is presently loaded or unloaded?

3    A.   By opening the action, pulling the slide back and

4         cocking it open with the slide stopped, I can, in

5         fact, look down into the chamber visually and see

6         that there's not a cartridge or a cartridge case in

7         the chamber.  I can also take my finger and nudge it

8         there and feel that there's nothing in there.

9    Q.   You've used some different terms as you've checked to

10        make sure the weapon is safe.  You mentioned chamber

11        and different things.  Can you just give the jury

12        kind of a brief, cursory education about the

13        different components of that firearm as terms that

14        you've just used here in court.

15   A.   Okay.  The lower portion of this that is not -- that

16        does not reciprocate -- the slide reciprocates back

17        and forth.  This would be the slide.  The part that

18        does not we refer to as the frame.  Some people may

19        refer to it as a receiver.  The barrel is the metal

20        tube where the bullet is fired through.  The chamber

21        is actually a part of the barrel, and that's where

22        the loaded cartridge goes into and is contained while

23        it's firing.  As the slide moves to the rear, there's

24        an extractor that grabs ahold of the cartridge, pulls

25        it from the chamber.  There is a fixed pin in the

1       frame called an ejector, and as the extractor pulls

2       it out, the pin hits the cartridge and levers it out

3       and ejects it from the firearm.

4  Q.   Government's Exhibit No. 61, tell us about this item

5       and explain to the jury how it functions in

6       connection with the firearm.

7  A.   This is termed as a magazine.  It holds the

8       ammunition that is going to be in reserve to be fired

9       in the firearm once the ammunition is loaded into it.

10      To insert this --

11  Q.   Yes, please do.

12  A.   -- the magazine is inserted through the bottom of the

13      grip, what we call the magazine well.  It is seated.

14      There is -- I'll back it back out.  There is a notch

15      on this particular firearm on either side of the

16      magazine body.  There is the corresponding device on

17      the frame called a magazine latch.  When the magazine

18      is inserted in the firearm and you hear it click, it

19      is locking into this latch that holds the magazine in

20      the firearm, and it doesn't remove -- cannot be

21      removed until you depress that latch to let the

22      magazine come out of the gun.

23  Q.   All right.  Let me see that just for a second.  Just

24      so the jury can maybe see a little clearer, the

25      magazine, you've indicated, is seated into the grip

1          then, and you mentioned there was a mechanism or a

2          way of then causing the magazine to come back out of

3          the firearm?

4    A.    That's correct.

5    Q.    It doesn't come out just by pulling on it?

6    A.    It should not, no.

7    Q.    And what is that?

8    A.    I can't draw very well.  The magazine latch inside

9          the circle there with the serrations on it is held in

10         place by a flat spring.  When you push on that latch,

11         it moves a small notch away from the magazine, which

12         takes it -- there's a little cut out in the magazine

13         that I showed you.  When that's pushed away, that

14         allows the magazine to fall out of the frame.

15   Q.    Can you just hold that up so that the jury can see

16         that.  And what I want you to do is hold it up so

17         that it's parallel.

18              MS. MOREHEAD:  Sorry, Judge.  I -- it was

19         going to be pointed at somebody.  Sorry.

20              THE COURT:  I'm expendable.

21   Q.    (By Ms. Morehead) And what happens then -- if

22         you're -- how you would normally hold the gun, if you

23         would?

24   A.    [Indicated.]

25   Q.    If you're operating it normally and you wanted to

```
 1          eject the magazine, how would that happen?
 2    A.    Normally for a right-handed shooter shooting this gun
 3          you would use your thumb to depress that latch and
 4          allow the magazine to fall free.
 5    Q.    And for the record, just pushing that button -- the
 6          jury obviously will have the opportunity to do that,
 7          but can you describe how much pressure that took just
 8          to put your thumb on that release button to eject the
 9          magazine?
10    A.    I have not done any tests as far as how many pounds
11          it takes, but it takes a certain amount of pressure.
12          You have to push on it to make it move, to take that
13          latch away from that notch.
14    Q.    You're able though just with the thumb of your right
15          hand to just push that button, and then literally
16          when you push that button what happens with regards
17          to the magazine?
18    A.    On this firearm when you depress that, the magazine
19          will fall free without having to be manually pulled
20          from the frame.
21    Q.    Are there some firearms that you have to, if you push
22          the button manually, remove the magazine from the
23          frame?
24    A.    Yes, there are some.
25    Q.    This one comes out with just the push of a thumb?
```

```
 1    A.    Yes.

 2    Q.    All right.  So we have loaded the magazine.  We have

 3          seated the magazine into the magazine well.  And tell

 4          us -- go ahead and describe how -- we're assuming the

 5          magazine is loaded with ammunition.

 6    A.    Okay.

 7    Q.    Okay.  Now, does the slide have to be back in that

 8          fashion when the magazine is seated into the well?

 9    A.    No.

10    Q.    Okay.

11    A.    You can insert the magazine with the slide forward.

12          Also there is enough extra movement in the spring to

13          allow it to be compressed up against the bottom of

14          the slide.

15    Q.    All right.  Let's demonstrate it in both scenarios,

16          okay?  We have -- the slide is in its -- what do you

17          call that?

18    A.    Some people call it in battery.

19    Q.    Okay.  In battery.  And the magazine has been

20          inserted.  We're assuming it's loaded.  Now, if I

21          want to -- do you know what I'm talking about when I

22          say chamber a round?

23    A.    Uh-huh.

24    Q.    What does that mean to you?

25    A.    It really doesn't make any difference if there was
```

1       already a cartridge in the chamber or a cartridge

2       case and then live ammunition in the magazine or if

3       the chamber was empty.  If you pull the slide to the

4       rear, fully to the rear, if there were something in

5       the chamber, it should extract and eject that.  When

6       you let go of the slide, spring tension from the

7       recoil of the spring will drive the slide forward.

8       That will pick up a round out of the magazine and

9       drive it into the chamber.

10  Q.  Demonstrate for us how you would then chamber a

11      round.  Assuming there's nothing -- the gun's

12      unloaded, you've put the magazine in the well, how do

13      we chamber a round?

14  A.  This would be as if there was ammunition in the

15      magazine.

16  Q.  As if there were ammunition in the magazine?

17  A.  To demonstrate this, I have to hold the slide stop

18      down because with an empty magazine it's meant to

19      lock the slide to the rear on your last shot.

20  Q.  All right.  So if, in fact, it was loaded with

21      ammunition, that wouldn't have to occur?

22  A.  No.

23  Q.  It would automatically go into the chamber?

24  A.  Right.  The magazine follower is designed as such to

25      catch a notch on the inside of the slide stop and

```
 1            push it up, and that's what allows the slide to lock

 2            to the rear.

 3    Q.    All right.  Had there been a round in the chamber,

 4            would it have just been a simple --

 5    A.    It would do the same as if I hold it down, pull it

 6            back, and let go of it.

 7    Q.    All right.  So now we have got a round in the

 8            chamber.  Are we able to eject the magazine from the

 9            firearm even though there's a round in the chamber?

10    A.    Yes.

11    Q.    How do we do that?

12    A.    Just depress the magazine latch and it will fall from

13            the gun.

14    Q.    All right.  And now we have a round in the chamber;

15            is that right?

16    A.    Right.

17    Q.    I mean, we don't, but for demonstrate demonstration

18            purposes?

19                  THE COURT:  Let the record reflect.

20    Q.    (By Ms. Morehead) Hypothetically we have a round in

21            the chamber.  And what is the capability of the

22            firearm at this point with a round in the chamber?

23    A.    If the safety mechanism is pushed up so safety is

24            off, this gun will fire without the magazine in the

25            gun.  It is designed to fire with the magazine out of
```

1          the gun.

2     Q.   How do we do that?

3     A.   You just depress the trigger, pull the trigger.

4     Q.   Can you do that today?

5     A.   [Complied.]

6     Q.   Okay.  And the round that's in there would, in fact,

7          be -- I don't know what you -- expended? -- I don't

8          know --

9     A.   Discharged.

10    Q.   Discharged.  Thank you.  I don't want to be

11         nontechnical.  And so in connection with having a

12         round in the chamber, whether the safety is on or

13         not, the magazine does not have to be in the firearm

14         if one's intention was to fire the gun?

15    A.   That's correct.

16    Q.   Okay.  And did you, in fact, do a test fire of this

17         particular weapon?

18    A.   Yes, I did.

19    Q.   And how did you do that?

20    A.   The firearm was submitted to the firearms section in

21         this box.  It was sealed with evidence tape.  Once I

22         notated that it was a sealed box, I opened it,

23         removed the firearm, and we have a form that we fill

24         out where we go through and we check the model

25         number, we check the caliber so that we choose the

```
 1            right ammunition.  When we get ready to shoot it, we
 2            check the serial number to make sure it has a serial
 3            number and record that, and in our form at this point
 4            we determine that it has an external hammer on it.
 5            The barrel length was measured, the overall length of
 6            the firearm, and then the slide is locked to the
 7            rear.  We look in the barrel, one, to make sure
 8            there's no obstructions before we test fire it, and
 9            the other is to see how many lands and grooves are
10            there.
11   Q.    I just also want to be clear.  There was some DEA
12            testing that was requested from your laboratory as
13            well; is that correct?
14   A.    I believe that was on the submission sheet, yes.
15   Q.    And was that done by Ashley Clark?
16   A.    I believe so, yes.
17   Q.    In connection with her processing of the gun, would
18            she have done whatever she needed to do before you
19            would have had -- before you would have done your
20            part of doing the test fire of the firearm?
21   A.    Yes.  In our lab all other processes are done.
22            Firearms, actually, is the last one to receive the
23            firearm for testing.
24   Q.    Okay.  I just wanted to make sure that if DNA was
25            done it was done before you would have handled it.
```

1    A.    Right.

2    Q.    Okay.  Then what did you do?

3    A.    After that we did -- I did a trigger pull test on

4          this with a spring gauge that has been certified by

5          an outside source.  And with this firearm, this is

6          called a double-action firearm.  That basically

7          determines that it will fire in two different modes,

8          what you see now with the hammer completely forward,

9          if you pull the trigger, it will operate the hammer,

10         and you can pull it all the way through and fire it

11         from the double-action mode.  There's also a

12         single-action mode where you can manually cock the

13         hammer to the rear, the notch will hold it back, and

14         you can depress the trigger in this mode and fire it

15         that way also.  And we check the weight of the

16         trigger pull in both modes.

17   Q.    Okay.  And so the hammer does not have to be cocked

18         in order to fire this weapon?

19   A.    No.

20   Q.    Okay.  And then what did you do?

21   A.    Once that was done, we determine or specify that it

22         has what we call a detachable box magazine.  We check

23         the capacity of the magazine, which in this case was

24         eight, notate that there's a slide mounted safety and

25         T cocking lever, this lever up here on the slide on

2338

| | |
|---|---|
| 1 | both sides.  They call it ambidextrous.  So it can be |
| 2 | run by either right- or left-handed shooters.  The |
| 3 | decocking mechanism is, if you end up with a hammer |
| 4 | to the rear, then there's a safe way to lower the |
| 5 | hammer, which is to depress this decocking lever. |
| 6 | The decocking lever is basically a tube inside the |
| 7 | slide, and the firing pin runs through that tube.  As |
| 8 | you rotate that down, the firing pin actually turns |
| 9 | and is rotated away from contact from the hammer so |
| 10 | when the hammer falls it cannot go off.  It's |
| 11 | actually striking that tube.  In this model if you |
| 12 | leave the safety down it disconnects the trigger and |
| 13 | does not function. |
| 14 | Q.   Okay.  Now, Deputy Drake, we have had some |
| 15 | testimony -- you mentioned that that magazine has a |
| 16 | capacity of eight? |
| 17 | A.   Yes. |
| 18 | Q.   We have had testimony that there were actually eight |
| 19 | rounds in the magazine and then one round in the |
| 20 | firearm.  Can you speak to how that could occur? |
| 21 | A.   There was basically two ways that could occur.  They |
| 22 | could put one or all eight rounds in the magazine, |
| 23 | insert it in the gun so there is a round in the |
| 24 | magazine, cycle the slide.  That would load a round |
| 25 | from the magazine into the chamber.  And if they |

1          chose to decock it -- that would be up to the

2          operator -- they could remove the magazine and what

3          we call top off, but one more round to load the

4          magazine back to its full capacity, and then you

5          could insert it back in the gun.

6     Q.   So instead of having only an eight-round capacity,

7          you could now have a nine-round capacity as far as

8          the firearm itself, how many rounds it could fire?

9     A.   That's correct.

10    Q.   Okay.  And just so I'm clear, once that -- let's say

11         there's a round in the chamber and eight in the clip,

12         eight in the magazine.  I know firearm people don't

13         like that word, do they?  And how then would we cycle

14         through nine rounds?

15    A.   You could -- if the safety was off so that you could

16         manipulate the trigger, you could fire up to nine

17         rounds, and on the last round the slide would lock

18         open or it would be possible to remove the magazine

19         and either leave the round in the chamber, or you

20         could pull the slide back and extract and eject it

21         from the chamber.

22    Q.   Okay.

23              MS. MOREHEAD:  Judge, that's all I have of

24         this witness.  Thank you.

25              THE COURT:  All right.  Cross examination?

1            Mr. Rogers?

2                        CROSS EXAMINATION

3    BY MR. ROGERS:

4    Q.   I'm a little bit confused, but that's because I can't

5         see from way over here.  Okay, first of all, every

6         time you've been releasing and ejecting the magazine,

7         you've been holding it in a normal position so that

8         the grip is up and down; right?

9    A.   Yes, sir.

10   Q.   And so the magazine falls outs through the force of

11        gravity?

12   A.   Yes, sir.

13   Q.   Okay.  Let me show you what's been, first of all,

14        marked as Government's Exhibit 58.  And that's a

15        photograph of the magazine; is that correct?

16   A.   Yes, sir.

17   Q.   And you see where it's located between the -- between

18        the brake pedal and the foot rest of the vehicle?

19   A.   Yes, sir.

20   Q.   Now I'm going to show you what's been marked

21        Government's Exhibit 328.  And you see the firearm

22        there?

23   A.   Yes, sir.

24   Q.   And do you see the firearm -- the grip of the firearm

25        facing the outside of the door?

1    A.   Yes, sir.

2    Q.   And you see the bottom of the grip where the magazine

3         would fit?

4    A.   Yes, sir.

5    Q.   Okay.  If the firearm were in the position on

6         Government's Exhibit 328 and somebody pushed the

7         magazine latch button -- is that what you called it?

8    A.   Yeah, magazine latch.

9    Q.   If somebody pushed the magazine latch, that wouldn't

10        make the magazine fall out, would it?

11   A.   Probably not.

12   Q.   Okay.  Because it's flat or a little bit up?

13   A.   Yes, sir.

14   Q.   And gravity doesn't work like that?

15   A.   Yes.

16   Q.   And it certainly wouldn't make the magazine end up

17        like it is in this picture?

18   A.   Yes, right.

19   Q.   Okay.  Now, if the magazine and the gun were separate

20        but both under the seat of the car and some event

21        happened to make them slide out from under the seat

22        of the car, could that account for the magazine

23        ending up in the position between the brake pedal and

24        the foot rest?

25              MS. MOREHEAD:  Judge, I think that calls

1           for speculate; objection.

2                     THE COURT:  I think it's argument based

3           upon what the evidence consists of, so I'm going to

4           sustain the objection.

5    Q.    (By Mr. Rogers) Let me ask you this.  You've got a

6           magazine in front of you?

7    A.    Yes, sir.

8    Q.    And it's a smooth surface?

9    A.    Yes.

10   Q.    And if it were loaded with eight rounds, it would be

11          heavy and dense?

12   A.    Yes, sir.

13   Q.    And you have the weapon in front of you; correct?

14   A.    Yes, sir.

15   Q.    And it has a grip of texture and lines on it?

16   A.    Yes.

17   Q.    And it's a different shape than the magazine;

18          correct?

19   A.    Yes, sir.

20   Q.    And so there are bumps and ridges and things that

21          might not slide as regularly as the magazine; is that

22          a fair statement?

23   A.    It's possible, yes, sir.

24   Q.    Okay.  Now, I couldn't see what you were doing with

25          the decocking mechanism, so show me that again.

1    A.   Sure.  This is the slide stop.

2    Q.   All right.

3    A.   Its function is to hold the slide open.  You can

4         manually engage that, or the magazine has a

5         corresponding notch to contact the inner surface of

6         the slide stop so on its last round if you pull it

7         back manually it will lock the slide open.

8    Q.   And then what's the decocking mechanism?

9    A.   When the slide is forward, if the hammer is to the

10        rear or cocked, you can push on the safety -- and

11        it's a safety and a decock lever.  As you push this

12        down, it trips the sear, allowing the hammer to come

13        forward under spring pressure inside the slide.  The

14        firing pin is part of this tube that runs between

15        these two levers and is rotated up and out of the way

16        out of contact with the hammer.

17   Q.   So it allows the hammer to release from the cocked

18        position without the firing pin striking the primer

19        of the bullet?

20   A.   That's correct.

21   Q.   Okay.  And going back again to -- let's do Exhibit 57

22        here.  The decocking mechanism and the safety valve

23        mechanism are the same thing?

24   A.   Yes, sir.

25   Q.   And basically the safety is engaged and the hammer is

2344

1           decocked?

2    A.    Yes, sir.

3    Q.    And so the weapon as it is in that photograph,

4          whether or not there's a round in the chamber, is not

5          capable of being fired without working the slide,

6          right, or changing the safety?

7    A.    The safety lever would have to be pushed up to allow

8          the sear to engage the hammer.

9    Q.    Okay.  And that would also -- you said this is a

10         double-action pistol; correct?

11   A.    Yes, sir.

12   Q.    And so that means that it can be -- single-action

13         pistol has to be cocked before it's fired; right?

14   A.    That's correct.

15   Q.    And a double action can be cocked and fired with the

16         same pull of the pistol?

17   A.    Yeah.

18   Q.    Same pull of the trigger?  Excuse me.

19   A.    Yeah.  It has two options.  The double action, what

20         we would call a double-action pull, is a longer and

21         generally heavier amount of spring tension, or you

22         can cock the hammer to the rear, generally giving you

23         a little bit less pressure to push the hammer to

24         release the sear.

25   Q.    That's exactly what I was going to ask.  Thank you.

1      You're way ahead of me, sir.

2              MR. ROGERS:  Those are all the questions I

3      have, your Honor.

4              THE COURT:  Thank you.  Any other cross

5      examination?  I see no hands requesting such.

6          Ms. Morehead, any redirect?

7              MS. MOREHEAD:  No, your Honor.

8              THE COURT:  All right.  Mr. Drake, you may

9      step down, and we will take our noon recess.  We will

10     be in recess until 1:30.  I'll remind you of the

11     admonitions not to discuss the case among yourselves

12     or with anybody else.  Don't do anything which deals

13     with the case while you're on break.  We will see you

14     in a bit.  Ms. Scheurer will take charge of you as

15     soon as she comes in the door.  Participants, please

16     remain here.  Mr. Drake, you may step down.

17             THE WITNESS:  Thank you, sir.

18             (The following proceedings were had outside

19     the presence of the jury:)

20             THE COURT:  All right.  How many more

21     witnesses?

22             MS. MOREHEAD:  One more witness.

23             THE COURT:  All right.  And you said you

24     thought that might take a little bit more time than,

25     for example, this individual did?

1          MS. MOREHEAD:  Yeah.  I think he only took

2     30 minutes.  I think she will take a little while,

3     your Honor.

4          THE COURT:  Very good.  Anything from this

5     side of the room?

6          MR. BELLEMERE:  I would like to approach,

7     if I could, with other counsel, if necessary.

8          THE COURT:  You may.

9          MR. BELLEMERE:  Judge, you know, I have

10    been disturbed about something that the court said,

11    and I want to clarify this.  I do not recall giving

12    up on a foundation issue, but if I did, then I need

13    to apologize.  Again, but I've spent a lot of time

14    over the years of practicing law trying not to

15    mislead anybody about intentions, and so to the

16    extent that that occurred, I feel I need to apologize

17    to the court, albeit I'm not for sure how that

18    transaction occurred, but you had an opinion that I

19    had done so, and so that's been disturbing me, and I

20    want you to know that I am sorry if there is any

21    inference of me misleading the court.  As I said,

22    I've spent a lot of years practicing law, and I've

23    never consciously done that.

24          THE COURT:  Well, thank you.  And let me

25    clarify that I interpreted that you had from comments

```
1    you made about certain calls and saying, we don't
2    need to do any more of these because I'm satisfied
3    that the identification of Mr. McDaniel is enough to
4    not object on foundation.  I may have misunderstood
5    the purport of what you said.  I have had the
6    pleasure of having you before me in this case and
7    another matter, and I really don't think that you are
8    trying to play fast and loose by any means.  You and
9    I may have simply not communicated at that particular
10   point, and I may have exhibited a slight degree of
11   frustration when I realized the miscommunication and
12   therefore called you out on it, so to speak, in a way
13   that I wish I hadn't because I don't want to make you
14   disturbed.
15            MR. BELLEMERE:  If I did something I
16   shouldn't have done, I'm justly called to order on
17   it.
18            THE COURT:  The point is this.  The point
19   is this.  Irrespective of whether or not you did
20   withdraw your objection or waived your argument about
21   that, I am not considering that in any respect in
22   ruling on this issue with regard to your client.  I'm
23   not holding that against you or your client.  This
24   case has been, not overly lengthy, but it's taken a
25   few days to try.  We have had a lot of participants.
```

1      There's a lot of things going back and forth.  The

2      court could easily have misunderstood what you

3      intended, or, you know, perhaps it just didn't get

4      communicated, so I have no problem.

5                   MR. BELLEMERE:  I want to be clear about

6      this.  I wasn't inferring that you would have for any

7      reason held anything against my client or myself.  I

8      was more disturbed about the fact that I might have

9      somehow or another mislead the court.  We have

10     covered it; I've apologized to you now; and I'm sorry

11     about that.  And I'm sorry to engage all these other

12     counsel in this, but I have been stewing over that

13     since we last had this conversation up here, and it's

14     been bothersome.

15                   THE COURT:  It speaks well of you.  Your

16     apology is accepted, but it wasn't necessary because

17     I don't take any adverse feeling from it at all.

18                   MR. BELLEMERE:  Thank you.

19                   (The proceedings returned to open court.)

20                   THE COURT:  Anything else we should do

21     before we break?  Hearing none, see you all at 1:30.

22                   (The luncheon recess was taken.)

23                   THE COURT:  If we're ready to proceed, we

24     will bring in the jury.

25                   (The following proceedings were had in the

```
 1          presence of the jury:)
 2                    THE COURT:  The government may call its
 3          next witness.
 4                    MS. MOREHEAD:  Judge, I call Ashley Clark
 5          to the stand.
 6                    ASHLEY CLARK,
 7     having been duly sworn, was examined and testified as
 8     follows:
 9                    DIRECT EXAMINATION
10     BY MS. MOREHEAD:
11     Q.   Please tell us where you work.
12     A.   I work for the Johnson County Crime Lab.
13     Q.   And what are your duties with the Johnson County
14          Crime Lab?
15     A.   I accept evidence into the biology section, utilize
16          the necessary techniques for forensic biology and DNA
17          examination, write written reports, and testify as
18          needed.
19     Q.   Please relate to the jury your educational background
20          relative to your work at the Johnson County Crime
21          Lab.
22     A.   I have my bachelor's of science in cellular molecular
23          biology from Northwest Missouri State University as
24          well as a master's in forensic science from Nebraska
25          Western University.
```

1    Q.   And tell us about your training relative to your

2         current employment.

3    A.   I completed the training program at Johnson County

4         Crime Lab, which included directed readings, both

5         written and practical examinations, as well as

6         competency tests for both biology and DNA.

7    Q.   And is your -- is the lab you currently work at, is

8         it accredited?

9    A.   Yes.

10   Q.   Tell the jury, if you would, what DNA is.

11   A.   DNA is the building block of life, and it is what

12        gives us our eye color, our hair color, and we get

13        half of our DNA from our mother and half of our DNA

14        from our father, and no two people have the same DNA

15        profile with the exception of identical twins.

16   Q.   And is DNA unique to every individual then?

17   A.   It is, with the exception of identical twins, yes.

18   Q.   Could you briefly describe the process of DNA testing

19        used in your laboratory.

20   A.   I brought a PowerPoint.  Would you like me to use

21        that?

22   Q.   Would that assist the jury in kind of understanding

23        the processes that you go through with regards to

24        analyzing evidence as it relates to DNA?

25   A.   Yes, it would.

```
 1              THE COURT:  Is there any objection?  I hear
 2      none.  You may proceed, this being admitted for
 3      demonstrative purposes, members of the jury, that is,
 4      to assist the witness in explaining to you her
 5      testimony.
 6              MS. MOREHEAD:  Judge, could I move the
 7      monitor to where it's more in front of her so she's
 8      not looking away from the jury?
 9              THE COURT:  Certainly.
10              MS. MOREHEAD:  I'll try to do it in a way
11      that doesn't block anyone's view.  Is that okay?
12              THE COURT:  Yes.
13  Q.  (By Ms. Morehead) Okay.
14  A.  So this is the purpose of forensic DNA testing.  We
15      compare unknown DNA profiles that we get from
16      evidence to known DNA profiles that are submitted as
17      reference samples to include and exclude individuals
18      from being sources of these unknown DNA evidence
19      profiles.
20          What is DNA?  As I briefly stated before, DNA
21      stands for deoxyribonucleic acid, and it's the
22      blueprint for life.  Each individual has a unique DNA
23      profile, and we get half from your mother and half
24      from your father.  DNA is found in the nucleus of
25      cells.  Every cell in our body contains DNA, and the
```

1    process that we go through to obtain a DNA profile is

2    a four-step process.  It begins with extraction and

3    purification, quantification, amplification or PCR,

4    and separation and analysis.  During DNA extraction

5    and purification we take the sample, which can be

6    blood or skin cells, and chemicals are added to break

7    open these cells, and the DNA is released.  Then

8    other chemicals are added to get rid of all of the

9    cellular material so we are left with just purified

10   DNA.

11        During quantification we find out how much DNA

12   is present in that sample, and this is very important

13   because there is a target amount of DNA that gives us

14   an optimal DNA profile, and we need to get that

15   target amount for our next step, which is PCR, or the

16   polymerase chain reaction.  And this step is much

17   like a genetic copy machine.  You cycle -- it's a

18   cycle, and each cycle, more and more copies are made

19   of the DNA, and we go through 28 cycles and get

20   millions of copies of these certain cells of DNA that

21   we're looking at.

22        And the last step, which is separation and

23   analysis, this is the instrument that we put the DNA

24   on after it's been amplified.  And when we separate

25   the PCR copies, we use a capillary and

```
1        electrophoresis, and electricity helps separate these
2        DNA pieces by size and by color, and this gives us
3        our profile, and we use STRPSR, which stands for
4        short tandem repeat polymerase chain reaction.  And
5        it gives us our profile.  And we look at different
6        alleles, which the alleles are an alternate form of
7        the gene, and your allele number corresponds with the
8        number of these short tandem repeats that you have.
9             And so in this example you can see at the top
10       there are -- here we have four of these repeats, and
11       that gives us a four for the profile, and then below
12       you have six of that same repeat, and that gives us a
13       six here.
14            I can't work this little screen.
15            And this pair is a heterozygous pair, and that's
16       because there is a four and a six; and if there were
17       two fours, then we would call that person a
18       homozygous, which I don't have that example up here;
19       but this person's profile is a 46 at one allele and a
20       57 at the other.
21   Q.  And what we end up with are 13 of these in connection
22       with one individual?
23   A.  Correct.
24   Q.  Okay.  And the methods and techniques you use for
25       DNA, are they accepted in the scientific community?
```

1    A.   They are.

2    Q.   And in connection with DNA testing, have you been

3         qualified as an expert to conduct DNA testing and

4         render an opinion based upon the testing that you

5         perform?

6    A.   I have.

7    Q.   In connection with this particular case, were you

8         asked to analyze several items of evidence that came

9         to you?

10   A.   I was.

11   Q.   Now, you mentioned that you -- in order to do DNA

12        comparison, you have to have a known sample from --

13        and just tell us what a known is.

14   A.   A known sample is a DNA sample that they collected --

15        that they, being the officer, police officer or a

16        detective, has collected from a known individual and

17        known source.  Usually it comes in the form of a

18        buckle swab, which is a sterile swab that they rub on

19        the inside of a person's cheek so we know that that

20        DNA came directly from that person.

21   Q.   All right.  And did you receive two known samples

22        along with a firearm in this particular case?

23   A.   I did.

24   Q.   I want to first show you what I've marked as

25        Government's Exhibit No. 60 and just ask you if you

1         can identify that and tell us if you've seen that

2         item of evidence before.

3    A.   I have.  And I can identify it.

4    Q.   How can you do that?

5    A.   The date that I examined it and my initials are

6         written on the box.

7    Q.   All right.  And then Government's Exhibit No. 80,

8         tell us what that is.

9    A.   That is the known DNA sample of Simpson.

10   Q.   All right.  And have you seen that item before?

11   A.   I have.

12   Q.   And how do we know that?

13   A.   The date that I examined it and my initials are

14        written on the outside of the packaging.

15   Q.   And Government's Exhibit No. 81, tell us what that

16        is.

17   A.   That is the known DNA sample from Wesley.

18   Q.   And have you seen that item before?

19   A.   Yes, I have.

20   Q.   And how do we know that?

21   A.   Again, the date of my examination and my initials are

22        on the outside of packaging.

23   Q.   All right.  Now, with regards to -- first of all,

24        Government's Exhibit No. 60, can you tell us what you

25        did in connection with this particular item of

1            evidence.  Or let's just start, when you received

2            these three items of evidence, tell us what you did

3            in order to begin the process of what you ultimately

4            did, which was DNA testing.

5     A.    Upon the receiving of the gun, I collected sterile

6            swabs from the trigger of the gun as well as the grip

7            of the gun, and this was done by using a sterile swab

8            which was moistened with sterile water and just

9            rubbing on the trigger as well as on the grip of the

10           gun, and I collected separate swabs from each of

11           those locations.

12    Q.    Can you remove Government's Exhibit No. 60.  And for

13           the record I would tell you Deputy Drake had examined

14           that and it is safe.

15    A.    Okay.

16    Q.    But could you just take that out and just show the

17           areas that you would have looked at with regards --

18           or that you would have swabbed with regards to this

19           item.

20    A.    Okay.  Again, the trigger, we swabbed this area of

21           the trigger, the inside where you would touch.

22    Q.    Let me -- let's do something different.  Let me put

23           this on the monitor.  And with that now on the

24           monitor can you just show us where you would have --

25           what you would have done by way of swabbing the

```
 1          firearm.
 2     A.   Yes.  I would have swabbed this area of the trigger
 3          that's kind of -- more on the inside where your
 4          finger would have touched as well as this entire
 5          rough surface of the grip of the gun.
 6     Q.   Okay.  And would you agree with me the grip has two
 7          sides, obviously, from this particular gun?
 8     A.   Correct.
 9     Q.   Right?  And would you have swabbed both sides
10          specifically with the gun?
11     A.   Yes, both sides of the grip.
12     Q.   Now, what you're describing, were there two separate
13          swabbing processes that occurred: one of the trigger
14          and then one of the grip?
15     A.   That's correct.
16     Q.   And tell the jury why you would pick areas -- first
17          of all, why would you pick the area of the trigger,
18          which is the area where your finger would be located
19          at?  Why you would pick that area as a source of
20          swabbing?
21     A.   We would choose that area because that is an area
22          where if someone was shooting the gun or holding the
23          gun in a manner in which they might shoot it there
24          would be a lot of contact with their skin on that
25          area to leave skin cells behind.
```

1    Q.   What about with regards to the handle or the grip

2         area of the gun?

3    A.   The handle area of the gun is a rough surface, which

4         is a very good surface for leaving behind skin cells,

5         so that is why we would choose that area.

6    Q.   All right.  And you described that you -- you

7         mentioned the buckle swabs that you would get by way

8         of the known samples.  Are these similar types of

9         swabs that you use when you're swabbing an object

10        like a gun in order to retrieve possible DNA

11        evidence?

12   A.   Yes.  It's the same type of swab.  They are both

13        sterile swabs that are packaged in individual

14        packages to be sterile, and that is typically what

15        the officers use, and that is always what we use to

16        collect our swabs.

17   Q.   All right.  So once you swab the trigger area of the

18        firearm and the grip area of the firearm, is that all

19        you would have done by way of handling or having

20        contact with Government's Exhibit No. 60?

21   A.   Yes.

22   Q.   Okay.  What then did you do after you swabbed the

23        firearm?

24   A.   I also swabbed the magazine that was in there.

25   Q.   Okay.  I should have had that.  And Government's

```
 1              Exhibit 61, is that the item that you referred to
 2              that you would have swabbed in connection with this
 3              case?
 4     A.   Yes.
 5     Q.   Okay.  How did you swab the magazine?  Let me put it
 6              up on the display.
 7     A.   The entire magazine would have been swabbed.  Two
 8              sterile swabs were used to just cover the entire
 9              surface of that magazine.
10     Q.   And do you moisten the swab before you retrieve DNA
11              on an object?
12     A.   Yes.  Sterile water is used to moisten the swab to
13              pick up the cells more readily.
14     Q.   Okay.  So you end up with three different swabs, two
15              from the firearm and then -- I should say two --
16              three different sets of swabs, two sets of swabs from
17              the firearm and then one set of swabs from the
18              magazine?
19     A.   That's correct.
20     Q.   What else did you do?
21     A.   After that exam was complete, I opened the packages
22              from the known sample and collected a portion of
23              those swabs to take on to DNA analysis.
24     Q.   Can you explain, Ms. Clark, as you are handling
25              evidence in your laboratory -- we have talked about
```

1    the swabbing of the gun; now you're moving on to the

2    knowns -- what process you go through to assure that

3    we're not having any issues with the subsequent

4    testing.

5  A.   That is a good question.  Bench paper is put down on

6    our benches, on our work benches, that is, clean

7    bench paper, and that is changed out after every item

8    that is examined.  So after the gun is examined,

9    fresh bench paper is put down before examining the

10   known, and it is changed in between known samples as

11   well.  We use gloves that are changed very

12   occasion -- a lot.  The gloves are changed a lot, and

13   they are definitely changed in between each item.  We

14   also use lab coats that are changed after every case

15   that is worked, and we use a bleach solution that is

16   used to spray down our benches as well as our markers

17   between each case.

18  Q.   Okay.  And did you follow all of those protocol and

19   procedures in connection with the handling of the

20   evidence in this case?

21  A.   I did.

22  Q.   After you then -- you then indicated that you did

23   something with the known samples.  Tell us what you

24   did in connection with those samples.

25  A.   The known samples were opened and -- can I look at my

1      notes?

2  Q.  Yes.  Did you take some notes in connection with

3      this?

4  A.  Yes.

5  Q.  And would that refresh your recollection?

6  A.  It would help, yes.  Thank you.

7  Q.  Okay.

8  A.  There were two swabs inside of the packaging.  Each

9      of the known DNA samples had two swabs, and the tip

10     was cut off of one to take on to DNA processing.

11 Q.  And the swab that we're talking about, what would you

12     compare it to, the portion that you took a cutting

13     from?

14 A.  These swabs look a lot like a Q-Tip.  It's just

15     one-ended with white cotton on one end.  So the tip

16     of that swab was cut for DNA.

17 Q.  All right.  Did you take cuttings from each of the

18     two swabs that were in each of the individual

19     envelopes then?

20 A.  A cutting was taken from one swab out of each of the

21     envelopes.

22 Q.  All right.  So there would remain intact known DNA

23     samples for other testing if so requested?

24 A.  That's correct.

25 Q.  So what did you do next?

1    A.    Those samples were taken on to DNA next, to the

2          extraction process.

3    Q.    And with regards to the swabs that you did with the

4          trigger the grip and the magazine, are we going

5          through that same process that you would have gone

6          through with the known samples, taking a cutting of

7          each of those?

8    A.    Yes.  In the case of the evidence swab, all of the

9          swabs were used for DNA testing.

10   Q.    Okay.  And so when you go through the extraction and

11         purification phase, which is the first phase of DNA,

12         tell us what you did in connection with the various

13         swabs that you've testified about now.

14   A.    All the swabs are in separate DNA tubes.  They are in

15         separate tubes and chemicals are added to break open

16         these cells that are possibly present on the swabs,

17         and more chemicals are used, added and washed away,

18         to get rid of any of the extra cellular material that

19         might be present on those swabs.

20   Q.    I think I noticed in your PowerPoint preparation a

21         picture or several pictures of what appeared to be

22         tubes.

23   A.    Uh-huh.

24   Q.    Is that right?  Is that similar to what you would use

25         in the laboratory?

1    A.    Yes.

2    Q.    And these tubes that you use, do they actually have a

3          small cap on the end of them?

4    A.    They do.

5    Q.    And so for instance, the cutting, cutting that you

6          would have taken from the known sample of Rtayvian

7          Simpson, that would have gone in a tube?

8    A.    That's correct.

9    Q.    What about the cutting that you took from the known

10         sample of Monterial Wesley?

11   A.    That's also placed in a separate tube.

12   Q.    Okay.  And then the cuttings that you took from the

13         trigger, where is that?

14   A.    That is in a tube.  And I should note that when we

15         extract the samples from the question, from the

16         question samples, which are the ones from the gun and

17         the magazine, those are extracted and run through

18         this entire process at a completely separate time

19         than the samples, than the known samples.  The

20         questioned samples were processed first.

21   Q.    And tell the jury why you would do that as part of

22         your protocol and procedure in your laboratory.

23   A.    We do that to assure that there is no question as to

24         cross contamination, that there's no way that someone

25         can wonder if DNA from the known samples of the

1      suspects in this case got into the tubes from the

2      questioned samples from the guns and the magazine.

3  Q.  All right.  So the process that you do with the four

4      steps that you talked about in your PowerPoint, you

5      do those four processes of the known samples in -- I

6      don't want to say in a fell swoop, but in progression

7      with those samples, and then you would do the swabs

8      from the firearm and the magazine separately; is that

9      right?

10 A.  That's correct.

11 Q.  Okay.  And so tell us then, after whatever respective

12     sample we're talking about in this case -- we will

13     talk about the knowns first.  You placed them in the

14     tube with the chemicals?

15 A.  Uh-huh.  And like I said, they were extracted; the

16     cells were broken up, and the DNA was purified; and

17     next we moved to the quantification step to determine

18     how much DNA was in that tube from these known

19     samples so that we can get the optimum profile in the

20     very end and then the polymerase chain reaction.

21 Q.  Could we go back to quantification?  With regards to

22     known samples, would you expect to have good

23     quantification on a known sample?

24 A.  Yes.

25 Q.  And why is that?

1   A.   That's because the sample is collected directly from

2        the mouth and it is a good sample.  There is --

3        should not be anything in that sample that might

4        cause problems with our polymerase chain reaction.

5   Q.   All right.  And then tell us about the amplification

6        PCR process.

7   A.   The PCR process is much like a genetic copy machine.

8        It makes millions of copies of these specific areas

9        on the DNA that we're looking at, the short tandem

10       repeats, and it cycles.  There's 28 cycles, and with

11       each cycle we get more and more copies of the DNA.

12  Q.   Okay.  And then -- and you did that with regards to

13       the known samples?

14  A.   That's correct.

15  Q.   Okay.  And then what did you do with the known

16       samples?

17  A.   Then they were put -- for separation and analysis

18       they were put on that machine that was in the

19       picture, and capillary electrophoresis uses

20       electricity to separate the areas of DNA by size and

21       also by color.

22  Q.   And what's the final process that you do?

23  A.   The final process is looking at these 13 locations

24       that we get and determining, in this case, with the

25       known sample, just looking at it and determining that

```
1          it is a single source profile, and that's
2          basically -- then we compare it to our questioned
3          sample profiles.
4     Q.   Okay.  I want to hand you what I've marked as
5          Government's Exhibit 335.  Tell the jury what that
6          is.
7     A.   This is the known DNA profile of Monterial Wesley.
8     Q.   And Government's Exhibit 336?
9     A.   This is the known DNA profile of Rtayvian Simpson.
10               MS. MOREHEAD:  Judge, I would ask for
11         admission of Government's Exhibit 335 and 336.
12               THE COURT:  Is there any objection?
13         Hearing none, those two exhibits are admitted.
14               (Exhibits 335 and 336 were admitted into
15         evidence.)
16    Q.   (By Ms. Morehead) I'm going to first just put up
17         Government's Exhibit 335, and we obviously know what
18         this is because there's a title at the bottom of the
19         page; is that right?
20    A.   That's correct.
21    Q.   Tell us what this is that we're seeing with regards
22         to this particular document.
23    A.   Okay.  As you can see, there are 13 different
24         locations, meaning this is one location, this is two;
25         and these are noted at the top of the page.  I just
```

1    wrote over it by these little designations at the top

2    of the page.

3  Q.   Okay.  So right here?

4  A.   Yes.  Those are the different locations on the DNA

5    sample or on the DNA that we're looking at, and they

6    continue down.  You can see the four different

7    colors, the blue, the green, the black, and the red;

8    and each one has its little designation at the top

9    for each location or locus on the DNA.

10  Q.   Can you just number those locations so the jury can

11    kind of see this first on this first document.

12  A.   Do you want them just numbered 1 through 13?

13  Q.   Yes.

14  A.   Okay.  This would be No. 1, 2, 3, 4, then we have 5,

15    6, 7, 8, 9, 10, 11, 12, 13.

16  Q.   Okay.

17  A.   And I'm sorry.  I said 13, but there's actually 16

18    that we look at.  I'm sorry.

19  Q.   All right.  And are there two different processes

20    that the laboratories have now, one for 13 loci and

21    one for 16?

22  A.   Yes.  And I'm sorry.  The old process was 13, and the

23    new process is 16.

24  Q.   And with 16, what does that do by way of being able

25    to do comparisons?  You know, the old one was 13.

1              Now we have -- how have we gone from 13 to 16?

2     A.   By having 16 different locations, it gives us more

3          differentiating material; it gives us more locations

4          to look at and therefore more locations to say that

5          they match or that they don't match.

6     Q.   All right.  And so in this particular case you used

7          the new process, that being 16?

8     A.   That's correct.

9     Q.   Has that been a fairly recent development over the

10         last couple years?

11    A.   Yes.

12    Q.   Okay.  Go ahead.  I apologize.

13    A.   Fourteen -- and this one is the sex determining

14         location.  If there is an X and a Y, that means that

15         it's a male.  If there is only an X, then that's a

16         female.

17    Q.   You're talking about No. 14?

18    A.   No. 14, that's correct.

19    Q.   Okay.

20    A.   Fifteen, and then 16.

21    Q.   And just looking at this 14 loci here, what does that

22         tell us about Monterial Wesley?

23    A.   That tells us that he is a male.

24    Q.   All right.  And in connection then with these

25         different loci, these 16 different loci, this tells

```
 1              us the sex of someone.  Do each of those other loci

 2              tell us different things about a particular

 3              individual?

 4    A.        No, they do not.  This DNA that we look at does not

 5              have any determination.  I can't look at this profile

 6              and tell you what color of hair or skin or eyes.

 7              This is just the short tandem repeat location on the

 8              DNA, which is kind of what we refer to as junk DNA.

 9    Q.        All right.  So now that we have identified for the

10              jury 16 loci that you developed in this case, tell us

11              how we then go about the business of reading these

12              different loci or interpreting these different loci.

13    A.        We just look at the locations, and as you can see at

14              the first location, he is a 13.  He has a 13 and a

15              15, so we would say that he is a 13/15 at the first

16              location, and we go so on and so forth down the

17              number.

18    Q.        Now, it looks like at each loci there would be two

19              numbers that would be associated with a particular

20              individual.

21    A.        In Mr. Wesley's case he is heterozygous, meaning he

22              has two different numbers at every location.  Some

23              people are homozygous at some locations, meaning they

24              only have one number or they have two copies of the

25              same number.
```

1    Q.   And I think we will see one of those examples with

2         regards to Mr. Simpson, but with regards to Mr.

3         Wesley, in connection with each loci then there would

4         be two numbers associated with his DNA profile?

5    A.   That's correct.

6    Q.   All right.  Let's look at Government's Exhibit 336.

7         It tells us much the same as the prior document; is

8         that right?

9    A.   That's correct.

10   Q.   Do we see a representation on here about a homozygous

11        example of an allele with Mr. Simpson?

12   A.   Yes.  This last location there is only -- he only has

13        one allele, or he's homozygous.  That means he has

14        two 23s.

15   Q.   Okay.

16   A.   Homozygous 23.

17   Q.   And just for clarification purposes, if we were to

18        compare the database profile of Rtayvian Simpson and

19        Monterial Wesley, is it as simple as lining up the

20        various alleles -- and I'm going to look first of all

21        at allele D8S1179.  Do you see that on the screen?

22   A.   Uh-huh, yes.

23   Q.   And tell us, just comparing these two alleles, what

24        we can determine -- or how we can distinguish the DNA

25        of these two individuals at that allele.

1   A.   You can see that the bottom individual --

2   Q.   And Mr. Wesley is on the left?

3   A.   Okay.  Which is Wesley?

4   Q.   This.

5   A.   He has a 13 and a 15, and you can see that Mr.

6        Simpson has a 13 and a 16, so these samples do not

7        match.

8   Q.   Okay.  Now, can there be an occasion where someone

9        has the same alleles at a particular loci?

10  A.   It can happen, yes.

11  Q.   Okay.  And let's look at, for instance, Loci CSF1PO.

12       And this time Mr. Wesley is on the right and

13       Mr. Simpson is on the left.  What do we see at this

14       particular loci?

15  A.   We would notice that they both have the same profile

16       at this location.

17  Q.   Okay.  And when you look at a particular sample, is

18       that why it's necessary to look at different loci in

19       order to distinguish one person from another?

20  A.   That's correct.  That's why we use 16 different

21       locations, because it gives us more of a

22       discriminating factor, so if they match at one or

23       more locations like this, that's why we have 16

24       different places, so they will not match at 16 places

25       unless they are identical twins.

```
 1    Q.   And if they did, if we had two -- I don't know, do

 2         you call these autorads, or what do you all these?

 3    A.   Electropherograms.

 4    Q.   Okay.  If you had two of these that had the exact

 5         same information at every loci, every allele

 6         matching, then the conclusion would be what?

 7    A.   If they are both known samples, then the conclusion

 8         would be that they are either from the same

 9         individual or they are identical twins.

10    Q.   All right.  So after the four steps that you did with

11         regards to the known samples, is this the analysis

12         then that you're able to do with regards to

13         identifying the known DNA of Monterial Wesley and

14         identifying the known DNA of Rtayvian Simpson?

15    A.   Yes.

16    Q.   I want to now hand you what I've marked Government's

17         Exhibit No. 337 and then 338.  Tell us first of all

18         what 337 is.

19    A.   337 is the DNA profile from the swab that I collected

20         of the trigger of the gun.

21    Q.   And what is 338?

22    A.   338 is the DNA profile from the swab that I collected

23         from the grip of the gun.

24    Q.   Okay.  And do those exhibits accurately show the

25         analysis that you did in connection with the swabs
```

```
 1            that you took from both the trigger and the grip?
 2   A.   They do.
 3                MS. MOREHEAD:  Judge, I would ask for
 4        admission of Government's Exhibit 337 and 338.
 5                THE COURT:  Is there any objection?
 6        Hearing none, those two exhibits are admitted, 337
 7        and 338.
 8   Q.   (By Ms. Morehead) Now, Ms. Clark, you indicated that
 9        you also took swabs from the magazine?
10   A.   That's correct.
11   Q.   And tell the jury about your -- the testing that you
12        did with regards to the magazine.
13   A.   The testing that I performed on the swabs of the
14        magazine was exactly the same as the swabs from the
15        trigger and the swabs from the grip of the gun.  We
16        followed the extraction, quantification,
17        amplification, and separation steps.
18   Q.   And what happened -- tell us about the analysis in
19        connection with the swabs in the magazine.
20   A.   There was -- no typing results were received from the
21        swabs of the magazine, meaning no profile was
22        developed.
23   Q.   Tell the jury what effect -- let me ask you first,
24        just because I touch an object, does that mean I'm
25        going to deposit my DNA on it?
```

1    A.   No, it does not.

2    Q.   What affects -- under what circumstances, or what

3         affects whether DNA will be deposited from touching

4         an object?

5    A.   An individual's ability to shed skin cells very much

6         affects how much DNA is left behind.  Different

7         things like weather and the sunlight can also affect

8         the amount of DNA that is on the object when we

9         receive it.

10   Q.   And with regards to the magazine, does the fact that

11        you weren't able to develop a DNA profile on that

12        object, does that mean no one ever touched the

13        magazine?

14   A.   No, it does not.

15   Q.   And in order to do a DNA profile, how much DNA is

16        actually necessary in order to develop a sufficient

17        profile?

18   A.   Approximately the equivalent of ten skin cells would

19        be needed -- or ten cells would be needed to develop

20        a profile.

21   Q.   And in connection with the swabs that you took from

22        the grip and the trigger, does the surface of

23        whatever object you're swabbing affect or impact how

24        much DNA, specifically skin cells, might be deposited

25        on it?

 1   A.   Yes.  If an object is very rough or very porous, more

 2        DNA can be left behind because there's more chances

 3        for that surface to rub against the skin, and

 4        therefore, you know, you leave the skin cells behind.

 5   Q.   Now, did you go through, in fact, the same four-step

 6        process with regards to the swabs from the trigger

 7        and the swab from the grip in connection with your

 8        analysis?

 9   A.   I did.

10   Q.   With regard -- before I leave the swab of the

11        magazine, because you weren't able to develop a DNA

12        profile, you're not able to make any findings in

13        connection with anyone's DNA on that object; is that

14        accurate?

15   A.   That's correct.

16   Q.   Okay.  Let's first look at Government's Exhibit 337.

17        And tell us what we have here.

18   A.   This is the profile from the swab that I collected of

19        the trigger of the gun.

20   Q.   Okay.  And in connection with this exhibit, it

21        actually is comprised of two sheets; is that right?

22   A.   That's correct.

23   Q.   And why specifically -- does this have the same 16

24        loci that we had on the known samples of Wesley and

25        Simpson?

1    A.   Yes, it does.

2    Q.   Why is it on two pages as opposed to one page with

3         them?

4    A.   It's on the two pages because you can see it's a

5         mixture of DNA.  There's more than just two numbers

6         at each location, and that just makes it enough that

7         it bumps our printouts onto two pages.

8    Q.   All right.  Tell the jury what a mixture is, if you

9         would.

10   A.   A mixture is when you have two or more people that

11        deposit DNA on an item.

12   Q.   And how are we able to know when what we have is a --

13        when we are presented with a mixture of DNA on a

14        particular object?

15   A.   As you can see, just at this very first location

16        there are four alleles at the very first location,

17        and you know that that is not just one person because

18        any one person can only contribute up to two alleles.

19   Q.   Okay.  And is there any way when you have a mixture

20        of DNA such as this that you can say how many people

21        have touched a particular object?

22   A.   No.  We can't say how many people have touched that

23        object; we can say that at least two people have left

24        their DNA on this object.

25   Q.   Why aren't you able to say a number of people then

1      or, like, whether it was two or three or four?

2   A.   Some people, as we stated before, may be homozygous

3        or only have one allele at a location, and at this

4        particular place you see that there are four, so if

5        each person who deposited DNA had only one allele

6        there, then we could maybe say there were four

7        people, but because we know that people can leave two

8        alleles, there could only be two people there too.

9        So we only say that there are at least two people.

10  Q.   Okay.  And in connection -- going back here to

11       Simpson and Wesley on this particular comparison,

12       again, going to the first allele or the first loci,

13       would you agree they both have a 13 loci?

14  A.   That's correct.

15  Q.   And then Mr. Simpson has a 16, Mr. Wesley has a 15?

16  A.   That's correct.

17  Q.   Okay.  Then going to the first loci of Government's

18       Exhibit 337, what do we see?

19  A.   We see a 13, a 14, a 15, and a 16.

20  Q.   And when you have two people with a common allele, is

21       there any way to know whether the allele is

22       attributed -- or let me ask you this:  Can a single

23       allele be attributable to two individuals?

24  A.   Yes, they can.

25  Q.   And so if two people have the same allele at a

1    particular loci, is there any way for you to

2    differentiate, again, between whether it was just

3    these two people or three people or how many people?

4  A.  No, there isn't.

5  Q.  Would you agree with me if we assume hypothetically

6    that Mr. Simpson and Mr. Wesley would have both

7    touched this particular -- this was a swab from the

8    trigger -- if they would have both touched the

9    trigger, we would expect to see a 13, a 15, and a 16?

10 A.  That's correct.

11 Q.  Okay.  And with the first allele then we see a 13,

12    14, 15, and a 16.  If we have a -- if we know that

13    those two have touched it, what would you conclude

14    about at least how many people had touched this

15    object?

16 A.  If we knew that both of them had touched it, it would

17    appear that at least one other person had possibly

18    touched this gun.

19 Q.  And that's because we have a 15 -- or a 14 in there

20    that would be unaccounted for?

21 A.  That's correct.

22 Q.  All right.  Now, with regards to Government's

23    Exhibit 337, when we were looking, for instance, at

24    Mr. Wesley's known DNA, each allele on each loci

25    appears -- and I don't know if this is proper.  I

1    call them -- they look like peaks to me like that you

2    see on a printout or something, but the peaks are at

3    a different height along each different loci.  Is

4    that significant at all as far as the analysis

5    process?

6  A.  The peak height only tells us approximately how much

7    DNA was there.  Because these peak heights are 900

8    and 1,000, that tells me that there was quite a bit

9    of DNA in that sample.  In these heights, you see the

10   numbers underneath the 13 and the 15.  If those

11   numbers underneath the 13 and the 15 had been, say,

12   50 or 100, that would tell me that there was not very

13   much DNA that contributed to those peaks.

14 Q.  And just so we're not -- I'm trying not to be too

15   technical, but the numbers that you're referring to,

16   where are they in connection with each allele?

17 A.  The allele number is the 13, which is at the top, and

18   then the height number is this 963 that is below the

19   13.

20 Q.  Okay.  And we see that with regards to each allele?

21 A.  That's correct.

22 Q.  At each loci?

23 A.  That's correct.

24 Q.  So going back now to Government's Exhibit 337, the

25   swab of the trigger, looking at this

```
 1              electropherogram, can you tell us about the amount of

 2              DNA that you were able to collect on the swab from

 3              the trigger.

 4    A.    As you can see, because these numbers are 300, 57,

 5              140, there was not a lot of DNA on the trigger, or on

 6              the swab that I collected from the trigger.

 7    Q.    And if there's not as much DNA present, does it

 8              somewhat limit you with regards to some aspects of

 9              opinions that you are able to render?

10    A.    Yes, it limits what we can say.

11    Q.    It though does still allow you, does it not, even if

12              you don't have a lot of DNA, does it still allow you

13              to render an opinion whether someone is included or

14              excluded as a source of DNA?

15    A.    It allows us to say -- in this case this is a

16              mixture, so it allows us to say that someone is

17              included in the mixture or excluded from being a

18              contributor to the mixture.

19    Q.    And explain to the jury how you exclude somebody as

20              being a contributor to a source of DNA.

21    A.    In the example of a mixture, because this is very low

22              level, they have to be missing -- their DNA profile

23              has to be missing from a lot of the places on the

24              DNA.  If this was a single source profile, they would

25              only need to be missing from one location to be
```

```
 1           excluded.
 2    Q.     Okay.  And so because we know this is a mixture, you
 3           said we would need to have an indication that their
 4           profile was missing from several different loci then.
 5           And what do you consider -- what would be sufficient
 6           to actually exclude somebody from a particular sample
 7           that was a mixture?
 8    A.     In this case, this location right here, every single
 9           number, every single allele, is over 125, and during
10           our validation studies of this particular chemistry
11           that we use to get these 16 locations we determined
12           that at 125, the height of 125, you can say that
13           somebody, all of their information would be there.
14           If they were included in this mixture, all their
15           information should be there.  So in this case if they
16           were missing even one allele from this location,
17           which is the one, they would be excluded from this
18           profile.
19    Q.     And that's the THO1 allele; is that right?
20    A.     That's correct.
21    Q.     Okay.  And even though you might not have a profile
22           of 125 or more, are you still able to make a
23           determination if someone's DNA is missing or present
24           at other alleles?
25    A.     Yes, we are.
```

1    Q.   Okay.  And, frankly, all it takes is a good pair of

2         eyes.  Would you agree with that?

3    A.   Basically, yes.

4    Q.   Okay.  So then also Government's Exhibit 338, is that

5         much the same as what we saw with 337, but this being

6         the swab of the grip?

7    A.   Yes.  It is also a mixture that is very low level, as

8         you can see.

9    Q.   And, again, two pages showing the 16 different loci?

10   A.   That's correct.

11   Q.   All right.  I would like to go through, first of all,

12        a comparison of Government's Exhibit 337, the swab of

13        the trigger, and look at the various loci with

14        regards to Monterial Wesley and Rtayvian Simpson, and

15        I think I can do this by putting those up and looking

16        then at the first loci.  What can you tell us with

17        regards to the comparison of Monterial Wesley, this

18        being the trigger, Wesley, and Simpson, okay?  Tell

19        us what we see here then.

20   A.   As you can see on the swab from the trigger, there is

21        a 13, 14, 15, and 16.  Wesley has a 13 and a 15, and

22        Simpson has a 13 and a 16.

23   Q.   All right.  And so at this loci are either Wesley or

24        Simpson excluded as a contributor of the DNA on the

25        swab of the trigger?

2383

```
 1    A.    No.

 2    Q.    Let's go to the second allele.  And tell us what we

 3          see here.

 4    A.    Here we see a 31, a 32.2, and a 35, all of which are

 5          very low level, as you can see by the 79 and 57.

 6    Q.    This is --

 7    A.    Wesley has a 29 and a 30, and Simpson has a 32.2 and

 8          a 35.

 9    Q.    And from that comparison it does not appear that

10          Wesley's alleles appear on this particular loci?

11    A.    That's correct.

12    Q.    But Simpson's do?

13    A.    That's correct.

14    Q.    I'm going to switch this out.  We're going to go to

15          the third allele.  Tell us what we see here.

16    A.    At D7 you see only an eight on the swab of the

17          trigger, and Wesley has an 8/10; and Simpson has an

18          8/12.

19    Q.    All right.  And I just want to look at this

20          particular sample here, and sometimes on these

21          electropherograms we see a little notch on the loci.

22          Do you see what I'm talking about?

23    A.    Yes.

24    Q.    What are those?

25    A.    We cannot make a conclusion on what those are.  They
```

 1           could be something that is in our baseline, just an

 2           electrophoretic anomaly, something that the

 3           electricity has caused to occur, or it could be that

 4           there was not enough DNA there to bring that peak up

 5           high enough to be called.

 6     Q.    Okay.  And so with regards to what we have here, we

 7           have an eight, and what can you say about Wesley and

 8           then Simpson at this allele or loci?

 9     A.    We can say only that they each have an eight and that

10           an eight is present, but their other alleles, the ten

11           and the 12, are not there.

12     Q.    And are there explanations if, in fact, they had

13           touched this object why that allele wouldn't be

14           there?

15     A.    Yes.

16     Q.    What are those?

17     A.    As you can see, these locations are clear out to the

18           right of our electropherogram, and as you move to the

19           right of the electropherogram, the locations of DNA

20           that were amplified are large, and these large pieces

21           of DNA oftentimes due to sun or weather -- lots of

22           different things can cause these large pieces of DNA

23           to be chopped up.  When that occurs -- or degraded.

24           When that occurs, it does not allow us to be able to

25           amplify that region of DNA.

1    Q.   All right.  Now, going to the fourth loci then, tell

2         us what we see with regards to the fourth loci again

3         with regards to Wesley and then Simpson.

4    A.   We see that the swab of the trigger has an 11/12 and

5         both Wesley and Simpson also have an 11/12.

6    Q.   Okay.  And with regards -- is there -- we have four

7         different rows of alleles that we're going to talk

8         about; is that right?

9    A.   That's correct.

10   Q.   Containing different loci?  Is there some meaning or

11        reference to what each of those rows of alleles or

12        loci represent?

13   A.   I'm not sure I understand the question.

14   Q.   I probably didn't ask it right.  You know, you talked

15        about the different colors, and I'm terribly

16        color-blind.  What's this top color here?

17   A.   The top is blue.

18   Q.   I was going to say blue, but I didn't want to guess.

19        And the second one appears to be green; and the third

20        one, black; and the fourth one would be red.  Why do

21        we have that different color sequence?

22   A.   We have the different color sequence because each

23        different color allows us to be able to type more

24        different locations on the DNA.  You can only have so

25        many locations typed in each color, so by adding more

1      colors you're able to add more locations.

2  Q.  All right.  So from this first location, the blue

3      location, it appears that -- or let me ask you this.

4      At any of those four loci on the first typing was

5      Rtayvian Simpson's DNA ever missing?

6  A.  Yes.  He was missing -- at D7 the 12 was missing.

7  Q.  Okay.  And then with regards to Mr. Wesley, what

8      about him?

9  A.  At the second location his 29 was missing, and at the

10     third location his ten was missing.

11 Q.  All right.  And when you say one of the alleles was

12     missing, would it be more concerning if both alleles

13     were missing as opposed to whether one of the two

14     alleles are missing in a heterogeneous individual, in

15     a heterozygous --

16 A.  In a heterozygous --

17 Q.  Heterozygous.  I shouldn't even try, should I?

18     Heterozygous.

19 A.  In a heterozygous pair sometimes one allele is amped

20     more than the second allele, so it's possible that

21     because one of them was present that possibly that

22     allele was amped instead of the other allele.

23 Q.  Okay.  Let's go to the green typing then, which would

24     be the fourth loci -- the fifth loci.  Sorry.  What

25     were your findings in connection with that loci?

```
 1    A.    Both individuals, all of their alleles were present

 2          in the swab of the trigger.

 3    Q.    With regards to the sixth, what can you tell us about

 4          that?

 5    A.    Both of their DNA was present at this location on the

 6          swab from the trigger.

 7    Q.    With regards to the seventh?

 8    A.    Again, both of their DNA was present.

 9    Q.    And the eighth loci?

10    A.    Wesley, the 12 allele from Wesley is missing at this

11          location, but both of the alleles from Simpson are

12          present.

13    Q.    And then the ninth loci?

14    A.    The 16 from Wesley is missing, and the 23 from

15          Simpson is missing.

16    Q.    Okay.  And with regards to the tenth loci?

17    A.    Both individuals' alleles are present on the swab of

18          the trigger.

19    Q.    The next one?

20    A.    Again both of the individuals' DNA is present.

21    Q.    The 12th?

22    A.    At this location the six from Wesley is missing but

23          both alleles from Simpson are present.

24    Q.    And the 13th?

25    A.    At this location none of the alleles from either
```

1           individual are present.

2    Q.    Okay.  And we're going to go to the red, and you

3          indicated the 14th loci had to do with the sex; is

4          that right?

5    A.    That's correct.

6    Q.    And is there any comparison that you do with regards

7          to this loci?

8    A.    We just make sure that if the known DNA sample is

9          from a male and the questioned profile is that, it

10         appears, from a female, we just make sure that they

11         match.

12   Q.    Okay.  And what about the 15th?

13   A.    Again both individuals alleles are present.

14   Q.    And the 16th?

15   A.    The 24 allele from Wesley is missing, but the 23 from

16         both individuals is present.

17   Q.    And based upon the analysis that you did of the known

18         samples of Monterial Wesley, Rtayvian Simpson, and

19         the swab of the trigger, were you able to make a

20         determination about whether Wesley and Simpson's DNA

21         is found on the swab of the trigger?

22   A.    Yes, I was.

23   Q.    And what were your -- what's your opinion with

24         regards to that?

25   A.    Both Monterial Wesley and Rtayvian Simpson are

2389

1          included as contributors to this sample, and there's

2          a 76.77 percent probability of seeing an unrelated

3          individual at random from the population who would

4          also be included in this mixture.

5     Q.   When we start talking about random frequency and the

6          percentage that you just threw out, the

7          probabilities, what do you base that on, Ms. Clark?

8     A.   This percentage was based on the one location where

9          all of the alleles were above that 125, which in this

10         case was only this location.

11    Q.   All right.  So you have to base the statistical part

12         of this case only on a particular loci where the

13         numbers are more than 125 at all alleles; is that

14         right?

15    A.   That's correct.

16    Q.   And even though there were many other loci where, for

17         instance, Monterial Wesley's DNA was consistent with

18         what was shown on the trigger, you cannot take those

19         matches into your consideration as far as statistical

20         purposes; is that right?

21    A.   That's correct.

22    Q.   Are you still able to take those matches at all of

23         the different other loci and the alleles into

24         consideration as far as your opinion about whether

25         their DNA -- whether they have been included or

1              excluded from the particular sample?

2     A.    The entire profile is looked at as a whole to

3            determine if they are included or excluded, yes.

4     Q.    And you certainly did not exclude Monterial Wesley as

5            the source -- as one of the sources of DNA with

6            regards to the swab of the trigger; is that right?

7     A.    He's included as a contributor to this mixture.

8     Q.    And you did not exclude Rtayvian Simpson as a source

9            of -- from the mixture from the trigger; is that

10           right?

11    A.    He is also included as a contributor to this mixture.

12    Q.    All right.  Government's Exhibit 338, you identified

13           that as being a swab of the grip?

14    A.    That's correct.

15    Q.    With regards to -- we could go through the same

16           process with this exhibit that we just went through

17           with regards to the swab from the trigger; is that

18           right?

19    A.    That's correct.

20    Q.    Can you give us, based upon your review first of all

21           of the swab of the trigger, the quantity of DNA that

22           was there then?

23    A.    Yes.

24    Q.    What was the quantity of DNA with regards to the swab

25           of the trigger?

1    A.   There was 1.16 picograms of DNA.

2    Q.   What does that mean?

3    A.   That means there's a very tiny amount.

4    Q.   Okay.  And what about with regards to the swab from

5         the grip?  Were you able to quantify how much DNA was

6         present with regards to the swab of the grip?

7    A.   Yes.

8    Q.   How much was there present with regards to the swab

9         of the grip?

10   A.   There was 5.88 picograms.

11   Q.   And I don't want to presume anything, but does the

12        higher number indicate that there's more quantity of

13        DNA on the grip than there would be on the trigger?

14   A.   That's correct.

15   Q.   All right.  And with regards then to the grip, going

16        through that same process of comparison with Rtayvian

17        Simpson and Monterial Wesley, what did you determine

18        with regards to their DNA on the swab of the grip?

19   A.   Monterial Wesley and Rtayvian Simpson were both

20        included as contributors to this mixture, and there

21        was a 76.25 percent probability of selecting an

22        unrelated individual randomly from the population who

23        would also be included in this mixture.

24   Q.   All right.  And, again, was that based upon the fact

25        that at the various loci you were looking at the peak

REBECCA S. RYDER, CCR, RMR
UNITED STATES COURT REPORTER
913-551-5645

1    levels and that they had to be more than 125-tall

2    alleles?

3  A.  That's correct.  In this case this location right

4    here was the only one that was able to be used for

5    that statistic.

6  Q.  And with regards to the overall examination and

7    analysis of the 16 loci for Monterial Wesley, did you

8    exclude him as a source of the DNA profile that you

9    extracted from the swab of the grip?

10 A.  No, I did not.

11 Q.  Did you exclude Rtayvian Simpson as a source of the

12    DNA profile that you acquired with regards to the

13    swab of the grip?

14 A.  No, I did not.

15 Q.  Both of them are included in that DNA profile?

16 A.  That's correct.

17        MS. MOREHEAD:  Judge, that's all I have of

18    this particular witness.

19        THE COURT:  Very well.  Cross examination?

20    Mr. Rogers?

21            CROSS EXAMINATION

22  BY MR. ROGERS:

23 Q.  So when you say included as contributors, what you

24    really mean is included as possible contributors?

25 A.  They are included as contributors to the mixture.

1    Q.   You don't mean they contributed to the mixture; you

2         mean they might have; right?

3    A.   I suppose, yes.

4    Q.   Okay.  As a matter of fact, more than three out of

5         four males in the United States might have; right?

6    A.   That's correct.

7    Q.   So there is, what, 150 million males in the United

8         States?

9    A.   I don't know that.

10   Q.   Somewhere around there?

11   A.   Possibly.

12   Q.   Well, there's a population of over 300 million?

13   A.   Okay.

14   Q.   About half of them are male; right?

15   A.   Okay.

16   Q.   And so there would be well over a hundred million

17        individuals who are included as contributors of the

18        DNA that you tested from the trigger of the pistol or

19        from the grip of the pistol; correct?

20   A.   That are possible contributors.

21   Q.   Okay.  Just like Mr. Simpson, just like Mr. Wesley?

22   A.   That's correct.

23   Q.   Now, I think I understand from what you described,

24        taking the swabs, that you don't do it in layers; is

25        that a fair statement?

2394

```
 1    A.    I'm not sure that I understand.

 2    Q.    In other words, you can't tell, if there's a mixture

 3          of DNA, whose got there first?

 4    A.    That's correct.

 5    Q.    You can't tell when that DNA was deposited on

 6          whatever surface it came from?

 7    A.    That's correct.

 8    Q.    And you can't tell whether that DNA was deposited by

 9          the person whose DNA it is touching the surface

10          directly or the person whose DNA it is touching

11          something else which was touched by something or

12          someone else which then touched the surface?

13    A.    That scenario is possible but not probable.

14    Q.    Transferred DNA?

15    A.    That's correct.

16    Q.    That's the name of it?

17    A.    That's correct.

18    Q.    It at least happens often enough that it has a name?

19    A.    I suppose, yes, that's correct.

20    Q.    And you can't tell whether or not that happened?

21    A.    That's correct.

22    Q.    And you can't tell when the DNA was deposited there

23          or under what circumstance?

24    A.    No, I cannot.

25    Q.    And so assuming that the source of the questioned DNA
```

1    in this case, the pistol, was put in a bag or a box

2    or something, sealed up in November of 2007,

3    you don't know whether the DNA that you found may or

4    may not have been deposited there in October or

5    August or 2006 or 2005; correct?

6  A.  That's correct.  We can't date DNA.

7  Q.  Now, if someone has an allele which is present in

8    their known sample which is not present in the

9    questioned sample, that doesn't exclude them, does

10   it?

11 A.  Not necessarily.

12 Q.  Okay.  And even if the allele is at a locus where

13   there is another allele which is present in a number

14   of more than 125, whatever that measures, that still

15   wouldn't exclude them necessarily, would it?

16 A.  Can you rephrase the question.

17 Q.  Say you have a locus where there is an allele on the

18   questioned sample which is at 127 in the second

19   number, okay?  What does that number measure, by the

20   way, peak height, but what --

21 A.  Peak height, yes, and it's an approximate

22   measurement.  You can get a feel for how much DNA is

23   present by the height of the peak.

24 Q.  Okay.  So at this particular locus hypothetically

25   there's -- say 200 is the peak height of one allele.

```
 1          If there is no allele present which corresponds to
 2          the known sample at that locus, would that exclude
 3          the person?
 4    A.    If the person has no alleles present, they would
 5          likely be excluded.
 6    Q.    Likely but not always?
 7    A.    It depends.  As I said before, as you get further
 8          this way on the DNA, the locations that we measure or
 9          that we profile get larger, and if someone was
10          missing only from one of these large locations clear
11          out on the right-hand side, it's possible if they
12          were missing from that location and present
13          everywhere else that they could still be included.
14    Q.    Okay.  And if there is an allele present at a
15          particular location which does not appear in the
16          known sample, then that is attributed to it possibly
17          being a mixture; correct?
18    A.    That's correct.
19    Q.    So you can't get excluded by having an allele there
20          that doesn't match, and you can't get excluded by not
21          having an allele there that does match; is that a
22          fair statement?
23    A.    If there's not an allele there, then it cannot match,
24          but if there's an allele there that is not present in
25          our known sample, it's possible that you can still be
```

1           included.

2    Q.    Okay.

3    A.    If your other alleles are present.

4    Q.    And I think we already said, even if you have an

5          allele at that locus which is not present in the

6          questioned sample, that still does not necessarily

7          exclude you?

8    A.    That's correct.

9    Q.    You are not able to tell us that with any reasonable

10         degree of scientific certainty that Rtayvian Simpson

11         ever touched that pistol, are you?

12   A.    I cannot say with a reasonable degree of scientific

13         certainty that he's present, no.

14   Q.    Thank you.

15                MR. ROGERS:  That's all the questions I

16         have.

17                THE COURT:  Any other cross examination?

18                MR. JOHNSON:  May I inquire, Judge?

19                THE COURT:  You may.

20                CROSS EXAMINATION

21   BY MR. JOHNSON:

22   Q.    How are you, Ms. Clark?

23   A.    I'm good.

24   Q.    You're a scientist?

25   A.    That's correct.

2398

```
1   Q.   And you're trained as a scientist?

2   A.   That's correct.

3   Q.   You are generally in the business of solving

4        problems?

5   A.   Sure, yes.

6   Q.   And you use a methodology for problem-solving called

7        scientific method?

8   A.   That's correct.

9   Q.   And that is just a basic procedure that has been used

10       for centuries by scientists?

11  A.   That's correct.

12  Q.   That includes identifying the problem that you need

13       to solve; correct?

14  A.   Yes.

15  Q.   And then you investigate it?

16  A.   Yes.

17  Q.   Then you draw a hypothesis?

18  A.   Uh-huh.

19  Q.   That's a yes?

20  A.   Yes.

21  Q.   And then you do your testing?

22  A.   That's correct.

23  Q.   And then you publish your results and draw your

24       conclusions?

25  A.   That's correct.
```

2399

1    Q.   And the reason that you publish your results is so

2         that other people can take a look at your work?

3    A.   That's correct.

4    Q.   Scientists are concerned with transparency?

5    A.   That's correct.

6    Q.   In your job your supervisor needs to be able to

7         review your work?

8    A.   That's correct.

9    Q.   Prosecutors need to be able to review your work?

10   A.   Yes.

11   Q.   Defense lawyers?

12   A.   Yes.

13   Q.   And ultimately jurors?

14   A.   Correct.

15   Q.   And so to maintain this transparency so that we can

16        look at your work, you track everything you do?

17   A.   That's correct.

18   Q.   And you have got a binder in front of you?

19   A.   I do.

20   Q.   And in that binder I bet you have your reports?

21   A.   I do have my reports.

22   Q.   You also have notes?

23   A.   That's correct.

24   Q.   And you actually referred to your notes during the

25        course of this testimony?

1    A.    Uh-huh, yes.

2    Q.    And they are called bench notes?

3    A.    That's correct.

4    Q.    And you write down everything you do every step of

5          the way?

6    A.    That's correct.

7    Q.    Because when you want somebody to review what you

8          did, transparency is important?

9    A.    That's correct.

10   Q.    Thank you.

11              MR. JOHNSON:  I've got no further

12         questions.

13              THE COURT:  Any further cross examination?

14         Hearing none, any redirect, Ms. Morehead?

15                  REDIRECT EXAMINATION

16   BY MS. MOREHEAD:

17   Q.    Ms. Clark, Mr. Rogers asked if you were able to say

18         within a reasonable degree of scientific certainty

19         whether Rtayvian Simpson -- I think he said was

20         included.  Is that what he asked you?

21   A.    I am not sure exactly what the question was that he

22         asked.

23   Q.    Based upon your analysis in this case, are you able

24         to give an opinion about whether Rtayvian Simpson's

25         DNA is on the swab and -- I'm sorry, is on the

```
 1          trigger and whether Rtayvian Simpson's DNA is on the
 2          grip?
 3   A.     He was included in both of those mixtures.
 4                    MS. MOREHEAD:  That's all I have, your
 5          Honor.
 6                    THE COURT:  Mr. Rogers?
 7                    RECROSS EXAMINATION
 8   BY MR. ROGERS:
 9   Q.     I realize we're quibbling with words, but when you
10          say he was included in both of those mixtures, what
11          you mean is he cannot be excluded; correct?
12   A.     No.  I mean that he was included.
13   Q.     Okay.  Now, you don't mean that that's his DNA, do
14          you, to a reasonable degree of scientific certainty?
15   A.     To a scientific certainty I cannot say that that is
16          his DNA.
17   Q.     Okay.  So when you mean included, you mean included
18          in the universe of possible contributors; correct?
19   A.     I mean that he is included at the location that was
20          high enough to do a statistic on.  He was included in
21          the mixture at that location.
22   Q.     And we say included in the mixture.  You don't say
23          Rtayvian Simpson's DNA was included in that mixture;
24          you mean Rtayvian Simpson shares with millions of
25          other people the particular alleles at that locus;
```

1      correct?

2   A.   I mean that his alleles are present at that location.

3   Q.   The alleles which are found in his DNA?

4   A.   That's correct.

5   Q.   Not necessarily alleles from his DNA?

6   A.   Not necessarily.

7   Q.   Okay.  You see the different there?

8   A.   Yes.

9   Q.   And there's a difference between saying he's included

10      as a possible contributor and saying it's his; right?

11   A.   That's correct.

12   Q.   And you're not saying it's his; you're saying he's

13      included as a possible contributor?

14   A.   That's correct.

15   Q.   Along with seventy-six point something percent of men

16      in the United States?

17   A.   Along with 76.77 and 76.25 percent of unrelated

18      individuals.

19   Q.   Okay.

20   A.   Not necessarily males.

21   Q.   But we know that they are males because of the XY

22      thing down at the bottom; right?

23   A.   We can't say that it's exclusively from a male

24      because females have an X and males have XY, so the X

25      is present.

1    Q.   All right.  So if there were no Y's, then you could

2         say it's exclusively female, but if you have both, it

3         could be a mixture including females?

4    A.   That's correct.

5    Q.   So that expands the list of possible contributors all

6         the way up to 300 million?

7    A.   Included at random from the population.

8    Q.   Would you agree that, since DNA is genetic by

9         definition, that people who are genetically related

10        are more, and not less, likely to share alleles?

11   A.   That's correct.  Related individuals are more likely

12        to share locations of DNA than unrelated.

13   Q.   Okay.  So if you're talking about people in the

14        Simpson and Wesley family -- you know they are half

15        brothers; right?

16   A.   I was not aware of that.

17   Q.   Okay.  Then if there's other siblings, they would be

18        more than 75 percent likely to be the contributors?

19   A.   We don't do a statistic on that.

20   Q.   Okay.  Thanks.

21             MR. ROGERS:  That's all.

22             THE COURT:  Anything further?  Ms.

23        Morehead?

24             MS. MOREHEAD:  No, your Honor.

25             THE COURT:  Very well.  You may step down,

1        and you are excused, Ms. Clark.

2                Counsel, would you approach, please.

3                (Counsel approached the bench and the

4        following proceedings were had:)

5                THE COURT:  Does that conclude the

6        presentation of evidence?

7                MS. MOREHEAD:  Yes, Judge.  I wanted to do

8        a quick review with someone to make sure that all the

9        exhibits I hope I've introduced have been introduced

10       and with that I will be resting my case.

11               THE COURT:  All right.  In addition, I want

12       to -- before resting your case I want to make a

13       ruling on the two issues that are dealing with

14       conditional admission of certain evidence, which I

15       will do.  Then I will let you rest on the record.

16       I'm going to send the jury out for a relatively short

17       recess now, and we will take care of that, allowing

18       you to take a look at your exhibits, and then we will

19       send them back out, and we will see if there's any

20       other business we need to transact before we move on.

21               MS. MOREHEAD:  Are you saying I'll be able

22       to rest after we have looked at the exhibits, Judge?

23               THE COURT:  Yes.  I think you've -- I think

24       there isn't anything like the one we caught yesterday

25       that's hanging out there that you probably think you

1    have admitted.

2              MS. MOREHEAD:  I just want to make sure.

3              THE COURT:  But I don't know.  You

4    certainly can check.  Here is my sheet, which is the

5    official record.

6              MS. MOREHEAD:  I'll take a look at that.

7    Are we going to take a short break now, or do you

8    want me to do that right now?

9              THE COURT:  We're going to send the jury

10   out.

11             MS. MOREHEAD:  If I could have a couple

12   minutes to look over that?

13             THE COURT:  Yeah.  Mr. Bellemere?

14             MR. BELLEMERE:  I had a witness show up for

15   about 3:00 o'clock this afternoon, and I don't know,

16   if I should find him out in the hallway, should I

17   send him back and have him come in on Tuesday?

18             THE COURT:  Not necessarily.  I would say

19   keep him -- how long do you think that witness would

20   take?

21             MR. BELLEMERE:  On the stand?  Twenty

22   minutes.

23             MS. MOREHEAD:  Who is that?

24             MR. BELLEMERE:  It's a person from CCA with

25   regard to the records of warehousing of Humphrey and

1    McDaniel.

2              THE COUT:  The point is, don't release

3    them.  We will see where we go.

4              (The proceedings returned to open court.)

5              THE COURT:  Members of the jury, we're

6    going to take a recess now for 15 minutes, and then

7    we will be back.  I'll remind you of those

8    admissions.  Ms. Scheurer, please take charge of the

9    jury.  Participants, remain here.  Thank you.

10             (The following proceedings were had outside

11   the presence of the jury:)

12             THE COURT:  We're now proceeding outside

13   the hearing of the jury.  There are two categories of

14   evidence which I previously admitted conditionally

15   subject to certain tying up under 104(b) and under

16   the procedure that I have adopted with approval in

17   prior cases from the Tenth Circuit for 801(d)(2)(E)

18   evidence.  The two forms of evidence are in some

19   respects related.  It's almost which one should I do

20   first, because they have some relation to one

21   another, but I'm going to start with the issue of the

22   authentication of the phone call issue and testimony

23   by a witness that that person recognized a voice of a

24   person with whom a telephone conversation was claimed

25   to have been had or whose voice is heard on a

1          telephone conversation is sufficient proof of

2          identity to justify the admission of the conversation

3          into evidence, at least where there is a basis on

4          which to make a reasonably accurate identification.

5          However, it is also well established that the

6          identity of a participant in a telephone conversation

7          may be established by other means, including

8          circumstantial evidence and the substance of the

9          conversation.  See, for example, Federal Rule of

10         Evidence 901, Advisory Committee Note 4, stating,

11         quote, a telephone conversation may be shown to have

12         emanated from a particular person by virtue of its

13         disclosing knowledge of facts known particularly to

14         him, end quote.  The United States v. Cox, 449 F.2d

15         679, 689-90 (10th Cir. 1971), holding that

16         circumstantial evidence may be used to establish the

17         identity of a caller, and Andrews v. the United

18         States, 78 F.2d 274, 275 (10th Cir. 1935).  It is

19         necessary to supply some evidence of identity of the

20         person with whom the conversation is alleged to have

21         been had; however, recognition of the voice is not

22         necessary to such identity.  Like any other ordinary

23         fact, it may be established by direct evidence or by

24         circumstances, in addition citing some authority from

25         other circuits.  The United States v. Console, 13

```
 1          F.3d 641, 661 (3d Cir. 1993), holding that the

 2          content of the conversation can be used to support a

 3          finding that the defendant was the caller.  The

 4          United States v. Alper, 449 F.2d 1223, 1229 (3d Cir.

 5          1971).  It is well settled that telephone calls may

 6          be authenticated by circumstantial evidence as well

 7          as by direct recognition of the person calling, Lewis

 8          v. United States, 295 F. 441 (1st Cir. 1924), holding

 9          that recognition of a voice over the telephone was

10          not the only means of identification and that

11          circumstantial evidence may be as persuasive as

12          testimony that the voice was recognized.

13               Here on each of the telephone calls in question

14          in which obje4ctions were raised concerning

15          identification of the voices, I do find that either

16          by or in combination with the testimony of people who

17          expressed familiarity with the voices and/or the

18          circumstances of the phone calls sufficient

19          foundation has been laid by the government to

20          establish the authenticity of those calls.

21               With regard to the calls involving the voice of

22          Mr. Goodwin, both Mr. Jones and Mr. Grigsby testified

23          about their familiarity with Mr. Goodwin's voice from

24          firsthand contact with Mr. Goodwin and identified his

25          voice in connection with those telephone calls.
```

1          In addition, there is other circumstantial

2     evidence that ties that identification to the -- by

3     virtue of the transactions that are being discussed

4     with regard to Mr. Foy.  The testimony of Mr. Freeman

5     was indicative of his personal knowledge of the voice

6     of Mr. Foy and his ability to identify that and to

7     provide a direct identification by voice.  Similarly,

8     Jamicah Johnson identified Mr. Foy's voice on a

9     telephone call and supplied some additional direct

10    identification here.

11         And I think perhaps of most importance the

12    circumstantial evidence concerning Mr. Foy's

13    identification is extremely high.  There are several

14    incidents in which he is discussing various events at

15    or about the time of their occurrence or either he

16    appears or someone else appears consistent with the

17    subject matter of the conversation, and, of course, I

18    think most dramatically and tellingly the evidence

19    concerning the home invasion presented here by both

20    Mr. Jones and Mr. Slaybaugh and the conversations

21    that Mr. Foy had about the occasion on those calls

22    definitely provide strong circumstantial evidence

23    that he was the person speaking in that connection.

24         As to Ms. Temple, there was both a direct

25    identification of her voice and also the context of

1      the conversations, including the use of names on

2      various calls which -- particularly Exhibits 254 and

3      255, which provide an appropriate authentication for

4      Ms. Temple.

5           And as to Mr. McDaniel, Mr. Jones testified

6      about his firsthand knowledge of Mr. McDaniel's

7      voice, identified his voice on those calls, and Mr.

8      McCue provided corroboration of that particular

9      testimony.  There's also some circumstantial evidence

10     that ties those calls together as well.

11          There was no specific objection raised in that

12     connection with Mr. Wesley, but clearly that same

13     authentication was supplied there, as it was for

14     Mr. Trinkle, who I believe withdrew his objection at

15     a fairly early date on a tactical basis to probably

16     prevent additional evidence being presented along

17     those lines, which I think was a very appropriate

18     tactical decision for Mr. Trinkle to have made there.

19          I could enumerate all those exhibits, but I

20     think it's probably easier, unless people want me to,

21     to simply indicate that I find none of the exhibits

22     are ones for which there is no authentication which

23     involves of the voice of the defendants at this

24     particular trial.

25          The other question is the 801(d)(2)(E) matter,

1    in which I have conditionally admitted evidence

2    concerning various phone calls and other evidence

3    that would otherwise be hearsay were it not for

4    801(d)(2)(E) categorizing coconspirators' hearsay

5    testimony as being not something that falls within

6    the definition of hearsay.

7        I am finding by a preponderance of the evidence

8    that the following individuals were, in fact,

9    coconspirators: Thomas Humphrey, Monterial Wesley,

10   Shevel Foy, Henry Grigsby, Gerardo Trevino, James

11   Heags, Donnie Johnson, Jamicah Johnson.  Sasha

12   Gerard, Keenan Ringgold, Harold Wallace, Lakela

13   Houff, Billy Trinkle, Michael Clark, Kurtz Griffin,

14   Shannon Perez, Byron Brown, Latysha Temple, Keith

15   McDaniel, and Franklin Goodwin, all in the conspiracy

16   which was charged in Count 1 of the superseding

17   indictment.

18       Next, I also find that the statements offered by

19   the government under Rule 801(d)(2)(E) for the truth

20   of the matter and which the court admitted

21   conditionally were made during the course of and in

22   furtherance of that conspiracy.  In making that

23   ruling, I have considered the contents of the

24   statements, as I am permitted to do both under the

25   rule and under case law that deals with that subject,

```
 1        but I do not base my ruling on that alone.  The

 2        testimony of the live witnesses is integral to that

 3        finding, as well as the other exhibits in the case,

 4        and the evidence in that regard is more than

 5        sufficient for me to make that decision by a

 6        preponderance of the evidence.

 7             In addition to telephone calls -- once again, I

 8        could go through and elaborate on the telephone

 9        calls, if you wish me to, but there are other items

10        other than telephone calls that were similarly

11        subject, in my opinion, to what I believe you

12        probably were objecting to on 801(d)(2)(E) even

13        though there may not have been contemporaneous

14        objections here.  One was -- and now I've lost track,

15        frankly, in my notes, and I'm not going to take the

16        time to figure it out now because what I'm going to

17        say is going to cover it.

18             Mr. Jones gave some testimony concerning the

19        contents of a telephone conversation between Mr. Foy

20        and Mr. Wesley on September 5.  2007.  That call may

21        subsequently have been played.  To the extent that it

22        was not, his testimony about those contents, what Mr.

23        Foy and Mr. Wesley said, fell within -- falls within

24        this ruling.  Moreover, there was certain testimony

25        from Mr. Grigsby which included testimony by way of
```

1    statements which fall within my ruling.  Those

2    include testimony concerning Mr. Trinkle and Mr.

3    Heags, Mr. Heags informing Mr. Grigsby about

4    Mr. Donnie Johnson be stopped, Mr. Heags informing

5    Mr. Grigsby about Jamicah Johnson being stopped,

6    Mr. Grigsby's testimony about Michael Clark, saying

7    that he was going to cook the powder into crack, the

8    discussion that Mr. Grigsby related with Mr. Wesley

9    about concerns after Mr. Johnson's arrest and the

10   discussion with Mr. Wesley about his bad cocaine and

11   those conversations related by Mr. Grigsby all fall

12   within 801(d)(2)(E) and are admissible for the truth

13   of the matter under that rule.  As indicated, I can

14   go through and enumerate each of these exhibits, but

15   I think everyone probably has that pretty well under

16   control in terms of what exhibits are questioned, but

17   I would be happy to respond to any further questions

18   in that regard should someone have it to clarify.  I

19   hear none.

20       Have you had a chance to look at your list yet,

21   Ms. Morehead?

22            MS. MOREHEAD:  Judge, I have.  I didn't

23   want to get up and move around.  There were two

24   exhibits that I'm pretty certain were admitted.  It

25   might take me just a minute to locate them, but I

1    believe they were introduced during Officer

2    Greene's -- or Detective Greene's testimony.

3              THE COURT:  I take it they are not shown to

4    be admitted on the list that I was keeping.

5              MS. MOREHEAD:  Yes, yes.  And one was a

6    water bill.  It was Exhibit 73 and 74.  One was a

7    water bill to 932 Cherokee, and the other one was a

8    Western Union receipt, and I seem to recall

9    specifically displaying those.  Those were documents

10   that were seized at the Wesley residence.

11             THE COURT:  It's a relatively easy matter

12   for me to ask the court reporter to go back through

13   Ms. Green's testimony and see if 73 and 74 were

14   offered.  I certainly concede that that's possible

15   and that I missed it or that they were -- or that

16   your memory and my memory are thinking about

17   documents that are included in a particular exhibit

18   as part of that exhibit.  But let's have Ms. Ryder

19   check that out.  Let's save you the time looking

20   through it, Ms. Morehead.  Let's just let Ms. Ryder

21   do that.

22             MS. MOREHEAD:  That's fine, Judge.  I

23   haven't looked at the phone calls.  I just need to

24   look back through and see what ones are left over.  I

25   know I didn't play all of them because when we

1    initially did the exhibit list there were more

2    defendants that were going to trial.

3         THE COURT:  Why don't we take five.  I'll

4    step down; you can make that review; then we will

5    bring the jury back and you can rest on the record

6    after I indicate that those exhibit are admitted for

7    all purposes here; then we can put the jury on break

8    again until we see where our next round of

9    discussions takes us.  So we're in recess briefly.

10        Mr. Rogers?

11        MR. ROGERS:  I notice you didn't mention

12   Rtayvian Simpson in your list of coconspirators.

13        THE COURT:  Correct.

14        MS. MOREHEAD:  There weren't any statements

15   that were made with regards to Mr. Simpson.

16        THE COURT:  Mr. Rogers' statement is

17   correct about what my finding was.

18        (A recess was taken.)

19        THE COURT:  What, Ms. Morehead, did you

20   discover with regard to those exhibits?

21        MS. MOREHEAD:  Judge, what happened was, I

22   marked the envelope -- there was a group of documents

23   in a single envelope.  I marked that as 330, asked

24   for that to be admitted.  You admitted that, and then

25   within that envelope was 73 and 74, which I had

1   individually marked as exhibits.

2            THE COURT:  But got offered as such?  They

3   were simply part of the larger exhibit?

4            MS. MOREHEAD:  330.

5            THE COURT:  Which is what I thought had

6   happened, but didn't rely on --

7            MS. MOREHEAD:  So they were admitted.

8            THE COURT:  Right, but they are part the

9   330; they are not individually admitted as whatever

10  the other numbers were.

11           MS. MOREHEAD:  Yes.  They are in.  That's

12  all that -- because I remembered showing them to the

13  jury, so I was sure they were in.

14           THE COURT:  I had the same recollection,

15  that you showed them, but I thought that they came in

16  the way I described.

17           MS. MOREHEAD:  Yes.

18           THE COURT:  So you're set with regard to

19  the exhibits?

20           MS. MOREHEAD:  I am.

21           THE COURT:  We will bring the jury back in.

22  I will indicate my ruling with regard to the

23  authentication under 801(d)(2)(E).  Then you can rest

24  in front of the jury, and we will send them back out

25  again.  If we're ready to proceed, we will do so.

1          (The following proceedings were had in the

2     presence of the jury:)

3          THE COURT:  Members of the jury, during the

4     course of the trial certain exhibits were

5     provisionally or conditionally admitted by me subject

6     to my making a final ruling with regard to their

7     admissibility in the case.  Those included issues

8     raised about authentication of telephone calls, as to

9     whether or not sufficient evidence had been presented

10    from which I could conclude and the jury could

11    ultimately conclude if you chose to believe it that

12    the calls were involving individuals who were

13    identified in the calls.  I have made rulings on that

14    now, and I have now admitted for all purposes those

15    calls, finding the authentication foundation has been

16    appropriately laid, so you may consider those calls

17    for any appropriate purpose for which they were

18    admitted.

19         I also admitted certain evidence subject to

20    conditional ruling under what you may have heard me

21    refer to as Rule 801(d)(2)(E), and under that rule I

22    permitted certain what-would-otherwise-be-hearsay

23    statements to be presented to you, which included

24    those telephone calls as well as testimony by certain

25    witnesses about what other people said out of court.

1    I have now made the ruling that those statements

2    which I previously allowed you to hear and admitted

3    conditionally -- frequently with rulings that were

4    made outside your hearing simply for purposes of

5    expedition -- are now admitted for all purposes, and

6    you may consider them for the truth of the matter.

7    And to the extent that they were conditionally or

8    provisionally admitted previously, any reservations

9    or restrictions on that are now removed.

10          With that, Ms. Morehead?

11              MS. MOREHEAD:  Your Honor, the government

12   would rest.

13              THE COURT:  All right.  Now, members of the

14   jury, I'm going to send you back out on break.  We

15   have some business we're going to attend to.  I'm not

16   quite sure how long that's going to take, and that

17   will depend -- will determine how quickly I will get

18   you back in here and what we do next.

19          The admonitions remain in full force and effect.

20   You've heard the government's evidence; you've seen

21   the government's evidence; you've gotten that part of

22   the story; but, of course, the story is not over.

23   Certainly you haven't heard the instructions of the

24   court on what the law is in the case, so it would be

25   absolutely a violation of your oath to suddenly start

```
1        trying to process this and say, well, now we have

2        heard all this, now we can, even individually, get a

3        head start on this.  Don't do that.  Just take a

4        normal break like you've done throughout the trial.

5        We will get back to you as soon as we're in a

6        position to know what's going to happen next.

7             Ms. Scheurer, please take charge of the jury.

8                  (The following proceedings were had outside

9        the presence of the jury:)

10                 THE COURT:  All right.  On the break I

11       received a written motion under Rule 29 from

12       Mr. Simpson.  Any other parties have written motions

13       to tender?

14                 MR. BELL:  I do, Judge.

15                 THE COURT:  You may proceed.  I assume you

16       have or are about to furnish copies to the

17       government?

18                 MR. HEATHMAN:  I have not.

19                 THE COURT:  It would be very helpful for

20       your adversary to see what you --

21                 MR. HEATHMAN:  That's my fault.

22                 THE COURT:  Mr. Rogers, have you provided a

23       copy to the government?

24                 MR. ROGERS:  To the government, I have not.

25       To all my cocounsel.  I didn't bring enough.
```

1            MR. HEATHMAN:  Is there a photocopy machine

2      I can --

3            THE COURT:  There is.

4            MR. BELL:  Judge, for the record, this was

5      just filed about 20 seconds ago on ECF as well.

6            THE COURT:  All right.  Thank you.

7            MR. BELLEMERE:  Judge, I unfortunately

8      haven't filed mine electronically yet because my

9      secretary is on vacation.  She's got more vacation

10     time than I've got.

11           THE COURT:  I understand.  Thank you.

12           MR. BELLEMERE:  All right.  There are -- I

13     have a question.  Do any other counsel intend to make

14     oral motions?

15           MR. CALBI:  I do, your Honor.

16           THE COURT:  I'll hear from you first.

17           MR. CALBI:  Thank you, Judge.  May it

18     please the court, your Honor?

19           THE COURT:  You may proceed.

20           MR. CALBI:  Thank you, your Honor.  Your

21     Honor, on behalf of Mr. Wesley, I move for judgment

22     of acquittal at the close of the government's

23     evidence.  As we know, there was, I believe, 14

24     counts against Mr. Wesley.  At the voir dire he

25     pleaded guilty to four of those counts, so there are

1     ten counts remaining as this trial proceeded.

2         I would like to first address with the court

3     Count 2 of the indictment, which was Mr. Wesley

4     conspiring with Mr. Foy to sell the 5 grams of crack

5     cocaine on February 9, 2007.  I believe the only

6     evidence presented by the government concerning that

7     event, your Honor, was the videotape, and in that

8     videotape Mr. Wesley did not partake in any of the

9     actions pertaining to that sale.  The video

10    originally showed Mr. Wesley just sitting in the

11    living room.  He went forward somewhere in the house

12    in a different area.  He didn't partake in the

13    cooking of whatever Mr. Perez was doing.  He did not

14    partake in any money exchange.  He wasn't even part

15    of the initial investigation of which the DEA and

16    other law enforcement officials were looking into.  I

17    don't believe there are any grounds where a jury

18    could come back and reasonably find that -- or beyond

19    a reasonable doubt, excuse me, that Mr. Wesley would

20    be guilty of Count 2 of the indictment.

21         THE COURT:  I want to clarify what you

22    said.  I may have misheard you, but I believe you

23    said that Count 2 alleged Mr. Wesley and Mr. Foy

24    conspired to do something.

25         MR. CALBI:  I meant Mr. Perez, your Honor.

2422

1        THE COURT:  It charges Mr. Perez, and

2    Mr. Perez distributed.

3        MR. CALBI:  Distributed, correct.

4        THE COURT:  And also an aiding and abetting

5    charge as well.  It's neither a conspiracy charge --

6        MR. CALBI:  I had Mr. Foy on my mind, your

7    Honor, and I apologize.

8        THE COURT:  All right.  I understand your

9    argument.

10        MR. CALBI:  And then I would also like to

11    turn to Count 39, your Honor, which is the weapons

12    charge in that -- the evidence -- there's two prongs

13    that the government would need to show: that first

14    there was some sort of drug transaction taking place,

15    and then, secondly, whether a firearm was used to

16    facilitate that.

17        Judge, I understand that whether a drug

18    transaction took place or not would be a question the

19    jury would have to consider, and though I'm not

20    conceding that point, I understand that at least for

21    purposes of this motion that first hurdle has

22    probably been cleared by the government.

23        But if we look at the evidence concerning the

24    gun, your Honor, the gun was dismantled.  The

25    magazine wasn't in the weapon.  We understand there

1    was a live round in the weapon, however, if you look

2    at the Supreme Court decision in Bailey versus the

3    United States at 516 U.S. 137 --

4              THE COURT:  Let me interrupt you a moment

5    because I am familiar with Bailey.

6         Ms. Morehead, the indictment charges "use and

7    carry and possess in furtherance."  The evidence

8    appears to not support "use and carry" quite the same

9    way it does "possess in furtherance."  What is the

10   government's position here?

11             MS. MOREHEAD:  Judge, I think obviously our

12   position is stronger with regards to "possess."  The

13   burden is much less there.  I think clearly this

14   situation is distinguishable from Bailey.  In Bailey,

15   that involved a gun being in a foot looker, not

16   accessible; and this, it was clearly accessible.

17             THE COURT:  In my opinion it is clear that

18   the government has a submissible case on "possess in

19   furtherance," but I don't think they have a

20   submissible case on the other prong, which simply

21   tailors the instruction that they get, but I do

22   believe --

23        Mr. Calbi, I could go into more detail

24   explaining my ruling here.  I hesitate to because I

25   don't want to make the government's closing argument

1      for them.

2                    MR. CALBI:  I understand, Judge.

3                    THE COURT:  So therefore I don't mean to be

4      peremptory if I deny motions without elaborating too

5      much, but it simply is because I have sometimes heard

6      the other side sort of repeat some of the things I

7      said, and I say, gee, I'm not supposed to be helping

8      people here, and I'm not trying to, because obviously

9      I'm saying if you give the government all the

10     inferences to which they are entitled and if the jury

11     believes the evidence that has been presented, they

12     draw certain inferences, and from that can they find

13     beyond a reasonable doubt?  And I think with regard

14     to Count 39 that's an easy call, and I deny your

15     motion.

16                    MR. CALBI:  Understood, Judge.  I

17     appreciate the lack of elaboration for your reasons.

18                    THE COURT:  Count 2, I would like to hear

19     from Ms. Morehead further on.

20                    MS. MOREHEAD:  Judge, I really don't have

21     any argument.  I'm not going to belabor that point.

22     We did not call the CI that certainly had Mr. Perez

23     gone on trial we may have opted to do so.

24                    THE COURT:  I'm going to grant the motion

25     with regard to Count 2.

```
 1                    MR. CALBI:  Thank you, your Honor.

 2                    THE COURT:  Anything further, Mr. Calbi?

 3                    MR. CALBI:  Judge, two further counts I

 4       would like to bring out, and one of them concerns the

 5       Count 17, which talks about the sale on September 5

 6       of 2007 between Mr. Humphrey, Mr. Wesley, Mr. Foy,

 7       and Ms. Johnson.  I believe the evidence concerning

 8       any events that took place on September 5 was that if

 9       anything was exchanged on that day it was currency

10       and not narcotics; therefore, there was no sale of

11       cocaine on that day as alleged.

12                    THE COURT:  Count 17 charged an attempt to

13       possess with intent to distribute the cocaine.

14                    MR. CALBI:  That's correct.

15                    THE COURT:  So the question is, was the

16       evidence sufficient to sustain that?  Ms. Morehead,

17       what do you say to that?

18                    MS. MOREHEAD:  One second, Judge.

19                    THE COURT:  Count 17 is September 5, 2007.

20                    MS. MOREHEAD:  I've got it.  I was looking

21       back at some of the calls.  The charge is "on or

22       about," and clearly the calls relate -- appear to

23       relate to money in connection with the transaction

24       relative to that date.

25                    THE COURT:  Here's the question I have.
```

1      Let me cut through to what's bothering me about it.

2      Stay up here, Ms. Morehead, because I want to talk to

3      you about it.  Here is the evidence that I believe if

4      the jury credited it they could consider: the phone

5      calls, the photographs, and Mr. Humphrey's testimony.

6      If one believes Mr. Humphrey and one then gives all

7      these inferences would indicate that on that occasion

8      money changed hands for a drug debt.  I think that's

9      what it would establish if you believe Mr. Humphrey.

10     Mr. Humphrey also testified that it was the practice

11     of his business relationship with Mr. Wesley and

12     those who he believed were associated with Mr. Wesley

13     that he would deliver them drugs and then within a

14     matter of hours or a day he would receive payment for

15     it, so one could give an inference that there had

16     been drugs delivered at some time prior to that.

17                  MS. MOREHEAD:  Yes.

18                  THE COURT:  My biggest question here is, in

19     light of the fact that the evidence -- that the only

20     evidence that would exist would have been of a

21     completed transaction, that is, that this payment was

22     not for an attempt to get some drugs that they never

23     got but rather was payment for money which they

24     already got, given what Mr. Humphrey's testimony was,

25     the person who, if you believe him at all, is best

1    suited to know what was going on, then can the

2    defendants be found guilty of an attempt under those

3    circumstances, where the only evidence is of a

4    completed crime?  Now, that may be a simple answer,

5    but to me that's the question with regard to the

6    September 5.  And, of course, I would like to hear

7    Mr. Sandage's point of view on that as well at some

8    juncture, since that implicates his client too.

9              MS. MOREHEAD:  Judge, as we sit here today,

10   we're in the District of Kansas.  The completed

11   transaction would have occurred in the District of

12   Missouri, and we charged this as a conspiracy in the

13   state of Kansas and elsewhere, but for the purposes

14   of Kansas it's merely an attempt because the

15   completed act is in Missouri, so what led up to the

16   completed act is an attempt, so that's why.

17             THE COURT:  Do you have any law on that?

18   Because I have had a lot of trouble finding any law

19   that explains this.  That's an interesting argument

20   you're making.

21             MS. MOREHEAD:  I haven't done any research,

22   Judge.  Frankly, that's the practice we have always

23   adhered to in our office because our jurisdiction

24   obviously is in the state of Kansas, so what we look

25   at is what occurred in the state of Kansas, and it

1    would have been an attempt to go to another location

2    in order to complete the act.  That's why it's

3    charged in that fashion as opposed to the actual

4    completed act on the back end.

5              THE COURT:  What is the evidence of what

6    was done in Kansas on that attempt?  That's a very

7    interesting view.  You've raised an interesting point

8    that I hadn't thought about, all this evidence in

9    front of Chili's in Westport, which, as the record

10   will reflect, is in the District of Missouri, not in

11   the District of Kansas.  So what evidence is there of

12   what happened in the District of Kansas here that

13   would support, from the government's perspective, the

14   attempt?

15             MS. MOREHEAD:  In the very first -- first

16   of all, Mr. Wesley -- and that's Exhibit 197.  Mr.

17   Wesley said, "I just got out of bed.  I gotta take

18   this little dude to school.  All right.  I'm leaving

19   my house."  And so it appears from that Mr. Wesley is

20   leaving from his house in Kansas to go down to the

21   city.

22             THE COURT:  And that's on the day in which

23   the money is delivered; right?

24             MS. MOREHEAD:  That's right.

25             THE COURT:  How does that support an

1    attempt?

2                     MS. MOREHEAD:  Because when he leaves

3    Kansas, it's for the purpose of attempting to

4    purchase cocaine.

5                     THE COURT:  Here is what I'm going to do.

6         Mr. Calbi, do you have any authority on this

7    question?

8                     MR. CALBI:  No, your Honor, I don't.

9                     THE COURT:  Mr. Sandage, do you?

10                    MR. SANDAGE:  [Shook head.]

11                    THE COURT:  I'm going to retain the issue

12   of Count 17 under advisement and invite either one of

13   you to provide some briefing.  I think the

14   government's theory is that some things -- there's

15   some evidence of things that were done on or about

16   September 5, 2007, in Kansas, and because there's no

17   evidence that the transaction was consummated in

18   Kansas, then that's -- that supports an attempt.

19   I'm, frankly, dubious about that a little bit, but

20   it's novel enough that I would be happy to see some

21   law on it either way, so let's leave that aside.  My

22   taking it under advisement, of course, means when I

23   ultimately rule on it it's on the state of the record

24   as of now, not based upon anything that may happen if

25   and when any of the defendants put on a case in

1     chief.  We will talk about when to submit authority

2     here in a bit.

3                  MR. CALBI:  Thank you, your Honor.

4                  THE COURT:  You had another count?

5                  MR. CALBI:  I have one more count, your

6     Honor.  That would be Count 19, which deals with the

7     cell phone charge concerning the conversation between

8     Mr. Wesley and Ms. Temple, and I believe, your Honor,

9     that the only evidence concerning the subject matter

10    of that phone conversation was Officer Jones

11    indicating that all they were talking about was

12    money.  Again, there was no indication or tie-in by

13    the government at all that that had to do with any

14    drug transactions of any kind.  It was Mr. Wesley

15    telling Ms. Temple, the bigger stack, not the smaller

16    stack, and everyone's agreed that they were talking

17    about money, and no one has ever come back to show

18    that that money had anything to do with narcotics

19    activity, and so therefore I don't believe the

20    government has made a submissible case on that count

21    either.

22                  THE COURT:  Ms. Morehead?

23                  MS. MOREHEAD:  Sorry, Judge.  I was looking

24    for a date you mentioned --

25                  MR. CALBI:  September 10.

```
 1              THE COURT:  September 10.

 2              MS. MOREHEAD:  Judge, I would agree that's

 3       where he's telling her where the money is hidden, and

 4       I think based upon the totality of the evidence in

 5       this case it would be reasonable for the jury to

 6       infer that the money hidden somewhere around the hot

 7       water tank or in the bathroom or somewhere in Ms.

 8       Temple's location were, in fact, proceeds or

 9       connected to drug trafficking.

10              THE COURT:  Mr. Heathman, do you wish to be

11       heard on this as well, since this count obviously

12       implicates Ms. Temple as well?

13              MR. HEATHMAN:  Yes, sir.  On this

14       particular count I think another significantly

15       important factor is, there's no evidence in the

16       record as to whether or not she actually complied

17       with Mr. Wesley's wishes.  There was no surveillance

18       that saw her go meet with Mr. Wesley and carry

19       anything to or vice versa.  So we have a phone call

20       where he's saying, bring me some money.  I would

21       agree with Mr. Calbi that I didn't hear any tie-in to

22       narcotics, and my concern -- and this goes to the

23       remainder of my motion as well -- is that we are --

24       if we leave this count in, we're letting the jury

25       infer that it was somehow drug related without a fact
```

```
1    on which to base that inference, so I would agree

2    with Mr. Calbi.

3              MS. MOREHEAD:  Judge, if I could mention

4    one more thing?

5              THE COURT:  You may.

6              MS. MOREHEAD:  On September 10 both

7    preceding this call from Latysha Temple and following

8    this call from Latysha Temple -- preceding there was

9    one call with Wesley and Foy, and following, again,

10   on September 10, there were three calls with Wesley

11   and Foy, all where they were talking about money,

12   getting their money together, counting their money,

13   and the like.  So, again, I have a problem with

14   counsel trying to extrapolate one single call and

15   looking at the contents of that single call.  I

16   believe the correct analysis is to look at the call

17   in the totality of all of the circumstances, and

18   specifically if we look at the totality of the

19   circumstance on September 10, it would indicate that

20   it's a reasonable inference that those were connected

21   to drug trafficking.

22             THE COURT:  I'm denying the motion with

23   regard to Count 10.  I do believe that at this

24   juncture it is my view --

25             MS. MOREHEAD:  It was Count 19.
```

1          THE COURT:  I'm sorry, Count 19, subject,

2     of course, to later briefing on a posttrial motion,

3     where you can lay it out more clearly to me, but I

4     believe that in the totality of the context of the

5     phone calls that the evidence is such that a

6     reasonable jury could find beyond a reasonable doubt

7     a violation as alleged in Count 19, so I do deny that

8     motion.

9          MR. CALBI:  Your Honor, I misspoke.  I

10    guess I had one more count I would like to bring to

11    the court's attention.

12         THE COURT:  No harm in asking, as they say.

13         MR. CALBI:  Thank you, Judge.  I want to

14    talk about the forfeiture allegation.  I know I'm

15    behind the eightball there because Mr. Wesley, in

16    fact, pled guilty to the conspiracy, so I understand

17    that there's some sort of forfeiture that is going to

18    be involved with that; however, the government's

19    number of $10,750,000, I don't believe there's been

20    any evidence that comes close to that figure in any

21    fashion.  There were some numbers thrown around about

22    Mr. Humphrey's property and what was seized from him;

23    there was some numbers thrown around about what was

24    seized from Mr. Wesley; and there might have been Mr.

25    Foy's vehicle and Mr. Heags' vehicle, but unless my

1    math is really off, I don't think we got close to

2    $10 million, and I don't even think the amount of

3    kilograms of cocaine that were actually shown to

4    maybe have been involved in this conspiracy would

5    come close to producing numbers to that effect, and I

6    just don't believe the government carried its burden

7    of showing that the forfeiture allegation should be

8    in that amount.

9              THE COURT:  Ms. Morehead?

10             MS. MOREHEAD:  Judge, forfeiture

11   allegations are a bifurcated proceeding, much like a

12   death penalty case.  We have the guilt phase.  If

13   they find them guilty, the forfeiture allegation is

14   up for the jury's consideration, at which time we

15   would present evidence specifically connected to the

16   forfeiture allegation, which they can consider

17   everything they have already heard, but we can

18   certainly expand on that, and we would have

19   additional evidence with regards to the forfeiture

20   allegation at the appropriate time, but we have not

21   focused on that in connection with that because

22   that's a bifurcated matter for the jury.

23        Frankly, many of these cases, in fact, if an

24   individual's convicted, defendants opt not to have

25   the forfeiture be considered by the jury but instead

 1    ask that that be held off and have the judge consider

 2    that as part of the sentencing in this case.  I'm not

 3    suggesting that that's going to happen here, but,

 4    again, that's why -- that's all held back because

 5    it's not -- forfeiture allegation is not a

 6    guilt-or-innocence matter.

 7            THE COURT:  It doesn't go to the jury on

 8    the verdict form.

 9            MS. MOREHEAD:  Right.

10            THE COURT:  You've raised some issues.  I'm

11    denying them at this juncture because it's premature.

12    Those are issues to raise in Mr. Wesley's case.  They

13    will need to be raised at some time because of his

14    plea of guilty to the conspiracy, and whether they go

15    to this jury or to the court is something for you and

16    Mr. Wesley to ponder about what's the best way to do

17    it, but it's premature to rule on it now.

18            MR. CALBI:  Judge, lastly, I would like to

19    bring to the court's attention -- and I know we all

20    cringe like fingernails on a chalkboard when we say

21    we're going to object for the record or make a motion

22    specifically for the record, but I think in this kind

23    of matter on the remaining counts I would like to

24    move for the record that Mr. Wesley should be

25    acquitted and the government hasn't reached the

1      burden on the remaining counts, without getting

2      specific --

3              THE COURT:  I understand that no one should

4      ever think that any of you have overlooked anything

5      because I don't think you all have.  I think you all

6      have done an excellent job of representing the

7      interests of your clients in connection with this

8      trial.  Some arguments are stronger and therefore

9      should be emphasized because you might actually win

10      them; some arguments simply need to be made because

11      an appellate court may see it differently than the

12      trial court.  But I have no problem with your making

13      that motion in this context, and it is denied.

14              MR. CALBI:  Thank you.

15              THE COURT:  I want to go to you, Mr.

16      Sandage, if I could, and I think you indicated you

17      had an oral motion that you wanted to make.

18              MR. SANDAGE:  Yes.  Similar to Mr. Calbi,

19      we would ask for judgment of acquittal under Rule 29.

20      I will try to touch briefly -- as to Count 1, the

21      government alleged in the indictment cocaine and

22      crack cocaine.  I don't think there's been any

23      competent evidence introduced at trial that Mr. Foy

24      in any way knew about any distribution of crack

25      cocaine.  There's been no evidence -- the only thing

```
1        that is closely related to that was the brief
2        encounter regarding Mr. Wesley possibly selling Mr.
3        Grigsby some crack cocaine.  In fact, that
4        transaction I don't believe even ever happened.
5        There was no telephone calls or anything like that
6        related to Mr. Foy that tied him in to having any
7        knowledge of that.  Since the government chose to
8        indict with the word "and," I think they should be
9        held to that standard, and for at that reason I don't
10       believe the government has met its burden on Count 1.
11                 THE COURT:  That's denied.  What's next?
12                 MR. SANDAGE:  As to Count 17 I ask that the
13       previous arguments be incorporated, and I think
14       you've stated as such.  Grouping 17, 22, and 29 as
15       substantive counts together, taking the government's
16       legal analysis they just gave you on 17, no act --
17       there's been no evidence of any act that Mr. Foy
18       participated in that ever happen in the District of
19       Kansas, period.
20                 THE COURT:  What do you say about that, Ms.
21       Morehead?
22                 MS. MOREHEAD:  Well, Judge, he was part of
23       the conspiracy and joined that activity as an aider
24       and abettor, and I think the phone calls clearly
25       indicate that.
```

| | |
|---|---|
| 1 | THE COURT:  I think this is something that |
| 2 | I'm going to retain under advisement for you to |
| 3 | provide some additional authority on, the extent to |
| 4 | which his conduct, which all physically took place |
| 5 | with him in Missouri -- I don't think we ever had any |
| 6 | evidence of Mr. Foy being in the state of Kansas |
| 7 | physically doing anything here, apart from perhaps |
| 8 | having gone to a family gathering or something here |
| 9 | in Kansas.  Whether participating on the phone call |
| 10 | from Missouri is enough to constitute commission of |
| 11 | the act in the District of Kansas I think abides a |
| 12 | certain degree of both legal and factual analysis. |
| 13 | Frankly, I'm not sure where Mr. Wesley was on these |
| 14 | calls either.  And while Mr. Foy can be charged with |
| 15 | the conspiracy for thing he may have done in Missouri |
| 16 | under the conspiracy law, which has a much broader |
| 17 | scope, it appears to me there has to be a sufficient |
| 18 | connection with the District of Kansas to implicate |
| 19 | him, and I would leave that for the government to |
| 20 | address further.  So I will retain your motion under |
| 21 | advisement on Counts 22 ask 29. |
| 22 | MR. SANDAGE:  The last count involving Mr. |
| 23 | Foy is Count 37, your Honor.  I don't believe there's |
| 24 | been any evidence introduced at this trial that Mr. |
| 25 | Foy used a cellular phone in that transaction.  To |

```
 1        bolster that, your Honor, if the court remembers, my
 2        client is out of the country at the time those
 3        telephone calls are made.  And, in fact, I believe
 4        that there is a phone call that was admitted into
 5        evidence in which he actually says in that phone call
 6        that his actual phone, the 816 number that they
 7        alluded to, was left -- a phone of his was left at
 8        the airport.  The closest that the government came in
 9        that evidence to reach that is Exhibit 258.  Roughly
10        I think at it's about minute 152 when Mr. Foy says he
11        had to get a rent-a-phone.  I don't believe that that
12        gets the government over the hurdle that he used a
13        cell phone, so for that reason I would ask for
14        judgment of acquittal on Count 37.
15                  THE COURT:  Ms. Morehead?
16                  MS. MOREHEAD:  Judge, we do know that Mr.
17        Wesley was using a cellular phone and Mr. Foy called
18        Mr. Wesley on that cellular phone, and that's the
19        indication, is that a cellular phone was used in
20        connection with the activity.  I haven't had a chance
21        to look at that specific call, but the indication is
22        that at least from the parameters that Mr. Foy
23        indicated on the phone that he was also calling from
24        a cellular telephone.
25                  THE COURT:  I will retain that under
```

1          advisement and let you take a look at this.  I

2          certainly recall the evidence about the rental phone.

3          I don't recall as I sit here today whether Mr. Foy

4          indicated he was on the rental phone.  I think you

5          may be right, Mr. Sandage, that it's not very clear

6          if that's the case.  Ms. Morehead seems to have

7          another theory, or alternative theory, and that would

8          be that Mr. Foy, by being on the cell phone with Mr.

9          Wesley, that would also make him liable here, and

10         I'll allow Ms. Morehead to brief that to the extent

11         that that's the government's argument as well as

12         taking a look at what Ms. Morehead actually thinks

13         the testimony reflects in that respect.

14                  MR. SANDAGE:  Thank you, Judge.

15                  THE COURT:  Thank you, Mr. Sandage.  Other

16         people with oral motions?  Mr. Johnson?

17                  MR. JOHNSON:  Thank you, Judge.  I don't

18         think it's necessary that I rehash the facts in the

19         light most favorable to the government.  What I want

20         to state first as to both counts against Mr. Goodwin,

21         while some witnesses identified his photograph in

22         court, he was never actually identified in open court

23         as a person who committed these acts.  All of the

24         identification went simply to the photograph and not

25         to Mr. Goodwin himself, so I don't think there's been

```
 1          a satisfactory identification of Mr. Goodwin such for

 2          this case to go to the jury.

 3               I want to talk next about Count 1.  A variety of

 4          things I think that the government failed to do.  One

 5          is whether there is actually sufficient evidence to

 6          believe that there was an agreement, whether there

 7          was sufficient evidence presented to believe that

 8          there was interdependence among the conspirators,

 9          whether or not Mr. Goodwin knew of the scope of the

10          conspiracy, and lastly whether or not there was

11          sufficient evidence as to the quantity of drugs

12          involved in the conspiracy.

13               I think the first issue, Judge, as to whether or

14          not there was an agreement was put best by Mr.

15          Grigsby himself.  I will say that when we look at the

16          government's chart where they put the spokes on the

17          wheel there are two arrows, one pointing to Wesley

18          and one pointing to Grigsby.  At least as it related

19          to Mr. Goodwin, the only evidence that there was any

20          participation in the conspiracy between Mr. Goodwin

21          and Mr. Wesley was a single phone call in August

22          where Mr. Wesley essentially said, you know, I didn't

23          call you.  I didn't know how you wanted your stuff.

24          And then they talked about how the quality of the

25          products at that day and time weren't very good, and
```

1           there was never anything else.  There was nothing to

2           indicate that those two were ever conspiring together

3           to distribute cocaine or crack cocaine.

4               So that leaves us with the potential of a

5           conspiracy, Mr. Goodwin joining the conspiracy

6           through involvement with Mr. Grigsby.  I think all of

7           the evidence and the reasonable inferences drawn from

8           that evidence in favor of the government would

9           indicate only that Mr. Goodwin was a customer of Mr.

10          Grigsby's.  In fact, Mr. Grigsby testified directly

11          that he had no agreement with Mr. Goodwin to

12          distribute the drugs that he purchased.  This is not

13          a situation where we can draw an inference of an

14          agreement from all of the facts at the trial when we

15          have direct evidence from one of the principal

16          coconspirators, Mr. Grigsby, that, in fact, there was

17          no agreement.

18               THE COURT:  I understand your argument.  I

19          reject it, however, because I think that at the time

20          the government objected to your asking that question

21          because of the legal aspect of what an agreement is I

22          permitted Mr. Grigsby to answer because I think it

23          was appropriate for him to testify as to whatever he

24          might have thought the term agreement meant, but

25          whatever he thought the term agreement meant and what

1      the concept of an agreement is within conspiracy law

2      are different matters; therefore, while you're free

3      to make that argument to the jury, I'm not persuaded

4      that that carries the day on this point.

5                   MR. JOHNSON:  The second issue is whether

6      or not there's interdependence.  Again, I think what

7      we have had here is a customer/buyer relationship

8      between Mr. Goodwin and Mr. Grigsby, and I know that

9      this court is aware that a customer/buyer

10     relationship is insufficient to show that that

11     customer intended to join the conspiracy.

12                  THE COURT:  And that is the subject of some

13     extensive briefing by Mr. Bell on behalf of

14     Mr. Trinkle.  I'll deal with the buyer/seller matter

15     in a moment and let you be heard further on that

16     after we have heard from Mr. Bell.

17                  MR. JOHNSON:  He briefed it, and part of

18     the reason I didn't file a written motion is I knew

19     that Mr. Bell was doing that.

20                  THE COURT:  I agree you were perfectly

21     appropriate not doing any more than you have done

22     because Mr. Bell did do that.

23                  MR. JOHNSON:  We were aware that it was

24     coming.  Mr. Grigsby specifically -- testified

25     specifically in regards to Mr. Trinkle, but I think

1    you can draw the inference that it applied to all of

2    his low level customers, such as Mr. Goodwin, that he

3    was essentially not dependent upon them, that any

4    individual one of them could cease as a customer and

5    his operation would continue just fine, his

6    conspiracy to distribute cocaine products.  I don't

7    believe there was any interdependence, that Mr.

8    Grigsby was relying on Mr. Goodwin for anything to

9    effectuate the conspiracy.  So for that reason,

10   Judge, I don't think they met the burden on that

11   issue.

12            THE COURT:  I understand your argument.

13            MR. JOHNSON:  And then lastly, Judge, I

14   think that the scope of the conspiracy is fairly

15   broad.  I know that Mr. Bell briefed it.  I know that

16   Mr. Trinkle and Mr. Goodwin are similarly situated as

17   far as the allegations are concerned.  The details of

18   the facts as to each are different, but in those

19   regards I'll leave that one to Mr. Bell.  And then

20   lastly, in terms of the quantity, as to whether or

21   not Mr. Goodwin intended to -- there was sufficient

22   proof that he conspired to distribute that quantity,

23   I think, your Honor, that the government failed to

24   meet its burden that Mr. Goodwin was conspiring to

25   distribute in excess of 50 grams of crack or

1        5 kilograms or cocaine, or, actually, both.  I think

2        that the evidence was insufficient on that point.

3                THE COURT:  All right.  Thank you.  Ms.

4        Morehead, reserving the buyer/seller question to talk

5        about in a little bit here, Mr. Johnson has made

6        arguments about evidence concerning scope and

7        quantity.  Do you want to address those specifically

8        while we're thinking about them, please?

9                MS. MOREHEAD:  Judge, scope and quantity --

10       with regards to quantity, that, frankly, Judge, is

11       not an element of the offense.  That's an issue

12       independent of the elements of the offense.  And in

13       connection with the overall scope of the conspiracy,

14       the overall scope of the conspiracy was to distribute

15       cocaine.  And when we talk about interdependence,

16       what we look at is, does one person's actions impact

17       the outcome of the scope?  And if they were -- and I

18       don't want to say individually taken out of the

19       equation if it would impact, but are they an integral

20       part of the scope of the conspiracy?  And certainly

21       in this case -- and I'll speak both to Mr. Trinkle

22       and Mr. Goodwin, since Mr. Johnson wants to equate

23       them in similar positions, but individuals like Billy

24       Trinkle and individuals like Franklin Goodwin were an

25       integral part to this conspiracy.  It was simply,

```
 1        Judge, going from the top down.  And while we could
 2        have taken Billy Trinkle out and taken the kilos that
 3        he bought out over the course of a year and a half,
 4        yeah, Mr. Grigsby still would have sold drugs, but
 5        it's the interdependence that Mr. Trinkle created,
 6        it's the interdependence that Mr. Goodwin created
 7        that allowed this conspiracy to be successful in an
 8        overall scheme and scope.  It's not a situation where
 9        we isolate out an individual and say, okay, what
10        impact did they have?  It's how they interacted and
11        how they were an integral part to the overall success
12        of what transpired here.
13                  THE COURT:  Thank you.  I understand your
14        argument.  Thank you.
15                  MS. MOREHEAD:  All right.
16                  THE COURT:  Mr. Heathman, did you give me
17        something in writing or not?
18                  MR. HEATHMAN:  I didn't, your Honor.
19                  THE COURT:  Okay.  The reason I
20        differentiate is because I have your arguments in
21        writing.  I want to start, so to speak, with those.
22                  MR. BELL:  Judge, I'm sorry, I have
23        something to add orally to my motion.  I didn't know
24        if you were done listening to --
25                  THE COURT:  I'm not.  I'm not done.  I'm
```

1    just trying to figure out which one I'm going to go

2    to next to solicit some more information from.  In

3    fact, I was thinking it was Mr. Bellemere's, but it's

4    yours.  Mr. Bellemere, I want to go to you next.  You

5    have filed a written motion under Rule 29?

6              MR. BELLEMERE:  Yes, sir.

7              THE COURT:  Do you wish to elaborate on

8    that at this time?

9              MR. BELLEMERE:  Well, Judge, what I see

10   from the government's evidence in this case is it

11   seems like there's a series of phone calls, one on

12   August 15 and three, I believe, on August 16, and

13   those phone calls are capable of being -- capable of

14   being related to marijuana as well as cocaine

15   according to some of the testimony in this

16   proceeding, but more particularly those two telephone

17   calls, if you take them in their substance, are

18   referring to conduct or drugs, if you want to call

19   them drugs, that were distributed in Missouri.  I

20   think the calls, one of them refers to stuff that

21   came in Tysha's house, another something about Rat's

22   house, which the government has maintained is Mr.

23   Foy, and both of those residences are in Missouri.

24             THE COURT:  Well, Mr. McDaniel is charged

25   in the conspiracy count, in which, as long as

1    something happened in the District of Kansas

2    connected with the conspiracy, the fact that his part

3    of it happened in Missouri, assuming it happened,

4    would not defeat the charge, and whether or not those

5    calls were about cocaine and marijuana may be a

6    question of fact for you to argue to the jury, but I

7    definitely believe in the context of those calls the

8    jury could find that they were about cocaine and

9    therefore implicate Mr. McDaniel.  Perhaps you can

10   persuade them otherwise.

11              MR. BELLEMERE:  My argument was that all

12   his contact occurred in Missouri, at least in part,

13   as I saw it, even including the resale.  There's no

14   evidence that he did anything more than, at best, buy

15   it.  He certainly wasn't a party to Mr. Wesley's

16   alleged agreements, or Mr. Foy's.  That had to do

17   with the conspiracy part.  The other part had to do

18   with the cell phone and furtherance of it, and I

19   don't see evidence that there's a cell phone, other

20   than for sure Mr. Wesley's cell phone, since it was

21   apparently a tap on it --

22              THE COURT:  Which counts are those?

23              MR. BELLEMERE:  I believe that's No. 34,

24   but I'm not exactly sure.  I don't have it right in

25   front of me.  I think it was the use of a cell phone

1      in furtherance of the conspiracy.  I think I

2      remember -- if I remember correctly, your Honor, the

3      government's evidence on that is such that there's no

4      firm offer to buy or sell drugs in that phone call,

5      and I think Mr. Jones finally agreed that there was

6      no offer to buy or sell and there was further no

7      subsequent phone call consummating the deal.  So I

8      didn't think that that count, that the government had

9      sustained its burden of proof with regard to the use

10     of a cellular phone in furtherance of the conspiracy

11     because there wasn't anything that you could -- I

12     assume to further the conspiracy would either be to

13     buy or sell drugs.  I don't think that the evidence

14     has conclusively concluded to -- amounts to an offer

15     to buy by Mr. Wesley -- I mean Mr. McDaniel --

16     anything.

17              THE COURT:  On that particular call, while

18     I respectfully disagree with you about whether or not

19     the substance of it would be sufficient, I have the

20     same reservations about Mr. McDaniel's participation

21     from Missouri on that count.  Again, there's no

22     indication to me he did anything in Kansas,

23     therefore, personally, physically, and I will leave

24     that under advisement for Ms. Morehead to further

25     brief, as she's going to with regard to Mr. Foy,

1    because on that count I believe the approach is

2    different than it is on the conspiracy count and I

3    will need to look at that more carefully to see

4    whether or not that stands up.  As to the Count 1

5    your motion is denied.

6         All right.  Now, let me go to you, Mr. Heathman.

7              MR. HEATHMAN:  Thank you, your Honor.  I'm

8    not willing, I guess, to concede on Count 19 in the

9    phone call.  I know the government's response --

10             THE COURT:  I'm sorry, Mr. Bellemere.  Did

11   you --

12             MR. BELLEMERE:  Listen, I'm embarrassed to

13   interrupt anything, but wouldn't it be smart -- this

14   man went to work this morning at 6:00 o'clock --

15             THE COURT:  I was hoping we could get

16   there.

17             MR. BELLEMERE:  It would take about 20

18   minutes.

19             THE COURT:  I was hoping we would not have

20   to make him come back again.

21             MR. BELLEMERE:  I think he will do that.

22   Are we going to start Tuesday at 9:00 o'clock?

23             THE COURT:  Yes.  All right.  Mr. Heathman?

24             MR. HEATHMAN:  Your Honor, on Count 19, as

25   it involves Ms. Temple, it was my understanding the

1    government's response to Mr. Calbi was that there

2    were some other phone calls between Mr. Wesley and

3    Mr. Foy in trying to connect up what they might be

4    doing, but certainly Ms. Temple can't be held

5    responsible for phone calls between Mr. Wesley and

6    Mr. Foy and what their state of mind is, at least in

7    terms of her knowledge and awareness as to what Mr.

8    Wesley might be doing with that money.

9              THE COURT:  I'm going to save you the

10   argument at this point because I'm going to deny your

11   motion.  If she's convicted on this count, you can

12   renew it in a different context later, but I'm

13   satisfied for these purposes that that can go

14   forward.

15             MR. HEATHMAN:  Then the remainder of my

16   motion, your Honor, that's written deals with --

17             THE COURT:  Let me take that back.  Strike

18   that, because, again, I'm not sure where Ms. Temple

19   is physically in all this in terms of the same

20   concern I have about Mr. Foy and Mr. McDaniel, so let

21   me reverse course.  While I don't agree that the

22   substance of the entirety of the calls isn't enough

23   that one could draw the inferences that the

24   government is asking and find what the government has

25   charged, I do have this reservation about whether or

```
 1        not that, for other reasons, because of the,

 2        apparently, Ms. Temple being in Missouri during this

 3        time, whether or not that call stands up, or that

 4        charge stands up.  So I will retain it under

 5        advisement on that aspect of Count 19.

 6                  MR. HEATHMAN:  Thank you, your Honor.  The

 7        remainder of my motion went to her involvement in the

 8        overall conspiracy.  I assume with the court's ruling

 9        on Count 19 it would find similarly.  I would rest on

10        my motion without delaying further, on my written

11        motion.  I think the court can read, my main focus

12        and import was on the issue that was raised in Jones

13        and dealing with her mere presence and whether

14        somebody who is kind of in association with can be

15        responsible for the conspiracy.

16                  THE COURT:  And for reasons I indicated to

17        Mr. Calbi, I'm going to decline to go into a detailed

18        recitation of your position because I don't want to

19        be doing that.  Suffice it to say that I think the

20        government is entitled to inferences from which the

21        jury could find beyond a reasonable doubt that

22        Ms. Temple was a participant in the conspiracy.

23                  MR. HEATHMAN:  That's all I have, your

24        Honor.

25                  THE COURT:  Next I want to go to you, Mr.
```

1          Bell, if we can get you.

2                    MR. BELL:  Judge, I will start off with

3     Counts 14 and 15.  I apologize that those weren't

4     included in my written motion.  I wanted to do some

5     research before I opened my mouth, so to speak, and

6     that motion was done before I had a chance to finish

7     the research.  Counts 15 and 14 are, for lack of lack

8     of a better term, the phones counts against

9     Mr. Trinkle.  I believe that there's been -- you can

10    argue that there's been a fatal variance in what's

11    charged in the indictment and what's been proven at

12    trial.  I will say that neither of the theories,

13    either what I'll call the defense theory, Mr.

14    Sandage's theory, or Ms. Morehead's theory about how

15    you can prove a violation of that statute, was there

16    any evidence that Mr. Trinkle violated that statute

17    as charged by the government.  The government can

18    charge broadly and prove narrowly, but it can't

19    charge narrowly and prove broadly, which is what I

20    think happened in this case.  There is no evidence

21    that Mr. Trinkle was on a cellular phone as charged

22    in Counts 14 and 15 when he made these phone calls.

23    There's no evidence, I don't believe, that Mr.

24    Grigsby was on a cellular telephone call -- or

25    cellular telephone when these calls were made.  Even

1      if there was evidence that Grigsby was on a cellular

2      telephone, the statute says that you have to

3      knowingly and intentionally use a communication

4      facility, and as the government charged it, that

5      would be a cellular phone.  So even if the government

6      is saying, well, we don't know Mr. Trinkle was using

7      a cell phone but we know Grigsby was, they would

8      additionally have to prove that Mr. Trinkle knew

9      Grigsby was on a cellular telephone, and there's been

10     no evidence of that, and there's been no evidence

11     that anyone could infer that he knew that Grigsby was

12     on a cellular telephone.  So in this instance I would

13     say there's not a scintilla of evidence to support

14     that charge.

15          The second thing on that would be the same

16     reservation that I had on some of these other

17     charges.  We don't know where Mr. Trinkle was when

18     these calls were made.  They could have been made in

19     Kansas; they could have been made in Missouri; they

20     could have been made from Hawaii -- we don't know

21     where they were made -- which would potentially

22     divest this court of jurisdiction over those alleged

23     crimes.  Those are my comments on Counts 14 and 15,

24     Judge.

25                    THE COURT:  For both of the reasons you

```
 1           cited, I will retain those under advisement.
 2                     MR. BELL:  As to Count 1, I filed a lengthy
 3           written memorandum.  I don't want to be duplicitous.
 4                     THE COURT:  And I've reviewed your
 5           memorandum.
 6                     MR. BELL:  I would say, Judge, that
 7           conspiracy law is, some would argue, intentionally
 8           vague.  What helps me, right or wrongly, about a
 9           conspiracy is that if their objective was not
10           illegal, would it qualify as a corporation? could you
11           impute agency amongst the people involved?  And in
12           this instance I don't think that you can.  I think
13           that instead of looking at the Corleone family or,
14           you know, criminal version of Exon, what you're
15           really looking at, at least as it goes to
16           Mr. Trinkle, are independent distributors who just
17           happen to deal with each other, who just happen to be
18           a segment of a particular illegal economy in this
19           area.  I don't think there's any what you would
20           traditionally see in a conspiracy as far as
21           Mr. Trinkle goes.  You don't see it.  There's no
22           commingling of profits; he doesn't go in with other
23           people to buy quantities of cocaine; he doesn't have
24           a shared objective; there's no agreement.  His
25           quantities, even if you think that he's distributing
```

1    or you think that there's enough credible evidence

2    that he's distributing, which we don't concede that

3    there is, but no one cares what he does with the

4    drugs once he buys them.  Mr. Grigsby doesn't care.

5    He's buying such small quantities and his activities

6    are so divorced from what the other people in this

7    alleged conspiracy are doing that I don't think you

8    can argue that he is -- or a reasonable jury could

9    find that he's a member of a conspiracy as charged by

10   the government.  The government has the option of

11   what kind of conspiracy they wanted to charge.  They

12   potentially would have a stronger case if they

13   charged a conspiracy between Mr. Trinkle and Heags

14   and Grigsby, but to go from Humphrey, who was getting

15   40 kilograms per transaction from Mexico, all the way

16   down to Mr. Trinkle, who was getting a quarter of an

17   ounce per transaction, the quantities alone would

18   seem to indicate -- I understand the government

19   doesn't think so, but the quantities alone show that

20   there's no way Mr. Trinkle could have even known he

21   was joining the conspiracy that the government is

22   proving.  And the conspiracy the government is

23   proving is vast.  You've got Wallace and Grigsby

24   acting as an importer/exporter for a gang out in

25   California; you've got cross border shipments of

1    cocaine coming in; you've got Humphrey, who owns a

2    multistate fish franchise and apartment complexes;

3    and then you have Mr. Trinkle, who lives with his

4    mom.  I understand --

5              THE COURT:  That's a heck of a closing

6    argument, Mr. Bell.

7              MR. BELL:  Judge, I wanted that -- I

8    wouldn't be giving the government a preview of it if

9    I didn't believe that this were the case.  I guess I

10   would say, one call that the government played was

11   very illustrative.  It's the call when Mr. Trinkle

12   allegedly calls Mr. Grigsby and says, did Byron talk

13   to you the other night?  He's mad because he's saying

14   I'm not bringing money to him.  I am not aware of any

15   conspiracy where people are fighting for the business

16   of one of the members of the conspiracy.  If the fact

17   that Mr. Trinkle took his business away from Mr.

18   Brown at some point and that caused anger on behalf

19   of Mr. Brown, then that's not a vertically or

20   horizontally integrated enterprise, which is what a

21   conspiracy is.  That's just some people who happened

22   to do business with each other, and Mr. Trinkle is a

23   customer who has taken his business to somebody else.

24             THE COURT:  That may not be very different

25   from two commissioned sales people working at JC

1    Penney who both would like to get the sale when you

2    go in and buy something.  I understand your argument,

3    but I don't think that's determinative.  I understand

4    your argument, and I want to hear what Ms. Morehead

5    has to say about it.

6              MS. MOREHEAD:  Judge, it's always

7    interesting to hear people say, this is how a

8    conspiracy is, it's vertical or horizontal, and

9    that's just not accurate.  We have seen it happen

10   time and time again, and I hate to do this to you

11   again, but I'm going to use a different analogy.  I

12   think defense counsel often think of it as a tiered

13   pyramid thing; sometimes it's referred to as a wagon

14   spoke.  But I like to use the spider web, and

15   oftentimes what we end up with in these cases are

16   situations where at different times conspirators have

17   different roles:  Sometimes they are the supplier;

18   sometimes they are the customer.  And in connection

19   with a conspiracy what it requires is an agreement,

20   number one, and what we have here is an agreement to

21   distribute cocaine.  That was the overall scope of

22   this conspiracy.  And what we need to look at then

23   is, what's the foreseeability that we have here?  Was

24   it foreseeable that these other members of the

25   conspiracy, that they were -- that it was foreseeable

1    what -- that there were other individuals involved?

2    And the instructions that I believe that you will

3    give the jury, consistent with Tenth Circuit pattern

4    instructions, is that all of the coconspirators don't

5    even need to know who the other conspirators are.

6    But obviously it was foreseeable by Mr. Trinkle that

7    Mr. Grigsby was getting his drugs from someone else

8    and that whoever he was getting his drugs from, that

9    he was getting it from someone else.  But there's no

10   requirement that Mr. Trinkle have direct contact with

11   Gerardo Trevino in Mexico, or even know who he is, or

12   that maybe Mr. Grigsby is getting his drugs from

13   Boytina Locke in Missouri.  There can be various

14   sources of supply coming into this overall scope of

15   the conspiracy, and I think that's how I would equate

16   this conspiracy based upon the evidence you've heard,

17   is the spider web theory.

18            THE COURT:  I'll give you a chance while

19   you're up to address the specific buyer/seller

20   arguments briefed by Mr. Bell and joined by

21   Mr. Goodwin as well through Mr. Johnson's argument.

22            MS. MOREHEAD:  I think the buyer/seller

23   arguments only hold water if it's a situation where

24   the individual is, for instance, only buying for

25   using because then it stops at that point.  In this

```
 1        case, while I'll concede to Mr. Bell that, in fact,

 2        Mr. Trinkle was a user, there's clearly sufficient

 3        evidence to establish that he was also a distributor

 4        and that he was distributing cocaine beyond that.

 5        Clearly with regards to Mr. Goodwin, Mr. Goodwin, we

 6        have his admissions that he was, in turn, cooking the

 7        crack and then selling the crack.  So it wasn't a

 8        situation where we stop with them being a customer.

 9        And as Mr. Grigsby testified, he believed based upon

10        the quantity, the sheer quantity of cocaine that

11        Mr. Trinkle was buying -- sometimes multiple times a

12        day, but we did the math, as you recall, nearly

13        2 kilos over a year-and-a-half period of time -- that

14        he was, in fact, distributing.  And we had played at

15        least one call where Mr. Trinkle specifically

16        mentions that that's his goal, is to turn around and

17        make some money on what he's buying from Mr. Grigsby.

18        So there are certainly -- there's sufficient evidence

19        for the jury to conclude that Mr. Trinkle, and for

20        that matter Mr. Goodwin, that this was not a

21        buyer/customer kind of scenario where it stopped

22        there.

23                  THE COURT:  All right.  Mr. Bell?

24                  MR. BELL:  As they are fresh in my mind,

25        I'll address Ms. Morehead's point.  I believe the
```

1      testimony of Mr. Grigsby was he just assumed that

2      Mr. Trinkle was selling.  He didn't offer a basis

3      that based on the amount -- I didn't make a

4      foundation objection for tactical reasons, because if

5      the government doesn't want to get into it, I'm not

6      going to force them to; however, he just made the

7      assumption that they were being sold.  As to

8      buyer/seller, Judge, Officer Jones testified that in

9      his experience people can go through eightball --

10     users can go through eightball quantities a day.

11     Grigsby testified that that was about how much

12     Mr. Trinkle was going through.  Jones also testified

13     that some drug users will buy more than they need for

14     a day, just as someone will buy not two slices of

15     bread when they want to make a sandwich.

16              THE COURT:  All of which are good arguments

17     to make to the jury, but those are what those are,

18     because we have evidence that the quantities

19     Mr. Trinkle purchased were consistent with resale,

20     and the jury could draw that inference from that,

21     particularly in light of Mr. Trinkle's telephone call

22     in which he says he was just trying to make some

23     money.  While I think you have some arguments to make

24     about what really should be believed about what

25     Mr. Trinkle was doing, at this stage the court has to

1    evaluate the evidence in the light most favorable to

2    the government, and I think the government is

3    entitled to the inference that these were resale

4    quantities and that there were at least several bits

5    of evidence that would tie in, including Mr.

6    Ringgold's testimony, for whatever that may be worth,

7    you know, here that would support the government's

8    position if one believes Mr. Ringgold.  So I think

9    what you're telling me now is probably something you

10   should be telling the jury eventually.

11              MR. BELL:  I would just state that even if

12   there is evidence of redistribution that still

13   doesn't preclude a buyer/seller relationship.

14              THE COURT:  That's where it brings a fact

15   question and not a matter of law whether that's true.

16              MR. BELL:  As to the scope of the

17   conspiracy that Mr. Trinkle allegedly joined, the

18   government said he could have foreseen this, he could

19   have foreseen that.  I was reminded -- in my research

20   I ran across a case where the government said this

21   person could have foreseen that the drugs were coming

22   in from the Medellín Cartel in Columbia and that

23   therefore this person is responsible for all the

24   drugs distributed by that cartel.  And, of course,

25   the Tenth Circuit said no.

1          THE COURT:  That's a little bit different

2     in terms of what the person is held responsible for.

3     For example, on a sentencing capacity, if Mr. Trinkle

4     were found guilty of this conspiracy, I think the

5     government's argument that he is responsible for

6     everything that Gerardo Trevino distributed would be

7     a tough sell, and I don't think the government would

8     try to make that argument, but that's a different

9     argument.

10          MR. BELL:  I agree, Judge.  When I said he

11     couldn't foresee the scope of the conspiracy that he

12     was joining, Ms. Morehead said, of course, he could

13     because he could have foreseen this.  It is a similar

14     argument as to what the limits of foreseeability are

15     when you're joining the conspiracy.

16          I'll just say in closing, you brought out the

17     example of two commissioned salespersons arguing for

18     a sale.  In that metaphor Mr. Trinkle is the

19     customer; he's not the agent of JC Penney; he's the

20     customer.

21          THE COURT:  Which is why, as I say, it's

22     not -- it can be dangerous to throw out metaphors

23     without thinking about it, but the point is the fact

24     that there's competition among people.  Let's say

25     it's commissioned salesmen at one of those stores

```
 1         that sells building supplies with a contractor who is
 2         going to go resell yet again.  I mean, the point is,
 3         it doesn't have to end with an end consumer, and the
 4         fact that there's competition among people within the
 5         group isn't -- doesn't defeat the notion of a
 6         conspiracy.  I understand your argument, Mr. Bell,
 7         and you've made it very well.  You're not going to
 8         win here today, but you made the argument very well.
 9              And let me say I don't take this lightly because
10         I think that the conspiracy law is pretty far
11         reaching.  Whether it should be or not is a matter
12         for the Tenth Circuit and the Supreme Court of the
13         United States to decide, but I think within the
14         conspiracy law as the Tenth Circuit has articulated
15         it your motion should be denied.  I'm going to give a
16         little bit more particulars on this buyer/seller
17         issue, but I'm not going to go through too much
18         detail about this.
19                   MR. BELL:  Thank you.
20                   THE COURT:  The Tenth Circuit has made it
21         clear that in order to prove conspiracy in violation
22         of 21 U.S.C. Section 846 the government must prove,
23         No. 1, an agreement with another person to violate
24         the law; No. 2, knowledge of the essential objectives
25         of conspiracy -- it's the essential objectives of
```

1    conspiracy; 3, knowing and voluntary involvement; and

2    4, interdependence among the alleged conspirators.

3    There's, of course, a ton of cases that stand for

4    that.  I'm citing United States v. Heckard, 238 F.3d

5    1222, 1229 (10th Cir. 2001); see also United States

6    v. Carter, 130 F.3d 1432, 1439 (10th Cir. 1997).  In

7    that respect the agreement, of course, need not be an

8    express agreement; it need not be the kind of formal

9    agreement that we lawyers think of in terms of

10   contracts.  Lay people, in fact, enter into

11   agreements without even thinking they are agreements,

12   and the agreements can be proven by circumstantial

13   evidence of the context of what people were doing.

14   Knowledge is not of the entire scope of the

15   conspiracy or how far it goes or all the intimate

16   details, but rather the essential objectives, here

17   the essential objectives being to sell cocaine in

18   both its powder and crack form, depending upon the

19   interests of the particular person who is a part of

20   the conspiracy.  A knowing and voluntary involvement

21   is a fairly easy aspect under the facts of this case.

22   It's not really so much an issue.  And

23   interdependence is probably where the buyer/seller

24   relationship comes into play.  Proof of the existence

25   of a buyer/seller relationship without more is

1      inadequate to indict the buyer into a large

2      conspiracy.  United States versus Watson, 594 F.2d

3      1330, 1337, (10th Cir. 1979); see also United States

4      versus Wright, 506 F.3d 1294 (10th Cir. 2007), United

5      States versus Evans 970 F.2d 663, 673 (10th Cir.

6      1992), and United States versus McIntyre, 836 F2d

7      467, 471 (10th Cir. 1987).

8          Now, this is an important point.  I'm quoting

9      from United States versus Ivy.  "The purpose of the

10     buyer/seller rule is to separate consumers who do not

11     plan to redistribute drugs for profit from street

12     level, mid-level, and other distributors who do

13     intend to redistribute drugs for profit, thereby

14     furthering the objective of the conspiracy."  United

15     States versus Ivy, 83 F.3d 1266, 1286 (10th Cir.

16     1996), citing United States versus Roberts, 14 F.3d

17     502, 513 (10th Cir. 1993).  Also see United States

18     versus Horn, 946 F.2d 738, 741 (10th Cir. 1991).

19     "Casual transactions with persons involved in the

20     conspiracy are insufficient to establish a critical

21     connection.  One who merely purchases drugs or

22     property for personal use from a member of a

23     conspiracy does not thereby been a member of the

24     conspiracy.  That's Horn, 946 F.2d 741, quoting Fox,

25     902 F.2d at 1514.

1              In the Roberts case the Tenth Circuit held that

2       although there was no direct evidence establishing

3       that the defendants sold methamphetamine, the

4       circumstantial evidence of multiple deliveries,

5       pickups, and the defendant's conversations with other

6       codefendants who were coconspirators revealed more

7       than a simple buyer/seller relationship.  14 F.3d at

8       512-13.  As a result, the Tenth Circuit affirmed the

9       defendant's conspiracy conviction.

10             In Ivy the Tenth Circuit held that the evidence

11      shows that the defendant was, quote, much more than a

12      consumer or end user of cocaine, end quote.  83 F.3d

13      1286.  Several witnesses testified that they saw the

14      defendant distribute cocaine.  In addition, one

15      witness testified that the defendant had purchased

16      1/2-ounce and 1-ounce quantities of crack on at least

17      three or four occasions.  Another witness testified

18      that inside the defendant's house the witness had

19      seen 1/2 ounce of crack cut up into 16-ounce packets,

20      one of which was sold in her presence; and another

21      witness testified that he had purchased 1/2 ounce of

22      crack cocaine.  Based on this evidence the circuit

23      found a reasonable jury could find that the defendant

24      redistributed crack for profit and thus affirmed the

25      defendant's conspiracy conviction.

1           In Watson the Tenth Circuit affirmed the

2       conspiracy convictions of three defendants, each of

3       whom, in challenging their convictions, argued that

4       they were merely consumers or users of the drugs.

5       The government presented evidence from a cooperating

6       codefendant who testified that she had been present

7       when the wholesaler of the conspiracy had sold heroin

8       to one of the defendants; that she had delivered

9       heroin to that defendant on behalf of the wholesaler;

10      and that the defendant had told her once that he had

11      several people waiting for dope.  She also testified

12      that she knew this defendant was a user of drugs

13      himself.

14           With respect to the second defendant, the

15      cooperating codefendant testified that if she ran out

16      of heroin or cocaine she would refer her customers to

17      him; that she sold drugs to him when the wholesaler

18      was out of town; and that she knew that the defendant

19      distributed drugs.

20           Finally, with respect to the third defendant,

21      the cooperating codefendant testified that she had

22      been present when the defendant purchased heroin from

23      the wholesaler; that she had referred customers to

24      the defendant; that she knew the defendant was a

25      seller; and that the defendant knew the supplier for

1      the wider conspiracy.  She also testified that the

2      three defendants all knew each other.

3           In addition to the testimony of the cooperator,

4      the government presented various recorded phone

5      conversations between the defendants and the

6      wholesaler arranging drug transactions and presented

7      evidence of surveillance of these alleged deals.

8           In viewing this evidence in the light most

9      favorable to the government, the Tenth Circuit was

10     satisfied that there was sufficient evidence as to

11     the existence of the conspiracy and the defendant's

12     knowing and intentional involvement in it.

13          In viewing the evidence presented in the light

14     most favorable to the government -- I'm not going to

15     list all that evidence that has to do with quantity

16     and other circumstances that we have talked about,

17     the number of times and the amount of drugs there's

18     evidence that Mr. Trinkle purchased, for example, and

19     Mr. Goodwin purchased.  I believe that the evidence

20     supports the notion that Mr. Trinkle and Mr. Goodwin

21     are more than mere users of the cocaine and/or crack

22     cocaine.  The evidence was presented, as I indicated,

23     about resale and about the quantities for resale, and

24     I think that that all fits in here.  As I say, I

25     don't want to -- it's on this aspect that I don't

1    want to elaborate.  Suffice it to say, if the time

2    comes that this motion is renewed and I need to

3    elaborate more on all the evidence, I will do so, but

4    I think this is not the time to do it.  So the motion

5    is denied.

6         Mr. Rogers, we're now to, I have read your

7    motion in writing, and I would like to give Ms.

8    Morehead the opportunity to respond, and then you

9    will be given the opportunity to rebut.

10         MS. MOREHEAD:  Judge, I see, frankly, two

11    issues with regards to Mr. Simpson.  First of all,

12    clearly there's the issue about the conspiracy, which

13    there's two ways I think that you can look at this.

14    You can look at this as the counts collectively --

15    and sorry, Judge, I don't have these memorized --

16    Count 1 being, obviously, the conspiracy, and then

17    Mr. Simpson was also charged in Count 38, which had

18    to do with the attempted possession of the cocaine on

19    November 27, and Count 39, which had to do with the

20    924(c) firearm charge.  Clearly, those counts can be

21    looked at in combination with the conspiracy,

22    separated out from the conspiracy, though if the

23    court were to opine that Mr. Simpson was not part of

24    the conspiracy, he could independently be up for

25    consideration on Counts 38 and 39 if it was deemed

1    that those -- that his participation on that date

2    wasn't part of the conspiracy.

3                THE COURT:  May I ask you about that again

4    too, since the only evidence -- again, looking at 38

5    and 39, this is an issue I didn't address with Mr.

6    Calbi, frankly, on this.  Those also took place in

7    Missouri.  Granted, obviously, Mr. Wesley and

8    apparently Mr. Simpson left Kansas to go to Missouri.

9                MS. MOREHEAD:  Right.  It was an ongoing

10   activity.

11               THE COURT:  There needs to be probably some

12   further briefing by the government on that point

13   because clearly we all know that where this all went

14   down was in the District of Missouri.

15               MS. MOREHEAD:  I understand, Judge.  I

16   think I'll be able to find case law.  We have lots of

17   occasions where somebody is in another state and the

18   phones are being used.  And, frankly, Judge, I think

19   the case law will bear out that neither participant

20   has to physically be in the jurisdiction --

21               THE COURT:  These are phone calls, of

22   course.  Count 38 and 39 arise out of the takedown in

23   Missouri at the car wash.

24               MS. MOREHEAD:  Yes, I understand.

25               THE COURT:  So that presents those issues

 1        that need to be addressed with regard to Mr. Wesley.

 2                    MS. MOREHEAD:  And I think I will be able

 3        to do that, Judge.

 4             Just globally I just want to talk about

 5        Mr. Simpson.  I found some insightful -- I didn't

 6        find a lot of good case law in the Tenth Circuit, but

 7        I found some pretty insightful case law from the

 8        First, Seventh, and Eleventh Circuits, and I tried to

 9        look at similar situations that would bear upon a

10        situation like we have with Mr. Simpson where what we

11        have is him driving his brother to a drug

12        transaction.  And in looking at these cases, there's

13        a few comments that I think that come out of these

14        cases.  One -- and I think you kind of mentioned

15        this.  I think I heard you mention this, but

16        certainly inferences are permissible for the jury to

17        draw upon, and the possibility of innocuous

18        explanations for behavior does not foreclose the

19        jury's consideration as to contrary inferences.

20        That's a First Circuit case, United States v. Hughes,

21        211 F.3d 626.  And in connection with that it said

22        the jury was generally at liberty to select freely

23        among a variety of reasonable constructions of the

24        evidence.

25             And Mr. Rogers spent a lot of time arguing that

1     he was going to clean carpets and the like, and

2     certainly that's one innocuous explanation.  However,

3     the other explanation, as the government put forth,

4     was that he was driving his brother to a drug deal.

5     And the cases that I think are most insightful have

6     similar situations, where we have somebody driving a

7     drug trafficker to a drug deal, and I am just going

8     to quote kind of some passages from this, and then

9     I'll mention the cases, Judge.  But the court

10    concluded that it was unreasonable to conclude that

11    the person was not an active participant in light of

12    the evidence, and what they said was that a jury may

13    find knowledgeable, voluntary participation from

14    presence when the presence is such that it would be

15    unreasonable for anyone other than a knowledgeable

16    participant to be present.  And the cases are United

17    States versus Morales, which was the Eleventh Circuit

18    case at 868 F.2d 1562, and it actually cited United

19    States versus Cruz-Valdez, which I believe is also an

20    Eleventh Circuit case.  It's 773 F.2d 1541.  And

21    within that it cites to a Seventh Circuit case, which

22    is United States versus Moya-Gomez, which is at 860

23    F.2d 706.

24        And so what I, frankly, Judge, would look at in

25    this case is, again, the totality of the

1    circumstances here.  If we had evidence that Mr.

2    Wesley was some -- I'm trying to carefully pick my

3    word -- lackadaisical, care-free, inattentive drug

4    trafficker and he would surround himself by unwitting

5    people, then I think Mr. Rogers would have a valid

6    argument.  But what we have is a situation based upon

7    the evidence that Mr. Wesley was very careful about

8    who he associated with, and we had no evidence

9    presented -- I'm going to talk about the lack of

10    evidence here -- no evidence that he ever had, you

11    know, individuals that were unknown during the course

12    of this conspiracy, unknown to the parties.  Clearly

13    this is his brother.  He's not going to let somebody

14    that's not knowledgeable about what's going on drive

15    him to a drug deal.  That seems beyond imagination.

16    He knows based upon the phone calls that you have

17    heard.

18         A couple things are going on.  One is the police

19    are watching him; the feds are watching him.  We

20    played numerous calls where he was aware of that

21    set of circumstances.  He was aware that there were

22    dangers associated with drug-trafficking.  He was --

23    he had contemplated, as indicated in the phone calls,

24    along with Mr. Foy at some point in time prior to

25    Christmas ripping Mr. Humphrey off of cocaine so that

1    they could have a nice Christmas present in

2    connection with one of these deliveries.  And so

3    Mr. Wesley was very careful about who he associated

4    with, how he conducted his -- and I say that.  I

5    mean, obviously, we're watching, we have got phone

6    calls, so we have the upper hand.  But he's doing

7    countersurveillance; he's doing all sorts of things

8    in connection with this.  And it is, Judge,

9    unreasonable for anyone to believe that he's going to

10   go pick up 5 kilos of cocaine and he's going to take

11   someone or have someone drive him that's not fully

12   aware and knowledgeable about what's going on.  And

13   the reason for that, Judge, is because of the

14   dangerousness of this entire situation in that he

15   knew he was being possibly watched and under

16   surveillance.  And what the court said in Morales,

17   again, citing Cruz-Valdez, which I previously

18   mentioned, was, "Juries and courts know much more

19   about commerce and controlled substances than we did

20   a decade or more ago --" this was a 1989 case, so,

21   you know, we're now another 20 years into the game

22   "-- and some of the familiar realities of drug

23   transactions we are able under circumstances to show

24   the realities are probative in determining whether a

25   drug offense has occurred, and it's recognized that a

1    reasonable jury may conclude --" and this was based

2    upon the Valdez case -- "that, quote, a prudent

3    smuggler is not likely to suffer the presence of

4    unaffiliated bystanders, end quote.

5         And so that's what I would ask the court to draw

6    upon with regards to Mr. Simpson, is how reasonable

7    is it to believe that he would take his own brother

8    who had no knowledge about what was going on to a

9    5-kilo drug transaction?

10        And one of the purposes of Mr. Brown was to

11   establish -- I don't think Mr. Brown's testimony

12   about Mr. Simpson driving Mr. Wesley on prior

13   occasions was conclusive that on the prior occasions

14   Mr. Simpson would have known, but that would have

15   certainly been a good starting point, that here we

16   are moving forward.

17        The other thing, Mr. Simpson was living with his

18   brother.  He's fully aware his brother's not

19   employed.  He would be -- fully reasonable to

20   conclude that he has lots of money that is otherwise

21   not explainable.  And in connection with this, they

22   are meeting an individual, there are phone calls

23   occurring in the vehicle as they are driving,

24   Mr. Simpson being with his brother throughout the

25   entirety of this, going from place to place along the

1     way until they finally meet up with Mr. Humphrey.

2          So based upon the totality of the evidence, we

3     believe that it is a submissible case to the jury,

4     that it should be their decision on whether there's

5     sufficient evidence and to decide whether it's

6     reasonable or unreasonable to conclude that

7     Mr. Simpson was just there, along for -- I don't want

8     to say along for the ride. He was driving. But that

9     he was oblivious to what was going on. And, you

10    know, all the evidence indicated that this was going

11    to be a completed drug transaction. Mr. Simpson --

12    Mr. Wesley was observed getting into the -- opening

13    the passenger door. And these other incidents that

14    you heard lots of evidence about, that's exactly how

15    they occurred. Mr. Wesley would go to Mr. Humphrey's

16    passenger door and do what appeared to be a switch of

17    packages or bags or duffel bags, and the transaction

18    would then be completed .. So based upon that line

19    of authorities and the argument that can be made

20    based upon the totality of the evidence and the

21    reasonable inferences that can be drawn, we believe

22    that there's sufficient evidence to go forward with

23    Mr. Simpson.

24          THE COURT: Thank you, Ms. Morehead.

25          Mr. Rogers, I need not hear from you unless you

1          want to talk me out of ruling in your favor.  I am

2          granting the motion as to all three counts.  And this

3          is not a decision I make lightly.  I have considered

4          this very carefully.  I think the government has

5          worked with what they have had and has made the case

6          they have to make, but I do not believe that a

7          reasonable jury could find beyond a reasonable doubt

8          that Mr. Simpson was guilty of any of the three

9          charges that were brought against him.

10              Let me start with the event that brought

11         Mr. Simpson to the -- into focus, and that was the

12         day of the arrest, on November 27 of 2007.  Ms.

13         Morehead makes a good argument about questioning

14         whether the -- if the presence is unreasonable other

15         than as a knowledgeable person to be present, but I

16         think the circumstances about a prudent smuggler

17         bringing along a stranger is far different from a

18         situation in which the only evidence we have in that

19         respect is that a person who is a brother to another

20         person, that other person doesn't have a driver's

21         license, they drive from their home in Leavenworth to

22         places in Kansas City that are associated with their

23         family and with -- were normal activities, such as

24         going to the barber shop and the car repair shop,

25         where there are no drugs in the car, there's no money

```
 1        in the car.  There may be a gun in the car, but
 2        nobody was a prohibited person, and there's no
 3        evidence who knew what about the gun being in the
 4        car.  But I think it's irrelevant, frankly.  If the
 5        gun had been sitting out on the dashboard of the car,
 6        no one was prohibited from having the gun.  And I'm
 7        not a big fan of guns, frankly, but it doesn't make
 8        having a gun create anything different under the
 9        circumstances here where there's no evidence from
10        which a reasonable jury could find that Mr. Simpson
11        would have known that what was afoot was a drug
12        transaction.
13            The strongest evidence against him is that he
14        was present at the time of this arrest, but it's
15        clear that a defendant's presence at the crime scene
16        is a material and probative factor that the jury may
17        consider but is not sufficient to support an
18        inference of participation in the conspiracy, United
19        States versus Riggins, 15 F.3d 992, 94, (10th Cir.
20        1994).  A lot of cases that talk about that basic
21        issue.  The circuit has made clear that it cannot
22        sustain a conspiracy conviction if the evidence does
23        no more than create a suspicion of guilt or amounts
24        to a conviction resulting from piling inference on
25        top of inference, United States versus Horn, 946 F.2d
```

1    738, 741.  See also United States versus Anderson,

2    941 F.2 1560, 1564 and 1565.  (10th Cir. 1992).  I

3    think it is -- there is a suspicion here.  A

4    reasonable suspicion is clearly here, but that's all

5    there is.  There's not enough to sustain a

6    conviction.

7         You talk about absence of evidence.  And, of

8    course, this isn't something I think should be

9    factored in by me other than it is notable, since

10   we're talking about the absence of evidence.  With

11   all the incredible amount of investigation and

12   surveillance that was done, Rtayvian Simpson doesn't

13   surface on any phone call, doesn't surface on

14   anything we have had presented to us other than

15   something that Mr. Brown told to the authorities

16   after he was apprehended.  Mr. Simpson is someone who

17   simply fell into the net here by accident on the day

18   that the arrest was made.  That doesn't mean --

19   that's not determinative, but the point is, it is

20   interesting, the total absence of anything else that

21   ties Mr. Simpson to any of these events.  I'm not

22   saying Mr. Simpson's innocent.  I'm saying that the

23   government doesn't have the evidence from which a

24   reasonable jury could find him guilty beyond a

25   reasonable doubt; therefore, the motion is granted

```
1    and he is discharged.

2         All right.  We have got a jury sitting around

3    out there.  What I need to know next is, what about

4    presentation of evidence by the defendants?  What are

5    you contemplating, Mr. Calbi?  I don't want to hold

6    you to anything.

7              MR. CALBI:  I'm contemplating not putting

8    on any evidence.  If something would change before

9    Tuesday, it would be de minimis, but I think it would

10   be safe to assume there would be nothing.

11             THE COURT:  Mr. Sandage?

12             MR. SANDAGE:  There is one issue I want to

13   bring up to the court.  It involves Chauncey

14   Anderson.  And we have been down that road, and the

15   government proffered to the court that there were --

16   he testified that he had met with the government 30

17   some odd times.  The government proffered to the

18   court in a sidebar that there was nothing in those

19   reports.  He admitted on the stand a prior

20   inconsistent statement, and the defense is

21   considering calling one of the two agents to further

22   go into that.  Before I feel comfortable saying that,

23   I would ask the court to order the government for an

24   in camera review of those 30 some odd reports so the

25   court can make some sort of independent determination
```

1    if there's anything in there that would help us, any

2    prior inconsistent statements, and also, obviously,

3    Brady or Giglio material.  I didn't do it at the time

4    because we hadn't made certain decisions on how to

5    proceed, but I think the issue is ripe now for

6    discussion.

7              THE COURT:  Ms. Morehead?

8              MS. MOREHEAD:  Judge, frankly, because of

9    the circumstances of that, I don't feel comfortable

10   discussing this in open court or to anyone else.  You

11   know, it's a --

12             THE COURT:  Do you object to providing

13   information in camera to the court?

14             MS. MOREHEAD:  I could do that, but first

15   of all, I have a problem with this representation

16   that there's going to be 30 reports.  Just because

17   you meet with someone doesn't mean there's a report.

18             MR. SANDAGE:  I apologize.  I meant 30

19   meetings rather than a report was generated.

20             MS. MOREHEAD:  So I think we could

21   probably -- I don't know how easy that would be, or

22   how voluminous, frankly, Judge, that would be.  It

23   may be volumes and volumes and volumes of materials.

24   I don't have any knowledge about the amount of

25   materials that the court would be provided or what

```
 1          you would want or --
 2                    THE COURT:  Well, I will say this.  I
 3     consider Mr. Anderson's credibility suspect, and as a
 4     result I'm sympathetic to the desire to pursue the
 5     matter further.  What I would suggest though,
 6     Mr. Sandage, is perhaps you and Ms. Morehead can get
 7     together tomorrow and see if you can shape a request,
 8     shape something that might not create just an
 9     overwhelming burden for everyone.  And if ultimately
10     the best result is getting something for the court to
11     review in camera, so be it, and I'm willing to do
12     that and to order Ms. Morehead to do that.
13     Obviously, I'm loath to sit and have a library worth
14     of material to sort through on the hopes that I can
15     find something that I think might be helpful to you.
16     That's not my job, obviously.
17                    MR. SANDAGE:  I understand that.  I don't
18     want to put the court in that position, but given the
19     government's representations at our side bar and what
20     she reiterated right now, hopefully, we will be able
21     to work it out.  As I thought about possible remedies
22     to my solutions, it's the only one I could come up
23     with that seemed reasonable to accommodate all the
24     parties' requests.
25                    THE COURT:  Ms. Morehead, I would ask you
```

```
1      to talk to Mr. Sandage, see if there's any
2      accommodation you can come to.  If you cannot, I
3      would like to see if you can shape this material in a
4      way that would facilitate a review by the court.  I'm
5      not going to entertain looking through libraries'
6      worth of stuff, but by the same token if there's
7      something which is a prior statement by Mr. Anderson
8      which the government is aware of which the government
9      can understand is potentially an inconsistent
10     statement by Mr. Anderson and the government thinks
11     it should be protected because it's part of an
12     ongoing investigation or for some other reason that
13     the government will assert outweighs the defendant's
14     interests in getting that statement, well, then I
15     think the government needs to tee that up for me by
16     showing what it is and why you think that.
17          We have the jury waiting.  I want to let them
18     know what we're going to do on Tuesday.
19          Mr. Heathman?
20          MR. HEATHMAN:  My assistant gave you my
21     brief in writing.  That hasn't been filed because I
22     haven't had a chance, but I will do so immediately.
23          Secondly, I would just join in Mr. Sandage's
24     argument.  I know Mr. Anderson had some thing to say
25     about my client as well, and I think it's highly
```

```
 1            probative.  It might be.  Let me put it that way.
 2            And I would like the opportunity to work with Ms.
 3            Morehead as well and see what we can come up with.
 4                      THE COURT:  All right.  Does anybody
 5            sitting here now believe you're going to put on any
 6            evidence in the defendant's case-in-chief?
 7                 Mr. Bellemere, I'll start with you.  You
 8            indicated you thought you were going to do something
 9            with regard to the person at CCA.
10                      MR. BELLEMERE:  Yes, your Honor.
11                      THE COURT:  Any other evidence?
12                      MR. BELLEMERE:  I wanted to read what I
13            consider to be an admission against interests from
14            the government.
15                      THE COURT:  Thirty minutes or less?
16                      MR. BELLEMERE:  Thirty minutes or less.
17                      THE COURT:  Mr. Johnson?
18                      MR. JOHNSON:  Seventy seconds is all I
19            need.  I tried to complete Mr. Grigsby's impeachment
20            during the government's case.  I guess I would call
21            Jones and McCue back to the stand, and we will get
22            the prior inconsistent statement in, and I will be
23            done.
24                      THE COURT:  Mr. Bell, what about you?
25                      MR. BELL:  I am in the same boat as Mr.
```

1    Calbi.  Minimal, if any, evidence.

2              THE COURT:  One of the problems with you is

3    you reserved your opening statement.

4              MR. BELL:  Judge, that was a tactical

5    decision.  It didn't work out the way I imagined or

6    as much as the way I imagined, so I will be waiving,

7    or sacrificing, opening statement.

8              THE COURT:  Very well.  It would appear

9    that when we come back on Tuesday we will have a

10   relatively brief period of time, I suppose, for

11   presentation of evidence.  In that connection I will

12   want to wait until Tuesday to ask each of the

13   defendants if they are aware of their constitutional

14   right to testify if the defendants choose not to.  I

15   will want to ask each of you counsel on that occasion

16   what your client's pleasure is, and I will want to

17   inquire them directly.  So we will bring the jury

18   in for a little bit of evidence, probably, and then

19   sit them down again while we talk about instructions.

20        Ms. Morehead, let's talk about your day on

21   Wednesday.  Why don't we bring the jury in and let

22   them know where we are.

23              (The following proceedings were had in the

24   presence of the jury:)

25              THE COURT:  Members of the jury, I am very

1    sorry.  I probably could have tumbled to this before

2    now and let you go.  I was hoping we could get back

3    to you yet today with some more business in front of

4    you, but it turns out we cannot.  We still have our

5    own business we're transacting here.

6         I'm going to send you home.  I wish I had done

7    it an hour ago.  I'm sorry.  People have long ways to

8    drive, some of you, and I feel bad about that.

9         We will be in recess until 9:00 o'clock on

10   Tuesday morning.  The admonitions hold in full force

11   and effect.  As I indicated to you earlier, just

12   because you've heard the government's evidence, you

13   haven't heard the complete picture that you need to

14   have presented to you in order to decide the case, so

15   don't try to get a head start.  You'll have plenty of

16   opportunity to deliberate.  Things get a little

17   choppy as far as our procedure when we get to this

18   stage.  I'm shuttling you in and out more than I like

19   to, but don't hold it against them.  I'm trying to

20   make it work for everybody.  If it doesn't work, it's

21   on me.  Try to understand that we're trying to get

22   this case resolved and to you all in the best way

23   possible for everyone.

24        Have a nice weekend.  We will see you on

25   Tuesday.  Ms. Scheurer -- I thought I heard her

2488

1    sneaking around there.  Did she get lost?  Ms.

2    Scheurer, please take charge of the jury.  Everyone

3    else remain here, please.

4            (The following proceedings were had outside

5    the presence of the jury:)

6            THE COURT:  I interrupted somebody to do

7    that.  Who was talking to when I did that?

8            MR. CALBI:  Judge, I believe you were going

9    to ask Ms. Morehead about her day on Wednesday.

10           THE COURT:  Thank you.  That's what it was.

11   Ms. Morehead?

12           MS. MOREHEAD:  Judge, before I knew what

13   your schedule was on Wednesday, because you had

14   indicated at the limine conference that I was going

15   to be held to task and I needed to be available, I

16   filed a motion with the Tenth Circuit to present my

17   argument either by video teleconferencing or

18   alternatively to move it to Monday or alternatively

19   to continue it.  And just as I expected, they did not

20   agree to let me not appear or to continue it, and

21   they did not agree to move it up, but they did agree

22   on Wednesday to do it via teleconferencing.  The only

23   order we have is that we're supposed to report at

24   11:45, which that would be 10:45 their time.  We were

25   the last case on the docket, which there were six

1    cases.  I don't know if that's -- usually they have

2    you show up an hour or so before.  I am not sure what

3    time I'll be presenting my argument, but the order

4    was to show up at 11:45.  I haven't contacted them to

5    verify or ask questions about that yet, but Ms.

6    Morgan is on the other side.  We will both be

7    appearing here in the courthouse and arguing by video

8    conference.  So that's about the best I can tell you.

9    I would be available before that and after that,

10   obviously.

11            THE COURT:  Yeah, that is -- that is really

12   bad timing, obviously, right in the middle of the

13   day, for you and everybody else in terms of trying to

14   figure out what to do.  You've done your best.

15   There's nothing you can do other than that.

16        In addition, of course, Ms. Morehead, I've

17   indicated that you as well as those who raised the

18   issue by motion will have additional time to brief

19   some of these questions, the things that took place

20   in Missouri or the -- you know, the points we held

21   under advisement.  Would it be possible -- is there

22   anybody that couldn't get that submitted to the court

23   by noon on Monday?  Would that be all right?  I'll

24   set the deadline then for supplemental briefing on

25   the Rule 29 issues that I retained under advisement

1        for noon on Monday, Monday being May 4.

2            Now, I'm still trying to balance in my mind what

3        to do with that -- I'm trying to pick a jury in

4        another case.  I thought Ms. Morehead was scheduled

5        to go to May 6, so I set the other case up to pick

6        the jury on May 6.  Now I'm trying to figure out if

7        we can get this done and move that other case back to

8        start on Thursday.  Might be better.  I want to also

9        make sure we can have enough of Wednesday to work

10       with that that would make sense.  Let me ask, what do

11       you think in terms of the amount of closing, time for

12       closing, that you are interested in?

13            MS. MOREHEAD:  That's exactly what I was

14       going to ask, Judge.  The situation with closing

15       argument is a lot different than opening.  I think

16       you gave me an hour and them two hours, and, frankly,

17       the overview of the evidence was the same as to all

18       the defendants, so I wasn't really bothered by that.

19       With regards to closing argument though, as you have

20       seen from the evidence, there was various arguments

21       as to each defendant.  So I'm not saying I want

22       necessarily equal time, but I definitely want

23       comparable -- I want enough time that I can address

24       each of the respective defendants with regards to

25       whatever arguments they might make, so I guess I

1      would ask what you're going to give them.  I'm not

2      going to ask for equal time, but I want some --

3                THE COURT:  Let's start with how much you

4      think you could get away with asking me for.  In

5      other words, how much do you think really is a

6      reasonable request for you to ask in light of the

7      fact that you've got six defendants and multiple

8      charges?

9                MS. MOREHEAD:  I would ask for two hours.

10     I think, Judge, I base that -- I just tried a lengthy

11     case a couple months back.  I had an hour and a half,

12     and I only had three defendants, and, frankly, I felt

13     comfortable with that amount of time.  I think two

14     hours would be sufficient.  If you give them six

15     hours, then I'm having to address six hours, you

16     know --

17               THE COURT:  I don't think I'm going to do

18     that.

19          Mr. Calbi, let's start with you in terms of your

20     thinking about this.

21               MR. CALBI:  Judge, I was thinking perhaps

22     45 minutes just for Mr. Wesley.  He does have, I

23     guess, nine counts remaining against him.  I guess

24     since this is Operation Stonewall and everything

25     else, I think I would perhaps have more details to

1    get into and more things to talk about, so I don't

2    want to go out on a limb and say an hour.  I think I

3    could probably go in 45 minutes, and perhaps less,

4    but I don't want to cut myself sort.

5              THE COURT:  Mr. Sandage, what are you

6    thinking?

7              MR. SANDAGE:  My thoughts were 30 to 45

8    minutes.

9              THE COURT:  Mr. Bellemere, what were you

10   thinking?

11             MR. BELLEMERE:  Your Honor, I am generally

12   pretty short.  I think 30 minutes would be all right

13   with me.

14             THE COURT:  Mr. Bell, what were you

15   thinking?

16             MR. BELL:  Judge, I was going to ask for

17   about 45 minutes to an hour.  I know, you know,

18   Mr. Trinkle doesn't have many counts, but I think the

19   factual issues are somewhat unique to him and require

20   a little bit more explanation.

21             THE COURT:  Mr. Johnson?

22             MR. JOHNSON:  I guess we could do this in

23   20 to 30 minutes.

24             THE COURT:  And Mr. Heathman?  I'm sorry, I

25   skipped over you.

1          MR. HEATHMAN:  I would need 45 minutes to

2     an hour.

3          THE COURT:  Their total is around four if I

4     gave them everything they wanted, Ms. Morehead.  If I

5     gave you two --

6          MS. MOREHEAD:  I count up four and a half.

7          THE COURT:  I wasn't giving them everything

8     they wanted.

9          MS. MOREHEAD:  You know, Judge, if they are

10    going to get four, I think I would ask for three.  I

11    mean, again, the more they argue and the points they

12    bring up -- I'm not going to, obviously, use it all

13    on my front end; I would use some of it as rebuttal.

14    But I've got to have enough time -- if you were going

15    to give them three hours collectively, I think two

16    would be sufficient for me.  If you're going to give

17    them four or more, I think I'm going to need three.

18          THE COURT:  It will take an hour to read

19    instructions, so there's that to fold into the

20    picture here.  If we get -- I hate to be so

21    indecisive about all this, but I'm thinking out loud.

22    I'm thinking out loud so I can get your -- I woke up

23    in the middle of the night trying to make this all

24    work in my mind, so I have been thinking about this

25    a lot, but I want to get your input because it's

1    important for everybody and I don't want to impose my

2    thinking on you about this.

3        Typically I don't like there to be breaks of any

4    significant time when we get into argument.  I like

5    to have it all flow.  We could even at a three- and

6    four-hour allocation basically fill a day, and that

7    wouldn't be all that bad, but it would be hard to

8    make that day be Wednesday because of the uncertainty

9    of your schedule, Ms. Morehead.  I suspect you're

10   going to be out of commission more than an hour.

11   Maybe not.  But I don't think we could count on you

12   not being out of commission for an hour.

13            MS. MOREHEAD:  Could we start earlier on

14   Wednesday and maybe go a little bit later on

15   Wednesday?

16            THE COURT:  I would have no problem with

17   that.  I assume counsel for defendants wouldn't.  We

18   have one juror coming from as far as Troy, which is a

19   pretty good haul, but we could find out how they feel

20   about that.  Would it be your preference

21   collectively -- I'm not just talking about Ms.

22   Morehead, but collectively, counsel, to try to get --

23   here is what we would have -- here is the best we

24   could probably do.  Assuming that the defendants'

25   evidence doesn't take very long on Tuesday -- which,

```
 1          frankly, it doesn't sound like it's going to take
 2          very long -- and by the morning recess we are done
 3          with that, Rule 50 motions are renewed and denied --
 4          pardon me, renewed and ruled on, granted if, for
 5          example, your briefing shows it should be, or
 6          whatever, but by the noon recess we have attended to
 7          all of that, I would give you the instructions at
 8          that point.  I would give you some time to look at
 9          them -- I don't think they are going to come as a
10          great shock to anybody; there might be two or three
11          points that everybody may be particularly interested
12          in -- and leave ourselves in a situation in which we
13          would get the jury instructed that afternoon, then
14          come back Wednesday morning and have argument, carry
15          through and go -- start early and go until we get
16          done, and I would be amenable to an allocation
17          maybe -- I don't see -- I don't think it's
18          unreasonable to have an allocation of approximately
19          three hours to four hours, three hours to the
20          government, four hours to the defendants.  I may
21          fine-tune it, but I don't think that's unreasonable
22          to have the proportion.  I would hope you wouldn't
23          necessarily feel the need to front end load it, which
24          you indicated you wouldn't, Ms. Morehead, but to have
25          the time to respond to things.  We do have six
```

1    defendants here, and so there is that, and there are

2    particularized issues.  But does anybody feel

3    aggrieved if that is the approach that we take?

4    Mr. Bellemere?

5              MR. BELLEMERE:  I don't feel aggrieved.  I

6    don't know if it's a problem with doing this, and Ms.

7    Morehead is busy on Wednesday.  Are we unable to do

8    it on Thursday and then you have a whole day and

9    somebody doesn't have to drive in from Troy and you

10   don't have to be verklempt, so to speak, in trying to

11   get everything accomplished?  I don't have any idea

12   about the process, but other than that -- it was just

13   a suggestion.

14             THE COURT:  Well, because it sounds like

15   closing is going to require in the neighborhood of

16   seven hours to really give everybody the time they

17   need, that's really a full day, so when you add in

18   reading the instructions, which is about another

19   hour, probably 60 pages or so, the instructions,

20   that's more than a full day's worth.  I don't want to

21   go to from Monday, reading instructions to the jury

22   to the middle of the afternoon on Monday --

23             MS. MOREHEAD:  Tuesday.

24             THE COURT:  Excuse me, Tuesday, thank

25   you -- middle of the afternoon on Tuesday to argument

1    on Thursday, skipping Wednesday.  I think that's not

2    so good to have that much break in between the two.

3    That was my thinking.  If Ms. Morehead is willing to

4    try to live with it this way --

5            MS. MOREHEAD:  And I'll try to call the

6    Tenth Circuit and maybe talk to the law clerk

7    assigned to the case and see if they can ask the

8    court to -- I'll explain that we're going to be in

9    the midst of closing arguments, and maybe they

10   will -- I know they don't think trials are nearly as

11   important as appeals, but maybe they will try to hone

12   in on that, on what time period we're going to argue,

13   and try to make it so that it's over our lunch hour,

14   maybe.

15           THE COURT:  Right.  Which is what it sounds

16   like the basic approach would be.  It's just our

17   lunch hour will be as long as it needs to be to

18   accommodate your schedule, and unfortunately for you,

19   you're probably not going to get a lunch.

20           MS. MOREHEAD:  I haven't had lunch a lot of

21   times during this trial, Judge.  But you wouldn't

22   know it, would you?

23           THE COURT:  All right.  That's where I

24   think I'm headed on this.  I don't think there's

25   probably a better way to do it.  Is there anything

1      further we should do this evening?

2                    MS. MOREHEAD:  Could we approach the bench,

3      just counsel?

4                    THE COURT:  Yes, you may.

5                    MS. MOREHEAD:  Judge, I was going to broach

6      this -- this actually came up in connection with the

7      last break.  There have been a number of individuals

8      in the courtroom, and I asked for a limiting -- or I

9      think we talked before about witnesses coming in and

10     out of the courtroom, and yesterday when we left I

11     was going down the hallway and there were some of the

12     people who had been in the courtroom making comments

13     in the hallway, and I know the jury had already left.

14     But I don't know these people.  I don't want to cause

15     any animus.  I don't want to say anything to them.

16     But they were clearly talking about the case, making

17     improper snide comments.  And I'm thick-skinned.  It

18     doesn't bother me.

19                    THE COURT:  I assume they are not going to

20     be witnesses?

21                    MS. MOREHEAD:  I hope not.  I don't know.

22     I would ask defense counsel -- these are obviously

23     friends and family members of the defendants.  I

24     assume maybe they know who they are, but maybe to

25     talk with them and discuss with them the perils of

1    doing that.  And now we're -- now that the evidence

2    is done, you know, problems could still arise, so I

3    just thought it might be best if defense counsel

4    would handle that.

5             THE COURT:  Mr. Heathman, I know a number

6    of these people seem to be friends of Ms. Temple.

7    Maybe she could help us in that regard.

8             MR. HEATHMAN:  I will certainly ask her to

9    do so.

10            THE COURT:  I don't know who some of the

11   other folks are but --

12            MR. HEATHMAN:  I know they are not

13   witnesses that I'm using, but to the extent that they

14   are in the hallway making those comments, I'll talk

15   to her about that.

16            THE COURT:  It doesn't help Ms. Temple.  It

17   doesn't help any of the defendants, frankly.  So that

18   would be great.  And if any of you know who it is,

19   you ought to say something.  That would be --

20            MS. MOREHEAD:  I just didn't think it was

21   my place to say shut up and stop saying stuff.

22            THE COURT:  And I don't suggest that

23   people's First Amendment rights of expression should

24   be restricted either, but I think obviously the

25   extent to which this is a relatively small confine

```
 1        here, something somebody might say might be
 2        overheard, and it, frankly, might backfire, you know,
 3        and it might never be something that there would be
 4        made a record of.  It wouldn't be as if -- a juror
 5        might have heard some comments that they didn't like
 6        and they held it against the defendants, but yet
 7        there would never be any record of that, so it
 8        wouldn't be the basis for a mistrial, but it could
 9        hurt the defendants.  So it's the kind of thing that
10        I can't see any benefit, and when it's all said and
11        done, you know, clearly people can have whatever view
12        of this proceeding they want to have, but it probably
13        doesn't help the defendants or anybody else if views
14        are being expressed out there.
15                  MR. HEATHMAN:  On a different note, I'm
16        assuming that Mr. Rogers is not going to be with us
17        on Tuesday.
18                  THE COURT:  That's why closing argument for
19        the defendants is only four hours.
20                  MR. HEATHMAN:  Would the court be
21        opposed -- most of this trial my back's been to the
22        jury and I have tried to contort and turn.  Can Ms.
23        Temple and I move to the other side?
24                  THE COURT:  Yeah, sure.
25                  MS. MOREHEAD:  I assume, Judge, at some
```

1     point you'll give -- maybe even Tuesday to start out,

2     that they are not to concern themselves with

3     anything.

4               THE COURT:  I will.  That's going to be the

5     opening on Tuesday.

6               MS. MOREHEAD:  They will never know what

7     the court's done with regards to Mr. Simpson, I

8     assume?

9               THE COURT:  They certainly won't know

10     before they return a verdict in the case.

11               MR. CALBI:  Judge, I mean, Count 2 against

12     Mr. Wesley --

13               THE COURT:  Is also gone.

14               MS. MOREHEAD:  But they don't know that.

15     You read the -- they don't know what counts there are

16     or what counts there aren't.

17               MR. BELL:  You didn't tell them anything

18     about Mr. Wesley pleading guilty.

19               THE COURT:  It's a little bit different

20     when Mr. Wesley pled guilty when he did and how he

21     did in terms of what I felt the necessity was to

22     instruct the jury on.  I think the appropriate

23     thing -- and I had forgotten about Count 2 -- would

24     be to instruct the jury that Mr. Simpson is no longer

25     a participant in the case, nor is Count 2 involved in

1    the case; they should draw no inferences about that

2    or speculate as to what the circumstances were; they

3    are simply no longer matters for them to have to

4    resolve.  And if there are any of these other counts

5    that sort themselves out in the same way and are

6    dismissed, I will give them a similar instruction

7    about those counts.

8              MS. MOREHEAD:  Thank you, Judge.

9              THE COURT:  Anything else?  All right.

10             (The proceedings returned to open court.)

11             THE COURT:  Ms. Scheurer was showing me for

12   my approval the order that would discharge

13   Mr. Simpson so it can be processed and he can be let

14   out of custody.

15        Anything further?  Hearing none, I will see you

16   all on Tuesday.  We are in recess.

17             (Court was adjourned.)

18                  * * * * *

19

20

21

22

23

24

25

1      <u>TUESDAY, MAY 5, 2009</u>

2                (The following proceedings were had outside

3      the presence of the jury:)

4                THE COURT:  We're back in session outside

5      the hearing of the jury.  We have moved the seating

6      around.

7           Mr. Heathman, are you comfortable where you are?

8                MR. HEATHMAN:  I'm fine, your Honor.

9                THE COURT:  And, Mr. Sandage, works for

10     you?

11               MR. SANDAGE:  Yes, your Honor.

12               THE COURT:  I want to address the in-camera

13     submission that the government made initiated by

14     counsel for Mr. Foy.  The court has reviewed the

15     files related to Chauncey Anderson, who was a witness

16     in this case, which were produced in camera pursuant

17     to the order issued by me on May 4, 2009.  The court

18     has found no information which the government should

19     have produced to any of the defendants pursuant to

20     Brady, Giglio, the Jencks Act, or otherwise, under

21     Rule 16 or case law.  The government has represented

22     that it made its own thorough review and reached the

23     same conclusion before deciding not to furnish this

24     information to the defendants.  Based on the court's

25     review, it concurs.

1      The files are all part of an independent,

2   unrelated investigation in another district, and

3   there would be a danger that that investigation would

4   be compromised if information from these files were

5   simply turned over to the defendants for their own

6   perusal; therefore, the in-camera process which we

7   wound up following, I believe, was the procedurally

8   appropriate way to deal with this question.

9      I do note that the government indicates that it

10  did turn over a report of the January 12, 2009,

11  interview from this investigation.  It was in

12  redacted form, but it did contain certain references

13  to various individuals indicted in this case.  The

14  court found no other such references anywhere else in

15  the file, and I also agree that it was appropriate

16  for the government to have made the redactions that

17  it did in light of the unrelated information that was

18  contained there.

19      I next would like to turn my attention to the

20  Rule 29 issues which were argued last week before we

21  broke.  The court has received and reviewed

22  supplemental briefing submitted by the parties in

23  connection with the defendants' Rule 29 motions.  The

24  court is satisfied that, although it could find no

25  Tenth Circuit cases on point, our circuit would

1    follow what appears to be well established law in

2    other circuits that with respect to venue for the

3    telecommunications counts venue is proper both where

4    the call is placed or the call is received.  See, for

5    example, Andrews v. United States, 817 F.2d, 1277 at

6    1279, (7th Cir. 1987) stating, "Neither the language

7    of Section 843(b) nor its legislative history make a

8    distinction between placing and receiving a call.

9    Section 843(b) proscribes a continuing offense, and

10   as a result the crime is committed where the call

11   originates and where it is received.

12       The United States v. Barnes, 681 F.2d 717, 724

13   (11th Cir. 1982), holding that an 843(b) offense is

14   committed for venue purposes both in the district

15   where the call was made and in the district where the

16   call was received.

17       Thus, venue in our case is a question of fact.

18   The court retains under advisement the matter

19   concerning the sufficiency of the evidence presented.

20   I will instruct the jury on venue, and if the

21   defendants are convicted, then I will revisit this

22   subject posttrial upon proper motion.  I also believe

23   that substantially for the reasons argued by the

24   government in its supplemental submission that

25   attempt to possess with attempt to distribute is a

```
1            continuing offense and that venue is for these
2            offenses proper also in any district where the crime
3            began, continued, or was completed.  Once again then
4            venue is a question of fact.  I will instruct on it.
5            Again, I will retain under advisement the question of
6            sufficiency of the evidence and revisit the subject
7            posttrial, if necessary.  I also retain under
8            advisement the issues raised concerning the issue of
9            a cell phone as a communications device, for example,
10           that is, such things as whether more than one of the
11           participants must have used a cell phone, what state
12           of mind concerning a cell phone a participant must
13           have had, and the sufficiency of the evidence on any
14           of these matters.
15                In other words, I will submit to the jury the
16           cell phone counts, but I will retain under advisement
17           those Rule 29 motions.  The significance, of course,
18           of me retaining under advisement these various issues
19           that I have identified is that I will then decide
20           them posttrial on the factual record as of the close
21           of the government's case, not based upon any evidence
22           elicited by the defendants themselves should the
23           defendants present any evidence to the jury.  That's
24           obviously the significance of retaining it under
25           advisement rather than denying it, and so the factual
```

1    record is what it is.

2         That concludes what the court has dealt with

3    with regard to some of the issues we needed to take

4    up before the jury came back today.  I also would

5    note for the record that in my ongoing responsibility

6    to assess whether or not motions to sever were

7    imprudently denied by the court that it is my belief

8    that the way this trial has unfolded that the

9    defendants, none of them, have been unfairly

10   prejudiced by any potential spillover effect or

11   otherwise, and I continue to believe that the motions

12   to sever were appropriately denied.

13        I also wanted to run by you what I intend to

14   tell the jury about the Rule 29 motions that, in

15   fact, the court did grant.  I propose to instruct

16   them as follows when they return to the courtroom:

17        Members of the jury, Rtayvian Simpson is no

18   longer a participant in this case.  In addition,

19   Count 2 of the superseding indictment is no longer at

20   issue in this case.  You are not to speculate as to

21   why these things are as I have stated, and you may

22   not draw any inferences whatsoever as to any other

23   remaining defendants or remaining counts in this

24   case.

25        Is there any objection to that proposed

1          instruction?  I hear none.  All right.

2               Now, the next step is to ascertain what we're

3          doing with regard to defendants putting on evidence.

4               I'll start with you, Mr. Calbi.  What is

5          Mr. Wesley's intention?

6                    MR. CALBI:  Judge, we are not going to be

7          putting on any evidence.

8                    THE COURT:  Mr. Sandage?

9                    MR. SANDAGE:  We're not going to be putting

10         on any evidence.

11                    THE COURT:  Mr. Bell?

12                    MR. BELL:  We have no evidence, Judge.

13                    THE COURT:  Mr. Heathman?

14                    MR. HEATHMAN:  Yes, your Honor.

15                    THE COURT:  And Mr. Bellemere?

16                    MR. BELLEMERE:  Yes, your Honor.

17                    THE COURT:  And Mr. Johnson?

18                    MR. JOHNSON:  Yes, your Honor.  Again,

19         limited to just recalling Officer Jones.

20                    THE COURT:  Is there any particular order

21         we should go?

22                    MR. CALBI:  Mr. Bellemere asked this

23         morning if he could go first.  I think he has a

24         witness waiting to testify and he wants to get that

25         witness in and out.

```
 1              THE COURT:  Any objection, Mr. Heathman?

 2              MR. HEATHMAN:  No, your Honor.

 3              MR. JOHNSON:  We're indifferent, Judge.  We

 4        need literally one minute and that's it.

 5              THE COURT:  We will start with Mr.

 6        Bellemere, go to Mr. Heathman, and wind up with

 7        Mr. Johnson.  At the conclusion of all of that, I

 8        will come back again certainly to those of you that

 9        have indicated no evidence, and I will make inquiry

10        then of your clients concerning their understanding

11        of their right to have testified had they so chosen;

12        and also in the event that there's no evidence

13        presented or testimony presented by any of the other

14        defendants, I'll so inquire of them as well so that

15        before the defendants actually rest we will have had

16        the one last opportunity to revisit as to whether or

17        not that's what we should to.  Is there any reason

18        not to bring the jury in at this time?

19            Mr. Bellemere?

20              MR. BELLEMERE:  Would it be all right if I

21        just bring my witness in at this time?

22              THE COURT:  Sure.

23              (The following proceedings were had in the

24        presence of the jury:)

25              THE COURT:  Members of the jury, I
```

1    apologize for the delay in getting started.  Really,

2    the reason relates to my having been out of town for

3    the last several days on unrelated business and

4    needing to get a couple things resolved yet this

5    morning that would have been able to have been

6    resolved had I been here.  I apologize to you for

7    having to sit around.  I wish I had asked you to come

8    in a little bit later.  I want to give you an

9    instruction at this point, if you would entertain

10   this, please.

11       Members of the jury, Rtayvian Simpson is no

12   longer a participant in this case.  In addition,

13   Count 2 of the superseding indictment is no longer at

14   issue in this case.  You're not to speculate as to

15   why these things are as I have stated, and you may

16   not draw any inferences whatsoever as to any of the

17   remaining defendants or remaining counts in this

18   case.

19       Next I'm going to recognize Mr. Bellemere.  I

20   understand that Mr. McDaniel would like to call a

21   witness.

22              MR. BELLEMERE:  Yes, your Honor.  Thank

23   you.

24              THE COURT:  You may proceed.

25

```
 1                     HAROLD JAY FOSKETT,

 2    having been duly sworn, was examined and testified as

 3    follows:

 4                      DIRECT EXAMINATION

 5    BY MR. BELLEMERE:

 6    Q.   Mr. Foskett, would you tell the jury where you're

 7         employed.

 8    A.   I'm employed at Correctional Corporation of America,

 9         Leavenworth Detention Center.

10    Q.   What is Corrections Corporation of America?

11    A.   We're a private organization that houses inmates

12         through the United States.

13    Q.   In what capacity are you employed there?

14    A.   I am a classification coordinator.

15    Q.   What does a classification coordinator do, sir?

16    A.   Responsible for intakes, releases, paperwork, housing

17         of inmates, anything, basically, to do with inmate

18         records.  I'm responsible for all that.

19    Q.   I asked you to come to court and bring with you

20         certain records regarding -- I don't want to use the

21         word warehousing; that's not appropriate -- the

22         housing records relating to Thomas Humphrey and Keith

23         McDaniel.  Have I not done that?

24    A.   Yes, sir.

25    Q.   And have you brought those records with you in court
```

2512

```
 1        today?

 2   A.   Yes, sir.

 3   Q.   I want to show you what has heretofore been marked as

 4        McDaniel Exhibit 1436 and ask if you can identify

 5        that record for the court and the jury.

 6   A.   This is a housing record of Inmate McDaniel since

 7        he's been at CCA.

 8   Q.   Is that record kept in the ordinary course of CCA's

 9        day-to-day business?

10   A.   Yes, sir.  Any time they make some moves, they are

11        moved in the computer, and it's stored in the

12        computer.

13   Q.   So the records of CCA are computerized records?

14   A.   That's correct, sir.

15   Q.   What we're looking at when we look at Exhibit 1436 is

16        a computer printout; is that accurate?

17   A.   Yes, sir.

18   Q.   Is that record made at or near the times made on that

19        record?

20   A.   Yes, sir.

21   Q.   Contemporaneously?

22   A.   Yes, sir.

23   Q.   Is that record kept under your care, custody, and

24        control in your capacity in your employment at CCA?

25   A.   Yes, your Honor.
```

1          MR. BELLEMERE:  Move to introduced into

2     evidence what's been heretofore marked and identified

3     as Exhibit 1437.

4          THE COURT:  You mean 1436?

5          MR. BELLEMERE:  I'm sorry.  I'm holding

6     1437.

7          THE COURT:  Is there any objection?

8     Hearing none, 1436 is admitted.

9          (Exhibit 1436 was admitted into evidence.)

10  Q.  (By Mr. Bellemere) I want to hand you, Mr. Foskett,

11     what has heretofore been marked and identified as

12     No. 1437 and ask if you can identify that record.

13  A.  Yes, sir.  This is the housing record of Inmate

14     Thomas Humphrey.

15  Q.  Is that record kept in the ordinary -- during the

16     course of the day-to-day business of Corrections

17     Corporation of America?

18  A.  Yes, sir.

19  Q.  Is it kept under your care, custody, and control?

20  A.  Yes, sir.

21  Q.  And are the entries on that record made at or near

22     the time of the events reflected thereon?

23  A.  Yes, sir.

24          MR. BELLEMERE:  I move to introduce into

25     evidence what has heretofore been marked as

```
 1            Defendant's Exhibit 1437.

 2                    THE COURT:  Any objection?  Hearing none,

 3            Exhibit 1437 is admitted.

 4                    (Exhibit 1437 was admitted into evidence.)

 5    Q.   (By Mr. Bellemere) Now, then, when you look at those

 6            two exhibits -- let me see if I can do this.  I hope

 7            this will show up.  I don't know.  Let me see.  On

 8            the monitor, Mr. Foskett, I have the top exhibit,

 9            which is 1437, relating to Thomas Humphrey, and right

10            under that I have what is known as Defendant's

11            Exhibit 1436.  It relates to Keith McDaniel.  Can you

12            see that on your screen?  And I apologize.  It's not

13            particularly 100 percent clear, but let me ask you

14            this.  Can you tell from looking at this exhibit

15            whether or not Mr. Humphrey and Mr. McDaniel were

16            ever collectively together 100 percent at CCA during

17            the course of their stay there?

18    A.   Yes, sir, they were.  They were housed together in E

19            pod for a period of 2/21/08 to 2/27/08.  They lived

20            in the same unit together.

21    Q.   So your testimony is that they are in the same pod in

22            February of '08; correct?

23    A.   Yes, sir.

24    Q.   And they are there for how many days together?

25    A.   Approximately six or seven, from the 21st to the
```

1      27th.

2  Q.   Now, just so the jury will understand, could you do

3       me a courtesy, sir, and explain to me what you mean

4       by a pod.

5  A.   Yes, sir.  A pod is a living area where the inmates

6       are housed.  This particular pod has ten cells on the

7       bottom, on the back wall, ten cells on the top tier,

8       and each cell holds up to three inmates where they

9       sleep and reside at night, and counts and everything

10      else.  They are let out approximately six in the

11      morning where they can come out in a day room where

12      they can mingle with other inmates and stuff like

13      that, and watch TV, play card games, checkers.

14      During counts they are locked down, and from 11 to,

15      like I said, 6:00 a.m., they stay locked down in

16      their cells.

17 Q.   Okay.  You kind of did that quickly, but at nighttime

18      starting at 11:00 o'clock in the evening to 6:00

19      o'clock in the morning everybody is in their cells?

20 A.   Correct.

21 Q.   I understand that.

22 A.   Pretty much except for a couple people outside

23      cleaning the unit up.

24 Q.   Then in the morning they are let out at six or

25      thereafter?

```
1    A.   Give or take, yeah, 5:30, 6:00 o'clock, eat

2         breakfast.

3    Q.   Do they eat breakfast in the pod?

4    A.   Yes, sir.  They all stay in the day room.  They have

5         tables where they eat if they choose to do so.

6    Q.   You mentioned something about counts?

7    A.   Yes, sir.  Inmate head counts.

8    Q.   How do inmate head counts occur?  Explain that to the

9         jury.

10   A.   We have certain counts.  We have nine counts in a

11        day, and every count, when they call count, the

12        inmates are to go back down to their cells and get

13        locked in.  Officers go by and we do head counts, and

14        they stay locked down until the whole facility count

15        is cleared.  Once the facility count is cleared, they

16        are let back out of the day room, but at 11:00

17        o'clock they don't come back out until 5:30 or 6:00

18        o'clock in the morning.

19   Q.   From 5:30 or 6:00 o'clock in the morning until 11:00

20        o'clock at night, there's approximately nine times

21        that the prisoners are put back --

22   A.   During that time it's probably four or five times.

23        There's four other counts at night also while they

24        are still locked down.

25   Q.   While they are actually locked in their cell, there's
```

1       four?

2   A.  Yes, yes.

3   Q.  What about recreation?  Do they take all their meals

4       in the pod?

5   A.  Yes, sir.

6   Q.  Is there any outdoor recreation time or anything like

7       that?

8   A.  Yes, sir.  There is outdoor recreation Monday through

9       Friday, weather permitting, where two units go out.

10      Like, E pod and F pod will go out together on the

11      yard for an hour.

12  Q.  So that likewise is another -- so they have an

13      opportunity to mingle from 5 to 11 at night?

14  A.  Yes.

15  Q.  And that's indoors and outdoors; true?

16  A.  Yes, sir.

17  Q.  And you've given us the dates that these two parties

18      were in the same pod together; true?

19  A.  Yes, sir.

20  Q.  Let me ask you this.  When you have different pods,

21      are there different opportunities for these people to

22      mingle?

23  A.  I don't quite understand that.

24  Q.  Let me see.  What pod did Mr. McDaniel move to from E

25      pod on November 27?

```
 1   A.   H pod.

 2   Q.   What is H pod?

 3   A.   H pod is a workers' pod.

 4            MS. MOREHEAD:  Mr. McDaniel wasn't in CCA

 5        in November of 2007.  I think he meant Mr. Humphrey,

 6        but I think he said Mr. McDaniel.

 7   Q.   (By Mr. Bellemere) Well, was Mr. McDaniel in your

 8        facility in February of 2007 -- I mean February of

 9        2008?  I'm sorry.  That's the date I have, the

10        dates --

11            THE COURT:  I think Ms. Morehead is

12        correct.

13   Q.   (By Mr. Bellemere) Let me strike that and go back.

14        We're talking about, Mr. Foskett, we're talking about

15        2008 here; right?

16   A.   2008, yes, sir.

17   Q.   Okay.  Then I've gotten it confused when I said 2007,

18        and I'm sorry.  That was my mistake.  But everything

19        that you've testified to regarding the place where

20        Mr. Humphrey and Mr. McDaniel were kept in 2008 with

21        regard to E pod is accurate, I mean relates to

22        February; is that true?

23   A.   February of '08, yes, sir.

24   Q.   All right.

25            MR. BELLEMERE:  I have no further
```

1          questions, your Honor.

2                    THE COURT:  Any cross examination?

3                    MS. MOREHEAD:  No, your Honor.

4                    THE COURT:  All right.  Mr. Foskett, you

5          may step down, and without objection you're excused.

6          Mr. Bellemere, does Mr. McDaniel wish to --

7                    MR. BELLEMERE:  I have some additional

8          evidence that I wish to consider -- have the court

9          consider, and I think probably we need to approach.

10                   THE COURT:  All right.

11                   MR. BELLEMERE:  Your Honor, I'm showing you

12         what's been marked as Defendant's Exhibit 1414, and

13         what that is, your Honor, is a third and final

14         ten-day progress report filed by Ms. Morehead in the

15         matter before the judge in this jurisdiction having

16         to do with the wiretaps, and I propose to read into

17         evidence on page -- I'm sorry, I've lost it again.  I

18         don't know why I'm having such a tough time with

19         this -- on Page No. TP40334, Paragraph C.  And my

20         thinking on that is that it is the government's

21         position that my client asked Mr. Wesley to sell him

22         a kilo of cocaine, and in this report it advises that

23         Mr. Wesley was trying to sell my client a kilo of

24         cocaine for $23,000, and it makes no representation

25         of any acceptance with regard to the offer either

1     way.  This is a report filed on December 5 making

2     reference to a telephone conversation occurring on

3     the 26th day of November, 2007.

4          MS. MOREHEAD:  Judge, first of all, I guess

5     my first argument is that this is irrelevant to any

6     of the issues.  You know, Mr. Bellemere claims that

7     we're alleging that Mr. McDaniel offered to buy a

8     kilo, and, in fact, Mr. Wesley offered to sell a

9     kilo, which is the same -- was the same sequence of

10    events.  This has to do with the phone call where Mr.

11    Wesley specifically indicated that the ticket was

12    23,000, Mr. McDaniel indicated that he was hoping to

13    make 30,000 but that he would take one, and that was

14    the substance of the call.  There's nothing that this

15    report bears in any regard to the evidence that's

16    been presented.

17         The other thing, these ten-day reports are

18    reports to the presiding judge to update him on the

19    case, to give him snippets of, you know, things that

20    occurred throughout the course of the wire, number

21    one, to show the need for continued interceptions.

22    And, in fact, this one was offered because there was

23    no longer a need to intercept, and so some of these

24    calls were included for that reason.

25         If we're going to open up this whole big can of

```
 1          worms, pulling out one 10-day report out of dozens
 2          that were filed on all target phones and taking a
 3          single sentence from a single reference in a single
 4          paragraph, clearly any probative value -- and I'm not
 5          seeing what the probative value is here -- any
 6          probative value would be outweighed by the
 7          prejudicial effect and the unfair inference that this
 8          gives.
 9               THE COURT:  Thank you.  I sustain the
10          objection, Mr. Bellemere, for three reasons at least.
11          First of all, I see no relevance to what you've
12          indicated, and I see no relevance to this document
13          for several reasons.  First of all, this is a report
14          made on December 5, 2007, by counsel for the
15          government to a judge overseeing a wiretap concerning
16          certain information which the government believes
17          would justify its continued wiretap.  There is no
18          basis to introduce against the government the
19          lawyer's statement preindictment about what it
20          thought was going on in any respect here.  We have
21          heard this phone call; we have heard this phone call
22          numerous times; and it is what it is.  I see nothing
23          in how the government characterized it here that
24          should be in any way introduced based upon that
25          having been a representation by counsel about what it
```

1     was making of this phone call.

2          This is not the same situation as if we had a

3     statement here by Mr. Jones or Mr. McCue that would

4     be inconsistent with the prior testimony by them.

5     This is a statement by counsel for the United States.

6     Furthermore, any minuscule probative value that I

7     believe this would have would be greatly outweighed

8     under Rule 403 by the necessity to explain the entire

9     process of the wiretap and the extent to which these

10    kinds of disclosures are made to the judge for what

11    purpose, what the duty of completeness or accuracy

12    with regard to a particular characterization of the

13    call is, and I believe it would lead us into a

14    lengthy trial on various issues that would involve

15    Ms. Morehead becoming a witness in the case to

16    testify.  For all these reasons I see no basis to

17    proceed and your offer is rejected.

18          MR. BELLEMERE:  I would like to say to the

19    court this.  I'm not trying to argue with the court.

20    I want to make my position clear, if it's all right

21    with the court.  My position on the document itself

22    was that it was a statement made by the U.S.

23    Attorney.  I have a case in there where a U.S.

24    Attorney can make an admission against interest in a

25    separate case in closing arguments, and I feel that

1       that's what this is when it's a pleading.  I just

2       want to --

3                  THE COURT:  I see absolutely no basis for

4       that.

5                  MR. BELLEMERE:  Okay.

6                  THE COURT:  I do not contest the notion

7       that the U.S. Attorney could make a statement against

8       interest in a particular setting, but that is a

9       different setting than the one we have here for all

10      of the reasons that I indicated, number one, because

11      in my view the probative value is miniscule.

12      Frankly, I see nothing inconsistent with it or which

13      supports Mr. McDaniel's version of the case.  And,

14      moreover, it would by necessity lead to an

15      explication by the U.S. Attorney as to what the

16      circumstances were and why the particular language

17      may have been chosen, which would lead us on a path

18      that would be highly inappropriate here.  So your

19      offer is rejected.

20                 MR. HEATHMAN:  Your Honor, I have one brief

21      thing.  I think Ms. Temple is next.  I didn't know

22      until this morning whether or not she would testify.

23      That's a decision we have been making.  I am aware of

24      a conviction that she has, I think on a check back in

25      the late nineties, '96, I believe it was, and then I

REBECCA S. RYDER, CCR, RMR
UNITED STATES COURT REPORTER
913-551-5645

1    think there might be some shoplifting before that.  I

2    would like a ruling on whether or not the government

3    intends to try to impeach her with that.

4              MS. MOREHEAD:  There are two convictions,

5    one in '98, which was a forgery, and then one in --

6              MR. HEATHMAN:  That's the check.

7              MS. MOREHEAD:  -- one in '97, which was a

8    felony theft, and both of those, I believe, are

9    probative, and I was going at the appropriate time to

10   ask for permission to impeach her on those matters.

11   I looked through the other convictions that she's

12   had, frankly, and I don't think that there are any

13   others -- if I could just take one minute?  I wasn't

14   expecting to have this.

15        Actually, there were several others.  One was a

16   theft in 1991 in Overland Park, a theft in 1995 in

17   Overland Park, and then the forgery in Clay County,

18   Missouri, in '98, and then a felony theft in Johnson

19   County, which was in '97.  Then there was a

20   misdemeanor, resisting an officer, in '04.  I didn't

21   intend to get into that.

22              THE COURT:  With regard to the convictions

23   you've referenced here, it sounds like the dates of

24   the convictions are all in excess of ten years.  What

25   about release of a witness from confinement?  Are any

1    of those within ten years?

2              MS. MOREHEAD:  The '98 she got five years'

3    confinement, which was suspended with five years of

4    probation, so the probation time does coincide, does

5    go beyond that.  It was within ten years of the

6    conspiracy.  The conspiracy is '06 to '07, so both of

7    those, the '97 and the '98 felony convictions, would

8    both be within ten years from the date of the

9    conspiracy.

10             THE COURT:  I do not read Rule 609 to date

11   the ten years from the date of the alleged offense

12   but rather from the date of the trial.

13             MS. MOREHEAD:  Judge, frankly, just because

14   those are crimes that involve truth or veracity --

15             THE COURT:  Not necessarily.

16             MS. MOREHEAD:  Forgery and felony theft?

17             THE COURT:  Yeah.  Felony theft doesn't

18   necessarily involve truth and veracity.  I don't

19   think it does under Kansas law.

20             MS. MOREHEAD:  Yeah, it does.  It

21   absolutely does.

22             MR. HEATHMAN:  I don't believe it's an

23   automatic --

24             THE COURT:  It's been a long time since

25   I've thought about that under Kansas law.

1          MR. HEATHMAN:  I think it's something that

2     can be considered, but I don't think it's an

3     automatic crime involving dishonesty.

4          As far as the forgery count goes, your Honor, I

5     don't believe that's within ten years from the date

6     of the trial, and I don't -- I think its prejudicial

7     effect far outweighs any probative value.  It says

8     she had a bad check or wrote a name on a check that

9     wasn't hers ten years ago.  This is a two-year,

10    ten-hour-a-day, seven-day-a-week cocaine trafficking

11    investigation.  Those are so far removed from each

12    other that it would be more prejudicial than any --

13          THE COURT:  Tell me about the theft

14    conviction.  When was it?

15          MS. MOREHEAD:  In '97 in Johnson County.

16    It was a felony theft.

17          THE COURT:  And it clearly is more than ten

18    years before the date of the trial.  I do believe the

19    probative value of that conviction substantially

20    outweighs its prejudicial effect.  I wouldn't let you

21    use it.  I think similarly -- I think the forgery

22    conviction also fits the "more than ten years ago,"

23    and I also believe that whether I balance it that way

24    or whether I balance it under 609(a)(1) I'm not going

25    to permit you to inquire about it if Ms. Temple

```
 1            testifies.
 2                       (The proceedings returned to open court.)
 3                       THE COURT:  Mr. Bellemere, anything further
 4            from Mr. McDaniel?
 5                       MR. BELLEMERE:  Nothing further, your
 6            Honor.
 7                       THE COURT:  All right.  Mr. Heathman, let's
 8            take just a brief recess here, if we could.
 9                       MR. HEATHMAN:  Thank you, your Honor.
10                       THE COURT:  I told you it was going to be a
11            little bit unusual this morning.  Ms. Scheurer,
12            please take charge of the jury.  The admonitions
13            apply.  We will be back with you shortly.
14                       (The following proceedings were had outside
15            the presence of the jury:)
16                       THE COURT:  Mr. Heathman, would you like a
17            couple more minutes?  I'll step down if you would.
18                       MR. HEATHMAN:  Yes, sir, just a few.
19                       THE COURT:  That would be fine.  We're in
20            recess.
21                       (A recess was taken.)
22                       THE COURT:  Mr. Heathman, what is Ms.
23            Temple's plan with regard to testifying?
24                       MR. HEATHMAN:  We are going to put on
25            evidence, your Honor.  Ms. Temple will testify.
```

1        THE COURT:  Let me use this opportunity to

2    inquire of Ms. Temple about her understanding of her

3    rights.

4        Ms. Temple, would you stand, please.  I want to

5    make sure you understand that under the Constitution

6    of the United States that you have a right in this

7    trial either to testify, that is, to take the stand,

8    have the oath administered to you and testify, or to

9    refrain from testifying, remaining silent and forcing

10   the government to convict you without any assistance,

11   possibly, from something you might say.  These are

12   your rights; they are personal to you; and it's your

13   decision which direction you wish to proceed, that

14   is, whether you wish to testify or to refrain from

15   testifying.  You should consult with your lawyer

16   about that, but in the end this is your decision, and

17   your decision alone, to make.  What decision have you

18   made concerning whether or not you wish to testify?

19        DEFENDANT TEMPLE:  I am kind of confused.

20   I'm kind of confused about it.

21        THE COURT:  Again, this decision should be

22   entirely yours.  You understand if you do testify

23   you'll be subject to cross examination by counsel for

24   the United States?  If you do not -- and this needs

25   to be your decision however you do this, but I want

1      to make sure you understand that aspect here, and if

2      you do not testify, the jury will be instructed that

3      they cannot draw any inference from your failing to

4      testify.  Those are two things which I perhaps didn't

5      explain fully earlier, but this is your decision.

6                DEFENDANT TEMPLE:  I'll testify.

7                THE COURT:  All right.  And has anyone made

8      any promises to you or threats against you or

9      anything that makes you want to go ahead and testify

10     here?  Is this just your own personal decision of

11     what you want to do?

12               DEFENDANT TEMPLE:  Yes.

13               THE COURT:  Just your personal decision of

14     what you want to do?

15               DEFENDANT TEMPLE:  [Nodded head.]

16               THE COURT:  And you've considered your

17     lawyer's advice, and you've decided that that's what

18     you think is in your best interests here, to testify;

19     is that correct?

20               DEFENDANT TEMPLE:  Not really.

21               THE COURT:  Well --

22          If you want to have some conference with her in

23     confidence, of course, just so indicate, but I think

24     for the record it would be appropriate for the

25     reporter to take down your remarks as well as hers.

1          MR. HEATHMAN:  Thank you, your Honor.  I

2     was just asking Ms. Temple if she has considered my

3     advice, that we have discussed this issue for some

4     time now, and she has considered the advice that I

5     have given regarding the issue of her testifying.

6          DEFENDANT TEMPLE:  Yes, sir.

7          MR. HEATHMAN:  And considering that advice

8     and considering the judge's comments today, do you

9     wish to testify?  I can't give the decision for you.

10          DEFENDANT TEMPLE:  I know that.  It's --

11     yes.

12          THE COURT:  And this decision is your own

13     free and voluntary decision that you have made; is

14     that correct?

15          DEFENDANT TEMPLE:  Yes.

16          THE COURT:  Very well.  Then I will accept

17     your -- that you understand what your rights are and

18     that you are waiving your right to remain silent and

19     that you will voluntarily take the stand.  Am I

20     correctly understanding you?

21          DEFENDANT TEMPLE:  Yes.

22          THE COURT:  Very well.  All right.  Thank

23     you.  You may be seated.  Just give us a minute here.

24     May we proceed, Mr. Heathman?

25          MR. HEATHMAN:  Yes, your Honor.

```
 1                      THE COURT:  Very well.  Let's bring in the
 2          jury.
 3                      (The following proceedings were had in the
 4          presence of the jury:)
 5                      THE COURT:  I'll now recognize
 6          Mr. Heathman.
 7                      MR. HEATHMAN:  Thank you, your Honor.  I
 8          would call his Latysha Temple, your Honor, to the
 9          stand.
10                      THE COURT:  Ms. Temple, please come up to
11          the witness stand.
12                      LATYSHA DENISE TEMPLE,
13  having been duly sworn, was examined and testified as
14  follows:
15                      DIRECT EXAMINATION
16  BY MR. HEATHMAN:
17  Q.   Latysha, where do you reside?
18  A.   At the present time I am in Kansas City, Missouri.
19  Q.   And is that a different location than where you
20       resided back in -- prior to November of 2007?
21  A.   Yes, it is.
22  Q.   Where did you reside in November of 2007?
23  A.   At 3116 South Arrowhead Court.
24  Q.   When did you move to the Arrowhead Court address?
25  A.   October of '06.
```

```
 1   Q.   So in the summer of 2006 where were you living?

 2   A.   At 744 Sunnyside Road in Blue Springs, Missouri.

 3   Q.   A different address than where you were living in the

 4        fall of '07?

 5   A.   Yes, sir.

 6   Q.   How many people lived with you at the Arrowhead

 7        address?

 8   A.   Including myself, four.

 9   Q.   And who were those?

10   A.   My daughter Kierra Johnson, my son Roland Mitchell,

11        my other son Ronald Mitchell, and occasionally my

12        grandson.

13   Q.   So you had four children residing with you?  Did I

14        understand that correct?

15   A.   Yes.

16   Q.   And then you would be the fifth person living in the

17        household?

18   A.   Yes.

19   Q.   Describe for me this house at Arrowhead.

20   A.   It was a split-level home, four bedrooms, two bath,

21        two-car garage.

22   Q.   Were you buying that home?

23   A.   No.

24   Q.   Were you renting that home?

25   A.   Yes.
```

```
 1    Q.   You kind of got ahead of me with the family members,

 2         but you have four children; is that right?

 3    A.   No.  I have five children.

 4    Q.   Where is your fifth child?

 5    A.   My -- well --

 6    Q.   At this time where was the fifth child living?

 7    A.   She was living with her grandmother, going to school.

 8    Q.   Okay.  And did you have a daughter also going to

 9         college?

10    A.   Yes.  That was her.

11    Q.   That was the daughter living with your grandmother?

12    A.   That was my daughter who, yes, lived with her

13         grandmother.

14    Q.   Where was she going to school?

15    A.   Clark Atlanta University.

16    Q.   Okay.  Atlanta, Georgia?

17    A.   Yes, sir.

18    Q.   Now, during 2007 were you employed?

19    A.   Yes, sir.

20    Q.   In '06 were you employed?

21    A.   Yes, sir.

22    Q.   '05 were you employed?

23    A.   Yes, sir.

24    Q.   Back to 2002 had you always been employed?

25    A.   Yes, sir.
```

```
1    Q.    Was that at the same company?

2    A.    Yes, sir.

3    Q.    Where was that?

4    A.    Diagnostic -- St. Luke's Outpatient Imaging Center.

5    Q.    What did you do for St. Luke's Diagnostic Imaging

6          Center?

7    A.    I was a contracted film delivery carrier.  I was

8          their offsite management for their offsite field

9          location.

10   Q.    And were you an employee of theirs, or were you a

11         contractor of theirs?

12   A.    I was privately contracted.

13   Q.    Do you recall what your income was from St. Luke's

14         Diagnostic Imaging?

15   A.    My weekly was $800 a week.  My yearly gross was

16         $41,600.

17   Q.    Were there some years where it might not add up all

18         the way to forty-one six?

19   A.    Yes.

20   Q.    Sometimes you may take off and not get paid,

21         something like that?

22   A.    Yes.

23   Q.    I want to hand you what has previously been marked as

24         Defendant Temple Exhibit 1302.  That's been provided

25         to the government.  All right?  Can you look through
```

```
 1        that?  I'm going to represent to you it's a packet.

 2        There are several documents in that exhibit.  Can you

 3        tell the jury what that is.

 4   A.   These are my paystubs from '07, dating all the way

 5        back to '02.

 6   Q.   Is it every single paystub that you've had?

 7   A.   No.  These are just all the ones that I kept.

 8   Q.   All right.  All the ones that you could find?

 9   A.   Yes, sir.

10              MR. HEATHMAN:  I would move for the

11        admission, your Honor, of Defendant's Exhibit Temple

12        1303.

13              THE COURT:  Any objection?  Hearing none,

14        Exhibit 1303 is admitted.

15              (Exhibit 1303 was admitted into evidence.)

16   Q.   (By Mr. Heathman) I want to hand you now

17        Exhibits 1304, A, B, C, and D.  Can you identify what

18        those are for me, please.

19   A.   These are my tax return transcripts.

20   Q.   Is there a stamp on there that shows where those came

21        from?

22   A.   Yes.

23   Q.   And I apologize.  I've got one more.  It's 1304E.

24        I'm going to add that to your stack.  Is that also a

25        tax return transcript?
```

2536

1    A.    Yes, sir.

2    Q.    Were those obtained from the Internal Revenue

3          Service?

4    A.    Yes, sir.

5    Q.    Do those exhibits fairly and accurately reflect the

6          amount of your income that you were reporting to the

7          government?

8    A.    Yes, sir.

9                    MR. HEATHMAN:   I would move for the

10         admissions, your Honor, of 1304A through E.

11                   THE COURT:   Is there any objection?

12         Hearing none, Exhibit 1304 is admitted.

13                   (Exhibit 1304 was admitted into evidence.)

14   Q.    (By Mr. Heathman) And just so the jury is clear, I

15         don't want to go all the way through 1303,

16         Exhibit No. 1303, but do you see the document on the

17         monitor in front of you?

18   A.    Yes, sir.

19   Q.    Is that a paystub that you were talking about?

20   A.    Yes, sir.

21   Q.    And it shows your income of $800?

22   A.    Yes, sir.

23   Q.    And the remainder of these documents -- or excuse me.

24         The remainder of the exhibit is just more copies of

25         your paystubs?

1    A.   Yes, sir.

2    Q.   And are each of those for $800?

3    A.   Yes, sir.

4    Q.   Exhibit 1304B on the monitor in front of you, is that

5         your return for tax period -- do you see next to that

6         purple dot?

7    A.   Yes.

8    Q.   What tax period is that for?

9    A.   2006.

10   Q.   And in 2006 did you report self-employment income?

11   A.   Yes.

12   Q.   Do you know whether or not that's contained on a

13        Schedule C for the IRS?

14   A.   I'm not sure.

15                  MS. MOREHEAD:   What is that exhibit number?

16                  MR. HEATHMAN:   This is 1304B.

17   Q.   (By Mr. Heathman) Where it shows the income, gross

18        receipts or sales, do you see where I've put my piece

19        of paper?

20   A.   Yes, sir.

21   Q.   Okay.  What's the amount right over here?

22   A.   41,600.

23   Q.   Is that consistent with $800 a week, 52 weeks?

24   A.   Yes, sir.

25   Q.   All right.  Now, in 2007 -- did you earn $41,600 in

```
 1        2007?

 2   A.   No.

 3   Q.   Okay.  Why not?

 4   A.   Because my job position was terminated.  I was laid

 5        off.

 6   Q.   When did that occur?

 7   A.   August 10 of '07.

 8   Q.   And do you know why you were laid off?

 9   A.   Yes, because -- the Diagnostic Image -- excuse me.

10        I'm having a hard time today.

11   Q.   Are you nervous?

12   A.   Yes, I am.

13   Q.   Why are you nervous?

14   A.   Because I'm up here I'm fighting for my life.

15   Q.   Okay.  Is it scary for you?

16   A.   Yes.

17   Q.   All right.  You need to take a breath?

18   A.   Okay.

19   Q.   Do you need some water?

20   A.   No.  I'm fine.

21   Q.   Why didn't you earn the same $41,600 in 2007?

22   A.   Because my job ended, and I was working at St. Luke's

23        Imaging Center, and they went to the PACS system.

24        The PACS system is computerized imaging system where

25        they didn't need -- had no need for live film
```

1          anymore.  Everything was on the computer.

2     Q.   Following your being laid off, I suppose, in August

3          of 2007, did you look for employment?

4     A.   Yes.

5     Q.   Did you work for any other company beyond August of

6          2007?

7     A.   No.

8     Q.   Did you find a job in October of 2007?

9     A.   Yes, I did.

10    Q.   Where did you find employment in October of '07?

11    A.   At Diagnostic Imaging Center as its a medical records

12         clerk.

13    Q.   And where was that?

14    A.   301 Northeast Mulberry in Lee's Summit, Missouri.

15    Q.   So on Exhibit 1304A the tax period ending December 31

16         of '07, you see where I've put the little dot?

17    A.   Yes, sir.

18    Q.   That tax return would be less than the $41,600?

19    A.   Yes, sir.

20    Q.   Up until the time of your termination does it show

21         gross receipts and sales on page 5 of 6 of the

22         exhibit?

23    A.   Yes.

24    Q.   Okay.  I'm just going to put my paper across here

25         again.  See where I've put my dot on income?

1    A.   Yes, sir.

2    Q.   And if you look across to the gross receipts and

3         sales, what's that thing here?

4    A.   25,600.

5    Q.   Does that reflect the notion that you were laid off

6         in August then?

7    A.   Yes, sir.

8    Q.   Did you, Ms. Temple, operate any other business or

9         any other ventures during this time, 2006 and 2007?

10   A.   Yes, sir.

11   Q.   What was that?

12   A.   I was an Exquisite party planner.

13   Q.   Pardon me?  A party planner?

14   A.   Yes, sir.

15   Q.   Can you tell me what a party planner does.

16   A.   A party planner, I do bachelor parties, birthday

17        parties, anniversary parties, car shows, all kind of

18        events, comedy shows, bring in entertainment.

19   Q.   I want to hand you what's been marked as

20        Exhibit 1305B.  Can you identify what that is for me.

21   A.   The top part is my TNT Production.

22   Q.   Okay.  Is the bottom part some writing that's

23        contained on the back of that card?

24   A.   Yes.

25   Q.   Okay.  And I'm assuming then that you had business

1       cards made up?

2   A.   Yes, sir.

3   Q.   Is your name on that card?

4   A.   Yes, sir.

5   Q.   Is your phone numbers on that card?

6   A.   Yes, sir.

7   Q.   Or are your phone numbers on that card?

8   A.   Yes, sir.

9               MR. HEATHMAN:  I would move for the

10       admission of Exhibit 1305B.

11              MS. MOREHEAD:  Judge, could we approach?

12              THE COURT:  You may.

13              (Counsel approached the bench and the

14       following proceedings were had:)

15              MR. HEATHMAN:  Here is the original card.

16       I just put both sides on one page for ease at trial.

17              MS. MOREHEAD:  Judge, I just want you to

18       know where I'm going.  What has been introduced is a

19       document showing that she filed with the IRS income

20       of 41,600.  This now indicates that she had other

21       income that year that was not reported, so we're

22       getting into now occasions where Ms. Temple was

23       committing fraud on the government, and I don't know

24       if that's his intention, but that's --

25              THE COURT:  Somehow I suspect not.

```
 1              MR. HEATHMAN:  It's not, and I don't know

 2      that we have gotten into her earning any income from

 3      this business yet.

 4              MS. MOREHEAD:  This says she was paid

 5      $1,500 cash for a job in 2006.  That does not factor

 6      in anywhere in what her income was reported in 2006.

 7              MR. HEATHMAN:  Your Honor, I think it says

 8      she paid cash to this individual.  It doesn't say --

 9              THE COURT:  For advertising.

10              MR. HEATHMAN:  Yeah.

11              MS. MOREHEAD:  I intend to get into that.

12      I just want you to know.

13              THE COURT:  Sure.  I think Mr. Heathman had

14      to understand that by introducing evidence that there

15      was other business activities being engaged in that

16      that would entitle the government to cross examine

17      about whether or not that income was appropriately

18      shown, but obviously Ms. Temple -- who knows what her

19      answer is going to be, but I find it probative

20      because if, in fact, she was intentionally not

21      disclosing her income to the government, that

22      certainly is probative of her truthfulness here

23      today, so I see no problem with inquiring along those

24      lines.

25              (The proceedings returned to open court.)
```

1           THE COURT:  Any objection to Exhibit 1305B

2      being admitted?

3           MS. MOREHEAD:  No objections.

4           THE COURT:  1305B is admitted.

5           (Exhibit 1305B was admitted into evidence.)

6           MR. HEATHMAN:  Thank you, your Honor.

7  Q.  (By Mr. Heathman) Ms. Temple, we went through your

8      returns at least to a certain degree that showed the

9      amount of money that you were making from your job at

10     the Imaging Center.  Do you remember that?

11 A.  Yes.

12 Q.  Did you report on your tax returns income for your

13     production business or your party planning?

14 A.  No.

15 Q.  Why didn't you report income for that?

16 A.  Because the money that I was generating from my job,

17     I would take that money and start my business with

18     party planning.  It never really got -- I didn't

19     intend to make any money for that year.  I just

20     wanted to get my name out, and I never made any money

21     off of it.

22 Q.  Did you do your own returns?

23 A.  No.

24 Q.  You had somebody else help you or --

25 A.  Yes.

1    Q.    Was it an accountant who did your returns?

2    A.    Yes.

3    Q.    All right.  And I believe you said that you paid

4          somebody money out in connection with this business;

5          correct?

6    A.    Yes.

7    Q.    And at the bottom portion, which is the opposite side

8          of the business card that we have talked about in

9          Exhibit 1305B --

10   A.    Yes.

11   Q.    -- does it show that you had paid $1,500?

12   A.    Yes.

13   Q.    And who did you pay that to?

14   A.    To Don Proctor [phonetic].  He was an advertiser for

15         KPRS radio for my car show.

16   Q.    Okay.  So if I understand you correct, you paid some

17         money out to get your name out there, but you didn't

18         really earn income to report?

19   A.    No.

20   Q.    I'm going to hand you what's been marked as

21         Defendant's Exhibit 1306, and I'm going to skip just

22         to C and D.  Can you identify what those are for me.

23   A.    Yes.  Both of these are certificates of title for

24         my -- one is for my 1999 Mercedes Benz, and the other

25         one is for my 1996 Mercedes Benz.

```
 1   Q.   And you recognize those documents as copies of the

 2        title?

 3   A.   Yes.

 4   Q.   Those are your vehicles?

 5   A.   Yes, sir.

 6             MR. HEATHMAN:  Your Honor, I would move for

 7        the admission of Exhibits 1306C and D.

 8             THE COURT:  Any objection?

 9             MS. MOREHEAD:  I just wanted to see the

10        original.

11             THE COURT:  I'm sorry.  Is there any

12        objection?

13             MS. MOREHEAD:  No, your Honor.

14             THE COURT:  Exhibits 1306C and D are

15        admitted.

16             (Exhibits 1036C and 1036D were admitted

17        into evidence.)

18   Q.   (By Mr. Heathman) On the monitor, ma'am, is

19        Exhibit 1306C.  What is this?

20   A.   A copy of my certificate of title.

21   Q.   For which vehicle?

22   A.   For the '96 Mercedes Benz.

23   Q.   Is that a car or an SUV?

24   A.   That's the car.

25   Q.   And what was your purchase date?
```

1    A.    6/15 of '05.

2    Q.    So this car was approximately, what, nine years old

3          when you purchased it?

4    A.    Yes, sir.

5    Q.    Do you recall how much you purchased this vehicle

6          for?

7    A.    No, sir.

8    Q.    And Exhibit 1306D, what is that?

9    A.    Another certificate of title, but this is to my 1999

10         Mercedes Benz, the SUV.

11   Q.    This is the white SUV we had seen pictures of?

12   A.    Yes, sir.

13   Q.    And what's the date of purchase?

14   A.    5/23 of 2006.

15   Q.    Is that it right there where I put the purple arrow?

16         It shows the date of purchase?

17   A.    Yes, sir.

18   Q.    Did you own that car in February of 2006?

19   A.    No, sir.

20   Q.    Were you receiving any other forms of assistance or

21         income during the years of 2006 and 2007?

22   A.    Yes, sir.

23   Q.    And where did that come from?

24   A.    From child support.

25   Q.    I'm going to hand you what I've marked as Defendant's

1          Exhibit 1307.  Can you identify what that is, please.

2          This is my order of child support payment.

3     A.   Okay.

4     Q.   Is this order in Exhibit 1307, is that for your

5          daughter, Erica?

6     A.   Yes, sir.

7                    MR. HEATHMAN:  I would move for the

8          admission of Exhibit 1307, your Honor.

9                    THE COURT:  Any objection?

10                    MS. MOREHEAD:  Judge, could we approach,

11         please?

12                    THE COURT:  You may.

13                    (Counsel approached the bench and the

14         following proceedings were had:)

15                    MS. MOREHEAD:  Judge, I'm not sure why

16         there's this discrepancy.  This order was for 2005.

17         When Ms. Temple was interviewed by pretrial services,

18         she reported that she actually received $382 in child

19         support, and so that was my question, if there's an

20         amended or a more recent order, because that's what

21         she reported to pretrial services.  I don't want to

22         inquire about inconsistent statements.  I think the

23         only one that -- that's one that shows -- what is it?

24         -- 293.

25                    MR. HEATHMAN:  She was also not under order

1        but receiving money for child support for her other

2        children from their father, and that makes up the

3        difference.

4                 MS. MOREHEAD:  Again, that would be income

5        that she did not report on her income taxes.

6                 THE COURT:  Gifts, who knows whether

7        that's -- what that is.  I'll let you inquire about

8        that.  You may cross examine her.

9                 (The proceedings returned to open court.)

10                THE COURT:  There being no objection to the

11       admission of Exhibit 1307, it is admitted.

12                (Exhibit 1307 was admitted into evidence.)

13   Q.  (By Mr. Heathman) And in 2006 and 2007, Ms. Temple,

14       were you receiving child support for your daughter

15       Kierra?

16   A.  Yes, sir.

17   Q.  Do you recall the amount?

18   A.  293.

19   Q.  Is that amount reflected on the order of child

20       support?

21   A.  Yes, sir.

22   Q.  Somewhere near the arrow I put on there?

23   A.  Yes, sir.

24   Q.  All right.  We will deal with proximity.  Did you

25       also receive any support from the other children's

1      father that wasn't court ordered?

2  A.   Yes, sir.

3  Q.   Was that sporadic?

4  A.   Yes, sir.

5  Q.   All right.  Now, you've obviously been in court the

6       entire time individuals have been testifying; is that

7       true?

8  A.   Yes, sir.

9  Q.   And I wanted to go through some of what has

10      transpired and give you a chance to give us your

11      thoughts on those.  Would that be all right?

12 A.   Yes, sir.

13 Q.   First, do you recall a phone call regarding Mr.

14      Wesley requesting you to get some money on or about

15      September 10 of 2007?

16 A.   Yes, sir.

17 Q.   I think that was Call No. 662.  Do you remember that?

18 A.   Yes, sir.

19            MR. HEATHMAN:  Can you pull up the

20      transcript for that, or do you have a way to do that,

21      the demonstrative exhibit?

22            MS. MOREHEAD:  I don't think we can pull up

23      just the transcript.

24            THE COURT:  The transcript, of course, is

25      demonstrative evidence to help in listening to the

```
 1        phone call.
 2                    MR. HEATHMAN:  I thought it might be faster
 3        to look at the writing instead of trying to replay
 4        all of these.  Maybe I'll do it this way.  Would the
 5        government have objection to me using the --
 6                    (Counsel conferred.)
 7   Q.   (By Mr. Heathman) Ms. Temple, you recall the phone
 8        call from September 10, 2007?
 9   A.   Yes, sir.
10   Q.   I believe Mr. Wesley, if I remember right, had asked
11        you to go somewhere in your house and find some money
12        that he had hidden there?
13   A.   Yes.
14   Q.   Did you know he had hidden some money in your house?
15   A.   No, sir.
16   Q.   Did he tell you where to find it?
17   A.   Yes, sir.
18   Q.   Did you find it?
19   A.   Yes, sir.
20   Q.   How much money were you -- were we talking about?
21   A.   Like, no more than $600.
22   Q.   Okay.  What did it look like?  Was it rolled up?  Was
23        it flat?
24   A.   It was, like, in some little stacks of hundred
25        dollars.
```

```
 1   Q.   Okay.  And there was maybe six of them, I guess?

 2   A.   Yes.

 3   Q.   Did you count it?

 4   A.   No.

 5   Q.   And he asked you to bring that money with you when

 6        you met him?

 7   A.   Yes.

 8   Q.   Did you do that?

 9   A.   Yes, sir.

10   Q.   And do you know where that money came from?

11   A.   No, sir.

12   Q.   Do you know how Mr. Wesley generated that income?

13   A.   No, sir.

14   Q.   Do you know if Mr. Wesley was employed anywhere?

15   A.   No, sir.

16   Q.   How do you think Mr. Wesley made his money?

17   A.   Well, I know that he had properties and he flipped

18        cars and he -- he had properties and he flipped cars.

19   Q.   What do you mean when you say he flipped cars?

20   A.   He will take old cars and make them custom and bring

21        them back to life and sell them.

22   Q.   How do you know he did that?

23   A.   Because I was with him times when he found old

24        junk-looking cars.

25   Q.   Did he ever ask you to assist him in his car
```

1        endeavors?

2    A.   No.

3    Q.   Did he ask you to pick up parts for cars?

4    A.   Yes.

5    Q.   Did you do that?

6    A.   Yes.

7    Q.   Do you recall any places that you would have gone to

8         to pick up parts for Mr. Wesley's car?

9    A.   I went to a Charger dealership off 71th and Main, 71

10        South and Main, in Grandview, Missouri.

11   Q.   Now, on this particular day, back to September 10,

12        this phone call that we're talking about where he's

13        asking you to get the money, was that for car parts?

14   A.   No.

15             MR. HEATHMAN:  Let me rephrase that, your

16        Honor.

17   Q.   (By Mr. Heathman) Why don't you tell me what that

18        money was for, if you know.

19   A.   September 10 was my daughter's birthday.  We went out

20        and celebrated her birthday.  She was away in

21        college.  She was getting sworn in on her birthday,

22        some kind of freshman college swear-in thing.  We

23        went and we uploaded her visa card, and we put money

24        on there so she could go out, but we also -- the rest

25        of the family went out and we took pictures and kind

```
 1           of did a little camcord video thing and uploaded it

 2           to the computer so she could see that we celebrated

 3           her birthday for her even though she wasn't there.

 4    Q.     And you know the date of September 10 because that

 5           was your daughter's birthday?

 6    A.     Yes, sir.

 7    Q.     Was that money that you took to Mr. Wesley to your

 8           knowledge pooled with any other money?

 9    A.     No, no, sir.

10    Q.     Do you know whether or not Mr. Wesley took any of

11           that five or six hundred dollars and used it in a

12           cocaine transaction?

13    A.     No, sir.

14    Q.     Did he ever do that in front of you?

15    A.     No, sir.

16    Q.     We haven't touched on this, but I know we need to.

17           Mr. Wesley, the evidence has been, had a lot of

18           girlfriends.  Is that fair to say?

19    A.     Yes, sir.

20    Q.     You were one of those girlfriends?

21    A.     Yes, sir.

22    Q.     Did that upset you?  Did that bother you?  Were you

23           okay with having a boyfriend in that manner?

24    A.     I guess it's kind of like when you get tired of them

25           you can send them home, kind of, you know.  It was --
```

1    Q.   All right.  My wife probably feels like that

2         sometimes.  You had a family; is that true?  You had

3         children?

4    A.   Yes, sir.

5    Q.   And was your main focus your family or Mr. Wesley?

6    A.   My family.

7    Q.   Then I want to jump ahead to the October 17 time

8         frame.  Do you recall that, October 17 of 2007?

9    A.   Yes, sir.

10   Q.   Do you recall an event happening at Mr. Foy's house

11        in or around that October 17 -- on or around that

12        October 17 date?

13   A.   Yes, sir.

14   Q.   All right.  And what's your relationship to Mr. Foy?

15   A.   His wife is my first cousin.

16   Q.   All right.  And what's his wife's name?

17   A.   Kecia Foy.

18   Q.   And I think the testimony has been it was the

19        overnight hours, 11:00 o'clock or so, sometime in

20        that time frame, on the 17th that the home invasion

21        occurred.  Is that consistent with your memory?

22   A.   Yes, sir.

23   Q.   And then you found out about it the following day?

24   A.   Yes, sir.

25   Q.   All right.  Were you concerned when you heard about

```
 1         these events at your cousin's house?
 2    A.   Very much so.
 3    Q.   Why?
 4    A.   Because that was my family's home and their children
 5         were there.
 6    Q.   Were you concerned for their safety?
 7    A.   Yes, sir.
 8    Q.   Did you become concerned for your own safety?
 9    A.   Yes, sir.
10    Q.   Why were you concerned for your own safety?
11    A.   Because if it can happen to them, it can happen
12         anywhere.
13    Q.   Where was your house in relation to the Foy
14         residence?
15    A.   Kind of in -- we're in the same area, just they are a
16         little ways down.
17    Q.   Same neighborhood but they are a little ways away?
18    A.   Yeah.
19    Q.   All right.  And during the day of the 18th do you
20         recall anyone coming to your home?
21    A.   The day of the 18th, yes, sir.
22    Q.   Who came to your home on the 18th?  And just so I'm
23         specific, it would be the 18th of October of 2007.
24    A.   Mr. Wesley and Mr. Foy.
25    Q.   How did they get to your home?
```

```
 1   A.   They were in Mr. Wesley's white Escalade.

 2   Q.   Do you know why they came to your home?

 3   A.   No.

 4   Q.   Did you leave that afternoon then with someone?

 5   A.   Yes, sir.

 6   Q.   Who did you leave with?

 7   A.   Mr. Wesley.

 8   Q.   Were you driving?

 9   A.   Yes, sir.

10   Q.   Why was Mr. Wesley with you, if you know?

11   A.   Because I was taking him up to my dad's shop where

12        his car was being repaired.

13   Q.   Your dad has a car shop?

14   A.   Yes.

15   Q.   Did you take Mr. Wesley to the car shop?

16   A.   Yes, sir.

17   Q.   On the way to the car shop did something happen

18        with -- did you see individuals with walkie-talkies

19        in other vehicles?

20   A.   Yes, sir.

21   Q.   Tell me about that, Ms. Temple.  How did that happen

22        as you remember it?

23   A.   Well, when they pulled up to my house, Mr. Wesley got

24        in the car with me, and he left Mr. Foy in his truck.

25        Mr. Foy pulled out first, and for some reason, I
```

1        don't know if I left my cell phone, I had to run back

2        in and get my cell phone, then come back out.  I got

3        in and we proceeded to go north up Arrowhead Court.

4        Then we turned and we go towards Hidden Valley.

5    Q.  Okay.  Was there a phone call that took place during

6        the time you're with Mr. Wesley then driving?

7    A.  Yes.

8    Q.  And who had called him?

9    A.  Mr. Foy.

10   Q.  Now, the jury's heard this phone call as to what Mr.

11       Wesley and Mr. Foy were saying; correct?

12   A.  Uh-huh.

13   Q.  You heard that, Exhibit 339?

14   A.  Yes, sir.

15   Q.  When you were in the car, could you hear anything

16       Mr. Foy was saying on the phone?

17   A.  No, sir.

18   Q.  So you didn't have privy to Mr. Foy's end of this

19       discussion; is that true?

20   A.  No, sir.

21   Q.  All right.  Did you have discussions then about being

22       followed or somebody being followed?

23   A.  Not specifically us.  When Mr. Foy called Mr. Wesley,

24       he asked about a red truck, and at the time I didn't

25       know what he was talking about.  We were driving, and

```
 1          I didn't see a red truck.  But then as they went

 2          through the light, Mr. Foy went through the light,

 3          and a red truck went behind him, and we pulled up

 4          west to a green truck that was like -- we're facing

 5          west, but to turn on 291, you would be going south.

 6          And when we pulled up next to the green truck, the

 7          walkie-talkie was up.

 8   Q.     All right.  Did you become concerned that Mr. Foy or

 9          yourself were being followed?

10   A.     No.  At first I was thinking that it was the same

11          guys who did the home invasion, so we didn't know who

12          it was.  He was, like, on a black -- we didn't know

13          because we didn't -- we seen the tail butt of the red

14          truck, but when we came parallel to the green truck,

15          we seen the walkie-talkie, and they were white, and

16          we said, they are white.

17   Q.     Did someone then remark to the effect that, oh, those

18          are the feds?

19   A.     Yes.

20   Q.     All right.  What did you take that to mean, when

21          someone said, those are the feds?

22   A.     The police.

23   Q.     Did you think that they were federal agents, DEA,

24          involving a cocaine conspiracy or --

25   A.     No.  I thought they were the police, but I was -- I
```

```
1              was kind of confused because why would the police be

2              following him if he was the victim of the home

3              invasion?  It was kind of -- it was weird, and it

4              freaked everybody out.  What was going on?  We didn't

5              know what was going on.

6    Q.   And then later in that same day was there a phone

7              call?  I believe it was 4073, and I will represent to

8              you that was a phone call where you're talking about

9              Mr. Wesley and Mr. Wesley asks something to the

10             effect of, why did they go back around to Rat's

11             house?  Do you recall that phone call?

12   A.   Yes, sir.

13   Q.   Who is Rat?

14   A.   Shevel Foy.

15   Q.   And in his discussion with you about why they went

16             back around to Rat's house, what was your response?

17             Do you remember?

18   A.   Because they know that we seen them.  They messed up.

19   Q.   Okay.  Why do you think they messed up?

20   A.   I just figured that they were -- I don't know.  I

21             just figured that they were just following him,

22             trying to see what was going on.  We didn't -- I

23             don't know.

24   Q.   All right.  Did you think those were the police

25             involving the home invasion that --
```

2560

```
 1   A.   Yes, sir.

 2   Q.   And do you recall they went back around to Rat's

 3        house and told Spud and them that they might be

 4        around in different vehicles?

 5   A.   Yes, sir.

 6   Q.   And did you -- do you have an opinion, I guess, of --

 7        let me rephrase that.  Why do you think they were

 8        telling Spud and them that they may be around in

 9        other vehicles?

10   A.   Because we seen them in other vehicles other than

11        police cars.

12   Q.   Did it scare you when you saw them in other vehicles?

13   A.   Not really.  I just thought it was weird.

14   Q.   Okay.  Would it have been nice for you to know that

15        maybe police were going to be around you and Mr. Foy?

16   A.   Yeah.  I didn't mind.

17   Q.   Okay.  And that's, in fact, what they did when they

18        went back and talked to Spud and them, wasn't it?

19   A.   Yes.

20   Q.   Okay.  And then we get to the next conversation,

21        which I believe is 4075, that happened around 2:40

22        that same afternoon, just a few minutes after that

23        phone call.  And this is the phone call involving the

24        bag of clothes?

25   A.   Uh-huh.
```

1    Q.   Do you recall that?

2    A.   Yes.

3    Q.   Now, did Mr. Wesley stay at your house?

4    A.   Not stay like --

5    Q.   All right.

6    A.   You know.

7    Q.   Did he spend the night occasionally at your house?

8    A.   Yes, he did.

9    Q.   All right.  And when he would spend the night

10        occasionally at your house, would he bring personal

11        items with him?

12   A.   Yes, he would.

13   Q.   Would he bring clothes?

14   A.   Yes, sir.

15   Q.   How would he bring these clothes?

16   A.   In a bag.

17   Q.   As he would wear these clothes, where did they go?

18   A.   Everywhere.

19   Q.   Were you happy about that?

20   A.   No.

21   Q.   Following the home invasion there are phone calls

22        involving you and Mr. Wesley and Mr. Foy; correct?

23        You've heard these phone calls that have been played?

24   A.   Yes, sir.

25   Q.   Were you also having other conversations with Mr.

1        Wesley when you weren't on the phone?

2   A.   Yeah.

3   Q.   Do you remember having a conversation on the 18th

4        with Mr. Wesley about an alarm system?

5   A.   Yes, sir.

6   Q.   What was that?

7   A.   That was just for reassurance that me and my children

8        would be safe, and it was regarding my having

9        somebody come out to the house and come in and walk

10       around so they could see where we needed the monitors

11       or what have you.  We also had a talk about his

12       clothes everywhere and he needed to get them.

13  Q.   Why did his clothes figure into the people coming out

14       for the monitoring?

15  A.   Because they needed to be out of the way so the

16       people can do what they needed to do.

17  Q.   All right.  So in that follow-up conversation then in

18       Exhibit -- I think it was Phone Call 4075, you told

19       Mr. Wesley that you had found a place for his bag of

20       clothes?

21  A.   Yes, sir.

22  Q.   What did bag of clothes mean?

23  A.   Clothes.

24  Q.   Did Mr. Wesley get in your car earlier that day?

25  A.   Yes.

```
 1    Q.   Did he get a bag of anything when he got into your
 2         car?
 3    A.   No, sir.
 4    Q.   Did he have a bag of marijuana that you were aware
 5         of?
 6    A.   I wasn't aware of it.
 7    Q.   Did he have a bag of a large amount of money when he
 8         got into your car?
 9    A.   No, sir.
10    Q.   Now, you were also here when Mr. Humphrey testified;
11         correct?  Thomas Humphrey?  You heard him?
12    A.   Yes, sir.
13    Q.   Were you ever the driver or the passenger in your
14         Mercedes SUV when Mr. Wesley would meet with
15         Mr. Humphrey?
16    A.   No, sir.
17    Q.   How many times did you meet Mr. Humphrey?
18    A.   Once.
19    Q.   Where was that?
20    A.   At the strip club.
21    Q.   Okay.  Did you go there to meet Mr. Humphrey?
22    A.   No, sir.
23    Q.   What was your purpose of going to the club?
24    A.   I was going to do a bachelor party, and I was going
25         to scout girls who would do a private party for the
```

1    guy I was doing the party for.

2  Q.  And while you were at the club, did Mr. Humphrey come

3      over to you or to Mr. Wesley?  Or tell me how that

4      happened.

5  A.  He came over to Mr. Wesley, and we were already

6      sitting down, and he just came and sat down and

7      talked with him.

8  Q.  All right.  And did you ever meet Mr. Humphrey

9      outside of that club?

10  A.  No, sir.

11  Q.  Did you ever meet him two times in the club parking

12      lot?

13  A.  No, sir.

14  Q.  Were you ever in any other vehicle with Mr. Wesley

15      when he was meeting with Mr. Humphrey?

16  A.  No, sir.

17  Q.  We also had Mr. Anderson.  Do you remember Chauncey

18      Anderson testifying?

19  A.  Yes, sir.

20  Q.  And I believe, if I'm correct, he said that there was

21      one incident where he saw something in a shoebox.

22      One time it was money, and one time it was cocaine.

23      Do you recall that?

24  A.  Yes, sir.

25  Q.  All right.  That particular incident was one

```
 1        incident, but he said you weren't home.  Do you
 2        recall ever being home when Mr. Anderson was at your
 3        house?
 4   A.   Do I recall --
 5   Q.   Inartful question.  Were you present when Mr.
 6        Anderson said he saw the cocaine or the money?
 7   A.   No, sir.
 8   Q.   To your knowledge has Mr. Wesley ever stored money at
 9        your house that you knew was connected to drug
10        transactions?
11   A.   No, sir.
12   Q.   Has he ever stored cocaine at your house?
13   A.   No, sir.
14   Q.   Did you ever participate in any cocaine dealings?
15   A.   No, sir.
16   Q.   On his behalf?
17   A.   No, sir.
18   Q.   Or with him?
19   A.   No, sir.
20   Q.   We also have a few photographs that were taken at
21        your house.  I want to show you Government's Exhibit
22        No. 62.  Do you recall that photograph?
23   A.   Yes, sir.
24   Q.   Whose purple car is that?
25   A.   Monterial Wesley.
```

```
 1   Q.   Is that one of the cars that he might fix up and try

 2        to flip?

 3   A.   Yeah.

 4   Q.   Okay.  And that was at your house?

 5   A.   Yes, sir.

 6   Q.   All right.  And what is -- okay.  Back where I kind

 7        of made those marks, what's back there in that

 8        corner?

 9   A.   Those are paint garments.

10   Q.   Whose garments are those back there?

11   A.   Some of them, mine, but some of them are his.  It's a

12        bag there.  That's the clothes that I took out of the

13        house.

14   Q.   When you say "his," who do you mean?

15   A.   Monterial Wesley.

16   Q.   When you say you found a place a better place for his

17        bag of clothes, is this area in the garage, hanging?

18        Is that the better place that you found?

19   A.   Yeah, but they are kind of stuffed down in.

20   Q.   Okay.  And you also told me about, or told the jury

21        about, chafing or chafing dishes.  Maybe you didn't.

22        Maybe I --

23   A.   Yeah.

24   Q.   All right.  In connection with your party planning

25        business?
```

1    A.    Uh-huh.

2    Q.    Did you -- do you know what chafing or chafing dishes

3          are?

4    A.    Yes, sir.

5    Q.    Okay.  And what are those?

6    A.    It's, like, if you are catering a party and you have

7          it buffet style, the food can have a live fire

8          underneath it to keep everything warm while the party

9          is going.

10   Q.    Did you have those at your house as well?

11   A.    Yes, sir.

12   Q.    Do you see in Government's Exhibit 63 any evidence of

13         chafing or chafing dishes?

14   A.    Yes, sir.

15   Q.    Where would that be?  Can you put a mark or circle

16         it?  If you can just touch the --

17   A.    [Witness complied.]

18   Q.    You pointed to some black, it looks like a round --

19   A.    Black wrap, yeah.

20   Q.    What are those black racks that you pointed to?

21   A.    Those are the chafing dishes.  It's, like, some

22         portable holders.

23   Q.    And you see this big item here?

24   A.    Yes.

25   Q.    What's that?

```
 1    A.   That's my wrap.

 2    Q.   When you say your wrap, do you know what kind of wrap

 3         is it?

 4    A.   It's like Saran wrap.  That's what I use after the

 5         party is done.  We wrap big stuff up with it, like

 6         the rest of the cake, anything that could not fit on

 7         a paper plate or in a box.

 8    Q.   Did you ever use that wrap to wrap up any kind of

 9         cocaine?

10    A.   No, sir.

11    Q.   Not crack, not powder --

12    A.   No, sir.

13    Q.   To your knowledge has anyone told you that there was

14         a test done where there was residue of cocaine on

15         that wrap?

16    A.   No, sir.

17    Q.   Has anyone told you they found cocaine in your house?

18    A.   No, sir.

19    Q.   Found a gun in your house?

20    A.   No, sir.

21    Q.   Did they find a dog in your house?

22    A.   No, sir.

23    Q.   Did they find scales?

24    A.   No, sir.

25    Q.   Electronic scales to weigh drugs?
```

1    A.    No, sir.

2    Q.    You know what I'm talking about?  Did they find that

3          in your house?

4    A.    No.

5    Q.    Multiple Baggies to package materials, package

6          cocaine?

7    A.    No, sir.

8              MR. HEATHMAN:  That's all the questions I

9          have, your Honor.  Thank you.

10             THE COURT:  All right.  Ms. Morehead?

11                    CROSS EXAMINATION

12   BY MS. MOREHEAD:

13   Q.    Ms. Temple, you've testified to this jury that you

14         submitted income tax documents to the IRS.  And you

15         know what I'm talking about when I say IRS; correct?

16   A.    Yes, ma'am.

17   Q.    The Internal Revenue Service?

18   A.    Yes, ma'am.

19   Q.    In 2006 you showed an income of $41,600?

20   A.    Yes, ma'am.

21   Q.    Net -- or gross; is that correct?

22   A.    Yes, ma'am.

23   Q.    And then all of 2007, gross income of $25,600.

24   A.    Yes, ma'am.

25   Q.    And looking first at Defendant's Exhibit 1304B, when

1    we look at this document that you have supplied to

2    the jury, there's a provision there that says "other

3    income."  Do you see that notation?

4  A.   Yes, ma'am.

5  Q.   And tell the jury what you reported to the IRS in

6    2006 as other income.

7  A.   Zero.

8  Q.   Okay.  Now, you indicated that in 2006/2007 all the

9    way up to August of 2007 you were employed at St.

10   Luke's in their film -- doing some film work or

11   something; is that right?

12 A.   Yes, ma'am.

13 Q.   And describe for the jury, if you would, what that

14   work involved.

15 A.   It involved delivering film from the off site

16   facility to the radiology department of St. Luke's

17   Hospital, to the Breast Cancer Center for Women, and

18   to St. Luke's Outpatient Imaging Center.  I retrieved

19   film from there; I store them; I get them for

20   upcoming appointments, for medical procedures if it's

21   surgical procedures.

22 Q.   Okay.  And when you say you deliver it, how far are

23   we talking about?  You were -- where was your office

24   physically located?

25 A.   Well, I really -- my office was from home, but I had

```
 1              another location that I will go in that they stored

 2              the stuff.  So I was on call 24 hours a day.  Any

 3              time they needed me, they would page me, and I will

 4              leave from home, no matter what -- no matter what

 5              time it is.  If the hospital needed film, I had to go

 6              and pull the film.

 7    Q.   Okay.  And so you would drive from home to St. Luke's

 8         and deliver the film then to St. Luke's; is that

 9         right?

10    A.   Yes, ma'am.

11    Q.   Okay.  And when you filed your income taxes in 2006

12         and 2007, you listed expenses; isn't that right?

13    A.   Yes, ma'am.

14    Q.   And the reason when people file their income taxes

15         they list expenses is because whatever your gross

16         income is, any expenses will be factored into the

17         amount of taxes that you pay in and then how much of

18         a refund you get back; correct?

19    A.   Correct.  Yes, sir.  Yes, ma'am.

20    Q.   And do you remember how much you put down by way of

21         expenses in 2006 for your tax year of 2006?

22    A.   No, ma'am.

23    Q.   Before we go there, we were talking about your two

24         Mercedes.

25    A.   Yes, ma'am.
```

1    Q.    And what were the monthly payments for your two

2          Mercedes?

3    A.    One was 218.  That's for the 1996.  And the other one

4          was 324.

5    Q.    And that was for the 1999?

6    A.    Yes, ma'am.

7    Q.    If my math does me right, your annual car payments

8          for those two payments would be $6,504.  Do you have

9          any dispute with that?

10   A.    You talking about yearly?

11   Q.    Yes.

12   A.    No.

13   Q.    And when did you get -- one of the cars you didn't

14         get until 1996; correct?

15   A.    1996?

16   Q.    I'm sorry.  2006.

17   A.    Yes.

18   Q.    Which car was that?

19   A.    That was the Mercedes, the car.

20   Q.    The '96 or the '99?

21   A.    The '96.

22   Q.    When did you get that?

23   A.    I don't know the exact date, but you have the title

24         paper.

25   Q.    That would be on the title; correct?

1    A.    Yes, ma'am.

2    Q.    All right.  It looks like the lien date was May of

3          '06.  Would that coincide with your recollection?

4    A.    No.  That's the Mercedes -- that's the SUV.  That's

5          the '99.

6    Q.    I'm sorry.  I thought you said it was the '99.

7    A.    No.  I said the '96.

8    Q.    I apologize.  So the '96?

9    A.    Uh-huh.

10   Q.    You had it since June of '05; correct?

11   A.    Yes, ma'am.

12   Q.    All right.  And then the '99 you got in May of '06?

13   A.    Yes, ma'am.

14   Q.    Right?  So five months in 2006 you didn't have that

15         car payment; correct?

16   A.    Yes, ma'am.

17   Q.    And that would amount to -- we subtract out those

18         five months for 2006, is what I'm talking about.  It

19         looks like your car payment for those two vehicles

20         would have been about $4,889 -- do you have new

21         dispute with that? -- in 2006.  Do you have any

22         dispute with that, paying, as you indicated $218 a

23         month for the '96 and $324 a month for the '99

24         Mercedes?

25   A.    No.

```
 1   Q.   All right.  And you indicated you don't recall what

 2        you put down for expenses for your vehicle.  Looking

 3        here, car and truck expenses for 2006 are listed at

 4        $19,190.

 5   A.   Yes.

 6   Q.   And what's that based on, Ms. Temple?

 7   A.   That's for my mileage; that's for my gas; and that's

 8        for the full coverage insurance on both the vehicles.

 9   Q.   So you claimed mileage and gas and what else?

10   A.   Well, it's the same thing.

11   Q.   Well, you said it's for mileage, gas, and what else?

12   A.   And my car insurance.

13   Q.   And car insurance?

14   A.   Yes.

15   Q.   Does that mean you were claiming -- for every mile

16        you drove that you counted that against your income

17        tax, and also any gas you put in your car?

18   A.   Yes, it is.

19   Q.   And you didn't see any problem with that?

20   A.   No.

21   Q.   How much mileage did you turn in in 2006?

22   A.   I don't remember.

23   Q.   How much gas did you claim in 2006?

24   A.   I don't remember.

25   Q.   How much car insurance did you claim in 2006?
```

```
 1    A.    I don't remember.

 2    Q.    Regardless, you recognized, obviously, the importance

 3          of keeping track of that kind of documentation to

 4          submit with your taxes; correct?

 5    A.    Yes.

 6    Q.    The expenses that you had?

 7    A.    Yes.

 8    Q.    Because you knew that would offset any income that

 9          you made; correct?

10    A.    Yes.

11    Q.    Now, out of $41,600 that you were grossing with your

12          income at St. Luke's, how much were you netting?

13          What was your net pay?

14    A.    What do you -- like yearly -- what do you --

15    Q.    After taxes are taken out and the like, what was your

16          net pay?

17    A.    Well, I would get a 1099 at the end of the year.

18    Q.    So that was why you were keeping track of your

19          expenses, so that that would offset the taxes that

20          you're paying; correct?

21    A.    That's because that's what my tax guy told me to do.

22    Q.    All right.  Well, we talked about this business that

23          you had.

24    A.    Uh-huh.

25    Q.    What was the name of that again?  TNT?
```

1    A.    Productions, yes.

2    Q.    And that was your professional party planning that

3          you were doing; correct?

4    A.    Yes, ma'am.

5    Q.    You said, I thought your testimony was, I wasn't

6          intending to make any money on that business.  Was it

7          your intention to lose money then, Ms. Temple?

8    A.    My intention was to get my -- I didn't say that I

9          didn't intend to make any money.  I understand that

10         when you start a business do not expect to make money

11         that first part.  It was just to get my name out

12         there.

13   Q.    Let's talk about getting your name out there.  In

14         2006 with regards to this business that you had you

15         mentioned that you did birthday parties, bachelor

16         parties, anniversary parties, all sorts of things;

17         correct?

18   A.    Yes, ma'am.

19              MS. MOREHEAD:  I don't see that document.

20              MR. HEATHMAN:  Which one?

21              MS. MOREHEAD:  With the business card.

22              THE COURT:  Exhibit 1305B?

23              MR. HEATHMAN:  I thought I left it up

24         there, but here is my copy.

25              THE COURT:  Is it not on the table where

1      the admitted exhibits are supposed to go?

2                  MR. HEATHMAN:  I thought I left it up here.

3                  MS. MOREHEAD:  They were left right here,

4      Judge, and I don't see it.

5                  MR. HEATHMAN:  Here is my copy.  No, that's

6      the original.  I've got it, your Honor.

7                  THE COURT:  All right.

8  Q.  (By Ms. Morehead) This, for instance, was, you

9      mentioned -- I think you said "my car show," and it

10     looks like there's a date in here, August through

11     September of 2006 is when this activity was going on;

12     is that right?  September of 2006?

13 A.  Yes, ma'am.  Those are the dates of the

14     advertisement, when they started and when they ended.

15 Q.  Okay.  And you had a car show -- you had some car

16     show, didn't you, in 2006?

17 A.  Yes, ma'am.

18 Q.  At the Day's Inn?

19 A.  Yes, ma'am.

20 Q.  And how much money did you make in connection with

21     that car show?

22 A.  I broke even.

23 Q.  Okay.  Well, did you report that to the IRS, that you

24     earned income and what that amount was and then what

25     your expenses were in connection with that?

1  A.  I didn't really earn income.  It was the income that

2      I took from my job that I already was making, and I

3      generated that towards promoting myself as just being

4      an event person.  That's how -- I never -- I didn't

5      make any money.  I just broke even off the money of

6      my earnings from my own employment.

7  Q.  Well, where are those records, Ms. Temple?

8  A.  Of what?

9  Q.  Of your business that you had, your promotion

10     business.

11 A.  What records?  I'm trying to understand.

12 Q.  Did you not keep records with regards to that

13     business?

14 A.  As far as me throwing the car show?

15 Q.  The car show, the birthday parties, the bachelor

16     parties, all of these parties that you had.

17 A.  I do have records of them.  My attorney has some.

18 Q.  Have you -- where are they?  Do you have them here in

19     court?  What records do you have?

20 A.  I have receipts.  I have receipts for everything,

21     receipts from anything that I have rented, receipts

22     for anything -- any purchases from napkins to spoons

23     to the people who I had --

24 Q.  Why -- I'm sorry.  I don't mean to interrupt.  Go

25     ahead.  So you have all these receipts?

1    A.    Yes, ma'am.

2    Q.    Why did you keep all those receipts?

3    A.    It was for my taxes.

4    Q.    It was for your taxes that you never filed?

5    A.    No, ma'am.

6    Q.    You had a 40 album release party; right?

7    A.    No, I never had that.

8    Q.    You didn't have that?

9    A.    No.  I didn't get the chance to have that.

10   Q.    So on --

11   A.    Excuse me.  I don't mean to interrupt you, but those

12         are my -- that's my planning of events that I had.

13         Some things fell through and some things happened.

14   Q.    All right.  So the 40 album release party, that fell

15         through?

16   A.    Yes, ma'am.

17   Q.    So when it says in your day planner September 17,

18         2006, album release party, that was -- that doesn't

19         mean anything?

20   A.    Yes, it means something.  That was my planner.

21         That's my old planner book, meaning that these events

22         were to take place.  I never went back and scratched

23         them out.  It was just a date that I retained for

24         myself so I could be clear to have that date

25         available to wherever.

2580

1   Q.   Car show, September 2, 2006?

2   A.   That happened.

3   Q.   That happened.  A bachelor party.  How many bachelor

4        parties did you host?

5   A.   Maybe two.

6   Q.   Two bachelor parties?

7   A.   Yes.

8   Q.   And how many birthday parties did you host?

9   A.   Four.

10  Q.   And what other parties or events did you host?

11  A.   That would be it.

12  Q.   That's it?

13  A.   Yes, ma'am.

14  Q.   What about Big E album release party?

15  A.   I didn't get to do that.

16  Q.   What about Sean Paul concert?

17  A.   I didn't get him because he was too expensive.

18  Q.   So all this stuff you put in your day planner to

19       present here in court, that wasn't presented?

20            MR. HEATHMAN:  Objection, your Honor.  She

21       didn't present the planner in court.

22            MS. MOREHEAD:  I'll offer it, Judge.

23            MR. HEATHMAN:  I think it misstates the

24       evidence.  She didn't present a day planner.

25            THE COURT:  I'm going to sustain the

```
 1            objection.
 2                      MS. MOREHEAD:  I'll rephrase it, Judge.
 3                      THE COURT:  You may.
 4    Q.   (By Ms. Morehead) I'm going to mark this as
 5         Government's Exhibit 340.  Is this one of the
 6         documents that you're saying you had in connection
 7         with your business?
 8    A.   Yes.  And this party, I had this party.
 9    Q.   My question though is, is that the document we have
10         been talking about, your planner?
11    A.   Yes, ma'am.
12                      MS. MOREHEAD:  Judge, I would ask for
13         admission.
14                      MR. HEATHMAN:  No objection, your Honor.
15                      THE COURT:  All right.  Exhibit 340 is
16         admitted.
17                      (Exhibit 340 was admitted into evidence.)
18    Q.   (By Ms. Morehead) So obviously this day planner was
19         important to keep track of dates and events?
20    A.   Yes, ma'am.
21    Q.   And this was in 2006; correct?
22    A.   Yes, ma'am.
23    Q.   And of all the parties that you made or events that
24         you had, how much money did you report to the IRS as
25         income?
```

 1    A.    None.

 2    Q.    How many -- how much in expenses did you report to

 3          the IRS with regards to this business that you had?

 4    A.    None.  I really didn't have any other than my

 5          business card.

 6    Q.    I thought you said you had all these receipts for --

 7    A.    I did have all those receipts, and most of those

 8          people paid for their own party.  It was to get the

 9          name out.  I was coordinating their party.  My name

10          was threw out there.  It wasn't like I was having my

11          own money.  I didn't have that kind of money to do

12          that.  They just liked the way that I coordinate a

13          party, and if I did go out and buy napkins, I'll show

14          them the receipt and they will pay me for napkins,

15          but most of the time me and that person were in

16          agreement.  I'll call them, look, I found you a

17          location.  How much are you willing to pay?  And I'll

18          negotiate from there.  Them two people will pay.  I

19          will just have my name out there saying that I put

20          together this party.  I have never, like, took my own

21          money and just actually bought this stuff for them.

22          I haven't have it like that.

23    Q.    So when Mr. Heathman asked you in 2006 if you had

24          other income, and 2007, you really didn't have any

25          other income, did you, Ms. Temple?

1    A.   Not that it generated like that, no.

2    Q.   Well, what do you mean, not that it generated like

3         that?

4    A.   If I made an extra hundred or fifty dollars, no,

5         not --

6    Q.   Did you have any other income, as Mr. Heathman

7         indicated, in 2006, 2007 other than what was reported

8         on your income tax?

9    A.   And my child support?

10   Q.   And your child support.

11   A.   And my kids' father giving me money to take care of

12        his two sons?  No.

13   Q.   So the $41,600?

14   A.   Yes.

15   Q.   Plus child support?

16   A.   Yes.

17   Q.   Plus any other money the son's father would pay?

18   A.   Yes.

19   Q.   What did that amount to?

20   A.   It was just whatever he give me.

21   Q.   Can you give us some idea in 2006 and 2007 what that

22        would have been?

23   A.   No.

24   Q.   Now, back in 2006 you lived at 744 Sunnyside; is that

25        right?

1    A.   Yes, ma'am.

2    Q.   Blue Springs, Missouri?

3    A.   Yes, ma'am.

4    Q.   And that was up until October of 2006?

5    A.   Yes, ma'am.

6    Q.   How much were you paying rent at 744 Sunnyside?

7    A.   595 with all utilities paid.

8    Q.   And then in October of 2006 through November of 2007

9         you moved to 3116 South Arrow -- you were living at

10        3116 South Arrowhead Court; correct?

11   A.   Yes.

12   Q.   And how much was your rent when you moved there?

13   A.   I am thinking it started off 1195 or something.

14   Q.   Close to $1,200; correct?

15   A.   Yes, ma'am.

16   Q.   Did it increase over that time period?

17   A.   Yes, ma'am.

18   Q.   What did it increase to?

19   A.   1095.

20   Q.   It increased to a 1095?

21   A.   It decreased.

22   Q.   Oh, it decreased to a 1095?

23   A.   Yes.

24   Q.   So at what point did it decline to a 1095?

25   A.   I guess the homeowner took on -- he refinanced or

1          something.  I don't know.

2     Q.   But when was that in connection to the time that you

3          were living there?

4     A.   I'm not sure.

5     Q.   Did you report in February of 2008 that your rent at

6          that time was $1,200 a month?

7     A.   I'm not sure.

8     Q.   And that did not include utilities; correct?

9     A.   No, ma'am.

10    Q.   Now, I would like to talk about a few of these calls

11         that Mr. Heathman brought up and also talk about a

12         few others.  First of all, he talked to you about

13         Call No. 207, which was a call that occurred on

14         September 10 of 2007.  Do you remember that call?

15    A.   Yes, ma'am.

16    Q.   And I would like to play that call to refresh your

17         recollection about something that you said.  Okay?

18    A.   Uh-huh.

19              THE COURT:  Exhibit 207?

20              MS. MOREHEAD:  207, your Honor.

21              THE COURT:  All right.

22              (A portion of Exhibit No. 207 was played in

23         open court.)

24    Q.   (By Ms. Morehead) You testified to this jury that

25         before this occasion you never knew Mr. Wesley to

1       hide money or drugs at your house before?

2   A.  Yes, ma'am.

3   Q.  And this call starts out, "Remember that time when I

4       was like, can you -- can you reach up there?"  So

5       obviously he's talking about an event that occurred

6       before; correct?

7   A.  Yes, ma'am.

8   Q.  Go ahead.

9               (A portion of Exhibit No. 207 was played in

10      open court.)

11  Q.  (By Ms. Morehead) "There's a big one and a little

12      one."  Correct me if I'm wrong; that's a pretty good

13      indication there's two things there; right?

14  A.  Yes, ma'am.

15  Q.  A big one and a little one?

16  A.  Yes, ma'am.

17  Q.  Okay.  And he directed you to the little one; right?

18  A.  Yes, ma'am.

19  Q.  And you're saying that little one was $600; correct?

20  A.  Yes, ma'am.

21  Q.  You didn't ever say what the big one was though.

22  A.  No.

23  Q.  How much was in the big one?

24  A.  I don't know because I never touched or bothered the

25      big one.

1    Q.   All right.  But you knew on September 10 that

2         Monterial Wesley was storing money at your house?

3    A.   No, I didn't.  It was a previous call before this.

4         That's how I knew what did he want me to bring.  He

5         had called me and I was in the shower.

6    Q.   All right.  My point is, on September 10, if we take

7         it that that's the first occasion you knew there was

8         money there, from September 10 to November 27 you

9         knew that your boyfriend had stored money at your

10        house that you didn't know about, a big -- small

11        bundle of $600 and a big bundle of who knows how

12        much; right?

13   A.   That was my first time.

14   Q.   That's what I'm saying, if we said that from

15        September 10 through November 27 you knew that he had

16        stored money there on occasion.

17   A.   No, ma'am.  This call right here I knew because

18        that's when I grabbed it.  After that, not to my

19        knowledge was I ever involved in even getting any

20        money.

21   Q.   What happened to the big one, Ms. Temple?

22   A.   I don't know.

23              MS. MOREHEAD:  Go ahead.

24              (A portion of Exhibit No. 207 was played in

25        open court.)

1    Q.   (By Ms. Morehead) So now he's referring you to

2         something else he had put up in your house; right?

3    A.   Yes, ma'am.

4                   MS. MOREHEAD:  Go ahead.

5                   (A portion of Exhibit No. 207 was played in

6         open court.)

7    Q.   (By Ms. Morehead) And you admit that you had put

8         something up on a prior occasion; correct?

9    A.   The night before.

10   Q.   The night before?

11   A.   Uh-huh.

12   Q.   And you're saying there would be a call the night

13        before between you and Monterial Wesley that

14        discussed that?

15   A.   No, ma'am.  I'm telling you that before this call it

16        was a call when he called me in the shower.  He said

17        he called me because I need to see if you can get

18        something for me, can you reach up there?  And I was

19        like, well, I'm in the shower.  I'm getting out now.

20        Then I'll call you back, or what have you.

21   Q.   And so when you said, "No.  Do you remember that I

22        put the other up there too"?

23   A.   Yes.  That's the money he gave me the night before

24        when we went to the strip club because he didn't want

25        to --

1  Q.  So he had asked you to put money up for him in your

2      house?

3  A.  No.  It's his leisure money.  It was a little money.

4  Q.  $600 is the small one, and a big one, which we don't

5      know how much money, that was his leisure money that

6      he stored at your house; is that right?

7  A.  I'm not talking about that.

8  Q.  You're talking about some other money that he stored

9      at your house?

10 A.  That I took home the night before.  Before then,

11     before this phone call, I didn't know money was

12     there.  I knew about the money that I went home with,

13     and I knew about the money that he put up because I

14     was in between jobs for me to pay my bills as they

15     came.

16              (A portion of Exhibit No. 207 was played in

17     open court.)

18 Q.  (By Ms. Morehead) And he told you to bring what you

19     had put up and to keep them separate; right?

20 A.  No.  He told me -- say that again.

21 Q.  He told you to bring the money that you just referred

22     to that you put up, bring them both but keep them

23     separate.  That's what he told you; right?

24 A.  He told me to bring the little one and bring the

25     money that he gave me before, the strip club.

```
 1   Q.   Well, here's this man that -- he's been storing money

 2        at your house that you didn't know about.  Did you

 3        talk to him about that?  Did you say, hey, what's up

 4        with this?  Why are you storing this money at my

 5        house?

 6   A.   No, ma'am.

 7   Q.   A small one, $600, and this big one of who knows how

 8        much money, and you never talked to him about this

 9        amount of money --

10   A.   It wasn't --

11   Q.   Could I finish my question?

12   A.   Yes, ma'am.

13   Q.   You never asked him about this money had he hidden in

14        your house without your knowledge and without your

15        permission?

16   A.   No, ma'am.

17   Q.   Do you remember Call No. 251 about the bag of

18        clothes?

19   A.   Yes, ma'am.

20   Q.   And just so I get it right, your explanation to this

21        jury is in that call you're telling him, hey, I found

22        another place for your bag of clothes, and this

23        picture that we saw with this car downstairs, that's

24        where you put his bag of clothes, was down there in

25        the garage?
```

2591

```
 1    A.    Yes, ma'am.

 2    Q.    That was the big important thing that you had to call

 3          and tell him about; right?

 4    A.    No.  It was kind of like being funny.

 5    Q.    Being funny?

 6    A.    Yes.

 7    Q.    If it was being funny, why was it so important not to

 8          discuss that on the phone, where you were going to

 9          put this in your house?

10    A.    Because he felt like I was trying to put him out.

11          That's why he was like, I don't want to -- I don't

12          want to hear about it.  We will talk about that

13          later.

14                    MS. MOREHEAD:  Could you play Call No. 251,

15          please.

16                    THE COURT:  Again, just --

17                    MS. MOREHEAD:  It's Exhibit 251, yes, your

18          Honor.

19                    THE COURT:  I always say that to

20          differentiate because we have been talking call

21          numbers.

22                    MS. MOREHEAD:  I know.  I shouldn't have

23          called it a call number.

24    Q.    (By Ms. Morehead) It was Exhibit 251, which was made

25          on October 18, 2007, the day after the home invasion
```

1       at the Foy residence; correct?

2  A.   Yes, ma'am.

3  Q.   And this is a time when it's okay to be funny.  We

4       have had this serious event; your cousin's family has

5       been threatened; their life has been threatened;

6       you're concerned about your own safety; and now we

7       have this call about the bag of money; correct?

8  A.   While we were in the car, we had some personal issues

9       that we addressed, but that's not on the phone call.

10      We were talking about personal things between me and

11      him.

12                 (Exhibit No. 251 was played in open court.)

13 Q.   (By Ms. Morehead) And this is two people who are

14      having issues with their relationship, and he's

15      worried that you're going to put him out, and that's

16      what your reference to the bag of clothes was about?

17 A.   Yes, ma'am.

18 Q.   You heard the phone call that we played?

19                 MS. MOREHEAD:  Judge, I don't remember what

20      number this is.  It's Exhibit No. 339, which is Call

21      No. 5407.

22 Q.   (By Ms. Morehead) Do you remember Mr. Heathman asked

23      you about Exhibit 339, Ms. Temple?

24 A.   I don't know what Exhibit 339 is.

25 Q.   When you were in the car with Mr. Wesley on

1       October 18 and you saw the feds, who you thought --

2       who you believed to be the feds.  Do you remember

3       that call?

4  A.   Yes, ma'am.

5  Q.   Where it was Mr. Foy and Mr. Wesley talking, but you

6       can hear your voice in the background in that call;

7       correct?

8  A.   Yes, ma'am.

9  Q.   And you're saying that in that call your voice shows

10      a sign of alarm because you're concerned that you're

11      being followed by the same people who had been

12      involved in this home invasion.  Is that what you're

13      saying?

14 A.   No.  We wasn't being followed.  Mr. Foy called Mr.

15      Wesley, who was on the passenger's side of me, asking

16      us do we see somebody who is following him.

17 Q.   Okay.  So did you know what Mr. Foy was calling

18      about?

19 A.   Not when the phone call took place, but as we were in

20      the car and, yeah, okay.

21 Q.   And so you weren't concerned about the police

22      following Mr. Foy; correct?

23 A.   I was wondering why.

24 Q.   And you, in fact, made a series of phone calls to Mr.

25      Wesley on the 18th where, in fact, you believed you

1        had identified the individual who was responsible for

2        the home invasion; correct?

3   A.   Yes, ma'am.

4   Q.   And that was an individual named Carlos Hill?

5   A.   Yes, ma'am.

6   Q.   And you're very concerned that you could be the next

7        intended victim of a home invasion; correct?

8   A.   I wasn't really very concerned that I would be the

9        next home invasion victim.

10  Q.   Well, I thought that's what you testified on direct

11       with Mr. Heathman.

12  A.   I'm concerned that it could happen to me.  I was

13       trying to prevent any chance of that happening.

14  Q.   Well, one good way to prevent that would be to call

15       the police and give the police the information that

16       you had about Carlos Hill; correct?

17  A.   But we wasn't sure.  We wasn't sure.  First it was a

18       white Impala, then it was a black Monte Carlo.  It

19       was confusing.  The whole thing was confusing.

20  Q.   But wouldn't it have been a good idea to call the

21       police and give them any information that might have

22       helped them solve this home invasion?  Wouldn't that

23       have been a good idea for your cousin?

24  A.   Yes.

25  Q.   And, in fact, you have a relative that is some kind

1        of law enforcement officer, don't you?

2   A.   No.

3   Q.   No?

4   A.   No.

5   Q.   Well, do you remember -- well, he might not be a

6        relative.  Is he a friend, the sergeant that Mike and

7        Lee ran into up at court?

8   A.   No.  He's not a friend of mine.  I've never met him

9        before.

10  Q.   Well, you described him to Mr. Wesley in the phone

11       call where -- and I am referring to Government's

12       Exhibit 254, which occurred only seven days after the

13       home invasion.  Do you remember that call?

14  A.   Yes.

15  Q.   And in that call you get information from Lee and

16       Mike.  Who are Lee and Mike?

17  A.   Mike and Lynn.  Lynn is my best friend, and Mike is

18       her ex-boyfriend.

19  Q.   Okay.  It says, "They had to go to court, and he came

20       out of court where my uncle is.  Like, he's the

21       sergeant; he's the sergeant. "

22            Who is the uncle that's the sergeant?

23  A.   I don't know his name, but he's not my uncle.

24  Q.   Why did you refer to him as your uncle in this call?

25  A.   I never did.

```
 1    Q.   Okay.

 2                   MS. MOREHEAD:   Could you pull up Phone Call

 3         No. 254, please.

 4                   (A portion of Exhibit No. 254 was played in

 5         open court.)

 6    A.   Romand's uncle, Romand.

 7    Q.   (By Ms. Morehead) Romand's uncle is the sergeant?

 8    A.   Yes, ma'am.

 9    Q.   Who is Romand?

10    A.   That's Mike's best friend.

11    Q.   All right.  So you have a connection, this sergeant,

12         Romand's best friend, his uncle; right?

13    A.   Uh-huh, yes, but I don't know him.

14                   MS. MOREHEAD:   And go ahead and play that.

15                   (A portion of Exhibit No. 254 was played in

16         open court.)

17    Q.   (By Ms. Morehead) And this sergeant evidently always

18         gives you the heads up when there's something amiss;

19         correct?

20    A.   No, ma'am.

21    Q.   Isn't that what you told Wesley?

22    A.   I wasn't meaning -- it was indirect.  He let them

23         know if they have warrants, or whatever.

24    Q.   Uh-huh.  This sergeant will let people know when

25         there's --
```

1    A.    Not me.   Mike and Romand, his nephews, people of that

2          nature.   I have never met him before.

3    Q.    In this case this sergeant says, hey, Latysha Temple

4          and her boyfriend Monterial Wesley, people are

5          looking at them, and you knew then, you knew on

6          October 25 that what they were talking about is the

7          police were looking at you and Monterial Wesley; is

8          that right?

9    A.    I was kind of confused about that because how can a

10         person -- I have never been anywhere with Lynn.   I

11         have never -- how could he connect me to Mike's Lynn

12         to know she's my best friend, to know anything about

13         me?   It was confusing to me, but then at the same

14         time, if he said my name and he said Monterial's

15         name, it made me wonder what's going on.

16   Q.    And it didn't concern you at all that we have got

17         these repeated incidents where the police are

18         creeping into you and Monterial Wesley's situation,

19         and you don't think there's anything -- you don't

20         have any concerns at all?

21   A.    Only seen the police once, and that was after the

22         home invasion.

23   Q.    Here we have got the police asking questions about

24         you and Monterial Wesley seven days later?

25   A.    And I never knew what it was about.   I never knew

```
 1          what it was about.

 2   Q.   And you never had concerns, did you?

 3   A.   I did have concerns.  Me and him talked one on one.

 4   Q.   Did he tell you he was a drug dealer?

 5   A.   No, ma'am, he did not.

 6   Q.   You know he's a drug dealer now; correct?

 7   A.   Yes, from -- I am just now finding out a lot of

 8          things.

 9   Q.   And you said your main focus was on your family?

10   A.   Yes, ma'am.

11   Q.   That's what you told this jury?

12   A.   Concerning the home invasion, yes, ma'am, right.

13   Q.   Well, I thought that was in connection with the fact

14          that you knew Monterial Wesley had a lot of

15          girlfriends.  And I think you told the jury when you

16          get tired of them you can just send them back home,

17          and the comment then was made, my main focus was on

18          my family.

19   A.   Yeah.

20   Q.   Did you tell this jury that?

21   A.   Yes, ma'am.

22   Q.   And so you have got a boyfriend who is married?

23   A.   Yes, ma'am.

24   Q.   Coming around your children?

25   A.   Yes, ma'am.
```

```
1    Q.   That's a good environment, isn't it?

2    A.   Well, my children didn't know he was married.

3    Q.   Your children didn't know he was married?

4    A.   [Shook head.]

5    Q.   The one phone call that we heard back on September 4,

6         2007, where Wesley called over and asked your son to

7         look for some money that -- you heard that phone

8         call, didn't you?

9    A.   Yes, ma'am.

10   Q.   It was Exhibit 194?

11   A.   Yes, ma'am.

12   Q.   Which son was that?

13   A.   My youngest son, Nuke.

14   Q.   What's his name?

15   A.   Nuke.

16   Q.   Nuke is his name?

17   A.   Ronald.

18   Q.   Ronald.  And that occurred on September 4, 2007.

19        Again, you didn't know anything about money being at

20        your house or --

21   A.   I was out of town.

22   Q.   Okay.  And in connection then with having Monterial

23        Wesley, this individual who kept money, unexplained

24        money, at your house without your permission or

25        authority, that was -- your main focus was your
```

```
 1         family, your kids, your children; correct?
 2    A.   Yes, ma'am.
 3    Q.   You and Monterial Wesley went a lot of places during
 4         the course of your relationship; is that right?
 5    A.   A lot of places?  Being out to eat?
 6    Q.   Out to eat, running errands, whatever; correct?
 7    A.   Yes, ma'am.
 8    Q.   In 2006 or 2007 were there ever any times that you
 9         were with him when he went to meet someone that you
10         did not know?
11    A.   Not that I can recall.
12    Q.   So any time you were with him and he met with
13         someone, you knew who that person was?
14    A.   Not that I can -- I don't remember who all he met
15         with when I was with him or even if I noticed he was
16         meeting somebody.
17    Q.   You said that your kids didn't know Wesley was
18         married.  Were you present at the -- I think it was
19         the Chili's in connection with Antwon Simpson's
20         birthday party?
21    A.   Yes, ma'am.
22    Q.   Your car was parked right out front; correct?
23    A.   Yes, ma'am.
24    Q.   Were any of your children at that birthday event?
25    A.   No, ma'am.  It was for grownups.
```

1   Q.   In connection with Chauncey Anderson, you had a

2        birthday party for Monterial Wesley at your house; is

3        that right?

4   A.   No, ma'am.  It was -- it wasn't even intended to be

5        like that.  His friends -- he had a friend that came

6        from out of town, and he came over.  His brother was

7        with him, and then Shevel Foy ended up over there,

8        and I wasn't doing nothing, so I made them some Rotel

9        and some chicken.  It wasn't a birthday party.  We --

10       they and they left and went out to celebrate his

11       birthday and I stayed home.

12  Q.   Okay.  And there were certainly times -- I know we

13       talked about your relationship with Shevel Foy.  His

14       wife is your cousin; correct?

15  A.   Yes, ma'am.

16  Q.   And Keith McDaniel is your cousin as well; is that

17       right?

18  A.   Yes, ma'am.

19  Q.   And so on the phone calls that we heard involving

20       Keith McDaniel where he refers to Wesley as Cuz and

21       they were not cousins, your relationship with Keith

22       McDaniel is as a cousin; correct?

23  A.   Yes, ma'am.

24  Q.   So let's go back to this bag-of-clothes conversation

25       that, again, occurred on October 18 of 2007, that bag

1        of clothes where you found that better place for his

2        clothing down in the basement.  His clothes stayed

3        there from October 18, 2007, until November 27 of

4        2007 when the police came, for about five weeks; is

5        that right?

6   A.   Yes, ma'am.  He will come and get stuff out.

7   Q.   Just didn't move it back upstairs after you found a

8        good place for the bag of clothes?

9   A.   I really didn't have no room upstairs.  I needed all

10       that closet space.

11                 MS. MOREHEAD:  One second, Judge.

12                 THE COURT:  Surely.

13  Q.   (By Ms. Morehead) You indicated that sometimes you

14       would take Monterial Wesley -- like, on October 18

15       you were taking him to your dad's shop to check on a

16       car; is that right?

17  A.   Yes, ma'am.

18  Q.   And how many times did you rent cars for Monterial

19       Wesley?

20  A.   I don't know.

21  Q.   Numerous times; correct?

22  A.   Many times.

23  Q.   Many times?

24  A.   Uh-huh.

25  Q.   And was there a reason that you would rent those cars

1          in your name instead of his name?

2     A.   Because I had a credit card.

3     Q.   Do you know if he had credit cards?

4     A.   I don't know.

5     Q.   I want to show you what I've marked as Government's

6          Exhibit 17.  This particular photograph, Exhibit 17,

7          that shows Mr. Wesley getting out of a vehicle; is

8          that right?

9     A.   Yes, ma'am.

10    Q.   Kind of a maroon Impala, it looks like?

11    A.   Yes, ma'am.

12    Q.   Is that one of the cars you rented?

13    A.   I don't recall.

14    Q.   Just so I'm clear about your finances, in 2007 you

15         lost your job.  You said in August.  Was it of 2007?

16    A.   August 10 that was my last day.

17    Q.   And then you said you got another job in October of

18         2007?

19    A.   October 20.

20    Q.   And was that a nine-to-five job, Monday through

21         Friday?

22    A.   Yes, ma'am.

23    Q.   And so really you were only unemployed for a little

24         over -- the remainder of August, all of September,

25         and 20 days in October; correct?

1    A.    Yes, ma'am.

2    Q.    So it amounts to about two months, little over two

3          months; correct?

4    A.    Yes, ma'am.

5    Q.    And in October of 2007 your income drastically

6          reduced; is that right?

7    A.    Yes, ma'am.

8    Q.    You went from earning $3,200 a month, $800 a week;

9          right?

10   A.    Yes, ma'am.

11   Q.    To $2,300 a month; correct?

12   A.    Yes, ma'am.

13   Q.    And was that 2,300, was that gross or net?  Was that

14         a salaried position?

15   A.    No, ma'am.

16   Q.    That was the same deal where you were getting paid

17         cash?

18   A.    No, ma'am.  It was weekly.  It was hourly, 12.50.

19   Q.    Okay.  And so are you testifying that between 2006

20         and 2007 the income that you got from your jobs that

21         we have talked about along with your child support

22         that we have also indicated, that that's the only

23         money that you had to pay the bills that you paid in

24         connection with you and your children's day-to-day

25         expenses?

 1   A.   And my kids' father helping, yes.

 2   Q.   All right.  I said child support.

 3   A.   I was thinking you were talking about child support

 4        payments.  I'm talking about the additional two kids

 5        by my other kids' dad.

 6   Q.   But you said you didn't even know how much that was

 7        and it was sporadic; correct?

 8   A.   But he made my ends meet.

 9   Q.   He made your ends meet?

10   A.   Yes.

11   Q.   So if we have credit card bills far exceeding

12        whatever your reported income would be, then that

13        would have been made up from the two -- from the

14        sporadic payment of the -- your two sons' father?

15   A.   I didn't have credit cards amounting over any amount.

16   Q.   And I'm not saying amounting over.  If you paid them

17        off every month, then whatever you were spending on

18        credit cards, that's obviously money you're spending;

19        correct?

20   A.   Yes.

21   Q.   And in connection with the two sons' father, what is

22        his name?

23   A.   Roland Mitchell Jr.

24   Q.   And where is he at?

25   A.   In Kansas City, Missouri.

1    Q.   And the other father -- the father who was paying the

2         $382-a-month child support, what was his name?

3    A.   Derek Johnson.

4    Q.   What was it?

5    A.   Derek Johnson.

6              MS. MOREHEAD:  Judge, that's all I have of

7         this witness.

8              THE COURT:  Any redirect?

9              MR. HEATHMAN:  Just a brief couple things,

10        your Honor.

11             THE COURT:  All right.

12                    REDIRECT EXAMINATION

13   BY MR. HEATHMAN:

14   Q.   Just a few brief -- Ms. Temple, I want to go back and

15        cover more of this one particular phone call on

16        October 18 when you're talking about going around --

17        actually, you're not talking.  Let me rephrase that.

18        You and Mr. Wesley are talking, and he's asking why

19        they went back around to Rat's house and told Spud

20        and them that they were going to be in other police

21        cars.  Do you remember that conversation?

22   A.   Yes, sir.

23   Q.   And then later in that conversation you asked Mr.

24        Wesley something to the effect of, how am I going to

25        do this by myself?  Do you recall that part of the

```
 1        conversation?

 2   A.   Yes.

 3   Q.   I wanted to talk to you about that.  What is it that

 4        you were having to do by yourself on that particular

 5        time of day?

 6   A.   Well, he had to meet me up at Star Motors to drop off

 7        a car.  Then he had to take me to go and pick up a

 8        rental car because both of my vehicles was in the

 9        shop.

10   Q.   Okay.  And I believe, if my number is right, that was

11        Exhibit No. 250.  And could you get from the Star

12        Motors to the rental car company by walking?

13   A.   No, sir.

14   Q.   Did he actually pick you up then?

15   A.   Yes, sir.

16   Q.   Was he with someone?

17   A.   Yes, sir.

18   Q.   Does he say -- do you recall in that conversation

19        that's been played here before who he says he was

20        with?

21   A.   Yes, sir.

22   Q.   Who was that?

23   A.   My cousin Telly.

24   Q.   And did you go with Telly and Mr. Wesley to go rent a

25        car?
```

```
 1    A.    Yes, sir.

 2    Q.    And that was after he picked you up at Star Motors?

 3    A.    Yes, sir.

 4    Q.    And Government's Exhibit 251, the bag-of-clothes

 5          conversation the government just played for us?

 6    A.    Uh-huh.

 7    Q.    At the end of that he says that he's just going to go

 8          meet you at Star Motors?

 9    A.    Yes, sir.

10    Q.    So is that all in connection with him picking you up

11          and taking you to get the rental car?

12    A.    Yes, sir.

13    Q.    You were asked a few questions about cuz.  Is cuz a

14          slang term?

15    A.    Yes.

16    Q.    Does it actually mean your cuz?

17    A.    No.

18    Q.    I've heard a lot of words used in the tapes that have

19          been played.  Brother is one, brother or bro'.  Does

20          that make somebody your brother?

21    A.    No, sir.

22    Q.    And you were questioned about, you know, Mr. Wesley

23          having stuff at your house and you didn't know what

24          it was?

25    A.    Yes, sir.
```

```
 1    Q.   You didn't talk to him about it being connected with

 2         cocaine transactions?

 3    A.   I had no reason to believe that stuff like that was

 4         going on.

 5    Q.   Mr. Wesley was married?

 6    A.   Yes, sir.

 7    Q.   And his wife lived in a big house with him, didn't

 8         she?

 9    A.   Yes, sir.

10    Q.   In Leavenworth?  And we saw evidence that --

11         actually, we heard evidence from witnesses that a lot

12         of times Ms. Wesley was with Mr. Wesley going places

13         and picking up different things.  Do you recall the

14         witnesses who testified to that?

15    A.   Yes, sir.

16    Q.   And Ms. Wesley was also upset because Mr. Wesley

17         would give her cash and she didn't want to be

18         embarrassed, pulling out a bunch of small bills at

19         the Wal-Mart.  Do you recall that conversation?

20    A.   Yes, sir.

21    Q.   And yet Mr. Wesley has apparently succeeded in

22         keeping his drug dealing business away from his wife;

23         is that your understanding?

24              MS. MOREHEAD:  Judge, I'm going to object.

25         That would call for speculation on her part.
```

1            THE COURT:  Sustained.

2    Q.   (By Mr. Heathman) Do you know whose names were on the

3         bank deposits that -- excuse me, the safe deposit box

4         that Mr. Wesley has?

5    A.   Yes, sir.

6    Q.   Who were those?

7            MS. MOREHEAD:  Judge, I'm going to ask how

8         she knows that.  First of all, if it's not firsthand

9         knowledge then --

10           MR. HEATHMAN:  She heard it.

11           THE COURT:  If she merely heard it in

12        court, that's a matter for you to argue in closing

13        argument if it has some significance, but not to

14        independently ask her about it.

15           MR. HEATHMAN:  That's fair enough.

16   Q.   (By Mr. Heathman) You recall Mr. Danny Tarrants, the

17        individual with the autoimmune disease?

18   A.   Yes.

19   Q.   Did you know him?

20   A.   No.

21   Q.   Let me save ourselves some time and objection.  You

22        don't know anything about his wife or what she knew

23        or anything else?

24   A.   I never met her.

25           MS. MOREHEAD:  Judge, I'm going to object.

1      We're way far afield from redirect.

2                    THE COURT:  Sustained.  Way beyond the

3      scope.

4                    MR. HEATHMAN:  All right.  I don't have

5      anything further, your Honor.

6                    THE COURT:  Ms. Morehead?

7                    MS. MOREHEAD:  Nothing.

8                    THE COURT:  All right.  Ms. Temple, you may

9      step down.

10         Mr. Heathman, any additional evidence from Ms.

11     Temple?

12                    MR. HEATHMAN:  Defendant Temple would rest,

13     your Honor.

14                    THE COURT:  All right.  Mr. Johnson?

15                    MR. JOHNSON:  Yes, your Honor.  We will

16     call Officer Eric Jones to want stand, please.

17                         ERIC JONES,

18     having been previously duly sworn, was examined and

19     testified as follows:

20                    DIRECT EXAMINATION

21     BY MR. JOHNSON:

22     Q.  Officer Jones, I just have a couple questions about

23         your interview with Henry Grigsby on March 26.

24     A.  Yes, sir.

25     Q.  You were there on the interview on March 26, 2009?

```
 1    A.   Yes, sir.

 2    Q.   And you began part of the interview asking him about

 3         his background as a drug dealer?

 4    A.   I believe so.

 5    Q.   And did he tell you during that interview that he

 6         began selling at age 14?  Would the report help?

 7    A.   Yes, it would.

 8    Q.   I'm going to show you your March 26 report.  You're

 9         the personal who actually prepared that?

10    A.   Yes, sir.

11    Q.   I've underlined some portions on Paragraph 2, if you

12         want to review those to help refresh your memory.

13    A.   Yes, sir.

14    Q.   And he indicated to you during that interview that he

15         began selling crack cocaine and marijuana at age 14?

16    A.   I believe he just said crack cocaine initially.

17    Q.   Okay.  And then he said that he sold crack and

18         marijuana off and on until age 25?

19    A.   Yes, sir.

20    Q.   Did he tell you at all during that interview that he

21         had, in fact, stopped selling drugs at age 17?

22    A.   I don't remember if he specifically said 17.

23    Q.   Okay.  So when you interviewed him, it was off and on

24         until age 25?

25    A.   Yes, sir.
```

1         MR. JOHNSON:  No further questions.  Thank

2    you, officer.

3         THE COURT:  Ms. Morehead?

4         MS. MOREHEAD:  Nothing based on that.

5         THE COURT:  All right.  Mr. Jones, you make

6    that step down.

7         MR. JOHNSON:  And, your Honor, Franklin

8    Goodwin rests.

9         THE COURT:  Let's take a recess here.  This

10   is going to be a relatively brief recess, and we will

11   come back and I'll tell you what's going to happen

12   next.

13        Members of the jury, the admonitions apply.

14        Ms. Ludwig, please take charge.

15        I will bring you back in 15 minutes, and then

16   I'll give you further advice about where we stand.

17        (The following proceedings were had outside

18   the presence of the jury:)

19        THE COURT:  As to those defendants who have

20   not testified, other than Ms. Temple, I would like to

21   inquire of you about your understanding of your right

22   to testify if you so desire, and I am going to tell

23   you the information collectively to all five of you.

24   I think you heard what I said to Ms. Temple, and so

25   that gives you some background, but I want you to

1    each understand, Mr. Wesley, Mr. Foy, Mr. Trinkle,

2    Mr. McDaniel, and Mr. Goodwin, that each of you under

3    the Constitution of the United States have a right

4    that you are the one who gets to make the decision

5    about whether to testify at this trial or not.  You

6    certainly have the right to remain silent and not

7    testify, but you also have the right to testify, if

8    you want to.  And the point is, it's a decision for

9    you to make, not your lawyer to make.  It's

10   appropriate for you to consult with your lawyer; it's

11   appropriate for you to think about it and try to

12   decide what's in your best interests; but in the end

13   the decision whether or not to testify in the case is

14   one that you need to make individually.  So I want to

15   ask each of you --

16        Mr. Wesley, if you would stand, please.  Mr.

17   Wesley, do you understand that it is your right under

18   the Constitution of the United States to testify in

19   this trial?

20             DEFENDANT WESLEY:  Yes, sir.

21             THE COURT:  Have you decided that it is in

22   your best interests to refrain from or decline to

23   testify in this case?

24             DEFENDANT WESLEY:  Yes, sir.

25             THE COURT:  Has anyone threatened you or

1    made any promises to you or anything like that in

2    order to get you to waive your right to testify here?

3              DEFENDANT WESLEY:  No, sir.

4              THE COURT:  So it's nothing you believe you

5    simply want to do in your best interests, and it's

6    your decision and not your attorney's decision; is

7    that correct?

8              DEFENDANT WESLEY:  Yes, sir.

9              THE COURT:  Thank you.  I will accept your

10   waiver as being made knowingly and voluntarily.  You

11   may sit down.

12        Mr. Foy, I'm going to ask you the same

13   questions, in essence.  You understand, do you not --

14             DEFENDANT FOY:  Yes.

15             THE COURT:  -- that it is your right to

16   testify or not to testify; is that correct?

17             DEFENDANT FOY:  Yes, sir.

18             THE COURT:  And you have considered this

19   matter, and you have decided that you do not want to

20   testify; is that correct?

21             DEFENDANT FOY:  Yes, sir.

22             THE COURT:  Has anyone made any threats or

23   promises to you in order to get you not to testify?

24             DEFENDANT FOY:  No, sir.

25             THE COURT:  So are you telling me then that

```
1         you are making this decision not to testify based on

2         your own personal decision and not your lawyer's

3         decision; is that correct?

4                   DEFENDANT FOY:  Yes, sir.

5                   THE COURT:  All right.  Thank you.  I will

6         accept your decision not to testify as being made

7         knowingly and voluntarily.

8              Mr. Trinkle, you know where I'm going here.  You

9         understand that you have a right under the

10        Constitution of the United States to either testify

11        in this case or not to; is that correct?

12                  DEFENDANT TRINKLE:  Yes.

13                  THE COURT:  And you have decided that you

14        do not want to testify; is that correct?

15                  DEFENDANT TRINKLE:  Yes.

16                  THE COURT:  And has anyone made any threats

17        or promises or anything like that in order to get you

18        to decide not to testify?

19                  DEFENDANT TRINKLE:  No, sir.

20                  THE COURT:  Have you considered this and

21        decided for yourself that you believe it's in your

22        best interests not to testify?

23                  DEFENDANT TRINKLE:  Yes, sir.

24                  THE COURT:  And that's something that you

25        are doing not because your lawyer's made that
```

 1     decision but you've made that decision; is that

 2     correct?

 3                    DEFENDANT TRINKLE:  Yes, sir.

 4                    THE COURT:  All right.  Then I will accept

 5     your decision as being made knowingly and voluntarily

 6     as well.

 7           Mr. McDaniel?

 8                    DEFENDANT MCDANIEL:  Yes, sir, your Honor.

 9                    THE COURT:  I take it that you understand

10     that you do have the right under the Constitution of

11     the United States to testify at this trial or not to;

12     is that correct?

13                    DEFENDANT MCDANIEL:  Yes, sir.

14                    THE COURT:  And you've considered the

15     matter, and you've decided that you do not want to

16     testify; is that correct?

17                    DEFENDANT MCDANIEL:  Me and my lawyer were

18     discussing it, but at this juncture, yes, sir.

19                    THE COURT:  Well, we are at the point now

20     where you've got to fish or cut bait, as the old

21     saying goes.

22                    DEFENDANT MCDANIEL:  No, sir, I'm not going

23     to testify, sir.

24                    THE COURT:  And that's your decision and

25     not your attorney's decision; is that right?

```
 1                   DEFENDANT MCDANIEL:  Yes, sir.

 2                   THE COURT:  And you've decided not to

 3       testify, fully understanding that if you said, I want

 4       to testify, we would be able to bring the jury back

 5       and commence to allow to you testify under whatever

 6       questioning your lawyer wished to engage in.  Do you

 7       understand that?

 8                   DEFENDANT MCDANIEL:  Yes, sir, your Honor.

 9                   THE COURT:  And has anybody made any

10       threats or promises in order to get you to give up

11       your right to testify?

12                   DEFENDANT MCDANIEL:  No, sir, your Honor.

13                   THE COURT:  Thank you, Mr. McDaniel.  You

14       may sit down.  I will accept your waiver as being

15       made knowingly and voluntarily made.  Thank you.

16            Mr. Goodwin, do you understand that it is your

17       right under the Constitution of the United States to

18       testify at this trial or not to testify?

19                   DEFENDANT GOODWIN:  Yes, sir.

20                   THE COURT:  And you have decided that what

21       you want to do is to give up your right to testify

22       and not to testify at this trial; is that correct?

23                   DEFENDANT GOODWIN:  Yes, sir.

24                   THE COURT:  And is that something that is

25       your decision?
```

```
 1              DEFENDANT GOODWIN:  Yes, sir.

 2              THE COURT:  It's not your lawyer's

 3    decision; is that correct?

 4              DEFENDANT GOODWIN:  No, sir.

 5              THE COURT:  Has anybody made any threats or

 6    promises to you in order to get you to decide not to

 7    testify?

 8              DEFENDANT GOODWIN:  No, sir.

 9              THE COURT:  All right.  Thank you,

10    Mr. Goodwin.  I will accept your waiver as being made

11    knowingly and voluntarily.

12         All right.  With regard to the defendants, I

13    will permit you to collectively rest on the record

14    when the jury comes back.  A couple of the defendants

15    have essentially done that, but I want to make sure

16    that the jury understands that.

17         Does the government have any rebuttal evidence?

18              MS. MOREHEAD:  I may, Judge.  My witness

19    has came in, or he's out.  I need some time to talk

20    to see if there's anything I'm going to present.

21              THE COURT:  It will probably come out of

22    your closing argument time if you do because we're

23    running close on time.

24              MS. MOREHEAD:  Could I have ten minutes to

25    consult with him to see if there's anything?  And
```

```
 1          frankly, Judge, it's based upon Ms. Temple's
 2          testimony.  I obviously did not know everything that
 3          she was going to testify to.
 4                    THE COURT:  I understand.
 5                    MS. MOREHEAD:  If I could have ten minutes
 6          to consult with that witness, and then I would be
 7          able to tell you whether --
 8                    THE COURT:  I will give you until 12:20.
 9                    MS. MOREHEAD:  That's fine, Judge.  I
10          should be able to do that.
11                    THE COURT:  All right.  Then we will resume
12          at 12:20, and I'll see you all then.
13                    (A recess was taken.)
14                    THE COURT:  Ms. Morehead, what is your
15          pleasure?
16                    MS. MOREHEAD:  Judge, we have no rebuttal.
17                    THE COURT:  All right.  We will bring the
18          jury back in, I'll allow the defendants to rest, and
19          I will tell them at that point that -- excuse me.
20          Before we do that, I will assume or deem that all of
21          you have now renewed your Rule 29 motions, and my
22          rulings remain the same; that is, to the extent that
23          I've either denied or taken under advisement the
24          motions, those rulings remain the same.
25                    MR. JOHNSON:  If I may?  And just for the
```

```
1    record, as I did not make a Rule 29 motion regarding

2    Count 11, which was a wire communication count, but

3    to the extent that those arguments apply to

4    Mr. Goodwin regarding venue and the fact that there

5    was no testimony as to where either Mr. Grigsby or

6    Mr. Goodwin was at the time of the phone calls, I

7    will do that now at the close of all evidence.

8              THE COURT:  Thank you, Mr. Johnson.

9    Obviously, my ruling is the same as it was on the

10   other motions along those lines.  And, frankly, I

11   have deemed all the defendants to be covered by that

12   general argument in any event.  I'm not quite sure if

13   I totaled everybody up if everybody has exactly

14   gotten an X in the right box, but as far as I'm

15   concerned, that issue is preserved across the board

16   for each defendant.

17      What I would intend to do then would be to put

18   the jury in recess until 3:30.  I would, hopefully,

19   within -- this may be a little optimistic, but in the

20   1:00 to 1:15 time frame I would hope to be able to

21   have you all copies of instructions, and at that

22   point I would give you some time to look at those and

23   we would regather at 2:00 o'clock-ish.  At that point

24   we would have the instruction conference.  The way I

25   do that is all on the record in open court so that
```

1     you'll have your opportunity to make your objections,

2     to renew your requests for instructions, etc., all at

3     that time.  Depending upon what changes, if any, I

4     may be persuaded to make, of course, there's always

5     some time that it takes for copying and all those

6     kinds of things.  It would then be my intention to

7     bring the jury back in as soon after 3:30 as possible

8     to read the instructions to them.  As I mentioned to

9     you before, I will give the jurors copies of the

10    instructions to follow along as I read.

11         When we're finished with that, I will then

12    explain to the jury that the next step is closing

13    argument and that what I'm going to do is recess

14    until tomorrow morning.  I'm going to ask if they

15    would have any problem starting at 8:30 tomorrow so

16    that we can get started and be able to work around

17    Ms. Morehead's issues with her arguments before the

18    Tenth Circuit.  I would contemplate working from

19    eight -- do you have some update on that, Ms.

20    Morehead?

21         MS. MOREHEAD:  Judge, I would just tell

22    you, I went back and looked at the order issued by

23    the court, and it has me arriving at 11:45 which

24    would be, frankly, 10:45 their time.  We are the last

25    of six cases.  They have told us that obviously they

1     don't know when they will get to us, so we're going

2     to be on standby.  I hate to say this, but I may be

3     on standby for about an hour and a half before they

4     even get to us.

5              THE COURT:  I doubt that, given my

6     experience with the circuit.

7              MS. MOREHEAD:  I was just counting

8     15-minute arguments for both sides on five other

9     cases.

10              THE COURT:  Lots of times it doesn't take

11     that long.  My point is, I realize we have to work

12     with what we have got.

13              MS. MOREHEAD:  Right.

14              THE COURT:  But I'm not going to ask them

15     to start any earlier than 8:30 because we have

16     someone coming from as far away as Troy, and I think

17     that's unrealistic or unfair to ask somebody to come

18     any earlier.  And this time of year when it stays

19     light late, it doesn't bother me to ask them to stay

20     a little later, so I'm going to ask them to stay

21     later.  I don't know whether you have any flexibility

22     in your being at the station at a quarter of twelve

23     but, again, I will accede to your wishes on that, Ms.

24     Morehead, but I would certainly plan then to break in

25     the morning in time to get you there by 11:45.  Where

1      are you doing this from?

2                  MS. MOREHEAD:  I assume it's on the sixth

3      floor.  That's where we have done it before.  They

4      just told us to show up.  They didn't really tell us

5      where.  I was going to check in with the clerks.  But

6      I assume it will be the sixth floor.

7                  THE COURT:  Then we will simply be on hold.

8      And, of course, you may not have -- you may have

9      finished your opening portion of your closing, and we

10     may well be in Mr. Calbi's portion.  We're simply

11     going to have to play this as it develops and go as

12     we can down the line.

13         With regard to the instructions, the last two

14     instructions are actually ones that I read after the

15     closing argument, so I just throw that out for your

16     interest.  Let's bring the jury back in so we can

17     explain to them where we're going next.  The first

18     step will be to permit counsel for the defendants to

19     rest in front of the jury.

20                  (The following proceedings were had in the

21     presence of the jury:)

22                  THE COURT:  All right.  Mr. Calbi?

23                  MR. CALBI:  Your Honor, Monterial Wesley

24     rests.

25                  THE COURT:  Mr. Sandage?

1          MR. SANDAGE:  Your Honor, Mr. Foy rests.

2          THE COURT:  Mr. Bell?

3          MR. BELL:  Mr. Trinkle rests.

4          THE COURT:  Mr. Heathman?

5          MR. HEATHMAN:  Ms. Temple rests, your

6     Honor.

7          THE COURT:  Mr. Bellemere?

8          MR. BELLEMERE:  Mr. McDaniel rests, your

9     Honor.

10         THE COURT:  And Mr. Johnson?

11         MR. JOHNSON:  Your Honor, Mr. Goodwin

12    rests.

13         THE COURT:  Does the government have any

14    rebuttal witnesses?

15         MS. MOREHEAD:  No, your Honor.

16         THE COURT:  Ladies and gentlemen of the

17    jury, that concludes the presentation of evidence in

18    this case.

19         As I told you, I will give you instructions on

20    the law that will guide your deliberation.  Let me

21    tell you a little bit about the process that's

22    involved in that because it takes a little bit of

23    your time here today. I have drafted a set of

24    proposed instructions to share with the lawyers.

25    These are fairly thick, and the lawyers haven't seen

1    them yet.  They all have some idea, perhaps, of what

2    my instructions might be because of their knowledge

3    of the law, and they have requested certain

4    instructions be given and so on and so forth, but

5    they will need some time to look at these proposed

6    instructions.  Then I will get together with them,

7    and I will talk to them about the instructions.  They

8    will have an opportunity to explain to me why some

9    instructions should be given different from what it

10   is that I've proposed, or as mundane a thing as

11   catching a clerical error or something like that in

12   the proposed instructions.  That takes a little bit

13   of time as well.  I don't give the instructions out

14   until all the evidence is in for several reasons:

15   one, because one doesn't really know for sure all the

16   things that need to be instructed about until the

17   case is over in terms of the presentation of

18   evidence; and moreover it could conceivably give some

19   advantage to one side or the other if they know

20   exactly which instructions the court intends to give.

21   So it simply is the practice not to the give them out

22   until all the evidence is in.

23       The bad news is that leaves some time for the

24   jury cooling your heels when the presentation of

25   evidence falls the way it did on this particular

```
1     case.  What I'm going to do is put you in recess

2     until 3:30.  It is my hope that that will be enough

3     time to do that, and then my plan would be to read

4     the instructions to you yet today.  That takes

5     roughly an hour, give or take, to do, and then we

6     will recess for the day and reconvene tomorrow for

7     closing arguments.

8          Closing arguments, I will set aside a fairly

9     lengthy amount of time for closing arguments, much

10    more so than opening statement, and we have got -- we

11    have a logistical issue in the middle of the day

12    based on the schedule of one of our attorneys in the

13    case who has to make an oral presentation to the

14    Tenth Circuit Court of Appeals in a totally unrelated

15    matter by video conference from here in the

16    courthouse, so our schedule tomorrow is going to be a

17    little bit broken up in the middle of the day.  What

18    I would like you to be thinking about is, is there

19    any reason why you all could not start at 8:30

20    tomorrow morning?  And you also should know that we

21    may run a little bit past 5:00 o'clock tomorrow.  I

22    want to try to keep it as short as possible, but my

23    goal and desire is to get you instructions today, all

24    of the argument tomorrow, and then you would be in a

25    position to start your deliberations Thursday
```

```
1    morning, assuming that it does take all of tomorrow
2    to give the argument.
3         With that, remember that the admonitions remain
4    in full force and effect, that is, not to discuss the
5    case among yourselves or with anybody else or to have
6    any contact with any of the participants in the case
7    or to do anything which touches on the case in any
8    way.  And I want to reemphasize that you have heard
9    all of the evidence but you have not heard the law
10   and you have not heard the arguments of counsel.  The
11   lawyers in their closing arguments will try to
12   explain to you what the significance of the evidence
13   was, how to sort these things out, and how a
14   particular bit of evidence in that lawyer's mind fits
15   into what it is the government has to prove, or
16   whatever it might happen to be.  So the closing
17   arguments are extremely useful for you in trying to
18   make sense out of what the evidence was.  And in
19   addition, of course, you can't really sort it through
20   without knowing what it is the law requires for your
21   decision-making.  So please just keep your mind open
22   and be prepared to keep up the good work.  You've
23   been very attentive and an excellent jury.  Keep it
24   up, and we will see you again at or about 3:30.  Come
25   back at 3:30, and we will start just as soon
```

 1          thereafter as we possibly can.

 2               Ms. Ludwig, would you take charge of the jury.

 3          Counsel and the participants, please remain here.

 4                    (The following proceedings were had outside

 5          the presence of the jury:)

 6                    THE COURT:  Are there any other loose ends

 7          I may have neglected or you can think of that we

 8          ought to talk about before we break?

 9                    MS. MOREHEAD:  What time are we getting the

10          jury instructions?

11                    THE COURT:  Why don't you all plan to be

12          back here half-an-hour-ish, and we will, hopefully,

13          have them for you.  My guess is it might be a little

14          longer.  If you grab something to eat and be back

15          here in half an hour, that would be great.  And we

16          won't reconvene formally at that time; the law clerk

17          will simply come down and give you copies for you to

18          go over.  And then, as I say, keep 2:00 o'clock in

19          mind as the time when we will reassemble for the

20          discussion of the instructions.  All right.  If

21          there's nothing further then, we are in recess.

22                    (A recess was taken.)

23                    THE COURT:  We are now back in court

24          outside the hearing of the jury to take up the

25          court's proposed instructions.  I apologize about

1    those missing pages.  I would like to say it was just

2    to see if you were alert, but it wasn't it.  I was

3    not alert, so I apologize to you.

4         I'll begin with the United States.  And this is

5    your opportunity to make objections as well as

6    suggestions for changes and the like.  So Ms.

7    Morehead?

8              MS. MOREHEAD:  Judge, it's really not an

9    objection, I guess, more an addition, and I was

10   trying to -- I made a notation in my instructions, my

11   proposed Instruction No. 10, which talked about

12   codefendants pleading guilty, and that's your

13   Instruction No. 43, and there were some additional

14   notations in my instruction that included information

15   about plea bargaining, plea agreements, and the like;

16   and I think there was six sentences that I would ask

17   that you incorporate in Instruction No. 43.  I think

18   everything else in that Instruction No. 10 is

19   included, if not in Instruction 43, somewhere else,

20   specifically relating to cooperating individuals and

21   considering their testimony.  But those sentences

22   begin in the second full paragraph of my

23   instructions.  It starts, "There was testimony that

24   the government has entered into plea agreements," and

25   that would continue through the second paragraph into

```
 1        the third paragraph, the first four sentences of

 2        that.  And I don't know if you want me to read that

 3        or --

 4               THE COURT:  I think you're giving me enough

 5        here, but I may -- because it's out of context, I may

 6        have to come back.  Let me just finish my notes.  It

 7        was "testimony that the government has entered into

 8        plea agreements . . ."

 9               MS. MOREHEAD:  The exact provision, "There

10        was testimony that the government has entered into

11        plea agreements with individuals providing, for

12        example, for the dismissal of some charges and a

13        recommendation of a lesser sentence than the

14        codefendant would otherwise likely receive.  Plea

15        bargaining is lawful and appropriate, and the rules

16        of this court expressly provide for it.  An alleged

17        accomplice, including one who has entered into a plea

18        agreement with the government, is not prohibited from

19        testifying.  On the contrary, the testimony of an

20        alleged accomplice may by itself support a guilty

21        verdict.  You should receive this type of testimony

22        with caution and weigh it with great care.  You

23        should never convict a defendant upon the unsupported

24        testimony of an alleged accomplice unless you believe

25        the testimony beyond a reasonable doubt."  So that's
```

1    the information that I would request be included

2    within Instruction No. 43.  And that's, Judge, all I

3    had.

4             THE COURT:  All right.  Thank you, Ms.

5    Morehead.  Let me go to the defendants now and begin

6    with Mr. Calbi.

7             MR. CALBI:  Judge, we have no objection or

8    comments on any of the proposed instructions

9    submitted to us by the court.

10            THE COURT:  All right.  What is your --

11   honestly, the language that Ms. Morehead just read is

12   language from their No. 10 that I usually include.

13   Frankly, I have to go back and satisfy myself that

14   it's not there someplace, but I will because

15   typically that is language that I include, and it may

16   have been that in attempting to synthesize a couple

17   different instructions I inadvertently left it out.

18   But do you have any objection to the inclusion of

19   language to that effect?

20            MR. CALBI:  I have no objection to the

21   inclusion of that language, your Honor.

22            THE COURT:  All right.  Mr. Sandage?

23            MR. SANDAGE:  To that point we would have

24   no objection to the including of that information.

25       The only objection that we would have would be

1    your proposed Instruction No. 12, found on page 19.

2    It kind of goes along the same lines as one of the

3    Rule 29 issues I brought up to the court that you

4    denied.  I realize it's probably -- if you're

5    considering any variance, I would object to that,

6    saying that it actually broadened -- to clear up the

7    record, I'm referring to the fact that you say "crack

8    or cocaine" in your jury instructions.  It was my

9    argument that the word should be "and."  I believe

10   this variance broadens the indictment more than

11   narrows it.  When it's broadened, you run into

12   problems under the Fifth Amendment.

13             THE COURT:  Thank you.  I should have said

14   initially that any issues you have raised by rule --

15   by your Rule 29 motions concerning which I have made

16   a ruling, whether or not you reassert it in

17   connection with the instructions, I certainly deem it

18   not to have been waived, and I want to make that

19   clear for the record, but it is appropriate -- it's

20   not inappropriate for you to call that out, and

21   you're correct that I included the instruction as I

22   wrote it for the same reasons that I denied your

23   Rule 29 motion on that issue.  So therefore I deny

24   your objection.

25             Mr. Bell?

1          MR. SANDAGE:  Thank you, Judge.

2          MR. BELL:  Just briefly, your Instruction

3     No. 49, which is the instruction on other crimes

4     outside the conspiracy, my recollection is that I

5     don't know that there was testimony about other

6     crimes, or to the extent that there was, I think it

7     was very de minimis, so I don't believe that

8     including this instruction -- I will say I think it

9     would be prejudicial and perhaps highlighting that

10    there might have been other crimes, that I don't

11    believe there was a great deal of testimony that

12    occurred.

13         THE COURT:  There definitely was evidence

14    about marijuana trafficking.  I think one of the

15    concerns some of the defendants have indicated from

16    the very beginning in this case, I think some of the

17    defendants who are still with us, was the potential

18    for confusion by virtue of the fact that there is no

19    charge concerning marijuana here, so I think it is

20    appropriate to include that instruction.  That is why

21    I did so.

22         MR. BELL:  Judge, the other, just a

23    question for the court, and potential objection, was

24    your Instruction 52, which I believe is somewhat of

25    an Allen charge, or at least that's the way it's been

1      used in the other Tenth Circuit cases.  I don't know

2      if you were planning on giving that instruction right

3      off the bat to the jurors or holding that back and

4      waiting to see if it was necessary.

5           THE COURT:  No, we always give this.  In

6      fact, the Tenth Circuit encourages that you give this

7      instruction up front so that if you do come back to

8      it later in the case it will not be something that

9      seems to come out of the blue.  So this is an

10     instruction which I have given in probably every

11     case, criminal or civil, that I have had occasion to

12     try.

13          MR. BELL:  That's all, Judge.

14          THE COURT:  All right.  Mr. Heathman?

15          MR. HEATHMAN:  Your Honor, I don't have on

16     behalf of Ms. Temple any objection to the language

17     that the government asked to be included, nor do we

18     have any objection to the instructions as provided.

19          THE COURT:  All right.  Thank you.

20        Mr. Bellemere?

21          MR. BELLEMERE:  We have no objections, your

22     Honor.

23          THE COURT:  And Mr. Johnson?

24          MR. JOHNSON:  Your Honor, on

25     Instruction 27, which is on page 40, which is this

1     court's instruction on aiding and abetting, it

2     includes, among other counts, Count 1; and I'm having

3     a hard time trying to figure out how a person can aid

4     and abet a conspiracy without becoming a member of

5     it.

6              THE COURT:  That's a darn good question.

7     Let me go back and look at the -- from your memory,

8     Ms. Morehead, Count 1 does charge aiding and

9     abetting, doesn't it?

10             MS. MOREHEAD:  Yes, Judge.

11             THE COURT:  Do you have a response to

12    Mr. Johnson on that?

13             MS. MOREHEAD:  You can aid and abet without

14    actually being a participant in any crime.  And that

15    would include a conspiracy, so, you know --

16             THE COURT:  I suppose you -- yeah, I

17    suppose you could.

18             MR. JOHNSON:  It seems to be kind of an

19    ethereal concept.  I can see how a person might aid

20    and abet an act of a conspiracy without intending to

21    join it or having an agreement to join it, but if you

22    aid and abet the conspiracy itself, I think by

23    definition you must also have come to an agreement to

24    further the conspiracy.  I mean, maybe I'm wrong.

25             THE COURT:  Let me go back to Ms. Morehead.

```
 1        Without second-guessing how the indictment reads, can

 2        you envision under the evidence presented in this

 3        case a scenario in which there is any realistic

 4        likelihood that the jury would find, whoops, this

 5        person was not a coconspirator but they aided and

 6        abetted?

 7                    MS. MOREHEAD:  I don't know, Judge.  I just

 8        know that aiding and abetting has -- that we have

 9        done this in prior cases, and, frankly, it's never

10        been an issue.

11                    THE COURT:  Obviously, it hasn't been for

12        me either because I hadn't thought about it.

13                    MS. MOREHEAD:  In connection with others, I

14        think this has come up.  I think it's proper.  I

15        can't rationalize out that kind of on the spur of

16        minute.  I guess if what he's saying is true then I

17        guess my argument would be then, what's the harm?

18        If, in fact, in aiding and abetting you're, in fact,

19        becoming part of the conspiracy, there wouldn't be

20        any prejudice in this.  If you want me to get

21        authority for charging aiding and abetting in

22        connection with the conspiracy, I need a little bit

23        of time to be able to do that.

24                    THE COURT:  I'm not suggesting that at this

25        point.
```

1          Mr. Johnson?

2               MR. JOHNSON:  My concern, what the

3     potential harm is is that a jury deliberates, they

4     could come to a unanimous conclusion that the person

5     does not commit the crime of conspiracy but come to

6     the conclusion that they have aided and abetted based

7     upon the same facts.  Because of the confusion

8     inherent in this instruction, it can lead to an

9     inconsistent verdict, and we have no way of ferreting

10     that out.

11               THE COURT:  I see from the perspective of

12     Mr. Goodwin and Mr. Trinkle why this is a potential

13     issue because -- so as you elaborate, I could

14     envision the situation in which the jurors would

15     conclude that they were not coconspirators based

16     upon, for example, the buyer/seller defense, or

17     whatever it might happen to be, but that nonetheless

18     that constituted aiding and abetting.  So now the

19     question is, I suppose, back to you, Ms. Morehead, as

20     to the proprietary of charging -- of charging it or

21     proceeding with it here.  I guess there's at least a

22     potential scenario where the jurors could reason,

23     well, what they did here certainly could have fit

24     this definition.  Do you have --

25               MS. MOREHEAD:  I guess I don't see that,

1    Judge.  You just kind of threw that out there as far

2    as an example, but I don't see that being -- let's

3    say this was a drug user, a true drug user, and they

4    bought drugs from the conspiracy, from members of the

5    conspiracy.  I don't believe that constitutes aiding

6    and abetting the conspiracy.

7              THE COURT:  Well, I wouldn't think it

8    should, let's say.

9              MS. MOREHEAD:  I don't think that would be

10   enough.

11             THE COURT:  I think the proper thing to do

12   in the absence of any authority to the contrary is to

13   sustain that objection, strike Count 1 from the

14   instructions so as not to potentially confuse this

15   matter in light of what appears to me to be no

16   contention by the government that there's specific

17   evidence that it can identify which would support

18   aiding and abetting separate from the conspiracy, and

19   I could envision a potential confusion on the part of

20   the jurors in which they accepted the defense that

21   these people were mere buyer/seller purchases of

22   drugs and because of that that aided and abetted the

23   conspiracy.  So I'm going to sustain the objection.

24   And for future reference, obviously, we simply need

25   to have some authority presented on it, I guess, if

```
 1      this is charged this way in further cases.  I don't

 2      know the answer as we sit here; but I cannot see any

 3      harm to the government; I can see potential harm to

 4      those two defendants; so I am going to sustain that

 5      objection as to Instruction No. 27.

 6              MS. MOREHEAD:  Could we go back to that

 7      before -- I guess I'm thinking along the lines of,

 8      let's say, Ms. Temple, who, I think the evidence

 9      clearly shows she was aiding and abetting the

10      conspiracy in connection with her activity, so I

11      guess I see --

12              THE COURT:  Why wasn't she a conspirator if

13      that's what she was doing?

14              MS. MOREHEAD:  Well, she does become a

15      conspirator because aiding and abetting, you become a

16      principal, which would be the charge of conspiracy.

17              THE COURT:  But doesn't that broaden

18      conspiracy law?

19              MS. MOREHEAD:  It broadens every crime.

20              THE COURT:  Sure.  But, you know, it seemed

21      to -- I will give you some time.

22              MS. MOREHEAD:  I would like a little bit of

23      time.

24              THE COURT:  How long would you like?

25              MS. MOREHEAD:  Well --
```

1          THE COURT:  How long do you realistically

2     think --

3               MS. MOREHEAD:  I would say 30 minutes,

4     Judge.  I think I can do a quick search.  I know this

5     came up in one of our Topeka cases, it seems to me,

6     so I can get an answer, I think, hopefully, if

7     there's an answer to be gotten, fairly quickly.

8               THE COURT:  I think that's fair, that you

9     should have that opportunity.

10        Mr. Bell?

11               MR. BELL:  I happened to do a brief search

12    while we were talking about this, and I found a Tenth

13    Circuit case I believe would be specifically on

14    point, U.S. v. Foreman, 87 Fed. Appx. 107 (2004) and

15    it's pages 110 and 111.  It says, "Aiding and

16    abetting under 18 U.S.C. 2 makes one who aids and

17    abets equally responsible for the substantive crime

18    as a principal.  Defendants who commit substantive

19    crimes in furtherance of conspiracy and defendants

20    who aid and abet routinely are coconspirators.  We

21    hold that for purposes of Pinkerton instruction a

22    distinction does not exist between the principals and

23    aiders and abettors because no basis for such a

24    distinction exists in the statute or case law."

25        Judge, I believe that's exactly what we were

1    talking about, that at the point you're attempting to

2    aid and abet a conspiracy, you have by definition

3    become a coconspirator.

4              THE COURT:  So what would you say that case

5    says, that you don't instruct on aiding and abetting

6    or do you instruct on aiding and abetting?

7              MR. BELL:  I believe it says you don't just

8    for the fact that, because there's no difference,

9    it's in the position where, as you indicated, it

10   could result in some prejudice.

11             THE COURT:  I'll let Ms. Morehead have a

12   little time.  Let's finish our discussion here.

13        Mr. Johnson?

14             MR. JOHNSON:  Thank you, Judge.  We had

15   submitted converse instructions that begin, "If you

16   have a reasonable doubt as to whether Franklin

17   Goodwin," etc.  I had taken those instructions from

18   my practice, as they are a form instruction in the

19   State of Missouri under state law.  I'm going to

20   clear up for the record, as I proposed them and they

21   are not in the instruction packet, that the court has

22   rejected those instructions.

23             THE COURT:  That's correct.

24             MR. JOHNSON:  My last objection, Judge, is

25   as to the verdict director itself, which would be

```
 1          Paragraph 2 and 3 regarding quantities.
 2                    THE COURT:  Which instruction?
 3                    MR. JOHNSON:  The verdict director itself,
 4          Judge.
 5                    THE COURT:  On the verdict form itself?
 6                    MR. JOHNSON:  Yes, the verdict form.  I'm
 7          sorry.  Semantics from a different jurisdiction.
 8                    THE COURT:  No problem.
 9                    MR. JOHNSON:  I'm going to admit that I
10          don't -- I understand that the quantity of narcotics
11          involved is not an element of the offense; however,
12          it needs to be submitted and proven beyond a
13          reasonable doubt for sentencing purposes under
14          Apprendi, but I guess the question that I have and
15          the argument that I am making is that this verdict
16          director should direct this jury to find whether or
17          not Mr. Goodwin himself conspired, not whether the
18          entire global sphere of the conspiracy involved that
19          quantity, but rather whether Mr. Goodwin himself
20          intended and acted knowingly to conspire to move that
21          quantity of drugs, and I think that here at least
22          there's the possibility to say if they believe, for
23          example, Thomas Humphrey that everybody, including
24          Mr. Goodwin, would be responsible all the way up to
25          the top and all the way to the bottom, and I think
```

1    that kind of runs counter to the idea of the scope of

2    the conspiracy and things along that nature.  For

3    that reason, I would object to the verdict form.

4              THE COURT:  I understand the objection.

5         Ms. Morehead?

6              MS. MOREHEAD:  Judge, with regards to that

7    argument, that clearly flies contrary to all the

8    other instructions that you've given with regards to

9    conspiracy.  What he's suggesting is exactly that, a

10   sentencing issue, and sentencing is not for the jury.

11   The question for the jury's consideration is the

12   scope of the conspiracy.

13             THE COURT:  Conspiracy as a whole.

14             MS. MOREHEAD:  Not each individual person's

15   liability --

16             THE COURT:  I'm going to cut you off.  I

17   agree with you.  I just wanted to let you speak to

18   it.  I agree with you.

19        Ms. Morehead has articulated the reasons why we

20   have done it this way.  There is an issue with regard

21   to relevant conduct at sentencing should Mr. Goodwin

22   be found guilty.  That cuts a different way, but I do

23   believe this is the appropriate way to address it

24   here.  I may not have made it clear to all of you as

25   we went through that I was soliciting objections to

1    the verdict form as well as the instructions.  To the

2    extent that anyone had any objections to the verdict

3    form that you didn't realize, I was asking to speak

4    now.  I hear none.  All right.

5        Then, Ms. Morehead, why don't you -- let's come

6    back in 30 minutes and see where we are on that

7    point.

8            MS. MOREHEAD:  Great.

9            THE COURT:  We're in recess.

10           (A recess was taken.)

11           THE COURT:  All right.  We are now back in

12   court still outside the presence of the jury to

13   resume our discussion of instructions and objections,

14   and we are now dealing with Instruction No. 27 and

15   whether or not Count 1, the conspiracy count, should

16   be subject to the aiding and abetting which was

17   charged in the indictment.  During our break as Ms.

18   Morehead was researching, she provided information to

19   Ms. Scheurer, the courtroom deputy, about various

20   cases she was finding, which I have relayed to

21   counsel for the defendants as well as looking at

22   myself.

23       Ms. Morehead, I'll hear from you now and then

24   hear from Mr. Johnson.  Hello?

25           MS. MOREHEAD:  I'm sorry, Judge.  I had

1    provided them, but I wanted to make sure that I had

2    provided the court with all that I --

3              THE COURT:  I just wanted to make sure you

4    heard me.

5              MS. MOREHEAD:  I did.  I'm sorry, Judge.  I

6    get in my zone.

7         I think I presented to the court three Tenth

8    Circuit cases.  This was kind of on the fly.  I

9    wasn't able to get ahold of our Topeka office, but I

10   know this issue did come up in a case with regards to

11   the -- and it was an appeal issue, but the cases I

12   provided frankly, Judge, were U.S. v. Pursley, which

13   is a 2007 case, 474 F.3d 757; U.S. v. Bowen, which is

14   at 527 F.3d 1065, and then U.S. versus Langston, et

15   al., 970 F.2d 692.

16        And in looking at these, it clearly indicates

17   that -- Mr. Johnson argued that conspiracy and aiding

18   and abetting are one in the same, and these cases

19   stand for the premise that conspiracy and aiding and

20   abetting are two separate entities.  In the Pursley

21   case at KeyCite 24, 25, and 26 -- I'm not seeing the

22   page number.  I apologize.  You know, it specifically

23   says conspiracy and aiding and abetting a crime are

24   different criminal acts, and it has a citation then

25   and says --

1          THE COURT:  With regard to the first two

2     cases, not Langston, but the other two, is the fact

3     that those are Pinkerton conspiracies, does that make

4     any difference in the analysis compared to --

5          MS. MOREHEAD:  I don't think so because the

6     theme remains the same whether it's Pinkerton or not.

7     I know Mr. Bell mentioned the Pinkerton theory, but

8     in connection with -- the holdings appear to be the

9     same, that conspiracy and aiding and abetting are

10    separate.  And I didn't have much time.  Just, for

11    example, Judge, I picked up a Seventh Circuit case,

12    U.S. versus Rivera, which was a 1998 case, which,

13    again, same kind of situation where you had a

14    conspiracy and someone was charged also as an aider

15    and abettor.  The case law seems to indicate that a

16    defendant can be maybe guilty of a conspiracy as an

17    actual participant or as an aider and abettor.

18          THE COURT:  Langston is the 1992 case that

19    you provided?

20          MS. MOREHEAD:  Yes.

21          THE COURT:  Which is at 970 F.2d 692 (10th

22    Cir. 1992).  There was a conspiracy to manufacture

23    amphetamines, and there the defendants were charged

24    both with the conspiracy and aiding and abetting, and

25    the circuit went through and evaluated those

1    independently and made the observation of the

2    difference between the two and indicated that the

3    defendants could have been found guilty under, in

4    that case, either theory but seemed to indicate that

5    they were stand-alone analyses.  So I want to hear

6    Mr. Johnson, I guess, now and see what his response

7    is.

8              MR. JOHNSON:  Judge, I read page 705 and

9    706 of the Langston case, which would be Section 7

10   under it, and I don't know in the Langston case what

11   objections were made to the instructions themselves

12   because the instructions were given.  The discussion

13   in Langston is as to the sufficiency of the evidence

14   to sustain a conviction either on conspiracy or for

15   aiding and abetting.  The citations in Langston

16   regard general principles of aiding and abetting.  I

17   have not read, for example, the citation White v.

18   United States, 366 F.2d 474 at 476 -- and that's from

19   the Tenth Circuit, 1966 -- to know whether or not its

20   discussion of aiding and abetting in that case was in

21   connection with a conspiracy.  We don't know, had the

22   defendants presented in the court in Langston this

23   issue, which is whether or not it was even

24   appropriate to instruct on those two issues, how this

25   court would have ruled.  Those instructions were

```
 1    given; it was charged; as such, it does not appear as
 2    though there was an objection; hence, there could
 3    have been sufficiency on either of those issues.
 4    And, really, I think it illustrates the point that I
 5    am making here, which is that evidence of the
 6    conspiracy can also be evidence of the aiding and
 7    abetting, and perhaps things would have been
 8    different in Langston had there not been that
 9    instruction.
10             THE COURT:  All right.  Mr. Bell?
11             MR. BELL:  Judge, just briefly.  I have had
12    a brief opportunity to review the cases that the
13    government submitted.  I would submit that the Bowen
14    and Pursley cases are not particularly helpful, given
15    these factual circumstances, that those cases deal
16    with whether you can charge somebody with a
17    substantive count on top of the conspiracy to perform
18    the substantive act.  That's not the situation here.
19    The Langston case I think is very factually
20    dissimilar from the circumstances we have here.  In
21    the Langston case it was whether the acts that the
22    particular defendants took would make them either
23    principals or aiders and abettors of a conspiracy.
24    There was no danger of confusion because there was no
25    one who potentially could be seen as simply a buyer
```

1      or a customer of the conspiracy.

2           However, that is the circumstances we have here.

3      We find that certain defendants, Mr. Trinkle and

4      Mr. Goodwin, could be viewed as aiders and abettors

5      by a jury confused by the aiding and abetting

6      instruction and therefore backdoored in as principals

7      when the law clearly says a buyer/seller relationship

8      would not make them members of the conspiracy

9      regardless of sort of the aiding and abetting

10     backdoor circuit.  I understand that Langston says

11     you can put an aiding and abetting instruction -- or

12     let me rephrase that -- that you can be found guilty

13     as a principal or as an aider and abettor of a

14     conspiracy, and under those facts that's true.  You

15     were looking at the acts, the substantive acts, that

16     the defendants took to sort of nudge along the

17     conspiracy or what they were doing to help out the

18     conspiracy.

19          However, given the danger of confusion to the

20     jury, given our factual circumstance where some

21     people would be considered buyers and could

22     potentially be considered aiders and abettors, I

23     don't believe that language is particularly helpful

24     in resolving that potential confusion dilemma.  So

25     Judge, for those grounds I would say Langston is not

```
 1        particularly persuasive.
 2                  THE COURT:  Thank you, Mr. Bell.
 3            Ms. Morehead?
 4                  MS. MOREHEAD:  Judge, could I just -- you
 5        know, I can appreciate what Mr. Bell and Mr.
 6        Goodwin -- Goodwin's attorney.
 7                  THE COURT:  Mr. Johnson.
 8                  MR. JOHNSON:  Mr. Johnson.
 9                  MS. MOREHEAD:  Mr. Johnson.  But what I
10        would like to point out is Latysha Temple -- and this
11        is an argument I made to you before I asked for some
12        time -- clearly could fall into that scenario.  I
13        disagree that the jury is going to be confused by
14        this.  You have instructed them that simple
15        buyer/seller doesn't equate to them being involved,
16        and --
17                  THE COURT:  And actually let me cut through
18        to the chase because I am going to overrule the
19        objection.  Pardon me for cutting you off, but I am
20        going to overrule the objection because I think as I
21        study the aider and abettor instruction that if you
22        look at -- here is the key language in the
23        instruction, looking at page 40, Instruction 27, and
24        that is, "Second, the defendant intentionally
25        associated himself in some way with the crime and
```

1    intentionally participated in it as he would in

2    something he wished to bring about."  Again, this is

3    subject to argument by counsel, including counsel for

4    the defendants, to point out that if the theory is a

5    mere buyer or a mere person who has proximity to one

6    who has committed a crime, does not associate

7    themselves with the conspiracy in a way in which they

8    cared about bringing the conspiracy about, that

9    argument is clearly there as to what this language

10   means and that you could -- one could certainly

11   argue, and the jury could certainly accept, that a

12   mere buyer really doesn't care whether the conspiracy

13   is successful or not.  The buyer merely wants to be

14   in a situation to get their -- whatever they are

15   getting from it.

16        So the next sentence says, "This means that the

17   government must prove that the defendant consciously

18   shared the other person's knowledge of the underlying

19   criminal act and intended to help them," that is, to

20   be an aider and abettor.  Under that theory then the

21   government would have to prove that Mr. Goodwin,

22   Mr. Trinkle, or Ms. Temple consciously shared the

23   knowledge of the underlying criminal act, that is,

24   the conspiracy to sell drugs, and intended to help

25   them, whether it be by buying or hiding something or

1      whatever theory the government might happen to have.

2      To that extent I don't think it's confusing, and I

3      think the Langston case stands for the proposition

4      that conspiracy and aiding and abetting are

5      stand-alone and different offenses for the reasons

6      pointed out in Langston, which go largely towards

7      what the aspects of knowledge and intention might

8      actually happen to be.

9           I went back and looked at some instructions from

10     prior cases of mine, which doesn't mean much because

11     nobody's ever objected before, but I have routinely

12     instructed on aiding and abetting in a conspiracy.

13     Like I said, that doesn't mean much because you all

14     are just smarter than all the other lawyers that have

15     ever tried a conspiracy case in front of me, but I

16     have a certain degree of solace, I suppose, in the

17     fact that it is something we have instructed on in

18     the past, and I do believe that it's appropriate to

19     instruct on here, so I will overrule the objection.

20                MR. BELL:  Judge, I guess just in the wake

21     of that, there may be a way that we could make sure

22     that there wouldn't be any confusion.  On the last

23     sentence of Instruction No. 27, if we could add

24     "merely purchasing drugs or mere presence at the

25     scene of a crime."  Again, I think that would make

1      sure -- that would alleviate myself and Mr. Goodwin's

2      concerns as sort of an extra step towards making sure

3      that confusion doesn't occur.

4                 THE COURT:  Ms. Morehead, would you have

5      any objection to that?

6                 MS. MOREHEAD:  Judge, I think you've

7      already instructed on that.

8                 THE COURT:  That's in connection with the

9      conspiracy.  This is in connection with the aiding

10     and abetting to show that a person who is not -- a

11     mere purchaser is likewise not by being a mere

12     purchaser an aider and abettor of the conspiracy.

13                MS. MOREHEAD:  Well, I thought he had two

14     parts to that.

15                THE COURT:  Part of it is already there.

16     Mere presence at the crime is already there.

17                MS. MOREHEAD:  Okay.  I knew that had been

18     given.  Say that again.  If he could go back?

19                MR. BELL:  "Merely purchasing drugs or mere

20     presence at the crime," and then the rest of it.

21                THE COURT:  Adding "merely purchasing

22     drugs."

23                MS. MOREHEAD:  I think that's misleading

24     because it can be aiding and abetting, merely

25     purchasing drugs, not in the context of being a

1    buyer/seller, but, you know, Mr. Wesley merely

2    purchased drugs from Mr. Humphrey.  Mr. McDaniel

3    merely purchased drugs from Mr. Wesley.

4              THE COURT:  I don't think they merely

5    purchased, according to the government's theory.  I

6    think that's why Mr. Wesley -- of course, he's

7    already pled guilty to this count, but why Mr. Wesley

8    would not have been able to avail himself of the

9    buyer/seller argument, because he certainly did more

10   than merely purchase.  The question is what we mean

11   by "merely."

12             MS. MOREHEAD:  Exactly.

13             THE COURT:  Sure.  And that leads back to

14   the -- what's the instruction number on/buyer seller?

15             MR. JOHNSON:  It's on page --

16             MR. BELL:  I think it's 17.

17             MR. JOHNSON:  Twenty-nine.  It's

18   Instruction 18, your Honor.

19             MR. BELL:  I submit Instruction 18 speaks

20   totally to conspiracy; it doesn't address --

21             THE COURT:  Right.  I understand.

22             MS. MOREHEAD:  I think the word "merely

23   purchasing," I mean, without more --

24             THE COURT:  What if we said, a simple

25   buyer/seller relationship or a mere presence at the

1    scene of the crime is not sufficient?  In other

2    words, what if we transported the term "simple

3    buyer/seller"?

4              MR. JOHNSON:  We would concur in that,

5    Judge.

6              MR. BELL:  That would be fine with us,

7    Judge.

8              THE COURT:  I think to be an aider and

9    abettor you would need to be more than a mere

10   purchaser who didn't really give a hoot what became

11   of the underlying enterprise.

12             MS. MOREHEAD:  I don't know that I would

13   have a real problem with that, Judge.  I just -- my

14   problem was, here we're throwing out some term that

15   hadn't been in there before.  What you're proposing

16   is, a simple buyer/seller relationship or mere

17   presence at the scene of a crime and knowledge that a

18   crime is being committed are also --

19             THE COURT:  And we will, of course, already

20   have talked about that simple buyer/seller

21   relationship in Instruction No. 18.

22             MS. MOREHEAD:  I don't necessarily have a

23   problem with that.

24             THE COURT:  If I said, a simple

25   buyer/seller relationship or mere presence at the

1    scene of a crime and knowledge, etc., that would be

2    what I would add.

3            MR. BELL:  That would be fine with us,

4    Judge.

5            THE COURT:  Any objections, Mr. Heathman,

6    about how your ox is potentially gored here?

7            MR. HEATHMAN:  No, your Honor.  I think

8    that would be fine.

9            THE COURT:  All right.  I will make that

10   change.  I've also added the language that Ms.

11   Morehead requested.  We will make this change, make

12   the copies, and come back.  It will be close to

13   4:00 o'clock maybe, but let's say why don't you all

14   be ready at a quarter of four in case we can get

15   ready that quickly, understanding that we can only go

16   as fast as we can go.

17        Until that time, unless there's anything else,

18   we are in recess.

19            (A recess was taken.)

20            THE COURT:  If we are ready to proceed, we

21   will bring in the jury.

22            (The following proceedings were had in the

23   presence of the jury:)

24            THE COURT:  You'll notice, members of the

25   jury, as you sit down that there are copies of the

1   instructions at your seat in the jury box.  The

2   instructions themselves are in white, and they are

3   for you to read along with me as I read them to you

4   should you choose to do so.  In blue is a copy of the

5   verdict form.  When the case is actually submitted to

6   you for your deliberation, there will be an original

7   verdict form which will be on white paper.  I give

8   you the blue verdict form just so you don't get

9   confused and make notes on the original somehow or

10  something like that.  I will not read aloud to you

11  the verdict form.  I will read aloud to you the

12  instructions, all but the final two instructions,

13  which I will read to you tomorrow after you've heard

14  the closing argument, but the lawyers may well make

15  use of the verdict form in their closing arguments.

16          (Instructions 1 through 53, inclusive, were

17  read to the jury.)

18          THE COURT:  Well, members of the jury, that

19  concludes the presentation of the instructions that

20  I'm reading to you before you've heard the closing

21  arguments of counsel, which is what we will

22  reassemble for in the morning.

23      We will start at 8:30 in the morning, and I will

24  remind you of the admonitions not to discuss the case

25  among yourselves or to do anything which touches on

1    the case.  Now, of course, you've heard what the law

2    is that applies to the case, but you're not permitted

3    to take your copies of these instructions home with

4    you.  They must remain here with your notes.  So once

5    again you must suspend your thinking about all this

6    until you come back tomorrow.  Although you've heard

7    the evidence and you've heard the law, obviously,

8    I've read rather quickly through a great many

9    instructions with a great deal of information

10   contained in them, and you will have plenty of

11   opportunity in deliberation to go back and at your

12   own pace go through those instructions.  In the

13   meantime, tomorrow you'll get the benefit of the

14   argument by counsel, who will attempt to give you

15   their thoughts about how the evidence relates to

16   those instructions, and I think that should be of

17   great use to you in trying to sort this all out.

18       So, again, trying to process things in advance

19   is, first of all, not something that you ought to do

20   and, second, isn't very helpful to you in any event,

21   so please don't.  Just come on back tomorrow morning

22   prepared to proceed at 8:30.

23       With that, Ms. Scheurer, please take charge of

24   the jury.  Counsel and the participants remain here.

25            (The following proceedings were had outside

1          the presence of the jury:)

2                    THE COURT:  Let me talk to you about

3     exhibits.  My expectation would be that all admitted

4     exhibits, including firearms and drug exhibits, would

5     go back to the jury deliberation area.  The chart

6     which was admitted for demonstrative purposes and any

7     other evidence that was admitted for demonstrative

8     purposes ordinarily would not go back to the jury

9     deliberation room absent the agreement of the parties

10    to the contrary.  To me the gray area is, what are we

11    going to do about phone calls?  Should we recognize

12    that it is likely that the jury will want to listen

13    to phone calls?  And if so, how are we going to deal

14    with that in terms of providing them the mechanism to

15    do so?  Especially since I suspect many of the

16    admitted exhibits were actually presented by way of

17    excerpts which were played through the government's

18    computerized presentation system; is that correct,

19    Ms. Morehead?

20                    MS. MOREHEAD:  Judge, all of our exhibits,

21    there's physical copies of, except I noticed at least

22    one is missing, and it's one of Mr. Trinkle's, and

23    I'm not sure why.  I know we had it and copies were

24    made of the transcript, but I went to look for it,

25    and it's not there.  I haven't went back through to

1    see what else might be missing.

2                  THE COURT:  Do you know which exhibit

3    number that was?

4                  MS. MOREHEAD:  Yes, Judge.  Exhibit 321.

5                  THE COURT:  All right.  I would ask each of

6    counsel to make sure you haven't somehow accidentally

7    walked off with Exhibit 321, and we will sort of look

8    for that as well.

9         My question though was with regard to what was

10   played in court compared to the exhibits.  Were the

11   admitted exhibits the excerpts of the phone calls

12   that were played, or were they the whole phone call,

13   from which you took excerpts that you played on the

14   computer?

15                  MS. MOREHEAD:  I think there were just a

16   couple that it was the whole exhibit that was

17   introduced, but we actually -- and I indicated what

18   portions we actually played.  For instance, I think

19   there were a couple that we only played the first

20   33 -- or I think it was a call between Ms. Houff and

21   Mr. Grigsby, for instance, we only played the first

22   33 seconds of a very lengthy conversation, but the

23   whole call was introduced.

24                  THE COURT:  With regard to the CDs that are

25   in evidence, I assume they do not have transcripts

1    somehow associated with them and anything that we

2    have that's been introduced physically in evidence;

3    correct?

4              MS. MOREHEAD:  No, Judge.  Each disk,

5    that's all that is on there, is that individual call

6    that was introduced with regards to that exhibit

7    number.

8              THE COURT:  All right.  That leaves -- that

9    answers the question that I had in that connection.

10   There's nothing along those lines to go back?  Can

11   you think of other demonstrative exhibits other than

12   the chart outlining the conspiracy, for example, that

13   would not go back?  Now, the chart with regard to the

14   phone numbers you didn't mark or enter into evidence?

15             MS. MOREHEAD:  I just kept notes up there

16   so I could have them as a quick reference when I had

17   the different witnesses back there, Judge.

18             THE COURT:  So that's clearly

19   demonstrative.  Is there a second board?

20             MS. MOREHEAD:  There are actually three

21   boards, Judge.  There's Exhibit 269, which is the

22   chart; and then there were two boards, which are 270,

23   which have all of the individuals along with names,

24   and then 270A, which just has the photographs of the

25   individuals without names.  Frankly, Judge, I did two

1     just in case there was ever an occasion where we

2     wanted to do an array without names, but I think

3     those were actually introduced as exhibits, not as

4     demonstrative, Exhibits 270 and 270A.

5            THE COURT:  Let's find out if there's any

6     objection to 272 and 270A, although they are

7     duplicative.  There would be no reason to submit both

8     of them.  Hold the one with people's names on it up

9     for a moment, if you would, please.  Is there any

10    objection to that exhibit being taken back to the

11    jury room?  I hear none.

12        With regard to Exhibit 270?

13            MS. MOREHEAD:  Yes.

14            THE COURT:  I had shown that it was for

15    demonstrative purposes.

16            MS. MOREHEAD:  Okay.

17            THE COURT:  But I will permit it to go

18    back, and I'll change my finding on that.  270A,

19    because it's cumulative, I would say we would not

20    send that back.  And 269, I believe, is demonstrative

21    only.

22            MR. JOHNSON:  Judge, so I understand

23    procedures here in front of this jury, do you send

24    back all exhibits when they receive the case for

25    deliberations, or do we wait until they make a

1       request?

2                   THE COURT:  No, no.  They will go back.

3       The tougher question is, should we immediately give

4       them something on which they can play the CDs?

5       because I can't imagine they are not going to want to

6       listen to some of the phone calls, although who

7       knows?

8                   MS. MOREHEAD:  Are you saying -- did we

9       reach an agreement?

10                  THE COURT:  That's what I'm throwing out.

11      That's what I'm going to talk about.  We could wait

12      until they request it or give them something up

13      front.  If they request it, I can't imagine we aren't

14      going to give it to them.

15                  MR. BELL:  Since we all have to be in the

16      building anyway, if they request it, we can bring

17      them out, play the call for them, and send them back

18      into the jury room.

19                  THE COURT:  I would not do it that way.

20      These are exhibits they are able to use in their own

21      way to talk about, to play, play back.  That would

22      not be the proper way to do it.  The question is

23      really whether we would give them the ability to do

24      it up front or wait until they ask for it.  I'm

25      inclined to do it right up front.

1          MS. MOREHEAD:  I think that's wise, Judge.

2    I know the court has -- the IT people have laptops

3    that are clean that can be given to them.  I would

4    only request that speakers be provided.  I don't

5    think laptop without speakers are quite as useful,

6    especially in a big room like a jury deliberation

7    room.

8          THE COURT:  These are conventional CDs;

9    right?

10         MS. MOREHEAD:  Yes.

11         THE COURT:  These are not with the synced

12   transcript?  These would simply be the sound only?

13   That's my understanding, this is just the sound only?

14         MS. MOREHEAD:  Yeah, this is just the sound

15   only.  Now, there was the CD of the video of the one

16   buys.  Again, things like that I think will -- will

17   that work on theirs?  Okay.  I was looking at my

18   guru.  I guess we could leave it that if they have

19   difficulty they should let us know.  I don't think

20   they will have any difficulty.

21         THE COURT:  That would be my thinking.

22      Mr. Calbi?

23         MR. CALBI:  There was the video of the

24   Shannon Perez sale.  That count has been dismissed.

25   I don't believe that exhibit should go back to the

1    jury room.

2              THE COURT:  It's been dismissed as a

3    substantive count, but not part of the evidence of

4    the conspiracy.  In other words, the separate charge

5    against Mr. Wesley on that count is gone, but that

6    doesn't mean that that isn't part of the conspiracy

7    of which Mr. Perez and others were --

8              MR. CALBI:  Correct.

9              THE COURT:  -- claimed to be conspirators.

10   Okay.  The last thing then that -- is it straight

11   with you, Ms. Scheurer, what you think is going to

12   happen?

13             THE COURTROOM DEPUTY:  Sure.  I'll attempt

14   to get a computer that works.

15             THE COURT:  The final thing is with regard

16   to closing argument, and I have taken into

17   consideration the requests that everyone made

18   yesterday, and I'm trying to put this in conjunction

19   with the scheduling we have to do and getting it all

20   to the jury tomorrow by a reasonable time.

21        I've decided that I will allocate to the

22   government two hours and 45 minutes and to the

23   defendants three hours and 45 minutes, which I'll

24   explain to you as follows how that will be, largely

25   at your own request: Mr. Wesley, 45 minutes; Mr. Foy,

 1          30 minutes; Mr. Bell -- excuse me, Mr. Trinkle, 45

 2          minutes; Ms. Temple, 45 minutes; Mr. McDaniel, 30

 3          minutes; and Mr. Goodwin, 30 minutes.  That largely

 4          tracks your requests.  This should be able to be done

 5          then with a break in the morning and a break in the

 6          afternoon as well as however long we need to take off

 7          for Ms. Morehead to attend to her Tenth Circuit

 8          business, should allow us to be able to get the case

 9          taken care of.  The jury indicated they are willing

10          to start at 8:30.  Obviously, as you can tell, Ms.

11          Scheurer told that to me, and they are willing to

12          stay after five for a reasonable period of time.  As

13          you can tell, the air handling equipment gets shut

14          off at 5:00 o'clock.  It gets stuffy pretty quick, so

15          that's good incentive for all of us to get finished

16          at or about 5:00 o'clock tomorrow.

17              Is there anything else to take up before we

18          break for the day?

19                  MR. CALBI:  Just so you know, we have

20          decided to do our closing argument in the order of

21          the indictment.

22                  THE COURT:  All right.  Very well.  I will

23          call on you in that order.  Anything else?

24              I just want to tell all of you, counsel, that I

25          really appreciate the professionalism and the very

1     excellent job that all of you did in presenting

2     this -- the evidence in this case, which obviously

3     there could have been a lot more difficulties to all

4     of that if counsel had not been as professional and

5     as, I think, extremely effective on both sides of the

6     aisle as you were.  The court appreciates that.  I

7     look forward to hearing your closing arguments

8     tomorrow, and until that time we are in recess.

9                 (Court was adjourned.)

10                      *  *  *  *  *

11                 WEDNESDAY, MAY 6, 2009

12                (Closing arguments were made by the

13     parties; Instructions 54 and 55 were read to the

14     jury; the bailiffs were sworn.)

15                THE COURT:  A few more things before I let

16     you go home for the evening, members of the jury.

17     Tomorrow when you come in and you return to the jury

18     room, you are not to begin your deliberations until

19     the bailiff closes the door and tells you it's time

20     to started your deliberations; that is, as two or

21     three or more of you arrive and assemble, you're not

22     to sit and talk about the case.  You're to wait until

23     everyone is there.  And that admonition is in effect

24     at all points during your deliberations.  In other

25     words, if and when you take breaks, you are literally

1    taking a break, and you can't go off in small groups

2    and over a cup of coffee, or whatever, continue some

3    discussion that may have gone on in the jury room.

4        The idea behind this jury deliberation is to

5    take advantage both of your collective knowledge and

6    perception and memory that you've developed

7    throughout the course of this case and, of course,

8    the individual aspect that each juror brings to it.

9    It is not a matter that we want to sort of develop

10   factions or groups of people who have had a chance to

11   think their thoughts through but without the

12   opportunity to visit with others.  So simply do not

13   do anything about the case except when you are

14   actually formally deliberating.

15       You will be given all of the exhibits that have

16   been admitted in the case, so if there's something

17   that is not given to you, it is something that was

18   not admitted in evidence as an exhibit in the case,

19   so that's why you didn't get it.  Only those things

20   which were offered and admitted under the rules of

21   evidence are exhibits and will be sent back with you.

22       With regard to the CDs of the phone calls, you

23   will be provided with a laptop to be able to use to

24   play those CDs, should you want to.  Should you have

25   any difficulty working the laptop, simply let the

```
 1        bailiff know, and the bailiff will let Ms. Scheurer
 2        know, and she or one of the IT people will show you
 3        how to do it.  They won't give you any help about the
 4        substance of it, but they will show you how to do it
 5        if you have trouble running it.  Your bailiff should
 6        simply make that inquiry, if need be.
 7             As I gather from what Ms. Scheurer has told me,
 8        Ms. Shaw and Ms. Heron, you have figured out before
 9        today that the two of you are alternates.  And I
10        know, Ms. Shaw, in your situation in particular, and
11        probably Ms. Heron as well, you have been serving
12        here at some considerable sacrifice, and I'm going to
13        take up with the lawyers after we break here whether
14        or not we might be able to arrange something to
15        permit you to go back to work while you're not
16        actually serving, but I want you to -- you and
17        Ms. Heron to wait a little bit so I can talk about
18        that with the lawyers and give you further
19        instructions because typically we don't do that.
20        Typically we simply put the alternate jurors in a
21        separate room and they remain here in case we need to
22        call them to action.  I'm certain we will bring you
23        back tomorrow simply because we want to make sure all
24        12 of the other jurors are here, safe and sound and
25        ready to start.  Goodness sake's, we hope it doesn't
```

1    happen, but if something occurs that we don't have

2    all 12 tomorrow, we certainly want to be in a

3    position to have the other alternates available to

4    serve.  But we will give you further instruction on

5    that when the time comes.

6         In any event, to the extent that you are not

7    participating in the deliberations as a juror, in

8    other words, if you aren't called upon to replace one

9    of the other 12, then, of course, the admonition does

10   apply at all times, and you may not talk about the

11   case.  You may not do anything which touches on the

12   case.  You can't tell your coworkers or friends or

13   anybody else what you're doing.  You just simply have

14   to keep the admonition in full force during the

15   course of all of this.

16        I would suggest to all of you that you start

17   your deliberations after you select your foreperson

18   by going through that verdict form.  The lawyers did

19   not use their time to do so, and that's fine, but it

20   is a fairly lengthy set of documents, and I think it

21   would help you to go through the verdict forms, see

22   what it is you're going to have to resolve, see how

23   they correlate to the instructions that you have been

24   given and the arguments that you heard concerning the

25   verdict form.  I would suggest the foreperson might

1    help you by taking you through those to make sure you

2    see what it is you need to do and structure your

3    deliberations accordingly.

4         You will be in charge of your own scheduling at

5    that point tomorrow, when you come back.  I'll have

6    you come back at 9:00 o'clock tomorrow, but with

7    regard to whether you take breaks and how long you

8    take breaks and so forth, that will be entirely up to

9    you.  You will not come back into the courtroom

10   tomorrow morning; you will not come back into the

11   courtroom in connection with your breaks; you'll

12   simply inform the bailiff concerning what it is

13   you're going to do.  If we reach the end of the day

14   tomorrow and you have not arrived at a verdict,

15   that's perfectly fine.  We will simply bring you in

16   the courtroom at that point so I can remind you of

17   the admonition and set a time for you to come back on

18   Friday.  There's no time constriction here.  You take

19   whatever time is necessary for you to deliberate in

20   this particular case, and feel free to do so.  With

21   that then I'm going to put you all in recess for the

22   evening.

23        Ms. Ludwig, if you would please take charge of

24   the jury.  Reassemble at nine in the morning, if you

25   would, please.  The rest of you please remain here.

```
 1              (The following proceedings were had outside
 2       the presence of the jury:)
 3              THE COURT:  I have handed the original of
 4       the instructions and the original of the verdict form
 5       to the clerk to transmit to the bailiff so that will
 6       be available with the jury tomorrow.
 7          Just going over a few final wrap-up points,
 8       Mr. Bellemere, I understand that you have secured the
 9       substitute CD and have talked to Ms. Morehead about
10       this; is that correct?
11              MR. BELLEMERE:  Yes, your Honor.  In fact,
12       they are on the table and properly stamped and
13       identified as Defendant's Exhibit 1417, which had to
14       do with Call No. 6831, and Defendant's Exhibit 1420,
15       which had to do with Phone Call 6843, both on Target
16       Phone No. 4.
17              THE COURT:  Those are the same numbers as
18       were given the exhibits previously; it's simply you
19       have -- those CDs with those exhibit numbers now just
20       have the phone calls that you played and not other
21       phone calls; correct?
22              MR. BELLEMERE:  That's correct, your Honor,
23       and I believe I had the transcript of those phone
24       calls marked as those same numbers but with an A
25       after it.  They are on the table as well.
```

1           THE COURT:  Very well.  Ms. Morehead, do

2      you concur that that's where we stand?

3           MS. MOREHEAD:  I haven't looked at that.

4      He originally had all those phone calls, so I assume

5      what he's presented is what we have provided to him,

6      so I don't have any dispute with that.

7           THE COURT:  Very well.

8           MS. MOREHEAD:  The other thing, there are

9      two exhibits that Ms. Scheurer says are not there.

10          THE COURT:  That's my next item on my

11     agenda.  Exhibits 337 and 338, the originals, are not

12     here.  I understand there is some thought that

13     perhaps counsel who is no longer in the case may

14     perhaps have inadvertently taken those.  I was

15     provided what appeared to be the duplicate original

16     copies, which have exhibit stickers on them.  It

17     seems to me that without objection they could be

18     substituted.  This is the DEA evidence exhibits,

19     which, frankly, have turned out to be not even

20     discussed really in connection with the closing in

21     the case.  Is there any objection to substituting

22     those duplicate copies of Exhibits 337 and 338?

23     Hearing none, that's what we will do.

24          Third, I would request without objection from

25     the defendants that the U.S. Attorney's Office

1    maintain custody and control of the drug and gun

2    evidence overnight.  The U.S. Attorney's Office has

3    the capability to do that in a secure way -- the

4    court does not have that facility -- make that

5    available then at the time in the morning such that

6    it will be in the jury room when they are ready to

7    deliberate.  Is there any objection to that?  All

8    right.  Hearing none, that's what we will do.

9         With regard to the CDs that I discussed a little

10   bit ago, Ms. Scheurer tells me there are several

11   steps you have to go through to make that work.  It's

12   possible the jury will be able to figure it out on

13   their own.  If they don't, is there any objection to

14   simply having Ms. Scheurer or our IT person -- I

15   think Ms. Scheurer can probably do it herself -- go

16   in there and show them how to do it if they so

17   request?  I see no objection, so that's what we will

18   do.

19        I broach that issue with Ms. Shaw and Ms. Heron,

20   but particularly with regard to Ms. Shaw, who has not

21   been being paid since the first few days of this

22   particular trial, has continued to serve, has not

23   requested to be excused, but she did -- and she

24   figured out a while back that she was probably an

25   alternate -- ask Ms. Scheurer if it would be possible

1    for us to not have her be here during the

2    deliberations.  I have done that on one occasion in

3    the past.  I would seek your counsel and feelings

4    about this.  As you know, the rule is that if an

5    alternate is called into service the deliberation has

6    to begin from the very beginning, so if that should

7    happen and we have to call somebody in and we had to

8    plug them in, there's going to be, obviously, some

9    delay, and I would bring the jury back in and

10   instruct them to that to begin with.  It's not as if

11   there's a seamless transition in any event.  So I

12   guess I'm inclined to accommodate her request under

13   all the circumstances, and there's no reason not to

14   have the same apply to Ms. Heron as well.  She's been

15   having trouble with her asthma, and I think she would

16   probably very much appreciate being able to be in her

17   own home unless she needs to be called upon.

18       Ms. Scheurer, you have the ability to contact

19   them, I assume, and we would make sure we had the

20   ability to contact them to get them here on

21   relatively short notice; is that correct?

22                THE COURTROOM DEPUTY:  That's correct.

23                THE COURT:  Without objection I would then

24   say -- because I see heads nodding in assent to the

25   notion, without objection then I will have Ms.

1    Scheurer instruct Ms. Shaw and Ms. Heron that,

2    subject to their following the admonition that I've

3    repeated to them here in court and upon which I

4    elaborated concerning their position as alternates

5    not actually participating in deliberation, I will

6    have her communicate that they do not need to remain

7    here tomorrow but that they must come here first

8    thing in the morning just to make sure that we don't

9    have to substitute them right after the bat.  If we

10   do, so be it.  Hopefully, we won't, of course, and we

11   can send them off subject to call.  Is there any

12   objection to that?  I hear none.

13        Is there anything else that we should do before

14   we break?

15             MR. CALBI:  Just to be clear, tomorrow we

16   just need to be in the building; we don't need to sit

17   in here; we just need to let Ms. Scheurer know where

18   we need to be?

19             THE COURT:  I did not specifically address

20   that.  Somebody brought it up earlier.  Let me go

21   through what -- I typically would actually say it

22   more expressly.  Yes, you need to be here at the

23   building someplace and subject to us being able to

24   contact you in case there is a question.  As a

25   practical matter, because I'm beginning jury

```
 1        selection at 9:30 tomorrow next door -- I'm going to
 2        use that courtroom for that trial so you all can keep
 3        your situation here logistically, but the likelihood
 4        is, even if there is a question, I'm not going to get
 5        to it right away unless it is a truly urgent
 6        question, but because do I reserve the right to
 7        consider the question truly urgent, please be here at
 8        9:00 o'clock just in case, but if it is something I
 9        think can wait, I will wait until some more natural
10        break with the jury selection process before I come
11        in here and attend to a question.  Is there anything
12        else then?  All right.  Thank you all very much.  I
13        will look forward to seeing you as we go, and until
14        that time we are in recess.
15                (Court was adjourned.)
16                    * * * * *
17                THURSDAY, MAY 7, 2009
18                (The jury commenced deliberations at 9:00
19        a.m., and at 1:20 p.m. during said deliberations the
20        following proceedings were had outside the presence
21        of the jury:)
22                THE COURT:  We have what I would consider a
23        relatively predictable question from the jury.  It
24        reads as follows:
25            "Was Government's Exhibit 269 --" as you'll
```

 1    recall, it's the chart of the pictures with various

 2    alleged roles assigned "-- entered into evidence?  If

 3    so, may we please have it?"

 4         Obviously, the answer is that it was admitted

 5    only for demonstrative purposes.  Unless there were a

 6    unanimous agreement among all concerned, I would not

 7    submit the chart to them.  Is there any desire to

 8    have the chart submitted?  Mr. Bell?

 9              MR. BELL:  We would be fine submitting the

10    chart.  As a matter of fact, we actually prefer doing

11    it.

12              THE COURT:  What about the other

13    defendants?  How do you all feel about that?  The

14    government's position, I assume --

15              MS. MOREHEAD:  I don't have a problem with

16    it being submitted.  Sure.

17              MR. BELLEMERE:  Mr. McDaniel has no

18    objection to it being submitted.

19              THE COURT:  All right.

20              MR. SANDAGE:  No objection on behalf of Mr.

21    Foy.

22              MR. CALBI:  No objection on behalf of

23    Mr. Wesley.

24              MR. HEATHMAN:  No objection on behalf of

25    Ms. Temple.

1        THE COURT:  Mr. Johnson?

2        MR. JOHNSON:  We will object, Judge.

3        THE COURT:  All right.  Sustained.  It was

4    admitted for demonstrative purposes only, and that's

5    the purpose for which it will remain.

6        This is the court's answer to the question.  The

7    answer is, "The exhibit was admitted for

8    demonstrative purposes only, and so it may not be

9    given to you during deliberations."  Dated and signed

10   by me.  Is there any objection, in light of my

11   ruling, to the way in which I have phrased that?

12   Hearing none, I will give it to Mr. Rempel, who is

13   the bailiff at this juncture, to transmit it to the

14   foreperson.  The jury is at lunch.  They should be

15   back shortly, and it will be submitted.

16             (The jury continued to deliberate, and at

17   3:30 p.m. during said deliberations the following

18   proceedings were had outside the presence of the

19   jury:)

20             THE COURT:  The jury's question is as

21   follows:

22       "Instruction 19 states that the government must

23   prove each of the following beyond a reasonable

24   doubt.  Paragraph 3 in Instruction 20 states beyond a

25   preponderance of the evidence.  Could we please have

1        guidance towards which to use, reasonable doubt or

2        preponderance of the evidence, for Counts 11, 14, 15,

3        19, 34 and 37?"

4             I have drafted a response.  If you look at the

5        instructions, I see what their potential confusion

6        is, but here is the proposed response.

7             "The only time that the

8        preponderance-of-the-evidence standard applies in the

9        context in which you have inquired is to determine

10       whether or not a particular call at issue was made

11       from or received in the state of Kansas.  In all

12       other respects the government's burden of proof is

13       beyond a reasonable doubt."

14             That, I think, answers the question they have in

15       that regard.  Is there any objection to my giving

16       that response?  I hear none.  By the way, the

17       foreperson, presiding juror, is Haley Bruns.  Here is

18       my answer.  And, Mr. Rempel, I know you know this,

19       but I want to make sure it's on the record.  You are

20       to give this to the foreperson with directions to

21       hold the question and responses to be returned with

22       the verdict form when it is delivered back in court

23       at the end of the case.

24             Anything else we need to do in this matter now?

25       Hearing none --

```
1              MS. MOREHEAD:  You want us back here a

2       little before five, Judge?

3              THE COURT:  Yes.  We will bring the jury

4       back in at 5:00 o'clock, assuming they have not

5       returned a verdict, to admonish them at the end of

6       the day.  So gather here at five.  I'm conducting a

7       jury trial at the other courtroom next door, so I'll

8       get back over here as quickly as I can get back.

9              MS. MOREHEAD:  Could I ask for one other

10      favor, Judge?  If we could have it -- we need the

11      evidence back about five minutes until five to put it

12      in the safe with DOD.  I don't know if that's

13      possible.

14              THE COURT:  Yes.

15              MS. MOREHEAD:  Just because there's nowhere

16      to secure it after five here in the courthouse.

17              THE COURT:  Okay.  I will tell -- have the

18      bailiff tell the jury that whether they have reached

19      a verdict or not they will stop their deliberations

20      by 4:55.

21              MS. MOREHEAD:  That would be fine.

22              MR. SANDAGE:  For scheduling purposes for

23      me, if it happens to go into next week, will they

24      deliberate on Monday?

25              THE COURT:  Yes, they will deliberate on
```

```
 1    Monday.  Basically, what I would do -- I take it

 2    back.  Since I advertised that we don't have trial on

 3    Monday, I will tell them it's up to them.  If they

 4    have relied on that as including deliberations,

 5    obviously, that's fine.  The problem is my schedule

 6    because I conduct other business on Monday.  It's

 7    fine for them to deliberate.

 8              MR. SANDAGE:  Thank you, your Honor.

 9              THE COURT:  If there's nothing else, we

10    will be back with you when needed.

11              (The jury continued to deliberate, and at

12    5:00 p.m. during said deliberations the following

13    proceedings were had:)

14              THE COURT:  Members of the jury, I brought

15    you back into the courtroom to remind you of the

16    admonitions before I excuse you for the evening.

17    It's important for me to emphasize, I think, at each

18    stage how important adhering to that ammunition is.

19    Obviously, now you've actually begun your

20    deliberations; you've heard it all; you know

21    everything that's out there; you've started

22    discussing it all.  What I would suggest to you is

23    that you not go home kind of keeping this going in

24    your mind.  I would suggest that the most useful

25    thing is if you could put it on hold where you left
```

1       at the end of the day.  Because the nature of the

2       jury deliberation is collective and individual, I

3       think it's important for you to remember that you are

4       working as individuals within a group.  You will hold

5       your own views, whatever they may be, and so on and

6       so forth, but I think it's not terribly useful,

7       necessarily, to be sort of working overtime outside

8       the collective group and trying to process

9       information.  Just go home, do what you need to do in

10      your life otherwise, and come back tomorrow morning.

11          Certainly don't talk to anybody about the case.

12      Don't read or listen to anything about the case.

13      Don't do any research about the case.  Don't have any

14      contact with the participants in the case.  We will

15      start with you at nine in the morning.  We will not

16      bring you in the courtroom at nine.  You'll simply

17      report to the jury room, but you may not begin

18      deliberations until the bailiff gives you the

19      go-ahead.  When that happens, you're free to proceed.

20          With that, Mr. Rempel, please take charge of the

21      jury.  We're in recess as to the jury.

22              (The following proceedings were had outside

23      the presence of the jury:)

24              THE COURT:  Is there anything anyone would

25      like to take up before we break?  Thank you all very

1    much.  We will continue as necessary until tomorrow.

2    Until then we are in recess.

3              (Court was adjourned.)

4                   * * * * *

5              FRIDAY, MAY 8, 2009

6              The jury resumed deliberations at 9:00

7    a.m., and at 3:20 p.m. during deliberations the

8    following proceedings were had outside the presence

9    of the jury:)

10             THE COURT:  As a preliminary matter, I

11   wanted to let you know that over the noon recess the

12   bailiff asked the foreperson if we could provide --

13   the foreperson asked the bailiff whether or not the

14   court could provide them with an easel and blank pad.

15   They had been posting things up on the wall to look

16   at.  I didn't think we needed to reassemble all of

17   you to permit that, so I authorized the bailiff to

18   give them an easel and blank pad, and I wanted to

19   simply make a record of that.  I assume there's no

20   objection.  If there is, please feel free to speak

21   up.  I hear none.

22             Okay.  That brings us to the question that was

23   posed, and I believe I've provided copies to all of

24   you so that you could not be hit by this cold as I

25   read it in open court because I think it takes a

1    little bit of flipping back to the verdict form to

2    fully understand the request.  Let me read it for the

3    record.

4         "Under Count 1 the verdict form has three

5    questions.  Questions 2 and 3 specifically mention

6    the conspiracy, but Question 1 does not.  Are we to

7    mark Question 1 according to the defendant or the

8    conspiracy?"

9         The answer to that obviously, in my opinion, is

10   that their answer should be the same as to each

11   defendant whom they find guilty under Count 1, and

12   therefore, whatever that is, that is as to the

13   conspiracy.  In terms of the way they put it, I think

14   the best way to answer that is to say their answer

15   should be the same for each defendant because it is a

16   conspiracy to do one, the other, or both; it's not

17   each individual had a different objective of the

18   conspiracy.  There was a conspiracy to do one or the

19   other or both if there was a conspiracy at all.  I

20   think that's what the answer ought to be.  Ms.

21   Morehead, what do you think?

22              MS. MOREHEAD:  Judge, I think if you use

23   the word "as to each defendant" then it gets a little

24   confusing because they couched it as, is it as to

25   each defendant individually or as to the conspiracy?

1    which it would be the latter based upon what you

2    said, as to the conspiracy.  So maybe if you could

3    incorporate --

4              THE COURT:  As to the conspiracy;

5    therefore, your answer should be the same as to each

6    defendant?

7              MS. MOREHEAD:  That you find guilty, if you

8    found them guilty, something to that effect, yes,

9    Judge.

10             THE COURT:  Any objections from the

11   defendants?

12      Mr. Johnson?

13             MR. JOHNSON:  Maybe I'm reading their

14   question differently.  It's a little bit difficult to

15   work through the question, figure out what they mean.

16   I propose an answer, because of the way I read their

17   question, that it should read something along the

18   lines of, Question 1 relates to conduct occurring

19   within the conspiracy, not all conduct relating to

20   the defendant, or something along those lines.  I

21   think as I read their question it was if they

22   believed that a defendant had some conduct within the

23   conspiracy and some conduct outside of that

24   conspiracy.

25             THE COURT:  I don't think so, Mr. Johnson.

```
1      I think they are asking whether Question 1 under

2      Count 1 -- which reads, "What controlled substance do

3      you find beyond a reasonable doubt was involved?"

4      That pertains to what was involved with the

5      conspiracy, not what somebody may have been involved

6      in in some random fashion.  I don't think you can

7      read it that way.  Is there anything else?  Let me

8      propose to answer it this way.  I'm still thinking

9      about this out loud, so I'm writing it on the fly.

10     "The question about which you inquire pertains to the

11     conspiracy; therefore, your answers to Questions 1

12     through 3 concerning Count 1 should be the same for

13     each defendant whom you find guilty of Count 1."  Any

14     objection?  I hear none.

15          There's another question, but let's dispose of

16     the first one first.  My answer is, as I indicated it

17     would be:

18          "The question about which you inquire pertains

19     to the conspiracy; therefore, your answers to

20     Questions 1 through 3 concerning Count 1 should be

21     the same for each defendant whom you find guilty of

22     Count 1."

23          Dated and signed by me.  I'm giving that to the

24     bailiff to take back and give to the foreperson.

25          We will look at the next one.  I'm reading it to
```

1      you aloud as I read it now.

2           "On page 6 Count 17 says, quote, attempted to

3      possess with intent to distribute 5 kilograms.  On

4      page 33, Instruction 21 the first essential element

5      states the defendant attempted to possess with intent

6      to distribute a controlled substance but does not

7      state a quantity.  Is there a quantity requirement or

8      not?"

9           Well, the answer to that obviously is they are

10     to answer it as -- again, I'm just talking.  I

11     haven't put this down.  They need to follow

12     Instruction 21, and then if they find someone guilty,

13     there are follow-up questions concerning the

14     quantity, so they need to proceed in that fashion.

15     If you look at the verdict form, the easiest way to

16     look at it, Mr. Wesley's, because it's on top of the

17     packet, shows the verdict form with the three

18     questions which follow below it.  As you know, the

19     weight is not an element; the weight has other

20     consequences; and the weight they simply need to

21     determine by answering the question below.  Any

22     comment or input?  Anyone?  Let me see if I can -- I

23     am getting some help here.

24          MS. MOREHEAD:  Instruction 25, I think.

25          THE COURT:  That's what Ms. Ludwig was --

1          yeah.  All right.  Let's give this a try.  The

2      elements are as stated in Instruction No. 21.  That

3      instruction informs you of what the government must

4      prove beyond a reasonable doubt in order to find a

5      defendant guilty.  Instruction No. 25 then tells you

6      that if you find a defendant guilty you must then

7      make an additional finding as to quantity as set out

8      on the verdict form.  Any objections to that?

9      Hearing none, that will be my answer.  Here is the

10     answer as I've written it on the form.

11          "The elements are as stated in Instruction 21.

12     That instruction informs you of what the government

13     must prove beyond a reasonable doubt in order to find

14     a defendant guilty.  Instruction 25 then tells you

15     that if you find a defendant guilty you then must

16     make an additional finding as to quantity as set out

17     on the verdict form."

18          Dated and signed by me.  Without objection then,

19     I will tender this to the courtroom deputy to hand to

20     the bailiff to hand to the foreperson.

21          One other thing.  We asked the jury whether or

22     not they would, assuming they do not tell us they are

23     done with their work by 5:00 o'clock, want to come

24     back on Monday or wait until Tuesday, and their view

25     was they do not want to come back on Monday.  People

1    have work things they need to do.  We will honor

2    that.  I probably should have put it to them

3    differently and not given them some reliance interest

4    in thinking they would have Monday off, but in

5    light of the fact that people have made plans to the

6    contrary, I'm not inclined to pull the rug out from

7    under them, so we will bring them back in at 5:00

8    o'clock and recess them until Tuesday if they have

9    not arrived at a verdict.

10        If there's nothing further, we will be back to

11   you when we need to visit some more.  We are in

12   recess.  What we will do again, Ms. Morehead -- I

13   assume five till five is what you need?

14            MS. MOREHEAD:  Yes, five till five.  Thank

15   you, Judge.

16            THE COURT:  By that I mean being able to

17   store the guns and drugs and so forth.

18            MS. MOREHEAD:  Yes, Judge.

19            (A recess was taken, and at 5:05 p.m.

20   during deliberations the following proceedings were

21   had outside the presence of the jury:)

22            THE COURT:  Is there anything we need to do

23   before we bring the jury in and admonish them for the

24   weekend?  All right.  Let's bring them in.

25            (The following proceedings were had in the

 1          presence of the jury:)

 2                    THE COURT:  Members of the jury, we will

 3          now recess for the weekend.  We will recess until

 4          Tuesday morning at 9:00 o'clock per your request.

 5          The admonition, of course, remains in full force and

 6          effect.  Don't discuss the case with anybody,

 7          including a fellow juror.  Don't do anything which

 8          has anything to do with the case.  Don't have any

 9          contact with the participants.  Don't do any

10          investigation or research about the case.  And as I

11          told you yesterday, as best as possible, hold your

12          mind in suspended animation, so to speak, until you

13          come back Tuesday.  Don't let your views crystallize

14          or harden to the point that they are not open to

15          further discussion with others.  That's really what

16          I'm trying to say as much as anything else in that

17          particular regard.  Have a pleasant weekend.  Come on

18          back on Tuesday.  We will see you then.  Until that

19          time we are in recess as to the jury.  The other

20          participants, stay here and we will talk about a

21          couple things before we break.  Ms. Ludwig, please

22          take charge.

23                    (The following proceedings were had outside

24          the presence of the jury:)

25                    THE COURT:  Anything we need to do before

1    we break?  All right.  Thank you all very much.  I'll

2    see you on Tuesday.  Until that time we are in

3    recess.

4                 (Court was adjourned.)

5                        * * * * *

6                 <u>TUESDAY, MAY 12, 2009</u>

7                 (The jury resumed deliberations at 9:00

8    a.m., and at 4:25 p.m. during said deliberations the

9    following proceedings were had in the presence of the

10   jury:)

11                THE COURT:  Members of the jury, I

12   understand that you're ready to break for the

13   evening, so I will bring you back here, as I have, to

14   remind you of the admonition.  I suspect each and

15   every one of you could give the admonition to me at

16   this point, you've heard it so often, but it bears

17   reminding that when you leave here you're done with

18   your deliberation, done with your involvement in the

19   case, until you come in tomorrow.  As you come in

20   tomorrow, don't start your discussions about the case

21   until you're all here and the bailiff has given you

22   the go-ahead.  So don't talk to anybody about the

23   case.  Don't do anything that touches on the case or

24   have any contact in the participants.  Just come on

25   back tomorrow morning at 9:00 o'clock.

1          Mr. Rempel, please take charge of the jury.

2     Until then we are in recess.

3               (The following proceedings were had outside

4     the presence of the jury:)

5               THE COURT:  All right.  Is there anything

6     that we should do before we break for the evening?  I

7     don't hear anything.  We will keep you posted.  Until

8     that time we are in recess.

9               (Court was adjourned.)

10                       * * * * *

11                  WEDNESDAY, MAY 13, 2009

12               (The jury resumed deliberations at 9:00

13     a.m., and at 10:10 a.m during deliberations the

14     following proceedings were had outside the presence

15     of the jury:)

16               THE COURT:  We're back in hearing outside

17     the presence of the jury to take up a question from

18     the jury, a copy of which I have provided to counsel,

19     but let me read it aloud for the record.

20          "We are stuck on a specific count.  Are we

21     permitted to consider evidence in the entire

22     conspiracy for a count other than Count 1, or should

23     we just take into consideration evidence on or about

24     that date of the specific count?  Instruction 10 is

25     unclear."

```
 1              Here is what I would propose as an answer

 2       subject to your feedback and some additional input.

 3       Instruction No. 10 provides in part, although the

 4       same evidence can be relevant to multiple counts,

 5       each count and the evidence pertaining to it should

 6       be considered separately.  That means that you can

 7       consider any of the evidence in the case that you

 8       find relevant to arriving at a verdict on the count

 9       in question.

10           I don't know if that's going to help them any

11       more, but I don't know what to tell them.  I think

12       Instruction 10 is fairly clear on its face.  I think

13       this answers the question the best I can, other than

14       saying, reread the instructions, folks, which I think

15       this is slightly more helpful to them.  Is there any

16       objection to that answer?  All right.  That's the

17       answer I'll give, see what that does.  Here is the

18       answer I propose to provide.

19           "No. 10 provides in part, although the same

20       evidence can be relevant to multiple counts, each

21       count and the evidence pertaining to it should be

22       considered separately.  That means that you can

23       consider any evidence in the case that you find

24       relevant to arriving at a verdict on the count in

25       question."
```

1          Dated and signed by me.  Hearing no objections,

2     I will tender this to the bailiff to give to the

3     foreperson.

4          And while we're here, my next question is with

5     regard to, in the event that a verdict would be

6     returned which would give rise to a forfeiture

7     process, do any of the defendants wish to have that

8     presented to the jury, or do you prefer to waive that

9     and have it done by the court?  Mr. Wesley, as I

10    understand it, having pled on the conspiracy count,

11    doesn't have an option there.  I think he is bound to

12    have it done by the court.  Do you disagree with

13    that, Mr. Calbi?

14          MR. CALBI:  Judge, whether we disagree or

15    not, we want the court to decide anyway, so I guess

16    we have carried that issue.

17          THE COURT:  Mr. Sandage?

18          MR. SANDAGE:  I have conferred with Mr. Foy

19    about that prior to today.  It's been our opinion --

20    I think he reasserted that -- he would let the court

21    make that decision.

22          THE COURT:  Mr. Bell?

23          MR. BELL:  We're the same as Mr. Sandage.

24    We would like the court to do it.

25          THE COURT:  Mr. Heathman?

1          MR. HEATHMAN:  The same, your Honor.  Allow

2     the court to do it.

3          THE COURT:  Mr. Bellemere?

4          MR. BELLEMERE:  My client agrees to allow

5     the court to do it.

6          THE COURT:  Mr. Johnson?

7          MR. JOHNSON:  We're going to waive the jury

8     trial, Judge.

9          THE COURT:  If there is a verdict that

10    gives rise to forfeiture, that will conclude with

11    this jury, and we will talk about all that in due

12    course.

13        If there's nothing further we need to do at this

14    juncture, we're in recess until further call.

15          (The jury continued to deliberate, and at

16    12:05 p.m during said deliberations the following

17    proceedings were had outside the presence of the

18    jury:)

19          THE COURT:  We're back in court again

20    outside the hearing of the jury.  Ms. Temple

21    apparently is not here; is that correct, Mr.

22    Heathman?

23          MR. HEATHMAN:  That's correct.  I was late

24    getting her called.  She is downstairs and should be

25    here momently.

```
 1                    THE COURT:  Do you want to wait for her?
 2                    MR. HEATHMAN:  No.  I think we can proceed.
 3                    THE COURT:  Very well.  I passed out copies
 4          of this question to counsel.  The question is on a
 5          cell phone count.
 6               "Can we only use the phone calls involving the
 7          specific individual or can we use any call of that
 8          day to establish location of an individual even if
 9          the specific individual is not on the call?"
10               I've not actually drafted a proposed answer
11          already, but it appears to me that the jury is
12          entitled to rely on any evidence that they believe is
13          relevant to establishing the location and that the
14          answer should be something to that effect.  All
15          right.  Let me draft something.
16               Let the record reflect that Ms. Temple has
17          joined us.
18               Here is the proposed answer:
19               "The jury may rely on any evidence which you
20          find relevant to establishing the location of the
21          individual in question."
22               Mr. Sandage?
23                    MR. SANDAGE:  Could we add something as it
24          relates to the -- these calls are time specific.  I
25          mean, the charge, if they are going to rely -- if the
```

1    jury is going to rely on a piece of evidence as to

2    the location of that caller two hours earlier or two

3    hours later after the specific count of that phone

4    call, I'm not -- I don't know if that answer narrows

5    it as to what their inquiry has to be.

6              THE COURT:  It's not clear to me what their

7    inquiry specifically is, but I think they have to

8    decide in their own mind, what does it tell us if

9    person A was someplace two hours before or two hours

10   after?  Does that -- there certainly are inferences

11   to be drawn that if they were there two hours before

12   or two hours after they were there at some other

13   time.  I think cutting it any finer winds up perhaps

14   directing them too much or, on the other hand, being

15   confusing.

16              MR. SANDAGE:  All right.

17              THE COURT:  Any other comments or any

18   objections?  Hearing no objections, then I will

19   provide them this answer.  All right.  I'm going to

20   give this to the bailiff with directions to give that

21   to the foreperson.  I have to attend a judges meeting

22   for a little bit here.  If we get a verdict -- I'll

23   be out of that fairly shortly.  I'm due to start

24   instructions in the other trial at 1:00 o'clock, but

25   I've told counsel in that case if we were to get a

1    verdict before we started the instructions at 1:00

2    o'clock I would delay that process to take the

3    verdict here.  If we get word that there is a verdict

4    while I am reading instructions, I will finish

5    reading instructions, then take a break before going

6    to closing argument.  If I get the word that we have

7    a verdict while we have started closing arguments, I

8    will probably go through closing arguments before

9    taking the verdict.  I don't want to unduly disrupt

10   the lawyers in that case either.  That's just a heads

11   up of where we're going.  Of course, it's possible we

12   won't get a verdict at all, but we will see what

13   happens.  Mr. Sandage?

14            MR. SANDAGE:  How long do they have for

15   closing arguments?

16            THE COURT:  Thank you.  The government has

17   30 minutes; the defendants collectively have 40

18   minutes.

19            MR. SANDAGE:  Thank you.

20            THE COURT:  And I doubt they will use it.

21   Actually, it will probably be an hour's worth of

22   closing argument.

23            MR. SANDAGE:  So it's not something that

24   would take us to the end of the day.

25            THE COURT:  No.  All right.  If there's

```
 1          nothing else, I'll see you later, meaning we're in

 2          recess.  We do have a question.  There's no reason to

 3          give them the answer to the question tonight.  I'll

 4          tell you what question is, and you can ponder it

 5          while we bring the jury back in to excuse them for

 6          the evening.

 7               The question is, "Instruction 26, third

 8          element."

 9               I didn't bring my instructions back here.  I

10          think they are on the other bench.

11               "Does the evidence if the offense either began,

12          continued, or completed in the state of Kansas apply

13          to the gun?"

14               In other words, this is an issue involving

15          really just Mr. Calbi and Ms. Morehead here, but

16          think about that.

17               Mr. Rempel, if you would like to bring the jury

18          in, please.

19                    (The following proceedings were had in the

20          presence of the jury:)

21                    THE COURT:  All right.  Members of the

22          jury, I'm going to dismiss you for the day.  What

23          time do you want to start in the morning?

24                    THE FOREPERSON:  I think we have agreed to

25          start at 9:00 o'clock.
```

1          JUROR MILLER:  9:00 o'clock sharp.

2          THE COURT:  All right.  Let's have it be

3     that way.  9:00 o'clock sharp.  And I'll remind you

4     of all the admonitions.  I'm not even going to go

5     through them again.  You know what they are.  Just

6     have a nice break, come on back ready to go in the

7     morning.  Mr. Rempel, please take charge of the jury.

8     As to the jury, you are in recess for the evening.

9          (The following proceedings were had outside

10    the presence of the jury:)

11          THE COURT:  All right.  Again, the

12    question, "Instruction 26, third element, does the

13    evidence that the offense either began, continued, or

14    completed in the state of Kansas apply to the gun?"

15         My reaction to that is yes.  Anybody disagree?

16    No?  All right.  All right.  This is going to be

17    good.  My answer is going to be yes.  I bet they will

18    appreciate that for a change.

19         All right.  Ms. Ludwig, I'm going to give you

20    this answer, and we will give that in the morning to

21    the foreperson of the jury.

22         Is there anything else we should do before we

23    break for the evening?  Hearing nothing, we will

24    expect you all back again first thing in the morning,

25    9:00 o'clock.  We will assemble when the jury makes

 1      it such that we need to assemble.  Until that time we

 2      are in recess.

 3                  THURSDAY, MAY 14, 2009

 4                  (The jury resumed deliberations at 9:00

 5      a.m., and at 11:45 a.m during deliberations the

 6      following proceedings were had outside the presence

 7      of the jury:)

 8                  THE COURT:  We have two questions which are

 9      related, and I will read them both to you.  The first

10      is:

11          "Instruction 26 provides a list of nine factors

12      to help determine whether possession of a firearm

13      furthers, advances, or helps advance a drug

14      trafficking crime.  How many factors are needed to

15      determine the furtherance of a drug trafficking

16      crime?"

17          Then the second question is, "What do you

18      consider a reasonable definition of accessible?"

19      accessibility being one of the factors listed in

20      Instruction No. 26.

21          Going backwards, I would suggest that the answer

22      to, "What do you consider a reasonable definition of

23      accessibility?" is something along the lines of, you

24      must determine that, taking into account the totality

25      of the circumstances involved.  I don't believe we

```
 1          should get into some more detailed definition of
 2          accessibility.  This is, again, a count that affects
 3          Mr. Wesley only.  If Mr. Calbi and Ms. Morehead
 4          disagree with me and you have some definition of
 5          accessibility you all can agree upon, I'm open to
 6          that.  But assuming that's not the situation, is
 7          there any objection to some sort of response along
 8          the lines I just indicated?  I hear none coming.
 9               On the how-many-jurors-does-it-take-to-screw-in-
10          a-lightbulb question, the answer to that, again, I
11          think is one we can't answer.  I think it should be
12          something along those lines of, I cannot give you a
13          mathematical formula to apply.  You simply have to
14          evaluate all of the evidence and arrive at a
15          conclusion, something along those lines.  Is there
16          any objection to that sort of approach?
17                    MR. CALBI:  No.  I think that's the law.
18                    THE COURT:  All right.  With regard to the
19          question concerning the factors, I would suggest an
20          answer along the lines, "I cannot give you a
21          mathematical formula.  You must decide this
22          considering all of the evidence in the case."
23               With regard to accessibility, I would propose an
24          answer, "I cannot give you a precise definition.  You
25          must take into account the totality of the
```

1    circumstances as revealed by the evidence in the

2    case."

3         Any objection to either of those?  Ms. Morehead?

4              MS. MOREHEAD:  No, your Honor.

5              THE COURT:  Mr. Calbi?

6              MR. CALBI:  No, your Honor.

7              THE COURT:  Anyone else?  Hearing

8    none, all right.  I have written those answers I

9    indicated I would, signed my name, and I'm giving

10   both of those questions to the bailiff to hand to the

11   foreperson of the jury.

12        All right.  Is there anything further we should

13   do at this point?  I hear nothing, so we are in

14   recess until further call.

15              (The jury continued to deliberate, and at

16   4:23 p.m. during said deliberations the following

17   proceedings were had outside the presence of the

18   jury:)

19              THE COURT:  Perhaps you all have had the

20   opportunity take a look at this question.  I'll read

21   it out loud:

22        "Count 1 for conspiracy.  Instruction 12 has

23   four essential elements.  According to Instruction

24   14, if Element 1 is not met, then it states we must

25   find the defendant not guilty.  Instruction 27 says

1    Count 1 is included.  Does that mean we could only

2    use those two essential elements of Instruction 27 to

3    find guilty of conspiracy?"

4         All right.  That's the question.  I would be

5    happy to entertain your thoughts.  My inclination is

6    to say that you must resolve this matter by your

7    reading of the instructions.

8              MR. JOHNSON:  I think, Judge, you probably

9    know our perspective.  We went around in circles

10   about what we thought were some real difficulties

11   with Instruction 27 regarding the conspiracy.  My

12   preference for the court would be that, in order to

13   find guilty of conspiracy, you must find each and

14   every element beyond a reasonable doubt.  I mean,

15   that would be our preference.

16             THE COURT:  I'm not going to change the

17   instructions as given, and I've satisfied myself by

18   further research since we have submitted this that it

19   was correct, at least far as the law has been

20   developed through the only circuit cases that have

21   dealt with this at all, that one can have an aiding

22   and abetting in conspiracy.  The Tenth Circuit hasn't

23   dealt with this; therefore, this case has been tried

24   on this theory, and I'm not going to change that

25   posture at this juncture.  The question is how to

1    respond to this because it is simplistic to say yes

2    because really there's -- they still have to find

3    that -- to have aided and abetted the conspiracy,

4    they would have to find that the aider and abettor

5    knew of the conspiracy, meaning they would have to

6    find there was a conspiracy and what that conspiracy

7    was which the person aided and abetted.  So the

8    answer isn't as simple as yes.  The difference is

9    that the person to aid and abet it doesn't have to

10   him or herself have agreed to become a part of the

11   conspiracy.  I think that answer is more complicated

12   and more detail than I want to give them; therefore,

13   I think I should simply send them back to reading the

14   instructions as we have given them, and that's what I

15   intend to do unless somebody can persuade me to the

16   contrary.

17        And now Ms. Morehead will have the opportunity

18   to do so.

19             MS. MOREHEAD:  Judge, frankly, the question

20   is with regards to Instruction No. 27.  There are two

21   elements, and if, in fact, they find beyond a

22   reasonable doubt those two elements, can we, in fact,

23   find someone guilty of conspiracy?  Those two

24   elements are, first, that someone else committed the

25   charged crime and, second, that the defendant

```
1         intentionally associated himself in some way with the
2         crime and intentionally participated in it as he
3         would in something he wished to bring about.  So I
4         believe the answer is yes, and I know you think that
5         that's too simple, but that's the exact question that
6         they are asking, if we find that those two elements
7         are met --
8                   THE COURT:  I understand.  And I --
9                   MS. MOREHEAD:  -- can we convict them?  And
10        I think the answer is yes.
11                  THE COURT:  I think the short answer is
12        yes, but I don't think that's the answer that I want
13        to give them here simply because I think that runs
14        the risk of causing them not to focus on the
15        difference between the two.  I have trouble fathoming
16        why they would ask this question without thinking
17        that there is something going on in all of this that
18        could conceivably be misleading, and I want them to
19        go back and focus on the words of the instruction.
20        Judge O'Connor was a great one for generally
21        following the principle of sending people back to the
22        instructions.  Oftentimes I have tried to be more
23        helpful to jurors than that, but I think this is a
24        case where Judge O'Connor's prudent approach makes
25        sense to me, and I'm going to simply send them back
```

1       to the words of instruction.

2               MR. BELL:  Judge, I loathe to ask for this,

3       but given the jury's question, I think it might be

4       appropriate.  I think I share your concern that there

5       might be something a little misleading about the

6       aiding and abetting questions with the conspiracy.  I

7       know the verdict forms don't have them on them now,

8       but in light of that question I think it would be

9       appropriate to ask them on the verdict form if they

10      are finding the defendants guilty as a principal or

11      under an aiding-and-abetting theory, the reason

12      being, if they were to find someone like Mr. Trinkle

13      and Mr. Goodwin guilty under an aiding-and-betting

14      theory, that would be vulnerable to a

15      sufficiency-of-the-evidence challenge.

16              THE COURT:  The one second thought -- I

17      will confess to you the one second thought that I

18      have had about all this is that I wish I had included

19      on the verdict form the alternative for them to

20      decide on Count 1 whether they were finding the

21      person liable as a principal or as an aider and

22      abettor simply because it would preserve that issue

23      for appeal purposes more cleanly, and I wish I had

24      done it that way.  That is the second thought that I

25      have had.  I'm not sure about the mechanics, however,

1    of interjecting that at this juncture, but I would

2    entertain a discussion of that.  Is there any

3    discussion?

4              MR. JOHNSON:  I'll discuss it.

5              THE COURT:  I'm not surprised.

6              MR. JOHNSON:  We have a variety of

7    remedies.  Our concern has been well stated.  One

8    remedy we know we're not going to do is to change the

9    instruction.  I think that bell has rung.  Another

10   option is to rescind the verdict form and submit a

11   new one, which I think might be confusing to the

12   jury, especially in light of this question.  We're

13   kind of having one of these holy cow moments, and

14   they will see it.  The other option is to poll the

15   jury at the end.  If there is a guilty verdict on

16   conspiracy, we ask each juror if they found him

17   guilty as an aider and abettor.  Obviously, we

18   have -- I have only polled jurors in terms of whether

19   that is, in fact, their vote.

20             THE COURT:  I think that's a bit

21   complicated.

22             MR. JOHNSON:  These are brainstorm ideas

23   but --

24             THE COURT:  No, I appreciate that.  I think

25   that's a bit -- I doubt that that's the avenue I

1    would like to proceed.  Any other thoughts?

2             MS. MOREHEAD:  Well, my only problem with

3    that, Judge, is that clearly delves into their

4    deliberation process, which is strictly forbidden.

5             THE COURT:  The question I have is, is

6    there any merit in thinking about going back and

7    revising the verdict form?  I'm obviously loathe to

8    do that for lots of reasons, but it is -- Mr. Bell

9    has touched on the one darn-I-wish-I-could-do-it-over

10   thought I had, and that is, it would have been nice

11   to be able to preserve that to be able to make an

12   appeal cleaner, but we didn't, so there we are.  The

13   question is, would it be appropriate to go back and

14   do that now?

15        Mr. Sandage, what do you think?

16             MR. SANDAGE:  I have no objection to that.

17             THE COURT:  Mr. Heathman, what do you

18   think?

19             MR. HEATHMAN:  I wouldn't have any

20   objection to that.

21             THE COURT:  Mr. Bellemere?

22             MR. BELLEMERE:  I have no objection.

23             THE COURT:  Mr. Johnson?

24             MR. JOHNSON:  No objection.

25             THE COURT:  What do you think, Ms.

1          Morehead?

2                    (Another question from the jury was

3          delivered.)

4                    THE COURT:  They have another question.

5          They have a way of doing this.  Here is their next

6          message, which is interesting.

7              "We are struggling to reach a unanimous decision

8          on one charge.  Should we move on to another charge?

9          Will one undecided charge hang the entire trial or

10         just that count?"

11             Obviously, the short answer to that is that they

12         are entitled to return a unanimous verdict as to

13         whatever of the defendants and whatever charges they

14         are able to arrive at a verdict on, and we can

15         certainly tell them that at this juncture.

16             This business, you know, we're struggling and

17         should we move on, I don't think I should tell

18         them -- answer that.  I think the second part of

19         their question, will one undecided charge hang the

20         entire trial or just that count, I think we can

21         answer, as I say, in the form of, you may return a

22         unanimous verdict as to whichever defendants, if any,

23         and whichever counts, if any, you are unanimously

24         able to arrive at a verdict on.  Is there any

25         objection to giving them that instruction while we

1    ponder what we're going to do about this other

2    matter?  I hear no objection.

3         This is the first sentence.  I was thinking I

4    might add another one.  "You may return a verdict on

5    any counts, if any, and as to whichever defendants,

6    if any, concerning which you have arrived at a

7    unanimous verdict."  Then I could add a sentence to

8    say, in doing so you may tell us that you are unable

9    to reach a unanimous agreement as to other counts or

10   defendants.  Any objection to adding that sentence?

11   I'm going to answer that one first with some hope

12   that that may break a logjam here.  So in answer to

13   the we-are-struggling-to-reach question, I am going

14   to give the following answer:

15        "You may return a verdict on any counts, if any,

16   and as to whichever defendants, if any, concerning

17   which you have arrived at a unanimous verdict.  In

18   doing so, you may tell us that you are unable to

19   arrive at a unanimous verdict as to other counts or

20   defendants."

21        Mr. Rempel, without second-guessing my thinking,

22   which was not entirely consistent there, I am asking

23   you to give that to the foreperson.

24        Well, we have a verdict in the other case, so at

25   least 12 people can agree on something in some case.

1    That's reassuring.  In the meantime, why don't you

2    all remain here and -- because -- I say that from the

3    marshals' perspective.  There's no reason to take the

4    defendants out.  We're either going to have something

5    happen or send the jury home fairly soon, and I might

6    want to talk about that question a little bit more

7    after I deal with the verdict in the other case.  So

8    see you in a bit.

9              (A recess was taken.)

10             THE COURT:  The jury is ready to go home

11   for the day, so we will bring them in and admonish

12   them, and we can discuss this question a little bit

13   more after they are gone.

14        I think we're ready to bring the jury in.

15             (The following proceedings were had in the

16   presence of the jury:)

17        Well, we're at the end of yet another day, so I

18   will remind you of the admonitions.  I heard it said

19   in the hallway that you were coming back at 8:30; is

20   that correct?

21             (Affirmative responses from the jury.)

22             THE COURT:  So we will see you back here at

23   8:30.  I won't bring you back in the courtroom, of

24   course.  I will remind you of the admonitions.  Don't

25   discuss the case among yourselves or with anybody

1     else or do anything which has anything to do with the

2     case.  Don't have any contact with any participants

3     or anything like that.  Come on back tomorrow ready

4     to proceed.

5          Mr. Rempel, please take charge of the jury.  As

6     to the jury, we are in recess for the day.

7     Participants, please stay here.

8               (The following proceedings were had outside

9     the presence of the jury:)

10              THE COURT:  The jury has now departed, and

11    we are back among ourselves.  I also heard them say

12    in the hall, I'll bring the Christmas tree if you'll

13    bring the turkey.  I'm not sure what that portends,

14    but in any event, have you all had a chance to think

15    any further about the question we left unanswered at

16    our last gathering?

17         Mr. Bell?

18              MR. BELL:  Judge, this was drafted when you

19    were in the other courtroom.  I haven't had a chance

20    to share amongst my cocounsel, so I don't know if

21    they have an objection.  I thought this might be a

22    reasonable answer to how many angels can dance on the

23    head of a pin for aiding and abetting a conspiracy.

24         You may find each defendant guilty of Count 1 as

25    either a principal under Instruction 12 or as an

 1     aider and abettor under 27.  However, to find a

 2     defendant guilty as an aider and abettor, you must

 3     find beyond a reasonable doubt that there was a

 4     conspiracy between two or more people and find beyond

 5     a reasonable doubt that the defendant aided and

 6     abetted that conspiracy by intentionally helping the

 7     conspirators agree to violate the federal drug laws

 8     as listed in Instruction 12 by intentionally helping

 9     the conspirators know the essential objectives of the

10     conspiracy per Instruction 12, intentionally helping

11     the conspirators knowingly and voluntarily involve

12     themselves in the conspiracy per Instruction 12, or

13     intentionally helping the conspirators act together

14     for their mutual benefit per Instruction 12.

15          What I essentially did was went through the

16     elements of the conspiracy, which the aider and

17     abettor would have had to have helped them do in some

18     fashion so as not to become a principal but assisted

19     the other conspirators in forming that conspiracy.

20               THE COURT:  Have you shared that with --

21               MR. BELL:  I haven't.  I finished it just

22     as you were speaking to us, Judge.

23               THE COURT:  Here is what I would suggest.

24     I think that's a very interesting suggestion.  I

25     think other counsel should have the opportunity to

```
 1      take a look at that.  Why don't we reconvene at 8:30

 2      tomorrow, since we're all going to be here anyway.  I

 3      have a suppression hearing at 9:30, but I need to

 4      kill some time before then, so I might as well hang

 5      out with you all.  Why don't you reduce that to some

 6      sort of typewritten form, get copies, e-mail them, or

 7      whatever you wish, to Ms. Morehead and the other

 8      defense counsel -- this isn't so much Mr. Calbi's

 9      issue, but I'm sure he would love to be included

10      nonetheless -- as well as to me.  Send an email copy

11      to the chambers account, and we will get together in

12      the morning at 8:30.  If anybody else has any other

13      input -- Ms. Morehead, obviously, specifically that

14      would include you in terms of maybe having another

15      perspective as well -- please feel free to do the

16      same, and if anybody wants to pursue the

17      revision-to-the-verdict-form idea, feel free to think

18      about how you might draft something along those

19      lines, and I'll do the same myself in our absence.

20           Is there anything else that you would like to

21      talk about right now?

22                MR. SANDAGE:  Logistically, if they go

23      beyond Monday -- last week we had Monday off because

24      you hadn't informed them.  Do you plan on asking

25      them?
```

1           THE COURT:  The other thing I heard them

2     say in the hall as they were walking back, I heard

3     somebody talk about coming in Monday.

4           MR. SANDAGE:  So I assume the court's

5     fine --

6           THE COURT:  Yes.  I have other stuff going

7     on Monday, but I can do it next door.  I really

8     sympathize with all the rest of you who -- I

9     recognize you have other things as well, and please

10    understand the court is mindful of that, but as you

11    can see, we never know where in the course of the day

12    something is going to break.  Having lawyers

13    dispersed from Douglas County to the wilds of

14    Missouri, you know, is something that just makes it

15    pretty difficult to make things work if we're not all

16    together, and I'm sorry it has to be that way, but

17    that's how it is.

18         Anything else we ought to do before we quit for

19    the day?  Thank you all.  I will see you in the

20    morning.  Until then we are in recess.

21                   FRIDAY, MAY 15, 2009

22           THE COURT:  We're back in session here

23    this morning outside the presence of the jury to take

24    up some matters that relate to the question that we

25    left unanswered yesterday and matters that flow from

1    that concern.  I received and reviewed a copy of the

2    email from Mr. Bell with the suggested answer.  I

3    believe that that answer you propose, I think it's

4    too narrow.  I think the conspiracy could be aided

5    and abetted in ways other than as you enumerated.  As

6    I continued to think about it last night, my thoughts

7    remained what they were at the end of the day, and

8    that is, any explanation runs the risk of the need to

9    write a treatise on the relationship between these

10   subjects, and therefore I would propose the following

11   answer, which is along the lines where I was

12   yesterday afternoon, that is, members of the jury, I

13   am unable to provide you any additional guidance on

14   this matter.  You must follow all of the instructions

15   given you by the court and decide this case on all

16   the evidence which has been admitted.  That's my

17   proposed answer.  Is there any objection?

18             MS. MOREHEAD:  Judge, we've got this

19   supplemental verdict form.  Are you saying you're

20   not --

21             THE COURT:  I'm going to that next.  That's

22   unrelated to answering the question.

23             MS. MOREHEAD:  I guess I want to kind of

24   address that in connection with the answer.  You've

25   just proposed -- first of all, I concur with your

```
 1        recitation of Mr. Bell's proposed instruction;
 2        however, I believe this can all be accomplished
 3        simply by indicating that clearly there are two
 4        theories under which someone could be convicted under
 5        the conspiracy, one being as a principal of the
 6        conspiracy and one as an aider and abettor; and I
 7        believe that an indication to them that it would be
 8        necessary for them to have a unanimous decision as to
 9        either of those theories, that, in essence, answers
10        the question.  It also addresses the supplemental
11        verdict form.
12                  THE COURT:  What I would intend to do --
13        I'm happy to address the supplemental instruction and
14        verdict in answering the question, if you desire.
15        What I would intend to do if the supplemental
16        instruction and supplemental verdict form would meet
17        with the parties' approval would be first to return
18        this answer to the jury, and then virtually
19        immediately thereupon I would bring them back into
20        court, read the supplemental instruction to them, and
21        explain to them that they have this supplemental
22        verdict form to be used in the event that they need
23        to based upon the supplemental instruction.  That way
24        they would have the answer, shortly followed by the
25        supplemental instruction and verdict form, which I
```

1    think gives them ample guidance.

2              MS. MOREHEAD:  I guess my problem with

3    doing the supplemental verdict form as to Count 1,

4    Judge, is Instruction No. 27, which has to do with

5    aiding and abetting, there were other charges that

6    they were also charged with aiding and abetting for.

7              THE COURT:  Correct, but I don't think they

8    have evinced any confusion with regard to any other

9    count, nor is there any legal issue raised as to

10   whether or not aiding and abetting is appropriate as

11   to any of the other counts.  The principal reason for

12   which I want to submit a separate verdict form with

13   regard to Count 1, having them answer this question,

14   is to make clear for appellate review as to what the

15   basis was for any particular defendant's conviction

16   so that for appeal that issue of whether or not one

17   can aid and abet a conspiracy can be properly

18   addressed without there being any confusion.  That's

19   the only reason for which I'm proposing the

20   supplemental verdict form.  I do think that that may

21   help them focus on the fact that there are two

22   alternative approaches here and that they need to

23   tell us which one it is.

24             MS. MOREHEAD:  I just -- frankly, I

25   think -- I know it's confusing.  I think there's an

1    easier, simpler way to do that, just advising them

2    that under whichever theory they feel appropriate, if

3    they find them guilty, that their decision has to be

4    unanimous as to either of those theories, like we did

5    in connection with many of the other alternative

6    theories that were given within the jury

7    instructions, for instance, Instruction No. 14, which

8    had to do with the five alternative theories of

9    conspiracy, and you advised them there that their

10   decision had to be unanimous as to any of the

11   particular theories.  That's what we're talking about

12   here as well.  That's all.  I just think there's a

13   simpler way to do it.

14              THE COURT:  Thank you for your input.  Any

15   objection by the defendants to the proposed

16   supplemental instructions and supplemental verdict

17   form?

18              MR. SANDAGE:  On behalf of Mr. Foy we would

19   object.

20              THE COURT:  What is your basis?

21              MR. SANDAGE:  I believe it could

22   fundamentally have changed the way we might have

23   argued to the jury -- the case to the jury; I think

24   it brings too much into focus a particular issue; and

25   for those reasons we object.  We think it would

```
 1        prejudice Mr. Foy.
 2                     THE COURT:  Your objection is sustained.  I
 3        will not provide the supplemental instruction or
 4        verdict form.  I will simply give the answer to the
 5        jury which I indicated I would.
 6                     MR. BELL:  I would like to renew for the
 7        record on behalf of Mr. Trinkle our request that the
 8        supplemental instruction be given with the
 9        supplemental verdict form.
10                     THE COURT:  I'm declining to do so.  No
11        such supplemental instruction or verdict form was
12        requested by counsel.  This is an after-the-fact
13        thought, and I do not believe that Mr. Trinkle is
14        unfairly prejudiced.  In fact, I believe from the
15        defendants' aspect you are somewhat better off
16        without the supplemental verdict form.  In the event
17        that the jury arrives at a verdict of guilty, it is
18        not clear whether or not the individual is found as a
19        principal or an aider and abettor; therefore, if on
20        appeal the Tenth Circuit decides that aiding and
21        abetting a conspiracy is not something recognized in
22        the Tenth Circuit, then I suspect all conspiracy
23        convictions will be reversed and the case will be
24        remanded for a new trial.  Therefore, from the
25        defendants' point of view, from a purely tactical
```

```
 1          standpoint, I believe you're better off without the

 2          supplemental verdict form.  It's for that reason I

 3          sustain Mr. Sandage's objection to doing this after

 4          the fact rather than having done it up front, at

 5          which point we might have been able to hash it out

 6          and you might have been able to tailor your arguments

 7          accordingly.

 8              In saying that, let me reinforce my belief that

 9          in light of the fact that the only reported circuit

10          law on this point supports there being an ability to

11          find someone guilty as an aider and abettor to a

12          conspiracy, and understanding the reasoning, not just

13          that there is a case that says that, but

14          understanding the reasoning that the Seventh Circuit

15          applied in those cases, that one could help the

16          conspiracy without agreeing to joining it as long as

17          they knew about the conspiracy and intended to help

18          the conspiracy, I think the Tenth Circuit will

19          recognize that that could occur.  In the event that

20          it doesn't, I look forward to seeing you all again

21          some day.  All right.  I'm providing the following

22          answer to the jury's question:

23              "Members of the jury, I am unable to provide you

24          any additional guidance on this matter.  You must

25          follow all of the instructions given you by the court
```

 1      and decide this case on all the evidence which has

 2      been submitted."

 3           Is there any objection from any of the

 4      defendants?  I hear none.  From the government?  I

 5      hear none.

 6           All right.  Ms. Ludwig, would you please hand

 7      this to the bailiff and instruct the bailiff to give

 8      it to the foreperson of the jury upon receipt.

 9           Is there anything further we should do in this

10      matter this morning before we hear something more

11      from the jury?  I hear none.  We are in recess.

12                (A recess was taken, and at 10:16 a.m.

13      during deliberations the following proceedings were

14      had outside the presence of the jury:)

15                THE COURT:  I've had a situation called to

16      my attention that I want to get your input on how we

17      should proceed next.  The foreperson encountered the

18      bailiff in the hallway, and she said she was

19      concerned that one of the jurors had done some

20      outside research.  She was instructed to have this

21      put in a written form to notify the court, and that's

22      what she's done.  Here is what is not really the form

23      of a question but rather her notification to us.

24      It's dated today.

25           By the way, upon receiving that information, I

```
 1        instructed the bailiff to tell the jury to suspend

 2        their deliberations, to go on break until we had a

 3        chance to resolve this.  So the jury is on break.

 4        They don't know why or what we're doing.  I suspect,

 5        obviously, the foreperson would have a clue.

 6             It reads, "Judge, a juror has done outside

 7        research by timing with a stopwatch how long it takes

 8        to retrieve an item from the floorboard of a car

 9        while sitting at red lights.  This has been brought

10        into the jury room and shared with other jurors."

11        Signed by the foreperson.

12             It seems quite apparent to me, Mr. Calbi and Ms.

13        Morehead, that that would be in reference to the last

14        count in the case involving Mr. Wesley and the gun

15        count.  I want to get your thoughts about where we

16        might go here.  There's a number of things that might

17        happen.  Certainly on the face of it and what I have

18        in this note, there is nothing that the jury has done

19        improper other than on this limited point, but I

20        think it requires further inquiry on my part to

21        determine that that's the case.  It's clearly

22        improper what they have done with regard to this

23        point there.  I want to first solicit your views, Ms.

24        Morehead, on this topic.

25                  MS. MOREHEAD:  Well, Judge, frankly, I
```

1    think that's something they could have done in the

2    jury deliberation room had they used a stopwatch to

3    time that out.  In the jury room they can do whatever

4    they want to by way of deliberations.  Extraneous,

5    obviously, they can't, but I think that -- I don't

6    know.  I've never had this, frankly, come up.  I have

7    in some regards during the trial where it's become

8    obvious jurors have gone off and done things on their

9    own.  That's why I try to --

10            THE COURT:  Well, I doubt the jury could

11    bring in a stopwatch and perform experiments without

12    the permission of the court.  Now, you're right, we

13    would never know if they just looked at their watch

14    and tried to do those things.

15            MS. MOREHEAD:  Right.

16            THE COURT:  But I don't think -- I think it

17    is of great concern if they are attempting to

18    recreate activities along these lines.  Excuse me.  I

19    interrupted you.

20            MS. MOREHEAD:  I don't think it's improper

21    for them to recreate activities if that's part of

22    what they do during their deliberations.  I'm

23    confident juries do that all the time in analyzing

24    the evidence and using their common knowledge and

25    common sense in determining whether someone is

1      telling the truth.  They process that, you know.

2      It's just like if this was a murder case and someone

3      was charged with, you know, something in connection

4      with a murder.  They might be back there basically

5      recreating that event.

6              THE COURT:  One reason I have a concern is,

7      as a lawyer in private practice, I had a conviction

8      that I got overturned in part because of juries doing

9      exactly that in the jury deliberation.  Now, that's

10     in state court, and it's 20 some years ago.  Who

11     knows what the law is today and in federal court on

12     all that.  But obviously when I hear this I go, hum,

13     isn't that interesting? because it relates to

14     something in my own, albeit ancient history,

15     experience.  So I have a little more concern than you

16     do, Ms. Morehead, about the proprietary of this, not

17     that you may not be right, because you may be, but I

18     think it's important that we think about it.

19          Mr. Calbi?

20              MR. CALBI:  Judge, my concern is -- Ms.

21     Morehead may have a point.  We don't know what

22     happens behind closed doors, what the jury does back

23     there, but there seems to be one particular juror who

24     has been timing it with a stoplight, with red lights,

25     so he or she is obviously acting outside the jury

1       room, and they are not acting collectively, so I

2       think there's a distinct difference whether what they

3       do behind closed doors as a group of 12 as opposed to

4       what one juror is doing on his or her own raises

5       questions.  I have never had this happen before as

6       far as something -- doing this outside, or at least

7       being brought to the attention, but it obviously

8       doesn't pass the smell test, if I can go back to a

9       phrase I used in here five or six weeks ago.  It

10      raises a concern.  What the remedy is, I don't know

11      yet.  I haven't given it enough thought.  But I

12      believe it's highly improper for one juror to be out

13      on his or her own and doing some sort of test, if you

14      will, for lack of a better term.

15              THE COURT:  Would you agree that I should

16      make inquiry of initially the foreperson, myself with

17      the foreperson and with the court reporter, just the

18      three of us, to pin down exactly what the details

19      might happen to be and whether or not there's any

20      other such incident that the foreperson is aware of?

21              MS. MOREHEAD:  I think that's a good

22      starting point, Judge, at the very least.  Obviously,

23      I think there needs to be some sort of cautionary --

24      I know you've given them the admonition every day,

25      and we can't think of every possible thing they might

1      go out and do.

2              THE COURT:  I'm not going to add to my

3      admonition don't use stop watches.

4              MS. MOREHEAD:  Well, you probably will now.

5      But, you know, like, going out and getting on the

6      internet, we cover those as they -- but, you know, I

7      can't imagine that this juror did it thinking, oh, I

8      shouldn't do this, but I'm going to do it.  You know

9      what I mean?

10             THE COURT:  I hope you're right.

11         Is there anyone who disagrees that the starting

12     point should be me making inquiry of the foreperson

13     off -- not off the record but outside the presence of

14     anyone else, just the foreperson, myself, and the

15     court reporter?

16             MR. SANDAGE:  In that inquiry are you going

17     to ask which juror it is?

18             THE COURT:  Yes.

19             MR. SANDAGE:  Because the concern I have --

20     obviously, we're going to revisit this.  The concern

21     I have is that this shows a tendency that this juror

22     is doing things outside the jury room.  We might

23     never know other things the juror has done that

24     impacts his or her thoughts and how they are

25     deliberating.

1           THE COURT:  Obviously, there is a point in

2     time at which, of course, the basis of their

3     deliberation is beyond our ability, or legal ability,

4     shall I say, to discover and analyze, and had this

5     not been called to our attention formally, as Ms.

6     Morehead suggests, we might not have known about it;

7     and if you had found out about it later, you probably

8     couldn't have been able to do anything about it.

9     Once it's called to our attention, I think it's a

10    different matter.  One of the things that occurred to

11    me as an additional possibility of what needs to be

12    done here is that I should also talk to that juror

13    and ascertain what he or she says happened, find out

14    what, if anything, else that juror may or may not

15    have done to satisfy ourselves that this was perhaps

16    a -- again, I'm with Ms. Morehead.  Let's put the

17    most optimistic, positive spin on it.  Out of

18    frustration of days and days of deliberation,

19    somebody finally said, what the heck, let's try doing

20    this and see if it was something that was out of the

21    pattern of what the jurors were otherwise doing.

22    Obviously, if that leads us to a different path,

23    well, then, you know, there we go.  We're down that

24    road.  But my suggestion is that as a starting point

25    I should talk to the foreperson.

1    Then my second suggestion was going to be then I

2    think I should talk to the juror in question if

3    there's no objection to that.  Then once I have

4    gotten that information, I will report back to you

5    all and tell you what the situation is and make my

6    recommendation about what I think we should do next,

7    which includes a number of different possibilities.

8         Mr. Bell?

9              MR. BELL:  With apologies to the court

10   reporter, is there any way we can get copies of the

11   transcripts of the conversations between you and the

12   foreperson and the juror before we come back to make

13   whatever recommendation --

14              THE COURT:  I see heads being shaken

15   vigorously here.  I don't know that I want to -- I

16   don't know that I want to read that either to you.  I

17   think -- obviously, there will be a record made so

18   that some day should someone second-guess what we

19   ultimately conclude here there will be a record on

20   which to base that.  In the meantime, I would suggest

21   that we, unless you object to this, probably need to

22   use me as a conduit so that we don't simply set these

23   jurors down and say, I'm going to talk to you about

24   this, and then basically come and read what they say

25   into court.  Again, I'm not -- I'm certainly not

1    infallible, and therefore there is a record that

2    shows what did happen, and if my judgment is to be

3    second-guessed, so be it, but I think in the meantime

4    that's where we need to go.  That's my sense.  Is

5    there any objection?  Who disagrees with that?  All

6    right.

7              MR. JOHNSON:  I agree with all of that.  I

8    guess I have one question.  Is there some reason you

9    want to interview these jurors in camera instead of

10   in front of the parties?

11             THE COURT:  Because I think they would be

12   less likely to feel defensive, less likely to -- I

13   think they would be more candid, honestly.  I think

14   they will tell me what happened and not feel put on

15   the spot by being -- and I think to the extent that

16   they did -- were asked to do that in front of all the

17   parties it could wind up being prejudicial or

18   negative from the standpoint of the parties.  I mean,

19   the juror says something, and some lawyer might react

20   in some way.  I just see no gain for anybody to

21   subject the juror to doing that in front of all

22   assembled here.  That's my thinking.

23             MR. JOHNSON:  It's certainly our preference

24   to hear what the juror says directly, but I don't

25   have an objection one way or another as long as

1       there's an inquiry.

2                  THE COURT:  Very well.  Anything further?

3       Any other input?  Mr. Bellemere?

4                  MR. BELLEMERE:  I'm sorry.  I was wondering

5       this if maybe after you talked to the foreperson

6       whether or not you might consider coming back and

7       discussing it again with us.

8                  THE COURT:  Before I talk to the other

9       juror?

10                 MR. BELLEMERE:  Yes.  I was wondering --

11      and while I don't know the circumstances, I was

12      wondering, once you satisfy yourself as to the

13      situation, maybe a simple admonition to the jury en

14      banc that they should disregard any kind of effort

15      made on behalf of any of the jurors to do some

16      individual investigation and keep in mind the

17      instructions, work together and work this out.  I

18      don't know.  Just a thought, only a thought.

19                 THE COURT:  Well, the third component of

20      what I had thought of coming in here but which I had

21      left unspoken until I heard more was that I thought

22      the final step should be to admonish the jury once

23      again about what their duty is, to decide the case

24      solely from the record and not to go beyond it.  But

25      I didn't throw that out initially simply because

1    there could be more that I might want to say than

2    just that based upon the conversation.  The question

3    is whether I should come back and report to you after

4    I just talk to the foreperson or after I talked to

5    both jurors.  I'm inclined to talk to both first and

6    then come back, but I'm open to input.

7              MR. CALBI:  Judge, I don't think there's

8    any right or wrong way.  I guess perhaps, following

9    up with Mr. Bell, if you spoke to the foreperson

10   first and reported back to us, perhaps we may have

11   input as to what you should say to this -- or talk

12   about with this other juror, and perhaps not.  I

13   mean, there's no right or wrong way to do that.

14             THE COURT:  I'm happy to do it that way.

15   The court reporter running back and forth is probably

16   the worst part about that, but I think she can live

17   with it, so let's do it that way.  That way I'll get

18   the benefit of your collective wisdom should there be

19   something we need to get along those lines.  All

20   right.  We will be in recess.  I would ask the

21   marshals to have the defendants remain readily

22   available here in the courtroom because I hope to be

23   right back in here quite shortly.

24             (A recess was taken, and the following

25   proceedings were had in chambers:)

1          THE COURT:  Ms. Bruns, I understand that

2     you have reason to believe that there's been some

3     outside experimentation of some kind by one of the

4     members of the jury; is that correct?

5          THE FOREPERSON:  Yes.

6          THE COURT:  And which juror is that?

7          THE FOREPERSON:  It's Curtis.  I don't know

8     his last name.

9          THE COURT:  Where is he sitting?

10          THE FOREPERSON:  He's on the north side,

11     second from the end.

12          THE COURT:  Sort of directly in front of

13     where you're sitting?

14          THE FOREPERSON:  Yes.

15          THE COURT:  Okay.  Now tell me what

16     happened.

17          THE FOREPERSON:  Yesterday afternoon he

18     pulled out a stopwatch and said he had put his

19     checkbook on the floor of his car at stoplights and

20     timed how long it took him to pick it up, as if it

21     were a gun, 3 to 3 1/2 seconds, to see if it could be

22     used in connection to drug use in an effort to

23     convince us of his opinion.

24          THE COURT:  When did this happen?

25          THE FOREPERSON:  Yesterday afternoon.  He

1    said he had done it on the way to courthouse that

2    morning.

3              THE COURT:  Okay.  Was there any indication

4    that anyone else had done anything at all like this

5    outside of the jury deliberation process?

6              THE FOREPERSON:  No.

7              THE COURT:  Was there any indication that

8    Mr. Miller had done anything else in the way of

9    experimentation or anything like that outside of the

10   deliberation process?

11             THE FOREPERSON:  Well, today he had a tape

12   measure, which is what made me think, this is wrong.

13             THE COURT:  Well, thank you.  You did the

14   right thing.  As the foreperson it is your duty to

15   report something like this, and you've discharged

16   your duty appropriately.  Thank you very much.

17             (A recess was taken, and the following

18   proceedings were had in court outside of the presence

19   of the jury:)

20             THE COURT:  I have now had the opportunity

21   to visit with the jury foreperson in the office

22   that's just off of the courtroom here with just

23   myself, the foreperson, and the court reporter

24   present.  She indicated to me that the individual in

25   question was a male juror who is seated on the first

1     row of the jury, would have had the third seat in

2     from the right if you count the alternate, who, of

3     course, hasn't been with us recently.  She indicated

4     that this juror around the afternoon break time

5     yesterday took a stopwatch out of his pocket and said

6     that he had placed a checkbook on the floor of his

7     car and, at each stoplight as he was driving to the

8     courthouse yesterday, reached down, put the checkbook

9     on the floor, and then picked it up and timed it at 3

10    to 3½ seconds and that he believed that that informed

11    himself and should inform the rest of the jury about

12    matters that could be pertinent to whether or not the

13    gun might be something that would assist in a drug

14    transaction.

15        I asked her specifically whether any other juror

16    had indicated that he or she had engaged in any

17    activity which would run afoul of the admonition or

18    of their oath that they have given.  She indicated

19    unequivocally that no one else had and that nothing

20    else had happened before that time to indicate that

21    Mr. Miller or anyone else had.

22        I then asked about whether or not that juror had

23    done anything else other than that, and she said,

24    well, he brought a measuring tape in with him today,

25    and that raised a concern in her mind whether or not

1     he had some additional plans in mind, and that is

2     what caused her to then bring it to the attention of

3     the bailiff.  The incident yesterday passed pretty

4     much without much more than he made his statement.

5     People didn't seem to react too much one way or the

6     other, so I think she was simply going to let that

7     slide until this occurred this morning.

8          That's where we stand.  And now I would solicit

9     your views about where we go next on this.  I

10    would -- it is my still thought that it would be

11    appropriate to talk to this individual juror to find

12    out whether or not he has done anything else that

13    might be outside the scope of deciding the case on

14    the facts and the law, and then I think that I

15    definitely should bring the jury back in and admonish

16    them -- assuming that that interview is as benign as

17    it could be, I would then be inclined to bring the

18    entire jury back in, readmonish them that they are to

19    decide the case solely on the evidence and the law,

20    that it's not appropriate to perform experiments that

21    are not subject to cross examination or other

22    examination by counsel or to utilize things that are

23    not part of the jury room equipment, so to speak, in

24    that regard.  I think that's an appropriate thing to

25    do.  That's my thinking.  Ms. Morehead?

1    MS. MOREHEAD:  I think all that's

2    appropriate, your Honor.

3    THE COURT:  Mr. Calbi?

4    MR. CALBI:  Judge, not knowing what this

5    individual juror may say when you speak to him, I

6    don't know if I am as convinced that we can tie it up

7    in that neat of a package, so I guess I will reserve

8    whatever comments I have until you report back from

9    what he has to say.  Obviously, I think it's very

10   important that you speak with him.

11   THE COURT:  Very well.  Do you have any --

12   one of the reasons I'm back in here now is, you

13   suggested that it might be possible you would have

14   some helpful hints for me after having heard from the

15   foreperson.

16   MR. CALBI:  I have just been looking at

17   some case law, Judge, on jury misconduct.  I'm only

18   into it for about ten minutes.  I can't say I have

19   the authority, but there are six factors that the

20   court should look into, according to the Tenth

21   Circuit, and that's the degree to which the jury

22   discussed and considered the extrinsic information,

23   the extent to which the jury had difficulty reaching

24   a verdict prior to receiving the improper evidence,

25   the degree to which the information related to a

 1          material fact in the case, the strength of the

 2      information of the legitimate evidence, and whether

 3      the extrinsic evidence merely duplicates evidence

 4      properly before the jury, and the court went on to

 5      say that the introduction of cumulative extraneous

 6      material may render the jury misconduct harmless.  My

 7      concern here is that really there was nothing in this

 8      case about a checkbook underneath the seat of a car

 9      nor a traffic light, having anything to do with the

10      stop and the timing of that.

11                THE COURT:  More fundamentally, I don't

12      want to interrupt you, but there was no evidence

13      about how long it might take a person to access the

14      gun from the floor, as to whether or not, therefore,

15      3 seconds or 3½ seconds is -- I don't know what it

16      means, whether that means it wouldn't be helpful to

17      you or it would be helpful to you if you had a gun,

18      if you were going to a drug transaction, and if it

19      were on the floor 3½ seconds away from your reach,

20      but there certainly was no evidence along those

21      lines.

22                MR. CALBI:  We have someone running a test,

23      for lack of a better term, on something that wasn't

24      even introduced into the case.  I don't know if

25      that's poisoning the pool.  I hate to say that dirty

```
1        word, since we have been here so long, but I do have

2        legitimate concerns, and now I'm interested in what

3        this gentleman has to say when you speak with him.

4                THE COURT:  Do you have any suggestions

5        about other inquires I should make of him?

6                MR. CALBI:  Unfortunately, I don't, Judge.

7        I'll leave it to your wisdom.

8                MR. BELL:  Judge, to the extent I have a

9        dog in this fight, I would ask if you would ask this

10       juror if he's performed any other --

11               THE COURT:  I intend to.  One of the things

12       I would hope to be able to do would be to establish

13       if, in fact, that is correct, as the foreperson would

14       indicate, that if there has been any misconduct at

15       all it is isolated to the one count in question,

16       which is Count 39 involving Mr. Wesley; and if it is

17       isolated to that, of course, we can deal with that

18       however it may be that we should deal with it.  But I

19       am certainly concerned to satisfy myself that there

20       is no pattern of impropriety that would somehow

21       infect the deliberation process.  Thus far, based

22       upon my examination of the foreperson, I am to that

23       extent satisfied that there has been no other conduct

24       which would violate the oath or violate the

25       admonitions or which would in any other way
```

```
 1              constitute juror misconduct and therefore in any
 2              respect pollute whatever result the jury may come to
 3              with regard to the other defendants and the other
 4              counts.  So I do intend to ask this juror questions
 5              along those lines, and, of course, if it opens doors
 6              that have to be pursued in another direction, I will
 7              inform you all of that and get your guidance
 8              accordingly.  Thank you, Mr. Calbi.
 9                      MR. JOHNSON:  Just so I know, the juror is
10              this gentleman that said, we're going to return at
11              9:00 o'clock sharp?
12                      THE COURT:  Yes, that's the gentleman.  And
13              he's got that stopwatch to prove it.  All right.
14              Anything further before I go visit with that
15              individual?  All right.  Then I will report back to
16              you.
17                      (A recess was taken, and the following
18              proceedings were had in chambers:)
19                      THE COURT:  Mr. Miller, we're on the record
20              with the court reporter, just the three of us, for me
21              to follow up on something which the foreperson called
22              to my attention this morning.  She called to my
23              attention that you had brought a stopwatch into the
24              jury deliberation and indicated that you had
25              basically performed an experiment outside the
```

1        courtroom in which you had placed a checkbook on the

2        floor of the car when you got to stoplights and then

3        you bent down and saw how long it would take to pick

4        up the checkbook, 3, 3½ seconds, and you feel that

5        that was useful information in deciding how the jury

6        should arrive at a verdict on one of the counts in

7        the case, specifically, I assume, Count 39, the gun

8        count.  Is that information correct?

9                  JUROR MILLER:  Yes.

10                 THE COURT:  All right.  She also indicated

11       that you indicated this morning that you had brought

12       a tape measure with you today; is that correct?

13                 JUROR MILLER:  Yes.

14                 THE COURT:  All right.  I want to ask you

15       several questions about those.  First of all, let me

16       start off by saying, whether it's been clear or not

17       from the court's admonitions when I've instructed you

18       not to do anything about the case when you're not

19       deliberating, that includes performing experiments

20       outside the jury deliberation area.

21            The whole point of this process is for the jury

22       to decide based on evidence in the case.  If the

23       prosecution or defense had thought it was something

24       for the jury to consider how long it would take for

25       someone to reach down, be able to access a gun, then

1      that would have been evidence that would have been

2      presented in the case.  It's information that might

3      or might not be useful to a jury, but, unfortunately,

4      we're not in a position, jurors or judges, to expand

5      on or supplement what the parties have decided is the

6      evidence that should be presented.  That's why I give

7      the admonition not to do any investigation or

8      anything which touches on the case outside the jury

9      room.  You may or may not have fully understood that

10     when I explained the admission to you.  Do you

11     understand that now?

12          JUROR MILLER:  Yes, sir.

13          THE COURT:  All right.  Similarly, bringing

14     things into the jury room, even as apparently

15     innocuous as a stopwatch or tape measure, are not

16     appropriate.

17          JUROR MILLER:  Okay.

18          THE COURT:  For much of the same reasons.

19     In other words, it's a fine line between using sort

20     of common experience and common sense to evaluate

21     things and then kind of going over the next step and

22     sort of performing, again, even in the jury room

23     experiments or recreations where the lawyers don't

24     have a chance to say, did you think about this, or

25     did you think about that?  The jury might try to do

```
 1            something to recreate or to measure or calculate, and

 2            if one of the lawyers -- if this were done in open

 3            court with an expert witness or one of the witnesses

 4            in the case, then a lawyer might say, you know what?

 5            How about that?  And you or I or anybody else might

 6            say, that's a good point.  I hadn't thought about

 7            that, and therefore it might change the whole

 8            process.  That's why jurors aren't supposed to that

 9            even in the jury room, because it's taking away the

10            opportunity to get the benefit of somebody else's

11            perspective, and it makes it sort of like new

12            evidence or fresh evidence because it's been

13            processed by the jury through some -- something more

14            than just sort of the reason and common sense of

15            discussion.  That's a very fine line, but it's one

16            that I wanted to make sure you and ultimately the

17            rest of the jurors understand.  Do you understand

18            that as well?

19                    JUROR MILLER:  Yes, sir.

20                    THE COURT:  Now, other than what we have

21            just discussed here with regard to the stopwatch and

22            the checkbook, have you done any other research or

23            experimentation or investigation outside the jury

24            room?

25                    JUROR MILLER:  Absolutely not, haven't gone
```

1    on line, nothing.

2              THE COURT:  May I assume that you just

3    reached a point of frustration with not arriving at a

4    verdict yet and as a result thought this might be

5    helpful to the jury?

6              JUROR MILLER:  That's it precisely, and I

7    think part of it had to do -- you know, I was

8    basically trying to toy in my mind whether or not I

9    was accurate as far as my own thoughts were

10   concerned.

11             THE COURT:  Sure, sure.  Well, again, I

12   want to satisfy myself about the scope of what

13   occurred here.  Is it correct that the

14   experimentation you did was yesterday morning -- is

15   that correct?

16             JUROR MILLER:  Yes, sir.

17             THE COURT:  -- was only with regard to, in

18   essence, the gun on the floorboard of the car?

19             JUROR MILLER:  Exactly.

20             THE COURT:  Using the checkbook as a

21   substitute?

22             JUROR MILLER:  Exactly.

23             THE COURT:  That you've done no such

24   investigation, research, or experimentation with

25   regard to any of the other counts in the case or any

 1              of the other evidence in the case; is that correct?

 2                        JUROR MILLER:  Absolutely not.

 3                        THE COURT:  All right.

 4                        JUROR MILLER:  I've not done anything with

 5              the tape measure, nothing.

 6                        THE COURT:  All right.  And what I would

 7              intend to do, most likely, once we complete all this,

 8              is bring the jury back in the courtroom and

 9              reemphasize the admonition.  That is not meant -- I

10              don't want you to feel unduly called on the carpet or

11              chastised because I sense no malice on your part or

12              no intention to do anything wrong, rather simply not

13              having fully understood the whole scope of what I

14              meant by the admonition.  Am I correct in that

15              understanding?

16                        JUROR MILLER:  Yes, sir.

17                        THE COURT:  But I think it's important --

18              probably important for me to bring the jury in,

19              reemphasize that aspect of the admonition, and direct

20              them that they should disregard anything brought to

21              their attention that may have occurred outside the

22              courtroom or that involved bringing anything into the

23              jury box room, wasn't part of the evidence in the

24              case.

25                        JUROR MILLER:  Yeah.  And I didn't involve

1     anybody else.

2                    THE COURT:  All right.  Thank you very

3     much, Mr. Miller.  I appreciate your coming in.

4                    (A recess was taken, after which the

5     following proceedings were had in the courtroom

6     outside the presence of the jury:)

7                    THE COURT:  I have now had the opportunity

8     to sit down and have a discussion with the juror in

9     question.  Again, this was myself, the court

10    reporter, and the juror.  He indicated to me

11    basically exactly what the foreperson had indicated,

12    and that is that yesterday morning on his way to the

13    courthouse he did place a checkbook on the floorboard

14    of the car on several occasions at stoplights and

15    timed with his stopwatch how long it would take him

16    to reach down and pick it up.  And he did this

17    without any thought that that violated the court's

18    admonition.  It just didn't occur to him that he was

19    actually doing something other than just, as he put

20    it, testing whether his own sense of how long it

21    would take was actually correct.  He indicated that

22    he did bring a tape measure this morning, but he's

23    not even brought it out.  He just had it with him.  I

24    did not inquire what his intentions were because I

25    explained to him in some detail that, whatever his

1     understanding may have been, that it is inappropriate

2     and contrary to the admonition to do anything outside

3     the courtroom, that if the parties had seen fit to do

4     an experiment with regard to how long it takes to

5     pick something up off the floorboard of the car they

6     would have presented that evidence, and since they

7     did not, that was not something for the jury to do on

8     their own, and furthermore, even within the confines

9     of the jury room, it is inappropriate to bring in

10    extraneous materials, such as stop watches or tape

11    measures, for the jury to recreate things without the

12    lawyers present to say, wait a minute, did you think

13    of this, or did you think of that? which could, of

14    course, put a different spin on things, which is why

15    jurors shouldn't bring experiments or recreations in

16    the jury room, because there isn't the check of both

17    sides being there to make sure that there isn't some

18    important aspect that has been left out of their

19    experimentation.  And I feel very strongly that

20    that's a wise way to draw the line.

21        In any event, I also inquired of him, of course,

22    about whether he had engaged in any other activity

23    that was comparable to this, and he assured me that

24    he had not.  I asked him whether or not this was

25    basically just borne out of some frustration based

1    upon the fact that he had been deliberating a long

2    time, and he said yes, that was it, but that he

3    understood now, with me having explained to him, that

4    this was something he shouldn't do and won't do

5    again.

6         That's my report with regard to my contact with

7    that particular juror.  I told him that, although I

8    don't want to single him out, do not intend to single

9    him out in front of the other jurors -- although

10   obviously there is some of that that is implicit in

11   all this -- that I would intend to bring the jurors

12   back into the courtroom, repeat the admonition to

13   them, expand on the admonition, and make sure they

14   understand that any kind of experimentation or any

15   kind of utilization of equipment that's not part of

16   the evidence is inappropriate and to direct them to

17   disregard anything which was brought up in the jury

18   deliberations which might have been based on

19   something that someone did outside the courtroom.

20   That's where things stand, and that is what I propose

21   to do.  Ms. Morehead, any input from the government?

22             MS. MOREHEAD:  No.

23             THE COURT:  Mr. Calbi?

24             MR. CALBI:  Judge, I have three requests to

25   make to the court.  My first request is, I believe

1         that we should have a mistrial granted or, in the

2         alternative, this juror it discharged.  I'm a little

3         bit concerned -- I mean, I know you've spoken to him.

4         Perhaps that may have some benefit.  But not only did

5         he do the stopwatch yesterday but had a tape measure

6         today.  If they don't reach a resolution, God only

7         knows what he may bring next time.  I'm not really

8         sure.  And not being sure is the scary part because

9         we should always be sure that jurors aren't going to

10        be doing anything extraneous.

11             Or in the alternative, I believe the gun count

12        against Mr. Wesley has been highly compromised by

13        this experiment that this juror has partaken and has

14        shared with the other jurors what his results were,

15        and that at least should be carved out at this

16        particular time if it appears to the court that the

17        other defendants' counts haven't been prejudiced by

18        his extraneous activities.  But those are at least my

19        three requests to the court.

20                  THE COURT:  So let's get down to brass

21        tacks here.  Are you moving for a mistrial?

22                  MR. CALBI:  I am, Judge.

23                  THE COURT:  And in the alternative to a

24        mistrial on all counts, you're moving for a mistrial

25        on Count 39?

1              MR. CALBI:  That's correct, your Honor.

2              THE COURT:  Tell me where excusing the

3      juror fits in.

4              MR. CALBI:  I guess I'm just apprehensive

5      that this particular individual -- you've admonished

6      this jury at least 25 to 30 times during this trial,

7      and I, quite frankly, just can't comprehend that he

8      didn't think what he was doing was outside the

9      admonishment that you have been giving day in and day

10     out, sometimes two or three times a day.  And, you

11     know, in his own mind, not only did he do the

12     stopwatch yesterday, he did the tape measure; and I

13     believe he has gone outside the scope of what his

14     responsibilities have been and he has violated his

15     duty, and I believe he's violated his duty not only

16     to the defendants but to the government and to this

17     court as well and he should be removed from the jury

18     and one of the alternates should be brought in.

19          I say that with a heavy heart because if the

20     court does sustain that the deliberations start all

21     over, and, quite frankly, no one's going to be too

22     thrilled about that, but I think in the interests of

23     justice that needs to be done.

24             THE COURT:  Now, let me -- thank you.  I

25     understand your argument.  Are you making that

1        request as an alternative that you would be satisfied

2        with and would, if granted, therefore not request a

3        mistrial on any or all counts, or are you making that

4        request as an alternative only in the event that the

5        court denies your request for a mistrial?

6                MR. CALBI:  If the court would deny our

7        request for a mistrial.

8                THE COURT:  All right.  Thank you.  That

9        clarifies the record.  Ms. Morehead?

10               MS. MOREHEAD:  Well, Judge, first of all, I

11       don't know of any authority that there is to dismiss

12       a count during deliberations.  I have a hard time

13       believing that such authority exists.  Going back to

14       Mr. Calbi's factors or considerations that the court

15       would have on an appellate issue, the content of what

16       this juror did is de minimis in light of all of the

17       evidence.  It certainly wouldn't take a rocket

18       scientist to think that within seconds you could

19       reach under the seat and pick up a checkbook or a gun

20       or any other object.  Now, the exact -- how long that

21       might take is another thing, but certainly within

22       seconds.  You could use your common knowledge and

23       assume that.  And, frankly, Judge, given the totality

24       of the evidence in this case, I do not believe that

25       this extraneous consideration or extraneous --

1    somebody called it a experiment.  I don't know that

2    it's an experiment, but that this extraneous

3    information is going to impact the outcome of the

4    case.

5        The other thing -- and I'll just kind of throw

6    this out there.  Frankly, Mr. Wesley's already pled

7    to the conspiracy charge, and where I think he's

8    going to fall on the guidelines, he's going to get a

9    two-level enhancement for the gun being present, and

10   he's going to actually get a far higher sentence by

11   that two-level enhancement, wherever he is on the

12   guidelines, than he would if he's convicted on the

13   924(c) charge, which has a sentence of five years.

14             THE COURT:  Which, of course, begs the

15   question of why we had the trial on that count.

16             MS. MOREHEAD:  Well --

17             THE COURT:  But I won't pursue that

18   further.

19             MS. MOREHEAD:  I'm throwing that out there,

20   Judge.

21             THE COURT:  I totally understand that.

22             MS. MOREHEAD:  I think the remedy the court

23   is suggesting, bringing the jurors in and admonishing

24   them, is sufficient.

25             THE COURT:  All right.  Does anyone else

```
 1          wish to be heard?  Mr. Sandage?
 2                    MR. SANDAGE:  Your Honor, on behalf of Mr.
 3          Foy, we would ask that the remedy be that that juror
 4          be removed and be replaced with one of the
 5          alternates.
 6                    THE COURT:  Thank you.
 7                    MR. SANDAGE:  For the reasons previously
 8          stated by Mr. Calbi.
 9                    THE COURT:  And I will deem anyone who does
10          not wish to specifically exempt yourself as having
11          joined in Mr. Sandage's request.
12                    MR. BELL:  On behalf of Mr. Trinkle, we
13          have a little bit different request.  Our request
14          would be that the juror be excused and that the court
15          allow the jury of 11 to return a verdict pursuant to
16          23(b)(3), which allows the court to do that for good
17          cause shown.  I believe that good cause has been
18          shown.  As Mr. Calbi said, this juror has been
19          instructed countless times not to do the thing he
20          specifically did.  I would expect an explanation
21          other than, I didn't know I was supposed to do that,
22          when confronted with that.  I think that puts the
23          juror's credibility or their tendency to follow the
24          court's other admonitions at issue.  We were lucky
25          this time because we found out the admonition wasn't
```

```
 1        being followed, but on behalf of Mr. Trinkle I have a

 2        reluctance to allow that juror to continue to

 3        deliberate, given the flat, contradictory nature

 4        between your admonition that's been given countless

 5        times and the juror's behavior.

 6                THE COURT:  That's obviously a slightly

 7        different approach.  Are there any others who wish to

 8        join in that request, that the juror be excused and a

 9        jury of 11 be permitted to deliberate?  If so, please

10        indicate now.

11                MR. HEATHMAN:  Can I have a moment just to

12        discuss that, your Honor, with my client?

13                THE COURT:  You may.

14                MR. JOHNSON:  Let me make sure our record

15        is clear.  We join Mr. Sandage's motion to excuse the

16        jury and replace that individual with an alternate

17        juror.

18                THE COURT:  I believe it would take

19        unanimous consent to proceed with a jury of 11.  If

20        everyone doesn't agree with Mr. Bell's request, I

21        believe that ends the discussion right there, so

22        that's perfectly fine.

23                MR. BELLEMERE:  I'm sorry, your Honor, this

24        is for Mr. McDaniel that I object --

25                MR. HEATHMAN:  And I would as well, your
```

1          Honor, request the 12.

2                    THE COURT:  Mr. Bell, I congratulate you on

3          your creativity.  You have demonstrated that at

4          numerous points during the course of the trial, but

5          your colleagues are not with you on that, so

6          therefore I will not do that.  I am persuaded that

7          Mr. Calbi's motion and those motions made by Mr.

8          Sandage and joined in by others should be and hereby

9          are denied for the following reasons:

10          Based upon my examination of the juror in

11          question and the foreperson, I am persuaded that this

12          was an isolated incident born out of a mistake

13          concerning how far the admonition about research,

14          investigation, and so forth may go.  He was trying to

15          check his own common sense or his own perception by

16          performing this particular exercise.  I believe that

17          that is contrary to the admonition, but I believe

18          that it is a certainly grayer matter than getting on

19          the internet or trying to drive by locations, of

20          which he expressly disclaimed.  When I asked him if

21          he had done anything else, he said no, I haven't

22          gotten on the internet or done any of those kinds of

23          things.  So I think here I believe the juror that

24          this was an isolated act on his part born out of

25          misunderstanding of how far the admission went.

1          Moreover, in looking at the six-factor test that

2     we discussed earlier, I am most persuaded that,

3     although the factor which would counsel in favor of

4     some relief for Mr. Wesley and/or others would be

5     that this was not just cumulative of something that

6     was done at trial, what I'm most persuaded by is

7     really the argument Ms. Morehead just made a moment

8     ago, and that is the, in retrospect, relatively

9     innocuous aspect of what the witness -- I keep

10    calling him the witness -- what the juror did.  In

11    this particular situation, whether it would take 3 to

12    3½ seconds or whether it would take one second or ten

13    seconds, frankly, I suspect that's -- I don't see

14    that being very important.  The precise time that it

15    might take to reach down and get an object from under

16    a car seat strikes me as being relatively irrelevant

17    in applying the factors that are being set out for

18    the jury with regard to determining the issues

19    concerning Count 39.  Moreover, even in this -- even

20    further divorced from the exact nature of the time,

21    it's not as if this was a situation in which the

22    facts were that Mr. Humphrey, the seller of the

23    drugs, allegedly walked over to the driver's side of

24    the vehicle with a bag full of contraband where Mr.

25    Wesley or anyone else seated in the driver's seat

1      would then be in a position to have us consider how

2      quickly could they access the gun in that scenario,

3      because of course here the transaction itself was

4      taking place at some distance from the car.  So I

5      think that makes it even more attenuated than if the

6      transaction were taking place right at the vehicle.

7      So the notion of how long it would take to access the

8      gun strikes me as having very little to do with

9      whether or not the government has satisfied its

10     burden of proof beyond a reasonable doubt as to

11     Count 39.  It is apparent that the gun was on the

12     floorboard of the vehicle.  There may be some fact

13     question for the jurors to decide, whether or not it

14     had been tucked underneath the seat and jolted out by

15     Mr. McCue's vehicle coming up behind the vehicle in

16     which Mr. Wesley was riding or whether it was out on

17     the floorboard already, but be that as it may, the

18     experiment -- and that's my term that I used for want

19     of a better term -- that Mr. Miller, the juror in

20     question, performed I believe has very little

21     significance in resolving that issue.  So I do not

22     believe that certainly as to the case as a whole --

23     because this is an isolated incident born not out of

24     a juror who is basically demonstrating a desire to

25     flaunt the court's instructions, but rather an

1   isolated incident born out of a misapprehension of

2   the court's instructions, I do not believe it gives

3   rise to a cause for a mistrial for the case as a

4   whole.  Moreover, as to Count 39, for the reasons I

5   indicated concerning the significance or, in my

6   opinion, lack of significance of this particular

7   experiment to the factors to be applied there, I do

8   not believe it would justify a mistrial as to that

9   particular count as well.  And, finally, because I am

10   convinced that the juror acted out of mistake and not

11   out of any ill will or intention to disregard the

12   court's instructions in an area that I think could

13   conceivably be argued as gray, this is not a

14   situation in which he should be excused as being

15   someone who is out disregarding the instructions of

16   the court.  I do believe the appropriate remedy is to

17   bring the jurors back into court, renew the

18   admonition, explain it further, and to instruct them

19   to disregard anything which has been brought to their

20   attention which is based on something which occurred

21   outside the hearing of the jury, and that's what I

22   will intend to do as soon as we can get the jury

23   lined up and available to do so.

24       So, Ms. Scheurer, would you please alert the

25   bailiff and ask him to get the jury ready to go.

1              (The following proceedings were had in the
2        presence of the jury:)
3              THE COURT:  Members of the jury, I've asked
4        to have you brought back into the courtroom simply so
5        that I could remind you of the admonition in the case
6        and expand on it a little bit to make sure that there
7        is no confusion in anyone's mind.  You may recall
8        that in the court's instructions to you I instructed
9        you, do not try to do any research or make any
10       investigation about this case on your own, and I gave
11       some examples about driving by locations and getting
12       on the internet and things like that.
13             The same vein of that instruction and the notion
14       of what you're supposed to do to decide the case also
15       applied to doing any what I might call experiment or
16       recreation or anything like that concerning events
17       involved in the trial, whether inside the jury room
18       or outside the jury room.
19             With regard to outside the jury room, it clearly
20       is something that runs afoul of my instruction to you
21       that I want to now emphasize that you aren't to do
22       anything which touches on the case while you're not
23       together deliberating.  That may not have been clear
24       as to how far that extends, and I hope now it is
25       clear that it does extend to anything along those

1          lines, including experimentation or recreation.

2               If the parties in the case had felt that a

3          particular experiment, a particular example, might

4          have been relevant to the jury in deciding the issues

5          in the case, then the parties, the government or the

6          defendants, would have had the opportunity to present

7          such evidence to you, and then it would have been

8          evidence, and it would have been subject to cross

9          examination by the other parties so that you would

10         have had the opportunity to see whether or not such a

11         procedure was, in fact, helpful to you or not.

12              Similarly, with regard to things which are done

13         within the jury room, again, even though they may

14         simply seem to be extensions of the application of

15         reason and common sense, nonetheless, to the extent

16         that things done within the jury room to recreate

17         tend to actually manipulate the evidence, so to

18         speak, that too then becomes something that the

19         lawyers have not had the opportunity to give some

20         input on and say, well, wait a minute here.  If

21         you're going to try to recreate something, you are

22         not taking into account . . . whatever it might

23         happen to be that parties on either side might think

24         would be appropriate for you to consider were there

25         something that would be of benefit to you by having a

1    recreation done.  I want to clarify to you that the

2    admonition covers those things.

3         Furthermore, to the extent that anything has

4    been called to your attention during the

5    deliberations that is based upon anything that

6    someone may have done outside the jury deliberation

7    process and brought back to you to share with you,

8    you must disregard that.  That is not evidence in the

9    case, and it's something on which you may not rely in

10   any regard in arriving at your verdict in this case.

11        All right.  Ms. Scheurer, would you please take

12   charge of the jury.

13        You may now resume your deliberations and

14   proceed at your own pace.

15             (The following proceedings were had outside

16   the presence of the jury:)

17             THE COURT:  Is there anything further we

18   should do before we recess?  Hearing nothing, thank

19   you all for your input this morning.  It's been very

20   helpful.  I hope I don't need it again, but we're in

21   recess until next call.

22             (A recess was taken.)

23             THE COURT:  I have been informed that the

24   jury has arrived at a verdict.  In informing us of

25   that, they also informed us that as to one count they

```
 1    were unable to arrive at a unanimous verdict and have

 2    so indicated on the verdict form that will be

 3    returned in court.

 4         One logistical matter; that is, typically I

 5    permit counsel and encourage the jury to stay around

 6    afterwards so that you can visit with the jurors

 7    about the verdict.  In light of the length of their

 8    deliberation, the time of day on a Friday, and, most

 9    importantly, the pending storm, I'm disinclined to

10    impose upon the jury along those lines, so I'm not

11    going to suggest to them that they wait around to

12    talk to counsel.  I regret that because I think it's

13    helpful for counsel typically to do so, but, frankly,

14    I think it's time to let them move on with their

15    lives, and the rest of you as well.

16         With that, Ms. Scheurer, please bring in the

17    jury.

18              (The following proceedings were had in the

19    presence of the jury:)

20              THE COURT:  Ms. Bruns, I understand that

21    the jury has arrived at a verdict; is that correct?

22              THE FOREPERSON:  Yes, your Honor.

23              THE COURT:  Very well.  Would you please

24    hand the verdict to Ms. Scheurer.  Very well.  I'll

25    ask the bailiff to read the verdict.
```

1          (The Wesley verdict was published in open

2      court.)

3              THE COURT:  Would counsel approach.

4              (Counsel approached the bench and the

5      following proceedings were had:)

6              THE COURT:  With regard to Count 39, does

7      counsel for the government or for the defendant have

8      any objection to accepting that result and ultimately

9      at the conclusion declaring a mistrial on Count 39?

10             MS. MOREHEAD:  No objection.

11             MR. CALBI:  No objection.

12             THE COURT:  Very well.  That's what I will

13     do.

14             (The proceedings returned to open court.)

15             THE COURT:  Mr. Rempel, you may proceed to

16     read Mr. Foy's verdict.

17             (The Foy, Trinkle, Temple, McDaniel, and

18     Goodwin verdicts were published in open court.)

19             THE COURT:  Thank you.  Ms. Bruns, is this

20     and was this the unanimous verdict of the jury in

21     this case?

22             THE FOREPERSON:  Yes, your Honor.

23             THE COURT:  Very well.  Does counsel for

24     any of the parties wish to have the jury polled?  Ms.

25     Morehead?

1          MS. MOREHEAD:  No, your Honor.

2          THE COURT:  Any of the defendants?

3          MR. JOHNSON:  We would request polling,

4     Judge.

5          THE COURT:  Very well.  Ms. Scheurer,

6     please poll the jury.

7          (In answer to the question by the courtroom

8     deputy, "Was this and is this your verdict?" each

9     juror answered in the affirmative.)

10          THE COURT:  I will then accept the verdict

11     of the jury, enter judgment accordingly, and with

12     regard to Count 39, on which the jury was unable to

13     arrive at a unanimous decision, I will declare a

14     mistrial as to that particular count.  A presentence

15     investigation report is ordered to be made, and

16     sentencing is set for Monday, September 14, 2009.  It

17     may be that as that time approaches I will need to or

18     want to reset some of the hearings, but for now I'm

19     going to set you all on that track and we will see

20     how that develops.

21          Members of the jury, that concludes your service

22     in this case, and, of course, you have labored long

23     and hard, and we appreciate very much, all of us, the

24     extent to which you have taken time out of your lives

25     to do this, and it is something that you have played

1       an extremely important role in society by sitting

2       here and taking on this particular responsibility.

3           I have just a few more things I need to talk

4       about with counsel, but for any of those of you who

5       have a few moments to stay around, I'm going to come

6       back and thank you again more personally, but as soon

7       as you walk out that door, you're excused, and you

8       may go about your business.  So please don't

9       hesitate, but I will come back and thank you

10      personally, for those of you who are able to stay.

11          With that, Mr. Rempel, would you please take

12      charge of the jury.  And counsel, remain here.

13              (The following proceedings were had outside

14      the presence of the jury:)

15          First, with regard to forfeiture, Ms. Morehead,

16      you are going to take the next steps to move that

17      process down the road; is that correct?

18              MS. MOREHEAD:  Judge, I would suggest doing

19      it in connection with the sentencing proceeding.

20              THE COURT:  That would be my preference,

21      but if there's anything different from that, just

22      file something appropriate, and we will do so.

23      Otherwise, that would be my contemplation as well.

24          Next, to the extent that any of you feel the

25      need for an extension of time to file briefing in

```
1        connection with any posttrial motions, remember that

2        ten-day period is jurisdictional, so you must get

3        your motion on file within that time period, but I

4        would entertain a motion to extend the time for you

5        to file a brief, not by a whole terribly long amount

6        of time because I think for all of us it would be

7        best to get this matter resolved while it's still

8        fresh in your minds, as well as my own.  But if you

9        think you need a little bit more time, I'm likely to

10       grant it to you, but only in connection with

11       extension of time to file a brief.  Don't forget to

12       file your motion in a timely fashion if you choose to

13       file a motion.

14           I now will ask if there's anything else that we

15       need to do at this juncture.

16           MS. MOREHEAD:  Judge, Ms. Temple has been

17       out on bond.  This is a mandatory detention case.  We

18       ask that she be immediately remanded to the custody

19       of the United States marshals.

20           THE COURT:  I understand.  Mr. Heathman,

21       can you explain any exceptional circumstances that

22       would apply?

23           MR. HEATHMAN:  Your Honor, I would point

24       out to the court that Ms. Temple has done, obviously,

25       what she needed to do on bond.  She has young
```

1    children.  I have told her to be prepared in case the

2    court were to order that, but I think under the

3    circumstances it would be appropriate to continue her

4    on bond until sentencing.

5               THE COURT:  Thank you.  Mr. Heathman, as

6    you have appropriately advised Ms. Temple, the law

7    now shifts, and upon this conviction then the court

8    has no power to keep her out except if there were

9    exceptional circumstances.  There are no exceptional

10   circumstances.  Even having young children is, in

11   fact, relatively par for the course for people who

12   are, unfortunately, involved in circumstances such as

13   brought Ms. Temple before us, so I will remand Ms.

14   Temple to the custody of the United States marshals.

15   Is there anything further we should do?

16               MR. CALBI:  For housekeeping, I believe

17   when Mr. Wesley entered his plea of guilty you set

18   that sentencing for July 20.  I assume that's

19   overridden and we go forward to September 14?

20               THE COURT:  Thank you, Mr. Calbi.  I had

21   forgotten that I had set that date, although had I

22   reflected I probably would have figured I would have

23   set some date, but I do want all the individuals on a

24   common track.

25        Mr. Bell?

1           MR. BELL:  For the record, I'll renew my

2      Rule 29 motions I made orally and in writing.

3           THE COURT:  You need not do that now.

4      Well, you have done that now, but to the extent that

5      you want to, you should file something in writing.

6      If you want, as I said, some additional time for

7      briefing, just ask, but keep that in mind.  I'm not

8      thinking about a huge amount of extra time, but a

9      little bit of extra time would be fine.

10          Mr. Sandage?

11          MR. SANDAGE:  I presume the court doesn't

12     want to take it up now, but we have all the Rule 29

13     motions the court had taken under advisement

14     regarding the communication counts.  I assume we will

15     finally get a disposition on those motions.

16          THE COURT:  Yes.  I would -- for those of

17     you who filed motions, I would ask you simply to

18     remind the court of those ones that have been taken

19     under advisement.  Some of them have been rendered

20     moot by the verdicts; some have not.  Obviously, you

21     have some idea which ones are which, but I will deal

22     with those in connection with any other motions.  If

23     no motions other than that are filed, I will deal

24     with those in connection with ruling on whatever

25     motions are filed.

1          Anything further?  All right.  If there's

2     nothing further, I do remand the defendants to the

3     custody of the United States marshals, and we are in

4     recess.

5               MS. MOREHEAD:  Judge, do you want us to

6     take custody of the exhibits?

7               THE COURT:  Excuse me.  Without objection I

8     will ask the government to take custody of the drug

9     and gun exhibits.  Is there any objection?  Hearing

10    none, the government is so instructed.

11              (Court was adjourned.)

12                   * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T E

2

3

4    STATE OF KANSAS        |

5                          |   ss

6    COUNTY OF JOHNSON      |

7

8           I, Rebecca Ryder, RMR, CRR, a Certified

9    Shorthand Reporter and official reporter for the United

10   States District Court, District of Kansas, do hereby

11   certify that as such official reporter I was present at

12   and reported in machine shorthand the above and foregoing

13   proceedings.

14           I further certify that a transcript of my

15   shorthand notes was prepared and that the foregoing

16   transcript is a true and correct transcript of my notes in

17   said case to the best of my knowledge and ability.

18

19                            /Rebecca S. Ryder
                              REBECCA S. RYDER, RMR, CRR
20                            U.S. Court Reporter

21

22

23

24

25

REBECCA S. RYDER, CCR, RMR
UNITED STATES COURT REPORTER
913-551-5645