```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF KANSAS
 2

 3   UNITED STATES OF AMERICA,

 4                     Plaintiff,

 5   vs.                        Case No. Case No. 07-20168-20

 6   LATYSHA D. TEMPLE,

 7                     Defendant.

 8
                TRANSCRIPT OF SENTENCING PROCEEDINGS
 9                          before
                  HONORABLE JOHN W. LUNGSTRUM
10                            on
                     SEPTEMBER 24, 2009
11

12                        APPEARANCES

13   For the Plaintiff:    Terra D. Morehead
                           United States Attorney's Office
14                         500 State Avenue
                           Kansas City, Kansas 66101
15
     For the Defendant:    James C. Heathman
16                         Attorney at Law
                           3706 S.W. Topeka Blvd., Ste. 402
17                         Topeka, Kansas 66609

18

19

20

21

22

23

24

25
```

```
 1                    THURSDAY, SEPTEMBER 24, 2009

 2              THE COURT:  We're here in

 3    Case No. 07-20168-20, United States of America versus

 4    Latysha D. Temple.  Would the parties state their

 5    appearances, beginning with counsel for the United

 6    States.

 7              MS. MOREHEAD:  May it please the court,

 8    Terra Morehead, assistant United States attorney,

 9    appearing on behalf of the government.

10              MR. HEATHMAN:  May it please the court,

11    your Honor, Ms. Temple appears in person and with

12    counsel James Heathman.

13              THE COURT:  Thank you, counsel.  Let me

14    begin, since we are here for sentencing today,

15    Mr. Heathman, by inquiring of you for the record

16    whether you have reviewed and reviewed with

17    Ms. Temple a copy of the presentence investigation

18    report.

19              MR. HEATHMAN:  I have, your Honor.

20              THE COURT:  And, Ms. Temple, do you confirm

21    that Mr. Heathman has, in fact, reviewed with you a

22    copy of the presentence investigation report?

23              THE DEFENDANT:  Yes, sir.

24              THE COURT:  All right.  Thank you.  I will

25    place the presentence investigation report into the
```

1    official record of the case.  It will be maintained

2    confidential, but in the event that either party

3    should need access to it for some appropriate legal

4    purpose, then it will be made available, except for

5    the recommendation portion, which always does remain

6    confidential.

7         Now, in this case the government has lodged one

8    objection; the defendant has lodged six.  I think the

9    best way to deal with this is to have you,

10   Mr. Heathman, address your objections, address your

11   ultimate sentencing thoughts, in other words, what

12   sentence you are arguing for, and give Ms. Temple the

13   opportunity to be heard, and then I'll hear from Ms.

14   Morehead and we will simply put all of this together

15   and not sort of do it piecemeal.  Do you have any

16   objection to proceeding along those lines?

17              MR. HEATHMAN:  No, your Honor.

18              THE COURT:  Ms. Morehead, do you have any

19   objection to proceeding --

20              MS. MOREHEAD:  No objection, your Honor.

21              THE COURT:  Mr. Heathman, you may proceed.

22              MR. HEATHMAN:  Thank you, your Honor.  Your

23   Honor, I believe first and foremost the objection was

24   to the guideline calculation of the -- under the

25   Sentencing Guidelines for the base offense level, and

1        in the presentence report, my recollection was, or

2        is, that that was a 33, and I argued that it should

3        be something less than that.  And the way I think the

4        government calculated that, or it's calculated in the

5        presentence report, was that Ms. Temple may have been

6        along with Mr. Wesley as many as ten times when

7        Mr. Wesley had some kind of transaction with

8        Mr. Humphrey.  My recollection from the testimony was

9        that sometimes those might have been drugs, sometimes

10       they were money.  I don't think there was any

11       information about how much money, if it was partial

12       payments, full payments.  Mr. Humphrey did indicate

13       that he dealt with Mr. Wesley in weights of

14       5-kilogram, and other times there were even more, and

15       I think the government or the presentence report

16       writer had calculated using the framework of as many

17       as ten.  With 5 kilograms that equals 50 kilograms

18       that is at least possible.  My recollection of the

19       testimony, however, is that I don't believe there was

20       a time frame set out for when any of these ten

21       ride-alongs may or may not have occurred, if they

22       were before the September date when she got involved

23       with the wiretaps or even potentially prior to the

24       conspiracy charged in this case.

25            The other issue that I have is that

1          Mr. Humphrey's testimony is certainly in conflict

2     with itself.  Mr. Humphrey denied -- and I think this

3     is fully set out in our sample.  He denied for a year

4     and a half ever knowing Ms. Temple, and I know

5     there's been argument that, well, what he said was

6     that he didn't know any of Wesley's people back in

7     December of 2007; that just meant Mr. Foy.  But the

8     court may recall that Officer Jones was asked

9     specifically, how did that question come about you?

10    You didn't just ask him about Mr. Foy; you said

11    something along the lines of, tell me everything you

12    know, or, who all was involved? and he agreed.  That

13    was the context of the question in which Mr. Humphrey

14    said he didn't know any of Wesley's people, of which

15    I think clearly her involvement would indicate she

16    would be one.  So Mr. Humphrey for a year and a half,

17    more than a year and a half, denies even knowing

18    Ms. Temple as one of Mr. Wesley's people.  In a

19    statement given in 2009 just shortly a week before

20    trial Mr. Humphrey had stated that he knew her, and

21    he said that Mr. Wesley would use her vehicle as many

22    as ten times but Mr. Wesley was always the driver.

23    That's what his proffer statement said.  Then at

24    trial -- and the court may recall we had to show him

25    the statement numerous time to get him to admit that,

1          yes, in fact, he had said that Mr. Wesley was always

2          the driver, but at trial that changed to Ms. Temple

3          always being the driver.  And so I think there is

4          some significant conflict in what Mr. Humphrey said

5          and whether or not the jury believed Mr. Humphrey.

6          And to that extent we really don't know because with

7          the aiding and abetting instruction that was given,

8          the jury certainly could have found Ms. Temple guilty

9          without believing Mr. Humphrey.  There was other

10         testimony presented that Mr. Wesley usually had the

11         drugs sold prior to picking them up from

12         Mr. Humphrey; in other words, he would set up a deal

13         with Mr. Humphrey; he would get on the phone to his

14         contacts and make sure he can get rid of the drugs,

15         meet with Mr. Humphrey; he would get the drugs; he

16         would go deliver them to people that were

17         distributing for him; and then he would get the money

18         and go back and pay Mr. Humphrey.

19              Now, in that scheme there's no need to store or

20         stash drugs anywhere.  Mr. Humphrey said that there

21         were a few times when Mr. Wesley could not pay until

22         the next day, and I believe that that is fairly

23         consistent with what Mr. Anderson testified to,

24         although I certainly think there are conflicts in Mr.

25         Anderson's statement as well.  His testimony, the

1          judge may recall, was that there was one episode at

2          Ms. Temple's house where he saw something -- in one

3          of his statements he said it was in '06; in one he

4          said it was in '07.  In one statement he said it was

5          a half kilogram of crack cocaine; and the other

6          statement, he said it was cash.  So there's one event

7          taking place.  The nature of the contraband changes,

8          and the date changes.  So that's certainly an issue,

9          I think, that bears upon Mr. Anderson's credibility.

10         But what it does tell us is that potentially there

11         may have been a half a kilogram stored at

12         Ms. Temple's house from time to time, and the only

13         reason to store that would have been those few times

14         when Mr. Wesley couldn't get rid of it.  So if you

15         use the half kilogram calculation two or three times,

16         we have got anywhere from half a kilo to maybe

17         2 kilograms of cocaine.  And if that's her

18         involvement, I think that certainly reduces the

19         guideline sentence, the base offense level, to 26,

20         but it also would reduce the statutory framework from

21         a 50-kilogram to a 500-kilogram scenario where her

22         sentence would be five to 40 instead of ten.  So I

23         would ask the court to give consideration, if we

24         apply these facts in trying to really ferret out what

25         her involvement was from the evidence, lacking

1    anything else, I think the case law is that we have

2    to go with the smaller value.

3              THE COURT:  Mr. Heathman, I don't think I

4    followed that last argument of yours.  She was found

5    guilty of being part of a conspiracy, the object of

6    which was one that has a ten-year mandatory minimum

7    sentence.  I don't think even if she is found to be

8    personally responsible for a smaller quantity of

9    drugs that that suddenly changes what she was

10   convicted of and what the statutory sentence in terms

11   of the mandatory minimum is, do you?  Is that what

12   you're arguing to me?

13             MR. HEATHMAN:  I'm arguing that this court

14   should consider that, that if her --

15             THE COURT:  Do you have any authority for

16   that proposition?

17             MR. HEATHMAN:  No, sir.

18             THE COURT:  I didn't think you did.

19             MR. HEATHMAN:  No, sir.  But it would be, I

20   think, also consistent with the sentencing purposes

21   if that framework is established that that's what

22   she's really doing and that's what she's really

23   involved in.  Otherwise, we have punishments that I

24   think grossly outweigh her actual involvement in the

25   case.  Having said that, your Honor, I think we would

1    start at a Level 26 instead of a 33.

2         And the other objection to the PSR was the

3    weapon enhancement.  I think it's clear that she

4    wasn't in possession of a weapon and it wasn't in

5    close proximity to her, and therefore it can be

6    attributable to her if it's reasonably foreseeable to

7    her, and I know the case law that we have cited has

8    specifically indicated just because it's a drug

9    conspiracy with a large amount of drugs that doesn't

10   automatically mean there are going to be weapons

11   involved.  There has to be something other than that.

12   The only indication of any conversations that she had

13   about a weapon was after the home invasion that we

14   argued is not connected to this conspiracy in any

15   way, and Mr. Wesley had told her he wanted her to buy

16   a gun.  She obviously didn't do that.  There is no

17   indication that Mr. Wesley ever possessed a weapon in

18   her presence.  There's no indication that she was

19   ever in the vehicle in which the weapon that was, I

20   think, most closely tied to Mr. Wesley at the time of

21   his arrest, that she was ever in that vehicle or knew

22   about it.  And, frankly, I'm not sure who that weapon

23   belonged to or if it was even connected to the

24   conspiracy, so I don't believe it was reasonably

25   foreseeable to Ms. Temple that there would be weapons

1    involved, especially in light of her limited role in

2    the conspiracy, and I think it's established her role

3    as limited.  I don't know that the government opposes

4    the idea that she was not ever involved directly in

5    drug transactions -- I believe they stated so at

6    sentencing -- but she played a part in the overall

7    conspiracy even without being involved in the actual

8    transactions.  So having said that, I don't believe

9    it's foreseeable to her, and the weapon enhancement

10    shouldn't attach.

11        As for the role in the offense, there was a

12    finding of a mitigating role.  In my sentencing

13    memorandum I address the fact that we certainly don't

14    object to the mitigating role.  I think it should be

15    a minimal participant as opposed to a minor

16    participant, the distinction being that a minimal

17    participant is truly among the least culpable of

18    individuals.  And if you recall the involvement of

19    other individuals in the case similarly situated to

20    Ms. Temple, those would be the girlfriends of some of

21    the other more culpable operators --

22        THE COURT:  You didn't actually file an

23    objection on that basis though, did you?

24        MR. HEATHMAN:  I didn't object to the minor

25    as a mitigating role.

```
1                    THE COURT:  Right.  But you didn't file an
2         objection and say it should have been a minimal.
3                    MR. HEATHMAN:  That's correct.
4                    THE COURT:  Did you?
5                    MR. HEATHMAN:  That's correct.
6                    THE COURT:  All right.
7                    MR. HEATHMAN:  But in consideration of the
8         role adjustment, whether it should be minor or
9         minimal, I think under the circumstance if you apply
10        her actual role the minimal category seems to be more
11        applicable than just the minor.
12             The other objection that we had, your Honor, was
13        to the obstruction.  I don't know what she said that
14        the jury believed was a lie.  I think the government
15        would be required to put on exactly which statement
16        it was, and we would have to have a finding of which
17        statement it was that was a lie because the
18        statement, number one, has to be under oath, which
19        obviously her testimony would be it has to be on a
20        material issue, which I don't know because I don't
21        know which statement they are attributing to her as a
22        lie, and it can't be by some form of mistake but
23        actually an intent to deceive or mislead.
24                    THE COURT:  The issue is not what the jury
25        believed or didn't believe; it's what the court
```

1    believed or didn't believe.

2                    MR. HEATHMAN:  I understand.

3                    THE COURT:  All right.

4                    MR. HEATHMAN:  But at this point we don't

5    know what statement is being attributed to her that

6    was alleged to be untruthful.  I think the court

7    would have to make a specific finding as to a

8    specific statement, and I know of none; therefore, I

9    don't think the enhancement for obstruction would

10   apply.  The case cited certainly takes into account

11   that there may be people who testify and a jury

12   convicts them and simply by the nature of their

13   testimony does not mean they have committed perjury,

14   and it appeared to me from the presentence report

15   that that was exactly the scenario that was being

16   alleged.  She testified.  The jury obviously didn't

17   believe her; therefore, it's perjury, and the

18   enhancement would attach, and I don't think that's

19   sufficient.

20        Having said that, I think those are the

21   objections that I raised in my sentencing -- in my

22   objections to the presentence report and in the

23   sentencing memorandum.  Those would be the objections

24   that I had.

25                    THE COURT:  Is there a specific sentence

1          for which you are arguing?

2                    MR. HEATHMAN:  Well, in my sentencing

3     memorandum, your Honor, I think that the need -- the

4     sentencing mandate to be sufficient but not greater

5     than necessary to carry out the purposes of

6     sentencing is obviously the key component, and one I

7     know the court's concerned with.  In doing so, we

8     have to look at numerous factors.  Other similarly

9     situated individuals and disparities in sentencing is

10    obviously a concern.  I guess I would answer it this

11    way.  Under the statutory framework if this court

12    were to indicate that ten years is the appropriate

13    formulation because it couldn't go below that based

14    on what she was found guilty of, then I think the

15    ten-year mandatory minimum sentence certainly is more

16    in line with her involvement.  It is also, I believe,

17    even at ten years almost double or double that of

18    other individuals.  Ten years, being the mandatory

19    minimum, I think is certainly seen by the legislature

20    as minimally sufficient or else it would be a higher

21    minimum level.  I don't think the 188 month, which is

22    the low end of the guideline range, would be

23    appropriate because I do think that would be

24    excessive in terms of her involvement in the case.

25          Keeping in mind the other sentencing factors,

1      her criminal history, which I hadn't addressed, I

2      think is also important in that most of what she had

3      done was prior to 1997.  Her scores for the two

4      offenses in 1997 would have dropped off at ten years,

5      and she was nine years and nine months, if my

6      calculations are right.

7                THE COURT:  But you would concede, would

8      you not, though, that the sixth objection concerning

9      the criminal history points that are derived from the

10     convictions in Paragraphs 195 and 196 should be

11     overruled based upon the probation officer's

12     response?  Wouldn't you agree with that?

13                MR. HEATHMAN:  I believe that's correct.

14                THE COURT:  All right. I will then overrule

15     those for that reason.

16                MR. HEATHMAN:  And I didn't raise those in

17     my objection for that reason.

18                THE COURT:  I noticed you did in the

19     addendum to the presentence report, but in your

20     sentencing memo you did not, so I assumed you were

21     persuaded by the --

22                MR. HEATHMAN:  Correct.  I think the

23     accurate way to calculate it for purposes of the

24     presentence report was to count those as

25     criminal history.  In terms of calculating a sentence

1    based on the criminal history, however, I think it's

2    important that they are property crimes, number one.

3    We're talking about the felony crime is the most

4    serious, and it is a $200 and $400 amount.  So we're

5    not talking about a master, extensive criminal

6    endeavor.  And the other offense that was scored was

7    an attempted theft out of Johnson County.  Both of

8    those, your Honor, were just right at just shortly

9    prior to the ten-year sentence, and I think under the

10   comments to the Sentencing Guidelines there is

11   certainly statements made that when you have a

12   situation like that that overrepresents

13   criminal history the court may either depart to a

14   criminal history category of I or certainly take that

15   into account in looking at the issue of variance.

16   But it is not just the fact that those two scorable

17   offenses were nine years and nine months, but if you

18   look at her criminal history that was more recent,

19   there was an offense in 2005, I believe, which was

20   resisting a police officer.  That stemmed from an

21   argument where she was told to be quiet and she

22   continued to argue.  Certainly, again, not an

23   extensive criminal endeavor.  And the remainder seem

24   to be traffic offenses.  And those other offenses

25   were -- the other traffic offenses, your Honor, were

1   prior to -- excuse me -- were more recent, 2006,

2   2007, but, again, were speeding tickets and traffic

3   in nature.

4       So if you look at her overall criminal history

5   since 1999, I think she's turned a corner.  I think

6   her criminal involvement was minimal.  I think that

7   her record reflects that.  Her testimony, her work

8   history.  She had been regularly employed at decent

9   jobs throughout even up into her involvement in this

10  case.  I think it is sufficient -- significant that

11  she was employed and not even a known participant in

12  any of this until roughly September of 2007.  She had

13  lost her job the first week of August 2007, and she's

14  relying on Mr. Wesley to help pay bills, and at that

15  point she's heard on phone calls that are involving

16  money and transactions, money left at her house and

17  to bring some money left at her house.  She went back

18  to work to support her family on her own in late

19  October, so there was a two-month window where she is

20  out of work and relying on Mr. Wesley.  And following

21  that she's back at work, supporting herself, and I

22  think that gives us a picture of her personal

23  characteristics, of what her interest was.

24      She was -- and the court can read through the

25  memorandum, but she didn't have the easiest life.

1    She had a divided family.  She had sexual abuse as a

2    child.  She was pregnant as a teenager, dropped out

3    of school without graduating because she had three

4    kids, but she had raised them pretty much as a single

5    parent, although it wasn't the easiest, and my

6    understanding from speaking to Ms. Temple was some of

7    the thefts that are involved in her criminal history

8    actually involved clothing items and things like that

9    for the children.  Obviously, that doesn't excuse it,

10   but I think it gives a picture of a lady as a single

11   mother with limited education and background, that

12   she's making choices to try to better her family and

13   do what's necessary, not a mastermind criminal.

14        I don't think there was any allegation in this

15   case that she was making a lot of money from this

16   criminal enterprise other than to get some help

17   paying some bills.  She had vehicles that were liened

18   up mostly.  They weren't worth much more than what

19   the amounts were that she was paying.  And those

20   amounts, if my recollection was -- one of them was

21   7,000 and one was maybe 13,000.  Between the two

22   we're looking at about a $20,000 value in vehicles,

23   so certainly she wasn't one that's driving around in

24   a $45,000 or $55,000 vehicle.  And I think that's the

25   type of personal characteristic that the court should

1    consider.  I mean, that's who she is, and that's what

2    she was doing, and I think her biggest trouble arose

3    from dating Mr. Wesley, and Mr. Wesley's enterprises

4    were spilling over into her personal life, more so

5    after she lost her job, and at that point you see the

6    phone calls, you hear the phone calls, you see her

7    involvement, and not before.  I say that because I

8    want the court to consider that in determining not

9    only her role in the offense but also in terms of the

10    sentencing factors and her characteristics and trying

11    to find an appropriate sentence that is minimally

12    sufficient, giving her just consideration for what

13    she's actually done and what she's dealing with.

14              THE COURT:  Thank you, Mr. Heathman.

15         Ms. Temple, you have the right to make a

16    statement to the court if you want to.  You're not

17    required to do so, but you may if you wish.  If you

18    do, then please come up to the lectern.

19              THE DEFENDANT:  As I stand here today, I

20    still don't know what I done wrong.  I understand

21    that a jury found me guilty of being a part of a

22    conspiracy about drugs.  I don't understand it.  I

23    was a mother.  I did everything -- I worked.  I took

24    care of my kids.  I took my daughter to college, and

25    she had to come back because she had to take care of

```
 1        her siblings because this thing happened.  I don't
 2        understand how people can come and testify, a person
 3        I've never seen before in my life, never seen him
 4        before in my life, can sit here and tell me, not tell
 5        me, yeah, me, the jury, everybody that was in the
 6        courtroom that he witnessed drugs transactions with
 7        me being involved.  How could you have ever done
 8        that, sir, when even in the car you said that I was
 9        driving, I had never even purchased it?  That right
10        there shows that anybody can come up here and say
11        anything, and that's what it is.
12            But what about me?  What about the person -- I
13        still -- I don't understand.  I sit in CCA every day
14        wondering, what did I do wrong?  And Terra Morehead
15        don't get no credit for me.  This don't have nothing
16        to do with her.  The Lord was trying to bring me to
17        him, and if this is the way he did it, I might not
18        understand it now, but I can trust him because I know
19        what he has for me is for good.  While I'm out on
20        house arrest, I find out that my son have been
21        molested, the same thing that I endured.  I was not
22        there to be able to hold him or hug him and let him
23        know that I know, it happened to me, but all because
24        Ms. Morehead wanted to take something that she
25        think -- if you thought that, if she really, truly
```

```
1      thought that I had involvement when she first picked

2      me up, Judge Lungstrum -- she never came to talk to

3      me.  I would be somebody pertinent.  I know that I

4      have done wrong in the past.  I know that I can admit

5      guilt when I have done something wrong.  I couldn't.

6      I couldn't.

7           When I was on house arrest, she offered a plea

8      of two months halfway house, six months paper.  When

9      I declined, by the time I got home, my attorney got a

10     phone call, we got two witnesses that said ten times

11     this, ten times that.  Oh, now I finally been seen.

12     Somebody -- and I respond to motions to sever, and

13     she said it.  Severance.  She said it.  Nobody --

14     even though she wasn't never seen or nothing that --

15     and I have the paperwork that I never was seen.  Now

16     all of a sudden -- I don't take that.  I'm not going

17     to put my tail between my legs and be glad and happy

18     and, oh, thank you, and I'll get this.  I could have

19     done that.  I could have done -- I did five years on

20     paper.  I could have done two months in a halfway

21     house and six months paper.  I have been at CCA for

22     four right now.  I could have done that.  I couldn't

23     do it because I didn't do nothing wrong.  I'm not --

24     I know people come here every day and say what they

25     didn't do or what -- I mean, lie and just -- my
```

1    government -- this is the government.  But she

2    twisted it.  She twisted it so much that the whole

3    case contradicts itself.  If I'm involved -- I'm not

4    involved, then you want to give me two months halfway

5    house and six months paper, but you think I'm

6    involved with 50 kilos of cocaine.  This is Terra

7    Morehead.  Everybody knows that she wouldn't let up

8    like that on me.

9        My family has been torn apart.  It wasn't my

10   fault I lost my job.  Two months.  I was off two

11   months, and my whole life changed because this man

12   gave me money to pay my bills or to help me buy

13   groceries or to pay my mortgage for two months?  I

14   was working since '01.  I have check stubs since '01.

15   Would a drug dealer girlfriend do all this that Ms.

16   Morehead claimed?  Would they do that?  She claimed

17   that I was being investigated for tax evasions when

18   we first got involved in this case, my first court

19   appearance.  That was a lie, but this is the

20   government.  That's a lie.  I have tax papers from

21   '01.  I have check stubs from '01 to '07, the day I

22   was picked up.  I have -- my cars, they said when

23   they came to my home they didn't know that those were

24   my vehicles.  I offered to let them see my bank lien

25   statements then.  I got loans for those cars.  The

1    bank wouldn't have gave me those cars if I didn't

2    have an adequate way of paying it.  You just can't

3    walk in a bank and just ask for that and they give it

4    to you without them knowing you have means of paying

5    it.

6        My income, when I first got involved in this

7    case, she said that the $800 that I was depositing

8    every month -- every week in my account was drug

9    money.  This is why I didn't get pretrial the first

10   time.  But why would she not be truthful?  Because I

11   have check stubs, and I have bank statements that

12   shows that every month I deposited an $800 check.

13   She said it was cash.  She said it was money that I

14   was getting from Monterial putting into the account.

15   That was a lie.

16       My life has been a nightmare.  Could you imagine

17   waking up and your whole life been stripped from you?

18   Everything, everything, my pride, my dignity,

19   everything that I told my kids what to stand for.

20   And then for her to offer me a plea, to think that

21   sounds good, you take it, take it, take it?  I

22   couldn't do that.

23       The day that I got found guilty, I looked at the

24   jury, and I was trying to understand.  Okay.

25   Maybe -- I don't know what they said.  Maybe he

1   wasn't supposed to help me pay the bills.  Maybe he

2   didn't supposed to use my car.  I was never there.

3   She got me at a birthday party at Chili's.  Yeah, I

4   was there.  He was in his own vehicle too.  I can't

5   say he never drove my car before, but I didn't have

6   knowledge of it.

7        When I was on the stand, they said that I

8   obstructed justice because my attorney warned me not

9   to take the stand, but I had to -- I had to explain

10  some things.  If you get snippet phone calls, bits

11  and pieces of a phone call, not the whole entire

12  phone call, it do sound funny -- I heard them -- when

13  she played just half of it, but I'm the one on the

14  other end.  I know.  I know that this phone call

15  consisted of more.  I know that it was a phone call

16  before this.  I know.  But when you got a woman in

17  power who just all about winning, don't care about

18  who life it destroy -- I am somebody's mother; I'm a

19  grandmother; I'm a sister; I'm a granddaughter; I am

20  somebody's daughter.  They care.  I keep thinking

21  something good going to come out of this.  I know the

22  Lord, he got a plan.  Something good going to come

23  out of this.  I fail to see it, but I still trust

24  him.  I took the stand, and they said that I'm not

25  telling the truth.  But you can debrief somebody over

1    30 times and he's telling the truth?  I just feel

2    like if you're going to tell the truth you best

3    remember it the first time, but then you will

4    remember closer when I get to trial after they

5    debrief you 30 times?  Over 30.  That's what Mr.

6    Anderson said.

7        And then Mr. Humphrey, you didn't know Wesley's

8    people, and then when we get our -- the objections

9    from the PSR people, oh, he was just meaning the

10   people who was part of the drug transaction.

11   Exactly.  He wasn't meaning you, the girlfriend.

12   Exactly.  Because they know that's all I was, was the

13   girlfriend.  He had a wife.  She would know more

14   about him.  She would know more about him than me.  I

15   want to understand it.  I try over and over again.  I

16   don't even know what I did to Ms. Morehead.

17       While we sitting in trial she comes in here and

18   tell my attorney that I have been shoplifting over

19   the weekend.  I have a monitor on my ankle.  I didn't

20   have a pass or anything.  Why would you do that?

21   What is wrong with -- what is wrong with you?  Is it

22   all about power?  You don't care?  That's my family.

23   They know me.  They know.  But she thinks she knows

24   me from some phone calls?  She said 33.  I can count

25   seven that she played, and half of those was my

1     cousin house being invaded.

2          Yes, I was scared.  I lived nearby him, and I

3     don't want nobody coming to harm me or my children,

4     but I also knew I was a felon and I wasn't buying a

5     gun, I couldn't be taken away from my children, but

6     at the hands of Terra Morehead I was.

7               THE COURT:  All right.  Thank you,

8     Ms. Temple.  You may be seated, counsel and

9     Ms. Temple.  Ms. Morehead?

10              MS. MOREHEAD:  Your Honor, my objection

11    that's mentioned in the presentence report, frankly,

12    I don't know that I intended it as an objection; it

13    was more of an observation than anything.  I saw the

14    notation in the presentence report in connection with

15    the court's considerations, and I merely wanted to

16    point out that Ms. Temple had actually already

17    received, based upon the presentence report, five

18    levels off of where she initially started, and the

19    government didn't believe that she should receive yet

20    another benefit because her mitigating and minor role

21    had already been fully assessed.  Ms. Temple without

22    that starts out at 324 to 405 months, and she's

23    already receiving an adjustment down of 136 to 170

24    months.  That's based upon the calculations in the

25    presentence report.

1          Judge, with regards to the first objection which

2     Mr. Heathman mentioned having to do with the quantity

3     of drugs involved, one argument he makes is, we don't

4     know when this time frame is, whether it was actually

5     once she became involved with the phone calls or if

6     it was before that, outside the conspiracy.  And

7     frankly, Judge, that doesn't matter.  Based upon

8     relevant conduct, if she was involved in this

9     conspiracy, even if it was outside of the two years

10    that we charged, then it counts as relevant conduct.

11         As far as when her phone calls began, that's

12    because that's when we started intercepting Monterial

13    Wesley.  We were monitoring Henry Grigsby's phones

14    before that, if you recall, so we wouldn't have had

15    the opportunity to hear Ms. Temple's calls before

16    that.

17         And as far as this argument that he repeatedly

18    makes about not knowing any of Mr. Wesley's people,

19    as Mr. Humphrey mentioned, he didn't personally know

20    Ms. Temple like he knew Mr. Wesley.  What he

21    testified to was he had met her or seen her on a

22    couple of occasions in addition to these occasions

23    where she was with Mr. Wesley or driving Mr. Wesley

24    on these transactions.  And when he was shown a photo

25    of her, he immediately recognized her as being

```
 1          Wesley's girlfriend.  There would have been no way
 2          for him to know that if he had never seen her before,
 3          never observed her before.  So the fact that he could
 4          identify her corroborated that information, you know.
 5               As far as the quantity of drugs, the presentence
 6          report, the government believes, has given a fair
 7          assessment of what she should be held accountable
 8          for.  Frankly, Judge, as you're aware, because Wesley
 9          and Foy's presentence reports have been assessed --
10          they are being assessed at least 150 kilos, and I
11          think at their sentencings it could actually go
12          higher based upon some relevant conduct because of
13          their objections that could come out, but she is only
14          being held accountable for what probation reasonably
15          could assess that she was involved with, and
16          Mr. Humphrey did testify that there were at least ten
17          occasions where she was present.  Even if we give the
18          benefit of yet another doubt -- and I'm not
19          suggesting that you do that, certainly, but
20          Mr. Humphrey did indicate sometimes money was
21          involved, sometimes drugs were involved.  Even if we
22          take that down to, okay, let's say five times they
23          were drugs and five times they were money, there's no
24          way to say, was the money exchanged in connection
25          with those particular drugs that had been just
```

```
1        transferred?  So let's say there were five occasions

2        at 5 kilos.  That still only drops her two additional

3        levels, which still puts her at 151 to 188 months.

4        That's an offense level of 34 based upon all the

5        adjustments, the other adjustments given.  So the 188

6        at least, the low end of where she is right now, is

7        still within that next guideline range below that.

8        That's even giving her an additional benefit of the

9        doubt.  And, again, I'm not suggesting that she --

10       that that's the case.  I think the probation office

11       was very generous with this assessment.

12            It's also interesting, Ms. Temple's lawyer gets

13       up and said says, well, you should believe Chauncey

14       Anderson about this half kilo, he says, and let's

15       assess her just for half a kilo, yet Ms. Temple gets

16       up right after that and says, don't believe anything

17       Chauncey Anderson specifically says because he's not

18       believable, and she mentions this 50 times he was

19       debriefed.  And, Judge, you did the in-camera

20       inspection of Chauncey Anderson's file.  All of that

21       other information had nothing at all to do with Ms.

22       Temple or this case.  There were only the few

23       occasions where he was interviewed in connection with

24       his knowledge of this case, and that's what was

25       presented, and there weren't 50 occasions he was
```

1    debriefed.  And so you can give, frankly, all of the

2    testimony whatever weight you think it deserves, but

3    I think Ms. Temple has attempted to mischaracterize a

4    few things in the comments that she made to the

5    court.

6         Firearm enhancement, I would like to talk about

7    next.  Mr. Heathman says, well, Judge, there's no

8    evidence that she ever possessed a gun, and beyond

9    that there's no evidence that she knew Monterial

10    Wesley ever possessed a gun.  There can be no dispute

11    that when Monterial Wesley was arrested that he had a

12    gun in his vehicle in the middle of a drug deal;

13    however, what Mr. Heathman and Ms. Temple both

14    ignored was Government's Exhibit No. 241.

15         Now, Ms. Temple said there were only seven calls

16    and they were only partial calls that were played.

17    Actually, Judge, at trial we played a total of 15

18    calls that Ms. Temple was involved with, and we

19    played the entirety of the calls that were made

20    involving Ms. Temple.

21         And the other argument they made was, any calls

22    that were made about any guns, like Ms. Temple was

23    going to go buy a gun, came after this home invasion

24    because they were concerned about her safety.  If you

25    remember, the home invasion occurred the evening of

1    October 17, close to midnight; however, there was a

2    call on specifically October 16 that we played, which

3    was Exhibit 241, between Ms. Temple and Mr. Wesley,

4    and this was a call where Mr. Wesley asked Ms. Temple

5    to go by Ant's house.  If you remember, Ant was

6    Antoine Nunn, who was another identified unindicted

7    coconspirator who was involved in distributing drugs.

8    And Mr. Wesley mentioned that -- and I'll quote this.

9    Wesley says, "I want you to ride by Ant's.  He is in

10   handcuffs.  I want to see if Peep's --" and then

11   there's some unintelligible comment, and Ms. Temple

12   says, "By who?"  And Mr. Wesley says, "By Ant's," and

13   Ms. Temple says, "Oh, 51st?"  And Wesley says, "Yeah.

14   You know where his house is, over around there, don't

15   you?"  And she answers, Yes," and he answered, "Yeah.

16   I want you to ride by there.  The police have him in

17   handcuffs, and I am trying to see what's going on.  I

18   got this pistol and shit in here," and she answers,

19   "All right.  Where you at?"  And we played that call.

20   Mr. Wesley told her he wanted her to go over there

21   and see what was going on at Ant's house.  He

22   couldn't go over there because -- he couldn't make

23   contact over there because he had a gun in the car.

24   And it wasn't some vague reference; it was, "I got

25   this pistol and shit in here."

```
 1            And so what we have to show to get that firearm
 2      enhancement, frankly, Judge, is foreseeability.  And
 3      if this isn't foreseeability, I'm not sure what is,
 4      when we have a specific reference where Monterial
 5      Wesley tells her, I've got a gun, and he's wanting
 6      her to go checkout his fellow drug trafficker's
 7      residence to see what was going on.
 8            So we believe that the firearm enhancement --
 9      this was prior to the home invasion, Judge.  This was
10      a full day before the home invasion.  So this had
11      nothing to do with the home invasion.  It's
12      completely unrelated to the calls about her getting a
13      gun, and we believe then the firearm enhancement is
14      appropriate.
15            We have this debate now about the minor/minimal
16      participant, and, Judge, I did not object to that.
17            THE COURT:  I deem it waived.  I deem any
18      objection by the defendant further to have been
19      waived, and I would say I would not grant it in any
20      event based upon what I believe was the situation
21      here, but you need not address it further.
22            MS. MOREHEAD:  Okay.  I won't.  She got
23      five levels off at three and two, and we believe
24      that's appropriate.
25            The other one, Judge, is, frankly, the
```

1    obstruction.  And, Judge, Mr. Heathman says, well,

2    you've got to point to something that shows that she

3    was lying.  Everything Ms. Temple testified to,

4    Judge -- we talked about every -- just about every

5    call she had.  We talked about the money.  We talked

6    about the countersurveillance, the one call where

7    she's calling out the police in this call.  And it's

8    a call between Wesley and Foy, but you can hear her

9    voice in the background, and she's calling out

10   countersurveillance.  Judge, if I remember, she

11   denied any knowledge of Mr. Wesley being involved in

12   drug trafficking; she denied any knowledge about, you

13   know, participating at all in any of these

14   transactions; and so based upon her testimony -- this

15   isn't a situation based upon confusion, mistake, or

16   faulty memory where she, you know, remembered things

17   differently or we could make that assessment.  These

18   were material issues.  You know, if she would have

19   got up here and said, well, yeah, I knew Monterial

20   Wesley was involved in drug trafficking, but I wasn't

21   involved, that's her ability or her opportunity to

22   profess her innocence, but her testimony went beyond

23   that.  Her testimony went to the point of flat out

24   denying things that there was hard and fast evidence

25   of: the countersurveillance, the money at her house.

1        All of that indicates that she was not being

2   truthful.

3        You know, Judge -- and I don't want to belabor

4   my comments too much, but, you know, she wants to

5   blame this on me, and that's fine, but her attitude

6   here today is markedly different than the Latysha

7   Temple you saw in court for six or seven weeks.  And

8   her interaction with Monterial Wesley here in this

9   courtroom, it wasn't something where she was

10  disassociating herself or she was shocked that he

11  would subject her to this type of, you know,

12  activity, and her comments about plea offers, or

13  whatever, you know, she had the same opportunity to

14  cooperate that anybody else in this case did.

15  Everyone -- there was no one that was foreclosed from

16  cooperating in this case, and she opted not to do

17  that.  She wants to profess her innocence.  She

18  certainly has that right to.  She wants to say that,

19  you know, she was a good, hardworking mother, and I'm

20  sure there are good attributes that can be spoken

21  about her.

22       Look at her criminal history.  You know, there

23  are -- they want to say, well, in '97 she had these

24  occasions, but there were other occasions, not just

25  one or two times she stole things, but three, four

1    times.  And her recollection about me telling her

2    attorney that she had shoplifted, I never once told

3    her attorney that.  Actually, pretrial had advised of

4    an incident that occurred while she was on release

5    during the course of the trial, and if you want the

6    specifics of that, Ms. Goldsmith can give those to

7    you.  But Ms. Temple returned an enormous amount of

8    goods there was no record of having been bought, that

9    there was only a certain amount that were in stores,

10   and they determined that they had -- that same amount

11   had been stolen from another similar store.  They

12   couldn't say who stole them or how they came to be in

13   that, but they didn't allow her to return them.  I

14   never used the word shoplifting, so I think that's

15   funny that that came out today, but that never

16   happened.

17        We believe, Judge, that a sentence of 188 months

18   is fair and just.  That's just shy of a little over

19   15 years.  She's given a huge benefit by mitigating

20   and minor role.  She wants to compare, frankly, her

21   participation with other girlfriends, and I just

22   don't see the comparison.  If there's any comparison,

23   it would be Lakela Houff.  The difference between

24   Latysha Temple and Lakela Houff though, Judge, is

25   Lakela Houff cooperated.  She was, you know, able to

1    come in and testify about her participation as far as

2    her facilitation of this.  It was similar to Latysha

3    Temple, certainly was no more than Latysha Temple's.

4    And based upon all of the facts and circumstances in

5    this case, we believe that the presentence report is

6    accurate.  We believe that all the enhancements

7    should apply and that a sentence within the

8    guideline range is appropriate in this case.

9              THE COURT:  Thank you, Ms. Morehead.  I'm

10   going to take just a moment here.  I'll be in recess

11   and then back with you shortly.

12             (A recess was taken.)

13             THE COURT:  The court has carefully

14   considered the parties' written submissions,

15   including the objections as set out in the

16   presentence investigation report and the submissions

17   that were made by way of sentencing memoranda, the

18   statements, arguments, and the recollection of

19   certain evidence that was made here in the courtroom

20   today.  The court has decided that the sentence which

21   is sufficient but not greater than necessary to carry

22   out Congress' objectives for sentencing is a sentence

23   of 151 months.  I arrive at that sentence as follows:

24        First of all, with regard to Objection No. 1, to

25   the base offense level based upon quantity, I do

1    sustain that objection.  It is my finding by a

2    preponderance of the evidence that Ms. Temple was

3    responsible as the law defines it, that is,

4    concerning the quantity of drugs which she reasonably

5    foresaw and which fell within the scope of her

6    particular agreement with the coconspirators of over

7    five but less than 50 kilograms of cocaine.

8        I rely in part upon Mr. Humphrey's testimony at

9    trial, and I do believe that Mr. Humphrey's

10   statement, to which there was an objection lodged in

11   Paragraph 273 about not knowing Wesley's people, I

12   believe Ms. Temple has made far too much of that.  I

13   agree with the assessment that all Mr. Humphrey meant

14   was that he didn't really know all the goings-on of

15   how Mr. Wesley conducted his business.  I think he

16   testified persuasively at trial about his modus

17   operandi, the way he worked with Mr. Wesley, and the

18   extent of the times that Ms. Temple was with him.

19   And he indicated that he did see Ms. Temple with

20   Mr. Wesley either driving the car or in the car,

21   perhaps her car, on what he described as several

22   occasions.

23       I think that the flaw in the computation in the

24   presentence investigation report attributing

25   50 kilograms to Ms. Temple is not really taking into

```
 1            account the way they did do business.  Mr. Humphrey
 2            in his testimony made it clear that Mr. Wesley
 3            virtually never paid cash, certainly never paid for
 4            the full amount when he picked up the drugs;
 5            therefore, there were numerous meetings where either
 6            there was -- were drugs exchanged or there was money
 7            exchanged.  And there's no way for me to sort out
 8            from Mr. Humphrey's testimony whether the number of
 9            times they met -- even if you took the ten -- that
10            was not his testimony at trial but in some statements
11            that he made -- there's no way to sort out whether
12            those were all drugs or some money.  And I believe
13            it's more likely than not that some were drugs and
14            some were money, so therefore I believe that the
15            computation of the quantity was too high.  I do
16            believe that Ms. Temple did accompany Mr. Wesley on
17            perhaps as many as ten trips, that she knew they were
18            drug transactions, and that she knowingly assisted
19            Mr. Wesley either by driving and/or by loaning her
20            vehicle.  In addition, she may well have stored a
21            kilogram or two at her house, and I think all of that
22            adds up to a quantity level which justifies a
23            two-level lower base offense level, but that's the
24            extent of it.
25                 Second, with regard to the objection in
```

1    Paragraph 258 concerning the firearm, I am overruling

2    that objection for the following reasons:  It is true

3    that there was no firearm found on Ms. Temple and

4    that the firearm on the day of the arrest of

5    Mr. Wesley.  That may be significant as to

6    Mr. Wesley, but the significance that he had one that

7    day simply is corroboration of other testimony or

8    other evidence in the case.

9        Mr. Humphrey again testified at some length that

10   he on numerous occasions saw Mr. Wesley during their

11   drug transactions with a gun in his vehicle and

12   identified them as handguns.  These would have been

13   some occasions of which may have involved Ms. Temple

14   having driven or accompanied Mr. Wesley, so I came to

15   this hearing today with at least a certain level of

16   suspicion that Ms. Temple would have had reason to

17   have known about Mr. Wesley's involvement with

18   firearms as part of his drug trafficking operation,

19   but I was not really persuaded yet until Ms. Morehead

20   called to my attention Exhibit 241, which was a

21   telephone call played during the trial of the case,

22   the details of which I had not recalled until she

23   refreshed my recollection today, and that is the

24   conversation concerning Ms. Temple going and checking

25   out Ant's house and that Mr. Wesley said he had a gun

1    in his car, and it's obvious in all of that that Ms.

2    Temple expresses no surprise, no consternation.  It's

3    a matter of fact -- of course, she will go check it

4    out -- and it was just matter of fact that Wesley's

5    got a gun in his car.  I think this is consistent

6    with the general notion that the nature of the drug

7    business, the specifics of Mr. Wesley's having a gun

8    on numerous occasions as reported by Mr. Humphrey and

9    as corroborated by his arrest -- the date of his

10   arrest and then this phone conversation which shows

11   that it clearly was, as the law requires, foreseeable

12   to Ms. Temple that Mr. Wesley would be using -- or

13   having a firearm in connection with the drug

14   transactions.  So I think that it was reasonably

15   foreseeable and that the two-level enhancement was

16   proper.

17        I also overrule the objection at Paragraph 266

18   concerning obstruction of justice.  I believe that

19   Ms. Temple perjured herself at trial, that she

20   intentionally testified falsely on material matters

21   in order to affect the outcome of the case.

22   Ms. Temple denied that Mr. Wesley was -- that she

23   knew that Mr. Wesley was involved in drug dealing and

24   that she didn't help him in any way with his drug

25   dealing.  I believe that was false when she said it

1    at trial; I believe it was false when she said it

2    today.  I don't know whether she's trying to justify

3    herself to friends and family; I don't know whether

4    she has simply tried to justify it in her own mind

5    because she's had a difficult life and a number of

6    mouth to feed, but I'm satisfied that Ms. Temple was

7    well aware of what Mr. Wesley was doing and that she

8    was participating in it herself by way of assisting

9    him by driving him to transactions, loaning a car, or

10   storing things at her house, and she is fully

11   culpable for those matters.

12        There was also an objection raised at

13   Paragraph 269, a fourth objection, concerning a phone

14   call on September 19, 2007.  I'm not going to rule on

15   that objection because it does not affect the outcome

16   and I'm not taking it into account.

17        I previously indicated that the Objection No. 6

18   at Paragraph 278 is overruled for the same reasons

19   that the probation officer gave in her response at

20   Paragraph 280, and Mr. Heathman conceded that that

21   was appropriate.

22        The objection that was discussed today, if you

23   call it an objection, that rather than a minor role

24   there should have been a minimal role, as I indicated

25   when Ms. Morehead was at the lectern, I believe has

1     been waived by not having been preserved in the

2     presentence report objections or in the sentencing

3     memorandum.  Moreover, even had it not been waived, I

4     believe that the nature of Ms. Temple's role was not

5     minimal.  In some respects I think the probation

6     office was fairly generous in the way in which they

7     treated Ms. Temple in this case with regard to the

8     adjustments, and for those reasons clearly I would

9     not have considered her among the very least culpable

10    people that you could conceivably have here.  I mean,

11    she just was involved in too many occasions to get a

12    minimal adjustment, and she was only held accountable

13    for those drugs that she was directly participating

14    in, not the entire scope of the conspiracy.  So for a

15    lot of reasons I don't think she's entitled to a

16    minimal adjustment.  Mr. Heathman's arguments could,

17    of course, be construed to be requesting a downward

18    variance in light of the totality of his argument,

19    and, of course, the government noted that in

20    Paragraph 247 here there was -- in 247 that there had

21    been some recognition by the probation office of

22    bases on which a court might vary down and the

23    government's disagreement with that.  I see no basis

24    to vary downward here for all of the reasons that I

25    indicated.  I think the probation office was very

1    generous in their scoring of all of this with regard

2    to the role in the offense.  I think that her

3    participation has been adequately reflected by a

4    sentence within the guideline range.

5        I think that that sentence of 151 months takes

6    into account the seriousness of the offense, the need

7    for just punishment or deterrence, and incapacitation

8    of Ms. Temple.  I greatly regret the impact on her

9    family that this will cause, but it's a choice that

10   she knowingly made, and these are the consequences

11   that attend to it.  With regard to supervised

12   release, a period of five years is appropriate.  I'm

13   not going to impose a fine.  There is a special

14   assessment of $100 which is mandatory under the Crime

15   Victims Relief Act.

16           UNIDENTIFIED SPECTATOR:  You stupid bitch.

17   I'm going to kill you.

18           THE COURT:  There is a special assessment

19   of $100, which is mandatory under the Crime Victims

20   Relief Act.  I'm not going to deny federal benefits

21   because it would not serve a punitive purpose here.

22       I intend to impose each of the mandatory and

23   special provisions of supervision which are set forth

24   in Part D of the presentence report.

25       The supervised release term in addition to the

1    imprisonment sentence will allow the defendant the

2    opportunity to receive correctional treatment in an

3    effective manner and will assist with community

4    reintegration in accordance with 18 U.S.C.

5    Section 3553(a)(2)(D).

6         In light of Ms. Temple's inability to pay a

7    fine, the court intends to waive the fine amount.

8         A $100 special assessment is required pursuant

9    to 18 U.S.C. Section 3013.

10        The defendant is prohibited from purchasing or

11   possessing a firearm or other dangerous weapon as

12   defined by statute as a result of the instant offense

13   of conviction.

14        The mandatory condition for drug testing and DNA

15   collection is imposed pursuant to 18 U.S.C. Section

16   3583(d).

17        Due to a reported history of substance abuse,

18   substance abuse treatment and alcohol prohibition

19   conditions are deemed warranted.

20        That's the court's proposed sentence.

21        Ms. Morehead, anything further on behalf of the

22   government?

23             MS. MOREHEAD:  No, your Honor.

24             THE COURT:  Mr. Heathman, on behalf of

25   Ms. Temple?

1          MR. HEATHMAN:  No, your Honor.

2          THE COURT:  Very well.  Is there any legal

3     reason why sentence should not now be imposed in this

4     case?

5          MR. HEATHMAN:  The defendant knows of none,

6     sir.

7          THE COURT:  Very well.  Please rise.

8     The court determines that the presentence

9     investigation report and the previously stated

10    findings are accurate and orders those findings to be

11    incorporated in the following sentence:

12    Pursuant to the Sentencing Reform Act of 1984,

13    it is the judgment of the court that the defendant,

14    Latysha D. Temple, is hereby committed to the custody

15    of the Bureau of Prisons to be imprisoned for a term

16    of 151 months on Count 1.

17    Upon release from imprisonment, she shall be

18    placed on supervised release for a period of five

19    years on Count 1.

20    Within 72 hours of release from the custody of

21    the Bureau of Prisons, she shall report in person to

22    the probation office in the district to which she is

23    released.

24    While on supervised release, she shall not

25    commit another federal, state, or local crime, shall

1    comply with the standard conditions that have been

2    adopted by this court as well as the special and

3    mandatory conditions previously stated by the court.

4         It is further ordered Ms. Temple pay to the

5    United States a special assessment of $100 through

6    the Clerk of the United States District Court.

7    Payments on the assessment are to begin immediately

8    and may be satisfied while in Bureau of Prisons

9    custody.

10        The court waives a fine in this case based on

11   the defendant's inability to pay.

12        The court further orders a money judgment

13   against the defendant for a sum of money equal to

14   $10,750 in United States currency representing the

15   amount of proceeds obtained as a result of the

16   offense, the distribution of cocaine and cocaine

17   base, all controlled substances in violation of 21

18   U.S.C. Section 841(a)(1), for which the defendants

19   are jointly and severally liable.

20        Both the government and the defendant are

21   advised of their respective rights to appeal this

22   sentence and conviction.  An appeal taken from this

23   sentence is subject to 18 U.S.C. Section 3742.

24        The defendant is advised that you can lose your

25   right to appeal if you do not timely file your notice

1    of appeal.  You can lose it if you don't file it

2    within the time period proscribed by law in the

3    district court.

4        Rule 4(b) of the Federal Rules of Appellate

5    Procedure gives you ten days after the entry of

6    judgment to file a notice of appeal.  If you so

7    request, the clerk of the court will immediately

8    prepare and file a notice of appeal on your behalf.

9    If you are unable to pay the cost of an appeal, you

10   have the right to apply for leave to appeal in forma

11   pauperis.

12       That shall be the sentence of the court.

13       Is there anything further to be brought before

14   the court today, Ms. Morehead?

15            MS. MOREHEAD:  No, your Honor.

16            THE COURT:  Mr. Heathman?

17            MR. HEATHMAN:  Nothing, sir.

18            THE COURT:  Very well.  I do remand the

19   defendant to the custody of the United States

20   marshals, and that concludes this matter.  We are in

21   recess.

22            THE DEFENDANT:  I'll see you again, Ms.

23   Morehead.

24            (Court was adjourned.)

25                 * * * * *

1

2                                    CERTIFICATE

3    STATE OF KANSAS          |

4                            |   ss

5    COUNTY OF JOHNSON         |

6

7            I, Rebecca Ryder, RMR, CRR, a Certified

8    Shorthand Reporter and official reporter for the United

9    States District Court, District of Kansas, do hereby

10   certify that as such official reporter I was present at

11   and reported in machine shorthand the above and foregoing

12   proceedings.

13           I further certify that a transcript of my

14   shorthand notes was prepared and that the foregoing

15   transcript is a true and correct transcript of my notes in

16   said case to the best of my knowledge and ability.

17

18                                S/REBECCA S. RYDER
                                  REBECCA S. RYDER, RMR, CRR
19

20

21

22

23

24

25